Approved:  *Amanda L He* (signature)
        EMIL J. BOVE III / AMANDA L. BOULE
        Assistant United States Attorneys

Before:  HONORABLE KATHARINE H. PARKER
        United States Magistrate Judge
        Southern District of New York

FILED
MAY 3 1 2017
S.D. OF N.Y.

ORIGINAL

DOC #____

17 MAG 4151

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA     :  **SEALED COMPLAINT**
                      :
     - v. -            :  Violations of
                      :  18 U.S.C. §§ 2339B,
ALI KOURANI,           :  2339D, 924(o), 1425(a);
    a/k/a "Ali Mohamad Kourani," :  50 U.S.C. § 1705(a)
    a/k/a "Jacob Lewis,"      :
    a/k/a "Daniel,"         :  COUNTIES OF OFFENSE:
                      :  NEW YORK, BRONX
              Defendant. :

- - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK     )
                    ) ss.:
COUNTY OF NEW YORK   )

    JOSEPH T. COSTELLO, being duly sworn, deposes and says that he is a Special Agent at the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE

(Provision of Material Support to Hizballah,
a Designated Foreign Terrorist Organization)

    1.  From at least in or about 2002, up to and including in or about September 2015, in the Southern District of New York, Lebanon, and elsewhere, and in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, who is expected to be first arrested in the Southern District of New York, knowingly did provide and attempt to provide, and aided and abetted the provision of, "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, to wit, Hizballah, which has been designated by the Secretary of State as a foreign terrorist

organization since 1997, pursuant to Section 219 of the Immigration and Nationality Act ("INA"), and is currently designated as such as of the date of the filing of this Complaint, including, among other things, personnel, knowing that Hizballah was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(A), (d)(1)(C), (d)(1)(D), (d)(1)(E), (d)(1)(F), (d)(2), 3238, and 2.)

## COUNT TWO

(Conspiracy to Provide Material Support to Hizballah, a Designated Foreign Terrorist Organization)

2.    From at least in or about 2002, up to and including in or about September 2015, in the Southern District of New York, Lebanon, and elsewhere, ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, who is expected to be first arrested in the Southern District of New York, and others known and unknown, knowingly did combine, conspire, confederate and agree together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, to wit, Hizballah, which has been designated by the Secretary of State as a foreign terrorist organization since 1997, pursuant to Section 219 of the INA, and is currently designated as such as of the date of the filing of this Complaint.

3.    It was a part and an object of the conspiracy that ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, and others known and unknown, would and did agree to provide Hizballah with material support and resources, including personnel, knowing that Hizballah was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

4.   In furtherance of the conspiracy and to effect the illegal object thereof, ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, and others known and unknown, committed the overt acts set forth below, among others:

a.   From at least in or about 2009, up to and including in or about September 2015, KOURANI conducted surveillance of U.S. military and intelligence outposts in New York City, as well as airports in New York City and another country, in support of anticipated terrorist attacks by Hizballah's Islamic Jihad Organization.

b.   In or about July 2011, KOURANI attended a military training camp in the vicinity of Birkat Jabrur, Lebanon, which was operated by Hizballah's Islamic Jihad Organization, where KOURANI was provided with military-tactics and weapons training.

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(A), (d)(1)(C), (d)(1)(D), (d)(1)(E), (d)(1)(F), (d)(2), and 3238.)

## COUNT THREE

(Receipt of Military-type Training from Hizballah,
a Designated Foreign Terrorist Organization)

5.   In or about 2011, in Lebanon and elsewhere, and in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, who is expected to be first arrested in the Southern District of New York, knowingly received military-type training from and on behalf of Hizballah, which has been designated by the Secretary of State as a foreign terrorist organization since 1997, pursuant to Section 219 of the INA, and is currently designated as such as of the date of the filing of this Complaint, knowing that Hizballah was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339D(c)(4)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212 of the INA), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), to wit, KOURANI received training in the use of weapons and military tactics from other members of Hizballah.

(Title 18, United States Code, Sections 2339D(a), (b)(1), (b)(3), (b)(4), (b)(5), (b)(6), 3238, and 2.)

## COUNT FOUR

(Conspiracy to Receive Military-type Training from Hizballah,
a Designated Foreign Terrorist Organization)

6.     In or about 2011, in Lebanon and elsewhere, and in an
offense begun and committed outside of the jurisdiction of any
particular State or district of the United States, ALI KOURANI,
a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel,"
the defendant, who is expected to be first arrested in the Southern
District of New York, and others known and unknown, knowingly did
combine, conspire, confederate and agree together and with each
other to receive military-type training from and on behalf of
Hizballah, which has been designated by the Secretary of State as
a foreign terrorist organization since 1997, pursuant to Section
219 of the INA, and is currently designated as such as of the date
of the filing of this Complaint.

7.     It was a part and an object of the conspiracy that ALI
KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a
"Daniel," the defendant, and others known and unknown, would and
did receive military-type training from and on behalf of Hizballah,
knowing that Hizballah was a designated foreign terrorist
organization (as defined in Title 18, United States Code, Section
2339D(c)(4)), that Hizballah engages and has engaged in terrorist
activity (as defined in section 212 of the INA), and that Hizballah
engages and has engaged in terrorism (as defined in section
140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years
1988 and 1989), in violation of Title 18, United States Code,
Section 2339D.

8.     In furtherance of the conspiracy and to effect the
illegal object thereof, ALI KOURANI, a/k/a "Ali Mohamad Kourani,"
a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, and others
known and unknown, committed the overt acts set forth in paragraph
4, supra, which are fully incorporated by reference herein, among
others.

(Title 18, United States Code, Sections 371, 2339D(a), (b)(1),
(b)(3), (b)(4), (b)(5), (b)(6), and 3238.)

## COUNT FIVE

(Conspiracy to Possess, Carry, and Use Machine Guns and
Destructive Devices During and in Relation to Crimes of
Violence)

9.   From at least in or about 2002, up to and including in
or about September 2015, in the Southern District of New York,
Lebanon, and elsewhere, and in an offense begun and committed
outside of the jurisdiction of any particular State or district of
the United States, ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a
"Jacob Lewis," a/k/a "Daniel," the defendant, who is expected to
be first arrested in the Southern District of New York, and others
known and unknown, knowingly did combine, conspire, confederate,
and agree together and with each other to violate Title 18, United
States Code, Section 924(c).

10.   It was a part and an object of the conspiracy that ALI
KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a
"Daniel," the defendant, and others known and unknown, during and
in relation to a crime of violence for which KOURANI may be
prosecuted in a court of the United States, namely, the offenses
charged in Counts One, Two, Three, and Four of this Complaint,
would and did use and carry machine guns and destructive devices,
to wit, firearms that were capable of automatically firing more
than one shot without manual reloading, including an AK-47 assault
rifle, an MP5 submachine gun, and a Russian PKS machine gun, and
destructive devices, including rocket-propelled grenade launchers
("RPGs"), and, in furtherance of such crime of violence, possess
machine guns and destructive devices, in violation of Title 18,
United      States      Code,      Sections      and      924(c)(1)(A)      and
924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

## COUNT SIX

(Making or Receiving a Contribution of Funds, Goods, and
Services to and from Hizballah, in Violation of the
International Emergency Economic Powers Act)

11.   From at least in or about 2002, up to and including in
or about September 2015, in the Southern District of New York,
Lebanon, and elsewhere, and in an offense begun and committed
outside of the jurisdiction of any particular State or district of
the United States, ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a
"Jacob Lewis," a/k/a "Daniel," the defendant, a United States

person, who is expected to be first arrested in the Southern District of New York, willfully attempted to and did make and receive a contribution of funds, goods, and services to and for the benefit of, as well as from, Hizballah, a specially designated terrorist, in that KOURANI attempted to and did provide to Hizballah personnel and services.

(Title 50, United States Code, Section 1705(a); Title 18, United States Code, Sections 3238 and 2; and Title 31, Code of Federal Regulations, Sections 595.204, 595.205, and 595.311.)

## COUNT SEVEN

(Conspiracy to Make or Receive a Contribution of Funds, Goods, and Services to and from Hizballah, in Violation of the International Emergency Economic Powers Act)

12.   From at least in or about 2002, up to and including in or about September 2015, in the Southern District of New York, Lebanon, and elsewhere, and in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, a United States person, who is expected to be first arrested in the Southern District of New York, knowingly and willfully, along with others known and unknown, did combine, conspire, confederate, and agree together and with each other to make and receive a contribution of funds, goods, and services to and for the benefit of, as well as from, Hizballah, a specially designated terrorist, by agreeing with others to provide to Hizballah personnel and services, and to receive funds from Hizballah.

(Title 50, United States Code, Section 1705(a); Title 18, United States Code, Section 3238; and Title 31, Code of Federal Regulations, Sections 595.204, 595.205, and 595.311.)

## COUNT EIGHT

(Unlawful Procurement of Citizenship or Naturalization to Facilitate an Act of International Terrorism)

13.   In or about 2009, ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, in the Southern District of New York and elsewhere, knowingly procured and attempted to procure, contrary to law, the naturalization of any person to facilitate an act of international terrorism as defined in Title 18, United States Code, Section 2331, to wit,

KOURANI submitted a naturalization application for himself containing false statements relating to, among other things, his membership in and provision of material support and resources to Hizballah.

(Title 18, United States Code, Sections 1425(a), 3291, and 2.)

The bases for my knowledge and the foregoing charges, are, in part, as follows:

14. I have been a Special Agent at the FBI since approximately 2014. Prior to joining the FBI, I served as a Special Agent with the U.S. Department of State, Diplomatic Security Service, for approximately five years. For the last approximately two years, I have been assigned to the FBI's New York Joint Terrorism Task Force ("JTTF"). The focus of my counterterrorism and counterintelligence efforts has been investigating and disrupting terrorist activities by Hizballah and, in particular, Hizballah's Islamic Jihad Organization ("IJO").

15. I have learned the facts contained in this Complaint from, among other sources, my personal participation in this and related investigations, my discussions with other law enforcement personnel, searches in which I have participated, surveillance in which I have participated, and my review of documents and other materials. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of this investigation. Further, any statements related herein are described in substance and in part only.

## INTRODUCTION

16. The FBI's investigation revealed that ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, was a member of the IJO, which is a highly compartmentalized component of Hizballah responsible for the planning, preparation, and execution of intelligence, counterintelligence, and terrorist activities outside of Lebanon. Beginning in approximately 2000, KOURANI obtained training from Hizballah and the IJO in tradecraft, weapons, and military tactics. KOURANI later identified himself to the FBI as an IJO "sleeper" operative working undercover in the United States. Principally responsible for conducting IJO intelligence-gathering and surveillance activities, KOURANI received taskings in Lebanon and executed his missions covertly. For example, KOURANI gathered

intelligence and conducted surveillance of U.S. military and intelligence outposts in New York City, as well as airports in New York City and elsewhere, in support of anticipated IJO terrorist attacks.

## HIZBALLAH, AL MANAR, AND THE ISLAMIC JIHAD ORGANIZATION

17.   Based on my training and experience, my participation in this and related investigations, and my review of publicly available documents, reports, and other materials, I understand the following, in substance and in part:

a.   Hizballah is a Lebanon-based Shia Islamic organization with political, social, and terrorist components. Hizballah was founded in the early 1980s with support from Iran after the 1982 Israeli invasion of Lebanon, and its mission includes establishing a fundamentalist Islamic state in Lebanon. In 1997, the U.S. Department of State designated Hizballah a Foreign Terrorist Organization, pursuant to Section 219 of the INA, and it remains so designated today.  In 2001, pursuant to Executive Order 13,224, the U.S. Department of the Treasury designated Hizballah a Specially Designated Global Terrorist entity.  In 2010, State Department officials described Hizballah as the most technically capable terrorist group in the world, and a continued security threat to the United States.

b.   Al Manar is a media organization controlled by the Iran-funded Hizballah terrorist network.  Al Manar employs Hizballah personnel, supports fundraising and recruitment for Hizballah, and at least one Al Manar employee engaged in operational surveillance activities on behalf of Hizballah under cover of employment by Al Manar.  In 2006, pursuant to Executive Order 13,224, the U.S. Department of the Treasury designated Al Manar a Specially Designated Global Terrorist entity.

c.   The IJO, which is also known as the External Security Organization and "910," is a component of Hizballah responsible for the planning and coordination of intelligence, counterintelligence, and terrorist activities on behalf of Hizballah outside of Lebanon.  IJO operatives are typically assigned a Lebanon-based "handler," sometimes referred to as a mentor, responsible for providing taskings, debriefing operatives, and arranging training. IJO often conducts targeted operations in stages, sending waves of one or more operatives with separate taskings such as surveillance, obtaining and storing necessary components and equipment, and attack execution.

d.   Since Hizballah's formation, the organization has been responsible for numerous terrorist attacks that have killed hundreds, including the 1983 bombing of the United States Marine barracks in Lebanon, which killed 241 Marines; the 1983 bombing of the United States Embassy in Beirut, which killed 24 people; the 1985 hijacking of TWA Flight 847, which killed one U.S. citizen; the 1992 bombing of the Israeli Embassy in Argentina, which killed 29 people; and the 1994 bombing of a Jewish cultural center in Buenos Aires, which killed 95 people.

e.   In July and August 2006, Hizballah and Israel engaged in armed conflict (the "2006 Lebanon War"), resulting in numerous casualties, after an incident on or about July 12, 2006 when Hizballah attacked Israeli Defense Force ("IDF") personnel. A ceasefire brokered by the United Nations went into effect on August 14, 2006.

f.   In January 2012, Hussein Atris, an IJO operative with dual Lebanese-Swedish citizenship, was detained in Thailand as he tried to board a flight at a Bangkok airport.   Atris subsequently led law enforcement personnel to a commercial building near Bangkok that housed a cache of nearly 10,000 pounds of urea-based fertilizer and 10 gallons of ammonium nitrate, which are chemicals that I know, based on my training and experience, can be used to construct explosives.   The ammonium nitrate was stored in First Aid ice packs manufactured by a Guangzhou, China-based company ("Guangzhou Company-1").

g.   In July 2012, Mouhamad Hassan Mouhamad El Husseini, an IJO operative with dual Lebanese-French citizenship, detonated explosives on a bus transporting Israeli tourists in the vicinity of an airport in Burgas, Bulgaria.   Six people were killed and 32 others were injured.   Law enforcement authorities recovered three fraudulent, purportedly U.S.-based, driver's licenses during the investigation, subsequently linked the attack to the IJO, and determined that ammonium nitrate was an active ingredient in the explosives.

h.   Also in July 2012, Hossam Taleb Yaacoub, an IJO operative with dual Lebanese-Swedish citizenship, was arrested after conducting surveillance of Israeli tourists in the vicinity of an airport in Larnaca, Cyprus.   Law enforcement authorities seized from Yaacoub a notebook containing coded entries relating to, among other things, Israeli tour busses.   In March 2013, Yaacoub was convicted of crimes in Cyprus relating to these activities on behalf of the IJO.

i.   In May 2015, Hussein Bassam Abdallah, an IJO operative with dual Lebanese-Canadian citizenship, was arrested in Cyprus after Cypriot authorities seized from an apartment rented by Abdallah approximately 8.2 tons of ammonium nitrate, at least some of which was stored in First Aid ice packs manufactured by Guangzhou Company-1, the manufacturer of the First Aid ice packs seized in Thailand in January 2012.  See paragraph 17(f), supra. Abdallah possessed a copy of a fraudulent passport at the time of his arrest, and he was subsequently convicted of crimes in Cyprus relating to these activities on behalf of the IJO.

**THE DEFENDANT**

18.  Based on my review of documents and information maintained by federal and state authorities in the United States, I am aware of the following:

a.   ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, was born in the vicinity of Bint Jbeil, Lebanon in 1984.

b.   In 2003, KOURANI lawfully entered the United States using a Lebanese passport.  In the United States, KOURANI obtained a Bachelor of Science in biomedical engineering in 2009, and a Masters of Business Administration in 2013.

c.   In April 2009, KOURANI became a naturalized citizen of the United States, see paragraph 20(c), infra.

d.   KOURANI's U.S. and Lebanese passports reflect, among other things, travel to Lebanon at least approximately once annually between 2005 and 2015, and to Guangzhou, China in May 2009.

## THE DEFENDANT'S RECRUITMENT AND TRAINING BY
## HIZBALLAH AND THE IJO

19.   Based on my participation in interviews of ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, as well as my review of reports relating to interviews of KOURANI,[1] I know that KOURANI provided the following information to law enforcement, in substance and in part:

a.   KOURANI considers his family name to be akin to the "Bin Ladens of Lebanon," and one of his brothers is the "face of Hizballah" in Yatar, Lebanon.

b.   In approximately 2000, three years before entering the United States, see paragraph 18(b), supra, KOURANI attended a 45-day Hizballah "boot camp" in Lebanon.  KOURANI was approximately 16 years old at the time, and he was permitted to attend because of his family's connections to a high-ranking Hizballah official named Haider Kourani.  During the training, KOURANI was taught to fire AK-47 assault rifles and rocket launchers, as well as basic military tactics, by Hizballah personnel wearing uniforms.

c.   KOURANI was in Southern Lebanon during the 2006 Lebanon War, see paragraph 17(e), supra, and his family's home was destroyed by an Israeli bombing during the conflict.  KOURANI fled the area with relatives, and he returned to the United States via Syria.

d.   In approximately 2008, KOURANI was recruited by Sheikh Hussein Kourani in Lebanon to join the IJO.  KOURANI considered the IJO to be responsible for "black ops" on behalf of Hizballah and "the Iranians."  By the time KOURANI joined the IJO, he understood that Hassan Nasrallah, the Secretary-General of

---

[1] ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, made statements to the FBI during multiple voluntary interviews in 2016 and 2017.  The interviews in 2016 were conducted in a non-custodial setting.  Five interviews were conducted in 2017 after an attorney representing KOURANI contacted the FBI and explained, in substance and in part, that KOURANI wished to provide information to the FBI in the hope of obtaining financial support and immigration benefits for certain of his relatives.  No promises were made to KOURANI regarding such benefits, and the five interviews in 2017 were conducted in the attorney's presence, at the attorney's office, in a non-custodial setting.

Hizballah, operated the IJO and reported directly to Ali Khamenei, the Supreme Leader of Iran.

e.   KOURANI believes that he was recruited to join the IJO in light of his education and residence in the United States, and in connection with efforts by the IJO to develop "sleepers" who maintained ostensibly normal lives but could be activated and tasked with conducting IJO operations.

f.   Following KOURANI's initial recruitment by the IJO, KOURANI participated in a series of interviews in Lebanon with IJO personnel during which he was asked about his background, religious practices, and travel history, as well as provided with training on topics such as conducting interrogations, resisting interrogations, and surveillance techniques.

g.   KOURANI was subsequently driven, while wearing a blacked-out motorcycle helmet, to a meeting with the man who acted as his IJO handler, whom KOURANI knew as "Fadi" and "Hajj" ("Fadi"). Fadi typically wore a mask during their meetings, and explained to KOURANI early in their relationship that the "golden rule" of the IJO was that "the less you know the better it is." Fadi acted as KOURANI's IJO handler until approximately September 2015, when KOURANI claims that he (KOURANI) was deactivated by the IJO.

h.   One of Fadi's first instructions to KOURANI, who was a lawful permanent resident at the time, was to obtain United States citizenship and a U.S. passport as soon as possible.

i.   Fadi later instructed KOURANI to obtain a U.S. passport card that could be used to re-enter the United States if his U.S. passport was seized outside the United States. Specifically, Fadi told KOURANI that he could use his Lebanese passport to fly to Mexico or Canada, and then enter the United States at a land border using the U.S. passport card.

j.   KOURANI used at least two email addresses ("Kourani Email-1" and "Kourani Email-2") to communicate with IJO personnel abroad regarding his status and activities.

20. Based on my review of documents and information maintained by federal and state authorities in the United States, I am aware of the following:

a.   ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, departed Lebanon, via Beirut-Rafic Hariri International Airport, in approximately late-January 2008.

b.   In approximately August 2008, KOURANI submitted an application for naturalization in the United States (the "Naturalization Application"). KOURANI certified on the Naturalization Application, under penalty of perjury, that the information provided was true and correct. In the Naturalization Application, KOURANI made the following declarations, among others:

i.   He had never "been a member of or in any way associated (either directly or indirectly) with . . . [a] terrorist organization."

ii.   He had never "given false or misleading information to any U.S. government official while applying for any immigration benefit . . . ."

iii.   He had never "lied to any U.S. government official to gain entry or admission into the United States."

c.   On or about April 15, 2009, the Naturalization Application was approved, and KOURANI became a naturalized citizen of the United States.[2]

d.   On or about April 15, 2009, KOURANI submitted an application for a U.S. passport, attaching the naturalization certificate that he was issued on the same day. In the passport application, KOURANI claimed, under penalty of perjury, that he had "no plans yet" with respect to foreign travel.

e.   On or about April 22, 2009, KOURANI was issued a U.S. passport.

f.   On April 30, 2009, KOURANI was issued a visa to enter China that was valid until October 30, 2009.

_____

[2] The Naturalization Application was processed, in part, at a Manhattan office of the U.S. Citizenship and Immigration Services. ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, admitted to the FBI in 2017 that he understood that the Naturalization Application would be processed, at least in part, in the Southern District of New York.

g.   On or about May 3, 2009, KOURANI entered China at an airport in Guangzhou, the location of Guangzhou Company-1, i.e., the manufacturer of the ammonium nitrate-based First Aid ice packs seized in connection with thwarted IJO attacks in Thailand and Cyprus, see paragraphs 17(f) and 17(i), supra.

h.   In approximately April 2013, KOURANI obtained a U.S. passport card by relying on his naturalization certificate as an identification document.

21.   Based on my review of documents and information relating to Kourani Email-1, which were produced by an Internet services provider, I am aware of the following:

a.   In approximately late-January 2008, just days after ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, left Lebanon following his recruitment by the IJO, see paragraphs 19(d) and 20(a) supra, KOURANI conducted a series of Internet searches relating to the 2006 Lebanon War, including the terms "vinograd report" and "lebanon second war."   Based on publicly available reporting, I know that Judge Eliyahu Winograd led the Commission to Investigate the Lebanon Campaign in 2006, i.e., the 2006 Lebanon War, which issued interim and final reports relating to the conflict.

b.   Beginning in approximately May 2008, KOURANI conducted Internet searches and visited websites relating to Al Manar, the Specially Designated Global Terrorist entity that acts as a propaganda arm of Hizballah, see paragraph 17(b), supra. KOURANI conducted similar searches relating to Al Manar in approximately October 2012 and approximately March 2015.

c.   Beginning on or about April 29, 2009, just one day before KOURANI obtained a visa to enter China, see paragraph 20(f), supra, he conducted Internet searches relating to the city of Guangzhou, China.

d.   In approximately January 2013, KOURANI conducted an Internet search, in Arabic, and visited a website relating to Rabee Fares.   The website KOURANI visited contains multiple images of Fares posing with weapons and military gear, and indicates that Fares was a member of Hizballah who was killed while fighting in

Syria approximately two days before KOURANI's Internet search.[3]

      e.  In approximately January 2013, KOURANI conducted an Internet search, in Arabic, for the phrase "if Hizballah was defeated," and visited a website with a Hizballah propaganda video produced by Al Manar featuring, among other things, a statement from Hizballah Secretary-General Nasrallah.

      f.  In approximately March 2013, KOURANI conducted an Internet search, in Arabic, relating to IJO operative Hossam Taleb Yaacoub, who was arrested in Cyprus in July 2012 based on his surveillance of Israeli targets in Cyprus, see paragraph 17(h), supra.

      g.  In approximately January 2014, KOURANI conducted an Internet search, in Arabic, and a visited website relating to prayers for victory over "the enemy."

      h.  In approximately March 2015, KOURANI conducted an Internet search, in Arabic, for the phrase "martyr leader Khattar Abdullah." Based on publicly available reporting, Khattar Abdullah was a Hizballah commander born near the same city in Lebanon as KOURANI, Bint Jbeil, and Abdullah was killed during battle in Syria in approximately March 2015.

### THE DEFENDANT'S USE OF IJO COMMUNICATIONS SECURITY AND TRADECRAFT

    22.  Based on my participation in interviews of ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, as well as my review of reports relating to interviews of KOURANI, I know that KOURANI provided the following information to law enforcement, in substance and in part:

      a.  KOURANI was instructed by IJO personnel abroad to use digital storage media, such as USB drives and memory cards, to transport pictures and data back to Lebanon relating to his external operations.

      b.  In order to establish contact with Fadi when KOURANI returned to Lebanon, KOURANI would call a telephone number associated with a pager (the "IJO Pager") and provide a code that he understood was specific to him. After KOURANI called the IJO

---

[3] All translations set forth herein are preliminary and in draft form.

Pager, Fadi would contact KOURANI to set up an in-person meeting by calling a phone belonging to one of KOURANI's relatives.

        c.    KOURANI and Fadi used code during operational communications when KOURANI was outside of Lebanon. Initially, the code involved Fadi using marriage-related code, such as "bride," to signal to KOURANI that he should return to Lebanon. After KOURANI married, Fadi communicated similar recall messages using coded references to a "job" or "employment" prospect in Lebanon.

        d.    KOURANI also provided Fadi with the name of a particular childhood friend of KOURANI, and Fadi established one or more email accounts using that name for purposes of operational communications while KOURANI was outside of Lebanon. KOURANI deleted electronic communications from Fadi immediately after reviewing them.

        e.    In approximately 2011 or 2012, Fadi instructed KOURANI not to use existing operational email accounts or the IJO Pager, as the IJO assessed that these communications selectors had been compromised. KOURANI and Fadi did not use email to communicate regarding IJO operations after approximately 2012.

    23.  Based on my review of documents and information relating to Kourani Email-1 and Kourani Email-2 as well as other email accounts, which were produced by Internet service providers, I am aware of the following:

        a.    The email contacts stored in Kourani Email-2 contained two email addresses ("Fadi Email-1" and "Fadi Email-2") with usernames that are similar to the name of the childhood friend that ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, identified to Fadi, see paragraph 22(d), supra.

b.   The contact for Fadi Email-1 was first saved in the account associated with Kourani Email-2 in approximately March 2008, and the contact entry relating to Fadi Email-1 was last modified on or about July 1, 2012.

c.   Fadi Email-2 was created on or about October 15, 2011, and the user of the account indicated that he or she was based in Lebanon.  The contact for Fadi Email-2 was first saved in the account associated with Kourani Email-2 on or about October 19, 2011.  Like Fadi Email-1, the contact entry relating to Fadi Email-2 was last modified on or about July 1, 2012.

d.   Consistent with Fadi's instruction that IJO operational email accounts had been compromised in approximately 2011 or 2012, see paragraph 22(e), supra, there was no message content stored in Kourani Email-2, Fadi Email-1, or Fadi Email-2, as of approximately May 2017.

24.  Based on my review of documents and information maintained by federal and state authorities in the United States, I know that, on or about September 18, 2015, ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, departed Beirut, Lebanon, and entered the United States at John F. Kennedy International Airport ("JFK").  During a secondary inspection, law enforcement personnel determined that KOURANI's cellphone did not contain a memory card, but found a memory card secreted under a travel sticker affixed to KOURANI's U.S. passport.  The personnel conducting the inspection did not search the contents of the SIM card.

**THE DEFENDANT'S ADDITIONAL IJO MILITARY TRAINING**

25.  Based on my participation in interviews of ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, as well as my review of reports relating to interviews of KOURANI, I know that KOURANI provided the following information to law enforcement, in substance and in part:

a.   In approximately July 2011, KOURANI attended an IJO military training camp, located in the vicinity of Birkat Jabrur, Lebanon, where he was provided with military-tactics and weapons training.

b.   In order to get to the training camp, KOURANI was picked up by an unknown driver, in a van with blacked-out windows, in the vicinity of Nabatieh, Lebanon.  KOURANI was provided with a black, balaclava-style mask, which he put on and then got in the

back of the van with approximately five or six other IJO operatives.

c.   A total of between approximately 20 and 25 IJO operatives attended the military training at Birkat Jabrur, which lasted for approximately two days and two nights.

d.   During the training, KOURANI used---and fired--- several weapons.  When interviewed by the FBI in 2017, KOURANI identified, through counsel, photographs of several of the weapons that he discharged during the 2011 IJO training, including an RPG, an AK-47 assault rifle, an MP5 submachine gun, a PKS machine gun (a Russian-made belt-fed weapon), and a Glock pistol.   KOURANI knew that several of the weapons he used during the training (including the MP5, PKS, and AK-47) could be fired in "automatic" mode; he was taught that these firearms could be discharged more accurately in semi-automatic mode, and his IJO trainers were unhappy when KOURANI fired in automatic mode during the training.[4]

## THE DEFENDANT'S INTELLIGENCE-GATHERING ACTIVITIES IN THE UNITED STATES ON BEHALF OF THE IJO

26.   Based on my participation in interviews of ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, as well as my review of reports relating to interviews of KOURANI, I know that KOURANI provided the following information to law enforcement, in substance and in part:

a.   Fadi directed KOURANI to surveil and collect information regarding military and intelligence targets in the New York City area.  In response to this tasking, KOURANI conducted physical surveillance of the following targets:  (i) a U.S. government facility, which includes FBI offices, in Manhattan, New York; (ii) an U.S. Army National Guard facility in Manhattan, New York; (iii) a U.S. Secret Service facility in Brooklyn, New York; and (iv) a U.S. Army Armory facility in Manhattan, New York ("U.S. Armory-1").  KOURANI used his phone to videotape activity around at least one of these surveillance targets, transferred the video footage to a memory card, and brought the memory card to Fadi and other IJO personnel in Lebanon.  KOURANI also used the Internet to obtain images of at least one of these surveillance targets, and

---

[4] Based on my conversations with another agent who has expertise in firearms, as well as my training and experience, I understand that the AK-47 assault rifle, MP5 submachine gun, and PKS machine gun are each firearms capable of firing more than one round through a single function of the trigger without manual reloading.

he provided the images to Fadi and other IJO personnel in Lebanon.

b. When interviewed by the FBI in 2017, KOURANI identified, through counsel, photographs of the above-referenced four locations in New York City where he conducted surveillance for the IJO.

c. Fadi directed KOURANI to surveil and collect information regarding airports, including the layout of terminals, the locations of cameras and personnel, and other security features.[5] In response, KOURANI provided detailed information to Fadi regarding specific security protocols; baggage-screening and collection practices; and the locations of surveillance cameras, security personnel, law enforcement officers, and magnetometers at JFK and an international airport in another country.

d. Fadi directed KOURANI to cultivate contacts in the New York City area who could provide firearms for use in potential future IJO operations in the United States. KOURANI brought Fadi a list of individuals he believed could supply firearms, but Fadi rejected the candidates as unreliable.

e. Fadi directed KOURANI to identify and collect intelligence regarding individuals in the United States affiliated with the IDF. KOURANI believed that the IJO gave him this tasking to facilitate, among other things, assassinations of IDF personnel in retaliation for the 2008 assassination of Imad Mughniyah, the former leader of the IJO. KOURANI used a social media account to identify IDF members or associates in the New York City area, and he described his search methodology to Fadi.

f. Consistent with the fraudulent identification documents seized during the investigation of IJO activities in Bulgaria and Cyprus, see paragraphs 17(g) and 17(i), supra, Fadi asked KOURANI if KOURANI could obtain employment at a Department of Motor Vehicles office in order to facilitate efforts by the IJO to obtain fraudulent identification documents for use in operations. KOURANI told Fadi he could not do so because he believed that it would draw too much attention if someone with his educational background applied for such a clerical position.

g. Fadi directed KOURANI to obtain surveillance equipment in the United States, including drones, night-vision

---

[5] Based on my training and experience, I understand that a standard tasking to many IJO operatives is to surveil and collect information regarding airports.

goggles, and high-powered cameras, so that the underlying technology could be studied and replicated by the IJO.

27. Based on my review of documents and information relating to Kourani Email-1, which were produced by an Internet service provider, I am aware of the following:

a. In approximately April 2011, ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, viewed a series of Google Maps related to LaGuardia Airport in Queens, New York, some of which were zoomed in on the locations of terminals.

b. In approximately April 2012, KOURANI conducted a series of Internet searches, and viewed images, relating to sniper rifles.

c. In approximately May 2012, KOURANI visited the website of a company that sells weapons (including firearms), body armor, uniforms, and tactical gear.

d. In approximately February 2013, KOURANI used Google Maps to view an image of, among other things, a U.S. Armed Forces Career Center in Queens, New York.

e. In approximately February 2014, KOURANI visited a website with information relating to manufacturing, repairing, and operating drones.

f.   In approximately April 2014, KOURANI conducted an Internet search and visited a website relating to U.S. Armory-1, i.e., one of the locations that KOURANI told the FBI in 2017 that he surveilled, see paragraph 26(a), supra.

WHEREFORE, the deponent respectfully requests that a warrant be issued and that ALI KOURANI, a/k/a "Ali Mohamad Kourani," a/k/a "Jacob Lewis," a/k/a "Daniel," the defendant, be arrested and imprisoned, or bailed, as the case may be.

_____
JOSEPH T. COSTELLO
Special Agent, FBI


Sworn to before me this
31st Day of May, 2017

_____
HONORABLE KATHARINE H. PARKER
United States Magistrate Judge
Southern District of New York

21