UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

ALI KOURANI,
    a/k/a "Ali Mohamad Kourani,"
    a/k/a "Jacob Lewis,"
    a/k/a "Daniel,"

                              Defendant.

17 Cr. 417 (AKH)


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANT'S PRETRIAL MOTIONS**


GEOFFREY S. BERMAN
United States Attorney Southern
District of New York
*Attorney for the United States
    of America*


Emil J. Bove III
Amanda L. Houle
        Assistant United States Attorneys
        *Of Counsel*

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................ 5

    I. The Defendant's Activities on Behalf of Hizballah and the Islamic Jihad Organization ....... 5

    II. The Facts Adduced in the Defendant's Motions ................................................................. 7

    III. Procedural History ........................................................................................................... 11

DICSUSSION ............................................................................................................ 12

    I. The Defendant Was Not Promised Immunity and
    Dismissal of the Indictment Is Not an Appropriate Remedy .................................................. 12

        A. Applicable Law ........................................................................................................... 12

        B. Discussion ................................................................................................................... 13

            1. The FBI Agents Did Not Promise Immunity and Any Such Promise
            Would Have Been Unenforceable Because the Agents Lacked Authority ..................... 13

            2. Assurances of Confidentiality Cannot Be Converted Into Immunity ......................... 17

    II. The Defendant's Statements Were Voluntary and No Hearing Is Required ..................... 22

        A. Applicable Law ........................................................................................................... 22

        B. Discussion ................................................................................................................... 24

            1. The Defendant Has Not Met His Burden of Establishing Deception by the FBI ........ 24

            2. The Totality of the Circumstances Demonstrates that
            the Defendant's Statements Were Voluntary ................................................................. 29

               a. The Defendant Is a Sophisticated Adult with Experience
               in the Criminal Justice System ...................................................................................... 29

               b. The Conditions of the Interviews Support a Finding of Voluntariness ................... 33

               c. The Agents Conducted the Interviews in a Professional Manner ............................ 36

            3. Challenges to Denbeaux's Performance Are Not a Basis for Relief ........................... 38

            4. The Defendant's Motion Should Be Denied Without a Hearing ................................. 39

    III. The Defendant Is Not Entitled to a Bill of Particulars ...................................................... 41

        A. Relevant Facts ............................................................................................................. 41

        B. Applicable Law ........................................................................................................... 42

        C. Discussion ................................................................................................................... 43

    IV. The Defendant Is Not Entitled to the Identities of Informants ........................................... 45

        A. Applicable Law ........................................................................................................... 45

        B. Discussion ................................................................................................................... 46

CONCLUSION ............................................................................................................ 49

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     -v.-                               17 Cr. 417 (AKH)

ALI KOURANI,
     a/k/a "Ali Mohamad Kourani,"
     a/k/a "Jacob Lewis,"
     a/k/a "Daniel,"

                         Defendant.

The Government respectfully submits this memorandum of law in opposition to the three pretrial motions filed by the defendant: (i) a motion to dismiss Indictment 17 Cr. 417 (AKH) (Dkt. No. 20 (the "Def. Dismissal Mem.")); (ii) a motion to suppress statements by the defendant to the FBI during five meetings between March 23, 2017 and April 26, 2017 (Dkt. No. 26 (the "Def. Suppression Mem.")); and (iii) a motion for a bill of particulars and information relating to informants (Dkt. No. 24 (the "Def. Particulars Mem.")).

The defendant is a terrorist with an extensive educational background and training from Hizballah on topics such as interrogation tactics, counterintelligence practices, and the use of firearms and explosives. He admitted to all of these things, and more, during five counseled, non-custodial interviews in March and April 2017, which were conducted by two FBI agents (the "FBI Agents") in the presence of the defendant's then-attorney, Mark Denbeaux, and at Denbeaux's office. The defendant appears to have believed that despite his prolonged support of Hizballah's external attack-planning mission on U.S. soil, the Government would look past his grievous crimes designed to cause harm to U.S. and Israeli interests in exchange for the mere privilege of speaking to him. He was wrong.

The defendant now pursues the benefit of a bargain he never asked for—namely, immunity[1]—by grasping at assurances relating to confidentiality that he and Denbeaux discussed with the FBI Agents. The agents agreed, based on safety concerns described by the defendant, that they would seek to prevent the disclosure of the interviews and the defendant's statements to persons outside the Government who might cause harm to the defendant or his family, and nothing more. The defendant relies on a mischaracterization of those assurances as the principal basis for seeking to avoid the consequences of his five-meeting, counseled confession. Tellingly, at no point in the Declarations filed by the defendant and Denbeaux does either claim that anyone associated with the Government actually agreed to provide the defendant with immunity. This is a glaring omission in light of the defendant's arguments, but one that is grounded in fact. Put simply, there was no such promise. And assurances regarding confidentiality, which were plainly addressed to safety issues, are far too thin a reed to establish a promise, much less an actual agreement by the Government, to immunize the defendant for his acts of terrorism.

The defendant nevertheless seeks to do so in his pretrial motions based on two legal theories. First, he invokes principles of contract law to argue that the Indictment should be dismissed because there was actually an agreement conferring immunity. Nothing could be further from the truth. The defendant seeks, in essence, specific performance of a non-existent contract. But he has not presented any allegation that would be sufficient, if true, to establish a meeting of the minds between the FBI Agents and himself conferring immunity. Even if there were sufficient

---

[1] The Government uses the term "immunity" in this brief to include the concepts of transactional and use immunity as well as a non-prosecution agreement—none of which were provided to the defendant at any time.

allegations to support the existence of such an agreement, the defendant's argument would still fail because the FBI Agents are not prosecutors and thus lack the authority to bind the Government on a matter such as immunity. The defendant's contract-law argument for the dismissal of the Indictment is meritless.

The defendant's second motion challenging his confession relies on the same facts but pivots away from contract law and argues that the confidentiality assurances from the FBI Agents deceived him and rendered his statements involuntary as a matter of due process principles. In support of this argument, the defendant maintains his reliance on an implausible *post hoc* interpretation of the assurances he obtained, which posits that the FBI Agents agreed that the entire Government would not prosecute him during a telephone call with Denbeaux on the day before the first interview—before the FBI Agents had any idea what the defendant planned to tell them. No agent would behave in that fashion, and certainly not in a domestic counterterrorism investigation. Thus, the defendant's mischaracterization of the facts is not a basis for suppression.

Indeed, the circumstances surrounding the five interviews, as described by the defendant, demonstrate that his statements were voluntary under the applicable legal standards. He was an educated and sophisticated participant in the meetings, who was well aware that he was the focus of a Hizballah-related investigation based on interactions and questioning from the FBI dating back to 2012. It was the defendant who requested each of the meetings; he contacted the FBI Agents via Denbeaux in February 2017 to reinitiate conversations with the agents after a decision in 2016 that he describes as having "cut" his "relationship with the FBI." He took this step with the benefit of counsel from Denbeaux, an experienced attorney in criminal and counterterrorism matters. Denbeaux was present during all of the meetings, and he helped the

defendant make five individual decisions to participate in each of the five separate interviews with ample time to assess and re-assess the situation as it developed. Under these circumstances, which are described in the defense Declarations and motion papers, the defendant's statements were voluntary.[2] Accordingly, the motion to suppress should be denied without a hearing.

Finally, the defendant filed a discovery motion seeking a bill of particulars with additional disclosures regarding his participation in the charged conspiracies, and to compel the Government to provide information regarding informants used in the investigation. He provides almost no explanation as to why such disclosures are necessary or appropriate, which is fatal to his efforts. The Government has already provided extensive pretrial disclosures, including a 21-page Complaint, FBI reports, and search warrant affidavits. As is customary in this District, the Government also intends to make witness-related disclosures pursuant to the Jencks Act and *Giglio*, including any necessary disclosures relating to informants, ten days prior to the as-of-yet unscheduled trial. In light of these considerations, and because the defendant has not overcome the informant's privilege, his discovery-related motion should be denied as well.

---

[2] The Government adopts the factual account set forth in the defendant's motion papers, including the supporting Declarations, for purposes of opposing his pretrial motions because even based on the defendant's account of the interviews, he does not meet the threshold for an evidentiary hearing, much less dismissal of the Indictment or suppression of his statements. Notwithstanding that, the Government does not concede the accuracy of the defendant's account for purposes of future proceedings, including any hearing on the motions, should the Court hold one, or at trial.

# BACKGROUND

## I.  The Defendant's Activities on Behalf of Hizballah and the Islamic Jihad Organization

The defendant was a member of Hizballah's Islamic Jihad Organization ("IJO")—also known as the External Security Organization ("ESO") or "910"—which is a highly compartmentalized component of Hizballah responsible for the planning, preparation, and execution of intelligence, counterintelligence, and terrorist activities outside of Lebanon.[3]  (Jan. 29, 2018 Decl. of Emil J. Bove III (the "Bove Decl.") Ex. C, Complaint ¶ 16).  Hizballah is responsible for numerous terrorist attacks that have killed hundreds, including the 1983 bombing of the United States Marine barracks in Lebanon, which killed 241 Marines; the 1983 bombing of the United States Embassy in Beirut, which killed 24 people; the 1985 hijacking of TWA Flight 847, which killed one U.S. citizen; the 1992 bombing of the Israeli Embassy in Argentina, which killed 29 people; and the 1994 bombing of a Jewish cultural center in Buenos Aires, which killed 95 people.  (*Id.* ¶ 17(d)).  In July 2012, an IJO operative conducted a bombing in Burgas, Bulgaria that killed six people and injured 32.  (*Id.* ¶ 17(g)).  Additional IJO attack plots in Thailand and Cyprus were thwarted in 2012, and another attack was thwarted in Cyprus in 2015, which involved

---

[3] Hizballah is a Lebanon-based Shia Islamic organization with political, social, and terrorist components.  Hizballah was founded in the early 1980s with support from Iran after the 1982 Israeli invasion of Lebanon, and its mission includes establishing a fundamentalist Islamic state in Lebanon.  In 1997, the U.S. Department of State designated Hizballah a Foreign Terrorist Organization, pursuant to Section 219 of the INA, and it remains so designated today.  In 2001, pursuant to Executive Order 13,224, the U.S. Department of the Treasury designated Hizballah a Specially Designated Global Terrorist entity.  In 2010, State Department officials described Hizballah as the most technically capable terrorist group in the world, and a continued security threat to the United States.

the seizure of approximately 8.2 tons of the bomb-making component ammonium nitrate.  (*Id.* ¶¶ 17(f), 17(h), 17(i)).

Beginning in approximately 2000, the defendant obtained training from Hizballah in tradecraft, military tactics, and weapons such as AK-47 assault rifles and rocket launchers.  (*Id.* ¶¶ 16, 19(a)).  The defendant later acted as an IJO "sleeper" operative working undercover in the United States.  (*Id.* ¶¶ 16, 19(e)).  He entered the country in 2003, and studied biomedical engineering and business.  (*Id.* ¶¶ 16, 18(b)).  In approximately 2008, the defendant was recruited to join the IJO, which he considered to be responsible for "black ops" on behalf of Hizballah and "the Iranians."  (*Id.* ¶ 19(d)).  The defendant received training from the IJO in, among other things, conducting interrogations, resisting interrogations, and surveillance techniques.  (*Id.* ¶ 19(f)).  At the direction of his IJO handler, the defendant became a naturalized U.S. citizen in 2009 and later obtained a U.S. passport card.  (*Id.* ¶ 18(h)).  In July 2011, the defendant attended an IJO training camp in Lebanon where he received additional weapons training, including with a rocket-propelled grenade launcher, an AK-47 assault rifle, an MP5 submachine gun, a PKS machine gun (a Russian-made belt-fed weapons), and a Glock pistol.  (*Id.* ¶¶ 25(a), 25(d)).

Relying on his training from Hizballah and the IJO, and in response to taskings obtained from his IJO handler in Lebanon, the defendant conducted intelligence-gathering and surveillance activities in the United States.  (*Id.* ¶ 16).  For example, the defendant conducted physical surveillance of the following targets:  (i) a U.S. government facility, which includes FBI offices, in Manhattan, New York; (ii) a U.S. Army National Guard facility in Manhattan, New York; (iii) a U.S. Secret Service facility in Brooklyn, New York; and (iv) a U.S. Army Armory facility in Manhattan, New York.  (*Id.* ¶ 26(a)).  Based on an IJO tasking to surveil and collect

information regarding airports—including the layout of terminals, the locations of cameras and personnel, and other security features—the defendant provided detailed information to his IJO handler regarding specific security protocols; baggage-screening and collection practices; and the locations of surveillance cameras, security personnel, law enforcement officers, and magnetometers at John F. Kennedy International Airport and an international airport in another country. (*Id.* ¶ 26(c)). The defendant also used the Internet to obtain images of at least one of his surveillance targets, and he provided the images to his IJO handler and other IJO personnel in Lebanon. (*Id.* ¶ 26(a))

## II. The Facts Adduced in the Defendant's Motions

Set forth below is a summary of the factual record reflected in the defendant's motion papers, including the January 7, 2018 Declaration submitted by the defendant (Dkt. No. 27 (the "Kourani Decl.")), and the January 7, 2018 Declaration submitted by Denbeaux (Dkt. No. 28 (the "Denbeaux Decl.")). The Government assumes the veracity of the Declarations submitted by the defense for purposes of this opposition brief, only. *See* note 2, *supra*. The Government also reserves the right to present additional and contrary facts, and to contest the truthfulness of both Denbeaux and the defendant, should the Court conduct a hearing.

On "about eight total occasions" between 2012 and 2016, FBI personnel questioned the defendant about, among other things, Hizballah and his "involvement" in the terrorist organization. (Kourani Decl. ¶¶ 4, 5). In approximately July 2016, the defendant was "attacked" and threatened in Beirut by "members" of Hizballah, who "shot bullets" at his home and "tried to abduct or kill" him. (Kourani Decl. ¶ 8). Also in 2016, the defendant decided that FBI personnel

"could not be trusted," he "did not want to be an informant," and he declined offers of benefits, including money and immigration benefits for relatives. (Kourani Decl. ¶ 6).

In early 2017, based on stress arising from Hizballah's efforts to kill him and the FBI's ongoing investigation, the defendant decided that "the FBI could help to ease the strain and pressure they had partially caused" if he "finally helped the FBI." (Kourani Decl. ¶ 10). In February 2017, the defendant engaged Denbeaux to "help me get my children back." (Kourani Decl. ¶ 11; *see also* Def. Suppression Mem. at 1 (asserting that the defendant "got a lawyer to help him speak with the FBI" because the defendant was "worried about seeing his children again and his relatives' safety")). The defendant told Denbeaux that the FBI had "accused" him of being a member of Hizballah and "repeatedly tried to get me to be an informant." (Kourani Decl. ¶ 11). Beginning on February 28, 2017, Denbeaux contacted the FBI, identified the defendant as his "client," and indicated that the defendant "wish[ed] to speak with the FBI." (Denbeaux Decl. ¶ 2).

On March 22, 2017, Denbeaux participated in a telephone call with two FBI agents. (Denbeaux Decl. ¶ 2). Denbeaux indicated during the call that he was aware that FBI personnel had interviewed the defendant previously, and the agents suggested that Denbeaux communicate with the defendant about the substance of the prior interviews. (Denbeaux Decl. ¶ 2). Denbeaux also "mentioned" to the agents "that the defendant was very nervous about his and his family's physical safety should anyone find out that he was talking to the FBI." He claims that, in response, the FBI Agents "assured" him during the call "that any meeting would 'remain confidential.'" (Denbeaux Decl. ¶ 2; *see also* Def. Suppression Mem. Ex. B (FBI report summarizing the March 22 call)).

Beginning on March 23, 2017, the defendant participated in "five meetings with the FBI and [the defendant's] then lawyer," Denbeaux, all of which were conducted at Seton Hall Law School, where Denbeaux works.  (Kourani Decl. ¶ 12).   According to the defendant, "Denbeaux and the agents told me that he had spoken to the FBI and that they promised that no one other than their supervisors would know about the meetings and that they would be confidential."  (Kourani Decl. ¶ 12).  The defendant asserts that Denbeaux, rather than the FBI Agents, also "told me that I would not be prosecuted for what I said at the meetings so that I could be honest."  (Kourani Decl. ¶ 12).  The defendant admits that the agents told him that the immigration relief he sought "could not be totally guaranteed."  (Kourani Decl. ¶ 17).  Denbeaux likewise concedes that the agents subsequently "pushed back" on suggestions by Denbeaux that the FBI had "promised to secure [the defendant's] relatives' safety," thereby confirming their lack of assent.  (Denbeaux Decl. ¶ 5).

Shortly after the interview of the defendant, Denbeaux sent the following text messages to one of the FBI Agents:[4]

---

[4] Denbeaux's messages are in yellow; the agent's message is in blue.



(Bove Decl. Ex. B; *see also* Denbeaux Decl. ¶ 6).

The defendant claims that "[b]efore the second meeting," "Mr. Denbeaux provided a piece of paper to the FBI" (hereinafter, the "April 3 Document", which "summarized our verbal agreements with them, including the fact that I would not be prosecuted for what I said." (Kourani Decl. ¶ 14; *see also* Denbeaux Decl. Ex. B (the April 3 Document)). Denbeaux describes the April 3 Document as "a typed summary of my notes concerning what was previously discussed between us." Denbeaux does not specify in his Declaration whether he intended the term "us" to include the FBI Agents or is limited to attorney-client communications. The April 3 Document included the following text:

What these meetings are not:

1. This is not a plea negotiations nor is it a proffer of any sort.
2. He is not seeking any kind of immunity or protection, because as it has already been agreed, he has committed no crime and faces no prosecution.

10

(Denbeaux Decl. Ex. B).  Denbeaux's Declaration does not provide any information about the alleged terms or context for the purposed "agree[ment]" referenced in the April 3 Document—because there was no such agreement with the FBI Agents.

Kourani admits that there was "a kind of dispute" with the FBI agents when Denbeaux presented the April 3 Document, which the defendant claims related to "what other promises or benefits regarding my children and immigration I would receive."  (Kourani Decl. ¶ 14).  Neither Denbeaux nor the defendant claims that the FBI agents present at the meeting ratified any of the contents of the April 3 Document, which they did not.  Rather, the agents returned the April 3 Document to Denbeaux during the meeting and did not keep a copy.

In addition to the March 23 and April 3 interviews, the same two FBI agents interviewed the defendant at Seton Hall on April 5, April 14, and April 26, 2017.  Denbeaux acknowledges that "there was still no clear deal regarding immigration benefits" during the April 14 meeting, and there is no allegation by the defendant or Denbeaux that a "clear deal" regarding such benefits was reached subsequently.[5]

## III.  Procedural History

On May 31, 2017, more than 30 days after the last interview, the defendant was charged via Complaint with terrorism offenses related to his activities on behalf of Hizballah. (Bove Decl. Ex. C).  The defendant was arrested the following day, and his apartment was searched pursuant to a warrant.  (Bove Decl. Ex. D).  The search revealed, among other things, a copy of the April 3 Document and handwritten notes by the defendant relating to, *inter alia*, his

---

[5] Denbeaux's Declaration states incorrectly that the meeting was conducted on April 13, 2017. (Denbeaux Decl. ¶ 9).

membership in Hizballah's External Security Organization ("ESO"),[6] efforts to "evaluate your interrogation," and a notation reflecting interest in helping to "extradite" a co-conspirator. (Bove Decl. ¶ 6 & Ex. E).

## DICSUSSION

## I. The Defendant Was Not Promised Immunity and Dismissal of the Indictment Is Not an Appropriate Remedy

The defendant has not claimed that anyone from the FBI offered him immunity, and his interpretation of the confidentiality assurances is highly strained. His allegations, if true, would not establish the existence of an immunity agreement with the FBI Agents. And even if the FBI Agents had extended such an agreement, it would not be binding because FBI agents cannot bind the Government. Accordingly, the defendant's motion to dismiss the Indictment should be denied.

### A. Applicable Law

"The defendant bears the burden of proving the existence of any agreement or promise not to prosecute." *United States* v. *Sattar*, No. 02 Cr. 395 (JGK), 2003 WL 22510398, at *2 (S.D.N.Y. Nov. 5, 2003) (citing *United States* v. *Rosario*, 237 F. Supp. 2d 242 (E.D.N.Y. 2002) (Raggi, J.)). "Interpretation of alleged nonprosecution agreements is more difficult" where, as here, the alleged agreement is "oral," and courts "'must consider the possibility that immunity discussions . . . never progressed to a meeting of the minds and formation of an enforceable bargain.'" *Id.* (quoting *United States* v. *Aleman*, 286 F.3d 86, 89 (2d Cir. 2002)).

---

[6] Hizballah's External Security Organization is also known as the Islamic Jihad Organization and "910." (*See* Bove Decl. Ex. C, Complaint ¶ 17(c)).

"[A] defendant who seeks specifically to enforce a promise" by law enforcement personnel must establish two things: (i) "that the promisor had actual authority to make the particular promise"; and (ii) "that he (the defendant) detrimentally relied on it." *United States* v. *Rudaj*, No. 04 Cr. 1110 (DLC), 2005 WL 2508404, at *2 (S.D.N.Y. Oct. 11, 2005) (internal quotation marks omitted). "If either part of this showing fails, the promise is unenforceable." *Id.* With respect to the first element of the required showing, "'[a] promise of use immunity made independently by an FBI agent exceeds the scope of his actual authority (and is, therefore, unenforceable).'" *Id.* (quoting *United States* v. *Flemmi*, 225 F.3d 78, 84 (1st Cir. 2000)).

## B. Discussion

The defendant's motion to dismiss the Indictment is predicated on two so-called "promises" that he claims were extended by the FBI Agents: (i) that his statements "would not be used against him in order to arrest him and charge him with crimes"; and (ii) "that what he said to the FBI would remain confidential." (Def. Dismissal Mem. at 1). Neither argument is sufficient to warrant dismissal of the Indictment.

### 1. The FBI Agents Did Not Promise Immunity and Any Such Promise Would Have Been Unenforceable Because the Agents Lacked Authority

The defendant offers no evidence, in the Declarations or otherwise, of a promise by the Government that "there would be no prosecution." (Def. Dismissal Mem. at 2). Indeed, the defendant claims that it was Denbeaux—not the agents—who "told me that I would not be prosecuted for what I said at the meetings . . . ." (Kourani Decl. ¶ 12). Denbeaux, however, was in no position to bind the Government to an immunity agreement. As an experienced attorney, he could not have reasonably believed otherwise. *See United States* v. *Rosario*, 237 F. Supp. 2d at 248 (reasoning that "[e]xperienced attorneys know" that "prosecutorial options are deliberately

13

kept open, at least until the witness has finished cooperating and often until the statute of limitations has run its course"). In *United States* v. *Li*, Judge Cote denied a similar motion where the defendant "[did] not identify any oral statement ever made by any law enforcement officer in which he was promised immunity or that his confession would not be used against him." No. 98 Cr. 713 (DLC), 1999 WL 311818, at *7 (S.D.N.Y. May 18, 1999). So too here. Because the defendant has not offered evidence of a promise of immunity by the Government, his claim fails.

Denbeaux's Declaration is similarly deficient. He fails to identify a promise of immunity by anyone. Rather, he claims that "there was *no dispute* whatsoever that my client would not be arrested," and that "[w]ithout a doubt there was still *no dispute* that my client would not be arrested." (Denbeaux Decl. ¶¶ 5, 9 (emphases added)). But the lack of a "dispute" on the issue between the FBI Agents and the defense team is a woefully insufficient basis for the defendant to meet his burden of establishing an agreement between the parties in the meeting or with the Government. *Sattar*, 2003 WL 22510398, at *4 (noting "no persuasive authority for the proposition that the Government was obligated to disclose to [defendant] that she could be indicted" and reasoning that "while [defendant] might have hoped that the Government's silence concerning her prosecution meant that none was contemplated, no reasonable person could have interpreted [prosecutor's] conduct or his representations to have been, explicitly or implicitly, an agreement or promise not to prosecute her"); *United States* v. *Heatley*, 39 F. Supp. 2d 287, 302 (S.D.N.Y. 1998) (reasoning that "[i]f [defense counsel] 'understood' this, it was certainly not because of any assurances given by [prosecutor], who, as noted earlier, gave no indication whatsoever of the type of information which would suffice to win [defendant] a cooperation agreement"). Unlike in *Sattar* and *Heatley*, Denbeaux and the defendant were not even talking to

prosecutors about these issues, which further weakens his position. Thus, Denbeaux's Declaration lends no support to this aspect of the defendant's motion.

Consistent with the shortcomings of the defense Declarations, the April 3 Document confirms that immunity was not sought by the defense. Specifically, the document, which was written by Denbeaux and shown to the agents, indicated that the defendant was "*not seeking any kind of immunity or protection*" and not seeking to engage in plea negotiations (Denbeaux Decl. Ex. B (emphasis added)). *See Sattar*, 2003 WL 22510398, at *3 ("There could never have been an agreement on the nonprosecution of [defendant] because that subject was never even the topic of conversation between [defense counsel] and the Government."). The defendant cannot escape the import of this language, especially in the context of a contract-law argument, by arguing that the April 3 Document is "very badly worded" and "poorly written." (Def. Dismissal Mem. at 2). "It is clear that, under general contract law principles, a party may not be bound by the meaning attached to a promise by the other party if the first party had no reason to know of the other party's meaning." *United States* v. *Heatley*, 39 F. Supp. 2d at 309. Thus, the April 3 Document does not establish an "agree[ment]" between the participants in the meetings that the defendant "committed no crime and faces no prosecution." (Denbeaux Decl. Ex. B). Denbeaux does not describe the basis for the assertion that he made in the April 3 Document, and no attorney could reasonably believe that the FBI Agents, as opposed to prosecutors, were in any position to make such agreements. Rather, the document contains assertions by Denbeaux that were never adopted. *See United States* v. *Williams*, No. 02 Cr. 1372 (BSJ), 2004 WL 1637026, at *2 (S.D.N.Y. July 20, 2004) ("At best, the statement 'nothing of this can be used against you' is ambiguous, and the failure of the law enforcement officers to correct this statement cannot be deemed ratification

of another interpretation of the agreement.").[7] Neither Denbeaux nor the defendant alleges anything to the contrary, and the defendant even admits that there was a "kind of dispute" relating to the contents of the document. (Kourani Decl. ¶ 14). Denbeaux and Kourani do not claim that the FBI Agents said anything about the April 3 Document's reference to prosecution of the defendant or its claim that the defendant had "committed no crime." Indeed, any allegation to the contrary would be incredible on its face. The idea that any law enforcement agent, as opposed to a prosecutor, would be in a position to clear a suspect of *any* criminal culpability after the first meeting in a series of interviews (let alone a suspect who law enforcement overtly deemed to be a member of a violent terrorist organization) is absurd.

Even if there was evidence that the FBI Agents extended an offer of immunity during the meetings, the defendant's argument for dismissal would still necessarily fail because the agents lacked authority to bind the Government to such an agreement. *See Doe* v. *Civiletti*, 635 F.2d 88, 96 (2d Cir. 1980) ("[I]t is axiomatic that the United States is not bound by the unauthorized acts of its agents.")); *see also Rudaj*, 2005 WL 2508404, at *2; *Arriaga* v. *United*

---

[7] The *Williams* decision is instructive. There, in a prosecution involving narcotics and firearms charges, the defendant moved to suppress statements made pursuant to an agreement that barred use of his statements in criminal or civil proceedings concerning violations of narcotics laws in the state of Virginia. The defendant alleged that, in the presence of Virginia law enforcement personnel, and before the defendant made the relevant statements, his attorney advised him that "nothing of this can be used against you," and the law enforcement officer present did not object. In denying the defendant's suppression motion, Judge Jones held that: (i) the state immunity agreement did not prevent use of the defendant's statements in a federal prosecution; (ii) the attorney's statement that nothing could be used against the defendant did not bind law enforcement; (iii) law enforcement had no obligation to correct any misstatement by the attorney, and their silence on the issue could not be deemed ratification; and (iv) regardless of whether the defendant's statements were made under a misunderstanding about how they could be used (even a misunderstanding that may have been reinforced by his attorney) the statements were nonetheless voluntary, and could not be suppressed.

*States*, No. 08 Civ. 4388, 2009 WL 890652, at *1 (E.D.N.Y. Feb. 26, 2009) ("DEA agents cannot bind the Office of the United States Attorney without authorization from that Office.").[8] Accordingly, the defendant has not established that he obtained an agreement conferring immunity, and even if he had adduced evidence to that effect, which he has not, his contract-law argument would still fail because the FBI Agents lacked authority to bind the Government on these issues.

### 2. Assurances of Confidentiality Cannot Be Converted Into Immunity

The defendant's arguments regarding "confidentiality" are also insufficient to achieve dismissal of the Indictment. Assurances regarding confidentiality are not promises of immunity, and the defendant cannot overcome the agents' lack of actual authority to bind the Government to an immunity agreement.

The defendant's argument is remarkable in that the confidentiality assurances he claims established an implied grant of immunity was made during a March 22, 2017 call with Denbeaux, which occurred before any of the meetings during which he confessed. (*See* Def.

---

[8] *Accord United States* v. *Ellis*, 527 F.3d 203, 205 (1st Cir. 2008) ("Even if the [prison] warden had made such a promise [to file a Rule 35 motion], he was without authority to do so and the promise may not be enforced"); *United States* v. *Fuzer*, 18 F.3d 517, 521 (7th Cir. 1994) (holding that defendant not entitled to relief because, *inter alia*, there was "no evidence" that "ATF agents were authorized to bind the United States Attorney even if they did make such a promise" of non-prosecution); *United States* v. *Streebing*, 987 F.2d 368, 373 (6th Cir. 1993) ("[B]ecause the FBI agent lacked any actual or apparent authority to make the alleged promise not to prosecute, the District Court did not err in failing to dismiss the indictment."); *United States* v. *Kettering*, 861 F.2d 675, 678 (11th Cir. 1988) (affirming District Court ruling that agent "possessed no authority to bind the government to the proposed plea agreement"); *Ray* v. *United States*, No. 04 Civ. 013, 2004 WL 1243173, at *1 (E.D.N.Y. Apr. 5, 2004) (rejecting habeas claim on basis of argument that attorney should have filed a "motion to dismiss the indictment based upon a promise of immunity allegedly made by an FBI agent" for the "reasons succinctly stated" in *United States* v. *Flemmi*, 225 F.3d 78 (1st Cir. 2000)).

Suppression Mem. Ex. B).  In other words, on the defendant's telling, the FBI Agents agreed on behalf of the Government to immunize the defendant before hearing a single word of what he had to say, all in the context of a significant counterterrorism investigation involving hostile attack-planning efforts in the United States.  This characterization of the confidentiality assurances strains credulity.  *E.g.*, *Heatley*, 39 F. Supp. 2d at 309 ("[T]he government cannot in any way be said to be bound by the meaning [defendant] and [defense counsel] attached to [prosecutor's] promise, particularly since that meaning (if actually held) was an unreasonable one.").  And although the defendant claims that he believed "no one other than [the FBI Agents'] supervisors would know about the meetings," it is clear from the defendant's motion papers that the FBI Agents told him they would need to disclose his statements outside the FBI because "they needed to enlist the help of ICE," a component of the Department of Homeland Security, "and the State Department." (Kourani Decl. ¶¶ 12, 17; *see also* Denbeaux Decl. ¶ 4 (noting agents' statement that "they had to rely on ICE and the State Department for help with visa and other issues")).  The defendant also admits that the agents told him they would have to "reach out to other government agencies" and potentially coordinate with foreign authorities to set up "a meeting in Canada."  (Kourani Decl. ¶ 17).  These representations from the FBI Agents, as described by the defendant, make clear that they told the defendant that any cooperation would have to be disclosed to other parts of the U.S. government, and potentially Canadian authorities, if they were to do what he asked.  In that context, the defendant "had no reasonable basis to believe that the agents would conceal his statement from the prosecutors."  *Rudaj*, 2005 WL 2508404, at *3.  Thus, the far more restrictive scope of confidentiality now suggested by the defendant, *i.e.*, that his statements would not be provided to anyone outside the FBI (including prosecuting authorities), is belied by the record.

18

In addition, it is clear that "a promise of confidentiality and a promise of use immunity are separate and distinct assurances." *Rudaj*, 2005 WL 2508404, at *3. "Simply because an FBI agent appropriately may keep an informant's identity to himself does not by some mysterious alchemy imbue the agent with the (otherwise nonexistent) power to promise use immunity." *United States* v. *Flemmi*, 225 F.3d at 88. Thus, an individual facing the circumstances confronted by the defendant in February and March 2017 "could not have formed any reasonable belief that any statement he made to the agents after they promised him limited confidentiality would constrain the prosecutors in shaping their evidence against him at trial." *Rudaj*, 2005 WL 2508404, at *3. "For if the power to confer use immunity is not necessarily implied by the FBI's duty to investigate crimes, then it certainly would not be necessarily implied by the authority to promise informants confidentiality, itself an implied authority incident to the duty to investigate crimes." *Rudaj*, 2005 WL 2508404, at *3.

The defendant's motion papers demonstrate that, consistent with *Rudaj* and *Flemmi*, his request for confidentiality was based on safety concerns rather than an interest in immunity. By July 2016, the defendant was concerned about a "rumor" that he "was an American government informant." (Kourani Decl. ¶ 8). Members of Hizballah had also tried to murder him. (Kourani Decl. ¶ 8). On March 22, 2017, based on Denbeaux's indication that the defendant "was very nervous about his and his family's physical safety should anyone find out that he was talking to the FBI," agents "assured that any meeting would 'remain confidential.'" (Denbeaux Decl. ¶ 2). The defendant "made it clear at the outset with the FBI" and "repeatedly" that he was focused on his desire to "protect and be with my children in the United States and insure the safety of my family in Lebanon." (Kourani Decl. ¶ 16). These safety concerns—rather than concerns about

criminal exposure and immunity—led the defendant to seek an "assur[ance] that any meeting would 'remain confidential.'" (Denbeaux Decl. ¶ 2; *see also id.* ¶ 4 (noting Denbeaux's March 23, 2017 expressions of concern about "grave danger" arising after the defendant "talked to the FBI")). The FBI report filed by the defendant is consistent with the Declarations. (Def. Suppression Mem. Ex. B). The report states that the agents told Denbeaux that the March 23, 2017 meeting would "remain confidential" in response to the defendant's "concerns about other people knowing that he was meeting with FBI." (*Id.*). Finally, the April 3 Document also demonstrates that confidentiality was important to the defendant because of safety concerns: "[T]he act of cooperation not only endangers him, but also his family." (Denbeaux Decl. Ex. B; *see also id.* (suggesting that speaking to FBI agents was "jeopardizing himself and exposing his family")). Beginning in March 2017 and throughout the five interviews, the defendant sought to address safety issues rather than immunity. He cannot now stretch the assurances he received beyond their terms in order to avoid punishment for his long-running terrorism offenses.

Whereas the defendant has not established the existence of any type of immunity agreement, the cases he cites involved actual agreements with, or promises by, prosecutors acting within the scope of their authority rather than law enforcement agents. (*See* Def. Dismissal Mem. at 2). In *United States* v. *Nersesian*, the court found that, "[p]ursuant to the cooperation agreement, the government agreed that anything [defendant] told the government would not be used against him so long as the information and testimony he provided was full and complete and he ceased his drug dealing." 824 F.2d 1294, 1306 (2d Cir. 1987). In *United States* v. *Heatley*, the court analyzed statements by a prosecutor to defense counsel in order to determine the nature and scope of the "assurances" at issue. 39 F. Supp. 2d 287, 299-300 (S.D.N.Y. 1998). In *United States* v. *Pelletier*,

"[t]he terms of the cooperation agreements at issue were spelled out by the prosecutor in the brief sequences set forth in the November 5, 1987, grand jury transcripts." 898 F.2d 297, 302 (2d Cir. 1990). Because there is no evidence of an immunity agreement in this case, the *Pelletier* court's finding that there was, in fact, such an agreement renders inapposite the language and citations in the *Pelletier* opinion relating to resolving ambiguities in an existing agreement against the Government. *See United States* v. *Aleman*, 286 F.3d at 90 ("We must consider the possibility that immunity discussions in this case never progressed to a meeting of the minds and formation of an enforceable bargain."). Because all of these cases involved assurances by government personnel acting within the scope of their authority, the equitable principles the defendant invokes are also unavailing. *See also Flemmi*, 225 F.3d at 85 ("As a general rule, doctrines such as estoppel and apparent authority are not available to bind the federal sovereign."). Therefore, the limited authority cited by the defendant does not support his position.

\* \* \*

The defendant has invoked contract principles in seeking dismissal of the Indictment, but failed to offer evidence of an agreement and must concede that the parties to the discussions upon which he relies lacked authority to bind the Government. In *Sattar*, Judge Koeltl denied a similar motion to dismiss an indictment "on the basis of a nonprosecution agreement" where the defendant "failed to show that a nonprosecution agreement was reached or that the Government made any promise at all not to prosecute her." *Sattar*, 2003 WL 22510398, at \*4. The same result is appropriate here, for the same reasons. Accordingly, the defendant's motion should be denied.

## II.   The Defendant's Statements Were Voluntary and No Hearing Is Required

Lacking an actual immunity agreement, and therefore finding no refuge in contract law, the defendant also argues that his counseled confessions in March and April 2017 were involuntary as a matter of due process principles because the FBI Agents deceived him.  His promise-related arguments fail in this regard as well.  The defendant is an educated, experienced, sophisticated adult who chose to participate in five separate non-custodial interviews with the benefit of an attorney with experience in criminal and counterterrorism matters.  Therefore, the motion should be denied without a hearing.

### A.   Applicable Law

Due process principles require that statements by a defendant to law enforcement be "voluntary."  *E.g.*, *Dickerson* v. *United States*, 530 U.S. 428, 433 (2000).  The pertinent question is "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  *Id.* at 434 (quoting *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 223 (1973)).  In order to address that question, courts consider the "totality of the circumstances, including '1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police.'"  *United States* v. *Konn*, 634 F. App'x 818, 822 (2d Cir. 2015) (summary order) (quoting *Parsad* v. *Greiner*, 337 F.3d 175, 183 (2d Cir. 2003)).

"[A] violation of the constitutional guarantee occurs when one is 'compelled' by *governmental* coercion to bear witness against oneself in the criminal process."  *Duckworth* v. *Eagan*, 492 U.S. 195, 209 (1989) (emphasis added).  Thus, "'[c]oercive police activity is a necessary predicate to the finding that a confession is not voluntary.'"  *McMillon* v. *Culley*, 380 F. App'x 63, 67 n.3 (2d Cir. 2010) (summary order) (quoting *Colorado* v. *Connelly*, 479 U.S. 157,

167 (1986)); *accord United States* v. *Romero*, 897 F.2d 47, 52 (2d Cir. 1990). Finally, to "prevail

on a claim" that "trickery and deception" rendered a defendant's statements involuntary, he "'must

produce clear and convincing evidence that the . . . agents affirmatively misled [him] as to the true

nature of [their] investigation.'" *United States* v. *Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992)

(quoting *United States* v. *Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987)).

        "[I]n the absence of promises, threats, physical coercion or protracted interrogation,

certain statements made by the defendant in a non-custodial interview at the defendant's place of

business could not be considered involuntary." *United States* v. *Qayyum*, No. 97 Cr. 1000 (AGS),

1998 WL 159054, at *2 (S.D.N.Y. Apr. 1, 1998). "[C]ourts in the Second Circuit have found that

defendants waived their rights voluntarily in circumstances indicating far more physical pain and

mental confusion than was present" in this case. *United States* v. *Draconis*, No. 11 Cr. 1003

(DAB), 2012 WL 1267838, at *2 (S.D.N.Y. Apr. 11, 2012).

> Circumstances that support a finding of involuntariness may include the youth of
> the accused, his lack of education, or his low intelligence, the lack of any advice to
> the accused of his constitutional rights, the length of detention, the repeated and
> prolonged nature of the questioning, and the use of physical punishment such as
> deprivation of food or sleep.

*United States* v. *Guarno*, 819 F.2d 28, 29 (2d Cir. 1987); *see also Pagan* v. *Keane*, 984 F.2d 61,

63 (2d Cir. 1993) (statements voluntary notwithstanding that defendant was in "extremely critical"

condition during the interview, "had been given morphine less than three hours before his

interrogation," "was required to wear an oxygen mask (which he apparently took off to answer

questions)," and had "at least five tubes or catheters . . . connected to his body"); *United States* v.

*Khalil*, 214 F.3d 111, 121 (2d Cir. 2000) (statements voluntary notwithstanding that defendant

"was being prepared for life-saving surgery on his leg" during interview); *Campaneria* v. *Reid*,

891 F.2d 1014, 1020 (2d Cir. 1989) (statements voluntary notwithstanding that defendant "was suffering from a serious knife wound" and "in serious pain" during the interview, which occurred while defendant was "in the ICU with tubes running in and out of his body").

## B. Discussion

The defendant has not established that his statements to the FBI Agents during five separate counseled interviews between March 23 and April 26, 2017 were involuntary.

### 1. The Defendant Has Not Met His Burden of Establishing Deception by the FBI

The defendant's suppression argument is based on a theory of "trickery or deception," *i.e.*, that the "agents accomplished this manipulation by falsely promising" certain things. (Def. Suppression Mem. at 1). This theory fails because the defendant has not offered any evidence, much less "clear and convincing evidence," that he was in any way misled regarding the "true nature" of the investigation. *United States* v. *Mitchell*, 966 F.2d at 100.[9]

The defendant argues that he was deceived by the agents because he was promised that the interviews would "remain confidential" and that he "would not be prosecuted based upon the information that he provided to the agents." (Def. Suppression Mem. at 1). For the reasons already stated, the defendant seeks to stretch assurances of confidentiality well past their breaking point into an oral immunity agreement. *See* Part I.B.2, *supra*. Neither the facts nor the law support that position. *See Flemmi*, 225 F.3d at 88; *Rudaj*, 2005 WL 2508404, at *3; *see also United States* v. *Fisher*, 700 F.2d 780, 784-85 (2d Cir. 1983) (finding that promise by New York State Trooper

---

[9] The defendant concedes that this is the legal standard applicable to his "trickery and deception" claim, and that he "'must produce clear and convincing evidence'" to support it. (Def. Suppression Mem. at 3 (quoting *United States* v. *Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987)).

that the defendant's statements "would not be forwarded to federal authorities" did not preclude use of the statements in subsequent federal criminal prosecution); *United States* v. *Williams*, No. 02 Cr. 1372 (BSJ), 2004 WL 1637026, at *2 (S.D.N.Y. July 20, 2004) (reasoning that "[t]he defense has provided no authority for the proposition that if a defendant misunderstands the scope of a cooperation agreement that any statements he makes must be suppressed" and "such an argument would appear at odds with" *Colorado* v. *Connelly*, 479 U.S. 157 (1986)). Thus, the defendant's position regarding confidentiality assurances is as meritless with respect to due-process voluntariness as it is as a matter of contract law.

The defendant has offered nothing to suggest that the agents, as opposed to Denbeaux, assured him that he would not be prosecuted. *See* Part I.B.1, *supra*. In *United States* v. *Heatley*, then-District Judge Sotomayor described the facts presented in a manner strikingly similar to those adduced by the defendant in his motion. 994 F. Supp. 477, 483 (S.D.N.Y. 1998). The defendant "heard what he wanted to hear," rather than what the agents actually told him, and made a voluntary decision to confess "because he chose to focus, perhaps unwisely, on the possibility that cooperation . . . would pay off in some way to the exclusion of carefully considering whether he had received any promise that his confessions would not be used against him." *Id.* In this case, the defendant took a similar approach after analyzing the situation through the lenses of his education and experience, *see infra* Part II.B.2.a, upon consulting an experienced criminal attorney, *see infra* Part II.B.2.b, in the context of non-custodial interviews at his lawyer's office. The defendant's *post hoc* regrets about the outcome of the meetings do not establish that his statements were involuntary in light of actions by the FBI. Accordingly, the defendant's promise-related arguments are insufficient to establish that his statements were coerced by means of deceit.

Because there is insufficient evidence of an actual meeting of the minds between the defendant and the FBI Agents, *United States* v. *Haak*, 215 F. Supp. 3d 218 (W.D.N.Y. 2016)—the case upon which the defendant places almost exclusive reliance—is inapposite. (*See* Def. Suppression Mem. at 5). In *Haak*, the court found that "[t]here can be little doubt" that a detective "promised that in exchange for [the defendant's] cooperation, he would not be charged," and that the detective's message was "loud, clear, and unmistakable." 215 F. Supp. 3d at 228. The *Haak* court emphasized the following aspects of the interview:

> For example, Detective Zawierucha told [the defendant] that "I am not looking to mess with you" or even "to come after you but you gotta get on board or you, you shut your mouth and then the weight of the federal government is gonna come down on you." (emphasis added). What can that mean other than that the authorities will not "come after" [the defendant] if [the defendant] "gets on board"—that is, that [the defendant] will not be charged with a crime if he cooperates—but "the weight of the federal government" will come down on him if he does not?
>
> [The defendant's] choice was an easy one, Detective Zawierucha told him. He could "play for this team"—that is, cooperate with the government—or he could "be on the losing team." And if [the defendant] played on the government's team, he was told, "you're gonna save yourself a world of hurt."

*Id.* at 228-29. Unlike in *Haak*, the defendant relies principally on confidentiality assurances from the FBI Agents and comments from Denbeaux, the latter of which are irrelevant to the analysis because Denbeaux was not a state actor. As the defendant has not alleged that there was actually a promise from the FBI Agents that he would not be charged, much less a clear and unmistakable promise regarding that issue, *Haak* is not at all "instructive." (Def. Suppression Mem. at 5). To the contrary, it lends no support to his position.

The defendant also suggests that his statements were involuntary because the FBI Agents failed to advise him whether he was a "target" of the investigation. (*See* Denbeaux Decl. ¶ 2). This argument should be rejected. In his Declaration, Denbeaux concedes that the FBI told

him that the defendant was "well aware from his prior interviews what the nature of the FBI's interest was." (Denbeaux Decl. ¶ 2). The defendant's Declaration also confirms that, before he met with the FBI and confessed his crimes, he understood that the FBI believed he was a member of Hizballah as a result of interviews and encounters with "American law enforcement authorities" dating back to 2012. (Kourani Decl. ¶ 4). As a result of these interactions, the defendant told Denbeaux that the FBI had "accused" him of being a member of Hizballah (Kourani Decl. ¶ 11). The FBI's criminal investigative mission is well known, and surely Denbeaux's experience in "deal[ing] with the FBI and CIA agents" helped him to understand and advise the defendant, based on the defendant's admitted description of events, that the FBI was conducting a criminal counter-terrorism investigation relating to support of Hizballah by the defendant and others. (Kourani Decl. ¶ 11). Thus, the defendant cannot claim to have lacked sufficient information regarding his status in the investigation. *See United States* v. *Washington*, 431 U.S. at 189 ("[B]y the time he testified respondent knew better than anyone else of his potential defendant status."). He was well aware prior to the interviews that the FBI believed he had violated U.S. terrorism laws.

Moreover, the law does not require law enforcement to "disclose to a witness voluntarily speaking with them evidence that they may possess implicating the witness or their subjective view of the witness status as potential defendant." *United States* v. *Rizvi*, No. 91 Cr. 377 (JSM), 1992 WL 80771, at *2 (S.D.N.Y. Apr. 2, 1992); *see also United States* v. *Washington*, 431 U.S. 181, 189-90 & n.6 (1977) (rejecting argument that "it is fundamentally unfair to elicit incriminating testimony from a potential defendant without first informing him of his target

status").[10]  The Supreme Court has "'never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.'" *Colorado* v. *Spring*, 479 U.S. 564, 576-77 (1987) (quoting *Moran* v. *Burbine*, 475 U.S. 412 (1986)); *see also United States* v. *Bary*, 978 F. Supp. 2d 356, 366 n.55 (S.D.N.Y. 2013) (rejecting argument that defendant's "statements were coerced because his attorney had not been provided sufficient material to enable him to provide [defendant] meaningful assistance").  Thus, "a criminal defendant need not have perfect knowledge of all the circumstances and consequences of his waiver of Fifth Amendment rights in order for his confession to be voluntary." *United States* v. *Valdez*, 16 F.3d 1324, 1329 (2d Cir. 1994); *see also Oregon* v. *Elstad*, 470 U.S. 298, 317 (1985) ("[W]e have not held that the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the consequences flowing from the nature and the quality of the evidence in the case."); *California* v. *Beheler*, 463 U.S. 1121, 1125 n.3 (1983) (rejecting argument that "even though [defendant] voluntarily engaged in the interview with police, his participation was 'coerced' because he was unaware of the consequences of his participation").  The Declarations establish that the defendant understood the nature of the FBI's interest in him, him but even if he did not, the FBI Agents were not required to provide him with their subjective views about his investigative status.  Thus, the defendant's

---

[10] *Accord Okwumabua*, 828 F.2d at 953; *United States* v. *Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) ("[L]aw enforcement officials have legitimate reasons for protecting the secrecy of ongoing investigations and the identities of the targets of those investigations."); *United States* v. *Olivieri*, 740 F. Supp. 2d 423, 424 (S.D.N.Y. 2010) ("The law places no generalized duty on the Government to inform individuals who are being investigated, interviewed, or deposed that they are a target or subject of a criminal investigation."); *United States* v. *Sawinski*, No. 00 Cr. 499 (RPP), 2000 WL 1357491, at *6 (S.D.N.Y. Sept. 20, 2000) ("The government is also not required to provide information that might be useful to the defendant.").

confession cannot be deemed involuntary on this basis, and the defendant has failed to establish trickery or deception by the FBI Agents that would justify the suppression remedy he seeks.

## 2. The Totality of the Circumstances Demonstrates that the Defendant's Statements Were Voluntary

Taking the defendant's submissions at face value, the evidence he has proffered relating to his personal characteristics, the conditions of the interviews, and the conduct of the FBI Agents all support a finding that the defendant's statements were voluntary and should not be suppressed.

### a. The Defendant Is a Sophisticated Adult with Experience in the Criminal Justice System

The defendant's personal characteristics demonstrate that he was more than capable of making a voluntary decision to speak to FBI agents under the circumstances presented, and that he in fact did so—five separate times—during interviews on March 23, April 3, April 5, April 14, and April 26, 2017. "[T]here is no indication in this record that [the defendant] was a newcomer to the law, mentally deficient, or unable . . . to exercise a free choice." *United States* v. *Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (internal quotation marks omitted); *see also United States* v. *Konn*, 634 F. App'x 818, 822 (2d Cir. 2015) (summary order) (statements not involuntary where defendant was "an adult," had "a college degree," the interview conditions "were not harsh or confining," and "the officers' conduct was professional"). The defendant is an adult with a "degree in biomedical engineering and an M.B.A. degree." (Kourani Decl. ¶ 19). These are significant educational credentials reflecting a level of sophistication and analytical capability that set the defendant apart from most defendants who file such motions.

Second, far from being susceptible to manipulation by law enforcement, the defendant considers himself "highly qualified" to perform the job of the agents who interviewed him. (Kourani Decl. ¶ 19).[11]  In fact, notes seized from the defendant's apartment suggest that he was taking steps to "evaluate" his "interrogation" and considering whether it would be possible to help the FBI "extradite" a co-conspirator. (Bove Decl. ¶ 6 & Ex. E).  The defendant was also convicted of a crime in 2013 in connection with a prosecution that involved the use of his statements to law enforcement. *E.g.*, *United States* v. *Hall*, 724 F.2d 1055, 1059 (2d Cir. 1983) ("[T]here is force in the judge's observation that [defendant] knew his rights all along since he was not 'a newcomer to the law.'" (quoting *United States* v. *Watson*, 423 U.S. 411, 424-25 (1976))); *United States* v. *Heatley*, 994 F. Supp. at 483 (Sotomayor, J.) (reasoning that defendant "knew he was under no obligation to confess" based on prior "experience with the criminal justice system").  Specifically, in November 2013, the defendant was charged with multiple violations of New York law after a traffic stop in which he admitted to possessing counterfeit boots, and he subsequently pleaded guilty to a lesser-included offense. (Bove Decl. ¶ 2 & Ex. A).  The defendant's references to evaluating his interrogators and extradition proceedings, coupled with his prior experience in the criminal justice system, demonstrate that he operated with an above-average understanding of the legal system.

Third, the defendant's interactions with the FBI demonstrate that he was well aware of his right to remain silent.  He admits that he declined to answer questions from law enforcement

---

[11] The defendant's confidence in his qualifications for a job at the FBI is likely based less on his formal educational background and more on the counterintelligence and interrogation-tactics training that he described receiving from Hizballah. (*See* Bove Decl. Ex. C, Compl. ¶¶ 16, 26(a), 26(e)).

personnel "on about eight total occasions" since 2012, and that he "cut [his] relationship with the FBI" before 2017. (Kourani Decl. ¶¶ 4, 7). He also refused to answer some questions in the interviews he now challenges. *See United States* v. *Sawinski*, No. 00 Cr. 499 (RPP), 2000 WL 1357491, at *6 (S.D.N.Y. Sept. 20, 2000) ("Defendant refused to answer some questions during the course of the interview. . . . Those refusals are inconsistent with Defendant's claim that his waiver of his *Miranda* rights was a result of deception or trickery."). Denbeaux conceded as much in the April 3 Document, which contains Denbeaux's accurate assessment that the defendant declined to answer some of the FBI's questions during the March 23 meeting. (*See* Denbeaux Decl. Ex. B (noting that the defendant "wants the protection of a commitment from someone in authority . . . *before he provides all of his information*" and that the agents "want[] him to break down various 'walls'" that he erected with non-responsiveness during the first interview (emphasis added)). The defendant's long history of declining to answer Hizballah-related questions by law enforcement provides strong support for the conclusion that when he spoke during the challenged interviews in 2017, he did so voluntarily.

In arguing otherwise, the defendant claims that he was "worried about seeing his children again and his relatives' safety" prior to the challenged interviews, which resulted in "tremendous psychological pressure." (Def. Suppression Mem. at 1, 5). He does not argue that all of this alleged pressure was "caused by the FBI." (Def. Suppression Mem. at 5). The concession is a necessary one because the defendant concedes that he was nearly murdered by his Hizballah co-conspirators during a trip to Lebanon in the summer of 2016. (Kourani Decl. ¶ 8 ("These people shot bullets at my home and tried to abduct or kill me, I am not sure which.")). And it is hardly surprising, in light of these circumstances of the defendant's own making, that his

wife and children left Lebanon for Canada. (*See* Kourani Decl. ¶ 8). Dangers arising out of the defendant's years-long affiliation with a foreign terrorist organization are the sort of "self-generated pressure[s]" that "do[] not constitute 'compulsion' within the meaning of the Fifth Amendment." *Gray* v. *Meachum*, 101 F.3d 1394, 1996 WL 478665, at *2 (2d Cir. 1996) (unpublished opinion); *see also United States* v. *Bin Laden*, 132 F. Supp. 2d 198, 213 (S.D.N.Y. 2001) ("The 'compulsion' experienced by [defendant], if any, was the product of his own internal wishes and not of any coercive conduct on the part of U.S. personnel."). This is so because the voluntariness requirement does not protect against "moral and psychological pressures to confess emanating from sources other than official coercion." *Oregon* v. *Elstad*, 470 U.S. 298, 304-05 (1985); *see also Heatley*, 994 F. Supp. at 483 ("To begin with, the threat to [defendant's] safety (if any) stemmed from his alleged co-conspirators; government agents played no part in creating the danger."). The defendant alone is to blame for the genesis of his safety concerns and his separation from relatives, and those circumstances do not warrant suppression of his confession.

Finally, the defendant acknowledges that he decided to speak to the FBI Agents in 2017 on the theory that the agents "might help me, if I finally helped the FBI." (Kourani Decl. ¶ 10). This motivation is not a mitigating consideration. "Inculpatory statements are not involuntary when they result from a desire to cooperate, or from a defendant's ignorance of, or inattention to, his right to remain silent." *Mitchell*, 966 F.2d at 100. The record demonstrates that the defendant is an educated, experienced, and sophisticated international actor, who had received Hizballah training in interrogation tactics, and who spoke voluntarily when he met with FBI agents in the presence of Denbeaux during each of the five challenged interviews. Accordingly, the defendant's personal characteristics do not support his motion.

### b. The Conditions of the Interviews Support a Finding of Voluntariness

The conditions under which the interviews were conducted further support a finding of voluntariness. By early 2017, the defendant made a conscious decision without prompting from the FBI to provide information to the FBI Agents in an effort to obtain immigration and other benefits for himself and his family. (Kourani Decl. ¶ 10). He did not go to the FBI directly. Rather, based on advice from a "trusted" associate, he first secured Denbeaux's assistance. (Kourani Decl. ¶ 11). Prior to the interviews, based on initial consultations with his new attorney, the defendant concluded that Denbeaux "knew how to deal with the FBI and CIA agents." (Kourani Decl. ¶ 11). Denbeaux's professional history provided a more-than-adequate basis for the defendant's conclusion. Denbeaux is not only an attorney, but also a law professor who has "taught courses in constitutional law, criminal law and evidence." (Denbeaux Decl. ¶ 1). Denbeaux is also experienced in counter-terrorism matters such as this one. He is "the Director of the Seton Hall Law School Center for Policy and Research, which is best known for its dissemination of the internationally recognized series of reports on the Guantanamo Bay Detention Camp." (Denbeaux Decl. ¶ 1).

Having secured representation from an experienced attorney and law professor, the defendant caused Denbeaux to contact the FBI on his behalf. (Denbeaux Decl. ¶ 2). After a series of calls and emails between Denbeaux and the agents, the defendant participated in the first interview on March 23, 2017. (Denbeaux Decl. ¶ 3). Denbeaux was present during all five of the challenged interviews.[12] Neither the defendant nor Denbeaux has suggested that they obtained a

_____

[12] During the April 3, 2017 meeting, the defendant asked to speak to one of the FBI agents alone, outside of Denbeaux's presence, for the majority of the interview. The agents granted the request,

written agreement from the FBI to govern any of the meetings or memorialize the protections and limitations they purport to have obtained. For the reasons already stated, the April 3 Document contained a series of unilateral demands and assertions by Denbeaux, which were never accepted by the agents or any personnel with authority to act on behalf of the Government. *See* Part I.B.1, *supra*. The absence of a written agreement is particularly telling in light of the defendant's claim that, prior to when the defendant "cut" his "relationship with the FBI" in approximately 2016, agents "showed me a legal document . . . that they offered to me so I could be an informant." (Denbeaux Decl. ¶ 6). Thus, by his own admission, the defendant was aware of the possibility of negotiating and obtaining a written agreement to provide the protections or limitations he purports to have obtained. Undoubtedly, so too was Denbeaux. But they both elected to participate in each of the five meetings—often with days between interviews to re-evaluate the situation as it developed—in the absence of such an agreement.

All of the meetings were held at Denbeaux's "office at Seton Hall Law School in New Jersey" instead of an FBI facility. (Denbeaux Decl. ¶ 3). The defendant concedes that the interviews were "non-custodial." (*E.g.*, Def. Suppression Mem at 1). He was therefore not entitled to *Miranda* warnings, and he had no constitutional right to have counsel present. *United States* v. *Okwumabua*, 828 F.2d at 953 n.1; *see also United States* v. *Bing Yi Chen*, 433 F. App'x 14, 15 (2d Cir. 2011) (summary order) ("The Sixth Amendment right to counsel attaches upon indictment; it does not arise at the time of arrest upon a warrant following the filing of a complaint"). Though Denbeaux's presence was not mandated by law, his assistance to the defendant during and outside

_____

but Denbeaux and the second agent remained nearby the interview room through the duration of the meeting.

of the interviews is an extremely significant consideration in assessing whether the interviews were consistent with the Constitution. *See United States* v. *Perry*, No. 96 Cr. 1053 (RPP), 1997 WL 642554, at *6 (S.D.N.Y. Oct. 17, 1997) (finding proffer statements made voluntarily where defendant "was not in custody during her meetings with the government," "was, at all times, represented by counsel," and "[t]here is no evidence that at any time an actual promise of non-prosecution was made to her"). In *Miranda* v. *Arizona*, for example, the Supreme Court noted that:

> The presence of counsel, in all the cases before us today, would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege (against compelled self-incrimination). His presence would insure that statements made in the government-established atmosphere are not the product of compulsion.

384 U.S. 436, 466 (1966)); *see also Brady* v. *United States*, 397 U.S. 742, 754 (1970) (rejecting argument that the "possibly coercive impact of a promise of leniency could not be dissipated by the presence and advice of counsel"). Thus, Denbeaux's presence and the non-custodial setting of the interviews strongly support the conclusion that the defendant's statements were voluntary.

In sum, the pertinent circumstances surrounding the challenged interviews are as follows: (i) the defendant initiated the meetings in 2017, without prompting by the FBI, after having previously "cut" his "relationship with the FBI agents" in 2016; (ii) the defendant did so only after engaging Denbeaux, a criminal attorney with experience in counterterrorism matters; (iii) Denbeaux communicated with the agents on behalf of the defendant to set up the meetings, and was present at or in the vicinity of all the interviews; (iv) each interview was conducted in a non-custodial setting at Denbeaux's office; and (v) there were long breaks between each of the five meetings, which often lasted multiple days and provided the defendant and Denbeaux with

time to evaluate the prior meeting and make an informed, voluntary decision about whether to participate in the next one. These circumstances, coupled with the defendant's personal characteristics, are undisputed and demonstrate that the defendant's motion to suppress should be denied.

### c. The Agents Conducted the Interviews in a Professional Manner

The conduct of the FBI Agents was beyond reproach during these interviews and lends no support to the defendant's position. The agents' discussion of confidentiality and potential immigration benefits for certain of the defendant's family members, which were never guaranteed, was standard in the context of the relationship with law enforcement that the defendant sought to initiate. In discussing some of the steps that could potentially be taken in response to the defendant's requests (*see* Kourani Decl. ¶¶ 10, 16), the agents

> were doing two things: first, informing [the defendant] of one of the possible benefits of cooperation (*i.e.*, getting off the street and out of danger), and second, allaying any possible fear that if [the defendant] should choose to become a cooperator, his family would be subject to recriminations from his alleged co-conspirators. . . . [T]here is nothing improper in spelling out for a suspect the benefits that could flow from his cooperation.

*Heatley*, 994 F. Supp. at 483. There is no allegation that the agents "suggested that [they or] the police would refuse to protect him and his family if he did not confess." *Id.*; *see also United States* v. *Beckett*, No. 04 Cr. 158 (WHP), 2004 WL 2849171, at *4 (S.D.N.Y. Dec. 13, 2004) ("Discussing the potential benefits of cooperating with law enforcement is a far cry from circumstances which have been held to be inherently coercive."). Therefore, the defendant has not shown that the agents' discussion of potential benefits during the interviews turned an otherwise-voluntary situation into a coercive one.

The defendant presents a host of additional arguments about consequences of "[t]he FBI's actions," including flight delays, loss of employment, "harm[]" to his "reputation," and separation from his wife and children. (Def. Suppression Mem. at 5; Kourani Decl. ¶¶ 4, 9, 10, 18). The "actions" mischaracterized by the defendant are standard law enforcement practices, such as witness interviews. (*See, e.g.*, Kourani Decl. ¶ 7). Those steps were undertaken in a prudent and reasonable fashion—months, at least, before the challenged interviews—in connection with the FBI's ongoing criminal counterterrorism investigation of activities conducted by Hizballah (including on U.S. soil) and efforts to protect the public. Thus, "there is no indication of out-of-the-ordinary conduct on the part of the law enforcement officials that amounted to coercion." *United States* v. *Johnson*, 131 F.3d 132, 1997 WL 792443, at *2 (2d Cir. 1997) (unpublished opinion). The defendant also refers to benefits he was offered by the FBI, including use of a "special phone," cash payments, immigration benefits, as well as "threat[s]" he claims agents made relating to his "children's health insurance," employment, and apartment. (Kourani Decl. ¶¶ 5-6). But "[t]ruthfully pointing out a potential collateral consequence of criminal behavior does not constitute unlawful coercion," and "[t]he Fifth Amendment does not bar police from applying moral suasion to extract confessions." *United States* v. *DeJesus*, No. 04 Cr. 533 (LTS), 2015 WL 996413, at *5 (S.D.N.Y. Mar. 6, 2015). Perhaps more importantly, each of these alleged offers and threats is alleged by the defendant to have occurred *before* he "cut" his "relationship with the FBI agents" in 2016. (Kourani Decl. ¶ 7). Thus, these actions by the FBI, assuming they took place, are far too attenuated from the challenged interviews to support a finding of coercion.

The defendant also asserts that the FBI "knew that his family members' lives were in danger in Lebanon." (Def. Suppression Mem. at 5). He provides no authority for the suggestion

that agents' alleged knowledge of his personal situation rendered subsequent questioning unduly coercive. "[O]ne's mental state does not become part of the calculus for the suppression of evidence unless there is an allegation that agents of the United States engaged in some type of coercion." *United States* v. *Salameh*, 152 F.3d 88, 117 (2d Cir. 1998). Nor can the defendant reasonably claim that the agents used any such knowledge against him unfairly during the interviews he challenges. The FBI Agents did not seek to rely on or leverage fears harbored by the defendant arising from the events he describes, and the defendant has not suggested that the agents even sought to interview him after 2016. Rather, it was the defendant who re-initiated contact, through counsel, in February 2017. The agents cannot be faulted for accepting the invitation, and the defendant's allegations are insufficient to demonstrate that their behavior warrants suppression of his confession over the course of five interviews.

### 3. Challenges to Denbeaux's Performance Are Not a Basis for Relief

With the benefit of hindsight, current defense counsel criticizes Denbeaux's performance at times in support of the defendant's motions, suggesting, for example, that the April 3 Document was "very poorly written" and "badly worded." (Def. Dismissal Mem. at 2). Because the defendant had no right to counsel at all, he cannot obtain relief based on the argument that "he was deprived of his Sixth Amendment right to *effective counsel*." *United States* v. *You Hong Chen*, 104 F. Supp. 2d 329, 331 (S.D.N.Y. 2000) (emphasis added) (citing *Claudio* v. *Scully*, 982 F.2d 798, 802 (2d Cir. 1992)); *see also Wainwright* v. *Torna*, 455 U.S. 586, 587-88 (1982) ("Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely."). Nor can the defendant "cloak[] a Sixth Amendment ineffective assistance of counsel claim in Fifth

Amendment dress." *Id.* at 334; *see also United States* v. *Williams*, No. 02 Cr. 1372 (BSJ), 2004 WL 1637026, at *2 (S.D.N.Y. July 20, 2004) ("[R]egardless whether an ambiguous statement by [defendant's] attorney may have reinforced that misunderstanding, [defendant's] statements were clearly 'voluntary'—that is, not the subject of police coercion or deception-and will therefore not be suppressed"); *Claudio* v. *Scully*, 791 F. Supp. 985 (E.D.N.Y. 1992), *rev'd on other grounds*, 982 F.2d 798. In *You Hong Chen*, the defendant argued that "his attorney's inadequate representation of him" during an interview "prevented him from making a knowing and intelligent waiver of his right to remain silent." 104 F. Supp. 2d at 331. Although the defendant in *You Hong Chen* was provided *Miranda* warnings, then-District Judge Chin's reasoning applies forcefully under the circumstances presented by this case. Specifically, "[i]f defendant's argument were accepted, law enforcement agents would be put in the uncertain and untenable situation of having to evaluate a suspect's attorney's performance before interrogating that suspect." *Id.* at 333. Indeed, the aim of the exclusionary rule is to deter violations of the Constitution, and where, as here, law enforcement agents act lawfully and without coercion, "suppression of the statements would not serve to deter violations in the future." *Id.* at 334. The defendant was not entitled to counsel at his meetings with the agents and his criticism of Denbeaux's performance does not entitle him to the relief he seeks. Instead, at bottom, Denbeaux's participation in the case only underscores that the defendant's statements to the FBI were voluntary.

### 4. The Defendant's Motion Should Be Denied Without a Hearing

The facts set forth in the defense Declarations appended to the defendant's motions preclude a finding that the defendant's statements to the FBI in 2017 were involuntary. Thus, the defendant's motion to suppress should be denied without a hearing.

"A defendant must satisfy his initial burden to allege sufficient facts which, if proven, would require granting the motion." *United States* v. *Calvente*, No. 12 Cr. 732, (WPP), 2013 WL 4038952, at *2 (S.D.N.Y. July 26, 2013); *see also United States* v. *Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969) (reasoning that courts are "not required as a matter of law to hold an evidentiary hearing if [defendant's] papers did not state sufficient facts which, if proven, would have required the granting of the relief requested"); *United States* v. *Johnson-Guzman*, No. 98 Cr. 350 (RWS), 1998 WL 730327, at *6 (S.D.N.Y. Oct. 16, 1998) ("The defendant must show that disputed issues of material fact exist before an evidentiary hearing is required." (internal quotation marks omitted)).

In *United States* v. *Qayyum*, the court denied a motion to suppress statements without a hearing where the defendant claimed that:

> (1) he was not permitted to have an attorney at the interviews (though he does not allege that he ever requested one); (2) he did not have the services of a translator; (3) he was "scared and confused"; and (4) he was not advised of the possible consequences of the interview.

No. 97 Cr. 1000 (AGS), 1998 WL 159056, at *2 (S.D.N.Y. Apr. 1, 1998). The undisputed facts here support the same result with even greater force. As in *Qayyum*, the defendant alleges that he was "scared." Here, however, Denbeaux was present during the interviews, the defendant had an opportunity to consult Denbeaux regarding potential consequences before, during, and after the interviews, and no translator was requested because the defendant speaks English. Thus, as in

*Qayyum*, because the Declarations submitted by the defendant do not allege sufficient facts which, if proven, would require granting the motion, the motion should be denied without a hearing.[13]

## III.  The Defendant Is Not Entitled to a Bill of Particulars

The defendant seeks a Bill of Particulars specifying:  (i) "what evidence will be used against him to prove his alleged role in the conspiracy"; (ii) "those specific statements or events that establish the details of any material support for a foreign terrorist organization that Mr. Kourani allegedly provided"; and (iii) "information detailing the facts underlying the charge that he supported [Hizballah] with goods, funds or services."  In light of the Government's pretrial disclosures, he is not entitled to any of this relief.

### A.  Relevant Facts

The defendant was arrested based on the charges in a 21-page Complaint, which contains a detailed description of the case and the evidence against him.  (*See* Bove Decl. Ex. C). During discovery to date, the Government has produced nine judicial applications relating to various investigative techniques used during the investigation, such as search warrants, that also include narrative descriptions of the evidence and additional information not set forth in the Complaint.  (*E.g.*, Bove Decl. Exs. D, F, G).  The Government also produced more than 30 reports

---

[13] By putting his communications with Denbeaux at issue, the defendant has waived any applicable attorney-client privilege. *See Graziose* v. *United States*, No. 03 Civ. -8109 (RWS), 2004 WL 102699, at *1 (S.D.N.Y. Jan. 21, 2004) ("The attorney-client privilege cannot be used as both 'a shield and a sword.'  The privilege 'may implicitly be waived when a defendant asserts a claim that in fairness requires examination of protected communications.'" (quoting *United States* v. *Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991))).  Should the Court order a hearing on the defendant's motions, the Government will seek an order directing:  (i) Denbeaux to turn over documents and communications with and regarding the defendant and testify at the hearing; and (ii) the defendant to submit a certification of his informed consent to such testimony, document production, and the related waiver of the attorney-client privilege.

prepared by FBI personnel relating to the investigation, some of which do not describe statements by the defendant and are therefore beyond the scope of Rule 16. Thus, the Government has exceeded its discovery obligations and provided the defendant with more than enough information to avoid unfair surprise at trial.

### B. Applicable Law

"Rule 7(f) of the Federal Rules of Criminal Procedure provides that a court may direct the Government to file a bill of particulars." *United States* v. *Wedd*, No. 15 Cr. 616, 2016 WL 1055737, at *3 (S.D.N.Y. Mar. 10, 2016) (citing Fed. R. Crim. P. 7(f)). A bill of particulars is "required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *Id.* (quoting *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)). This is so because "[t]he purpose of the bill of particulars is to avoid prejudicial surprise at trial and give [a] defendant sufficient information to meet the charges against him." *Id.* Thus, "a 'bill of particulars is not a discovery device and should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.'" *United States* v. *Yun Lee*, No. 13 Cr. 290, 2013 WL 4889178, at *1 (S.D.N.Y. Sept. 9, 2013) (quoting *United States* v. *Miller*, No. 12 Cr. 368, 2012 WL 4791992, at *4 (S.D.N.Y. Oct. 9, 2012)). "Nor is the proper scope and function of a bill of particulars to obtain disclosure of evidence or witnesses to be offered by the government at trial." *United States* v. *Dames*, 380 F. Supp. 2d 270, 274 (S.D.N.Y. 2005).

Ordering bills of particulars only insofar as necessary to facilitate *reasonable* defense preparation and to avoid *unfair* surprise at trial makes sense. The Government has a legitimate and weighty interest in avoiding the types of safety risks that can arise from making

disclosures beyond those required by Rule 16, *Giglio*, and *Brady*. *See United States* v. *Gotti*, No. 02 Cr. 743, 2004 WL 32858, at *9 (S.D.N.Y. Jan. 6, 2004) (denying disclosure of the identities of co-conspirators, witnesses and victims because the "Government has a legitimate concern about the safety of those individuals it intends to call at trial"). Detailed inquiries into the Government's evidence pursuant to Rule 7(f)—long in advance of trial—unduly restrict the Government in presenting additional proof and argument to the jury based on resources devoted to trial preparation and the ongoing investigation in the time before the trial. *See, e.g.*, *United States* v. *Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993). Finally, "[t]he danger of defendants tailoring their testimony to explain away the Government's case, which has been disclosed in advance, is not unreal." *United States* v. *Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962).

### C. Discussion

"The prosecution need not particularize all of its evidence." *United States* v. *Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). "Nor will a defendant be permitted to use a request for a bill of particulars to compel the government to disclose the manner in which it will prove the charges or preview the government's evidence or legal theory." *United States* v. *Guerrero*, 669 F. Supp. 2d 417, 426 (S.D.N.Y. 2009). "Simply put, a defendant may not employ a bill of particulars as a general investigative tool." *Id.* Because that is precisely what the defendant is seeking to do, and he clearly has sufficient information relating to the nature of the charges against them, his motion should be denied.

The defendant's first request, for further information relating to "his alleged role in the conspiracy," should be denied. "[I]n this circuit, demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring

are routinely denied." *United States* v. *Santana*, No. 13 Cr. 147, 2015 WL 5781413, at *2 (S.D.N.Y. Oct. 1, 2015) (internal quotation marks omitted). Indeed, "[i]n the context of prosecutions of narcotics conspiracies, courts have consistently refused to grant a bill of particulars requesting the following kinds of information: (1) when the conspiracy was formed; (2) when the defendant joined the conspiracy; and (3) how the Government alleges the defendant performed acts in furtherance of the conspiracy." *United States* v. *Santiago*, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001).[14] In light of the extent of the Government's pretrial disclosures, there is no need to depart from the weight of the authority by granting this aspect of the defendant's requests.

The defendant's second and third requests, for "details of any material support" and "the facts underlying the charge that he supported [Hizballah] with goods, funds or services," are similarly flawed. "Acquisition of evidentiary detail is not the function of the bill of particulars." *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (internal quotation marks omitted). "Accordingly, Courts in this District have routinely denied requests for bills of particulars concerning the 'wheres, whens, and with whoms' of the crime." *United States* v. *Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *19 (S.D.N.Y. Jan. 18, 2017) (internal quotation marks omitted). The Complaint and search warrant affidavits produced in discovery provide the defendant with more than enough information regarding these issues, and the defendant has not provided any specific justification for these requests. *See, e.g.*, *United States* v. *Lobo*, No. 15 Cr. 174 (LGS),

---

[14] *Accord United States* v. *Carroll*, 510 F.2d 507, 509 (2d Cir. 1975) ("There is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge."); *United States* v. *Guerrero*, 669 F. Supp. 2d at 426 ("'[D]emands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied.'" (quoting *United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001))).

2017 WL 1102660, at *2 (S.D.N.Y. Mar. 22, 2017) ("Given the Superseding Indictment and the Government's disclosures, Defendants have not justified the need for the broad-ranging demands in their respective motions."). Therefore, his second and third requests should be denied.

## IV. The Defendant Is Not Entitled to the Identities of Informants

The defendant also seeks an order directing the Government to disclose "the identity and whereabouts" of informants who participated in the case. (Def. Particulars Mem. at 2).

### A. Applicable Law

The "general and well-established rule is that the Government enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'" *United States* v. *Shamsideen*, No. 03 Cr. 1313, 2004 WL 1179305, at *11 (S.D.N.Y. Mar. 31, 2004) (quoting *Roviaro* v. *United States*, 353 U.S. 53, 59 (1957) and *United States* v. *Jackson*, 345 F.3d 59, 69 (2d Cir. 2003)). To overcome this qualified privilege against disclosure—often referred to as the informant's privilege—"[t]he defendant bears the burden of showing the need for a disclosure of an informant's identity, and to do so must establish that, absent such disclosure, he will be deprived of his right to a fair trial." *United States* v. *Fields*, 113 F.3d 313, 324 (2d Cir. 1997) (internal citation omitted). Overcoming the informant's privilege requires the defendant to do more than simply show that the informant was a witness to the crime charged. *See United States* v. *Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (citing *United States* v. *Jimenez*, 789 F.2d 167, 170 (2d Cir. 1986)); *United States* v. *Castro*, No. 94 Cr. 809, 1995 WL 6235, *2 (S.D.N.Y. Jan. 6, 1995). Nor can a defendant meet his burden by speculating about the Government's case, or the informant's role therein. *See United States* v.

*Fields*, 113 F.3d at 324 ("Speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden . . . ."). Instead, the defendant must make a specific showing that "the disclosure of an informant's identity . . . is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause." *United States* v. *Saa*, 859 F.2d at 1073 (internal quotation marks omitted) (holding that defendant had made requisite showing where NYPD officers gave conflicting testimony regarding defendant's whereabouts during drug transaction, and informant could have provided additional information on defendant's location during transaction). Since *Saa*, the Second Circuit has found disclosure at trial of the identity of informants, or the Government's production at trial of the informants for testimony, sufficient to permit a defendant to conduct a meaningful defense. *See DiBlasio* v. *Keane*, 932 F.2d 1038, 1043 (2d Cir. 1991) (permitting Government to physically produce informant for testimony to address defendant's need to obtain informant's identity).

## B.  Discussion

Neither Rule 16 nor the Jencks Act requires the Government to produce statements or reports by any of its witnesses before trial. *See* Fed. R. Crim. P. 16(a)(2) ("Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500."). Nevertheless, in addition to the extensive disclosures in the Complaint and search warrant affidavits, the Government exceeded its discovery obligations by producing reports relating to the FBI's interactions with Denbeaux. In addition, the Government will complete its disclosures pursuant to the Jencks Act and *Giglio* at least 10 days prior to the as-of-yet unscheduled trial, and make disclosures pursuant to Rule 404(b) and 702 prior to trial pursuant to a schedule set by the Court. *See United States* v. *Trippe*, 171 F. Supp. 2d

230, 238 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense . . . at least one day before the Government witness is called to testify."); *United States* v. *Muyet*, 945 F. Supp. 586, 602 n.16 (S.D.N.Y. 1996) (reasoning that calling informants to testify at trial, coupled with production of impeachment material one week prior to testimony of each witness, allowed "defendants to conduct a meaningful defense). In connection with those disclosures, the Government intends to make any informant that is expected to testify available to defense counsel ten days prior to trial, either in person or by providing the informant's contact information.[15] *See United States* v. *Campo Flores*, No. 15 Cr. 765 (PAC), 2016 WL 5946472, at *12 (S.D.N.Y. Oct. 12, 2016) (reasoning that similar informant-related disclosures ten days prior to trial "is sufficient for defense counsel to prepare"). Nothing more is required.

This is particularly true in light of the fact that the defendant has not provided any specific reason to justify his request for disclosures relating to informants. *United States* v. *Lobo*, 2017 WL 1102660, at *2 ("The assertion that these confidential informants participated in critical events and may be key witnesses, without further explanation, is insufficient to overcome the privilege at this stage. . . . This is especially true where, as here, the Government has stated that it will complete its disclosures pursuant to the Jencks Act and *Giglio* at least 10 days prior to the trial date."). "[M]ere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure." *United States* v. *Santoro*, No. 03 Cr. 484, 2004 WL 2346621, at *3 (S.D.N.Y. Oct. 19, 2004); *see also United States* v. *Campagna*, No. 16 Cr. 78

---

[15] The Government reserves the right to move *in limine* for the imposition of protective measures with respect to any informant who is expected to be called as a witness.

(LGS), 2016 WL 4367992, at \*6 (S.D.N.Y. Aug. 11, 2016) (denying motion for disclosure of informant identities because defendant "speculated that disclosure will be helpful to his defense, but has not met the burden required by law); *United States* v. *Belin*, No. 99 Cr. 214, 2000 WL 679138, at \*10 (S.D.N.Y. May 24, 2000) (rejecting argument that "in order to properly prepare a defense in this matter, it is important that the defense be aware of all information related to the informants' credibility and background" as "insufficient to show how confidential informants' potential testimony would be relevant to the defense, or even, what the defense would be"). Indeed, the defendant offers little more explanation from his request other than that "[t]he informants . . . may be percipient witnesses."  (Def. Particulars Mem. at 2).  This is not a compelling or sufficient basis to require the disclosures the defendant seeks.  This is especially true in the context of a terrorism trial involving a highly trained operative of a sophisticated international terrorist organization, where releasing informants' information would likely raise substantial safety concerns for the informants, their families, and associates, and could potentially compromise ongoing investigations.  Therefore, the defendant's motion should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the defendant's pretrial motions should be denied without a hearing.

Dated: New York, New York
January 29, 2018

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By:     /s/
                          Emil J. Bove III
                          Amanda L. Houle
                          Assistant United States Attorneys

Cc:     Defense Counsel
          (Via ECF)