UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA

       v.                              17 CR 417 (AKH)

ALI KOURANI,
                           Conference

              Defendant.

------------------------------x

                              New York, N.Y.
                              March 9, 2018
                              11:10 a.m.

Before:

      HON. ALVIN K. HELLERSTEIN

                              District Judge

      APPEARANCES

GEOFFREY S. BERMAN
     Interim United States Attorney for the
     Southern District of New York
AMANDA L. HOULE
EMIL J. BOVE III
     Assistant United States Attorneys

ALEXEI SCHACHT
     Attorney for Defendant

1          (Case called)

2          MS. HOULE:  Good morning, your Honor.  Amanda Houle

3   and Emil Bove for the government.

4          MR. SCHACHT:  Alexei Schacht for Mr. Kourani.

5          THE COURT:  Good morning.  I called this conference

6   because I was becoming confused about what was going on.  I

7   scheduled an evidentiary hearing for March 26th.  The

8   government has made a motion for me to recognize a waiver of

9   privilege.  It caused me to read the papers rather intensively.

10         I don't think we are involved with a privilege unless

11  Mr. Kourani is going to testify that he spoke to the government

12  on advice of counsel.  It is not clear from the declarations if

13  that is the case.  If he spoke to counsel and counsel told him

14  what the government said, repeated it, then I don't think there

15  was any privilege involved.  The lawyer may not be competent to

16  testify because that would be hearsay.  If I let it in, it

17  would be just for whatever purpose it had.

18         If it's advice of counsel, namely, that a conversation

19  was recounted and upon this conversation in the lawyer's

20  professional judgment there was an immunity conferred, then I

21  have to consider this in a different light.  But I don't think

22  we are there.  I don't think that is the issue.  The only way I

23  could find out was to call this conference and to ask you, Mr.

24  Schacht.

25         MR. SCHACHT:  Your Honor, I think it does get into a

1    partial issue of attorney-client privilege inasmuch as my

2    client is going to testify, and also I hope to have the prior

3    lawyer testify as to conversations that that lawyer had with

4    the FBI not in my client's presence.

5            THE COURT:  Those are not part of the privilege.

6            MR. SCHACHT:  I'm just explaining to you what the

7    proposed testimony is, and then your Honor can decide.  That

8    lawyer is going to testify as to what he says he spoke to the

9    FBI about and what he told Mr. Kourani.  My client is then

10   going to say, my lawyer told me this was my arrangement with

11   the FBI, essentially.

12           THE COURT:  Counsel, that is not professional advice.

13   That is only retelling what the government's lawyers and

14   investigators said.

15           MR. SCHACHT:  All right.

16           THE COURT:  I'm not even sure it's competent

17   testimony.  It seems to me it is hearsay.  The government

18   agents will be here to testify, Mr. Kourani can testify, the

19   lawyer can testify.

20           MR. SCHACHT:  My argument that my client's statements

21   were not voluntary is based upon information that my client

22   heard personally from the FBI agents and also based upon what

23   his lawyer told him his conversations were with the agents.  I

24   don't think that is hearsay.

25           THE COURT:  The lawyer can testify about the

1    conversations he had with the agents.  He has indeed testified

2    by his declaration.

3          Let me ask you another question, Mr. Schacht.  Let's

4    say Mr. Kourani and his lawyer had a deep conversation, the

5    lawyer gave professional advice that Mr. Kourani can't be

6    prosecuted, and it turns out that that advice was wrong.  Does

7    Mr. Kourani have a remedy other than against his lawyer?

8          MR. SCHACHT:  He certainly has, I think, under those

9    circumstances a valid claim of ineffective assistance of

10   counsel.

11         THE COURT:  Can it come up at a 2255?

12         MR. SCHACHT:  I don't think that issue is ripe right

13   now, and the case law in that area for a defendant who is not

14   in custody is not as favorable as I would like it to be.

15         THE COURT:  If he is going to testify on the basis of

16   advice of counsel, then I'm going to draft a motion that the

17   government wants and require a turnover of all your papers

18   relating to those proffer sessions -- interviews.  They are not

19   proffer sessions, they are interviews.

20         But I question whether I will allow the testimony in

21   the first instance.  It would be hearsay.  What the lawyer and

22   the government said to each other is competent testimony.  What

23   the defendant said to and heard from the government is

24   competent testimony.  But what the lawyer said to Mr. Kourani

25   is not proper testimony until the 2255 proceeding.

1          MR. SCHACHT:  Your Honor, my motion is not based upon

2   ineffective assistance of counsel.  I'm not alleging that.  I'm

3   not alleging that the prior lawyer --

4          THE COURT:  You are alleging that there was immunity

5   conferred based on --

6          MR. SCHACHT:  I am alleging that the government made

7   actual promises that induced my client to speak and the

8   government did not fulfill those promises.

9          THE COURT:  Hearing that, Ms. Houle, I rule that the

10  government is not entitled to a production of papers by the

11  counsel, that there is no legal advice that is involved here,

12  and it wouldn't be relevant anyhow.  Therefore, there is no

13  need to invade the attorney-client privilege.

14         MS. HOULE:  May I have a moment, your Honor?

15         THE COURT:  Sure.

16         MS. HOULE:  Your Honor, we had understood that the

17  statements that either Mr. Kourani or Mr. Denbeaux were going

18  to testify to related to Mr. Denbeaux's advice to Mr. Kourani

19  as to these 2017 meetings with the FBI, which is why we took

20  the view that they fall within the scope of the attorney-

21  client privilege.  I am not quite following Mr. Schacht's

22  argument now that they don't fall within the privilege.

23         THE COURT:  They are not advice.  They are a retelling

24  of what he claims to have heard from the FBI agents.  That is

25  not advice.  If it turns out from the testimony something

1   different, I will reconsider and rule.  But right now we don't

2   have any advice, so I'm not going to allow it.

3           MS. HOULE:  I think what Mr. Schacht has proffered is

4   that those statements were made in connection with Mr.

5   Denbeaux's advice to Mr. Kourani about whether to proceed with

6   the 2017 meetings with the FBI.

7           THE COURT:  I don't think so.

8           MS. HOULE:  Is it your Honor's finding that

9   discussions between Mr. Kourani and Mr. Denbeaux regarding what

10  the FBI said to Mr. Denbeaux are not relevant for the hearing?

11          THE COURT:  They are hearsay.  I will allow the

12  hearsay testimony to come in for what it is worth because I

13  might as well create the record for the Court of Appeals, but I

14  don't think I'm going to give you necessarily the invasion of

15  the privilege.

16          What you do have is something else.  Mr. Denbeaux is

17  going to testify about what he heard from the government.  He

18  has the memorandum created by the government.  Why shouldn't

19  you have the memorandum created by Mr. Denbeaux?

20          MS. HOULE:  Why should we or why shouldn't we?

21          THE COURT:  Why shouldn't you?  Why should you not?

22          MS. HOULE:  We agree.  We believe we should have those

23  memoranda.

24          THE COURT:  Mr. Schacht?

25          MR. SCHACHT:  I'm not sure what memoranda you're

1  talking about.

2          THE COURT:  Any notes that were prepared by Mr.

3  Denbeaux based on his conversations with the government.

4          MR. SCHACHT:  I can save us a lot of time.  I met with

5  Mr. Denbeaux in person about a week ago.  He told me that he

6  has no notes or memoranda other than the approximately one-page

7  document that is attached to my motion, which everyone already

8  has.

9          THE COURT:  I need a representation from Mr. Denbeaux

10  to that effect.  I can get it by letter.  That would end the

11  inquiry.  He is a member of the bar of this court?

12          MR. SCHACHT:  Yes.  Well, he is a member of the New

13  York bar.  I'm not a hundred percent certain, but I assume he

14  is a member of the bar of this court.

15          THE COURT:  Let him make a declaration.

16          MR. SCHACHT:  Could I have a week to get that?

17          THE COURT:  Sure.  Any time before the 26th.

18          MR. SCHACHT:  Also, he could be asked about that under

19  oath.  I'll get a declaration within a week.

20          THE COURT:  What I don't want is to find out is that

21  there was a memorandum created that has not been produced.

22          MR. SCHACHT:  I understand.  I promise I'll get that

23  for everyone within a week.

24          THE COURT:  To that extent the motion is granted but

25  denied.  To sum up, the motion to invade the attorney-client

1    privilege is denied.  The motion to obtain such documents as

2    the witness prepared to reflect conversations the witness

3    had --

4           It is not polite to have a conversation what I'm

5    talking.

6           MS. HOULE:  I'm sorry, your Honor.

7           THE COURT:  You should know better.

8           MR. BOVE:  I apologize.

9           THE COURT:  Do you know what I said?

10          MR. BOVE:  Your Honor was reiterating the ruling that

11   you made, Judge, regarding the pending motion.

12          THE COURT:  Since you knew it perfectly, you didn't

13   need to pay attention?

14          MR. BOVE:  That's not true, Judge.  I apologize.

15          THE COURT:  Let me ask this of you, Mr. Schacht.  What

16   we have based on the declarations of your client and Mr.

17   Denbeaux is a government promise of confidentiality and no more

18   than that.

19          MR. SCHACHT:  I disagree.  I think it is more than

20   that.

21          THE COURT:  Let me get the Denbeaux declaration.

22          MR. SCHACHT:  Also, I should add that the declarations

23   are just three or four pages.  The meetings collectively were

24   many hours.  I'm not sure how many hours.  What would come out

25   at a hearing would be far beyond what is in the three- or

1    four-page declaration.

2                MS. HOULE:  In response to that, your Honor --

3                THE COURT:  Not yet.

4                Starting with paragraphs 5 and 6 of the Denbeaux

5    declaration, he states that he repeatedly told the FBI agents

6    of Kourani's concern about the safety of his relatives in

7    Lebanon.  The government believed that Mr. Kourani had valuable

8    information relating to the Hezbollah and they were to question

9    him to that extent.  Mr. Kourani was concerned about the safety

10   of his relatives if he were to tell the government.  He felt

11   that he needed some confidentiality about that.  In other

12   words, he didn't want it to be known that he was talking to the

13   government before he decided to talk to the government if he

14   decided to talk to the government.

15               Denbeaux continued to push back about this.  He said

16   that while they would try, they could not guarantee it.

17   However, it goes on.  "There was no dispute whatsoever that my

18   client would not be arrested based upon what happened at the

19   meetings and that the information he gave would be kept between

20   us and the agents' supervisors and not used against him."  That

21   is a conclusory statement that has little value unless it is

22   backed up by what somebody said in particular.

23               Mr. Denbeaux goes on, paragraph 6.  "Shortly after the

24   first meeting, I sent a text message to the FBI stating that I

25   knew there would be no promises to Mr. Kourani."  What does

1   this mean, Mr. Schacht, no promises to Mr. Kourani?

2           MR. SCHACHT:  Your Honor, I think it goes into that

3   perhaps in the next couple of paragraphs.  That is related to

4   the issue of visas for my client's father and sister and

5   children to come to the United States.  When Mr. Denbeaux sent

6   that message, that was regarding the issue of guarantees of

7   visas.  That's what Mr. Denbeaux will testify to.

8           THE COURT:  I'm looking at the memo.  Denbeaux writes

9   in paragraph 2, "He's not seeking any kind of material

10  protection."  How do I take that?  I don't understand that.

11          MR. SCHACHT:  I think you have to understand that

12  memo, which is really notes taken in the context of everything

13  that it says there.  It's quite badly written.  It also says in

14  there, "We have already agreed that my client is not going to

15  be prosecuted."  Obviously, the government disagrees with that

16  fact.

17          THE COURT:  Paragraph 5 says, "The government wants

18  his information before making any commitment, and he wants the

19  protection commitment by someone in authority that his family

20  interests will be protected before he provides all the

21  information."  Nothing said about immunity.

22          MR. SCHACHT:  Your Honor, I don't have it in front of

23  me, but in the top two paragraphs it says we have agreed that

24  he is not going to be prosecuted or words to that effect.  The

25  part later on about needing promises from higher-ups in the

1    justice department relates again to this issue of whether or

2    not his sister and father are going to be helped by ICE or

3    other government agencies to get immigration and safety

4    benefits.

5            THE COURT:  I'm looking at paragraph 4 also, which

6    gives five goals that he has.  None of it is immunity.

7            MR. SCHACHT:  That is because that is at the top, the

8    first thing.  It is already understood.  That's what it says at

9    the top of the memo.  I think it uses the phrase "we have

10   agreed that my client's is not going to be prosecuted."  That

11   everything that follows after the initial we have agreed he is

12   not going to be prosecuted.

13           THE COURT:  Where do I see that?

14           MR. SCHACHT:  I'm sorry.  I don't have it in front of

15   me, your Honor.

16           THE COURT:  Borrow mine.

17           MR. SCHACHT:  The government may be nice enough to

18   show me.

19           THE COURT:  Do you have a copy for Mr. Schacht?  Here.

20           MR. SCHACHT:  Thank you, your Honor.

21           I'll read it, "What these meetings are not:

22           "1.  This is not a plea negotiation nor is it a

23   proffer of any sort.

24           "2.  He is not seeking any kind of immunity or

25   protection because, as it has already been agreed, he has

1   committed no crime and faces no prosecution."

2              That sentence is a little bit internally inconsistent

3   because someone who faces no prosecution obviously is being

4   given some kind of immunity.  But these are simply notes.  That

5   is what I was referring to when it says we have already agreed

6   that he is going to be facing no prosecution, that was the

7   promise.

8              There is also an additional promise that is not

9   included in there but which is in the 302 and which was also

10  made verbally at the meetings, which is the promise of

11  confidentiality, which is a separate part or separate argument

12  from the promise of no prosecution.

13             THE COURT:  Okay.  I'll see you on the 26th.

14             (Adjourned)

15

16

17

18

19

20

21

22

23

24

25