I3qrkou1

1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4           v.                        17 CR 417 (AKH)

 5   ALI KOURANI,
                                       Suppression Hearing
 6              Defendant.

 7   ------------------------------x

 8                                     New York, N.Y.
                                       March 26, 2018
 9                                     11:00 a.m.

10   Before:

11        HON. ALVIN K. HELLERSTEIN

12                                     District Judge

13

14

15

16        APPEARANCES

17
     GEOFFREY S. BERMAN
18        Interim United States Attorney for the
          Southern District of New York
19   AMANDA L. HOULE
     EMIL J. BOVE III
20        Assistant United States Attorneys

21
     ALEXEI SCHACHT
22        Attorney for Defendant

23

24

25
```

I3qrkou1

1          (Case called)

2          THE COURT:  Good morning everyone.  This is the United

3     States v. Ali Kourani.  We have Amanda Houle and Emil Bove for

4     the government.

5          MS. HOULE:  Good morning, your Honor.

6          THE COURT:  With you is?

7          MS. HOULE:  Your Honor, we have with us Michael

8     DeLuca, who is a paralegal from our office.

9          THE COURT:  Good morning, Mr. DeLuca.

10         For Mr. Kourani we have Alexei Schacht.

11         MR. SCHACHT:  Good morning, your Honor.

12         THE COURT:  Good morning.  How shall we proceed, Ms.

13    Houle?

14         MS. HOULE:  Thank you, your Honor.  Before we begin,

15    one point about the proposed exhibits.  The government has

16    proposed a set of exhibits.  We understand that with the

17    exception of the 200 series and the 800 series, there is no

18    objection from the defense to admitting these exhibits.  As to

19    the 200 series and 800 series, we understand from Mr. Schacht

20    that he does not object to the authenticity of the exhibits,

21    but he would prefer that we lay a foundation through a witness

22    and that they are admitted to the extent that they are asked

23    about on cross-examination.

24         THE COURT:  Just do it.  If there is an objection,

25    I'll deal with it.

1      MS. HOULE:  Thank you, your Honor.  As to the exhibits

2  that are not objected to in advance --

3      THE COURT:  Do not give me a mass offer.  Give me them

4  one by one.

5      MS. HOULE:  Thank you, your Honor.  The government has

6  two witnesses that we propose to call, the first being Special

7  Agent Joseph Costello.

8      THE COURT:  I would like you to make a short opening.

9  I would like to have you make a short opening and then have Mr.

10  Schacht make a short opening and you will call the first of

11  your two witnesses.

12      MS. HOULE:  Thank you, your Honor.  Your Honor has

13  ordered this hearing after the defendant made a motion to

14  suppress in this case.  As your Honor's order indicated, the

15  primary point at issue is whether or not any promises were made

16  to the defendant by the FBI agents when he met with them in

17  2017, and particularly whether the FBI agents ever promised the

18  defendant or his attorney that he would not be prosecuted based

19  on the statements that he made in those meetings, whether there

20  was any conferral of immunity.

21      The government believes that the FBI agents will both

22  testify that in the course of those meetings with the defendant

23  and his attorney and in their separate conversations with that

24  attorney they never made any sort of indication that the

25  defendant would not be prosecuted, they never indicated that he

1  had not committed any crimes, they never indicated that he

2  would have any sort of immunity or protections for his

3  statements.

4          THE COURT:  Mr. Schacht.

5          MR. SCHACHT:  Your Honor, I think the evidence here is

6  going to show that there were three separate types of promises

7  that were made by the FBI to my client.  One type of promise

8  that was repeatedly made was that everything that was going to

9  be said or was said was going to remain confidential.  Another

10  type of promise that was going to be made was that what he was

11  saying or going to say was not going to be used against him.

12  The third type of promise that was made at one point was that

13  he was not going to be prosecuted.

14          THE COURT:  These are three separate promises?

15          MR. SCHACHT:  Yes.  There were many hours of meetings.

16  They had five separate meetings.

17          THE COURT:  I don't think in your papers you said

18  three sets of promises.

19          MR. SCHACHT:  I'm just categorizing them as sets.

20  They are promises.  I'm just putting them in different boxes to

21  make it easier for you to follow.

22          THE COURT:  From your papers I gather that there was

23  one statement made to Mr. Kourani that his statements would be

24  kept confidential.  Maybe I remember wrongly, but I don't

25  remember anything else in your moving papers.

I3qrkou1

1          MR. SCHACHT:  Yes, your Honor.  In addition to being

2     promised that it would be kept confidential --

3          THE COURT:  Are there other statements in your moving

4     papers that suggest other promises?

5          MR. SCHACHT:  Yes.  I included in the moving papers

6     the one-page document, the notes that were given by my client's

7     them lawyer to the FBI.  Contained within that document that

8     your Honor has a copy of is a promise that my client would not

9     be prosecuted.  That is an exhibit that will be introduced

10    today as well.

11         THE COURT:  I'm looking at the document.

12         MR. SCHACHT:  At the top you will see.

13         THE COURT:  The top line is what these meetings are

14    not.

15         MR. SCHACHT:  Right.  Then there are two sentences.

16    At the end of one of the sentences, it says "It has been agreed

17    that there will be no prosecution."  That document was given to

18    the FBI by the lawyer.

19         THE COURT:  So it is referring back to some other

20    promise or agreement.

21         MR. SCHACHT:  Right.  That is simply a physical

22    manifestation of what the conversations were up until that

23    point.

24         THE COURT:  What is the government's position, Ms.

25    Houle?

I3qrkou1

1      MS. HOULE:  Mr. Schacht had just indicated that this

2  line refers to a prior promise.  But in fact in Mr. Denbeaux's

3  declaration there is no specific promise that is ever

4  articulated.  He does not indicate when or how the FBI agents

5  ever told him.

6      THE COURT:  Denbeaux was not in the case earlier,

7  right?

8      MS. HOULE:  Mr. Denbeaux submitted a declaration, who

9  was the attorney.

10      THE COURT:  He came into the case at this time just

11  before the meeting that was preceded by this memorandum?

12      MR. SCHACHT:  Your Honor, Mr. Denbeaux was there the

13  whole time.  Mr. Denbeaux arranged the meetings with the FBI on

14  behalf of Mr. Kourani, and he was present at all the meetings.

15      THE COURT:  From the very beginning?

16      MR. SCHACHT:  There were meetings prior to Mr. Den-

17  beaux being involved, but those statements are not at issue in

18  this case.  The only statements at issue are the statements

19  from the time that Mr. Denbeaux got involved afterward.  Mr.

20  Denbeaux will be here.  I'll call him as a witness and you will

21  be able to hear what he says happened.

22      THE COURT:  Ms. Houle, put on your witness.

23  JOSEPH COSTELLO,

24      called as a witness by the government,

25      having been duly sworn, testified as follows:

1    DIRECT EXAMINATION

2    BY MS. HOULE:

3    Q.   Mr. Costello, where do you work?

4    A.   I'm a special agent at the Federal Bureau of Investigation.

5    Q.   For how long have you been a special agent with the FBI?

6    A.   Approximately three and a half years.

7    Q.   Do you work on any particular squad?

8    A.   I do.  I serve on FBI New York's joint terrorism task force

9    on squad CT-9.

10   Q.   For how long have you served on squad CT-9?

11   A.   Approximately two and a half years.

12   Q.   Does CT-9 have any particular focus?

13   A.   Yes.  We are tasked with investigating Hezbollah's external

14   security organization, the external terrorism wing task force.

15   Q.   Does that wing within Hezbollah by any other names?

16   A.   It does, the Islamic Jihad Organization, IJO; unit 910; or

17   Hezbollah black ops.

18   Q.   Before you were assigned to CT-9, did you have serve in any

19   other squad with the FBI?

20   A.   I did, I spent approximately a year on SO-13, surveillance

21   squad.

22   Q.   What generally are your duties as a special agent on the

23   CT-9 squad?

24   A.   I investigate individuals believed to be associated with

25   Hezbollah's external security organization.

1  Q.  What did you do before you were a special agent with the

2  FBI?

3  A.  I was a special agent with the United States Department of

4  State diplomatic security service.

5  Q.  During what years did you work there?

6  A.  I worked there from 2010 until 2014.

7  Q.  What generally were your duties there?

8  A.  I was tasked with investigating passport fraud, visa fraud,

9  human smuggling, human trafficking, and document fraud.

10  Q.  Going first to your time as a special agent with the state

11  department, did you participate in any training programs as

12  part of that job?

13  A.  I did.  I took training in the Federal Law Enforcement

14  Training Center's criminal investigative training program and

15  also the Diplomatic Security Training Center's basic special

16  agent course.

17  Q.  Approximately when did you attend those trainings?

18  A.  I was at the Federal Law Enforcement Training Center from

19  approximately March of 2010 until June 2010, and at the

20  Diplomatic Security Training Center from approximately July

21  2010 until December 2010.

22  Q.  What topics did those training programs cover?

23  A.  The training programs covered a wide variety of topics:

24  firearms, defensive driving, defensive tactics, legal inter-

25  viewing, etc.

1  Q.  Focusing on interviewing which you just described as one of

2  the topics, could you describe that training generally.

3  A.  Certainly.  Both at the Federal Law Enforcement Training

4  Center and Diplomatic Security Training Center, there are

5  blocks of instruction called interviewing or interviewing and

6  interrogation.

7  Q.  What did that consist of?

8  A.  They consisted of both what I would call the soft skills of

9  interviewing: soliciting response, getting to know people.

10  Also the legal side of things: Fourth Amendment protections,

11  Fifth Amendment protections, right to counsel, custodial versus

12  noncustodial interviews.

13  Q.  What, if any, discussion was there at those trainings

14  regarding discussing potential benefits with the subject of an

15  interview?

16  A.  One of the core precepts of the training is that as special

17  agents of the U.S. government, we are not authorized to offer

18  any benefits on behalf of the U.S. government.

19          THE COURT:  Authorized to offer what?

20          THE WITNESS:  Any sort of benefits, sir.

21  Q.  When you say benefits, what are you referring to?

22  A.  Prosecutorial immunity, fiscal incentives, immigration

23  benefits.

24  Q.  Are you aware of any exceptions to that rule?

25  A.  No.

1   Q.  Did you receive any similar interview training with the

2   FBI?

3   A.  I did.

4   Q.  When was that?

5   A.  I attended the FBI academy in Quantico, Virginia, from

6   October 2014 until March 2015.

7   Q.  Can you describe that interview training generally.

8   A.  Sure.  Very similar to my previous training.  We had a

9   block of instruction called interviewing and interrogation.  It

10  nearly mirrored my previously training in both the soft skills

11  of interviewing but also the legal protections afforded

12  interviewees.

13  Q.  Was there any discussion at that training of discussions

14  with subjects of interviews regarding potential benefits?

15  A.  Yes, there was.  Just the same as my previous training, we

16  were taught that as special agents of the FBI we are not

17  authorized to make any promises of goods, benefits, or services

18  on behalf of the U.S. government.

19  Q.  Are you aware of any exceptions to that rule?

20  A.  No.

21  Q.  Have you previously met the defendant Ali Kourani?

22  A.  I have.

23  Q.  When did you first meet the defendant in person?

24  A.  August 2016.

25  Q.  Where was that?

I3qrkou1                    Costello - direct

1    A.   Beirut, Lebanon.

2    Q.   Why had you traveled to Lebanon?

3    A.   I traveled to Lebanon at that time because I had been

4    notified that Mr. Kourani had come into the United States

5    embassy and was looking to speak with someone from the U.S.

6    government.

7    Q.   Did you have any understanding about what he wanted to

8    speak about?

9    A.   My understanding was that Mr. Kourani had been in some sort

10   of altercation and would like to speak about that.

11            THE COURT:  Altercation with whom?

12            THE WITNESS:  At that point, sir, I'm not entirely

13   sure if I knew the specifics, but that he had been in a family

14   altercation.

15   Q.   Did you meet with the defendant that day?

16   A.   When I went to Beirut, yes.

17   Q.   Who else was present?

18   A.   Myself, Special Agent Gary Batista from my squad, and a

19   representative from the U.S. Department of State.

20   Q.   You mentioned that before you went into the meeting you

21   understood that the defendant wanted to discuss some sort of

22   altercation, right?

23   A.   Yes.

24   Q.   Did you discuss that with the defendant during your

25   meeting?

1   A.  I did.

2   Q.  What did he say about that?

3   A.  The defendant stated that he was in I guess a child custody

4   dispute with his wife that escalated into some sort of physical

5   fight between himself, his wife, his mother-in-law; and that

6   based off of that altercation, his wife's family, some of which

7   are evidently Hezbollah militia members, assaulted the

8   defendant.

9   Q.  Was there any further discussion with the defendant of

10  Hezbollah at that meeting?

11  A.  Yes, there was.

12  Q.  What was discussed?

13  A.  I asked the defendant pointedly if he was a member of

14  Hezbollah and if he would be willing to discuss his involvement

15  with Hezbollah.  He stated that he was not and maintained that

16  throughout the interview, but did provide his brother Kassem

17  was a Hezbollah member and political head of Hezbollah in his

18  home village.

19  Q.  What, if any, discussion was there with the defendant about

20  the defendant cooperating with the FBI at that meeting?

21  A.  The defendant volunteered he would be willing to meet

22  further with the FBI once he returned to the U.S.  We stated to

23  the defendant unless he was willing to discuss his involvement

24  with Hezbollah, we were uninterested in having that meeting.

25  Q.  To be clear, who raised the topic of potential cooperation?

1    A.   The defendant.

2    Q.   How did this meeting end?

3    A.   The meeting ended with the state department representative

4    returning the defendant his passport, and he was escorted from

5    the U.S. embassy grounds.

6    Q.   Did you later learn that defendant was again interested in

7    speaking with the FBI?

8    A.   I did.

9    Q.   Turning your attention to what has been marked for

10   identification as Government Exhibit 101, there is a binder by

11   you but then it also should appear on the screen, whichever you

12   prefer.  What is this document?

13   A.   This document is an email I received from the FBI's public

14   access line on March 1st of 2017.

15            MS. HOULE:  Your Honor, the government respectfully

16   moves to admit Government Exhibit 101 into evidence.

17            MR. SCHACHT:  No objection.

18            THE COURT:  Received.

19            (Government's Exhibit 101 received in evidence)

20   Q.   Special Agent Costello, what is the date of the email?

21   A.   It is dated March 1st, 2017.

22   Q.   To whom was this email sent?

23   A.   Myself and Special Agent Keri Shannon, also a member of

24   squad CT-9 in New York.

25   Q.   Can you please read the email into the record.

1   A.  Sure.

2           THE COURT:  It's in the record.  Is there something

3   there you want to ask him about?

4   Q.  Special Agent Costello, on the first line of the email the

5   person who sends the email identifies themself as a customer

6   service representative at the FBI public access line.  What is

7   that?

8   A.  My understanding is the FBI's public access line is a phone

9   number for the public to contact the FBI regarding allegations

10  of criminal offenses or just to speak with the FBI.

11  Q.  The second full paragraph begins, "On March 1, 2017, Mark

12  Denbeaux," and it indicates a telephone number that he

13  provided, "wanted to discuss his client with the FBI.  Denbeaux

14  would not provide his client's identity but did mention his

15  client was Middle Eastern descent.  Denbeaux stated that the

16  FBI is interested in his client and that the client is now

17  willing to meet with the FBI agents."  Then there is an

18  indication that Mr. Denbeaux had reached out to Special Agent

19  Shannon previously.

20  A.  Yes.

21  Q.  What did you infer from this message?

22  A.  That Mr. Denbeaux was an attorney and had an individual who

23  would like to speak with the FBI.

24  Q.  At the time that you received this email, did you

25  understand who Mr. Denbeaux's client was?

1    A.  No, I did not.

2    Q.  What, if anything, did you do in response to this email?

3    A.  Myself and Special Agent Shannon placed a phonecall to Mr.

4    Denbeaux.

5    Q.  Turning your attention to March 22nd, 2017, did you

6    participate in a phonecall with Mr. Denbeaux on that day?

7    A.  I did.

8    Q.  Was Special Agent Shannon also on the call?

9    A.  She was.

10   Q.  By the time of this call, did you understand who Mr.

11   Denbeaux's client was?

12   A.  Yes, I did.

13   Q.  How did you understand that?

14   A.  I believe in a previous phonecall Mr. Denbeaux had identi-

15   fied his client as the defendant.

16   Q.  A previous phonecall with whom?

17   A.  Special Agent Shannon.

18   Q.  Turning to that call on March 22nd with Mr. Denbeaux, did

19   Mr. Denbeaux ask any questions on that call?

20   A.  He did.  He inquired if his client, Mr. Kourani, was the

21   target of an FBI investigation.  I stated to Mr. Denbeaux that

22   it is the policy of the FBI not to comment or discuss the

23   status of ongoing investigations.  He had two other questions

24   as well.

25   Q.  Holding with that first question, was there any further

I3qrkou1                    Costello - direct

1  discussion of whether the defendant was a target of the FBI's

2  investigation?

3  A.  Yes.  Mr. Denbeaux posited that he did not believe the

4  defendant cared one way or the other whether he was a target in

5  the investigation.

6              THE COURT:  Say what he said.  What was the question

7  and what was the answer?  Ms. Houle, bring it out.

8  Q.  You indicated that Mr. Denbeaux asked whether or not the

9  defendant indicated that he was a target?

10  A.  Correct.

11  Q.  And that you responded that there was a policy of the FBI

12  not to share that information?

13              THE COURT:  Don't testify for him.

14              MS. HOULE:  I'm sorry, your Honor.

15              THE COURT:  Was there a discussion at this meeting,

16  phonecall, of March 22, 2017, about prosecution?

17              THE WITNESS:  No, sir, there was not.

18              THE COURT:  Was there discussion about any kind of

19  immunity?

20              THE WITNESS:  No, sir, there was not.

21              THE COURT:  Was there a discussion of any kind of

22  motivation that Mr. Kourani was identified at that time?

23              THE WITNESS:  Yes, your Honor.

24              THE COURT:  Was there a discussion of whatever need he

25  had, whatever motivation he had?

I3qrkou1                        Costello – direct

1          THE WITNESS:  No, your Honor.

2          THE COURT:  How did the question of being a target

3   come up?

4          THE WITNESS:  Mr. Denbeaux, to the best of my

5   recollection, your Honor, inquired of me, he asked is Mr.

6   Kourani the target of an FBI investigation.

7          THE COURT:  Did you answer?

8          THE WITNESS:  I did.  I stated it's the policy of the

9   FBI not to discuss the status of ongoing investigations.

10         THE COURT:  What did he say?

11         THE WITNESS:  He said he understood and that he didn't

12  think it mattered to Mr. Kourani one way or the other if he was

13  the target of an investigation.

14         THE COURT:  Go on.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   BY MS. HOULE:

2   Q.  Did you give any indication on this call as to what the

3   FBI's interest in Mr. Kourani was?

4   A.  No, I did not.  But I did state -- excuse me --

5   Mr. Denbeaux did ask me than and I stated that he could speak

6   to Mr. Kourani and that we'd previously made clear our

7   objectives in speaking to Mr. Kourani.

8   Q.  What did you mean by that when you told him that?

9   A.   When I met with Mr. Kourani in August of 2016 in Beirut I

10  pointedly asked him, we were interested in his involvement

11  where Hezbollah, I believe at that time that he knew why the

12  FBI was interested in speaking with him and Mr. Denbeaux could

13  speak to Mr. Kourani regarding it.

14  Q.  Did Mr. Denbeaux raise any concerns on the call?

15  A.  He did.  Mr. Denbeaux was concerned about it being

16  confidential, that Mr. Kourani was going to speak with the FBI.

17  I stated we would do that.

18  Q.  Was there any discussion about whether the FBI would tell

19  anyone outside the Lebanese community that the defendant was

20  meeting with the FBI?

21  A.  Not at that juncture, no.

22  Q.  Prior to this call with Mr. Denbeaux had you approached

23  anyone in the Lebanese community to discuss the defendant?

24  A.  I did.

25  Q.  With whom did you meet?

1   A.   I spoke to the defendant's mother.  I spoke to a family

2   friend or a cousin of the defendant and I spoke to the

3   defendant's former employers.

4   Q.   When generally did those meetings take place?

5   A.   Summer into fall 2016.

6   Q.   What was the purpose of those meeting?

7   A.   To identify if they'd had any information regarding

8   Hezbollah but also to telegraph the defendant the importance of

9   the case.

10  Q.   What do you mean by that?

11  A.   When other agents had previously met with the defendants we

12  had stated we were going to expand our investigation to see if

13  they had any investigation regarding involvement with

14  Hezbollah.

15  Q.   Did you visit any prior employer of the defendant?

16  A.   I did.

17  Q.   Who was that?

18  A.   Two brothers, Hiqmak and Ibrahimi Ali.

19  Q.   Based on your experience of this investigation and your

20  review of the case file, were FBI interviews conducted of any

21  other employer of the defendant?

22  A.   Not that I recall, no.

23  Q.   Did the topic of Hezbollah come up during any of these

24  meetings that you've just described?

25  A.   Yes.

1  Q.  In what context?

2  A.  We asked the defendant's mother if she knew her son to be a

3  member of Hezbollah.  We asked the defendant's family friend

4  and cousin if he knew the defendant to be a member of

5  Hezbollah.  And I believe with the employers we may not have

6  said had "Hezbollah" specifically but we used the word

7  "terrorism".

8          THE COURT:  What was the answer?

9          THE WITNESS:  From who, sir?

10          THE COURT:  Mother.

11          THE WITNESS:  She said she did not know her son to be

12  a member of Hezbollah.

13          MS. HOULE:  May I move on, your Honor?

14          THE COURT:  Yes.

15  Q.  Turning back to your March 22nd call with Mr. Denbeaux, in

16  response to the judge's question you indicated that there was

17  no discussion of immunity; is that correct?

18  A.  Correct.

19  Q.  Could you have offered the defendant immunity at that time?

20  A.  No.

21  Q.  Why not?

22  A.  As I was trained as a special agent of the FBI, I'm not

23  authorized to offer immunity.

24  Q.  Based on yours experience as a special agent, what's your

25  understanding of the process for making any sort of offer of

1    immunity to any target of an investigation?

2    A.  My understanding is I take in the information or the

3    allegation of criminal activity.  I then share it with my chain

4    of command at the FBI and then we liaise directly with the

5    appropriate U.S. Attorney's Office and the ultimate decision

6    for any sort of immunity comes from the United States

7    Attorney's office, not from the FBI.

8    Q.  Prior to your March 22 call with Mr. Denbeaux, had been in

9    contact with the U.S. Attorney's Office for the Southern

10   District of New York in relation to Mr. Kourani?

11   A.  Yes.

12   Q.  What, if any, discussions did have you with the U.S.

13   Attorney's Office regarding immunity for the defendant?

14           THE COURT:  With whom?

15   Q.  Did you have any discussions with any representative from

16   the U.S. Attorney's Office for the Southern District regarding

17   immunity?

18   A.  No.

19   Q.  Were you ever given any authorization from the U.S.

20   Attorney's Office to over the defendant immunity?

21   A.  No, I was not.

22   Q.  Did you have any discussions with anyone at the FBI about

23   offering the defendant immunity?

24   A.  No, I did not.

25   Q.  Following this March 22 call with Mr. Denbeaux, did you

1    meet with the defendant and Mr. Denbeaux?

2    A.  I did.

3    Q.  Why did you agree to the meet with the defendant?

4    A.  We were interested in hearing the defendant's information

5    regarding his involvement with Hezbollah.

6    Q.  I'd like to cover some details of those meetings but before

7    we do, a few general questions.

8         At any time during any of your meetings with the

9    defendant or Mr. Denbeaux or any phone calls with the defendant

10   or Mr. Denbeaux, did you ever offer immunity for the defendant?

11   A.  No, I did not.

12   Q.  Were you ever asked about immunity?

13   A.  No, I was not.

14   Q.  Did you ever promise that the defendant's statements would

15   not be used against him?

16   A.  No, I did not.

17   Q.  Were you ever asked if his statements would be used against

18   him?

19   A.  No, I was not.

20   Q.  I'd like to turn to that first meeting that you had with

21   the defendant and Mr. Denbeaux; was that on March 23, 2017?

22   A.  Yes, it was.

23   Q.  Where did that meeting take place?

24   A.  Seton Hall University Law School.

25   Q.  What was the setting for the meeting?

1   A.  A conference room in the law school.

2   Q.  Why was the meeting held at Seton Hall?

3   A.  Mr. Denbeaux worked there and I believe it was convenient

4   to both the defendant and Mr. Denbeaux.

5   Q.  Who else was present?

6   A.  Myself, Special Agent Keri Shannon from my squad, the

7   defendant and Mr. Denbeaux.

8   Q.  How were you dressed for the meeting?

9   A.  I was in business attire without a tie.

10  Q.  How was Special Agent Shannon dressed?

11  A.  The same.

12  Q.  Did you display your firearm at any time during the

13  meeting?

14  A.  No, I did not.

15  Q.  Did you see Special Agent Shannon display her firearm?

16  A.  No, I did not.

17  Q.  During the course of those meetings were you dressed in

18  business attire?

19  A.  I was.

20  Q.  Was Special Agent Shannon?

21  A.  She was.

22  Q.  Did you ever display your firearm?

23  A.  No, I did not.

24  Q.  Did you ever observe her display her firearm?

25  A.  No, I did not.

1    Q.   How did you introduce yourself at the start of the meeting?

2    A.   Given that it had been some time since I had met

3    Mr. Kourani and I'd yet to meet Mr. Denbeaux in person, I

4    introduced myself in what I would call my official format.  I

5    introduced myself as Special Agent Joseph Costello of the FBI,

6    that they can call me "Joe".

7    Q.   Did you see how Special Agent Shannon introduced herself?

8    A.   She did the same.

9    Q.   Following those introductions, how to the meeting begin?

10   A.   The meeting began with Mr. Kourani positing how he why felt

11   the FBI was interested in speaking with him.  I stated it

12   wasn't important why he felt we were there.  What was more

13   important was speaking with him regarding his involvement with

14   Hezbollah.

15   Q.   What happened next during the meeting?

16   A.   Mr. Kourani then began to posit on what he felt he was

17   entitled to if he were to cooperate with the U.S. government.

18   I immediately cut him off and explained to him and Mr. Denbeaux

19   that as a Special Agent of the FBI could not offer any promise

20   of any benefit or service on behalf of the government for his

21   cooperation.

22   Q.   What's, specifically, did the defendant request?

23   A.   The defendant mentioned he had a sister and father in

24   Lebanon that he'd like visas for.  And at that point he had

25   some child care custody issues with his wife who was living

1   with his children in Canada.

2   Q.  Was there any discussion of what would need to happen

3   before there could be any further discussion within the FBI

4   about benefits for the defendant?

5   A.  Yes.  I explained to the defendant that should he be

6   completely cooperative and forthcoming regarding his

7   involvement with Hezbollah and should individuals outside of

8   the FBI decide that cooperation merited benefits, that it would

9   involve a great deal of government bureaucracies both within

10  the Department of Justice but also with U.S. Department of

11  State, the Department of Homeland Security and finally the

12  government of Canada based off the types of benefits the

13  defendant wanted.  I tried to explain to him that they were

14  quite complicated in achieving and that we would have to share

15  a lot of information and it would take some time.

16  Q.  When you say share a lot of information, what specifically

17  did you say to the defendant about that?

18  A.  He would have to be completely forthcoming on his

19  involvement with Hezbollah and that information, the principle

20  information would have to be shared with all equity partners on

21  the defendant's behalf.

22  Q.  What do you mean by "equity partners"?

23  A.  The U.S. Department of State, Homeland Security and finally

24  the government of Canada.

25  Q.  During this meeting what, if any, discussions was there of

 1    a timeframe for the defendants requests?

 2    A.   The defendant asked me for an estimate for the benefits he

 3    wanted.  I explained the defendant I felt very uncomfortable

 4    giving him an answer on the timeframe for these benefits.  I

 5    stated to him that I didn't like to give that answer because it

 6    could seem as if I'm making some sort of, not promise but and

 7    secondly, I'd be speaking for a variety of government agencies

 8    of which I have no visibility or direct knowledge of.  So at

 9    that point I made a phone call.  After a break I called my

10    supervisor regarding that question.

11    Q.   Following your discussion with your supervisor, what did

12    you do?

13    A.   I again explained to the defendant with those two caveats

14    that I'll give you an estimate but it's not a promise.  It's

15    just an estimate.  And secondly, that it is an estimate based

16    off my limited knowledge of these other agencies and

17    governments and that it's just a guestimate.  Because I felt so

18    uncomfortable giving him that answer, I asked that he

19    acknowledge and affirm that he understood that it was just an

20    estimate, that it was no promise and he understood the caveats

21    which he did.  At that point I said we were meeting in March.

22    Maybe the end of summer those benefits could happen.

23    Q.   You say that you asked the defendant to acknowledge the

24    caveats and that he did.  What did he say?

25    A.   He said he did.  He said, yes, I did.

1        THE COURT:  I missed that.  Do it again.

2   Q.  You said that you asked the defendant to acknowledge the

3   caveats that you just described.

4   A.  Correct.

5   Q.  And that he did.  How did he acknowledge them?

6   A.  I wanted the defendant --

7        THE COURT:  What did you say and what did he say?

8   A.  I said, Mr. Kourani, I need you to understand that this is

9   just an estimate, that it's not a promise and that i's just a

10  best guess and I need you to tell me you understand that.  And

11  he said, I do.

12  Q.  Did the defendant raise any safety concerns connected to

13  his time in Lebanon during that meeting?

14  A.  A little bit.  He discussed the altercation he had had in

15  August with the Hezbollah militia members and his wife's

16  family.

17  Q.  What more did he say about that?

18  A.  The defendant felt that based, if he -- based off that

19  previous time that Hezbollah would be unhappy with him based

20  off that fight.

21  Q.  When you say "that fight" what are you referring to?

22  A.  Based off the child custody dispute with his wife and his

23  mother-in-law, individuals in her family who according to the

24  defendant are Hezbollah members had attempted to assault him

25  and may still be angry with him.

1  Q.  During this meeting did the defendant make any admissions

2  that you considered significant?

3  A.  Yes.

4  Q.  What was that?

5  A.  He stated that he was a member of Hezbollah and a member of

6  the ESO.

7  Q.  Did he use the term "ESO"?

8  A.  No, he did not.

9  Q.  What term did he use?

10  A.  He used Unit 910 Islamic Jihad and Hezbollah black ops.

11  Q.  Did the defendant describe any training that he received as

12  part of his membership in Unit 910?

13  A.  He did.  He discussed some of the training he received in

14  small arms, explosives, small unit tactics and also

15  interviewing and interrogation training.

16  Q.  What did he say about training on interview and

17  interrogation?

18  A.  The defendant stated he was trained to only admit to what

19  was proven in front of him.  So if a security service were to

20  question him, to not surrender any facts that they could not

21  prove or they did not know regarding his involvement with ESO.

22  Q.  During the March 23 meeting, was there any discussion of

23  immunity?

24  A.  No, there was no not.

25  Q.  Was there any discussion of whether the defendant's

1    statements could be used against him?

2    A.  No, there was not.

3    Q.  Was there any discussion of any legal implications if the

4    defendant lied to the FBI?

5    A.  Yes, there was.  Early in the meeting I stated to the

6    defendant that it was important in meeting with us that he be

7    completely truthful and forthcoming and provide the whole and

8    complete truth and that lying to the FBI could raise legal

9    issues.

10   Q.  How did this meeting end?

11   A.  The meeting ended with me reminding, thanking the defendant

12   for his cooperation but reminding him that while I was

13   appreciative of his cooperation to date, we had a lot more to

14   go and that at no point whether then or now could I make any

15   promises of any benefits of the things that he wanted.  The

16   defendant and Mr. Denbeaux stated they acknowledged it.  They

17   were kind of laughing, that I'd said it so many times they said

18   I sounded like a broken record.  I sad to Mr. Denbeaux, give me

19   a break.  I'm just a government bureaucrat doing my job, so to

20   speak.  To which point Mr. Denbeaux said, don't tell me that.

21   That's the same thing the Natzis said in World War II and the

22   cops who sprayed Black people with hoses said.  I said I found

23   that very offensive then left.

24   Q.  What was your next communication with Mr. Denbeaux?

25   A.  Approximately 15 minutes I received a text message from

1    Mr. Denbeaux.

2    Q.  Turning your attention to Government Exhibit 301.  What is

3    that?

4    A.  That is a picture of my cellular telephone.

5    Q.  Did you take that picture?

6    A.  I did.

7            MS. HOULE:  Your Honor, the government moves to admit

8    Government Exhibit 301 into evidence.

9            MR. SCHACHT:  No objection.

10            THE COURT:  Received.

11            (Government's Exhibit 301 received in evidence)

12    Q.  Mr. Costello, is this the text message that you received

13    from Mr. Denbeaux?

14    A.  It is.

15    Q.  Could you please read the top three messages and indicate

16    who wrote what?

17    A.  Sure.

18            From Mr. Denbeaux:  I understand that you can't

19    promise or guarantee.

20            From myself:  Thank you.  I'm glad we're on the same

21    page.

22            From Mr. Denbeaux:  We always were.

23    Q.  What did you understand Mr. Denbeaux to mean when he wrote

24    "that he can't promise or guarantee"?

25    A.  Because I had said so many times throughout that first

1   meeting that we appreciated the defendant's cooperation but

2   that we could not make any promises of anything, benefits,

3   prosecutorial immunity, that we could only be the messenger, I

4   acknowledged this to be Mr. Denbeaux acknowledging to me that

5   he understood that on and based off how the meeting had

6   ended -- he wanted to tell me.  He understood.

7   Q.  You just mentioned "prosecutorial immunity" in you answer.

8   I just want to make sure that we're clear.  During the meeting

9   was there any discussion of prosecutorial immunity?

10  A.  No.

11  Q.  But when you reviewed Mr. Denbeaux's text message what were

12  you saying then about prosecutorial immunity?

13  A.  I think I just meant that I said throughout the interview I

14  can't make any patrol promises.  I used the phrase a lot.  I am

15  just the messenger.  So I assume Mr. Denbeaux being an attorney

16  understood that.

17  Q.  What was your assessment after this initial meeting with

18  the defendant and Mr. Denbeaux about the defendant's attempted

19  cooperation?

20  A.  I felt the defendant had been truthful and honest but we

21  still had a lot of information regarding his involvement with

22  Hezbollah to get to.

23  Q.  Turning your attention to March 30, 2017, did you meet with

24  Mr. Denbeaux on that date?

25  A.  I did.

1    Q.   Where did that meeting take place?

2    A.   Seton Hall University Law School.

3    Q.   Was the defendant present?

4    A.   No, he was not.

5    Q.   Why not?

6    A.   My understanding was either the defendant or Mr. Denbeaux

7    had mixed up the dates and as such it was just myself, Special

8    Agent Shannon and Mr. Denbeaux.

9    Q.   What happened during that meeting?

10   A.   We had a very informal conversation.  I think we went and

11   got coffee.  I just spoke informally to Mr. Denbeaux about

12   Hezbollah's Unit 910 and that the information Mr. Kourani had

13   was significant and very important.  And then I kind of

14   provided Mr. Denbeaux, I provided Mr. Denbeaux a little bit of

15   background on Unit 910.  I explained to him that Unit 910 is a

16   very capable threat to U.S. national security that they were

17   worldwide.

18              THE COURT:  Slow down.

19   Q.   Slow down but proceed.

20   A.   Sure.  I stated that they were a very capable threat, that

21   while you may not hear of them like your hear of ISIS or

22   al-Qaeda but they are a capable and deadly organization.  And

23   just to provide him some historical framework I talked about a

24   few of Unit 910's successful attacks, the 1992 and 1994

25   bombings in Argentina and then the 2012 Burgas, Bulgaria bus

1    attack.

2    Q.  Why did you provide Mr. Denbeaux that information about

3    Unit 910?

4    A.  I felt Mr. Denbeaux should know that Mr. Kourani's

5    information was of great importance and that it would take a

6    significant amount of time to get the full breadth of this

7    information.

8    Q.  Was there any discussion of immunity for the defendant

9    during that meeting with Mr. Denbeaux?

10   A.  No, there was not.

11   Q.  Was there any discussion about whether the defendant's

12   statements would be used against him?

13   A.  No, there was not.

14   Q.  Turning your attention to April 2, 2017, did you speak with

15   Mr. Denbeaux by phone that day?

16   A.  I did.

17   Q.  Who else was on the call?

18   A.  Just myself and Mr. Denbeaux.

19   Q.  What was discussed?

20   A.  Mr. Denbeaux stated he had spoken with the defendant by

21   phone and that the defendant remained adamant that if he were

22   to continue to cooperate with the U.S. Government he would like

23   certain benefits.  Mr. Denbeaux relayed to me that he reminded

24   the defendant that we would not be making any promises.  I

25   thanked Mr. Denbeaux for echoing how I felt and I then restated

1   Mr. Denbeaux that we would need the whole and complete truth

2   regarding Mr. Kourani's involvement with 910 and then we would

3   relay it to the appropriate entities regarding his demands.

4   Q.  Was there any discussion of immunity for the defendant

5   during this call?

6   A.  No, there was not.

7   Q.  Did you make any promise that the defendant's statements

8   would not be used against him?

9   A.  No, I did not.

10  Q.  Turning your attention to the following day, April 3, 2017,

11  did you meet with the defendant that day?

12  A.  I did.

13  Q.  Who was else was present?

14  A.  Myself, Special Agent Shannon, the defendant and

15  Mr. Denbeaux.

16  Q.  Where was that meeting held?

17  A.  The same conference room that we had met previous at Seton

18  Hall Law School.

19  Q.  How did that meeting begin.

20  A.  The meeting began with the defendant stating he wanted a

21  job in his field.

22  Q.  I'm sorry to interrupt you but before you even began your

23  discussions with the defendant when you first entered the room,

24  how did the meeting began?

25  A.  Mr. Denbeaux had provided us a piece of paper that he

1    stated were his thoughts on the meeting at that point.  I took

2    a look at it and I had Special Agent Shannon take a look at it

3    and I asked for a break to speak about it with Special Agent

4    Shannon.

5    Q.   What happened next?

6    A.   Special Agent Shannon and I went out into the hallway

7    alone.  We took a quick look at Mr. Denbeaux's thoughts.  I saw

8    some things I disagreed with and we both agreed that we

9    disagreed.  We were there to speak with Mr. Kourani regarding

10   his involvement with Hezbollah and we would like to proceed

11   with the interview.

12            MS. HOULE:  Could pull up Government Exhibit 703.

13            (Pause)

14   Q.   Do you recognize this document, Special Agent Costello?

15   A.   I do.

16   Q.   What is this?

17   A.   It appears to be the document that Mr. Denbeaux had

18   provided to us that morning.

19            MS. HOULE:  Government offers Government Exhibit 703.

20            MR. SCHACHT:  No objection.

21            THE COURT:  Received.

22            (Government's Exhibit 703 received in evidence)

23   Q.   You said there were things --

24            THE COURT:  What's the date again of this meeting?

25            THE WITNESS:  April 3, your Honor.

1          THE COURT:  2017?

2          THE WITNESS:  Yes, sir.

3   Q.   What were the things that you didn't agree with on this

4   document?

5   A.   So I didn't read much of it but I saw things I disagreed

6   with.  Namely, it states because it has already been agreed he

7   has committed no crime and faces no prosecution.  I didn't know

8   who Mr. Denbeaux thought he was speaking for.  We had never

9   discussed anything like that and so that's what I disagreed

10  with chiefly.

11  Q.   When you say you didn't know who Mr. Denbeaux thought he

12  was speaking for, what do you mean?

13  A.   I didn't know if Mr. Denbeaux was speaking for himself and

14  Mr. Kourani speaking for himself and the FBI or anyone else.

15         THE COURT:  What did you say to Denbeaux?

16         THE WITNESS:  I didn't say anything, sir.

17         THE COURT:  You just questioned yourself?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Internally?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  I am more interested in what you said to

22  Denbeaux.

23  Q.   What happened when you went back into the room?

24  A.   We returned to room.  I return the piece of paper to

25  Mr. Denbeaux.  I stated those are your thoughts.  We have a lot

1    to get through with Mr. Kourani.

2    Q.  Were you asked any questions about this document when you

3    returned to the room?

4    A.  No, I was not.  Special Agent Shannon and I did discuss if

5    we were going asked but we were not there for Mr. Denbeaux

6    thoughts.  We were there for Mr. Kourani's information.

7              THE COURT:  Denbeaux said in line number two he has

8    already been agreed he committed no crime and faces no

9    prosecution.  What, if anything, did you say to Denbeaux about

10   that phrase.

11             THE WITNESS:  He never asked me about it and --

12             THE COURT:  But it's in the memo he gave you.

13             THE WITNESS:  Correct.

14             THE COURT:  Was it a part of the discussion that you

15   and Shannon had?

16             THE WITNESS:  Yes.  That was what we saw --

17             THE COURT:  You saw that line and you disagreed with

18   it?

19             THE WITNESS:  Yes, your Honor.

20             THE COURT:  Both of you went back into the meeting and

21   didn't say word to Denbeaux about this?

22             THE WITNESS:  Again, I didn't really know what this

23   document was.

24             THE COURT:  You know it was given to you by

25   Denbeaux --

1              THE WITNESS:  Correct.

2              THE COURT:  Denbeaux is the lawer for Kourani, no?

3              THE WITNESS:  Correct.

4              THE COURT:  So you know that Denbeaux was giving you a

5    memorandum of what he thought this meeting was going to be,

6    correct?

7              THE WITNESS:  I don't understand what it was.

8              THE COURT:  He gave it to you as a memorandum.

9              THE WITNESS:  Correct.

10             THE COURT:  And you read it?

11             THE WITNESS:  Just the first part.

12             THE COURT:  What's the first part?

13             THE WITNESS:  Just the first few points.

14             THE COURT:  Then you stopped reading?

15             THE WITNESS:  Yes.  I immediately saw --

16             THE COURT:  What did you say to Denbeaux?

17             THE WITNESS:  Nothing.  We returned to him and --

18             THE COURT:  When you saw it and read it.  He produced

19   this at the meeting and you read it.

20             THE WITNESS:  I asked for a break to speak to Special

21   Agent Shannon, your Honor.

22             THE COURT:  You spoke with Shannon about it.

23             THE WITNESS:  Yes, your Honor.

24             THE COURT:  You both said you don't agree with this

25   statement.

1          THE WITNESS:  Correct.

2          THE COURT:  Well, how could you go back and not tell

3     Denbeaux you disagreed?

4          THE WITNESS:  I thought it was more important we were

5     there for Mr. Kourani's information at that time.

6          THE COURT:  Do you think it's possible that this was

7     misleading to Mr. Kourani?

8          THE WITNESS:  Mr. Denbeaux stated it was his thoughts

9     on the matter.

10         THE COURT:  Well, he is the lawyer, isn't he, for

11    somebody.

12         THE WITNESS:  True.

13         THE COURT:  For Kourani?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  So whether he is speaking as a lawyer for

16    Kourani you have to take it as Kourani's concerns as well.

17         THE WITNESS:  Yes, your Honor.  But again, he is

18    referring to discussions that never happened.  So I was not

19    really sure where it was coming from and more to that point it

20    just seemed very unusual to me.

21         THE COURT:  Well then, why not ask him about it?

22         THE WITNESS:  I figured he would ask us about it.

23         THE COURT:  Well, he says so in a memorandum.

24         THE WITNESS:  I'm not sure I follow.

25         THE COURT:  Weren't you concerned with that statement

1    in the memorandum that Kourani could be misled?

2              THE WITNESS:  I was significantly concerned to the

3    point I'd told Special Agent Shannon that we would not be

4    signing this memorandum.  We would not be keeping a copy.  And

5    if we were to be asked by Mr. Denbeaux regarding any of the

6    points that we had read, we would be upfront with him, that he

7    is speaking about a discussion that never occurred --

8              THE COURT:  But he is giving you the ground rules for

9    a meeting.

10             THE WITNESS:  He never described them as such.

11             THE COURT:  How would you take them.  Were these

12   meetings or no?

13             THE WITNESS:  That's what I didn't understand at the

14   time.  He never went ever it with us.  He just said, these are

15   my thoughts and that was it.

16             MS. HOULE:  May I proceed, your Honor?

17             THE COURT:  No.

18             Did you understand that paragraphs 4A through E were

19   the concerns of Kourani?

20             THE WITNESS:  I didn't even read those, your Honor, at

21   that time.

22             THE COURT:  Now that you read it, did you believe at

23   the time that these accurately expressed the concerns of

24   Kourani?

25             THE WITNESS:  It's difficult for me to say what

1    Mr. Kourani's concerns were.  He was more vocal at that time

2    about what he wanted in terms of benefits not concerns.

3             THE COURT:  But did he tell you that he thought

4    cooperation might endanger him.

5             THE WITNESS:  I think he felt that Hezbollah should

6    not know he is cooperating.

7             THE COURT:  Did he express to you that he might be

8    endangering his life by talking to you?

9             THE WITNESS:  I don't think he said it explicitly,

10   your Honor.

11            THE COURT:  How did he say it?

12            THE WITNESS:  He discussed an altercation in

13   August 2016.

14            THE COURT:  He was concerned that Hezbollah would get

15   back at him.

16            THE WITNESS:  Yes.

17            THE COURT:  You knew that?

18            THE WITNESS:  That altercation was unrelated to him

19   meeting with the FBI.

20            THE COURT:  You knew he wanted to move his mother and

21   father to the United States?

22            THE WITNESS:  Yes.  I knew his father and his sister.

23   I did not know about his mother until recently now, your Honor.

24            THE COURT:  Go ahead, Ms. Houle.

25   Q.  What happened next during the meeting?

1    A.  Mr. Kourani then posited that he wanted a $120,000 a year

2    annually from the U.S. government if he were to cooperate, a

3    job in his field.  I again, cutoff Mr. Kourani.  I laughed.  I

4    said make more money than I do.  We're here to discuss your

5    involvement with Hezbollah.  We can't make promises.  We can

6    only take the information and relay it to the appropriate

7    entity at the Department of Justice.

8    Q.  What, if anything, did the defendant say in response?

9    A.  He stated he understood.  At every juncture I would say

10   does he understood but he still discussed it.

11   Q.  You testified that in a March 23 meeting there was some

12   discussion by the defendant of training that he received by 910

13   relating to interrogation?

14   A.  I did.

15   Q.  Was there any similar discussion at this meeting?

16   A.  Yes.  He discussed a weeklong training program he attended

17   in 2011.

18              THE COURT:  Who is "he"?

19              THE WITNESS:  The defendant, your Honor.

20              THE COURT:  Kourani?

21              THE WITNESS:  Yes, sir.

22   A.  The defendant stated he attend a weeklong training program

23   in Lebanon with ESO on interviewing and interrogation.  And the

24   defendant also stated that he has done a lot of self study on

25   interviews, interrogations and solicitation techniques.

1    Q.  Was there any discussion at this meeting about the

2    defendant's prior interactions with members of 910 and their

3    concerns that the defendant might be a government informant?

4    A.  Yes.  The defendant discussed a meeting he had with his 910

5    handler who he identify as Fadi in late --

6                THE COURT:  Spell that.

7                THE WITNESS:  F-a-d-i.  In late 2014 or early 2015,

8    along with another individual who wore a mask whose identity

9    the defendant did not know but knew him to be a member of ESO.

10   The defendant stated in that meeting he was questioned at

11   length regarding his historic contact with any security

12   services with both the U.S. or Canada.

13   Q.  You mentioned the term "handler".  What is a handler?

14   A.  Based off the defendant's statements to me I understood him

15   to have a single point of contact, so to speak at ESO.  His

16   handler, his handler would task him with missions.  He would

17   require him training to attend and he would kind of for lack of

18   a better word, handle all of the defendant's operational

19   activity on behalf of ESO.

20   Q.  Were there any breaks taken during this April 3 meeting?

21   A.  There were multiple breaks taken.  Most of them casual but

22   one in particular sticks out toward the end of the meeting.

23   Q.  Can you describe that?

24   A.  I asked the defendant if he ever served overseas on behalf

25   of 910 or been tasked with any missions out of U.S. or Lebanon.

1    The defendant stated he had not.  At that point Special Agent

2    Shannon and I reminded the defendant that lying to the FBI is a

3    crime and recommended that Mr. Denbeaux speak with Mr. Kourani

4    privately regarding that.  Approximately, five minutes later we

5    were invited back into the room.  The defendant stated he had

6    traveled to China in 2009 but that it was unrelated to his 910

7    membership.  We then re-admonished the defendant on the

8    importance of not lying to the FBI.  At which point the

9    defendant stood up and left the interview room and was followed

10   shortly thereafter by Mr. Denbeaux.

11           THE COURT:  Remind me again, what's 910.

12           THE WITNESS:  It's a terrorist wing of Hezbollah, the

13   external terrorist wing.

14   Q.  You used the terms "ESO" and 910.  Are those both

15   references to the same unit?

16   A.  Yes.  Forgive me.  They are both the same.

17   Q.  You said that the defendant and Mr. Denbeaux left the room

18   again?

19   A.  Yes.

20   Q.  What happened next?

21   A.  They returned approximately five minutes later.  They sat

22   down.  Mr. Denbeaux stated based off his conversation with the

23   defendant he understood that either, A, the defendant didn't

24   know what we were asking or, B, was too scared to provide the

25   information.  At that point the defendant stated he was scared

1   and did not want to discuss it.  We stated that was fine, that

2   we would be willing to meet at a later date to discuss it and

3   we ended the meeting.

4   Q.  Were you asked any questions at this meeting about immunity

5   for the defendant?

6   A.  No, I was not.

7   Q.  Did you make any promise that the defendant would not be

8   prosecuted?

9   A.  No, I did not.

10  Q.  Did you make any promise that the defendant's statements

11  would not be used against him?

12  A.  No, I did not.

13          MS. HOULE:  That's all I have for this meeting, your

14  Honor.

15          THE COURT:  Anyone need to use the facility?

16          MR. SCHACHT:  Yes.

17          THE COURT:  It'll be a five minute break.

18          You may step down but don't have any conversations

19  with anyone.

20          (Recess)

21          THE COURT:  All right.  Mr. Costello, you remain under

22  oath.

23          MS. HOULE:  Thank you, your Honor.

24  Q.  Special agent, turning your attention to April 5, 2017, did

25  you next meet with the defendant on that date?

1    A.  I did.

2    Q.  Where did that meeting take place?

3    A.  Seton Hall University Law School in the same conference

4    room we had met previous.

5    Q.  Who was present at that the meeting?

6    A.  Myself, Special Agent Shannon, the defendant and

7    Mr. Denbeaux.

8    Q.  How did that meeting begin?

9    A.  That meeting began with the defendant stating he wanted to

10   do the right thing as an American and that's why he was

11   continuing to cooperate with the FBI.

12           THE COURT:  Who called the meeting?

13           THE WITNESS:  Mutually between myself and

14   Mr. Denbeaux.

15           THE COURT:  Did you reach out to him or did he reach

16   out to you?

17           THE WITNESS:  I can't remember exactly how the

18   scheduling went.  I think we had stated at the end of the

19   previous meeting we would like to meet again and then

20   Mr. Denbeaux called me with dates to meet.

21           THE COURT:  Last meeting he just walked out, right?

22           THE WITNESS:  The defendant did.

23           THE COURT:  Kourani walked out?

24           THE WITNESS:  Correct.

25           THE COURT:  When was it you said you would like to

1    neat again?

2           THE WITNESS:  It may have been at the end of the last

3    meeting.

4           THE COURT:  After he got up to walk out.

5           THE WITNESS:  Yeah.  It may have been just between

6    myself and Mr. Denbeaux, your Honor.  I can't recall exactly.

7           THE COURT:  Denbeaux called you back and gave you some

8    dates and the first date was April 5 two days later?

9           THE WITNESS:  Yes, your Honor.

10          THE COURT:  Go ahead.

11   BY MS. HOULE:

12   Q.  Special agent, you were testifying as to what the defendant

13   said at the start of the meeting?

14   A.  The defendant stated he was cooperating with the FBI

15   because he was an American and he wanted to do what was right

16   as an American and because his children were American citizens

17   he wanted to do the patriotic thing.  I thanked the defendant

18   for that, stated that was the right thing to do but no matter

19   the motivations we would not be making any promises, just

20   reminding him of any benefit for his cooperation, that we would

21   need to finish speaking with him first to get the totality of

22   his information.

23   Q.  What happened next?

24          THE COURT:  I don't understand that sentence.  Any

25   benefit you left hanging?

1      THE WITNESS:  Yes, your Honor.  The defendant multiple

2  times would state, I want my kids here or I want my father

3  here.  And I would always remind him that I understand that but

4  I can't make any promises.  I can't make that happen.  And so

5  when he'd stated that he was cooperating as an American I

6  remind him that I appreciated that but that we could not make

7  any promises for benefits just because his motivations had

8  changed.

9      THE COURT:  Did he ask you how you could help?

10      THE WITNESS:  I explained to him how it worked in the

11  first meeting and the second meeting.  It would involvement

12  people at the Department of Justice and other government

13  agencies and the government of Canada in relation to his

14  children in Canada.  So I think he understood that it was a

15  large bureaucratic process.

16      THE COURT:  But did he ask you how he could get help

17  from you when you hear his information find out?

18      THE WITNESS:  He did not.  I believe he understood

19  that I could not directly promise anything.

20      THE COURT:  Without promising do you say a word to

21  somebody that would help?

22      THE WITNESS:  I explained to the defendant how it

23  again worked, the process I would run the information of my

24  chain of command at the FBI.  We would liaise with the

25  appropriate entity, the various government agencies, the U.S.

1    Attorney's Office.

2             THE COURT:  Part of the thing that you would be saying

3    to your superiors was the man wants some help on some

4    immigration issue?

5             THE WITNESS:  Yes, both the totality of the

6    defendant's statements regarding his involvement with Hezbollah

7    but also his demands.

8             THE COURT:  Is it fair to say that you understood that

9    one of the motivations for helping you by telling you things

10   you wanted to know was his help of the Department of Justice?

11            THE WITNESS:  Yes, that is fair, your Honor, but I

12   explained to him on multiple occasions that we would need the

13   whole and complete truth regarding his involvement with

14   Hezbollah and not just a little bit but that we need

15   everything.

16            THE COURT:  And he then hoped at least as far as your

17   understanding goes that if he did that he would get the help of

18   the Department of Justice in advocating for his immigration

19   issues?

20            THE WITNESS:  Yes.  It's difficult but, yes, it's

21   difficult for me to opine with he felt --

22            THE COURT:  I'm asking what is your understanding.

23            THE WITNESS:  My understanding was based off my

24   statements to him.  He understood if he provided the whole and

25   complete truth regarding his involvement with Hezbollah that we

1  would attempt to interview or -- excuse me -- do what we could

2  with the powers that be on his behalf.

3              THE COURT:  Go ahead.

4  Q.  When you say "Department of justice" what discussion was

5  there with the defendant about the Department of Justice?

6              THE COURT:  Couldn't hear.

7  Q.  What discussion was there with the defendant about the

8  Department of Justice?

9  A.  On the April the 3rd interview of the defendant I explained

10  to him as I was stating that it was a process to make things

11  happen.  It wasn't just Special Agent Costello in my purview to

12  make things happen and that the first people we would discuss

13  his cooperation with would be the Department of Justice,

14  meaning the U.S. Attorney's Office.

15  Q.  When you say that the Department of Justice would discuss

16  what he was asking for, did that relate in my way to immunity?

17  A.  I'm sure I follow the question.  I mean, yes, because the

18  defendant had admitted to multiple what I assessed to be

19  illegal activity.

20  Q.  Let me make that clear.  When you say that he was seeking

21  help from the Department of Justice, did that relate

22  specifically to immunity?  Did he ever request immunity?

23              THE COURT:  Are you objecting to that question,

24  Mr. Schact?

25              MR. SCHACHT:  Yes, your Honor.

1              THE COURT:  Sustained.

2     Q.  You said that there was discussion about how the Department

3     of Justice could help the development?

4              THE COURT:  -- the rest of it is argument unless you

5     have more conversation.

6     Q.  What were the types of benefits that were discussed that

7     the Department of Justice could assist in providing?

8              THE COURT:  Who discussed with whom?

9     Q.  That you discussed with the defendant?

10    A.  Immigration benefits nothing specific to the Department of

11    Justice but at no time did immunity come up.

12             THE COURT:  That was not the question.  Do you know

13    the question?

14             THE WITNESS:  Yes, your Honor.

15             THE COURT:  Answer it.

16             THE WITNESS:  I explained to the defendant in the

17    first interview that we would have to work with multiple of

18    government agencies to make his request happen should that be

19    deemed a decision we would make.

20    Q.  What was the request?

21    A.  For example, his father and his sister in Lebanon that he I

22    explained to he defendant at that time it involved the U.S.

23    Department of State, the embassy in Lebanon getting them visas,

24    U.S. Department of Homeland Security signing off on, based on

25    my understanding of the process and then Citizenship and

 1   Immigration Services in the U.S. to get them here.

 2            MS. HOULE:  OK.

 3            THE COURT:  How did you say that the Department of

 4   Justice might be able to help?

 5            THE WITNESS:  I didn't say "help", your Honor.  I

 6   apologize if I was misleading.  In the second interview when I

 7   explained to the defendant how the process would work --

 8            THE COURT:  You tell him about the process, who has

 9   got to be involved and the difficulties and so on, but in the

10   end he wanted help, right?

11            THE WITNESS:  Correct.

12            THE COURT:  He wanted help from you?

13            THE WITNESS:  Correct.

14            THE COURT:  He wanted help from your superiors?

15            THE WITNESS:  Correct.

16            THE COURT:  What did you say about that?

17            THE WITNESS:  I explained to him that we needed the

18   whole and complete truth regarding his involvement in Hezbollah

19   and I would relay it to my superiors and other entities within

20   the government and those would be the people making the

21   decision.

22            THE COURT:  Along with the request that they'd help

23   him?

24            THE WITNESS:  Yeah, I relayed the totality of the

25   information, your Honor.

1          THE COURT:  At the end of the day if you got what you

2    wanted you were ready and you told him you were ready to try to

3    help him?

4          THE WITNESS:  If we got the totality of information,

5    yes, your Honor.

6          THE COURT:  You would help him by asking your

7    superiors to put in a good word with those other agencies so

8    that what he wanted might come to pass?

9          THE WITNESS:  Yes, your Honor.

10   Q.   What happened next during the meeting?

11   A.   During the meeting -- or excuse me -- at the beginning of

12   the meeting after we had that discussion, the defendant asked

13   to conduct the meeting alone with Special Agent Shannon.

14   Q.   Did you have any concerns about that request?

15   A.   I did.

16   Q.   What were your concerns?

17   A.   At that time Special Agent Shannon was eight months

18   pregnant and given that the defendant had previously admitted

19   to being trained in weapons -- I did not feel comfortable

20   leaving her alone with the defendant in the room.  Off that I

21   asked for a break to discuss it with Special Agent Shannon.

22   Q.   What happened next.

23   A.   We agreed she would conduct the interview alone but that

24   she would sit closer to the door and then I would stand by the

25   door outside with a view into the room through some plateglass.

1    Q.  Were there any other security measures in place?

2    A.  Yes.  I asked Special Agent Shannon if she had her weapon

3    on her and it was loaded and she said she did.

4    Q.  So you left the room, right?

5    A.  I did.

6    Q.  Did Mr. Denbeaux remain in the room?

7    A.  He left with me.

8    Q.  For approximately how long were you and Mr. Denbeaux

9    outside the room?

10   A.  Approximately two hours.

11            THE COURT:  This is April 5?

12            THE WITNESS:  Yes, your Honor.

13   Q.  During the time that you were outside the room with

14   Mr. Denbeaux, did you have any discussions relating to the

15   defendant?

16   A.  Nothing substantive.

17   Q.  Was there any discussion of immunity for the defendant?

18   A.  No, there was not.

19   Q.  Did you eventually reenter the room where the defendant was

20   speaking with Special Agent Shannon?

21   A.  I did.

22   Q.  What happened next?

23   A.  I believe Mr. Denbeaux asked how did we do or where we're

24   at.  Before Special Agent Shannon could answer, I reminded Mr.

25   Denbeaux that no the matter information Mr. Kourani provided we

1    would still have to relay it to our superiors and we would not

2    be making any promises on behalf of the U.S. government.

3    Q.  What, if anything, was said about meeting with the

4    defendant again?

5    A.  I asked, I stated to Mr. Denbeaux that we would be willing

6    to meet with the defendant again and would like to, to which

7    they said they would as well.

8    Q.  During the course of this meeting was there this any

9    discussion regarding immunity for the defendant?

10   A.  No, there was not.

11   Q.  Did you make any promises that the defendant's statements

12   would not be used against him?

13   A.  No, I did not.

14   Q.  Turning your attention to April 12, 2017, did you meet with

15   Mr. Denbeaux that day?

16   A.  I did.

17   Q.  Where was that?

18   A.  Seton Hall University Law School.

19   Q.  Who else was there?

20   A.  Just myself and Special Agent Shannon.

21   Q.  Was the defendant present?

22   A.  No.

23   Q.  Why not?

24   A.  I believe either the defendant or Mr. Denbeaux had mixed up

25   the date.

1    Q.  Did you set a new time to meet?

2              THE COURT:  Who mixed up the date?  You mean that

3    Denbeaux and Kourani mixed up the dates so Kourani was not at

4    the April 12 meeting?

5              THE WITNESS:  Correct, your Honor.

6    Q.  Did you set a new time to meet?

7    A.  We did.

8    Q.  Was there any discussion with Mr. Denbeaux regarding

9    immunity for the defendant?

10   A.  No, there was not.

11   Q.  Did you make any promise that the defendant's statements

12   would not be used against him?

13   A.  No, I did not.

14   Q.  Turning your attention to April 14, 2017, did you meet with

15   the defendant that day?

16             THE COURT:  April 12 was a nonmeeting.  Nothing

17   happen.

18             THE WITNESS:  Yes, your Honor.

19             THE COURT:  It was rescheduled April 14.

20             THE WITNESS:  Yes, your Honor.

21   Q.  Where did the April 14 meeting take place?

22   A.  Seton Hall University Law School.

23   Q.  Was it in the same conference room?

24   A.  Yes, it was.

25   Q.  Who was present.

1   A.   Myself, Special Agent Shannon, the defendant and

2   Mr. Denbeaux.

3   Q.   How did this meeting begin?

4   A.   The meeting began with the defendant stating that if he

5   were to cooperate with the U.S. government he'd like a doorman

6   building and as I had previously said before to the defendant

7   I'd restated, that's great but you can want anything in the

8   world but I can't make my promises.  It's more important that

9   we get the whole and complete truth regarding his involvement

10  in Hezbollah before we discuss anything else about benefits.

11  Q.   Did the defendant make any requests in connection with his

12  wife's family?

13  A.   Yes, he did.  The defendant felt based off of the

14  altercation that occurred in Lebanon that year before and I

15  think some subsequent disagreements with his wife and her

16  family regarding childcare and child custody, that he could

17  utilize the FBI to take revenge were the words he used or take

18  vengeance on his wife's family.  The defendant stated something

19  about no flying members of her family, getting them on the

20  no-fly list, extraditing I believe his wife's brother-in-law

21  and getting restraining orders.

22  Q.   Were there any breaks taken during this meeting?

23  A.   There were multiple but one particular break towards the

24  end of the meeting does stand out.

25  Q.   Can you describe the circumstance?

1    A.   Towards the end of the meeting I asked the defendant to

2    identify other 910 ESO operatives that he knew to be

3    operational.  The defendant stated he wasn't comfortable

4    providing that information and then I believe took a break and

5    left.  Mr. Denbeaux followed him out and then Mr. Denbeaux

6    returned and said the defendant was leaving for the day.  Given

7    that we have come all that way I stated to Mr. Denbeaux that we

8    were willing to put that question aside to continue the

9    interview if Mr. Kourani wants to return.

10   Q.   What happened next?

11   A.   Mr. Denbeaux called Mr. Kourani, explained our position and

12   Mr. Kourani returned.

13   Q.   Did you continue the meeting?

14   A.   We did.

15   Q.   Did you keep with your representation that you wouldn't ask

16   questions again about having the defendant name other 910

17   operatives?

18   A.   In that meeting, yes.

19   Q.   Was there any discussion during this meeting of immunity

20   for this defendant?

21   A.   No, there was not.

22   Q.   Did make any promise that the defendant's statements would

23   not be used again him?

24   A.   No, I did not.

25   Q.   Following this meeting what was that your assessment --

1    A.  Felt the defendant had provided some truthful and useful

2    information regarding his involvement with Hezbollah but no

3    where near the entirety of the information.  But given that he

4    was still unwilling to identify the other 910 operatives that

5    we still had to --

6    Q.  Did you convey that?

7    A.  I did.

8    Q.  What did you say?

9    A.  I believe I used the phrase we've broken down some walls

10   but we still have a way to go.

11   Q.  Turning you attention to April 19, 2017, did you speak with

12   Mr. Denbeaux by phone that day?

13   A.  I did.

14   Q.  Who was on the phone call?

15   A.  Just and an Mr. Denbeaux.

16   Q.  What was discussed on the call?

17   A.  Mr. Denbeaux stated that he had had a long conversation

18   with the defendant and that they both felt it was to

19   defendant's best interests to continue meeting with the FBI.

20   Q.  What, if anything, did you say in response?

21   A.  I stated we would be willing to meet again.

22   Q.  Was there any discussion of immunity on this call?

23   A.  No, there was not.

24   Q.  Did you make any promise that the defendant's statements

25   would not be used against him?

1    A.  No, I did not.

2    Q.  Turning your attention to April 25, 2017, did you again

3    speak by phone with Mr. Denbeaux that day?

4    A.  I did.

5    Q.  Was anyone else on that call?

6    A.  Just myself and Mr. Denbeaux.

7    Q.  What was your said on the call?

8    A.  Mr. Denbeaux stated he had a conversation with the

9    defendant regarding our scheduled upcoming meeting and that he

10   was hopeful the defendant would have a big day.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  What did you understand Mr. Denbeaux to mean by "a big

2   day"?

3   A.  I believe Mr. Denbeaux meant that the defendant was going

4   to be providing a lot of very good new information regarding

5   his involvement with Hezbollah.

6   Q.  Was there any discussion on this call about immunity for

7   the defendant?

8   A.  No, there was not.

9   Q.  Did you make any promise that the defendant's statements

10  would not be used against him?

11  A.  No, I did not.

12  Q.  Turning your attention to the following day, April 26,

13  2017, did you meet with the defendant that day?

14  A.  I did.

15  Q.  Where did that meeting take place?

16  A.  Seton Hall University Law School.

17  Q.  Who was present?

18  A.  Myself, Special Agent Shannon, the defendant, and Mr.

19  Denbeaux.

20  Q.  Did the meeting take place in the same conference room?

21  A.  It did.

22  Q.  You testified that prior to this meeting you had a call

23  with Mr. Denbeaux where he indicated he believed this would be

24  a big day.  How did the meeting begin?

25  A.  The meeting began -- if I look at my notes I could probably

1    better recall.  I can't recall offhand.

2    Q.  During the course of this meeting, did the defendant

3    correct any prior statements that he had made to the FBI?

4    A.  Yes.  The defendant had stated in that meeting that he had

5    previously lied to the FBI in his first meeting with us on

6    March 23rd.  The defendant stated he was actually recruited

7    into the Hezbollah's ESO in 2008, not 2010.  The defendant

8    stated he had omitted that from us because he did not want us

9    to know that he had been a member of unit 910 in Hezbollah

10   previous to his achieving his U.S. citizenship and that he was

11   tasked to retain his U.S. citizenship by ESO, Hezbollah.

12   Q.  At the end of the meeting, what was your assessment of the

13   defendant's attempt at cooperation?

14   A.  I thought the defendant had provided a few pertinent new

15   facts but by no means had a big day or provided anything

16   anywhere near the totality of his information regarding his

17   involvement with Hezbollah.

18   Q.  Were there any breaks taken during this meeting?

19   A.  Yes.  Towards the end of the meeting, myself and Special

20   Agent Shannon took a break.  We contacted the U.S. Attorney's

21   office and stated that we were going to be ending a meeting

22   based on our assessment of Mr. Kourani's statements.

23   Q.  Why did you call a representative from the U.S. Attorney's

24   office?

25   A.  I felt at that point it was good to notify them that we

 1   were going to be ending the interview, that we felt that Mr.

 2   Kourani was no longer being completely forthcoming, that he was

 3   still unwilling to answer some significant questions regarding

 4   his involvement with Hezbollah.

 5   Q.   Following that call, did you return to the meeting room?

 6   A.   We did.

 7   Q.   What, if anything, did you say?

 8   A.   We thanked the defendant for his time and I stated to both

 9   him and Mr. Denbeaux that I'd be in touch.

10   Q.   Was there any discussion at this meeting regarding immunity

11   for the defendant?

12   A.   No, there was not.

13   Q.   Did you make any promise that the defendant's statements

14   would not be used against him?

15   A.   No, I did not.

16   Q.   Was there any discussion on April 26th of an individual

17   name Moustafa Kourani?

18   A.   Yes, there was.

19   Q.   Who is Moustafa Kourani?

20   A.   The defendant's brother.

21   Q.   Turning your attention to what has been marked for

22   identification as Government Exhibit 103, what is this?

23   A.   It's an email company I received from a U.S. Immigration

24   and Customs Enforcement attorney handling Moustafa.

25           MS. HOULE:   The government moves Government Exhibit

1    103.

2                MR. SCHACHT:  No objection.

3                THE COURT:  Received.

4                (Government's Exhibit 103 received in evidence)

5    Q.  If we could start, Mr. Costello, with the second page of

6    this email.  It appears that this email was sent on April 26,

7    2017.  It is from Adam Panopoulos.  Who was that?

8    A.  The immigration attorney with Immigration and Customs

9    Enforcement.

10   Q.  It is sent to someone named Gregory King, yourself, and

11   someone is cc'd named Lovito Lukose.  Who are those people?

12   A.  Gregory King is a special agent on my squad.  And Lovito

13   Lukose is an attorney with the U.S. Department of Justice.

14   Q.  Why were you all corresponding about Moustafa Kourani's

15   immigration hearing?

16   A.  Moustafa Kourani was the subject of an FBI investigation,

17   was so at that time, separate from his brother.

18   Q.  Mr. Panopoulos reminds you that there is a status hearing

19   that will take place tomorrow at 9:30 on the 12th floor of 26

20   Federal Plaza. He indicates that it is likely there will be a

21   ruling on removability.  He indicates in the third line it's

22   very likely that the IJ will set this out to another status

23   hearing for an update on relief.  The final line in that first

24   paragraph he says, "Based on our last meeting, it looks like

25   buying time is a solid approach at this point, so I won't

1    object to a reasonable adjournment for the filing of relief.

2    Q.  What was he referring to based on our last meeting?

3    A.  Myself, some other members from my squad had met with Mr.

4    Panopoulos in March regarding Moustafa Kourani and our investi-

5    gation of him.

6    Q.  What was your understanding of "looks like buying time is a

7    solid approach"?

8    A.  We had stated in March when we met --

9              THE COURT:  Who is "we"?

10             THE WITNESS:  Myself and other members of the FBI.

11   A.  I had stated, your Honor, that we had a lot going on in

12   terms of the Moustafa Kourani investigation and other linked

13   investigations and that we would like to keep all our options

14   on the table regarding Moustafa Kourani if possible.

15   Q.  You said you referenced other investigations.  Did you

16   specifically indicate to Mr. Panopoulos during that meeting or

17   at any other time that you were investigated Ali Kourani?

18             MR. SCHACHT:  Objection.

19             THE COURT:  Overruled.

20   A.  No, I did not.

21   Q.  Turning to the first page of the email, it looks like you

22   replied to Mr. Panopoulos on Wednesday April 26th at 4:35 p.m.

23   You write, "Sorry for the late reply.  Currently handling

24   something.  Agreed buying time would 100 percent serve our

25   purposes as it stands with the investigation right now.  If

1    possible, I will touch base after the hearing."

2            What did you mean when you said that "buying time 100

3    percent serves our purposes as it stands with the

4    investigation"?

5    A.   As I previously stated to Mr. Panopoulos at our meeting a

6    month prior, we had a lot of ongoing equities and that we would

7    like to keep all the options on the table regarding Moustafa

8    Kourani.

9    Q.   How did any investigation stand to benefit by the delay in

10   Mr. Moustafa Kourani's immigration hearing?

11   A.   Given that we were in active talks with his brother, I

12   didn't want Moustafa Kourani to get deported or anything to

13   send kind of the wrong message.  I wanted to keep all the

14   options on the table.

15   Q.   Where were you when you sent this email?

16   A.   Seton Hall University Law School, to the best of my

17   recollection.

18   Q.   Do you remember if you had any discussions with the

19   defendant about Moustafa Kourani's immigration hearing around

20   the time that you were corresponding with Mr. Panopoulos?

21   A.   I did.

22   Q.   Can you describe those discussions.

23   A.   I looked at my phone at one point or the other and saw the

24   email from that morning stating that Mr. Kourani -- that it was

25   my understanding that his brother would like to get a deferment

1    in his immigration hearing.

2    Q.  Did the defendant say anything in response?

3    A.  Thanked me.

4    Q.  What did you understand him to be thanking you for?

5    A.  Giving him the heads-up that his brother was going to have

6    a deferment.

7    Q.  Did the defendant ever make any request to you in

8    connection with his brother's immigration proceedings?

9    A.  No, he did not.

10   Q.  Turning your attention to May 1, 2017, did you speak again

11   with Mr. Denbeaux that day?

12   A.  I did.

13   Q.  Was that by phone?

14   A.  Yes, it was.

15   Q.  Was anyone else on the call?

16   A.  Just myself and Mr. Denbeaux.

17   Q.  What was said during that call?

18   A.  Mr. Denbeaux called me to inquire as to the status of Mr.

19   Kourani's case.  I stated we were still analyzing some of his

20   statements and that we would be in touch.

21   Q.  Did Mr. Denbeaux respond?

22   A.  He was kind of unhappy with that.  I believe he said it was

23   a bureaucratic answer and abruptly hung up the phone.

24   Q.  Was is there any discussion of immunity for the defendant

25   on this call?

1    A.  No, there was not.

2    Q.  Turning your attention to May 3, 2017, did you receive text

3    messages from Mr. Denbeaux on that date?

4    A.  I did.

5    Q.  Turning your attention to what's been marked for identi-

6    fication as Government Exhibit 302, what is this a picture of?

7    A.  It's a picture of a text message I received from Mr.

8    Denbeaux that was sent to both myself and a number I know to be

9    Ali Kourani's.

10   Q.  Did you take that picture?

11   A.  I did.

12          MS. HOULE:  The government offers Government Exhibit

13   302.

14          MR. SCHACHT:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibit 302 received in evidence)

17   Q.  Who is the sender of this message?

18   A.  Mr. Denbeaux.

19   Q.  Can you please read the message aloud.

20   A.  Sure.

21          THE COURT:  It's in the record.  No need to read it

22   aloud.

23   Q.  It says here that there are three points Mr. Denbeaux

24   raises which he says were true at the conclusion of the last

25   meeting.  The third point is that "You and I will talk about

1   the government's plans to provide the assistance agreed upon."

2   What did you understand Mr. Denbeaux to be referring to?

3   A.  I didn't know at that time and I still don't.  No agreement

4   was ever made between myself, the defendant, or Mr. Denbeaux

5   regarding any government assistance.

6   Q.  Mr. Denbeaux then writes in the second full paragraph, "My

7   client had given you nothing that you did not already know and

8   you had nothing for his assistance."  What did you understand

9   him to be referring to there?

10  A.  I think he is paraphrasing what I stated at the conclusion

11  of the fifth interview.  I stated that Mr. Kourani had provided

12  us some new information but not the totality of his involvement

13  with Hezbollah.

14  Q.  The next line says, "That means his children who are

15  American citizens remain in danger along with his other family

16  members."

17          MS. HOULE:  If you could turn to the second page, Mr.

18  DeLuca, so we could looked the whole message there.  Focus in

19  on that line, "That means his children."

20  Q.  He says, "That means his children who were American

21  citizens remain in danger along with his other family members

22  and he has been abandoned after days of voluntary cooperation

23  with his government."  What did you understand Mr. Denbeaux to

24  be referencing there?

25  A.  Mr. Kourani had previously stated to me that he felt his

1    mother-in-law was a drug addict and that a member of his wife's

2    family was a possible pedophile, and that as such the fact that

3    his children were in the custody of his wife and her family in

4    Canada, that they were at risk.

5    Q.   What, if anything, did you do in response to this message?

6    A.   Because I disagreed with so much of it, I called Mr.

7    Denbeaux.

8    Q.   What did you say on the call?

9    A.   I explained to Mr. Denbeaux that I disagreed with what he

10   said and that it would be difficult to discuss any sort of

11   benefits given that Mr. Kourani had admitted to being a member

12   of a designated foreign terrorist organization and that he had

13   conducted multiple operational acts in the U.S.

14   Q.   What, if anything, did Mr. Denbeaux state in response?

15   A.   Mr. Denbeaux stated he would go to the media.

16   Q.   What did you say in response?

17   A.   I said that was fine, and then Mr. Denbeaux hung up the

18   phone.

19             THE COURT:  Is this a good time to break for lunch?

20             MS. HOULE:  Thank you, your Honor.

21             THE COURT:  Yes?

22             MS. HOULE:  Yes.

23             THE COURT:  We will break until 2:15.  How much more

24   do you have with this witness?

25             MS. HOULE:  30 minutes at the most, your Honor.

1          THE COURT:  Is it equal time with the second witness?

2          MS. HOULE:  Less time, your Honor.  Probably about 45

3     minutes on direct.

4          THE COURT:  Mr. Schacht, will you tell me what time

5     your case is going to take in terms of time.

6          MR. SCHACHT:  Mr. Denbeaux is here.  I predict my

7     direct examination of him would be probably about 30 minutes.

8     My cross-examination of the government witnesses will be, I

9     predict, shorter than the direct.

10         THE COURT:  Thank you.  Have a good lunch.  Don't

11    discuss the testimony over lunch.

12         (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

I3qrkou3                    Costello - direct

2:15 p.m.

JOSEPH COSTELLO, resumed.

            THE COURT:  Mr. Costello, you remain under oath.

DIRECT EXAMINATION (continued)

BY MS. HOULE:

Q.  Special Agent Costello, drawing your attention to May 17,

2017, did you speak with Mr. Denbeaux by phone that day?

A.  I did.

Q.  Was anyone else on the call?

A.  Just myself and Mr. Denbeaux.

Q.  What was said on the call?

A.  Mr. Denbeaux stated he had spoken with the defendant and

that the defendant stated he was looking to travel back to

Lebanon and felt that the best chance to get custody of his

children was in Lebanon.

Q.  What, if anything, did you say in response?

A.  I stated to Mr. Denbeaux that is certainly his right, I

can't really comment on the status of the custody of his

children between him and his wife.  Mr. Denbeaux then asked me

if it was safe for Mr. Kourani in Lebanon.  I said based off

Mr. Kourani's previous statements regarding the alteration with

the Hezbollah militia, I can't give an official answer, I don't

know, but he should ask Mr. Kourani.

            THE COURT:  How would he think you know what happened

1    in Lebanon?

2              THE WITNESS:  I'm not sure, your Honor.

3              THE COURT:  You have no special pipeline to the

4    situation in Lebanon?

5              THE WITNESS:  No, your Honor, I don't.

6              THE COURT:  Did you think that question was strange?

7              THE WITNESS:  I did a little bit, your Honor.  But to

8    be frank, Mr. Denbeaux and I had discussed Hezbollah and unit

9    910.  Maybe Mr. Denbeaux thought because I knew so much about

10   910 that I knew about the security situation in Lebanon, which

11   obviously I did not.

12   Q.  Did you have any concerns about the defendant potentially

13   returning to Lebanon?

14   A.  I did.

15   Q.  What concerns?

16   A.  Based off the comments on the conduct that the defendant

17   had taken part in in his time in the U.S. on behalf of unit

18   910, more specifically his surveillance and operations within

19   the U.S. airports, I didn't want the defendant anywhere near a

20   United States airport or air carrier.  Further, given that the

21   case was starting to progress, I didn't want the defendant

22   leaving the country.  I didn't want him speaking to members of

23   Hezbollah about myself, Special Agent Shannon, the questions we

24   asked him, the information he had provided us.

25   Q.  What, if anything, did you do with the information that Mr.

1  Denbeaux provided about the defendant's potential travel to

2  Lebanon?

3  A.  I related both to my superiors at the FBI and the U.S.

4  Attorney's office.

5         THE COURT:  Who were you dealing with at the U.S.

6  Attorney's office?

7         THE WITNESS:  At that time, your Honor?

8         THE COURT:  Yes.

9         THE WITNESS:  Assistant United States Attorney Bove

10  and Assistant United States Attorney Amanda Houle.

11  Q.  Turning your attention to May 26, 2017, did you speak with

12  Mr. Denbeaux by phone again that day?

13  A.  I did.

14  Q.  Was anyone else on the call?

15  A.  No, just myself and Mr. Denbeaux.

16  Q.  What was said on that call?

17  A.  Mr. Denbeaux stated he had had another conversation with

18  the defendant and that the defendant was going to relocate to

19  the Midwest, the U.S., where he had previously worked.  Mr.

20  Denbeaux also relayed that Mr. Kourani told him that he

21  understood him to be no-fly, that he could not board a U.S. air

22  carrier.  Mr. Denbeaux -- that was it.

23  Q.  What, if any, concerns did you have about the defendant

24  traveling to the Midwest?

25  A.  Similar to him traveling to Lebanon, given some of the

1    comments on the conduct he had taken on behalf of ESO, I didn't

2    want him traveling anywhere.  I was concerned about notifying

3    the appropriate FBI division should he travel.  Finally, I

4    didn't want him trying to fly or anything like that.

5    Q.  What, if anything, did you do with the information from Mr.

6    Denbeaux about the defendant potentially traveling to the

7    Midwest?

8    A.  Again, I relayed it to my superiors at the FBI and also the

9    U.S. Attorney's office.

10   Q.  Did there come a time in this case when the defendant was

11   arrested?

12   A.  Yes.

13   Q.  When was that?

14   A.  June 1, 2017.

15   Q.  Between that May 26 call with Mr. Denbeaux that you just

16   described and the defendant's arrest, did you have any

17   communications with Mr. Denbeaux?

18   A.  No, I did not.

19   Q.  Did you have any communications with the defendant?

20   A.  No, I did not.

21   Q.  Did you participate in creating a plan for the defendant's

22   arrest?

23   A.  I did.

24   Q.  What generally was the plan?

25   A.  The plan in broad strokes was to arrest Mr. Kourani as

1    quietly as possible.  We wanted to preserve Mr. Kourani

2    cooperating with us without anyone knowing.  So we had drawn up

3    a plan to, again, arrest him very quietly without making a big

4    splash so to speak.

5    Q.  When you say you wanted to preserve and cooperate, what do

6    you mean?

7    A.  A lot of the value of his cooperation with the FBI is tied

8    up with individuals in Hezbollah and the Lebanese community not

9    knowing that he is cooperating with the FBI.

10   Q.  At that point did you know whether the defendant would

11   continue to cooperate?

12   A.  I did not.

13   Q.  Did you participate in the arrest of the defendant?

14   A.  I did not.

15   Q.  Did you speak with the agents who did?

16   A.  I did.

17   Q.  Based on your discussions with those agents, what is your

18   understanding about whether the arrest followed the plan?

19   A.  It followed the plan to a tee.

20   Q.  Once the defendant was arrested, where was he brought?

21   A.  He was brought down to 26 Federal Plaza, the FBI's New York

22   field office, for processing.

23   Q.  Were you there?

24   A.  I was.

25   Q.  What happened next?

1    A.  I provided the defendant a telephone.  He contacted a

2    lawyer, I believe Mr. Denbeaux.  He told me he was going to

3    call Mark.  I left the room.  The defendant then finished the

4    call.  I guess he yelled so I could hear him.  I returned to

5    the room.  He stated he wanted to cooperate and he needed a

6    criminal defense lawyer.

7    Q.  Was he put in contact with a new criminal defense lawyer?

8    A.  Yes.  He was put in contact with the public defenders

9    office.

10   Q.  Did you meet with a public defender?

11   A.  He would.

12   Q.  Following his meeting with the public defender, was the

13   defendant brought to court that day?

14   A.  No, he was not.

15   Q.  Why not?

16   A.  Again, in keeping with the idea of keeping his cooperation

17   quiet from the Lebanese community, the defendant agreed,

18   because he wanted to cooperate, to waive his initial appearance

19   that day.

20   Q.  Did you meet with the defendant and his attorney that day?

21   A.  I did.

22   Q.  Were myself and AUSA Bove present for those meeting?

23   A.  Yes.

24   Q.  Where was the defendant housed that night?

25   A.  We housed the defendant that night at the downtown Marriott

1   in TriBeCa.

2   Q.  Was he kept in custody there by the FBI?

3   A.  He was.

4   Q.  Why was he housed there?

5   A.  Again, in keeping with the arrest plan, subsequent arrest,

6   and him waiving his initial appearance, we thought keeping him

7   there in custody versus in a prison would help preserve the

8   possibility of cooperation.

9   Q.  Did you meet with the defendant and his attorney the

10  following day?

11  A.  Yes, I did.

12  Q.  Where was that meeting held?

13  A.  Here in the Southern District.

14  Q.  Were there representatives from the U.S. Attorneys present

15  as well at that meeting?

16  A.  Yes, they were.

17  Q.  At the conclusion of that meeting, what was your assessment

18  of the defendant's potential cooperation?

19  A.  I felt the defendant had still not been completely forth-

20  coming regarding his involvement with Hezbollah.

21  Q.  Did the defendant appear in court later that day?

22  A.  He did.

23  Q.  Was the complaint unsealed that day?

24  A.  It was.

25  Q.  In connection with this investigation, has the FBI executed

1    search warrants?

2    A.  Yes.

3    Q.  Did the FBI execute a search warrant on an email account

4    with the name ali.m.kourani@gmail.com?

5    A.  Yes.

6    Q.  Based on your investigation, is that an email account

7    associated with the defendant?

8    A.  Yes.

9    Q.  Have you reviewed the return of that search warrant?

10   A.  I have.

11   Q.  In preparation for your testimony today, have you assisted

12   the U.S. Attorney's office in pulling extracts from that email

13   account?

14   A.  I have.

15   Q.  If you could look in your binder there for what has been

16   marked for identification as Government Exhibits 201 through

17   229.

18   A.  Yes.

19   Q.  Are these emails that were seized by the FBI pursuant to

20   that search warrant?

21   A.  Yes, they are.

22            MS. HOULE:  Your Honor, the government offers Exhibits

23   201 to 229 into evidence.

24            THE COURT:  That's 28 exhibits.

25            MS. HOULE:  Yes, your Honor.

1          THE COURT:  29.

2          MS. HOULE:  29 exhibits.

3          THE COURT:  Will he be questioned on all of them?

4          MS. HOULE:  This ones he will not, your Honor.  We are

5     putting them into evidence now so the defendant can be cross-

6     examined using those emails.

7          MR. SCHACHT:  Judge, I'm not disputing the authen-

8     ticity of those emails.  But I would like them to be gone

9     through one by one.  I don't want them introduced unless a live

10    witness is going to be asked about them.  But if my client

11    testifies, I would consent to them going into evidence to

12    cross-examine him about them.

13         MS. HOULE:  Your Honor, if the defendant is not

14    testifying, the government would still seek to rely on these

15    exhibits.

16         THE COURT:  Put them in one by one.  Otherwise, I

17    don't have any sense of them and what their importance or

18    unimportance is.

19         MS. HOULE:  Your Honor, we will proceed with offering

20    them into evidence now and we can address them if the defendant

21    testifies.  If he does not, we may seek separately to put them

22    into evidence.

23         THE COURT:  Okay.

24         MS. HOULE:  Your Honor, Government Exhibits 801

25    through 806 is a series of text messages.  We will plan to

1    proceed in the same format.  Assuming the defendant testifies,

2    we will offer them into evidence then.  But now we will lay the

3    foundation.

4              THE COURT:  Why?

5              MS. HOULE:  Your Honor, I believe it is important to

6    establish where the text messages were from, where it was found

7    and how they were associated with the defendant.

8              THE COURT:  You are going to use them?

9              MS. HOULE:  In cross-examining the defendant.

10              THE COURT:  Your cross-examination of the defendant?

11              MS. HOULE:  Of the defendant.

12              THE COURT:  Simply use the document then.

13              MS. HOULE:  Perhaps, your Honor, the defense could

14    stipulate now to the authenticity of those exhibits and that

15    they were seized from a cell phone found in the defendant's

16    residence.

17              MR. SCHACHT:  I'll do better.  I will stipulate that

18    they are exchanges that my client had.

19              THE COURT:  There you go.

20              MS. HOULE:  Thank you, your Honor.

21              THE COURT:  Pace Judge Weinfeld: nothing goes into

22    evidence unless the judge understands it when it's put in.

23              MS. HOULE:  Understood, your Honor.

24    BY MS. HOULE:

25    Q.  Special Agent, based on your review of FBI records in this

 1  case, was a search warrant executed at a location in the Bronx,

 2  New York, on June 1, 2017?

 3  A.  Yes.

 4  Q.  Was that a residence?

 5  A.  Yes.

 6  Q.  Who lived there?

 7  A.  The defendant, his brother, and one or two other

 8  individuals.

 9  Q.  Did FBI agents collect and voucher evidence pursuant to a

10  search of that apartment?

11  A.  We did.

12  Q.  Have you retrieved any evidence from the FBI's evidence

13  vault that was vouchered as part of that search?

14  A.  I have.

15  Q.  Showing you what have been marked for identification as

16  Government Exhibits 401 and 402.  Turning first to 401, what is

17  this document?

18  A.  That document appears to me to be notes the defendant took

19  that were seized from the residence.  They also are consistent

20  with pieces of paper the defendant had on him during our

21  interviews of him at Seton Hall University Law School.

22  Moreover, some of the statements written in the notes are

23  consistent with some of the things the defendant said to me in

24  our interviews.

25  Q.  To be clear, based on your review of FBI records, this

1   document was seized from the defendant's residence in the

2   search on June 1st, right?

3   A.   Correct.

4   Q.   I believe what you just said is that it looks consistent

5   with pieces of paper that you observed the defendant with

6   during the course of your meetings with him?

7   A.   Correct.

8            MR. SCHACHT:  Judge, I will stipulate these are my

9   client's notes.

10           THE COURT:  All right.

11           MS. HOULE:  Your Honor, we offer Government Exhibit.

12  401 and 402 into evidence.

13           THE COURT:  What on 401 do you want me to pay

14  attention to?

15           MS. HOULE:  I'm going to be asking this witness, your

16  Honor, about certain lines on this exhibit.

17           THE COURT:  And 402 is already in evidence.

18           MS. HOULE:  The first page of 402 is, your Honor, as

19  it was an attachment to the defense's motion.  The second page,

20  there are handwritten notes which are the defendant's notes.

21           THE COURT:  401 and 402 are admitted.

22           (Government's Exhibits 401 and 402 received in

23  evidence)

24  Q.   Special Agent, in preparing to testify today, have you

25  reviewed the handwritten notes on Government Exhibit 401?

1    A.  I have.

2    Q.  I'm going to ask you about a few lines.

3            MS. HOULE:  Mr. DeLuca, if you could highlight on the

4    right-hand side of the page, you are just above it now.  Thank

5    you.

6    Q.  Special Agent Costello, what do you read that to say?

7    A.  "I see way to bring my kids or take revenge" exclamation

8    point.

9    Q.  Do you recall the defendant making any statements along

10   those lines during the course of your interviews with him?

11   A.  I do.  Nearly verbatim, the defendant stated he felt the

12   FBI could go and just take his kids, and also he could utilize

13   the FBI to go after his wife's family for some sort of

14   perceived slight.

15           MS. HOULE:  Turning to the next page, Mr. DeLuca, if

16   you could zoom in on the top four bullet points there.

17   Q.  Special Agent, what do you read those notes to say?

18   A.  At the top, "No-flight list, all her family.  Kicked out of

19   an airport job.  Restraining order, mom.  BK, extradite him.

20   Facebook message."

21   Q.  Do you recall the defendant making any statements along the

22   lines of those notes during your interviews of him?

23   A.  Yes.

24   Q.  What do you recall?

25   A.  For example, the defendant had requested that we put his

wife's family on the no-fly list.  He had previously discussed

with us an individual of his wife's family who worked at the

Fort McMurray, Canada, airport.  I assume that's what that's a

reference to.  Finally, he used the phrase "restraining order"

in terms of his wife's mother, his mother-in-law, and Bashir

Kourani, his wife's brother-in-law.  And finally that we could

extradite Bashir Kourani for something.  I was never clear

what.

Q.  We covered a number of meetings and conversations that you

had with the defendant and Mr. Denbeaux.  Are there any

meetings or conversations we have not covered during your

testimony in which you made any offer of immunity?

A.  No, there was not.

Q.  Were you ever asked about immunity for the defendant?

A.  No, I was not.

Q.  Did you ever promise that the defendant's statements would

not be used against him?

A.  No, I did not.

            MS. HOULE:  Thank you.  No further questions.

            THE COURT:  Cross-examination, Mr. Schacht.

CROSS-EXAMINATION

BY MR. SCHACHT:

Q.  Mr. Costello, are you a lawyer?

A.  No, sir.

Q.  As part of your training to become an FBI agent, you

1    received some legal training you talked about on direct

2    examination, right?

3    A.  Yes.

4    Q.  You also received some training on how to conduct yourself

5    in court, is that right?

6    A.  Yes.

7    Q.  Tips about how to testify?

8    A.  Yes.

9    Q.  In this case you and Agent Shannon prepared what are called

10   302 reports, is that right?

11   A.  Yes.

12   Q.  It's part of your training, am I right, to accurately fill

13   out your 302 reports?

14   A.  Yes.

15   Q.  Generally speaking, the way you make a 302 report is by

16   looking back at notes and going to your own recollection of

17   what happened and then typing up what happened at a meeting,

18   right?

19   A.  Correct.

20   Q.  You mentioned a few minutes ago that at some point you had

21   been in touch with the two Assistant U.S. Attorneys who are

22   here in court about this case, is that right?

23   A.  Yes.

24   Q.  When was the first time in connection with your investi-

25   gation of Ali Kourani did you have any contact with any

 1    Assistant U.S. Attorneys, these two or anyone else in the

 2    Southern District of New York?

 3    A.  Well before Mr. Kourani came forward in 2017.

 4    Q.  Would it be fair to say in 2016 or before then?

 5    A.  2015, 2016, somewhere in there.

 6    Q.  So at some point in the 2015 to 2016 period you started

 7    discussing your investigation of Ali Kourani with prosecutors

 8    in the Southern District of New York, is that right?

 9    A.  Correct, when I came on the squad, which was in December of

10    2015.  So yes.

11    Q.  From that time at least?

12    A.  Correct.

13    Q.  At that time there were different prosecutors than those

14    two in court?

15    A.  Correct.

16    Q.  Did you communicate with Assistant U.S. Attorneys after

17    each of the five meetings that you testified about regarding

18    the interviews?

19    A.  I believe each.  I can't say for certain if each one, but I

20    believe so.  At least four of the five.

21    Q.  Was that with these U.S. Attorneys or different U.S.

22    Attorneys?

23    A.  I believe after the first interview on March 3rd I may have

24    spoke to a different U.S. Attorney.  But from then-abouts it

25    would have been these two Assistant U.S. Attorneys.

1  Q.  Who was the different one from March 3rd if you recall?

2  A.  Assistant United States Attorney Andrew Bateman.

3  Q.  You testified on direct examination that as part of your

4  training or the rules that you are required to follow as an FBI

5  agent, you are not allowed to promise things to people that you

6  are interviewing.  Is that a fair summary of what you said?

7  A.  Yes.

8  Q.  Do you recall in the phonecall before the first meeting

9  that you had with Mark Denbeaux, in that phonecall you and

10 Agent Shannon promised confidentiality to Mr. Denbeaux and Mr.

11 Kourani?

12 A.  We certainly didn't use the word "promise," but we did

13 state to Mr. Denbeaux that we would keep Mr. Kourani's state-

14 ments confidential from the Lebanese community, which was

15 specific to Mr. Denbeaux's question.

16 Q.  Did you say confidential from the Lebanese community, as

17 you recall?

18 A.  I can't directly quote myself, as I don't directly recall,

19 but something to that effect, yes.

20 Q.  Wouldn't it be fair to say, though, that you were telling

21 Mr. Denbeaux the truth?  You weren't lying to him, right?

22 A.  Correct.

23 Q.  So by saying you would keep it confidential from the

24 Lebanese community, that was a kind of promise, wasn't it, you

25 were promising it for to Mr. Denbeaux?

 1   A.  I would say that at that time we would certainly keep it

 2   confidential from the Lebanese community.

 3   Q.  What time period are you referring to when you say "at that

 4   time"?

 5   A.  We hadn't met with Mr. Kourani yet.  At that time we were

 6   keeping all our options on the table.

 7   Q.  What does that mean, all your options on the table?

 8   A.  I mean if Mr. Kourani was going to be providing the full

 9   and complete truth to the U.S. government, we would certainly

10   not be sharing that with anyone.

11   Q.  Did you say to Mr. Denbeaux --

12           THE COURT:  I don't think that answers the question of

13   what options were available.  That is your question, right?

14           MR. SCHACHT:  Yes, your Honor.

15   A.  It depends.  We had previously met with Mr. Kourani.  He

16   had provided us no information.  We then interviewed

17   individuals in the Lebanese community.  So it is difficult to

18   speak for what could happen.  But at that point I did say to

19   Mr. Denbeaux that we would keep it confidential from the

20   Lebanese community, him meeting with us.

21   Q.  But you didn't say to Mr. Denbeaux that that was a

22   condition or a conditional promise, right?  Withdrawn.  I'll

23   rephrase the question.  You didn't say to him that it was only

24   confidential if he tells the truth?  You didn't say that, did

25   you?

1   A.  No, I did not.

2   Q.  Can you describe what you meant by "confidential."

3   A.  We wouldn't be taking the information Mr. Kourani provided,

4   whatever that was, and, say, telling other individuals in the

5   community that he was providing us that information.

6   Q.  In fact, here in court today, this is a public courtroom,

7   right?

8   A.  Correct.

9   Q.  What's happening is public, right?

10  A.  Correct.

11  Q.  So nothing you are saying today is confidential, correct?

12  A.  Correct.

13  Q.  When you arrested Mr. Kourani, a complaint was prepared,

14  right?

15  A.  Correct.

16  Q.  I believe you signed the complaint in this case, didn't

17  you?

18  A.  Yes.

19  Q.  Many of the facts in the complaint come from my client's

20  mouth, right?

21  A.  Correct.

22  Q.  Those were things that he said to you after you told Mr.

23  Denbeaux that it was going to be confidential, right?

24  A.  Correct.  The complaint was sealed though.

25              THE COURT:  You did you use the word "confidential"?

1              THE WITNESS:  In that first phonecall with Mr.

2      Denbeaux?

3              THE COURT:  Yes.

4              THE WITNESS:  I believe Mr. Denbeaux used the word in

5      his question to me about the Lebanese community.

6              THE COURT:  What did he ask?  What did he say?

7              THE WITNESS:  I'm paraphrasing here from memory:  Will

8      you be keeping my client's statements to you confidential from

9      the Lebanese community?  To the best of my knowledge and

10     recollection, your Honor.

11             THE COURT:  He used "from the Lebanese community."

12             THE WITNESS:  Something thereabouts, yes.

13             THE COURT:  What is the best of your recollection of

14     what he said?

15             THE WITNESS:  "Lebanese community."  He may have said

16     "Lebanese associates" or "friends."

17             THE COURT:  But Lebanese definitely?

18             THE WITNESS:  Yes.

19             THE COURT:  And you said?

20             THE WITNESS:  I said yes, we would be.

21             THE COURT:  Did you have to check with your superiors?

22             THE WITNESS:  No, I did not, not at that juncture.

23             THE COURT:  Why not?

24             THE WITNESS:  I relayed the conversation to my

25     superiors, but I'm authorized, at least on that call, to answer

1    his question.

2    BY MR. SCHACHT:

3    Q.  Do you recall the time period when you went to Lebanon the

4    first time you met my client?

5    A.  I do.

6    Q.  At that time the reason why my client asked to meet with

7    people from the U.S. government was because the U.S. government

8    at the American embassy in Lebanon had taken his U.S. passport,

9    is that right?

10   A.  That's not my understanding.  I was notified the client

11   came in and wanted to meet with someone from the U.S.

12   government, and I flew out to meet him.

13   Q.  When you met with Mr. Kourani, do you recall him asking to

14   have his passport returned to him?

15   A.  It was returned to him.

16            THE COURT:  That wasn't the question.

17   Q.  Do you recall him asking for his passport?

18   A.  I do not.

19   Q.  Do you know what the FBI calls a confidential human source?

20   A.  I'm familiar with the term.

21   Q.  What is a confidential human source?

22   A.  Not quoting FBI policy, but my understanding of it is an

23   individual signed up with the FBI to provide information on

24   criminal activity.

25   Q.  A confidential human source is a kind of informant, right?

1   A.   Yes.

2   Q.   The informant promises to do certain things for the FBI.

3   They are a confidential human source, right?

4   A.   I don't know if they promise.  They provide information.

5   Q.   Presumably, the FBI wouldn't make someone a confidential

6   human source unless they were providing some information?

7   A.   Certainly.

8   Q.   Presumably, the FBI promises certain things to the

9   confidential human source in exchange for the information,

10  right?

11  A.   No.

12  Q.   No?

13  A.   No, that's not my understanding of it at all.

14  Q.   Like the name implies, don't they promise the person

15  confidentiality?

16  A.   Yes but -- I mean it implies.  I would hesitate to say it

17  is any spoken promise.

18          THE COURT:  He can't testify about what is implied

19  unless he meant to say that.  Ms. Houle, you are allowed to

20  object, you know.

21          MS. HOULE:  Thank you, your Honor.

22  Q.   If you know, are FBI confidential sources promised

23  confidentiality?

24  A.   I don't know.

25  Q.   Have you ever had a confidential human source as an FBI

1   agent?

2   A.  I have.

3   Q.  Have you promised that person or people anything?

4   A.  No.

5   Q.  I don't mean personally.  I mean on behalf of the FBI.

6   A.  No.

7   Q.  Do those people sign an agreement with the FBI?

8   A.  It's been some time.  I don't believe so, no.

9   Q.  You have been an FBI agent three and a half years, right?

10  A.  Approximately.

11  Q.  How long ago was it that you signed up someone as a

12  confidential human source?

13  A.  Approximately two years ago.

14  Q.  You don't remember what the terms of that agreement were

15  from two years ago?

16  A.  Sir, we have what we call our admonishments, which deal

17  with illegal activity, their status as an agent of the

18  government.  Yes.

19  Q.  Do you remember what was in that agreement?

20  A.  Again, it's a verbal admonishment, that to the best of my

21  recollection I verbally admonished the informant.

22          THE COURT:  What is it you admonish?

23          THE WITNESS:  That they are not to conduct any illegal

24  activity, that they are not protected by any protections from

25  the FBI, and finally that they are not an agent of the

1   government.  They can't go out and conduct activity on their

2   own without first being directed by me, their handler.

3   Q.  It is your testimony that they are not given anything in

4   exchange for that from the FBI?

5   A.  No promises, certainly not.  In my experience I've not

6   given anything to my informants.

7   Q.  What are they being informants for then?  For what reason?

8   A.  A variety of reasons.  Many informants are different.  It's

9   tough to nail one down.

10  Q.  In your experience, it's never because the FBI is offering

11  them anything?

12  A.  No, never that, no.

13  Q.  It's always some other personal reason?

14  A.  I don't want to speak to -- I can't speak for all

15  informants.  I can only speak from my limited experience.

16  Q.  I'm only asking about your personal experience.  You have

17  never promised any informant anything?

18  A.  No.

19          THE COURT:  No, you never did?

20          THE WITNESS:  No, I never have, your Honor.  Nor am I

21  authorized to.

22  Q.  Do you recall specifically in this case that my client was

23  interested in being reunited with his children?  Right?

24  A.  I do.

25  Q.  He was interested in having his sister and father, who were

1    then in Lebanon, somehow allowed to come legally to the United

2    States, correct?

3    A.  Correct, I do remember that.

4    Q.  Those were things that he was asking you for, right?

5    A.  Correct.

6    Q.  Your testimony, am I right, is you have never offered any

7    informants ever anything in exchange for them being informants,

8    is that right?  I want to make sure I'm right.

9    A.  I have discussed it with informants.  But I have made clear

10   to my informants that I can't promise nor deliver anything for

11   their testimony or their information.

12           THE COURT:  How many informants have you had?

13           THE WITNESS:  With the FBI officially?  Two.

14   Q.  I'm not asking about whether you can personally do it.  But

15   as a representative of the FBI, have you ever offered anything

16   to these two informants on behalf of the FBI after checking

17   with your supervisors?

18   A.  Other than coffee, no.

19   Q.  Would it be fair to say, then, that Mr. Kourani is the only

20   person in your career who you have discussed -- I'm not asking

21   if you promised -- who you have discussed giving benefits to?

22   Is that fair to say?

23   A.  No.

24   Q.  There are other people you have discussed giving benefits

25   to?

I3qrkou3                              Costello - cross

1    A.  I mean in my career I have interviewed individuals who will

2    say I would like this or I'd like that, and I would maintain

3    that I understand that but I can't make any promises, or

4    deliver any promises for that matter.

5              THE COURT:  Would you say that all confidential

6    informants that you have experienced want something?

7              THE WITNESS:  No, I would not say that, your Honor.

8              THE COURT:  Some do?

9              THE WITNESS:  Some do, your Honor, yes.

10   Q.  In this case you discussed or you and Agent Shannon in your

11   presence discussed with Mr. Kourani the possibility of

12   providing him or his family with immigration help, right?

13   A.  Yes.

14   Q.  At some point in the meetings you discussed a possible time

15   line for that, right?

16   A.  Yes.

17   Q.  When you offered that possible time line for the help, you

18   were being honest, I assume, right?

19   A.  Yes.  But as I stated in my direct, I felt very uncomfort-

20   able giving him that answer.  I was speaking for other govern-

21   ment agencies, which are, we all know, large bureaucracies with

22   their own processes.  So it was a best guess.

23   Q.  You mentioned on direct examination that Mr. Kourani wanted

24   help getting a job, is that right?

25   A.  Yes.

1   Q.  You discussed with him the possibility of the FBI helping

2   him to get a job, right?

3   A.  Not really.  It was more of a one-way conversation specific

4   to that, and a lot of his other, quote, demands.  He would

5   state these things, and I would constantly remind him that it

6   didn't matter if he wanted the world.  It was more important

7   that we discuss his involvement with Hezbollah before we have

8   any of those conversations.

9   Q.  At some point my client actually gave you his résumé,

10  right?

11  A.  I believe he emailed it to me.  I can't recall.  Or he gave

12  it to me.  One or the other.

13          MR. SCHACHT:  Mr. DeLuca, could you please, when you

14  have a moment, put Government Exhibit 225 on the screen.  Thank

15  you very much.

16          Your Honor, I would ask for a stipulation that this be

17  put in evidence.  I can lay the groundwork if you would like.

18          MS. HOULE:  That's fine, your Honor.

19          MR. SCHACHT:  Thank you.

20          THE COURT:  225 is in evidence, received.

21          (Government's Exhibit 225 received in evidence)

22  Q.  Mr. Costello, please take a look at that.  I ask if that

23  refreshes your recollection about whether he gave it to you or

24  emailed it to you?

25  A.  Yes, it appears to be an email sent to my email account

from an address I know to be Mr. Kourani's.

Q.  He had previously, it looks like, sent an email to someone

else, a recruiter, and then he is forwarding that email to you

which has his résumés attached, right?

A.  That's what it appears, yes.

Q.  He did this, it looks like, on April 18, 2017, yes?

A.  Yes, that is the time stamp.

Q.  This was after he had asked your help or the FBI's help in

getting him a job, right?

A.  That's not exactly how he put it.  He stated he wanted a

job in his field for $120,000 a year.

Q.  But he wanted a job that paid $120,000, not that he wanted

you personally to give him $120,000?

A.  I wasn't entirely clear on that.

Q.  You weren't clear?  You thought that he was asking you

personally for money?

A.  No.  I think what I'm trying to say is him sending his

résumé came as a surprise to me, a shock for lack of a better

word.

            THE COURT:  Why were you shocked?

            THE WITNESS:  Mr. Kourani had discussed with us the

idea of should he continue to cooperate, he would like

employment.  But at no point did I tell him to send me his

résumé, and at no point would I want him to based off some of

the issues with Hezbollah's access to email addresses.  So I

I3qrkou3                              Costello - cross

 1  was very surprised to receive this email.

 2  Q.  I'm sorry.  What did you mean about Hezbollah and access to

 3  email addresses?  What are you referring to there?

 4  A.  For example, Mr. Kourani didn't want to have a cell phone

 5  on him during his interviews with us because he felt Hezbollah

 6  could listen in.  Based off that from Mr. Kourani, I didn't

 7  know if they had access to his email address.  I didn't want

 8  him emailing an FBI.gov account at that point.

 9  Q.  Do you know how he got your email address?

10  A.  Either from Mr. Denbeaux or -- no, I don't know, excuse me.

11  Q.  Do you recall there was an exhibit where Mr. Denbeaux had

12  sent you a text message saying that there is no promises?  Do

13  you recall that text message?

14  A.  I do.

15  Q.  That text message was sent very shortly, perhaps within an

16  hour, of when you completed the meeting that day with Mr.

17  Kourani, right?

18  A.  It was.

19  Q.  That meeting ended before he sent the text message with you

20  and Mr. Denbeaux having a dispute, a verbal dispute for lack of

21  a better word, is that fair to say?  Maybe "dispute" is the

22  wrong word.  How would you characterize the way that ended,

23  that conversation?

24  A.  I felt that he just insulted me kind of out of nowhere.

25          THE COURT:  Insulted you about what?

I3qrkou3                                      Costello - cross

THE WITNESS:  I was reminding both Mr. Denbeaux and

Mr. Kourani that I couldn't make any promises.  They said I

sounded like a broken record.  I said directly to Mr. Denbeaux,

Mr. Denbeaux, give me a break, I'm just a low-level agent, I

can make these things happen, I'm just doing my job.  He said,

that's the same thing the Nazis said in World War II and that's

the same thing the cops who sprayed black people with hoses in

the South said.  I found that very offensive.

THE COURT:  You said it?

THE WITNESS:  Yes.  I said I was greatly insulted by

it, and I left.

Q.  The thing that Mr. Denbeaux was upset about was you told

Mr. Denbeaux that you couldn't make any promises about

benefits, right?  Benefits to Mr. Kourani I mean.

A.  Correct.

Q.  What they were looking for at the end of the meeting was

help with the immigration issue, right?

MS. HOULE:  Objection.  I think it calls for

speculation.

THE COURT:  Put the question again, please.

MR. SCHACHT:  I'll rephrase the question.

Q.  The dispute that you were having at the end of the meeting

or dispute on Mr. Denbeaux's part was that you were moving too

slowly in getting the immigration help and Denbeaux was upset,

right?

1              THE COURT:  Did Denbeaux say that?

2              THE WITNESS:  No, your Honor, not to my recollection.

3              THE COURT:  You can't ask that question.  The

4    objection is sustained.

5    Q.  Denbeaux told you that he was angry that you were moving

6    too slowly with helping his client get the immigration help,

7    right?

8    A.  No.

9    Q.  He didn't tell you that?

10   A.  At the end of the first meeting, to my recollection, no.

11   It was just our first meeting.

12             THE COURT:  At some point did he say that?

13             THE WITNESS:  Your Honor, towards the end in May, when

14   we were on the telephone, Mr. Denbeaux and I, he did express

15   anger.

16             THE COURT:  Anger about what?

17             THE WITNESS:  I can't really testify to what he felt,

18   but he was angry that the government had not come through for

19   his client yesterday, as it said in his text message.

20             (Continued on next page)

21

22

23

24

25

1  BY MR. SCHACHT:

2  Q.  Right.  And "come through for his client" what he meant by

3  that was with the immigration help?

4  A.  I really can't state to what he meant specifically.

5  Q.  Well, what other topic could it have been other than the

6  immigration help, based on your conversations?

7  A.  Mr. Kourani talked at length at the FBI targeting his

8  in-laws at giving him a doorman building in Manhattan, giving

9  him money annually.  Nearly every meeting would begin with

10  Mr. Kourani kind of opining what he felt he was entitled to.

11  Q.  But my question was very specific.  It's just about that

12  meeting that day March 24.  Mr. Denbeaux was upset or said he

13  was upset that you were not, you, the FBI, were not providing

14  the benefits quickly enough, right?

15  A.  No.  Again it ended very amicably, the meeting.  We

16  laughed.  I believe Mr. Denbeaux said I sounded like a broken

17  record saying that I can't make promises.  And at that point

18  that's when I said kind of "give me a break".  To the best of

19  my recollection that's when he insulted me.

20  Q.  I'd like to have you take a look -- do you have the 3500

21  material with you or should I hand you a book, if you have a

22  binder?

23  A.  I do.  I have two here.

24        MS. HOULE:  Objection, your Honor.  He hasn't been

25  asked any question that he said he couldn't recall.

1          THE COURT:  He is not doing anything.  He is just

2     looking at a binder.  When he does something --

3     Q.  Can you please look at 350 -- it's called 3501-28.

4          THE COURT:  I didn't hear.

5          MR. SCHACHT:  A 3501-28.

6          THE COURT:  Give me time to get to it.

7          MR. SCHACHT:  Sure.  Sorry.

8          (Pause)

9     Q.  On the second page of this two-page document, 3501-28, is

10    it your testimony that --

11         THE COURT:  Don't do it that way.

12         MR. SCHACHT:  Withdrawn.

13    Q.  Do you recall --

14         THE COURT:  Are these your notes, Mr. Costello?

15         THE DEFENDANT:  They don't appear so.

16         MR. SCHACHT:  No, your Honor.  These are notes --

17         THE COURT:  I just asked him a question.  Don't tell

18    me.

19    Q.  Do you recall telling Ms. Houle that Denbeaux made a joke

20    to you that you, he, Mr. Denbeaux knows you're able to get this

21    done regarding benefits; do you recall telling her that?

22    A.  No, not in those words, no.

23         THE COURT:  In substance?

24         THE WITNESS:  My understanding what Mr. Denbeaux said

25    to me kind of give me a break, not that he knows I can make

1    things happen.

2            THE COURT:  Give me a bake about what?

3            THE WITNESS:  I kept saying that I can't make

4    promises.  I can't make promises.

5    Q.  And he said to you give me a break or words to that effect?

6    A.  Yeah, I believe so, yes.

7            THE COURT:  So he was acting as if he believed you

8    could make promises?

9            THE WITNESS:  My understanding, yes.  Oh, no.  I'm

10   sorry, your Honor.  Can you restate that?

11           THE COURT:  Was it your understanding that Denbeaux

12   thought you could make promises?

13           THE WITNESS:  No.  My understanding because we had

14   discussed it in the beginning of the meeting is that

15   Mr. Denbeaux knew I could not make promises, your Honor.

16           THE COURT:  When he said, "give me a break", what did

17   you take that to mean?

18           THE WITNESS:  Because I had said it again.  I

19   bookended most of these meetings with kind of two things.

20           THE COURT:  So give me a break because he found your

21   comments too repetitive?

22           THE WITNESS:  Correct, your Honor.

23           THE COURT:  That was your interpretation?

24           THE WITNESS:  Yes, your Honor.

25   Q.  So, you say that you bookended the meetings typically with

1   a blanket statement about being unable to make promises, right?

2   A.  Correct.

3   Q.  And so when Mr. Denbeaux provided that exhibit to you,

4   which for the record is 703, I believe which is the document

5   where Mr. Denbeaux says you've already agreed that there's not

6   going to be a prosecution, that must have come as a big shock

7   to you, right?

8        THE COURT:  703?

9   Q.  When he handed you and Agent Shannon that document, that

10  must have been a shock to you that he was saying you had agreed

11  there would be no prosecution, right?

12  A.  Correct.  We were surprised.

13  Q.  And when you say "we" you mean you and Agent Shannon?

14  A.  Yes.

15  Q.  And it's your recollection is, what did you do with the

16  copy of this document that you'd been given?

17  A.  I'm sorry.  The question was?

18        THE COURT:  What did do you with Exhibit 703?

19        THE WITNESS:  We exited the room, looked at it

20  briefly, agreed that we didn't agree with some of the points on

21  it, re-entered the room, placed it back on the table and began

22  our interview with Mr. Kourani.

23  Q.  Did it sit there on the table throughout the interview?

24  A.  I can't recall where it sat.

25  Q.  And did you or Agent Shannon do you recall take it with you

1   after the meeting?

2   A.  No, we did not.

3   Q.  Did you discuss with AUSA Beaty or any other AUSA about the

4   document at that time?

5   A.  I can't recall.  I don't think so.

6   Q.  You didn't think that that was a relevant thing to discuss

7   with the assistant U.S. Attorneys?

8   A.  I can't really state to what I was thinking at the time but

9   it wasn't really pertinent to the information we wanted to get

10  from Mr. Kourani.

11  Q.  You can't state because you don't recall?  Why can't you it

12  state what you were thinking at the time?

13  A.  We were more concerned with Mr. Kourani's information than

14  Denbeaux's thoughts.

15  Q.  So it would be fair to say you very much wanted what you

16  believed to be Mr. Kourani's help if he was willing to help you

17  in a way that you thought he could, right?

18  A.  I hesitate to use word the "help".  I would say we wanted

19  Mr. Kourani's cooperation.

20  Q.  His cooperation.  That was important to you?

21  A.  Yes.

22  Q.  Do you recall the later text message that Mr. Denbeaux sent

23  to you which is Government Exhibit 302?

24  A.  Yes, I do recall receiving that text message.

25  Q.  And that text message, also am I right, surprised you to

1   get that as well, right?

2   A.  Correct.

3   Q.  And part of the reason it surprised you was because it

4   includes the statement that you and he had agreed upon certain

5   assistance that you would provide to Mr. Kourani?

6   A.  Correct.  I was surprised because he had agreed on nothing.

7   Q.  And did you bring this text message to the attention of any

8   U.S. Attorney's at that time, if you recall?

9   A.  I don't think I did.  I may have.  I really can't recall.

10  Q.  Do you recall what, if anything, you said to Mr. Kourani or

11  Mr. Denbeaux about Mr. Kourani sending you his resume, if

12  anything?

13  A.  I believe I said to Mr. Kourani I'd received his e-mail but

14  that based off his previous statements he should refrain from

15  e-mailing me again.

16           MR. SCHACHT:  One moment, your Honor.  I need to

17  consult with my client for a second.

18           THE COURT:  Sure.

19           MR. SCHACHT:  Thank you, your Honor.  I have no other

20  questions.

21           THE COURT:  Redirect, Ms. Houle?

22           MS. HOULE:  Just one question, your Honor.

23           Could you please pull back up Government Exhibit 703.

24  And new could focus in again on those first two lines.

25           (Pause)

1  REDIRECT EXAMINATION

2  BY MS. HOULE:

3  Q.  Mr. Costello, you were just asked some questions about this

4  phrase here because it has already been agreed he has committed

5  no crimes and faces no prosecution.  To be clear, when you

6  received this document and initially reviewed it, did you

7  understand who Mr. Denbeaux was referring to when he said "it

8  had been agreed"?

9  A.  No, I did not know who he was speaking for other than I

10  knew it to not include me because we made no agreement.

11        MS. HOULE:  One moment, your Honor.

12        No further questions.

13        THE COURT:  Thank you.  You can step down.

14        MR. BOVE:  Your Honor, the next witness is Keri

15  Shannon.

16   KERI SHANNON,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19  DIRECT EXAMINATION

20  BY MR. BOVE:

21  Q.  Ms. Shannon, where do you work?

22  A.  I work at THE Federal Bureau of Investigation.

23  Q.  How long have you worked at THE FBI?

24  A.  I've been at the FBI for just over five years.

25  Q.  Are you currently assigned to a particular squad?

1   A.  I am assigned to the Joint Terrorism Task Force and I am

2   assigned to a squad that works Iranian threats and Lebanese

3   Hezbollah.

4   Q.  What did you do for work before you joined the FBI?

5   A.  I was an attorney.

6   Q.  Did you practice law?

7   A.  I did.

8   Q.  For about how long?

9   A.  About four years.

10  Q.  What kind of law did you practice?

11  A.  I did imminent domain and real estate tax certiorari.

12  Q.  Have you ever practice criminal law?

13  A.  I have not.

14  Q.  Did you receive any training when you started to work at

15  the FBI?

16  A.  I did.  I attended the FBI training academy in Quantico,

17  Virginia for about five months.

18  Q.  When approximately did you start the training at Quantico?

19  A.  In February of 2013.

20  Q.  What were some of the topics that were covered at this

21  Quantico training?

22  A.  The basis of the academy is learning how to be a law

23  enforcement officer and the curriculum is broken down into two

24  major areas, academics and operational.

25          THE COURT:  You can lead her, Mr. Bove, on the

1    background.

2    Q.  Did you is receive any training on the topics of interviews

3    and interrogations?

4    A.  I did.

5    Q.  What, if any, other training did you receive on those

6    issues?

7    A.  We learned the differences between interviews and

8    interrogations.  We focused on the difference essentially being

9    in the objective of each.  So the purpose of an interview is to

10   collect information from a victim, a witness, a subject and in

11   the context of an interrogation, the objective is to elicit a

12   confession or an admission.

13   Q.  And in light of those objectives, did you receive any

14   training in Quantico about how to approach these two types of

15   interactions?

16   A.  Yes.  With respect to an interview, the subject, the

17   witness, the victim, the interviewee is the person who does

18   most of the talking.  They explain what they've done, what

19   they've seen, what they've heard, observed.

20           THE COURT:  Slow down please.

21   A.  With respect to an interrogation it is the interviewer or

22   the law enforcement officer who does most of the talking.

23   Q.  Did you receive any training at Quantico on the topic of

24   making promises during interviews?

25   A.  Yes.  We covered that topic in connection with what

1   authorities we possess as law enforcement officers and we lack

2   authority to make promises on behalf of the bureau or the

3   United States government at large.

4   Q.  Did you receive any training at Quantico about providing

5   again benefits in connection with interviews?

6   A.  Yes.  Similar context, that we lack authority or power to

7   guarantee or promise benefits of any kind.

8   Q.  What about immunity, was that covered at Quantico?

9   A.  It was.

10  Q.  And what was the sum and substance of the training on the

11  topic of immunity at Quantico?

12  A.  Again, as agents we are not authorized to promise anyone

13  immunity from prosecution but that is something that the

14  prosecutors, that is in their wheelhouse rather than agents.

15  Q.  When you say "wheelhouse" do you mean that the FBI lacks

16  the authority to -- immunity?

17  A.  Correct.

18  Q.  Do you know a man named Ali Kourani?

19  A.  I do.

20  Q.  Have you ever have you interviewed him before?

21  A.  I have.

22  Q.  Did you approach any of those meetings as interrogations

23  rather than interviews as you've just described those terms?

24  A.  No, I did not.

25  Q.  About how many interviews did you participate in of

1   Mr. Kourani?

2   A.   Approximately, six interviews of Mr. Kourani.

3   Q.   During any of those interviews, did Mr. Kourani ask about

4   immunity from prosecution?

5   A.   He did not.

6   Q.   During any of those interviews did he ask about protections

7   of his statements?

8   A.   He did not.

9   Q.   Did you promise immunity to Ali Kourani at any time?

10  A.   I did not.

11  Q.   Did anyone promise immunity to Kourani in your presence?

12  A.   No.

13  Q.   When was the first time that you interviewed Ali Kourani?

14  A.   The first time I interviewed Mr. Kourani was September 12,

15  2016, at Newark Airport in New Jersey.

16  Q.   Did you identify yourself during that interview?

17  A.   I did.  The agents involved in that interview were me and

18  Special Agent Daniel Gancey and we began the interview by

19  identifying ourselves and showing Mr. Kourani our bureau issued

20  credentials.

21  Q.   During that interview on September 12, 2016, did

22  Mr. Kourani say anything about his family?

23  A.   He did.  Mr. Kourani relayed a story about a recent

24  incident in Lebanon in August of 2016 which involved his wife's

25  family.  Mr. Kourani indicated that matters came to a head when

he went to his mother-in-law's house to pick up his two young

children and his wife.  Mr. Kourani stated that his

mother-in-law is unstable and that she came out of the

residence screaming and yelling at him and threw his two

children into the back of his car.  Mr. Kourani stated she

continued to yell at him his, mother-in-law, and pulled on his

door handle to try to get him to exit the vehicle, at which

point she tripped and fell backwards as a result of pulling on

the door handle.  Following that incident Mr. Kourani stated

that his wife's family to include her brothers and cousins who

are all part of Hezbollah militia in Lebanon went to his home,

surrounded his home, threatened him and according to

Mr. Kourani fired bullets at his house.

            THE COURT:  How did this meeting come to happen?  Was

it arranged?

            THE WITNESS:  Yes, sir.  This meeting happened after

Mr. Kourani went through a secondary screening at the airport

upon reentering into a United States.

            THE COURT:  So he was trying to come into the United

States and he was told to go to another room for what purpose?

            THE WITNESS:  Mr. Kourani came, returned from Lebanon

and he was interviewed by CDP first.

            THE COURT:  CBP?

            THE WITNESS:  Customs Border officers.  And we entered

the room after they conducted their interview and we spoke with

1    Mr. Kourani at that time.

2            THE COURT:  How did you know it was an interview and

3    not an interrogation?

4            THE WITNESS:  How did I know?

5            THE COURT:  Right.

6            THE WITNESS:  Based on my training at the academy in

7    this case we asked Mr. Kourani if he was willing to speak with

8    us.  He indicated he was and he relayed and answered all of our

9    questions that we posed to him at that time.

10   Q.  Just to be clear, when you conducted the interview on

11   September 12, did you first identify yourselves?

12   A.  Yes.

13   Q.  During the course of the interview was cooperation

14   discussed?

15   A.  Yes.  Mr. Kourani indicated he was cooperating with FBI

16   agents.  He was speaking to agents.  And I explained to

17   Mr. Kourani that it would only be considered cooperation if he

18   were truthful, honest in providing meaningful information to

19   the FBI.

20   Q.  Did you ask Kourani any questions about Hezbollah during

21   the interview on September 12, 2016?

22   A.  I did.  I asked him to provide us with the name of his

23   contact or his handler in Hezbollah.

24   Q.  How, if at all, did he respond to that question?

25   A.  Mr. Kourani denied having a contact in Hezbollah.

 1   Q.  How did this interview end?

 2   A.  I again asked Mr. Kourani if he could tell us the name of

 3   his contact.  He denied having a contact for a second time and

 4   I told him at that point we had nothing further to discuss with

 5   him.

 6   Q.  Now, after the interview on September 12, 2016, did someone

 7   contact you on behalf of Kourani?

 8   A.  Yes.  Mr. Mark Denbeaux contacted me on February 28, 2017.

 9   He left me a voice message.

10           THE COURT:  So between September of 2016, February 20,

11   did you say February 20?

12           THE WITNESS:  February 28.

13           THE COURT:  Of 2017 you had no contact with

14   Mr. Kourani.

15           THE WITNESS:  Correct, your Honor.

16           THE COURT:  And Denbeaux called you on February 28?

17           THE WITNESS:  Yes, your Honor.

18           THE COURT:  So you were asked questions of Mr. Kourani

19   on September 12, 2016?

20           THE WITNESS:  Yes.

21           THE COURT:  Was there a colleague of yours also doing

22   it?

23           THE WITNESS:  Yes.

24           THE COURT:  Who?

25   A.  Special Agent Daniel Gancey was with me.

1      THE COURT:  Was Costello?

2      THE WITNESS:  No, he was not.

3      THE COURT:  And Denbeaux called you on February 28 and

4  did he announce that he was a lawyer acting for Kourani?

5      THE WITNESS:  No, sir.  He indicated that he was an

6  attorney and he had a client who wished to meet with the FBI

7  but he did not provide the name of his client at that time.

8  Q.  If I could just clarify, was that information -- excuse

9  me -- if I could clarify, how was that information from

10 Mr. Denbeaux conveyed to you on February 28, 2016?

11 A.  He left a voice mail for me on my cellphone.

12 Q.  Did you return that voice --

13     THE COURT:  February 28, 2017?

14     THE WITNESS:  Yes, sir.

15     MR. BOVE:  Thank you, judge.

16 Q.  Did you return that voice mail immediately?

17 A.  I did not.

18 Q.  Why not?

19 A.  I didn't know who Mark Denbeaux was and he had not

20 indicated who he represented, and so I was waiting to have some

21 more information before returning that phone call.

22 Q.  Are you aware of other efforts by Mr. Denbeaux to contact

23 the FBI in this timeframe in 2017?

24 A.  Yes.  The next day on March 1, 2017, I received a second

25 voice message from Mr. Denbeaux indicating that he again had a

1   client who wished to meet with the FBI and he wanted to speak

2   with me.  And that same day in the evening I received an e-mail

3   from a customer service representative from the FBI's public

4   access line indicating that Mr. Denbeaux was trying to get in

5   contact with me regarding a client whose name he would not

6   provide at that time but would only state that he was of Middle

7   Eastern descent.

8          MR. BOVE:  Could you please bring up Government

9   Exhibit 101.

10         (Pause)

11  Q.  Special Agent Shannon, is this the e-mail that you were

12  just referring to?

13  A.  Yes, this is it.

14  Q.  Based on this e-mail communication, did you infer anything

15  about the identity of Mr. Denbeaux's client?

16  A.  I thought that perhaps Mr. Denbeaux represented Ali

17  Kourani.  Based on the fact that this e-mail went to both

18  myself and Special Agent Costello and Mr. Denbeaux's

19  description of representing a client of Middle Eastern descent?

20         THE COURT:  How did Costello get into the case?

21  Denbeaux had not met with him as far as you know.

22         THE WITNESS:  No.  Neither of us had met with

23  Mr. Denbeaux as of this time, your Honor.  So it was my belief

24  that Mr. Denbeaux had been told by someone that Special Agent

25  Costello and myself were involved in the Ali Kourani

1    investigation.

2                THE COURT:  Go ahead.

3    Q.  Did you return Mr. Denbeaux's calls at some point?

4    A.  I did.  The next day on March 2, 2017, I called

5    Mr. Denbeaux back.

6    Q.  Did Mr. Denbeaux identify his client during that call?

7    A.  Yes.  During that telephone call Mr. Denbeaux indicated he

8    represented Ali Kourani and that Mr. Kourani wished to meet

9    with the FBI.

10   Q.  Did Mr. Denbeaux say anything about Kourani's family during

11   the call on March 2, 2017?

12   A.  Yes.  Mr. Denbeaux indicated that Mr. Kourani seemed

13   frighten because he was having issues with his wife's family

14   both in Canada and Lebanon.

15   Q.  What, if anything, did Mr. Denbeaux say during the call

16   about advice that he provided to Kourani at that point?

17   A.  Mr. Denbeaux stated he wasn't certain whether FBI agents

18   will previously met with Mr. Kourani or if agents were asking

19   other people about his client but that Mr. Denbeaux had advised

20   Mr. Kourani that it was likely in his best interest to

21   cooperate with the FBI and to the extent Mr. Kourani hadn't

22   been truthful with the FBI previously, it was in his interest

23   to be truthful now.

24               THE COURT:  This is what Denbeaux told you.

25               THE WITNESS:  This is what Mr. Denbeaux told me he had

1    advised is client, Mr. Kourani.

2    Q.  How did the call end?

3    A.  I told Mr. Denbeaux that we would be willing to meet with

4    him and his client and that I would call him back to set up a

5    meeting date.

6    Q.  During the call on March 2, 2017, did Mr. Denbeaux mention

7    immunity?

8    A.  He did not.

9    Q.  Did he ask any questions during this call about protections

10   for Kourani's statements?

11   A.  He did not.

12   Q.  Following that call did you do any research regarding

13   Mr. Denbeaux?

14   A.  Yes.  After that telephone call I Googled the name "Mark

15   Denbeaux" to learn a little bit about him.

16   Q.  What did you learn from there Internet search?

17   A.  I learned that Mr. Denbeaux was a senior faculty member, a

18   law professor at Seton Hall Law School and as a practitioner he

19   was involved in criminal defense work and had represented

20   Guantanamo detainees.

21   Q.  Following the call on March 2, 2017, did you contact

22   Mr. Denbeaux again about scheduling?

23   A.  I did.  On March 3, 2017, I reached out to Mr. Denbeaux to

24   schedule an appointment to meet with him and Mr. Kourani.

25   Q.  Was it a date for that interview discussed on the call?

A.  Yes.  During that telephone call we agreed to schedule an

interview for March 16, 2017, with the caveat that Mr. Denbeaux

needed to confirm that that date worked for his client,

Mr. Kourani.

Q.  Did you say anything to Mr. Denbeaux during this call about

who participate in this interview from the FBI?

A.  I did.  During this telephone call I told Mr. Denbeaux that

I would bringing my partner, Special Agent Joseph Costello,

with me to the interview of Mr. Kourani.

Q.  During the March 3rd call did Mr. Denbeaux mention

immunity?

A.  He did not.

Q.  Did he ask my questions during the call about protections

about of Mr. Kourani's statements?

A.  He did not.

Q.  Now after that call on March 3rd of 2017, did there come

another time when you spoke to Mr. Denbeaux on the phone?

A.  Yes.  I reached out to Mr. Denbeaux on March 22, 2017,

pursuant to an e-mail from him requesting that I give him a

call.

Q.  And had that March 16th tentative date been used for an

interview?

A.  No.

Q.  You called him back, Mr. Denbeaux back on March 22nd of

2017.  Did anyone else participate in the call?

1   A.  Yes.  Special Agent Joseph Costello was on that call with

2   me.

3   Q.  How did the call begin?

4   A.  The call began with Mr. Denbeaux stating that he had had an

5   opportunity to meet with his client, Mr. Kourani, and that he

6   was now aware of what it was that Mr. Kourani was involved in

7   and why it was that Mr. Kourani wished to meet with the FBI.

8   Q.  When Mr. Denbeaux said during the call --

9              THE COURT:  What date is that?

10             THE WITNESS:  This is March 22, your Honor, 2017.

11             THE COURT:  What happened when you arranged the

12  meeting on March 2, with Denbeaux and Kourani?

13             THE WITNESS:  On that date we had agreed to schedule a

14  meeting for March 16.  I believe that during that time period

15  there were a couple of snowstorms in that year.  His law school

16  as closed.

17             THE COURT:  For whatever reason was that meeting that

18  was adjourned in March 22.  So that's the first time you met

19  with Denbeaux on this case?

20             THE WITNESS:  Sir, we were talking over the telephone.

21             THE COURT:  The first time you met with him?

22             THE WITNESS:  No.  The March 22 was a telephone call.

23  Q.  There is a binder in front of you with some tabs.  If you

24  could flip to, I think it's the smaller binder.

25  A.  OK.

1          MR. BOVE:  May I approach, judge?

2          THE COURT:  Yes.  What number are you looking for?

3          MR. BOVE:  Government Exhibit 102, judge.

4    Q.  Do you recognize this?

5    A.  I do, yes.

6    Q.  What is that?

7    A.  This is a chain of e-mails between me and Mr. Denbeaux

8    beginning on March 3, 2017.

9          MR. BOVE:  Your Honor, the government offers 102.

10          MR. SCHACHT:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 102 received in evidence)

13          MR. BOVE:  Please, the message dated March 22, 2017

14    at.

15    Q.  Is this the e-mail that led to the call between you,

16    Special Agent Costello and Mr. Denbeaux?

17    A.  Yes, sir, it is.

18          THE COURT:  Which call did it lead to?

19          THE WITNESS:  The March 22, 2017 call with

20    Mr. Denbeaux.

21          THE COURT:  Who is on the line?

22          THE WITNESS:  Mr. Denbeaux, Special Agent Costello and

23    myself.

24          THE COURT:  Not Kourani?

25          THE WITNESS:  No, no, sir.

1   Q.  You testified a moment ago that during this call

2   Mr. Denbeaux said that he had an opportunity to meet with

3   Kourani and had a better understanding of what Kourani was

4   involved in, correct?

5   A.  Yes.  That's what Mr. Denbeaux said.

6   Q.  And with Mr. Denbeaux used that phrase "involved in", what

7   did you understand him to mean?

8   A.  I understood Mr. Denbeaux to be saying that he had met with

9   Mr. Kourani and that Mr. Kourani had told him about his

10  affiliation with Unit 910 of Hezbollah and that the fact that

11  he was operational within the United States, and that

12  Mr. Denbeaux was aware of the criminal, potential criminal

13  exposure Mr. Kourani faced in connection with those activities.

14  Q.  You just used a phrase "operational in the United States"?

15  A.  Correct.

16  Q.  What did you mean by that?

17  A.  That he had been in the, present in the United States as an

18  operative of 910 collecting information and whatever directive

19  he was receiving from the organization.

20          THE COURT:  Was that information a product of your

21  investigation or a product of what Kourani told you in the

22  airport interview?

23          THE WITNESS:  A product of the investigation, sir.

24          THE COURT:  As far as you know Kourani never mentioned

25  this to you directly that he was an operative of 910.

1    THE WITNESS:  Not prior to our interview of him on

2  March 23.

3    THE COURT:  So Denbeaux's information was the first

4  time you heard it?

5    THE WITNESS:  Mr. Denbeaux didn't provide that

6  information.

7    MR. BOVE:  I believe the testimony, judge, is that

8  Mr. Denbeaux indicated to the agent that he had spoken with

9  Kourani and understood what Kourani was, quote, involved in.

10   THE COURT:  But we don't know what that meant.

11   MR. SCHACHT:  No.  You are confused, your Honor,

12  because this is what the agent thinks he meant by that.

13   THE COURT:  Is that right?

14   THE WITNESS:  Yes, sir.

15   THE COURT:  Thank you, Mr. Schact.  I was confused.

16  Q.  After that part of the call did Mr. Denbeaux ask any

17  questions?

18  A.  He did.  He asked whether Mr. Kourani was a target.

19  Q.  What response was provided?

20  A.  I told Mr. Denbeaux that we were not permitted to discuss

21  the ongoing nature of a criminal investigation but that his

22  client, Mr. Kourani, had been interviewed by the FBI on a

23  number of occasions and was fully aware of FBI's interests in

24  him.

25   THE COURT:  A number of occasions?  When were those

1  occasions?

2          THE WITNESS:  Your Honor, in 2016 Mr. Kourani was

3  interviewed a number of times by the FBI.

4          THE COURT:  This is before the interview upon his

5  coming into the country?

6          THE WITNESS:  That's correct, sir.

7          THE COURT:  Were you involved in that?

8          THE WITNESS:  No, sir.

9          THE COURT:  As far as you know was Costello involved?

10         THE WITNESS:  Mr. Costello had been involved in one of

11  those interviews as far as I'm aware, not all of them, no.

12  Q.  When you provided that answer in response to Denbeaux's

13  question about whether or not Kourani was a target, did

14  Mr. Denbeaux express any concern about what you had said?

15  A.  Mr. Denbeaux stated that he wasn't even sure whether his

16  client cared whether he was a target or not.

17  Q.  Did Mr. Denbeaux express any concerns during this call on

18  March 22, 2017?

19  A.  Yes.  Mr. Denbeaux indicated that Mr. Kourani was concerned

20  about people in the community knowing that he was meeting with

21  FBI.  And so Special Agent Costello and I told Mr. Denbeaux

22  that we would use our best efforts to insure that the community

23  was not aware that Mr. Kourani was meeting with us, that we

24  would do our best to keep confidential the fact that

25  Mr. Kourani was meeting with the FBI.

1  Q.  And when that term "community" was used during this call

2  what did you intend it to mean?

3  A.  Members of the Lebanese diaspora here in the New York City

4  area, as well as people back in Lebanon and his wife's family

5  in Canada.

6  Q.  How did this call end?

7  A.  With an agreement to meet the following day March 23, 2017,

8  at Seton Hall Law School.

9  Q.  During that call on March 22, 2017, did Mr. Denbeaux say

10 anything about immunity?

11 A.  He did not.

12 Q.  And did you participate in the interview of Kourani the

13 following day, March 23, 2017?

14 A.  I did.

15 Q.  Did you do anything to prepare for the interview?

16 A.  I did.  I met with senior agents on my squad and discussed

17 some possible topics of interests or themes, if you will, for

18 the interview the next day.

19         MR. BOVE:  Could we take a look at Government Exhibit

20 501 please.

21 Q.  Do you recognize this document?

22 A.  I do.

23 Q.  What is Government Exhibit 501?

24 A.  These are a copy of my notes.

25         MR. BOVE:  The government offers 501, judge.

1          MR. SCHACHT:  Your Honor?

2          THE COURT:  That's past recollection.  You can use it

3     to refresh her memory.  It's just the notes.  It's not evidence

4     in itself.

5          MR. BOVE:  I submit, judge, I can lay a better

6     foundation that's evidence of the agent's intent.

7          THE COURT:  Do it the way you normally would.  This is

8     not evidence.

9          MR. BOVE:  You can take that down.

10         THE COURT:  Unless Mr. Schact doesn't care.

11         MR. SCHACHT:  Your Honor, it's a one page of a larger

12    document.  I wouldn't object if the whole document --

13         THE COURT:  We are not going to do that.  No evidence

14    that we don't need.  All right.  You bring it on in a matter

15    course.  You want to question her, go ahead and question here

16    if she can't remember.

17    Q.  You said that you had a meeting with other people at the

18    FBI to discuss how to approach the interview of Ali Kourani on

19    March 23, 2017?

20    A.  That's correct.

21    Q.  And did, you based on that meeting, develop some themes

22    that you intended to cover with Mr. Kourani during the

23    introductory part of the interview?

24    A.  Yes.

25    Q.  Do you remember what those themes were?

1   A.  Yes.  The first thing that we wanted to make clear to

2   Mr. Kourani was who it was he was meeting with that day.  And

3   so we wanted to explain from my perspective and Special Agent

4   Costello's perfective what our job is at the FBI.  And first

5   and foremost we view it as a job to protect American people

6   both within the United States, overseas and we wanted to make

7   that very clear to Mr. Kourani that that was our principal

8   objective as FBI agents.

9   Q.  I'll come back to the themes at a later point.  Let's just

10  set the stage.  Did you actually meet with Kourani on March 23,

11  2017?

12  A.  I did.

13  Q.  Where?

14  A.  Seton Hall Law School.

15  Q.  Who was present for the meeting?

16  A.  Mark Denbeaux, Mr. Kourani, Special Agent Costello and

17  myself.

18  Q.  How did the interview begin?

19  A.  The interview began with Special Agent Costello and I,

20  introducing ourselves and showing our bureau issued credentials

21  to both Mr. Denbeaux and Mr. Kourani.  Mr. Denbeaux offered a

22  few introductory remarks having been the one to arrange the

23  meetings.  And then Mr. Kourani spoke about what it was that he

24  wanted in exchange for the information that he was going to

25  provide.

1   Q.  And before Mr. Kourani said those things, were some

2   preliminary remarks made about the terms of the meeting?

3   A.  Yes.

4   Q.  Was the topic of lying during the meeting covered?

5   A.  Yes.  We again, as part of the themes as FBI agents we

6   wanted to make clear to Mr. Kourani that if he were to lie to

7   us over the course of the interview that that would be

8   problematic for him.  It was a crime.  We also included --

9           THE COURT:  You told Kourani it was a crime to lie to

10  the FBI.

11          THE WITNESS:  To lie to the federal agents, yes.

12  Additionally, we explained to Mr. Kourani that if his lies were

13  to involve matters of terrorism, he could face enhanced

14  penalties.

15  Q.  During this introductory part of interview, did you say

16  anything about the topic of legal protections?

17  A.  Yes.

18  Q.  What was said about that?

19  A.  We explain that as FBI agents we were not authorized to

20  make any promises for benefits in exchange for information and

21  we didn't have the authorization to promise anything with

22  respect to protections.

23  Q.  And in connection with that admonishment, was reference

24  made to the Department of Justice?

25  A.  Yes.

1    Q.   What was said about the Department of Justice?

2    A.   That the Department of Justice possesses prosecutorial

3    authorities, not the bureau.

4    Q.   When you said "the bureau", what did you mean by that?

5    A.   The FBI.

6    Q.   Now you mentioned that after those admonishments during the

7    interview Mr. Kourani made a series of statements?

8    A.   Yes.

9    Q.   What were some of the things that he requested?

10   A.   Mr. Kourani was requesting immigration benefits for a

11   number of members of his family.  Specifically, he referenced

12   his father Mohammad and his Laila, both of whom were in Lebanon

13   at the time.  He wished to have them brought to the United

14   States.

15              THE COURT:  Slow down please.

16   A.   Mr. Kourani also referenced his two young children who were

17   in Canada with his estranged wife.  He wished to have them

18   brought to the United States as well.

19   Q.   What were some of the things that were said initially in

20   response to those requests from Kourani?

21   A.   We again explained that we were not authorized to make any

22   promises with respect to providing any benefit to Mr. Kourani

23   in exchange for the information that he was going to provide.

24   And further we explained that in order for the FBI to even

25   advocate for any of those things on Mr. Kourani's behalf, his

1    information would have to be truthful and honest.  He could not

2    lie to us.  He could not withhold information.  And second,

3    that his information had to be valuable.  There would be an

4    assessment of the information he was providing and it had to

5    justify the benefits that he was requesting at that time.

6              THE COURT:  Who said that?

7              THE WITNESS:  Special Agent Costello and I both spoke

8    about those concepts, your Honor.

9              THE COURT:  So he tells you I need immigration help

10   for members of my family in Lebanon and Canada and was it your

11   response that if you tell us the truth and if we find the

12   information useful we can, and fill out the rest.  We can do

13   what?

14             THE WITNESS:  That we would do our best to advocate

15   for him but we were not in a position to guarantee or promise

16   that those things would happen because as FBI agents we lacked

17   authority to make these promises to him.

18   Q.  From your perspective at the time who in the United States

19   government was in a position to provide the types of

20   immigration benefits that Kourani said he was seeking?

21             THE WITNESS:  Those types of immigration benefits

22   would have to be coordinated with Department of Homeland

23   Security.

24   Q.  Did you say anything during the interview on March 23,

25   2017, about communicating with the Department of Homeland

1   Security relating to the benefits and what that would entail?

2   A.  Yes.  We explained that immigration benefits were not

3   something that the FBI could unilaterally provide.  It required

4   coordination with other governmental entities and we also

5   explained that same thinking with respect to what he was

6   requesting with his family in Canada.

7                THE COURT:  Say that again.

8                THE WITNESS:  Sure.  So we had explained --

9                THE COURT:  Some thing with respect to what he was

10  requesting.  You and your colleagues had to deliberate about

11  it?

12               THE WITNESS:  No, your Honor, that we would have to --

13  that that wasn't something that the FBI alone as an

14  organization would be able to do, that it would require

15  coordination with Department of Homeland Security,

16  specifically, in the instance of an immigration benefit.

17               THE COURT:  You used the term "thinking".

18               THE WITNESS:  The same thinking with respect to his

19  family in Canada in that it would require coordination with

20  other entities beyond the FBI.

21  Q.  Did you tell Mr. Kourani during this meeting that in order

22  to pursue those immigration benefits with other parts of the

23  U.S. Government and a foreign government, you would have to

24  disclose the fact that he had met with the FBI?

25  A.  Yes.

1   Q.  Did Kourani ask you any questions about timing at this

2   point in the interview?

3   A.  Yes.  He asked for a specific date as to when he could

4   expect his family to be brought to the United States.

5   Q.  Did you provide a specific date?

6   A.  No.  We explained that again based on the fact that we were

7   not authorized to make any promises we couldn't guarantee that

8   that would happen.  And second that because there needed to be

9   an assessment of the information that he was providing to

10  determine whether or not the information justified his

11  requested benefits, that it was impossible for us to give an

12  exact timeframe for when that would happen.

13  Q.  Was Kourani provided with an estimate about timing during

14  this meeting?

15  A.  Yes.  We indicated that should Kourani be truthful and

16  honest, provide valuable information, that we would try to

17  followthrough with helping him by the end of summer 2017.

18  Q.  At any point during that meeting did Kourani ask questions

19  about any type of immunity?

20  A.  No, he did not.

21  Q.  Did Mr. Denbeaux ask any questions about any type of

22  immunity during the March 23, interview?

23  A.  He did not.

24  Q.  Did either man, Kourani or Mr. Denbeaux, ask any questions

25  about the potential for an arrest?

1    A.  No.

2    Q.  Did Mr. Kourani participate in the interview on March 23?

3    A.  He did.

4    Q.  How did the interview end?

5    A.  The interview ended I believe Mr. Denbeaux had an

6    appointment that afternoon and so he requested that we end the

7    meeting so that he could get to his appointment.

8    Q.  Did the topic of promises come up at the end of the

9    interview?

10   A.  Yes.  At the end of the interview Special Agent Costello

11   and I reiterated that while Mr. Kourani was sharing important

12   information, we were not authorized to make any promises with

13   respect to the information he was providing in exchange for any

14   kind of benefit.

15   Q.  Did Mr. Denbeaux send any communications following the

16   meeting?

17   A.  He did.  He sent a text message to Special Agent Costello.

18   Q.  And did Special Agent Costello show you the message around

19   the time he received it?

20   A.  He did.  We were still en route back to the office when

21   that text message came through.

22          MR. BOVE:  Could we take a look at Government Exhibit

23   301 please.

24          (Pause)

25   Q.  Is the top message here the message that Special Agent

1    Costello showed you on the day of the March 23, 2017 interview?

2    A.  Yes, it is.

3    Q.  Did you read it at the time?

4    A.  I did.

5    Q.  When you saw this message from Mr. Denbeaux I understand

6    that you can't promise or guarantee, what did you understand

7    him to mean?

8    A.  I understood that to be a categorical unqualified statement

9    about the fact that there were no promises.

10             THE COURT:  This is Exhibit 301?

11             MR. BOVE:  Yes, judge.

12             THE COURT:  OK.

13   Q.  I'd like to direct your attention to March --

14             THE COURT:  Is that a evidence?

15             MR. BOVE:  Yes, your Honor.  It was offered through

16   the testimony of Special Agent Costello.

17             THE COURT:  Go ahead.

18             MR. BOVE:  Thank you, judge.

19   Q.  I would like to direct your attention to March 30th of

20   2017.  Did you have any plans with respect to Kourani that day?

21   A.  Yes.  We were supposed to meet with Mr. Kourani and

22   Mr. Denbeaux on that date.

23   Q.  Where was the meeting planned to take place?

24   A.  Seton Hall Law School.

25   Q.  Did you can go to Seton Hall on March 30, 2017?

1   A.  We did.

2   Q.  What happened when you got there?

3   A.  When we arrived at Seton Hall Mr. Kourani as not there.

4   Mr. Denbeaux reached out to his client over the phone and

5   explained that Mr. Kourani had confused the dates and was not

6   going to be able to attend the meeting that day because he was

7   at work.

8   Q.  Was anyone with you that day from the FBI?

9   A.  Yes.  I was with Special Agent Costello.

10  Q.  So did you and Special Agent Costello talk to Mr. Denbeaux

11  on March 30 about scheduling additional interviews?

12  A.  We did.  We explained to Mr. Denbeaux at that time that we

13  were going to -- it was going to require a number of hours to

14  collect all of the information that Mr. Kourani was going to be

15  sharing with respect to his recruitment and operational

16  activities.

17  Q.  How if at all did Mr. Denbeaux respond to that information?

18  A.  It was Mr. Denbeaux's suggestion that we try to schedule

19  multiple meetings the following week to try to move at a faster

20  pace in terms of covering information.

21  Q.  Was Hezbollah discussed with Mr. Denbeaux on March 30?

22  A.  Yes.

23  Q.  What were some of the things that you and Special Agent

24  Costello said to Mr. Denbeaux about Hezbollah?

25  A.  We explained to Mr. Denbeaux that specifically Unit 910

possessed a worldwide capability and that there was a lot of

information that Mr. Kourani had not yet shared with respect to

his training recruitment and operational activity on behalf of

that terrorist unit and that I believe we cited for

Mr. Denbeaux two recent attacks that were tied to the ESO.

Q.  What kinds of attacks?

A.  Terrorist attacks.

Q.  Did you and Special Agent Costello provide Mr. Denbeaux

with an assessment of Kourani's disclosures up to that point on

March 30, 2017?

A.  We did.  We told Mr. Denbeaux that there was a lot of

information that Mr. Kourani had not yet shared.

Q.  Did Mr. Denbeaux ask anything during this meeting about

immunity?

A.  He did not.

Q.  Did he ask any questions during that meeting about

confidentiality?

A.  He did not.

Q.  Now I'd like to direct your attention to April 3rd of 2017.

A.  Yes.

Q.  Did you meet with Kourani that day?

A.  We did.

Q.  Where?

A.  Seton Hall Law School.

Q.  Who was present for the interview?

1    A.  Mr. Denbeaux, Mr. Kourani, Special Agent Costello and

2    myself.

3    Q.  How did this interview gain?

4    A.  This interview began with Mr. Denbeaux handing out a copy

5    of his notes.

6    Q.  What, if anything, did Mr. Denbeaux say when he handed the

7    note out?

8    A.  Mr. Denbeaux indicated that these were his notes and his

9    assessment of things as they stood so far, something along

10   those lines.

11   Q.  When he handed the notes out, what happened next?

12   A.  Special Agent Costello and I picked up the notes and we

13   stepped into the hall to review them.

14   Q.  What were some of the things that you and Special Agent

15   Costello discussed in the hall outside of the interview room?

16   A.  So we gave the document a cursory review.  We saw that

17   there were items in the document that we had never discussed

18   there were inaccuracies and we were confused to see what it was

19   Mr. Denbeaux wanted with respect to the document.  He hadn't

20   posed any questions to us about the contents.  And so Special

21   Agent Costello and I agreed what that we would go back into the

22   interview room, return Mr. Denbeaux's notes, answer any

23   questions he had with respect to the documents, honestly and if

24   not asked anything about the document we would continue with

25   your interview of Mr. Kourani.

1    Q.  Did you go back to the room with Special Agent Costello?

2    A.  We did.  I did.

3    Q.  When you did, did Mr. Denbeaux ask you any questions about

4    the document?

5    A.  He did not.

6    Q.  What was done with the document that he had handed you?

7    A.  Spatial Costello handed the document back to Mr. Denbeaux.

8    Q.  Did you keep a copy of that document?

9    A.  I did not.

10   Q.  Did Mr. Kourani ask any questions about Mr. Denbeaux's

11   notes?

12   A.  He did not.

13   Q.  What, if anything, did Kourani say at this point in the

14   interview after you had come back into the room?

15   A.  Mr. Kourani reiterated his immigration demands from the

16   previous interview with respect to his father, sister and his

17   children in Canada and he increased his requests to include an

18   annual salary of 120,000 and also requested that we provided

19   him with a house.

20   Q.  You said he increased his requests.  Were those new

21   demands?

22   A.  Those were.

23   Q.  Did anyone promise Kourani any benefits in response the

24   complaints that he made on April 3?

25   A.  No.

1   Q.  Did you agree to do anything at this point?

2   A.  No.  Again, Special Agent Costello and I indicated that we

3   lacked authority to make any promises on half of the bureau or

4   the United States government and all that we could do was offer

5   to try to help and pass his demands along should he be

6   completely truthful, honest and again, if his information was

7   valuable.

8   Q.  After these events took place did Mr. Kourani participate

9   in an interview on April 3, 2017?

10  A.  He did.

11  Q.  How did that interview end?

12  A.  That interviewed ended with a discussion about his

13  operational activities overseas on behalf of Unit 910.

14  Q.  When you say "operational activities" just now, what do you

15  mean by that?

16  A.  Tasks or things that he did on behalf of the organization

17  outside of the United States and outside of Lebanon.

18  Q.  And in your view was Kourani forthcoming in response to

19  questions about things that he did on behalf of Hezbollah

20  outside of Lebanon?

21  A.  No.  And at that time we provided Mr. Kourani with a

22  warning that lying to federal law enforcement officers was a

23  crime and that he should consult with his attorney before

24  continuing to have a conversation with us about this matter.

25  Q.  How did the interview on April 3, 2017 end?

1    A.  It ended with Mr. Kourani and Mr. Denbeaux reentering the

2    interviewer conference room and Mr. Denbeaux stating that in

3    his view one of two things was possible.  Number one, either

4    Mr. Kourani led agents to believe he possessed more valuable

5    information than he actually did or in the alternative

6    Mr. Kourani did in fact possess valuable information but was

7    simply unprepared to share it at that time.

8    Q.  Did Mr. Kourani say anything after Mr. Denbeaux made those

9    representations?

10   A.  Yes.  Mr. Kourani adopted both of those notions and stated

11   that he had some information that he was too scared to share

12   with us and also that we had overrated his knowledge of Unit

13   910.

14   Q.  Now I'd like to direct your attention to April 5th of 2017.

15   Did you interview Kourani that day?

16   A.  Yes, I did.

17   Q.  Where?

18   A.  Seton Hall Law School.

19   Q.  Who was present at the beginning of this meeting?

20   A.  Mr. Denbeaux, Mr. Kourani, Special Agent Costello and me.

21   Q.  Did Mr. Denbeaux say anything at the start of the

22   interview?

23   A.  Yes.  Mr. Denbeaux attempted to reset the stage a bit as

24   the previous interview ended on a more tense note.  He

25   indicated that his client was an American and wished to

1   cooperate on that basis.

2   Q.  Did you or Special Agent Costello make any promises at that

3   point based on what Mr. Denbeaux had said?

4   A.  No.

5   Q.  After that exchange with Mr. Denbeaux, what happened next?

6   A.  After that Mr. Kourani requested to conduct the interview

7   one-on-one with me outside the presence of Special Agent

8   Costello and his attorney, Mr. Denbeaux.

9   Q.  Did Kourani say anything about why he had that preference?

10  A.  Yes.  He indicated that intelligence work was done 101 and

11  that he was comfortable with me.

12  Q.  How did you respond to this request from Mr. Kourani?

13  A.  Special Agent Costello and I stepped into the hallway to

14  discuss his request.

15  Q.  What did you talk about with Special Agent Costello?

16  A.  We talked about whether we thought there were any safety

17  concerns that should preclude us from moving forward on a

18  one-on-one basis, with whether we should even consider speaking

19  to Mr. Kourani outside the presence of his attorney.

20  Q.  What did you decide to do?

21  A.  We decided we should continue with the interview one-on-one

22  but reconfirm with Mr. Kourani that he wished to speak with me

23  outside of the presence of Mr. Denbeaux.

24  Q.  Did you take any safety precautions?

25  A.  Yes.  Mr. Kourani had requested that we change positions in

1    the interview room.  He wanted to sit on the opposite side of

2    the table from where we had originally been positioned.  And so

3    in my new seat I made sure that I had a sight line to Mr --

4    Special Agent Costello outside the interview room.

5    Q.  Were you also armed that day?

6    A.  I was.

7    Q.  Were you armed in the interview?

8    A.  I was.

9    Q.  Was your firearm visible?

10   A.  No, it was not.

11          THE COURT:  So he had been sitting in one seat the

12   previous meeting and now he wanted to sit in another seat?

13          THE WITNESS:  Yes, your Honor.

14          THE COURT:  He made that request?

15          THE WITNESS:  He requested that we change sides of the

16   table.

17   Q.  What was your assessment of the purpose of that request?

18   A.  My belief was that this was an attempt by Mr. Kourani to

19   control the interview setting.

20   Q.  Did you interview Kourani alone on April 5th of 2017?

21   A.  I did.

22   Q.  How did you start the interview?

23   A.  When I went back into the room to speak with Mr. Kourani I

24   confirmed with him that he was comfortable speaking with me

25   without defense counsel, Mr. Denbeaux, present.

1    Q.  During the interview did Kourani say anything about having

2    withheld information in prior interviews?

3    A.  Yes.  Mr. Kourani began by stating that he had previously

4    withheld information about his first mission inside the United

5    States on behalf of Unit 910.

6    Q.  Did you describe that mission during the meeting on April

7    10?

8    A.  Yes.

9    Q.  What were some of the things that he said about it?

10   A.  Mr. Kourani had previously been tasked to collect

11   information on military or intelligence type targets inside New

12   York City.  Mr. Kourani indicated that he had actually

13   videotaped a location in New York City later determined to be

14   the U.S. Armory in Manhattan and that he did so -- he

15   videotaped this location on his cellphone.

16   Q.  During the interview on April 5, did Kourani say anything

17   about what he did with that video surveillance?

18   A.  He did.  He moved that video surveillance from his

19   cellphone to a memory card and then transported that memory

20   card on his person back to Lebanon where he handed that

21   information off to his handler in 910 Fadi.

22   Q.  When you used the term "handler", is that also a term that

23   Kourani used?

24   A.  Yes.  He used the term handler/mentor.

25   Q.  What did you understand that to mean?

1          MR. SCHACHT:  Your Honor, I object.

2          THE COURT:  Overruled.

3     Q.   What did you understand Mr. Kourani to mean when he used

4     the term "handler"?

5     A.   I understood Mr. Kourani to be describing the person that

6     he was in contact with within the organization 910 when he

7     would return to Lebanon.

8          THE COURT:  He was the person in 910 to whom Kourani

9     reported?

10         THE WITNESS:  Correct.

11         THE COURT:  And who directed his activities?

12         THE WITNESS:  Yes, your Honor.

13         THE COURT:  Did he tell you that he televised the

14    meeting, which meeting did he tell you he televised?

15         MR. BOVE:  Your Honor, I believe the testimony is that

16    Kourani said that he had taken video surveillance of a military

17    installation in the city.

18         THE COURT:  OK.

19    Q.   Is that correct, Special Agent Shannon?

20    A.   Yes, sir.

21    Q.   During that interview on April 5, 2017 did Kourani provide

22    new information about interview training that he had received

23    in Hezbollah?

24    A.   Yes, he did.  He spoke about one-on-one training that he

25    received with respect to how to handle questions posed to him

1    by intelligence or law enforcement officers.

2    Q.  And what did Kourani say about the main point of this

3    one-on-one interview training?

4    A.  Mr. Kourani indicated that he was coached in how to answer

5    questions without revealing any weaknesses for the interviewer

6    to leverage.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  What, if anything, did Kourani say about having deployed

2  that strategy in prior entries by the FBI?

3  A.  Mr. Kourani indicated that he had previously used this

4  technique when he was interviewed by the FBI in 2016.  By way

5  of example, Mr. Kourani stated at that time he told inter-

6  viewing agents that he was interested in immigration benefits

7  for his wife and his brother Moustafa, when in reality those

8  were not things that he cared about.  That is how he prevented

9  the interviewing agents from knowing about any weaknesses that

10  he had.

11  Q.  During this interview on April 5, 2017, did Kourani ask any

12  questions about immunity?

13  A.  He did not.

14  Q.  Did he ask anything about the potential for being arrested?

15  A.  He did not.

16  Q.  Did you make any promises to Ali Kourani on April 5, 2017?

17  A.  I did not.

18  Q.  How did the interview end?

19  A.  The interview ended with Mr. Denbeaux knocking on the door

20  indicating that he had a standing appointment, and we agreed to

21  terminate the interview at that time.

22  Q.  Who was in the room at that point?

23  A.  At that point Mr. Denbeaux and Special Agent Kourani

24  re-entered the interview room.

25  Q.  Did anyone address the topic of promises at that point in

1   the meeting on April 5, 2017?

2   A.  Yes.  As had become our customary practice, we reiterated

3   to Mr. Denbeaux and Mr. Kourani that we could not make any

4   promises with respect to benefits on behalf of the FBI or the

5   United States government.

6   Q.  You may have misspoken in your answer.  Did you refer to

7   Special Agent Kourani?

8   A.  I'm sorry.  Special Agent Costello.  Apologies.

9   Q.  Did you participate in an additional interview with Mr.

10  Kourani after April 5, 2017?

11  A.  I did.

12          THE COURT:  Before we get into that, may we have a

13  5-minute break?

14          MR. BOVE:  Yes, your Honor.

15          MR. SCHACHT:  Also, your Honor, I would like to

16  discuss whenever you are ready the schedule.  I have Mr.

17  Denbeaux outside.  I was hopeful we could get to him today, but

18  I don't know whether that is realistic.

19          MR. BOVE:  I have just a few questions left, Judge.

20          THE COURT:  Ask those questions.

21  Q.  Did you participate in additional interviews of Mr. Kourani

22  after April 5, 2017?

23  A.  I did.  I met with Mr. Kourani again on April 14th and

24  April 26th.

25  Q.  During those additional interviews, was immunity discussed?

I3qrkou5                    Shannon - cross

1    A.  No.

2    Q.  During those interviews were any promises made to Kourani?

3    A.  No.

4              MR. BOVE:  Nothing further.

5              THE COURT:  How long will your cross-examination be?

6              MR. SCHACHT:  15 or 20 minutes.

7              THE COURT:  Let's take a five-minute break.

8              (Recess)

9              THE COURT:  Agent Shannon, you remain under oath.

10             Mr. Schacht, you may begin your cross-examination.

11             MR. SCHACHT:  Thank you.

12   CROSS-EXAMINATION

13   BY MR. SCHACHT:

14   Q.  Ms. Shannon, when you interviewed Mr. Kourani in this case,

15   you frequently took notes, right?

16   A.  I did.

17   Q.  Then oftentimes you would convert those notes into a typed

18   form 302, right?

19   A.  That's true.

20   Q.  Before coming here today, you reviewed, I assume, am I

21   right, your notes and the 302s in preparation for testifying?

22   A.  Yes.

23   Q.  You were one of the agents responsible for this case, yes?

24   A.  Yes.

25   Q.  You are aware of the history and background, I assume, of

1   the investigation into Ali Kourani?

2   A.  Yes.

3   Q.  You are aware, are you not, that in 2016 FBI agents other

4   than yourself spoke to my client?

5           MR. BOVE:  Objection.  Calls for hearsay.

6           THE COURT:  No, it doesn't.  Overruled.

7   Q.  Are you aware that other agents spoke to my client before

8   you did?

9   A.  Yes, I am, sir.

10  Q.  Are you aware that those agents offered money to my client

11  in exchange for being an informant?

12          MR. BOVE:  Objection.

13          THE COURT:  Overruled.

14  Q.  Are you aware of that?

15  A.  I heard that from the agents who interviewed him, yes, sir.

16          THE COURT:  Are these the 2016 interviews?

17          THE WITNESS:  Yes, sir.

18  Q.  Are you aware of the amounts of money that those agents

19  offered or you just know generally that it was money?

20  A.  I just know generally that it was money, sir.  I'm not sure

21  of the precise amount offered.

22  Q.  You are familiar with the rules and procedures of FBI

23  agents, I assume?

24  A.  Yes.

25  Q.  Is it legal for FBI agents to offer money to people they

1   want to be informants?

2   A.   It's legal for FBI agents to pay people who are informants,

3   people who are signed up and confidential human sources.

4   Q.   "Confidential human source" is a technical term within the

5   FBI, right?

6   A.   That is.

7            THE COURT:   What does it mean?

8            THE WITNESS:   It means that it's a confidential human

9   source, so it's a human, a person, an informant, somebody who

10  is working --

11           THE COURT:   For the FBI as an informant?

12           THE WITNESS:   Correct, yes, your Honor.

13           THE COURT:   Because they have special knowledge in

14  what you are looking at or investigating?

15           THE WITNESS:   Yes, your Honor.

16  Q.   In the case of a confidential human source, the source or

17  the informant is getting money or some other benefit in

18  exchange for helping?

19  A.   Sometimes.

20  Q.   In this case you had a conversation on March 22nd, is that

21  right, on the telephone with Mark Denbeaux?

22  A.   Yes, I did, sir.

23  Q.   Do you recall in that conversation that Mr. Denbeaux told

24  you and Costello, Agent Costello, that Mr. Kourani was worried

25  about his physical safety?

1    A.  He was worried about people knowing that he was meeting

2    with the FBI is what Mr. Denbeaux told us at that time, people

3    in the community.

4    Q.  You and Costello sought to allay that concern, is that fair

5    to say?

6    A.  Yes.  We told him we would use our best efforts, yes.

7    Q.  Didn't you in fact tell him that what was said would remain

8    confidential?

9    A.  No, sir.  We told him the fact that he was meeting with the

10   FBI, we would try to keep that confidential.

11   Q.  When you say you would try to keep that confidential, did

12   you use the word "try" with Mr. Denbeaux?

13   A.  Yes.  We said we would use our best efforts to keep

14   confidential the fact that Mr. Kourani was meeting with the

15   FBI.

16   Q.  Do you recall in the 302 report that you prepared you used

17   the phrase "remain confidential"?

18   A.  Yes, sir.

19   Q.  The report says remain confidential, but you didn't tell

20   Mr. Denbeaux that it would remain confidential?

21   A.  We told Mr. Denbeaux we would use our best efforts to have

22   the fact that Mr. Kourani was meeting with us remain

23   confidential, yes, sir.

24   Q.  What did you mean by "best efforts"?

25   A.  That we would do what we could to keep the fact that Mr.

 1   Kourani was meeting with us confidential.  By way of example,

 2   sir, we went to Seton Hall Law School to conduct the interview

 3   with Mr. Kourani.  We didn't bring Mr. Kourani into FBI space.

 4   We didn't interview him in his neighborhood.  We went to an

 5   area where he would be outside the purview of the Lebanese

 6   diaspora that he was concerned about.

 7   Q.  You had been to Canada and spoken to Mr. Kourani's

 8   relatives, isn't that right?

 9   A.  That is correct.

10   Q.  Do you recall what year that was in?

11   A.  I met with his wife Laila Abady in September of 2016.  I

12   also spoke with her in February of 2017.

13   Q.  Do you recall testifying on direct examination that at the

14   beginning of the March 24th meeting -- withdrawn.  Was that

15   meeting March 23rd or 24th, the in-person meeting with Mr.

16   Kourani and Mr. Denbeaux?

17   A.  It was an in-person meeting on March 23rd, 2017.

18   Q.  Do you recall saying on direct examination that Mr.

19   Denbeaux made some introductory remarks at the start of the

20   meeting?

21   A.  Yes, I recall saying that.

22   Q.  Do you recall what the introductory remarks were?

23   A.  The exact nature of Mr. Denbeaux's remarks, no.

24          THE COURT:  In substance.

25   A.  In substance, I believe Mr. Denbeaux explained why it was

 1    that Mr. Kourani had requested a meeting, that he wanted to

 2    explain what it was that he was involved in.

 3    Q.  Do you recall Mr. Denbeaux saying that it was his

 4    understanding that what was said at the meeting would not be

 5    used against Mr. Kourani in court?  Do you recall that?

 6    A.  No.  That was not said.

 7    Q.  Do you recall testifying on direct examination that you and

 8    Agent Costello gave a kind of estimate to Mr. Kourani of when

 9    he might be able to get help with his family's immigration?

10    A.  I do.

11    Q.  Do you recall testifying on direct examination that you

12    thought that you might be able -- you told him you might be

13    able to get that help by the end of summer 2017?

14    A.  Yes.  We explained that if the preconditions discussed were

15    met, we would try to do our best to help him in that time

16    frame, yes.

17    Q.  In fact, didn't you make much more specific statements

18    regarding when you might be able to get that help?

19    A.  Get the immigration benefits?

20    Q.  Yes.

21    A.  No.

22    Q.  You don't recall that?

23    A.  No, I don't recall that, sir.

24    Q.  If you have the binder in front of you, the 3500 binder,

25    when you have that, please take your time and look at 3502-06,

1   specifically page 3 of that document.  Whenever you have a

2   chance.

3           THE COURT:  She's had a chance by now.

4   Q.  Do you have that in front of you?

5   A.  Yes.

6           THE COURT:  What page?

7           MR. SCHACHT:  3502-06, page 3 of 14.

8   A.  Yes.

9   Q.  Does that refresh your recollection at the top of that

10  document about what time frame you made certain statements

11  about regarding the immigration benefits?

12  A.  No.  We told him by the end of summer of 2017.

13  Q.  Whose notes are these?

14  A.  These are my notes.

15  Q.  Do you see where it says "Laila four weeks"?

16  A.  Right.

17  Q.  Isn't it true that you told Mr. Kourani that it was

18  possible that you could get her to the United States within

19  four weeks?

20  A.  That is not true.  Next to that note it says, "Estimations

21  based on end of summer time frame."  We never indicated any

22  time frame for bringing Laila, his estranged spouse, into the

23  United States.  That was not one of Mr. Kourani's requests in

24  fact.  He only mentioned his children.

25  Q.  Do you remember what my question was?

1    A.  I do.

2    Q.  What was my question?

3    A.  If we provided a precise time frame.  We did not.

4    Q.  That was actually not my question.  Now I will ask you my

5    question.  What does that mean, "Laila four weeks"?

6    A.  That he had not seen Laila in more than four weeks?  I have

7    no idea what that means.

8    Q.  They are your notes.

9    A.  Correct.

10   Q.  You have no idea what your notes mean?

11   A.  I have no idea what the "four weeks" next to "Laila" means.

12   It was one of Mr. Kourani's statements, not mine.

13   Q.  When your notes say "Kids near end of summer," what did you

14   mean by that?

15   A.  Those were the requests of Mr. Kourani, that he would want

16   his kids here as quickly as possible.  We had provided

17   estimations based on the end of the summer.

18   Q.  When you say estimations with an S on the end, that's

19   plural, right?

20   A.  Correct.

21   Q.  Isn't it true that where it says "end of summer," four

22   weeks and six weeks, that these were the estimations that you

23   gave him?

24   A.  No, we did not provide precise estimations in a weeks time

25   frame.

1   Q.  At the top where your notes say "Ali to Canada six weeks,"

2   what does that mean?

3   A.  My recollection is that those were Mr. Kourani's requests

4   at that time.

5              THE COURT:  Give me the context.  What was being

6   discussed?

7              THE WITNESS:  Mr. Kourani was asking about a time

8   frame for when he could expect his children to be brought to

9   the United States or have some sort of visitation with his

10  children and also immigration benefits for his father and

11  sister, who were both in Lebanon at that time.

12             THE COURT:  What did Kourani want to do?  Visit

13  Canada?

14             THE WITNESS:  He wanted to see his children, so either

15  have them brought to the United States, which was his

16  preference, or somehow visit them in Canada, which was

17  apparently an obstacle due to his relationship with his wife at

18  the time and her family.

19             THE COURT:  Did he discuss with you how you could fix

20  that problem of a marital dispute?

21             THE WITNESS:  He did.  Well, your Honor, he didn't ask

22  me to fix his marital dispute.  He was asking about how it was

23  that we could potentially facilitate a visitation with his

24  children or bring his children to the United States.

25             THE COURT:  Was the problem a no-fly list?

I3qrkou5                    Shannon - cross

THE WITNESS:  I don't know that that was the principal

problem at that time, your Honor.  There had been an earlier

incident in Lebanon in August of 2016 in which his wife took

their two children and fled to Canada.

THE COURT:  Go ahead, Mr. Schacht.

BY MR. SCHACHT:

Q.  Isn't it true that my client wanted his relatives there

immediately?  Right?  That was his hope, right?

A.  He wanted them there as soon as possible, I suppose.  Yes,

that was his hope.

Q.  Yes, his hope.  He told you his hope.  I'm not asking you

to read his mind.  He said he wanted it immediately, right?

A.  He said as soon as possible.

Q.  Right.  So these estimates here are not estimates that he

created, are they?

A.  The week references, yes.  We never gave Mr. Kourani any

estimation in weeks.

Q.  On his own he said, my sister in four weeks and my children

end of summer?  That's your testimony, that he said that?

A.  That he was referencing a time period in which he would

want his demands met by, yes.

THE COURT:  Is Laila his sister?

MR. SCHACHT:  Yes.

THE WITNESS:  Laila is both the name of his sister and

his wife, your Honor.

1    Q.  He said, I demand or I want Laila here within four weeks,

2    and you wrote that down?

3    A.  We wrote down, yes, what Mr. Kourani was requesting by way

4    of benefits, as we told him we would.

5    Q.  Next, where it says "father," what does that say?

6    A.  "Ten-year ban."

7    Q.  What does that mean?

8    A.  He's been gone 12 years.  Mr. Kourani indicated that his

9    father had self-deported previously due to the fact that he had

10   engaged in a fraudulent or fake marriage here in the United

11   States.

12   Q.  He wanted your help in getting his father back, right?

13   A.  That's correct.

14   Q.  But he didn't have a demand for a time period for his

15   father?

16   A.  He was asking that his father and sister be brought over

17   together.

18   Q.  Where it says "Laila four weeks," in reality he requested

19   his father and Laila in four weeks, is that your testimony?

20   A.  He always requested benefits with respect to Laila and his

21   father, Mohammed, together, yes.

22   Q.  I see next to this you have written, "No promises made.

23   Estimations based on end of summer time frame but can't make

24   promises guarantee."  Is that what that says?

25   A.  Yes.

1   Q.   When did you add in those lines that I just read?

2   A.   All of these notes were taken on these pages contempo-

3   raneously with when we were having the conversations in the

4   interview room.

5            THE COURT:  I haven't seen the original, but it

6   appears that the writing on the right side is with a different

7   instrument than the writing on the left side.

8            THE WITNESS:  I was taking notes throughout the course

9   of that interview.

10           THE COURT:  Same pencil or same pen?

11           THE WITNESS:  I believe so, unless we paused and

12  somehow I picked up a different pen at some point.

13           THE COURT:  Does it indicate to you that the writing

14  on the right is darker than the writing on the left?

15           THE WITNESS:  It doesn't appear that way to me, your

16  Honor.  My notes are quite sloppy.

17           THE COURT:  It's all relative.  It depends on who is

18  looking at it and who is making it.  They appear to me to have

19  a firmer line and a darker tone than the writing on the left-

20  hand side.  Do you agree with that?

21           THE WITNESS:  I don't see that, your Honor, no.

22           THE COURT:  Go ahead, Mr. Schacht.

23  BY MR. SCHACHT:

24  Q.   Do you recall on your direct examination you mentioned that

25  you got the one-page typewritten set of notes from Mr. Denbeaux

 1    that then you and Agent Costello reviewed?

 2    A.  I do.

 3    Q.  Is it your testimony that when you read that on that day,

 4    you were surprised, to put it mildly?  Is that fair to say?

 5    A.  Yes.

 6    Q.  That virtually nothing in that document did you agree with?

 7    A.  There were items in the document that we did not agree with

 8    or that we had never discussed with Mr. Denbeaux.

 9    Q.  For example, where Mr. Denbeaux says that there is going to

10    be no prosecution, that obviously is something you disagree

11    with?

12    A.  Correct.

13    Q.  You hadn't promised that?

14    A.  Correct, we had not promised that.

15    Q.  In fact, you hadn't even discussed that?

16    A.  We had not discussed that.

17    Q.  What was the reason that you didn't say to Mr. Denbeaux, we

18    disagree or I disagree with this?

19    A.  Mr. Denbeaux never asked us to adopt that document or

20    whether we agreed to the information contained in the document.

21    So there was no question posed to answer.

22    Q.  He simply handed it to you and said no words?

23    A.  He handed the document to us and said these were his notes

24    and they were his assessment of things so far.

25    Q.  Then you left the room, read them, and returned them, and

1    there was no conversation at all about them?

2    A.   That's correct.

3    Q.   Your testimony is you didn't keep a copy, right?

4    A.   I did not keep a copy, no, sir.

5            THE COURT:  Did Costello?

6            THE WITNESS:  To my knowledge, no, he did not keep a

7    copy.

8    Q.   You did not discuss with any of the Assistant U.S.

9    Attorneys involved in the case those notes?

10   A.   No.

11   Q.   At that time.

12   A.   No.

13   Q.   Do you recall Mr. Kourani asking for the FBI's help in

14   getting a job?

15   A.   I do recall that.

16   Q.   Do you recall him telling you that he's a trained engineer

17   and he'd like to get a job in engineering?

18   A.   I recall him indicating that he had a degree in engineering

19   and that that was a field that he was interested in.

20   Q.   Were you aware that he had sent his résumé to Agent

21   Costello?

22   A.   I believe yes, I do recall Special Agent Costello

23   mentioning that to me at one point.

24   Q.   Isn't it the case that repeatedly throughout the five

25   in-person meetings my client expressed concern that anyone

1    would learn that he was talking to you, that that was a topic

2    that he brought up frequently?

3    A.  I don't know that he brought it up every meeting, but he

4    did bring it up, yes, sir.

5    Q.  Didn't you seek to reassure him by repeating the statement

6    that you made previously about confidentiality to Mr. Denbeaux?

7    A.  I'm sorry.  Can you repeat that question?

8    Q.  Didn't you tell Mr. Kourani, in response to him mentioning

9    his worry, that what would be said was confidential?  Do you

10   recall telling him that?

11   A.  No, we did not tell him that what he said would be

12   confidential.

13   Q.  You told him that the fact that he was meeting with you

14   would be confidential?

15   A.  With respect to members of the community knowing that he

16   was meeting with us, yes.  That we would try to keep that

17   confidential, the fact that he was meeting with us, yes.

18            MR. SCHACHT:  I have no further questions.  Thank you.

19            THE COURT:  Redirect?

20            MR. BOVE:  Yes.  Thank you.

21   REDIRECT EXAMINATION

22   BY MR. BOVE:

23   Q.  Special Agent Shannon, you were asked some questions on

24   cross-examination about instances in 2016 when you were told

25   Mr. Kourani was offered money by the FBI?

1    A.   That's correct.

2    Q.   Was Mr. Kourani offered any money in 2017?

3    A.   No, he was not.

4    Q.   You were asked some questions about the term "confidential

5    human source" during cross-examination.  Do you recall those

6    questions?

7    A.   I do.

8    Q.   Did that term ever come up during the 2017 interviews of

9    Mr. Kourani?

10   A.   No.

11   Q.   Did that term ever come up during the 2017 communications

12   with Mr. Denbeaux?

13   A.   No.

14   Q.   At any time did you or Special Agent Costello offer to let

15   Ali Kourani sign a confidential human source agreement?

16   A.   No.

17   Q.   At any time did Ali Kourani or Mr. Denbeaux request such an

18   agreement?

19   A.   No.

20   Q.   You were asked some questions about your use of the term

21   best efforts in connection with the March 22, 2017 call with

22   Mr. Denbeaux.  Do you recall those questions?

23   A.   I do.

24   Q.   Did you use that term during the call because it was

25   possible that despite your efforts, someone might find out

1   about the meetings?

2   A.   Of course.

3   Q.   What about students at Seton Hall?

4   A.   Was it possible that they could find out about the

5   meetings?  Certainly.  Mr. Denbeaux was a law professor there.

6   Q.   What about the Department of Homeland Security?

7   A.   Absolutely.  We explained to Mr. Kourani that in fact the

8   immigration benefits he was requesting required us to have a

9   conversation with Department of Homeland Security and actually

10  disclose the fact that we are meeting with him and about the

11  information that he was providing.

12  Q.   What about the Canadian government?

13  A.   Also with respect to the Canadian government: when it came

14  to Mr. Kourani's two children who were in Canada, that was

15  something that the United States government would have to

16  discuss with a foreign government, in this case the Canadian

17  government.

18  Q.   You were asked some questions more generally about the

19  discussion of confidentiality during that call.  Do you recall

20  those questions?

21  A.   Yes.

22  Q.   Special Agent Shannon, is there anything necessarily

23  inconsistent between confidentiality and a criminal

24  prosecution?

25  A.   No, there is not.

1   Q.  Does this case provide an example of how that can work?

2           THE COURT:  The witness is not -- I don't know if Mr.

3   Schacht objects or not.

4           MR. SCHACHT:  He can make the argument very nicely,

5   I'm sure, in a submission.

6           THE COURT:  Do you object?

7           MR. SCHACHT:  Yes, Judge.

8           THE COURT:  Sustained.

9   Q.  Did you participate in a conversation about the unsealing

10  of the complaint in this case?

11  A.  Yes.

12  Q.  What was the driving factor in the decision to unseal the

13  complaint in this case?

14  A.  Lack of candor on the part of Mr. Kourani.

15          MR. BOVE:  Nothing further, Judge.

16          THE COURT:  Anything further, Mr. Schacht about the

17  new matters that were brought up?

18          MR. SCHACHT:  I have no recross-examination.

19          THE COURT:  Thank you very much.

20          (Witness excused)

21          THE COURT:  Does the government rest?

22          MS. HOULE:  Your Honor, I note that we may seek to

23  admit additional exhibits during the cross of Mr. Kourani.  We

24  may have additional exhibits to offer, but we have no further

25  witnesses to call.  I noted, your Honor, that the 200 series

1    and the 800 series we have not yet admitted into evidence.  We

2    may seek to admit them through the cross of Mr. Kourani.  To

3    the extent that he doesn't testify, we will otherwise seek to

4    admit them so we can provide post-hearing briefing on the

5    contents.

6              THE COURT:  What is the nature of the documents?

7              MS. HOULE:  They are his emails and his text messages.

8              THE COURT:  Are you offering them as the case in chief

9    or as impeachment?

10             MS. HOULE:  Impeachment, your Honor.

11             THE COURT:  Do you rest?

12             MS. HOULE:  Yes.

13    MARK DENBEAUX,

14        called as a witness by the defendant,

15        having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. SCHACHT:

18   Q.  Mr. Denbeaux, how old are you?

19   A.  74.

20             THE COURT:  That's young.

21             THE WITNESS:  I agree, your Honor.

22   Q.  What kind of work do you do for a living?

23   A.  I teach law school at Seton Hall Law School.

24   Q.  What kind of classes do you teach?

25   A.  Usually a first-year course, a basic first-year course,

1    normally evidence, and four of the last ten years I've been

2    teaching seminars on expert witnesses.

3    Q.  Do you practice law as well as being a professor?

4    A.  I don't know about as well, but I do practice law.

5    Q.  What kind of law practice do you have?

6    A.  Currently I'm representing two people who are detained in

7    Guantanamo.  Before that, I have had a fairly disparate

8    practice because I can take cases as I wish as a law professor.

9    Some criminal, civil, civil rights.

10            THE COURT:  Do you make these cases a clinic for your

11   students?

12            THE WITNESS:  Not usually.  It is hard to make it

13   educational for them, for course credit anyway.

14   Q.  Do you recall meeting Ali Kourani?

15   A.  Yes.

16   Q.  About when did you first meet Ali Kourani?

17   A.  Some months before I first contacted the FBI.  I'm not

18   quite sure when that was.

19            THE COURT:  Give him a reference date, Mr. Schacht.

20   Q.  You contacted the FBI in March of 2017.

21   A.  Probably then the late fall, early December before that.

22   Q.  When you contacted the FBI in March of 2017, what, if

23   anything, was your goal?

24   A.  I wanted to introduce him to the FBI so that he could give

25   them some information that he understood they wanted, and he

I3qrkou5                    Denbeaux - direct

1    wanted in exchange some assistance for them with his family.

2    Q.  Do you recall the first time that you spoke to any FBI

3    agents about Ali Kourani?

4    A.  I think I made several phonecalls that did not go through

5    to the right person.  And then I received a phonecall back

6    probably in February of that year from -- I'm not sure of the

7    name of the person who called me back.

8    Q.  Did you ever eventually speak to either Agent Costello or

9    Agent Shannon?

10   A.  Yes, I did.

11   Q.  Do you recall the first time you spoke to them?

12   A.  I spoke to one of them on the phone because they wanted to

13   make sure that my client really wanted to cooperate and talk

14   openly to them, and I assured them that he did.

15   Q.  That was in the first conversation you had?

16   A.  Yes, the first time we had a conversation, not the first

17   phonecall.

18   Q.  With regard to the phonecall, do you recall the first

19   phonecall you had with either of them or both of them?

20   A.  Yes, I do.

21   Q.  Could you tell the judge what you said and what they said.

22   A.  I told them that my client was willing to talk to them, to

23   help them.  He believed the FBI thought he had information that

24   they wanted, and he definitely believed the FBI could help him

25   with his father, his sister, and especially his children.

1   Q.   Help in what way with those people?

2   A.   From the very first time I met him, before we called the

3   FBI, he'd wanted assistance getting his children from Canada

4   back into the United States.  They were U.S. citizens.  He

5   wanted them there.  He was distressed about the circumstances

6   they were in.  That's what he came to me to talk about the very

7   first time.

8   Q.   In that conversation with the FBI, was there any conver-

9   sation on the FBI agent's part about what, if anything, they

10  might be able to offer?

11  A.   No, in the phonecall there wasn't.  I just assured them

12  that he was willing to talk openly and that if they wanted to

13  meet with him, we could make those arrangements.

14  Q.   But there were no promises about immigration benefits at

15  that time?

16  A.   No, nor any promises that he had anything of value.  But I

17  think we assumed he did.

18  Q.   When you say "we," who are you referring to?

19  A.   I think the FBI agents specifically believed that he had

20  lots of information about it.  I was less sure of that.

21  Q.   With regard to that conversation still, was there any

22  discussion either by you or the FBI about the topic of

23  confidentiality?  If you recall.

24  A.   I don't recall what was said about confidentiality in the

25  phonecall before we met.

1    Q.  After that phonecall, you arranged a meeting, shortly

2    thereafter?

3    A.  Yes, I did.

4    Q.  Did that meeting occur?

5    A.  Yes, it did.

6    Q.  If we could call that "the first meeting."  At that first

7    meeting, how did it begin?

8    A.  It began by my explaining to them what I thought was fully

9    understood based on the brief conversation we had, which was

10   that he was prepared to cooperate and give them information in

11   exchange for their doing all that they could to help him with

12   his family, especially his children.

13            In the course of that very first meeting, I made it

14   very clear that he was there fully cooperating, he was there to

15   give whatever information he had, that he was not a suspect, a

16   subject, a target, that there were no plans to prosecute him,

17   and that he was there just to provide assistance.  I even said,

18   I think, assistance that he wanted to give to America to

19   protect them, if he had anything.

20   Q.  What you just said, that was all verbal at that time?

21   A.  Yes, but it was quite an extensive conversation.

22   Q.  What, if anything, do you recall they said at that time?

23   A.  I believe they said thank you very much, and we discussed a

24   little bit how it was going to proceed.  I think at some point

25   very early on there the kids' concern was expressed by me,

1   which was confidentiality was crucial.  He believed he was

2   giving information that might be very dangerous for him and for

3   his family, and he wanted assurances that everything would be

4   held in confidence.  They absolutely agreed to that.

5   Q.  After that beginning part of the meeting where these things

6   were discussed, then they proceeded to ask questions, I assume,

7   of him?

8   A.  Yes.  They just sat there and started asking questions, and

9   he would give answers, and they would respond.  It was a

10  colloquy and an open and relaxed communication.  Everything

11  seemed to me to be moving along.  I assumed they were

12  appreciating what they were getting.  We had frequent

13  discussions about how he would get what he was seeking from

14  them.  At every meeting that would come up.

15        Right away they talked about it would be difficult to

16  get the children back from Canada in the sense that that would

17  take time.  As I recall, not Agent Costello, said at one point,

18  well, it's going to be harder to get the children from Canada

19  but that we would be able to get them by August, which seemed a

20  long time away at that time in one sense and seemed to be very

21  reassuring to my client at the same time.

22  Q.  When you say August, do you mean August of 2017?

23  A.  Yes.

24  Q.  Was there any discussion about the sister and the father,

25  who you mentioned earlier?

1  A.  Oh, yes.

2  Q.  What was the discussion at the first meeting about the

3  sister and the father?

4  A.  The first thing was the father's situation was a little

5  more complicated because he had been in the United States and

6  had returned to Lebanon apparently in a way that made

7  immigration issues complicated.  I don't know anything about

8  immigration law, but that's what Agent Costello said.

9          As to the sister, the assurance was given that they

10  could easily get the sister here but that they thought they

11  would want to do the father and the sister at the same time.

12  That seemed to be okay with my client.

13  Q.  Was there anything unusual, or do you recall how the

14  meeting ended, or did it just end by planning the next meeting?

15  A.  I think it was ending in a very friendly way.  Time was up.

16  Everybody was tired.  I think we had spent quite a few hours

17  talking.  They said thank you very much, we appreciate what you

18  have given, we would like to talk to you further, is that

19  possible.  I think we agreed yes, and they said they would work

20  out the next meeting time with me.

21  Q.  Did you in fact work out a second meeting?

22  A.  Yes.  I think we did it by phone.

23  Q.  Roughly how much later was the second meeting, if you

24  recall?

25  A.  I'm going to say approximately a week or ten days later.

1    That seems to be the space between each meeting.

2    Q.  What, if anything, happened at the beginning of the second

3    meeting?

4    A.  At the beginning of the second meeting I began with a

5    document that I had prepared just because I wanted to make sure

6    all the facts were agreed upon in writing.  I prepared that

7    document.  For me the crucial part of the document was the fact

8    that he wasn't a target, wasn't a suspect, he wasn't charged

9    with a crime, no expectation that that was happening.  He was

10   there just to cooperate.

11           I spent most of the time discussing the arrangements

12   in the conversation about how the FBI would be able to assist

13   him.  Because, as the first conversation had gone on, it was

14   true that the assurance was have the children from Canada by

15   the end of August.

16           It was also true things were being said such as why

17   didn't I represent him in a domestic action so that would help

18   get the children back.  I said I don't do that.  And besides,

19   that wouldn't do it.  See, we had various things where he say

20   okay, we'll check with our boss, we'll bring the higher-ups,

21   this is very helpful, what you have given, but we may need

22   more, etc.  That was the nature of the conversation.

23           The really important part of my document, I thought,

24   was explaining the communications and the difficulties that

25   people were having in how simply to accomplish what it was that

I3qrkou5                        Denbeaux - direct

1    brought him there.

2    Q.  When you handed this document to the FBI agents at the

3    meeting, what, if any, conversation was there about the

4    document?

5    A.  I didn't think there was any surprise.  I handed it I

6    believe to Mr. Costello, who looked at it.  It seemed pretty

7    clear to me that we had all agreed in advance that he wasn't a

8    target, suspect.

9              THE COURT:  No.  What did they say?

10             THE WITNESS:  I apologize, your Honor.

11             THE COURT:  You're an evidence professor.

12             THE WITNESS:  I know.  Here now it's different.

13             THE COURT:  You're a witness.  The question was what

14   did they say when they gave you the document.

15   A.  They said thank you, looked at the document, turned and

16   handed it to the other agent.  I forget her name.  She looked

17   at it, opened her notebook, and put it in it, and we all moved

18   on.

19   Q.  When you say you all moved on, there was no other conver-

20   sation about the document?

21   A.  No.

22   Q.  What happened next at the meeting?

23   A.  They continued asking him questions and seeking information

24   about a variety of things, many things.

25   Q.  Do you have any memory of what happened or how the second

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  meeting ended?

2  A.  The same way.  Every time Mr. Kourani would say, okay, now

3  what's going to happen with my children, what's happening with

4  my father, how are we going to deal with that.  They'd say

5  we'll get back to you on the details of that, the final

6  decision isn't up to us, but we will present it and we'll be

7  back to you the next time we talk.

8  Q.  How did you react, if at all, to what they said about we

9  need to talk to our higher-ups and we'll get back to you?

10  A.  I can't remember each time, but I would point out to them

11  that we were there, he was going to cooperate and give them

12  everything he had, and we were there in exchange for their

13  doing their very best efforts to assist him with some or all of

14  these circumstances.

15  Q.  Do you recall ever sending Agent Costello a text message

16  where you said there's no promises?

17  A.  I think that came up several times, text and in person.

18  Q.  Say again.

19  A.  Yes, I recall sending that.

20  Q.  You recall sending the text message?

21  A.  Yes, I do.

22  Q.  When you sent that text message saying there's no promises,

23  what did you mean by that?

24  A.  It was dealing with the only subject he and I ever talked

25  about in this regard, which was whether he would be able to get

I3qrkou5                    Denbeaux - direct

the children back from Canada or not.  He repeatedly said that

he would be working with his higher-ups, it would be hard, I'm

making no promises, but I will do my very very best.  That

subject came up frequently, and it always was the same way,

which was it was going to be difficult but they could do it.

At no time did they ever say it would take longer than getting

the children back by August.

Q.  When Agent Costello said to you regarding the children,

that there's no promises, was there any doubt in your mind that

there were other promises made, not about the immigration,

about whether or not he would be prosecuted?

          MR. BOVE:  Objection.

          THE COURT:  Sustained to form.  Change the form.

Q.  Other than the immigration, were there any promises made to

you by the agents?

A.  Yes.  As I think I mentioned, they repeated discussed the

need for confidentiality, that he would discuss his concerns

about it going public.  There were discussions.  I think Agent

Costello said, you have never heard of any of these other

people that we have been asking about.  That proves we are

keeping confidences.  We will keep your confidences the same

way.

Q.  Did you ever have any disagreements or arguments with the

agents?

A.  I think a couple of times -- no, I don't actually recall

I3qrkou5                    Denbeaux - direct

1   any arguments or disagreements.  He might have said he

2   wasn't -- no, there weren't any.

3   Q.  What were you about to say?  He might have said what?

4   A.  I think there was some discussion about how much Mr.

5   Kourani knew and they believed he knew more than he seemed to

6   know and certainly more than he said.  They would suggest

7   things like, well, if we're going to have to do the heavy lift

8   to get your children here, we are going to need more than you

9   have given us so far.  We would have discussions at the end of

10  the meeting which said -- it began always with that assistance

11  being expected, and there was no condition that he had to give

12  information of some quality or quantity.

13  Q.  Later on, when you learned that he was arrested, Mr.

14  Kourani was arrested, what, if anything, was your reaction?

15  A.  I was shocked, betrayed.  I was really, really distressed

16  because it seemed to me I must have engaged in some form of

17  malpractice or incompetence.

18          THE COURT:  I don't think that is really competent

19  evidence.  You are allowed to object, Mr. Bove or Ms. Houle,

20  whoever is doing it.

21          MR. BOVE:  Thank you, Judge.

22  Q.  Why were you shocked?

23  A.  Because they had promised --

24          THE COURT:  It's the same issue.  Do conversations,

25  Mr. Schacht.

1    Q.  Did you contact or did you have contact --

2              THE COURT:  Did you express your shock in any way?

3    Q.  Did you express your shock?

4    A.  Yes.

5    Q.  To any members of the government?

6    A.  Yes.

7              THE COURT:  What did you say?

8              THE WITNESS:  An Assistant U.S. Attorney called me to

9    tell me -- he offered they could come down so they could have

10   further conversations with Mr. Kourani.  I said I'm not

11   prepared to do that.  You folks promised me this would be in

12   confidence, this wouldn't happen.  And I said I was ashamed by

13   what my government had done.

14             THE COURT:  What did the assistant say?

15             THE WITNESS:  He said, well, if you're going to talk

16   that way, then this conversation is over.

17             MR. SCHACHT:  Thank you.  I have no other questions.

18             THE COURT:  Cross.

19   CROSS-EXAMINATION

20   BY MR. BOVE:

21   Q.  Mr. Denbeaux, you're an extremely experienced attorney,

22   correct?

23   A.  I'm also a brilliant one and a good father and a good

24   husband, yes.

25             MR. BOVE:  So stipulated, Judge.

 1          THE COURT:  We don't know about being a good husband

 2   and a good father.  We will have to take evidence on that.

 3          THE WITNESS:  That's the more important part.

 4   Q.  You graduated from NYU in 1965?

 5   A.  Yes, I did, 1968.

 6   Q.  You are admitted to the bar of New York?

 7   A.  Yes.

 8   Q.  Also the bar of New Jersey?

 9   A.  Yes.

10   Q.  You are admitted to the bar of this court?

11   A.  I believe so.

12   Q.  Over the course of your career, you have extensive

13   experience practicing criminal law, correct?

14   A.  Some criminal law.

15   Q.  Just some?

16   A.  Well, I never had lots of cases, but I would have selected

17   ones with some interest to me and some significance.

18   Q.  You are one of the founding members of South Bronx Legal

19   Services, correct?

20   A.  Yes, I was.

21   Q.  You were also citywide coordinator for Community Action for

22   Legal Services?

23   A.  Yes, I was.

24   Q.  You had a law firm in New Jersey with your family?

25   A.  Actually, the law firm is my son and my former wife.

1   Q.  Are you not listed currently?

2   A.  I think I'm of counsel, but I'm not a partner or involved

3   in any significant way.

4   Q.  If I could finish the question.  I'm sorry.  Are you not

5   listed today as a member of that law firm on the firm's

6   website?

7   A.  I don't know.  If so, I'm of counsel.

8   Q.  You are also a law school professor?

9   A.  Yes, I am.

10  Q.  You are one of the most senior faculty members at Seton

11  Hall?

12  A.  Yes.

13  Q.  You have been there since 1972?

14  A.  Yes.

15  Q.  Taught courses in constitutional law?

16  A.  Yes.

17  Q.  Criminal law?

18  A.  Yes.

19  Q.  Evidence?

20  A.  Yes.

21  Q.  Contracts?

22  A.  Yes.

23  Q.  And professional responsibility?

24  A.  Yes.

25  Q.  At Seton Hall you founded the Center for Policy Research?

I3qrkou5                    Denbeaux - cross

1    A.  Yes, I did.

2    Q.  That was in 2006, approximately?

3    A.  I believe so.

4    Q.  You have published a significant amount of writing, fair to

5    say?

6    A.  Yes.

7    Q.  In connection with your work at the center for policy and

8    research, you are familiar with federal criminal terrorism

9    statutes, correct?

10   A.  Some of them.

11   Q.  Are you familiar with the statute prohibiting providing

12   material support to a designated foreign terrorist organ-

13   ization?

14   A.  I have never had a client charged with that, but I've heard

15   of it.  I have never read the statute.

16   Q.  Do you consider Mr. Kourani a client?

17   A.  Yes.

18   Q.  Are you aware that he is currently charged with violating

19   that statute?

20   A.  I am now.

21   Q.  You have extensive experience in national security cases,

22   right?

23   A.  No.  I have extensive experience with people detained in

24   Guantanamo without a trial or hearing.

25   Q.  You consider those national security cases?

1          THE COURT:  Let's not fence, folks.  It is not

2     relevant to what we are doing.

3     Q.  Have you represented in habeas proceedings --

4          THE COURT:  What's that got to do with this case?

5          MR. BOVE:  Mr. Denbeaux is handling the representation

6     of one of those detainees that occurred at exactly the same

7     time as --

8          THE COURT:  So what?

9          MR. BOVE:  Because the tactics used were strikingly

10    similar, Judge.  They will demonstrate that Mr. Denbeaux

11    threatened to go to the media in both cases.

12         THE COURT:  So what?

13         MR. BOVE:  Mr. Denbeaux here has testified that there

14    was a promise of confidentiality that he relied upon when in

15    fact --

16         THE COURT:  That's what I'm interested in, what it

17    means.  I'm not interested in any cases in Guantanamo in this

18    case.  Sharpen your questions, please, Mr. Bove.  Otherwise,

19    I'll just stop.

20              (Continued on next page)

21

22

23

24

25

1    BY MR. BOVE:

2    Q.  You threatened Special Agent Costello in May of 2017 that

3    you would take Mr. Kourani's case to the media if the benefits

4    he was seeking were not provided?

5    A.  No, I didn't say that.  But I did say if they betrayed the

6    promises that they made to me that I would make it clear to the

7    many people in the profession that I had been betrayed and that

8    I had been hurt and that they were not trustworthy and I may

9    have included the media but it was going to include lawyers

10   that I knew.

11   Q.  You described the circumstances in which the investigation

12   was handled?

13   A.  No.  The promises that I was made that were made to me that

14   would have led me to allow a man to come in and talk openly and

15   freely to the FBI agents because they'd assured me that it

16   would be in confidence, he wouldn't be prosecuted and he

17   wouldn't be charged.  That's what I was upset about.

18   Q.  Now, you knew that agents sometimes make recommendations

19   about whether criminal charges are appropriate, right?

20   A.  I presume so.

21   Q.  Those are only recommendations because prosecutors make the

22   final decisions, correct?

23   A.  I presume so.

24   Q.  At no time prior to the arrest of Ali Kourani did you talk

25   to a prosecutor relating to this case?

1   A.   No.  I only spoke to the agents.

2   Q.   And at no time prior to the arrest of Ali Kourani, did you

3   ask to speak to a prosecutor?

4   A.   No, I didn't.  I relied on Costello and the other agent.

5   Q.   You've obtained immunity before for other clients, correct?

6   A.   Probably.  I don't remember.

7   Q.   You probably obtained?

8   A.   I've discussed it but I've never gone to -- no.  The answer

9   is I do not remember going to get immunity for somebody to

10  testify.  Nor did I think I was asking for immunity here.

11  Q.   And as a law professor --

12           THE COURT:  What does it mean not to ask for immunity

13  but to expect immunity?

14           THE WITNESS:  Your Honor, I didn't think immunity was

15  even the issue.  I thought it was understood that he was

16  somebody cooperating with the FBI because they thought he had

17  information and he was volunteering it and that they did not

18  consider him a target or a defendant and they were seeking

19  information and they would use elsewhere.  If I had ever

20  thought for a minute that everything we said could have been

21  used against him I would have said --

22           THE COURT:  Why didn't you ask for a letter of

23  immunity.

24           THE WITNESS:  Your Honor, I never thought of it.

25           THE COURT:  You knew the procedure to be -- you

I3QAAKOU6                    Denbeaux - Cross

haven't given any testimony about receiving a promise of no

prosecution except things you said.  So how could you expect

there would be immunity?

THE WITNESS:  Well, I had never dealt with a federal

case involving a criminal prosecution or immunity or anything

else.  Whatever it is I called him up and said we have noticing

and apparently they wanted it.  I said this is what he wants

and this is our understanding and they agreed with it.  Whether

I should have gone further or not, I don't know.  But that was

the basis upon which the interviewing was proceeding as far as

I was concerned and I'm sure as far as Mr. Kourani as

concerned.

THE COURT:  You said you knew that the agents lacked

authority themselves.

THE WITNESS:  I knew they lacked authority to give him

what he hoped for which is to move his children back to the

United States.

THE COURT:  And they lacked authority as well to give

him them immunity --

THE WITNESS:  I did not know that.  I should have.  I

never thought of it, your Honor.

THE COURT:  In answer to one of Mr. Bove's questions

you said you knew that only the prosecutor could give immunity.

THE WITNESS:  Yes, your Honor.  I knew that.

THE COURT:  You knew these fellows were not

1   prosecutors.  They were is special agents.

2          THE WITNESS:  Right.  And I thought that nothing we

3   said were going to be used in any way against him because he

4   wasn't a target and there was no criminal risk at stake.

5          THE COURT:  But you never were told you said it,

6   didn't say it?

7          THE WITNESS:  I told them what I understood the

8   premise was and we repeated it over and over again.  At no

9   point was I ever advised the assumptions that we were making or

10  that I'd put in writing were not true and being upheld.  The

11  only thing we ever discussed was their inability to provide the

12  assistance that he was needing to move people into the country.

13  And I think I fully understood that was a difficult task and

14  they might have a hard time doing it but that was all we were

15  talking about.

16         THE COURT:  -- using their best efforts?

17         THE WITNESS:  Yes, they promised they would use their

18  best efforts and they were confident more at sometimes than

19  others they would be able to do it.  But at all times we were

20  assuming that they would do their very best and it would be

21  held in confidence and that they would be grateful to him for

22  his efforts.

23  BY MR. BOVE:

24  Q.  You testified that you believed you were introduced to

25  Mr. Kourani in the late fall or perhaps into December of 2016?

1    A.   Yes.

2    Q.   And it was a Mr. Ali that introduced you to Mr. Kourani,

3    correct?

4    A.   No.

5    Q.   Who introduced you to Mr. Kourani?

6    A.   A friend of mine named Joseph Hickman, a former

7    intelligence analyst I had been working with on some other

8    questions.  He lived in Wisconsin.  He called me to tell me

9    that he had a friend who was having serious domestic problems

10   dealing with his children.  He wanted to know if I could help.

11   My wife did family work and had done a great deal of it but she

12   had recently did and I advised him that I could not possibly do

13   that.

14   Q.   Did Mr. Hickman tell you that Mr. Kourani wanted to meet

15   with the FBI?

16   A.   I don't remember or that he said they wanted to meet or the

17   FBI wanted to talk to him.  But when Mr. Kourani came to talk

18   to me he made that clear that the FBI wanted to talk to him and

19   he was willing to talk to the FBI but he wanted their help

20   getting his children.

21   Q.   And you told Mr. Kourani when you met him that you knew how

22   to deal with FBI agents and CIA agents?

23   A.   It's pretty clear I have no idea how to deal with CIA

24   agents and I have no experience dealing with FBI agents.

25   Q.   So you never conveyed that to Mr. Kourani?

1    A.  I don't remember doing it.

2            THE COURT:  Keep your voice up, Mr. Bove.

3    Q.  Now, do you remember the first date that you reached out to

4    the FBI?

5    A.  No.

6    Q.  You submitted two sworn declarations in this case, correct?

7    A.  I believe so.

8    Q.  One of them was dated December 20, 2017?

9    A.  I don't have a copy.  I'm sure whatever date you have is

10   the one I signed.

11           MR. BOVE:  Can we take a look at Government Exhibit

12   702 in evidence please?

13           THE COURT:  702?

14   Q.  Do you recognize that document?

15   A.  I'm sure this is --

16   Q.  I am going to bring a hard copy.

17   A.  OK.

18   Q.  Let us know if you recognize that?

19   A.  Yes, I do.

20   Q.  Is that your signature on page four?

21   A.  Yes.

22           MR. BOVE:  Your Honor, the government offers 702.

23           MR. SCHACHT:  I have no objection.

24           THE COURT:  Received.

25           (Government's Exhibit 702 received in evidence)

1   Q.  You signed this document under penalty of perjury?

2   A.  I don't know what it says but I don't see it sworn to but

3   it's certainly -- Yes.  It says under penalty of perjury.

4            THE COURT:  It's pursuant to 28 U.S.C. 1746.

5            THE WITNESS:  Yes, your Honor.

6            THE COURT:  You understand, you know about that

7   section?

8            THE WITNESS:  Yes, I do.  I was --

9            THE COURT:  So you can't say it's not under penalty of

10  perjury.

11           THE WITNESS:  I was looking at jurat at the end.

12           THE COURT:  But a declaration of 28 U.S.C. 1746 is the

13  same?

14           THE WITNESS:  Yes.

15           THE COURT:  You understand that?

16           THE WITNESS:  Yes, I do, your Honor.

17  Q.  That line continues -- reading from government 702 --

18  declares under penalty of perjury, correct?

19  A.  That's correct.

20  Q.  And Mr. Schact wrote this document for you?

21  A.  Yes, he wrote most of it.

22  Q.  He wrote most of it?

23  A.  Yes.

24  Q.  Because let's take a look at paragraph two, right, do you

25  see that and it starts on February 28, 2017?

1    A.  Yes.

2    Q.  That's not a date that you have any independent

3    recollection of, correct?

4    A.  I don't think so, no.

5    Q.  But you signed this document?

6    A.  Yes.

7    Q.  Now, you testified earlier about what you believed was the

8    first phone call that you had with Special Agents Shannon and

9    Costello, correct?

10   A.  I did earlier.  I don't think I said I knew which one was

11   which.

12   Q.  Do you remember the date of the first phone call?

13   A.  It was somewhere in the winter about this time prior to our

14   first meeting.

15   Q.  But you don't remember it being on March 2, 2017?

16           THE COURT:  I think it's safe to say that Mr. Denbeaux

17   is not aware of the precise dates and took from Mr. Schact what

18   the dates were, right?

19           THE WITNESS:  That's right.

20   Q.  Now you testified on direct that you don't remember the

21   topic of confidentiality coming up on this first phone call,

22   right?

23   A.  Not the first phone call.

24           MR. BOVE:  If we could take a look the page two of

25   Government Exhibit 702 and zoom-in on the carryover of

1   paragraph two on the top of the page.  The last sentence of

2   this paragraph of the sworn declaration reads:

3          I mentioned that the defendant was very nervous about

4   his and his family's physical safety should anyone find out

5   that he was talking to the FBI.  I was assured that any meeting

6   would, quote, remain confidential.

7          do you see that?

8   A.  Yes.

9   Q.  You don't have an independent recollection of that being

10  said during the call, correct?

11  A.  Well, I don't remember the date of this call.  I don't

12  remember the date of the call with both Shannon and Costello.

13  I remember there was a call before that as well trying to

14  schedule it.  This was a more substantive call.

15  Q.  But you do not have an independent recollection of the

16  phrase "remain confidential" being used during a telephone call

17  with Special Agent Shannon and Special Agent Costello?

18  A.  I don't remember that.

19  Q.  Nevertheless, in this sworn declaration you included that

20  phrase in quotation marks, right?

21  A.  Yes.  I said that every single time, I had communications

22  with them by phone or in person.

23  Q.  And you understood that this declaration was going to be

24  used in support of Mr. Kourani's motion, right?

25  A.  Yes.

1   Q.  And that it was important to be honest about the state of

2   your recollection?

3   A.  Yes, it is.

4   Q.  And that it was important to inform the Court of salient

5   facts relating to your interactions with the FBI, correct?

6   A.  Yes.

7   Q.  It is simply not true that you have a recollection of this

8   phrase "remain confidential" being used during the March 22?

9            THE COURT:  Overruled.

10           MR. SCHACHT:  I am objecting because of the timeframe.

11   It's not relevant.

12           THE COURT:  Overruled.

13           MR. SCHACHT:  What he recollects today.

14           THE COURT:  When you get up to object, folks, there is

15   one word to say, "objection".  If I need further information,

16   I'll ask for it. I don't want any speaking objections.

17           Understand, Mr. Schact?

18           MR. SCHACHT:  Yes, your Honor.

19           THE COURT:  Don't do it again.

20           MR. SCHACHT:  All right.

21   A.  So I don't understand when you say March 22 or February 28?

22   Q.  I'm focused right now on the portion of your declaration

23   related to the March 22, 2017 call.  And your summary, the

24   sworn declaration of that call includes the phrase in quotation

25   marks "remain confidential", correct?

1   A.  Yes.

2   Q.  You do not have an independent recollection of that phrase

3   being used during a phone call on March 22, 2017?

4   A.  I do not remember that phrase being used in that phone

5   call.  I remember it used in almost every phone call.

6   Q.  That's not what you testified to on direct, is it?

7   A.  I don't remember.

8   Q.  Now, this declaration that you signed under penalty of

9   perjury does not say anything about discussions of immunity,

10  right?

11  A.  It does not.

12  Q.  Cause there were no discussions about immunity?

13  A.  There were no discussions about immunity.

14  Q.  And did you summarize this call to Mr. Kourani after it

15  happened?

16  A.  I summarized this call.  I went through these materials

17  with him and he and I drafted this and I believe it accurately

18  reelects everything that I had told him.

19          THE COURT:  I thought you were mixing up Schact and

20  Kourani.  The question was what were you -- Mr. Kourani, your

21  client?

22          Is that right, Mr. Bove?

23          MR. BOVE:  Yes?

24          THE WITNESS:  I'm sorry.  I didn't understand the

25  question.

I3QAAKOU6                    Denbeaux - Cross

1    Q.  Do you remember having a conversation with Mr. Kourani

2    about the phone calls with the FBI?

3    A.  Yes.

4    Q.  And did you use the word "immunity" during that

5    conversation?

6    A.  I don't have a memory of what I said to him when I talked

7    about it but I presume I didn't use "immunity".  I used

8    "confidentiality".

9    Q.  Now let's take a look at Government Exhibit 402.

10   A.  I find this -- could you give me a hard copy of that also?

11   Q.  Here is a hard copy of that.

12   A.  All right.

13   Q.  Now, in your sworn declaration you described this document

14   as a typed summary of my notes concerning what was previously

15   discussed.  Do you recall swearing to that under penalty of

16   perjury?  This is paragraph eight of Government Exhibit 702.

17   A.  I don't believe I had any notes.  I didn't have any notes.

18   That was my memory of what had been discussed the day before.

19   Q.  So paragraph eight of Government Exhibit 702 is inaccurate

20   in that respect?

21   A.  Yeah.  I didn't take notes.  It was based on my memory.

22   Q.  When Mr. Schact sent you the declaration did you make any

23   changes to it?

24   A.  I believe so.

25   Q.  How did you communicate the changes to the declaration that

1    you wanted to make to Mr. Schact?

2    A.  I don't recall.  I think he met with me in my office and we

3    talked about it.

4    Q.  Did you send him any e-mails about the declaration?

5    A.  Not that I know of.

6    Q.  And you filed a second declaration in this case, correct?

7    A.  Yes, apparently.

8    Q.  You don't recall?

9    A.  I think I recall at least one or maybe two.  I'm not sure

10   which one came first.

11   Q.  Showing you what's been marked for identification as

12   Government Exhibit1005; do you see that?

13   A.  Oh, yes, right.

14   Q.  What is this?

15   A.  I think it was a statement I was asked by, if I had taken

16   any notes and I had advised him that I had no notes and I think

17   Mr. Schact asked me to sign an affidavit confirming that.  And

18   I made no notes and I never have any notes.

19            MR. BOVE:  Your Honor, the government offers

20   Government Exhibit 1005.

21            MR. SCHACHT:  No objection.

22            THE COURT:  Received.

23            (Government's Exhibit 1005 received in evidence)

24   Q.  That document sworn under penalty of perjury is accurate;

25   is that your testimony?

1   A.  Yes.

2   Q.  And Government Exhibit 702 sworn under penalty of perjury

3   is not accurate, correct?

4   A.  Yes, it's not accurate as to my notes.

5           THE COURT:  And it wasn't accurate as to the memory of

6   your meeting, right?

7           THE WITNESS:  Could you repeat that?

8           THE COURT:  And it wasn't accurate as to the memory of

9   the date of the meeting?  You didn't have a memory?

10          THE WITNESS:  No.  I didn't have a memory.

11          THE COURT:  Even though you said you had.

12          THE WITNESS:  Yes.

13          MR. BOVE:  Let's take a look the 702, page two,

14  please.

15  Q.  Do you remember the date of your first interview with

16  Mr. Kourani and Special Agent Costello and Shannon?

17  A.  No, I don't.

18  Q.  But here in paragraph three you swore under penalty of

19  perjury that it occurred on or about March 24, 2017?

20  A.  On or about March 24 would be right about.

21  Q.  But you don't have any independent recollection of the

22  specific date?

23  A.  No.  I knew it was in March.

24  Q.  Nevertheless, you included that date in this declaration,

25  correct?

1          MR. SCHACHT:  Objection, your Honor.

2          THE COURT:  Overruled.

3   A.  If that's what I said, that's what I said.

4   Q.  You testified on direct exam about having a recollection of

5   text messages that you sent to Special Agent Costello?

6   A.  I have at least one I remember quite strongly.

7          MR. BOVE:  Could we take a look the Government Exhibit

8   301 in evidence.  Zoom-in on the top message.

9   A.  Yes.

10  Q.  Do you recall sending this message to Special Agent

11  Costello?

12  A.  Yes.

13  Q.  Do you recall it being on March 23rd of 2007 independently

14  of the date at the top of this?

15  A.  No.

16  Q.  You testified on direct that your references in this text

17  message the word "promise" was a reference to immigration

18  benefits that Kourani had requested?

19  A.  Yes.

20  Q.  And you were clear with Special Agent Costello that you

21  understood that you could not promise or guarantee, right?

22  A.  Yes.

23  Q.  But in your declaration Government Exhibit 702 you said the

24  agents conveyed the sense they were guaranteeing help with

25  insuring safety; do you see that?

1    A.   Yes.

2    Q.   That's not accurate, is it?

3    A.   I think it is accurate.  They repeatedly conveyed it and

4    they repeatedly said we can't promise but this is what we

5    believe we're doing.  We are going to talk to our bosses.

6    They're very pleased with what's happening so far.  We need

7    more information because it's a heavy lift to get children

8    moved out of Canada and that conversation came up over and over

9    again.

10   Q.   And as you said, they repeatedly said that they could not

11   promise?

12   A.   That's right.

13             MR. BOVE:  Let's go back to Government Exhibit 402

14   please.

15             THE COURT:  What's the exhibit number?

16             MR. BOVE:  402, judge.

17             Zoom-in on the top section.

18   A.   Yes.

19   Q.   This is the document that you handed to the agents in a

20   second interview, correct?

21   A.   Correct.

22   Q.   And let's focus on paragraph number two.  It starts out

23   with he is not seeking any kind of immunity or protection,

24   correct?

25   A.   Yep.

1  Q.  And when you wrote "he" there that was a reference to

2  Kourani?

3  A.  Yes.  But's not the rest of the sentence.  The sentence

4  goes on, right?

5  Q.  It does and we'll get to that.  The sentence continues that

6  it has already been agreed he has committed no crime.  Do you

7  see that phrase "committed no crime"?

8  A.  Yes.

9  Q.  You were at the first interview of Ali Kourani, correct?

10  A.  Yes.

11  Q.  You don't remember the exact date but you know there was

12  one before this document was provided?

13  A.  Yes.

14  Q.  And during that meeting Mr. Kourani admitted to being a

15  member of Hezbollah, correct?

16  A.  Yes.

17  Q.  He admitted to having received training from Hezbollah in

18  Lebanon?

19  A.  Yes.

20  Q.  He admitted to having conducted surveillance of targets in

21  the United States such as at 26 Federal Plaza?

22  A.  I don't remember what meeting you are talking about but,

23  yes.  He had certainly had said that at some point.

24  Q.  Well, you're sure that in the first meeting he admitted

25  that he was a member of Hezbollah?

1    A.  Yes, he did.

2    Q.  He described some of training he received.  Based on those

3    admissions, sir, how could you possibly believe that he had

4    committed no crime?

5    A.  The answer was this was agreed to before the meeting even

6    started and that was what these meetings are not.  This is not

7    a plea negotiations.  This was written after the first meeting

8    describing what we had agreed upon.

9              THE COURT:  So the question is after you heard your

10   client admit that belonging to a terrorist organization, how

11   could you write that it's agreed that he has committed no

12   crimes?

13             MR. SCHACHT:  Objection.

14             THE COURT:  On what ground?

15             MR. SCHACHT:  He didn't admit that he was a member of

16   a terrorist organization.  He admitted that --

17             THE COURT:  A member of Hezbollah and Hezbollah is a

18   terrorist organization.

19             MR. SCHACHT:  It's not a crime to be a member of

20   Hezbollah.

21             MR. BOVE:  Judge, the witness just testified it was a

22   crime.

23             THE COURT:  Let's modify the question.

24             After hearing that he was a member of Hezbollah and

25   had received training from them, how could you say that it was

1  agreed he had committed no crime?

2          THE WITNESS:  I did not believe being a member of

3  Hezbollah in Lebanon and training in Lebanon would constitute a

4  crime in the United States.

5  Q.  What was your basis for that belief?

6  A.  I did no research.  I believed that to be the case.  If I'm

7  wrong, I'm wrong.  You asked why I wrote that and how could I

8  do it.  It's because I didn't believe that being a member of

9  Hezbollah in Lebanon was a crime.

10 Q.  You said that it's your testimony that he has committed no

11 crime conversation happened before the present interview?

12 A.  Yes.  At the beginning of the interview we started.

13 Nothing here wasn't already discussed, at least the first part

14 of it, before anything happened.

15 Q.  So it was your belief that agents from the Federal Bureau

16 of Investigation could make that agreement before hearing a

17 word that Mr. Kourani said?

18 A.  Yes.  Because I told him we weren't going to be talking any

19 further if that wasn't agreed to.

20 Q.  You also wrote in this document that Kourani faces no

21 prosecution; do you see that?

22 A.  Yes.

23 Q.  But you already testified that you never spoke to a

24 prosecutor prior to the arrest of Ali Kourani?

25 A.  Right.  I only spoke to the agents.

1   Q.  And no agent mentioned a prosecutor to you, correct?

2   A.  No.  And no agent also told me that this is, none of this

3   is true and that we still we want to continue with this

4   conversation.

5   Q.  Well, sir, let's talk about the format of this document?

6           THE COURT:  May I interrupt?  It's 5:35.  Where are

7   you going?  I don't think we're going to finish by six.  So

8   maybe we should resume tomorrow at 11?

9           MR. BOVE:  I think that makes sense, judge.

10          THE COURT:  Yes.

11          Off the record.

12          (Discussion held)

13          THE COURT:  Mr. Bove makes a request that since you

14  are on cross-examination that you not speak to anyone about

15  this case.

16          Any objection to that, Mr. Schact?

17          MR. SCHACHT:  Absolutely, not.  The only conversation

18  I would have with him is about scheduling to make sure he is

19  here.

20          THE COURT:  We've already done that.  You need not to

21  have any conversation.

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  No conversations with anyone about this

24  case or the facts of this case.

25          (Adjourned to Tuesday, March 27, 2017 at 2:30 p.m.)

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    JOSEPH COSTELLO

4    Direct By Ms. Houle . . . . . . . . . . . . . . 9

5    Cross By Mr. Schacht . . . . . . . . . . . . . .87

6    Redirect By Ms. Houle . . . . . . . . . . . 111

7    KERI SHANNON

8    Direct By Mr. Bove . . . . . . . . . . . . . 111

9    Cross By Mr. Schacht . . . . . . . . . . . . 152

10   Redirect By Mr. Bove . . . . . . . . . . . . 166

11   MARK DENBEAUX

12   Direct By Mr. Schacht . . . . . . . . . . . 170

13   Cross By Mr. Bove . . . . . . . . . . . . . 182

14                  GOVERNMENT EXHIBITS

15   Exhibit No.                         Received

16   101  . . . . . . . . . . . . . . . . . . . . .15

17   301  . . . . . . . . . . . . . . . . . . . . .32

18   703  . . . . . . . . . . . . . . . . . . . . .37

19   103  . . . . . . . . . . . . . . . . . . . . .66

20   302  . . . . . . . . . . . . . . . . . . . . .70

21   401 and 402  . . . . . . . . . . . . . . . . .85

22   225  . . . . . . . . . . . . . . . . . . . . 100

23   102  . . . . . . . . . . . . . . . . . . . . 125

24   702  . . . . . . . . . . . . . . . . . . . . 192

25   1005  . . . . . . . . . . . . . . . . . . . 199