1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA

4           v.                        17 CR 417 (AKH)

5  ALI KOURANI,
                                      Hearing
6              Defendant.

7  ------------------------------x

8                                     New York, N.Y.
                                      March 27, 2018
9                                     2:45 p.m.

10 Before:

11      HON. ALVIN K. HELLERSTEIN

12                                    District Judge

13

14

15

16        APPEARANCES

17

   GEOFFREY S. BERMAN
18      Interim United States Attorney for the
        Southern District of New York
19 AMANDA L. HOULE
   EMIL J. BOVE III
20      Assistant United States Attorneys

21

   ALEXEI SCHACHT
22      Attorney for Defendant

23

24

25

1          (Hearing resumed)

2     MARK DENBEAUX, resumed.

3          THE COURT:  I remind you, Mr. Denbeaux, that you

4     remain under oath.  Mr. Bove will continue his

5     cross-examination.

6     CROSS-EXAMINATION (continued)

7     BY MR. BOVE:

8     Q.  Good afternoon, Mr. Denbeaux.

9     A.  Good afternoon.

10    Q.  After you left the courtroom yesterday, did you discuss the

11    case with anyone?

12    A.  No, I did not.

13    Q.  Did you review any documents related to the case?

14    A.  No, I did not.

15    Q.  When you first met Ali Kourani, he told you that his

16    children were in town with his wife, correct?

17    A.  Yes.

18    Q.  He told you that he was distressed by the circumstances

19    that they were in?

20    A.  Yes.

21    Q.  You understood that Kourani's concerns related to disputes

22    with his wife and her family, correct?

23    A.  I think part of them, yes.

24    Q.  You were aware that Kourani was having serious domestic

25    problems dealing with his children?

1    A.  I knew he had a lot of problems with his children.  I don't

2    remember whether it was domestic or not.

3    Q.  You testified yesterday about a conversation you had with

4    Mr. --

5              THE COURT:  He knows he had trouble with his wife, he

6    knows that he had trouble with his children.  Let's move on.

7    Q.  Mr. Kourani also told you about an incident in which

8    members of Hezbollah shot at his house in Lebanon, correct?

9    A.  Yes.

10   Q.  He told you that happened in August of 2016?

11   A.  I don't think he told me when that happened.  He discussed

12   that with Mr. Costello when I was in the room.  I don't

13   remember being told that separately, but I probably was.

14   Q.  So this was something that Mr. Kourani said to the FBI the

15   first time, before you even knew about that?

16             THE COURT:  He didn't say that.  Open up new

17   territory.  We have gone over this a number of times.

18   Q.  In May of 2017, Mr. Kourani told you that he was

19   considering going back to Lebanon, correct?

20   A.  I think the subject came up.  I don't know that he said he

21   was considering going.  But he was feeling like there was no

22   point in staying here for him.

23   Q.  He told you that he tried to leave but he learned that he

24   was on a no-fly list?

25   A.  I don't remember that.

1  Q.  You don't remember saying that to Special Agent Costello in

2  May of 2017?

3  A.  I remember saying something about his seeing no point in

4  staying here and wanting to leave.  I don't know about the

5  no-fly list.  In fact, Mr. Costello told me he wouldn't be able

6  to leave because he was on a no-fly list.

7  Q.  Leave to go to Lebanon, correct?

8  A.  I think so.

9  Q.  You testified yesterday that Mr. Schacht wrote most of your

10 2017 declaration?

11 A.  I think said that.  I don't know what "most" means.  But

12 yes, he certainly drafted it.

13 Q.  "Most" is a word that you used, correct?

14 A.  I don't remember.

15       THE COURT:  Why go over this again?  Mr. Bove, new

16 ground.  Don't repeat.

17 Q.  Mr. Schacht wrote all of the declaration, correct?

18       THE COURT:  Mr. Bove, did you hear me?

19       MR. BOVE:  Yes, Judge.

20       THE COURT:  Move on to something else.

21       MR. BOVE:  May I approach, Judge?

22       THE COURT:  You may.  You don't have to ask me.

23 Q.  I show you a document we discussed yesterday, Government

24 Exhibit 402.

25 A.  Yes.

1   Q.  Do you recognize that?

2   A.  Yes.

3   Q.  You recognize this as a document you provided to agents

4   during the second meeting?

5   A.  Yes.

6   Q.  Before you wrote this document, you knew that Hezbollah was

7   a terrorist organization, correct?

8   A.  Actually, I probably did not.  I was aware of some, and I

9   didn't know if Hezbollah was the government or secret governing

10  force, but I obviously knew it wasn't a nice collection of

11  people.  I don't know what terrorist list they were on or not.

12  Q.  Did you know that some members of Hezbollah were involved

13  in terrorist activities?

14  A.  Oh, yes.

15  Q.  You testified yesterday about a conversation that you

16  had --

17          THE COURT:  Hezbollah blew up the Marines in Lebanon

18  in 19 --

19          THE WITNESS:  83.

20          THE COURT:  You knew that.

21          THE WITNESS:  I knew they were said to have done that.

22  I didn't know.  I wasn't surprised by it.

23  Q.  You testified yesterday about a conversation that you said

24  you had with an agent at the first interview of Ali Kourani,

25  correct?

1    A.  We had several during that conversation.

2    Q.  You said yesterday that at the first interview you made it

3    very clear that Kourani was not a suspect, a subject, a target,

4    and that there were no plans to prosecute him?

5    A.  Yes, that was my understanding.  That's what I told them.

6            THE COURT:  That wasn't the question.

7    A.  Yes.

8            THE COURT:  Listen to the question again, please.

9            (Question read)

10   A.  Yes.

11   Q.  You confirm that that was your testimony yesterday?

12   A.  Yes.

13   Q.  You testified that the agent's only response to that was

14   "Thank you very much"?

15   A.  I don't remember what I said yesterday, but he obviously --

16   yes, we talked about it.  He said something in response to it.

17   Q.  You testified yesterday that what the agent said was "Thank

18   you very much," correct?

19   A.  I don't remember what I said yesterday, but I do know that

20   when he and I talked about it, he acquiesced, nodded.  We

21   discussed it very, very superficially.

22           THE COURT:  You knew that the agents couldn't bind

23   anybody, didn't you?

24           THE WITNESS:  Yes, your Honor.  That goes to the

25   question of immunity.  I don't believe they could bind anybody.

1   I do believe they could advise me -- I believe they understood

2   that if we didn't have an understanding, my client was not

3   going to voluntarily sit and talk to them and put himself in

4   jeopardy.  So we did discuss the fact that he was there

5   voluntarily.

6          THE COURT:  On such an important matter, why didn't

7   you write a letter stating this other than to slip it through

8   in a memorandum like you did?

9          THE WITNESS:  I've asked that question myself several

10  times, your Honor.  I don't know why I didn't.  I actually

11  believed when my client came in that he was there because he

12  had information to give them that he thought they wanted.  They

13  seemed to believe they wanted it also, and he wanted help from

14  them.  I didn't believe --

15         THE COURT:  You've done criminal defense and you teach

16  criminal defense.  How could you let your client go into a

17  situation without writing a letter that he is not a suspect or

18  a target?

19         THE WITNESS:  Your Honor, I guess the answer was I

20  thought this memo that I gave them followed the conversation

21  that we had, and I confirmed it in this memo.  Granted it

22  wasn't a letter, but I went out of my way to record it just to

23  make it clear after the first meeting.

24         THE COURT:  I just don't understand.  You knew that

25  the agents didn't have authority.  Wouldn't you want this

1   important fact to be recorded by somebody with authority, like

2   a government prosecutor, Assistant U.S. Attorney, a supervisor

3   in the FBI, somebody that you could rely on?

4           THE WITNESS:  I guess, your Honor, I relied on them,

5   including their statement that each day they would go back and

6   talk about what information he'd given and how helpful he has

7   been and how much assistance they were willing to give him in

8   getting his children back.  Those conversations came

9   frequently, including their describing that they are reporting

10  to their superiors.

11          THE COURT:  I know he wanted them to help him with

12  immigration, but this is another matter.  This is a matter

13  where any normal lawyer would put something in writing before

14  his client would commit himself to incriminating information.

15  It's hard for me to understand why you didn't do that if what

16  you say occurred, that you said he is not a suspect or a target

17  and they agreed.

18          THE WITNESS:  I said that in writing.  What I put here

19  in writing was a summary of what I had said the first time too.

20  I had always said that, and he always at least acquiesced in my

21  view on it.  They had always been grateful.  They would thank

22  him for his cooperation, we would discuss something, they would

23  say that's very helpful.

24          THE COURT:  They never once said that he is not a

25  suspect?

1          THE WITNESS:  No, they never said that.

2          THE COURT:  Did they once say he is not a target?

3          THE WITNESS:  No.

4          THE COURT:  It's just your words not theirs?

5          THE WITNESS:  That's right.  My words and their

6     acquiescence.  But my words.

7          THE COURT:  Their acquiescence, they didn't correct

8     it?

9          THE WITNESS:  They certainly didn't correct it.  They

10    nodded.  We would talk about it frequently back and forth.  We

11    were there for four or five days in an informal series of

12    conversations in which they were thanking me for helping them,

13    thanking Mr. Kourani for helping them.  Everything about our

14    communications in that circumstance I was led to believe and I

15    think Mr. Kourani was, if for no other reason by me, that he

16    was there helping and cooperating.  He wasn't a target.  I

17    never believed we were negotiating immunity.

18         THE COURT:  You said he was not a suspect, yet you

19    knew there were a lot of bad things about Hezbollah and if you

20    checked you would have found out it was a terrorist

21    organization.

22         THE WITNESS:  Yes.

23         THE COURT:  So how could you say that he hadn't

24    committed a crime?

25         THE WITNESS:  Your Honor, the question of committing a

1  crime was being a member of a terrorist organization.

2          THE COURT:  And being trained by them.  You knew that,

3  too.

4          THE WITNESS:  I knew that eventually, your Honor.

5          THE COURT:  You knew that before you went in?

6          THE WITNESS:  No.

7          THE COURT:  Didn't you debrief your client before you

8  went in?

9          THE WITNESS:  We spent a lot of time debriefing it.

10  The question our client had was he was sure he had information

11  that was going to be helpful, he was sure he would give them

12  everything he had, he knew they wanted information from him.

13          THE COURT:  You went in saying he was a member of

14  Hezbollah and but you never asked him if he --

15          MR. SCHACHT:  Objection.

16          THE COURT:  Overruled.  On what grounds?

17          MR. SCHACHT:  It gets into attorney-client privileged

18  material.

19          THE COURT:  If he is saying he relied on what his

20  attorney said, which I think he is, then the privilege is

21  waived.  Overruled.

22          MR. SCHACHT:  Can I make a record, your Honor, very

23  briefly?

24          THE COURT:  Yes.

25          MR. SCHACHT:  I think it is legitimate to ask what did

1    Mr. Denbeaux say to Mr. Kourani because that might be something

2    he relied upon.  But what Mr. Kourani said to Mr. Denbeaux I

3    don't think is relevant.

4              THE COURT:  I take your point.  I'll amend the

5    question.

6              You knew that your client was involved in a terrible

7    organization, as you put it, one that had members committing

8    terrorist acts, including killing a large number of American

9    soldiers?  You knew that?

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  You didn't go into the FBI agents or U.S.

12   Attorney yourself and tell them what you think your client

13   might say?  For example, get a queen-for-a-day type of

14   activity, you didn't do that?

15             THE WITNESS:  No, your Honor.

16             THE COURT:  You just brought in your client, and you

17   agree with me that the government never said anything about

18   your client was not a suspect or a target and so was not

19   immunized?

20             THE WITNESS:  They said absolutely no words with

21   regard to that.  But I would say the communication was much

22   more clear than what is coming across from what I was just

23   saying.

24             THE COURT:  They were just silent?

25             THE WITNESS:  They were just silent.

1          THE COURT:  They continued to ask the questions and

2    continued to get information?

3          THE WITNESS:  Yes, your Honor.  At one point I made it

4    very clear to them that I saw no reason to be here as long as

5    his voluntary conversations with them and their promises it

6    would be held in confidence would not be honored.

7          THE COURT:  What does it mean "hold in confidence"?

8    He was worried that somebody in the Lebanese community would

9    get wind of his cooperation?

10          THE WITNESS:  That was one thing.

11          THE COURT:  He was worried that his family might get

12    shot up by Hezbollah in Lebanon?

13          THE WITNESS:  If he cooperated with the FBI, yes.

14          THE COURT:  It was very important for him to get his

15    family out of Lebanon?

16          THE WITNESS:  Yes, your Honor.

17          THE COURT:  He was silent because he was afraid they

18    would not live in Lebanon?

19          THE WITNESS:  Yes.

20          THE COURT:  Somebody would shoot them, particularly if

21    they knew he was talking to the government.

22          THE WITNESS:  Yes.

23          THE COURT:  Didn't you think the confidence related to

24    that rather than immunity from prosecution?

25          THE WITNESS:  I never thought he was getting immunity

1   from prosecution for anything he had done.  I thought they

2   would not be using the confidential communication that he gave

3   to them that they wouldn't otherwise have had as criminal acts

4   themselves.  That's where I was.

5            THE COURT:  What's the difference?

6            THE WITNESS:  The difference might be, your Honor,

7   they came in and felt he committed crimes and they wanted to

8   get information from him or work out a plea or work out a deal.

9   In this case they came in, as I understood it, and I'm sure he

10  did, because they wanted help from him with information in

11  investigations they were doing of others and of Hezbollah in

12  the country.

13           They wanted that information.  And he was prepared to

14  give it to them voluntarily provided it was going to be viewed

15  in confidence between us and them.  They could use it for any

16  background information they wanted, any investigation they

17  wanted, and that he would not be exposed for having done that,

18  and that included not being publicly arrested or prosecuted.

19  All of that is what I understood he was offering, and that's

20  what I believed that we were negotiating and agreeing to and

21  providing.

22           THE COURT:  Mr. Bove.

23  BY MR. BOVE:

24  Q.  You didn't ask the agents to sign Government Exhibit 402,

25  correct?

1   A.  No, I didn't.

2   Q.  You just described what your understanding of these

3   meetings was?

4   A.  Yes.

5   Q.  You understood that the agents expected that Mr. Kourani

6   would tell the truth in exchange for anything, correct?

7   A.  Yes.  I believed he expected that he had to tell the truth

8   regardless.  That was the one instruction I gave him.  You

9   don't have to talk to them, but if you do, make sure you tell

10  the truth.

11  Q.  Because telling the truth was a precondition to anything

12  else being done, correct?

13  A.  No.

14  Q.  It is your testimony that you believed that Mr. Kourani

15  would walk into the room and lie and that the agents would

16  provide benefits to him?

17  A.  No, I'm not talking about precondition.  I told my client

18  that he had an obligation, that it was foolish of him to come

19  talk if he weren't going to come tell the truth.  He agreed

20  that he was.  My understanding was his criminal exposure was

21  limited to having lied to FBI agents.  He assured me he under-

22  stood that and had no intention of, and to my knowledge never

23  did, lying.

24  Q.  You understood that he did have potential criminal exposure

25  with respect to potential lies to FBI agents?

1    A.   If he lied to an FBI agent, he and I both understood there

2    was criminal exposure there.

3    Q.   Because you know that lying to FBI agents is a crime?

4    A.   Absolutely.

5    Q.   And withholding information during a conversation is a lie,

6    correct?

7    A.   Withholding can be a lie.  I don't know what you are

8    referring to, but clearly withholding information is a

9    variation of lying.

10   Q.   It's possible to commit the crime of lying to federal

11   agents by intentionally withholding information?

12   A.   That is my understanding.

13   Q.   You acknowledge in your notes document, Government Exhibit

14   402, that the agents believed that Mr. Kourani had withheld

15   information in the first meeting, correct?

16   A.   Yes.

17   Q.   You acknowledge that?

18   A.   Yes.  They told me they believed it.

19   Q.   So on the face of that document you knew that Mr. Kourani

20   had criminal exposure based on withholding information in the

21   first interview, correct?

22   A.   Yes, if he lied or withheld information.

23   Q.   I'm referring here to Government Exhibit 402, to paragraph

24   5(b).  Would you take a look, please.

25   A.   Yes, 5(b).

1    Q.   That reads, "Our government wants him to break down various

2    walls with important information."  Do you see that?

3    A.   Yes.

4    Q.   When you wrote "our government," you were referring to the

5    FBI, right?

6    A.   Yes.

7    Q.   When you wrote "him" you were referring to Kourani?

8    A.   Yes.

9    Q.   By "break down various walls," you were referring to the

10   fact that the agents had told you that they felt during the

11   first interview that he had intentionally withheld some

12   information?

13   A.   No, I don't believe that.

14   Q.   That's not what "break down various walls" meant?

15   A.   There were walls between him and them.  The question was

16   information that he would know about other people in the United

17   States that might be helpful to them that they didn't under-

18   stand or have knowledge of.  My understanding was that's a

19   reference to the whole purpose of why he was talking to them.

20   He had knowledge based on his experiences that might be helpful

21   to them about Hezbollah's people and operations in the United

22   States, and he wanted to share it.

23   Q.   It was information that he failed to provide in the first

24   interview, correct?

25   A.   No, I didn't say he failed to provide.  It says there they

1   want him to break down various walls.

2   Q.  They wanted him to provide the complete truth?

3   A.  Yes.  This was the first of our five meetings, yes.

4   Q.  In this document you wrote that you understood that agents

5   took the view that he had not provided the complete truth.

6   A.  Where does it say that?

7   Q.  That was not your intention when you wrote --

8   A.  Just show me where I said that.

9           MR. SCHACHT:  Objection.

10          MR. BOVE:  I'll move on.

11          THE COURT:  Objection to what?  The witness's

12  statement or the question?

13          MR. SCHACHT:  Both.

14          THE COURT:  Overruled.

15  Q.  You testified yesterday that confidentiality was crucial to

16  the communications you had with the FBI, right?

17  A.  Yes.

18  Q.  Yet the word "confidentiality" appears nowhere in

19  Government Exhibit 402, does it?  Just yes or no.

20  A.  I'm looking at it.  You said nowhere in the document.  The

21  word is not there.

22  Q.  You also testified yesterday that another crucial part of

23  this document from your perspective was the fact that Mr.

24  Kourani was not a target, right?

25  A.  Yes.

1  Q.  The word "target" does not appear in that document,

2  correct?

3  A.  Yes.

4  Q.  After you presented this document at the second meeting,

5  you never referred to it again during your interactions with

6  the FBI, correct?

7  A.  I referred to it always.  This was the premise upon which

8  every meeting took place.

9  Q.  It is your testimony today that you referred to this

10  document in every meeting that you had with the FBI?

11  A.  I didn't have the document in my hand, but we discussed

12  every time the fact that it's been agreed he's committed no

13  crimes and faces no prosecution.  It's not a plea negotiation

14  because of that.  He's not seeking any kind of immunity or

15  protection because it has already been agreed he has committed

16  no crime.  That came up every single session.

17  Q.  That is your testimony today?

18  A.  Yes.

19  Q.  You failed to mention yesterday that you began each and

20  every meeting with the FBI by conveying that statement?

21  A.  I don't think I said at the beginning of every meeting, but

22  throughout each meeting that came up, constantly.

23          THE COURT:  How come it is not listed in paragraph 4?

24  You write, "All he wants for his cooperation is protecting his

25  family," and five instances are listed.

1          THE WITNESS:  You mean why it doesn't say confidential

2     or why it doesn't say --

3          THE COURT:  Why not the simple statement, I want a

4     commitment that what I told you won't be used against me?

5          THE WITNESS:  The answer is I didn't think that was

6     necessary given our understanding of what I had written here.

7     Q.  You know how to confront members of law enforcement right?

8     A.  Would you repeat that?

9     Q.  You know how to confront law enforcement personnel,

10    correct?

11    A.  I guess so.  I know how to talk to them.  Is that what you

12    mean?

13    Q.  No.  I mean if you wanted to be confrontational with

14    Special Agent Costello with respect to whether or not he agreed

15    to the terms of Government Exhibit 402, you could have,

16    correct?

17    A.  Yes, especially if he suggested he didn't agree with it.

18    But I always understood he did.  There would be no reason to

19    confront somebody who didn't disagree with it.

20    Q.  Yet all Special Agent Costello said to you about this

21    document was "thank you"?

22    A.  No.  That's the first time I gave it to him.  The substance

23    of this document was a given, at least in my circumstances

24    talking with him and with the other agent every single time.

25    Look at this.  A big part of it was discussing --

1    Q.  If I can stop you right there.  You agree that what you

2    just said, if it were true, would be a pretty critical fact,

3    right?  That you had presented these claims at the beginning of

4    every meeting with the FBI, that would be a critical fact to

5    resolve this motion, right?

6    A.  Yes.

7    Q.  It is not in your declaration, correct?

8    A.  I don't remember, but it probably isn't.

9    Q.  You did not say that yesterday, did you?

10   A.  I don't remember what I said yesterday about this.

11           MR. BOVE:  Nothing further, Judge.

12           THE COURT:  Redirect?

13           MR. SCHACHT:  Very briefly, your Honor.

14   REDIRECT EXAMINATION

15   BY MR. SCHACHT:

16   Q.  Mr. Denbeaux, do you recall, during the five meetings was

17   there ever a time when the topic of Mr. Kourani's citizenship

18   came up?

19   A.  Yes.

20   Q.  Do you remember roughly which meeting that was?  Do you

21   recall that?

22   A.  No, I have no idea.  It may have come up more than once.  I

23   don't remember.

24   Q.  Prior to that discussion about the citizenship, was there

25   anything at all said by you to the agents, if you recall?

1    A.  I don't recall.

2              MR. SCHACHT:  No other questions.

3              THE COURT:  Thank you very much, Mr. Denbeaux.

4              (Witness excused)

5              THE COURT:  Mr. Schacht?

6              MR. SCHACHT:  Your Honor, the defense would call Ali

7    Kourani.

8     ALI KOURANI,

9        called as a witness on his own behalf,

10       having been duly sworn, testified as follows:

11             THE CLERK:  Please state your full name and spell your

12   full name slowly for the record.

13             THE WITNESS:  Ali Kourani.  A-L-I, last name

14   K-O-U-R-A-N-I.

15             THE COURT:  Before Mr. Kourani begins, would you state

16   for the record, Mr. Schacht, what is important for a witness

17   who is a defendant to know before he testifies.

18             MR. SCHACHT:  It is extremely important for any

19   witness who is a defendant to know before he testifies that he

20   is under oath to tell the truth and he must tell only the

21   truth.

22             THE COURT:  He has his privilege against self-

23   incrimination.

24             MR. SCHACHT:  He has a constitutional right against

25   self-incrimination, and he does not need to testify or say

1   anything at all if he does not want to.

2          THE COURT:  Because his silence can be used against

3   him.

4          MR. SCHACHT:  His silence cannot be used against him

5   and you cannot draw any adverse inferences against him if he

6   did not want to testify.

7          THE COURT:  But if he does want to testify, he can be

8   treated like any other witness and cross-examined?

9          MR. SCHACHT:  Yes.

10         THE COURT:  Prior history can be brought in to impeach

11  his credibility, right?

12         MR. SCHACHT:  Yes, prior criminal history can in some

13  circumstances be brought in.

14         THE COURT:  Are his statements available to the

15  prosecution at a trial of the criminal issues?

16         MR. SCHACHT:  My intention here is to ask him

17  questions on direct examination about the issue of

18  voluntariness primarily, with some background questions about

19  his life.

20         THE COURT:  If you open the door --

21         MR. SCHACHT:  I'm not planning to open the door.

22         THE COURT:  The government then can't ask him about

23  guilt or innocence.

24         MR. SCHACHT:  I'm not planning on eliciting any

25  questions about --

1          THE COURT:  Just so you know.  If you don't open the

2     door, the government cannot go into that area, right?

3          MR. SCHACHT:  Thank you, your Honor.

4          Do you understand all that, Mr. Kourani?

5          THE DEFENDANT:  Just the last part, the last thing.

6          MR. SCHACHT:  The last part you did not understand?

7          THE DEFENDANT:  Yes.

8          THE COURT:  If your lawyer wanted to bring out that

9     you are innocent of the crimes, the government can ask on

10    cross-examination anything it wants to about your alleged

11    criminal acts.  But if your lawyer confines his questioning

12    only to the areas of the voluntariness of the statements that

13    you gave to the government, the government cannot do that.  Do

14    you understand?

15         THE WITNESS:  I understand.

16         THE COURT:  Similarly, if you volunteer your

17    innocence, you open the door to cross-examination on these

18    issues by the government.  Do you understand that?

19         THE WITNESS:  I do understand.

20         THE COURT:  You do or you don't?

21         THE WITNESS:  I do understand.

22         THE COURT:  Go ahead, Mr. Schacht.

23         MR. SCHACHT:  Thank you, your Honor.

24    DIRECT EXAMINATION

25    BY MR. SCHACHT:

1    Q.  How old are you, Mr. Kourani?

2    A.  I'm 33 years old.

3    Q.  Have you ever testified in court before in your life?

4    A.  No.  This is the first time.

5    Q.  Are you taking any drugs, alcohol, medication right now?

6    A.  I'm taking medication for anxiety and depression.

7    Q.  The medication that you are taking for anxiety and

8    depression, does that medication affect your ability here today

9    to understand what's occurring?

10   A.  It doesn't affect my ability.  Just in case I need a break,

11   I'm going to ask for it.

12            THE COURT:  Just ask for it and you'll get it.

13   Q.  Could you please tell the judge how far you went in school.

14   A.  I have two degrees.  One degree is in biomedical

15   engineering, and the second degree is a Master's degree in

16   business management, concentration in project management.

17   Q.  In what country and city did you get those degrees?

18   A.  Both of them from New York City, City College uptown and

19   Kellogg graduate school.

20   Q.  Are you married today?

21   A.  Yes, I'm still married.

22   Q.  What is your wife's name?

23   A.  Laila Abady.

24   Q.  Where does she live now?

25   A.  She lives in Canada.

1   Q.  Do you have any children?

2   A.  Two kids.

3   Q.  Where do they live?

4   A.  Both of them there.  As far as I know, they are there.

5   Q.  Do you have brothers and sisters?

6   A.  Two brothers and two sisters.  All of them live in Lebanon

7   with my family.

8   Q.  When you say with your family, does that mean your parents?

9   A.  Yes, both my parents, dad and mom.

10  Q.  Going back to about the year 2012, do you recall having any

11  unusual interactions with anyone from the American government?

12  A.  Yes.  The NYPD intelligence usually, occasionally.  They

13  visited me at my residence, knocked on the door out of the

14  blue, asked questions about Hezbollah, asked questions about

15  other Lebanese people in the community that lives in the States

16  or outside the States.

17  Q.  For approximately how long did that go on with the New York

18  City Police Department intelligence?

19  A.  As far as I remember, I remember the first time after I

20  came.  It happened before in 2009, but personally it started

21  happening in 2012.  They visited me twice in the summertime and

22  regularly after that.  They would do a checkup every few

23  months.

24  Q.  At some point after 2012 did you ever have conversations

25  with anybody from the FBI?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  I don't recall having any conversation with the FBI.  I

2    don't know if --

3    Q.  I don't mean in 2012.  I mean any time since 2012.

4    A.  In the period after 2012 it really happened that I start

5    having complications with some of the immigration things.  One

6    of the things, I applied for my wife.

7    Q.  You applied for your wife for what?

8    A.  For residency.  She was already pregnant, and I applied for

9    her to get her residency in the States.

10   Q.  Do you recall what year that was?

11   A.  It was 2013, less than a year after our marriage.  She was

12   pregnant at that time.  The application was going smoothly.

13   Everything was going smoothly.  Just a week before her

14   interview, our interview, the interview was canceled.  I recall

15   after that, when we started inquiring about it, they said that

16   she is on background check or security clearance check.  Her

17   residential application took almost four years, until she left

18   in August of 2016.

19   Q.  Between 2012 and 2016 did you ever have any unusual

20   experiences at airports?

21   A.  It was all unusual experiences at the airports.

22   Q.  What were your unusual experiences at the airports?

23   A.  I'm not allowed to get my boarding pass from the machines.

24   Every time I went to get the boarding pass, they had to call

25   Homeland Security to issue me a boarding pass.  Sometimes I

1    missed my flight.

2            I do remember one time in 2015, early 2015 -- no, late

3    2014-early 2015 I was leaving from Newark and I was supposed to

4    take my wife with me to Lebanon because we just had our first

5    baby.  Basically, immigration refused to give her a permit so

6    that she could go and guarantee her coming back to New York.

7    In the airport, I remember very well, they always say I will be

8    randomly selected for extra security check.  I was traveling

9    with my baby, the 1-year-old at that time.  I remember that.  I

10   had take off her clothes and even take off her diaper just to

11   make sure that -- you know.

12   Q.  Did any of your other relatives have any unusual

13   immigration problems of that sort?

14   A.  My mom, she used to come back and forth.  And my sister, I

15   don't recall that they encountered that.  But my brother, my

16   younger brother, he filed an application for his citizenship,

17   and all of a sudden his naturalization process went into, like,

18   without reply.

19   Q.  Just so it is clear, because you mentioned you had a few

20   brothers, what brother by name are you referring to?

21   A.  I'm referring to my younger brother, Moustafa.

22            THE COURT:  How many brothers do you have?

23            THE WITNESS:  Two brothers, your Honor.  I have one

24   older than me and one younger than me, seven years younger than

25   me.

1  Q.  Going ahead to about April 1st of 2016, do you recall that

2  day in particular?

3  A.  Yes, I recall it very well.

4  Q.  Why do you recall that day well?

5  A.  April Fool's.

6  Q.  What happened on that day?

7  A.  On that day I just got back from Chicago.  I was being a

8  district manager for a cellular company.  I just got back to

9  New York so that I would move my family to Chicago because I

10  was having a decent, stable job over there.  I was going to

11  Starbucks, grab my coffee, grab my cake, and an FBI agent,

12  actually an agent, I think his name was Gary or Greg, he

13  stepped forward, showed his badge, said I'm an FBI Special

14  Agent, I would like to talk to you.  I said sure.

15        He took me to the McDonald's which was next door.  We

16  sat.  And there was another two agents sitting there.  I'm

17  like, how could I help you?  Out of the blue he said, oh, we

18  know your affiliation with Hezbollah.  You most likely have the

19  wrong person or the wrong guy.

20        THE COURT:  You said that?

21  A.  Yes, I said that.  Then he was like, no, we are sure that

22  you have an affiliation with Hezbollah.  I was like, could you

23  interpret that?  What do you really mean by that?  Do you mean

24  that I have family members that are Hezbollah or what?  He's

25  like, no, you have a connection with Hezbollah.

1              THE COURT:  He said what?

2              THE WITNESS:  He asked, no, you have connections with

3    Hezbollah.  I'm like, what's that connection?  Then he took the

4    conversation a little bit easier, stating like I graduated,

5    what high school I graduated from, saying things about my

6    family members, just like normal things, like what I'm doing

7    right now and what's going on in my life, all of that.

8    Q.  How did that meeting end, April 1, 2016 meeting?

9    A.  I told him I don't feel comfortable to keep talking to you

10   guys, especially the circumstances where we are sitting in a

11   public place.  Then he handed a file to me and he said, inside

12   that file there is a phone, a burner phone, a flip phone.

13             THE COURT:  A cell phone?

14             THE WITNESS:  A cell phone.

15   A.  He was like, I'm going to reach you at that phone number.

16   Make sure that no one knows that you have that phone or you

17   don't call anyone from that phone.

18   Q.  Did you agree to take that phone from the FBI?

19   A.  Actually, I have no choice.  He just passed it, left it on

20   the table, turned their backs and left.

21   Q.  But you took it with you?

22   A.  I took it with me, yes.

23   Q.  Okay.

24   A.  Later that day he told me, like, could we arrange another

25   meeting in a more private place?  He's like, I'm going to ask

1   you random questions, your help is really appreciated.  I

2   didn't mind that.

3   Q.  Then you agreed to meet them in a more private place?

4   A.  Exactly.

5   Q.  About how long after the April 1st meeting was your second

6   meeting with the FBI?

7   A.  It was the same day.

8   Q.  It was the same day?

9   A.  Yes, in the afternoon.

10  Q.  Where did you meet them?

11  A.  It was at a hotel in Flushing.

12  Q.  In Queens, New York?

13  A.  Queens, New York.  It was very close to my residence where

14  I used to live.

15  Q.  You met the same agents there that day?

16  A.  Yes.  He met me around one of the corners.  We walked

17  around.  He took me to the hotel, in the hotel to other agents,

18  the same agents that were sitting there, and he started asking

19  me questions.

20  Q.  How long were you with them at the hotel in Queens that day

21  roughly?

22  A.  I think about like an hour.

23  Q.  Did you have any further contact with the FBI after that?

24  A.  One of the things he said -- I already mentioned to him,

25  like I'm packing my stuff, I'm leaving to Chicago, I'm not

1   staying in that apartment anymore because the rent will be due,

2   I already have an apartment in Chicago so I'm moving my family

3   there.  He kept mentioning that no, you're not going anywhere,

4   and a smiling face.  I even mentioned to him, like, what's this

5   all about.  At one point I felt like it's some sort of an April

6   Fool thing.

7   Q.  Did you actually move to Chicago, to the Midwest?

8   A.  I did.

9   Q.  How long after that?

10  A.  Just the second day, if I'm not mistaken.  The second day,

11  early morning.

12  Q.  When, if at all, was your next contact with the FBI?

13  A.  Within the same week after I get there, he called me, he

14  checked on me.  He called me actually: did you get there

15  safely, how is your family, how is everything, would you mind

16  if we meet in Chicago.  I'm like, no, I don't mind.

17  Q.  When you say he called you, did he call you on that cell

18  phone that the FBI gave you?

19  A.  Exactly.

20  Q.  Did you meet with them in Chicago?

21  A.  Yes, I did.

22  Q.  Roughly when was that?

23  A.  Within a week from April 1st.

24  Q.  How did the second meeting go?  I should say the third

25  meeting.

1  A.  It could be the third meeting.  I recall some of the

2  points, some of the headlines: to be straightforward we want

3  you to be an informant for us, we want you to work for us.  He

4  brought up the name of Hassam Kourani.  Hassam Kourani is a

5  second cousin of mine, first cousin of my wife.

6  Q.  Regarding that person, they wanted you to provide some

7  information about this relative of yours?

8  A.  Hassam Kourani was a member of Hezbollah back in the '90s.

9  He decided to change his life.  He went to Brazil.  From Brazil

10 he went to London.  From London he came to the United States,

11 got married.  He has kids.  Maybe his past kept following him.

12 Within his community, he knows everything.  We know he was a

13 Hezbollah fighter back there.  So the FBI or the U.S.

14 government kept questioning him.

15      He was like, are you aware of those facts?  I was

16 like, yes, I'm aware of those facts.  How are you aware of

17 those facts?  I heard about it.  I heard people talking.  Did

18 he mention that to you personally?  I'm like, no, he never

19 mentioned that to me personally.  Do you reach out to him?  No.

20 Do you have his phone number?  Can you get me his phone number?

21 I'm like, I'll try to do that.

22      He was like, what do you think if Hassam Kourani stays

23 in the United States, what will happen to him?  I'm like, what

24 do you mean by that question?  He was like, with his

25 background, his past experience, of his history, do you think

1  he will still live in the United States?  I'm like definitely

2  he will still live in the United States.  He was like, why do

3  you think that?  Because, I'm like, he changed his life.  He

4  adopted a new life.

5          And he confirmed it to me.  He was like, if he

6  cooperated with us, given us what we need, yeah, he would have

7  been here, he would have had his residence, his citizenship,

8  and no one will mess with him, no one will turn his life upside

9  down.

10          THE COURT:  This is your cousin?

11          THE WITNESS:  It's a second cousin of mine, your

12  Honor.

13  Q.  And?

14  A.  Then he goes like, do you know of anyone else that has the

15  same story?  I'm like, yeah, most of the people that came in

16  the '90s from Lebanon almost have the same story.  They were

17  part of the militia.  Lebanon went through a civil war for 15

18  years.  Everybody was fighting everybody.  It was a war machine

19  over there.  Who doesn't have experience?

20  Q.  Did you have any more meetings with the FBI --

21  A.  To interrupt your question, I mentioned a name for him.

22  This guy, he lives here in the States.  I gave him valuable

23  information about it, and he looked like he knew about it.  And

24  that guy never been prosecuted.

25  Q.  Did you have more meetings with these same agents in

1    Chicago?

2    A.  I think when they came there I met them on two consecutive

3    days, one day in a hotel, the other day in a restaurant.  I

4    think in the restaurant we just sat down, had lunch.  It was

5    basically friendly.

6    Q.  What year was this all?

7    A.  2016, April 2016.

8    Q.  At any of these meetings with the FBI in Chicago did the

9    FBI agents offer you anything?

10   A.  They offered a lot of things.

11   Q.  What did they offer to you?

12   A.  That no one knows about those meetings, no one will ever

13   know about those meetings.  That's the first thing.

14   Q.  What's the second thing?

15   A.  They offered me money.

16   Q.  How much money did the FBI offer you?

17   A.  I don't know how much is it, but it was a bundle of

18   hundreds.  I refused it.  I'm like, why would you give me that

19   money?  They was like we are interrupting you from your work.

20   I was really busy doing whatever I was doing at that time.  And

21   for your services, for your help.  I said to him I didn't do

22   anything special.  I considered that my civil duty.

23   Q.  How many times did they offer you money?

24   A.  They kept insisting.  I refused it the first time.  I

25   recall very well that after I left the hotel, Gary, the bald

1   guy -- I don't know what was his real name, I had never seen a

2   badge -- he followed me to the hotel entrance and he offered me

3   the money again, and he insisted on taking it.  I refused the

4   take it.

5   Q.  Was there anything else that those agents offered you in

6   Chicago?

7   A.  Definitely.  They offered me to work with them.  They said

8   it would stay confidential, no one will know about it, you are

9   highly educated, you are respected within your community,

10  nobody will suspect that you are working for the FBI.

11  Q.  Did you agree to work with the FBI in 2016?

12  A.  No, I refused.  I said if you want me to work for the FBI,

13  give me a job application.  That's how I'd do it.

14  Q.  In 2016 --

15  A.  One of the reasons I just mentioned I would like a job

16  application, I was like I could be your boss.  I know two

17  different languages, I have a good background, I'm very well-

18  educated.

19  Q.  That was the end of your meetings more or less in 2016?

20  A.  The last meeting I remember was in a park.  We came to the

21  park, the three of them.  We were sitting at a table.  On one

22  of the times I met with Gary alone, we went to the botanical

23  garden.  We were talking friendly things.  They still offered

24  me another $2,000 in the park.

25          They said there is a legal document.  You could show

1    it to a lawyer.  That shows that whatever you talked about or

2    whatever help you provide, we'll be on your side for your

3    safety.  They offered some immigration benefits.  They were

4    like, we're aware of your wife.  She is not able to get her

5    green card.  They can make even an immigration agent call me

6    and schedule an appointment for me.  In that meeting also they

7    offered -- the woman that was with them, she said, we could pay

8    you a thousand dollars a month if you work with the FBI.

9            I put all the offers down.  I didn't feel like I could

10   trust them.  I was already having a decent job, a stable

11   family.

12   Q.  Regarding the stable family, you have heard here, have you

13   not, the testimony yesterday about problems that occurred in

14   your family?  You heard that testimony, right?

15   A.  Yes.

16   Q.  Could you please tell the judge when it was that the

17   problems that you started having with your wife began.

18   A.  I would like to restate more things about those meetings

19   first of all.

20           THE COURT:  Wait for the question.  He asked this

21   question.  Now he is asking about when the problems with your

22   wife started.

23           THE WITNESS:  Your Honor, what I want to state about

24   those meetings, I would like to finish the topic.

25           MR. SCHACHT:

1   Q.  I can circle back to that.  Please answer the question

2   first about your wife.

3   A.  Yes, there was an argument between me and wife.

4              THE COURT:  When?

5              THE WITNESS:  July 26, 2016.

6   Q.  As a result of that argument, what, if any, problems did

7   you begin to have with her family and with her?

8   A.  It was an argument between a husband and his wife.  She

9   wanted to go to Canada with the kids.  I refused to do that and

10  took a vacation actually.  She left to her mom.  Her mom was

11  in -- she came back from a visit, from Canada, and she was with

12  her cousins.  Her cousins are all involved in militia

13  activities.

14             THE COURT:  All involved in what?

15             THE WITNESS:  All involved in militia activities.

16             MR. SCHACHT:  The militia.

17  A.  I sent her a text message.  I wasn't at home after that.

18  When I came back, I sent her a text message: where are you at?

19  She says, I'm at my cousin's house.  I'm like, I'm coming to

20  pick you up.  She was like, you can just come and pick up your

21  kids.  I wasn't on good terms with my mother-in-law.  She came

22  out with the kids.  She was really harsh on the kids.  She even

23  held my 10-month son from his arm and threw him in the car.

24  She was very aggressive.  She is a drug addict.

25  Q.  These problems that you were having with your wife and your

1   mother-in-law, how did that affect your thinking about your

2   family and your children at that time?

3            THE WITNESS:  They came to my house that same day.

4   Within two minutes, as soon as they get to the house, as if

5   they were fucking -- I'm sorry for the word -- as if they were

6   really prepared to do whatever he wanted to do.  20, 30 guys

7   with guns surrounded my house yelling, screaming, asking for my

8   head.  Then they started shooting at the house.  They were even

9   calling me the American traitor.

10           This is as a result for the FBI agents going after my

11  mom and telling her your son is a dangerous guy and going to my

12  cousins and telling them the same thing, while at the same time

13  I was still living in the United States.  Obviously, those

14  people thought if the FBI is after him and he is a dangerous

15  person, why is he still in America?

16  Q.  What was the time frame, if you recall, that the FBI spoke

17  to your relatives about you?

18  A.  The same time, after I refused being an informant for them,

19  they went, they stopped my mom at the airport.  Then they went

20  after my cousin.  I don't know who else they talked to.

21           THE COURT:  Who is "they"?

22           THE WITNESS:  FBI agents.

23  Q.  Did there come a time when you had a problem with the

24  American embassy in Beirut?

25  A.  The first day they attacked my house two times.  People in

1    the village interfered.  My dad is a very respectful man.  He

2    is not a trouble-maker.

3              THE COURT:  Who is the "they" here?

4              THE WITNESS:  My dad.

5              THE COURT:  The first "they," "they attacked my

6    house," who is they?

7              THE WITNESS:  The militia.

8              THE COURT:  Where?  In Lebanon?

9              THE WITNESS:  Yes, which are my in-laws' cousins.

10   Q.  The same day --

11   A.  The same day I sneaked myself out of the village.  They

12   were doing checkpoints.  They were still looking for me.  They

13   were still threatening me.  I didn't take my kids out of my

14   family's house because my family suggested that if they are

15   still attacking our family house, they have to give the kids

16   back to calm things down.

17             The second day or the third day I went to the American

18   embassy and I spoke to the consulate over there.  I told the

19   consulate I'm having trouble with both militias, all I'm asking

20   you for is use your connection with the Lebanese government to

21   send the police or the army -- I know you have connections --

22   to get my kids out of the village and I want to leave the

23   country.

24   Q.  Are your children U.S. citizens?

25   A.  Both of them are U.S. citizens.  Both of them were born in

1    New York.

2    Q.  At that time you were a U.S. citizen?

3    A.  I was a U.S. citizen.  I am still a U.S. citizen.

4    Q.  What, if anything, did the consul say to you?

5    A.  The consulate took my -- she asked me for my passport.  I

6    gave her my passport.  Then she left for like 15, 20 minutes.

7    She came back and she was like, you know, the department of

8    state issued a warning that U.S. citizens should not come to

9    Lebanon and you're not supposed to be here, I could do nothing

10   to help you.

11          In addition, she said, I have bad news for you.  I'm

12   like, what's the bad news?  She was like, I have to confiscate

13   your passport.  I'm like, this is my way out.  I came here for

14   help.  Now you're taking my passport?  What if I got my kids

15   out of the village tomorrow and I want to leave this country,

16   how am I supposed to leave?  And I insisted.  I'm like, I'm not

17   leaving until you figure this thing out.  At that point she

18   said like, all we have to do is reach to the FBI.  I'm like, do

19   you have a number for them?  She goes like, no, you should have

20   the number.

21   Q.  What happened next?

22   A.  She said, we will call you and let you know when you could

23   get your passport back.

24   Q.  Did she eventually call you?

25   A.  No.  The second week I called.  I don't know if it was her

1   or some member in the consulate said that you could come the

2   next week and have your passport or we'll talk about your

3   passport.

4   Q.  To back up a second, how long were you then in Lebanon

5   between the time that they confiscated your passport and they

6   called you to come back to the embassy?

7   A.  I don't know.

8   Q.  Roughly.

9   A.  You mean after that conflict?

10  Q.  Yes.  After she told you she was confiscating your

11  passport, how long were you without your passport?

12  A.  For like a week.

13  Q.  Did you call the FBI or did the FBI call you?

14  A.  I didn't have a number for them, and I'm not that crazy to

15  call the FBI from Lebanon.

16  Q.  How was it that you were able after approximately a week to

17  get your passport back?  How did that come about?

18  A.  As I told you, she scheduled an appointment for me and she

19  said to come to the embassy at that date at that time.

20  Q.  Did you do that?

21  A.  I did.

22  Q.  What happened when you went back to the embassy?

23  A.  The special agent that was interviewing me in Chicago was

24  there.  Special Agent Costello -- I didn't know his name, that

25  was the first time I meet him -- he was there.  And there was

1   another agent.  They said he is from like a top echelon thing

2   in the government.  He was there too.  They took me to a side

3   room.

4   Q.  Did you talk to them?

5   A.  Yes.  I do recall most of the time that the special agent,

6   he said he is from a top echelon of the government, he was

7   sitting there with me in the room.  The other two agents, most

8   of the time they were not present or they weren't present in

9   the room.  The first thing I said to him, I need my passport

10  back.

11  Q.  Did they agree to give you your passport back?

12  A.  He said, I have your passport.  He didn't say he will give

13  it to me.

14  Q.  What happened then?

15  A.  He asked me, who do you know that's a Hezbollah member?  I

16  said, my brother Kassem Kourani is a Hezbollah member, what

17  does that have to do with me.  He asked me about other people.

18  Whatever I know I said.  Then he goes, who is your contact?

19  Who is your contact with Hezbollah.  I said I don't have a

20  contact with Hezbollah.

21  Q.  Roughly for how long were you talking to them,

22  approximately?

23  A.  Like 45 minutes.

24  Q.  At the end of the meeting, did you get your passport back?

25  A.  He was very reasonable.  He wasn't biased.  I told him

1   there was a car following me all the way before I get to the

2   American embassy.  I said to him it could be the last time that

3   they see me.  I remember very well I was wearing a Guess shirt.

4   He goes like, that's like a Guess shirt.  I was like, yes, it

5   could be the last shirt I wear.  He was like, no, you'll be

6   okay.  He was like, no, you're going to be okay.  He handed me

7   back my passport.

8   Q.  Did you stay in Lebanon or did you leave?

9   A.  I booked a ticket as fast or as close as I could get it.  I

10  was about to board the airplane when they said that they got a

11  call from Homeland Security that I can't board that flight, all

12  I have to do is reach back to the embassy.

13  Q.  Did you reach back to the embassy?

14  A.  Yes.  I already had the email of the consulate.

15  Q.  Eventually did you get out of Lebanon and back to the

16  United States?

17  A.  It took me another two, three weeks, even more, to get out

18  of Lebanon.  I got here back in September 12, 2016.

19  Q.  When you came back to the United States in September of

20  2016, did you have a job?

21  A.  I already lost my job.

22  Q.  Did you get a new job?

23  A.  When I first get to the airport, as usual, I have a hard

24  time.  After I get out of the checkpoint, I was about to grab

25  my bags, Special Agent Keri, she was there.  That was the first

1  time I meet her.  And there was the other agent, I met him the

2  second time.  He was the one who brought me here to court when

3  I got arrested.

4          They took me to a side room, a closed room.  The first

5  thing she said, we are not going to question you, we are not

6  going to interrogate you, you are just going to come back to

7  the United States like that.  I'm like, what's the deal with

8  it?  I came.

9  Q.  You left the airport after talking to them, yes?

10  A.  After receiving several threats from her.  She said, this

11  is the last time, this is the last time that FBI agents will

12  reach for you to have your cooperation, to be an informant.

13  She asked me about the kids, and she said, you will never see

14  them again.  She said I will never get any job because they

15  already went to my previous job and they said to my employer

16  that I'm a dangerous guy.

17          Honestly, you know, to flee from the situation that I

18  was in, I was so happy to be back.

19  Q.  Were you able to get a new job?

20  A.  I have good credentials.  I'm really good at what I do.

21  Q.  Is that a yes or a no?

22  A.  It was a bit hard for me.  Like one of the things when I

23  get back to my previous job, I already had signed a contract

24  with them for a whole year, a contract for one year.  They were

25  supposed to hire me for a whole year based on stable

1   commission, stable salary.

2           But after the encounter with the FBI and after I'm not

3   being able to return at the right time, he said that that

4   position was taken, I have no option for you.  He offered me

5   another job that is half of what I was being paid.  It's

6   another way of telling me that you're fired or I won't let you

7   work for me anymore.

8           My apartment was evicted during that time.  I forgot

9   to mention that.  He asked me for it.

10  Q.  When you came back in September 26, 2016, were you living

11  in Chicago or in the New York area?

12  A.  I stayed here for a week.  I already had my connections

13  with Weyerhaeuser companies.  So I reached out to some of them

14  and one of them offered me a job.

15  Q.  Where was the job?

16  A.  The job was supposed to be in Green Bay, Wisconsin.

17  Q.  Did you go to Green Bay, Wisconsin?

18  A.  At first I went to Chicago for two or three weeks, moved my

19  stuff out of the storage facility.

20          THE COURT:  Into an apartment?

21          THE WITNESS:  Into an apartment I rented in Green Bay,

22  Wisconsin.

23  Q.  When was the next time that you spoke to any FBI agents?

24  A.  Agent Keri, she said, this is your last chance, you will

25  never get a job again, we'll turn your life upside down.

1   Q.  That was at the meeting in Newark Airport you are talking

2   about?

3   A.  Exactly.  I never encountered them again, but I got an

4   email from Canadian police, from one of the Canadian police,

5   mounted police.  I don't know what they call them.

6   Q.  It doesn't matter.  Some Canadian police contacted you?

7   A.  Agency, yes, stating that they would like to call me.  I

8   never responded to their email.  Then he called me.

9   Q.  Who is he?

10  A.  An agent for the Canadian police.  At first he started like

11  friendly, a friendly conversation.  After that he was like, do

12  you know the FBI were asking about you?  I was like, yes, I

13  just met them a few weeks ago when I got back from Lebanon.

14  They have my information, my phone number, my email, my

15  address, you don't need to tell me that.  I don't know if he

16  asked me for -- he asked to have another conversation with him

17  or another call.  I'm like, there is no need for that.

18              THE COURT:  Who said that?

19              THE WITNESS:  The Canadian policeman.

20              THE COURT:  He said that or you said that?

21              THE WITNESS:  The Canadian police agent, he asked me,

22  your Honor, if he could call me back again, if he could reach

23  out.

24              THE COURT:  Who said there is no need for that?

25              THE WITNESS:  I said that.

1   Q.   When was this, roughly, when you had this contact with the

2   Canadian authorities?

3   A.   I think it's like early October, late September or early

4   October.

5   Q.   What year?

6   A.   2016.

7   Q.   Between September 2016 and March 2017, did you have any

8   more contact with the FBI in that time period?

9   A.   At one time they went to my wife in Canada.  My wife, she

10  told me about it.  Then they went another time in February.

11  She told me that they are coming.

12          THE COURT:  Keep your voice up, please.

13  Q.   February 2017?

14  A.   Yes, that's right.

15  Q.   Do you recall the first time you spoke to Mark Denbeaux?

16  A.   First time I spoke to him was either December or November

17  of 2016.

18  Q.   What was your reason that you wanted to get a lawyer?

19  A.   My wife with her family, they were putting pressure on me.

20  I didn't know anything about my kids.

21          THE COURT:  Can we take a short break?

22          MR. SCHACHT:  Yes, your Honor.

23          (Recess)

24          THE COURT:  I remind you, Mr. Kourani, that you remain

25  under oath.  Mr. Schacht, you may continue to examine.

1 | BY MR. SCHACHT:

2 | Q.  Before we took that break, I had asked you what was your

3 | thought process that caused you to seek out a lawyer.

4 | A.  I was having a hard time with my wife's family concerning

5 | the kids' visitation or even talking about the kids.  My

6 | daughter was even diagnosed with mild autism at that time.

7 | Where they live, that is all the way in north Canada.  As Agent

8 | Keri said to me, it's like nowhere, a snowy desert.  So I

9 | didn't want my kids to be raised there.

10 | Q.  How did you think a lawyer might be able to assist you?

11 | A.  One of the other things I would like to mention here is

12 | that --

13 |         THE COURT:  Just answer questions.

14 | A.  What is your question again?

15 | Q.  How did you think a lawyer could help you with what your

16 | concerns were?

17 | A.  I needed legal advice, like what could I do about it.

18 |         THE COURT:  About your children and custody?

19 |         THE WITNESS:  Have custody or even my children back

20 | here, concerning the safety of my kids.  I don't want my kids

21 | raised by people who try to kill them.

22 |         THE COURT:  We understand.  Go ahead.

23 | Q.  I'm not asking you what you said to Mr. Denbeaux privately.

24 | But as a result of speaking to Mr. Denbeaux, what, if anything,

25 | did you and he decide to do as a strategy?  Was Mr. Denbeaux

1    going to do anything as a result of your conversations with

2    him?

3    A.   There was several suggestions on the table.  One of them

4    was I will try to convince him to bring the kids over here.

5    Once the kids gets here because they are American citizens,

6    born here in the U.S., I'll get a court order to have them

7    raised here in the U.S.

8    Q.   What was the other possibility?

9    A.   That we go to Canada and bring them here.

10            THE COURT:  Denbeaux told us that he is not a divorce

11   lawyer or a family lawyer.  Did you know that when you went to

12   see him?

13            THE WITNESS:  Yes, I did know that.

14            THE COURT:  He is not a family lawyer, he is not a

15   divorce lawyer, he is not involved in matters of custody of

16   children.

17            THE WITNESS:  Yes, I am aware of that, your Honor.

18            THE COURT:  Were you aware of that at the time?

19            THE WITNESS:  Yes, I was aware.

20            THE COURT:  So there was a different reason why you

21   went to Denbeaux?

22            THE WITNESS:  I still know that he is a law professor

23   and has massive connections, so he could really help me out

24   with that.

25   Q.   Did you follow either of those two things, of either going

1    to Canada to bring them back and get a court order here?  Did

2    you do those things or no?

3    A.  I wasn't able to convince her to bring my kids over here

4    because her family in Lebanon were still putting pressure on

5    me.  If we go to Canada, I stated to him that the FBI was

6    giving me a hard time, and one of the reasons that I can't go

7    to Canada was that my wife was trying to give me a Canadian

8    green card and the application was rejected, and the Canadian

9    authorities said that I could not visit Canada.

10   Q.  As a result of that, did you have Mr. Denbeaux contact the

11   FBI?

12   A.  No, not as a result of that.  I think it was after two,

13   three weeks I was still under pressure.  My family in Lebanon

14   were still getting threats.  They were still stating to them

15   that we know that your son went to the United States embassy,

16   all of that kind of stuff.

17   Q.  When you say during a two-, three-week period you were

18   getting these indirect threats, what time period are you

19   talking about?

20   A.  From the time I came back from Lebanon, which is September

21   12 to February.

22   Q.  At some point then did Mr. Denbeaux contact the FBI, as far

23   as you know?

24   A.  Yes, based on my records.

25   Q.  When was that, roughly?

1  A.  That was actually the last week of February 2017.

2  Q.  What was your hope in your mind of what the FBI might be

3  able to do based on your prior experience?

4  A.  Continue where we stopped at last year in 2016, when they

5  offered me whatever they offered.  I know they needed my help,

6  and at the same time I needed to stop those harassments.

7  Q.  Did there come a time when you had an initial meeting with

8  them?

9  A.  Conversations over the phone.  I think I went to his office

10  once or twice.  And we talked about stuff.

11  Q.  Eventually, did you have a first meeting with the FBI?

12  A.  Yes, we did.

13  Q.  Prior to that first meeting, did Mr. Denbeaux tell you

14  anything about what the rules were about the meeting?

15  A.  No, but I assured Mr. Denbeaux that when he first talked to

16  them I want strict confidentiality.  I don't want to talk to

17  the previous agents because they looked like they are very well

18  known among the community.  I don't want to be seen around

19  them.

20  Q.  When you say the community, what community are you talking

21  about?

22  A.  Muslim community.

23  Q.  At the first meeting, was it different agents or the same

24  agents?

25  A.  There were two different agents.

1   Q.  At which meeting?

2   A.  The first meeting.

3   Q.  Who were the agents at the first meeting?

4   A.  Joseph Costello and Keri Shannon.

5   Q.  Do you have any memory of how the first meeting began?

6   A.  Yes.  The first thing Mark said to them is that it's not

7   like a proffer agreement.  I wasn't familiar with that term at

8   that time.  It's not a plea negotiation.  He said a couple of

9   things.  But what really stuck in my mind that he said to them:

10  whatever my client says here will not be used against him and

11  everything will remain confidential.

12  Q.  What, if anything, did Agent Shannon or Agent Costello say

13  or do in response to that?

14  A.  They just agreed to it, nodded their head, and accepted

15  those facts.  They even assured me that at that meeting only

16  him -- only the two agents and their supervisors know about it.

17  They even stated that the agents that met with me before

18  doesn't even know those meetings are happening.

19  Q.  How many hours, more or less, were you with them on that

20  first day?

21  A.  Hour, hour and a half, two hours.

22  Q.  How did the meeting end?

23  A.  Before the meeting ends, after they agreed to whatever Mr.

24  Denbeaux said, I said that before I can be open and

25  forthcoming, I need to ensure the safety of my family and I

1  need my kids back from Lebanon.

2  Q.  Break that down for me for a minute.  When you say the

3  safety of your family, were you specific about which family

4  members you were interested in?

5  A.  Yes.  My younger brother Moustafa was still living in the

6  United States.  My mother and my younger sister could come back

7  and forth.  My sister Laila had an expired green card, so I

8  really needed to renew that.  My father had already applied as

9  a citizen and somehow his application was rejected.  I needed

10 to ensure that my father and my sister Laila could be granted

11 visas to come over to the United States.

12        I had a negotiation with them that I needed my sister

13 Laila to have her green card renewed, and she was like no, we

14 could not do that because it's already been expired.  What we

15 could do for her is issue her a visa, and when she gets here

16 she could file for asylum.  Your dad's case is much easier

17 because as soon as he gets here, he is a U.S. citizen, so you

18 could adjust his status.

19 Q.  When you say she said that, who are you referring to?

20 A.  Both of them actually.  It was a conversation between

21 Joseph and Keri.  You know, during those meetings, most of

22 those legal terms was coming from Keri.

23 Q.  Did you insist on any kind of a time frame or deadline for

24 these safety concerns that you had?

25 A.  They stepped over -- yes, I did.

1   Q.  What did you say regarding --

2   A.  I said I need a time frame.

3   Q.  What, if anything, did they say?

4   A.  They said concerning the visas, it will take around two

5   months.  Concerning the kids -- no.  Concerning the visas, they

6   said it will take around two months.  I even asked them that I

7   wanted to be able to visit Canada because of the business

8   dispute I have in Canada.  Joseph said that within six weeks we

9   could grant you that.

10          Then, when it comes to my kids, he looked at Keri and

11  Keri said, by late summer.  I said?  Why is it by late summer,

12  what's late summer?  Give me a month.  She was like, definitely

13  by late August your kids will be here.  I'm like, why is it

14  taking that long?  I know the FBI from whatever I experienced,

15  they really have the powers to do everything.  She said that

16  they have to reach out to the department of state concerning my

17  kids because it's involving two countries.  But she said, your

18  kids are born over here, so their first nationality comes

19  first.

20          Concerning my dad's visa, she was like, we have to

21  reach out to the Department of Homeland Security and

22  immigration, ICE, and the process may take time.  But they

23  assured me that is the max time.  They were like, it could

24  really happen before that.

25  Q.  You heard agents Costello and Shannon testify here, right?

1    A.  Yes.

2    Q.  Did you hear them testify that they repeatedly told you and

3    Mr. Denbeaux that they couldn't make specific promises about

4    help with immigration issues because it was not fully within

5    their control?  Did you hear them testify to that?

6    A.  Yes.

7    Q.  Do you recall them saying to you that or anything like that

8    back then in March-April of 2017?

9    A.  I do recall that one of the things that popped up is that

10   it's hard for them concerning my dad.  And I'm like, why is it

11   hard?  They were like, your dad entered illegally to the United

12   States in 2000.  I was a little bit aware of the war at that

13   time.  And they start going back and forth.  Then I asked for a

14   break.

15        I told Mark, listen, my dad asked for a voluntary

16   departure and he has been outside of the United States for more

17   than ten years.  I'm not asking for privilege.  I'm asking for

18   what's my right.  I'm a U.S. citizen and I have the right to

19   bring my dad over here.  I don't want it to feel like they are

20   giving me too much.  So let's stop with the crap and make

21   things clear for them.

22        He stepped outside actually and he talked to them.

23   When he came back he was like, since your dad has been outside

24   the country for more than ten years, I don't think it will be

25   difficult, but we still have to reach out for the Homeland

1    Security, for the department of state concerning my kids, for

2    ICE.  They mentioned several agencies.  But they were sure,

3    they were hundred percent sure that on the side of the FBI this

4    is a done deal, no question about that.  And when you asked for

5    a time frame and they gave me a time frame, what else could I

6    do?  What other things I could request?

7            Surprisingly, I have to mention it, in the 302, when

8    they talk about the first meeting, when I asked for a time

9    frame, they said, oh, there is no promises.  But when I look at

10   Keri's notes, she mentioned those time frames.

11   Q.  At the end of that meeting, the first meeting I'm talking

12   about with them in March, was there an arrangement for another

13   meeting?

14   A.  They were very thankful.  They appreciated I'm forthcoming.

15   They appreciated my cooperation with the government.  They were

16   like we are looking for a second meeting.  They even during

17   that time called their supervisors one or two times, I don't

18   recall how many times they stepped outside, and they said that

19   they were very happy with what's going on.

20   Q.  In the hearing yesterday you saw the text message that Mr.

21   Denbeaux sent to them saying there were no promises, right?

22   You saw that evidence, right?

23   A.  Yes, I did.

24   Q.  Had you ever seen that text message or did you know that he

25   sent that text message before you saw the discovery in the

1    case?

2    A.  No, I wasn't aware of that message.  I wasn't really aware

3    of that message.  Joseph Costello yesterday, he recalled my

4    memory about at the end of the meeting Joseph was like, I'm

5    going to do my best.  And then I recall that Mark said, you

6    just gave them a time frame, you just promised.  He was like,

7    it involves other agencies.  I think this is when the things

8    about the IMNS and the DOS came up.  Me and Mark, we already

9    know what the FBI are capable of and what they could do as a

10   government, so there was no need to keep bringing whatever we

11   agreed upon.

12   Q.  About how much later was the second meeting, roughly?

13   A.  Almost like a week.

14   Q.  At that second meeting, do you recall, was there any

15   discussion about confidentiality or any other issues concerning

16   what they were promising you?

17   A.  They assured the confidentiality.  He kept saying to me not

18   to mention anything about those meetings to my brothers, to my

19   sister, to whoever it is.  I recall in the second meeting it

20   didn't start well.

21   Q.  Why didn't the second meeting start well?

22   A.  Keri said that concerning my kids, it will be difficult

23   than they thought it would be because my wife, she still has

24   the right for the kids' custody.  So she could do it as I will

25   be able to go visit Kara, and they could arrange a meeting

1  between me and Kara with the presence of the two governments

2  and we could agree on that.

3          I rejected that because I told them that this is a

4  thing that's already been agreed on, that this is a thing you

5  already gave me a time frame for.  Things start getting wrong.

6  This is when Costello jumped in and he started saying, we are

7  still working on that thing.  We are not saying that it will

8  never happen, but we are giving you a different option or a

9  different suggestion.

10          She also stated, Keri also stated, that as soon as I

11  could bring my kids over here for a visit, I could still issue

12  a court order that prevents them from traveling or living

13  anywhere else.  I tried to explain to her that I'm not trying

14  to deprive my wife from the kids' custody, but at the same time

15  I don't want my kids to be raised around such kind of people.

16  Q.  After you had this dispute, I think you called it, about

17  the possibility of you going to Canada instead of the FBI

18  bringing them here, did the meeting continue when you talked

19  about the topics that they were interested in?

20  A.  Yes.  After Joseph Costello reassured me, he was like they

21  are still working on that, it's not like a definite no, but we

22  are giving you a different suggestion, different option, just

23  in case things go wrong.  I remember at that time Joseph

24  Costello had the birth certificates of my kids in his hand.

25          THE COURT:  Did you hear them say that they would use

1    their best efforts or did you hear them say we'll guarantee

2    you?

3            THE WITNESS:  On their part, the FBI part, they

4    guaranteed it.  On the other agents's part, they will use their

5    best efforts.

6            THE COURT:  Who said they will guarantee it?

7            THE WITNESS:  Both of them, Costello and Keri.

8            THE COURT:  Did you hear your lawyer say that they

9    promised only their best efforts, they didn't guarantee it?

10           THE WITNESS:  When he testified?

11           THE COURT:  Yes.

12           THE WITNESS:  Yes, I heard him.

13           THE COURT:  So he was wrong?

14           THE WITNESS:  I don't think he was wrong.  He was

15   incomplete about that statement.

16           THE COURT:  He said they didn't guarantee it.

17           THE WITNESS:  They didn't guarantee it concerning

18   other agencies, your Honor.

19           THE COURT:  The other agencies?

20           THE WITNESS:  Yes.

21           THE COURT:  You thought the FBI could just reach in,

22   grab the kids, and bring them to you?

23           THE WITNESS:  After what they did to me, I believed

24   they could do that.

25           THE COURT:  That's what you thought at that time?

1          THE WITNESS:  No.  I wanted to do it the legal way.

2          THE COURT:  You knew they had to work with Homeland

3    Security, right?

4          THE WITNESS:  For what?

5          THE COURT:  To get your kids back, to give you

6    visitations.

7          THE WITNESS:  They mentioned the department of state

8    at that time.

9          THE COURT:  So they had to work with the department of

10   state?

11         THE WITNESS:  That's true.

12         THE COURT:  Did they say they can't guarantee, they

13   can only use their best efforts, they being the two agents?

14         THE WITNESS:  The general understanding is that they

15   will guarantee it.

16         THE COURT:  I'm asking you what they said.

17         THE WITNESS:  Yes, your Honor.

18         THE COURT:  Did they say, we'll guarantee it?

19         THE WITNESS:  Yes, they said, we'll guarantee it.

20         THE COURT:  Or did they say, we will try our best?

21         THE WITNESS:  They said, we will guarantee it.  Your

22   Honor, when they give me a time frame that by late August your

23   kids will be here, what does that mean?

24         THE COURT:  It could mean anything.  It could mean

25   they guaranteed or they will try their best to get to it.  The

1  question is, what did you hear them say?  Not what you thought,

2  but what did you hear them say?

3              THE WITNESS:  They guarantee it, your Honor.

4              THE COURT:  You heard them say, we'll guarantee it?

5              THE WITNESS:  Yes.  That was the basic understanding.

6              THE COURT:  I didn't ask you what the basic under-

7  standing was.

8              THE WITNESS:  They guaranteed it, your Honor.

9              THE COURT:  They said to you, we'll guarantee it?

10             THE WITNESS:  Yes, they said, we'll guarantee it.

11             THE COURT:  You will have your kids back in August?

12             THE WITNESS:  Yes.

13             THE COURT:  That's what I wanted to know.

14  BY MR. SCHACHT:

15  Q.  How did that meeting end?

16  A.  Second meeting?

17  Q.  Yes.

18  A.  As usual, we thank you for your cooperation.

19  Q.  Did you have a third meeting?

20  A.  We did have a third meeting.

21  Q.  Was there anything in your recollection unusual about the

22  third meeting?

23  A.  At the third meeting, there is a bit of confusion when Mark

24  submitted this piece of paper right here, the memorandum.

25  Q.  You have to say --

1              THE COURT:  Exhibit 405.

2    Q.  Exhibit 405?

3    A.  Exhibit 402 actually.

4    Q.  402.  Let me ask you a preliminary question.  You heard the

5    agents and you heard Mr. Denbeaux say that Exhibit 402 was

6    given at the beginning of the second meeting, right?

7    A.  Yes.

8    Q.  You submitted an affidavit that you recall where you said

9    it was at the second meeting.

10   A.  That's true.

11   Q.  Now, as you sit here today, is it your recollection that

12   that was at the second or third meeting?

13   A.  I don't know that it matters if it was the second or the

14   third.  It was submitted to them.

15   Q.  Right.  When that was submitted to them, to the FBI by

16   Mark, were you in the room?

17   A.  Yes, I was in the room.

18   Q.  What, if anything, was said by Mark or the agents when he

19   gave them that document?

20   A.  The reason that that document was given to them is that I

21   complained to Mark.  When they sort of start giving me another

22   suggestion for bringing my kids mere, I was like I don't want

23   things to be -- I want things to be a mutual understanding.  At

24   the start of that meeting he submitted that letter.  That was

25   the first time I read that letter or that memorandum.

1        I recall Joseph Costello sitting across from, me and

2   Keri was sitting a little bit to the left.  Me and Joseph, we

3   finished it quickly.  And Joseph was like, I agree to it, I

4   have no objections in it.  Then Keri said, excuse me, I'm a

5   slow reader, I didn't finish reading it.

6        This is when Joseph, Special Agent Joseph Costello, he

7   summarized it for her.  It was like the first note says that no

8   statements could be used against him, no prosecution.  And she

9   was like, I got that part, I read that part.  Then he explained

10  the second part, which concerned bringing the kids from Canada

11  to the United States.

12  Q.  Do you recall what, if anything, they did with the

13  document?

14  A.  Keri put it in her file.  I remember that very well.

15  Joseph Costello had it right in front of him.

16  Q.  Was there anything at that third meeting that stands out in

17  your memory about the meeting?

18  A.  Yes.

19  Q.  What stands out in your memory as you sit here now about

20  that third meeting?

21  A.  I asked to speak to Agent Keri alone.

22  Q.  Was that agreed to?

23  A.  Yes, that was agreed to.

24  Q.  Was there any changing of seating in the conference room

25  where you were meeting?

1    A.  Yes.  The room had a glass door.  I asked Agent Keri to sit

2    right in front of the door just in case for Agent Costello to

3    keep seeing in.  And I sat to the other side.  So we switched

4    seats.  One of the reasons that I didn't want to have Costello

5    at the meeting that the day, and I discussed that with Mark

6    later on at that meeting, is that Special Agent Costello in the

7    meeting before, he took some things personally, and he gets on

8    some of my personal stuff.  I thought that was very disrespect-

9    ful, so I didn't feel like talking to him.

10   Q.  Was most of that meeting alone with you and Agent Shannon?

11   A.  That's true.

12   Q.  How did that meeting end?

13   A.  Mark knocking on the door that he has to go.

14   Q.  Was there an arrangement for a fourth meeting or was that

15   done later?

16   A.  Yes.  Most of the arrangements went between them and Mark

17   because Mark at that time, he was getting some sort of

18   medication and trying to fit them in his schedule.

19   Q.  At the fourth meeting was there any discussion about the

20   immigration help that your family needed?

21   A.  There wasn't any discussion about that.  This matter was

22   settled that they are working on those visas.  I recall that

23   Joseph Costello said to me not to mention to my family, like my

24   father and my sister -- or how to mention to my father and my

25   sister about the visa thing.

1    I told them that I'm eligible to file for my father,

2    and I already told them that I filed the application for him.

3    And for my sister, I already mentioned to her that I'm sending

4    her a visitation letter, so most likely she will come back to

5    the United States.

6    He was like, yes, that's the best thing to do because

7    even in the American embassy in Beirut, Lebanese people work

8    over there and we can't trust them.  That's part of keeping

9    everything confidential.

10   Q.  Getting back to the use of the word "confidential," you

11   testified that you were promised confidentiality.  Is that the

12   actual word that was used?

13   A.  Yes.

14   Q.  What did you understand that word to mean,

15   "confidentiality"?

16   A.  Secrecy, keeping everything disclosed.

17   Q.  Do you know what "disclosed means," keeping everything

18   disclosed?

19   A.  I mean like not spread out, not to tell anyone of those

20   meetings.  Just to illustrate that point, during that time

21   Michael Flynn was about to be prosecuted, the national security

22   adviser.  We had a discussion, me and Mark, because he was

23   asking for immunity at that time.  I'm like, Michael Flynn is

24   asking for immunity.  Do you think we should ask for that?  He

25   said like, you got confidentiality, you got the agreement or

1   the promise of no prosecution, no crime committed.

2          THE COURT:  That's not a waiver of attorney-client

3   privilege, Mr. Schacht.

4          MR. SCHACHT:  It's a waiver of the advice that Mr.

5   Denbeaux gave to him, yes.  I think talking about the advice

6   that Mr. Denbeaux gave is fair game.

7          THE COURT:  Does that raise the question of all the

8   attorney-client privileges surrounding these meetings?

9          MR. SCHACHT:  I think we addressed this at the

10  beginning of the hearing where I said I think the advice that

11  he got in certain areas to further the narrative is important

12  to come out.  I thought I said it when Mr. Denbeaux was on the

13  stand during cross-examination.  In response to my objection,

14  you asked me what I was objecting to.

15         THE COURT:  I think if the government were to ask for

16  all of the writings that existed between your client and Mr.

17  Denbeaux, I would give it to them if you continue this line.

18         MR. SCHACHT:  All right, your Honor.

19  A.  My understanding --

20         THE COURT:  Don't.  Wait for a question.

21  Q.  Stop for a second.  In your conversation --

22         THE COURT:  And I'll disregard the question and his

23  answer.

24         MR. SCHACHT:  I can rephrase it.

25         THE COURT:  It's already been answered.

1          MR. SCHACHT:  Is it part of the record?  It's not

2    stricken?

3          THE COURT:  I'll strike it from the record if the

4    government consents.

5          MS. HOULE:  Your Honor, we will consent to striking it

6    if Mr. Schacht will now refrain from this line of questioning.

7          MR. SCHACHT:  I won't ask what Mr. Denbeaux said to

8    him.

9          THE COURT:  Or what he said to Denbeaux.

10          MR. SCHACHT:  Yes.

11          THE COURT:  It's only what Denbeaux said to the

12    government that he heard him say to the government.

13          MR. SCHACHT:  Yes.

14          THE COURT:  That testimony is stricken.

15    BY MR. SCHACHT:

16    Q.  Do you remember testifying earlier at the first of the five

17    meetings with Agents Shannon and Costello that there was talk

18    about confidentiality at the first meeting?

19    A.  Yes, I do remember that.

20    Q.  What was your understanding --

21          THE COURT:  He said confidentiality means not to talk

22    to anyone.

23    Q.  Is that your answer, that confidentiality means what was

24    said in the room wouldn't be repeated?

25    A.  Yes, it won't be released to the public.  That's concerning

1  the safety of my family and my kids.

2  Q.  Do you recall the fifth meeting that we have heard about

3  here at the hearing?

4  A.  Yes, I do recall the fifth meeting.

5  Q.  Was there anything noteworthy at the fifth meeting that

6  occurred with you and Mr. Denbeaux and the two agents?

7  A.  I recall at the start of the meeting that Agent Costello

8  reassured me that he is working on the visa application and

9  whatever other promises he gave me.  He said that he is doing

10 his best concerning the kids.  Then I recall very well that

11 Mark, he said, you promised.  Then Agent Costello said, I

12 didn't promise.  This is when Mark stood up in his face and he

13 pointed his finger at him, and he was like, yes, you promised,

14 you promised us.  This is when Joseph Costello kept quiet.  And

15 the meeting went on.

16 Q.  Do you recall testimony here from Agent Costello about the

17 fact that you had sent him, emailed him, your résumés?

18 A.  That's true, I recall that.

19 Q.  How did that come about that you sent him your résumé?

20 A.  In the fourth meeting -- I mean in the third meeting

21 Special Agent Keri, she said, how could we help you, how we

22 could make things easier for you, just let me know and we could

23 help.  I said, I would like to have a job in the engineering

24 domain.

25        In the fourth meeting Agent Joseph Costello, he

1    brought up the issue.  He was like, to show you that we are

2    really truthful about helping you out and about the promises

3    that we give, why don't you give us something that's really

4    very easy to achieve, it doesn't really take time.  I'm like,

5    like what?  He was like, like finding a job.  I was like yeah,

6    I would love to have a job in the engineering domain.

7            I remember he was taking some notes about what

8    major -- or what position I would like to have.  I recall that

9    I said to him I won't accept any job that will pay me less than

10   $120,000 a year that's in the engineering domain.  He said,

11   this is more than I make.  This is when I said, I won't be

12   doing whatever you're doing.  My credential, my degree may be

13   better than yours.  But it had nothing to do with an FBI

14   position or FBI job.

15           Surprisingly, in the complaint, I don't know what is

16   the reason they say that, that I asked for $120,000, that I

17   sold information for $120,000.

18   Q.  So the reason why you sent him the résumé was following

19   these conversations?

20   A.  He asked me to send a résumé to Mark and Mark would forward

21   it to him.  But when I was preparing the résumé to send it to

22   Mark, I don't know, my instinct just told me to send it

23   straight to him, so I sent it straight to him.

24           THE COURT:  How much more do you have?

25           MR. SCHACHT:  I only have about another five to ten

1    minutes.

2              THE COURT:  How much cross-examination?

3              MS. HOULE:  Probably about 30 minutes, your Honor.

4              THE COURT:  We are going to come back tomorrow at

5    10:30.  Okay everybody?

6              MR. SCHACHT:  You said 10:30 tomorrow?

7              THE COURT:  I did.

8              MR. SCHACHT:  Do you want me to finish my five to ten

9    minutes?

10             THE COURT:  Do another ten minutes.  Maybe you will

11   finish.

12   BY MR. SCHACHT:

13   Q.  You testified that you had been promised confidentiality.

14   My question is, Mr. Kourani, would you have spoken to the FBI

15   had they not promised you confidentiality?

16   A.  No.

17             THE COURT:  That's not a proper question, Mr. Schacht.

18   You know that.

19             MR. SCHACHT:  I think that gets to the heart of the

20   issue here.

21             THE COURT:  Yes, but it's not testimony.  It's what he

22   can now say he wished to happen.

23             MR. SCHACHT:  I'm asking him whether --

24             THE COURT:  All right, ask your question.

25             MR. SCHACHT:  It is arguably in a slightly leading

1  fashion.

2          THE COURT:  Ask the question.

3  Q.  What was the significance to you of being promised

4  confidentiality.

5  A.  My safety.

6  Q.  How would confidentiality ensure your safety?

7  A.  I already seen what those militias are capable of.  You

8  know very well, even in this court here, I'm not comfortable

9  speaking in public.  I already suggested that.

10 Q.  You testified a little earlier that you were told that what

11 you had said to the FBI would not be used against you.  Was

12 that one of the promises that you understood you were receiving

13 from them?

14 A.  That was the basic understanding that we all initiated the

15 conversation of the meeting on.

16 Q.  Which meeting?

17 A.  All of the meetings with FBI agents.  That was the first

18 statement that Mark said to them.

19 Q.  Would you have spoken to them openly without that promise?

20 A.  No.  They already spoke to me before, and I never said

21 anything.

22         THE COURT:  You didn't answer the question.

23         MR. SCHACHT:  He answered no, your Honor, and followed

24 up.

25         THE COURT:  He explained it.

1   A.  The answer is no, I would never speak to them.

2          MR. SCHACHT:  I have no other questions on direct

3   examination.

4          THE COURT:  Do you want to do about five minutes, Ms.

5   Houle?

6   CROSS-EXAMINATION

7   BY MS. HOULE:

8   Q.  Mr. Kourani, you testified about the education that you

9   received on direct examination, right?

10  A.  Yes, that's right.

11  Q.  One of the things that you didn't mention, though, is that

12  you were also trained in withstanding interrogation, right?

13  A.  Interviewing or interrogation.

14         THE COURT:  Answer the question yes or no.

15  A.  No.

16  Q.  You are trained in withstanding interviewing or

17  interrogation, right?

18  A.  Yes to interviewing, no for interrogation.

19  Q.  You were trained to withstanding interviewing, right?

20  A.  Yes.

21  Q.  That is something that you have researched on your own,

22  right?

23  A.  Researched on my own, from my own experience.

24  Q.  The answer is yes?

25  A.  Yes.

1   Q.  It's something that you also received training for from

2   unit 910, right?

3          MR. SCHACHT:  Objection, your Honor.

4          THE COURT:  Overruled.

5   A.  Sorry?

6          MR. SCHACHT:  Your Honor --

7          THE COURT:  You received training from an outfit

8   called 910?

9          MR. SCHACHT:  Your Honor, I object that this won't be

10  admissible if there were to be a trial in the case.  It goes

11  beyond my direct examination, which began --

12         THE COURT:  I sustain your objection.

13  Q.  Without getting into the specifics of who trained you, you

14  received --

15         THE COURT:  You got that.  Move on, Ms. Houle.

16         MS. HOULE:  Okay.

17  Q.  In 2016, when you spoke with FBI agents, you employed some

18  of the tactics that you had learned to withstand interviewing,

19  right?

20  A.  2016?

21  Q.  Right.

22  A.  With what agents?

23  Q.  With the FBI agents that you testified about on direct.

24  A.  I don't recall that.

25         THE COURT:  The agents who spoke to you in 2016, the

1   question by Ms. Houle is whether you used the techniques you

2   learned about being interviewed in giving answers in an

3   interview.

4   A.  No.

5   Q.  You didn't avoid telling them about your weaknesses?

6   A.  No.

7           THE COURT:  Ms. Houle, this is a profitless exercise.

8           MS. HOULE:  I'll move on, your Honor.

9   Q.  I'd like to focus on those meetings that you had in 2016

10  with the FBI agents.

11  A.  That's in Chicago, right?

12  Q.  In New York and Chicago I believe was your testimony.

13  Right?

14  A.  Yes.

15  Q.  You talked a lot about those meetings, and there are just a

16  few points that I want to focus on.  First, it is your

17  testimony, right, that the FBI agents told you in 2016 that if

18  you wanted to cooperate, you needed to be straightforward.

19  That was your word, right?

20          THE COURT:  Did you say that?

21  A.  I don't recall I said that in 2016.

22  Q.  In your testimony on direct examination you said that you

23  understood that the agents were requiring you to be straight-

24  forward if you wanted to cooperate, right?

25  A.  I said I don't recall that.  What I recall about 2016 is

1  that they were trying to hire me as an informant.

2  Q.  Okay.  You understood that --

3          THE COURT:  In that effort to hire you as an inform-

4  ant, did you hear the words or the substance of the words that

5  Ms. Houle asked you?  Stop fencing, please.  Answer the

6  questions.

7          THE WITNESS:  Maybe.

8          THE COURT:  Do you want to hear it again?

9          (Question read)

10          THE COURT:  Was that your understanding?

11          THE WITNESS:  Yes, that's my understanding.

12          THE COURT:  Then say it.

13  Q.  The agents also told you that they believed that you were a

14  member of Hezbollah, right?

15  A.  No, they didn't say that.

16  Q.  You didn't testify to that on your direct examination

17  today?

18  A.  On my direct examination I said that they believe I have

19  affiliation with Hezbollah.

20  Q.  You were affiliated with Hezbollah?

21  A.  Yes.

22  Q.  You said that you denied that?

23  A.  Exactly.

24  Q.  But the agents did not believe you, right?

25  A.  I don't know what the agents believed or not.

1  Q.  They told you that you were lying, right?

2  A.  No, they didn't say that.

3            THE COURT:  What did they say?

4            THE WITNESS:  They said that you have some

5  connections, and then they changed the topic, they changed the

6  subject.  They started talking about my background.

7            THE COURT:  You said you had no connections and they

8  said you had connections.  Obviously, both they and you had a

9  different understanding.

10           THE WITNESS:  Exactly.

11           THE COURT:  You said you had no connections, right?

12           THE WITNESS:  Yes, I denied that.

13           THE COURT:  They said you did have connections?

14           THE WITNESS:  Yes, your Honor.

15 Q.  The FBI agents told you that if you were not honest with

16 them, they were going to continue to investigate you, right?

17 A.  No, they didn't say that.

18           THE COURT:  What did they say?

19           THE WITNESS:  They said they will turn my life upside

20 down if I don't cooperate with them.  They threatened me with

21 my baby's health.

22 Q.  Let's talk about turning your life upside down.  You

23 testified on direct to interviews --

24           THE COURT:  This is profitless.  There is no point to

25 this, Ms. Houle.  Focus on what is important.

1   Q.  In 2016 you told the FBI that you did not want to

2   cooperate, right?

3   A.  I don't want to be an informant.

4   Q.  Then in 2017 you went back to the FBI because now you were

5   interested in cooperating, right?

6   A.  In helping them out.

7          THE COURT:  And being an informant right?

8          THE WITNESS:  Yes, and being an informant.

9   Q.  You had your lawyer call them, right?

10  A.  Yes.

11  Q.  You had your lawyer set up meetings on your behalf?

12         THE COURT:  Ms. Houle, please go into what's

13  important, not what's obvious.

14  Q.  To be clear, Mr. Kourani, you testified that in 2016 you

15  were offered money?

16  A.  That's true.

17  Q.  In 2017 you were not offered any money, right?

18  A.  No, they offered me.  He said that's the easiest thing they

19  could get.  I said I don't need money.

20  Q.  Who said that?

21  A.  Joseph Costello.

22  Q.  When did he say that?

23  A.  I think it was around the fourth meeting when he talked

24  about the job, when he talked about things that's easier to

25  achieve.

1    Q.  You are saying that he said he could perhaps help you get a

2    job?

3    A.  Mm-hm.

4    Q.  But no one offered you money?

5    A.  I didn't say no one offered me money.

6    Q.  Did anyone offer you money in 2017?

7    A.  Definitely offered money in 2017.  He said that's the

8    easiest thing to do.  Money, we have plenty of that.  I

9    remember his words very well.

10             THE COURT:  Let's recess at this point.  Ms. Houle,

11   spend the night and try to focus just on what's important.

12             MR. SCHACHT:  Understood, your Honor.

13             THE COURT:  Not repeating what was said to try to

14   catch a number of things, but just what is important.  Okay?

15             MS. HOULE:  Yes, your Honor.

16             THE COURT:  It can be a 15-minute cross-examination.

17   See you at 10:30 in the morning.

18             (Witness not present)

19             THE COURT:  What's going on?

20             MR. BOVE:  Your Honor, for planning purposes, we were

21   wondering whether following the conclusion of evidence there

22   was going to be an opportunity to submit briefing.

23             THE COURT:  No.

24             MR. BOVE:  What should we plan on tomorrow, your

25   Honor?

1          THE COURT:  Ms. Houle will finish and the direct will

2     finish, you will argue your points, and I'll rule.

3          MR. BOVE:  Thank you, Judge.

4          MR. SCHACHT:  Thank you.

5          (Adjourned to 10:30 a.m., March 28, 2018)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    INDEX OF EXAMINATION

2    Examinationof:                     Page

3    MARK DENBEAUX

4        Cross By Mr. Bove . . . . . . . . . . . . 208
         Redirect By Mr. Schacht . . . . . . . . 226
5

6    ALI KOURANI

7        Direct By Mr. Schacht . . . . . . . . . 229
         Cross By Ms. Houle  . . . . . . . . . . 278
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25