1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA

4              v.                          17 CR 417 (AKH)

5    ALI KOURANI,
                                           Conference
6                   Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           March 28, 2018
9                                          10:41 a.m.

10   Before:

11        HON. ALVIN K. HELLERSTEIN

12                                         District Judge

13

14

15

16        APPEARANCES

17

     GEOFFREY S. BERMAN
18        Interim United States Attorney for the
          Southern District of New York
19   AMANDA L. HOULE
     EMIL J. BOVE III
20        Assistant United States Attorneys

21

     ALEXEI SCHACHT
22        Attorney for Defendant

23

24

25

1          (Case called)

2          THE COURT:  Good morning, all.  Be seated.

3          Come on up here, Mr. Kourani.

4    ALI KOURANI, resumed.

5          THE WITNESS:  Good morning.

6          THE COURT:  Good morning, Mr. Kourani.  Please be

7    seated.  I remind you that you remain under oath.  I think

8    we're about to continue the cross-examination, right?

9          MS. HOULE:  Yes, your Honor.  Just one point before we

10   begin.  I appreciate your Honor's comments yesterday about

11   getting to the point and focusing the scope of the

12   cross-examination.  And we understand that the heart of the

13   issue here is whether or not immunity was offered or promised

14   to the defendant.  But the government believes that there are

15   certain things that Mr. Kourani said in his declaration and on

16   direct examination that are not true.  And so we'd like the

17   opportunity to confront him about those things, as your Honor

18   is assessing --

19         THE COURT:  Go ahead, Ms. Houle.

20         MS. HOULE:  Thank you, your Honor.

21         THE COURT:  I will try not to interrupt you.

22   CROSS-EXAMINATION CONTINUED

23   BY MS. HOULE:

24   Q.  Good morning, Mr. Kourani.

25   A.  Good morning.

1              MS. HOULE:  Mr. DeLuca, could you please bring up

2      Government Exhibit 701.

3              There's also a binder in front of you, Mr. Kourani, if

4      you prefer to look at the hard copy, which is the tab labeled

5      701.

6              May I approach, your Honor?

7              THE COURT:  You may.

8              Don't ask me to approach.  Just approach.

9      Q.  That is a declaration that you signed, Mr. Kourani; is that

10     correct?

11     A.  Yeah, that's correct.

12             MS. HOULE:  Your Honor, the government moves to admit

13     701.

14             MR. SCHACHT:  No objection.

15             THE COURT:  No point.  Are you doing this for

16     impeachment?  Impeach however you want.  We don't need this

17     document into evidence.

18     Q.  Mr. Kourani, you understood that you signed this document

19     under penalty of perjury, right?

20     A.  Yeah.  I did understand that.

21     Q.  Which means that you needed to tell the truth?

22     A.  Definitely.

23     Q.  And you say in the start of this document that your lawyer

24     drafted it for you, right?

25     A.  He helped me out with it.

1   Q.  But you reviewed it before you signed it, right?

2   A.  Exactly.

3   Q.  And you made sure that everything in it was the truth,

4   right?

5   A.  As the best of my knowledge.

6   Q.  Well there are things in here that you know are not true,

7   right?

8   A.  No.

9   Q.  Things that you left out to mislead the Court, right?

10  A.  I have never attempted to mislead the Court.

11  Q.  Let's talk about --

12  A.  But you know when I wrote that -- when I wrote that thing I

13  didn't mention everything.

14  Q.  Right.  There are things that you left out on purpose?

15  A.  Not on purpose.

16          MR. SCHACHT:  Object.

17          THE COURT:  Sustained.

18  Q.  Let's talk about --

19          THE COURT:  What are you complaining about,

20  Mr. Schacht.  All you do is stand up and say I object.

21          MR. SCHACHT:  Thank you.

22          THE COURT:  Sustained.

23  Q.  Let's look at paragraph eight.  You talk here about the

24  trip that you took with your family in July of 2016 to Lebanon,

25  right?

1    A.  Yeah.  That's right.

2    Q.  And you state here that you were attacked by members of

3    Hezbollah, right?

4    A.  That's what I read here.

5           THE COURT:  Don't be cute.  Just answer the question.

6           THE WITNESS:  Yes.

7    Q.  You said yesterday that you were attacked because you were

8    suspected of being a government informant, right?

9    A.  I mean you could easily say that it was fueled by the rumor

10   that I was an American government informant.

11   Q.  And that is what you said yesterday, right?

12   A.  That's true.

13   Q.  But that's not the reason that you were attacked, right?

14   A.  No.  That was the reason that I was attacked.

15          THE COURT:  Keep your voice up, please.

16   Q.  You were attacked --

17          THE COURT:  Talk as if the person listening to you is

18   at the clock.  See that clock.  Project your voice there.

19          THE WITNESS:  All right.

20   Q.  You were attacked because a fight that you had with your

21   mother-in-law, right?

22   A.  I mean do you believe a fight would -- an argument with my

23   wife will lead to 20 or 30 people surrounding my house within

24   two minutes with arms and shooting at my house?  Do you believe

25   that?

1   Q.  Well, let's talk about the fight --

2   A.  Do you believe -- no.  I want to continue.

3   Q.  I ask the questions here, OK.

4   A.  Go ahead.

5          THE COURT:  Why are we doing this?  He says following

6   an argument with my wife, fueled by the rumor that I was an

7   American government informant, members of Hezbollah attacked my

8   home in Yater, Lebanon.

9          MS. HOULE:  Because, your Honor, he has attempted to

10  mislead the Court about the reason that he was attacked.

11         THE COURT:  How does he know -- come on, Ms. Houle, go

12  and do what you want to do but don't do stupid things.

13  Q.  Mr. Kourani, you also tried to mislead the Court yesterday

14  about --

15         THE COURT:  It's not misleading.  There may be other

16  parts of it but this is not misleading.

17  Q.  Well did you say anything in your declaration, Mr. Kourani,

18  about the fight with your mother-in-law?

19  A.  I don't think that really matters for this motion.

20         THE COURT:  You're right.  It doesn't matter.

21         Ms. Houle, we don't need to nitpick.

22         MS. HOULE:  Moving on, your Honor.

23         THE COURT:  Good.

24  Q.  Mr. Kourani, you described the time that you spent in

25  Lebanon after this attack yesterday, right?

1   A.  Yes.

2   Q.  And you said that you were held in Lebanon because your

3   passport was held by the FBI, right?

4   A.  I said that the American consulate, she took it from me,

5   and when I insisted on the reason why she confiscated my

6   passport, she told me to call the FBI.  That's what I said

7   yesterday.

8   Q.  And you described the process of you getting out of Lebanon

9   as fleeing, right?

10  A.  Yeah.

11          THE COURT:  What?  What's the question?  What was the

12  last word you used?

13          MS. HOULE:  That he described getting out of Lebanon

14  as him fleeing from Lebanon.

15          THE WITNESS:  I was worried about my wife.

16  Q.  But, in fact, you stayed in Lebanon for several weeks after

17  you were cleared to fly, right?

18  A.  Thank you for mentioning that.  That's because of the

19  federal government.

20  Q.  You stayed in Lebanon because it was your choice to stay?

21  A.  I was forced to stay.  Yes.

22  Q.  It was your choice to stay?

23  A.  I was forced to stay there.

24  Q.  How were you forced to stay?

25  A.  They took my passport and they didn't -- they banned me

294

I3s9kou1              Kourani - cross

1    from flying back to the United States.  They said I have to

2    give them two weeks before --

3              THE COURT:  So let me ask this question.  Did there

4    come a time when your passport was returned?

5              THE WITNESS:  I'm sorry?

6              THE COURT:  Did there come a time when your passport

7    was returned?

8              THE WITNESS:  That's true.

9              THE COURT:  And after that did you stay in Lebanon any

10   longer?

11             THE WITNESS:  After that I book a ticket, I think the

12   same week.  When I went to board the airplane, they said you

13   can't board, you have to reach back to the embassy.

14             THE COURT:  So let me ask you this.  You got the

15   passport back.  That same week you made a reservation.

16             THE WITNESS:  Exactly.

17             THE COURT:  When was the reservation for?

18             THE WITNESS:  I mean as --

19             THE COURT:  Was it in the next few days or next few

20   weeks?

21             THE WITNESS:  As close as I could get in the next few

22   days, you know.

23             THE COURT:  In the next few days?

24             THE WITNESS:  Yeah.

25             MS. HOULE:  Mr. Kourani, that's not true.

1              THE COURT:  Just a minute, Ms. Houle.

2              Then what happened next?

3              THE WITNESS:  Then I went to the airport.  I got my

4    boarding pass.  As soon I was about to board the airplane, the

5    flight attendant said that you can't board the airplane.

6              THE COURT:  So you were forbidden to board the

7    airplane.

8              THE WITNESS:  Thank you.

9              THE COURT:  Did you go home?  You went home?

10             THE WITNESS:  She said that I have to reach out to the

11   American embassy again.

12             THE COURT:  So what you did do?

13             THE WITNESS:  I went back home.

14             THE COURT:  How long did you stay home before you were

15   able to get out of the country?

16             THE WITNESS:  I think the second day I sent an e-mail

17   to the consulate, until she replied to me and told me what's

18   the process, how was the process to go back to the United

19   States.  It took another two or three weeks.

20             THE COURT:  Until you got what?

21             THE WITNESS:  She said that I have to book an airline

22   ticket and that's in my e-mails.

23             THE COURT:  But you already did book the airline

24   ticket.

25             THE WITNESS:  No.  Let me finish.  I have to book an

1   airline ticket, and it has to be through one of the American

2   airlines like United Airlines or -- so I had to change my

3   ticket.  And she said that it has -- I have to send the -- the

4   ticket has to be two weeks ahead, you know.

5           So I can't book a ticket for the second day because I

6   have to book a ticket, and then send it to the consulate, and

7   then the consulate will reply to me until I'm clear to go.

8           THE COURT:  In total, Mr. Kourani, how long after your

9   passport was returned did you stay in Lebanon?

10          THE WITNESS:  Three or four weeks.

11          THE COURT:  You may question.  But try to question on

12  important things.

13          MS. HOULE:  I think he's continuing to mislead the

14  Court about --

15          THE COURT:  Try to -- come on, Ms. Houle.

16          MR. SCHACHT:  Objection.

17          THE COURT:  Ms. Houle, he's not misleading on these

18  things.

19          THE WITNESS:  Your Honor --

20          THE COURT:  You don't need to say anything.  Don't

21  speak -- don't volunteer information.  You get in trouble when

22  you volunteer information.  You should know that.

23          THE WITNESS:  I'm already in trouble.

24          THE COURT:  Right.  That's why you got a good lawyer.

25          MS. HOULE:  Let's look at paragraph --

I3s9kou1                    Kourani - cross

1        THE WITNESS:  I know that.  And I had a good lawyer

2    too.

3        THE COURT:  All right.  Enough of that.

4        Ms. Houle, next question.

5    BY MS. HOULE:

6    Q.  Let's look at paragraph nine of your declaration.

7        You say here that you were fired from your job in

8    Chicago, right?

9    A.  Yes.

10   Q.  And you say that that was because of being delayed in

11   Lebanon and because the FBI had gone to your workplace, right?

12   A.  That's true.

13   Q.  But you've left out an important fact here, right?  There

14   was another reason that you were fired?

15   A.  I can't read your mind.  Just can you say.

16       THE COURT:  Did you leave out an important fact as to

17   the reason you were fired?

18       You don't have to read her mind.  Listen to her

19   questions.

20       THE WITNESS:  Those are the basic two reasons that I

21   got fired from my job.

22   Q.  Didn't your boss accuse you of stealing money?

23   A.  No, he didn't.

24   Q.  Who was your boss at the time?

25   A.  You know the owner of the company, they're brothers, a

1   bunch of brothers, three brothers and I was dealing with the

2   three of them.

3   Q.  Hikmat and Ibrahim are two of them, right?

4   A.  And there is another one in Florida.  I forget his name.

5   Q.  And Ibrahim said that you took money that you were not

6   entitled to, right?

7   A.  That's what the FBI agent said to me in the airport, Keri

8   Shannon, that's what she said.

9   Q.  Ibrahim never said that to you?

10  A.  No.  I went to his office the second day I came from

11  Lebanon.  And I confront him about it.  And it came out it was

12  his bookkeeper mistake, normal mistake.

13          In addition, as I added yesterday, I still worked for

14  him for another week.  But, you know, when I worked for him for

15  another week he said that my position that I had in Chicago was

16  gone because I was, you know, I left him for all that long.

17  And at the same time, you know, I had that one year contract

18  with him.  So, you know, he didn't feel like -- like legally

19  fired me, but he still gave me a job that pays me not even

20  one-third of what I used to be paid, which is an indirect

21  approach of being fired.

22  Q.  Right.  I'd like to talk about that actually.  So let's

23  look at paragraph ten.

24          You say here that you lost another job from the FBI's

25  intervention.

1          THE COURT:  Who cares, Ms. Houle?

2          THE WITNESS:  Thank you.

3          THE COURT:  What's the big deal?

4          MS. HOULE:  Your Honor, in his motion he's argued that

5    these circumstances relating to losing his job and being

6    delayed in Lebanon and the circumstances of being attacked by

7    Hezbollah undermine the voluntariness of his statements.

8          THE COURT:  It has nothing to do with the

9    voluntariness or lack of voluntariness of his statements.

10          MS. HOULE:  That's our argument, your Honor, but

11    that's not the argument that he's made.

12          THE COURT:  Give me a break.

13          Are you arguing Mr. Schacht, that these things have

14    anything to do with the issue of the voluntariness of his

15    statement to the FBI?

16          MR. SCHACHT:  His mental state at the time that he

17    went to the FBI sets the groundwork for what happened later

18    which is to say he had this trouble in Lebanon, he was scared

19    for his life, he was scared for the lives of his father and his

20    sister and his children.

21          THE COURT:  And that's why he went?

22          MR. SCHACHT:  And that's the background of why he

23    went --

24          THE COURT:  That's why he went, but things having to

25    do with his job in Chicago, is that of any importance?

1          MR. SCHACHT:  It's only important inasmuch as it sets

2     the stage but, obviously, that doesn't prove one way or the

3     other whether it's voluntary.  I agree with you.

4          THE COURT:  A lot of stuff on the stage, Ms. Houle.

5     The job of a good cross-examiner is to focus on the important

6     things on the stage, not the unimportant things.

7     BY MS. HOULE:

8     Q.  A final question about your declaration, Mr. Kourani.

9          At paragraph 12, you say here before the first meeting

10    Mr. Denbeaux and the agents told me that he had spoken to the

11    FBI and that they had promised that no one other than their

12    supervisors --

13    A.  I'm sorry.  Which paragraph was that?

14          MS. HOULE:  Paragraph twelve.

15          THE COURT:  She's reading paragraph twelve, second

16    sentence.

17          THE WITNESS:  OK.

18          THE COURT:  Got it.

19          THE WITNESS:  Yeah, I got it.

20    Q.  "Before the first meeting, Mr. Denbeaux and the agents told

21    me that he had spoken to the FBI and that they promised that no

22    one other than their supervisors would know about the meetings

23    and that they would be confidential.  Mr. Denbeaux told me that

24    I would not be prosecuted for what I said at those meetings so

25    that I could be honest."

I3s9kou1                    Kourani - cross

1          But that's not what you said yesterday, right?

2     A.   I don't know, your Honor, if I could go into whatever.

3          THE COURT:  Just do the best of your recollection, is

4     that about the same thing you said yesterday?

5          THE WITNESS:  Yes.  That is about the same thing I

6     said yesterday.

7     Q.   Yesterday you said that Mr. Denbeaux did not tell you

8     anything about what the agents said before you went into the

9     first meeting.

10    A.   I don't recall that.  But I do remember that --

11         THE COURT:  You do or you don't remember that

12    testimony?

13         THE WITNESS:  I'm sorry?

14         THE COURT:  You do or you don't remember that

15    testimony?

16         THE WITNESS:  I don't remember that testimony.

17         MS. HOULE:  May I approach?

18         THE COURT:  You don't need to ask me.  Do you have the

19    transcript?

20         MS. HOULE:  Yes.  It's right here.

21         (Pause)

22         THE COURT:  Ms. Houle, I show you the transcript of

23    yesterday's session, page.

24         MS. HOULE:  It is page 257.

25         THE COURT:  Line.

1        MS. HOULE:  I am drawing your attention to line 13.

2    And it's also -- maybe we can pull it up on the screen,

3    Mr. DeLuca.

4        THE COURT:  You may.

5        MS. HOULE:  257, Mr. DeLuca.

6    Q.  Your attorney asked you, "Prior to that first meeting did

7    Mr. Denbeaux tell you anything about what the rules were about

8    the meeting?"

9        You said --

10        THE COURT:  Wait until it's up on the screen.  It's

11    not on the screen here.  He's got 258 on the screen.

12        MS. HOULE:  257, Mr. DeLuca.

13        THE COURT:  OK.

14        MS. HOULE:  Line 13.

15    Q.  "Prior to that first meeting did Mr. Denbeaux tell you

16    anything about what the rules were about the meeting?"

17        You answered, "No, but I assured Mr. Denbeaux that

18    when we first talked to them I want strict confidentiality."

19        But Mr. Denbeaux did not tell you anything about what

20    the agents had said before the first meeting, right,

21    Mr. Kourani?

22        MR. SCHACHT:  Objection.

23        THE COURT:  Overruled.

24        THE WITNESS:  I mean for me both statements are the

25    same.

1             THE COURT:  Let me ask you this.  You were asked

2    yesterday at that page and line number.

3    "Q.  Did Mr. Denbeaux tell you anything about what the rules

4    were about the meeting?"

5             This is before the first meeting.  And you answered

6    no.

7             Is that your testimony?

8    A.  Yes.  That's my testimony, your Honor.

9             THE COURT:  And today you say that, in your

10   declaration you say that you heard it directly from

11   Mr. Denbeaux and from the agents.

12            THE WITNESS:  That's true.

13            THE COURT:  Do you understand the contradiction

14   between --

15            THE WITNESS:  I don't understand the contradiction.

16            MR. SCHACHT:  Your Honor, I'm sorry.  I apologize.  I

17   have to --

18            THE COURT:  Just object.

19            MR. SCHACHT:  I have to make a speaking objection.

20            THE COURT:  No, you can't.

21            MR. SCHACHT:  I object.

22            THE COURT:  Objection overruled.

23            THE WITNESS:  Isn't that considered client lawyer

24   privilege, your Honor?

25            THE COURT:  Not if you say it.

I3s9kou1                    Kourani - cross

1              THE WITNESS:  All right.  I mean.

2              THE COURT:  You said --

3              THE WITNESS:  When I say I assured Mr. Denbeaux, I

4    didn't say Mr. Denbeaux didn't say, Oh, no.  That's not

5    assured.  I didn't say that Mr. Denbeaux said that, Oh, no, the

6    FBI didn't agree to your rules.

7              THE COURT:  So yesterday's testimony you assuring

8    Denbeaux and today's testimony is Denbeaux telling you.  That's

9    the contradiction that Ms. Houle is asking you about.

10             THE WITNESS:  It's a back-and-forth conversation, your

11   Honor.  I didn't tell everything yesterday.  But I was assured

12   by the FBI, by Mark, by the statesmen, that whatever was said

13   to stay confidential.

14             THE COURT:  Go ahead, Ms. Houle.

15             MS. HOULE:  Final topic, your Honor.

16             THE COURT:  What?

17             MS. HOULE:  It's my final line of questioning.

18             THE COURT:  Are you finished?

19             MS. HOULE:  One more question, set of questions.

20   BY MS. HOULE:

21   Q.  You testified yesterday that in 2016 the FBI agents told

22   you that they believed that you were affiliated with Hezbollah,

23   right?

24   A.  That's true.

25   Q.  And you knew that the United States considered Hezbollah a

I3s9kou1                    Kourani - cross

1   terrorist organization, right?

2   A.   I didn't look into the legal terms of that.

3            THE COURT:  Did you know it or did you not know it?

4            THE WITNESS:  I did know it.

5   Q.   I couldn't understand.

6   A.   I did know it, yes.

7            THE COURT:  You did know it, yes?

8            THE WITNESS:  Yes.  Yes.  Yes.

9   Q.   And you knew that Hezbollah had committed attacks outside

10  of Lebanon, right?

11  A.   I read that in the news.

12  Q.   Including a bus bombing in Bulgaria, right?

13           THE COURT:  The question is did you know it.  Not what

14  you read in the news.  The answer is yes or no.

15           THE WITNESS:  No.

16  Q.   You did not know about a bus bombing in Bulgaria?

17  A.   I didn't know about that.  I heard about it.

18           THE COURT:  You heard about it?

19           THE WITNESS:  Yes.

20           THE COURT:  So hearing about it, do you know whether

21  it was true or not?

22           THE WITNESS:  Your Honor, the news said that whoever

23  did it, it was like not clear.

24           THE COURT:  You just told me that you heard on the

25  news that Hezbollah was involved in a bombing in Bulgaria.

1          THE WITNESS:  I didn't say that, your Honor.

2          THE COURT:  What did you say?

3          THE WITNESS:  I said that there was a bombing in

4     Bulgaria.

5          THE COURT:  How did you know about it?

6          THE WITNESS:  News.

7          THE COURT:  OK.

8          THE WITNESS:  It was all over the news.

9          THE COURT:  And you don't hear -- you don't remember

10    anything saying that Hezbollah was suspect?

11         THE WITNESS:  I heard that the military wing of

12    Hezbollah was accused of that.

13         THE COURT:  OK.  So the answer is that Hezbollah,

14    through its military wing, was suspect.

15         THE WITNESS:  Exactly.

16         THE COURT:  And you knew about that before you told

17    the FBI that you were not a member or affiliated with

18    Hezbollah.

19         THE WITNESS:  Your Honor, if you look at the --

20         THE COURT:  Yes, no?

21         THE WITNESS:  No.

22         THE COURT:  You didn't know about it?

23         THE WITNESS:  I'm sorry.  Can you repeat?

24         THE COURT:  You didn't know about it?

25         THE WITNESS:  Can you repeat the question?

1            THE COURT:  The question is when you told the FBI that

2    you were not a member of or affiliated with Hezbollah did you

3    know about the incident in Bulgaria?

4            THE WITNESS:  Yes, I did know about the incident.

5            THE COURT:  You did know?

6            THE WITNESS:  Yes.

7            THE COURT:  Yes?

8            THE WITNESS:  Yeah, I did know.  The incident happened

9    in 2012 or 2013.  The FBI questioned me in 2016.

10            THE COURT:  So did you lie to the FBI?

11            THE WITNESS:  I never lied to the FBI.

12            I mean, your Honor, if I could bring your attention to

13    one thing.  In the complaint, according to the government --

14            THE COURT:  I'm not interested in the complaint

15    according to the government.  Just interested in answers to the

16    questions.

17            THE WITNESS:  This is very, very important.

18            THE COURT:  You said you did not lie.  OK.  I got it.

19    I heard it.

20            Ms. Houle, continue.

21            MS. HOULE:  No further questions, your Honor.

22            MR. SCHACHT:  Nothing further from me, your Honor.

23            THE COURT:  I have a couple questions.

24            When you hired Denbeaux, you told me yesterday that

25    you knew he was not a divorce lawyer, right?

I3s9kou1                    Kourani - cross

1              THE WITNESS:  That's true.

2              THE COURT:  And you knew he had no experience in

3    custody battles over children?

4              THE WITNESS:  That's true.

5              THE COURT:  But you went to him in an effort to get

6    your children back from Canada into the United States, right?

7              THE WITNESS:  In an effort of seeking help or legal

8    advice.

9              THE COURT:  So the answer is yes, you went to Denbeaux

10   to try to get help to get the kids in from Canada?

11             THE WITNESS:  That's true.

12             THE COURT:  And you knew that Denbeaux had no

13   experience in this matter, right?

14             THE WITNESS:  Yes.

15             THE COURT:  Did you believe that the only people who

16   could get or might be able to get the kids back from Canada was

17   the FBI?

18             THE WITNESS:  Yes.

19             THE COURT:  That's what you believed?

20             THE WITNESS:  That's true.

21             THE COURT:  So the purpose of you going to Denbeaux

22   was to get his help so you could induce the FBI to get your

23   kids back from Canada?  Right?

24             THE WITNESS:  I can't state that fact, your Honor.

25             THE COURT:  Can't hear you.

I3s9kou1                    Kourani - cross

1              THE WITNESS:  I can't state that fact.

2              THE COURT:  Why not?

3              THE WITNESS:  I mean I was still exploring any

4      options.

5              THE COURT:  You had other reasons too, but one of the

6      big reasons --

7              THE WITNESS:  I assure you it's not the reason that I

8      went to Mr. Mark Denbeaux so that he could talk to the FBI.

9              THE COURT:  Well you wanted to talk to the FBI?

10             THE WITNESS:  I'm sorry?

11             THE COURT:  You wanted to talk with the FBI?

12             THE WITNESS:  No.  I didn't want to talk with the FBI.

13             THE COURT:  What?

14             THE WITNESS:  I didn't want to talk to the FBI at that

15     time.

16             THE COURT:  Isn't it true that you wanted the FBI to

17     help you get your kids back from Canada?

18             THE WITNESS:  What I was really afraid of, your

19     Honor --

20             THE COURT:  That's yes, no, or I don't know.

21             THE WITNESS:  I don't know.

22             THE COURT:  You don't know.

23             And you were concerned about your family in Lebanon?

24             THE WITNESS:  That's true.  I was concerned about

25     that.

1              THE COURT:  You knew that Denbeaux was not an

2    immigration lawyer?  Right?

3              THE WITNESS:  Yes.

4              THE COURT:  Yet, you went to Denbeaux for help in

5    getting your family immigrated from Lebanon and your kids into

6    the United States from Canada against the wishes of their

7    mother?  Right?

8              THE WITNESS:  No.  That's not right.

9              THE COURT:  Not right?

10             THE WITNESS:  No.

11             THE COURT:  Why did you go to Denbeaux?

12             THE WITNESS:  I'm sorry?

13             THE COURT:  Why did you go to Denbeaux?

14             THE WITNESS:  Friendship, legal advice.

15             THE COURT:  Friendship.  Did you know him before?

16             THE WITNESS:  My friend in Wisconsin introduced me to

17   him.

18             THE COURT:  A friend in Wisconsin.

19        So did you ask your friend in Wisconsin to recommend a

20   professor who could be your friend, or did you go to Wisconsin

21   to get a suggestion of who might be a good lawyer for you?

22   Tell me, Mr. Kourani.

23             THE WITNESS:  I have to tell you.  You really have to

24   let me express myself here.  Like all of the time --

25             THE COURT:  The truth is you wanted Denbeaux to help

1    you in Denbeaux's expertise, right?

2              THE WITNESS:  The truth is I trusted Denbeaux.

3              THE COURT:  He was a criminal defense lawyer, right?

4              THE WITNESS:  I don't know at that time what he was.

5              THE COURT:  You didn't know.  What did you know about

6    him?

7              THE WITNESS:  I know about him as -- as a good person,

8    as a law professor.

9              THE COURT:  You didn't know him before you started?

10             THE WITNESS:  Yeah, but I have a couple conversations

11   before.

12             THE COURT:  He was a good -- a lot of people are good

13   persons but you went to Denbeaux.

14             Why did you go to Denbeaux?  You went to Denbeaux

15   because of his lawyering ability, right?

16             THE WITNESS:  One of the reasons.  I mean all of the

17   things that we used to talk about is --

18             THE COURT:  Was there any other reason you went to

19   Denbeaux?

20             THE WITNESS:  Connection.

21             THE COURT:  Connection to what?  To your friend in

22   Wisconsin?

23             THE WITNESS:  Yeah.  To my friend in Wisconsin.

24             THE COURT:  So you went to Denbeaux even though you

25   knew as a lawyer he couldn't help you with immigration, and he

1    couldn't help you with custody, he couldn't help you with

2    marital discords, but he did know how to represent you to the

3    government; isn't that correct?

4              THE WITNESS:  The immigration, I never brought it up,

5    your Honor.

6              THE COURT:  Answer the question, would you please,

7    Mr. Kourani.

8              THE WITNESS:  Yes.

9              THE COURT:  It was your purpose to try to get the FBI

10   to help you bring your kids in from Canada and your family in

11   from Lebanon?  Right?

12             THE WITNESS:  No.  That's not right.

13             THE COURT:  Not right?

14             THE WITNESS:  No.

15             THE COURT:  Well what was your purpose?

16             THE WITNESS:  My purpose was safety, your Honor.

17             THE COURT:  Safety?

18             THE WITNESS:  Yes.

19             THE COURT:  So it's a third purpose?

20             THE WITNESS:  Yes.

21             THE COURT:  Bring the kids in from Canada, bring your

22   family in from Lebanon, and be safe while you're doing it?

23             THE WITNESS:  A condition.

24             THE COURT:  So everything was to get Denbeaux to

25   assist you in approaching the FBI so you could accomplish these

I3s9kou1                    Kourani - cross

1   objectives?

2              THE WITNESS:  No.  That's not true.  That's not true.

3              THE COURT:  Not true?

4              THE WITNESS:  No.

5         The only reason the FBI came in when he said that why

6   don't you go to Canada and bring them in.  So this is --

7              THE COURT:  He said why don't you go bring them in.

8              THE WITNESS:  Yeah.

9              THE COURT:  Now I don't want to pry into your internal

10   conversations with your attorney.  I'm just asking about your

11   purpose.

12         So you told me you needed the FBI's help to bring your

13   kids in from Canada and the immigration of your family from

14   Lebanon and your own safety.  And Denbeaux was going to help

15   you do that.

16              THE WITNESS:  That's not my own safety, your Honor.

17   It's my family's safety, my kids' safety.

18              THE COURT:  So we'll leave that out.  We'll leave that

19   out.

20         Now, before you were approached the FBI, through

21   Denbeaux's calling them, the FBI had broken off contact with

22   you, didn't they?

23              THE WITNESS:  I don't think so.

24              THE COURT:  They were still asking you to talk?

25              THE WITNESS:  Yes.

1          THE COURT:  When was the last time they asked you to

2     talk?

3          THE WITNESS:  When they went to my wife in Canada in

4     February they were still sending me threatening messages.

5          THE COURT:  But you were not talking to them?

6          THE WITNESS:  No.

7          THE COURT:  Now all of a sudden you are interested in

8     talking to them.

9          THE WITNESS:  It's not all of a sudden.  It's an

10    ongoing coercion, your Honor.  It's an ongoing coercion.

11         THE COURT:  Coercion or not coercion, until

12    February 2017 you didn't want to talk to the FBI anymore.

13         THE WITNESS:  I didn't trust them.

14         THE COURT:  I don't care what the reasons were.

15         You didn't want to talk to the FBI anymore, right?

16         (Pause)

17         THE COURT:  Right?

18         THE WITNESS:  Yes.

19         THE COURT:  Now you wanted to talk with them?  And you

20    were concerned that your community and the affiliates in

21    Lebanon and Canada would not hear of your conversations with

22    the FBI, right?

23         THE WITNESS:  That's true.

24         THE COURT:  Because they could kill you?

25         THE WITNESS:  Or my family.

I3s9kou1                    Kourani - cross

1          THE COURT:  They could kill your family?

2          THE WITNESS:  That's true.

3          THE COURT:  Kill your children?

4          They were nasty people?

5          THE WITNESS:  I don't know if they could do that to

6    the babies.

7          THE COURT:  They are nasty people?

8          THE WITNESS:  I know for a fact they prevent me from

9    talking to them for the last few months.

10          THE COURT:  I'm sorry?

11          THE WITNESS:  I know for a fact they prevented me from

12    talking to them for the last few months.

13          THE COURT:  They what?

14          THE WITNESS:  Prevented me from reaching out to my

15    kids for the last few months.

16          THE COURT:  That's an example of how powerful they

17    are, right?

18          THE WITNESS:  That's true.

19          THE COURT:  So the purpose of the confidentiality you

20    wanted was to protect your family and your life, right?

21          THE WITNESS:  I don't care about my life.

22          THE COURT:  What?

23          THE WITNESS:  I don't care about my life.  I care

24    about --

25          THE COURT:  You don't care about your life?

I3s9kou1                    Kourani - cross

1          THE WITNESS:  I care about my family's life.

2          THE COURT:  To protect your family and to protect your

3    kids?

4          THE WITNESS:  That's true.

5          THE COURT:  That's why you --

6          THE WITNESS:  If I cared about my life, I wouldn't be

7    speaking here today.

8          THE COURT:  That's why you went to the government?

9          THE WITNESS:  That's true.

10         THE COURT:  And that's why you wanted confidentiality?

11         THE WITNESS:  That's true.

12         THE COURT:  That's why you didn't want anybody to know

13   about your conversations with the government?

14         THE WITNESS:  That's true.

15         THE COURT:  And out of this comes your statement that

16   you were also promised some kind of immunity.

17         THE WITNESS:  Confidentiality is bigger than immunity,

18   your Honor.

19         THE COURT:  Confidentiality is what?

20         THE WITNESS:  Is bigger than immunity.

21         THE COURT:  It's different from immunity, isn't it?

22         THE WITNESS:  My understanding is bigger.  I could

23   take immunity, but still could be raised to the public, could

24   be spread out to the public that I'm taking immunity and

25   testifying.  When it's confidential everything has to stay

1    closed.  That's my understanding.

2              THE COURT:  Did you think that no matter what you said

3    the government couldn't prosecute you?

4              THE WITNESS:  Yes.

5              THE COURT:  Did you think that if you told a lie the

6    government couldn't prosecute you?

7              THE WITNESS:  (Pause) A lie doesn't help no one, yeah.

8              THE COURT:  I asked you a question.

9              THE WITNESS:  They wouldn't.

10             THE COURT:  What?

11             THE WITNESS:  They wouldn't.

12             THE COURT:  They wouldn't?

13             THE WITNESS:  Yes.

14             THE COURT:  Because they told you they wouldn't?

15             THE WITNESS:  Yes.

16             THE COURT:  That's what you say?

17             THE WITNESS:  Yes.

18             THE COURT:  Any other questions from anybody?

19             (Pause)

20             MS. HOULE:  Considering, your Honor, that there

21    were --

22             THE COURT:  Don't give me a speech.  Do you have any

23    questions?

24             MS. HOULE:  Nothing other than what I've already tried

25    to ask, no, your Honor.

I3s9kou1                    Kourani - cross

1           THE COURT:  Does the moving party have any questions?
2     Mr. Schacht?
3           MR. SCHACHT:  No, your Honor.
4           THE COURT:  You're excused, Mr. Kourani.  You can step
5     down.  Thank you.
6           (Witness excused)
7           THE DEFENDANT:  I would like to take a break, your
8     Honor.
9           THE COURT:  Sure.
10          We'll take ten minutes.
11          (Recess)
12          When we get back we'll have argument on the motion.
13          (Recess)
14          (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

1          THE COURT:  By mutual consent, Mr. Bove will go first.

2      Right?

3          MR. SCHACHT:  Yes, sir.

4          THE COURT:  Mr. Bove.

5          MR. BOVE:  Thank you, Judge.  I think the legal

6      framework here is pretty clear and set out recently by the

7      Second Circuit in Haak.  I want to get right to the point.

8      This is a motion where the defendant is arguing that his

9      statements were coerced, so the relevant considerations are the

10     defendant's characteristics, the circumstances of the

11     interviews, and the conduct of law enforcement.

12         I don't think there is a much of a dispute that the

13     first two of those strongly, very strongly, supports denying

14     the motion.  The defendant is extremely sophisticated.  You

15     heard him testify yesterday that he believes he is more

16     sophisticated and more qualified for the FBI's jobs than the

17     agents themselves.

18         The circumstances of the interviews are as follows.

19     He requested them through Mark Denbeaux.  They were conducted

20     at Seton Hall in a voluntary setting.  The agents were in

21     plainclothes.  And there is simply no allegation that anything

22     threatening or coercive was said during of those.

23         At the end of the day, Judge, I think it is pretty

24     clear that given those circumstances, which were entirely

25     voluntary, it boils down to the discussions of confidentiality

1   and the record relating to that, and this notes document,

2   Government Exhibit 402.

3            THE COURT:  What is 402?

4            MR. BOVE:  That is Mr. Denbeaux's notes document.  The

5   testimony is pretty much undisputed that he slid it over to the

6   agents in the April 3, 2017 interview, the agents discussed it

7   and said thank you.

8            Before I get to those two issues --

9            THE COURT:  There is a factual dispute about what

10  happened to 402.  He said they looked at it and gave it back,

11  didn't take a copy, and Denbeaux and Kourani say that a copy

12  was taken by Shannon.

13           MR. BOVE:  I do agree that there is a dispute in that

14  respect, Judge.  But what is not seriously in dispute about

15  this document is that the only words that were said by the FBI

16  agents in that interview after Mr. Denbeaux provided it to them

17  were "thank you."

18           THE COURT:  The best case that can be made for Kourani

19  is that he was induced to speak, by his understanding, which

20  was reasonable, that what he said could not be used against him

21  because he was promised confidentiality.  Confidentiality is

22  not immunity.  We need to talk about the difference legally

23  between the two.  And we need to talk about the reasonable

24  understanding of someone told something by government agents

25  who lacked authority.  Those are the issues I'm interested in.

1              MR. BOVE:  Thank you, Judge.  That's helpful.

2              Focusing on confidentiality, at a hearing, your Honor,

3         there are factual issues to be resolved.  I think it is clear

4         the credible evidence at this hearing came from Special Agent

5         Costello and Special Agent Shannon.  I am not impugning Mr.

6         Denbeaux at all.

7              THE COURT:  They did say promised confidentiality, but

8         they added confidential so the family won't be hurt.

9              MR. BOVE:  Special Agent Shannon also testified that

10        the representation was that they would use their best efforts

11        to provide confidentiality.

12             THE COURT:  I think the best efforts were for

13        immigration purposes.

14             MR. BOVE:  I think it was both, Judge, and I think

15        that Mr. Denbeaux agreed with that during cross-examination.

16        In any event, whether it was best efforts or not, the focus was

17        on concerns expressed by the defendant and Mr. Denbeaux.

18             THE COURT:  I agree.  But I'm bothered by the

19        memorandum.  Let's say Denbeaux had no basis to say what he did

20        about agreed that he committed no crime and faces no

21        prosecutions.  That is for me to judge whether it is reasonable

22        or not.  But assume, as we have to, that the agents saw this

23        and didn't correct it.  This is before Kourani said anything

24        that he said.  Can he argue, in effect, promissory estoppel,

25        that he was induced and relied on the fact that the agents did

1    not contradict the statement of his lawyer about his immunity.

2              MR. BOVE:  The answer is very clear, Judge, from the

3    Second Circuit just this month.  The answer is no, he cannot

4    argue promissory estoppel.  There must be -- this is directly

5    from Judge Raggi -- a clear and unambiguous promise of immunity

6    from the agents.  The only record here at this hearing is what

7    the agents said is "thank you."  The law from the circuit this

8    month is clear that the agents did not have a duty to correct

9    Mr. Denbeaux's misimpression.

10             This is particularly true in this context, where there

11   is a lawyer there, Mr. Kourani is there.  Mr. Denbeaux

12   acknowledged yesterday that he is more than capable of having

13   confronted the agents if he wanted an answer to that question.

14   He failed to do so.  It was clear that he regrets that, so

15   perhaps that was his error.

16             THE COURT:  He said that it all goes to what was the

17   purpose of the meeting, which is a different issue.

18             MR. BOVE:  I think it is, Judge.

19             THE COURT:  I'm troubled by the fact that the agents

20   had a piece of paper from a lawyer in their hands that raised a

21   question as to what could be done with what Kourani said and

22   didn't correct it.

23             MR. BOVE:  Judge, the problem is that the document

24   itself is internally inconsistent.  It wasn't clear to the

25   agents, and they said this, it was not clear to them what Mr.

1    Denbeaux was trying to communicate.

2              THE COURT:  He said they were shocked.  He said they

3    were shocked by Denbeaux's line which I just read out.  "It has

4    already been agreed he has committed no crime and faces no

5    prosecution."

6              MR. BOVE:  One of the reasons they were shocked by

7    that --

8              THE COURT:  In the same sentence, "not seeking any

9    immunity or protection because, as has already been agreed, he

10   has committed no crime and faces no prosecution."  The agents

11   did not agree, as this memorandum said, that he did not clearly

12   commit a crime.

13             MR. BOVE:  Judge, not even Mr. Denbeaux agreed with

14   what was written in this document.  I don't even think Mr.

15   Kourani believed he had committed no crime.  This was a ploy

16   where they were seeking to put themselves in this position, and

17   I submit it was intentional.

18             THE COURT:  I agree with the ploy.  But it is hard for

19   me to accept the proposition that the agents shouldn't have

20   corrected the record.

21             MR. BOVE:  Judge, that proposition comes from the

22   Second Circuit.

23             THE COURT:  All they had to say was, Mr. Denbeaux, we

24   made no agreement.

25             MR. BOVE:  Haak is clear -- this is Judge Raggi in the

1   Second Circuit this month -- that they were not required to do

2   that.  What is required here on this motion is for the

3   defendant to present clear and convincing evidence that there

4   was a promise of immunity.  The only credible evidence at this

5   hearing is that the agent said "thank you" in response to this

6   document.

7             THE COURT:  What about a promise of confidentiality?

8   It might have been a clear and unmistakable promise in the

9   words but not in the scope.  What about that?

10            MR. BOVE:  This is now stepping away from this

11  document because Mr. Denbeaux didn't reference confidentiality

12  in this document, which I think supports our position that

13  these were internally inconsistent assertions being made by Mr.

14  Denbeaux that led to confusion on the part of the agents and

15  helps to explain why their handling of the situation was

16  rational.

17            Now I do want to focus on the confidentiality

18  discussion.  It was clear from both Mr. Denbeaux and the

19  defendant that the purpose of the request for confidentiality

20  was an effort to try to prevent members of the Lebanese

21  community from learning that the defendant was meeting with the

22  FBI.  But there are several indications in the record that not

23  even Mr. Denbeaux and Mr. Kourani believed that this

24  confidentiality was a categorical representation by the agents,

25  much less a representation on behalf of the U.S. Attorney's

1    office or other parts of the government.

2           THE COURT:  Denbeaux knew that they had no authority.

3           MR. BOVE:  He admitted that, Judge.  So how do we know

4    that this confidentiality discussion was not categorical,

5    meaning that everybody who was a party to these discussions

6    understood that this was absolutely not an unconditional,

7    categorical promise?

8           First of all, and I think this is undisputed, the

9    agent said, look, you're asking for these immigration benefits;

10   we are going to have to talk to other parts of the United

11   States government, the Department of Homeland Security.  I

12   believe Mr. Kourani said he was well aware they would have to

13   talk to the department of state.

14          In addition, the agent said you're asking for your

15   children to be brought here from Canada, we are going to have

16   to talk to the Canadian government.  Judge, it was clear from

17   what the agents communicated to both Denbeaux and Kourani that

18   this wasn't going to be just a general reference to Mr. Kourani

19   when they reached out to these entities.  They were going to be

20   asking for a benefit if they did this.

21          If they did this, they were going to have to ask these

22   other agencies and entities to do something.  And in order to

23   explain why they were doing that, they would have to explain

24   they were seeking things on Kourani's behalf because he had met

25   with them and because he was providing assistance.

1          Another way you know, it is clear from this record,

2     that the confidentiality representation was not absolute, that

3     there were clearly exceptions, is Mr. Denbeaux admitted

4     yesterday and Mr. Kourani admitted today that he well

5     understood that he could be prosecuted for making false

6     statements in that interview.

7          So it was clear then, Judge, that the basis of that

8     prosecution, if it were to come to pass, would be the use of

9     his statements against him.  This is another respect in which

10    both men, Denbeaux and Kourani, have acknowledged at this

11    hearing that they fully understood that it could come to pass

12    that the statements and the meetings would be disclosed in a

13    criminal prosecution, as they are here.

14         The last point, Judge.  Not even Mr. Denbeaux

15    believed, and he acknowledged this, that this confidentiality

16    representation was absolutely.  I asked him on cross-

17    examination, isn't it true, sir, that in May of 2017 you

18    threatened to go to the media about this case?  He said,

19    actually I threatened not only to go to the media but also to

20    tell members of the defense bar about the way in which this

21    investigation had been handled.

22         What you have in this motion, Judge, is Mr. Kourani

23    and Mr. Schacht trying to use this confidentiality discussion

24    as a shield, whereas it was Mr. Denbeaux -- Special Agent

25    Costello testified about this conversation as well -- who

1    threatened to breach confidentiality before anyone.  He was

2    first in line.

3            THE COURT:  It was a threat to the government about

4    the government's alleged breach of the confidentiality.  What

5    happened was that Kourani wanted to come in and talk, but in

6    the government's estimation not level, just talk about

7    something but not all things.

8            MR. BOVE:  Not only in the government's estimation.

9    That was communicated.

10           THE COURT:  Yes.  When the government broke off the

11   interview by saying you're lying to us or to that effect,

12   that's when the threat came.

13           MR. BOVE:  It did, Judge.

14           THE COURT:  They exposed themselves, and Denbeaux knew

15   that.  It was all calculated risk, I think.  You can finish.

16           MR. BOVE:  It was a calculated risk by Mr. Kourani and

17   Mr. Denbeaux to try and extract benefits from the U.S. govern-

18   ment while providing incrementally pieces of information with-

19   out disclosing the whole truth.  It was a calculated effort by

20   those two men to do that, and the agents time and time again

21   told them that is not acceptable.

22           Judge, this confidentiality issue was not reached, the

23   case was not unsealed, until Mr. Kourani was provided with one

24   final opportunity to be forthcoming.  Special Agent Shannon

25   testified about this.  He was arrested.  The complaint was

1    sealed.  Nothing had been made public.

2            There were multiple proffers.  He was kept at a hotel

3    room instead of being incarcerated, instead of being lodged

4    here at the facility.  He had every opportunity to control

5    whether confidentiality would be maintained by being candid,

6    and he simply failed to do so.

7            Judge, this confidentiality discussion, the law is

8    clear.  We need a clear and unmistakable promise of immunity

9    for cooperation.  That is not what this was.  Judge Cote said a

10   promise of confidentiality and a promise of use immunity are

11   separate and distinct assurances.  That's in the Rudaj case

12   that was cited to.  She says that, Judge, because this is a

13   very practical point.  Defendants cannot stretch a conversation

14   about confidentiality --

15           THE COURT:  There are some courts of appeals that say

16   a promise of confidentiality amounts to, effect, a use

17   immunity.

18           MR. BOVE:  Not in this circuit, Judge.

19           THE COURT:  No.

20           MR. BOVE:  In this circuit the binding law is Haak.

21   Haak says it must be clear and unambiguous.

22           THE COURT:  Yes, it's a very clear thing.

23           MR. BOVE:  So the promise of confidentiality rooted in

24   concerns about disclosures to the Lebanese community is

25   absolutely not a promise of immunity.  No reasonable person

1    could think otherwise, certainly not an extremely sophisticated

2    defendant who said things yesterday such as I left the room

3    because I was concerned the agents didn't understand the

4    immigration law that I was talking about, and I told Mr.

5    Denbeaux he better fix this because I was here to demand what I

6    was entitled to.

7            This is an extremely sophisticated defendant who is

8    running a ploy and is now seeking to avoid the consequences of

9    his actions and seeking to trick the Court into crediting this

10   position that is just counterfactual.

11           THE COURT:  What's Judge Cote's case, United States v.

12   Rudaj?

13           MR. BOVE:  Yes, Judge.  I have the cite.

14           THE COURT:  I have it.  It's a Westlaw site.

15           MR. BOVE:  Judge, I know there is authority in other

16   circuits about this.  One of them is this Punni case from the

17   First Circuit.  "Simply because an FBI agent appropriately may

18   keep an informant's identity to himself does not by some

19   mysterious alchemy imbue the agent with otherwise nonexistent

20   power to promise use immunity."  That is a very practical point

21   that Mr. Kourani surely understood and Mr. Denbeaux, who has

22   acknowledged that he is an experienced criminal attorney,

23   surely understood.

24           To the extent that the advice Mr. Denbeaux gave to Mr.

25   Kourani or the manner in which Mr. Denbeaux handled the

1   situation impacted Kourani's view of what was going on, Judge,

2   that is absolutely not a basis for suppression initiation.  The

3   actions of private actors do not support a finding of

4   coerciveness under the Constitution.  That is also a binding

5   legal proposition here in these proceedings.

6          Mr. Denbeaux testified about maybe I made some

7   mistakes, maybe I should have done things differently.  That is

8   not something that can be placed at the feet of the agents or

9   the government to suppress otherwise voluntary statements.

10          Judge, it bears noting these are statements relating

11  to extremely serious conduct involving the activities of a

12  terrorist organization to target United States citizens in this

13  city.  This is a man who admitted -- you heard this from

14  Special Agent Shannon and there was some discussion of it

15  yesterday -- he was trained by this organization to resist

16  interrogation, to participate in counterintelligence

17  activities.

18          All of that supports a finding that his testimony was

19  not credible on any of the matters he described, and, second,

20  that this was an intentional ploy by Kourani to try to induce

21  the government to provide benefits he was not entitled to.  I

22  think your Honor made the point this morning, one of the things

23  he seemed to be asking for was for the FBI to rip his children

24  involuntarily out of Canada from the wife.  These were bold,

25  extremely aggressive demands from Mr. Kourani.

1          He engaged in a ploy.  He is now in a situation and

2     should be required to face the consequences of his actions.

3     His voluntary statements about his actions are admissible

4     against him.

5               THE COURT:  Thank you.

6               Mr. Schacht.

7               MR. SCHACHT:  Thank you, Judge.  Your Honor, I agree

8     that the recent <u>Haak</u> decision is controlling here.

9               THE COURT:  That's a great concession.

10              MR. SCHACHT:  Thank you.

11              THE COURT:  Even if I didn't agree, what I do as a

12     district judge with that as a precedent?

13              MR. SCHACHT:  You can do what you want.

14              THE COURT:  Sure.

15              MR. SCHACHT:  Looking at that case is really, really

16     helpful.  I have been doing this 28 years, and I know you have

17     been doing it longer than I have.  I have never, ever seen

18     anything remotely like what happened to my client in this case.

19          I have the <u>Haak</u> decision in front of me.  What the

20     detectives in that case --

21              THE COURT:  Don't exaggerate.

22              MR. SCHACHT:  I'm not exaggerating judge.  I

23     researched this thoroughly.  I found no case like this.  I have

24     read all the cases the government supplied.  There is no case

25     like this, not a published case.

1          In <u>Haak</u>, all the detectives said to the defendant that

2     the defendant alleged made his statements involuntary was, "I'm

3     not trying to screw with you."  They also said they are not

4     trying to make trouble for him.  These were ambiguous,

5     ambiguous statements.  They were nothing remotely like what

6     happened here.

7          What happened here, Judge, is a lawyer had a conver-

8     sation before my client was interviewed and the agents promised

9     confidentiality.  There has been a lot of talk here about

10    whether something is authorized, not authorized.  I think it is

11    very important that we get into the weeds a little bit, Judge.

12    I'm looking at Special Agent Costello, page 91 line 21.  Your

13    Honor brought this out, thank you.

14          "Did you have to check with your superiors?

15          "The witness:  No, I did not, not at that juncture.

16          "The Court:  Why not?

17          "The witness:  I relayed the conversation to my

18    superiors, but I'm authorized, at least on that call, to answer

19    his question."

20          That's talking about the issue.  He was authorized to

21    offer confidentiality.  That's in the record.

22          THE COURT:  I don't get that from that snippet of

23    conversation.  It is clear he wanted confidentiality.  What is

24    ambiguous is the scope of that confidentiality.  Clearly, the

25    confidentiality did not restrict the agents from talking to the

1   supervisors and the supervisors talking to other organs of

2   government.

3            MR. SCHACHT:  Right.  My client had no fear of ICE or

4   the department of state knowing about it.

5            THE COURT:  The promise of confidentiality could mean

6   anything.

7            MR. SCHACHT:  No.

8            THE COURT:  He also was clear as to his fears and his

9   concerns.  And he is also clear as to why he had the meeting.

10  He initiated the meeting.

11           MR. SCHACHT:  Yes.

12           THE COURT:  And initiated the conversations.  And it

13  was not a proffer session, Denbeaux said.  What he wanted was

14  to protect his family from the repercussions of word getting

15  out that he is an informer.  He was afraid that his kids would

16  be killed and that his family would be killed, and he didn't

17  want the confidentiality to be breached.  The government

18  understood that.

19           MR. SCHACHT:  The government did breach it.

20           THE COURT:  How did it breach it?  By arresting him?

21           MR. SCHACHT:  No.  They breached it by making a

22  complaint and a press release and by seeking to introduce in

23  public court, which is what happened here, all these

24  statements.

25           THE COURT:  It's your motion.

1          MR. SCHACHT:  Right, Judge.  That's what my motion

2     says, that these statements must be suppressed.

3          THE COURT:  The press release is not a part of the

4     record in this case.  I can't deal with it.

5          MR. SCHACHT:  I attached it to my motion.  I think it

6     is.  In any event, the point is by arresting him, the

7     indictment is based upon his statements, Judge.  If you look at

8     the complaint when it was unsealed --

9          THE COURT:  As Shannon said, he had opportunity to

10     clear up things.

11          MR. SCHACHT:  Judge, they said he withheld some

12     information.  They promised confidentiality.  Again I would

13     like to read from the transcript.  The confidentiality was not

14     conditional, Judge.  I'm reading from Special Agent Costello,

15     page 89, cross-examination.

16     "Q.  But you didn't say to Mr. Denbeaux that that was a

17     condition or conditional promise, right?  Withdrawn.  I'll

18     rephrase the question.  You didn't say to him that it was only

19     confidential if he tells the truth?  You didn't say that, did

20     you?

21     "A.  No, I did not."

22          Why was this, and why did they eventually arrest him

23     and unseal the complaint?  We agree, on page 167, Agent Shannon

24     said lack of candor on the part of Mr. Kourani.  If they

25     thought he lacked candor or lied about something, if they asked

1   him do you know such and such a person is a terrorist and he

2   lied and said no, perhaps that would be a 1001 violation and

3   then they could indict him for that 1001 violation.

4        But that's not what happened here.  He is not charged

5   with 1001.  He is charged with material support for all the

6   statements that the government is saying, Judge, are truthful.

7   What they are saying is he admitted, according to them, that he

8   was a terrorist, he admitted to doing certain things.  So he is

9   not being prosecuted for his lies, he's being prosecuted for

10  what they say is the truth.

11       The government is not going to stipulate that all of

12  his confession supposedly is false.  Then he wouldn't be

13  arrested.  They're prosecuting him for what they say is the

14  truth.  What they are saying is he didn't say enough, he didn't

15  give us enough.  I have no idea if that is true or not true.

16  But they could charge him with 1001 if he denied something.

17  That's not what happened.  That's why they violated it.

18       Judge, you saw what Mr. Denbeaux's personality is

19  like.  You saw what my client is like.  My client, I say this

20  with some affection for him, he is a difficult guy.  You saw he

21  didn't answer questions very easily.  He's angry.  Do you think

22  he would have sat in the room with the agents handing over that

23  document that says he is not going to be prosecuted without

24  getting a promise, without getting something?

25       They were led to believe that he was not going to be

1    prosecuted.  Really, Agent Shannon almost admits that.  The

2    only reason is because he didn't give them enough.  They were

3    planning all along not really to arrest him.  That's why, when

4    your Honor asked Agent Costello why was it that you didn't say

5    anything about this written document with which you disagreed,

6    the answer was it was more important to us to get the

7    information.  It was a kind of significant national security

8    issue they thought.  They were going to blow by that lawyer's

9    statement that obviously my client sitting there was relying

10   upon, a document that says he's not going to be prosecuted.

11        The government can say it is internally inconsistent

12   and it is not well written and all of that, and I agree.  I

13   said that in my motion.  I think Denbeaux did a horrendously

14   awful job in this case.  I think we can all agree on that.  But

15   my client shouldn't be punished for that.

16        My client sat there looking at a document that says no

17   prosecution.  The fact that that document is crappy shouldn't

18   matter.  In his mind he has a lawyer, he has a law professor,

19   he's sitting in a law school.  How is he to know that there was

20   some disagreement on the part of the FBI?

21        Also, you heard both of the agents say that

22   repeatedly, repeatedly they told him there's no promises about

23   the visas because we don't know how long it can take and there

24   are other agencies and if the other agencies don't do it.  They

25   did not once say we disagree with this document, according to

1    them.

2         I find it hard to believe that in some way they did

3    not convey verbally, by their body language, by simply

4    accepting the document and not arguing about it, in the context

5    of what went on, where they are constantly warning them that

6    there is no promise about immigration benefits, for them to

7    then just take it and say thank you or something like that.

8         That is an agreement.  Remember, it doesn't have to be

9    a binding agreement in court.  I'm not suing under contract

10   law.  It just goes to the issue of voluntariness and what was

11   in my client's mind.  Much more so than the lines the

12   detectives used in <u>Haak</u>, this was a binding promise in my

13   client's mind.  In <u>Haak</u> the detectives just say stuff like

14   "we're not trying to screw with you."  That is a far cry from a

15   document written by a lawyer that says no prosecution in it.

16        Also, you remember Mr. Denbeaux actually says that

17   that whole document is a summary of what had gone on because

18   that was at the second meeting, I believe.  That was a summary

19   of what had gone on at the first meeting.

20        A lot of the language in that document, the Denbeaux

21   document, is unusual.  As I was reading through the transcript

22   last night, I noticed something that I thought was curious and

23   telling and made me think that Denbeaux was telling the truth

24   when he said that was a summary of what they discussed on the

25   first day.

1        Denbeaux uses a very odd phrase that we had some talk

2    about in court the other day.  That's in the middle of the

3    exhibit, where Denbeaux talks about the government wants him to

4    break down various walls.  I was surprised as I was reviewing

5    the transcript because I think that is an unusual express.

6        On page 59 Special Agent Costello says, "I believe I

7    used the phrase 'we've broken down some walls.'"  He was

8    talking about a different meeting, not the first meeting.  I

9    think he was talking about the third or fourth meeting.  But

10   obviously that is an expression that Costello admits using.

11       The fact that Denbeaux used that expression in his

12   document that he made at that time, which I posit is an unusual

13   expression, and that we know that Costello used it in court the

14   other day and said he used it at some of the meetings would

15   tend to support Denbeaux's testimony that that document is

16   actually, as he and Mr. Kourani said, a summary of what went

17   on.

18       Your Honor, I ask you also to disregard what the

19   prosecutor said about what this case is supposedly about

20   according to him.  I don't think it has any or it shouldn't

21   have any legal relevance.  Whether this is a material support

22   case or a drunk driving case or whatever, a petit larceny case,

23   shouldn't have any bearing on the outcome.

24       My client is not alleged to have personally harmed

25   anybody.  In fact, Hezbollah is not alleged, as far as I'm

1    aware, to have ever carried out any kind of attack within the

2    United States.  We heard about attacks in other countries.  I'm

3    not here representing or supporting Hezbollah in the slightest.

4    I just don't think that the issue of the charges should in any

5    way play a role in your decision, your Honor.

6            Thank you.

7            THE COURT:  There are certain fundamental propositions

8    that apply.  It is well-settled that the government may in its

9    discretion make agreements in which it exchanges various levels

10   of immunity from prosecution for the defendant's cooperation.

11   I'll leave out the citations here.  We'll follow this with a

12   written short opinion.

13           In order to specifically enforce a promise made by the

14   government, a defendant must show -- it is the defendant's

15   burden -- (1) that the promisor had actual authority to make a

16   particular promise, (2) that the defendant detrimentally relied

17   on it.  If either part of this showing fails, the promise is

18   unenforceable.

19           The United States is not bound by the unauthorized

20   acts of its agents.  Anyone entering into an arrangement with

21   the government takes the risk of having accurately ascertained

22   that he who purports to act for the government stays within the

23   bounds of his authority.

24           The sole issue in this case is whether Kourani's

25   statements made to the government in these meetings in 2017

1    were voluntary.  Statements are voluntary when they are the

2    product of an essentially free and unconstrained choice by

3    their maker.  One form of involuntariness is giving a statement

4    when it's coerced.  Kourani argues that his statement was

5    involuntary because he was fooled into talking with the

6    government by what he believed was a promise of

7    confidentiality.  It is that part that I have to examine.

8             There are certain facts that shout out about this.

9    Kourani was no fool.  He is a sophisticated man, college

10   educated, college educated in engineering, and someone who has

11   learned how to conduct himself in interviews.  He was fearful

12   that he could not get his kids out of Canada, that his wife

13   might move them to where he could not find them, that he could

14   not get visitation rights for his kids.  He was fearful that

15   his family in Lebanon was vulnerable, that they had already

16   been attacked by Hezbollah, and that they could be attacked

17   again.

18            He knew that he was powerless to accomplish what he

19   wanted.  He was persona non grata in Canada.  Couldn't fly

20   there, couldn't fly to the United States except with

21   difficulty.  He couldn't get into the court system in Canada;

22   and if he did, what would he accomplish?  So he thought that

23   the only way I can do something is to enlist the FBI to help

24   me.

25            He had experience with the FBI in 2016 where the FBI

1   was left with an unsatisfied belief that they could not get the

2   information from him that they really needed, that he was

3   holding back.  Denbeaux's memorandum, which I will talk about

4   in a minute, reflects that proposition, that there was more

5   that Kourani had than he was giving.  The conversations broke

6   off.

7          So Kourani, in order to get the FBI on his side,

8   believing that only they had the power to get his kids into the

9   United States or at least protect them, to get his family into

10  the United States from Lebanon, needed to go to the FBI again.

11  He needed help.  He needed a lawyer to help him.  He needed a

12  lawyer to set up the meetings.  He needed a lawyer the provide

13  cover so that he could go into a confidential area and not be

14  seen going into a government office, and provide a cover of

15  neutrality.

16         He was introduced by a friend in Wisconsin to

17  Professor Denbeaux, whom he had not known before.  He acknow-

18  ledged that he knew that Denbeaux did not have immigration

19  experience or knowledge and would not be useful as an

20  immigration lawyer to help Kourani get his family out of

21  Lebanon, that Denbeaux did not know anything about custody or

22  marital disputes and was not going to be able to help him in

23  any normal way of getting his kids out of Canada or even

24  getting visitation rights for himself.

25         He went to Denbeaux because Denbeaux had a background,

a background of dealing with the FBI.  He represented people at

Guantanamo.  He represented the black panthers.  He knew how to

deal with the government.  He was not afraid of the government

and he would stand up to the government.  At the same time he

was a respected professor at Seton Hall University and he had

many attributes that could be useful to Mr. Kourani, or so I

hold that Mr. Kourani believed.

He went to Denbeaux to set up meetings with the FBI so

that Kourani could tell them something and get them enlisted to

help achieve his goals with his kids and with his family.  In

that sense Denbeaux's memorandum which we have been talking

about, Exhibit 402, is interesting.

He writes in paragraph 5, "The dilemma is that the

government wants his information before making any commitment,

and he wants the protection of the commitment from someone in

authority that his family interest would be protected before he

provides all of this information," meaning he held information,

he was going to give some of that information, but he held back

vital parts.

Denbeaux goes on, "At the present time he has met

once."  That's the first meeting in 2017.  Denbeaux did not

write about or maybe he doesn't even know about the meetings in

2016.  He continues, "He has made clear from his first

utterance the facts that have opened him up as a trustworthy

source of information to protect the United States."

I3srkou2

1          Those are lofty goals.  Denbeaux is trying to work

2    around the proposition that Kourani is holding back vital

3    information, waiting to exchange that for a firmer under-

4    standing that his family can immigrate here and his kids can at

5    least provide visitation rights.

6          Denbeaux goes on in subparagraph (b), "Our government

7    wants him to break down various walls with important

8    information."  Denbeaux writes, "He is willing to do so."  But

9    the walls were there because Kourani wanted to effect a trade.

10   In dealing with this, he was dealing with it in a way that held

11   back vital information that was an essential part of his

12   negotiation.  He wanted the government to commit itself before

13   he would commit himself, and maybe he wouldn't have to commit

14   himself.

15         Denbeaux writes in paragraph 7, "We need to deal with

16   the perception of the power of the agencies involved.  One

17   side," meaning Kourani, "considers the agency to have a great

18   deal of power, and the agency suggests that it has very little

19   power.  That's a big problem," he writes.

20         In paragraph 8, "If it's true that our agency cannot

21   help with important considerations because of lack of power or

22   lack of will, the motivation to continue talking fades.  And

23   that is even truer if the agency has the power but has not

24   committed to using it."

25         It is clear to me, and I so hold, that Kourani

1    believed that the FBI had the power to achieve his goals, he

2    was holding back information, made the pretense that he was

3    willing to trade that information.  But ultimately he didn't.

4    The agency was not delivering to his satisfaction.  The

5    meetings broke down.

6            How to deal with this issue raised by Denbeaux in the

7    first two paragraphs?  He said, "This is not a plea negotiation

8    nor is it proffer of any sort."  Denbeaux knows what a proffer

9    is.  A proffer begins with a lawyer coming in to an Assistant

10   U.S. Attorney and telling the U.S. Attorney what his client

11   will say and wanting to get some kind of immunity in exchange.

12   The government can decide to give immunity based on the proffer

13   of various kinds, immunity of various kinds, or not.  But it is

14   not a proffer.

15           He writes in paragraph 2, "Kourani is not seeking any

16   kind of immunity or protection."  That's a telling proposition.

17   He is not seeking any kind of immunity or protection,

18   protection meaning against criminal prosecution, because

19   Kourani knows he can't get it.  The agents have already made it

20   clear that he can't get it.

21           Then Denbeaux makes this statement.  "Because it has

22   already been agreed he has committed no crime and faces no

23   prosecution."  How does Denbeaux know that?  Nothing in the

24   conversations at the first meeting said that.  Denbeaux agreed

25   that the government did not say anything like that.  This, he

1    said, was his belief and his understanding.

2           But it wasn't based on anything.  It was an assertion

3    by Denbeaux to give whatever protection he thought could be

4    given because Kourani needed the FBI.  He needed the FBI to

5    accomplish his goals of getting his family out of Lebanon and

6    his kids to visit him in the United States.  He thought the FBI

7    could do it, so he wanted to enlist the FBI.  Denbeaux, a very

8    good lawyer despite his protestations that he missed things and

9    didn't know things, was trying to slip in some kind of false

10   protection for his client.

11          In paragraph 4 he writes, "Candidly, all Kourani wants

12   for his cooperation is protecting his family because," in

13   subparagraph (a), "It is fully recognized that the act of

14   cooperation not only endangers him but also his family."

15   Subparagraph (b), "he wants his mother and father moved to this

16   country."

17          Subparagraph (c), "He wants temporary and immediate

18   assurance that his American-born children currently living in

19   Canada will not be moved to any other country than the United

20   States, and he wants custody of his children in the United

21   States.  He may even talk about the witness program."

22          It is Kourani who wanted the FBI to help him.  That's

23   what initiated these meetings and that's what makes his

24   statements to the FBI voluntary.

25          We will dress this up with a more formal opinion that

I3srkou2

1    will come.  Right now the motion is denied because Kourani's

2    statements to the government were voluntary.

3            There are several other parts of the motion.  There is

4    a demand for a bill of particulars and there is a demand for

5    certain information about confidential informants of the

6    government.  The latter will be dealt with at the final

7    pretrial conference.  Mr. Schacht?

8            MR. SCHACHT:  Your Honor, I would just like the record

9    to be complete for any possible future purposes, specifically

10   on the issue of the effective assistance of counsel.  In my

11   opinion, I think in Mr. Denbeaux's opinion currently, I'm sure

12   in the prosecutors' opinion, and I hope in your opinion, we can

13   all agree that this was totally, legally ineffective what

14   occurred here.  Any competent lawyer would have done exactly

15   what everyone here sort of hinted at, which is to call up an

16   Assistant U.S. Attorney and --

17           THE COURT:  Arrange a proffer.

18           MR. SCHACHT:  -- arrange a proffer.  There is no

19   strategic reason, there is no possible reason other than

20   incompetence and malpractice that a lawyer would choose not to

21   do that.

22           THE COURT:  I disagree.

23           MR. SCHACHT:  What possible reason?

24           THE COURT:  This was a strategy that Kourani agreed on

25   because he wanted the FBI's help.  If Denbeaux was going to

1    make a proffer, he was in effect admitting that his client was

2    ready to be prosecuted.  They didn't want to get to that point.

3              MR. SCHACHT:  Judge, my client didn't --

4              THE COURT:  Let me finish.  If Denbeaux recognized

5    that Hezbollah was a terrorist organization and that indeed a

6    crime had been committed earlier, the value that Kourani sought

7    would be eliminated.  The only possible way he could use

8    Denbeaux is the way Denbeaux agreed to be used, and that was to

9    give cover to what Kourani was doing because Kourani needed the

10   FBI and saw no resort other than to get the FBI.

11             MR. SCHACHT:  Judge, that is not the question.  The

12   question is whether the assistance of counsel was effective.

13             THE COURT:  It was effective in getting Kourani the

14   meetings he wanted and allowing him to make an effort to get

15   his family back.

16             MR. SCHACHT:  He didn't need any lawyer for that.

17   They were chasing him around the world and offering him money

18   in Chicago.  He didn't need a lawyer to do that.

19             THE COURT:  You will argue that in a 2255.

20             MR. BOVE:  I want to register, Judge, that the

21   government agrees with the Court's position.

22             THE COURT:  I'm so happy to hear that.

23             MR. BOVE:  Mr. Schacht made a representation about

24   what he felt the government's position was, and he was wrong.

25             THE COURT:  He is an advocate and you're an advocate.

1    I have heard enough of that stuff over 19 years.

2            Bill of particulars.  I don't think you need it.  The

3    complaint is clear.  It doesn't need to have particularization.

4    Evidence does not have to be given by the government at this

5    point in time just because that is what you want.  The motion

6    in all respects is denied.

7            Where do we go from here, Mr. Bove?  Give Mr. Schacht

8    a moment to talk with his client.

9            MR. SCHACHT:  Thank you, Judge.  I'm ready to go.

10           THE COURT:  Are you sure?

11           MR. SCHACHT:  Yes, sir.

12           THE COURT:  Go ahead.

13           MR. BOVE:  The next step in the case, Judge, I

14   anticipate will be motion practice pursuant to the Classified

15   Information Procedures Act.  This was something at the

16   beginning of the case at one of the initial conferences we set

17   aside for later.

18           THE COURT:  Tell me what you envision.

19           MR. BOVE:  I envision at minimum a motion pursuant to

20   section 4 of the Classified Information Procedures Act which we

21   can brief the Court on in camera pursuant to section 2 at a

22   later date when the court information security officer is

23   present.

24           THE COURT:  Tell them in summary what the government

25   has?

1          MR. BOVE:  I'm not in a position at this point, Judge,

2     to preview the government's position.

3          THE COURT:  I don't want to press you at this point

4     because you are not prepared.  So what should be the procedure?

5     Have another meeting?  Call a conference?

6          MR. BOVE:  I think it makes sense to do as much as we

7     can in open court.

8          THE COURT:  The next one should be in open court to

9     establish the procedures that would be followed in camera.

10          MR. BOVE:  Yes, Judge.  To the extent we can have the

11     security information officer present so we can proceed to,

12     pursuant to section 2, brief it as well, I think that would

13     permit a more fulsome discussion.

14          THE COURT:  I have had no experience with the act that

15     you have suggested, but I have had considerable experience with

16     in camera proceedings in the course of the long litigation

17     between the American Civil Liberties Union, the Department of

18     Defense, and the CIA in the context of a Freedom of Information

19     set of demands.

20          My aim in these proceedings is to have as much a

21     public record as is possible without compromising the

22     government's need for secrecy.  So we will have a public

23     conference first to set up the procedures that we will follow.

24     Whether the appropriate official of the Department of Justice

25     is here or not doesn't make any difference because it is going

I3srkou2

1    to be followed -- you might as well have him.  You're right, he

2    should be here.

3         MR. BOVE:  We will certainly notify that person of the

4    date of the next conference.

5         THE COURT:  Let's pick a date.

6         MR. BOVE:  May I have one moment to confer with Mr.

7    Schacht, Judge?

8         THE COURT:  Sure.

9         MR. BOVE:  Thank you, Judge.  Having consulted with

10    Mr. Schacht, the parties request that this next conference

11    regarding scheduling be set out for approximately one month so

12    that the parties have an opportunity to confer and make

13    efficient use of the Court's time when we next meet.

14         THE COURT:  What submissions will you be giving me?

15         MR. BOVE:  In advance of the next conference?

16         THE COURT:  Yes.  I would like to be informed of what

17    the government has in mind and what legal authority it has.

18         MR. BOVE:  That is something we contemplated.  We can

19    put that in, if it would be acceptable to you, a week prior to

20    the conference.

21         THE COURT:  It would.

22         MR. BOVE:  Thank you.

23         THE COURT:  Mr. Schacht may want to respond, so we

24    need to build in time.  I suggest you give yourself the time to

25    submit something to Mr. Schacht, Mr. Schacht will then respond,

I3srkou2

1   and we will have a conference.  Work it out.

2           MR. SCHACHT:  Judge, I don't think I'm going to need

3   to respond to it.  I think he is just going to preview what it

4   is the government wants to do in camera.  If I need to respond,

5   I could just do it verbally in court.

6           MR. BOVE:  I think, Judge, it will most likely just

7   set out the legal propositions at issue and perhaps even be

8   able to be accomplished jointly.

9           THE COURT:  How about a conference on May 1 at 4

10  o'clock?

11          MR. BOVE:  Thank you, Judge.

12          MR. SCHACHT:  That's fine.  Thank you.

13          THE COURT:  Do we need to exclude time?

14          MR. BOVE:  We do, Judge.  The government would move to

15  exclude time until May 1st in order to allow the defendant to

16  continue review discovery, to allow the parties to consult

17  regarding the additional pretrial motions that we have

18  previewed here, and to give an opportunity for the parties to

19  engage in negotiations.

20          THE COURT:  Without objection, Mr. Schacht?

21          MR. SCHACHT:  No objection.

22          THE COURT:  So ordered.  Thank you everybody.

23          (Adjourned)

24

25