USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/26/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

UNITED STATES OF AMERICA,

    -against-

ALI KOURANI,

               Defendant.

------------------------------------------------------------- x

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND FOR A BILL OF PARTICULARS**

17 Cr. 417 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

        On June 28, 2017, defendant Ali Kourani ("Defendant" or "Kourani") was indicted of a number of terrorism-related offenses. *See* 18 U.S.C. 2339B. The core allegation linking all of the charges is that Kourani was a member of, and offered material support to, Hizballah, a designated foreign terrorist organization. The indictment is largely based on a series of non-custodial interviews between Kourani and two FBI agents, Joseph Costello and Keri Shannon. Kourani's then-lawyer, Mark Denbeaux, was present at each of the meetings. Through a series of motions filed on January 1, 2018, Kourani claims that the agents offered him immunity or otherwise indicated that his statements would not be used against him, thereby rendering his statements involuntary. The government claims that no such offer of immunity was given, and any references to "confidentiality" before and during the interviews referred only to keeping the fact of Kourani's cooperation from reaching members of Hizballah, in Lebanon, where members of his extended family resided, and in the United States, where he lived. Kourani had told the agents that Hizballah already suspected that he had been cooperating, had engaged in various acts of intimidation against his family, and threatened to do more.

The Court held an evidentiary hearing on March 26–28, 2018. For the reasons stated on the record and supplemented herein, I find that no such offer of immunity or non-prosecution was made, and that the totality of the circumstances indicate that Kourani's statements were voluntary. The motion is denied.

**Background**

The defendant, Ali Kourani, was born in Lebanon in 1984. He came to the United States in 2003, obtained a Bachelor of Science in biomedical engineering in 2009, and a Masters of Business Administration in 2013. He became a naturalized citizen of the United States in 2009.

Between 2012 and 2016, FBI agents questioned Kourani a number of times on suspicion of being affiliated with Hizballah, the foreign terrorist organization. After their first meeting, Kourani testified that agents provided him with a burner phone in the hopes of convincing him to cooperate. *See* Trans. at 235:11–12. Kourani met with agents in New York City and Chicago numerous times during this period, but the agents came to believe that Kourani was not being completely forthcoming, and communication between the parties ceased by September 2016.

In their testimony, agents Costello and Shannon described two meetings with Kourani that are particularly relevant to the disposition of defendant's motion. First, in August 2016, Agent Joseph Costello met with Kourani at the United States embassy in Beirut, Lebanon.[1]

---

[1] The parties dispute how this meeting came about. Agent Costello testified that he went to Beirut after Kourani entered a United States embassy and asked to speak with someone from the U.S. government. *See* Trans. at 11:3–6. Kourani testified that he went to the U.S. embassy to seek aid after a conflict with his extended family, and when he arived consular officials confiscated his passport and asked him to return the following week to collect it. Kourani claims that when he returned, he was questioned by Agent Costello and two other agents about his involvement in Hizballah. Eventually, Kourani claims, his passport was returned and he was allowed to fly back to the U.S. *See* Trans. at 246:11–249:18.

Kourani told Agent Costello that he had been involved in a child custody dispute the previous month that escalated into a dangerous altercation between himself and members of his wife's family, many of whom were affiliated with Hizballah. As a result of the altercation and ensuing attack, his wife and children fled to Canada. But Kourani denied having any personal involvement with Hizballah, and Agent Costello told Kourani that unless he was willing to cooperate fully, the FBI would not assist him with his family dispute. The parties reached an impasse, and the interview was terminated. Second, upon his return to the United States in September 2016, Agent Shannon met with Kourani at Newark International Airport and questioned him about his involvement in Hizballah. Agent Shannon told Kourani that this was his last chance to cooperate, but Kourani continued to deny having any affiliation with Hizballah. Kourani testified that he cut off all communication with the FBI at that time.

When he returned to the United States in the fall of 2016, Kourani's family situation began to deteriorate. He was fearful that he could not remove his children from Canada, where they lived with their mother, and would not receive visitation rights. He was also fearful that his family in Lebanon was vulnerable, for they had been attacked by members of Hizballah at least once. As a result of his worsening family situation, and believing that the FBI alone could help him, Kourani decided to arrange a meeting with the FBI. To facilitate his cooperation, Kourani was introduced through a mutual acquaintance to Mark Denbeaux, an experienced criminal defense lawyer and law professor at Seton Hall Law School, who agreed to represent him. Kourani was attracted to Denbeaux because he had experience working with the FBI,[2] even though he had no experience in immigration or family law, the subjects touching

---

[2] Denbeaux had represented detainees held at Guantanamo Bay Detention Camp. Previously he had represented black panthers. Kourani hoped that Denbeaux's experience in representing controversial clients in negotiations with the FBI could be utilized to resolve his immigration and child custody disputes.

3

upon his needs. Kourani believed that, using Denbeaux's skillset with the FBI, he could trade his knowledge of Hizballah agents and plans for effective assistance in moving his family from Lebanon to the United States, and improve his chances of custody, or at least visitation, regarding his children in Canada.

Denbeaux contacted Agent Shannon on February 28, 2017, identified Kourani as his client, and told the agents that his client "wish[ed] to speak with the FBI." Declaration of Mark Denbeaux, ECF 28, at ¶ 2. The parties apparently had difficulty setting a date for the interview, and the next substantive discussion came during a March 22, 2017 call between Denbeaux and Agents Costello and Shannon. On the call, Denbeaux explained to the agents that Kourani "was very nervous about his and his family's physical safety should anyone find out that he was talking to the FBI." *Id.* In response, the agents told Denbeaux that any meetings between Kourani and the FBI would "remain confidential." *Id.* The meaning of the term "confidential" has since been disputed, but the agents, Denbeaux, and Kourani all testified that the promise of confidentiality related *solely* to keeping Kourani's cooperation from leaking to the Lebanese community, both in the U.S. and abroad. More generalized confidentiality, or immunity, was never discussed.

After the initial conversation between Denbeaux and the agents on March 22, 2017, Kourani participated in five non-custodial interviews with the FBI on March 23, April 3, April 5, April 14, and April 26. All meetings took place at Seton Hall Law School where, it was thought, there was less chance of arousing the suspicion of Hizballah.[3] It is undisputed that before, during, and after each of these meetings, the agents explained to Kourani that they were not authorized to make any promises or guarantees about potential benefits for Kourani's

---

[3] Agents Costello and Shannon also had a number of phone conversations with Denbeaux during this time, largely to coordinate future in-person meetings.

4

cooperation. This understanding was confirmed by Denbeaux through a text message, which stated "I understand that you can't promise or guarantee." Gov't Ex. 301.[4] Consistent with this representation, the agents testified that they never promised Kourani any of the benefits he sought. For instance, while the agents told Kourani that they would use their best efforts to secure certain immigration benefits for his family, including bringing his children from Canada to the United States by the end of the summer of 2017, the agents and Denbeaux credibly testified that the agents told Kourani that they could not make any specific promises about the success of any of their efforts.

Much of the dispute in this case centers on a memorandum drafted by Denbeaux and handed to Agents Costello and Shannon immediately before the second interview began on April 3, 2017. The document stated in relevant part: "[Kourani] is not seeking any kind of immunity or protection, because as it has already been agreed, he has committed no crime and faces no prosecution." Gov't Ex. 703. After receiving this document from Denbeaux, agents Costello and Shannon stepped out into the hall to confer. They reviewed the documented briefly, determined that it did not accurately capture the understanding of the parties, returned the document to Denbeaux without comment, and proceeded to interview Kourani.

As the meetings went on, the agents again became convinced that Kourani was holding back vital information. The meetings were ended, and Kourani was arrested on June 1, 2017, charged with providing material support to a foreign terrorist organization. Kourani's statements were important to the government's case. Kourani now makes this motion, challenging the admissibility of his inculpatory statements.

---

[4] While this affirmation related primarily to immigration benefits, the larger implication—that the agents could not make any specific promises or guarantees—was reiterated dozens of times and was intended to apply broadly to any benefit that Kourani might seek.

5

## Discussion

### A. Specific Enforcement

Kourani first attempts to specifically enforce the alleged offer of immunity as a matter of contract law. Even if such an offer of immunity had been made—and I find that it was not—Kourani cannot specifically enforce it.

"It is well settled that the government may in its discretion make agreements in which it exchanges various levels of immunity from prosecution for the defendant's cooperation." *United States v. Aleman*, 286 F.3d 86, 89 (2d Cir. 2002). Courts interpret such agreements "according to the principles of contract law," and "construe [them] strictly against the government in recognition of its superior bargaining power." *Id.* at 90. It is also clear that immunity agreements may be made orally, *see id.* at 89, but the defendant bears the burden of proving the existence of such an agreement, *see United States v. Rosario*, 237 F. Supp. 2d 242, 245 (E.D.N.Y. 2002) (collecting cases).

To specifically enforce a promise made by the government, a defendant must show (1) "that the promisor had actual authority to make the particular promise," and (2) "that he (the defendant) detrimentally relied on it." *United States v. Rudaj*, No. 04 CR. 1110 (DLC), 2005 WL 2508404, at *2 (S.D.N.Y. Oct. 11, 2005) (internal quotation marks omitted) (quoting *United States v. Flemmi*, 225 F.3d 78, 84 (1st Cir. 2000)). "If either part of this showing fails, the promise is unenforceable." *Id.* (internal quotation marks omitted) (quoting *Flemmi*, 225 F.3d at 84). As the Second Circuit has explained in a related context, "it is axiomatic that the United States is not bound by the unauthorized acts of its agents," and "[w]hatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk

6

of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *See Doe v. Civiletti*, 635 F.2d 88, 96 (2d Cir. 1980).

Applied here, it is undisputed that Agents Costello and Shannon lacked actual authority to make an offer of immunity, and they made that clear to Kourani and Denbeaux. Such offers can be conferred only by the Department of Justice, and Denbeaux testified that he never met with anyone other than Agents Costello and Shannon, nor did he understand that the agents had secured authorization to offer Kourani immunity from the U.S. Attorney's Office at any time during the series of interviews. Because the agents lacked authority to make an offer of immunity, Kourani cannot specifically enforce it.

### B. Voluntariness

Kourani's primary argument is that the conduct of the FBI agents in this case rendered his statements involuntary under the Due Process Clause of the Fifth Amendment. For the reasons that follow, I find that his statements were voluntary, and the defendant's motion to suppress is denied.

"When, as here, a defendant seeks to suppress non-custodial statements made to law enforcement authorities, the single issue before the court is whether the statements were voluntary, *i.e.*, the 'product of an essentially free and unconstrained choice by [their] maker,' or coerced by police activity in violation of constitutional rights not to incriminate oneself and due process." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (internal citations omitted) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).

"While 'coercive police activity' is a 'necessary predicate' to holding a confession constitutionally involuntary, a finding that police conduct is 'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render the

7

confession involuntary." *Id.* (first quoting *Colorado v. Conelly*, 479 U.S. 157, 167 (1986), and then quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)). The core question is whether, in "the totality of the surrounding circumstances . . . the defendant's will was overborne by the" agents' conduct. *Id.* In reviewing the surrounding circumstances, I must consider "(1) the accused's characteristics, (2) the conditions of the interrogation, and (3) the conduct of the police." *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003). To prevail on a claim of "trickery and deception," as Kourani has raised here, it must be shown "that the [FBI] agents affirmatively misled [him] as to the true nature of [their] investigation." *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) (internal quotation marks omitted) (quoting *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987)).

The Second Circuit's recent decision on this issue in *United States v. Haak* is instructive. In *Haak*, the defendant was charged with possession with intent to distribute a controlled substance resulting in death, in violation of federal narcotics laws. *Haak*, 884 F.3d at 402–03. The charges were based largely on the defendant's statements in a non-custodial, video-recorded interview at the police station. *Id.* During the interview, the officers "were dressed in casual street clothes with no weapons visible," and the defendant "was not handcuffed or otherwise restrained." *Id.* at 403. After the defendant admitted that he had sold the victim the drugs that killed him, the detective pushed him to reveal his drug supplier, telling him: "I'm not looking to mess with you, I'm not looking to come after you, but you gotta get on board or you, you shut your mouth and then the weight of the federal government is gonna come down on you." *Id.* at 405. The officer went on, warning the defendant, "Either you can get on board, put the team jersey on here, play for this team, or you can be on the losing team." *Id.* The district court found that the detective's comments created an offer of immunity, rendering the

8

defendant's statements involuntary and therefore inadmissible. *Id.* at 407–08. But the Second Circuit reversed, holding that "neither the words spoken by [the detective] nor the context in which he spoke them communicated a *clear and unmistakable promise of immunity in return for cooperation.*" *Id.* at 413 (emphasis added). Without the alleged offer of immunity, the Court held that the totality of the circumstances did not warrant suppression. *Id.* at 414–16.

1. Characteristics of the Accused

Applying the framework outlined above, I must first consider the characteristics of the accused. Ali Kourani is 33 years old and has an advanced educational background, having obtained a Bachelor of Science in biomedical engineering in 2009 and a Masters of Business Administration in 2013. He is intelligent and well educated, which cuts against a finding that his statements were involuntary. *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (holding that statements voluntary where, "there [was] nothing in the record to indicate that [defendant] lacks maturity, education or intelligence" and considering the defendant's "familiarity with police questioning").

Kourani understood the situation he faced and had some level of familiarity with the FBI. He had previously been offered (and rejected) a written confidentiality agreement in 2016, indicating that he was at least aware that he could obtain a formal agreement from the agents. He behaved strategically, seeking a meeting with FBI agents when his situation made doing so in his best interest, and he sought out Denbeaux knowing that he had no expertise in immigration or family law and could help him only insofar that he wanted the FBI's help to resolve his immigration problems. There is nothing in the record to indicate that Kourani was particularly susceptible to coercion.

9

2. Conditions of the Interviews

Second, in assessing the voluntariness of Kourani's statements I must consider the conditions of the interviews. This factor also cuts against defendant's motion. It is undisputed that Kourani was not in custody during the interviews, which took place in a conference room at Seton Hall Law School, rather than at an FBI facility. Kourani was assisted by a smart, experienced counsel, with a deep background of representing controversial defendants and negotiating with the FBI and prosecutors. Kourani was unrestrained throughout the interviews, *see Parsad v. Greiner*, 337 F.3d at 184; *Green v. Scully*, 850 F.2d 894, 902–03 (2d Cir. 1988), and the agents were dressed in business attire and never displayed their firearms, *see Haak*, 884 F.3d at 415. And it was Kourani who reached out to the FBI to set up the interviews, which took place over the course of several weeks, giving his attorney ample time to withdraw Kourani from the process. The conditions of the interview could hardly be deemed coercive, and I find that this factor also weighs against a finding of involuntariness.

3. Conduct of the Officers

Finally, I must consider the conduct of the law enforcement officers. Kourani claims that the FBI agents offered him immunity or otherwise indicated, either to him or to his lawyer, that his statements would not be used against him. Based on the testimony given at the evidentiary hearing and the sworn affidavits submitted by Kourani and Denbeaux, I find that no such offer of immunity or non-prosecution was made, and Kourani's statements were voluntary.

Kourani's motion is based on two related arguments, neither of which has merit. The first is an attempt to transform the agent's promise of "confidentiality" into an offer of immunity or non-prosecution. As a legal matter, at least one court in this district has held that generalized promises of confidentiality are of a different character than offers of immunity. *See*

*Rudaj*, 2005 WL 2508404, at *3 (noting that the First Circuit had observed in *Flemmi* that "[a] promise of confidentiality and a promise of use immunity are separate and distinct assurances" (internal quotation marks omitted) (quoting *Flemmi*, 225 F.3d at 88)). The Ninth and Eleventh Circuits, however, have indicated in passing that *generalized* promises of confidentiality can render a defendant's statements involuntary. *See Valenzuela v. United States*, 286 F.3d 1223, 1230 (11th Cir. 2002) (stating that the Court would not "countenance the Government's conduct"); *United States v. Brooklier*, 685 F.2d 1208, 1217 (9th Cir. 1982) (stating in dicta that "[s]tatements made in confidence are not immune absent an unconditional promise of confidentiality"). The Second Circuit has not written on the issue.

I need not resolve this dispute. As I have already explained, the only plausible interpretation of the agents' promise of "confidentiality" is that it related *only* to keeping Kourani's cooperation from reaching members of the Lebanese community, in the U.S. and abroad. It was not intended as an offer of immunity or non-prosecution, nor was it understood as such by Kourani or by his lawyer.[5] Kourani's argument that the agent's promise of confidentiality renders his statements involuntary fails.

Although Kourani attempts to weave the alleged promise of confidentiality throughout his claim, his motion ultimately relies on a document drafted by Denbeaux and

---

[5] The testimony of the agents, Denbeaux, and Kourani confirm that "confidentiality" in this context had a more restricted meaning than Kourani now advances. Agents Costello and Shannon testified credibly that this promise related only to confidentiality from the Lebanese community. *See, e.g.*, Trans. at 77:16–19, 88:16–89:2. Denbeaux confirmed that Kourani requested confidentiality because he was concerned for his family's safety "[i]f he cooperated with the FBI." *Id.* at 218:7–13. And Kourani testified that he wanted "strict confidentiality" because he did not want members of the Muslim community to see him with FBI agents. *Id.* at 257:15–22. Kourani also testified that confidentiality was important in ensuring his safety because he had "already seen what those militias are capable of." *Id.* at 277:3–9. Moreover, during the series of interviews that followed, the agents made clear that in order to seek the immigration benefits Kourani demanded in exchange for his cooperation, they would have to reveal the fact of his cooperation with other government entities. In sum, it is clear that all parties understood the term "confidentiality" to refer only to keeping the fact of his cooperation confidential from the Lebanese community.

11

provided to the agents at the start of their second meeting on April 3, 2017. That document, identified here as Government Exhibit 703,[6] purports to be Denbeaux's "status report," outlining the progress of the first meeting and identifying areas of concern moving forward. As explained below, Kourani relies heavily on paragraph 2 of the memorandum, which states in substance that Kourani was not seeking immunity because it had already been agreed amongst the parties that he was not the subject of the FBI's investigation.

So what to make of Denbeaux's memorandum? Much of it confirms the testimony of the agents, Denbeaux, and Kourani himself. Paragraphs 3 and 4 of the document explain that Kourani was "cooperating with his country because" the agents "believe that he possesses important and valuable information and he is willing to share." Gov't Ex. 703, at ¶¶ 3–4. But to do so, Kourani wanted protection for his family—he wanted assistance moving his father and sister from Lebanon to the United States, and he wanted to obtain custody of his children in the United States. *Id.* at ¶ 4.

The memorandum also outlines "[t]he dilemma," as Denbeaux calls it. *Id.* at ¶ 5. Denbeaux writes that "the government wants his information before making any commitment and he wants the protection of a commitment with someone in authority that his family interests will be protected before he provides all his information." *Id.* Meaning, in essence, that Kourani was holding back vital pieces of information in order to secure the benefits he sought. Denbeaux goes on to say that the "government wants him to break down various 'walls' with important information," and that Kourani "is willing to do so." *Id.* at ¶ 5(b). But, writes Denbeaux, Kourani is frustrated that he is similarly "facing 'walls' when talking to" the agents that "need to be broken down as well." *Id.* at ¶ 5(c). Specifically, Denbeaux writes that Kourani is frustrated

---

[6] Denbeaux's memorandum was introduced twice during the evidentiary hearing as Gov't Ex. 402 and 703. For consistency, I refer to the document as Exhibit 703.

12

that those interviewing him "require approval from higher ups," and that the parties had a divergent perspective of the power of the FBI. *Id.* at ¶ 6–7.[7] Finally, Denbeaux goes on to say that, "If it is true that our agency [cannot] help with important considerations because of lack of power or lack of will[,] the motivation to continue talking fades." *Id.* at ¶ 8. These paragraphs of Denbeaux's memorandum largely confirm the testimony adduced at the evidentiary hearing. Denbeaux was trying to work around the proposition that Kourani was holding back vital information, waiting to exchange it for a firmer commitment that his family could immigrate to the United States and he could establish a relationship with his children. But he wanted the government to commit itself before he committed himself, and when these issues were not resolved, the meetings broke down and Kourani's arrest followed.

Kourani's motion to suppress is largely based on the first two paragraphs of Denbeaux's memorandum. The first states that "[t]his is not a plea negotiations [sic] nor is it a proffer of any sort." *Id.* at ¶ 1. Based on his testimony, it is clear that Denbeaux knew how a proffer session worked, and he did not believe he was seeking immunity from the U.S. Attorney's office. *See* Trans. at 212:22–214:10. In paragraph 2, on which Kourani relies most heavily, Denbeaux writes that Kourani "is not seeking any kind of immunity or protection, because as it has already been agreed, he has committed no crime and faces no prosecution." Gov't Ex. 703, at ¶ 2. Denbeaux testified that this statement was based on a "premise," laid out at the beginning of Kourani's cooperation, that "nothing [Kourani] said [would] be used in any way against him because he wasn't a target and there was no criminal risk at stake." Trans. at 188. As explained above, Denbeaux handed this memorandum to the agents at the beginning of the second meeting. The agents reviewed the document outside of the interview room, and

---

[7] According to Denbeaux's memorandum, Kourani believed that "the agency [had] a great deal of power," while "the agency suggest[ed] that it [had] very little power." *Id.* at ¶ 7.

13

despite believing that it did not accurately characterize the parties' understanding, they decided to return the document without comment. Kourani argues that the Court should imply from this document and the agent's silence that he was effectively offered immunity, making any subsequent statements he made involuntary.

I find it implausible that paragraph 2 of Denbeaux's memorandum was an accurate representation of the parties' understanding, and I decline to read it as a conferral of immunity. In paragraph 2, Denbeaux writes that Kourani "is not seeking any kind of immunity or protection." Gov't Ex. 703, at ¶ 2. This is a telling proposition. Kourani was not seeking any kind of immunity because he knew he could not get it. The agents had made it clear that specific benefits or promises were off the table until Kourani cooperated fully. Denbeaux next writes that Kourani was not seeking immunity "because as it has already been agreed, he has committed no crime and faces no prosecution." *Id.* But how could Denbeaux know this? Denbeaux admitted during his testimony that the agents never told him or his client that Kourani was not the target of the FBI's investigation. I find that this portion of the memorandum was an assertion by Denbeaux intended to "boot-strap" his effort to obtain some level of protection for Kourani in relation to his desperate efforts somehow to bring his endangered family to the United States. He knew that he had to reveal inculpatory information to the FBI, for the FBI, he believed, presented the only viable way to help his family. Denbeaux testified that he knew that Kourani was a member of Hizballah, a terrorist organization, before the meetings began. And in the March 23 meeting, the first of five, Kourani admitted to being a member of Hizballah and to receiving military training by the terrorist wing of Hizballah in Lebanon. To then state that "it has already been agreed . . . that he has committed no crime and faces no prosecution" reflects not a promise, but a skilled lawyer's effort to color the event. *Id.*

14

Agents Costello and Shannon made it clear throughout the interviews that they could not promise to meet any of Kourani's demands.[8] The agents reiterated numerous times that they could not make any specific promises or guarantees because they would have to obtain the approval of their superiors and the assistance of other administrative agencies—namely the immigration authorities—to meet Kourani's demands. And Denbeaux acknowledged as much in writing via text message. *See* Gov't Ex. 301 (stating "I understand that you can't promise or guarantee"). The agents never offered immunity, and both Denbeaux and Kourani knew that they lacked the authority to offer immunity. These facts are undisputed, and they undermine Kourani's claim that he could have reasonably believed he was offered immunity or non-prosecution.

Even if the Court were to take Denbeaux's memorandum on its face, the document and the conduct of the agents is a far cry from the "clear and unmistakable promise of immunity in return for cooperation" required by the Second Circuit. *Haak*, 884 F.3d at 413. The memorandum explicitly states that Kourani was "not seeking any kind of immunity or protection." Gov't Ex. 703, at ¶ 2. The crux of Kourani's motion hinges on the notion that he was not seeking immunity because it had already been agreed that Kourani was not the subject of the FBI's investigation. But neither Denbeaux nor Kourani could identify any *specific* statements made by the agents that could reasonably have been understood as such an agreement. Neither Denbeaux's memorandum, nor the agent's silence after reading it, reflects a clear and unmistakable offer of immunity attributable to law enforcement officers.

I find that the totality of the circumstances indicate that Kourani's non-custodial statements were voluntarily made. As the Second Circuit held in *Haak*, "[i]n the absence of a

---

[8] Kourani made a number of demands during the interviews, including immigration benefits for his father and sister, assistance with a child custody dispute, and help finding a high-paying job.

15

false promise of immunity, there is no . . . support in the totality of circumstances for [a] suppression order." *Haak*, 884 F.3d at 414. The same is true here. Kourani, a well-educated and sophisticated actor, initiated the meetings with the FBI, and the agents' conduct does not rise to such a level that the defendant's will was overborne, *see Anderson*, 929 F.2d at 99, nor did the agents "communicate[] a clear and unmistakable promise of immunity in return for cooperation." *Haak*, 884 F.3d at 413. The motion to suppress is denied.

## C.  Discovery Disputes

Kourani also seeks a bill of particulars from the government under Federal Rule of Criminal Procedure 7(f). Under Rule 7(f), a district court may require the government to file a bill of particulars when it is necessary to explain the nature of the charges against the defendant, to allow him to prepare for trial, and to prevent unfair surprise. *See Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). The decision to grant a request for a bill of particulars is within my discretion. *Id.* Generally, no bill of particulars is required where the information sought by the defendant is provided in the indictment or in some other acceptable form, and it is well-settled that a bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001).

The government has already provided substantial pretrial disclosure, including a detailed 21-page complaint, judicial applications for search warrants, and other narrative descriptions of evidence not set forth in the complaint. *See* Declaration of Emil Bove, ECF 31, Exs. D, F, G. The government has also produced 30 reports prepared by FBI agents relating to the investigation. This is sufficient. Because the "[a]cquisition of evidentiary detail is not the

16

function of the bill of particulars," *United States Torres*, 901 F.2d 205, 234 (2d Cir. 1990), defendant's motion is denied.

Kourani also moved the Court to require the Government to reveal the identity of any informants in the case. As I stated on the record, this issue will be addressed at the Final Pretrial Conference.

**Conclusion**

For the reasons stated on the record and supplemented herein, defendant's motion to suppress his statements is denied. The clerk is instructed to terminate the motions (ECF 19, 20, 22, 25).

SO ORDERED.

Dated: April 26, 2018
New York, New York

/ALVIN K. HELLERSTEIN
United States District Judge