IA33KOUC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                        17 CR 417 (AKH)

5   ALI KOURANI,

6                Defendant.

7   ------------------------------x

8                                     New York, N.Y.
                                      October 3, 2018
9                                     3:00 p.m.

10

11  Before:

                    HON. ALVIN K. HELLERSTEIN,
12
                                            District Judge
13

14                        APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    EMIL BOVE
17  AMANDA HOULE
         Assistant United States Attorneys
18
    ALEXEI SCHACT
19       Attorney for Defendant

20  ALSO PRESENT:  FBI Special Agent Joseph Costello
    FBI Special Agent Keri Shannon
21

22

23

24

25
```

1          THE COURT:  Good afternoon.

2          THE DEPUTY CLERK:  U.S. v. Kourani.  Counsel, please

3    state your appearances for the record.

4          MR. BOVE:  Good afternoon.  Emil Bove and Amanda Houle

5    for the government.  And we have with us Joe Costello and Keri

6    Shannon from the FBI.

7          MR. SCHACT:  Good afternoon.  Alexei Schact for

8    Mr. Kourani.

9          THE COURT:  We have an application for bail.

10   Mr. Schact, do you want to present?

11         MR. SCHACT:  Thank you, your Honor.  I know you sat

12   through the suppression hearing, obviously, and you know the

13   facts of the case quite well.  I just want to start by

14   saying --

15         THE COURT:  Thank you for the flattery.

16         MR. SCHACT:  It's truthful flattery.  It is not

17   dishonest flattery.

18         THE COURT:  Don't feel inhibited in any way.  Tell me

19   what you want to tell me.  Don't assume I know.

20         MR. SCHACT:  Okay.  This case, your Honor, I

21   suspect -- I know it's not like any other case I've ever had.

22   I suspect it's not like any other case that you ever had, just

23   in terms of the basic fact pattern.  And I think the fact

24   pattern is part of the reason why you should grant my client

25   bail.

1    As you'll recall, my client was the one who approached

2  the FBI with his lawyer at the time, Mark Denbeaux.  That fact

3  in and of itself is obviously unusual, obviously in a case of

4  this sort.  It's not the case that I've been involved with,

5  where there is someone, typically, someone involved in the drug

6  business who wants to be an informant and approaches the

7  government.  It is relatively unusual that someone who ends up

8  facing these sorts of charges alleging material support for a

9  terrorist organization approaches the government.

10    He approached the government.  He had about five

11  meetings or five meetings in which there are alleged to be

12  statements in which he essentially confessed to the crime,

13  according to the complaint.  Those statements happened in about

14  2017.  The complaint, the indictment, alleges that the criminal

15  conduct ended in about 2015.  So that the alleged conduct here

16  is now several years old.

17    My client approached the government.  After the first

18  meeting, and after actually all five meetings with the agents,

19  after he had confessed, they say, they let him leave each

20  meeting.  And so, obviously, in the minds of the government,

21  and I think this is a reasonable supposition, they believed he

22  was not so dangerous that he needed to be arrested.  Otherwise,

23  they would have arrested him.

24    Now, of course there came a time where they arrested

25  him, and that's why we're here.  But, if he had truly been so

1   dangerous, such a threat to the public, that he needs to be

2   detained on bail, I submit to you that they would have arrested

3   him after the first meeting.  Or the second or the third or the

4   fourth.  Even after the fifth meeting, they didn't arrest him.

5   I don't remember the exact time period, but it was at least a

6   month until they did finally arrest him.  So, that fact alone I

7   think counters their claim that he poses some kind of a threat

8   to the people of the United States.

9            Another factor regarding flight, your Honor, is for

10  the same reason, he is not really a flight risk.  That again

11  gets to the unique facts here.  As you know, the reason he

12  approached the government is because he wanted help to ensure

13  his children's safety in the United States, and his father and

14  sister who were in Lebanon.  So what he was looking for --

15            THE COURT:  There's three points to this.  I think his

16  wife and children were in Canada.

17            MR. SCHACT:  Yes.

18            THE COURT:  His father, other members of his family

19  were in Lebanon.

20            MR. SCHACT:  Correct.

21            THE COURT:  And he was in Chicago.

22            MR. SCHACT:  He was between the Midwest and New York

23  at different times, yes.  He was in the Midwest and New York.

24  And he wanted them to be safely in the United States.

25            So, hypothetically, your Honor, if he got out on bail

1  now, his only other ties, other than in the United States and

2  he is a citizen, are either where his wife and children are in

3  Canada, or in Lebanon.

4      And we know from the facts in the case that he can't

5  flee to Lebanon, especially now after all of this has been made

6  public.  I think it's fair to say that he would be killed by

7  Hezbollah if he went to Lebanon, because it's now public

8  information that he approached the FBI to talk about Hezbollah

9  in exchange for help with his family being safe.  And so, he

10  literally can't go to Lebanon.

11      Now, of course, he could go hypothetically to France

12  or Japan or Argentina or some other place.  But, he doesn't

13  have any ties to those places.  He would be under house arrest.

14  He wouldn't have a passport.  He doesn't have the means to go

15  anywhere, other than, arguably, Canada or Lebanon, and he can't

16  go to Lebanon, and Canada would not be a safe location in the

17  mind of a fleeing defendant, because, of course, they are a

18  close ally of the United States.

19      And by the way, I should say if he were allowed out on

20  bail, and when I say "out" I mean under house arrest, with

21  strict pretrial detention and home confinement and electronic

22  monitoring.  He would be willing to sign an extradition waiver

23  so if he could hypothetically go to Canada, he could easily be

24  returned.

25      The government's arguments to the contrary, I think a

1    lot of it weighs on what they call the strength of the case

2    because my client confessed.  On that point, I think the

3    evidence is not as strong as the government would have you

4    believe.

5          The recordings here -- withdrawn.  I should say the

6    statements here are not recorded.  So that, what happened

7    between my client and the agents is the subject of some

8    dispute.  And I know from my experience myself, I was a

9    prosecutor for five years in the state court, I was an

10   assistant DA in Manhattan from '89 to '95, and in the state

11   court system, there's many more of these cases where it is

12   essentially a confession-only type of case.  I don't see these

13   too often in the federal court system.  And I know from my own

14   experience where the whole case rests upon the statements of

15   the defendant, and small pieces of corroborating information,

16   these are very, very difficult cases for the government to

17   prove for the simple reason that juries don't like them.

18   Nothing is recorded, it is not clear what was said.  Even if

19   notes were taken, you have to rely upon several layers of what

20   I would consider to be unreliable evidence.

21         First of all, they would have to assume that my client

22   is reliable.  So the government has to make the argument that

23   my client was honestly and reliably making statements.  If what

24   he was saying was not honest and reliable, then, of course, he

25   can't be convicted.  Because if he's not honest and reliable,

1   there is no case.

2           Then the agents have to be honest and reliable.  And

3   by honest and reliable, I don't mean that they're necessarily

4   going to come to court and fabricate stories.  I don't think

5   they would do that.  But, everybody's memory and everybody's

6   way of testifying is such that they come to court with a bias.

7   Just as I have a bias today.  My bias is obviously in favor of

8   my client.  The government witnesses' bias, of course, is in

9   favor of convicting my client.  Juries know that.

10          And through those different layers, there is so much

11  room for reasonable doubt, especially where, as here, the

12  corroboration, I submit to you, is quite weak.

13          And it is not a trial, I'm not going to get into it

14  too much, but you know from the government's submission that

15  they claim that the corroboration for my client's statements

16  amounts to different kinds of digital or electronic proof.  My

17  client made some internet searches that supposedly show that

18  he's somehow guilty.

19          I submit to you, your Honor, that people who search

20  things on the internet are not necessarily guilty of crimes.  I

21  have a 20 and a 15-year-old son.  Some of their internet

22  searches horrify me.  I don't think that makes them terrorists

23  or even criminals.  I don't think if my client looked up a

24  firearm on the internet, which might in and of itself even be a

25  legal firearm, that in any way corroborates the fact that he's

providing material support to a terrorist organization.  It is just too huge of a leap, and it's not rationally related to what's occurring.

Now, if they had some proof in the form of e-mails or text messages or WhatsApp messages that show my client either receiving or sending messages about actual terrorist activity, that might be different.  But, so far, at least in the evidence that I've gotten in discovery, there is no such proof.

The proof amounts to generalized searches that any person, innocent or guilty, might make.  And doesn't confirm the detailed statements that they claim he made.

So, for those reasons, your Honor, I think some reasonable amount of bail, with home confinement and electronic monitoring, in this case, is reasonable.  It can't be that simply because he's charged with material support to a terrorist organization he must be detained.  Otherwise Congress would make the law that anyone facing these charges is automatically detained, and I don't even have a right to seek bail.  So if he's not bailable, I don't know who else facing these kind of charges would be bailable.

Thank you.

THE COURT:  Mr. Bove.

MR. BOVE:  Thank you, Judge.  If I could, I'd like to start where Mr. Schact started with what he called the basic fact pattern, and talk a little bit about the legal framework

1  and address some of the arguments made today.

2          The basic fact pattern, Judge, is that the defendant

3  was an operational terrorist here in the city who was part of a

4  sleeper cell surveilling targets, including a building across

5  the street.  And that he did that, and then he admitted to it

6  five times, in five separate meetings.

7          Under those circumstances and everything that follows

8  from it, this is a man that should be detained pending trial.

9  The Bail Reform Act requires that.  And we start here with the

10  presumption, because of the charges, that he is to be detained.

11  And the defendant has a burden right now of not just

12  criticizing the government's case but --

13          THE COURT:  What's the statutory basis for the

14  presumption?

15          MR. BOVE:  It's 18 U.S.C. 3142(e)(3).

16          THE COURT:  Which subtitle?

17          MR. BOVE:  Paragraph (B), Judge, says that the

18  presumption applies with respect to an offense under Section

19  924(c).  There is a conspiracy charge in this case to violate

20  924(c).  That's Count Five.

21          In addition, subparagraph (C) basically refers to

22  crimes of terrorism, also give rise to the presumption, and

23  here, the specific crimes that give rise to that presumption

24  are Counts One and Two, violations of the material support

25  statute, and Counts Three and Four, relating to defendant's

1    efforts to obtain military-type training.

2         So, the defendant has a burden to actually put

3    evidence in front of you, Judge, that demonstrates that he is

4    not a flight risk, and not a danger to the community.  And that

5    burden requires more than previewing his cross-examination of

6    the special agents who are here to my right, and he hasn't met

7    that burden.

8         The factors that relate to bail under this statute,

9    all of them support continued detention.  The charges are very

10   serious.  I don't think there is much dispute about that.  The

11   defendant in total faces a statutory maximum of life

12   imprisonment.  There is a dispute, obviously, about the

13   strength of the evidence, and I'll get to that in a moment.

14        The defendant's personal history and characteristics

15   here, I think some of the important ones are that he has almost

16   no ties here in the United States.  And as the Court found in

17   its decision after the suppression hearing, he's already shown

18   an interest in doing what you called behaving strategically,

19   and I think this is a very strategic moment in these

20   proceedings.

21        The defendant started this case, the first pretrial

22   conference, explaining that he intended to move to suppress his

23   confession because it's obviously very powerful evidence of his

24   guilt.  He's now lost that motion.  That's going to come in at

25   this trial.  And now he's asking to be released after he's

1    faced that adverse decision.  I think that's just another part

2    of the strategic behavior that you've seen in the case.

3          There are a couple arguments that Mr. Schact made

4    today that I'm happy to address.  One relates to whether FBI

5    should have arrested Mr. Kourani mid-confession after meeting

6    one or after meeting two.  The agency's decisions on that front

7    don't bear on the defendant's flight risk and danger to the

8    community.

9          THE COURT:  It is a complicated interplay between

10   Mr. Kourani and the FBI agents.  As I remember from the

11   suppression evidence, the FBI was interested in whatever help

12   Mr. Kourani could give, and Mr. Kourani offered help, but the

13   help turned out to be largely illusory.  And so, one can

14   imagine that you have someone dangerous on the other side whom

15   you believe can be turned and become useful.  And needs an

16   exploration.  Obviously, a man can't be put in jail if you want

17   to get that kind of cooperation.

18         MR. BOVE:  Judge, that's absolutely --

19         THE COURT:  But these are prosecutorial decisions, not

20   judicial decisions.

21         MR. BOVE:  That's absolutely right, Judge.  And as

22   this was going on, in addition to the FBI's assessment of that

23   balancing that you're talking about between potential upside as

24   somebody cooperating proactively and obviously the risks posed

25   by his release, there was an ongoing criminal investigation.

1    And we are doing work, and it is reflected in the search

2    warrants in this case, to develop additional evidence.

3         The FBI doesn't go arrest someone because they're

4    concerned, without further evidence, that he presents a danger

5    to the community.  There was an ongoing investigation.

6         What prompted the defendant's arrest in this case,

7    because there were other steps taken to mitigate the threat he

8    posed.  What prompted his arrest on the timing that happened

9    here was the defendant's threats through his counsel to flee to

10   Lebanon.  The very place that he now says he couldn't possibly

11   go to.  That just doesn't stand to reason, given the facts in

12   this case.  Given that threat, given the fact that the

13   defendant still has family members --

14        THE COURT:  I don't remember that threat.

15        MR. BOVE:  That threat --

16        THE COURT:  Did it come up in the evidence?

17        MR. BOVE:  I don't think it came up in the suppression

18   hearing, Judge.  But the reports relating to it are attached to

19   our brief in this case.  Basically what happened is

20   Mr. Denbeaux started to call the agents and say, you know,

21   Mr. Kourani is telling me he wants to leave the country.  He

22   wants to return to Lebanon.  He's decided he's not getting what

23   he wants here.  So he's going back home.

24        So, it's just disingenuous to suggest that he couldn't

25   possibly go back there.  And I think that further supporting

1  that, Judge, is the fact he's got relatives there right now.

2  As far as we are aware, he's still in contact with them, and

3  they haven't been harmed in any way.

4          I think the broader point here, though, is that the

5  Court shouldn't just be concerned about the defendant going

6  back to Lebanon.  Right now the defendant is effectively a free

7  agent.  There are a number of countries and a number of

8  organizations and groups who are --

9          THE COURT:  Including disappearing in the United

10  States.

11          MR. BOVE:  In addition to that, Judge.  I think that

12  is also a risk.  But I think the bigger concern here that

13  trumps, frankly, all of it is that the defendant, as I said, is

14  a free agent right now, who has obtained a great deal of

15  information.  Information he obtained conducting surveillance

16  on behalf of Hezbollah, information he obtained during the

17  course of this case about the way that the FBI investigates

18  these things, and information about how the FBI's operated

19  generally in handling him.

20          So there are enemies in the United States, nations and

21  groups, all of whom would like access to that information.

22  Each of which could --

23          THE COURT:  Give me a word about the strength of your

24  evidence.

25          MR. BOVE:  Judge, just starting with the confession

1  part of this.  This is not just a one-time interaction.  This

2  is a defendant who, as I said, five different times requested a

3  meeting with the FBI, and on each of those occasions admitted

4  to the elements of the crime.

5          During those meetings, he and his attorney actually

6  initialed photographs of the weapons that he handled.  So

7  again, I understand the point these weren't videotaped, but

8  there are documents coming out of these that the defendant

9  placed his mark on to specify the types of violent training he

10 received to target the United States.

11         There is additional corroboration.  We've discussed

12 some of it in our briefs.  There are certainly parts of it that

13 are internet searches.  But internet searches, there are parts

14 of the evidence that corroborate the confession are internet

15 searches relating to weapons that the defendant used.  Internet

16 searches relating to propaganda arms of Hezbollah.  In

17 addition, there are internet searches relating to some of the

18 U.S. assets that he targeted, at the direction of the IJO in

19 the United States.  So --

20         THE COURT:  IJO is?

21         MR. BOVE:  Is the subgroup within Hezbollah that the

22 defendant operated for.

23         So, we're obviously going to have a trial, Judge, and

24 we'll see what the jury thinks about this evidence.  But what

25 we have here are five separate confessions corroborated by

1  internet evidence, corroborated by -- there is an e-mail

2  address that where the defendant said this is the code I would

3  use to communicate with my handler.  I asked him to set up this

4  account.  We found that account.

5       So there is powerful corroboration in this proof,

6  Judge.  There is five separate confessions.  We look forward to

7  trying the case, but for purposes of bail, and particularly in

8  light of the presumption that applies here, this is not a close

9  question.  This is a man who needs to be detained and face the

10 jury.

11      THE COURT:  Thank you, Mr. Bove.

12      Mr. Schact, last word.

13      MR. SCHACT:  Just very briefly, your Honor.  I think

14 if you cut through everything he's saying, he and I, Mr. Bove

15 and I actually agree on the evidence.  It comes down to these

16 five statements, which are not all of the statements.  And

17 remember, he calls it a confession.  You know from

18 Mr. Denbeaux's testimony and from Mr. Denbeaux's one-page

19 letter that Mr. Denbeaux told the FBI in writing that my client

20 did not commit a crime and wasn't going to be prosecuted.  Now,

21 Mr. Denbeaux may have been wrong about that and may have done

22 some malpractice or whatever word you want to use.  But you

23 know from the undisputed facts that, in my client's mind, his

24 lawyer who was with him, told the FBI --

25      THE COURT:  I don't credit it that way.

1          MR. SCHACT:  Well, I don't know --

2          THE COURT:  Mr. Denbeaux was looking very hard to put

3     words in the FBI's mouths of some kind of immunization which

4     failed.

5          MR. SCHACT:  Well, if that's what Mr. Denbeaux was

6     doing, my client --

7          THE COURT:  So he said something, you agree that my

8     client has committed no crime.  But the FBI agent never said

9     that.

10         MR. SCHACT:  I know that.  But I'm not talking about

11    the FBI agents' state of mind.  I'm talking about my client's

12    state of mind and my client's state of mind --

13         THE COURT:  He was very sophisticated.  You take out

14    Mr. Denbeaux and in planning this approach in the way of

15    getting immigration help from the FBI.

16         MR. SCHACT:  Judge, the law on material support to a

17    terrorist organization is complex, and no one knows what that

18    law is.  And people in this room do, but my client didn't know.

19         THE COURT:  We have all become expert in that.

20         MR. SCHACT:  He's charged with, supposedly years ago,

21    he got training on machine guns in another country.  I submit

22    to you that there is no reason for any educated citizen to know

23    that that might be a crime.

24         When I myself, I've been a defense lawyer for 28

25    years, when I think of gun possession, I think of being in a

IA33KOUC

1    certain jurisdiction, do I have a gun, is it operable, do I

2    have ammunition, am I in the jurisdiction where I am being

3    charged.  It is not rational for someone to think, because I

4    got firearms training in a country where my firearms training

5    was legal, that it might be illegal in the United States.

6         And so my client didn't think at that time, based on

7    what Mr. Denbeaux was telling him, that what he was saying was

8    some confession or admission.  And when he left the meeting

9    without being arrested, that was reinforced in his mind.

10        THE COURT:  Too many suppositions, Mr. Schact.  That

11   issue came up in the suppression hearing.  The suppression

12   hearing was all about a supposed statement by an FBI agent that

13   they were going to be told by Mr. Kourani, and I don't remember

14   the last part of it, but it had to do with protection he sought

15   for his family.  He wanted desperately to get protection for

16   his father in Lebanon, and he wanted his wife and children to

17   immigrate to the United States from Canada.

18        MR. SCHACT:  I agree with you.  And I submit that the

19   evidence shows that he would say anything, true or false, in

20   order to get that.  And that's part of the problem with the

21   proof.

22        THE COURT:  Okay.  Thank you.

23        The motion for bail is denied.  I find that there is

24   no condition or set of conditions that can assure that the

25   defendant will not flee or that he will not endanger society by

1    committing another crime.  There is a long count of involvement

2    between the defendant and the FBI.  And to fathom the purposes

3    that each had in dealing with the other is beyond the

4    capability of a district judge.  But I went through some of

5    this in the suppression hearing, and I found that what

6    Mr. Kourani intended was a promise of confidentiality was not

7    such at all.

8           Mr. Kourani is charged, and there is evidence to

9    support it, of giving aid and comfort to terrorism, the

10   Hezbollah terrorist organization.  Being trained by Hezbollah,

11   being involved with Hezbollah.  Even in the complicated way

12   that Mr. Kourani states that he was persona non grata with

13   Hezbollah raises a question of not only the possibility of

14   flight, but also danger to our society.

15          As for flight, he has no important contacts here.  His

16   family is in Lebanon.  His wife and children are in Canada.

17   There a large potential community in which he could become

18   invisible in the United States.  I find that the conditions for

19   possible flight are very high.

20          Accordingly, the defendant cannot overcome the

21   presumption that attaches in this case and the motion for bail

22   is denied.

23          Now, having said that, under our Constitution,

24   Mr. Kourani is presumed not to be guilty, as are all citizens

25   of the United States and residents of the United States.  And

1    so an early trial is desired.  In the robing room we met

2    earlier to discuss the earliest possible trial date.

3    Mr. Schact, you have something in February, but I have a long

4    criminal trial previously scheduled for February.  The first

5    date I can give you is?

6              THE DEPUTY CLERK:  March 25.

7              THE COURT:  March 25 at 10 o'clock.  We'll get the

8    jury at that time.  I'm told that this trial should last around

9    two weeks, I've allotted three week for the trial.

10             We should have a final pretrial conference by which

11   time all Brady, Giglio, Jencks material should be produced, and

12   at which time I will resolve all motions in limine.  Other

13   requirements are in my rules.

14             So I think that final pretrial conference should be a

15   week before trial begins.

16             THE DEPUTY CLERK:  March 19 at 11.

17             THE COURT:  Why are all faces downcast today?

18             MR. SCHACT:  That's fine with me, Judge.

19             MR. BOVE:  We'll be there Judge.  Thank you.

20             THE COURT:  And I repeat that any motion in limine

21   will be heard at that time.  So, the motions must be made and

22   fully posed by let's say five days before the hearing so I have

23   time to study it.

24             MR. SCHACT:  That includes 404(b) motions, Judge?

25             THE COURT:  It does.  At the final pretrial

IA33KOUC

1    conference, I will also want any particular voir dire questions

2    that you want me to ask.  I don't need the boilerplate.  And

3    any request to charge that you'd like me to consider.  And if

4    the parties have briefs, that would be fine, too.

5              Anything else?

6              MR. BOVE:  Other than a request for exclusion of time,

7    Judge, nothing from the government.  We do ask that time be

8    excluded until March 25, the trial date, in the interest of

9    justice in order to give the parties time to prepare for trial.

10             THE COURT:  Any objection, Mr. Schact?

11             MR. SCHACT:  No, your Honor.

12             THE COURT:  Without objection, so ordered.

13             We discussed a number of, we'll do it now, I

14   customarily try criminal cases with two alternates.  I think

15   that should be satisfactory here.

16             MR. BOVE:  That sounds appropriate to us, Judge.

17             MR. SCHACT:  Two is fine for a two-week trial.  I

18   agree.

19             THE COURT:  There are 10 peremptories available to the

20   defendant and six to the government.  The array will be some

21   number from which 32 are seated.  I'll ask a series of

22   questions to the jury, and challenges for cause will be taken

23   as they come.

24             If any juror can't sit, or a challenge for cause is

25   upheld, another juror will be taken from the array and put in

1    that juror's place.  There is also a process at the end by

2    which the jurors will tell something about themselves.

3         At the end of this process, I'll ask if there are any

4    more questions, and if there are none, we then go into the

5    peremptories.  They're to be exercised from your bench.  Each

6    side will have a sheet of paper and list peremptories

7    separately.  It is a process that should take about 15 minutes.

8    At the end of that, we'll go into the robing room and go over

9    these with you.

10         If fewer than all the peremptories are exercised, or

11   if both sides choose the same person as the objects of the

12   peremptories and there is fewer than 12 coming out of the

13   original 28, I will then exercise challenges.

14         In other words, we take the first 28 of the 32, and we

15   see if there are any peremptories with regard to those.  At the

16   end of the exercise of the peremptories, if there are any left

17   of the 28, more than 12, I will excuse the highest number

18   involved in that process.  And then at the same time you will

19   do the same for the alternates, which would be Jurors No. 29,

20   30, 31 and 32.  Each side has one.  And similarly, if you agree

21   on one of the peremptories, or if you don't exercise it, I will

22   excuse Juror No. 32 and so on coming down until we have a jury

23   of 12 jurors and two alternates.

24         If clarification is required, we can go into it

25   further at the pretrial conference.

IA33KOUC

1          MR. BOVE:  Thank you, Judge.  That was very helpful.

2          THE COURT:  Okay.  Thanks very much.

3          MR. SCHACT:  Thank you.

4          MR. BOVE:  At this time we'll convene the ex parte

5    CIPA Section 2 conference in the robing room.

6          (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25