UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     -v.-

ALI KOURANI,
     a/k/a "Ali Mohamad Kourani,"
     a/k/a "Jacob Lewis,"
     a/k/a "Daniel,"

                           Defendant.

17 Cr. 417 (AKH)

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

GEOFFREY S. BERMAN
United States Attorney Southern
District of New York
*Attorney for the United States
     of America*

Emil J. Bove III
Amanda L. Houle
     Assistant United States Attorneys
     *Of Counsel*

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 2

    I. Hizballah.......................................................................................................................... 3

    II. The Defendant's Early Hizballah Training and Illegal Entry into the United States............ 4

    III. The Defendant's Recruitment to Hizballah's Islamic Jihad Organization ......................... 5

    IV. The Defendant Obtains U.S. Citizenship and Immediately Travels to China ..................... 6

    V. The Defendant Conducts Additional IJO Operations in the United States........................... 6

    VI. The Erosion of the Defendant's Cover Identity and Relationship with Hizballah ............... 9

    VII. The Defendant's Admissions to the FBI ........................................................................ 11

    VIII. The Defendant's Arrest and Seized Evidence ............................................................... 11

THE CHARGES AND ANTICIPATED TRIAL EVIDENCE ................................................... 12

DISCUSSION .......................................................................................................................... 14

    I. The Defense May Not Elicit Testimony Regarding Legal Conclusions ............................... 14

        A. Applicable Law ...................................................................................................... 15

        B. Discussion .............................................................................................................. 15

    II. The Defense May Not Elicit Testimony Regarding Legal Advice to the Defendant .......... 16

        A. Applicable Law ...................................................................................................... 17

        B. Discussion .............................................................................................................. 17

    III. The Government May Cross-Examine the Defendant Regarding His Offense Conduct and His Lies to the FBI and This Court ........................................................................................ 19

        1. The Defendant's Travel to China ............................................................................. 20

        2. The Defendant's Rental of Storage Facilities for the IJO ........................................... 22

        3. The Defendant's July 2016 Conflict with Hizballah Militia Members in Lebanon ..... 23

    IV. The Government May Use the Defendant's Proffer Statements to Cross-Examine Him and to Rebut Defense Arguments and Evidence ........................................................................ 27

        A. Relevant Facts ........................................................................................................ 28

        B. Applicable Law ...................................................................................................... 29

        C. Discussion .............................................................................................................. 30

CONCLUSION ........................................................................................................................ 35

# INTRODUCTION

The Government respectfully submits these motions *in limine* seeking the following pretrial rulings with respect to the upcoming trial of defendant Ali Kourani:

1. <u>Inadmissible Legal Conclusions</u>.  The defense may not elicit testimony from any witness, including but not limited to the defendant's former attorneys, regarding legal conclusions.  Such testimony would improperly invade the province of the Court, as the exclusive arbiter of the law, and the jury, as the sole finder of fact, at the trial.

2. <u>Inadmissible Legal Advice</u>.  The defense may not elicit testimony from any witness regarding legal advice provided to the defendant.  The defendant was not represented by counsel during his crimes, and so he cannot advance an advice-of-counsel defense. He has also not articulated any other permissible purpose for such testimony.  Any evidence related to legal advice would, of course, waive the attorney-client privilege.

3. <u>Bases for Cross-Examination of the Defendant</u>.  If the defendant elects to testify, the Government may cross-examine him regarding (i) terrorist activities that he strategically denied undertaking in an effort to limit his exposure, (ii) July 2016 domestic violence incidents against his wife and mother-in-law that led a Hizballah militia to attack the defendant, and (iii) the defendant's lies during litigation over his suppression motion regarding those summer 2016 events and his motivations for approaching the Federal Bureau of Investigation ("FBI") in 2017.

4. <u>Admissibility of Post-Arrest Proffer Statements</u>.  Following the defendant's arrest, he participated in an interview with the Government, represented by new counsel, which was conducted pursuant to this Office's standard proffer agreement.  The terms of the agreement permit the Government to cross-examine the defendant regarding his proffer statements, without limitation, should he testify.  During the proffer, the defendant detailed his support of Hizballah and confirmed that he had actually carried out the acts of terrorism he described previously to the FBI.  Thus, if the defense suggests anything contrary at trial, or argues that the defendant's prior statements to the FBI were the product of coercion, the Government may offer related proffer admissions to rebut those claims.

5. 

1

# BACKGROUND

The defendant joined Hizballah in approximately 2000.  Shortly thereafter, he worked with his father and others to fraudulently obtain immigration status to the United States, and immigrated to this county to start developing a cover identity by obtaining a degree in biomedical engineering.

In 2008, the defendant joined Hizballah's Islamic Jihad Organization ("IJO")—also known as the External Security Organization ("ESO") or "910"—which is a highly compartmentalized component of Hizballah responsible for the planning, preparation, and execution of intelligence, counterintelligence, and terrorist activities outside of Lebanon.  Following additional training from the IJO in, among other things, firearms handling, resisting interrogations, and surveillance techniques, the defendant bolstered his cover identity at the IJO's direction by obtaining naturalization as a U.S. citizen as well as a U.S. passport in April 2009.  He relied on this identity while conducting surveillance and intelligence-gathering activities around New York City and in Canada, and transporting the products of his efforts back to his IJO handler in Lebanon.  Nevertheless, the defendant's principal IJO mission was to maintain his status as a deep-cover "sleeper" operative in the event that Iran or Hizballah elected to activate him to conduct or facilitate an attack in the United States or elsewhere outside of Lebanon.

 This plot went as planned for Hizballah, the IJO, and the defendant until late 2013, when the viability of the defendant's cover identity started to deteriorate.  Beginning around that time, the defendant was arrested by the New York City Police Department ("NYPD") based on a counterfeit-clothing offense, and he was subsequently convicted in a case that amply demonstrated that the defendant was not at all the biomedical engineer he purported to be.  He was approached by the Canadian Security Intelligence Service, based on information provided by his brother-in-

law, as well as the FBI, who questioned Kourani about his ties to Hizballah.  His relationship with Hizballah became further strained due to tension in the marriage between his sister and the son of the Hizballah official who first recruited the defendant to the IJO.  And in July 2016, after Kourani perpetrated two domestic violence incidents in Lebanon against his wife and mother-in-law—both of whom are also Hizballah affiliates—members of Hizballah attacked him in retaliation.

The defendant returned to the United States during the fall of 2016.  Beginning in March 2017, he participated in a series of five counseled, non-custodial interviews with the FBI.  The defendant incrementally increased his admissions throughout the process, ultimately confessing to serious terrorism crimes but still withholding information regarding certain aspects of his operational activity on behalf of Hizballah and the IJO that he knew would increase his criminal exposure and reduce the likelihood that the United States would provide him with requested benefits.

The FBI conducted the last non-custodial interview of the defendant on April 26, 2017.  In May 2017, the defendant's then-attorney informed the FBI that the defendant was considering leaving the jurisdiction.  In response, the FBI arrested the defendant on June 1, 2017.  He has been detained since that time, and is scheduled to be tried on the pending eight-count Indictment beginning on May 6, 2019.

## I.  Hizballah

Hizballah is a foreign terrorist organization with roots in Lebanon dating back to the 1980s.[1]  In 1985, Hizballah issued an open letter expressing allegiance to Iranian leader Ayatollah

---

[1] In January 1995, President Clinton sanctioned Hizballah in Executive Order 12,947, which was issued pursuant to the International Emergency Economic Powers Act ("IEEPA").  The U.S.

Ruhollah Khomeini and commitment to the formation of an "Islamic State" with a "nucleus" in Iran. Hizballah's 1985 letter declared that "America is behind all our catastrophes," and "we have no choice except confrontation." Since that time, Iran has provided Hizballah with hundreds of millions of dollars of support. Under the leadership of Secretary General Hassan Nasrallah and others, Hizballah has acted on its 1985 promise by carrying out terrorist attacks around the world that resulted in the deaths of numerous innocent civilians and military personnel.

## II.  The Defendant's Early Hizballah Training and Illegal Entry into the United States

In approximately 2000, the defendant relied on a family connection to a Hizballah official named Haidar Kourani to gain entry to a 45-day Hizballah military training camp in Lebanon. During the training, the defendant learned basic military tactics and was taught to fire a variety of weapons, including rocket-propelled grenade launchers ("RPGs") and AK-47 machineguns. Following the defendant's Hizballah training, his father, Mohamad Kourani, entered the United States illegally and obtained a fraudulent marriage to a woman in Queens ("Woman-1") for the purpose of obtaining immigration status in this country.

In 2002, the defendant left Lebanon and entered the United States under false pretenses, on the basis of the fraudulent marriage between his father and Woman-1. He obtained lawful permanent resident status in 2003, and enrolled at the City University of New York ("CUNY")

---

Office of Foreign Assets Control subsequently issued related sanctions pursuant to IEEPA and Executive Order 12,947. In 1997, the U.S. Department of State designated Hizballah a Foreign Terrorist Organization, pursuant to Section 219 of the Immigration and Nationality Act, and it remains so designated today. In 2001, pursuant to Executive Order 13,224, the U.S. Department of the Treasury designated Hizballah a Specially Designated Global Terrorist entity. In 2010, State Department officials described Hizballah as the most technically capable terrorist group in the world, and a continued security threat to the United States.

during the fall semester that year.  At CUNY, the defendant embarked on a course of study in biomedical engineering that later enhanced both his capabilities as a member of the IJO and his cover identity in the United States.

### III.   The Defendant's Recruitment to Hizballah's Islamic Jihad Organization

In approximately 2008, a relative and Hizballah member named Sheikh Hussein Kourani recruited the defendant in Lebanon to join the IJO.  The recruitment process involved a series of clandestine interviews culminating in an introduction to the defendant's IJO "handler," known as Fadi, and a tour of key sites in southern Lebanon from Hizballah's 2006 war with Israel.  Fadi told the defendant about the mission and structure of the IJO, including that Fadi's immediate IJO superiors reported directly to Secretary General Nasrallah, and that IJO's terrorist operations were also guided by the Iranian government.  Following additional weapons training and intelligence-gathering exercises in Lebanon, Fadi instructed the defendant to obtain U.S. citizenship and a U.S. passport as soon as possible, which would facilitate subsequent operational travel and further bolster the defendant's cover in the United States.

The defendant submitted an application for naturalization as a United States citizen in August 2008.  Despite having joined Hizballah in 2000, having previously gained immigration status in the United States on the basis of misrepresentations relating to the fraudulent marriage between his father and Woman-1, and Hizballah's decades-long open and violent hostility directed at the United States and Israel (among others), the defendant answered "No" to the following questions in the application:

- "Have you **ever** been a member of or in any way associated (*either directly or indirectly*) with . . . [a] terrorist organization?"

- "Have you **ever** advocated (*either directly or indirectly*) the overthrow of any government by force or violence?"

- "Have you **ever** given false or misleading information to any U.S. government official while applying for any immigration benefit . . . ?"

- "Have you **ever** lied to any U.S. government official to gain entry or admission into the United States?"

The defendant reiterated these and other false responses during an in-person interview, and was sworn in as a naturalized U.S. citizen on April 15, 2009.

## IV.   The Defendant Obtains U.S. Citizenship and Immediately Travels to China

Consistent with Fadi's instructions, the defendant applied for a U.S. passport on the same day that he was naturalized.  The passport was issued approximately a week later on April 22, 2009.  On April 30, the defendant received a visa to enter China using his U.S. passport.  He traveled to China on or about May 2.  Although the defendant denied to the FBI in 2017 this his 2009 trip to China was conducted at the direction of the IJO, the evidence suggests that this was one of the strategic lies the defendant told in an effort to limit his criminal exposure in this case. The timing of the trip alone, immediately following the defendant's naturalization, is highly suspicious.  Moreover, as discussed in more detail below, *see infra* Part III.B.1, Guangzhou is linked to thwarted IJO attack plots in Thailand and Cyprus that involved large caches of the explosive precursor ammonium nitrate stored in First Aid ice packs.  Thus, it appears that the defendant traveled to Guangzhou to help cultivate connections for obtaining similar explosive chemicals.

## V.   The Defendant Conducts Additional IJO Operations in the United States

After the defendant joined the IJO, he communicated with Fadi through coded emails and a pager system until approximately 2012.  Fadi then instructed the defendant to stop using those

6

communications facilities and to purge the accounts.  The defendant understood based on his conversations with Fadi that these instructions were part of the IJO's response to the July 2012 arrest in Cyprus of IJO operative Hossam Taleb Yaacoub.[2]

Although their communications methodologies varied over time, the defendant returned to Lebanon almost every year so that Fadi and others could debrief him in person and provide additional instructions.  When the defendant arrived in Lebanon, Fadi contacted him through either his father or one of his brothers.  Fadi provided the defendant with several IJO taskings during meetings in Lebanon, which the defendant acted on after obtaining U.S. citizenship and a passport.

First, the defendant used a social media website to identify former members of the Israeli Defense Forces, and described his search methodology to Fadi so that the IJO could replicate his intelligence gathering in Lebanon on an ongoing basis.  Second, the defendant physically surveilled and gathered photographs from the Internet relating to security at U.S. government facilities in Manhattan, Brooklyn, and Harlem as well as international airports in Queens and Toronto, Canada.  The defendant brought the fruits of these surveillance efforts to the IJO in Lebanon on storage media so that the IJO could use the information in attack planning.

Third, Fadi asked the defendant to apply for a job at a Department of Motor Vehicles ("DMV"), so that he would have access to means of making false identification documents for IJO members, and to investigate the possibility of obtaining additional false passports.  In July 2012, an IJO suicide bomber attacked a bus of Israeli tourists in Burgas, Bulgaria, and authorities found

---

[2] Law enforcement seized from Yaacoub a notebook that contained coded entries relating to, among other things, Israeli tour buses.  The defendant told the FBI in 2017 that he believed based on his interactions with Fadi that Fadi had also acted as Yaacoub's handler.

7

a fake Michigan driver's license at the scene of the bombing.  The defendant understood based on conversations with Fadi that Fadi helped coordinate the attack, and that his DMV-related tasking was part of an IJO strategy to help build cover identities to facilitate similar attacks.

Fourth, Fadi instructed the defendant to identify sources of firearms in the United States that IJO personnel could use in attacks.  The defendant identified several potential sources and disclosed their identities to Fadi, but, according to the defendant, Fadi indicated that the IJO needed more reliable sources because the IJO could call upon these weapon suppliers at any point in the future to support Hizballah and help the IJO plan an attack in the United States.

Finally, and relatedly, Fadi asked the defendant to research the process for establishing front companies in the United States that could be used to store weapons.  Drawing on extensive experience operating counterfeit clothing companies, such as entities named "New Spot Fashion," "Broadway Sportswear," and "WMC Sportswear," the defendant recommended to Fadi that they use storage lockers instead because less documentation was required.  In October 2009, just months after obtaining citizenship and commencing IJO operations in the United States, the defendant used the alias "Jacob Lewis" to rent a unit at a storage facility in Queens.  He was later surveilled by the FBI as he checked the unit, and he renewed the lease there in late 2013.

## VI.  The Erosion of the Defendant's Cover Identity and Relationship with Hizballah

After working for years as an IJO sleeper operative, a series of events caused friction between the defendant and Hizballah and weakened the viability of the biomedical engineering and project management cover identity he had spent years developing.

In Lebanon, the son of Sheikh Hussein Kourani, who had recruited the defendant to the IJO, married the defendant's sister, Laila.  Laila's marriage to Sheikh Kourani's son deteriorated, which the defendant believed called into question his status in the IJO.

In the United States, in November 2013, the NYPD arrested the defendant based on counterfeiting charges, after he admitted during a traffic stop to possessing counterfeit boots that were seized from his vehicle.  In January 2014, while the charges were pending, the defendant submitted an application to the NYPD for an intelligence analyst position.  The resume that the defendant submitted to the NYPD reflected a purported "Employment History" consisting solely of jobs at "J.K. Electronics Inc." and "Kourani & Sons Trading & Contracting."  The defendant failed to appear for interviews scheduled in April and May 2014, and he was not hired.  In May 2014, the defendant entered a guilty plea in the pending criminal case:  he received a conditional discharge on a disorderly conduct offense and was directed to pay a $250 fine.[3]  Following the guilty plea, the defendant traveled to Canada, was approached by the Canadian Security Intelligence Service, and returned to the United States in July 2014.

---

[3] Pursuant to Rule 404(b), the Government hereby provides notice to the defendant of its intention to offer limited evidence at trial of the facts described above relating to the defendant's 2013 arrest and 2014 conviction, subject to an appropriate limiting instruction.

The defendant traveled to Lebanon in December 2014 and returned to the United States in January 2015.  During the trip, the defendant's concerns about his IJO status increased after Fadi and a Hizballah associate named Ali Srour confronted the defendant about his NYPD job application.   The defendant returned to Lebanon in August 2015 and stayed there for approximately one month.  He told the FBI in 2017 that, during this trip, the IJO deactivated him as an operative because the organization believed he had been compromised by either U.S. or Canadian intelligence authorities.  Despite the IJO's apparent belief that the defendant was acting as a double agent, he was not harmed.  Rather, as the defendant later admitted to the FBI, the IJO deployed a counterintelligence strategy by telling him that the IJO had been disbanded in the hope that he would pass that false information to foreign authorities.  The IJO also offered to let the defendant join Hizballah forces fighting in the Syrian civil war.  The defendant declined the offer and returned to the United States.

Notwithstanding the defendant's understanding that Hizballah believed he had been compromised as of at least September 2015, the defendant returned to Lebanon in July 2016.  He told the FBI in 2017 that at the outset of the trip he was considering relocating to that country permanently.  In Lebanon, however, the defendant's wife told him that she wanted to bring their two children to Canada, and she took their passports.  The defendant later admitted to having "physically pushed" his wife during the argument, and as a result she went to her family's residence, which the defendant described to the FBI as a place where members of the Hizballah militia live in a "compound" like "Tora Bora," *i.e.*, the fortified cave complex, in which former al-Qa'ida leader Usama bin Laden concealed himself in late 2001.  The defendant traveled to the compound to pick up his children, and injured his wife's mother in a physical altercation.  In

10

response, Hizballah militia personnel related to the defendant's wife fired at the defendant's house. Thus, while the defendant sought to mislead the Court at the suppression hearing in this matter by suggesting that his interactions with the FBI in 2016 led to this shooting, the actual cause of the attack was his physical violence against his wife and mother-in-law.

## VII.   The Defendant's Admissions to the FBI

Beginning in March 2017, the defendant and his former counsel, Mark Denbeaux, participated in a series of non-custodial interviews during which the defendant admitted much of the foregoing criminal conduct.  As the Court observed following the suppression hearing, the defendant "behaved strategically" during the meetings, and the FBI "became convinced that Kourani was holding back vital information," including but not limited to his use of storage lockers in New York City on behalf of Hizballah and his travel to China in connection with IJO operational activity.  *United States v. Kourani*, No. 17 Cr. 417 (AKH), 2018 WL 1989583, at *3-4 (S.D.N.Y. Apr. 26, 2018).  Despite this strategy, the defendant nevertheless admitted to grave acts of terrorism in the United States and elsewhere on behalf of Hizballah and the IJO.

## VIII.   The Defendant's Arrest and Seized Evidence

The FBI interviewed the defendant for the last time on April 26, 2017.  He was arrested on June 1, 2017, after Denbeaux told the FBI in May that the defendant was considering fleeing the jurisdiction.  In connection with the arrest, the FBI seized a telephone from the defendant that contained contact information and communications with individuals the defendant had previously identified as members of Hizballah.  The defendant's phone also contained communications with his wife and others that corroborate other evidence demonstrating that any violence perpetrated by

11

Hizballah against the defendant in Lebanon during the summer of 2016 resulted from the defendant's assaults on his wife and mother-in-law.

On the day of the defendant's arrest, the FBI searched his apartment pursuant to a warrant and seized, among other things, a laptop that the defendant had used to view and download Hizballah propaganda and other related materials.  For example, just over a month after obtaining U.S. citizenship at the direction of the IJO, the defendant used the laptop to view a May 2009 article with the headline:  "Sayyed Hassan Nasrallah(HA) – Execute Spies, starting with the Shia Collaborators."  In January 2013, the defendant accessed YouTube videos related to Ayatollah Khomeini.  He also used the laptop to access videos and webpages with titles such as "Hezbollah in Action!," "Hezbollah combat," "hezbollah martyr funeral," "American Soldier Shot in Helmet," "Iran Military Power," and "Iran vs America."

## THE CHARGES AND ANTICIPATED TRIAL EVIDENCE

The Government will proceed at trial based on the eight charges in the Indictment.  Counts One and Two charge the defendant with providing, and conspiring to provide, material support and resources to Hizballah, in violation of 18 U.S.C. § 2339B.  Counts Three and Four charge the defendant with obtaining, and conspiring to obtain, military-type training from Hizballah, in violation of 18 U.S.C. §§ 371 and 2339D.  Count Five charges the defendant with conspiring to use, carry, and possess machineguns and destructive devices in connection with the crimes of violence charged in Counts One, Two, Three, and Four, in violation of 18 U.S.C. § 924(o).  Counts Six and Seven charge the defendant with providing, and conspiring to provide, funds, goods, and services to Hizballah, in violation of 50 U.S.C. § 1705(a).  Count Eight charges the defendant with naturalization fraud to facilitate international terrorism, in violation of 18 U.S.C. § 1425(a).

The Government expects to offer during its case-in-chief physical evidence, such as the defendant's phone, laptop, naturalization certificate, U.S. passport, U.S. passport card, and desert-colored combat boots that the defendant purchased in May 2017 while he contemplated returning to Lebanon.  The Government will also offer lay witness testimony from, among others, FBI Special Agents Keri Shannon and Joseph Costello regarding their interviews of the defendant, witnesses employed by the State Department and the Department of Homeland Security regarding applications filed by the defendant, and law enforcement witnesses who will describe the facilities targeted by the defendant and the IJO.

Finally, the Government expects to offer at least two types of expert testimony.  First, a Firearms Enforcement Officer from the Bureau of Alcohol, Tobacco, Firearms and Explosives will testify regarding the features of the weapons that the defendant used during Hizballah trainings in Lebanon, which will aid the jury in its consideration of whether the weapons were "machineguns" and "destructive devices" as alleged in Count Five.  *See* 18 U.S.C. §§ 921(a)(4), (a)(23) (defining the terms "machinegun" and "destructive device").  Second, in order to provide the jurors with context for the defendant's crimes, the Government will offer expert testimony regarding the formation and structure of Hizballah (including the IJO), Hizballah practices and tactics, Hizballah leaders and members referenced by the defendant during interviews with the FBI, and attacks and conflicts referenced by the defendant during interviews with the FBI.  For example, the defendant described being in South Lebanon during the 2006 war with Israel, and the Government's expert will provide limited background regarding that conflict.  The defendant also indicated that he believed he was asked to join the IJO as part of an increased Hizballah recruitment effort undertaken in the wake of the 2008 murder of former Hizballah leader Imad Mughniyeh, and the

Government's expert will provide limited testimony about that incident. Limited expert testimony regarding these issues is admissible because it is probative of, among other things, the defendant's intent in connection with the charged crimes.[4]

## DISCUSSION

## I.  The Defense May Not Elicit Testimony Regarding Legal Conclusions

The defendant's suppression motion focused on a document written by Denbeaux (the "Denbeaux Document"), which Denbeaux provided to Special Agents Shannon and Costello (the "Agents") during an interview on April 3, 2017.  The Denbeaux Document stated, in part, "[Kourani] is not seeking any kind of immunity or protection, because as it has already been agreed, he has committed no crime and faces no prosecution."  (Ex. A at 1).  While defense counsel may question witnesses at trial regarding the circumstances of Denbeaux providing the Document to the Agents during the interview, and what, if anything, the Agents said in response, defense counsel may not seek to improperly question witnesses—including Denbeaux—regarding their opinion of whether the defendant had committed a crime.

---

[4] Such expert testimony is routinely admitted, and has been found to be appropriate, in connection with terrorism trials in this Circuit.  *See, e.g.*, *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011) ("Expert testimony is . . . appropriate in the context of a case . . . which implicates the activities of terrorist organizations and their supporters."); *United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013) (affirming admission of expert testimony because, "[a]s the district court noted, Levitt's testimony was probative of the intent element of the charged conspiracies"); *United States v. Kassir*, No. 04 Cr. 356 (JFK), 2009 WL 910767, at *4 (S.D.N.Y. Apr. 2, 2009) ("Outside of the organized crime context, a number of courts have permitted expert testimony on the history, structure, leadership and methods of al Qaeda and other terrorist organizations."); *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 124 (D. Conn. 2008) ("[B]ackground information about the conflicts in Chechnya and Bosnia, and the activities of foreign mujahideen fighters, are also relevant to the Government's case against Mr. Abu-Jihaad since Mr. Abu-Jihaad purchased various videos regarding those conflicts from Azzam Publications.").

## A.   Applicable Law

Witnesses, even if qualified as experts, may not testify to legal conclusions regarding guilt or innocence in a criminal trial.  *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion." (collecting cases)).  Such testimony is not admissible because it effectively "tell[s] the jury what result to reach."  *Id.*  Testimony regarding legal conclusions is also inadmissible because it infringes on the Court's exclusive province to instruct the jury on the law by "communicating a legal standard—explicit or implicit—to the jury."  *Id.* at 364; *see also Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 709 (2d Cir. 1989) ("The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury."); *United States v. Scop*, 846 F.2d 135, 140 (2d Cir.), *on reh'g*, 856 F.2d 5 (2d Cir. 1988) (noting that expert testimony containing legal conclusions "invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law" (internal quotation marks and citation omitted)).

## B.   Discussion

At trial, on direct examination of the Agents, the Government intends to introduce the Denbeaux Document.  Consistent with the testimony at the suppression hearing, the Government expects the Agents will testify at trial that (i) they did not adopt the Denbeaux Document, its opinion regarding the defendant's culpability, or its promise of non-prosecution (Tr. at 37-41, 139-40), and (ii) they were not authorized to offer, and did not offer, any such promises or opinions (Tr. at 20-21, 112, 141).  While defense counsel may question the Agents, the defendant, and Denbeaux about the circumstances of how the Denbeaux Document was provided to the Agents,

15

and anything the Agents said in response, defense counsel may not question witnesses regarding their opinions about whether the defendant "committed no crime," as the Denbeaux Document states. The Agents were not qualified to offer criminal legal analysis during the interviews, and they are not competent trial witnesses for purposes of legal conclusions. Even if they were, controlling precedent in this Circuit precludes *any* witness from offering legal opinions. For that reason, even if Denbeaux were qualified as an expert (for which no notice has been provided), he may not testify at the trial regarding his legal conclusions. At bottom, such testimony from any witness would usurp the role of both the Court and the jury by "tell[ing] the jury what result to reach," *Jacobs*, 961 F.2d at 363, and implicitly conveying a legal standard, where it is the exclusive "province of the [C]ourt to . . . instruct the jury as to the law," *Scop*, 846 F.2d at 140. Accordingly, the Court should preclude defense counsel from eliciting testimony regarding any witness's view of whether the defendant committed a crime or any other legal conclusion.

## II.   The Defense May Not Elicit Testimony Regarding Legal Advice to the Defendant

The Court should also preclude testimony regarding any legal advice Denbeaux provided to the defendant. The question before the jury is whether the defendant committed the crimes charged in the Indictment between 2002 and September 2015. At the suppression hearing, Denbeaux testified that he first met the defendant in the fall of 2016, and contacted the FBI on the defendant's behalf several months later. (Tr. at 169). Accordingly, the defense should be precluded from introducing evidence of Denbeaux's legal advice at trial. Should, however, any such evidence be admitted, any remaining privilege over communications between the defendant and Denbeaux would be waived.

16

### A.   Applicable Law

A defendant seeking to advance an advice-of-counsel defense must show that he "(1) honestly and in good faith sought the advice of counsel; (2) fully and honestly laid all the facts before his counsel; and (3) in good faith and honestly followed counsel's advice, believing it to be correct and intending that his acts be lawful." *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012) (internal quotation marks, alterations, and citations omitted).   A defendant may only rely on an advice-of-counsel defense, however, "to the extent that it might show that a defendant lacked the requisite specific intent" to commit a crime. *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 183 (2d Cir. 2003).

Where a defendant advances an advice-of-counsel defense, he waives any claim of legal privilege over related communications with his attorney. *See United States v. Wells Fargo Bank N.A.*, 12 Civ. 7527 (JMF), 2015 WL 3999074, at *1 (S.D.N.Y. June 30, 2015) (noting that a defendant asserting an advice-of-counsel defense must "make a full disclosure during discovery" of the relevant attorney-client communications, and refusing to do so "constitutes a waiver of that defense" (internal quotation marks and citation omitted)).   Indeed, it is well-settled that a defendant's assertion of an advice-of-counsel defense "in fairness requires examination of protected communications." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991).

### B.   Discussion

The defendant may not offer an advice-of-counsel defense because Denbeaux did not even know the defendant until after the defendant had engaged in prolonged acts of terrorism against the United States.   Thus, any legal advice that Denbeaux gave the defendant has no relevance with

17

respect to the issue of the defendant's intent to commit the charged crimes. *Schreiber*, 327 F.3d at 183; *see also United States v. Sardana*, 101 F. App'x 851, 854-55 (2d Cir. 2016) (affirming district court's exclusion of evidence concerning a defendant's reliance on counsel where that evidence would not support an advice-of-counsel defense); *United States v. Al-Shahin*, 474 F.3d 941, 947 (7th Cir. 2007) (advice-of-counsel defense applies only where the defendant sought the attorney's advice before taking the relevant action). To the extent the defendant wishes to offer evidence regarding legal advice that he received, he should be required to establish its admissibility in the first instance outside the presence of the jury.

As the Court ruled at the suppression hearing, to the extent the defense is permitted to offer evidence regarding legal advice, the defendant must waive any remaining attorney-client privilege with Denbeaux. A defendant may not use his privilege "as a shield and a sword." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) ("[F]airness considerations arise when the party attempts to use the privilege both as a shield and a sword. The quintessential example is the defendant who asserts an advice-of-counsel defense and is thereby deemed to have waived his [attorney-client] privilege with respect to the advice that he received." (internal quotation marks and citations omitted)). At the suppression hearing, defense counsel attempted to elicit testimony from the defendant about a discussion the defendant had with Denbeaux regarding seeking immunity. (Tr. at 271-72). The Court ruled that such testimony would waive the attorney-client privilege and permit the Government to review and offer evidence of communications between the defendant and Denbeaux. (Tr. at 272). Defense counsel withdrew the question and the Court struck the answer from the record. (Tr. at 272). The same waiver principle applies at trial to the extent the defense

18

is permitted to elicit, over the Government's objection, testimony regarding legal advice Denbeaux provided.[5]

### III.   The Government May Cross-Examine the Defendant Regarding His Offense Conduct and His Lies to the FBI and This Court

If the defendant testifies at the upcoming trial, justice requires that the Government be permitted to challenge his credibility by cross-examining him regarding the full extent of his activities on behalf of Hizballah, including his operational travel to China in 2009 and his use of storage facilities on behalf of the IJO in New York.  These activities are directly relevant to the defendant's material support of Hizballah, and the defendant's 2017 lies to the FBI regarding these activities are probative of the defendant's character for truthfulness.

The Government also intends to cross-examine the defendant regarding the July 2016 conflict with members of Hizballah precipitated by his acts of domestic violence against his wife and mother-in-law.  The resulting deterioration of the defendant's relationship to Hizballah, and his desire to seek vengeance on certain of its members, is part of the reason he approached the FBI in 2017.  A full understanding of the defendant's motives is important evidence for the jury's consideration of his confessions.  Moreover, the defendant attempted to mislead the FBI and later the Court about the circumstances of the July 2016 incident, and therefore his misstatements bear on the defendant's credibility.

---

[5] To date, counsel has neither given notice of an advice-of-counsel defense nor disclosed communications between the defendant and Denbeaux.

19

### A. Applicable Law

"'It is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth.'" *United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998) (quoting *United States v. Havens*, 446 U.S. 620, 626-27 (1980)).  Accordingly, a defendant has "no right to avoid cross-examination into the truth of his direct examination, even as to matters not related to the merits of the charges against him." *Id.* at 58; *see also United States v. Beverly*, 5 F.3d 633, 639 (2d Cir. 1993) ("Where a defendant testifies on direct about a specific fact, the prosecution is entitled to prove on cross-examination that he lied as to that fact.").  Beyond challenging the defendant on misstatements made during his direct examination, the Government may also cross-examine the defendant regarding specific instances of conduct that are "probative of the [defendant's] character for truthfulness or untruthfulness." Fed. R. Evid. 608(b).  When cross-examining a defendant, the Government need not present the Court with extrinsic evidence of a defendant's lies "so long as it can point to a good-faith basis for its questions." *Payton*, 159 F.3d at 59.

### B. Discussion

#### 1. The Defendant's Travel to China

On or about May 2, 2009, the defendant traveled to Guangzhou, China.  The evidence surrounding the defendant's travel supports an inference that he took the trip at the IJO's direction to explore potential sources for obtaining explosive precursor chemicals.  The defendant submitted a U.S. naturalization application in August 2008 at the direction of Fadi, his IJO handler.  That naturalization application was approved on April 15, 2009, and, the very same day, the defendant applied for a passport, also at Fadi's direction.  The defendant claimed on the passport application,

under penalty of perjury, that he had *no plans* to travel internationally.  On April 22, 2009, the defendant was issued a U.S. passport.  Eight days later, despite his April 15th claim of having no travel plans, the defendant was issued a visa to enter China, and eleven days after that, the defendant departed for Guangzhou.

When questioned by the FBI about this 2009 China trip, the defendant gave inconsistent and illogical answers.  During an April 3, 2017 interview, the defendant claimed he had never deployed for the IJO outside the United States or Lebanon.  Knowing of the defendant's 2009 China trip, the Agents reminded the defendant that lying to the FBI was a crime.  After two breaks, the defendant claimed, among other things, that he was "scared" to share certain information with the Agents.  During an April 5, 2017 interview, the defendant again claimed that the China trip was not related to Hizballah or the IJO.  The defendant told the agents that the trip could not have been operational because the defendant was not recruited to the IJO until 2010, a year after his travel to China.  That was a blatant lie, later recanted during an April 26, 2017 interview.  In that session, the defendant admitted that the IJO recruited him in 2008 (a year prior to his China travel), and that he had, in fact, obtained U.S. citizenship and a passport at the IJO's direction.

Other assertions by the defendant regarding his trip to China made little sense.  He claimed not to know the full name of his travel companion or the person who booked his travel.  The defendant also claimed that the purpose of the trip was to visit a textile exhibition to view products including hospital beds, medical devices, and dentist chairs—even though the defendant has never sold medical devices or equipment.  The Government's good-faith basis for questioning the defendant about his trip to China is buttressed by the IJO's use of Guangzhou as a hub of explosives

supply.[6]  In January 2012, law enforcement in Thailand seized an IJO cache of explosive materials, including 10 gallons of ammonium nitrate stored in ice packs manufactured by a company in Guangzhou.   In May 2015, law enforcement in Cyprus seized an IJO cache of 8.2 tons of ammonium nitrate, some of which was stored in ice packs manufactured by the same Guangzhou company.

### 2.   The Defendant's Rental of Storage Facilities for the IJO

The defendant admitted to the FBI that his IJO handler, Fadi, tasked him with researching how to open businesses in New York that could be used to store firearms for attacks and assassinations.  The defendant also admitted that, in response to this tasking, he advised Fadi that a better way to covertly store weapons caches was to use storage facilities, which could be rented with little documentation from workers who were susceptible to being bribed.

In a 2017 interview with the FBI, the defendant denied renting storage facilities on behalf of the IJO.  The evidence suggests, however, that this was another strategic lie by the defendant intended to minimize his exposure.  In October 2009, while the defendant was actively working as an IJO operative in the United States, he opened a storage facility in Queens under the alias "Jacob Lewis."  The FBI later surveilled the defendant checking the unit in a suspicious fashion, including by entering and exiting without any boxes or other material.  Should the defendant testify, the

---

[6] The Government notes herein the IJO's use of Guangzhou, China, as an IJO operational location for purposes of demonstrating its good-faith basis to question the defendant regarding his 2009 China trip.  The Government does not presently intend to offer evidence of IJO's connection to Guangzhou in its case in chief, although the Government may question the Agents or the defendant regarding this topic should defense counsel open the door to such questioning.

Government should be permitted to cross-examine him regarding his use of storage facilities based on IJO taskings and his misrepresentations to the FBI on this topic.

### 3.  The Defendant's July 2016 Conflict with Hizballah Militia Members in Lebanon

In advance of the suppression hearing in this case, the defendant submitted a sworn affidavit in which he claimed that, in the summer of 2016, "members of Hezbollah attacked my home in Yater, Lebanon."  (Ex. B, ¶ 8).  While the defendant noted that the attack occurred following an "argument" with his wife, he claimed the attack was "fueled by the rumor that I was an American government informant."  (Ex. B, ¶ 8).  The defendant said that the Hizballah members "shot bullets at my home and tried to abduct or kill me."  (Ex. B, ¶ 8).  The defendant held to this narrative during his suppression hearing testimony, claiming that the "reason" he was attacked was because the Hizballah militia believed he was a government informant.  (Tr. at 291).

During an interview on March 23, 2017, however, the defendant told a different story about his July 2016 conflict with Hizballah.  The defendant told the Agents that, while in Lebanon, his wife decided she wanted to move their two children to Canada and the defendant disagreed.  The defendant described the argument that ensued, during which he said that he pushed his wife.  The defendant said that his wife retreated to her family's home in Lebanon—which the defendant described as a "compound" like "Tora Bora"—where armed Hizballah militia members lived.  The defendant also told the agents that when he traveled to the Hizballah "compound" maintained by his wife's family, he opened his car door into his mother-in-law during a physical confrontation over the children, which caused her to fall down.  The defendant told the FBI during 2017 interviews that, after these confrontations with his wife and mother-in-law, armed Hizballah members surrounded his home, and the defendant was forced to escape Lebanon covertly.

23

Thus, although the defendant told the Court that he was attacked by Hizballah based on the terrorist organization's suspicion that he was a government informant, he told the FBI he was attacked because of a fight with his wife and mother-in-law.  This discrepancy is reason enough to question the defendant about the circumstances of the July 2016 incidents with his wife, mother-in-law, and relatives from the Hizballah militia, and to confront the defendant with his prior sworn declaration if it is inconsistent with his testimony.[7]

The defendant's contemporaneous communications provide a further basis to cross-examine him on this topic.  For example, on August 14, 2016, the defendant's wife sent him a message indicating that the Hizballah militia had attacked the defendant because he had "almost killed" his mother-in-law by beating her and leaving her with bruises and a concussion.  On the same day, the defendant embraced his attack of his mother-in-law, admitting that he "almost killed her.  (Ex. C at 1 ("*Wife ("Lulu"):*  U almost killed their [*i.e.*, the Hizballah militia members'] aunt . . . . *Kourani ("A.K."):*  I almost did.")).  Consistent with the fact that the defendant returned to Lebanon after being deactivated by the IJO in September 2015 on suspicion that he was a double agent, the defendant did not shy away from violent confrontation with Hizballah while he was in

---

[7] "Although any sworn statement made by the defendant in support of his motion to suppress may not be used against him at trial on the issue of guilt, prior inconsistent suppression hearing testimony may be used to impeach the defendant during trial."  *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 n.2 (S.D.N.Y. 1995); *see also United States v. Jaswal*, 47 F.3d 539, 543 (2d Cir. 1995) ("Prior inconsistent suppression hearing testimony may properly be used to impeach a defendant during trial.").  Indeed, "[n]othing could be more probative of a witness's character for untruthfulness than evidence that the witness has previously lied under oath."  *United States v. Triumph Capital Grp., Inc.*, 237 F. App'x 625, 629 (2d Cir. 2007) (internal quotation marks and citation omitted).

Lebanon in the summer of 2016.  Rather, on August 14, 2016, he instructed his wife to "tell them before [I] didn't have a gun but now [I] have gernade [sic]."  (Ex. C at 2).

Finally, in September 2016, the defendant's wife informed the Canadian Security Intelligence Service ("CSIS") that the defendant had beaten her multiple times in the summer of 2016, and that one beating caused her to take her children to her family's home. [8]  (Ex. D, at 1).[9] The defendant's wife explained that the defendant came to the home, and that she found her mother on the ground unconscious with bruises all over her body when she came outside.  (Ex. D, at 2). The defendant's mother-in-law was present during the CSIS interview with pictures of the bruises she suffered as a result of the defendant's assault.  (Ex. D, at 2).

Like the defendant's strategic lies to the FBI regarding his trip to China and his use of storage facilities, the defendant's lies regarding the circumstances of his July 2016 conflict with Hizballah militia members bear directly on his character for truthfulness.  If, at trial, the defendant claims that Hizballah attacked him for being a suspected government informant, he should have to explain why he omitted that fact from his 2017 explanation to the FBI and contemporaneous communications in 2016.  If, at trial, the defendant admits that he was attacked because he beat his wife and mother-in-law, then he should have to explain why he offered a false explanation to this Court in a sworn declaration and under oath at the suppression hearing.  Either way, the Government should be permitted to question the defendant on these inconsistencies.

---

[8] The defendant's domestic abuse of his wife is referenced throughout his email and text message communications with her.

[9] In light of the sensitive personal information contained in this interview report, the Government respectfully submits the report under seal.

Testimony about the defendant's conflict with Hizballah in July 2016 is also separately relevant because it is important for the jury to understand the defendant's motivations for meeting with the FBI in 2017.  One of the defendant's apparent objectives for meeting with the FBI in that timeframe was to expose his in-laws' connections to Hizballah in retaliation for how they treated him in July 2016.  The documentary evidence bears this out.  In May 2017, while the defendant was meeting with the FBI, he sent his wife an email stating, "If you think . . . you are in strong position to hold my kids because of what your [Hizballah] militias family have been doing, lets see what will they do when I expose the hell [out] of you and your family."  (Ex. E, at 1).  In the same email chain, the defendant stated, "[I] will do anything possible to get back at you and your family."  (Ex. E, at 1).  As further evidence of his intent, during the time period of his meetings with the FBI, the defendant took notes that were seized from his apartment following his arrest. The notes include a remark about "revenge," as well as specific options such as "no flight list" and "extradit[ion]."  All of this is important context for the jury to understand when considering the circumstances, and complete voluntariness, of the defendant's confessions.

\*        \*        \*

In sum, the defendant's strategic denials to the FBI regarding core aspects of his IJO operational activity, and his misrepresentations to this Court, go to the heart of his character for truthfulness and are, accordingly, fair grounds for cross-examination pursuant to Rule 608(b).  *See Payton*, 159 F.3d at 58 (noting that the defendant "placed his credibility in issue simply by taking the stand").  The Second Circuit has time and again upheld cross-examination regarding false statements made in a wide variety of contexts.  *See, e.g.*, *Triumph Capital Grp., Inc.*, 237 F. at 629 ("This Court has held that it can be appropriate to introduce false statements, especially false sworn

statements, under Rule 608(b)(1) to shed light on a witness' credibility."); *United States v. Jones*, 900 F.2d 512, 520-21 (2d Cir. 1990) (affirming trial judge's decision to permit cross-examination of defendant on prior false statements); *United States v. Schatzle*, 901 F.2d 252, 255-56 (2d Cir. 1990) (cross-examination into a witness's failure to disclose a prior arrest on his bar application permitted); *United States v. Sperling*, 726 F.2d 69, 75 (2d Cir. 1984) (cross-examination of defendant regarding his false credit card application was probative of defendant's character for untruthfulness); *United States v. Sperling*, 726 F.2d 69, 74-75 (2d Cir. 1984) (cross-examination regarding false credit card application was probative of defendant's character for untruthfulness). Accordingly, the Court should permit the Government to cross-examine the defendant regarding the full extent of his operational activity on behalf of the IJO, as well as his false denials to the FBI, including his 2009 trip to China and his use of storage facilities in New York City. The Government should also be permitted to cross-examine the defendant regarding his shifting explanations for his July 2016 conflict in Lebanon, and his efforts to mislead the Court regarding the same.

## IV. The Government May Use the Defendant's Proffer Statements to Cross-Examine Him and to Rebut Defense Arguments and Evidence

The day after the defendant was arrested on June 1, 2017, he participated in a proffer session with the Government, while represented by new counsel, which was conducted pursuant to the standard proffer agreement used by this Office (the "Proffer Agreement"). Under the terms of the Proffer Agreement, if the defendant testifies at trial, the Government is permitted to question him regarding all of his statements during the proffer. Even if the defendant does not testify, the Government may offer the defendant's proffer statements to rebut contrary arguments and evidence offered at trial by the defense. For example, the Government should be permitted to use

27

the defendant's proffer statements to rebut any evidence or defense argument that the defendant's admissions to the FBI were not truthful; that the defendant engaged in the admitted conduct for any reason other than in support of Hizballah; that the Agents are lying about the defendant's admissions to them during the March and April 2017 interviews; or that the defendant only made those admissions to the FBI because he was coerced or otherwise pressured to do so.

### A.  Relevant Facts

On June 2, 2017, the defendant participated in a proffer session with the Agents and the Assistant U.S. Attorneys assigned to this case.  The defendant had new counsel at the proffer session, and the proffer was conducted pursuant to the Proffer Agreement, which the defendant reviewed with his attorney prior to the proffer.  The Proffer Agreement included a clause stating that "the Government may use statements made by [the defendant] at the [proffer session] . . . for the purposes of cross-examination should [the defendant] testify."  (Ex. F).  The Proffer Agreement additionally included a clause stating that "the Government may use statements made by [the defendant] at the [proffer session] to rebut any evidence or arguments offered by or on behalf of [the defendant] . . . at any stage of the criminal prosecution."  (Ex. F).

During the proffer session, the defendant detailed his Hizballah training and his actions as an IJO sleeper operative in the United States.  For example, the defendant described obtaining a U.S. passport and passport card based on taskings from the IJO; the military training he received from Hizballah and the IJO in 2000 and 2011, during which he fired pistols, machineguns, grenades, and RPGs; and his hostile surveillance of government buildings in New York City on behalf of the IJO.  The defendant also affirmed that he had in fact done everything he previously described to the FBI.

28

The defendant additionally admitted to conduct during his proffer session that he had previously withheld from the FBI.  For example, the defendant disclosed during the proffer that, in approximately 2010 or 2011, he set up a fake profile with a "Jewish name" on a social media website for the purpose of researching individuals associated with the IDF in the New York City area.  The defendant recorded the names of such individuals and provided the information to his IJO handler.  The defendant also stated that he had been tasked with identifying Israeli tour buses in New York City, though the defendant claimed during the proffer that he had not completed the tasking.

## B.  Applicable Law

"Like all contracts, proffer agreements must be interpreted to give effect to the intent of the parties."  *United States v. Rosemond*, 841 F.3d 95, 107 (2d Cir. 2016) (internal quotation marks and citations omitted).  The provisions of the Proffer Agreement at issue here—which permit the Government to cross-examine the defendant with his proffer statements and use those statements to rebut contrary arguments made by the defense—have been upheld repeatedly by courts.  *See United States v. Mezzanatto*, 513 U.S. 196 (1995); *United States v. Lyle*, 15-958, at 30-31 (2d Cir. April 1, 2019).  Moreover, it is well-settled in this Circuit that, once defense counsel makes a "factual assertion . . . that contradicts a statement made during the proffer session, the Government may then offer the earlier proffer statement to rebut the assertion being made at trial."  *Rosemond*, 841 F.3d at 107.

The concept of rebuttal evidence is a flexible one and may encompass "any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary."  *Id.* at 108 (internal quotation marks

29

and citations omitted); *United States v. Barrow*, 400 F.3d 109, 121 (2d Cir. 2005) ("Rebuttal is hardly limited to evidence that directly contradicts what it opposes; rather, rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary."). Indeed, to permit the defendant to present evidence or make arguments that are contrary to the admissions in his proffer session—without also permitting the jury to assess that evidence in light of that proffer— would thwart the truth-seeking purpose of a trial and mislead the jury. *See United States v. Gomez*, 210 F. Supp. 2d 465, 476 (S.D.N.Y. 2002) ("[E]nforcement of a proffer agreement does not preclude defense counsel from taking a position or presenting evidence inconsistent with a defendant's proffer statements . . . . [b]ut if she does, . . . it is only fair that the Government then be permitted to present the defendant's own words in rebuttal.").

## C.  Discussion

Should the defendant testify, the Proffer Agreement makes clear that the Government may cross-examine him about all of his admissions during the post-arrest proffer. Moreover, regardless of whether the defendant testifies, the Government may seek to admit his proffer statements to rebut arguments by defense counsel that contradict those proffer statements. For example, should defense counsel suggest in any way that the defendant did not actually do the things he admitted to the FBI and later to the Government during his proffer, or that he did not do those things on behalf of Hizballah, the Government may offer his proffer statements to the contrary. *See Barrow*, 400 F.3d at 120 (approving use of proffer statements as rebuttal evidence and noting that "direct contradiction certainly falls within the scope of" proper rebuttal). Additionally, should defense counsel suggest in any way, such as through cross-examination, that the Agents fabricated the

defendant's admissions, the Government may offer the defendant's proffer statements to the contrary.  *See Rosemond*, 841 F.3d at 108-09 (collecting cases and noting that defense argument or cross-examination that accuses a witness of fabricating an event opens the door to admission of proffer statements to the contrary).

Finally, should defense counsel argue or otherwise suggest that the defendant made admissions to the FBI only because of some form of alleged coercion, the Government may offer the proffer statements to show that the defendant made those same admissions following his arrest when he had no obligation to speak to the Government, had new counsel, and had not been promised immunity from prosecution or confidentiality.  While the defendant did not specifically address in his proffer session whether he was coerced by the FBI into making his prior admissions, the fact that he made those same admissions again in separate and entirely non-coercive conditions is relevant to the jury's evaluation of the defendant's confessions.  "[P]roper rebuttal is not limited to direct contradiction," *Barrow*, 400 F.3d at 120, and instead includes evidence that fairly "counters" or "casts doubt" on the truth of factual assertions by the defense, *id.* at 121; *see also Lyle*, 856 F.3d at 32 (affirming admission of proffer statements to rebut defense counsel's opening argument, in which counsel "did not ascribe the charged crime to someone else, but . . . did more than challenge the sufficiency of the government's proof" by claiming the defendant was not a drug dealer); *United States v. Kusek*, 844 F.2d 942, 948 (2d Cir. 1988) (affirming admission of post-arrest statement in which defendant denied knowing about seizure of cash from his home where, in his opening statement, defense counsel indicating that any such large sums of cash could be attributable to defendant's restaurant business); *United States v. Bari*, 750 F.2d 1169, 1180 (2d Cir. 1984) (affirming admission of evidence of defendant's prior escape attempt when defendant

was injured to rebut claim by defense counsel in opening statement that the defendant's injuries made his charged escape improbable).  Therefore, any argument or evidence from the defense that the defendant would not have said what he said to the FBI but-for coercion will open the door to the Government's rebuttal evidence that those same facts were confessed by the defendant under markedly different conditions during his proffer.

To the extent the Government believes the defense has opened the door to admission of the defendant's proffer statements, the Government will notify the Court and counsel outside the presence of the jury before seeking to offer those statements.

**V.** ██████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████ █ ███████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████

█ ████████████████████████████████
██████████████████████████



## **<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully submits that the Court should grant

the relief requested herein.

Dated:  New York, New York
April 1, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York


By:  ___/s/_____
Emil J. Bove III
Amanda L. Houle
Assistant United States Attorneys


Cc:  Defense Counsel
(Via Email)

35