J57KKOU1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

        v.                              17 CR 417 (AKH)

ALI KOURANI,
                             Jury Trial
          Defendant.

------------------------------x

                            New York, N.Y.
                            May 7, 2019
                            10:00 a.m.

Before:

                HON. ALVIN K. HELLERSTEIN,

                            District Judge
                          And A Jury


                      APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
AMANDA L. HOULE
EMIL J. BOVE III
     Assistant United States Attorneys

ALEXEI SCHACHT
     Attorney for Defendant

ALSO PRESENT:  KERI SHANNON, Special Agent FBI
MARGARET SHIELDS, Paralegal, US Attorney's Office

1              (Trial resumed; in open court; jury present)

2              (A jury of 12 and 2 alternates was impaneled and

3    sworn)

4              THE COURT:  Good morning, ladies and gentlemen.

5              JURY MEMBERS:  Good morning, your Honor.

6              THE COURT:  Thank you for your promptness.

7              Ms. Jones has distributed notebooks to all of you.

8    Whether you use them or not is your decision.  Some people are

9    good with taking notes, some people pay better attention.  That

10   way, conversely, others do better without notes.  So it's an

11   individual choice.

12             You cannot use your notes to prove a point to somebody

13   else.  Your notes are only for your own individual use.

14   Notebooks will be taken from you before the lunch break and

15   returned to you when you come back, and they'll be taken from

16   you at the end of the day and returned to you the next morning.

17             We're now going to have the openings.  The openings

18   are presentations by each side of what they expect the proof

19   will show.

20             Ms. Houle will start for the government.

21             MS. HOULE:  The defendant, Ali Kourani, was a

22   terrorist operative for Hezbollah, part of a sleeper cell here

23   in New York City.  For years, the defendant lived in the United

24   States under a cover of normalcy, waiting, ready, ready to

25   commit an attack against the United States.  And while the

J57KKOU1                    Opening – Ms. Houle

1    defendant lurked in the shadows, he collected information for

2    Hezbollah to help plan future attacks, information like

3    security features at airports and important government

4    buildings, including a building just across the street from

5    this courthouse.

6          The defendant was a member of a terrorist cell here in

7    this city.  That is why we are here today.  That is what this

8    case is about.

9          Now, through the course of this trial, you will learn

10   all about the defendant's support for Hezbollah – his

11   recruitment, his training, his operations.  This opening

12   statement is my opportunity to give you a preview of what the

13   evidence will be.  So let me spend a few minutes by telling you

14   what I expect the evidence will show.

15         You'll learn the ins and outs of Hezbollah, that it is

16   a terrorist organization based out of Lebanon in the Middle

17   East, that when it announced itself, it declared America is

18   behind all of our catastrophes, that it partners with Iran to

19   target the United States and Israel, that it has murdered

20   civilians all over the world.  And you will learn about the

21   different parts of Hezbollah.  In particular, you will learn

22   about the Islamic Jihad Organization, a secret and deadly

23   network of terrorists planted all over the world, just like the

24   defendant.

25         And you will learn about the defendant's long history

1   with Hezbollah, how he was recruited by Hezbollah in Lebanon.

2   You see, the defendant came from a prominent family in Lebanon,

3   with Hezbollah connections at the highest ranks.  And so, in

4   the year 2000, when the defendant was 16, Hezbollah began to

5   groom the defendant, to train him, on military tactics, how to

6   use machine guns, and other combat weapons.  Hezbollah was

7   making sure that the defendant was ready to fight.

8        And sometimes fighting for Hezbollah means being on

9   the front lines of a battle in Lebanon.  The defendant was

10  ready for that.  But Hezbollah is a sophisticated terrorist

11  organization.  It has operations all over the world, and

12  Hezbollah plays the long game.  So sometimes fighting for

13  Hezbollah means leaving Lebanon, laying roots in another

14  country, quietly helping Hezbollah plan for attacks there.

15  That's what the defendant did here in the United States.

16       In 2003, the defendant came to the United States, and

17  he started to build a cover identity.  He went to school for a

18  degree that he would only ever use as part of his cover, and he

19  started to build relationships here.

20       In 2008, Hezbollah promoted the defendant.  He was

21  recruited into the Islamic Jihad Organization, that secret and

22  deadly network of terrorists all over the world.  And as part

23  of his membership in the Islamic Jihad Organization, the

24  defendant would receive additional training from Hezbollah,

25  training, again, in military tactics and how to use weapons,

J57KKOU1                     Opening - Ms. Houle

1    but also in how to collect intelligence secretly for attacks,

2    and how to avoid questioning if the defendant was caught, how

3    to manipulate his interviewers, so that the defendant could

4    protect himself and protect Hezbollah.

5           By 2008, the defendant was no longer just a trained

6    soldier, ready to fight on the front lines.  He was now a spy

7    for Hezbollah, ready to help plan attacks in the United States.

8           So what was his first step?  Deepen his cover.

9    Hezbollah told the defendant to become a United States citizen,

10   and to get a U.S. passport, so that he could travel more easily

11   for terrorist operations.  The defendant did exactly that.

12          His next step?  Help Hezbollah plan for attacks in the

13   United States.  How did he do that?  Well, one way was to

14   collect information for Hezbollah about targets for attacks.  I

15   already mentioned some of the surveillance that the defendant

16   conducted.  He collected information for Hezbollah about

17   important buildings in New York City, buildings used to store

18   weapons and to protect the city against attacks, buildings

19   filled with law enforcement, but also with everyday citizens.

20   Take that building I mentioned across the street from this

21   courthouse.  In it, FBI offices, U.S. Citizenship and

22   Immigration Services, a court, and a daycare center.  That is a

23   building that the defendant scoped for a Hezbollah attack.

24          And the defendant's surveillance was not limited to

25   important government buildings.  He scoped out airports for

1    Hezbollah, for attacks, including JFK Airport.  The defendant

2    collected information for Hezbollah and reported back on the

3    security features at JFK, things like where the security were

4    located, whether they were armed, what types of questions they

5    asked to the travelers to try and screen them, and where the

6    cameras were.  The defendant provided a roadmap to Hezbollah

7    for how a terrorist could avoid detection at JFK.

8           And the defendant researched gun suppliers in New York

9    City for Hezbollah, so that Hezbollah could stockpile weapons

10   and have them ready for an attack.  The defendant completed

11   task after task for Hezbollah, and all the while, he did it in

12   secret, using his training to appear like an everyday

13   New Yorker.

14          But as time went on, it became difficult for the

15   defendant to keep up this cover identity, and his relationship

16   with Hezbollah also began to shift.  In 2013, the defendant was

17   arrested by the New York City Police Department.  Being

18   arrested, even on a minor offense, is bad for a secret

19   terrorist operative.  It puts you on the radar of law

20   enforcement, and that's what happened to the defendant.

21          Law enforcement started to look more closely at what

22   the defendant was doing here in the United States, and the

23   defendant could tell.  He was being stopped regularly at

24   airports and questioned, and he knew that the U.S. Government

25   was on to him.

1              In 2016, the FBI approached the defendant, and they

2       told him loud and clear, we know what you're up to.  The FBI

3       agents told the defendant to be honest about his connections to

4       Hezbollah, to provide information that could be important to

5       U.S. national security, and they told the defendant that if he

6       did not tell the truth, they would continue to investigate him.

7              The defendant refused to provide his information.  He

8       used his specialized training to avoid the FBI's questioning,

9       and like the true intelligence operative that he was, he used

10      those meetings to try and collect information from the FBI,

11      like who their sources were and what they knew about Hezbollah.

12             At the end of those meetings, the defendant challenged

13      the FBI.  He told them to bring it with their investigation.

14      That was his words.  And the FBI gave the defendant what he

15      asked for.  In 2016, the FBI continued to investigate the

16      defendant, and that meant speaking with people from all aspects

17      of the defendant's life.  The defendant's cover was cracking,

18      and he could feel it.

19             And the defendant's relationship to Hezbollah was also

20      under pressure.  Hezbollah grew suspicious about the

21      defendant's many interactions with U.S. law enforcement, and

22      they questioned him about it.  And in the summer of 2016, the

23      defendant had an argument with his wife in Lebanon, and that

24      argument involved some of her family members, who were also

25      part of Hezbollah.  After that argument, the defendant's wife

J57KKOU1                    Opening - Ms. Houle

1    left for Canada, taking their children with her.  The defendant

2    came back to the United States alone, and he was angry.  He

3    wanted to take his children back from his wife, and he wanted

4    revenge on those Hezbollah members who sided against him.

5           At that point, the defendant knew that his options

6    were limited.  The FBI was openly investigating him, and the

7    defendant's cover identity was falling apart.  But the

8    defendant thought that he still had a card left to play.  He

9    believed that the FBI still wanted to hear from him about

10   Hezbollah's inner workings.  He believed that his information

11   had value.  And so he decided he would try and leverage the

12   value of his information about Hezbollah to demand benefits

13   from the U.S. Government, benefits like taking his children

14   from his wife and having her family members arrested for their

15   support for Hezbollah.  And his demands did not stop there.

16   The defendant demanded things like a high-paying job, like

17   being put up in a doorman building in New York City, like

18   having his family members brought over from Lebanon into the

19   United States and given legal status here.

20          And, remember, the defendant was a sophisticated spy,

21   and he is no fool.  So he also had a backup plan.  He would use

22   these meetings with the FBI not just to provide information

23   about Hezbollah and demand benefits, but also to try and

24   collect intelligence from the FBI, information about how they

25   investigate terrorists, who their sources are, what they know

1    about Hezbollah and the Islamic Jihad Organization, information

2    that he could bring back to enemies of the United States, like

3    Iran and Hezbollah, if the defendant needed to reestablish

4    himself in Hezbollah in Lebanon.

5            The defendant set this plan in motion by finding an

6    attorney who reached out to the FBI and said that the defendant

7    wanted to meet.  The FBI was willing to meet with the

8    defendant, but the agents were clear from the start:  We cannot

9    promise you any benefits.

10           In early 2017, the defendant set his mission in

11   motion.  He met with the FBI agents five times.  Like those

12   meetings with the FBI in 2016, the defendant tried to collect

13   intelligence from the FBI.  But, unlike in 2016, the defendant

14   was now ready to share some of his information about Hezbollah.

15   He told the FBI agents about his recruitment into Hezbollah,

16   his training, some of his operations in the United States, his

17   membership in the Islamic Jihad Organization.

18           With each meeting, the defendant provided a little

19   more information, constantly testing whether he had told the

20   agents enough to get all of those benefits that he was

21   demanding.

22           But the FBI didn't give in to the defendant's

23   benefits, and he grew frustrated.  He and his attorney

24   threatened the FBI to shut down the meetings, to contact the

25   media, to have the defendant flee back to Lebanon, where the

J57KKOU1                      Opening – Ms. Houle

1    agents knew that he could provide information about them and

2    their investigation to Hezbollah.

3            Ladies and gentlemen, the defendant miscalculated.

4    His mission failed.  The U.S. Government was not prepared to

5    provide benefits and a doorman building to a terrorist, and the

6    FBI wasn't going to give the defendant a pass for his more than

7    15 years of support to Hezbollah, including targeting buildings

8    in New York City and airports.  And those meetings that the

9    defendant had with the FBI were more than just a failed effort

10   to demand benefits and extract intelligence; they were a

11   confession.  They are powerful evidence of the defendant's

12   support to Hezbollah.

13           Based on the defendant's confession and other evidence

14   that the FBI collected, the defendant was arrested.  And that's

15   why he stands charged here before you today for his crimes.

16           So that's what the evidence will show:  That the

17   defendant was a highly trained Hezbollah operative, that he was

18   a member of the Islamic Jihad Organization, and that he was

19   planted in the United States to be ready for an attack, and to

20   help plan attacks.

21           So now that I've described what I expect the evidence

22   will show, let me spend just a few minutes describing what that

23   evidence will look like, how the government will prove its case

24   to you.

25           Well, you'll hear about the defendant's crimes as he

J57KKOU1                    Opening - Ms. Houle

1    described them.  Those two FBI agents who interviewed the

2    defendant in 2017 will testify, and they will you what the

3    defendant said about his recruitment, his training, his

4    operations, his membership in the Islamic Jihad Organization.

5    And the defendant didn't just describe his crimes.  He

6    identified photographs of the buildings that he surveilled for

7    Hezbollah.  You'll see those photographs.

8              He identified photographs of the weapons that he used.

9    You'll see those photographs as well.

10             And during the course of the defendant's meetings with

11   the FBI, as he was telling them, in no uncertain terms, I am a

12   member of Hezbollah's Islamic Jihad Organization, a member of

13   Hezbollah's black ops, as he described it.  He was taking notes

14   of those meetings.  Those notes were seized from his apartment,

15   and you will see them as well, notes that the defendant could

16   use to keep track of what information he had given up to the

17   FBI, and also what information he could use against the FBI, if

18   he executed that backup plan, of going back to Hezbollah in

19   Lebanon.

20             You'll hear from other law enforcement officers who

21   investigated the defendant and interacted with him.  You'll

22   hear from one of those FBI agents who met with the defendant in

23   2016, when he denied his membership in Hezbollah, and when he

24   tried to collect intelligence from the FBI.  You'll hear from

25   an FBI agent who searched the defendant's apartment after he

J57KKOU1                    Opening - Ms. Houle

1   was arrested and found things like those notes that I

2   mentioned, and also things like combat boots and a go bag ready

3   with thousands of dollars and identification documents.  You'll

4   hear from an officer who caught the defendant trying to sneak a

5   small memory card into the United States from Lebanon, a memory

6   card that he had taken out of his phone and tried to hide under

7   a sticker on his passport.

8         You'll hear from witnesses who will show you travel

9   documents for the defendant that show his movement through the

10  United States and Lebanon, and through those airports that he

11  surveilled for Hezbollah.  You'll hear from a witness who will

12  show you the applications that the defendant filed at

13  Hezbollah's direction - for U.S. citizenship, a U.S. passport,

14  and a U.S. passport card.

15        You'll hear from witnesses who will show you evidence

16  collected from the defendant's electronic devices and accounts,

17  like his computer and his email accounts.

18        Some of that evidence will focus on what was found in

19  the accounts, things like Hezbollah propaganda, searches for

20  guns and other tactical equipment, research on Israel's

21  intelligence operations.  You'll even see a search that the

22  defendant conducted of a building that he admitted to

23  surveilling for Hezbollah.

24        And some of that evidence will focus on what wasn't

25  found in the defendant's accounts - things like Facebook

1   messages that he intentionally deleted with other members of

2   Hezbollah and email accounts that were abandoned after they

3   were set up by the defendant's Hezbollah supervisor in Lebanon.

4          And you will hear from witnesses who will give you

5   some context, so that you can understand the other evidence in

6   this case.  You'll hear from a witness who specializes in

7   Hezbollah, who will explain to you its background, its

8   membership, its structure.  You'll hear from a witness who

9   specializes in firearms, and he will describe to you the

10  specifics of those guns that the defendant admitted to using

11  during his Hezbollah training.

12         You'll hear from witnesses who will tell you about

13  those government buildings that the defendant surveilled for

14  Hezbollah, why they are strategic targets, where they're

15  located, who works inside of them, what's inside, and what the

16  U.S. Government does to try and protect against the very type

17  of surveillance that the defendant conducted.

18         So, as a result of the defendant's training by

19  Hezbollah, as a result of his efforts to help terrorists plan

20  attacks in this country, he is charged with eight crimes.  At

21  the end of this trial, Judge Hellerstein will give you

22  instructions on the law, and he will describe the details of

23  all of those crimes, but, generally, they relate to the

24  defendant's support for Hezbollah, his military training from

25  Hezbollah, the weapons that he used in that military training

J57KKOU1                         Opening - Ms. Houle

1   and in his support for Hezbollah, and the fraudulent U.S.

2   citizenship application that the defendant filed at Hezbollah's

3   instruction.  On that application, the defendant claimed that

4   he had never been a member of a terrorist organization.

5          At the end of this trial, you will know the truth -

6   that the defendant was a Hezbollah terrorist, a member of the

7   Islamic Jihad Organization, that he was here ready to commit

8   attacks, and that he helped Hezbollah plan for attacks, that he

9   is guilty of each of the crimes charged.

10          At the end of this trial, the government will have

11   another opportunity to stand up here and explain to you how all

12   of the evidence fits together to prove that the defendant is

13   guilty beyond a reasonable doubt.  Between now and then, we ask

14   that you do three things:

15          First, pay careful attention to the evidence as it

16   comes in;

17          Second, follow Judge Hellerstein's instructions on the

18   law;

19          And, third, use your common sense, the same common

20   sense that you use every day in your lives.

21          If you do these three things, the defendant will have

22   what every defendant deserves in an American courtroom, a fair

23   and just trial, and you will reach the only verdict consistent

24   with the evidence in this case, that the defendant is guilty as

25   charged.

1              THE COURT:  Thank you, Ms. Houle.

2              Mr. Schacht.

3              MR. SCHACHT:  Thank you very much, your Honor.

4              May it please the Court, members of the jury:

5              The evidence in this case is going to show that my

6     client is not, and was not, a terrorist, and did not provide

7     material support to a terrorist organization, Hezbollah.  I'm

8     going to talk now just about what the evidence is.  I'm not

9     going to tell you a story; I'm going to talk about the

10    evidence.

11             My client was born in a small town, and lived, and

12    grew up in a small town in southern Lebanon, near the Israeli

13    border.  The town that my client is from is in the area of

14    Lebanon that is controlled by Hezbollah.  He grew up surrounded

15    by Hezbollah, as did everyone else from that part of Lebanon.

16             You will hear that the structure of the government and

17    the Country of Lebanon is divided into different ethnic and

18    religious groups, and so the Government of Lebanon actually has

19    a religious split, where one of the leaders has to be a

20    Christian, one has to be a Shia Muslim, and you'll learn that

21    there's an historical schism, or split, between Shia and Sunni

22    Islam, which are two different branches of Islam, and that the

23    people in Hezbollah, and many of the people in South Lebanon,

24    are Shia Muslims.

25             My client is a Shia Muslim, and he grew up in an

1   atmosphere in which almost everybody was involved by being

2   taken care of, in some sense, by Hezbollah, because Hezbollah

3   is a terrorist organization that does commit acts of violence,

4   but it also is part of the government's structure, it has seats

5   in the parliament of Lebanon, and they provide education and

6   medical services for people.  And so everyone in Lebanon,

7   especially South Lebanon, has some connection to Hezbollah and

8   knows about Hezbollah, because, while it's an illegal terrorist

9   organization in the United States, in Lebanon, it's not

10  illegal, it's a legitimate part of the government there.

11          Be that as it may, my client certainly knows many

12  people that he grew up with who are involved in Hezbollah.  You

13  will see some emails from people he knows that were sent to

14  him, for example, with things about Hezbollah.  The evidence

15  will show that's simply a function of where he grew up.

16          What you will not see -- and the evidence will not

17  show -- is that there is any shred of evidence, other than some

18  statements that he himself made that Ms. Houle talked about in

19  meetings with the FBI, with another lawyer, not me, present

20  with him.  There is not one shred of evidence against him.  You

21  will not hear, for example, from anybody from Lebanon.

22  Ms. Houle talked about Hezbollah grew suspicious of him.

23  You're not going to hear any evidence from anybody who's in

24  Hezbollah who's going to tell you about what Hezbollah

25  supposedly is thinking or doing.  You're not going to hear any

1    wiretaps.  You're not going to see any physical evidence of the

2    form of fingerprints, or DNA, or anything of that sort.  The

3    reason why you're not going to see any evidence of my client's

4    guilt is because he's not guilty.

5          What happened here is a few years ago, the FBI started

6    approaching my client.  This was after he was arrested.  It's

7    true, in a counterfeit clothing case, he was arrested, and what

8    happened was FBI agents started approaching him.  Rather than

9    my client seeking benefits from the FBI, what happened is, they

10   were begging him to cooperate.  So the FBI would stop him, and

11   other intelligence agencies would stop him, literally around

12   the world.  He was stopped in Lebanon, he was stopped in

13   Wisconsin, Chicago, New York.  They would approach him in a

14   Starbucks or in a public place.  They would offer him wads of

15   cash, $5,000, $2,000.

16         So, rather than being a dangerous terrorist, this was

17   someone who the FBI thought might help.  I don't know what was

18   in the FBI's head, obviously, so I'm not going to say what was

19   in their head, but I am going to tell you that the facts will

20   show that they offered him money to help them.  That's what

21   happened.  My client said to them, I'm not in Hezbollah, and he

22   turned down thousands of dollars in cash from them.

23         They told him, the money can be used, it can help you

24   in business, it can help your family, all these kind of things,

25   we just want information about Hezbollah.  He said I can't help

1    you.

2              Eventually, what happened is, he had a problem with

3    his wife, they were splitting up, he was worried he wouldn't

4    see his children again, and he was fearful for their safety.

5    You'll hear that at one of the interviews, he talked about how

6    he's against Hezbollah, he thought they were eventually ruining

7    the country.  And so he said to the agents, the FBI agents, I

8    may talk to you.  What happened is, he went, he got a lawyer,

9    the lawyer contacted the FBI.  He wasn't interested, at that

10   point, in the cash.  All he was worried about was his family's

11   safety, his kids, and his dad, his sister, and there were

12   things happening in Lebanon, dangerous things happening, he was

13   worried about all of their safety.

14             So he approached the FBI.  The FBI made him a series

15   of promises.  What promises did they make?  The FBI promised

16   him, most importantly to him, they promised him

17   confidentiality.  Specifically, they promised him that no one

18   in the Lebanese community would find out what he was going to

19   talk about, because he was, obviously, worried if Hezbollah

20   were to learn that he would say something, that would be

21   terrible for him, of course, or his family.  So they promised

22   him confidentiality.

23             They also promised that they would help to bring his

24   family here.  The evidence is going to show that the FBI gave

25   him an actual timeline of when they thought they would be able

1    to bring his family.  And so, in this setting, under pressure,

2    fearful for his kids, he started telling them some things.

3    Some of the things he told them were true, many of the things

4    he told them were not true, but it was only after these five

5    meetings where he was sitting with a lawyer, not in custody,

6    promised confidentiality, at the end of those five meetings,

7    the FBI basically said to him, you haven't given us anything

8    helpful, you haven't told us anything that can help us.

9           And so, then, some of the same FBI agents, who

10   previously had been offering him cash and essentially

11   government friendship, they turned around, and they arrested

12   him based solely upon some statements that the FBI is going to

13   say he made at that meeting or at those five meetings.

14          Now, of course, I mentioned to you before, there's not

15   going to be any tape recordings.  Unfortunately, none of those

16   five meetings were recorded.  So this is another absence of

17   evidence.  And so all you're going to hear about in this case

18   is the defendant, suspected by the government of being involved

19   in Hezbollah in some way, begged to be an informant, him

20   refusing, and him then eventually going and telling the FBI

21   some things, some of which were true, some were false, as I

22   said before.  And that's all the evidence.  There's not going

23   to be anything to corroborate or confirm what he supposedly

24   said at those meetings.

25          The supposedly secret little cartridge of things that

J57KKOU1                        Opening – Mr. Schacht

1    she said was taped or something under his passport, you're not

2    going to have that either because the government didn't seize

3    that.  So we have no idea what was on there, if that was just a

4    kind of memory card that people who travel overseas change

5    memory cards.  Who knows what was in there.  I don't know,

6    you're not going to know, because it's not going to be in

7    evidence.

8            He has some emails and some Google searches.  The

9    evidence is going to show that a highly trained, supposedly

10   highly trained, terrorist doesn't do Google searches from their

11   home computer to do terrorism.  That's simply not credible.

12           It's also going to show that a highly trained,

13   supposedly, undercover secret terrorist operative doesn't sell

14   fake UGG boots as their job.  That's who my client is.  He's a

15   person who grew up, he came here, he knows people in Hezbollah,

16   as does everyone in his town, he got an education, he sold fake

17   UGG boots, he didn't do anything to try and harm the United

18   States.  And at the end of the case, I'm going to ask you to

19   find him not guilty.

20           Thank you.

21           THE COURT:  Thank you, Mr. Schacht.

22           Call your first witness.

23           MR. BOVE:  Thank you, your Honor.

24           The government calls Special Agent Daniel Ganci.

25           THE COURT:  When the oath is administered, I'd like

1    all of you to pay attention to the oath and not do anything

2    else.

3            Okay, Mr. Bove.

4            MR. BOVE:  Thank you, your Honor.

5            This is Special Agent --

6            THE COURT:  Did you hear what I said?

7            MR. BOVE:  Yes, your Honor.

8            THE COURT:  Have a seat.

9     DANIEL GANCI,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12            THE WITNESS:  Daniel M. Ganci, G-a-n-c-i.

13            MR. BOVE:  May I proceed, your Honor?

14            THE COURT:  Yes.

15   DIRECT EXAMINATION

16   BY MR. BOVE:

17   Q.  Special Agent Ganci, where do you work?

18   A.  I work with the FBI New York.

19   Q.  How long have you worked at the FBI?

20   A.  I have been a special agent for 11 years.

21   Q.  What did you do before you became a special agent at the

22   FBI?

23   A.  I was an army officer for seven years.

24   Q.  In your current work, are you assigned to a particular part

25   of the FBI?

1    A.   Yes.  I am part of the Counterterrorism Division.

2    Q.   Within the Counterterrorism Division, is there a component

3    that you are assigned to here in New York?

4    A.   Yes.  I'm on squad CT9.

5    Q.   Are you also a member of the Joint Terrorism Task Force?

6    A.   Yes, I am.  The squad is part of the Joint Terrorism Task

7    Force, yes.

8    Q.   What is the Joint Terrorism Task Force?

9    A.   Well, the Joint Terrorism Task Force is a partnership

10   between federal, state, and local law enforcement agencies

11   where we combine resources and authorities to investigate

12   terrorism matters in the New York area.

13   Q.   You said that within that task force, you're assigned to

14   squad CT9?

15   A.   Yes.

16   Q.   What is squad CT9?

17   A.   CT9 is one of the squads that's part of the task force.

18   Our responsibility is to investigate Hezbollah, Islamic Jihad,

19   as well as Iranian counterterrorism groups.

20   Q.   Do you know a man named Ali Kourani?

21   A.   I do.

22   Q.   Do you see him in court today?

23   A.   I do.

24   Q.   Could you please point him out, where he's sitting, and an

25   article of clothing that he's wearing?

1   A.  Yes.  He is at the defendant's table wearing a white shirt

2   with black glasses.

3          THE COURT:  The record will reflect the identification

4   of the defendant.

5          MR. BOVE:  Thank you, your Honor.

6   BY MR. BOVE:

7   Q.  Special Agent Ganci, have you spoken to the defendant

8   before?

9   A.  Yes, I have.

10  Q.  How many times?

11  A.  Two times.

12  Q.  Let's talk about the first time.  When was that?

13  A.  It was September 12, 2016.

14  Q.  Where did you speak to the defendant on September 12, 2016?

15  A.  It was at the customs and border section of Newark Liberty

16  International Airport.

17  Q.  Was anyone else from the FBI with you that day?

18  A.  Yes.  Special Agent Shannon was with me that day.

19  Q.  Why were you and Special Agent Shannon at the Newark

20  airport on September 12, 2016?

21  A.  We were there to interview the defendant as part of a

22  routine investigation we were conducting.

23  Q.  How did the interview begin?

24  A.  We asked the defendant if he was willing to speak to us and

25  that if he was willing to talk to us about his time in Lebanon.

1    Q.  Did you identify yourselves?

2    A.  Yes, we did.

3    Q.  Was the defendant required to answer questions on

4    September 12, 2016?

5    A.  No, he was not.

6    Q.  Was he told that?

7    A.  Yes, he was.

8    Q.  Did the defendant choose to speak to you on that day?

9    A.  Yes, he did.

10   Q.  During the interview, what, if anything, did the defendant

11   say about what he planned to do in the New York City area?

12   A.  The defendant said that he was returning from Lebanon, and

13   that he was going to be staying with his brother, Moustapha

14   Kourani, up in the Bronx, and that he currently did not have a

15   job, that he would be looking for work.

16   Q.  Did the defendant say why he would be looking for work?

17   A.  Yes.  The defendant said that before leaving for Lebanon,

18   he was living in Chicago, but that he had been fired from his

19   previous job.

20   Q.  You mentioned that the defendant said he had been in

21   Lebanon prior to coming to the Newark airport?

22   A.  Yes, he did.

23   Q.  What, if anything, did the defendant say about how long he

24   had been in Lebanon?

25   A.  The defendant said that he had planned originally to spend

1   two weeks in Lebanon, but due to some family matters, he ended

2   up spending two months in Lebanon.

3   Q.  Did the defendant say anything during the interview on

4   September 12, 2016, about his family matters?

5   A.  Yes.  The defendant described a problem that he was having

6   with his mother-in-law.  He said that his mother-in-law was

7   interfering with his marriage, and he said that despite what we

8   had heard, that he had not beaten his wife or his

9   mother-in-law.

10          The defendant then went on to describe a specific

11  incident while he was in Lebanon where he went to his

12  mother-in-law's houses to pick up his wife and children.  The

13  mother-in-law came out of the house, yelling at him.  The

14  defendant said that the wife -- excuse me, the mother-in-law

15  was unstable.  The mother-in-law threw his two children into

16  the back of his car, and the defendant attempted to leave, but

17  the mother-in-law continued to yell at the defendant and pull

18  at the car door.  Eventually, the car door opened, the

19  mother-in-law fell down, and then the defendant left the area.

20  Q.  Those are all things that the defendant said to you and

21  Special Agent Shannon on September 12, 2016?

22  A.  Yes.

23  Q.  After he described those facts, did the defendant say what

24  happened when he left his mother-in-law's area?

25  A.  Yes.  The defendant then said, later on that day, brothers

J57KKOU1                        Ganci - Direct

1   and cousins of the mother-in-law went to the defendant's house,

2   surrounded his house, and fired shots at his house.

3   Q.   When the defendant described that incident, what, if

4   anything, did he say about affiliation to Hezbollah?

5   A.   He said that all those members of his mother-in-law's

6   family were members of Hezbollah.

7   Q.   What, if anything, did the defendant say during the

8   interview about his marital status?

9   A.   He said that his wife and children were currently in

10  Canada, and that he was considering a divorce.  A lot of it had

11  to do with the recent incident.  The defendant said that he was

12  very angry at his wife for allowing her family to surround the

13  house and fire shots at the house, especially with their

14  children inside the house, but that he still loved his wife,

15  and he was trying to come to a decision.

16  Q.   Did the defendant tell you on September 12, 2016, where his

17  wife and children were?

18  A.   Yes.  He said that they were in Canada.

19  Q.   Was the defendant asked any questions about Hezbollah

20  during the interview?

21  A.   Yes.  The defendant was asked to provide the name of his

22  contact or handler at Hezbollah.

23  Q.   How, if at all, did the defendant respond when he was first

24  asked that question?

25  A.   The defendant said that he did not know anybody in

J57KKOU1                           Ganci - Direct

1   Hezbollah.

2   Q.  Did anyone in the interview respond to that claim?

3   A.  Yes.  Special Agent Shannon challenged him saying that he

4   had just said that numerous family members were in Hezbollah.

5   Q.  What happened after Special Agent Shannon made that

6   comment?

7   A.  The defendant acknowledged that he knew some people in

8   Hezbollah.

9   Q.  What happened next?

10  A.  The defendant said that he had talked and cooperated with

11  agents in the past, at which time we told him that it would

12  only be considered cooperation if he provided meaningful and

13  truthful information; if he didn't do that, then he would

14  continue to be under investigation.

15  Q.  How did the defendant respond to the comment about the

16  ongoing investigation?

17  A.  The defendant said, good, and that he felt safer knowing

18  that we would be watching him.

19  Q.  What was his demeanor like when he said that?

20  A.  It was a sarcastic remark.

21  Q.  Was the defendant asked any other questions at that point

22  in the interview?

23  A.  He was asked to provide the name of his handler again.

24  Q.  What happened after the defendant was asked that question a

25  second time?

J57KKOU1                          Ganci - Direct

1    A.   The defendant said he does not have a contact in Hezbollah,

2    and the interview ended.

3              THE COURT:  And what?

4              THE WITNESS:  The interview ended, sir.

5    BY MR. BOVE:

6    Q.   Now I'd like to jump ahead a bit to June 1st of 2017.  Were

7    you working that day?

8    A.   Yes, I was.

9    Q.   What was your assignment?

10   A.   I was the arrest team leader for the team responsible for

11   arresting the defendant that day.

12   Q.   And as the arrest team leader, where did you plan to make

13   the arrest?

14   A.   We were going to arrest the defendant a couple of blocks

15   away from his residence.

16   Q.   I'm going to show you documents marked for identification

17   as Government Exhibits 10-A, 10-B, and 10-C.

18             Could you please take a look at these.

19             What are the exhibits that I just handed you?

20   A.   Exhibit 10-A is a map overview of the defendant's

21   residence.

22             THE COURT:  Mr. Schacht, tell me when you're ready.

23             MR. SCHACHT:  I'm ready, Judge.  Thanks.

24             THE COURT:  Don't rush.  Are you ready?

25             MR. SCHACHT:  I'm ready.

1              THE COURT:  Okay.  Proceed.

2              THE WITNESS:  10-A is a map overview of the

3    defendant's residence, which is 183 West 238th Street.

4              Exhibit 10-B is a bit of a satellite overview of the

5    same residence.

6              And then 10-C is the main entrance to the residence

7    itself.

8    Q.  Do these exhibits, Government Exhibits 10-A, B, and C,

9    fairly and accurately depict the area around 183 West 238th

10   Street?

11   A.  They do.

12             MR. BOVE:  Your Honor, I offer those exhibits.

13             MR. SCHACHT:  No objection.

14             THE COURT:  Received.

15             (Government's Exhibits 10-A, 10-B and 10-C received in

16   evidence)

17             MR. BOVE:  Ms. Shields, could you please publish, for

18   the jury, Government Exhibit 10-A.

19             THE COURT:  These are Google Maps, right?

20             MR. BOVE:  Yes, your Honor.

21   BY MR. BOVE:

22   Q.  Special Agent Ganci, what does Government Exhibit 10-A

23   show?

24   A.  It shows the location, and the block dot is the subject's

25   residence, 183 West 238th Street, as well as some of the major

1    highways around that area.

2    Q.  This was the location of the planned arrest on June 1st,

3    2017?

4    A.  That is where we began our surveillance, and we planned to

5    arrest a block or two away from that area, yes.

6             MR. BOVE:  Ms. Shields, could you please bring up

7    Government Exhibit 10-B.

8    Q.  Special Agent Ganci, what are we looking at now?

9    A.  The satellite overview gives you a better view of West

10   238th Street, as well as the overpass over the Major Deegan,

11   and then on the top left corner, you can see the elevated train

12   over the top of Broadway.

13            MR. BOVE:  Ms. Shields, if you could please move this

14   exhibit to the left, and on the right side of the screen, bring

15   up Government Exhibit 10-C.

16   Q.  Special Agent Ganci, what is Government Exhibit 10-C?

17   A.  10-C is the main entrance into the defendant's residence.

18   It's 183 -- building 183.

19   Q.  Getting back to June 1st, 2017, what was the plan for the

20   arrest?

21   A.  We had approximately ten people spread over four different

22   cars.  The idea was to identify the defendant as he exited the

23   residence, and then, as he walked a couple of blocks away, we

24   would arrest him in the street.

25   Q.  Why did you plan to make the arrest outside the defendant's

1    apartment?

2    A.   For a number of safety concerns.  We didn't want to conduct

3    an arrest in the apartment that morning.  We didn't want the

4    defendant to become a barricaded subject.  We also wanted to

5    keep the arrest discrete.  There were a number of other events

6    that were being coordinated that day.

7    Q.   Had the FBI obtained any warrants related to the activity

8    planned for June 1st, 2017?

9    A.   Yes.  We had an arrest warrant for the defendant and a

10   search warrant for his residence.

11   Q.   You said there were approximately ten people on the arrest

12   team that morning?

13   A.   Yes.

14   Q.   What were the roles that those people were playing?

15   A.   Myself, NYPD Sergeant Sommer, as well as Detective Bonah

16   were in the main car and were in the position about where that

17   blue car is in 10-C, and we were responsible for the main

18   identification, as well as the eventual arrest.  The other

19   vehicles took up positions to assist in identifying the

20   subject, should he get past us, as well as to assist in the

21   arrest, should the subject resist us, as well as provide

22   general security, such as blocking traffic and whatnot, when we

23   eventually made our approach to the subject.

24   Q.   What time did you establish surveillance at the location

25   shown in 10-C on June 1st, 2017?

1    A.   Approximately 6:00 a.m.

2    Q.   What were you wearing that day?

3    A.   We were wearing bulletproof vests that identified ourselves

4    as FBI agents, as well as the blue and yellow gray vests, again

5    identifying ourselves as law enforcements.

6    Q.   I think you said "we."  Were all the members of the arrest

7    team dressed in a similar fashion?

8    A.   Yes, they were.

9    Q.   Now, could you please use the exhibits on the screen to

10   illustrate for the jury where you were positioned at the start

11   of the surveillance?

12   A.   Again, my vehicle was located on or about where the blue

13   vehicle is in front of the residence in 10-C.  We were in a

14   caravan-type vehicle that had tinted windows.  Other vehicles

15   were directly across the street, as well as at the intersection

16   to the right of 238th Street and to the left by the other

17   vehicles.

18   Q.   When you say positioned across the street, you mean the

19   south side of West 238th Street?

20   A.   Yes, on the south side of West 238th Street.

21   Q.   Where was the next team positioned?

22   A.   Then there was one team positioned to the east, or to the

23   right, of 10-C at that following intersection that you can see

24   in 10-B.  And then there was another vehicle positioned to the

25   left, or to the west, at the overpass area of where West 238th

1   Street crosses over the Major Deegan Expressway.

2   Q.  Who did you say was in the vehicle with you that morning?

3   A.  I was with NYPD Sergeant Sommer, as well as NYPD Detective

4   Bonah.

5   Q.  Did you see the defendant on June 1st, 2017?

6   A.  Yes, we did.

7   Q.  What time, approximately, did you see the defendant?

8   A.  He exited his building approximately 10:50.

9   Q.  What happened next?

10  A.  After making an initial identification, Sergeant Sommer

11  repositioned -- the defendant exited his residence, and then

12  turned to the right, his right, moving towards Broadway, or

13  west, along West 238th Street.  Sergeant Sommer repositioned

14  our vehicle in front of his path, so that he could see him

15  again and confirm that this was, in fact, the defendant.  We

16  did confirm that it was the defendant, and then we repositioned

17  one more time again, in the walking path or the anticipated

18  path of the defendant, in and around West 238th Street and

19  Broadway, which is the top left corner of Exhibit 10-B.

20  Q.  What happened at that location?

21  A.  At that location, we waited for the defendant to continue

22  walking towards us.  As he got to that intersection, he crossed

23  from the north side of West 238th Street to the south side.  As

24  he was crossing through the intersection, myself and Detective

25  Bonah exited our vehicle and approached him in the

1    intersection.  Detective Bonah called out his name, the

2    defendant identified himself.  Detective Bonah told him that

3    you are under arrest, and we put him in handcuffs.  We

4    conducted a quick search of him.  And then we brought him back

5    to our vehicle.

6    Q.  What happened inside the vehicle?

7    A.  Inside the vehicle, I informed the defendant that he was

8    under arrest, that he had the right to remain silent, that we

9    were going to bring him to the local precinct, where we would

10   be able to readjust his handcuffs, conduct a more thorough

11   search, and that he would eventually be transported to 26

12   Federal Plaza, which is the FBI New York headquarters, for

13   additional processing.

14   Q.  What was the local precinct?

15   A.  The local precinct was the 50th Precinct on Kingsbridge

16   Avenue.

17   Q.  Did you bring the defendant to the 50th Precinct that

18   morning?

19   A.  We did.

20          MR. BOVE:  Ms. Shields, could you please publish

21   Government Exhibit 10-A on the left side of the screen.

22   Q.  Could you please use this map to give an approximate

23   location of the 50th Precinct?

24   A.  Based on the map, it is just left of center, a little bit

25   higher over -- the intersection over the bridge portion, the

J57KKOU1                          Ganci - Direct

1    RID portion as you go up.  That's about the intersection of

2    where the 50th Precinct is located.

3    Q.  What happened when you got to the 50th Precinct on the

4    morning of June 1st, 2017?

5    A.  We got the defendant out of the vehicle, we repositioned

6    his handcuffs, so he was more comfortable, but still

7    restrained, we conducted a thorough search, documenting the

8    items that we took off of him.

9           While I was conducting the search, Sergeant Sommer was

10   asking the defendant to confirm his name, his residence, any

11   roommates that he had, as well as what other -- how long --

12   whether those roommates would be in the residence and how long

13   they would be away from the residence.

14   Q.  Did the defendant respond to those questions about his

15   residence and the occupants of the residence?

16   A.  He did.

17   Q.  What did he say?

18   A.  He said that he had a roommate, and that they would be gone

19   for most of the day.

20   Q.  You said that you seized some items from the defendant at

21   that point?

22   A.  Yes.

23   Q.  I'm handing you items marked for identification as

24   Government Exhibits 201 through 204.  If you could please take

25   a look at those.

1        What are those exhibits?

2   A.  These are some of the items that were on the defendant at

3   the time of his arrest.

4   Q.  And they were seized from him that morning?

5   A.  Yes.

6   Q.  Are the exhibits that you have, 201 through 204, in

7   substantially the same condition as they were when they were

8   seized at the 50th Precinct on June 1st, 2017?

9   A.  Yes.

10          MR. BOVE:  Your Honor, the government offers 201

11  through 204.

12          MR. SCHACHT:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibits 201 through 204 received in

15  evidence)

16  BY MR. BOVE:

17  Q.  Let's start with 204, please.

18          What is that exhibit?

19  A.  Exhibit 204 is a cell phone.

20  Q.  If you could hold that up for the jury, please.

21          What is Government Exhibit 203?

22  A.  Exhibit 203 is the defendant's Social Security card.

23          MR. BOVE:  Ms. Shields, could you please publish

24  Government Exhibit 203.

25  Q.  Special Agent Ganci, what is Government Exhibit 201?

1    A.  201 is the defendant's U.S. passport.

2              MR. BOVE:  Ms. Shields, could you please publish page

3    3 of Government Exhibit 201.  If you could zoom in on the

4    bottom page, please.

5    BY MR. BOVE:

6    Q.  Special Agent Ganci, when was the defendant's passport

7    issued?

8    A.  April 22nd, 2009.

9              MR. BOVE:  Ms. Shields, if you could turn to page 4 of

10   the exhibit, please.  And zoom in on the left.

11   Q.  Special Agent Ganci, who did the defendant list as his

12   emergency contact in the passport?

13   A.  Laila Abadi.

14   Q.  Did that name come up during the interview you described

15   earlier on September 12th of 2016?

16   A.  Yes.  The defendant said that Laila Abadi was his wife.

17             MR. BOVE:  Ms. Shields, could we take a look at

18   Government Exhibit 202.

19   Q.  Special Agent Ganci, what is Government Exhibit 202?

20   A.  It is a United States of America passport card for the

21   defendant.

22   Q.  When was this document issued?

23   A.  This was issued on April 30, 2013.

24             MR. BOVE:  Ms. Shields, you can take that down.

25   Q.  Now, getting back to the 50th Precinct on June 1st, 2017,

1    did the defendant confirm his apartment number?

2    A.  Yes.  51-W.

3    Q.  In addition to the items we just reviewed, were any keys

4    seized from the defendant that day?

5    A.  Yes.  I took the keys from the defendant and told him that

6    I was going to keep them with me, but that they would be

7    returned to him for a later date.

8    Q.  Why did you take the defendant's keys?

9    A.  We had a search warrant for his residence, and we were

10   going to use the keys for entry.

11   Q.  What happened after you took the defendant's keys?

12   A.  The defendant was put back into our car, and Sergeant

13   Sommer, Detective Bonah, and Special Agent Alex Adrian then

14   transported him down to 26 Federal Plaza for additional

15   processing.

16   Q.  What's at 26 Federal Plaza?

17   A.  It's our FBI New York headquarters.

18   Q.  What did you do on June 1st, 2017, after the defendant was

19   taken from the 50th Precinct?

20   A.  After the Defendant was being transported, we reconvened

21   the arrest team and kind of repositioned in preparation for a

22   search later that day.  We then took up positions outside of

23   183 West 238th Street and waited until we were told to conduct

24   our search.

25   Q.  What was the area you searched?

J57KKOU1                          Ganci - Direct

1    A.  It was going to be the defendant's residence, Apartment

2    51-W.

3    Q.  You said that the FBI obtained a warrant for that search as

4    well?

5    A.  Yes.

6    Q.  After you positioned on the street outside the apartment

7    building, did you commence the search immediately?

8    A.  No.  The search did not begin until approximately 2:50 p.m.

9    that day.

10   Q.  Why did you wait?

11   A.  There were numerous other events that our squad was

12   coordinating that day, and we were waiting for those events to

13   kind of play themselves out.

14   Q.  Approximately how many people were on the search team?

15   A.  Approximately 15 people on the search team.

16   Q.  What types of roles did people play on the search team?

17   A.  There was a group of people who conducted an initial safety

18   sweep, as well as people responsible for photographing the

19   condition of the apartment as we found it, as well as where we

20   find specific items.  There were people there responsible to

21   conduct a sketch of the residence, again, to identify rooms and

22   locations where key items were found.  And then there were

23   electronic specialists there to deal with any and all

24   electronics that would be found.

25   Q.  You mentioned a safety sweep.  How did you enter the

1  apartment on June 1st, 2017?

2  A.  Well, when we were eventually given the permission to

3  conduct our search, we entered the residence and worked our way

4  up to Apartment 51-W, where a group of five or six of us took

5  positions outside the door.  We knocked on the door, announced

6  we're the FBI, and that we had a search warrant.  When we did

7  not hear any sounds inside the apartment, we used the keys to

8  gain entry to the apartment, and we conducted a quick look,

9  going room to room, looking for anybody who was either hiding

10 there or anything that could be dangerous to the eventual

11 search team.

12 Q.  Did you find anything like that during the safety sweep?

13 A.  No, we did not.

14 Q.  What happened next?

15 A.  Once we were satisfied that the area was safe and secure,

16 the team pulled out of the apartment, and then we began the

17 formalized evidence recovery and search process.

18 Q.  Through your participation in the search that day, did you

19 become familiar with the general layout of Apartment 51-W?

20 A.  Yes.

21 Q.  I'm showing you a document marked for identification as

22 Government Exhibit 901.  What is this?

23 A.  This is a not-to-scale sketch of the apartment 51.

24 Q.  Other than the fact that the sketch is not to scale, does

25 it fairly and accurately depict the layout of the apartment

1    that you helped search that day?

2    A.  Yes, it does.

3    Q.  Will that sketch assist you in describing the search to the

4    jury?

5    A.  It will.

6            MR. BOVE:  Your Honor, the government offers 901.

7            MR. SCHACHT:  No objection.

8            THE COURT:  Received.

9            (Government's Exhibit 901 received in evidence)

10            MR. BOVE:  Ms. Shields, could you please bring up 901.

11   BY MR. BOVE:

12   Q.  Special Agent Ganci, starting from the bottom of the

13   screen, could you please use Government Exhibit 901 to describe

14   the layout of the apartment?

15   A.  Yes.  So room A at the front door moves into room A, sort

16   of an entry foyer area.  As you move deeper into the apartment,

17   you turn right, you have room B, which is a kitchen.  Then you

18   pass a closet, which is room A1.  You then enter into a common

19   area, where there was television, couch, tables, some other

20   items, what we called room C.  When you proceed deeper into the

21   apartment, you have a closet on your left-hand side and a small

22   hallway, which was marked D, you have a standard bathroom, E,

23   then you move into what was identified as a bedroom, in room F,

24   and a closet room, F1.

25            MR. BOVE:  Ms. Shields, if you could take that down

1     for one minute.

2               Your Honor, may I have a moment?

3               THE COURT:  Yes.

4               Why don't we take a ten-minute break.  Is that okay,

5     members of the jury?  Close up your books, put them on your

6     chairs.  Don't discuss the case, please.  We'll be back in ten

7     minutes, at 20 after.

8               (Jury not present)

9               THE COURT:  See you in ten minutes.

10              (Recess)

11              MR. BOVE:  Judge, should we get the witness?

12              THE COURT:  Yes, get the witness.

13              MR. BOVE:  Thank you.

14              (Jury present)

15              THE COURT:  Thank you, members of the jury.  You can

16    all be seated.

17              Mr. Ganci, you remain under oath.

18              Mr. Bove, continue your examination.

19              MR. BOVE:  Thank you, Judge.

20    BY MR. BOVE:

21    Q.  Special Agent Ganci, before the break, we were talking

22    about a diagram of the apartment that you searched on June 1st

23    of 2017.  Do you recall that?

24    A.  Yes.

25    Q.  When you described the document, were you using a document

J57KKOU1                          Ganci – Direct

1   in front of you?

2   A.  Yes.

3          MR. BOVE:  Ms. Shields, can we please publish that

4   diagram again?

5          Your Honor, for the record, this is a version of

6   Government Exhibit 901 that is the one that Special Agent Ganci

7   has in front of him.  We had an older version on the screen

8   before the break that I think might have led to some confusion.

9          THE COURT:  Which is 901?  What's the true 901?

10         MR. BOVE:  The exhibit in evidence is now on the

11  screen, and I apologize for the error.

12         THE COURT:  All right.

13         So you shortened it in terms of the entrance gallery

14  at the bottom, B is a bedroom, the hallway continues up.  It's

15  sort of a railroad flat they have in the Bronx apartments.  C

16  is a living room with a common area, closets and bathrooms, and

17  it's separate.  F, which I presume is the bedroom.  Is that

18  right?

19         THE WITNESS:  That is correct.

20         MR. BOVE:  You're doing his work for him.

21  BY MR. BOVE:

22  Q.  The only follow-up question I would ask is:  What is room B

23  on the document?

24  A.  Room B is a kitchen.

25         THE COURT:  Is a what?

1          THE WITNESS:  It's a kitchen, your Honor.

2          THE COURT:  A what?

3          THE WITNESS:  A kitchen.

4          THE COURT:  Are there any bedrooms?

5          THE WITNESS:  Yes.  Room F is the bedroom.

6          THE COURT:  F is the bedroom.  B stands for kitchen?

7          THE WITNESS:  The letters and numbers are sequentially

8     as we were going through them, your Honor.  It's as we hit

9     them, we threw up letters on them.

10          THE COURT:  Yes, okay.

11    BY MR. BOVE:

12    Q.  Special Agent Ganci, you said that part of the search team

13    that day included a photographer?

14    A.  Yes.

15    Q.  I'm handing you documents marked for identification as

16    Government Exhibits 150 through 174.  Could you please take a

17    look at these.

18    A.  These are photographs of the search that day.

19    Q.  Do those pictures, Government Exhibits 150 through 174,

20    fairly and accurately depict the apartment the way it looked on

21    the day of the search?

22    A.  They did.

23          MR. BOVE:  Your Honor, the government offers Exhibits

24    150 through 174.

25          MR. SCHACHT:  No objection.

J57KKOU1                          Ganci - Direct

1              THE COURT:  Received.

2              (Government's Exhibits 150 through 174 received in

3    evidence)

4              MR. BOVE:  Thank you, your Honor.

5              Ms. Shields, if we can move 901 to the left, please.

6    And on the right, if we could bring up Government Exhibit 150.

7              THE COURT:  If you can move a little more quickly on

8    these.

9              MR. BOVE:  Yes, your Honor.

10   Q.  Special Agent Ganci, what is on the screen there?

11   A.  This is the entrance doorway, a shot from the hallway

12   entering the apartment.

13   Q.  Now let's take a look at 151 on the right.

14              What is 151?

15   A.  151 is the entranceway hallway foyer area.  You can see how

16   we marked each room with a sticky tab on the top right corner

17   with the A.

18   Q.  Does that correspond to the A on 901?

19   A.  It does.

20              MR. BOVE:  152, please, Ms. Shields.

21   Q.  What is 152?

22   A.  It's a photograph taken in room A into room B, the kitchen.

23              MR. BOVE:  Now, if we could have 154, please.

24   Q.  Is this that closet, A1?

25   A.  Yes, this is the closet, A1.

1   Q.  Were there any items seized from that closet on the day of

2   the search?

3   A.  Yes.

4   Q.  I'm handing you items marked for identification as

5   Government Exhibits 210 and 212 through 219.  Would you take a

6   look at those, please.

7           What are those items?

8   A.  Items taken from room A1.

9   Q.  That's the closet on the screen?

10  A.  Yes, it is.

11  Q.  Are the items that you have, 210 and 212 through 219, in

12  substantially the same condition today as they were on the day

13  they were seized?

14  A.  Yes, they are.

15          MR. BOVE:  Your Honor, the government offers 210 and

16  212 through 219.

17          MR. SCHACHT:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibits 210 and 212 through 219

20  received in evidence)

21  BY MR. BOVE:

22  Q.  Special Agent Ganci, what is Exhibit 210?

23  A.  Exhibit 210 is a laptop.

24          THE COURT:  Are we going to have any objections to

25  this?

1          MR. SCHACHT:  No, your Honor.

2          THE COURT:  Received.

3          Go right to the screen.

4          MR. BOVE:  Thank you, your Honor.

5          Ms. Shields, could you please bring up Government

6    Exhibit 155?

7    BY MR. BOVE:

8    Q.  Special Agent Ganci, what does this show?

9    A.  It's the general location where the laptop was found in

10   room A1.

11         MR. BOVE:  156, please, Ms. Shields.

12   Q.  What does Government Exhibit 156 show?

13   A.  Inside of room A1, inside the bag on the left-hand corner,

14   these are items that were found inside the bag.

15   Q.  So everything that's on the floor, on the wooden floor,

16   came out of the bag that's on the left of the screen?

17   A.  Yes.

18   Q.  What is Government Exhibit 212?

19   A.  212 is an identification card in Arabic.

20         MR. BOVE:  Ms. Shields, could you please bring up 212.

21   Q.  Special Agent Ganci, do you speak Arabic?

22   A.  I do not.

23         MR. BOVE:  Your Honor, at this time I have a

24   stipulation to offer between the parties.

25         THE COURT:  A stipulation is an agreement between the

J57KKOU1                         Ganci - Direct

1    parties that if a witness were called, he would testify in a

2    certain way, and you take it just like the person was here to

3    testify.

4                MR. BOVE:  Thank you, your Honor.

5                Your Honor, may I publish the stipulation, so the

6    jurors can follow along as I read it?

7                THE COURT:  It's what's produced by the stipulation

8    that's important.

9                MR. BOVE:  That's true, your Honor.

10               THE COURT:  So focus on that.

11               MR. BOVE:  Government Exhibit 1014 is a stipulation

12   that states that:  There are a series of government exhibits at

13   this trial that contain foreign language, mostly Arabic, like

14   the Exhibit 212 that Special Agent Ganci was just describing,

15   and the stipulation contains a chart that sets forth the

16   foreign language exhibit and then another column that sets

17   forth the corresponding translation of the exhibit.

18               THE COURT:  Put it up.

19               MR. BOVE:  Thank you, your Honor.

20               Ms. Shields, if you could bring up page 3 of

21   Government Exhibit 1014.

22               This is the appendix that basically sets out one

23   language of the exhibit and the foreign language translation.

24   So the one we're talking about right now, you'll see is row 2,

25   there's a foreign language identification card seized from the

1    closet, it's Government Exhibit 212, and then there's a

2    document that translates that card marked 212-T.

3           Your Honor, pursuant to the parties' stipulation

4    that's Government Exhibit 1014, the parties agree that all of

5    the translations in this right column are fair and accurate

6    translations from the foreign language into the English.

7           THE COURT:  It should be accepted as such by the jury.

8           MR. BOVE:  Thank you, your Honor.

9           Ms. Shields, if we could now take a look at the

10   translation of the identification card, which is Government

11   Exhibit 212-T.  If we could zoom in on the top.  If you could

12   please highlight the defendant's name.

13   BY MR. BOVE:

14   Q.  Special Agent Ganci, the title of this card is "Card of

15   Final Exemption from Military Service."  Do you see that?

16   A.  I do.

17          MR. BOVE:  Ms. Shields, could you please highlight

18   that.

19   Q.  And then in the bottom row, it says, "Reason for Exemption:

20   Residing Abroad 65."  Do you see that?

21   A.  I do.

22          MR. BOVE:  Could you please highlight that,

23   Ms. Shields.

24          You can take that down.  Thank you.

25   Q.  Special Agent Ganci, what is Government Exhibit 213?

J57KKOU1                          Ganci - Direct

1    A.  213 is a certificate of marriage card for the defendant.

2            MR. BOVE:  Ms. Shields, if you could bring up 213,

3    please.

4    Q.  Who is listed on the certificate of marriage card?

5    A.  The defendant and Laila Abadi.

6    Q.  What is the date listed of the marriage?

7    A.  April 12, 2012.

8    Q.  Do you see where it says "Place of Marriage:  Fort

9    McMurray"?

10   A.  Yes.

11   Q.  Was is Fort McMurray?

12   A.  Fort McMurray is in the northern portion of Canada.

13           MR. BOVE:  Can we take a look at 215, please,

14   Ms. Shields.

15   Q.  Special Agent Ganci, what is 215?

16   A.  215 is a letter from the City College of New York.

17   Q.  What is the date of the letter?

18   A.  It's February 3rd, 2009.

19           MR. BOVE:  Ms. Shields, could you please highlight the

20   degree and major listed in the letter.

21   Q.  Special Agent Ganci, what is 216?

22   A.  216 is a transcript for the defendant from the City College

23   of New York.

24           MR. BOVE:  Ms. Shields, could you please publish

25   Government Exhibit 216.  If you could start by zooming in on

J57KKOU1                         Ganci - Direct

1    the right corner of the document.

2    Q.  Who is listed as the student on this transcript, Government

3    Exhibit 2 --

4    A.  The defendant.

5    Q.  -- 216?

6            What is listed as the major?

7    A.  He graduated with a biomedical engineering degree.

8            MR. BOVE:  Ms. Shields, could you please zoom in on

9    the entries right at the first semester in the transcript.

10   Q.  Special Agent Ganci, what is the date listed for the first

11   semester that the defendant attended school here?

12   A.  Fall of 2003.

13           MR. BOVE:  Ms. Shields, could you please zoom in on

14   the entries on the right side of the page related to graduation

15   information.

16   Q.  What is listed as the graduation date?

17   A.  The graduation date was February 1, 2009.

18           MR. BOVE:  Ms. Shields, can we take a look at 214,

19   please.

20   Q.  Special Agent Ganci, what is Government Exhibit 214?

21   A.  214 is a U.S. naturalization certificate for the defendant.

22   Q.  What was the date that this certificate was issued?

23   A.  April 15, 2009.

24           MR. BOVE:  Ms. Shields, could you please highlight

25   that date.

J57KKOU1                          Ganci - Direct

1    Q.  Special Agent Ganci, what is Exhibit 217?

2    A.  It is a transcript record for the defendant from the Keller

3    Graduate School of Management.

4            MR. BOVE:  Ms. Shields, could you please publish that

5    one.

6    Q.  What kind of degree is this document related to?

7    A.  Business management, with a major in project management.

8            MR. BOVE:  Ms. Shields, if you could zoom in on the

9    bottom in the middle left.  If you could highlight the major,

10   and specialization, and project management.

11   Q.  When was this degree issued, according to the transcript?

12   A.  1 September, 2013.

13           MR. BOVE:  Ms. Shields, could you please highlight

14   that.

15   Q.  Special Agent Ganci, what is Government Exhibit 218?

16   A.  218 is a United Wireless letter from Chicago.

17           MR. BOVE:  Ms. Shields, could you please bring that

18   up.  If you could zoom in on the body of the letter, please.

19   Q.  Special Agent Ganci, did the defendant discuss with you on

20   September 1st, 2016, a job at a wireless store?

21   A.  On September 12th, 2016, he identified that he previously

22   worked for multiple wireless stores in Chicago.

23   Q.  Thank you for the date correction.

24           Now let's take a look at some of the other items from

25   that apartment closet that was marked A1.

1          Special Agent Ganci, what is Government Exhibit 219?

2     A.   219 is a cache of valuable items that were found in the bag

3     in closet A1.

4          MR. BOVE:  Ms. Shields, if you could bring up 901 on

5     the left, please, and 156 on the right.

6          Your Honor, if it's acceptable to the Court, I'd like

7     to hand the exhibit that Special Agent Ganci has, 219, to the

8     jurors, so they can inspect it.

9          THE COURT:  What are they inspecting?

10         MR. BOVE:  It's the funds from the envelope seized in

11    a bag on the screen.

12         THE COURT:  So you're distributing funds?  What are

13    you distributing?

14         THE WITNESS:  Valuables, your Honor.

15         THE COURT:  Walk down and display them in front of

16    them.

17         THE WITNESS:  Certainly.

18         THE COURT:  Hold it up.  Hold it up.  Make believe

19    you're a kindergarten teacher.  Show and tell.

20         Nice work.

21         THE WITNESS:  Thank you, your Honor.

22         MR. BOVE:  Ms. Shields, if you could bring up 157 on

23    the right, please.

24    BY MR. BOVE:

25    Q.   Special Agent Ganci, what is Government Exhibit 157?

J57KKOU1                       Ganci - Direct

1    A.  That is the condition of where we found this money inside

2    the bag found inside room A1.

3    Q.  There are U.S. dollars in the envelopes, and there appears

4    to be some currency -- some bills, excuse me, above the

5    envelopes?

6    A.  Yes.  They were Lebanese cards.

7    Q.  These envelopes came from that bag that was in the closet?

8    A.  Yes.

9         MR. BOVE:  Ms. Shields, could you please publish

10   Government Exhibit 158.

11   Q.  What is 158, Special Agent Ganci?

12   A.  158 is a photograph taken in the vicinity of room A looking

13   into room C -- correction, I'm sorry.  This is the foyer area

14   of room A.  I apologize.  We can see by the sticky tab on the

15   top left portion of the photo, this is marked room C.  So the

16   photograph was taken at the entranceway of A and C looking into

17   the table area in the left-hand portion of the room on the

18   sketch.

19        MR. BOVE:  Ms. Shields, could you please bring up 161.

20   Q.  What does this photo show?

21   A.  This is, again, a photo taken in a similar area in room C,

22   just moved a little bit further to the right, so now you can

23   see the table and the hallway leading down to the room F.

24   Q.  Was anything seized from room C on June 1st, 2017?

25   A.  Yes.

J57KKOU1                          Ganci - Direct

1    Q.  I am handing you items marked for identification as

2    Government Exhibits 210 and then 221 -- 220 through 223.

3              MR. BOVE:  Excuse me, I placed 220 through 223 on the

4    witness stand.

5    Q.  What is Government Exhibit 220?

6    A.  220?  Those are desert combat boots and the receipt of

7    purchase.

8    Q.  Are those boots and receipt in substantially the same

9    condition as when they were seized on June 1st of 2017?

10   A.  They are.

11             MR. BOVE:  Your Honor, the government offers 220.

12             MR. SCHACHT:  Your Honor, I'd just like a brief voir

13   dire.

14             THE COURT:  Yes.

15   VOIR DIRE EXAMINATION

16   BY MR. SCHACHT:

17   Q.  Special Agent Ganci, those boots are size 10; is that

18   right?

19   A.  Yes, they are.

20             THE COURT:  Why don't you hold up a boot?

21   Q.  And those are Nike, made by the company Nike; is that

22   right?

23   A.  Yes, they are.

24             MR. SCHACHT:  I have no objection.

25             THE COURT:  Received.

J57KKOU1                        Ganci - Direct

1              (Government's Exhibit 220 received in evidence)

2              MR. BOVE:  Ms. Shields, could you please publish the

3    packing slip that is a part of 220.  If you can zoom in on the

4    top row, including the ship-to date.

5              THE COURT:  What are you publishing?

6              MR. BOVE:  The packing slip, your Honor, that is part

7    of Exhibit 220.

8    BY MR. BOVE:

9    Q.  According to this document, who was the recipient of

10   Government Exhibit 220?

11   A.  The defendant.

12   Q.  You can put the boots to the side, please.

13             And the other items up there on the witness stand are

14   221 through 223.  Could you please look at those.

15             What are those exhibits?

16   A.  These are items taken from room C.

17   Q.  Are those items in substantially the same condition as they

18   were on the day they were seized, June 1st, 2017?

19   A.  They are.

20             MR. BOVE:  Your Honor, the government offers 221

21   through 223.

22             MR. SCHACHT:  No objection.

23             THE COURT:  Received.

24             (Government's Exhibits 221 through 223 received in

25   evidence)

1        MR. BOVE:  Ms. Shields, could you please bring up

2   Government Exhibit 164 on the right.

3   BY MR. BOVE:

4   Q.  What does this exhibit show?

5   A.  This is a photograph taken in room C looking into room F,

6   and you can see the closet, room D, on the left-hand side, as

7   well as the entranceway into the bathroom, room E, on the

8   right-hand side.

9        MR. BOVE:  Ms. Shields, could you please bring up 169.

10  Q.  What is Government Exhibit 169?

11  A.  169 is a photograph taken from the entranceway of room F

12  into the top right corner of the sketch, to include the bedroom

13  and the window.

14       MR. BOVE:  And 168, please, Ms. Shields.

15  Q.  What is Government Exhibit 168?

16  A.  A photograph taken in a similar location, at the

17  entranceway to room F into the top left corner of the sketch,

18  to include a filing cabinet and the other window.

19  Q.  Was anything seized from that filing cabinet?

20  A.  Yes.

21  Q.  I'm now handing you items marked for identification as

22  Government Exhibits 224 through 230.  Could you please take a

23  look at those.

24       What are those exhibits?

25  A.  These are items that were taken from the filing cabinet on

J57KKOU1                        Ganci - Direct

1    the day of our search.

2    Q.  Are they in substantially the same condition now as they

3    were on the day they were seized?

4    A.  Yes.

5           MR. BOVE:  Your Honor, the government offers 224

6    through 230.

7           MR. SCHACHT:  No objection.

8           THE COURT:  Received.

9           (Government's Exhibits 224 through 230 received in

10   evidence)

11   BY MR. BOVE:

12   Q.  Special Agent Ganci, what is Government Exhibit 220-A?

13   Excuse me, 228?

14          THE COURT:  What is it, 228?

15          MR. BOVE:  Two-two-eight, your Honor.

16          THE WITNESS:  It's a title certificate for New York

17   State for a GMC van.

18          MR. BOVE:  Ms. Shields, if you could bring up

19   Government Exhibit 228, please.

20   BY MR. BOVE:

21   Q.  Who is listed in the top left of that document?

22   A.  The defendant.

23   Q.  Directing your attention to the upper right corner of the

24   certificate, when was this issued?

25   A.  It was issued January 28, 2011.

J57KKOU1                              Ganci - Direct

1              MR. BOVE:  Ms. Shields, if you could highlight that

2      date, please.

3      Q.  Special Agent Ganci, what is 229?

4      A.  It's a bill of sale.

5              MR. BOVE:  Ms. Shields, could you bring that up,

6      please.

7      Q.  Who is listed in the first line of the bill of sale?

8      A.  The defendant.

9              MR. BOVE:  Ms. Shields, if you could highlight that.

10     Q.  Directing your attention, Special Agent Ganci, to the

11     bottom left of Government Exhibit 229, what is the date on this

12     document?

13     A.  April 30th, 2011.

14     Q.  What is Government Exhibit 230?

15     A.  New York State DMV proof of the plates being destroyed or

16     disposed of those plates.

17             MR. BOVE:  Ms. Shields, if you could bring that one

18     up.

19     Q.  Directing your attention toward the middle of the document,

20     who is listed on this document?

21     A.  The defendant.

22             MR. BOVE:  Ms. Shields, if you could highlight that,

23     please.

24     Q.  When, according to Government Exhibit 230, were the license

25     plates surrendered?

1    A.  The license plates were surrendered on August 3rd, 2012.

2    Q.  Special Agent Ganci, what is Exhibit 224?

3    A.  It is a photocopy of a passport page with visas on it.

4         MR. BOVE:  Ms. Shields, if you could bring that one

5    up, please.  If you could zoom on those passport pages.

6    Q.  Do you see the stamp that's titled in the title "Embassy

7    of," and then it's obstructed "Republic," and it looks like

8    Cyprus and Beirut?

9    A.  Yes.

10        MR. BOVE:  Ms. Shields, if you could zoom in on that

11   one.

12   BY MR. BOVE:

13   Q.  What does this look like?

14   A.  It looks like a visa entry to enter the Republic of Cyprus

15   issued in Beirut.

16   Q.  Lastly, if you could take a look at Government Exhibit 226,

17   please.  What is that?

18   A.  It's a New York State income tax return.

19        MR. BOVE:  Ms. Shields, if you could bring that up,

20   please.  If you could zoom in on the box titled "Taxpayer Name

21   and Address."

22   Q.  Special Agent Ganci, who is listed as the taxpayer on

23   Exhibit 226?

24   A.  Wanda Reyes.

25   Q.  Who, on this document, is listed as the spouse of Wanda

J57KKOU1                          Ganci - Direct

1   Reyes?

2   A.   Mohammad Kourani.

3   Q.   Who is Mohammad Kourani?

4   A.   It is the defendant's father.

5          MR. BOVE:   Ms. Shields, could you please bring up

6   Exhibit 170 on the right.

7   Q.   What does this photo show?

8   A.   This was a check that was found inside the filing cabinet.

9   An uncashed check.

10         MR. BOVE:   Ms. Shields, if you could zoom in on the

11  check, please.

12  Q.   Who is listed as the accountholder, Special Agent Ganci?

13  A.   J.K. Toys Incorporated.

14         MR. BOVE:   Now, Ms. Shields, if you could bring up

15  171.

16  Q.   What does this picture show?

17  A.   More uncashed checks found in the filing cabinet.

18         MR. BOVE:   If you could zoom in on the top checks,

19  please, Ms. Shields.

20  Q.   Who is listed as the accountholder in this exhibit?

21  A.   J.K. Toys Incorporated.

22         MR. BOVE:   Ms. Shields, if you could bring up 172 on

23  the right, please.

24  Q.   What does this picture show?

25  A.   Additional checks that were also found in that filing

1    cabinet.

2              MR. BOVE:  Ms. Shields, if you could zoom in on the

3    top check.

4    Q.  Who is listed as the accountholder on this one?

5    A.  Broadway Sportswear Incorporated.

6              MR. BOVE:  Ms. Shields, if you could bring up 173.

7    Q.  What does this exhibit show?

8    A.  It's another check that was found in the same filing

9    cabinet.

10             MR. BOVE:  If you could zoom in on the check, please,

11   Ms. Shields.

12   BY MR. BOVE:

13   Q.  Who is the accountholder listed on this check?

14   A.  New Spot Fashion Incorporated.

15             MR. BOVE:  Finally, 174, please, Ms. Shields.

16   Q.  What does this picture show?

17   A.  Another check that was found inside the filing cabinet.

18             MR. BOVE:  If you can zoom in on the check, please.

19   Thank you, Ms. Shields.

20   Q.  Special Agent Ganci, who is listed as the accountholder on

21   this document?

22   A.  AM&K Fashion Corporation.

23             MR. BOVE:  Thank you, Ms. Shields.  You can take that

24   down.

25   Q.  Getting back to June 1st, 2017, when, approximately, was

J57KKOU1                          Ganci - Cross

1   the search completed?

2   A.   Approximately 6:20 p.m.

3   Q.   Where was the evidence taken after it was seized?

4   A.   It was brought to an FBI facility for a further

5   investigation and review.

6           MR. BOVE:  May I have one moment, your Honor?

7           THE COURT:  Yes.

8           (Pause)

9           MR. BOVE:  Nothing further, Judge.

10          THE COURT:  Thank you.

11          Cross-examination.

12  CROSS-EXAMINATION

13  BY MR. BOVE:

14  Q.   Special Agent Ganci, going back to the meeting you had with

15  Ali Kourani on June 1st, 2017, that meeting was at Newark

16  airport?

17  A.   No, sir.  He was arrested on June 1st in 2017.  I had an

18  interview with him on September 12th, 2016.

19  Q.   Where was that meeting?

20  A.   That was in Newark Liberty International Airport.

21  Q.   Was it at that meeting that the topic of him being fired

22  from his job came up?

23  A.   He brought it up, yes.

24  Q.   Didn't he essentially blame the U.S. Government for himself

25  losing his job?  Do you recall that?

J57KKOU1                         Ganci - Cross

1   A.  He told us that he did not steal the $3,000 that his

2   employees claimed stole from him.

3   Q.  Didn't he tell you that when he had been in Lebanon, the

4   U.S. Government had taken away his passport for some kind of

5   investigation?  Do you recall him telling you that?

6   A.  I do not recall him mentioning that during our interview.

7   Q.  Who else lived in that apartment where you conducted the

8   search the day my client was arrested, if you know?

9   A.  I do not remember the name, no.

10  Q.  But there was a person who you previously called a

11  roommate?

12  A.  Yes, there was a roommate.

13  Q.  Do you know, from your investigation, whether or not any of

14  Ali Kourani's brothers previously lived at that apartment?

15  A.  Yes.  His younger brother, Moustapha, previously lived at

16  that apartment.

17  Q.  You've interviewed Moustapha; is that correct?

18  A.  Yes.

19  Q.  And you've talked to Moustapha generally about his brother

20  Ali, right?

21  A.  Yes.

22  Q.  And you've talked to Moustapha, I assume, about himself,

23  about Moustapha, yes?

24  A.  Our conversation with Moustapha was about Kourani -- excuse

25  me, the defendant and his involvement with Hezbollah.

J57KKOU1                          Ganci - Cross

1   Q.  When you say "his involvement with Hezbollah," you think

2   he's involved in Hezbollah, right?

3   A.  We have evidence to believe he's involved with Hezbollah.

4   Q.  What I mean is:  Moustapha told you he's not involved in

5   Hezbollah?

6            MR. BOVE:  Objection.

7            THE COURT:  Overruled.

8            THE WITNESS:  Moustapha said he was not involved.

9   BY MR. SCHACHT:

10  Q.  Moustapha said he was not involved, right?

11  A.  Moustapha did not think he was involved with Hezbollah.

12  Q.  Right.

13           And on your direct examination by the prosecutor, you

14  didn't have any evidence or you didn't offer any evidence that

15  my client is involved in Hezbollah, did you?

16  A.  To Moustapha?

17  Q.  No.  In court here today.

18           None of the exhibits you showed show he's involved in

19  Hezbollah, do they?

20  A.  No.

21  Q.  The money that you found in my client's apartment, that

22  cash was in a TD Bank envelope; is that right?

23  A.  It was.

24           MR. SCHACHT:  Thank you.  I have no other questions.

25           MR. BOVE:  Brief redirect, your Honor?

J57KKOU1                        Ganci - Redirect

1            THE COURT:  Of course.

2    REDIRECT EXAMINATION

3    BY MR. BOVE:

4    Q.  Special Agent Ganci, Mr. Schacht asked you some questions

5    about whether any of the evidence that you helped seize from

6    the apartment on June 1st, 2017, contained evidence that

7    indicated the defendant was a part of Hezbollah.  Do you recall

8    that question?

9    A.  Yes.

10   Q.  You testified on your direct that you seized a laptop out

11   of the closet, A1, of the defendant's apartment, correct?

12   A.  Yes.

13   Q.  And you're aware, aren't you, that this laptop was

14   searched?

15   A.  Yes.

16   Q.  And as far as you know, was there information relating to

17   Hezbollah on this laptop?

18   A.  Yes.

19           MR. SCHACHT:  Objection.

20           THE COURT:  Sustained.

21           Disregard the answer, please.

22           MR. BOVE:  Nothing further, your Honor.

23           MR. SCHACHT:  Nothing else.  Thank you.

24           THE COURT:  Thank you.  You can step down.

25           (Witness excused)

J57KKOU1                         Levitt - Direct

1            THE COURT:  Next?

2            MS. HOULE:  Your Honor, the government calls Matthew

3     Levitt.

4            THE COURT:  Come up.  Pay attention to the oath.

5      MATTHEW LEVITT,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8            THE COURT:  Give your full name and spell it for the

9     reporter.

10           THE WITNESS:  Dr. Matthew Levitt, M-a-t-t-h-e-w

11    L-e-v-i-t-t.

12           THE COURT:  Try to speak more slowly.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  You may proceed, Ms. Houle.

15           MS. HOULE:  Thank you, your Honor.

16    DIRECT EXAMINATION

17    BY MS. HOULE:

18    Q.  Dr. Levitt, where do you work?

19    A.  I work at the Washington Institute for Near East Policy and

20    at Georgetown University.

21    Q.  What is the Washington Institute for Near East Policy?

22    A.  The Washington Institute is a nonpartisan think tank in

23    Washington, D.C., focused on U.S. policy towards the broader

24    Middle East.  We look at North Africa to Iran and Turkey to

25    Yemen.

J57KKOU1                    Levitt - Direct

1    Q.   What is your position there?

2    A.   I direct the institute's program on counterterrorism and

3    intelligence and am a senior fellow.

4    Q.   How long have you worked there?

5    A.   On and off, since 1998.

6    Q.   Can you explain for the jury, generally, what you do there?

7    A.   I look at terrorism in the Middle East and from the Middle

8    East as it pertains to U.S. interests and policy.

9    Q.   You mentioned that you also work at Georgetown University?

10   A.   That's right.

11   Q.   Do you teach there?

12   A.   I do.

13   Q.   What do you teach?

14   A.   I'm an adjunct professor at Georgetown, and I teach a class

15   now on combating the financing of transnational threats.

16   Q.   Have you taught at any other institutions?

17   A.   I have.

18   Q.   Which ones?

19   A.   Johns Hopkins University School of Advanced International

20   Studies, which is located also in Washington, D.C.

21   Q.   Before you began your work at the Washington, D.C.

22   Washington Institute, did you hold any positions in government?

23   A.   I did.

24   Q.   What were those?

25   A.   Well, immediately prior, I served as the deputy assistant

1   secretary for intelligence and analysis at the U.S. Department

2   of the Treasury.  And earlier in my career, I served as a

3   counterterrorism intelligence analyst at the Federal Bureau of

4   Investigation's headquarters in Washington, D.C.

5   Q.  Have you held any other government positions through your

6   career?

7   A.  I have.  Temporary ones.

8   Q.  What is your educational background?

9   A.  I have a Bachelor's in political science from Yeshiva

10  University here in New York.  I have a Master's of law and

11  diplomacy from The Fletcher School of Law and Diplomacy at

12  Tufts University, near Boston.  And I have a Ph.D. in

13  international relations, also from The Fletcher School at

14  Tufts.

15  Q.  What was the focus of your Ph.D. generally?

16  A.  The Ph.D. was on the impact of terrorist attacks on ongoing

17  negotiation process, and I looked at incidents of Jewish

18  terrorism and Islamic terrorism targeting the Oslo peace

19  process, the Israeli Palestinian peace process.

20  Q.  Are you being paid for your testimony, Dr. Levitt?

21  A.  I hope so, yes.

22  Q.  What is your rate?

23  A.  $550 an hour.

24  Q.  Is that consistent with the rate charged by your

25  colleagues?

1    A.  It is.

2    Q.  In your work at the Washington Institute, have you

3    researched an organization named Lebanese Hezbollah?

4    A.  Yes.

5    Q.  For purposes of your testimony today, I'd like to refer to

6    that organization as Hezbollah.

7             Have you testified before Congress regarding

8    Hezbollah?

9    A.  Several times.

10   Q.  Approximately how many times?

11   A.  At least a half a dozen, maybe more, on Hezbollah and Iran,

12   Iran's sponsorship for Hezbollah.

13   Q.  Have you testified in other court proceedings as an expert

14   regarding Hezbollah?

15   A.  I have.

16   Q.  Have you testified in any other court proceedings as an

17   expert on other terrorist organizations?

18   A.  I have.

19   Q.  Can you identify a few of those trials?

20   A.  The Hammoud case in Charlotte, North Carolina, was a

21   Hezbollah case.  The Boston Marathon bombing case in Boston,

22   Massachusetts, was an inspired jihadist case.  The Holy Land

23   Foundation for Relief and Development was a Hamas case in

24   Dallas.  I can go on.

25   Q.  What was the name of the defendant in the Boston Marathon

1    case?

2    A.   Tsarnaev.

3    Q.   Have you written any books regarding Hezbollah?

4    A.   I have.

5    Q.   What book is that?

6    A.   The book is called "Hezbollah:  The Global Footprint of

7    Lebanon's Party of God," and it was published by Georgetown

8    University Press.

9    Q.   Have you also published articles regarding Hezbollah?

10   A.   Many.

11   Q.   Approximately how many?

12   A.   I honestly don't know, but quite a few --

13              THE COURT:  More than ten?

14              THE WITNESS:  More than ten.  Probably more than 20.

15   BY MS. HOULE:

16   Q.   Were any of those articles published in a peer-reviewed

17   journal?

18   A.   Yes.

19   Q.   What's a peer-reviewed journal?

20   A.   A peer-reviewed journal is a journal where the author

21   submits an article, and before it is published, it is subject

22   to peer review; that is to say, the review of other academics

23   in the field with expertise in that area.  Those who review the

24   article remain anonymous to the author, and they can recommend

25   that the article not be published, that it be published, and

J57KKOU1                         Levitt - Direct

1    most often that it could or should be published, but with some

2    edits, additions, et cetera.

3    Q.  Can you describe for the jury what methods you have used to

4    learn about Hezbollah?

5    A.  The same that I use to learn about all terrorist groups,

6    which is to say, I conduct extensive interviews here in the

7    United States and around the world, I travel extensively.  I

8    collect documents and read everything I can, from the

9    newspapers, to academic journals, to court documents,

10   government reports, and then I vet that information against

11   other pieces of information that I find against other -- in

12   conversations with other experts in the field, and after an

13   extensive period of vetting information, publish, or lecture,

14   or continue to investigate.

15   Q.  You mentioned that you sometimes conduct interviews?

16   A.  I do.

17   Q.  Have any of your interviews involved interviewing people

18   who are in custody?

19   A.  Not many, but, yes.

20   Q.  And in connection with Hezbollah, will you be relying on

21   any such in-custody interviews as part of your testimony today?

22   A.  No.  I've done no in-custody interviews related to

23   Hezbollah.

24   Q.  For your testimony today, will you be relying on a

25   synthesis of the different types of sources and methods that

1    you just described?

2    A.  Yes.

3            THE COURT:  What's an in-custody interview?

4            THE WITNESS:  Pardon?

5            THE COURT:  What's an in-custody interview?

6            THE WITNESS:  That was the attorney's term of phrase.

7    I understood it to be did you interview anybody in jail.  I've

8    done that for the purpose of the book I wrote on Hamas, which

9    was published by Yale University Press, but I have not done

10   that since.

11           THE COURT:  You didn't do it for Hezbollah?

12           THE WITNESS:  No, sir.

13   BY MS. HOULE:

14   Q.  You mentioned, Dr. Levitt, that you have worked for the

15   government and the FBI.  While you worked in those jobs, did

16   you have access to classified information?

17   A.  I did.

18   Q.  Will any of your testimony today be based on any classified

19   information that you've reviewed?

20   A.  No.  And, in fact, when I last left government, I

21   proactively terminated all of my clearances, though I didn't

22   have to.

23           MS. HOULE:  Your Honor, the government moves to have

24   Dr. Levitt qualified as an expert.

25           MR. SCHACHT:  No objection.

1          THE COURT:  Dr. Levitt is an expert, and he may be

2     questioned as such.

3          An expert witness is someone who comes before you

4     offering opinions about a certain matter that is not

5     necessarily common knowledge, but is collected under a

6     discipline that makes a person an authority on a particular

7     subject.

8          And, here, the authority is of the nature of

9     Hezbollah, right?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.

12          MS. HOULE:  Thank you, your Honor.

13     BY MS. HOULE:

14     Q.  Dr. Levitt, what is Hezbollah?

15     A.  Hezbollah is a militant organization based out of Lebanon

16     that might best be thought of not as an organization, but as a

17     movement, because it engages in a broad array of activities.

18     It engages in expressly militant activities.  It has a militia,

19     The Islamic Resistance, which is in Lebanon and is much larger,

20     better trained, better armed, than the Lebanese armed forces,

21     the Lebanese Government's army.  It engages in social welfare

22     activities.  It runs schools, and hospitals, and kindergartens

23     through which it builds grassroots for its movement, but it is

24     providing social services, often services that the government

25     itself doesn't or won't provide.

1           It wasn't always, but it is now part of the Lebanese

2      Government.  It engages in politics, and there are Hezbollah

3      members in the Lebanese parliament, and ministers in the

4      government, and on down through local government as well.

5           Hezbollah, also, as part of its militant activity, not

6      only maintains the standing militia, but also engages in

7      intelligence activities, in terrorist activities, and as a

8      U.S.-designated terrorist organization, and criminal activities

9      in support of those terrorists and military activities.  So, in

10     short, it has both overt, meaning open, official activities,

11     and you can read about those in the papers, and you can get

12     Hezbollah officials to talk about those fairly openly, and it

13     has covert, or secret, or closed activities that it is much

14     more circumspect about, because if you're engaging in criminal,

15     or terrorist, or military activities, you don't want to

16     broadcast the details of those.

17           MS. HOULE:  Your Honor, the parties have entered into

18     a stipulation regarding the status of Hezbollah.  I'd like to

19     read from two paragraphs of the stipulation now and to refer to

20     it throughout Dr. Levitt's testimony.

21           THE COURT:  You may.

22           MS. HOULE:  This is at Government Exhibit 1001.  The

23     parties agree as follows:

24           At paragraph 2:  In 1995, pursuant to the

25     International Emergency Economic Powers Act, which is known as

J57KKOU1                         Levitt - Direct

1   IEEPA, President Clinton issued Executive Order 12947, which

2   imposed sanctions on Hezbollah and others and remains in

3   effect.

4              In 1996, the U.S. Treasury Department's Office of

5   Foreign Assets Control, which is known as OFAC, issued

6   regulations pursuant to IEEPA and Executive Order 12947 that

7   imposed further sanctions on Hezbollah and remain in effect.

8              In 1997, the U.S. Secretary of State issued a notice

9   in the Federal Register designating Hezbollah, including, but

10  not limited to, the Islamic Jihad Organization, as a foreign

11  terrorist organization under Section 219 of the Immigration and

12  Nationality Act.  Hezbollah has been continuously designated as

13  a foreign terrorist organization since 1997, and it remains so

14  designated.

15             Your Honor, if I may now read a separate stipulation

16  into evidence, which is marked as Government Exhibit 1002?

17             THE COURT:  Yes.

18             MS. HOULE:  The parties agree as follows:

19             The defendant did not at any point obtain any

20  authorization or licenses from the U.S. Treasury Department's

21  Office of Foreign Assets Control, which is known as OFAC, or

22  any authorization related to Executive Order 12947 or OFAC's

23  regulations to engage in transactions with Hezbollah or to

24  provide goods or services to Hezbollah.

25             It is agreed that this stipulation may be admitted

J57KKOU1                        Levitt - Direct

1    into evidence at trial.

2                The government offers 1002, your Honor.

3                MR. SCHACHT:  No objection.

4                THE COURT:  Received.

5                (Government's Exhibit 1002 received in evidence)

6    BY MS. HOULE:

7    Q.  Dr. Levitt, what, if any, relationship does Hezbollah have

8    with Iran?

9    A.   An intimate one.  Iran originally sent, in early 1980s,

10   some 1,500 officers from its Quds Force, or Jerusalem Force,

11   part of the Islamic Revolutionary Guard Corps of Iran, to

12   Lebanon.

13               THE COURT:  You called it the Jerusalem Force?

14               THE WITNESS:  Yes.  The word Quds in Arabic means

15   Jerusalem.  Most people won't recognize it if you refer to it

16   as Jerusalem Force.  It's commonly referred to as the Quds

17   Force.

18               They were sent to Lebanon just over the

19   Lebanese-Syrian border to help build what became known as

20   Hezbollah, which literally means the Party of God.  You had at

21   that point many different groups and militias of different

22   religious sects within Lebanon, which is a country which

23   includes many different religious sects, fighting each other,

24   fighting Israel, which had occupied the southern portion of the

25   country in 1982 in an effort to push out the Palestine

J57KKOU1                       Levitt - Direct

Liberation Organization from Southern Lebanon, which was

carrying out attacks against Israel from there.  And Iran

helped build these various Shia Islamic groups.  Shia Islam is

one of the sects -- one of the two main sects within Islam into

Hezbollah.

          Ever since, it has provided funds and weapons to

Hezbollah on a regular basis.  Its religious indoctrination,

its training in intelligence and in operations is critical to

Hezbollah's ability to be a sophisticated, a military and

terrorist organization as it is today.

BY MS. HOULE:

Q.  Dr. Levitt, I'm handing you a binder full of exhibits that

I'll reference throughout your testimony.  If you could turn to

the tabs as I note them.

A.  Yes.

Q.  I'm hoping, Dr. Levitt, that you can orient us to where

some of the places that you just identified are.

          If you could turn to Government Exhibit 1.  What is

that?

A.  This is a map of the Greater Middle East.  It includes more

than the Middle East.  It's zoomed out, but in the center, you

have the Middle East.

Q.  Are you familiar with that area of the world, based on your

research?

A.  I am.

J57KKOU1                      Levitt - Direct

1               MS. HOULE:  Your Honor, the government offers

2      Government Exhibit 1.

3               MR. SCHACHT:  No objection.

4               THE COURT:  Received.

5               (Government's Exhibit 1 received in evidence)

6               MS. HOULE:  Ms. Shields, if you could publish that to

7      the jury, please.  And, Ms. Shields, if you could zoom in on

8      the area surrounding Turkey.  Thank you.

9      BY MS. HOULE:

10     Q.  Dr. Levitt, could you explain for the jury where on this

11     map Lebanon is?

12              THE COURT:  Well, the jury can see it.

13              THE WITNESS:  Yes.

14              THE COURT:  It's on the eastern shore of the

15     Mediterranean, and it says Lebanon.  Do you all see it, jury?

16              JURY MEMBERS:  Yes.

17              THE COURT:  Okay.

18              MS. HOULE:  Thank you, your Honor.

19              Ms. Shields, if could you zoom out?

20     BY MS. HOULE:

21     Q.  And, Dr. Levitt, if you could indicate for the jury where

22     Iran is in relation to Lebanon?

23     A.  So if you remember where Lebanon is, on the eastern shore

24     of the Mediterranean, and then you move to the right, continue

25     to move east, you come to Syria, and then Iraq, and then Iran,

J57KKOU1                          Levitt - Direct

1   south of the Caspian Sea and alongside north of the Persian

2   Gulf.

3              THE COURT:  So what's the distance, say, from Lebanon

4   to the border of Iran on Iraq?

5              THE WITNESS:  I don't know the mileage, your Honor.

6   It is drivable, depending on conditions on the ground.  It

7   is --

8              THE COURT:  A day's journey?

9              THE WITNESS:  A day's journey or so, yes.  Maybe a

10  little more, because the roads don't go straight.

11  BY MS. HOULE:

12  Q.  Dr. Levitt, when you were describing the origins of

13  Hezbollah's founding and the movement of those revolutionary

14  guard troops into Lebanon, you mentioned a conflict with

15  Israel.  And I think you mentioned the Israeli Defense Force.

16  What is that?

17  A.  The Israeli Defense Force is the military of Israel.

18  Q.  What does it consist of?

19  A.  The IDF consists of an army, and an air force, and a navy,

20  and similar components much like ours, and it is populated by

21  Israeli citizens.  There is a mandatory draft system in Israel

22  for most, but not all, citizens, but with exception, majority

23  of Israelis, after high school, do a tour of duty in the IDF,

24  usually three years, sometimes more, sometimes less.  Most

25  Israelis then go on with their lives and then just do reserve

J57KKOU1                        Levitt - Direct

1   duty over the course of their lives, and some, like here in the

2   United States, choose to make a career of it.

3   Q.   Turning back to this map at Government Exhibit 1, one more

4   time, can you note for the jury where Syria falls in relation

5   to Lebanon?

6   A.   So you'll note that Lebanon is almost --

7          THE COURT:   Why don't you focus on that to make it

8   larger.

9          THE WITNESS:   There we go.

10         THE COURT:   The jury can see.

11  BY MS. HOULE:

12  Q.   Dr. Levitt, what role, if any, did Syria have in the

13  movement of those troops from Iran into Lebanon when Hezbollah

14  was founded?

15  A.   A critical one.   Not only is Syria kind of the land bridge

16  into Lebanon right next-door, but Syria, at this point, was the

17  dominant force in Lebanon itself.   So not only controlling

18  Syria, not only controlling the Syrian-Lebanese border, but

19  controlling events largely in Lebanon as well.

20         This base of operations was called the Abdullah

21  barracks, A-b-d-u-l-l-a-h.   It was in the Bekaa Valley, and

22  that's just over the border from Syria, where Syria was in

23  control.   So if it were not for the fact that Syria enabled and

24  allowed the movement of these Iranian troops to Lebanon to

25  happen, it would not have happened in the first place, and they

J57KKOU1                        Levitt - Direct

1    certainly would not have been allowed to stay, and thrive, and

2    function.

3    Q.  Dr. Levitt --

4           THE COURT:  You mentioned the Bekaa Valley?

5           THE WITNESS:  Yes.

6           THE COURT:  Is it B-E-K-A-A?

7           THE WITNESS:  B-E-K-A-A.  You'll also see it spelled

8    other ways, but it's transliteration.

9           THE COURT:  Can you blow up the map and show it,

10   Ms. Houle.

11          MS. HOULE:  Your Honor, if I may have one moment?

12          (Pause)

13          THE COURT:  Why don't you, while Ms. Houle is looking,

14   describe the topography of Lebanon.

15          THE WITNESS:  So Lebanon has, obviously, Mediterranean

16   coast, and it has mountains.  And the Bekaa Valley, without

17   being able to zoom in, is along the border with Lebanon and

18   then heading southwest.

19   BY MS. HOULE:

20   Q.  Dr. Levitt, I just placed before you what's been marked for

21   identification as Government Exhibit 6.  What is that?

22   A.  This is a map of Lebanon along the Syrian border.

23          THE COURT:  I take judicial notice of that.

24          MS. HOULE:  Thank you, your Honor.  May I publish to

25   the jury?

J57KKOU1                          Levitt - Direct

1              THE COURT:  Yes.

2              MS. HOULE:  Ms. Shields, if you could bring up

3    Government Exhibit 6, please?

4              THE COURT:  Yes.

5    BY MS. HOULE:

6    Q.  Dr. Levitt, if you could describe for the jury where the

7    Bekaa Valley is that you were just explaining?

8    A.  So, in essence, you're looking at it.  If you can see the

9    Town of Baalbek, which is sort of in the upper middle in white

10   to the right of some of the greenery on the right side of that

11   mountain range.  There you go, right there.  Thank you.  So

12   Baalbek is a major town of historical importance, major Roman

13   ruins, and is Hezbollah's stronghold within the Bekaa Valley.

14             THE COURT:  Is that large area of green slanting to

15   the right upwards the Bekaa Valley?

16             THE WITNESS:  That's the mountain range.

17             THE COURT:  That's the mountain range.

18             Where would the Bekaa Valley be?

19             THE WITNESS:  It's right where Baalbek is, north and

20   south of it, including well south.

21             THE COURT:  Just to the east of the mountain range?

22             THE WITNESS:  Correct.

23   BY MS. HOULE:

24   Q.  Dr. Levitt, does Hezbollah have a flag?

25   A.  It does.

```
 1    Q.  If you can turn to what's marked in your binder as

 2    Government Exhibit 101.  What is that?

 3    A.  One second.  Yes, that's the Hezbollah flag.

 4              MS. HOULE:  Your Honor, the government offers

 5    Government Exhibit 101.

 6              MR. SCHACHT:  No objection.

 7              THE COURT:  Received.

 8              (Government's Exhibit 101 received in evidence)

 9              MS. HOULE:  If you could publish that, Ms. Shields.

10    BY MS. HOULE:

11    Q.  Dr. Levitt, could you explain for the jury what the

12    different components are of the Hezbollah flag?

13    A.  So in Arabic script, in Kufi scripts, you have a stylized,

14    in green, the name Hezbollah.  Again, literally Party of God.

15    The first letter of the word a la of God extends upward into a

16    fist holding some type of automatic rifle.  Above that is a

17    quotation from a piece of the -- quotation from the Quran,

18    which is the holy text in Islam, Islamic faith, which basically

19    reads, "Surely Hezbollah, the Party of God, will be

20    Victorious."  In other words, it refers in the Quran to the

21    name of the group.  At the bottom, it explains, this is The

22    Islamic Resistance movement in Lebanon.  The Islamic Resistance

23    is the name of Hezbollah's militia, and you can see, again, a

24    globe, a book, some type of branch with leaves of some sort

25    behind it.
```

1          MS. HOULE:  Thank you, Ms. Shields.  You can take that

2     down.

3     Q.   Approximately when was Hezbollah founded?

4     A.   Well, that's a good question because there's some debate.

5     Hezbollah officially announced its existence in 1985 and

6     published what it described as an open letter announcing its

7     existence, and its name, and describing some of its goals,

8     ambitions, et cetera.  But, in fact, the group had existed for

9     a few years beforehand, before it kind of did us the service of

10    announcing itself publicly, and was responsible for several

11    major terrorist attacks in the years before.

12          We know that it was in existence because some of its

13    own leaders have published books talking about those early

14    years, and we also know because, for example, U.S. Government

15    documents have been declassified since, where you can see that

16    even in the period of 1982, '83, '84, the U.S. Government is

17    referring to a Lebanese group known as Hezbollah and its

18    Islamic Jihad Organization terrorist component.  So this was in

19    existence and operating even before it publicly announced

20    itself in 1985.

21    Q.   I'd like to spend a few minutes talking about that 1985

22    letter that Hezbollah issued.

23          Have you reviewed that letter?

24    A.   I have.

25    Q.   Does the 1985 letter include any references to the concept

J57KKOU1                        Levitt - Direct

1    of jihad?

2    A.   It does.

3    Q.   Based on your review and research of Hezbollah materials,

4    what is your understanding of what the concept of jihad means

5    in that context?

6    A.   Well, context is everything, because, of course, jihad has

7    two very general meanings, and they're quite different.  One is

8    the battle of oneself, the battle of self-improvement, becoming

9    a better person, for some becoming a more observant person,

10   fulfilling the basic requirements of someone who adheres to the

11   Muslim faith.

12          The second is of a military, militant nature, and that

13   has to do with fighting off the enemies or perceived enemies of

14   Islam, and that militant jihad can include two components:  It

15   can include a defensive component where one is protecting the

16   community of believers from those who are trying to do it harm,

17   and the other is an offensive jihad where one is taking the

18   fight to others, either to bring them religion, to convert

19   them, to reclaim lost lands that were once controlled by

20   Muslim, et cetera.

21          In the context of the 1985 open letter, we are clearly

22   talking about militant jihad, because of the context where it's

23   talking about things like pushing Israel out of Southern

24   Lebanon and doing so as a first step towards its total

25   annihilation.

J57KKOU1                    Levitt - Direct

1              THE COURT:  Total annihilation of?

2              THE WITNESS:  Of the State of Israel.  In other words,

3    it's not just about pushing Israel out of Lebanese territory,

4    it's about destroying the state next-door.  That, obviously, is

5    something of a militant nature and not of a self-improvement

6    nature.

7              It also talks about its antipathy and hatred, for

8    example, for the United States, which had peacekeepers in

9    Lebanon in the early 1980s and which it describes as being kind

10   of guilty by virtue of supporting Israel.  And once Hezbollah

11   would deal with the United States, the open letter states, it

12   would then go on to deal with the allies of the United States,

13   France and other countries of NATO.

14   BY MS. HOULE:

15   Q.  Does the 1985 letter include any references to the concept

16   of mujahideen?

17   A.  It does.

18   Q.  Based on your research and your review of Hezbollah

19   materials, what is your understanding of what that term means

20   in this context?

21   A.  Well, you can hear -- in the term mujahideen, you can hear

22   the word jihad.  So it, too, has those two meanings.

23   Mujahideen in the singular or mujahideen in the plural is one

24   or persons who engage in jihad.  So it could apply to people

25   who are engaging in self-improvement, but it certainly, also in

J57KKOU1                         Levitt - Direct

the context of the 1985 letter, open letter by Hezbollah,

clearly refers to those who are engaging in a militant jihad,

it's fighters in the cause of -- in their religious cause.

THE COURT:  How is mujahideen spelled?

THE WITNESS:  M-u-j-i-h-i-d-e-e-n or M-u-j-a.  It's a

transliteration.

BY MS. HOULE:

Q.  Does the 1985 letter include any references to the concept

of martyrdom?

A.  It does.

Q.  Based on your research and review of Hezbollah materials,

what's the meaning of that term in this context?

A.  Well, it's referring to one who is killed or dies for the

cause.  In this case, the cause of Hezbollah and Iran in

support of Shia around the world and against their perceived

enemies, first and foremost, Israel, and then the United

States.  Sometimes it's used, especially in colloquial to

refer, for example, to a suicide bomber.  It need not be.  One

who is sitting on the back porch and is killed by the enemy and

was in the service of the cause could also be referred to as a

martyr.  So it's got a broad meaning, but the point is that

people who die in the course of service for the cause.

Q.  Did the 1985 letter include any references to an individual

named Ruhollah Khomeini?

A.  It did.

J57KKOU1                          Levitt - Direct

1    Q.  Who is that?

2    A.  Ruhollah Khomeini was the supreme leader of Iran, the man

3    who brought the revolution to Iran in 1979, and created the

4    Islamic Republic of Iran that we now know today.

5    Q.  Through your research, have you seen photos of Khomeini?

6    A.  Yes.

7    Q.  If you could turn to what's been marked for identification

8    as Government Exhibit 104 in that binder.

9    A.  Yes.

10   Q.  Who is that?

11   A.  This is Ayatollah Ruhollah Khomeini.

12            MS. HOULE:  The government offers 104.

13            MR. SCHACHT:  No objection.

14            THE COURT:  Received.

15            (Government's Exhibit 104 received in evidence)

16            MS. HOULE:  If you could publish that, Ms. Shields,

17   please.

18   BY MS. HOULE:

19   Q.  What does the 1985 letter say about the individual on the

20   screen, Khomeini?

21   A.  It describes him as the person to be emulated by the

22   followers of Hezbollah and the followers of Iran.  In other

23   words, there's a concept of the just guardian, Waliyat

24   el-Faqih, W-a-l-i-y-a-t e-l hyphen F-a-q-i-h, guardianship of

25   the just ruler, meaning that the supreme leader of Iran in the

J57KKOU1

person of Ayatollah Khomeini was the person to be emulated on

earth, and that he was like -- almost like a spokesman for God

on earth, and that the members of Hezbollah were subservient to

him and took their cues, their direction, from him.

Q.   Dr. Levitt, you said that this letter called for the

annihilation of Israel; is that correct?

A.   Yes.

Q.   And you indicated that it described the United States as an

enemy of Hezbollah?

A.   As an enemy of Hezbollah, as -- it quotes Ayatollah

Khomeini as saying the United States is the root of all evil.

Q.   I'd like to cover briefly some of Hezbollah's military

conflicts.

          THE COURT:   Before we do that, is this a good time for

a break?

          MS. HOULE:   Yes, your Honor.

          THE COURT:   We're going to have a long lunch today,

members of the jury.  Come back at 2:15.  Close up your books,

give them to Ms. Jones on your way out.  Do not discuss the

case amongst yourselves or with anyone else.

          (Jury not present)

          THE COURT:   Have a good lunch, everyone.

          MR. SCHACHT:   Thank you.  You too, Judge.

          (Luncheon recess)

J57KKOU1                        Levitt – Direct

                            AFTERNOON SESSION

                                2:25 P.M.

1            (Trial resumed)

2            (In open court; jury present)

3            MS. HOULE:  Should Dr. Levitt take the stand, your

4    Honor?

5            THE COURT:  Good afternoon, members of the jury.  Be

6    seated, everyone.

7            Dr. Levitt, please remember that you are under oath.

8            Ms. Houle, please continue your examination.

9     MATTHEW LEVITT, resumed.

10   DIRECT EXAMINATION CONTINUED

11   BY MS. HOULE:

12   Q.  Dr. Levitt, I'd like to resume by asking you about some

13   military conflicts that Hezbollah has been engaged in.

14   A.  Okay.

15   Q.  You testified earlier that when Hezbollah was first formed,

16   they were trained by the Iranian Revolutionary Guard and that

17   they were engaged in a conflict with the Israeli Defense Force

18   in Lebanon; is that right?

19   A.  Yes.

20   Q.  If you could turn to what's marked in your binder as

21   Government Exhibit 5 for identification.

22            What is this?

23   A.  This is a map of Northern Israel and Southern Lebanon, with

J57KKOU1                        Levitt - Direct

1    the demarcation of the boundary between the two countries known

2    as the Blue Line.  Because it was demarcated by the United

3    Nations and U.N. soldiers who wear a blue helmet, so Blue Line.

4            MS. HOULE:  Your Honor, the government offers

5    Government Exhibit 5.

6            MR. SCHACHT:  No objection.

7            THE COURT:  Received.

8            (Government's Exhibit 5 received in evidence)

9            MS. HOULE:  Ms. Shields, could you please publish it.

10   BY MS. HOULE:

11   Q.  Dr. Levitt, now that this exhibit is on the screen, could

12   you explain to the jury what it shows?

13   A.  So this line you see, crooked line, is the Blue Line, the

14   border between Israel to the south --

15           THE COURT:  Could someone mark the light or some --

16           MS. HOULE:  Can you highlight the line, Ms. Shields,

17   that Dr. Levitt is referring to.

18           THE WITNESS:  From -- yeah.

19           THE COURT:  Okay.  It stretches across, doesn't it?

20           THE WITNESS:  So it starts there at the coast, the

21   Rosh HaNiqura on the Israeli side, and you can see it squiggle

22   south and then north around the Southern Lebanese Town of Bint

23   Jbeil.  It goes up right around the Israeli Town of Metula --

24   it's referred to as Israel's northern finger --

25           THE COURT:  Can you highlight Metula?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE WITNESS:  There you go.

2          THE COURT:  Highlight Rosh HaNiqura.  Not on the map.

3    State where it is.

4          THE WITNESS:  It juts down and then back up.  Where it

5    juts down, you can see a dotted line.  That is the

6    demilitarized zone line separating Israel from the Golan

7    Heights.  So there is the Israeli side control of the Golan

8    Heights and then the Syrian side of the Golan Heights.  This

9    line is just before the Golan.

10          THE COURT:  Okay.

11   BY MS. HOULE:

12   Q.  Using this map, Dr. Levitt, could you please explain where

13   that conflict between the early Hezbollah militia and the

14   Israeli Defense Force took place?

15   A.  So the Palestine Liberation Organization, Palestinian

16   terrorist group, had situated itself in this swath of Southern

17   Lebanon really all along -- kind of at a diagonal along the

18   border area.  It had effectively become a state within a state

19   and was carrying out attacks on these Northern Israeli

20   communities from this base in Southern Lebanon.

21          So, in 1982, after a Palestinian group tried to

22   assassinate an Israeli ambassador in London, the defense forces

23   moved north, crossed this border, and occupied what they called

24   the security strip, but occupied a part of Southern Lebanon all

25   along this border, and they stayed there.  They had a local

J57KKOU1                        Levitt - Direct

proxy called the South Lebanon Army, and so the Israel Defense

Forces and the South Lebanon Army occupied this swath of land.

            A variety of Lebanese groups, some of them Christian,

some of them Sunni Muslim, some Shia Muslim of the latter, to

include what became Hezbollah, fought the Israelis to push them

out of Southern Lebanon.

Q.   What, if anything, happened in December of 2000 in relation

to the conflict that you just described?

A.   In December 2000, the Israeli Government made a decision to

withdraw all forces from Southern Lebanon, and they did that,

in December 2000, moving all forces of theirs.  They also

withdrew any of the south Lebanese army elements that would

come into Israel proper, ending the occupation of Southern

Lebanon.  There's only one spot that is still contested.  It's

called the Shebaa Farms, and it's at that point going down to

the right of Metula where the three border areas kind of meet.

It is -- the U.N. says it's actually Syrian territory, but both

the Lebanese Government and Hezbollah still claim it as

Lebanese, and so they claim that Israel still occupies that

piece, but the international community does not believe it's

Lebanese land.

Q.   Turning to 2006, was Hezbollah engaged in another military

conflict at that time?

A.   Yes.

Q.   And what did that conflict consist of?

1    A.   The conflict was in the summer in July of 2006.  It lasted

2    just over a month.  Hezbollah sent members of its militia to

3    engage Israel Defense Forces soldiers who were located in

4    Israel on the Israeli side of the border.  They engaged them.

5    Some of the Israeli soldiers were wounded.  Hezbollah crossed

6    into Israel, grabbed those wounded Israeli soldiers, took them

7    into Lebanon, thus starting a war with Israeli reprisals to get

8    their soldiers back, and led to what's called as the July 2006

9    War.

10   Q.   What, if any, involvement did Iran have in the July 2006

11   War?

12   A.   Well, as we discussed this morning, Iran has, since

13   Hezbollah's inception, provided funds, and weapons, and

14   training to Hezbollah, and they certainly provided that in

15   advance of the July 2006 War.  The July 2006 War was remarkable

16   in many ways, but maybe most significantly because Hezbollah

17   had stockpiled an arsenal of rockets and shorter range

18   projectiles, mortars, et cetera, several thousand, a larger

19   arsenal than most sovereign countries have, and was shooting

20   these rockets into Israeli communities over the border, into

21   Israel.  Those rockets were provided by Iran, as is the funding

22   and the training that enables Hezbollah to carry out these

23   types of activities.

24   Q.   And this 2006 War, did it occur in the same area that you

25   described as the prior conflict, which would be along that

J57KKOU1                              Levitt - Direct

1  border between Israel and Lebanon?

2  A.  That's right.

3  Q.  How did that war end?

4  A.  It ended with Israel withdrawing back into Israeli

5  territory, with Hezbollah stopping its rocket attacks, and with

6  a little bit of lack of clarity on each side.  So on the

7  Hezbollah side, the Secretary General, the leader of Hezbollah,

8  Hassan Nasrallah, declared that this had been, in his words, a

9  divine victory, that by not being destroyed by the Israeli

10  army, they were the first Arab army to -- by not being

11  destroyed, to win, and it was a divine victory.  On the flip

12  side, he gave a public address where he issued a mea culpa, and

13  he said if I had known how ferocious the Israeli response would

14  have been, I wouldn't have had Hezbollah soldiers kidnap the

15  Israelis in the first place.

16         And then from the Israeli side, they put together a

17  national commission led by a former Supreme Court judge, Judge

18  Winograd, and, therefore, the Winograd Commission, which was

19  publicly available and was quite blunt on the shortcomings of

20  the way the IDF fought this war on the one hand, and, on the

21  other hand, we have not seen a conflict like that, between

22  Israel and Hezbollah, since 2006.

23         So for all of the ways in which they didn't fight it

24  as well as they could have, and for all of Hezbollah's divine

25  victory, it seems that both sides have kind of re-understood

1  the message of deterrence of what they can do to one another,

2  and we haven't had, thankfully, a conflict between Hezbollah

3  and Israel like that since 2006, which, in this region, is a

4  really long time.

5  Q.  Turning your attention to 2014, did Hezbollah become

6  involved in any conflict in Syria at that time?

7  A.  Yes.  At least they publicly announced that they were

8  engaged in conflict in Syria in defense of the regime of Bashar

9  al-Assad, the President of Syria, B-a-s-h-a-r a-l hyphen

10  A-s-s-a-d.  They had actually been fighting for some time

11  beforehand, and as Hezbollah militants were killed fighting in

12  Syria, there was an increasing number of funerals back in

13  Lebanon and Hezbollah, officials would attend them, they would

14  come out in the media, but it was around May that the Secretary

15  General Nasrallah came out publicly and acknowledged that

16  Hezbollah was fighting there after it had come out that

17  Hezbollah had paid a very critical role in the battle along the

18  Syrian-Lebanese border a month earlier.

19  Q.  What was the name of that battle?

20  A.  It was the Battle of Qusayr, Q-u-s-a-y-r.

21  Q.  You mentioned Bashar al-Assad?

22  A.  Yes.

23  Q.  Through your research, have you become familiar with photos

24  of him?

25  A.  I have.

1    Q.  If you could turn to what's been marked for identification

2    as Government Exhibit 113 in that binder.

3             THE COURT:  Do you have any objection to this?

4             MR. SCHACHT:  No, your Honor.

5             THE COURT:  All right.  Received.  Display it.

6             (Government's Exhibit 113 received in evidence)

7             MS. HOULE:  If you could publish that, Ms. Shields.

8    BY MS. HOULE:

9    Q.  Who is shown on the screen?

10   A.  This is President Bashar al-Assad of Syria.

11   Q.  Are you familiar with a location in Syria called the Shrine

12   of Sayyidah Zaynab?

13   A.  Yes.  The Sayyidah Zaynab Shrine.

14   Q.  What's the significance of that?

15   A.  This is a Shia Pilgrimage spot, where it is believed

16   Zaynab, who's the granddaughter of the Prophet Muhammad, is

17   buried.  So it's a holy site for Shia Muslims.

18   Q.  Does Hezbollah have any affiliation with that site?

19   A.  When it became public that Hezbollah was fighting in Syria,

20   one of the justifications that Hezbollah officials gave for

21   that was that, among other things, they were protecting the

22   Sayyidah Zaynab Shrine.

23   Q.  Let's turn to the structure of Hezbollah.

24             How is Hezbollah generally organized?

25   A.  Hezbollah is organized with a secretary general and a

1   deputy secretary general, who lead a consultative council, or a

2   Shura, S-h-u-r-a, Council, that is kind of the governing body

3   for the group.  Under the Shura Council are a variety of other

4   councils for thematic responsibility.  So, for media, for

5   social welfare activity, for political activity, for militant

6   intelligence terrorist activity.  That last one is referred to

7   as the jihad council.

8   Q.  I'd like to briefly discuss Hezbollah's terrorist

9   operations.

10           Are you familiar with the Islamic Jihad Organization?

11  A.  I am.

12  Q.  What is that?

13  A.  The Islamic Jihad Organization is the name or one of the

14  names for Hezbollah's terrorist wing.  Part of Hezbollah that

15  engages in terrorist attacks in and beyond Lebanon's borders

16  and also intelligence activities.

17  Q.  What other names does it go by?

18  A.  It goes by the name -- a variety of names, including the

19  External Security Organisation.

20           MS. HOULE:  Your Honor, I'd like to read another

21  portion of the stipulation at Government Exhibit 1001.

22           THE COURT:  Very well.

23           MS. HOULE:  The parties agree as follows -- this is at

24  paragraph 1 -- the Islamic Jihad Organization, which is also

25  referred to as the IJO, the External Security Organisation,

J57KKOU1                          Levitt - Direct

1   ESO, and unit 910 is part of Hezbollah, which is sometimes

2   spelled, among other ways -- so we have two spellings in the

3   stipulation, one is H-i-z-b-a-l-l-a-h and the other is

4   H-e-z-b-o-l-l-a-h.

5   BY MS. HOULE:

6   Q.  For purposes of your testimony today, Dr. Levitt, let's

7   refer to the Islamic Jihad Organization as the IJO.

8            What is the function of the IJO?

9   A.  The IJO is Hezbollah's terrorist wing.  It's responsible

10  for carrying out amounts of terrorism and related intelligence

11  and surveillance.

12  Q.  Has the IJO ever committed an attack abroad?

13  A.  Yes.  Several.

14  Q.  Who oversees the IJO?

15  A.  There is usually leadership of the IJO within this jihad

16  council.  The first and longest serving leader was a Hezbollah

17  operative named Imad Mughniyeh, I-m-a-d M-u-g-h-n-i-y-e-h.  He

18  was killed in 2008 and was succeeded in leadership of the IJO

19  by his brother-in-law and partner, Mustafa Badreddine.

20  Q.  You mentioned earlier that Hezbollah has a secretary

21  general?

22  A.  Yes.

23  Q.  Who is that?

24  A.  Hassan Nasrallah.

25  Q.  Are you familiar with photos of Hassan Nasrallah through

1   your research?

2   A.  I am.

3   Q.  If you could turn to what's been marked for identification

4   as Government Exhibit 103 in that binder.

5   A.  Yes.

6   Q.  Who is that a photo of?

7   A.  This is Hassan Nasrallah.

8            MS. HOULE:  The government offers 103.

9            MR. SCHACHT:  No objection.

10           THE COURT:  Received.

11           (Government's Exhibit 103 received in evidence)a

12           MS. HOULE:  If you could publish that, Ms. Shields,

13   please.

14   BY MS. HOULE:

15   Q.  In connection with Nasrallah, does the date August 31st,

16   1960, have any significance?

17   A.  That's his birthday.

18   Q.  Does Nasrallah, as the Secretary General, report to anyone?

19   A.  Not within Hezbollah, no.  He sits at the top of the

20   pyramid.  But as we discussed, Hezbollah is very close to Iran

21   and, in particular, to Iran's Islamic Revolutionary Guard

22   Corps, IRGC, and the IRGC's Quds Force.  In that regard, he

23   does liaise with, work with, and sometimes takes instructions

24   from leaders of the Quds Force and the IRGC.

25   Q.  Who is currently the Supreme Leader of Iran?

J57KKOU1                          Levitt - Direct

 1   A.  The Supreme Leader of Iran today is Ayatollah Ali Khamenei.

 2   Q.  If you could turn to what's been marked for identification

 3   as Government Exhibit 105.  Who is that a photo of?

 4   A.  This is Ayatollah Khamenei.

 5            MS. HOULE:  The government offers 105.

 6            MR. SCHACHT:  No objection.

 7            (Government's Exhibit 105 received in evidence)

 8            MS. HOULE:  Your Honor, may we publish Government

 9   Exhibit 105?

10            THE COURT:  You may.

11            MS. HOULE:  Ms. Shields, if you could publish that,

12   please.

13   BY MS. HOULE:

14   Q.  Who is shown on the screen?

15   A.  This is the current Supreme Leader of Iran, Ayatollah Ali

16   Khamenei.

17            THE COURT:  We've seen that before, haven't we?

18            MS. HOULE:  Not this picture, your Honor.  We saw the

19   prior Supreme Leader of Iran.

20            THE COURT:  Also named Khomenei?

21            MS. HOULE:  Yes, your Honor.

22            THE WITNESS:  Similar, but different spelling.

23            THE COURT:  Just to confuse us.

24            THE WITNESS:  Yes, sir.  Welcome to my world.

25

BY MS. HOULE:

Q.  Dr. Levitt, you mentioned earlier that Iran has a financial relationship with Hezbollah.  Has that financial relationship been consistent over the years?

A.  It has in the sense that there has consistently been Iranian funding for Hezbollah.  It has not in the sense that that funding sometimes fluctuates due to realities in the world, increase or drop in the price of oil affecting Iran's budget, international sanctions targeting Iran, et cetera.  So sometimes it gets higher, and sometimes it gets a little lower, but over time, it has been consistent in that it has flowed.

Q.  What, generally, are the levels of funding that Iran has sent to Hezbollah?

A.  Well, like I said, it has fluctuated, but the current estimate that U.S. Government officials use is somewhere around 700 to 800 million dollars a year.  In previous years, the estimate has been less, but also in the range of, you know, $200 million a year or something like that.

Q.  Has the U.S. Government imposed sanctions on Iran historically?

A.  Yes.

Q.  Has that had any impact on Iran's funding of Hezbollah?

A.  At times, yes, and at times not, but certainly there have been points where the sanctions in Iran have inhibited Iran from being able to provide the extent of financial aid that it

1   wanted to provide to Hezbollah.

2   Q.  In connection with your research of Hezbollah's leaders,

3   I'd like to ask you about a few more individuals before we move

4   on.

5           Who is Sheikh Hussein Kourani?

6   A.  Sheikh Hussein Kourani is a Hezbollah religious leader.  He

7   is, perhaps, best known for early on, in the mid- to late

8   1980s, saying that United Nations forces stationed in South

9   Lebanon were legitimate targets for Hezbollah because they were

10  preventing Hezbollah from being able to attack the Israelis

11  directly.

12  Q.  Who is Haider Kourani, H-a-i-d-e-r?

13  A.  Haider Kourani is a senior Hezbollah military operative.

14  At one point he was the head of security, military security,

15  for all of South Lebanon.

16  Q.  Dr. Levitt, you mentioned that Hezbollah has a media wing.

17  What types of media does Hezbollah use to express its message

18  to the public?

19  A.  Hezbollah engages in a broad multimedia campaign.  It runs

20  a satellite television station called Al-Manar, A-l hyphen

21  M-a-n-a-r.  It runs radio stations.  It has newspapers, some

22  that are actually Hezbollah, some that are kind of

23  pro-Hezbollah.  It runs websites.  It invests heavily in media.

24  Q.  If you could turn to what's been marked as Government

25  Exhibit 102 in your binder.

J57KKOU1                           Levitt - Direct

1   A.  Yes.

2   Q.  What is that?

3   A.  This is the symbol for Al-Manar.

4            MS. HOULE:  The government offers 102.

5            MR. SCHACHT:  No objection.

6            THE COURT:  Received.

7            (Government's Exhibit 102 received in evidence)

8            MS. HOULE:  Could you please publish it, Ms. Shields.

9   BY MS. HOULE:

10  Q.  Dr. Levitt, you said that this is the symbol for Al-Manar,

11  which is the sort of flagship of Hezbollah's media presence; is

12  that right?

13  A.  That's right.

14  Q.  What is Al-Nour?

15  A.  Al-Nour is one of Hezbollah's radio stations.

16           MS. HOULE:  Your Honor, I'd like to read the final

17  paragraph of that stipulation between the parties at Government

18  Exhibit 1001?

19           THE COURT:  Yes.

20           MS. HOULE:  Paragraph 4 reads:  Al-Manar and Al-Nour

21  are media arms of Hezbollah.  In 2006, the U.S. Department of

22  the Treasury designated Al-Manar and Al-Nour as specially

23  designated global terrorist entities, and they remain so

24  designated.

25           That is an agreement between the parties.  I read each

1  of the paragraphs now, your Honor, of the stipulation at

2  Government Exhibit 1001, so I offer it now.

3            MR. SCHACHT:  No objection.

4            THE COURT:  Received.

5            (Government's Exhibit 1001 received in evidence)

6  BY MS. HOULE:

7  Q.  Dr. Levitt, are you familiar with a series called "What If

8  Hezbollah Was Defeated"?

9  A.  Yes.  This is kind of a dramatic series that was aired on

10  Al-Manar.

11  Q.  Does Hezbollah also disseminate its messages through public

12  addresses?

13  A.  Yes.

14  Q.  If we could turn now back, Dr. Levitt, to the Islamic Jihad

15  Organization, IJO.  You mentioned earlier a leader of the IJO,

16  Imad Mughniyeh?

17  A.  Yes.

18  Q.  If you could turn to what's been marked in your binder as

19  Government Exhibit 1006.

20  A.  Yes.

21  Q.  Who is that?

22  A.  This is Imad Mughniyeh.

23            MS. HOULE:  The government offers 106.

24            MR. SCHACHT:  No objection.

25            THE COURT:  Received.

1           (Government's Exhibit 106 received in evidence)

2           MS. HOULE:  If we could publish that, Ms. Shields,

3     please.

4     BY MS. HOULE:

5     Q.  What role did Mughniyeh serve in the IJO?

6     A.  He was its founding leader and led the IJO until his death

7     in 2008.

8     Q.  How did he die?

9     A.  He was killed, he was assassinated, in Damascus after

10    leading a meeting with Syrian military intelligence.  An

11    explosive device was placed in his car.

12    Q.  Is there publicly available information about who carried

13    out that assassination?

14    A.  Well, it wasn't at the time, but there is now.

15    Q.  What is that?

16    A.  It was a joint operation between the United States and

17    Israel.

18    Q.  What, if any, impact did Mughniyeh's death have on the

19    priorities of the IJO at that time?

20    A.  Well, it added to them.  Mughniyeh was not only the leader

21    of this elite element, he was also one of the founding leaders

22    of the organization writ large and was very close to Nasrallah

23    himself.  So with his assassination, it became important to

24    Hezbollah to exact revenge for the assassination, and the IJO

25    began to carry out surveillance for a series of attempted

J57KKOU1                        Levitt - Direct

1    terrorist attacks around the world, done at least in part, to

2    avenge Mughniyeh's death.

3    Q.   Did Hezbollah make any public announcements in connection

4    with this focus on international attacks after Mughniyeh's

5    death in 2008?

6    A.   In a veiled sense, yes.  At his funeral, Second General

7    Hassan Nasrallah spoke, of course, and one of the things he

8    said was something to the effect that Israel had -- they blamed

9    Israel for this, even though the fact that it was a joint

10   U.S.-Israeli operation wasn't yet known, and said, Israel, you

11   carried out this attack in Syria, which is beyond the

12   Israeli-Lebanon traditional battle space, and so he said if you

13   want, and the quote was open war, then let there be open war.

14   I'm paraphrasing except for the words open war.

15            And so intelligence officials around the world, and

16   certainly in Israel, but here in the United States as well,

17   took that as a veiled threat that there would be attacks and

18   that they would not be limited to the Israeli-Lebanon arena.

19   Q.   I'd like to ask you about a few specific incidents, both

20   before and after Mughniyeh's death.

21            Was there an incident involving an aircraft in 1985?

22   A.   Yes.  The highjacking of TWA 847, which led to, among other

23   things, the brutal murder of a U.S. Navy diver.

24   Q.   Based on your research, is it your opinion that this 1985

25   highjacking was committed by the IJO?

J57KKOU1                         Levitt - Direct

1    A.  Without question.

2    Q.  Are you familiar with an individual named Mohammad Ali

3    Hamadi, H-a-m-a-d-i?

4    A.  I am.

5    Q.  Who is that?

6    A.  He is a Hezbollah operative who was one of the highjackers

7    Of this TWA highjacking and is still wanted by U.S.

8    authorities.

9    Q.  If you can turn to what's been marked as Government Exhibit

10   107 in that binder.

11   A.  Yes.

12   Q.  Who is that a photo of?

13   A.  This is Hamadi.

14          MS. HOULE:  The government offers 107.

15          MR. SCHACHT:  A brief voir dire, your Honor?

16          THE COURT:  All right.

17   VOIR DIRE EXAMINATION

18   BY MR. SCHACHT:

19   Q.  Sir, how do you know who that is in the picture?  Have you

20   met him before?

21   A.  I have not met him.  Among other things, he is one of the

22   FBI's most wanted, and there are several pictures of him there,

23   including this one.

24   Q.  So your statement that that's him is based upon the fact

25   that someone else in the FBI told you or told the world that

1   that is him?

2   A.   The FBI and others.   He also served time in Germany, and I

3   have met with German officials as well.

4   Q.   What have the German officials told you?

5   A.   That this is Mohammed Ali Hamadi.

6          MR. SCHACHT:   I have no other questions.   No

7   objection.

8          (Government's Exhibit 107 received in evidence)

9          MS. HOULE:   Ms. Shields, if you could publish

10  Government Exhibit 107.

11  BY MS. HOULE:

12  Q.   Turning your attention to 2012, based on your research,

13  what is your opinion of whether the IJO committed any attack

14  that year?

15  A.   They did.

16  Q.   What attack was that?

17  A.   Well, they carried out one successful attack and some

18  failed or thwarted attacks.   The successful attack was at the

19  airport in Burgas, Bulgaria, where Hezbollah operatives placed

20  a bomb on a bus of Israeli tourists who had arrived at the

21  airport on vacation and blew up the bus, killing several

22  Israelis, wounding several more, and killing the Muslim

23  Bulgarian bus driver as well.

24  Q.   Shortly before that bus attack in 2012, was there an arrest

25  of a suspected IJO operative?

J57KKOU1                          Levitt - Direct

1    A.   There was.  In Cyprus.

2    Q.   What was the name of that operative?

3    A.   Hussam Yacoub, H-u-s-s-a-m Y-a-c-o-u-b.

4    Q.   Through your research, have you seen a photo of Yacoub?

5    A.   I have.

6    Q.   If you can turn in your binder to what's been marked as

7    Government Exhibit 112.

8    A.   112?  Yes.

9    Q.   Who is shown in that photo?

10   A.   This is Hussam Yacoub.

11            MS. HOULE:  The government offers 112.

12            MR. SCHACHT:  No objection.

13            THE COURT:  Received.

14            (Government's Exhibit 112 received in evidence)

15            MS. HOULE:  If you could publish that, Ms. Shields.

16   BY MS. HOULE:

17   Q.   In connection with your research of the IJO, Dr. Levitt,

18   have you reviewed a website called Stop910?

19   A.   Yes.

20   Q.   What is that website?

21   A.   It is a website that purports to put up pictures of

22   Hezbollah operatives in an effort to kind of out them publicly.

23   910, as we said, is one of the names of Hezbollah's IJO

24   terrorist wings.  So Stop910, they're outing to try and stop

25   the activities of Hezbollah's IJO.

J57KKOU1                          Levitt - Direct

1    Q.   Who is Fady Kassab?

2    A.   Fady Kassab is a Hezbollah operative.

3    Q.   Have you seen photographs of Fady Kassab through your

4    research?

5    A.   I have.

6    Q.   If you can turn to what's been marked in that binder as

7    Government Exhibit 108.

8    A.   Yes.

9    Q.   Who is that a photo of?

10   A.   This is Fady Kassab.

11              MS. HOULE:   The government offers 108?

12              MR. SCHACHT:   No objection.

13              (Government's Exhibit 108 received in evidence)

14              MS. HOULE:   Could you publish that, Ms. Shields,

15   please.

16   BY MS. HOULE:

17   Q.   Who is Samir Kuntar?

18   A.   Samir Kuntar was a Druze, D-r-u-z-e -- the Druze are one of

19   the religious sects, among other places, in Lebanon, also in

20   Israel and Syria, he was from Lebanon -- who was involved with

21   a Palestinian terrorist group in 1979, I believe, carried out a

22   cross-border raid into Israel, where, among other things, he

23   bashed a four-year-old girl's head into a rock.  He served

24   about 30 years in an Israeli prison for that, eventually was

25   released in a prisoner exchange with Hezbollah who had

1    requested his release.  I believe that was in 2008.

2              Hezbollah lauded him as a great militant and

3    eventually dispatched him to Southern Syria, along the border

4    with Israel on the Syrian part of the Golan Heights, to recruit

5    local Druze youth to be a Hezbollah cell to carry out attacks

6    now against Israel not only from Lebanon, but from Syria.  And

7    shortly thereafter, he was killed in an Israeli air strike.

8    Q.  Through your research, have you seen photographs of Samir

9    Kuntar?

10   A.  I have.

11   Q.  Could you turn to what's been marked in your binder for

12   identification as Government Exhibit 111.

13   A.  Yes.

14   Q.  Who is that a photo of?

15   A.  This is Samir Kuntar.

16             MS. HOULE:  The government offers 111.

17             MR. SCHACHT:  No objection.

18             THE COURT:  Received.

19             (Government's Exhibit 111 received in evidence)

20             MS. HOULE:  Ms. Shields, could you publish it, please.

21   BY MS. HOULE:

22   Q.  That is Samir Kuntar, Dr. Levitt?

23   A.  Yes.

24   Q.  Who is Fauzi Ayub?

25   A.  Fauzi Ayub was a Hezbollah operative who, at one point,

J57KKOU1                          Levitt - Direct

1    came to Canada and obtained Canadian citizenship, so he was a

2    dual Lebanese Canadian.  At one point lived for some time

3    across the border in the United States, in Michigan, was on the

4    FBI's most wanted list.  There was an indictment for him for

5    his use of a false U.S. passport, which he used to travel to

6    Israel and the West Bank, Palestinian authority territory, the

7    West Bank.

8              He was arrested by the Palestinians, eventually handed

9    over to the Israelis, tried, convicted, served time in an

10   Israeli jail, and then he, too, was traded in an Israeli

11   prisoner swap and was later killed, I believe, in 2014,

12   fighting for Hezbollah and Syria.

13   Q.  Through your research, have you seen photos of Fauzi Ayub?

14   A.  I have.

15   Q.  If you could turn to what's been marked in your binder as

16   Government Exhibit 110.

17   A.  Yes.

18   Q.  Who is that?

19   A.  This is Fauzi Ayub.

20             MS. HOULE:  The government offers 110.

21             MR. SCHACHT:  No objection.

22             THE COURT:  Received.

23             (Government's Exhibit 110 received in evidence)

24             MS. HOULE:  Could you publish, please, Ms. Shields.

25

J57KKOU1                        Levitt - Direct

1    BY MS. HOULE:

2    Q.  Dr. Levitt, is that Fauzi Ayub?

3    A.  Yes.

4    Q.  Who is Mohammad -- I'm sorry, Mahmoud Kourani,

5    M-a-h-m-o-u-d?

6    A.  Mahmoud Kourani is a Hezbollah operative who at one point

7    came across the Mexican border into the United States

8    illegally, made his way to Michigan, and was ultimately

9    arrested.  I believe he pled guilty to providing material

10   support to Hezbollah and served several years in jail.

11   Q.  Through your research, have you seen photographs of him?

12   A.  I have.

13   Q.  If you could turn to what's been marked in your binder as

14   Government Exhibit 115.  Who is that a photo of?

15   A.  This is Mahmoud Kourani.

16           MS. HOULE:  The government offers 115.

17           MR. SCHACHT:  No objection.

18           THE COURT:  Received.

19           (Government's Exhibit 115 received in evidence)

20           MS. HOULE:  Could you publish, please, Ms. Shields.

21   BY MS. HOULE:

22   Q.  Dr. Levitt, are you familiar with a term "Op Israel"?

23   A.  I am.

24   Q.  What is that?

25   A.  It is an annual, or intended to be annual, cyber campaign

1    targeting Israel that has been blamed on Iran and Hezbollah.

2    Q.  Based on your analysis of attacks committed by the Islamic

3    Jihad Organization, have you identified any common features of

4    those attacks?

5    A.  I have.

6    Q.  Can you describe some of those features for the jury,

7    please?

8    A.  So Islamic Jihad Organization attacks tend to include

9    preoperational surveillance of a target.  They will often

10   involve then sending in other operatives to then carry out the

11   actual attack itself.  So one person will be sent from Lebanon

12   or from elsewhere to carry out surveillance.  That surveillance

13   is provided back to handlers.  Ultimately, for the attack

14   itself, often another operative will be sent in to carry out

15   the attack itself.

16          There will be logistics that have to go into an

17   operation like this.  So whether that is procuring material for

18   the explosive, procuring a vehicle, procuring or renting a

19   storage facility, moving the explosive, usually in a car, to

20   someplace near the intended bombing target a day or two before

21   the actual plot, and then recruiting people for these purposes

22   who have kind of comfort internationally, people who have

23   traveled and/or speak foreign languages, people who have

24   foreign nationality or can get foreign nationality, in other

25   words, they can travel on a non-Lebanese passport.  If they

J57KKOU1                         Levitt - Direct

1    have already a second passport, but it has stamps from Lebanon

2    asking them to say that they lost that passport and getting a

3    clean, non-Lebanese passport that they can travel on, and

4    sending people to travel for operational purposes through other

5    places.

6              So instead of, say, sending an operative from Lebanon

7    directly to Cyprus, though it's so close, maybe telling them to

8    travel somewhere else in the region first, make a stop, and

9    then go from there to Cyprus, so that there's not a direct

10   connection between Lebanon and the travel.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MS. HOULE:

Q.  You mentioned that operatives maybe tasked with procuring materials for explosives.  Can you describe what you meant by that?

A.  Well, there's lots of different ways to make a bomb.  But over the past several years one Hezbollah modus operandi that we've seen in multiple places in multiple regions has been to procure materials for ammonium nitrate.  One way to do this is to collect a large number of those one time use disposable ice packs, the ones that your soccer coach will have.  And then you punch it and it breaks a membrane and two chemical compounds mix and it gets very cold for a time and then it's not and you throw it out.

        Well, apparently some of the chemicals in those disposable ice packs can be removed and be used to build ammonium nitrate explosives.  That's something we've seen in several cases around the world.

Q.  Based on your research, is there any particular location where these ice packs used by the Islamic Jihad Organization are manufactured?

A.  Several cases have come back to China.

Q.  Through your research what have you learned about the Islamic Jihad Organization's recruiting tactics?

A.  The Islamic Jihad Organization is looking for people who are smart.  They're looking for people who are educated.

1   They're looking for people who can follow orders and do things

2   surreptitiously without drawing attention to themselves.  As I

3   said, they're looking for people who are comfortable traveling

4   and speak other languages and have other nationalities or legal

5   residency, especially, foreign passport.

6   Q.  Based on your research, what is your opinion of what

7   training consists of for IJO operatives?

8   A.  Well, there's a wide range of training for IJO operatives.

9   Hezbollah runs training camps in Lebanon.  It has run training

10  camps together with the Iranians in Iran.  And sometimes

11  Hezbollah trainees go to these camps.  Often they're put in a

12  car with the windows shaded.  Sometimes they have to wear a

13  helmet or a hood so that they can't see where they're going and

14  they can't see others traveling with them.

15         They are not allowed to use their real name.  They use

16  a fake name so that others that they're training with wouldn't

17  he be able to identify them because if you were caught you

18  won't be able to identify the true identities of someone else

19  you trained with.  Those types of training are usually done for

20  things like explosive training, small arms training, things

21  like that.

22         Hezbollah also does much smaller scale training that

23  can be done say in an apartment, say somewhere in Beirut where

24  you'll be brought somewhere.  And that might be ideological

25  training.  It might be a different type of explosives training,

1    electrical things.  It might be instruction in surveillance, in

2    countersurveillance, in how to resist interrogation, the type

3    of thing for which you don't actually need to be kind of out in

4    the wilderness where you might need the space to be able to

5    practice shooting or things like that.  So, there's a wide

6    array and there are different levels of the courses, as well.

7    Q.  Before we finish up there's one final area of the Islamic

8    Jihad Organization's operation that I'd like to review.  At the

9    beginning of your testimony you said that the IJO engages in

10   intelligence gathering activity; is that right?

11   A.  That's right.

12   Q.  Based on your research, what are the different types of

13   intelligence gathering activities that the IJO engages in?

14   A.  We can break them down in two baskets.  One is intelligence

15   and one is counterintelligence.  Counterintelligence is trying

16   to root out others that might be spying on you.  And there is

17   on ongoing kind of spy versus spy thing going on between

18   Hezbollah and its adversaries which include Israel and the

19   United States, others, even some of the Lebanese intelligence

20   services.

21       The second is a practice of intelligence of its own.

22   That would include things like collecting intelligence for

23   targeting purposes.  It might include preoperational

24   surveillance that can be of potential targets.  But it can also

25   be no less importance of where is a good place to rent a car?

J57AAKOU2                          Levitt - Direct

1    Where is a good place to park a car near a potential target

2    where, for example, you can take your car in or out multiple

3    times a day where you don't have to show your ID or if they

4    look at the ID, they don't look at it too closely.  It can

5    include things like identifying places or individuals through

6    whom you can acquire things that you might need whether it's

7    small arms or fake IDs.

8            And it can involve other types of logistical support

9    as well.  For example, to be able to support other Hezbollah

10   members who might come to the place where you located or

11   collect information on Israelis who live as expatriates where

12   ever you are and things like that.

13   Q.  And where do these intelligence gathering activities take

14   place?  Is it limited to Lebanon?

15   A.  No, of course not, because Hezbollah's actives are not

16   limited to Lebanon.  So, if Hezbollah wants to be able to be

17   engaged and active in other places in the world, then it needs

18   to have operatives who either can travel there or ideally can

19   be based there so that they can be called upon to provide

20   information.  That can be general information on what's the

21   general politics and how strong is the currency and how easy is

22   it to travel around to much more tactical things related to

23   operations.

24   Q.  In your writings you've used the term "sleeper cell" in

25   connection with the IJO.  What is a sleeper cell?

A.   So, the idea of a sleeper cell is that you have someone who
is dispatched to go to another place for an extended period of
time.  And their primary directive is not to be engaged in
activities for their organization -- in this case Hezbollah
IJO -- on a day-to-day basis but rather, to establish a life
and get a job and get residency and get an education and have
an income and then be able kind of on the side to be able to be
called upon as necessary to do things for the group without
drawing attention to oneself.  So, that could be to do things
in the location where you're based.

          It could also be to do things else where.  Again,
Hezbollah prefers not to send its operatives directly from
Lebanon to where ever it's going.  So, it's in Hezbollah's
interests, as well as other groups, to have individuals
somewhere else with kind of a clean identify unknown to law
enforcement intelligence that can be sent from there to yet a
third location to do something.  It's just good operational
security.

Q.   Have you heard the phrase "cover identity"?

A.   I have.

Q.   And what is that?

A.   Well, in the movies "cover identity" means you are going
undercover and so overnight you have to memorized a completely
fake persona.  That's a very bad cover identity.  In the real
world, a strong cover identity is built on your true identity,

1    only then will add to it.

2          So, Sumi Akube in Cyprus who we mentioned earlier was

3    sent to Cyprus multiple times by Hezbollah.  The first few

4    times to do nothing operational, to meet people, to tell people

5    he wanted to engage in import/expert businesses, to start

6    getting to know the lay of the land.  And then when he later

7    started going to Cyprus for operational purposes you have this

8    great cover story.  You have a Lebanese businessman who wants

9    to do business here.  I have been here a bunch of times

10   already.

11         So, the cover story is not necessarily made up.  It's

12   on top of.  It's built into your true identity so that you have

13   the cover to be over able to do something else in a covert

14   manner.

15   Q.  Based on your research, are you familiar with communication

16   techniques that the IJO uses to communicate with its overseas

17   operatives?

18   A.  Yes, primarily three, at least that I know of.  The one

19   that is the least desirable is travel.  So, you can travel

20   abroad either to Lebanon or someplace else.  And if you are a

21   Lebanese it's not at all strange for you to be traveling on to

22   Lebanon to see family, et cetera.  And you can then have

23   meetings with handlers and operatives whether in Lebanon or

24   some place else.  But you can't always travel and you don't

25   want to be traveling very often because you don't want to be

1    bring attention to yourself.

2            So, there are two primary ways for terrorist

3    operatives -- and then of course this is also used by

4    Hezbollah's IJO -- to communicate surreptitiously.  One is

5    tried and true, which is an old style pager.  So, you get a

6    page from a certain number and you know that that means to call

7    a completely different number at a completely, perhaps, at a

8    completely different time.  And if the person doesn't answer

9    then and sometimes there's a different time to call or a third

10   time to call.

11           And the second is to set up an e-mail account, Yahoo

12   or GMail or any of these systems.  You share the log-on

13   information with someone abroad and you draft an e-mail but you

14   never send it.  And so there's nothing to be intercepted in by

15   authorities with a warrant because nothing actually goes.  The

16   way you share the message is by putting it in the draft folder

17   and then someone maybe on the other side of world also has the

18   log-in information for that account and open that account and

19   see if there are any messages in the draft folder and

20   communicate back in the same manner.

21   Q.  In your writing you have used a term "intelligence war".

22   What does that refer to?

23   A.  That is kind of the spy versus spy phenomenon that I was

24   describing earlier.  And to be honest both sides have had

25   successes, international community.  U.S./Israel, they have had

1     penetrations into Hezbollah and Hezbollah has had some very

2     significant successes from their intelligence for targeting

3     Israel in the United States.

4     Q.  When you say "penetrations", what do you mean?

5     A.  When you are able to get into in this case Hezbollah's

6     inner circle and collect information.  That could mean by

7     planting a listening device.  It could be by recruiting an

8     individual who's trusted within Hezbollah but can report back

9     to you.  There are multiple ways to be able to penetrate either

10    United States, Israel or others into Hezbollah or vice versa.

11    Q.  What is the Mossad?

12    A.  The Mossad is the name of Israel's external intelligence

13    service, Israeli equivalent of the CIA.

14    Q.  What is Unit 8200?

15    A.  Unit 8200 is Israel's signal intelligence agency based out

16    of Israel's military intelligences signaling intelligences

17    tapping into phones and e-mails and satellites and what not.

18    Q.  Have you heard of an individual named Mohammad Shawraba?

19    A.  Yes.

20    Q.  Who is that?

21    A.  Mohammad Shawraba was a senior Hezbollah official who

22    around mid to late 2014 was put under investigation by

23    Hezbollah which suspected him of being a spy for Israel.  We

24    had mentioned earlier that after the 2008 assassination of Imad

25    Mughniyeh there were a series of Hezbollah operations.  Only

J57AAKOU2                         Levitt - Direct

1    that one in Bulgaria succeeded but a great many more failed or

2    were thwarted.  So Hezbollah got suspicious.  There was a leak,

3    and according to press accounts they believed the Shawraba was

4    the leak.

5    Q.  Through your research have you seen photos of Shawraba?

6    A.  Yes.

7    Q.  If you could turn to what's been marked as Government

8    Exhibit 109.

9    A.  109, yes.

10   Q.  Who is that?

11   A.  This is Shawraba.

12            MS. HOULE:  Government offers 109.

13            MR. SCHACHT:  No objection.

14            THE COURT:  Received.

15            (Government's Exhibit 109 received in evidence)

16            MS. HOULE:  If you could publish it, please.

17   Q.  Dr. Levitt, has the leader of Hezbollah made any comments

18   about the United States in the context of this intelligence

19   war?

20   A.  He has.

21   Q.  What has he said?

22   A.  He has said that the Hezbollah is in a struggle against

23   both Israel and the United States in this intelligence war and

24   that this is an ongoing effort.  Usually, neither the United

25   States or Israel or whoever it is on one side or Hezbollah on

1    the other talk about these things because they're covert but

2    every once in a while they'll make a comment.

3              MS. HOULE:  May I have a moment, your Honor?

4              No further questions.

5              THE COURT:  OK.  Cross?

6    CROSS-EXAMINATION

7    BY MR. SCHACHT:

8    Q.  Have you ever been to Israel?

9    A.  I have.

10   Q.  Do you speak Hebrew?

11   A.  Some.

12   Q.  Have you ever been to Lebanon?

13   A.  No.  Unfortunately, I am unable.

14   Q.  Do you speak Arabic?

15   A.  Not very much.

16             THE COURT:  Why are you unable?

17             THE WITNESS:  Because I've written very publicly about

18   Hezbollah and I've been warned off from going.

19   Q.  Have you been to Iran?

20   A.  No.

21   Q.  The main language in Iran is Farsi or sometimes called

22   Persian; is that right?

23   A.  Farsi, correct.

24   Q.  Do you speak that language?

25   A.  No.

1  Q.  Do you recall on direct-examination the prosecutor asked

2  you whether the rate of $550 an hour that you charge is similar

3  to the rate that other people in your field charge; do you

4  recall that?

5  A.  I do.

6  Q.  How many people are there, if you know or that you know of,

7  I should say, how many people do you know of who are experts

8  similar to yourself who testify in court?

9  A.  I know that others do.  I don't know how many.

10  Q.  How many do you know of?

11  A.  Quite a few.

12  Q.  And you discuss the rates that you charge with each other?

13  A.  In general terms.

14  Q.  How many hours did you spend alone or with the government,

15  the prosecutors preparing for your testimony?

16  A.  I don't know exactly but I would say probably somewhere in

17  the range, not including today's testimony, probably 10 to 15.

18  Q.  What is the difference between Sunni and Shia Islam?

19  A.  These are the two main sects within the Islamic faith.  And

20  there is a schism between the two over who the successor of the

21  Prophet Muhammad would be.  That is the bottom line.  As to the

22  types of practice, I don't know.

23  Q.  And is it fair to say that in the Middle East the majority

24  of countries, Saudi Arabia, Egypt are predominantly Sunni

25  countries?

J57AAKOUW                        Levitt - Cross

1    A.  Yes.  The Sunni community is much larger in general than
2    the Shia community.
3    Q.  And the only major country that is predominantly Shia is
4    Iran; is that right?
5    A.  No.  The only country that is ruled by Shia regime is Iran
6    but there are other countries like Iraq next door that are
7    majority Shia.
8    Q.  That brings me to ISIS.  What does I-S-I-S stand for?
9    A.  Islamic State of Iraq and al-Sham.  Al-Sham being the
10   general region across kind of Levant, which is why you'll
11   sometimes hear it referred to as I-S-I-L, Islamic State of Iraq
12   and the Levant or just Islamic State.
13   Q.  And the fact that there is or has been historically in the
14   last few years a strong ISIS presence in Iraq and in Syria is
15   something that has led to conflict with Hezbollah; is that fair
16   to say?
17   A.  Well, not really.  First of all, you said historically and
18   that's not the case historically.  We're talking about the very
19   past few years.
20   Q.  "Historically" just means any day before today.  That's all
21   I mean by "historically"?
22            THE COURT:  That's a narrow history.  Fix your
23   timeframe.
24   Q.  In the last six years.
25   A.  So, from 2013.  So, you have had conflict between several

1    different overlapping entities in Iraq and Syria and it's

2    extremely overly simplistic to just portray this as Hezbollah

3    versus ISIS.  You had a rebellion in Syria rebelling against

4    the dictatorial regime of Bashar al Assad and a very heavy

5    crack down.  It grew into an armed rebellion.  Assad regime let

6    al-Qaeda operatives out of prison and let people flow in in an

7    effort to make out someone worse than himself saying it's

8    either me, Assad, or the terrorists.  I don't think that was

9    true but he helped it become so by letting them out.

10          Then Iran and Hezbollah, other Shia militias from Iraq

11   and others from Russia came to the defense of the Assad regime.

12   Some claim that they're fighting the Islamic state.  But in

13   fact, either Russia nor with some exception the Shia militia or

14   Hezbollah are fighting the Islamic state.  They're actually

15   fighting those fighting the Assad regime in an effort to

16   preserve at Assad regime.  It's a very complex plot of overlaps

17   which does not simply boil down to Hezbollah versus ISIS.

18   Q.  You mentioned Russia's involvement.  Would it be fair to

19   say that in your writing you've discussed the fact that Russia

20   or Vladimir Putin, to be more specific, has on occasion

21   supported Hezbollah?

22   A.  What Russia has done by virtue of being on the side of

23   defending the Assad regime is provide air cover to whichever

24   foot soldiers are willing to kind of be the grunts willing to

25   face the bullets on the ground because he wasn't willing for

1   his own soldiers to do that.  He has been clearly very willing

2   to fight to the last Shia militant, to the last Hezbollah

3   militant but has been willing to provide the air cover, yes.

4   Q.   Have you had heard of a person called Ali Fayed?

5   A.   Yes.

6   Q.   Who is Ali Fayed?

7   A.   Ali Fayed is an arms merchant.

8   Q.   He is a Lebanese Ukrainian; is that fair to say?

9   A.   Yes, a dual national.

10  Q.   He has exceptionally close ties to Hezbollah?

11  A.   He has very close ties to Hezbollah.

12  Q.   And he was arrested by an American arrest warrant in Prague

13  in the Czech Republic; is that right?

14  A.   The Czechs arrested him based on an American warrant

15  pending his extradition.

16  Q.   And the U.S. Government was attempting to extradite him

17  here to this district, to this building; is that right?

18  A.   To the U.S.  I believe to this district.  I'm not sure.

19  Q.   And you have written, have you not, that Vladimir Putin

20  personally tried to prevent this man, this terrorist, Ali Fayed

21  from coming here to New York; you've written that, right?

22  A.   What I've written is that Putin interfered.  He didn't want

23  Ali Fayed extradited but I think it had more to do with the

24  fact that he was a major Ukrainian arms dealer with close ties

25  to Russia than it does to the fact that he was also close to

1    Hezbollah among others, though not limited to, was providing

2    arms to Hezbollah.

3    Q.  Have you met Vladimir Putin?

4    A.  Haven't had the privilege.

5    Q.  What is your basis for saying what his mental state was?

6    A.  I'm not commenting on his mental state.  I'm commenting on

7    what my assessment is as to why the Russians would not want Ali

8    Fayed released.  He was very close to Russia and involved in

9    selling mostly old Russian weapons to all kinds of bad guys.  I

10   would imagine that the Russians probably wouldn't want that

11   coming out in Southern District of New York even as they also

12   probably didn't want this Ukrainian with close ties to Russia

13   was providing weapons, among others, to Hezbollah.

14   Q.  Do you recall writing that Putin put significant pressure

15   on the Czech Republic not to extradite Fayed to the United

16   States?

17   A.  I don't remember exactly writing it and I don't have it in

18   front of me but that sounds accurate.  I've written about this.

19   Q.  The 1985 TWA hijacking that you testified about, what

20   country did that happen in?

21   A.  This was a flight that was on its way to the United States

22   from Athens and stopped in Rome, was diverted to Algeria and

23   then Beirut and then Algeria and then Beirut.

24   Q.  You know that my client's name is Ali Kourani, right?

25   A.  Yes.

J57AAKOUW                    Levitt - Cross

Q.  Do you know of the numerous people who you mentioned before
or whom you spoke about on direct-examination with the same
last name "Kourani"?  Do you know if any of those people have a
familial relationship to Ali Kourani here in court?

A.  I do not.

Q.  Do you know whether or not the name "Kourani" in South
Lebanon is a common name in South Lebanon?

A.  I don't know how common but I know that it's not an
uncommon name.  I've heard of it before.

Q.  You mentioned on direct-examination that one of the things
that IJO treats or -- withdrawn.

        One of the IJO techniques for training people is to
try and teach them or show them how to be -- I don't remember.
I think you might have used the phrase "under the radar" or
something like that so that they wouldn't be discovered,
obviously?

A.  OK.

Q.  You talked about that on direct-examination, right?

A.  I don't think I used the term "under the radar".  I am not
exactly sure what you are referring to.

Q.  Well, you were talking about having a good cover and a way
to avoid detection by, I assume, other intelligence services or
law enforcement; is that right?

A.  That's right.  The prosecutor was asking Hezbollah
operatives abroad.

1  Q.  And the point you were making is that there are good covers

2  and bad covers, right?  That was part of what you were saying?

3  A.  There are better covers and worse covers, yes.

4  Q.  You've testified before that you've never interviewed any

5  Hezbollah members who were in jail or in custody; do you recall

6  saying that?

7  A.  I do.

8  Q.  How many Hezbollah members have you interviewed who are not

9  in jail or out of custody?

10 A.  None to my knowledge because the part of Hezbollah that I

11 am researching is not that overt part that we discussed in the

12 beginning of the day about that they're willing to talk about

13 when you interview them.  My research is about the covert part

14 which they're not going to be willing to talk about.

15 Q.  The United States has a large budget for law enforcement;

16 is that fair to say?

17 A.  I don't know what the budget is but I assume that there's a

18 decent budget for different law enforcement agencies.

19 Q.  You used to work at the FBI, right?

20 A.  Correct.

21 Q.  Is it safe to say that the United States has a large budget

22 for intelligence gathering; is that fair to say?

23 A.  I have no personal knowledge of the budgets for the

24 intelligence community or law enforcement but we're a big

25 country.  So, I assume that there's a budget for it.

J57AAKOUW                         Levitt - Cross

1   Q.  You actually have no personal knowledge about anything you

2   are talking about today, right?

3   A.  I'm not sure how to translate that.  I have --

4   Q.  Is there something unclear about my question?

5          THE COURT:  No.  Let him answer the question.  He's

6   answering.

7   A.  I have direct personal knowledge of all the things that I

8   have gone and researched personally about.  I think you seem to

9   be getting at that I haven't interviewed Hezbollah people who

10  aren't going to tell me about the things that I'm researching.

11  So, I get my information elsewhere.  I'll let you ask the

12  question better.  It's kind of a vague question.

13  Q.  You don't speak Arabic, right?

14  A.  That's right.

15  Q.  So, you're not able to read any original document from

16  Hezbollah, ever?

17  A.  In order to be able to --

18  Q.  It's a yes or no question; are you able to?

19  A.  I think you get to ask the questions and I get to answer

20  them.  My turn.

21         THE COURT:  You do have to answer his question.

22         THE WITNESS:  Yes, absolutely.

23         THE COURT:  The question is:

24         Are you able to read any original document written in

25  Arabic?

1    A.  No.

2              THE COURT:  That's translation, right?

3              THE WITNESS:  In order to have --

4              MR. SCHACHT:  There's no question, sir.

5              THE COURT:  I asked the question.

6              What you read is Arabic original documents, is a

7    translation of the documents?

8              THE WITNESS:  What I ultimately work with is the

9    translation of the document.

10   Q.  So let me recap.  To your knowledge, you've never met

11   anyone in Hezbollah?

12   A.  Correct.

13             THE COURT:  I don't think you need to recap.  Ask the

14   questions.  Summation is for recapping.

15   Q.  You have never actually spoken to anyone with personal

16   knowledge of IJO training; is that fair to say?

17   A.  I've spoken to plenty intelligence and law enforcement

18   officials.  If you are asking if I've spoken to someone who's

19   gone through their training camps, no.  I've read the

20   transcripts of people who have.  I've spoken to law enforcement

21   officials who have interviewed people who have.

22   Q.  And these are things that are translated from the Arabic of

23   the person who is at the training camp?

24   A.  Well, when I am speaking to someone, that's not in Arabic.

25   In some cases these conversation the original would be in

1   Arabic.  In other cases, another language is.

2   Q.  Let me ask you, based on your research at a Hezbollah

3   training camp, are people speaking in what language?

4   A.  Primarily, Arabic.  Sometimes through translation.  So, for

5   example, when they are in a training camp in Iran, the Iranians

6   don't have enough people who speak Arabic either.  As you

7   mentioned, they speak Farsi.  So, they tend to work with the

8   translators which is one of the reasons why sometimes the

9   Iranians send other Shia militants, not to their own training

10  camps but to Hezbollah training camps, because Hezbollah while

11  Shia are Arabs and speak Arabic.

12  Q.  Farsi is another language you don't speak, right?

13  A.  Yes.

14  Q.  Have you heard of Project Cassandra?

15  A.  I have.

16  Q.  What is Project Cassandra?

17          MS. HOULE:  Objection.

18          THE COURT:  Side bar.

19          (Continued on next page)

20

21

22

23

24

25

1              (side bar)

2              MR. BOVE:  We just weren't sure about the one person

3    rule.

4              THE COURT:  It's her objection.  She should be up

5    here.

6              MR. BOVE:  There is background that I have more --

7              THE COURT:  Ms. Houle, come up.

8              MR. BOVE:  Thank you, judge.

9              THE COURT:  What is the basis of the objection,

10   Ms. Houle?

11             MS. HOULE:  Your Honor, we believe that --

12             THE COURT:  Tell me the basis of the objection.  Is it

13   evidentiary or something else?

14             MS. HOULE:  We don't believe that this is relevant,

15   your Honor.  I think that the defense is trying to ask the

16   witness --

17             THE COURT:  Besides irrelevant, the evidentiary

18   objection, is there something about Project Cassandra that is

19   covered by any kind of secrecy?

20             MS. HOULE:  Well, I don't know exactly the question

21   that defense is going to ask.

22             THE COURT:  Does he know of Project Cassandra.

23             MS. HOULE:  And what, if any, additional questions

24   were going to be asked after that.

25             THE COURT:  Find out.  At this point in time there is

1    no objection.

2              MS. HOULE:  We don't think that Project Cassandra is

3    relevant at all.

4              THE COURT:  I can't tell that at this point.

5              Objection overruled.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In Open Court)

2    BY MR. SCHACHT:

3    Q.   What is Project Cassandra?

4    A.   Project Cassandra was an operation led by the Drug

5    Enforcement Administration, DEA, focused on investigation where

6    terrorism and counter narcotics intersected specifically

7    related to Lebanese Hezbollah.

8    Q.   And in that operation the DEA was able to obtain evidence

9    and eventually arrest Hezbollah financiers and drug dealers; is

10   that fair to say?

11   A.   The DEA collected a lot of information.  It led to some

12   arrests.  It led to other actions including Treasury Department

13   designations.  I can't think of -- I don't know if there had

14   been any convictions here in the United States through Project

15   Cassandra yet.

16          THE COURT:  I think that's enough of an answer.  Go

17   ahead.  Next question.

18   Q.   The based on your research, it's fair to say that the

19   American and Israeli governments are able to gather huge

20   amounts of information about Hezbollah; is that fair to say?

21   A.   It's certainly true that the United States and Israel and

22   other governments and entities strive to collect information on

23   Hezbollah.  I really am not in a position to say how much or

24   how much is a lot.

25          THE COURT:  You can't use "huge".

1           MR. SCHACHT:  I'll withdraw the word "huge".

2    Q.  You, for example, through your research have learned about

3    the identities of many of the people who we saw pictures of,

4    right?

5    A.  Correct.

6    Q.  And that information partially is as a result of American

7    and other countries' law enforcement and intelligence services,

8    right?

9    A.  Some of it and some of it is others -- Bulgarians.

10   Q.  Other countries, generally, who are investigating this and

11   share intelligence; is that fair to say?

12   A.  A lot of what I'm seeing is at this point if it ever was

13   not intelligence, it's coming out in court or elsewhere but

14   information, yes.

15   Q.  Well, if it comes out in court though that's as a result

16   typically of law enforcement and intelligence gathering it and

17   then it's revealed in court?

18           THE COURT:  I don't think we're going anywhere with

19   this.  We have it that the activities of Hezbollah are of great

20   interest to American intelligence agencies and agencies of

21   other countries, correct?

22           THE WITNESS:  Yes.

23   Q.  You gave an estimate before about what you believed the

24   roughly annual financial contribution from Iran to Hezbollah

25   is; do you recall talking about that?

```
 1    A.  Well, I didn't say what I believed.  I quoted what U.S.
 2    Government officials state.
 3    Q.  And that's an example, is it not, of how the U.S.
 4    Government is able to learn what otherwise would be secret
 5    information?
 6    A.  Presumably.
 7    Q.  Well, Hezbollah doesn't publish its budget on a website as
 8    far as you know, does it?
 9    A.  No, Hezbollah doesn't.  But, for example, Iran sometimes
10    does publish its budget including how much it's giving to what
11    it refers to as resistance groups.  And I don't know you how
12    they came to that number, whether that was through intelligence
13    information, law enforcement information, someone sloppily
14    putting it -- they didn't say.
15    Q.  So, you've talked about a lot of things here today; is that
16    fair to say?
17          THE COURT:  Next question.
18    Q.  You just said that you testified about something and you
19    don't know where the source of that information comes from; did
20    you just say that?
21    A.  No.
22          THE COURT:  He knows the source of his information.
23    You are asking about authenticating various information by
24    original sources.
25    Q.  What's the source of the number $700 million a year?
```

J57AAKOUW                        Levitt - Cross

1  A.  Several U.S. Government officials have used it.  The most

2  recent I believe is an embassador Nathan Sales from the State

3  Department.

4  Q.  And that information, do you know where he got that

5  information?

6  A.  No.

7  Q.  You mentioned before own direct-examination, you talked

8  about the Boston Marathon bombing; do you recall that?

9  A.  I mentioned that in response to questions that I had

10  testified in this case.

11           THE COURT:  Try to confine your answers to yes or no.

12  Do you remember?

13           THE WITNESS:  Yes.

14  Q.  And those brothers who carried out that attack, they were

15  ISIS inspired Sunni militants; is that fair to say?

16  A.  No, they were not ISIS.  They were al-Qaeda inspired.

17  Q.  So, they were al-Qaeda and ISIS are both made up

18  predominantly of Sunni Muslims; is that right?

19  A.  Extremist Sunni Muslims, but let's not paint all Sunni

20  Muslims as being al-Quaeda or ISIS.

21  Q.  But it's fair to say that that has nothing to do with

22  Hezbollah?

23  A.  Correct.

24           MR. SCHACHT:  I have no other questions.

25           THE COURT:  Redirect?

1              MS. HOULE:  I have no additional questions, your

2       Honor.  There is an instruction that your Honor agreed to give

3       at the end of Dr. Levitt's testimony.  If I may pass it up?

4       It's the one agreed to by the parties.

5              THE COURT:  Yes, please, pass it up.  Make sure that

6       Mr. Schact sees it.

7              (Pause)

8              THE COURT:  Members of the jury, you just heard

9       testimony from Dr. Matthew Levitt who is qualified as an expert

10      witness in this case regarding Hezbollah.  I'll provide you

11      further instructions at the end of the trial regarding expert

12      testimony.  But I want to note at this point two points.

13             First, Dr. Levitt testified to certain historical acts

14      of violence that he assessed were committed by or on behalf of

15      Hezbollah.  I want to make clear that the defendant is not

16      charged with committing those particular acts of violence.

17             Second, Dr. Levitt's testimony was admitted to help

18      generally explain the operation, structure, membership and

19      terminology used by Hezbollah and its members.  His testimony

20      was presented to you on the theory that someone who is

21      experienced in the field can assist you in understanding the

22      other evidence in the case and then reaching an independent

23      decision on the facts.

24             You may give the testimony of Dr. Levitt and any other

25      expert testimony whatever weight, if any, you find it deserves

J57AAKOUW                    Donaldson

1    in light of all the other evidence in this case.

2              You should not however accept this testimony simply

3    because Dr. Levitt is an expert.  Nor should you substitute

4    such testimony for your own reason, judgment and common sense.

5              In a word, ladies and gentlemen, this is context and

6    background.  It's not being used to pin the defendant on any

7    particular acts charged in the indictment.  It's here to let

8    you understand the total circumstances that are depicted in the

9    background of this case and brought by the government.  Clear?

10             Ms. Houle, anything else?

11             MS. HOULE:  No.  Thank you, your Honor.

12             THE COURT:  Mr. Schact, anything else.

13             MR. SCHACHT:  No.  Thank you.

14             THE COURT:  Thank you.  You are excused, Dr. Levitt.

15             THE WITNESS:  Thank you, your Honor.

16             THE COURT:  Thank you very much.

17             Next witness please.

18             MR. BOVE:  The government calls Reginald Donaldson.

19             Pay attention to the oath please, folks.

20    REGINALD DONALDSON,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23    DIRECT EXAMINATION

24    BY MR. BOVE:

25    Q.  Mr. Donaldson, where do you work?

J57AAKOUW                    Donaldson

1   A.  I work for the U.S. Attorney's Office here in Southern

2   District.

3   Q.  How long have you worked at the U.S. Attorney's Office?

4   A.  A little over nine years.

5   Q.  And what is your title there right now?

6   A.  Investigative Analyst.

7   Q.  Do you focus on a particular type of work?

8   A.  Yes.

9   Q.  What type of work do you focus on?

10  A.  I perform cellphone forensics, call analysis and cell site

11  analysis.

12  Q.  Have you received any training relating to searches of

13  cellular telephones?

14  A.  Yes.

15  Q.  Would you please describe some of that training?

16  A.  I've received extensive training from the National White

17  Collar Crime Center on cellphone and computer forensic.  I've

18  received training from a company named Sumuri where I was

19  certified on the Cellebrite phone forensic tool.  I also

20  received training from a company named MSAB where I received

21  certification on the XLY forensic tool and I also received

22  training from the New York State Department of Justice.

23  Q.  Have you received training related to searches of laptops

24  and computers?

25  A.  Yes.

J57AAKOUW                    Donaldson

1    Q.  Could you please describe some of that training?

2    A.  Well, that's the same training.  Most of that training was

3    from the National White Collar Crime center.

4    Q.  Are you familiar with a program known as Forensic Tool Kit?

5    A.  Yes.

6    Q.  What's that?

7    A.  It's a forensic tool used to examine electronic media such

8    as hard drives.

9    Q.  About how many times have you participated in a search of

10   an electronic device?

11   A.  Thousands.

12   Q.  Could you please provide the jury with an overview of how

13   this forensic search process works?

14   A.  When have you electronic evidence you cannot work on the

15   evidence, the actual evidence itself because if you start

16   working on it or copying the information off you'll corrupt,

17   damage the actual evidence on the tool.  So, you have to use a

18   forensic tool to image that media.  And when you image the

19   media's bit by bit copy of that whatever that electronic media

20   is.  Then you use a forensic tool to examine that image and

21   that can get you the evidence that you're looking for.

22   Q.  So, it sounds like the first step with any device is to

23   extract an image of the device?

24   A.  Yes.

25   Q.  And that file that results, the image, what would that look

1   like on a computer if you or I tried to open it up?

2   A.  It's called a bin file.  It's a binary file.  It's just

3   ones and zeros.  We use what's called a hex viewer.  So it

4   makes it look like a hexadecimal alphabet.  It's a shortcut for

5   looking at binary instead of looking at ones and zeros.  It's a

6   base 16 system where you look at one through, zero through nine

7   after A through F, replaces like the bits.

8   Q.  Then you're able to use software to convert those bits into

9   something that I could read?

10  A.  Yes.

11  Q.  I am going to hand you a cellphone that's in evidence

12  marked as Government Exhibit 204.

13          MR. BOVE:  Your Honor, I have a stipulation to offer

14  between the parties.  This one is marked Government Exhibit

15  1013.  This stipulation reads that:

16          On June 1, 2017, agents from the FBI lawfully seized

17  from the defendant, among other things, an LG GSM MS 330

18  cellphone that is marked Government Exhibit 204, which is up on

19  the witness stand.

20          The cellphone was lawfully searched pursuant to a

21  search warrant.  The search revealed that he cellphone

22  contained about 4,601 safe contacts, 1,238 e-mails, 4,754 text

23  messages, 7,996 image files, 2,223 text files, 132 videos and

24  63 Microsoft Word documents.

25          Government's Exhibit 303 is a disk that contains a

1    report relating to data that was lawfully extracted from the

2    cellphone that's on the witness stand.  Government Exhibit 303

3    fairly and accurately depicts data extracted from that

4    cellphone.

5           Your Honor, I offer this stipulation, as well as

6    Government Exhibit 303, the report relating to the cellphone.

7           THE COURT:  Received.

8           (Government's Exhibits 1013 and 303 received in

9    evidence)

10           MR. BOVE:  Ms. Shields, if you could please bring up

11    Government Exhibit 303 and zoom-in on the top.

12    Q.  So, Mr. Donaldson, this is labeled "extraction report"?

13    A.  Yes.

14    Q.  Then you see where it says "tags"?

15    A.  Yes.

16           MR. BOVE:  Ms.  Shields, if you could highlight that.

17    Q.  What does that mean?

18    A.  This was created from a bigger report where the items of

19    interests were actually checked off to create this report here.

20    Q.  So this report sets out a number of items from the

21    cellphone?

22    A.  Yes.

23           MR. BOVE:  Could we take a look at page 12 please and

24    zoom in on tag 28.

25           (Pause)

1    Q.   What's indicated on the screen now, Mr. Donaldson?

2    A.   This is one of the tagged items which is from, taken from

3    the user accounts from the phone.

4          MR. BOVE:   November, could you highlight where it says

5    "user accounts".

6          (Pause)

7    Q.   What does that indicate, Mr. Donaldson?

8    A.   That's the section of the report that this tag was taken

9    from.   There's a section that has user accounts, any user

10   accounts that were found on the phone.

11   Q.   User accounts are accounts that the phone was used to

12   access?

13   A.   Yes.

14         MR. BOVE:   Ms. Shields, highlight the user name field

15   in the user account column.

16   Q.   What is that, Mr. Donaldson?

17   A.   That's the user name.   It's an e-mail address.

18         MR. BOVE:   Now Ms. Shields, if we could bring up page

19   eight please and zoom-in on Tag 20.

20   Q.   Now on top left it says 20 in e-mails; do you see that?

21   A.   Yes.

22   Q.   So, what part of the phone is this tag from?

23   A.   This is from the e-mail section of the phone.

24         MR. BOVE:   Ms. Shields, highlight the "from" field in

25   the column below that.

J57AAKOUW                    Donaldson

1              (Pause)

2    Q.  So what is this, Mr. Donaldson?

3    A.  That's an e-mail address.

4    Q.  Is that the account that was used to send this e-mail?

5    A.  Yes.

6    Q.  Let's talk about whether or not the e-mail was actually

7    sent.

8              MR. BOVE:  Ms. Shields, if you could highlight the

9    "status" field in the column labeled "other".

10             (Pause)

11   Q.  What does that indicate?

12   A.  It says it was unsent so it's probably in the draft section

13   of the e-mail.

14             MR. BOVE:  Now, I would like to focus on the e-mail

15   account that's highlighted.  Ali.M.kourani@GMail.com.

16             Your Honor, I have another stipulation to offer.  This

17   one is marked as Government Exhibit 1004.

18             This stipulation, ladies and gentlemen, relates to a

19   couple, to an exhibit that is disk that contains records from

20   Google related to the e-mail account that we were just looking

21   at Ali.M.kourani@GMail.com.

22             Your Honor, I offer stipulation 1004, as well as the

23   disk referenced in the stipulation which is 401 in the contents

24   of Government Exhibit 401.

25             THE COURT:  Yes, received.

1          (Government's Exhibits 1004 and 401 received in

2     evidence)

3          MR. BOVE:  Ms. Shields, could you please bring up

4     401-A and zoom-in on the top.

5          (Pause)

6     Q.  Mr. Donaldson, what's this?

7     A.  This is from Google.  It's subscriber information.

8          MR. BOVE:  Ms. Shields, if you could highlight the

9     e-mail address please.

10    Q.  Directing your attention to the row above that, what's the

11    user name associated with this account?

12    A.  Ali Kourani.

13    Q.  Can you tell when this e-mail account was created based on

14    this document?

15    A.  Yes.  It was created on August 21, 2007.

16         MR. BOVE:  Highlight that date please.

17    Q.  Do you see the entry that's titled "Terms of Service IP"?

18    A.  Yes.

19         MR. BOVE:  Ms. Shields, if you could highlight that.

20         (Pause)

21    Q.  What is indicated in that row, Mr. Donaldson?

22    A.  When a user creates a Google account, they have to agree to

23    terms of service.  And once they do that Google records the IP

24    address that it came from.

25    Q.  Is it sometimes possible to identify the geographic

J57AAKOUW                    Donaldson

1    location that's linked to a particular IP address?

2    A.  Yes.

3    Q.  Are there websites that provide that type of information?

4    A.  Yes.

5    Q.  Are those generally reliable and used by people in your

6    fields?

7    A.  Yes.

8    Q.  Were you able to identify a geographic location associated

9    with the IP addresses highlighted on the screen ending in .34?

10   A.  Yes.

11   Q.  What location was that?

12   A.  It came from a CUNY college in New York.

13           MR. BOVE:  Now, I'd like to take a look at some of the

14   Internet activity associated with this e-mail account.

15           Ms. Shields, if you could bring up Government Exhibit

16   401C.

17           (Pause)

18           MR. BOVE:  If you could start by highlighting row 3.

19   Q.  So, Mr. Donaldson, is this internet activity associated

20   with the e-mail account in row 3 the Ali.m.kourani account?

21   A.  Yes.

22   Q.  Generally speaking, how is this document organized?

23   A.  It's organized by activity.  Should be date order that was

24   on account for it, period.

25   Q.  Does it reflect internet searches?

J57AAKOUW                    Donaldson

1   A.  Yes.

2   Q.  As well as websites visited?

3   A.  Yes.

4           MR. BOVE:  Ms. Shields, if you could please highlight

5   row 155 in this exhibit.

6           (Pause)

7   Q.  Mr. Donaldson, what's reflected in that row?

8   A.  On January 29, 2008, there was a search for Lebanon second

9   war battles events Leningrad.

10          MR. BOVE:  Ms. Shields, highlight row 148.

11  Q.  What's reflected here, Mr. Donaldson?

12  A.  On May 16, 2008, a search was made for Al—Manar.

13  Q.  Now, let's look at the row right above that, row 147.

14  What's reflected in that row?

15  A.  On May 16, 2008 this site www.Al-Manar.com.LB was visited.

16          MR. BOVE:  If could you move this exhibit to the top

17  window please and in the bottom window please bring up

18  Government Exhibit 101 on page two.

19          (Pause)

20          MR. BOVE:  If you could please zoom-in on the fourth

21  paragraph and highlight the first sentence.

22          So, this is stipulation between the parties, ladies

23  and gentlemen, that's in evidence already.  The first sentence

24  of this paragraph says Al—Manar and Al Nour are media arms of

25  Hezbollah.

1          Ms. Shields, if you could now bring Government Exhibit

2    401C back in the main window and let's focus on row 104.

3          (Pause)

4    Q.  What is indicated here, Mr. Donaldson?

5    A.  On December 11, 2012 there was a search for an application

6    to spy on iPhone.

7    Q.  What about row 79, what's indicated in this row?

8    A.  November 2, 2013, there was a search for defined

9    conspiracy.

10          MR. BOVE:  Now, let's take a look at row 52, please.

11          (Pause)

12   Q.  What's in row 52 of the exhibit?

13   A.  On April 3, 2014, site was visited by the name of

14   anti-polygraph.org.

15   Q.  Now, if I could direct your attention to the row just above

16   that, 51, what's indicated there?

17   A.  On the same date a site was visited Wiki, How for Cheat a

18   Polygraph Test.

19          MR. BOVE:  Take that down please, Ms. Shields, and go

20   back to the subscriber information for this account, Government

21   Exhibit 401A.  If you could zoom-in on to the top please.

22   Thank you.  And highlight the entry titled "recovery e-mail".

23          (Pause)

24   Q.  Mr. Donaldson, what's a recovery e-mail?

25   A.  When a Google account is created the user will indicate a

J57AAKOUW                    Donaldson

1    secondary e-mail address in case they get locked out of the

2    account because they forgot the password or something.  So,

3    they put in a secondary e-mail address.

4    Q.  So here the recovery e-mail is AliKouKou@hotmail.com?

5    A.  Yes.

6              MR. BOVE:  Your Honor, at this time I have another

7    stipulation to offer.  This one is marked Government Exhibit

8    1005.

9              Ladies and gentlemen, this stipulation relates to some

10   documents from Microsoft that are on disks marked 402 and 403.

11   The disk marked 402 contains records relating to AliKouKou

12   e-mail address that was just up on the screen.

13             Your Honor, pursuant to this stipulation marked 1005,

14   I offer the stipulation, as well as the exhibits referenced in

15   the stipulation, Government Exhibit 402 and 403.

16             THE COURT:  Received.

17             (Government's Exhibits 1005, 402 and 403 received in

18   evidence)

19             MR. BOVE:  Ms. Shields, if you could bring up

20   Government Exhibit 402A please and zoom-in on the top.

21   Q.  What is this, Mr. Donaldson?

22   A.  This is a Microsoft account by the name of

23   AliKouKou@Hotmail.com.

24             (Continued on next page)

25

1   BY MR. BOVE:

2   Q.  Let's take a look at the actual subscriber information.

3          MR. BOVE:  If we can go to the next page of the

4   exhibit.  And zoom in on the table at the top.

5   Q.  What's the user name associated with this account,

6   Mr. Donaldson?

7   A.  Ali K.

8          MR. BOVE:  If you could highlight that, please,

9   Ms. Shields.

10  Q.  And directing your attention to the bottom row, when was

11  this account registered?

12  A.  April 23rd, 2002.

13  Q.  Now we're going to take a look at the contact entries saved

14  in this email account, alikuku@hotmail.com.

15         MR. BOVE:  Ms. Shields, if you could please bring up

16  Government Exhibit 402-B, and let's please highlight row 51.

17  Q.  Mr. Donaldson, the first column in this exhibit, column A

18  says "Target ID"?

19  A.  Yes.

20  Q.  The account listed as alikuku@hotmail.com; is that right?

21  A.  Yes.

22  Q.  So these are contacts saved in that email account?

23  A.  Yes.

24  Q.  So what's indicated in column B for row 51?

25  A.  Helal_kedal@hotmail.com.

1    Q.  If you could take a look at column G, please.  That's

2    titled "Create Date."  Do you see that up on the top?

3    A.  Yes.

4    Q.  What's the create date for the contact with this email?

5    A.  October 19, 2011.

6    Q.  Now we're going to take a look at the subscriber

7    information for the Helal_Kedal account.

8            MR. BOVE:  If we could move the exhibit on the screen

9    to the top.  And on the bottom, please bring up Government

10   Exhibit 403.  I'd like to focus Mr. Donaldson on the bottom

11   part of the screen that's Government Exhibit 403, row 5.

12   Q.  What's reflected here?

13   A.  It's called a registration profile.

14   Q.  What is the user name provided for this account, the

15   Helal_Kedal account?

16   A.  Helal Kedal.

17   Q.  In what country was this account established?

18   A.  Lebanon.

19   Q.  And on what date?

20   A.  October 15, 2011.

21           MR. BOVE:  Now, Ms. Shields, if you could highlight

22   row 7 of Government Exhibit 403.

23   Q.  The title here is "IP Connection History."  Do you see

24   that?

25   A.  Yes.

1   Q.  And in column D, there's an IP address 185.22.33.1?

2   A.  Yes.

3   Q.  Were you able to determine the geographic area associated

4   with that IP address?

5   A.  Yes.

6   Q.  Do you recall the location?

7   A.  It's Lebanon.

8               MR. BOVE:  You can take those down, please,

9   Ms. Shields.

10              Your Honor, I have another stipulation to offer.

11              THE COURT:  Okay.

12              MR. BOVE:  This one relates to Facebook accounts, and

13  this one is marked as Government Exhibit 1006.  So there are a

14  few Facebook accounts that are going to come into evidence now.

15  For one of them marked Government Exhibit 404, the user name is

16  Ali Kouran; the next, Government Exhibit 405, the user name is

17  Ali Kourani; the next one, Government Exhibit 406, the user

18  name is Bilal Kourani; and, finally, Government Exhibit 407,

19  it's a Facebook account with the user name Mohammad Sadek.

20              At this time we'll offer Government Exhibit 1006, the

21  stipulation, as well as Government Exhibits 404 through 407.

22              THE COURT:  Received.

23              (Government's Exhibits 1006 and 404 through 407

24  received in evidence)

25              MR. BOVE:  Ms. Shields, if you could please bring up

J57KKOU3                          Donaldson - Direct

1    Government Exhibit 404.  Thank you.

2            If you could zoom in from the top of the document to

3    the address information.  Let's start by highlighting the

4    target number at the top.

5    BY MR. BOVE:

6    Q.  Mr. Donaldson, what's a target number at Facebook?

7    A.  It's an account number.

8            MR. BOVE:  And, Ms. Shields, if you could please

9    highlight the user name associated with Government Exhibit 404.

10   Q.  What's the user name, Mr. Donaldson?

11   A.  Ali Kouran.

12           MR. BOVE:  Now, Ms. Shields, if you could highlight

13   the first two email addresses listed as registered email

14   addresses.

15   Q.  Do you see those, Mr. Donaldson?

16   A.  Yes.

17   Q.  Are those the two email addresses we've been talking about

18   so far today?

19   A.  Yes.

20           MR. BOVE:  Ms. Shields, if you could zoom out a little

21   bit to look at the registration date and the address.

22   Q.  Mr. Donaldson, do you see where it says address towards the

23   bottom of the screen?

24   A.  Yes.

25   Q.  What information was provided there?

J57KKOU3                          Donaldson - Direct

1   A.  Just the city and state.  New York, New York.

2   Q.  In the top left, do you see where it says registration

3   date?

4   A.  Yes.

5   Q.  What's the date provided?

6   A.  April 29, 2007.

7            MR. BOVE:  Ms. Shields, could we take a look at page

8   12 of this exhibit.  If you could zoom in on the photo in the

9   metadata.

10  Q.  What is this, Mr. Donaldson?

11  A.  This is an image from the account.

12  Q.  Can you see the date that it was uploaded?

13  A.  May 30, 2008.

14  Q.  Now let's take a look at page 13.

15           What is this, Mr. Donaldson?

16  A.  It's another image from the account.

17  Q.  Do you see the upload date?

18           MR. BOVE:  We need to go to page 14, please.  If you

19  can zoom in on that.

20  Q.  When was that photo uploaded?

21  A.  January 16, 2009.

22  Q.  Now let's take a look at page 15, please.

23           MR. BOVE:  If you can zoom in on the photo down to the

24  upload date, please, Ms. Shields.  Thank you.

25  Q.  What is this, Mr. Donaldson?

1   A.  Another image from the account.

2   Q.  And when was this one uploaded?

3   A.  February 23rd, 2011.

4   Q.  Now I'd like to look at some of the chat sessions that were

5   stored in this account, Government Exhibit 404.

6           MR. BOVE:  Ms. Shields, could you please go to page 17

7   of this exhibit.  If you can zoom in on the title and the first

8   two chats.

9   Q.  Mr. Donaldson, who are listed as the participants in this

10  chat?

11  A.  Mohammad Sadek and Ali Kouran.

12  Q.  And Ali Quran is the user name on this account, Government

13  Exhibit 404, right?

14  A.  Yes.

15  Q.  And directing your attention to the entry in the middle, in

16  the sent date, can you see when this chat session began?

17  A.  June 16, 2011.

18          MR. BOVE:  Ms. Shields, if you could highlight that,

19  please.

20  Q.  In the row below that, the row below the ones that are

21  highlighted, it says deleted - true.  Do you see that?

22  A.  Yes.

23  Q.  What does that mean?

24  A.  The actual chats were deleted from the account.

25  Q.  By the user of the account that's Government Exhibit 404?

1    A.  Yes.

2            MR. BOVE:  If you can zoom out, Ms. Shields.

3    BY MR. BOVE:

4    Q.  Were all the chats on this page deleted?

5    A.  Yes.

6    Q.  What about the next page?

7            MR. BOVE:  Ms. Shields?

8    A.  Yes.

9    Q.  So now let's take a look at the Mohammed Sadek account, the

10   other side of this chat.  That Facebook account is marked

11   Government Exhibit 407.

12           MR. BOVE:  Ms. Shields, if you could move the deleted

13   chats to the left, and on the right, please bring up 407.  If

14   you could zoom in on the top down to the registered email

15   addresses.  That's perfect.  Thank you.

16   Q.  Mr. Donaldson, what's the user name in Government Exhibit

17   407?

18   A.  Mohammad Sadek.

19   Q.  If I could have you take a look at the target number on the

20   right side of the screen, Government Exhibit 407.  Do you see

21   that number ending in 1921?

22   A.  Yes.

23           MR. BOVE:  Ms. Shields, on the left, could you zoom in

24   on the chat, the second one from the top.

25   Q.  How does the target number associated with Government

1    Exhibit 407 ending in 1921 compare to the target number on the
2    left side of the screen in Government Exhibit 404?
3    A.  It's the same number.
4              MR. BOVE:  Ms. Shields, on the right side of the
5    screen, could you please bring up page 6 of Government Exhibit
6    407.  If you could zoom in on the photo, please.  And down to
7    the upload date.
8    BY MR. BOVE:
9    Q.  Mr. Donaldson, can you tell from the exhibit -- one second,
10   I apologize.  Can you tell from this exhibit when it was
11   uploaded?
12   A.  August 25th, 2016.
13             MR. BOVE:  Ms. Shields, if you could highlight the
14   title entry on this page.
15             So, ladies and gentlemen, this is one of those times
16   where there's an exhibit that contains some foreign language
17   material, so there's a translation that the parties have agreed
18   to.
19             And so, Ms. Shields, if you could bring up page 8,
20   please.  If you can zoom in on the photo down to the title.
21   Q.  Mr. Donaldson, can you read the translation of the title
22   associated with that photo?
23   A.  "A meeting like a dream."
24             MR. BOVE:  Now, Ms. Shields, in the left window, could
25   you please bring up the photo of Hezbollah's Secretary General

1   Nasrallah, which is marked as Government Exhibit 103.

2            You can take that down.

3   BY MR. BOVE:

4   Q.  We're now going to go back for a moment to the saved

5   contacts in the Ali.M.Kourani account.  This is Government

6   Exhibit 401-B.

7            MR. BOVE:  Can you bring up that, please, Ms. Shields.

8   And this is the first saved contact that's in this exhibit, but

9   I'd like to take a look at the one on page 8, please.

10           If you can zoom in on the entry.

11  Q.  So what's the title of this entry, Mr. Donaldson?

12  A.  It says Aleex Kouran.

13  Q.  It's associated with an email account

14  alikourani1985@hotmail.com.  Do you see that?

15  A.  Yes.

16  Q.  Let's take a look now at one of the emails from this

17  account that's in evidence, Government Exhibit 401-D-5.

18           MR. BOVE:  Zoom in on the top email.

19  Q.  Mr. Donaldson, what's this?

20  A.  It's an email from Ali Kourani to Alikourani1985.

21  Q.  So it's from that Gmail account that we've been looking at,

22  correct?

23  A.  Yes.

24  Q.  And the message was sent to that alikourani1985 account

25  that we just had open in the contacts page?

1   A.  Yes.

2   Q.  And what was the date of this email?

3   A.  June 19, 2013.

4             MR. BOVE:  Ms. Shields, on the left side of the

5   screen, if you could please bring up the contacts entry, 401-B

6   at page 8.  If you could zoom in just on the contact name and

7   the email address.  And then on the left side of the screen,

8   let's look at the Facebook account that's associated with this

9   email address, alikourani1985.  And that Facebook account is

10  marked Government Exhibit 405.

11  Q.  So let's start with this account by looking at the user

12  name and email addresses.

13            So, focusing on the right side of the screen,

14  Mr. Donaldson, 405, what's the user name?

15  A.  Ali Kourani.

16            MR. BOVE:  Ms. Shields, could you please zoom in on

17  the second email address.

18  Q.  Is that the same email address that's in the saved contact

19  on the left side of the screen, Mr. Donaldson?

20  A.  Yes.

21            MR. BOVE:  Focusing on 405 again, Ms. Shields, if you

22  could zoom in on the current city associated with that account.

23  Q.  Is that a city in Lebanon, Mr. Donaldson?

24  A.  Yes.

25            MR. BOVE:  Now, on the right side of the screen, could

1    we take a look at page 4, please, of Government Exhibit 405.

2    BY MR. BOVE:

3    Q.   What is this, Mr. Donaldson?

4    A.   This was an image from the account.

5    Q.   Without making this too much of a vision test, can you tell

6    what the upload date was at the bottom of the screen?

7    A.   August 22nd, 2015.

8    Q.   Thank you.

9            MR. BOVE:  Can we take a look at page 6, please.

10   Q.   Mr. Donaldson, what's this?

11   A.   Another image from the account.

12           MR. BOVE:  Ms. Shields, if we can zoom in on the image

13   down to the upload date.

14   Q.   When was this photo uploaded to Government Exhibit 405?

15   A.   August 31st, 2013.

16           MR. BOVE:  Ms. Shields, if you could highlight the

17   title.  This is another one of those foreign language exhibits,

18   so now we'll bring up the translation, which is page 7 of

19   Government Exhibit 405.  Can you zoom in, please, on the photo

20   and the translation.

21   BY MR. BOVE:

22   Q.   Mr. Donaldson, what is the title of the translated version

23   of this on page 7 of Government Exhibit 405?

24   A.   "May You Be Well Year After Year, O Sayid.  Wishing You 200

25   Happy Years."

1        MR. BOVE:  Ms. Shields, can we please take a look at

2    page 10 of this exhibit, 405.

3    BY MR. BOVE:

4    Q.  Is this another photo uploaded to the account,

5    Mr. Donaldson Donaldson?

6    A.  Yes.

7        MR. BOVE:  You can take those down, please,

8    Ms. Shields.

9    Q.  Now I'd like to go back to the Facebook account that's

10   marked as Government Exhibit 404, the one with the photographs

11   of the defendant.

12       MR. BOVE:  If you could please bring up page 35 of

13   that exhibit.  If you could zoom in on the title and the first

14   couple of entries, please.  The first three.

15   Q.  Mr. Donaldson, these look like more chat entries from the

16   Facebook account marked Government Exhibit 404; is that right?

17   A.  Yes.

18   Q.  I think you said earlier that the account ending in the

19   number 9729 is the user of the account marked Government

20   Exhibit 404?

21   A.  Yes.

22   Q.  Who is the other participant in this chat group?

23   A.  Bilal Kourani.

24   Q.  When did these chats with Bilal Kourani begin, according to

25   the next entry in this exhibit?

1    A.  October 23rd, 2011.

2              MR. BOVE:  Ms. Shields, could you zoom out, so we can

3    see the whole page.

4    BY MR. BOVE:

5    Q.  Were all of these messages deleted, also, Mr. Donaldson?

6    A.  Yes.

7    Q.  Now we're going to take a look at the Bilal Kourani

8    Facebook account, the other participant in these chat messages.

9              MR. BOVE:  Ms. Shields, if you can move this to the

10   left and bring up Government Exhibit 406 on the right.  If you

11   could zoom in on the top down to the user name, please.  That's

12   perfect.  If you could zoom in on the first chat on the left,

13   so that Mr. Donaldson can compare the targeted numbers.

14   Q.  Are those the same, Mr. Donaldson?

15   A.  Yes.

16   Q.  On the right side of the screen, is the Bilal Kourani

17   Facebook account?

18   A.  Yes.

19             MR. BOVE:  Ms. Shields, let's take a look at page 2 of

20   Government Exhibit 406.

21   Q.  What is this, Mr. Donaldson?

22   A.  An image from the account.

23             MR. BOVE:  Let's take a look at page 4, please.

24             Page 9, please.

25             Page 6.

1          Page 7.

2          Page 13.

3          Page 11.  This is another one of those foreign

4    language exhibits, ladies and gentlemen, so let's start by

5    zooming in on the photo.

6          Now if we could take a look at the translation, which

7    is page 12 of this exhibit.

8    BY MR. BOVE:

9    Q.  So what does the translation say, Mr. Donaldson?

10   A.  "I might come back or I might not.  So, forgive me."

11   Q.  Now let's take a look at page 10 of Government Exhibit 406.

12         MR. BOVE:  Ms. Shields, in the heft window, if you

13   could bring up the Hezbollah flag, which is Government Exhibit

14   101.

15         Your Honor, I'm about to turn into the defendant's

16   laptop.  This might be a good transition point for the day.

17   I'm happy to continue.

18         THE COURT:  In what sense?

19         MR. BOVE:  I have a substantial amount of questions

20   about the search of the --

21         THE COURT:  It's a good time to break?

22         MR. BOVE:  Yes, your Honor.

23         THE COURT:  Excellent thought.

24         Brigitte.

25         All right.  Members of the jury, close up your books,

J57KKOU3                         Donaldson - Direct

1    give them to Ms. Jones on the way out.  We'll return them

2    tomorrow morning.

3               Ms. Jones keeps them under strict scrutiny.  No one

4    can read them.  See you tomorrow morning at 10:00 o'clock.

5               JUROR:  Thank you, Judge.

6               (Jury not present)

7               THE COURT:  Okay.  See you tomorrow at 10:00 o'clock.

8               MR. BOVE:  Thank you.

9               MS. HOULE:  Thank you, your Honor.

10              (Adjourned to May 8, 2019 at 10:00 a.m.)

11                                * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                          INDEX OF EXAMINATION

 2     Examination of:                              Page

 3     DANIEL GANCI

 4     Direct By Mr. Bove . . . . . . . . . . . . .23

 5     Cross By Mr. Bove  . . . . . . . . . . . . .65

 6     Redirect By Mr. Bove . . . . . . . . . . . .68

 7     MATTHEW LEVITT

 8     Direct By Ms. Houle  . . . . . . . . . . . .69

 9     Cross By Mr. Schacht . . . . . . . . . . . 129

10     REGINALD DONALDSON

11     Direct By Mr. Bove . . . . . . . . . . . . 147

12                         GOVERNMENT EXHIBITS

13     Exhibit No.                              Received

14     10-A, 10-B and 10-C  . . . . . . . . . . .31

15     201 through 204  . . . . . . . . . . . . .38

16     901  . . . . . . . . . . . . . . . . . . .43

17     150 through 174  . . . . . . . . . . . . .47

18     210 and 212 through 219  . . . . . . . . .48

19     220  . . . . . . . . . . . . . . . . . . .58

20     221 through 223  . . . . . . . . . . . . .58

21     224 through 230  . . . . . . . . . . . . .60

22     1002 . . . . . . . . . . . . . . . . . . .79

23     1  . . . . . . . . . . . . . . . . . . . .81

24     101  . . . . . . . . . . . . . . . . . . .86

25     104  . . . . . . . . . . . . . . . . . . .91
</pre>

```
 1    5     . . . . . . . . . . . . . . . . . . .94

 2    113   . . . . . . . . . . . . . . . . . . 100

 3    103   . . . . . . . . . . . . . . . . . . 103

 4    105   . . . . . . . . . . . . . . . . . . 104

 5    102   . . . . . . . . . . . . . . . . . . 107

 6    1001  . . . . . . . . . . . . . . . . . . 108

 7    106   . . . . . . . . . . . . . . . . . . 109

 8    107   . . . . . . . . . . . . . . . . . . 112

 9    112   . . . . . . . . . . . . . . . . . . 113

10    108   . . . . . . . . . . . . . . . . . . 114

11    111   . . . . . . . . . . . . . . . . . . 115

12    110   . . . . . . . . . . . . . . . . . . 116

13    115   . . . . . . . . . . . . . . . . . . 117

14    109   . . . . . . . . . . . . . . . . . . 128

15    1013 and 303    . . . . . . . . . . . . . 151

16    1004 and 401    . . . . . . . . . . . . . 154

17    1005, 402 and 403   . . . . . . . . . . . 158

18    1006 and 404 through 407  . . . . . . . . 161
```