J58KKOU1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

        v.                                    17 CR 417 (AKH)

ALI KOURANI,
                                 Jury Trial
          Defendant.

------------------------------x

                                New York, N.Y.
                                May 8, 2019
                                10:00 a.m.

Before:

              HON. ALVIN K. HELLERSTEIN,

                                District Judge
                                  And A Jury

                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
AMANDA L. HOULE
EMIL J. BOVE III
     Assistant United States Attorneys

ALEXEI SCHACHT
     Attorney for Defendant

ALSO PRESENT:  KERI SHANNON, Special Agent FBI
MARGARET SHIELDS, Paralegal, US Attorney's Office

J58KKOU1                        Donaldson - Direct

1              (Trial resumed; in open court; jury not present)

2              MS. HOULE:  Your Honor, should we get the witness?

3              THE COURT:  Yes, please.

4              (Jury present)

5              THE COURT:  Good morning, everyone.  Mr. Donaldson is

6     coming to the witness stand.

7              Mr. Donaldson, I remind you, you are under oath.

8              MR. BOVE:  Thank you, your Honor.

9              May I inquire?

10             THE COURT:  Yes, you may.

11     REGINALD DONALDSON, resumed.

12     DIRECT EXAMINATION CONTINUED

13     BY MR. BOVE:

14     Q.  Good morning, Mr. Donaldson.

15     A.  Good morning.

16     Q.  At the end of the day yesterday, we were looking at some

17     Facebook accounts.  Do you remember that?

18     A.  Yes.

19     Q.  One of them was marked Government Exhibit 404?

20     A.  Yes.

21             MR. BOVE:  Ms. Shields, could you bring that up,

22     please.  And if you could please zoom in from the top through

23     the registered email addresses.

24     Q.  Yesterday, we talked a little bit about the top two email

25     addresses that are at the bottom left.  Do you recall that?

J58KKOU1                    Donaldson - Direct

1    A.  Yes.

2            MR. BOVE:  Ms. Shields, if you can move this to the

3    left, please.  And bring up the subscriber information for the

4    ali.m.kourani account.  That's Exhibit 401-A.

5    BY MR. BOVE:

6    Q.  Mr. Donaldson, just to reorient ourselves, what is the user

7    name associated with this account?

8    A.  Ali Kourani.

9            THE COURT:  Which account is this?

10           MR. BOVE:  Your Honor, this on the right side of the

11   screen --

12           THE COURT:  That's what I want to know.

13           MR. BOVE:  It's the email account

14   ali.m.kourani@gmail.com.

15           Ms. Shields, if you could highlight that and zoom in

16   on it, please.  And then on the left side of the screen,

17   Ms. Shields, if you could bring up page 15.  Thank you.

18   BY MR. BOVE:

19   Q.  Now, what I'd like to do is look at the friends section of

20   Government Exhibit 404.

21           MR. BOVE:  Ms. Shields, could you please bring up

22   Government Exhibit 404, page 2.

23           THE COURT:  Do you want the jury to get a look at the

24   picture?

25           MR. BOVE:  Yes, your Honor.  The --

1          THE COURT:  It disappeared too quickly for us to

2     absorb.

3          MR. BOVE:  You can go back to that page, page 15 of

4     Government Exhibit 404.

5          THE COURT:  Is the legend important below it?

6          MR. BOVE:  It is, Judge.

7          And we can zoom in on that and just establish the date

8     that the picture was uploaded to this account.

9          THE COURT:  You're coming back to it?

10         MR. BOVE:  Yes.

11         THE COURT:  Okay.

12         MR. BOVE:  Thank you, your Honor.

13         Ms. Shields, if you can move this to the left, please.

14    And on the right side of the screen, bring up 401-A again.

15         What I'd like to do now is look at the friends list

16    that's in Government Exhibit 404 of this Facebook account.

17    It's on the left.  If you could bring up page 2, please.

18    BY MR. BOVE:

19    Q.  Mr. Donaldson, do you see where it says "Friends" in the

20    upper left?

21    A.  Yes.

22    Q.  Is this a list of Facebook accounts that are linked to or

23    associated with Government Exhibit 404?

24    A.  Yes.

25         MR. BOVE:  Ms. Shields, could you please bring up page

1    5 of the Exhibit 404.  If you could zoom in on the top third

2    and highlight the account with the user name Ali Kourani and

3    the target number ending in 7740.

4    BY MR. BOVE:

5    Q.  So this is one of the Facebook accounts that we looked at

6    yesterday.  It's marked as Government Exhibit 405.

7              MR. BOVE:  So let's bring that up on the right side of

8    the screen, please.  If you could zoom in on the top through

9    the registered emails.  And if you could highlight the target

10   number on the right, please.

11   Q.  So those account IDs match, Mr. Donaldson?

12   A.  Yes.

13   Q.  So the account that's in the friends list on the left is

14   shown on the right side of the screen?

15   A.  Yes.

16   Q.  We looked at Government Exhibit 405 yesterday to help

17   reorient there.

18             MR. BOVE:  Let's take a look at page 4 of Government

19   Exhibit 405.  And now page 8 of this exhibit, please.

20   Q.  And this is the photo of Hassan Nasrallah that we looked at

21   yesterday?

22   A.  Yes.

23             MR. BOVE:  Now if you could bring up page 12 of

24   Government Exhibit 405.

25             So this is another one of those foreign language

J58KKOU1                           Donaldson - Direct

1   exhibits, ladies and gentlemen, so this is what actually

2   appeared in the Facebook account.

3          And now if we could take a look at the translation,

4   which is on page 14 of this exhibit.  If you could zoom in on

5   the photo and the translation, please, Ms. Shields.

6   BY MR. BOVE:

7   Q.  So the translation reads:  "Mousa Kourani from Southern

8   Lebanon was one of Hezbollah's fighters who may have been

9   captured in Aleppo's southern countryside."

10          Do you see that, Mr. Donaldson?

11  A.  Yes.

12          MR. BOVE:  Thank you, Ms. Shields.  You can take that

13  down.

14  Q.  Now, I'm going to hand you, Mr. Donaldson, an item that was

15  seized from the defendant's apartment.  This is a laptop that's

16  in evidence as Government Exhibit 210.

17          Do you see that?

18  A.  Yes.

19          MR. BOVE:  Your Honor, at this point, I have a

20  stipulation to offer.

21          THE COURT:  Okay.

22          MR. BOVE:  This stipulation is marked as Government

23  Exhibit 1003.  This is another one of these agreements between

24  the parties.

25          This stipulation indicates that that laptop,

J58KKOU1                    Donaldson - Direct

1    Government Exhibit 210, was lawfully seized from the

2    defendant's apartment on June 1st, 2017, as you heard

3    yesterday, and that the laptop was searched pursuant to a

4    warrant.  The stipulation sets out the number of documents and

5    items that were found on the laptop, and then there are two

6    reports that were prepared relating to certain of the items

7    that were seized from the laptop.  Those reports, which we're

8    going to look at with Mr. Donaldson, are on disks that are

9    marked Government Exhibits 301 and 302.

10          This stipulation is an agreement between the

11   government and the defense, and it indicates that those items

12   on those two disks, 301 and 302, fairly and accurately depict

13   items that are actually on the laptop that's sitting up with

14   Mr. Donaldson.

15          Your Honor, so I offer the stipulation, 1003, as well

16   as the disks and their contents, which are marked 301 and 302.

17          THE COURT:  Yes.

18          MR. BOVE:  Thank you, your Honor.

19          THE COURT:  They're received.

20          (Government's Exhibits 1003, 301 and 302 received in

21   evidence)

22   BY MR. BOVE:

23   Q.   Now, Mr. Donaldson, yesterday, at the beginning of your

24   testimony, you mentioned a program called Forensic Toolkit.

25          Do you recall that?

J58KKOU1                          Donaldson - Direct

1    A.  Yes.

2    Q.  What is Forensic Toolkit?

3    A.  It's a forensic tool used to examine electronic media.

4            MR. BOVE:  Ms. Shields, can we take a look at the

5    Forensic Toolkit report, which is Government Exhibit 301.

6    BY MR. BOVE:

7    Q.  What I would like to do is start by focusing on the section

8    that's titled "File Overview."  You can see that in the column

9    on the left.

10           MR. BOVE:  And, Ms. Shields, if you could bring that

11   up for us, please.

12   Q.  Mr. Donaldson, what is shown in this part of the report?

13   A.  It is the analysis of the user, the FTK.  It categorizes

14   all of the items that are found on the hard drive.

15   Q.  So is this an inventory of the types of files that were

16   extracted from the laptop in that process that you described

17   yesterday?

18   A.  Yes.

19           MR. BOVE:  Ms. Shields, if you could highlight the

20   entry titled "Data Carved Files" that's in the file status

21   section.

22   Q.  Mr. Donaldson, in your work, what does it mean for a file

23   to be carved?

24   A.  Within the tool, it tries to -- every file has a signature

25   that identifies what type of file it is, whether it be an

1  image, or a document, or whatever.  Sometimes those files are

2  not complete, they may be deleted, and they may be just partial

3  of the file.  So a carving tool can go in and find other files

4  that would not normally be found in this normal operation of

5  the tool.

6  Q.  Is this carving process a feature of the Forensic Toolkit?

7  A.  Yes.  Carving can be done automatically with the toolkit,

8  and it can also be done manually.

9  Q.  So it's basically a process of carving data out of the

10 deleted space on the laptop?

11 A.  Yes.

12 Q.  Now, there is a title on the left side of the screen that

13 says "Bookmarks."  Do you see that?

14 A.  Yes.

15 Q.  Are these basically like the tags that we looked at

16 yesterday in the phone report?

17 A.  Yes.

18 Q.  So items are files that were marketed on the laptop?

19 A.  Yes.  They were examined, they were marked, and bookmarks

20 were created of what was found.

21        MR. BOVE:  Ms. Shields, let's start with the bookmark

22 labeled number 1.

23 Q.  What is this, Mr. Donaldson?

24 A.  This is the first bookmark, and it's from a folder named

25 Kourani.  It's in the user account named Ali Koran.

J58KKOU1                          Donaldson - Direct

1   Q.  Thank you.

2            MR. BOVE:  Ms. Shields, could you highlight the path

3   row?

4   BY MR. BOVE:

5   Q.  Is that what you were just referring to, Mr. Donaldson?

6   A.  Yes.

7   Q.  So there is a folder on the laptop with the name Ali Koran?

8   A.  Yes.

9   Q.  Did you see, earlier in the path, the reference to .E01?

10  A.  Yes.

11  Q.  What's that?

12  A.  That's a bin file.  It's a binary file.  It's just ones and

13  zeros.  What I explained yesterday about the image, that's what

14  the image is, the E01 file.

15  Q.  So the Forensic Toolkit looked at that image that was

16  extracted on the laptop, on the witness stand, and found this

17  older named Ali Koran?

18  A.  Yes.

19           MR. BOVE:  Let's take a look at the second bookmark,

20  please, Ms. Shields.  And if you could highlight the path here,

21  too.

22  Q.  Mr. Donaldson, what's shown in this bookmark?

23  A.  This was a photo that was in the Ali Koran folder on his

24  desktop -- on the desktop and in the photo directory.

25  Q.  You said it's a photo.  Do you recognize that file

J58KKOU1                    Donaldson - Direct

1    extension, .J --

2    A.   .JPEG, yes.

3             MR. BOVE:  Ms. Shields, could you please display the

4    native file of that picture and zoom out.  Thank you.

5             Let's take a look now at the third bookmark.  If you

6    could highlight the path again, please, Ms. Shields.

7    BY MR. BOVE:

8    Q.   What is this one, Mr. Donaldson?

9    A.   It's another photo that was on the Ali Kourani desktop.

10            MR. BOVE:  Ms. Shields, if you could bring that photo

11   up, please.  And zoom in a little bit.

12   Q.   What does this look like, Mr. Donaldson?

13   A.   It's a New York State driver's license.

14   Q.   Who was it issued to?

15   A.   Ali Kourani.

16            MR. BOVE:  Ms. Shields, let's take a look at the sixth

17   bookmark, please.  And if you could highlight the path again.

18   Q.   What is indicated in the path field here, Mr. Donaldson?

19   A.   This is also on the Ali Kourani desktop.  It's a PDF file.

20            MR. BOVE:  Ms. Shields, if you could bring up that

21   PDF, please, and zoom towards the bottom.

22   Q.   Mr. Donaldson, can you read the email address that's on

23   this document?

24   A.   Alimkourani@gmail.com.

25            MR. BOVE:  Let's take a look at bookmark 7, please.

1    And if you could highlight the path.

2    BY MR. BOVE:

3    Q.   Mr. Donaldson, do you see the reference in the path to

4    unallocated space?

5    A.   Yes.

6    Q.   What is unallocated space?

7    A.   Unallocated space is space on the hard drive, or whatever

8    it is, that's not being used by the operating system.  It's

9    available to the operating system to put files into.  If a file

10   is deleted, it goes back into the unallocated space.  The

11   contents are still there, but it's just the operating system

12   can use it to put other files on.

13   Q.   So what does it typically mean, when you're doing a

14   forensic search like this, if a file or a piece of text is

15   located in the unallocated space of a laptop?

16   A.   It means it was most likely deleted.

17        THE COURT:  You said "most likely."  What are the

18   possibilities?

19        THE WITNESS:  It could be a lost file.  It could have

20   been corrupted and been in unallocated space.

21        MR. BOVE:  Thank you, Judge.

22   BY MR. BOVE:

23   Q.   I'd like to take a look now in this bookmark, number 7, in

24   the bottom where it says "File Selections."

25        MR. BOVE:  Ms. Shields, could you please highlight

1    that?

2    Q.  Do you see where it says "Data" a few rows down?

3           MR. BOVE:  Ms. Shields, if you could highlight the

4    data line.

5           THE WITNESS:  Yes, I see it.

6    BY MR. BOVE:

7    Q.  What does this mean, a file selection in the data part of a

8    bookmark?

9    A.  Well, it's some type of data, and it's a Google Earth

10   download.  It was, I guess, the program for Google Earth was

11   downloaded.

12   Q.  So this is text from the unallocated space of the laptop?

13   A.  Yes.

14   Q.  And it reflects this Google Earth download?

15   A.  Yes.

16          MR. BOVE:  Ms. Shields, could we take a look at the

17   eighth bookmark, please.  And highlight the path.

18   Q.  What is shown here, Mr. Donaldson?

19   A.  This shows that there's a Google Earth app on the desktop

20   of the Ali Kourani user.

21          MR. BOVE:  Let's take a look at the eleventh bookmark.

22   What I'd like do here is first focus on the path, Ms. Shields.

23   If you could highlight that.

24   Q.  Do you see the reference to Chrome and Google in the path,

25   Mr. Donaldson?

1   A.   Yes.

2   Q.   What does that indicate?

3   A.   Chrome is a web browser.

4   Q.   It says "Archive to history" at the end of the path?

5   A.   Yes.

6           MR. BOVE:   If we could scroll down and look at some of

7   the file selections, some of the text from this file.

8   Ms. Shields, in the first file selection, would you please

9   highlight the words "Search" and "Helal."

10  Q.   Mr. Donaldson, what is indicated in this part of the

11  bookmark?

12  A.   A search was performed through this Gmail account for the

13  term --

14          THE COURT:   Louder, please, Mr. Donaldson.

15          THE WITNESS:   A search was performed using this Google

16  Gmail account looking for the term Helal.

17  Q.   Do you see the Gmail account in the far righter link,

18  ali.m.kourani?

19  A.   Yes.

20          MR. BOVE:   Ms. Shields, let's take a look at the data

21  in the second file selection.   And if you could highlight the

22  words "Search" and "Helal."

23  Q.   Mr. Donaldson, what's indicated in this data entry?

24  A.   A search was also performed for a variation of Helal,

25  Hilal, H-i-l-a-l.

J58KKOU1                    Donaldson - Direct

1    Q.  It's a search in that same Gmail account that we've been

2    talking about, ali.m.kourani?

3    A.  Yes.

4           MR. BOVE:  Let's take a look at the 15th bookmark,

5    please, Ms. Shields.  Let's start with the path again.

6    BY MR. BOVE:

7    Q.  Do you see the reference to Firefox, Mr. Donaldson?

8    A.  Yes.

9    Q.  What is Firefox?

10   A.  Firefox is a different browser.

11   Q.  Let's look at some of the file selections now.

12          MR. BOVE:  Ms. Shields, if you could scroll down.  And

13   let's focus on the third file selection.  If you could

14   highlight the part of the text for "Search" and "Hezbollah."

15   Q.  Mr. Donaldson, what's this?

16   A.  This was a Facebook search for the term "Hezbollah."

17   Q.  Do you see the references below to Sayed Hassan Nasrallah?

18   A.  Yes.

19          MR. BOVE:  Ms. Shields, if you could bring up the 17th

20   bookmark, please.  And if you could zoom down.  Just start to

21   focus on the file selections in the first one.  Could you

22   please highlight the words "Hezbollah Anthem" in the last line.

23   Q.  Mr. Donaldson, on that line, do you see the reference to

24   YouTube?

25   A.  Yes.

J58KKOU1                        Donaldson - Direct

1    Q.  So what does this data entry look like?

2    A.  A search was performed in YouTube for Hezbollah Anthem.

3              MR. BOVE:  Ms. Shields, in the next data selection,

4    the one below it, if you could highlight the last three lines

5    of text.

6    BY MR. BOVE:

7    Q.  Could you read that, please, Mr. Donaldson, just starting

8    with --

9    A.  Can you blow it up a little bit?

10   Q.  One second.

11   A.  "Israel has agreed to a prisoner exchange with Lebanon's

12   Hezbollah.  The most high-profile prisoner is Samir Kantar, the

13   longest serving Lebanese prisoner in Israeli custody."

14   Q.  Do you see the references in the data there to YouTube?

15   A.  Yes.

16   Q.  So what does this data entry look like?

17   A.  A YouTube search was performed for Hezbollah prisoner

18   exchange.

19             MR. BOVE:  Now let's take a look at the 18th bookmark,

20   please.  And scroll down to the file selections.  Let's focus

21   on the second one.  Ms. Shields, if you could highlight the

22   text in the link that begins after "Video about."

23   Q.  So this says, "Video of a village in South Lebanon that was

24   attacked by 'Israel' until Hezbollah forced them out."

25             Do you see that, Mr. Donaldson?

J58KKOU1                        Donaldson - Direct

```
 1   A.  Yes.

 2              THE COURT:  Where is that?

 3              MR. BOVE:  Excuse me, your Honor?

 4              THE COURT:  I can't find it.

 5              MR. BOVE:  Can you zoom in a little, please,

 6   Ms. Shields.

 7              Judge, it's the text highlighted in blue.

 8              THE COURT:  Oh, okay.

 9   BY MR. BOVE:

10   Q.  Do you see the reference to YouTube, Mr. Donaldson?

11   A.  Yes.

12   Q.  So what's indicated in this data entry?

13   A.  It looks like it was viewed -- it looks like the user

14   viewed this video as described in the text.

15   Q.  A video with that title?

16   A.  Yes.

17              MR. BOVE:  Let's take a look at the 20th bookmark,

18   please.  If you could start, Ms. Shields, by highlighting --

19              THE COURT:  A bookmark is a place where one opens a

20   computer and easily gets to?

21              MR. BOVE:  That's one version of a bookmark, your

22   Honor.  In this document, each bookmark is a --

23              MR. SCHACHT:  Objection.

24              THE COURT:  Sustained.  You can obtain that from the

25   witness.
```

J58KKOU1                        Donaldson - Direct

1           What is a bookmark?

2           THE WITNESS:  A bookmark is when a search was

3   performed using this program, FTK, things that they wanted to

4   highlight, they bookmarked.  They made a checkmark, so they can

5   create a file, like this file, so they can go back to those

6   bookmarks easily.

7   BY MR. BOVE:

8   Q.  So it's data from the laptop?

9   A.  Yes.

10          MR. BOVE:  So we're on bookmark 20 now.  Ms. Shields,

11  if you could highlight the path.

12  Q.  We're zoomed out a bit, Mr. Donaldson, but can you see the

13  references to Google Earth?

14  A.  Yes.

15  Q.  And the file extension at the very end of the path --

16          MR. BOVE:  If you could scroll over, please,

17  Ms. Shields.

18  Q.  -- is .KML?

19  A.  Yes.

20  Q.  Do you see that?

21  A.  Yes.

22  Q.  What's a KML file?

23  A.  A KML file is a list of destinations or locations that's

24  created in Google Earth, and then you can plot them using -- if

25  you have that file, you can plot those locations into Google

1   Earth.

2              MR. BOVE:  Let's take a look at the second file

3   selection in this bookmark.  And, Ms. Shields, if you could

4   highlight the text that begins "attached is a KML file."

5   BY MR. BOVE:

6   Q.  Mr. Donaldson, what does that sentence say?

7   A.  "Attached is a KML file containing placemarks for over

8   1,000 towns in Israel."

9              MR. BOVE:  Let's take a look at bookmark 22.  Please

10  scroll down to the file selections.  And if you could highlight

11  the title of the video on the first file selection, please,

12  Ms. Shields.

13  Q.  What does that say, Mr. Donaldson?

14  A.  "Insurgent fires RPG at U.S. troops.  Caught on camera by

15  U.S. soldiers in their Humvee."

16             MR. BOVE:  Ms. Shields, let's take a look at the sixth

17  file selection, please.  And if you could highlight the text

18  after that.

19  Q.  What does that say, Mr. Donaldson?

20  A.  "Hezbollah tactics during July war."

21             MR. BOVE:  Ms. Shields, if you could bring up the 25th

22  bookmark.  Let's go down to the file selections.  Focusing on

23  the first one, if you could highlight the text after the link.

24  Q.  What does that say, Mr. Donaldson?

25  A.  "Hezbollah in action."

1              MR. BOVE:  Let's focus on the sixth file selection,

2     please.  If you could highlight the text after the link.

3     BY MR. BOVE:

4     Q.  That one says, "Hezbollah martyr funeral."  Do you see

5     that?

6     A.  Yes.

7     Q.  Now I want to look at a different type of report from the

8     laptop, which is marked as Government Exhibit 302.  This is a

9     report from the Internet Evidence Finder based on the parties'

10    stipulation.

11             Mr. Donaldson, what's Internet Evidence Finder?

12    A.  It's a tool used to discover on electronic evidence, any

13    reference to Internet usage.

14    Q.  So is this a type of software that focuses more

15    specifically on Internet data and usage?

16    A.  Yes.

17             MR. BOVE:  Ms. Shields, could you please publish 302.

18    Let's start with the tab titled "Classifieds URLs."

19    Q.  Do you see that on the left?

20             Mr. Donaldson, could you please walk us through what

21    the column titles mean?

22    A.  Well, the record is the record in the order of, you know,

23    what's in the file.  Site name would be where -- the site that

24    was visited.  URL is the actual address of that -- that was

25    searched.  And date and time is the date and time of the

J58KKOU1                      Donaldson - Direct

1    search.

2    Q.  So let's focus on the top row, record 164.  What is this?

3    A.  It's an eBay search for -- it has "gun" in the search.

4          MR. BOVE:  Can you please highlight the word "gun" in

5    the eBay search, Ms. Shields.

6    Q.  Mr. Donaldson, can you tell, from record 164, the date when

7    that search was conducted?

8    A.  August 29, 2009.

9    Q.  And I'd like to focus now on the third row on the screen,

10   record 2030.  Do you see that?

11   A.  Yes.

12   Q.  What's reflected in this entry?

13   A.  That's another search on eBay, which included a gun search.

14         MR. BOVE:  Ms. Shields, if you could highlight the

15   word "gun" in record 2030.

16   Q.  Mr. Donaldson, are you able to tell, from looking at this

17   document, whether the search of eBay that's reflected in record

18   164 is different from the search in record 2030 in terms of

19   time when it was conducted?

20   A.  Yes.

21   Q.  How can you tell?

22   A.  It was done using two different browsers, Firefox and then

23   Safari.

24   Q.  Is there any date provided in record 2030 for the time of

25   the search?

1    A.   No.

2              MR. BOVE:   Ms. Shields, can you scroll to the right,

3    please.   If you could highlight the word "Unallocated

4    clusters."

5    BY MR. BOVE:

6    Q.   Mr. Donaldson, you testified a few minutes ago about what

7    it means to be in unallocated space?

8    A.   Yes.

9    Q.   Is unallocated clusters another term for unallocated space?

10   A.   Yes.

11   Q.   So what does it mean that this record, 2030, reflecting the

12   eBay search for the word "gun," was found in unallocated

13   clusters?

14   A.   It had been deleted.

15             MR. BOVE:   Ms. Shields, could you please bring up the

16   Google searches tab from the left.   And if you could highlight

17   record 2297.

18   Q.   What is this, Mr. Donaldson?

19   A.   It's a Google search for SAM-2 missiles.

20             MR. BOVE:   Ms. Shields, if you can scroll over a

21   little bit and see if there's a date for that one.

22   Q.   When was this search conducted, Mr. Donaldson?

23   A.   January 17, 2010.

24             MR. BOVE:   Let's take a look now in this part of the

25   report at record 4895.

J58KKOU1                    Donaldson - Direct

 1   Q.  What is this, Mr. Donaldson?

 2   A.  It's a search for SA Igla missiles.

 3          MR. BOVE:  Ms. Shields, can you please bring up parsed

 4   search queries.  This is another part of section of the report

 5   that is Government Exhibit 302.  Let's take a look at record

 6   1842, please.

 7   BY MR. BOVE:

 8   Q.  What is this one, Mr. Donaldson?

 9   A.  It was a YouTube search for "Training Combat."

10          MR. BOVE:  Ms. Shields, if you could scroll down to

11   record 3654 in this part of the report.

12   Q.  What's indicated here?

13   A.  It's a YouTube search for "Israel v. Hezbollah."

14          MR. BOVE:  Now, I'd like to look at another part of

15   Government Exhibit 302.  If you could go to the tab labeled

16   "Chrome archived web history."

17   Q.  Mr. Donaldson, are you familiar with a program called

18   Chrome?

19   A.  Yes.  It's a web browser.

20   Q.  What is reflected in the first record on the screen, 4739?

21   A.  A YouTube video was watched with the title "Imam Khomeini –

22   The Man Who Changed The World, Iran & The West, Part 1 of 3."

23          MR. BOVE:  Ms. Shields, if you could highlight the

24   title of that video, please.

25   Q.  Take a look at the row below that, Mr. Donaldson.  What's

J58KKOU1                         Donaldson - Direct

1   in record 4741?

2   A.  Another video watched on YouTube named "Declassified

3   Ayatollah Khomeini."

4           MR. BOVE:  Ms. Shields, if you could highlight that

5   title, please.

6           Now I'd like to take a look at the part of this report

7   titled "Safari Search History."  Ms. Shields, if you could

8   bring that up.

9   Q.  Mr. Donaldson, is this another web browser?

10  A.  It's an Apple web browser, yes.

11          MR. BOVE:  Ms. Shields, if you could scroll down to

12  record 29861, please.  And scroll over to the title column,

13  please.  And highlight that.

14  Q.  Mr. Donaldson, what's the title of this YouTube browser?

15  A.  "Hezbollah Reaches Pinnacle of Art of Irregular Warfare."

16          MR. BOVE:  Now, Ms. Shields, if we could look at row

17  51769 from this part of the report.  And if you could scroll

18  over to the title, please.

19  Q.  What's the title of this YouTube video?

20  A.  "Hezbollah Suspected In Bulgaria Bus Bombing."

21          MR. BOVE:  Finally, the last one, let's take a look at

22  record 80661.  If you could scroll over to the title, please,

23  Ms. Shields.

24  Q.  What is this one, Mr. Donaldson?

25  A.  The title?

1    Q.   Yes.

2    A.   "American Soldier Shot in Helmet."

3             MR. BOVE:  Nothing further, your Honor.

4             THE COURT:  Thank you.  Just a minute.

5             MR. SCHACHT:  Good morning, Mr. Donaldson.

6             THE COURT:  One minute, Mr. Schacht.

7             Can I be excused for two minutes?  Would you mind

8    staying in place?

9             Be seated.

10            (Pause)

11            THE COURT:  Mr. Schacht, cross-examination, please.

12            MR. SCHACHT:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. SCHACHT:

15   Q.   Mr. Donaldson, as far as you know, YouTube is not a

16   terrorist organization, right?

17   A.   Correct.

18   Q.   Neither is Google?

19   A.   Correct.

20   Q.   Nor eBay?

21   A.   Right.

22   Q.   Nor Facebook?

23   A.   Right.

24   Q.   And as far as you're aware, searching for things on those

25   four companies' sites is not illegal either?

J58KKOU1                        Donaldson - Cross

1    A.  Correct.

2    Q.  One of the documents that we saw summarized the contents of

3    the computer that you analyzed; is that right?

4    A.  Yes.

5    Q.  Do you recall that that document indicates that there were

6    close to 1 million files, total, on the computer?

7    A.  Yes.

8    Q.  We've looked today at a small portion of a million files;

9    is that right?

10   A.  Correct.

11   Q.  The telephone that you analyzed, that didn't have quite as

12   much material on it; is that right?

13   A.  Correct.

14   Q.  That had, I think you said, thousands of items, but less

15   than a hundred thousand, I believe?

16   A.  I don't remember the number, but it was less than what was

17   on the computer, yes.

18   Q.  As a result of your analysis of these two items, did you

19   find any purchases of any firearms, or weapons, or anything

20   illegal?

21   A.  I have to correct you.  I didn't do the analysis.

22   Someone -- the FBI did the analysis.  I just looked at the

23   results.

24   Q.  So, sitting here today, you have no idea whether there was

25   any evidence of anyone having done anything illegal on the

J58KKOU1                          Eannucci - Direct

1   phone or the computer?

2   A.  No.

3           MR. SCHACHT:  I have no other questions.

4           THE COURT:  Any redirect?

5           MR. BOVE:  No, your Honor.  Thank you.

6           THE COURT:  Thank you.

7           Mr. Donaldson, you're excused.

8           THE WITNESS:  You're welcome.

9           (Witness excused)

10          THE COURT:  Next witness, please.

11          MS. HOULE:  Thank you, your Honor.  The government

12  calls Officer Jared Eannucci.

13          THE COURT:  Let's pay attention to the oath, please.

14          Wait a minute.

15   JARED EANNUCCI,

16       called as a witness by the Government,

17       having been duly sworn, testified as follows:

18          THE WITNESS:  Jared Eannucci.  It's E-a-n-n-u-c-c-i.

19          THE COURT:  Jared is J-a-r-e-d?

20          THE WITNESS:  J-a-r-e-d, yes.

21          THE COURT:  You may examine, Ms. Houle.

22          MS. HOULE:  Thank you, your Honor.

23          (Continued on next page)

24

25

J58AAKOU2                        Eannuci – Direct

 1    DIRECT EXAMINATION

 2    BY MS. HOULE:

 3    Q.  Good morning, officer.  Where do you work?

 4    A.  I work for U.S. Customs and Border Protection.  I am

 5    currently assigned at the U.S. Attorney's Office in the

 6    Southern District of New York.

 7    Q.  What is U.S. Customs and Border Protection generally

 8    responsible for?

 9    A.  So U.S. Customs and Border Protection, easier to refer to

10    it as CBP is responsible for securing our nation's border,

11    among other things.  That includes U.S. ports of entry.  So at

12    any international airports here in the United States, at any

13    land border crossings in and out of the United States, any

14    seaports for which international vessels could arrive.  And

15    also responsible for area along the border between those ports

16    of entry which is the Border Patrol's responsibility.

17    Q.  What is your title at CBP?

18    A.  CBP officer.

19    Q.  How long have you worked there?

20    A.  So, approximately ten years.  I spent the first three and a

21    half years of my career with the U.S. Border Patrol which falls

22    under CBP out in San Diego, California.  I spent the last six

23    and a half years or so at JFK airport at CBP.

24    Q.  Where is JFK located?

25    A.  Jamaica, Queens, New York.

J58AAKOU2                          Eannuci - Direct

1   Q.  What type of airport is that?

2   A.  International airport, domestic and international arrivals

3   and departures.

4   Q.  Have you held different positions in your role as CBP at

5   JFK airport?

6   A.  Yes, I have.

7   Q.  What positions are those?

8   A.  When I started there I spent my first two years in an area

9   that's referred to as "passenger processing".  So, this is the

10  area where all arriving passengers from international flights,

11  this is their first stop when they come off of the plane.  This

12  is where they get processed, where they will show up, present

13  their travel document, speak to a CBP officer, ultimately

14  collect their bags and then carry on after there.  So, that's

15  the general passenger processing area.

        I then spent a year in the global entry office

16  conducting interviews of applicants.  So, global entry, it's a

17  CBP run program which essentially could help expedite you

18  through part of the CBP process.

19

        I then spent a little under two years with a Unit

20  that's referred to as "Tactical Terrorism Response Team" or

21  "TTRT" for short.  This team it's a unit within CBP at the

22  airport which is tasked with conducting interviews or

23  inspections of travelers who may have some type of nexus to

24  terrorism or terrorist activity.

25

J58AAKOU2                          Eannuci - Direct

1              And then I spent approximately the next two years with

2      the Joint Terrorism Task Force, commonly referred to as "JTTF"

3      out at JFK.  My duties there were pretty much to run travel and

4      lend CBP assets to the task force.  It's a task force which is

5      made up of federal, state and local law enforcement agencies,

6      who Were The pretty much investigate all terrorism related

7      things here in the United States.

8              Then since April 1st of this year, a little over a

9      month I have been assigned to the U.S. Attorney's Office here

10     in the Southern District of New York.

11     Q.  Turning back to your work at JFK, is CBP responsible for

12     any particular area within JFK?

13     A.  So, all of CBP's operations within the airport terminals

14     are conducting in an area that's either referred to as the

15     "federal inspection area" or the simple term, "CBP space" or

16     the "CBP area".  It's a secure location within the terminal

17     that CBP operates I was responsible for.

18     Q.  Based on the your time at CBP, are you familiar with the

19     term "preoperational surveillance"?

20     A.  Yes, I am.

21     Q.  What does that term mean?

22     A.  So, typically, if an individual were planning to conduct an

23     attack of some sort, they would most likely want to garner as

24     much knowledge about the area that they were planning on

25     conducting.  The attack, so that may include to visit the area

```
 1   to get the general layout, figure out if there's security
 2   personnel there, different entries and exits to the area, again
 3   just to gain as much knowledge about the location before
 4   conducting their attack.
 5   Q.  In your experience working in the Tactical Terrorism
 6   Response Team and the Joint Terrorism Task Force out at JFK,
 7   have you identified any potential risks of preoperational
 8   surveillance at that airport?
 9   A.  So, within --
10           THE COURT:  What's "preoperational surveillance"?
11           THE WITNESS:  So again, if someone were planning to
12   conduct some sort of attack, they would generally visit that
13   location beforehand to scope out, to gain as much knowledge of
14   that location as possible to understand the workings of the
15   location and as much as they can about the location.
16           THE COURT:  Why is it preoperational?
17           THE WITNESS:  So that when the operation, when the
18   attack or whatever operation is that they're planning
19   eventually happens they obviously have the most amount of
20   knowledge of the area going into it.
21           THE COURT:  This is from the perspective of someone
22   who might be planning an attack?
23           THE WITNESS:  Yes.
24           THE COURT:  I think Ms. Houle was asking what you do.
25           Am I right?
```

1          MS. HOULE:  What I was asking, your Honor, is if based

2     on the officer's experience at JFK he has identified any risks

3     of preoperational surveillance at that airport.

4          THE COURT:  Try to use non jargon terms.  It is might

5     be better.

6          MS. HOULE:  Thank you, your Honor.

7     A.  So in regards to that, within --

8          THE COURT:  Is it part of your job to identify where

9     the risk situations are?

10          THE WITNESS:  Yes, it is.

11          THE COURT:  You do that alone or with others?

12          THE WITNESS:  It's usually done.  All CBP officers are

13     told and are responsible for keeping an eye out for any

14     individual or any areas of risk or individuals of concern

15     within CBP space.

16          THE COURT:  Any areas of concern -- use normal

17     language.  What do you mean?  What do you do?  Where do you go?

18          THE WITNESS:  If a CBP officer observes someone doing

19     something suspicious, whether it's within their, the CBP area

20     or in the airport in general, generally, they're told to be on

21     the lookout for all different things, suspicious individuals.

22     Obviously, the most common thing is probably luggage that's

23     left alone but then other things that within the terminal such

24     as if individuals are taking photos of, within the CBP space,

25     that's something that we have been told in the past that

1    individuals who have traveled through may be taking those

2    photos for nefarious reasons, for the wrong reasons to get a

3    better understanding of the layout and paint a picture of how

4    CBP operates within their space.

5              THE COURT:  The CBP space is the whole airport?

6              THE WITNESS:  No.  So, it's within -- at JFK

7    specifically, each -- there's five international terminals

8    there.  So, it's in the terminal CBP operates its own space

9    within that area that's cut off from the rest of the terminal.

10             THE COURT:  Is that the space where people coming off

11   international flights appear to Customs and show their

12   documents?

13             THE WITNESS:  Yes, it is.

14             THE COURT:  That's your space?

15             THE WITNESS:  Yes.

16             THE COURT:  You're talking about looking out in and

17   around that space or something suspicious?

18             THE WITNESS:  Yes.

19             THE COURT:  OK.

20   Q.  Officer, if you identified someone collecting information

21   about the physical space at JFK, would that present an issue?

22   A.  Yes, it would.

23   Q.  What would that issue be?

24   A.  So.  If they were -- if and officer observed someone,

25   again, maybe taking notes of the layout of the area or taking

J58AAKOU2                        Eannuci - Direct

1    photos or anything suspicious along those lines, usually, they

2    would be confronted by a CBP officer, asked what the reason is

3    they were doing that.  And then from there if a logical reason

4    or a good explanation is provided that may be the end of it but

5    there's been other times where additional personnel have been

6    called at the airport for instances like that to include the

7    Port Authority Police who were there at airport and in some

8    other times the Joint Terrorism Task Force.

9            THE COURT:  No one gets into that space unless he or

10   she is coming off an international flight, it's international

11   arrivals?

12           THE WITNESS:  Yes.  The only people in that area would

13   be CBP personnel obviously, travelers arriving and then there's

14   other airport employees such as individuals who assist with

15   wheelchairs.

16           THE COURT:  Wheelchair pushers.

17           THE WITNESS:  Yes.  There's individuals who have been

18   vetted by CBP and they have a special ID that allows them to

19   enter and exit the area.

20           THE COURT:  Your focus is on folks coming off of

21   international flights?

22           THE WITNESS:  Yes.

23           THE COURT:  You are looking for something that might

24   look suspicious from travelers on one of those international

25   flights?

THE WITNESS: Yes.

BY MS. HOULE:

Q. What is the risk that CBP is trying to protect against when it stops someone from collecting information about that physical space?

A. Ultimately, from trying to conduct some sort of attack or some type of harm within the airport.

Q. What could they be looking for in collecting information about the physical space?

A. So, there is a obviously a lot of CBP officers within the space. These officers are, a majority of them are in uniform. They're armed. And they're positioned at static locations. So, they're within booths or at desks or at assigned posts. So, someone may be able to identify where there's a larger concentration of officers within the terminal who are within the CBP space versus what areas do not have a large office or presence in them.

THE COURT: So, you're looking to avoid risks to the officers themselves?

THE WITNESS: That's one of the concerns, yes.

THE COURT: What are some of the other concerns?

THE WITNESS: So, if a traveler was or if an individual within CBP's area were to take note of their security cameras throughout the area they'd be able to take note of where these security cameras are.

1          THE COURT:  Something that would compromise your

2     surveillance of the area?

3          THE WITNESS:  Yes.

4          THE COURT:  What are some other risks?

5          THE WITNESS:  So, the entries and exit points to the

6     CBP space, each CBP location within an airport terminal it's

7     different.  There's different entry points and exit points

8     within that terminal.

9          THE COURT:  The entry points would be the passengers

10    that come in from the flights?

11         THE WITNESS:  Those are some of the entry ponts within

12    the CBP space.  There's also entry points from outside of the

13    general area of the airport.  There's probably in each terminal

14    maybe three or four other locations where personnel from the

15    outside who are not arriving from international flights can

16    either try to enter --

17         THE COURT:  Every exit can be an access point?

18         THE WITNESS:  Yes.

19    BY MS. HOULE:

20    Q.  Let's talk a little bit about the screening process that

21    the passengers go through.

22         Are you familiar with the term "secondary

23    examination"?

24    A.  Yes.

25    Q.  What is that?

J58AAKOU2                        Eannuci - Direct

A.   So, just to give a brief overview, when the passengers

arrive from an international flight, the first area, the first

phase of the CBP process that they'll go through is referred to

as "primary".  This is probably the area that most people are,

know from traveling internationally before --

          THE COURT:  The first thing they see is a long line.

          THE WITNESS:  Exactly.  Typically, you are put in a

queue to wait for your turn to see an officer or to go to a

kiosk first before seeing an officer to present your travel

document, whether that's your passport or if you are a lawful

permanent respondent, a Green Card holder, a visa holder.

You'll see an officer, present your document and the officer

will conduct an inspection which is essentially asking a couple

questions to get a better understanding of either what your

purpose of traveling to the United States is, if you may be a

visitor or where you were while you were overseas.

          Now, after primary, assuming there weren't any other

issues or there was not additional inspection required, you'll

continue on.  If the officer determines that there is

additional inspection that's required, they will bring you down

into an office within CBP space which is referred to as

"secondary".

          Now, within that space the officers who are assigned

to the secondary area, they have access to more databases that

the officers on primary do not.  They also have a little bit

1   more time to conduct a more thorough interview to address

2   whatever the reason was that they were sent in for additional

3   inspection.  So, you typically someone who gets sent into

4   secondary, they'll usually speak to an officer.  An officer

5   will conduct an interview.  And that may include also a search

6   of their baggage or whatever they're carrying with them.  And

7   depending on the situation, it could include copies of travel

8   documents as well if the situation warrants it.

9   Q.  If someone was trying to collect information about that

10  secondary screening process that you just described, would that

11  be a concern for CBP?

12  A.  So, we have had instances in the past where especially with

13  travelers who are sent into secondary often.  They have

14  identified through CBP officers lines of questioning which

15  answers tend to appease CBP officers, which answers they know

16  that if they gave usually there's not usually a follow-up

17  question to.  So, that could be one area of concern especially

18  if someone has been sent into the secondary area before and

19  kind of has an area of what they are going to be asked.

20          THE COURT:  So repeated travelers?

21          THE WITNESS:  Yes.

22          THE COURT:  You are talking about repeated travelers

23  who each time they come in are given secondary examinations?

24          THE WITNESS:  Yes.  That is the most common.  But even

25  it's your first time having ever been sent into secondary,

J58AAKOU2                          Eannuci - Direct

1    obviously, you'll be asked specific questions.  If you pick up

2    on those questions and if you wanted to use that information

3    for other purposes, for nefarious reasons to provide to other

4    people in case they're ever in that situation, you would then

5    have the line of questioning that you were asked and which

6    answers appease the officers or seem to not ask any follow-up

7    questions after.

8              THE COURT:  This is not recorded, is it?

9              THE WITNESS:  So, a lot of the area is recorded.

10             THE COURT:  A lot of it is recorded but it's not

11   recorded by traveler?

12             THE WITNESS:  No.  There have been instances in the

13   past where travelers have been caught with turning their

14   cellphone on and pressing "record" in their pocket to record

15   the conversations with CBP.

16             THE COURT:  That would be a suspicious event.  If

17   someone is there answering questions how could you form an

18   opinion that that person is suspicion.

19             THE WITNESS:  It's not necessarily that the individual

20   is suspicious.  It's that on future travel if they are put in

21   that situation they may have a better idea if they are trying

22   to hide something of what to answer to a --

23             MR. SCHACHT:  I object, your Honor.

24             THE COURT:  No.  It's relevant.  All of this is

25   relevant.

J58AAKOU2                        Eannuci - Direct

1          You are saying people who get questioned successive

2    times are put under suspicion not only because of the reasons

3    for getting questioned several times because they may be able

4    to understand the lines of questions and the preferred answers

5    to give.

6          THE WITNESS:  So, those situations have arised in the

7    past, yes.

8          And along the same lines as that, so with specific

9    lines of questioning travelers have been able to identify if a

10   CBP officer was part of a like a specialty unit at the airport.

11   So, specifically, I could speak with a tactical terrorism

12   response team when they're conducting interviews of travelers,

13   there have been instances in the past where travelers have made

14   note and mention to the CBP officer that he knows that he's

15   part of a terrorism team at the airport and that was based on

16   the types of questions that were asked of him, him are her.

17         So, again, that could be something that could be of

18   use for a traveler.  Again, there were --

19         THE COURT:  You've done enough.

20         Ms. Houle, go ahead.

21   Q.  Officer, in your time at JFK did you personally observe any

22   other measures used to avoid CBP screening?

23   A.  Yes.  So one of the most common is with concealing items on

24   whether it's in your luggage or on your person.  Those items

25   range from anything from narcotics or drugs to large bulk

J58AAKOU2                          Eannuci - Direct

1    currency to certain electronic devices to prohibited

2    agriculture items, items smaller such as memory cards and SIM

3    cards that go within those electronics that the individual is

4    carrying.

5    Q.  What is a SIM card?

6    A.  So, a SIM card is, it's a removable chip that's typically

7    found in a cellphone.  The SIM card can store information.  I

8    believe it can store contacts and text messages, among other

9    things.  A SIM card can easily be popped in and out of a phone

10   and when it's out of the phone it's small.  It's the size of a

11   dime or a penny.  So, obviously, it makes it easy to conceal.

12   So we've come across instances in the past where SIM cards or

13   memory cards --

14            MR. SCHACHT:  Objection.

15            THE COURT:  Overruled.

16   A.  -- have been found, concealed within certain areas, within

17   pockets, small pockets on clothing or within, taped on the back

18   of credit cards and passports or credit cards within wallets.

19            THE COURT:  Go ahead.

20   Q.  I'd like to turn now to a review of travel records.  Based

21   on your role at CBP, are you familiar with a system called

22   TECS?

23   A.  Yes, I am.

24   Q.  What is TECS?

25   A.  So, TECS is a CBP maintained systems which amongst our

J58AAKOU2                         Eannuci - Direct

1    things contains all travel history for anyone who has ever

2    traveled into or out of the United States.  It also includes

3    all of the flight manifests.  So, the airlines will provide a

4    list of every single passenger on a flight either arriving to

5    or departing from the United States.  Those manifests are

6    stored within TECS as well.

7    Q.  So TECS stores information about passenger travel.  Where

8    does it collect that information from?

9    A.  So, there's a few different ways.  One of the ways for all

10   air travel, there's an electronic system that's referred to as

11   the advanced passenger information system which is a system,

12   the airlines can upload their manifests.  So, their list of

13   everybody passenger on a specific flight.  They can upload that

14   into APIS and APIS then translates that information to CBP and

15   it gets put into TECS.  So, that's for ire travel.

16       For someone who is crossing the border into the United

17   States there's obviously no manifest ahead of time for that.

18   So, when an officer retrieves your travel document when they

19   swipe the travel document, that creates a travel document

20   within TECS.  And the same thing if you were to ever take a

21   cruise internationally and arrive to the U.S. seaport, when you

22   present your travel document, it would create a record of that

23   as well.

24   Q.  In connection with your testimony today, have you retrieved

25   and reviewed any documents that TECS system?

J58AAKOU2                          Eannuci - Direct

1    A.  Yes, I have.

2                THE COURT:  How do you spell "TECS".

3                MS. HOULE:  T-E-C-S.

4          Your Honor, if I could now read a stipulation between

5    the parties.  It's marked as Government Exhibit 1009.

6                THE COURT:  Yes.

7                MS. HOULE:  This stipulation says that the parties

8    agree that Governments 601 through 602 are records of the U.S.

9    Customs and Border Protection or CBP relating to entries and

10   exits of several people:  One, Ali Kourani, the defendant; two,

11   Mohammad Kourani, the defendant's father; and three, Kassem

12   Kourani, one of the defendant's brothers.

13         The stipulation says that these exhibits 601 through

14   603 are official public records and that they meet the

15   requirements for admissibility under the Federal Rules of

16   Evidence.

17         Your Honor, I move to admit Government Exhibit 1009

18   and the underlying exhibits which are Government Exhibit 601

19   through 603.

20               THE COURT:  Received.

21         (Government's Exhibits 1009, 601 - 603 received in

22   evidence)

23               MS. HOULE:  Ms. Shields, could you please publish

24   Government Exhibit 601 which is now in evidence.

25         (Pause)

J58AAKOU2                      Eannuci - Direct

1   Q.  Officer, is this a TECS report?

2   A.  Yes, it is.

3          MS. HOULE:  Ms. Shields, if you could zoom-in on the

4   top portion so that the officer can review the different

5   columns.

6   Q.  And you could take that from the left over to the right and

7   tell the jury what each of these columns designates.

8   A.  Starting on the left you'll have last name and then first

9   name of the traveler who is traveling on that day.

10         You'll then have the date of birth listed of the

11  traveler.

12         You'll then have the document type which it could be

13  different things, "P" for "passport".  It could be a Green Card

14  or a visa.  So that would be indicated for the document type.

15         The document number would be the number associated

16  with that document.  So, if you are traveling with a passport,

17  it would be your passport number.

18         The date and time would be the date and time of the

19  crossing that you are crossing the border whether it's into the

20  United States or out of the United States.

21         The carrier code, so if you are traveling by air the

22  airlines are assigned a two digit carrier code.  So, for

23  instance, the UA would stand for United Airlines.  So, it's

24  just an airline carrier code number, letter.  The carrier

25  number is the actual flight number for that specific flight

J58AAKOU2                        Eannuci - Direct

1    that the traveler flew on that day.

2           The I/O stands for whether it's in or out of the

3    United States.  The site, so that's a CBP specific code.  So

4    each port of entry has had a specific site code.  So, for

5    instance JFK, each one of those terminals has their own site

6    code attached to it.

7           The next column with the CBP officer who encountered

8    the individual on primary.  The next column is the type in

9    which this information was input into TECS.  So, for APIS that

10   would refer to all the air travel and it was put in there

11   through the APIS system.

12          If someone crossed by land border, if they drove into

13   the country it would indicate it was a vehicle crossing into

14   the United States.  And if someone used a pedestrian crossing

15   it would indicate pedestrian crossing into the United States.

16          The status, typically that will show whether the

17   individual if their flying was on the flight or not on board

18   the flight.  So, after a flight takes off from its departure

19   location, the airlines are supposed to transmit a new and

20   updated manifest indicating whether someone was on the flight

21   or if they didn't make their flight whether they were not on

22   the flight.

23          The next column, REF referral.  So, if the traveler

24   was referred to on that day it would indicate where they were

25   referred to.  The arriving location, that's an airport specific

J58AAKOU2                         Eannuci - Direct

1   code.  So the each airport has a three letter code assigned to

2   it.  So, that would be where the flight is arriving to.  And

3   then the next column, the departing location, which airport the

4   flight departed from.

5          MS. HOULE:  The follow-up question for you on status

6   column.

7          And Ms. Shields, if you could zoom-out please.

8   Q.  So we can see here, officer, that the status column is not

9   filled out all the way down the page.  It looks like there are

10  no status entries before March of 2013.  Why aren't there any

11  status entries of travel before March of 2013?

12  A.  So, as APIS and TECS have evolved and advanced, they've

13  become more complete.  So, specific to the status column

14  generally, that information is incomplete prior to like

15  2012/2013 just because it wasn't transmitted by the airlines as

16  consistently as it is nowadays.

17         MS. HOULE:  Ms. Shields, could you please turn to the

18  third page of this exhibit and highlight the bottom column and

19  zoom-in on that.

20  Q.  What does that entry indicate?

21  A.  This indicates that Ali Kourani with a date of birth of

22  June 23, 1984, traveled into the United States on July 30,

23  2003.  He flew from Amman, Jordan to JFK airport onboard Royal

24  Jordanian Airlines, flight 261.

25         MS. HOULE:  If you could zoom-out of that and turn to

J58AAKOU2                          Eannuci - Direct

1   page two of this exhibit, and if you could zoom-in on the third

2   row please.

3   Q.  Officer is this another travel entry for Ali Kourani?

4   A.  Yes, it is.

5   Q.  What is the date of travel listed?

6   A.  It is January 2, 2012.

7   Q.  Listed over to the right is the term "vehicle".

8           MS. HOULE:  Ms. Shields, if you could highlight that.

9   Q.  What does that indicate?

10  A.  It indicates that Mr. Kourani drove into the United States

11  in a vehicle at a U.S. port of entry.

12  Q.  Looking at this row, are you able to tell where Mr. Kourani

13  crossed using that vehicle?

14  A.  Yes, I am.  So, with the site code, that specific site code

15  is for the Champlain border crossing in Upstate New York.

16  Q.  Showing you what's been marked for identification as

17  Government Exhibit 11.  What is that?

18  A.  This is a map of the northern United States to include the

19  U.S. border, international border.

20  Q.  Does that fairly and accurately depict the location?

21          THE COURT:  Do you want me to take judicial notice of

22  the map?

23          MS. HOULE:  Thank you, your Honor.  The government

24  moves to admit Government Exhibit 11.

25          MR. SCHACHT:  No objection.

1            THE COURT:  Received.

2            (Government's Exhibit 11 received in evidence)

3            MS. HOULE:  We could publish it for the jury,

4  Ms. Shields, please.

5  Q.  So, officer, if we look on Government Exhibit 11 and there

6  are two dots listed, what is the dot listed on the right-hand

7  side that's marked with an address in Champlain, New York?

8  A.  That's where the Champlain CBP port of entry is.

9  Q.  Based on your review of the TECS record that you described,

10  is that where Ali Kourani crossed the border by vehicle on

11  January 2, 2012?

12  A.  Yes, it is.

13            MS. HOULE:  Ms. Shields, if you could turn back to

14  Government Exhibit 601 please and if you could highlight the

15  eighth row.

16  Q.  Officer, does this show another border crossing by Ali

17  Kourani?

18  A.  Yes, it does.

19  Q.  What is the date of the crossing?

20  A.  It is March 17, 2013.

21  Q.  And it lists "vehicle" again.  What does that indicate?

22  A.  That Mr. Kourani drove into the United States at U.S. port

23  of entry.

24  Q.  Looking at this, are you able to tell where that port of

25  entry was?

J58AAKOU2                    Eannuci - Direct

1    A.  Detroit Embassador Bridge, port of entry in Detroit.

2            MS. HOULE:  If you could turn back to Government

3    Exhibit 11.

4    Q.  Looking at that red dot on the left side of the screen

5    that's marked "Detroit, Michigan", what does that show?

6    A.  That would indicate the Embassador Bridge, port of entry

7    New York.

8    Q.  Is that where Mr. Kourani crossed by vehicle on March 17,

9    2013?

10   A.  Yes, it is.

11           MS. HOULE:  If you could take down those exhibits

12   please and bring up Government Exhibit 202 which is already in

13   evidence.

14   Q.  Officer, what is this?

15   A.  So, this is a U.S. passport card.

16   Q.  Who is it issued to?

17   A.  Mr. Ali Kourani.

18   Q.  What is the date of birth listed?

19   A.  June 23, 1984.

20   Q.  Based on your work at CBP, are you familiar with U.S.

21   passport cards?

22   A.  Yes, I am.

23   Q.  What could they be used for?

24   A.  U.S. passport cards could be used for entry into the United

25   States at the land border crossings, in addition to entry back

J58AAKOU2                    Eannuci - Direct

1    into the United States via the seaports.  So, if you go on a

2    cruise you could use a passport card upon entry back into the

3    United States at seaports.  It's also used for domestic travel

4    as a form of identification.  But the main stipulation is that

5    it cannot be used for international air travel.

6    Q.  When a passport card is used to cross a border in or out of

7    United States is there a record kept of that?

8    A.  Yes, there is.

9    Q.  Have you reviewed those databases to determine whether this

10   particular passport card was ever used?

11   A.  Yes, I did.

12   Q.  What did you find?

13   A.  That it was not used.

14        MS. HOULE:  If you could please bring up Government

15   Exhibit 602.

16   Q.  Is this another record from that TECS system?

17   A.  Yes, it is.

18   Q.  Does that indicate a traveler record?

19   A.  Yes, it does.

20   Q.  Who is the traveler?

21   A.  Mr. Mohammad Kourani with a date of birth of December 20,

22   1958.

23        MS. HOULE:  I'll just remind the jury that pursuant to

24   the stipulation between the parties Mohammad Kourani is the

25   defendant's father.

J58AAKOU2                         Eannuci - Direct

1    Q.  What is listed as the document type?

2    A.  So, this was a passport issued from the country of Belgium

3    with document number 1787294.

4    Q.  Where is the travel from and to?

5    A.  The travel was from Paris Charles de Gaulle airport.  I'm

6    sorry.  It was from JFK airport arriving in Paris at Charles de

7    Gaulle airport.

8    Q.  So, this shows that Mohammad Kourani, the defendant's

9    father, departed the United States on April 25, 2005; is that

10   right?

11   A.  Yes, it does.

12   Q.  Is there any record in the CBP databases of Mohammad

13   Kourani entering the United States?

14   A.  No, there was not.

15          MS. HOULE:  Ms. Shields, please bring up Government

16   Exhibit 603 in evidence.

17   Q.  Is this another traveler record?

18   A.  Yes, it is.

19   Q.  Who is the traveler listed?

20   A.  This is Mr. Kassem Kourani with a date of birth of

21   September 10, 1983.

22          MR. SCHACHT:  Objection, your Honor.

23          THE COURT:  Overruled.

24          MS. HOULE:  I'll remind the jury that by stipulation

25   the parties have agreed that Kassem --

1              THE COURT:  That's not appropriate.

2              MR. SCHACHT:  Objection.

3              THE COURT:  The comment is stricken.  We're not doing

4    summations here.

5    Q.  What is the date and time of the travel listed on the

6    bottom row?

7    A.  So, that is November 5, 2002 at 12:43 p.m.

8    Q.  And where is the travel to and from?

9    A.  So, that flight left Brussels, Belgium and arrived at New

10   York Liberty International airport.

11   Q.  The row above that, what is the date and time of travel

12   listed?

13   A.  October 4, 2009.

14   Q.  Where is the travel from and to?

15   A.  That is from JFK airport to Dubai.

16             MS. HOULE:  Ms. Shields, if you could move Government

17   Exhibit 603 to the bottom of the screen and publish Government

18   Exhibit 227 which is already in evidence at the top, and if you

19   could zoom-in.

20   Q.  What is this, officer?

21   A.  This is an employment authorization card commonly referred

22   to as a work permit.

23   Q.  What is the name of the person who held this card?

24   A.  Kassem Kourani.

25   Q.  What is the date of birth listed?

J58AAKOU2                         Eannucci - Cross

1   A.   September 10, 1983.

2   Q.   Looking down at the TECS travel record --

3            THE COURT:  -- the Green Card that we hear about.

4            THE WITNESS:  This card, no.  This card authorizes

5   individuals who are here in the United States with certain

6   types of visas to then be allowed to work while whatever

7   pending paperwork they may have is going on or with that visa

8   is required.

9   Q.   Comparing the date of birth to the Kassem Kourani listed in

10  the employment authorization card and the Kassem Kourani listed

11  in the travel records, are those dates of birth the same?

12  A.   Yes, they are.

13           MS. HOULE:  One moment, your Honor.

14           Thank you.  No further questions.

15           THE COURT:  Cross?

16  CROSS-EXAMINATION

17  BY MR. SCHACHT:

18  Q.   You mentioned before that the secondary areas where the CBP

19  interviews are frequently recorded or have the capability to

20  record things; is that right?

21  A.   Yes, they do.

22  Q.   Are there also cameras in the primary interview areas?

23  A.   Yes, they are.

24  Q.   The areas that the judge was talking about when people get

25  off the planes and are funneled down in those long lines,

J58AAKOU2                        Eannucci - Cross

1   there's cameras there also, right?

2   A.  Yes, they were.

3   Q.  So, in general if someone were doing something illegal or

4   suspicious that might well be on videotape, correct, at those

5   three areas of the airport?

6   A.  Yes, it could be.

7   Q.  You mentioned on direct-examination that on occasion people

8   try to conceal SIM cards.  Do you recall saying that?

9   A.  Yes, I do.

10  Q.  A SIM card is a tiny thing that fits inside of a cellphone?

11  A.  Yes, it is.

12  Q.  Would you agree it's less than an inch long and wide?

13  A.  Yes.

14  Q.  So, it's not possible, am I correct, to travel with a SIM

15  card without concealing it?

16  A.  Yeah.  So, it's typically --

17  Q.  Not typically.  I'm asking you a question.

18              THE COURT:  Is it possible?

19              THE WITNESS:  Yes.

20  Q.  It is possible to travel without concealing it?

21  A.  I'm sorry.  No.  No.  I'm sorry.

22  Q.  So, everyone who travels with a SIM card is concealing it?

23  A.  If having it in the phone is considered concealing it, then

24  yes.

25              THE COURT:  So, your answer is not everybody is

J58AAKOU2                          Eannucci - Cross

1    concealing it.  Suppose you had it in our pocket.  Is that

2    concealing it?

3           THE WITNESS:  To me, no.

4           THE COURT:  If you had it in your phone, is that

5    concealing it?

6           THE WITNESS:  To me, no.

7    Q.  Having it in a bag, is that concealing?

8    A.  If it's just left open in the bag, no, I would not consider

9    that concealing it.

10   Q.  What would you consider concealing it?

11   A.  So, if you could identify that the SIM card was purposely

12   placed in an area that, would be an area that you could avoid

13   detection, avoid someone finding it.  So, we've seen them

14   stitched into luggage before which is not an area you would

15   typically put your SIM card.  We've seen them taped onto the

16   back of a credit card within a wallet.  I would consider that

17   someone concealing for the purpose of not having the SIM card

18   found.

19   Q.  So, it would be concealed by putting it in a place that the

20   person was hoping would not be searched, right?

21   A.  So, no.  We've also seen it where it's been concealed on a

22   passports before.

23   Q.  The reason you mentioned that is because you are aware that

24   my client had a SIM card and a passport once, isn't that right?

25   A.  We've come across that multiple times.

J58AAKOU2                        Eannucci - Cross

1    Q.  The reason you mentioned this here today is because you

2    know that is true in this case, right?

3    A.  I was aware of that.  That's not specifically why I

4    mentioned it.  That's one of the concealment methods that I

5    remember specifically.

6    Q.  Your testimony is someone is concealing something when

7    they're handing it upon entering the port of entry and giving

8    it to an officer for inspection?

9    A.  Again, if SIM card was just tossed into a passport, the

10   traveler would be under the assumption that the officer is

11   going to open the passport and look through it.  But now if

12   it's taped on to the back of the passport in an area an officer

13   might not be looking under the back of a passport for a SIM

14   card.  There's usually, there's stickers found on backs of

15   passports.

16   Q.  A passport is something the traveler doesn't want to lose,

17   right?

18   A.  Yes.

19   Q.  Maybe they don't want to lose their SIM card?

20   A.  That's correct.

21   Q.  Isn't it true that many people when they travel

22   internationally travel with multiple SIM cards?

23   A.  Yes.

24   Q.  The reason why is because in some countries the SIM card

25   may or may not work and they pop in or out a SIM card, right?

1   A.   Yes.

2   Q.   When the SIM card is found concealed stitched in luggage,

3   if the CBP finds that, they will inspect the SIM card?

4   A.   Most of the time if the capabilities are there at the

5   airport, they will.

6   Q.   Isn't the only thing needed to inspect a SIM card popping

7   it into a phone?

8   A.   Yes.  But we've had instances where certain cards don't

9   work in other phones.

10  Q.   But certainly CBP would attempt if they found a concealed

11  SIM card?

12  A.   Yes.

13  Q.   If there was something illegal on it like for example child

14  pornography, CBP would arrest the person?

15  A.   Yes.

16          MR. SCHACHT:  I have no further questions, judge.

17          Thank you.

18          THE COURT:  Ms. Houle.

19          MS. HOULE:  One question, your Honor.

20  REDIRECT EXAMINATION

21  BY MS. HOULE:

22  Q.   Officer, you were asked questions about cameras that are in

23  the inspection areas for CBP?

24  A.   Yes.

25  Q.   Do you know how long the videos for those cameras are

1    retained?

2    A.  So it depends, generally, any within from 30 days to 90

3    days.

4             MS. HOULE:  Thank you.

5             No further questions, your Honor.

6             THE COURT:  All right.  Thank you, very much,

7    Mr. Eannucci.  You are excused.

8             We'll take our midmorning break.

9             Members of the jury, close your books.  Leave them on

10   your chairs.  Let's try to take ten minutes, 15 at the most.

11            (Jury not present)

12            (Recess)

13            (Jury present)

14            THE COURT:  Be seated.

15            The next witness Keri Shannon is on the witness stand.

16            Ms. Jones will swear her.

17    KERI SHANNON,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MR. BOVE:

22   Q.  Special Agent Shannon, where do you work?

23   A.  I work at the Federal Bureau of Investigation.

24   Q.  How long have you worked at the FBI?

25   A.  About six years.

1   Q.  What did you do before you joined the bureau?

2   A.  Prior to joining the bureau I was on attorney.

3   Q.  And for about how long did you practice law before you

4   became a special agent?

5   A.  Four years.

6   Q.  What kind of law did you practice?

7   A.  Civil litigation.

8   Q.  Have you ever practiced criminal law?

9   A.  I have not.

10  Q.  Getting back to your FBI work, are you assigned to a

11  particular squad right now?

12  A.  I am.

13  Q.  What squad is that?

14  A.  I'm assigned to the Joint Terrorism Task Force.  My squad

15  is CT-9.

16  Q.  For about how long have you been assigned to the FBI squad

17  CT-9?

18  A.  Approximately, four and a half years.

19  Q.  Do you know a man named Ali Kourani?

20  A.  I do.

21  Q.  Do you see him in court today?

22  A.  I do.

23  Q.  Could you please point him out based on where he is sitting

24  and an article of clothing he is wearing?

25  A.  Yes.  He is sitting at the second table and he is wearing a

J58AAKOU2B                        Shannon – Direct

1   red shirt.

2              THE COURT:  The record will reflect the defendant has

3   been identified.

4              MR. BOVE:  Thank you, your Honor.

5   Q.  Special Agent Shannon, have you spoken to the defendant

6   before?

7   A.  I have.

8   Q.  Approximately, how many times have you spoken to the

9   defendant?

10  A.  Six.

11  Q.  Where were most of those conversations conducted?

12  A.  At Seton Hall Law School in Newark, New Jersey.

13  Q.  How many times did you meet with the defendant at Seton

14  Hall?

15  A.  Five times.

16  Q.  And over what period of time were those five meetings?

17  A.  Just over a month, from March 2017 through April of 2017.

18  Q.  Who typically participated in the meetings at Seton Hall?

19  A.  I was there, my partner, Special Agent Joseph Costello

20  joined me.  The defendant was present, as was Mark Denbeaux.

21  Q.  What was Mark Denbeaux's role in those meetings?

22  A.  Mr. Denbeaux was the defendant's attorney.

23  Q.  Now, you just mentioned four participants in the typical

24  participants including yourself?

25  A.  That's correct.

J58AAKOU2B                    Shannon - Direct

1   Q.   Were there any meetings where the people who were in the

2   room changed?

3   A.   Yes.

4   Q.   How did that change?

5   A.   On April 5, 2017 the defendant requested that we conduct

6   the interview one-on-one, just me and him.

7   Q.   And did you conduct that interview in that fashion?

8   A.   Yes.

9   Q.   During the course of the five interviews at Seton Hall,

10  what, if anything, did the defendant say about his membership

11  in Hezbollah?

12  A.   The defendant stated he was a member of Unit 910, also

13  known as "Islamic Jihad" or "Hezbollah's Black Ops" and he

14  stated that his unit was Iranian controlled.

15  Q.   What, if anything, did the defendant say during the Seton

16  Hall meetings about the status of the Islamic Jihad

17  Organization within Hezbollah?

18  A.   The defendant stated that the Islamic Jihad Organization

19  was the secret or covert part of Hezbollah and that his Unit

20  reported directly to Secretary General Hassan Nasrallah and

21  that Hassan Nasrallah reported directly to the Supreme Leader

22  of Iran, Ali Khomeini.

23  Q.   During the meetings at Seton Hall what, if anything, did

24  the defendant say about the types of training that he received

25  from the Islamic Jihad Organization?

1    A.   The defendant described training that included

2    intelligence, counterintelligence, interrogation training, how

3    to resist interrogation.  He also described training with

4    respect to military and firearms.

5    Q.   Let's focus for a minute on the last part of the training

6    that you just mentioned, military and firearms.  During the

7    meetings at Seton Hall, did the defendant describe any weapons

8    that he was trained by Hezbollah and the Islamic Jihad

9    Organization to use?

10    A.   Yes, he did.

11    Q.   What were some of the weapons the defendant described

12    training on?

13    A.   The defendant described training on AK-47s, MP5s submachine

14    gun.  He also described using semiautomatic pistols, like a

15    Glock pistol.  He described utilizing a PKS, a Russian made

16    belt-fed weapon, and he also talked about RPGS, rocket

17    propelled grenade launchers.

18    Q.   During the meetings at Seton Hall, did the defendant use

19    the term "sleeper cell"?

20    A.   He did.

21    Q.   What did the defendant say at Seton Hall about sleeper

22    cells?

23    A.   He said that sleeper cells were here in the United States

24    and that he considered himself part of a sleeper cell here in

25    the U.S. in New York.

J58AAKOU2B                          Shannon - Direct

1    Q.  And when the defendant was describing that at Seton Hall

2    what, if anything, did he say about his role in a sleeper cell

3    operated by the Islamic Jihad Organization?

4    A.  The defendant stated that there would be certain scenarios

5    that would require action or conduct by those who belonged to

6    the cell.  The defendant stated that if the United States were

7    to engage in war with Iran that the sleeper cell would be

8    expected to act in that scenario and he also stated that if the

9    United States were to take any kind of action with respect to

10   Hezbollah, Nasrallah or any type of Iranian interest, that in

11   those scenarios the sleeper cell would also be triggered into

12   action.

13   Q.  During the meetings at Seton Hall, did the defendant

14   describe conducting any surveillance missions for the Islamic

15   Jihad Organization?

16   A.  He did.

17   Q.  What did the defendant say at Seton Hall about conducting

18   surveillance?

19   A.  The defendant stated that he conducted surveillance of

20   military and intelligence outposts here in New York City per

21   the tasking of his handler in the Islamic Jihad Organization.

22   Q.  What, if anything, did the defendant say at Seton Hall

23   about surveillance at airports?

24   A.  The defendant stated he conducted surveillance at airports.

25   Q.  Did he identify any airports that he surveilled?

J58AAKOU2B                          Shannon - Direct

1   A.  Yes.  He spoke about surveillance at JFK airport in Queens

2   and he also spoke about surveillance at Toronto Pearson airport

3   in Toronto, Canada.

4   Q.  Now, a moment ago you mentioned surveillance at military

5   and intelligence outposts?

6   A.  Yes.

7   Q.  Did the defendant identify any of the locations that he

8   surveilled in connection with that mission for the Islamic

9   Jihad Organization?

10  A.  He did.

11  Q.  What were some of the places that the defendant described

12  conducting surveillance of when he was meeting with you at

13  Seton Hall?

14  A.  The defendant described conducting surveillance of the U.S.

15  Army 69 Regiment Armory here in Manhattan on Lexington Avenue.

16          THE COURT:  Sixty-ninth?

17          THE WITNESS:  Sixty-ninth, yes, sir.

18  A.  The defendant also described conducting surveillance of a

19  U.S. National Guard location in upper Manhattan.  The defendant

20  also described conducting surveillance of 26 Federal Plaza

21  which is located just across the street from the courthouse on

22  the other side of Foley Square.  And he also described

23  conducting surveillance of an office building that houses the

24  Secret Service, U.S. Secret Service at 335 Adams in Brooklyn.

25  Q.  During the Seton Hall meetings, did the defendant describe

1  receiving any instructions or missions from the Islamic Jihad

2  Organization relating to obtaining weapons in the United

3  States?

4  A.  He did.

5  Q.  What did he say about that mission?

6  A.  The defendant stated that he was instructed by his handler,

7  his contact in the Islamic Jihad Organization to acquire names,

8  contact information of individuals in the New York City area

9  that he could utilize to precure weapons so that they could be

10 stockpiled here for use by the Islamic Jihad.

11 Q.  And at Seton Hall did the defendant describe any IJO

12 instructions or missions relating to obtaining places to store

13 those weapons?

14 A.  Yes.

15 Q.  What did he say about that tasking from the Islamic Jihad

16 Organization?

17 A.  The defendant stated that he was asked about commercial

18 type businesses or commercial cover for locations that could be

19 utilized in connection with the cache-ing or stockpiling of

20 weapons.  And the defendant stated that he explained to his

21 Islamic Jihad handler at that time that use of something like a

22 storage facility was far simpler than a commercial business.

23 Q.  And you used the word "handler" a couple times and I think

24 I have as well.  Is that basically like a supervisor?

25 A.  That's correct.

1    Q.  And during the meetings at Seton Hall, did the defendant

2    describe any instructions from his IJO handler relating to

3    purchasing technology?

4    A.  He did.

5    Q.  What did he say about those instructions?

6    A.  The defendant stated he was again tasked by the Islamic

7    Jihad to acquire a list of technological items to include night

8    vision goggles, waver jammers, drones, cameras with high lens

9    capability, thermal imaging devices and external hard drives.

10   Q.  When the defendant was describing that mission for the

11   Islamic Jihad Organization, did he say anything about the

12   quantity of those items that he was asked to obtain?

13   A.  Yes.

14   Q.  What did he say?

15   A.  The defendant stated that he was told by his Islamic Jihad

16   handler that quantity was not important.  It was the quality of

17   the item because the Islamic Jihad could work with the Iranians

18   and Russians to copy the technology once they had their hands

19   on device.

20   Q.  During the Seaton Hall meetings, did the defendant saying

21   anything about receiving instruction from the IJO related to

22   obtaining identification documents?

23   A.  Yes.

24   Q.  What did he say about that task?

25   A.  The defendant stated that he was tasked by his handler to

J58AAKOU2B                     Shannon - Direct

1    attempt to obtain a job at the Department of Motor Vehicles

2    because the IJO was interested in identification documents such

3    as licenses and they were also interested in procuring license

4    plates.

5    Q.  And you mentioned a moment ago that as part of the -- the

6    defendant said that as part of his assignment in the IJO

7    sleeper cell he may be asked to target American interests,

8    right?

9    A.  Yes.

10   Q.  During the meeting at Seton Hall did the defendant say

11   anything about targeting Israelis?

12   A.  Yes, he did.

13   Q.  What did the defendant say about that?

14   A.  The defendant stated that he was again tasked by his

15   Islamic Jihad handler to collect information with respect to

16   Israeli businessmen living in the New York area who were

17   veterans or former IDF, Israeli Defense Forces veterans and

18   that he should bring that information, contact information

19   about those individuals back to Lebanon.  The IJO was

20   interested in that information for purposes of either

21   recruitment or assassination.

22           MR. BOVE:  I'd like to take a look at one of the

23   documents seized from the defendant's apartment.

24           Ms. Shields, if you could bring up Government Exhibit

25   214, please.

J58AAKOU2B                        Shannon - Direct

1           (Pause)

2    Q.  Special Agent Shannon, what is this?

3    A.  This is a copy of the defendant's Certificate of

4    Naturalization.

5    Q.  During the meeting at Seton Hall what, if anything, did the

6    defendant say about his naturalization as a U.S. citizen?

7    A.  The defendant stated he was directed by the organization to

8    obtain his U.S. citizenship.

9           MR. BOVE:  If we could now take a look at Government

10   Exhibit 202 please.

11   Q.  Special Agent Shannon, what is this?

12   A.  This is a photocopy of the Defendant's U.S. passport card.

13   Q.  During the meetings at Seton Hall --

14          THE COURT:  What's the difference between a passport

15   and a passport card?

16          MR. BOVE:  Yes, your Honor.  To help Special Agent

17   Shannon explain that to the jury could we display page two of

18   this exhibit.

19   Q.  What is the difference between a passport and a passport

20   card?

21   A.  A passport card is only valid for land border crossing or

22   travel by sea.  Whereas, the passport can be utilized in

23   connection with air travel, international air travel.

24          THE COURT:  How do you get a passport card?

25          THE WITNESS:  You apply for one, your Honor.

J58AAKOU2B                          Shannon - Direct

1          THE COURT:  Do you have to have a passport first?

2          THE WITNESS:  I can't say that I know the answer to

3    that.

4          MR. BOVE:  We have another witness, judge, who will

5    explain those applications.

6          THE COURT:  OK.  I don't know if that's central to the

7    case but you've used the term.

8          MR. BOVE:  We'll make that clear.

9          Thank you, judge.

10   Q.  Getting back to the passport card, did the defendant say

11   anything about this passport card during the meetings at Seton

12   Hall?

13   A.  He did.

14   Q.  What did he say?

15   A.  He stated that he was directed by his Islamic Jihad handler

16   to obtain this passport card.  His handler specifically told

17   him that in the event he were traveling operational for the

18   Islamic Jihad Organization there was a chance that the United

19   States government could seize his U.S. passport.  If that were

20   to occur, he could utilize his Lebanese passport to fly to

21   either Mexico or Canada and then utilize this passport card to

22   land border cross back into the United States.

23   Q.  I'd like to talk about what happened before those Seton

24   Hall meetings.  When was the first time that you spoke to the

25   defendant?

1    A.   On September 12, 2016.

2    Q.   And had the FBI's criminal investigation of the defendant

3    started prior to that interview?

4    A.   Yes, it had.

5    Q.   And what were some of the steps that the FBI had taken

6    prior to September 12, 2016?

7    A.   A few of the things that we had done include physical

8    surveillance of the defendant.  We had analyzed his travel

9    records.  We sought court order to review some of his e-mail

10   communications and listen to some of his telephone calls and we

11   had also conducted witness interviews.

12   Q.   Where was the interview on September 12, 2016?

13   A.   That interview took place at Newark Liberty airport in

14   Newark, New Jersey.

15   Q.   Was anyone else from the FBI with you on that day at Newark

16   airport?

17   A.   Yes.

18   Q.   What was with you?

19   A.   I was joined that day by Special Agent Daniel Ganci.

20   Q.   He was the first witness at the trial, right?

21   A.   He was.

22   Q.   During the interview on September 12, 2016, did the

23   defendant refer to any members of Hezbollah?

24   A.   He did.

25   Q.   Who did he refer to?

J58AAKOU2B                    Shannon - Direct

1    A.   The defendant stated that multiple people in his wife's

2    family are members of his Hezbollah militia in Lebanon.

3    Q.   When the defendant said that on September 12, 2016, did you

4    ask any follow-up questions?

5    A.   I asked the defendant who his handler or his contact in

6    Hezbollah was.

7    Q.   And at any point in that meeting at Newark Airport did the

8    defendant respond with a name to that question?

9    A.   No.  He stated he did not have a contact with Hezbollah.

10   Q.   Following the interview at Newark airport, did someone

11   contact you on behalf of the defendant?

12   A.   Yes.

13   Q.   Who?

14   A.   Mark Denbeaux.

15   Q.   And you mentioned him earlier.  Who is Mark Denbeaux?

16   A.   Mark Denbeaux is a law professor at Seton Hall Law School,

17   a senior faculty member, teaches evidence criminal law, amongst

18   other classes.  And Mr. Denbeaux as a practitioner is a

19   criminal defense attorney.

20   Q.   When approximately, was the first time that Mr. Denbeaux

21   tried to contact you?

22   A.   Mr. Denbeaux contacted me on February 28, 2017.  He left me

23   a voice message on my cellphone.

24   Q.   What did Mr. Denbeaux say in that voice message?

25   A.   Mr. Denbeaux indicated he had a client who he thought was

1    interested in meeting with me, and asked that I give him a

2    phone call back.

3    Q.  Did Mr. Denbeaux identify the client in that first voice

4    mail on February 28, 2017?

5    A.  No, he did not.

6    Q.  Did you return that call immediately?

7    A.  I did not.

8    Q.  Why not?

9    A.  I didn't know who Mark Denbeaux was.  I'd never worked with

10   him before and I didn't know who it was that he represented.

11   Q.  Did Mr. Denbeaux try to contact you again?

12   A.  He did.

13   Q.  When was the next time?

14   A.  The very next day, on March 1, 2017.

15   Q.  Did he leave you a voice mail?

16   A.  Yes.

17   Q.  What did Mr. Denbeaux say in the second voice mail that he

18   left on March 1, 2017?

19   A.  He said the same thing he had the day before, that he was

20   looking to speak with me about a client he represented who

21   wanted to meet with me.

22   Q.  After Mr. Denbeaux left that voice mail, did he do anything

23   else to contact the FBI?

24   A.  He did.  That same day he contacted FBI's public access

25   line and I received an e-mail from a customer service

J58AAKOU2B                    Shannon - Direct

1   representative from that line indicating that Mr. Denbeaux was

2   looking to speak with me.

3   Q.  And in that communication to the FBI's public access line,

4   did Mr. Denbeaux identify his client?

5   A.  He didn't identify his client by name but he did state that

6   his client was of Middle Eastern descent.

7   Q.  Did you return Mr. Denbeaux's calls at some point?

8   A.  The next day on March 2, 2017, I spoke with Mark Denbeaux.

9   Q.  During that call, did Mr. Denbeaux identify his client?

10  A.  He did.

11  Q.  Who did he say he represented?

12  A.  Mr. Denbeaux stated that he represented the defendant, Ali

13  Kourani.

14  Q.  During the call on March 2, 2017, did Mr. Denbeaux say why

15  he had contact the FBI?

16  A.  Yes.  He stated that he represented Ali Kourani and he

17  wished to meet with us.  Mr. Denbeaux said he was not sure

18  whether the FBI had interviewed his client previously or if we

19  had just been speaking with people in the community about his

20  client.

21  Q.  What, if anything, did Mr. Denbeaux say during that call

22  about advice that he had given to the defendant?

23  A.  Mr. Denbeaux stated that he had told the defendant that it

24  was likely in his best interests to cooperate and to the extent

25  he had not been fully truthful with the FBI previously it was

J58AAKOU2B                    Shannon - Direct

1   in his interests to do so now.

2   Q.  How did that call on March 2, 2017 end?

3   A.  It ended with us agreeing to meet with the defendant and I

4   told him I would give him a call the next day to schedule

5   something.

6   Q.  Did you do that?  Did you call Mr. Denbeaux back the next

7   day?

8   A.  I did.

9   Q.  Was a tentative date set for a meeting?

10  A.  Yes.

11  Q.  What was the tentative date?

12  A.  I believe it was March 16, 2017.

13  Q.  And when you spoke to Mr. Denbeaux to set that date did you

14  tell him who from the FBI was going to participate in the

15  meeting?

16  A.  I did.

17  Q.  What did you tell him?

18  A.  I told them that I would be bringing my partner, Special

19  Agent Joseph Costello, with me.

20  Q.  How did the call with Mr. Denbeaux on March 3, 2017 end?

21  A.  With an agreement to meet at the scheduled date of, I

22  believe it was March 16.

23  Q.  Did a meeting actually happen on March 16, 2017?

24  A.  No.

25  Q.  Why not?

J58AAKOU2B                          Shannon - Direct

1    A.   In that year in 2017 there were a number of snowstorms in

2    the month of March and so the university was impacted by that

3    inclement weather and so we had to reschedule the meeting for a

4    another date.

5    Q.   When was the first time that you met with Mr. Denbeaux and

6    the defendant at Seton Hall?

7    A.   On March 23, 2017.

8    Q.   Did you talk to Mr. Denbeaux on the phone on the day before

9    that meeting, March 22?

10   A.   I did.

11   Q.   Did anyone else participate in that call other than you and

12   Mr. Denbeaux?

13   A.   Yes.  Special Agent Costello fellow was on that call with

14   me.

15   Q.   How did the call on March 22, 2017 begin?

16   A.   That call began with Mr. Denbeaux stating that he had

17   finally spoken with his client and had a better idea of what it

18   was that his client was involved in and why he wanted to speak

19   with the FBI.

20   Q.   During the call on March 22, 2017, did Mr. Denbeaux ask you

21   and Special Agent Costello any questions?

22   A.   He did.

23   Q.   What was one of the questions that he asked?

24   A.   Whether the defendant, Mr. Kourani, was a target of an FBI

25   investigation.

J58AAKOU2B                         Shannon - Direct

1    Q.   How, if at all, did you respond to that question?

2    A.   We told Mr. Denbeaux that we could not discuss the details

3    of or the nature of any ongoing FBI investigation but that his

4    client, the defendant, had had several meetings with the FBI

5    and was fully aware of FBI's interest in him.

6    Q.   When you said those things to Mr. Denbeaux during the call

7    on March 22, 2017, how if at all, did he respond?

8    A.   Mr. Denbeaux stated he didn't even know whether his client

9    cared if he was a target or not.

10   Q.   Did Mr. Denbeaux saying anything about concerns when he

11   spoke to you on March 22, 2017?

12   A.   Yes.

13   Q.   What concerns did Mr. Denbeaux express?

14   A.   Mr. Denbeaux stated that his client was concerned about

15   other people learning that he was going to be meeting with the

16   FBI.

17   Q.   Did you respond to that?

18   A.   Yes.

19   Q.   What did you say?

20   A.   We told Mr. Denbeaux that we would try our best.  We would

21   use our best efforts to keep confidential, the fact that

22   Mr. Kourani was going to be meeting with us.

23   Q.   How did the call end on March 22, 2017?

24   A.   It ended with an agreement to meet the following day,

25   March 23, 2017.

J58AAKOU2B                    Shannon - Direct

1    Q.  After that call, the March 22 call, did Mr. Denbeaux ever

2    ask about whether the defendant was the target of the

3    investigation again?

4    A.  He did not.

5    Q.  During the call on March 22, did you guarantee the meeting

6    scheduled for next day would be confidential?

7    A.  No.

8    Q.  Could you have made such a guarantee?

9    A.  No.

10   Q.  Why not?

11   A.  We were going to be meeting at Seton Hall Law School, a

12   public location.  I could not control who in that setting would

13   witness that our meeting was taking place.  Additionally, I had

14   no control over who the defendant or Mr. Denbeaux might tell

15   about the meeting.

16   Q.  You said that the first meeting with Mr. Denbeaux and

17   defendant did happen on March 23, 2017?

18   A.  Yes, it did.

19   Q.  Was that at Seton Hall?

20   A.  It was.

21   Q.  Who else was there other than the three of you?

22   A.  We were joined by the defendant, as well.

23   Q.  Was Special Agent Costello there?

24   A.  Yes, he was.

25   Q.  And prior to the beginning of the interview on March 23,

J58AAKOU2B                    Shannon - Direct

1    2017, had anyone provided you with a preview or a summary of

2    what the defendant was going to say?

3    A.  No.  We did not know what he was going to talk about.

4    Q.  Where at Seton Hall Law School were the five meetings

5    conducted?

6    A.  We conducted the meetings in a conference room.  It was my

7    understanding that that conference room belonged to the policy

8    and research clinic at Seton Hall Law School.

9    Q.  I'm showing you documents marked for identification as

10   Government Exhibits 116, 117 and 118.  Could you please take a

11   look at those?

12   A.  Sure.

13   Q.  What are those exhibits?

14   A.  These are photographs of the outside of Seton Hall School

15   of Law, as well as inside where our meeting took place, the

16   conference room.

17   Q.  Do those exhibits fairly and accurately depict the location

18   of the meeting at Seton Hall where you interviewed the

19   defendant?

20   A.  They do.

21            MR. BOVE:  The government offers 116, 117 and 118.

22            MR. SCHACHT:  No objection.

23            THE COURT:  Received.

24            (Government's Exhibits 116, 117 and 118 received in

25   evidence)

J58AAKOU2B                    Shannon - Direct

1              MR. BOVE:  Ms. Shields, could we take a look at 116

2     please.

3              (Pause)

4     Q.  Special Agent Shannon, what do we see in this exhibit?

5     A.  This the exterior or the outside of Seton Hall School of

6     Law.

7     Q.  Is this the building where you met with the defendant?

8     A.  It is.

9              MR. BOVE:  Ms. Shields, if we could take a look at 117

10    please.

11             (Pause)

12    Q.  Special Agent Shannon, what is Government Exhibit 117?

13    A.  This is the hallway just outside the conference room where

14    we met.  The open doorframe in the photograph is the conference

15    room where the meeting took place.

16             MR. BOVE:  Now, let's take a look at 118 please

17    Ms. Shields.

18             (Pause)

19    Q.  Special Agent Shannon, what is Government Exhibit 118?

20    A.  This is a photograph of the inside of the conference room.

21    Q.  Could you please give the jury a sense of where relative to

22    this photo, the door of the conference room is?

23    A.  Sure.  The door is to the bottom left of the photograph.

24    Q.  So, off the screen but towards the bottom?

25    A.  Yes.

1   Q.  Where did the participants in the meetings at Seton Hall

2   typically sit?

3   A.  Mr. Denbeaux sat at the head of the table, far left side of

4   the table.  The defendant sat on the side of the table closer

5   to the filing cabinets where all the papers are.  And then

6   myself and Special Agent Costello sat towards what's in the

7   foreground of the photograph on the other side of the table

8   across from the defendant.

9            MR. BOVE:  Ms. Shields, you can take this down.

10           (Pause)

11  Q.  At the beginning of the meeting on March 23, 2017, what, if

12  anything, did you say to the defendant about truthfulness?

13  A.  We explained to the defendant at the start of the meeting

14  that he would have to be completely truthful and honest with

15  us.  He couldn't lie to us and he couldn't withhold

16  information.  And we explained to the defendant that he was

17  meeting with FBI Special Agents, with federal law enforcement

18  officers and lying to us is a crime that he could be charged

19  with.

20  Q.  And at that point in meeting what, if anything, did you say

21  about the potential penalties for the crime of lying to FBI

22  agents?

23  A.  We explained to the defendant that if his lies were to

24  involved matters of terrorism he could face enhanced penalties.

25  Q.  Do you know what Miranda warnings are?

J58AAKOU2B                    Shannon - Direct

1   A.  I do.

2   Q.  Please tell the jury the Miranda warnings?

3   A.  You have the right to remain silent.  Anything you say can

4   and will be used against.  You have the right to an attorney.

5   If you can't afford an attorney, one will be provided to you.

6   Q.  Did you give the Miranda warnings to the defendant on

7   March 23, 2017?

8   A.  No.

9   Q.  Why not?

10  A.  The Miranda warnings were not applicable in this scenario.

11  Q.  What was that?

12  A.  This was a meeting that the defendant had requested, that

13  we were attending at the location in date and time of his

14  choosing.  The defendant was not in custody and he was not

15  under arrest at that time.  So, Miranda was not applicable.

16  Q.  During the introductory part of the time of March 23

17  meeting, did you make reference to the Department of Justice?

18  A.  Yes.

19  Q.  What did you say about the Department of Justice?

20  A.  We explained that the Department of Justice is the

21  department that possesses prosecutorial authority.  But that

22  was not something FBI agents had any authority with respect to.

23  Q.  At any point on March 23 or prior to that had Mr. Denbeaux

24  asked you about immunity?

25  A.  No.

J58AAKOU2B                        Shannon - Direct

1    Q.  Did the defendant ask any questions about immunity on

2    March 23?

3    A.  No.

4    Q.  Let's stay focused on the introductory part of this

5    meeting.  During that part, what if anything did you say to the

6    defendant about promises?

7    A.  We explained to the defendant that as FBI agents we are

8    criminal investigators and we lack authority to make any

9    promises or guarantees for anything in exchange for the

10   information that he might provide.

11   Q.  Now, after you explained the ground rules for this meeting,

12   did the defendant make any demands?

13   A.  He did.

14   Q.  What did the defendant demand?

15   A.  The defendant was demanding immigration benefits for his

16   father and his sister.  His father Mohammad Kourani, his sister

17   Lila Kourani, both of whom were located over in Lebanon.

18   Q.  Did the defendant say anything about his children during

19   the course of these demands?

20   A.  He did.

21   Q.  What did he say about his kids?

22   A.  The defendant's children were located with their mother,

23   the defendant's estranged spouse at that time in Canada and the

24   defendant wanted to us bring his children into the United

25   States.

Q.   When the defendant articulated this list of demands, what
were some of the things that you said initially in response?
A.   We explained to the defendant first that we lacked
authority to make any promises or guarantees with respect to
the types of benefits he was asking for.  We explained to the
defendant before we could even consider engaging anyone about
what it was that he was requesting, that his information would
have to be truthful and honest and that it would also have to
be valuable, that it would be vetted and a determination would
be made about how valuable it was.
Q.   Now you said that one of the defendant's demands related to
his father?
A.   Yes.
Q.   Did the defendant provide any context or information about
his father when he described that demand?
A.   He did.
Q.   What did he say?
A.   The defendant stated that his father came to the United
States in 2000.  He explained that his father had acquired a
Mexican visa in South Lebanon, that he traveled to Mexico and
then he illegally land border crossed from Mexico into the
United States.  He made his way to New York where he found a
woman by the name of Wanda Reyes, whom he married to obtain
legal status or to try to obtain legal status here in the
United States.

J58AAKOU2B                          Shannon - Direct

1    Q.  What, if anything, did the defendant say on March 23 about

2    the validity of that marriage between his father and Wanda

3    Reyes?

4    A.  The defendant stated that his father, Mohammad Kourani, was

5    in fact still married to his mother, Hana Kourani, back in

6    Lebanon at the time he engaged in marriage with Wanda Reyes

7    here in New York.

8              MR. BOVE:  I'd like to you take a look at one of the

9    documents seized from the defendant's apartment.

10             Ms. Shields, if you could bring up Government Exhibit

11   226, please.

12   Q.  Special Agent Shannon, what is this?

13   A.  Could you just zoom-in a little bit please?

14             MR. BOVE:  Zoom-in on the taxpayer and address box?

15   A.  Yes.  This is an income tax return form.

16   Q.  Who's listed as the taxpayer?

17   A.  Wanda Reyes.

18   Q.  Who is listed as the taxpayer spouse?

19   A.  Mohammad Kourani.

20   Q.  After the defendant described the marriage between his

21   father and Wanda Reyes, did he provide any additional

22   information about his interactions with Ms. Reyes?

23   A.  Yes.  The defendant stated that following his father's

24   marriage to Wanda Reyes, Wanda Reyes petitioned for the

25   defendant and his brother, Kassem Kourani, to come to the

J58AAKOU2B                          Shannon - Direct

1   United States.

2   Q.  Let's talk for a minute about immigration benefits.  Does

3   the FBI make final decisions about who is permitted to enter

4   the United States?

5   A.  No, we don't.

6   Q.  What are some of the parts of the U.S. government that make

7   final decisions on that issue?

8   A.  Those decisions are made by the state department when we're

9   talking about visas and Department of Homeland Security.

10  Q.  What, if any, role can the FBI play in decisions like that

11  by the Department of State and the Department of Homeland

12  Security?

13  A.  From time to time FBI is able to provide information to

14  those entities about an individual and make a request about

15  whether we would like to have a certain person admitted or

16  potentially denied entry.

17  Q.  In the context of someone who is providing assistance to

18  the FBI, how does that process typically work?

19  A.  In that scenario we would coordinate with the appropriate

20  entity and we would disclose the fact that somebody is talking

21  to us and providing valuable intelligence and that we're

22  requesting a benefit for that individual based on that.

23  Q.  And when the FBI makes a request like that to the

24  Department of Homeland Security or the State Department, who

25  makes the ultimate decision about whether entry or denied entry

J58AAKOU2B                        Shannon - Direct

1   is going to be granted?

2   A.  The agency, not us.

3   Q.  Did you explain the process that you just described to the

4   defendant and Mr. Denbeaux on March 23, 2017?

5   A.  Yes.  We explained that FBI could not unilaterally make any

6   decisions with respect to immigration benefits.

7   Q.  You said that one of the other demands that the defendant

8   made at the beginning part of this interview was to have his

9   children in Canada brought to the United States?

10  A.  Yes.

11  Q.  Did the defendant say anything during the interview about

12  why his children were in Canada?

13  A.  He did.

14  Q.  What did he say?

15  A.  The defendant described for us an incident that had

16  occurred earlier or the previous summer in 2016 in the village

17  of Yater, Lebanon involving him, his wife and his children.

18  Q.  What, if anything, did the defendant say about that

19  incident in Yater during the summer of 2016?

20          THE COURT:  Can you spell that?

21          MR. BOVE:  Y-A-T-A-R or in some spellings it ends in

22  an E-R.

23          THE COURT:  Y-A-T-E-R or A-R?

24          MR. BOVE:  Yes, judge.  Thank you.

25  Q.  Special Agent Shannon, did the defendant describe any

J58AAKOU2B                        Shannon - Direct

1    details relating to the incident he referenced with his wife in

2    Yater during the summer of 2016?

3    A.  He did.  He said that shortly after arriving in Yater,

4    Lebanon, his wife had made the decision to abruptly end the

5    trip.  She wanted to return with the children to Canada.  The

6    defendant explained that this created tension between the two

7    of them.  They began fighting.  The defendant stated he took

8    the children's passports away from his wife to prevent her from

9    leaving with them, which created greater tension and more

10   fighting between the two of them.  Ultimately, the argument

11   became heated.  The defendant stated he pushed his wife, at

12   which point his wife took the children and she left their home

13   in Yater and she went to her mother's home also located in the

14   village of Yater.

15        Defendant stated later that same day he received a

16   telephone call from his mother-in-law and she was screaming and

17   yelling at him and told him to come pick up his kids.  The

18   defendant explained that when he arrived at his mother-in-law's

19   home which he described as compound-like like Tora Bora.  She

20   came out of the house screaming with the children.  She threw

21   the children into his car.  They were involved in an argument

22   and he opened his car door into her, knocking her over and

23   causing her to fall backwards.

24   Q.  A moment ago you just mentioned that the defendant

25   described his mother-in-law's house in Lebanon as a compound

J58AAKOU2B                          Shannon - Direct

1  like Tora Bora?

2  A.  Yes.

3  Q.  What did you understand him to mean by "Tora Bora"?

4  A.  I understood the defendant to be talking about the Tora

5  Bora compound in eastern Afghanistan where Osama Bin Laden and

6  other al-Qaeda leadership was hiding out in the early 2000s.

7           THE COURT:  What does that mean?  What's a compound?

8           THE WITNESS:  Those were his words, your Honor.  He

9  said it was compound-like his mother-in-law's home.

10          THE COURT:  Did you inquire what that meant?

11          THE WITNESS:  I didn't.

12          THE COURT:  OK.

13  Q.  Getting back to the interview on March 23, 2017, what, if

14  anything, did the defendant say happened after that incident at

15  his mother-in-law as house?

16  A.  Following that incident the defendant stated that his

17  mother-in-law's family members whom are all part of Hezbollah

18  militia in the village surrounded his home threatening him and

19  trapped him there, essentially.

20  Q.  Now, I believe you said that this conversation and the

21  description of these events came up in the context of the

22  defendant's demands relating to his children?

23  A.  Yes.

24  Q.  From your perspective as an FBI agent what, if any

25  challenges, did the defendant's demands relating to his

1    children present?

2    A.  A couple.  First, the children were lawfully with their

3    mother in Canada.  Second, there had been a physical or

4    domestic incident that resulted in her leaving with the

5    children to go to Canada.  So, this would have required FBI to

6    coordinate with a foreign government.

7    Q.  Does the FBI have any authority to compel a foreign

8    government to turnover residents?

9    A.  No, we don't.

10   Q.  And did you explain to the defendant on March 23, 2017 that

11   the demand relating to his children would require you to

12   disclose the meetings that you were about to have to the

13   Canadian government?

14   A.  We did.

15   Q.  After you explained these things, after you described

16   grounds rules for the meeting, did the defendant ask any

17   questions about timing?

18   A.  He did.

19   Q.  What did he ask?

20   A.  The defendant wanted to know when he could expect his

21   demands to be met by.

22   Q.  Did you make any guarantees in response to that question?

23   A.  No.

24   Q.  How did you answer the defendant's question about timing?

25   A.  We told the defendant we could make no promise or

1   guarantees of any benefits and once Mr. Denbeaux and the

2   defendant stated that they understood it would not be a promise

3   or guarantee, Special Agent Costello and I said that if again,

4   the preconditions of his information were met, truthful, honest

5   and valuable, we would do our best to try to follow through

6   with helping him by the end of the summer of 2017.

7   Q.  You described three preconditions in doing that.  What do

8   you mean by the word "precondition"?

9   A.  That before we would do anything for the defendant his

10  information would have to be truthful, honest and valuable.

11  Q.  After that conversation during the interview on March 23,

12  2017, what happened next?

13  A.  The defendant sat back in his chair, squared his shoulders

14  to Special Agent Costello and I and stated, I am a member of

15  910, also known as Islamic Jihad or the Black Ops of Hezbollah.

16  The Unit is Iranian controlled.

17  Q.  What verb tense did the defendant use when he described his

18  membership?

19  A.  Present.  He said "I am".

20  Q.  Did you ask the defendant anything after he said that?

21  A.  Yes.

22  Q.  What did you ask him?

23  A.  I asked the defendant or we asked the defendant how it was

24  that he knew he was a member of Unit 910.

25  Q.  How, if at all, did the defendant respond to that question?

1   A.   The defendant stated that initially he did not know that

2   his unit was referred to as "910".  He only learned that after

3   the unit had been outed in the media.  Prior to that he only

4   thought of his unit as "Islamic Jihad" or the covert or secret

5   unit within Hezbollah, the Black Opts group.

6   Q.   Did you ask the defendant about other acronyms at that

7   point?

8   A.   We did.

9   Q.   What did you ask him?

10  A.   We asked the defendant if he had ever heard the term

11  "external organization" or "ESO".

12  Q.   What did the defendant do when you asked him that question?

13  A.   The defendant stated that he had never heard of that before

14  but he said the words "external security organization" out loud

15  to himself in Arabic and then stated that that was an accurate

16  name for what his unit did.

17  Q.   During the meeting on March 23, 2017 what, if anything, did

18  the defendant say about when he joined the Islamic jihad

19  Organization?

20  A.   On March 23rd he stated that he joined the organization in

21  2010.

22  Q.   In a subsequent meeting, did the defendant admit that he

23  had joined the IJO at an earlier date?

24  A.   Yes.

25  Q.   When did he say that he joined the IJO?

J58AAKOU2B                    Shannon - Direct

1   A.  In our April 26 meeting he stated that he joined the IJO in

2   2008.

3   Q.  So, we'll come back to that meeting in a bit but let's stay

4   focused on March 23.  During that interview on March 23, 2017,

5   did the defendant say anything about Hezbollah training prior

6   to joining the Islamic Jihad Organization?

7   A.  Yes, he did.

8   Q.  What did the defendant say about Hezbollah training?

9   A.  The defendant stated in the year 2000 he attended a 45-day

10  Hezbollah boot camp.

11  Q.  How did the defendant refer to that boot camp during the

12  interview?

13  A.  The defendant stated that this was like the Hezbollah 101

14  training.

15  Q.  Did he say where the boot camp occurred?

16  A.  He did.

17  Q.  What did he say?

18  A.  He said it occurred in the Bekaa Valley in Lebanon.

19          MR. BOVE:  Dr. Levitt talked about the Bekaa Valley

20  yesterday.

21          Ms. Shields, if you could bring up Government Exhibit

22  6 please.

23  Q.  Is the Bekaa Valley indicated on the screen here?

24  A.  Yes.

25  Q.  What's the general outline of the valley as indicated on

J58AAKOU2B                           Shannon - Direct

1    Government Exhibit 6?

2    A.   The area marked with the gray lines and to the east of that

3    is the Bekaa Valley area.

4    Q.   So, that the sort of rectangular shape on right side of the

5    photo?

6              THE COURT:  Use something to point on the photo.

7    Q.   Starts at top right corner; is that right?

8    A.   Yes.

9              MR. BOVE:  And then it concludes on the bottom center

10   or the bottom middle of the page, sort of the pointy end of the

11   rectangle?

12             THE COURT:  I don't know what you are talking about.

13   Can't you just point it out on the map?

14             MR. BOVE:  I don't have the ability to make an

15   annotation on the screen.

16             Ms. Shields, if you could zoom-in on the bottom so I

17   could see?

18             THE WITNESS:  There we go.

19             THE COURT:  What part of this is the Bekaa Valley?

20             THE WITNESS:  The gray lines, your Honor.  Do you see

21   the gray lines?  It starts at the top right corner now, goes

22   straight down.

23             THE COURT:  Jury following?

24             THE WITNESS:  Up and around and a little bit to the

25   east of those lines.

J58AAKOU2B                    Shannon - Direct

```
 1                THE COURT:  To the right and east is the Bekaa Valley.
 2                MR. BOVE:  Ms. Shields, if you could just trace the
 3     outline with the mouse, I think that would help.
 4                (Pause)
 5                THE COURT:  So it encompasses that green area?
 6                THE WITNESS:  Yes.
 7     Q.  Special Agent Shannon, did the defendant say anything on
 8     March 23, 2017 about who was running this Hezbollah 101
 9     training camp?
10     A.  Yes.
11     Q.  What did he say?
12     A.  He stated that uniformed members of Hezbollah were
13     conducting this military-type training.
14     Q.  What, if anything, did the defendant say on March 23 about
15     the types of weapons that he was trained and used during this
16     boot damp.
17     A.  The defendant described utilizing AK-47s, semiautomatic
18     pistols, RPGs, rocket-propelled grenade launchers.
19     Q.  Did the defendant tell you on March 23, 2017, how he got
20     involved in this Hezbollah boot camp?
21     A.  He did.
22     Q.  What did he say?
23     A.  The defendant stated that a family member by the name of
24     Haider Kourani who was a very prominent Hezbollah member is the
25     reason or how he was able to attend this training.
```

J58AAKOU2B                      Shannon - Direct

1              THE COURT:  What was the time of the training again?

2              THE WITNESS:  This was in the year 2000, your Honor.

3    Q.  Did the defendant say anything during the March 23

4    interview about the recruitment process of the Islamic Jihad

5    Organization?

6    A.  He did.

7    Q.  What did the defendant say about how that recruitment

8    process started for him?

9    A.  The defendant stated the first person he came into contact

10   with in terms of his recruitment was again another prominent

11   family member by the name of Shiek Hussein Kourani.

12   Q.  What did the defendant say about that initial interaction

13   with Shiek Hussein Kourani?

14   A.  The defendant stated that Shiek Hussein Kourani had spoken

15   to him about joining the organization and that Shiek's or

16   religious clerics, Shia religious clerics, are the key people

17   in the recruitment process.  They're responsible for spotting

18   and assessing potential recruits.

19   Q.  Did the defendant say whether Shiek Hussein Kourani

20   introduced him to anyone?

21   A.  Did he.

22   Q.  What did he say?

23   A.  The defendant stated that Shiek Hussein Kourani introduced

24   him to another individual that he met with in Hezbollah that he

25   knew only by the name of Abdullah.

1    Q.  Did the defendant say where he met with this man named

2    Abdullah?

3    A.  Yes.

4    Q.  Where?

5    A.  He stated that he met with Abdullah in the Dahyia area of

6    Lebanon.

7    Q.  What is the Dahyia?

8    A.  The Dahyia is an area in the southern suburbs, just south

9    of Beirut and that area is controlled by Hezbollah.

10            MR. BOVE:  Your Honor, at this point I have three maps

11   that I'd like to offer and ask the Court to take judicial

12   notice of.  Government Three is a map of Beirut. Government

13   Exhibit Four is a map to show the Dahyia.

14            THE COURT:  How do you spell that?

15            MR. BOVE:  D-A-H-Y-I-A.

16            And Government Exhibit eight is a map that's

17   zoomed-out quite a bit to include the Middle East and Asia.

18            THE COURT:  Yes.  I'll take judicial notice.

19            MR. BOVE:  Government Exhibits Three, Four and Eight.

20   Thank you, judge.

21            Ms. Shields, could you please bring up Government

22   Exhibit four.

23            (Pause)

24   Q.  Special Agent Shannon, could you please describe on this

25   map the general location of these suburbs that we're talking

1    about?

2    A.   Sure.  So, the Dahyia area is south of the city of Beirut

3    and north of, if you see on the map Rafic Hariri airport.

4              MR. BOVE:  Could you zoom-in on the airport.  Thank

5    you.  And now zoom back up.

6    Q.   The area between the Beirut label and the airport?

7    A.   Roughly.

8              THE COURT:  Could you do that again please.

9              (Pause)

10             MR. BOVE:  Was that helpful, your Honor?

11             THE COURT:  Where is Dahyia.

12             THE WITNESS:  The Dahyia, sir, is north of where that

13   airport is and just south of the city of Beirut.

14   Q.   The entire suburb?

15   A.   That's correct.

16   Q.   The entire what?

17             MR. BOVE:  Suburb, judge.

18             THE COURT:  I don't see it on the map.  Is there a

19   name on it?

20             MR. BOVE:  This is not -- judge, it's basically a

21   neighborhood.  It's not a city or a municipality.

22             THE COURT:  This is not drawn to scale.  So, it's very

23   hard to understand distances.  What is the mileage between the

24   airport and Beirut center?

25             THE WITNESS:  I don't know that, your Honor.

J58AAKOU2B                        Shannon - Direct

1          MR. BOVE:  There's a red circle on the screen.

2          THE COURT:  There was a moment ago.

3    Q.  Is this the general area of the Dahyia, the suburb that

4    we're talking about?

5    A.  Yes.

6          MR. BOVE:  You can take that down please.

7    Q.  You said that the defendant described an initial recruiting

8    meeting with a man named Abdullah?

9    A.  Yes.

10   Q.  Did he describe any additional meetings during the

11   recruitment process?

12   A.  He did.

13   Q.  How many additional meetings?

14   A.  The defendant described meeting with four other individuals

15   following his meeting with Abdullah.

16   Q.  Where in Lebanon did the defendant say the first meeting

17   occurred?

18   A.  In Dahyia.

19   Q.  Of those first three meetings, did the defendant describe

20   who he met?

21   A.  He did.

22   Q.  What did he say?

23   A.  The first individual that the defendant met with he didn't

24   know the individual's name but he stated that this person was a

25   member of Hezbollah's security unit.  The second individual he

J58AAKOU2B                    Shannon - Direct

1   with he also did not know that individual's name and stated

2   that this person was a member of Hezbollah's intelligence unit.

3   The third person he met with was his IJO handler who he came to

4   know as "Fadi" or "Hajj".

5   Q.  You mentioned that the defendant described a meeting with

6   somebody from Hezbollah's intelligence unit?

7   A.  Yes, he did.

8   Q.  What, if anything, did the defendant say happened during

9   the meeting with the Hezbollah intelligence unit

10  representative?

11  A.  The defendant stated that that meeting was approximately

12  two hours long and he spoke extensively with this person about

13  how to resist interrogations.

14  Q.  And did the defendant describe any examples or principles

15  that were articulated to him in that training?

16  A.  He did.

17  Q.  What did he say?

18  A.  The defendant stated that he was coached into how to evade

19  or avoid answering certain questions and also that he was

20  taught to deny everything and admit only things that your

21  interrogator or questioner could prove.

22  Q.  Did the defendant say whether during that training session

23  the topic of his 2000 Hezbollah boot camp participation came

24  up?

25  A.  He did.

1   Q.  What did he say about that?

2   A.  The defendant stated that this intelligence officer from

3   Hezbollah used that 2000 training as an example.  This

4   individual told the defendant that if he were ever questioned

5   by law enforcement about having participated in the 2000

6   training with Hezbollah he should deny that participation.  If

7   somebody were to present him with proof of his participation

8   like, for example, a photograph of him in a uniform at the

9   training, then he should admit only that which the photograph

10  demonstrates.  So, in that instance that he attended that

11  training on that day in 2000, nothing else.

12  Q.  You said the defendant also described a meeting that he had

13  with his Islamic Jihad Organization handler or supervisor?

14  A.  Yes.

15  Q.  I think you said that that man's name was "Fadi" or he was

16  known as "Fadi"?

17  A.  That's what the defendant stated.

18  Q.  Did the defendant say how he got to his first meeting with

19  Fadi?

20  A.  He did.

21  Q.  Please describe what he said.

22  A.  The defendant described having been waiting at a particular

23  location in the Dahyia, that a man on a motorcycle pulled up to

24  pick him up, that this individual handed the defendant a

25  motorcycle helmet that was completely blacked out, that he was

1   instructed to put on the helmet and get on the back of the

2   motorcycle bike.  The driver told the defendant that he should

3   close his eyes or look down while riding on the bike to avoid

4   getting dizzy.

5   Q.  What did the defendant say happened on the trip on

6   motorcycle?

7   A.  The defendant stated that he believed they were located on

8   the edges of the Dahyia based on how long they drove on the

9   motorcycle and that he was brought to an underground garage

10   type location and then transported via an elevator to a floor

11   to meet with someone.  The defendant described the elevator

12   buttons as being scrambled on or out of sequence and so he did

13   not know where in the building they went to.

14   Q.  What, if anything, did the defendant say happened when you

15   he got out of the elevator?

16   A.  The defendant stated when he got out of the elevator a man

17   in a mask that covered his entire face with the exception of

18   his eyes and mouth was waiting to meet with him.

19   Q.  Who did the defendant tell you that that was, the man in

20   the mask?

21   A.  The defendant stated that was his Islamic Jihad handler,

22   mentor, supervisor, essentially, his contact in the

23   organization, Fadi.

24   Q.  On March 23, 2017, did the defendant provide Fadi's legal

25   name?

```
 1   A.  The defendant stated that he did not know Fadi's true name.
 2              THE COURT:  Was is it?
 3              THE WITNESS:  F-A-D-I.
 4              THE COURT:  You gave another name too.
 5              THE WITNESS:  He also said he could be referred to as
 6   "Hajj".
 7   Q.  You said a moment ago that the defendant did not identify
 8   or provide a legal name for Fadi during the March 23, 2017
 9   interview?
10   A.  That's correct.
11   Q.  Did the defendant make any claims during that interview
12   about why he could not identify Fadi by name?
13   A.  He said he didn't know his name.  He never used a true name
14   with him.
15   Q.  What, if anything, did the defendant say about Fadi's
16   nationality?
17   A.  The defendant stated that he believed Fadi to be a dual
18   citizen of Lebanon and possibly somewhere in western Europe.
19   He thought maybe England.  He wasn't certain.
20   Q.  Did you do anything during the interview on March 23, 2017
21   to try to identify Fadi?
22   A.  Yes.
23   Q.  What did you do?
24   A.  We showed the defendant two different photographs at that
25   time.
```

J58AAKOU2B                     Shannon - Direct

1   Q.  I am showing you an exhibit marked for identification as

2   Government Exhibit 801.  What is that?

3   A.  These are the two photographs we showed the defendant at

4   that meeting.

5             MR. BOVE:  Your Honor, I offer 801.

6             MR. SCHACHT:  May I have a brief voir dire?

7             THE COURT:  March 23, 2017 meeting?

8             THE WITNESS:  This is March 23, 2017 meeting, yes,

9   sir.

10             THE COURT:  They're admitted.  They're received.

11             MR. SCHACHT:  Your Honor, I have a brief voir dire.

12             THE COURT:  You may.

13   BY MR. SCHACHT:

14   Q.  Agent Shannon, where did you get those photographs?

15   A.  These photographs were taken from stock images we have on

16   our squad.

17   Q.  When you say "stock images", you don't mean random images.

18   You mean people you suspect of being involved in criminal

19   activity?

20   A.  Yes.

21   Q.  And do you know personally the people in the photos?

22   A.  Have I personally met these individuals?

23   Q.  Yes?

24   A.  No, sir, I have not.

25

J58KKOU3                         Shannon - Direct

1    VOIR DIRE EXAMINATION  (Continued)

2    BY MR. SCHACHT:

3    Q.  Do you have a belief about who those people are, what their

4    real names are?

5    A.  I do.

6             MR. SCHACHT:  I have no further objection.

7             THE COURT:  Objection to the admission of the

8    documents?

9             MR. SCHACHT:  No, your Honor.

10            THE COURT:  Received.

11            MR. BOVE:  Thank you, Judge.

12            (Government's Exhibit 801 received in evidence)

13            THE COURT:  Why don't we post those and then go to

14   lunch.

15            MR. BOVE:  Thank you, Judge.

16            Let's take a look at the first page of Government

17   Exhibit 801.

18   BY MR. BOVE:

19   Q.  Who is this?

20   A.  I know this individual as Bassam Abdullah.

21   Q.  What, if anything, did the defendant show when you showed

22   him this picture on March 23rd, 2017?

23   A.  He did not recognize this individual.

24            MR. BOVE:  Let's take a look at the second picture.

25   Zoom in on that picture, please, Ms. Shields.

1   Q.   Who is this?

2   A.   I know this individual as Majed Abdullah.

3   Q.   What, if anything, did the defendant say when you showed

4   him this picture on March 23rd, 2017?

5   A.   The defendant stated he wasn't sure whether this individual

6   was the person he knew as his handler, Fadi.

7   Q.   What was done with the picture at that point?

8   A.   At this point, Special Agent Costello and I placed the

9   photograph in the center of the interview table for the

10  duration of the interview.

11  Q.   Were there any additional references to that photograph

12  during the interview?

13  A.   Yes.  Frequently, when the defendant would talk about

14  interactions he had with his handler, Fadi, he would point or

15  make reference to the photograph on the table.

16          MR. BOVE:  Your Honor, now is a good time for the

17  lunch break.

18          THE COURT:  The way we identify the two photographs,

19  they're both part of Exhibit 801, correct, Mr. Bove?

20          MR. BOVE:  Yes, your Honor.

21          THE COURT:  So one is identified as number 17 and the

22  second one is number 20?

23          MR. BOVE:  Those are the numbers on the page of the

24  documents, yes.

25          THE COURT:  Yes, okay.  The first one being identified

J58KKOU3                         Shannon – Direct

1    is Hassan Abdullah and the second one having been identified as

2    Majed Abdullah?

3              MR. BOVE:  Yes, Judge.

4              THE COURT:  We'll break now for lunch.  Ms. Jones will

5    collect your notebooks.  We'll come back at 2:15.  Have a good

6    lunch.  Don't discuss the case.  Keep an open mind.

7              (Jury not present)

8              THE COURT:  Have a good lunch, folks.

9              MR. SCHACHT:  Thank you.

10             (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                               2:17 PM

3              (Trial resumed; jury present)

4              THE COURT:  Ms. Shannon, you remain under oath.

5              Mr. Bove, please continue with your examination.

6              MR. BOVE:  Thank you, Judge.

7     KERI SHANNON, resumed.

8     DIRECT EXAMINATION CONTINUED

9     BY MR. BOVE:

10    Q.  Special Agent Shannon, this morning you testified about a

11    phone call with Mark Denbeaux on March 22, 2017.  Do you recall

12    that?

13    A.  Yes.

14    Q.  Was the word "community" used during that call?

15    A.  Yes.

16    Q.  Please describe what was said about that word during the

17    call.

18    A.  At that time, Mr. Denbeaux indicated that his client was

19    concerned about people in the community learning that he was

20    speaking with or meeting with the FBI.

21    Q.  Was it in reference to that concern, about the community,

22    that you made the statements regarding confidentiality that you

23    described this morning?

24    A.  Yes.

25    Q.  What did you understand that term, "community," to mean?

1    A.  I understood Mr. Denbeaux to be referring to the Lebanese

2    diaspora here in the New York City area, as well as members of

3    his wife's family in Canada, and individuals in Lebanon.

4    Q.  Also this morning, you testified about an interview of the

5    defendant on March 23rd, 2017, the next day?

6    A.  Yes.

7    Q.  Where we left off just before the break was with Government

8    Exhibit 801, on page 2.  This is the photograph of Majed

9    Abdullah.

10         MR. BOVE:  Ms. Shields, can you bring that up.

11   Q.  As I think you said before the break, that you showed this

12   picture to the defendant during that interview on March 23rd?

13   A.  Yes.

14   Q.  What did he say when you showed him this photo?

15   A.  The defendant stated he wasn't sure whether this person was

16   his handler, Fadi, or not.

17   Q.  What happened with that photo after the defendant said that

18   in the interview?

19   A.  Special Agent Costello and I placed this photo on the

20   interview table and left it there for the duration of the

21   interview.

22   Q.  Were there any other references made to the picture of

23   Majed Abdullah during the rest of the interview?

24   A.  Yes.

25   Q.  Describe what happened, please.

1   A.   Throughout the interview, as the defendant would speak

2   about interactions with his handler, Fadi, he would motion

3   towards the picture or point at it, gesture.

4             MR. BOVE:   Ms. Shields, you can take that down.   Thank

5   you.

6   Q.   Where you were in the testimony before lunch was describing

7   what the defendant said about his initial recruitment to the

8   Islamic Jihad Organization.   Do you remember that?

9   A.   I do.

10  Q.   I think you said that the defendant was recruited over the

11  course of a series of meetings in Dahieh, the Beirut suburbs;

12  is that right?

13  A.   That's correct.   That's what the defendant stated.

14  Q.   I think you explained that the defendant described a

15  meeting with Fadi, his handler, and some kind of building in

16  the suburbs?

17  A.   He described it as an underground garage that he was taken

18  to, and then he was moved up to a floor.   He wasn't sure which

19  floor number.

20  Q.   During the interview on March 23rd, 2017, what, if

21  anything, did the defendant say he discussed with Fadi during

22  that first meeting in or about 2008?

23  A.   In that first meeting, he said that Fadi taught him the

24  Golden Rule of Unit 910, which was the less you know about the

25  unit, the better.

1    Q.   Is Unit 910 a reference to the Islamic Jihad Organization?

2    A.   Yes.

3    Q.   What, if anything, did the defendant say he was instructed

4    by Fadi regarding the Islamic Jihad Organization status and his

5    status within Hezbollah?

6    A.   Fadi told the defendant that Unit 910, or the Islamic

7    Jihad, is very selective, and he should be proud of the fact

8    that he was selected for that unit.  He told the defendant that

9    what he does for this unit would never be publicly known, but

10   it helped Hezbollah achieve its goals, and that his conduct

11   would only be recognized by Allah.

12   Q.   What did the defendant say happened after his first meeting

13   with Fadi?

14   A.   The defendant described, after meeting Fadi, meeting

15   another individual, who took him on a tour of South Lebanon.

16   Q.   What, if anything, did the defendant describe on March 23rd

17   about the purpose of that tour?

18   A.   The defendant stated that during the course of the tour, he

19   was brought to key locations or sites that were relevant during

20   the 2006 War, that this tour guide showed him areas that were

21   significant during the battle for both Hezbollah and the

22   Israelis, and the tour guide told him that it wasn't enough to

23   see how the Israelis work, they also have to understand how the

24   Israelis think, and that the Islamic Jihad Organization is

25   Hezbollah's antivirus to the problem that is Israel.

J58KKOU3                        Shannon - Direct

1    Q.  After the defendant said that --

2              THE COURT:  Antivirus?

3              THE WITNESS:  Your Honor, yes, an antivirus.

4    BY MR. BOVE:

5    Q.  Was that a word that the defendant used during the

6    interview?

7    A.  Yes.

8    Q.  After he said that, what, if anything, did the defendant

9    say about how he reacted to the tour from the Islamic Jihad

10   Organization of Southern Lebanon?

11   A.  The defendant felt a sense of pride.

12   Q.  Did the defendant describe any details about the stops on

13   that tour?

14   A.  He did.  He explained the significance of multiple of these

15   locations as they toured areas that were significant during the

16   '06 War, but after sharing a bit of information, the defendant

17   stopped talking and said that he would no longer talk about the

18   tour because he was afraid that we were going to share the

19   information with the Israelis.

20   Q.  During this interview on March 23rd, 2017, what, if

21   anything, did the defendant say about his status in the Islamic

22   Jihad Organization following the tour of South Lebanon?

23   A.  The defendant stated, following this tour, he was

24   officially a member of the Islamic Jihad Organization, or Unit

25   910.

1    Q.  During that March 23rd interview, did the defendant

2    describe any personal experience with the 2006 War in Lebanon?

3    A.  Yes.

4    Q.  What did he say about that?

5    A.  The defendant was in South Lebanon when the war broke out.

6    The defendant stated that he wanted to help Hezbollah fight the

7    Israelis at that time, but thought that he would best serve his

8    people by continuing with his education in the United States.

9    And so, ultimately, he made his way out of the south during the

10   war, into Syria, and then back to the United States.

11   Q.  During the interview on March 23rd, 2017, did the defendant

12   say anything about Islamic Jihad Organization -- excuse me,

13   Islamic Jihad Organization missions that he participated in in

14   Lebanon?

15   A.  He did.

16   Q.  What did he say about that?

17   A.  The defendant described his mission inside Lebanon being

18   that his handler, Fadi, had explained to him that there was

19   somebody, a Western man, did not know the identity, who

20   frequently traveled into Hariri Airport and utilized the

21   diplomatic or customs line at the airport, and that this man

22   was believed to be a spy for a Western country.  Fadi told the

23   defendant that this individual frequented a cafe on Hamra

24   Street in Beirut, and the defendant was instructed to spend

25   about a week at the cafe on Hamra Street for a few hours a day,

1    identifying and learning about the people who worked at the
2    cafe, to potentially recruit somebody who worked at the cafe
3    who would be able to collect information on the individual who
4    frequented the cafe, that Western man believed to be a spy.
5    Q.  Now, you mentioned Hariri Airport.  Is that south of
6    Beirut?
7    A.  It is.
8    Q.  You also said that the man that the defendant described was
9    using a diplomatic line at Hariri Airport.  What's the
10   diplomatic line?
11   A.  That's the line where, if you're a member of -- an official
12   member of the state, you're able to transit through that line.
13   Q.  During the interview on March 23rd, did the defendant
14   describe any IJO assignments related to purchasing technology?
15   A.  He did.
16   Q.  What did he say about that mission assigned to him by the
17   Islamic Jihad Organization?
18   A.  The defendant stated that he was directed to obtain
19   technology for the Islamic Jihad, and he stated that those
20   items included drone technology, wave jammers, night vision
21   goggles, external hard drive, thermal heat imaging devices.
22   Q.  What, if anything, did the defendant say on March 23rd
23   about whether he carried out that mission for the Islamic Jihad
24   Organization?
25   A.  The defendant claimed he did not carry out that mission, he

J58KKOU3                         Shannon - Direct

1    never procured any items for the Islamic Jihad.

2    Q.  During the interview on March 23rd, did the defendant

3    describe any Islamic Jihad Organization assignments relating to

4    obtaining weapons in the United States?

5    A.  He did.

6    Q.  What did he say about that mission from the Islamic Jihad

7    Organization?

8    A.  The defendant stated he was tasked by his IJO handler to

9    identify people in the New York area who would be able to

10   procure weapons for the IJO for stockpiling in the area, in New

11   York City.

12   Q.  What, if anything, did the defendant say that he did in

13   response to that mission?

14   A.  The defendant stated that he had a number of contacts from

15   his days in the counterfeit clothing business, and that he

16   provided his handler with eight to ten names of individuals who

17   were involved in that business who he thought could procure

18   weapons for the organization.

19   Q.  What, if anything, did the defendant say about the reaction

20   of Fadi, his IJO handler, when the defendant identified those

21   weapon suppliers?

22   A.  The defendant stated his handler was unhappy with those

23   contacts.  The defendant stated that Fadi told him, those were

24   not the kinds of contacts they were looking for, those people

25   were not reliable, the organization was looking for individuals

J58KKOU3                          Shannon - Direct

1   that they could come back to after a period of time, so years

2   later, and he didn't think that those were the kinds of names

3   that the defendant had secured for the organization.

4   Q.  During the interview on March 23rd, did the defendant

5   describe any IJO assignments relating to surveillance of

6   buildings?

7   A.  He did.

8   Q.  What did he say the assignment was?

9   A.  The defendant said his assignment was to identify military

10  and intelligence outposts in the New York City area, conduct

11  surveillance, and provide information back to the organization.

12  Q.  What, if anything, did the defendant say on March 23rd

13  about how he reacted when Fadi gave him that mission, or

14  assignment?

15  A.  The defendant was angry about this mission.  He said that

16  it concerned him because he would be risking exposure if he

17  were to carry out this mission in the United States.

18  Q.  Did the defendant tell you and Special Agent Costello

19  whether he spoke to anyone else in Hezbollah about his concerns

20  related to the surveillance mission?

21  A.  He did.

22  Q.  What did he say about those conversations?

23  A.  The defendant described going to see Sheikh Hussein

24  Kourani, the cleric who originally had recruited him into the

25  IJO, and he wished to speak with him about his unhappiness in

1     terms of this tasking.

2     Q.  What did the defendant say happened when he arrived to meet

3     with Sheikh Hussein Kourani?

4     A.  The defendant stated when he arrived to meet with the

5     Sheikh, the Sheikh was involved in speaking with another man,

6     and that shortly after the defendant arrived, this other

7     individual that the Sheikh was speaking to departed the

8     location.

9     Q.  During the interview on March 23rd, did the defendant tell

10    you who was talking to Sheikh Hussein Kourani on that occasion?

11    A.  Yes.

12    Q.  What name did he provide?

13    A.  The defendant stated that the Sheikh told him he was

14    speaking with Mohammed Hamadi.

15              MR. BOVE:  Ms. Shields, could you please publish

16    Government Exhibit 107, which is in evidence.

17    Q.  Who is this, Special Agent Shannon?

18    A.  This is Mohammed Hamadi.

19    Q.  At this point in the interview on March 23rd, 2017, did the

20    defendant ask you any questions?

21    A.  He did.

22    Q.  What did he ask you?

23    A.  He asked Special Agent Costello and I if we knew who

24    Mohammed Hamadi was in a tone that indicated he was testing us.

25    Q.  How, if at all, did you respond to that question?

J58KKOU3                         Shannon - Direct

A.   We told the defendant that, of course, we knew who Mohammed
Hamadi was.  Mohammed Hamadi is one of the FBI's most wanted
terrorists.  He's wanted in connection with the 1985 TWA Flight
847 highjacking, in which a U.S. Navy diver was tortured and
murdered.
Q.   Did the defendant's question to you at that point in the
interview raise any concerns?
A.   It did.  I thought that he was challenging or testing our
knowledge to see whether we were worthy to receive the
information he was providing us.
          MR. BOVE:  Ms. Shields, you can take that down.
Q.   Following that exchange with the defendant on March 23rd,
2017, what, if anything, did he say happened during his meeting
with Sheikh Hussein Kourani relating to that IJO surveillance
mission?
A.   So the defendant stated that Sheikh Hussein Kourani was
speaking to him about Mohammed Hamadi and said that Mohammed
Hamadi still works for the organization.  Mohammed Hamadi had
spent 20 years in a German prison, was released in a prisoner
exchange deal, and continued working for the organization after
all that, and he told the defendant to man up with respect to
the tasking.
Q.   During that March 23rd interview, what, if anything, did
the defendant say about actually conducting surveillance for
the Islamic Jihad Organization?

J58KKOU3

1   A.   The defendant stated, in that March 23rd meeting, that he

2   utilized Google Earth to obtain satellite image photos of two

3   locations.

4   Q.   Did he describe those locations?

5   A.   He did.

6   Q.   What locations did the defendant say he helped surveil

7   during the March 23rd interview?

8   A.   The FBI building.  At the time he said 1 Federal Plaza.

9   It's located at 26 Federal Plaza.  And the office building

10  where U.S. Secret Service sits, at 335 Adams Street in

11  Brooklyn.

12  Q.   Was there any discussion of airports during the interview

13  on March 23rd?

14  A.   There was.

15  Q.   What, if anything, did the defendant say about airports?

16  A.   The defendant stated that Hezbollah, specifically the IJO,

17  is always very interested in airports, airport security

18  protocols and procedures, and that he had conducted

19  surveillance of airports and provided information to Fadi about

20  airports.

21  Q.   Did the defendant say anything about Canadian airports on

22  March 23rd, 2017?

23  A.   He did.

24  Q.   What did he say about Canadian airports?

25  A.   The defendant stated that it's also possible to utilize

1   people who are both witting and unwitting, and he gave the

2   example of Muhammad Abadi, who worked at an airport in Canada.

3   The defendant stated he could simply smoke hookah with the

4   defendant and -- excuse me, that the defendant would simply

5   smoke hookah with Abadi and then ask Abadi questions about

6   where the location of certain cameras were, or magnatrometers,

7   or be able to ask Muhammad Abadi to just put a heavy bag onto

8   an airplane, and that he would do it.

9   Q.  At that point in the interview, did the defendant say

10  anything about the strength of the Islamic Jihad Organization

11  in Canada relative to the strength of that organization in the

12  United States?

13  A.  Yes.

14  Q.  What did he say?

15  A.  The defendant said that the IJO was even more active in

16  Canada than they were in the United States.

17  Q.  During the interview on March 23rd, did the defendant say

18  anything about attending Islamic Jihad Organization training

19  with other operatives?

20  A.  He did.

21  Q.  What was the subject of the training that the defendant

22  described during the March 23rd interview?

23  A.  The defendant described attending interrogation training

24  with about 20 to 25 other operatives.

25  Q.  How, if at all, did the defendant describe that training?

J58KKOU3                        Shannon - Direct

1    A.  The defendant stated that this training took place in an

2    auditorium type setting, and that every operative wore a mask,

3    so that nobody knew the identity of anyone in attendance.

4    Q.  Did the defendant provide an estimate of how many IJO

5    operatives attended this training?

6    A.  Yes.

7    Q.  What did he say about the number of IJO operatives that

8    were there?

9    A.  The defendant stated that between 20 and 25 operatives

10   attended this training.

11   Q.  And I understand that the defendant said the operatives

12   were wearing masks, but did he say anything about their

13   accents?

14   A.  He did.  The defendant stated that it was his belief that

15   there were other American operatives in attendance at the

16   training, and the defendant said that he could always tell

17   Americans because of how they chew on the letter R.

18   Q.  How did the interview end on March 23rd, 2017?

19   A.  The interview ended that day because Mr. Denbeaux had an

20   appointment that he needed to get to, and so he asked that we

21   resume at another date.

22   Q.  Did the topic of promises come up at the end of the

23   interview?

24   A.  It did.

25   Q.  What was said about promises at the end of the interview on

J58KKOU3                        Shannon - Direct

1    March 23rd?

2    A.   At the end of that interview, Special Agent Costello and I

3    reiterated to the defendant and Mr. Denbeaux that, as FBI

4    agents, we lacked authority to make any promises or guarantees

5    for anything in exchange for the information that he was

6    providing.

7    Q.   Did Mr. Denbeaux send any communications immediately after

8    the meeting?

9    A.   He did.

10   Q.   In what format?

11   A.   He sent a text message to Special Agent Costello.

12   Q.   How do you know that?

13   A.   I was in the car with Special Agent Costello when the

14   message came through.

15   Q.   Did you see the message around the time that Mr. Denbeaux

16   sent it and Special Agent Costello received it?

17   A.   I did.

18   Q.   I'm handing you a document marked for identification as

19   Government Exhibit 802.  Could you please take a look at this.

20        Do you recognize that?

21   A.   I do.

22   Q.   What is Government Exhibit 802?

23   A.   This is a photocopy of the text message that I was just

24   speaking about.

25        MR. BOVE:  Your Honor, the government offers 802.

1          MR. SCHACHT:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 802 received in evidence)

4          MR. BOVE:  Ms. Shields, if you could please bring that

5    up.  If you can zoom in on the messages.

6    BY MR. BOVE:

7    Q.  So I think you said that these are messages between

8    Mr. Denbeaux and Special Agent Costello?

9    A.  That's correct.

10   Q.  Who sent the messages in yellow?

11   A.  Those were the messages sent by Mr. Denbeaux.

12   Q.  Do you see where it says, "I understand that you can't

13   promise or guarantee"?

14   A.  Yes.

15   Q.  Is that a message that Mr. Denbeaux sent to Special Agent

16   Costello?

17   A.  Yes.

18   Q.  And from your perspective, was that an accurate summary of

19   what you and Special Agent Costello conveyed to Mr. Denbeaux

20   and the defendant on March 23rd, 2017?

21   A.  It is.

22         MR. BOVE:  You can take that down, Ms. Shields.

23   Q.  Now, I'd like to direct your attention to March 30th, 2017,

24   about a week later.  Did you have any plans with respect to the

25   defendant that day?

J58KKOU3                          Shannon - Direct

1   A.  Yes, we did.

2   Q.  What were those plans?

3   A.  We had a meeting scheduled for March 30th.

4   Q.  When you say "we," who are you referring to?

5   A.  Special Agent Costello and I had scheduled a meeting to

6   meet with Mr. Denbeaux and the defendant on that day.

7   Q.  Did you travel to Seton Hall on March 30th, 2017?

8   A.  Special Agent Costello and I did, yes.

9   Q.  What happened when you and Special Agent Costello got to

10  Seton Hall?

11  A.  When we arrived at Seton Hall, we met up with Mr. Denbeaux.

12  The defendant was not present.

13  Q.  What, if anything, did Mr. Denbeaux say about the

14  defendant's location?

15  A.  Mr. Denbeaux made a phone call to the defendant and told us

16  that there was some kind of scheduling confusion with the

17  dates, and the defendant was not going to be able to make that

18  meeting.

19  Q.  Did you and Special Agent Costello have a conversation with

20  Mr. Denbeaux that day?

21  A.  We did.

22  Q.  Did you provide Mr. Denbeaux with an assessment of the

23  defendant's disclosures and performance in the March 23rd

24  meeting?

25  A.  We did.

1    Q.  What did you say?

2    A.  We told Mr. Denbeaux at that time that there was

3    significant information that the defendant had not provided

4    with respect to his training and his operational activity on

5    behalf of the Islamic Jihad Organization.

6    Q.  You mentioned the Islamic Jihad Organization coming up in a

7    conversation with Mr. Denbeaux.  Did you say anything else that

8    day, March 30th, about the IJO and Hezbollah?

9    A.  We did.  We explained to Mr. Denbeaux that Islamic Jihad

10   operatives are highly trained individuals, and we explained to

11   Mr. Denbeaux and cited for him two recent attacks that the IJO

12   was behind, that they had conducted.

13   Q.  After that conversation with Mr. Denbeaux on March 30th,

14   did you meet with the defendant again eventually at Seton Hall?

15   A.  Yes.

16   Q.  What was the date of the next meeting?

17   A.  The next meeting took place on April 3rd, 2017.

18   Q.  Who requested that meeting?

19   A.  That meeting was requested by the defendant through his

20   attorney, Mr. Denbeaux.

21   Q.  Was it held at Seton Hall?

22   A.  It was.

23   Q.  And who was present for the April 3rd, 2017 meeting?

24   A.  I was there, Special Agent Costello, Mr. Denbeaux, and the

25   defendant.

J58KKOU3                        Shannon - Direct

1   Q.   How did the meeting begin?

2   A.   The meeting began with Mr. Denbeaux handing out a copy of

3   what he referred to as his notes or his assessment of things so

4   far.

5   Q.   What, if anything, did Mr. Denbeaux say about the notes

6   when he handed them out during the meeting?

7   A.   Nothing else.

8   Q.   Did Mr. Denbeaux ask you to do anything with the document

9   at that point?

10  A.   He did not.

11  Q.   What did you and Special Agent Costello do when you were

12  handed the document?

13  A.   We stepped into the hallway at that time, to be able to

14  review the document and talk amongst ourselves.

15  Q.   What happened in the hallway?

16  A.   In the hallway, we briefly reviewed the document, and we

17  saw that the document contained inaccuracies and items that we

18  had never discussed.

19  Q.   Now, I'm going to hand you an item that was seized from the

20  defendant's apartment.  This is in evidence as Government

21  Exhibit 221.

22        Do you recognize that?

23  A.   Yes.  These are Mr. Denbeaux's notes.

24        MR. BOVE:  And, Ms. Shields, could you please publish

25  Government Exhibit 221.

1          THE COURT:  What's your question?

2          MR. BOVE:  I'm just waiting for the document to come

3    up, your Honor.

4          Thank you.

5          THE COURT:  Is this in evidence?

6          MR. BOVE:  Yes, Judge.  It was offered through Special

7    Agent Ganci.

8          Ms. Shields, if you could zoom on the document

9    entitled "What These Meetings Are Not."

10   BY MR. BOVE:

11   Q.  Special Agent Shannon, entry number 1 says, "This is not

12   plea negotiations, nor is it a proffer of any sort."  Do you

13   see that?

14   A.  I do.

15   Q.  How did you react to that when you read it on April 3rd,

16   2017?

17   A.  I thought that was accurate.

18   Q.  Have you ever engaged in plea negotiations?

19   A.  No.  Plea negotiations are something that prosecutors are

20   in charge of.

21   Q.  Are you familiar with the term "proffer"?

22   A.  Yes.

23   Q.  And what do you understand that term to mean?

24   A.  A proffer is something that a prosecutor negotiates with

25   defense counsel, generally.

J58KKOU3                          Shannon - Direct

1    Q.  Were there any prosecutors at the meetings on March 23rd or

2    April 3rd?

3    A.  No, there were not.

4    Q.  So did you agree and think this was accurate at the time

5    you read it, entry number 1?

6    A.  I did.

7    Q.  Now let's take a look at entry number 2.  This starts, "He

8    is not seeking any kind of immunity or protection."  Do you see

9    that?

10   A.  I do.

11          MR. BOVE:  Ms. Shields, if you could highlight that.

12   Q.  How did you react when you reviewed this part of the

13   document on April 3rd, 2017?

14   A.  I thought that was accurate.  Immunity had never been

15   discussed, and similar to plea negotiations and proffers,

16   conversations about immunity require prosecutors.

17   Q.  Now, the rest of this entry says, "because as it has

18   already been agreed, he has committed no crime and faces no

19   prosecution."

20          Do you see that?

21   A.  I do.

22   Q.  Was that statement true, from your perspective, on

23   April 3rd, 2017?

24   A.  No.

25   Q.  Had there been any such discussions?

```
 1    A.  No.

 2              MR. BOVE:  Ms. Shields, could you please zoom out, so

 3    we can see all of the first page of 221.  Now if you could zoom

 4    in, please, on the entirety of entry 5 and the title of it,

 5    "The problem."

 6    BY MR. BOVE:

 7    Q.  Special Agent Shannon, could you please read the first line

 8    of entry 5?

 9    A.  Yes.  "The dilemma is that the government wants his

10    information before making any commitment."

11              MR. BOVE:  Ms. Shields, if you could highlight that,

12    please.

13    Q.  Now, you said that you and Special Agent Costello reviewed

14    this document in the hallway outside the conference room on

15    April 3rd, 2017?

16    A.  Yes.

17    Q.  Did you and Special Agent Costello agree to a course of

18    action after you took a look at the document?

19    A.  We did.

20    Q.  What did you decide to do?

21    A.  We decided to return to the interview room, hand

22    Mr. Denbeaux back his notes, and answer any questions

23    Mr. Denbeaux or the defendant might have with respect to the

24    document.

25    Q.  Did you go back into the room?
```

1    A.  We did.

2    Q.  What happened when you reentered?

3    A.  When we reentered the room, Special Agent Costello handed

4    Mr. Denbeaux back his copy of notes, and we sat down.

5    Q.  Did Mr. Denbeaux ask any questions at that point?

6    A.  He did not.

7    Q.  Did the defendant ask any questions about the document?

8    A.  No, he did not.

9           MR. BOVE:  Ms. Shields, you can take that down.

10   Q.  Did the defendant say anything at that point during the

11   interview on April 3rd?

12   A.  He did.  He immediately launched back into his demands,

13   reiterating from the previous day, or the previous meeting, the

14   immigration benefits he was looking for with respect to his

15   father, and sister, and his children coming in from Canada, and

16   he had increased his demands to include that we provide him

17   with a job paying $120,000 a year annually, and that we give

18   him a safe house to live in.

19   Q.  How, if at all, did you and Special Agent Costello respond

20   to those demands?

21   A.  We, again, explained to the defendant and Mr. Denbeaux we

22   could make no promises with respect to any of the demands that

23   he was making, but that if his information was truthful and

24   honest, we would pass along his requests to our supervisors.

25   Q.  Following that conversation about the defendant's demands,

J58KKOU3                          Shannon - Direct

1    did you ask him any questions about the Islamic Jihad

2    Organization?

3    A.  We did.

4    Q.  How did you start the interview?

5    A.  We asked --

6             THE COURT:  Which interview is this now?

7             MR. BOVE:  April 3rd, 2017, your Honor.

8             THE WITNESS:  We asked the defendant what his jihad

9    name, or code name, in the Islamic Jihad Organization was.

10            THE COURT:  This was the first question?

11            THE WITNESS:  We asked this early into the interview,

12   your Honor.  I can't say for sure it was our very first

13   question.

14   BY MR. BOVE:

15   Q.  How, if at all, did the defendant respond to your question

16   seeking his jihad name?

17   A.  The defendant stated that his jihad name was Daniel.

18   Q.  What, if anything, did the defendant say about why he chose

19   that name?

20   A.  The defendant stated he chose the name Daniel because of a

21   biblical parable that he was familiar with about a prophet by

22   the name of Daniel being thrown into a hungry lion's den.

23   Q.  During the interview on April 3rd, did the defendant say

24   anything about weapons training directly from Fadi, his IJO

25   handler?

J58KKOU3                         Shannon - Direct

1    A.   He did.

2    Q.   What did the defendant say about weapons training from

3    Fadi?

4    A.   The defendant stated he received one-on-one weapons

5    training from his Islamic Jihad handler, that a driver picked

6    the defendant up and drove him and Fadi to a location where

7    they trained or practiced utilizing an AK-47 semiautomatic

8    pistol, an MP5 submachine gun, and I'm not sure if they shot

9    anything else that day.

10   Q.   Now, you testified earlier that during the March 23rd

11   interview, the defendant described a training by the Islamic

12   Jihad Organization that took place in an auditorium?

13   A.   Yes.

14   Q.   During the interview on April 3rd, did the defendant

15   provide any more details regarding that training?

16   A.   He did.

17   Q.   What did he say?

18   A.   The defendant stated that he believed two high level

19   Islamic Jihad operatives had also been in attendance at that

20   training in 2011.  He stated that it was his belief that Fadi

21   Kassub and also Mohammad Shawraba were in attendance at that

22   meeting.

23        MR. BOVE:  Ms. Shields, if you could please bring up

24   Government Exhibit 108 on the left and 109 on the right.  These

25   are both in evidence.

1    BY MR. BOVE:

2    Q.   Special Agent Shannon, who is shown on the left?

3    A.   Exhibit 108 is Fadi Kassub, and on the right is Mohammad

4    Shawraba.

5         MR. BOVE:   Thank you, Ms. Shields.   You can take those

6    down.

7    Q.   During the interview on April 3rd, what, if anything, did

8    the defendant say about the chain of command of the Islamic

9    Jihad Organization?

10   A.   The defendant stated that the Islamic Jihad reported

11   directly to Hezbollah Secretary General Hassan Nasrallah, and,

12   in turn, Hassan Nasrallah reported directly to the Supreme

13   Leader of Iran, Ali Khamenei.

14        MR. BOVE:   Ms. Shields, if you could bring up 103 on

15   the left and 105 on the right.

16   Q.   Do you recognize these photos, Special Agent Shannon?

17   A.   I do.

18   Q.   Who is on the screen now?

19   A.   The photograph on the left is Secretary General Hassan

20   Nasrallah, and the photo on the right is Iran's Supreme Leader,

21   Ali Khamenei.

22        MR. BOVE:   Thanks, Ms. Shields.   You can take those

23   down.

24   Q.   Did the defendant mention a man named Ali Srour, S-r-o-u-r,

25   during the interview on April 3rd?

1    A.  He did.

2    Q.  What did the defendant say about Srour during the April 3rd

3    interview?

4    A.  The defendant stated that Ali Srour was a good friend of

5    his from childhood, and that he had confided in Ali Srour about

6    being a member of the IJO.

7    Q.  What, if anything, did the defendant say on April 3rd about

8    interactions between Fadi, his IJO handler, and Ali Srour?

9    A.  The defendant stated he told his handler, Fadi, that he had

10   disclosed to Srour his relationship with the IJO.  The

11   defendant stated that Fadi was not mad about that, but, in

12   fact, began using Srour to deliver messages from the IJO to the

13   defendant.

14   Q.  Did the defendant say anything about how he communicated

15   with Srour when he was in Lebanon?

16   A.  He did.

17   Q.  What did he say about that during the April 3rd interview?

18   A.  The defendant stated he would reach out to people through

19   either his father's or his brother's phones, cell phones.

20   Q.  Did the defendant have a brother based in Lebanon after

21   2010?

22   A.  He did.

23   Q.  What was his name?

24   A.  Kassem Kourani.

25   Q.  Now, you said that during the March 23rd interview, the

1  topic of airports came up, generally?

2  A.  Yes.

3  Q.  Did the defendant say anything about airports on April 3rd?

4  A.  He did.

5  Q.  What did he say during the April 3rd interview about

6  airports?

7  A.  The defendant stated that he had provided information to

8  Fadi about the JFK Airport in Queens, New York.

9  Q.  Did the defendant describe the types of information that he

10 provided to Fadi about JFK?

11 A.  Yes.  The defendant stated that Fadi instructed him to

12 describe the airport from the moment he stepped off the

13 airplane.  And so the defendant provided Fadi with information

14 about how passengers disembarked from aircrafts, where they

15 collect their luggage, security checkpoints, location of

16 cameras, and other security equipment.  He talked about the

17 types of uniforms worn by both TSA and CBP officers and the

18 types of questions that he had been asked during the secondary

19 screenings.

20         MR. BOVE:  Ms. Shields, could you please bring up

21 Government Exhibit 601, which is in evidence.

22 Q.  Special Agent Shannon, if you can look at the upper left.

23 What traveler do these records relate to?

24 A.  The defendant, Ali Kourani.

25         MR. BOVE:  Ms. Shields, if you can go to page 2,

J58KKOU3                          Shannon - Direct

1    please, and zoom in on the entries from January 26, 2008,

2    through October 17th, 2011.

3    BY MR. BOVE:

4    Q.  Special Agent Shannon, I'll ask that you focus on the two

5    columns on the far right.  According to this document, how many

6    times did the defendant transit JFK Airport between

7    October 17 -- excuse me, January 26, 2008, and October 17,

8    2011?

9              THE COURT:  Do you know the number, Mr. Bove?

10             THE WITNESS:  Four -- I'm sorry, your Honor.

11             THE COURT:  You counted it up?

12             THE WITNESS:  I counted it up.  Fourteen times.

13             MR. BOVE:  You can take that down, Ms. Shields.

14             THE COURT:  So 14 times between January 26, 2008, and

15   October 17, 2011?

16             MR. BOVE:  That's correct, Judge.

17             THE COURT:  Roughly two and a half years?

18             THE WITNESS:  Yes, sir.

19             THE COURT:  A little more than two and a half years.

20             MR. BOVE:  Ms. Shields, could you please bring up

21   Government Exhibit 202.

22   BY MR. BOVE:

23   Q.  You testified this morning that the defendant discussed

24   this passport card during the course of the meetings at Seton

25   Hall?

J58KKOU3                          Shannon - Direct

1    A.   He did.

2    Q.   During the April 3rd, 2017 interview, what, if anything,

3    did the defendant say about this passport card?

4    A.   This was the meeting where the defendant stated that he had

5    been instructed by his IJO handler to obtain a U.S. passport

6    card because there would come a time when he was traveling

7    operationally for the Islamic Jihad Organization, and it could

8    be the case that the U.S. Government would seize his passport,

9    and if that were to happen, he would be able to utilize his

10   Lebanese passport to fly to Mexico or Canada, and then he could

11   utilize this passport card to land border, cross back into the

12   United States from either of those two countries.

13            MR. BOVE:   Thank you, Ms. Shields.   You can take that

14   down.

15   Q.   Did the defendant say anything on April 3rd, 2017, about

16   the CIA?

17   A.   He did.

18   Q.   What did the defendant say about the CIA during that

19   interview?

20   A.   The defendant stated that the Islamic Jihad Organization

21   was looking to retaliate against the CIA.   They blamed the CIA

22   for penetrations, that the CIA was responsible for recruiting

23   anywhere from two to four high-level Hezbollah operatives, and

24   for those reasons, the organization was angry and looking to

25   retaliate against the CIA.

1              MR. BOVE:  Ms. Shields, could you please bring up an

2       email in evidence, which is marked Government Exhibit 401-D-7.

3       If you could start by zooming in on the header on the first

4       paragraph of the email.

5       BY MR. BOVE:

6       Q.  Special Agent Shannon, who sent this email?

7       A.  This email was sent by the defendant from his

8       ali.m.kourani@gmail.com email address.

9       Q.  Do you recognize the recipient address?

10      A.  It is an NYPD.org official email address.

11      Q.  What is the date that this email was sent?

12      A.  January 20, 2014.

13      Q.  Now, if you could look at the bottom of the screen, what is

14      indicated in this email?

15      A.  The defendant submitted a resume for a position as an

16      intelligence analyst at the NYPD.

17              MR. BOVE:  If you could focus on the attachments line

18      in the email.

19      Q.  Were there any attachments to the document?

20      A.  Yes.

21      Q.  What's the title of the attachment?

22      A.  "Ali Kourani Project Manager."

23      Q.  So let's take a look at that.  It's page 2 of this exhibit.

24              Special Agent Shannon, what does this appear to be?

25      A.  This appears to be a resume of Ali Kourani.

J58KKOU3                    Shannon - Direct

1            MR. BOVE:  Ms. Shields, could you please zoom in on

2      the professional experience and employment history sections.

3      BY MR. BOVE:

4      Q.  Special Agent Shannon, what does the first bullet of the

5      professional experience section say?

6      A.  "Oversaw the execution of diversified projects,

7      construction projects, websites, business plans."

8      Q.  Are you aware of the defendant having any construction

9      experience?

10     A.  No.

11     Q.  What about website design?

12     A.  Not to my knowledge.

13            MR. BOVE:  Ms. Shields, could you please move this

14     exhibit to the top and bring up Government Exhibit 401-C on the

15     bottom.  Now, this is the document that we looked at with

16     Mr. Donaldson both yesterday and this morning.

17     Q.  Is this Internet activity associated with that email

18     account, Special Agent Shannon?

19     A.  It is.

20            MR. BOVE:  Ms. Shields, if you could highlight rows 50

21     through 56 in this document.

22     Q.  Special Agent Shannon, what is indicated in row 51?

23     A.  That the defendant visited a website --

24            MR. SCHACHT:  Objection.

25            THE COURT:  Sustained.

J58KKOU3                        Shannon - Direct

1   BY MR. BOVE:
2   Q.  What does the exhibit say in that row?
3           THE COURT:  It's not your document, is it?
4           MR. BOVE:  It's a document in evidence, Judge.
5           THE COURT:  So what?
6           MR. BOVE:  It's a Google document.
7           THE COURT:  She's not in any position to interpret the
8   document.
9   BY MR. BOVE:
10  Q.  Did you ask the defendant any questions about his 2014
11  application to the NYPD during the April 3rd interview?
12  A.  I did.
13  Q.  What did you ask him?
14  A.  We asked the defendant if he was directed by the Islamic
15  Jihad Organization to obtain a position at the NYPD.
16  Q.  How, if at all, did the defendant respond to that question?
17  A.  The defendant claimed he was not tasked by the IJO to
18  obtain such a position, and that he, in fact, had applied
19  because he thought that he was no longer a member of the IJO at
20  that time.
21          MR. BOVE:  Thanks, Ms. Shields.  You can take these
22  exhibits down.
23  Q.  Did the defendant describe any other trips to Lebanon
24  during the interview on April 3rd, 2017?
25  A.  He did.

J58KKOU3                         Shannon - Direct

1    Q.  What did he say?

2    A.  The defendant went back to Lebanon at the end of 2014

3    through early 2015.

4    Q.  What, if anything, did the defendant say happened when he

5    returned to Lebanon in that time frame?

6    A.  He was contacted by his handler to set up a meeting.

7    Q.  What did he say happened next?

8    A.  The defendant stated he, in fact, had a meeting with his

9    IJO handler during that trip back home, and there was another

10   unknown individual in the room during that meeting.

11   Q.  Did the defendant talk about what happened at this meeting

12   during the interview on April 3rd?

13   A.  He did.

14   Q.  What did he say happened?

15   A.  He stated at that time the unknown IJO operative and his

16   handler asked him questions about interactions he'd had with

17   the United States Government and the Canadian Government.  They

18   also asked him about his application with the NYPD and why it

19   had been almost two years since he had returned home to

20   Lebanon.

21   Q.  Did the defendant say whether he provided any information

22   to Fadi and this other IJO operative during that meeting?

23   A.  He did.

24   Q.  What did he say?

25   A.  The defendant stated that he told Fadi and the other

J58KKOU3                         Shannon - Direct

1    operative that he had been interacting with a man by the name

2    of Lieutenant York in the NYPD, and he provided the Islamic

3    Jihad members the contact information for Lieutenant York of

4    the NYPD.

5    Q.  Did that disclosure from the defendant raise any concerns

6    for you?

7    A.  It did.

8    Q.  What was your concern?

9    A.  I was concerned that the defendant had provided the

10   information of a law enforcement officer here in the United

11   States to a terrorist organization in Lebanon.

12   Q.  What, if anything, did you do based on that concern?

13   A.  After our meeting, Special Agent Costello and I contacted

14   our partners at the NYPD to notify them that the defendant had

15   provided information about one of their lieutenants to a

16   terrorist organization.

17   Q.  Now, staying focused on this April 3rd meeting, when the

18   defendant was describing his trip to Lebanon in 2014 or early

19   2015, did he describe any additional meetings that took place

20   in Lebanon during that trip?

21   A.  I'm sorry, can you give me that time frame again?

22   Q.  During the trip to Lebanon that we were just talking about,

23   did the defendant say whether there were any other meetings

24   with Fadi that occurred?

25   A.  Yes, he did.  He described another meeting with Fadi.

1    Q.  What did the defendant say about the second meeting with

2    Fadi during this trip to Lebanon?

3    A.  The defendant stated this meeting was just one-on-one with

4    Fadi, and that during this meeting, Fadi suggested that

5    Mr. Kourani, the defendant, remain in Lebanon and take on a

6    position in the IJO as a handler or a mentor himself.

7    Q.  What, if anything, did the defendant say to you and Special

8    Agent Costello about how he reacted to that offer from Fadi?

9    A.  The defendant was concerned about that because he assumed

10   that -- or believed that when operatives were requested to

11   return or remain in Lebanon, it meant that they were

12   compromised in some way.

13   Q.  Did the defendant tell you how he responded to the offer

14   from Fadi?

15   A.  He didn't want to do it.  That's what he said.

16   Q.  That he didn't want to accept the offer?

17   A.  That's correct.

18   Q.  At the end of the meeting on April 3rd, did you ask any

19   questions about the defendant's foreign travel?

20   A.  We did.

21   Q.  What did you ask?

22   A.  We asked the defendant if he had ever been operationally

23   deployed for the IJO to a location other than the United

24   States, Canada, or Lebanon.

25   Q.  When you say "operationally deployed," do you mean sent on

J58KKOU3                          Shannon - Direct

1   a mission?

2   A.  Yes, directed by the organization to go somewhere for them.

3   Q.  Why did you ask that question on April 3rd, 2017?

4            MR. SCHACHT:  Objection.

5            THE COURT:  Sustained.

6            MR. BOVE:  Ms. Shields, could you please publish

7   Government Exhibit 214.

8   BY MR. BOVE:

9   Q.  Special Agent Shannon, what is this?

10  A.  This is a copy of the defendant's certificate of

11  naturalization.

12  Q.  What date was that issued?

13  A.  This was issued on April 15th, 2009.

14           MR. BOVE:  Ms. Shields, if you can move that to the

15  left, please, and bring up page 3 of Government Exhibit 201.

16  And zoom in on the bottom page.

17           (Continued on next page)

18

19

20

21

22

23

24

25

J58AAKOU4                          Shannon - Direct

1    BY MR. BOVE:

2    Q.  When was the defendant's passport issued?

3    A.  April 22, 2009.

4          MR. BOVE:  If you could highlight that date.

5    Q.  So, about how long after the naturalization certificate did

6    the defendant get a passport?

7    A.  About one week.

8          MR. BOVE:  Now, Ms. Shields, could you please bring up

9    page 7 of Government Exhibit 201 in the left window, rotate

10   this and zoom-in on the bottom page.

11   Q.  Special Agent Shannon, what is this?

12   A.  This is copy of a Chinese visa that the defendant obtained.

13   Q.  When was this Chinese visa on the left side of the screen

14   issued.

15   A.  April 30, 2009.

16         MR. BOVE:  If you could highlight that please.

17         (Pause)

18         MR. BOVE:  In the right window could you please bring

19   up Government Exhibit 201 and let's zoom-in on the left page.

20   Q.  Special Agent Shannon, directing your attention to the top

21   left of that part of the exhibit, what is that stamp?

22   A.  That is an entry stamp.  The defendant entered China on

23   May 3rd of 2009.

24   Q.  How long is that travel after the date of the visa was

25   issued?

1    A.   Three days.

2    Q.   Were you aware that these documents in the sequence at the

3    time of the interview on April 3rd?

4    A.   I was.  That's why he asked about his travel.

5    Q.   When you asked the defendant about his foreign travel how,

6    if at all, did he respond at first?

7    A.   The defendant stated that he had never been directed by the

8    IJO to travel overseas.

9    Q.   What did you do when the defendant made that claim?

10   A.   At that point Special Agent Costello and I told the

11   defendant that it was a crime to lie to the FBI and we

12   suggested that he take a minute and discuss his answer with his

13   attorney at the time, Mr. Denbeaux, and we gave them privacy to

14   do that.

15   Q.   Did the meeting resume at some point?

16   A.   It did.

17   Q.   When the meeting resumed what, if anything, did the

18   defendant say about the travel to China?

19   A.   The defendant stated his trip to Guangzhou, China was not

20   operational.  It was not directed by the IJO, that he went

21   there strictly for business reasons, that he went to attend the

22   Canton Fair which is an import/export trade show and that he

23   was there to look at textiles, clothing, shoes, medical

24   equipment, medical devices.

25   Q.   When the defendant said those things on April 3, how if at

1    all, did you respond?

2    A.  We challenged the defendant about why someone who was

3    involved in the counterfeit clothing industry would go to China

4    to attend an export/import trade show that had to do with

5    medical devices and equipment.

6    Q.  What happened after you said those things to the defendant?

7    A.  The defendant again insisted that it was for business

8    reasons.

9    Q.  Did anyone leave the room at that point?

10   A.  Again, Special Agent Costello and I provided the defendant

11   with a warning that it was a crime to lie to the FBI and that

12   he should think about his answers to our questions before we

13   continued with the interview.  At that point, the defendant was

14   angry and walked out of the interview, said he needed to walk

15   and think.

16   Q.  What did Mr. Denbeaux do when the defendant walked out of

17   interview room?

18   A.  Mr. Denbeaux followed his client out of the room.

19   Q.  Did either of those men return to the interview room on

20   April 3rd?

21   A.  Yes, they did.

22   Q.  And what happened?

23   A.  When they returned to the interview room Mr. Denbeaux

24   stated that --

25             MR. SCHACHT:  Objection.

J58AAKOU4                        Shannon - Direct

1           THE COURT:  Sustained.

2           MR. BOVE:  May I have a side bar, judge?

3           THE COURT:  Yes.

4           (Continued on next page)

J58AAKOU4                         Shannon - Direct

1                (side bar)

2                THE COURT:  I sustained the objection because it's

3        hearsay.

4                MR. BOVE:  Judge, we briefed this and it was unopposed

5        in our motions in limine that Mr. Denbeaux's statements are

6        admissible as statements of an agent of the defendant within

7        the scope of the agency relationship because he represented the

8        defendant at the time.  There's Second Circuit case law firmly

9        stating as much.

10               THE COURT:  I can't hear you.

11               MR. BOVE:  Mr. Denbeaux's statements are admissible as

12       statements of an agent of the defendant pursuant to Rule 801

13       this was something we briefed and was unopposed to prior to the

14       trial.  So, I'm surprised at the objection.  There's clear

15       Second Circuit case law.

16               THE COURT:  Mr. Schact.

17               MR. SCHACHT:  I'm not sure what the witness is about

18       to say but it's true, a lawyer can be an agent for a client but

19       it has to be some kind of statement against penal interest or

20       it has to fill some to sort objection.

21               THE COURT:  I change my ruling.  Objection is

22       overruled.

23               (Continued on next page)

24

25

J58AAKOU4                          Shannon - Direct

1              (In Open Court)

2              THE COURT:  I changed my mind, members of the jury.

3    The objection is overruled and the testimony will be elicited.

4    BY MR. BOVE:

5    Q.  Special Agent Shannon, before that side bar you were

6    testifying about a point in the April 3, 2017 interview where

7    the defendant walked out and then Mr. Denbeaux walked out and I

8    think you said Mr. Denbeaux came back in.

9    A.  Mr. Denbeaux and the defendant both came back in.

10   Q.  What, if anything, did Mr. Denbeaux say at that point?

11   A.  Mr. Denbeaux stated that from his perspective, one of two

12   things was happening.  Either one, the defendant led us to

13   believe he had more valuable information than he actually had

14   or two, that the defendant had valuable information.  He was

15   simply unprepared to share it at this time.

16   Q.  After Mr. Denbeaux said those things, did the defendant say

17   anything?

18   A.  Yes.

19   Q.  What did he say?

20   A.  The defendant latched on to both of those reasons and

21   stated that there was some information that he was too scared

22   to share and also that we had overrated his knowledge of the

23   IJO.

24   Q.  What happened at that point on April 3, 2017?

25   A.  At that point we decided to end the interview for the

1    evening and reconvene at a later date.

2    Q.  Now, during the interview that we just talked about,

3    April 3, do you remember if the defendant took any notes?

4    A.  No, I didn't see him take any notes.

5    Q.  And that document that we spoke about before, Government

6    Exhibit 221 is still in front of you?

7    A.  Yes, it is.

8    Q.  Could you turn it over please?

9    A.  Yes.

10   Q.  Is there anything on the back?

11   A.  There are handwritten notes on the back.

12             MR. BOVE:  Ms. Shields, could you bring up the back

13   page of Government Exhibit 221 and if you could zoom-in on the

14   top left corner please.

15             THE COURT:  Whose notes are these, Ms. Shannon, do you

16   know?

17             THE WITNESS:  I believe these are the notes of the

18   defendant, your Honor.

19             MR. SCHACHT:  Objection.

20             THE COURT:  What's the basis of your belief?

21             THE WITNESS:  These were the -- this was a document

22   that was seized from the defendant's residence when we executed

23   the search warrant following his arrest.

24             THE COURT:  Objection overruled.

25   Q.  Special Agent Shannon, can you read any of the words on the

J58AAKOU4                        Shannon - Direct

1    list that are on the screen right now?

2               THE COURT:  She has no special competence to do that.

3    Q.  Are the things that are listed on screen right now topics

4    that came up during the meeting on April 3?

5    A.  They are.

6               MR. BOVE:  Ms. Shields, if you could zoom-out a little

7    bit so we could see the entry to the right of this on both

8    please.

9    Q.  Do you see the two lines to the right?

10   A.  I do.

11   Q.  Did you or Special Agent Costello use words like that

12   during the April 3 interview?

13   A.  No.

14              MR. BOVE:  Ms. Shields, could you please zoom-in own

15   the rest of left part of column of the document.

16              (Pause)

17   Q.  Do you see the entry that says that's an advantage to being

18   justice, collect information, send message to community?

19   A.  Yes.

20              MR. BOVE:  Ms. Shields, if you could highlight that.

21              (Pause)

22   Q.  During the interviews, did you or Special Agent Costello

23   use terms like "send message to community"?

24   A.  No.

25   Q.  There's a reference below that to security clearance; do

1    you see that?

2    A.  Yes.

3    Q.  Did security clearances come up on March 23 or April 3?

4    A.  No.

5            THE COURT:  Did you see defendant taking notes during

6    the meeting?

7            THE WITNESS:  Your Honor, I did not see him taking

8    notes during the meeting.

9            THE COURT:  You have no knowledge whether this set of

10   notes reflects anything said at the meeting or reflects

11   someone's thoughts afterwards?

12           THE WITNESS:  That's correct, your Honor.

13           THE COURT:  And we're assuming that this is

14   defendant's handwriting because it was found in defendant's

15   apartment.

16           MR. BOVE:  Judge, if I could ask one follow-up

17   question on the topic --

18           THE COURT:  Is that right, Ms. Shannon?

19           THE WITNESS:  That's correct, your Honor.

20   Q.  Are you also familiar with the defendants handwriting from

21   immigration applications?

22   A.  Yes.

23   Q.  What about passport applications?

24   A.  Yeah.

25   Q.  Did the defendant make marks on documents -- strike that.

1          You are familiar with the defendant's handwriting on

2    those two basis, as well?

3    A.  Yes.

4          MR. BOVE:  You can take those two down, Ms. Shields.

5    Q.  You just described an interview that took place on April 3,

6    2017?

7    A.  Correct.

8    Q.  I'd like to direct your attention to April 5, couple days

9    later?

10   A.  Yes.

11   Q.  Did you meet with the defendant that day?

12   A.  Yes, I did.

13   Q.  Who requested the meeting on April 5?

14   A.  The defendant through his attorney, Mr. Denbeaux.

15   Q.  Where was the meeting held?

16   A.  Seton Hall Law School.

17   Q.  And who was there at the start of the meeting?

18   A.  At the start of the meeting I was present, Special Agent

19   Costello was present, Mr. Denbeaux and the defendant.

20   Q.  Who spoke first on April 5, 2017?

21   A.  Mr. Denbeaux did.

22   Q.  What did he say?

23   A.  Mr. Denbeaux attempted to reset the stage of it.  The

24   previous meeting had ended on a tense note and so Mr. Denbeaux

25   stated that he wished to clear the air and that his client, the

1   defendant, was an American and he was here to help him provide

2   information on that basis.

3   Q.   How, if at all, did you respond when Mr. Denbeaux said

4   those things?

5   A.   We told Mr. Denbeaux and the defendant again that we could

6   make no promises or guarantees for any benefits in exchange for

7   the information he was providing.

8   Q.   Did you say anything about "candor"?

9   A.   Yes.

10  Q.   What did you say?

11  A.   We said that if the defendant was truthful and honest we

12  would pass along the request that he was making.

13  Q.   What happened at that point during the April 5 meeting?

14  A.   At that point the defendant stated that he wanted to

15  conduct the interview one-on-one with me.

16  Q.   Did he say why?

17  A.   He said intelligence work is done one-on-one and that he

18  was comfortable or saw something in me.

19  Q.   What happened after the defendant said that?

20  A.   At that time Special Agent Costello and I stepped out into

21  the hallway to discuss the requests that the defendant had

22  made.

23  Q.   What did you only Special Agent Costello talk about in the

24  hallway?

25         MR. SCHACHT:   Objection.

1          THE COURT:  Sustained.

2     Q.  Did you have any concerns at that point?

3          MR. SCHACHT:  Objection.

4     A.  I did.

5          THE COURT:  Sustained.  The jury will disregard the

6     answer.

7     Q.  Were there any circumstances about the defendant's requests

8     that raised an issue?

9          MR. SCHACHT:  Objection.

10         THE COURT:  Sustained.

11         Did you in fact have a one-on-one meeting?

12         THE WITNESS:  I did, your Honor.

13         THE COURT:  Proceed, Mr. Bove.

14    Q.  Were you comfortable having a one-on-one meeting?

15         MR. SCHACHT:  Objection.

16         THE COURT:  Sustained.

17         What happened?  Who said what?  Did you say anything

18    to him and did he say anything to you?

19         THE WITNESS:  I'm sorry, your Honor.  Did I say --

20         THE COURT:  You are talking now with Mr. Kourani,

21    right?

22         THE WITNESS:  When I re-entered the interview room I

23    was talking to Mr. Kourani.

24         THE COURT:  You and he, nobody else?

25         THE WITNESS:  That's correct, sir.  Yes, your Honor.

1          THE COURT:  In the same meeting room as before or in a

2     different room?

3          THE WITNESS:  We were in the same meeting room.

4          THE COURT:  Who opened?

5          THE WITNESS:  Who spoke first?

6          THE COURT:  Yes.

7          THE WITNESS:  When I re-entered the room, your Honor,

8     the defendant requested that we change seats in the interview

9     room.

10          THE COURT:  And what happened?

11          THE WITNESS:  I told the defendant I would sit where

12     ever he wanted me to sit.

13          THE COURT:  So he changed seats?

14          THE WITNESS:  We did.  We changed seats.

15          THE COURT:  Go ahead, Mr. Bove, keep going.

16     BY MR. BOVE:

17     Q.  Did you ask the defendant anything about Mr. Denbeaux

18     before you proceeded with the interview?

19          THE COURT:  Why don't we find out what he said and she

20     said.

21          You changed seats and who said something next?

22          THE WITNESS:  I spoke next, your Honor.

23          THE COURT:  What did you say?

24          THE WITNESS:  I asked the defendant if he was certain

25     that he wished to proceed one-on-one without the presence of

J58AAKOU4                        Shannon - Direct

1    his attorney.

2              THE COURT:  What was his answer?

3              THE WITNESS:  The defendant said, yes, he wanted to

4    talk one-on-one with me.

5              THE COURT:  Proceed in that fashion, Mr. Bove, who

6    said what and when.

7              MR. BOVE:  Yes, your Honor.

8    Q.  After the defendant confirmed that, did he say anything

9    about operational surveillance?

10             THE COURT:  What did he say next?

11   A.  The defendant then proceeded to state that he had

12   previously withheld information with respect to operational

13   surveillance he had conducted of military and intelligence

14   outposts in New York City.

15             THE COURT:  Did he say anything else then?

16             THE WITNESS:  He did.

17             THE COURT:  Or did you just answer?  Give us a running

18   account of what happened.

19             THE WITNESS:  Sure.

20             MR. BOVE:  May I be heard?  This is important.

21             THE COURT:  No.

22             Go ahead.

23   A.  The defendant stated that he then, that what he had done in

24   terms of surveillance with respect to those military and

25   intelligence outposts was not just --

1            THE COURT:  Hold on a minute.

2            Do you have an evidentiary concern or some other

3     concern?

4            MR. BOVE:  I have an evidentiary concern.

5            THE COURT:  Proceed.

6     A.  He said that he conducted surveillance of the U.S. Army

7     69th Regiment Armory on Lexington Avenue and that he did so

8     utilizing his cellphone.  He videoed that location.  He took

9     that data and then moved it to an SD card, took that SD card

10    and on his person and transported it back to Lebanon, where he

11    turned it over to his Islamic Jihad handler Fadi.

12           THE COURT:  What's an SD card?

13           THE WITNESS:  It's a storage card where you can store

14    data or information, your Honor.

15           THE COURT:  Continue, Mr. Bove.

16    Q.  Did the defendant say anything about identification

17    documents next?

18    A.  He did.

19    Q.  What did he say?

20    A.  The defendant stated that he was tasked by his IJO handler

21    to try to obtain a job at the Department of Motor Vehicles so

22    that he could obtain identification documents such as licenses

23    and also they were interested in procuring license plates.

24    Q.  Did the defendant provide a timeframe for when he was asked

25    to do that?

J58AAKOU4                    Shannon - Direct

1   A.  Yes, in the 2012/13 timeframe.

2   Q.  Did he say anything else about this tasking to obtain

3   identification documents?

4   A.  He did.  The defendant stated that he explained to his

5   handler at that time, Fadi, that it would be suspicious if he

6   were to try to obtain a job at the Department of Motor Vehicle

7   because he was someone who had an MBA degree and in the United

8   States that would be a high level of education for a job at the

9   DMV.  And so he told his handler that that would look

10  suspicious and that he didn't want to do that.

11  Q.  Did the defendant say that he made an alternate proposal?

12  A.  Yes.  The defendant stated that Fadi then instructed him to

13  befriend or get to know someone who worked at the DMV so that

14  that person could be utilized in the future to procure those

15  items on behalf of the IJO.

16  Q.  Did the defendant say anything about Israelis at that point

17  in the interview?

18          MR. SCHACHT:  Objection.

19          THE COURT:  Overruled.

20  A.  Yes, he did.  He stated that Fadi had at that time

21  instructed him to identify Israeli businessmen in the New York

22  area and to collect information about the identity of those

23  individuals.

24          (Continued on next page)

25

1    BY MR. BOVE:

2    Q.   Did you ask the defendant any questions about that IJO

3    mission?

4    A.   I did.

5    Q.   What did you ask him?

6    A.   I asked him why he thought the IJO would be interested in

7    collecting information on Israeli businessmen in New York.

8    Q.   What did the defendant say?

9    A.   The defendant stated that the IJO would have wanted this

10   information for purposes of revenge, assassination, or

11   recruitment.

12   Q.   Did the defendant say anything else on April 5th about the

13   IJO training in the auditorium?

14   A.   He did.

15   Q.   What did he say about this training session when he spoke

16   to you personally on April 5th?

17   A.   The defendant stated that at this training, he had

18   previously held back details about the training, that this was

19   not just an interrogation training, but it also included a

20   weapons or military component to it.

21   Q.   Did the defendant say anything about the schedule of the

22   training?

23   A.   He did.  The defendant stated that in the morning hours,

24   they would train on weapons or military small unit tactics, and

25   in the afternoons, they would get lecture-style interrogation

1   training.

2   Q.   Did the defendant say anything about interrogation training

3   directly from Fadi during the interview on April 5th?

4   A.   He did.

5   Q.   What did he say about that?

6   A.   The defendant stated that he had received lessons from Fadi

7   one-on-one about how to resist an interrogation.

8   Q.   Did the defendant talk about any of the principles that he

9   was instructed on during that training with Fadi?

10  A.   He did.  He stated that Fadi had coached him or taught him

11  how to not provide an interrogator or a questioner with any

12  weaknesses to leverage.  And the defendant gave an example of

13  that.

14  Q.   What did he say?

15  A.   The defendant stated that he had deployed or utilized this

16  training in 2016, when he previously met with FBI agents.  The

17  defendant stated that during those meetings, he had told the

18  FBI that he was interested in benefits for his wife and his

19  brother, Moustapha Kourani, at the time, but, in reality, those

20  were not things that the defendant was interested in.  He

21  didn't think he needed the FBI's assistance with obtaining

22  those benefits.  And so the defendant stated, by telling them

23  that that was something he was interested in when it wasn't, he

24  did not provide the agents with any weaknesses to leverage.  He

25  didn't provide them with anything that he truly cared about for

J58KKOU5                         Shannon - Direct

1    them to take advantage of.

2    Q.  Did the defendant say anything about codes during the

3    meeting on April 5th?

4                  THE COURT:  About what?

5                  MR. BOVE:  Codes.

6                  THE WITNESS:  He did.

7    BY MR. BOVE:

8    Q.  What did the defendant say?

9    A.  The defendant stated that he established a set of code

10   language to communicate with his handler, Fadi, when he was not

11   in Lebanon.  The defendant stated that prior to 2012, the code

12   language that they agreed on had to do with a job, so a message

13   would include or incorporate, "I have a job for you," or, "I

14   have a legitimate job back in Lebanon," and then that would be

15   a signal to the defendant that he should return to Lebanon.

16                  And then after 2012, the defendant stated those codes

17   changed -- excuse me, I need to correct what I just said.  The

18   codes that I just described, about having a legitimate job or

19   having a question about a job, were the codes that they used

20   after 2012.  Prior to that year, they utilized codes having to

21   do with marriage, "I have a bride for you," or, "I have someone

22   for you to meet in Lebanon."

23   Q.  Did he say why those codes changed?

24   A.  He did.  Post 2012, it changed to being about jobs because

25   he got married in 2012.

1   Q.   What, if anything, did the defendant say about talking to

2   Fadi directly on the phone?

3   A.   He did not talk to Fadi directly on the phone from the U.S.

4   Q.   What did the defendant say about saving emails from Fadi?

5   A.   The defendant stated any emails he received from his IJO

6   handler were immediately deleted because he knew they were

7   operational.

8   Q.   You testified earlier that the defendant described a friend

9   named Ali Srour during the April 3rd interview?

10  A.   He did.

11  Q.   Did he saying anything about Ali Srour on April 5th?

12  A.   He did.

13  Q.   What did he say?

14  A.   He stated that Ali Srour was a topographical engineer and

15  that he worked on missiles for Hezbollah.

16  Q.   Did the defendant say anything about a cell phone on

17  April 5th?

18  A.   He did.

19  Q.   What did he say?

20  A.   The defendant stated that he was aware that Hezbollah had

21  certain capabilities or abilities when it came to cell phones

22  and about WhatsApp communications.  I did not respond to the

23  defendant when he said that because I believed he was trying to

24  elicit information from me about FBI capabilities when it came

25  to cell phone technology and encrypted applications.

1    Q.  Did the defendant provide any more information about

2    airport surveillance on April 5th?

3    A.  He did.

4    Q.  What did he say?

5    A.  The defendant stated around the same time he provided

6    information about the JFK Airport in Queens, he also provided

7    information to his IJO handler about the Toronto airport,

8    Toronto Pearson airport.

9    Q.  Did he describe the types of information that he provided

10   about the Toronto airport to Fadi?

11   A.  Yes.  The defendant stated that he provided information

12   about security procedures, uniforms worn by security officers

13   in the airport, whether those security officers were armed.

14         MR. BOVE:  Ms. Shields, could you bring up 601 again,

15   please.  And zoom in on the rows for WestJet flights on June 9,

16   2014 through September 5, 2012.

17   Q.  Special Agent Shannon --

18         MR. BOVE:  Thank you, Ms. Shields.

19   Q.  Special Agent Shannon, if you could focus on the bottom

20   three rows.  Do you see the references to YYZ?

21   A.  I do.

22   Q.  What is YYZ?

23   A.  That is the three-digit airport code for Toronto Pearson

24   airport.

25   Q.  How many times, in those three rows, did the defendant

1    transit that airport?

2    A.   Twice.

3          MR. BOVE:  You can take that down, please.

4          THE COURT:  Which column are we talking about?

5          MR. BOVE:  Ms. Shields, if you could highlight, in the

6    far right, the two references to YYZ.  It's the bottom two,

7    actually.  Thank you.

8          THE COURT:  Ah, okay.  And each time he went there

9    from LaGuardia; is that right?

10         THE WITNESS:  Yes, your Honor.

11         THE COURT:  Thank you.

12         MR. BOVE:  Thank you, Ms. Shields.

13   BY MR. BOVE:

14   Q.   Did you ask the defendant any questions about China on

15   April 5th?

16   A.   I did not.

17   Q.   Did the defendant raise China himself?

18   A.   He did.

19   Q.   What did he say?

20   A.   The defendant stated that his travel to Guangzhou, China,

21   in 2009 was strictly for business, that he had a contact in the

22   counterfeit clothing business, a Chinese man, by the name of

23   Frank, he didn't know his last name, and that he had traveled

24   to China with Frank's son to attend this trade show.  He didn't

25   know the name of Frank's son.

1   Q.  When the defendant made those claims during the interview

2   on April 5th, did he say anything about his IJO recruitment?

3   A.  He did.  The defendant stated that, in addition to that --

4   the trip to China was in 2009, and he had not been recruited

5   into the IJO until 2010.

6   Q.  Did the defendant say anything about being terminated by

7   the Islamic Jihad Organization during the April 5th interview?

8   A.  He did.

9   Q.  What did he say?

10  A.  The defendant stated that he wanted to clarify when it was

11  that he was no longer a member of the IJO, and he stated that

12  in September 2015, he had returned to Lebanon, and at that

13  time, he was contacted by his handler to set up a meeting.

14  Q.  Did the defendant say that he met with Fadi during that

15  return trip to Lebanon in September 2015?

16  A.  He did.

17  Q.  What did he say happened?

18  A.  The defendant stated that when he arrived at the meeting,

19  Fadi was not present, it was another unknown individual from

20  the IJO, and that this person told him that his unit had been

21  dismantled or disbanded and thanked him for his service.

22  Q.  How did the interview on April 5th end?

23  A.  On April 5th, the interview ended with Mr. Denbeaux

24  knocking at the door indicating that he had an appointment that

25  he needed to get to.

J58KKOU5                           Shannon - Direct

1    Q.  Did Mr. Denbeaux and Special Agent Costello come back in
2    the room at that point?
3    A.  They did.
4    Q.  What happened next?
5           THE COURT:  How long had the one-on-one meeting taken
6    place?  How long had it elapsed?
7           THE WITNESS:  Your Honor, we were in there for a few
8    hours.
9    BY MR. BOVE:
10   Q.  What happened when Special Agent Costello and Mr. Denbeaux
11   came back into the room?
12   A.  When Special Agent Costello and Mr. Denbeaux reentered the
13   room, we ended the way we did most nights - reiterating that we
14   could make no promises or guarantees with respect to any of the
15   information the defendant had shared.
16   Q.  Did you meet with the defendant again after April 5th?
17   A.  We did.
18   Q.  Was the next meeting on April 14th?
19   A.  It was.
20   Q.  Who requested the April 14th, 2017 meeting?
21   A.  The meeting was requested by the defendant through his
22   attorney, Mr. Denbeaux.
23   Q.  Was this also at Seton Hall?
24   A.  It was.
25   Q.  And who was there for the April 14th meeting?

J58KKOU5                          Shannon - Direct

1    A.  I was present, Special Agent Costello, the defendant, and

2    Mr. Denbeaux.

3    Q.  At the beginning of this meeting on April 14th, did the

4    defendant say anything?

5    A.  He did.

6    Q.  What, if anything, did he say about financial assistance

7    and housing?

8    A.  The defendant stated that he wished for us to get him a job

9    in the engineering field, and also that he wanted us to get him

10   a doorman building in Manhattan.

11             MR. BOVE:  Ms. Shields --

12             THE COURT:  To live in?

13             THE WITNESS:  To live in, your Honor, yes.

14             MR. BOVE:  Ms. Shields, if you could please publish

15   Government Exhibit 401-D-15.  This is in evidence.  If you

16   could zoom in on the email header, please.

17   BY MR. BOVE:

18   Q.  Special Agent Shannon, what is this?

19   A.  This is an email from the defendant's account

20   ali.m.kourani@gmail.com, and it's sent to Special Agent Joseph

21   Costello at his FBI.gov email.

22   Q.  What's the date of the email?

23   A.  April 18, 2017.

24   Q.  Are there any attachments?

25   A.  There are.

1    Q.  What are their titles?

2    A.  DM-resume and BME_resume.

3              MR. BOVE:  Ms. Shields, if you could zoom out a bit,

4    so we could see the message, please.

5    BY MR. BOVE:

6    Q.  Do you see where it says, "These are two versions of my

7    resume"?

8    A.  I do.

9    Q.  Did anybody solicit the defendant's resume during the

10   meeting on April 14th, 2017?

11   A.  No.

12             MR. BOVE:  You can take that down, Ms. Shields.

13   Q.  When the defendant made these demands about the doorman

14   building and engineering job, how, if at all, did you respond?

15   A.  We told the defendant that we would pass along his request

16   to our supervisors.

17   Q.  Did you make any promises?

18   A.  No.

19   Q.  Did you show the defendant any photos at the beginning of

20   the meeting on April 14th?

21   A.  Yes, we did.

22   Q.  I'm showing you a document marked for identification as

23   Government Exhibit 803.  What is this?

24   A.  These are the photographs that we showed to the defendant

25   on April 14th.

1          MR. BOVE:  Your Honor, at this time I have a map to

2     offer.  It's marked Government Exhibit -- there's a map that I

3     would ask the Court to take judicial notice of.  It's marked

4     Government Exhibit 9.  It is a map of New York City and the

5     surrounding area.

6          THE COURT:  All right.

7          MR. BOVE:  Ms. Shields, if you could bring the map up

8     just for the Judge.

9          The government offers Exhibit 9, your Honor.

10          MR. SCHACHT:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 9 received in evidence)

13          THE COURT:  Officially noticed.

14          MR. BOVE:  Thank you, your Honor.  It's a map of

15     Manhattan.

16     BY MR. BOVE:

17     Q.  Special Agent Shannon, why did you start the meeting on

18     April 14th by showing the defendant some pictures?

19     A.  At this point, the defendant had discussed several

20     different locations that he had conducted operational

21     surveillance of, and we wanted to ensure that we had correctly

22     captured or identified the locations the defendant was

23     previously talking about.

24          MR. BOVE:  Ms. Shields, if you can bring up Government

25     Exhibit 9 for everyone on the left, and on the right,

J58KKOU5                        Shannon - Direct

1   Government Exhibit 803.  If you could zoom in a bit on the map

2   portions, so they can see the tags a little better.

3            THE COURT:  Keep your voice up, Mr. Bove.

4            MR. BOVE:  I apologize, your Honor.

5            Thank you, Ms. Shields.

6   BY MR. BOVE:

7   Q.  Special Agent Shannon, on the right side of the screen,

8   there's a photograph.  Do you see that?

9   A.  I do.

10  Q.  What is depicted in that exhibit on page 1?

11  A.  That is a photograph of the exterior of 26 Federal Plaza.

12  That's the building that I've referenced.  It's just across the

13  street from the courthouse here on the other side of Foley

14  Square.  This is the entrance that faces Broadway.

15  Q.  During the interview on April 14th, did you ask the

16  defendant to do anything when you showed him these photos?

17  A.  Yes.

18  Q.  What did you ask him to do?

19  A.  We asked the defendant to identify the locations he had

20  conducted surveillance of by placing his initials on the

21  document.

22  Q.  How did the defendant respond when you asked him to do

23  that?

24  A.  The defendant stated that he was concerned about putting

25  his initials on the document in case Hezbollah were to ever

1    discover he was cooperating with the FBI.  And so he directed

2    his attorney, Mr. Denbeaux, to place a star, asterisk, on the

3    photographs he positively could identify.

4    Q.  So there's some kind of a pen mark with a star below the

5    photo here.  Who made that mark?

6    A.  That mark was made by Mr. Denbeaux, at the direction of the

7    defendant.

8    Q.  You said that this address is 26 Federal Plaza?

9    A.  That is correct.

10         MR. BOVE:  Ms. Shields, could you please bring up

11   401-C.  And if you could highlight rows 86 through 88.

12   Q.  Special Agent Shannon, during the interview on April 14th,

13   did the defendant describe any steps that he took with respect

14   to 26 Federal Plaza?

15   A.  He did.

16   Q.  What did the defendant say he did?

17   A.  The defendant stated he had done searches on this location,

18   that he had done a Google Earth satellite aerial image of the

19   location, and that he had provided those images back to his IJO

20   handler, Fadi.

21         MR. BOVE:  Ms. Shields, if you could bring up

22   Government Exhibit 9 on the left again, and this time on the

23   right, if we could look at page 5 of Government Exhibit 803,

24   please.  If you could rotate that for us.  Thank you.

25   Q.  Special Agent Shannon, what is this?

1    A.   This is a copy -- excuse me.   This is a picture of 335

2    Adams Street in Brooklyn, the building.

3    Q.   Do you see that location on the map on the left side of the

4    screen?

5    A.   I do.

6    Q.   It's in the bottom towards the left corner?

7    A.   Yeah.   It's towards the center, all the way -- it's the

8    furthest southern marker all the way towards the bottom of the

9    page.

10   Q.   On the far right side of the screen, it looks like there's

11   another pen mark or a star.   Who made that?

12   A.   That mark was made by Mr. Denbeaux, at the direction of the

13   defendant, after he positively identified this location as the

14   building where U.S. Secret Service sits and he conducted

15   surveillance of.

16   Q.   Did the defendant describe how he conducted that

17   surveillance?

18   A.   Yes.   Just as in the case with 26 Federal Plaza, the

19   defendant had provided Google Earth satellite images of this

20   location to his IJO handler, Fadi.

21   Q.   Are you generally familiar with this building that we see

22   on the right side of the screen, 335 Adams Street?

23   A.   Yes.

24   Q.   Is there any indication on the outside of the building that

25   the Secret Service has offices there?

J58KKOU5                         Shannon - Direct

1    A.  No.

2              MR. BOVE:  Ms. Shields, on the right, could you please

3    bring up page 2 of Government Exhibit 803.  If you could zoom

4    in on the photo and the mark below.

5    BY MR. BOVE:

6    Q.  Special Agent Shannon, what is this?

7    A.  This is U.S. Army National Guard building in upper

8    Manhattan, on Fifth Avenue.

9    Q.  Do you see that location on the map on the left side of the

10   screen?

11   A.  I do.

12   Q.  Is that address 2366 Fifth Avenue?

13   A.  Yes.

14   Q.  In the upper right?

15   A.  That's correct.

16   Q.  It looks like there's a pen mark below the photo, page 2 of

17   Government Exhibit 803?

18   A.  Yes.

19   Q.  What is that?

20   A.  That is a pen mark put on the document by Mr. Denbeaux, at

21   the direction of the defendant.

22   Q.  What, if anything, did the defendant say about this

23   photograph during the interview on April 14th?

24   A.  The defendant stated that with respect to this location, he

25   had passed intelligence to the IJO.

1    Q.  Did he tell you what kinds of intelligence that he had

2    passed about this building?

3    A.  No.

4              MR. BOVE:  Ms. Shields --

5              THE COURT:  Did you ask?

6              THE WITNESS:  Your Honor, I'm not certain if we asked

7    him at that time.

8              MR. BOVE:  Ms. Shields, could you bring up page 8,

9    please.  Zoom in on the photo and the mark below.

10   BY MR. BOVE:

11   Q.  Special Agent Shannon, what's this?

12   A.  This is a picture of the U.S. Army 69th Regiment Armory

13   located on Lexington Avenue in Manhattan.

14   Q.  What is the star mark below that photo?

15   A.  That is the mark placed on the document by Mr. Denbeaux, at

16   the direction of the defendant, after he positively identified

17   this location.

18             MR. BOVE:  Could you bring up page 9 of the exhibit,

19   please, Ms. Shields.  And if you could zoom in on the photo and

20   the mark.

21   Q.  Is this another picture of the same armory?

22   A.  It is.

23   Q.  Who made the mark below it?

24   A.  That was Mr. Denbeaux, at the direction of the defendant.

25             MR. BOVE:  Ms. Shields, if you could bring up 401-C

J58KKOU5                        Shannon - Direct

1  again.  And highlight rows 58 and 59.

2  BY MR. BOVE:

3  Q.  During the April 14th meeting, what, if anything, did the

4  defendant say that he did with respect to this location, that

5  armory?

6  A.  The defendant stated that he had conducted surveillance of

7  this location, that he utilized his cell phone to conduct that

8  surveillance, and then that he transported that image back to

9  Lebanon.

10            THE COURT:  Transported or transmitted?

11            THE WITNESS:  He transported it on his person and took

12  it back with him to Lebanon, your Honor.

13            The defendant -- I apologize.  The defendant also

14  stated that the way he took the surveillance of this location

15  was in accordance with his IJO training, that he included areas

16  before the building and after, so that if someone were to find

17  this footage, they wouldn't really know what it was that he was

18  looking at or surveilling.

19  BY MR. BOVE:

20  Q.  To follow up on the question from the Court:  Did the

21  defendant say, during that interview, how he brought this video

22  back to Lebanon?

23  A.  Yes.  He had put this material onto an SD card and

24  transported it back to Lebanon.

25  Q.  What did the defendant say that he did with that SD card in

J58KKOU5                          Shannon - Direct

1   Lebanon?

2   A.   The defendant stated that he provided that to his IJO

3   handler, Fadi, and that Fadi told him IJO leadership would be

4   pleased with the surveillance of this location.

5   Q.   When the defendant described that conversation with Fadi,

6   did he say anything about the surveillance strategy of the

7   Islamic Jihad Organization?

8   A.   The defendant talked about the strategy of utilizing a

9   cover identity in connection with conducting surveillance.

10  Q.   What, if anything, did the defendant say about whether one

11  instance of operational surveillance would be sufficient for

12  the purposes of the IJO?

13  A.   The defendant stated that when the IJO is surveilling

14  locations, it is often their practice to send another operative

15  at a later date to surveil that same location before they take

16  any operational activity with respect to that location.

17  Q.   Now, you just mentioned that the defendant referred to

18  cover identities during this meeting?

19  A.   He did.

20  Q.   What else did he say on the topic of cover identities?

21  A.   The defendant stated that he was trained to use patterns

22  consistent with his cover identity when conducting operational

23  missions, and he stated that he did that in the instance of

24  surveilling the 69th Regiment Armory.

25             THE COURT:   Did he say what he meant by that?

1              THE WITNESS:  Yes.  Yes, your Honor, he did.

2              THE COURT:  What did he say?

3              THE WITNESS:  He said that he had surveilled this

4    location when he was taking his daily commute to his job at a

5    clothing store at that time, so that it fit within his normal

6    pattern of life.

7    BY MR. BOVE:

8    Q.  Did the defendant say anything about his last name at that

9    point in the interview?

10   A.  He did.  The defendant also stated that he was told by his

11   IJO handler that his last name provided some sort of cover

12   because people would not believe that someone with the last

13   name Kourani would be used as an operative because that name

14   was so well-known within Hezbollah.

15   Q.  Did the topic of IJO sleeper cells come up on April 14th?

16   A.  It did.

17   Q.  What, if anything, did the Defendant say about sleeper

18   cells maintained by the Islamic Jihad Organization?

19   A.  The defendant stated that sleeper cells were located in the

20   United States, and that he considered himself part of the

21   sleeper cell here in New York.

22   Q.  Did the defendant describe the IJO's strategy for using

23   those sleeper cells?

24   A.  Yes.  The defendant stated that there were a number of

25   different scenarios which could require a sleeper cell

1    operative to respond or react, and the defendant stated that

2    those instances would be if the United States were to engage in

3    a war with Iran, or if the United States were to take any

4    action against Hezbollah, Hassan Nasrallah, the Secretary

5    General of Hezbollah, or if the U.S. were to target Iranian

6    interests in any way.

7    Q.  Did the defendant talk about any particular IJO attacks

8    during the interview on April 14th?

9    A.  He did.

10   Q.  Which attack?

11   A.  The defendant spoke about the Burgas, Bulgaria bus bombing

12   in 2012.

13   Q.  What, if anything, did the defendant say about Fadi's role

14   in that bombing?

15   A.  The defendant stated that he believed Fadi was directly

16   involved in the Burgas, Bulgaria bus bombing.

17   Q.  Did the defendant tell you why he believed that?

18   A.  Yes.  The defendant stated that he was aware that Fadi was

19   responsible for IJO operatives in both the United States and

20   Canada, and one of the bombers involved in the Burgas bus

21   bombing was a dual Lebanese-Canadian citizen.

22          THE COURT:  You want to ask about the incident itself,

23   so the jury knows what we're talking about?

24   BY MR. BOVE:

25   Q.  Special Agent Shannon, are you familiar with the

1    circumstances of that attack?

2    A.  Yes.

3    Q.  What happened?

4    A.  In 2012, in July, in Burgas, Bulgaria, IJO operatives blew

5    up a bus that was transporting Israeli tourists, killing, I

6    think, approximately six tourists and also killing the bus

7    driver.

8    Q.  During the interview on April 14th, did the defendant say

9    anything about IJO assignments related to Canada?

10   A.  He did.

11   Q.  What did he say about IJO assignments related to Canada?

12   A.  The defendant stated that his handler, Fadi, had asked him

13   about transporting correspondence to operatives in Canada.  His

14   handler was aware that he had married a Canadian citizen, and

15   so he told the defendant that it wouldn't appear suspicious or

16   odd if he were to make travel to Canada with some regularity or

17   frequency.

18   Q.  Did the defendant describe any more details that he was

19   instructed about how those missions would be carried out?

20   A.  Yes.  Those missions were described that they would take

21   place like dead drops.

22   Q.  What's a dead drop?

23   A.  A dead drop is a spy technique in which an intelligence

24   officer or an operative passes -- they pass messages between

25   one another utilizing a secretive and static location, so that

J58KKOU5                         Shannon - Direct

1   the operatives or intelligence officers never have to meet

2   face-to-face.

3   Q.  Did the defendant say whether he had delivered messages to

4   IJO operatives in Canada?

5   A.  The defendant claimed he had never delivered any messages

6   to operatives in Canada.

7   Q.  Did you ask the defendant any questions about compensation

8   from the IJO during this interview?

9   A.  Yes.

10  Q.  What did the defendant say about compensation?

11  A.  The defendant stated that the IJO offered to pay him a

12  salary to reimburse him for travel and also to pay off some of

13  his debts, but the defendant stated he never took any money

14  from the IJO.

15  Q.  Did you ask the defendant to identify any IJO operatives on

16  April 14th?

17  A.  We did.

18  Q.  How did he respond?

19  A.  The defendant did not want to identify other operatives at

20  that time and stated that he would help create a profile of

21  what an operative looks like.

22  Q.  What, if anything, did you say in response to the offer of

23  a profile of an IJO operative?

24  A.  We told the defendant we do not need the profile of an

25  operative.  We were sitting there talking to him.

1   Q.  What happened next?

2   A.  At that point, the defendant -- I believe at that point,

3   the defendant left the room with his attorney for a period of

4   time.

5            THE COURT:  How did that come about?

6            THE WITNESS:  I don't recall, your Honor.

7   BY MR. BOVE:

8   Q.  What was the defendant's demeanor like when you asked him

9   to identify the IJO operatives?

10  A.  He was not happy with our request.  He was frustrated with

11  us.

12  Q.  And then he left the room?

13  A.  Yes.

14  Q.  You said Mr. Denbeaux did as well?

15  A.  Mr. Denbeaux did leave the room as well.

16  Q.  Did Mr. Denbeaux come back at some point?

17  A.  He did.

18  Q.  What did he say?

19           THE COURT:  Did Mr. Kourani come back with him?

20           THE WITNESS:  Your Honor, Mr. Denbeaux came back alone

21  at that time.

22  Q.  What did Mr. Denbeaux say when he first came back to the

23  room?

24  A.  Mr. Denbeaux said that the defendant was tired, and he

25  wanted to end the interview for the day.

J58KKOU5                        Shannon - Direct

1   Q.  How did you respond?

2   A.  We told Mr. Denbeaux that the defendant was free to end the

3   interview at that time, but that we would agree at that time to

4   not ask him any more questions about other operatives, as he

5   was clearly upset about having to answer that, and we would ask

6   him some additional questions if he was willing to come back in

7   the room and meet with us.

8   Q.  After you said those things, did the defendant eventually

9   come back in the room?

10  A.  Yes.  Mr. Denbeaux called the defendant on his cell phone,

11  and the defendant came back up.

12  Q.  What happened when he came back?

13  A.  When the defendant reentered the room, he sat down, and

14  Special Agent Costello and I put a couple of pictures in front

15  of him.

16  Q.  I'm showing you an exhibit marked for identification as

17  Government's Exhibits 804.

18          Do you recognize this?

19  A.  Yes.  These are the two pictures we showed the defendant at

20  that time.

21          MR. BOVE:  Your Honor, I offer 804.

22          MR. SCHACHT:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 804 received in evidence)

25          MR. BOVE:  Ms. Shields, if you could bring up page 2

J58KKOU5                              Shannon – Direct

1    of the exhibit on the left and page 1 on the right.

2              THE COURT:  These are both 804?

3              MR. BOVE:  Yes, your Honor.  It's a two-page exhibit.

4              Ms. Shields, if you could zoom in on the entire photo

5    on the left side of the screen.  Thank you.

6              On the right side of the screen, if you could just

7    zoom in on the sticker.

8    BY MR. BOVE:

9    Q.  Special Agent Shannon, focusing on the right side of the

10   screen, what is printed on the top of the sticker?

11   A.  Beirut.

12   Q.  And what about the bottom left?

13   A.  Kourani/Ali.

14   Q.  You said that you showed these photos to the defendant

15   during the interview?

16   A.  Yes.

17   Q.  What did he say?

18   A.  The defendant stated this was a picture of his passport and

19   his SIM card.

20             MR. BOVE:  Ms. Shields, if you could zoom back out on

21   the right side of the screen.

22   Q.  There is an item there with a T in the bottom right corner.

23             Do you see that?

24   A.  Yes.

25   Q.  What is that?

J58KKOU5                          Shannon - Direct

1    A.   That is a SIM card.

2    Q.   Do you see that SIM card in the picture that's on the left

3    side of the screen?

4    A.   Yes.   That's the SIM card -- the SIM card on the left-hand

5    side of the screen is secreted or hidden under that baggage

6    claim sticker.

7              MR. SCHACHT:   Objection.

8              THE COURT:   Overruled.

9    Q.   What did the defendant --

10             THE COURT:   It appears that the sticker is stuck on

11   top of the card on the left-hand side of the screen.

12             Is that a fair description?

13             MR. BOVE:   Yes, your Honor.

14             MR. SCHACHT:   I think so.   Thank you.

15   BY MR. BOVE:

16   Q.   What did the defendant say about these photograph?

17   A.   The defendant stated that he had put his SIM card there, so

18   he wouldn't forget it.

19             MR. BOVE:   You can take that down, Ms. Shields.

20             THE COURT:   What is the -- just a moment, please.

21             MR. BOVE:   Okay.   Bring up --

22             THE COURT:   What's the black object?   Is that part of

23   the exhibit, or is this just for demonstration purposes?

24             THE WITNESS:   That black object, your Honor, is the

25   passport, his U.S. passport.

1                 THE COURT:  The back of it?

2                 THE WITNESS:  The back of it, that's correct, your

3     Honor.

4                 THE COURT:  And top coupon is the kind of thing that

5     gets issued when you go through an airport?

6                 THE WITNESS:  Yeah, that's a baggage claim sticker,

7     your Honor.

8                 THE COURT:  Okay.

9                 Looking at the left, part of that baggage claim

10    sticker is stuck rather securely onto the back of the passport,

11    and the part on the left has been raised?

12                THE WITNESS:  Yes, your Honor.  It was raised for

13    purposes of taking the photograph.

14                MR. SCHACHT:  Objection.

15                THE COURT:  Overruled.

16                So you or your colleague did the raising?

17                THE WITNESS:  A colleague, your Honor.

18                THE COURT:  A colleague did.

19                To show what was underneath?

20                THE WITNESS:  That's correct, your Honor.

21                THE COURT:  Okay.

22                MR. BOVE:  Thank you, Judge.

23                Ms. Shields, you can take those down.

24    BY MR. BOVE:

25    Q.  I still want to stay focused for a bit more on the

1   April 14th interview.  Did the topic of pagers come up?

2   A.  Yes.

3   Q.  What, if anything, did the defendant say about pagers?

4   A.  The defendant stated that when he would return to Lebanon,

5   he would reach out to his handler, Fadi, at a specific

6   telephone number, and that this telephone number was hooked up

7   to what he believed to be a pager system.

8   Q.  Did the defendant say anything about how Fadi established

9   contact after the pager system was used?

10  A.  Yes.  The defendant --

11  Q.  What did he say?

12  A.  The defendant stated that he would call the number, the

13  pager number, and then he would input a series of codes.

14  Q.  Did the defendant say anything about the email addresses

15  that he used to communicate with Fadi?

16  A.  He did.

17  Q.  Did he identify them?

18  A.  Yes.

19  Q.  What are the two email addresses?

20  A.  The defendant stated that he utilized

21  ali.m.kourani@gmail.com and alikuku@hotmail.com.

22  Q.  What, if anything, did the defendant say about how long he

23  and Fadi used email to communicate?

24  A.  The defendant stated that as of about 2012, he no longer

25  utilized the email communications or the pager system because

J58KKOU5                       Shannon - Direct

1   he was instructed not to based on a belief by the IJO that

2   those communication methods had been compromised.

3   Q.  Did the April 14th interview end at that point?

4   A.  It did.

5   Q.  What did the defendant say?

6   A.  At that point the defendant stated he was tired, he wished

7   to end the interview and resume at a later date.

8   Q.  Was there one last interview at Seton Hall?

9   A.  There was.

10  Q.  Was that on April 26th, 2017?

11  A.  Yes, sir.

12  Q.  Who requested that meeting?

13  A.  That meeting was requested by the defendant through his

14  attorney, Mr. Denbeaux.

15  Q.  Who was at Seton Hall for that meeting on April 26th?

16  A.  I was there, Special Agent Costello, the defendant, and

17  Mr. Denbeaux.

18  Q.  At the beginning of the interview, what, if anything, did

19  the defendant say about the timing of his IJO recruitment?

20  A.  The defendant stated that he was recruited by the IJO in

21  2008, not 2010.

22  Q.  What, if anything, did he say about why he had provided a

23  different date in earlier interviews?

24  A.  The defendant stated that he had provided a different date

25  because he was concerned about his naturalization, because he

1   naturalized in 2009, and he didn't want us to think that he was

2   recruited prior to naturalizing.

3   Q.  What, if anything, did the defendant say about instructions

4   that he received from Fadi when he first joined the IJO related

5   to naturalization and a passport?

6   A.  The defendant stated that he was instructed by Fadi to

7   obtain his U.S. citizenship and apply for his U.S. passport as

8   soon as possible.

9   Q.  During the April 26th meeting, did the defendant say

10  anything about the focus of the IJO's activities around the

11  time that he joined in 2008?

12  A.  Yes.  The defendant stated that in 2008, the IJO was

13  desperate to recruit operatives.  They were desperate because

14  they were looking to exact revenge for the death, the

15  assassination, of Imad Mughniyeh, who was one of the founding

16  members of the Islamic Jihad Organization.

17          MR. BOVE:  Ms. Shields, could you bring up 106, which

18  is in evidence, please.

19  Q.  Who is this, Special Agent Shannon?

20  A.  This is Imad Mughniyeh.

21          THE COURT:  Could you give the spelling?

22          MR. BOVE:  M-u-g-h-n-i-y-e-h.  I believe that's how

23  Dr. Levitt spelled it yesterday.

24          THE COURT:  The last name?

25          MR. BOVE:  Mughniyeh.

1          THE COURT:  Spell that, too.

2          MR. BOVE:  That's the one I just spelled,

3   M-u-g-h-n-i-y-e-h.

4          May he proceed, Judge?

5          THE COURT:  Yes, sir, please.

6   BY MR. BOVE:

7   Q.  Did the defendant say anything about email accounts used by

8   Fadi during the interview on April 26th?

9   A.  Yes.

10  Q.  What did he say?

11  A.  The defendant stated that early into his IJO recruitment,

12  Fadi had asked the defendant to provide him with the name of a

13  childhood friend, someone who was not associated with

14  Hezbollah, so that Fadi could utilize that identity to create

15  email accounts or email addresses, so that the defendant would

16  recognize it when he received it.

17  Q.  Did the defendant say whether he provided a name to Fadi

18  for that purpose?

19  A.  He said yes.

20  Q.  What name did the defendant identify to you during the

21  April 26th interview?

22  A.  Helal Kedah.

23  Q.  Let's take a look at the saved contacts in the alikuku

24  email account.

25          MR. BOVE:  This is Government Exhibit 402-B,

J58KKOU5                        Shannon - Direct

1    Ms. Shields.

2              THE COURT:  She's not responsible for those.

3              MR. BOVE:  This is a document in evidence, Judge.

4              THE COURT:  It doesn't make a difference.  There's no

5    special competence to interpret the document.

6              MR. BOVE:  I'm just asking her to read it, not

7    interpret it, Judge.

8              THE COURT:  We can read it, but summation is the time

9    for reading.

10             MR. BOVE:  Thank you, Judge.

11             You can take that down, Ms. Shields.

12   BY MR. BOVE:

13   Q.  You said that during the prior interview, the April 14th

14   interview, that the defendant described how he had been

15   instructed by Fadi to stop using the original pager system in

16   2012?

17   A.  Yes.

18   Q.  During this interview on April 26th, what, if anything, did

19   the defendant say about why he stopped using those pagers?

20   A.  He believed that those methods of communication had been

21   compromised.

22   Q.  What, if anything, did the defendant say about why the IJO

23   thought the communication system had been compromised?

24   A.  The defendant stated that the arrest of Hussam Yacoub in

25   2012 led to a belief that these methods of communication may

1    have been compromised.

2              MR. BOVE:  Ms. Shields, if you could bring up 112 in

3    evidence, please.

4    BY MR. BOVE:

5    Q.  Who is this, Special Agent Shannon?

6    A.  This is Hussam Yacoub, who was arrested in Cyprus in 2012.

7    Q.  On April 26, 2017, what, if anything, did the defendant say

8    about the relationship between Yacoub and Fadi?

9    A.  The defendant stated he thought that Fadi was Yacoub's

10   handler.

11             MR. BOVE:  You can take that down, please,

12   Ms. Shields.

13   Q.  Now, you've testified that on a couple -- during a couple

14   of interviews, the defendant described an IJO training, part of

15   which took place in an auditorium, right?

16   A.  Yes.

17   Q.  Did the defendant say when, approximately, that training

18   occurred?

19   A.  Yes.

20   Q.  What did he say for a date?

21   A.  July 2011.

22             MR. BOVE:  Ms. Shields, if you could please bring up

23   Government Exhibit 601 and turn to page 2.  And zoom in on the

24   rows reflecting travel on June 21st and August 4th, 2011.

25   Q.  What do these indicate, Special Agent Shannon?

1    A.   This is the travel record of the defendant, and it

2    indicates that he exited the United States on June 21st, 2011,

3    and he did not return until August 4th, 2011.

4    Q.   During the interview on April 26th, what, if anything, did

5    the defendant say about how he got to this IJO training in

6    July 2011?

7    A.   The defendant described being picked up in a city,

8    Nabatieh, and that he was picked up in a van.  This van had a

9    curtain that separated the driver from the passengers, and that

10   when he was picked up, he would be handed a mask to wear if

11   there were other operatives inside the van.

12   Q.   Did the defendant say where he was taken?

13   A.   Yes.  The defendant stated that they went to a location

14   known as Birkat Jabbour to train.

15           MR. BOVE:  Your Honor, at this time I'm going to ask

16   the Court to take judicial notice of three additional maps of

17   areas in Lebanon.  They're marked as Exhibits 7-A, B, and C.

18           7-A reflects the locations that Special Agent Shannon

19   just described, Nabatieh and Birkat Jabbour.

20           7-B is a similar map with an overhead aerial view with

21   a pin at Birkat Jabbour.

22           And 7-C is a zoomed-in aerial shot of Birkat Jabbour.

23           Ms. Shields, if you could bring up each of those

24   shots, so the Judge can review them.

25           THE COURT:  There's no objection, right?

1              MR. SCHACHT:  No, Judge.  Thank you.

2              THE COURT:  You can put them up for the jury.

3              MR. BOVE:  Thank you, your Honor.

4    BY MR. BOVE:

5    Q.   Special Agent Shannon --

6              MR. BOVE:  Or, actually, Ms. Shields, could you please

7    draw a circle around Nabatieh on this map.

8    Q.   Special Agent Shannon, what is the red pin to the upper

9    right of Nabatieh?

10   A.   The red pin denotes the area of Birkat Jabbour.

11   Q.   Now let's take a look at 7-C, please.  Do you see the blue

12   text below the center there, Special Agent Shannon?

13   A.   Yes.

14   Q.   What does that indicate?

15   A.   That says Birkat Jabbour.

16   Q.   What did the defendant say that he did at Birkat Jabbour in

17   July 2011?

18   A.   The defendant stated he spent two days in that location,

19   conducting military and weapons training with Hezbollah, the

20   Islamic Jihad Organization.

21   Q.   Did the defendant identify any of the weapons that he used

22   during that training in July of 2011?

23   A.   He did.

24   Q.   I'm handing you a document marked for identification as

25   Government Exhibit 807.

1          What is this?

2     A.   These are photographs we showed to the defendant at that

3     interview.

4               MR. BOVE:  Your Honor, I offer 807.

5               MR. SCHACHT:  No objection.

6               THE COURT:  Received.

7               (Government's Exhibit 807 received in evidence)

8               MR. BOVE:  Ms. Shields, could you please publish page

9     5 of the exhibit.

10    BY MR. BOVE:

11    Q.   Special Agent Shannon, did you give the defendant any

12    instructions regarding this document during the interview on

13    April 26th?

14    A.   Yes.  We asked the defendant to put his initials on the

15    weapons that he trained on with the Islamic Jihad.

16    Q.   How did the defendant respond to that instruction?

17    A.   The defendant again stated he was uncomfortable putting his

18    initials on the photos in case Hezbollah was to discover his

19    cooperation, so he asked his attorney to place a mark on the

20    documents instead.

21              THE COURT:  Can you wait a minute, Mr. Bove?

22              MR. BOVE:  Yes, sir.

23              (Pause)

24              THE COURT:  Go ahead.

25              MR. BOVE:  Thank you, Judge.

1    BY MR. BOVE:

2    Q.  You said that you asked the defendant to mark the weapons

3    that he used in Birkat Jabbour in July 2011?

4    A.  Yeah, we had asked that.

5    Q.  What did the defendant say in response?

6    A.  He wanted to have Mr. Denbeaux place a mark on the

7    documents rather than put his initials.

8    Q.  It's a little faint on the screen, but I think you might be

9    able to see it better on the hard copy exhibit in front of you.

10          Is there a mark in the bottom right of this photo?

11   A.  Yes, there is.

12   Q.  Who made that mark?

13   A.  That mark was made by Mr. Denbeaux.

14   Q.  What did the defendant say about this picture during the

15   interview on April 26th?

16   A.  The defendant stated this was a Glock pistol, that this was

17   his favorite weapon, and that he utilized this during his

18   training in 2011.

19          MR. BOVE:  Ms. Shields, could you please bring up

20   page 2.

21          THE COURT:  What are the features of a Glock pistol?

22          MR. BOVE:  Your Honor, we'll be offering expert

23   testimony on that topic.

24          THE COURT:  Okay.

25

J58KKOU5                        Shannon - Direct

1    BY MR. BOVE:

2    Q.  So we're now at page 2 of Government Exhibit 807.  Is there

3    another mark in the bottom right of this one?

4    A.  There is.

5    Q.  Is that a mark from Mr. Denbeaux?

6    A.  That is.

7    Q.  What, if anything, did the defendant say about this photo

8    during the April 26th interview?

9    A.  The defendant identified this as an MP5 submachine gun.

10   The defendant stated that he was aware that the MP5 utilized

11   the same ammunition as the Glock handgun, and that this weapon

12   could be fired in both automatic and semiautomatic modes, and

13   that he utilized this in his training with the IJO at Birkat

14   Jabbour.

15             THE COURT:  What's a semiautomatic?

16             THE WITNESS:  Semiautomatic, your Honor?

17             THE COURT:  Yes.

18             THE WITNESS:  Indicates that each time you press the

19   trigger, a single bullet is fired, so you have to reset the

20   trigger each time you press.

21             THE COURT:  Why is that semiautomatic if a single

22   bullet is issued with each press of the weapon?

23             THE WITNESS:  That's -- I don't think I understand

24   your question, your Honor.

25             THE COURT:  If, when you press the trigger, only a

1   single bullet comes out, why is it semiautomatic?

2            THE WITNESS:  That's what it's known as as opposed to

3   automatic, your Honor, where one press of the trigger, multiple

4   rounds fire without having to reset the trigger.

5            THE COURT:  Got it.

6            THE WITNESS:  I am not a gun expert, though.

7            THE COURT:  Thank you.

8            MR. BOVE:  We'll have someone from the ATF, Judge,

9   address all those questions.

10           THE COURT:  Okay.

11           MR. BOVE:  Ms. Shields, if you could bring up page 4,

12  please, of 807.

13  BY MR. BOVE:

14  Q.  What is the mark in the bottom right corner?

15  A.  That is a mark made by Mr. Denbeaux after the defendant

16  positively identified this weapon.

17  Q.  What, if anything, did the defendant say on April 26th

18  about this photo?

19  A.  The defendant stated this is an AK-47, that he fired the

20  AK-47 at his training, and that they were issued an AK-47 for

21  the duration of the training, and they even slept with this

22  weapon.

23  Q.  What, if anything, did the defendant say about whether the

24  AK-47 was capable of automatic firing?

25  A.  He said it was.

1              MR. BOVE:  Let's take a look at page 3 of the exhibit,

2      please.

3      BY MR. BOVE:

4      Q.  Is that another mark from Mr. Denbeaux in the bottom right?

5      A.  It is.

6      Q.  What did the defendant say about these photos on

7      April 26th?

8      A.  The defendant stated that these were images of a PKS.  This

9      is a Russian-made weapon.  It's belt-fed, and it's an automatic

10     weapon.  The defendant stated that they fired Russian PKSs at

11     the training in Birkat Jabbour.

12             MR. BOVE:  Lastly, with this exhibit, Ms. Shields,

13     let's look at page 1.

14     Q.  Was this document also marked by Mr. Denbeaux on

15     April 26th?

16     A.  Yes.

17     Q.  Was that down by the yellow exhibit sticker?

18     A.  It is.

19     Q.  What did the defendant say about this weapon?

20     A.  The defendant identified this weapon as an RPG, a

21     rocket-propelled grenade launcher, and the defendant stated

22     they trained on RPGs in 2011 at Birkat Jabbour.

23             THE COURT:  You gave three initials for the previous

24     weapon.  Would you spell those initials?  Because I didn't get

25     them.

 1                THE WITNESS:  The previous weapon, your Honor?

 2                THE COURT:  Yes.

 3                THE WITNESS:  That was PKS.

 4                THE COURT:  PKS as in Sam.

 5                THE WITNESS:  S as in Sam, yes, your Honor.

 6                MR. BOVE:  You can take that down.

 7                THE COURT:  That's also an automatic?

 8                THE WITNESS:  It is, your Honor.

 9                THE COURT:  Belt fed?

10                THE WITNESS:  Belt fed, correct.

11    BY MR. BOVE:

12    Q.   The defendant said that he had trained on that, the

13    rocket-propelled grenade launcher, at Birkat Jabbour?

14    A.   Yes.

15    Q.   During the interview on April 26th, did the defendant

16    provide more information regarding the IJO tasking that he

17    received related to Israelis?

18    A.   He did.

19    Q.   What did the defendant say about targeting Israelis?

20    A.   The defendant stated that he was tasked with providing or

21    collecting information on Israeli businessmen in the New York

22    City area who were former or veterans of IDF, and that they

23    were interested in -- "they" the IJO, was interested in contact

24    information, where these individuals were located, what they

25    did, for purposes of assassination or recruitment.

J58KKOU5                          Shannon - Direct

1   Q.  Did the defendant mention the LinkedIn website when he was

2   describing this tasking?

3   A.  He did.  The defendant stated that he had queried LinkedIn

4   to identify individuals who were former IDF, and the defendant

5   claimed he did not provide any particular names or contact

6   information to the IJO about those individuals, but told the

7   IJO that it was easy to go on to LinkedIn and identify people

8   through that website.

9   Q.  On April 26th, did the defendant talk about IJO efforts to

10  obtain passports and other identification documents?

11  A.  Yes.

12  Q.  What did he say about those topics on April 26th?

13          THE COURT:  April what?

14          MR. BOVE:  April 26th, Judge.  This is the fifth

15  interview at Seton Hall.

16          THE COURT:  I'm confused.  Do we have an April 6th

17  meeting?

18          MR. BOVE:  I may have misspoke, Judge.

19          THE COURT:  April 26th?

20          MR. BOVE:  Yes, Judge.  Thank you for the

21  clarification.

22  BY MR. BOVE:

23  Q.  My question was intended to be:  During the meeting on

24  April 26th, did the defendant talk about an IJO mission related

25  to obtaining passports and other identification documents?

1    A.  Yes.  The defendant stated, at the same time Fadi had asked

2    him about documents and procuring them through the DMV, that he

3    also asked about obtaining other identification documents, such

4    as Social Security cards and birth certificates, other

5    identifying documentation.

6    Q.  When the defendant was describing that mission, did he talk

7    about any particular uses by the IJO of those documents in the

8    past?

9    A.  He did.

10   Q.  What did he say?

11   A.  The defendant stated that the IJO is interested in these

12   kinds of identifying documents because they would utilize those

13   in connection with attacks, as they did in the Burgas bus

14   bombing in 2012, where the bomber had utilized a fake driver's

15   license in connection with that attack.

16   Q.  Did the defendant say whether he discussed the Burgas,

17   Bulgaria attack with Fadi?

18   A.  He did.

19   Q.  What did he say about that discussion?

20   A.  The Defendant stated that Fadi told him the less he knew

21   about the Burgas bombing, the better.

22   Q.  Did the defendant say anything about front companies during

23   the interview on April 26th?

24   A.  Yes.

25   Q.  What did he say about front companies?

J58KKOU5                           Shannon - Direct

1   A.   The defendant stated that Fadi had asked him about

2   establishing commercial businesses or front companies for

3   utilization by the organization for purposes of stockpiling or

4   caching weapons in New York.

5   Q.   What, if anything, did the defendant say about how he

6   responded to that instruction?

7   A.   The defendant stated that he told Fadi that storage

8   facilities were more ideal in terms of utilizing them to store

9   or stash things.

10          MR. BOVE:  Ms. Shields, if you could bring up --

11   actually, never mind.

12   Q.   Are you familiar with a location called American Self

13   Storage?

14   A.   I am.

15   Q.   I'm showing you a document marked for identification as

16   Government Exhibit 114.

17          What is this?

18   A.   This is the outside of American Self Storage in Queens, in

19   Long Island City.

20   Q.   Does that picture fairly and accurately depict the area

21   around American Self Storage?

22   A.   Yes.

23          MR. BOVE:  Your Honor, I offer 114.

24          MR. SCHACHT:  No objection.

25          THE COURT:  Received.

1          (Government's Exhibit 114 received in evidence)

2          MR. BOVE:  At this time, Judge, I have a stipulation

3   to offer.

4          THE COURT:  Yes.

5          MR. BOVE:  This is marked as Government Exhibit 1007.

6   This is another agreement between the parties relating to the

7   admissibility of documents.  The documents referenced in this

8   stipulation are records from American Self Storage, the storage

9   facility that Special Agent Shannon just described.  The

10  exhibits in this stipulation are marked 501-A, 501-B, and

11  501-C.

12         Your Honor, I offer 1007 as well as the exhibits

13  referenced in this stipulation.

14         THE COURT:  Received.

15         (Government's Exhibits 1007, 501-A, 501-B and 501-C

16  received in evidence)

17         MR. BOVE:  Ms. Shields, can we start by taking a look

18  at Exhibit 114.  If you can zoom in on the American Self

19  Storage sign on the right side.  Now if you could please bring

20  up 501-C on the left.

21  BY MR. BOVE:

22  Q.  I'm going to hand you a hard copy of 501-C.

23         THE COURT:  Are you having trouble getting it up?

24         MR. BOVE:  A brief technical issue, but Ms. Shields is

25  on top of it, Judge.

1           THE COURT:  Sorry?

2           MR. BOVE:  Ms. Shields is on top of it.  It will be

3    addressed in a second.

4           THE COURT:  We'll go to 4:45, members of the jury.  Is

5    that okay?

6           JUROR:  Yes.

7    BY MR. BOVE:

8    Q.  Let's move on, Special Agent Shannon.

9           MR. BOVE:  You can take that down.  Thank you for

10   putting that up.

11   Q.  During the Seton Hall meetings, did the defendant say

12   anything about the use of draft emails?

13   A.  Yes.

14   Q.  What did he say about the use of draft emails?

15   A.  He stated that he had been instructed on utilizing draft

16   emails or sending emails to himself.

17   Q.  What did he say about that topic and its purpose?

18   A.  That that would be a method of potential communication.

19   Q.  Did the defendant say anything else about 26 Federal Plaza?

20          THE COURT:  Did he say how that would be a method of

21   communication?

22          THE WITNESS:  That individuals would be able to log in

23   to those accounts and check those messages.

24          THE COURT:  Without their ever being sent?

25          THE WITNESS:  Correct.

1          THE COURT:  Except to oneself?

2          THE WITNESS:  Exactly, your Honor, yes.

3          THE COURT:  So the recipient, there would be no

4   recipient shown other than oneself?

5          THE WITNESS:  That's correct, your Honor.

6   BY MR. BOVE:

7   Q.  And someone else could log in to the account in another

8   location to view the draft?

9   A.  That's correct.

10  Q.  Did the defendant say anything else about 26 Federal Plaza

11  at the April 26th interview in connection with his

12  naturalization application?

13  A.  Yes.  The defendant stated that he was aware that 26

14  Federal Plaza was a location where U.S. Citizenship and

15  Immigration Services, USCIS, that's where they sat, and that

16  that's where his naturalization paperwork was processed.

17  Q.  Did you ask the defendant any questions on April 26th about

18  the location of his Lebanese passport?

19  A.  Yes.

20  Q.  What did he say?

21  A.  The defendant stated that he kept his Lebanese passport in

22  Lebanon, and that he did that so that it wouldn't be a problem

23  for him when he was transiting the airport.

24          THE COURT:  In case he was searched, you mean?

25          THE WITNESS:  That's correct, your Honor, yes.

1          MR. BOVE:  Ms. Shields, could you please bring up

2   402-C-4.  And if you could zoom in on the top email, please.

3   BY MR. BOVE:

4   Q.  Special Agent Shannon, what's this?

5   A.  This is an email from an account ali_srour@live.com sent to

6   the defendant's email account, alikuku@hotmail.com.

7   Q.  When was this email sent?

8   A.  On March 19th of 2014.

9   Q.  Were there any attachments?

10  A.  There were two attachments.

11         MR. BOVE:  If you can move this to the left, please,

12  Ms. Shields.  And on the right, bring up the first attachment,

13  which is page 2.  And if you can zoom in on the document.

14  Q.  What's on the right side of the screen, Special Agent

15  Shannon?

16  A.  This is the defendant's Lebanese passport.

17  Q.  Focusing on the left side of the screen, who sent the

18  email?

19  A.  Ali Srour.

20  Q.  And what, if anything, did the defendant say on April 26th

21  about Ali Srour?

22  A.  That Ali Srour was an individual who had moved messages

23  between his handler, Fadi, and himself, and that Ali Srour --

24  he was not certain whether he was a member of the IJO, but he

25  knew he was a member of Hezbollah.

1   Q.  Did the defendant provide any additional information about

2   Ali Srour's specific role within Hezbollah?

3   A.  Yes.  The defendant had stated previously that Mr. Srour

4   was a topographical engineer and that he worked on missiles for

5   Hezbollah.

6           MR. BOVE:  You can take those down, please,

7   Ms. Shields.

8   BY MR. BOVE:

9   Q.  Did you ask the defendant to identify IJO operatives during

10  the April 26th interview?

11  A.  Yes.

12  Q.  What did he do in response to that question?

13  A.  The defendant utilized his cell phone to scroll through his

14  contact list and provided us with names of individuals that he

15  believed could be members of the IJO or were Hezbollah

16  sympathizers.

17  Q.  Did he mention a man named Hussein Nizam?

18  A.  Yes.

19  Q.  What did the defendant say about Hussein Nizam?

20  A.  The defendant stated that Nizam was a Canadian, he lived in

21  Windsor, Canada, and that he had relationships with prominent

22  Shia clerics who were all tied to Hezbollah.

23  Q.  Did the defendant mention anyone named Bilal Kourani on

24  April 26th?

25  A.  He did.

J58KKOU5                        Shannon - Direct

1    Q.   What did he say about Bilal Kourani?

2    A.   The defendant stated that Bilal Kourani had recently

3    attended a Hezbollah training camp and had emigrated to the

4    United States.

5    Q.   Did the defendant mention anyone named Mohammad Sadek?

6    A.   No, that name did not come up.

7    Q.   Did you meet with the defendant at Seton Hall again after

8    April 26, 2017?

9    A.   No, I did not.

10   Q.   Did Mr. Denbeaux ever talk to you about immunity?

11   A.   No, he did not.

12   Q.   Did the defendant ever ask you about immunity?

13   A.   No, he did not.

14   Q.   Could you have offered immunity to the defendant?

15   A.   No.

16   Q.   Why not?

17   A.   I do not have the authority or the power to provide

18   immunity to anyone.  That is something that the prosecutors

19   were responsible for.

20   Q.   During the course of the meetings at Seton Hall, what, if

21   any, other steps was the FBI taking in connection with the

22   investigation of the defendant?

23   A.   At that time, we were seeking additional court orders with

24   respect to facilities of the defendant, and accounts associated

25   with the defendant's social media, and other individuals that

1    he had identified in these interviews.

2    Q.  Were you looking at phone records?

3    A.  We looked at phone records, yes.

4    Q.  What about travel records?

5    A.  Yes.

6    Q.  In May 2017, were there any steps taken to monitor the

7    defendant's whereabouts?

8    A.  Yes.

9    Q.  What was that?

10   A.  We sought a court order to track the defendant through his

11   cell phone.

12   Q.  Why?

13   A.  At that time --

14           MR. SCHACHT:  Objection.

15           THE COURT:  Did you give reasons in the application?

16           THE WITNESS:  Yes, your Honor, we did.

17           THE COURT:  State the reasons.

18           MR. SCHACHT:  Objection.

19           THE COURT:  Come up.

20           (Continued on next page)

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  How far do you want to go on this,

3  Mr. Bove?

4          MR. BOVE:  My only question was why did they do it,

5  and I expect the witness will answer that they did it to --

6          THE COURT:  It's objectionable, but if he challenges,

7  you can put the application in for the warrant.  I don't know

8  if you want to.

9          MR. BOVE:  Thank you, Judge.  And we may take the

10  Court up on that, depending on the cross.  What I'm concerned

11  about, and if Mr. Schacht doesn't intend to ask about whether

12  the FBI was concerned about the defendant at this point, then

13  I'm happy to move on, but I expect he's going to cross-examine

14  Special Agent Shannon and suggest that the agents didn't

15  actually think he was dangerous, which is not the case.

16          THE COURT:  What difference does it make?

17          MR. BOVE:  I think it's irrelevant.  I'd be happy if

18  Mr. Schacht would agree to not question her on that basis.

19          MR. SCHACHT:  I'm not going to ask this witness about

20  her opinion of the defendant's dangerousness, but I am going to

21  state the obvious, which is that for years, they allowed him to

22  wander around without arresting him.

23          THE COURT:  So what?

24          MR. SCHACHT:  So the implication is that they didn't

25  have enough evidence, and I'm going to say that there's no

1    evidence --

2              THE COURT:  Or they wanted to use him?

3              MR. SCHACHT:  No, no, I'm talking about before he

4    confessed.  They couldn't arrest him because they had no

5    evidence.

6              THE COURT:  Is there a corroboration point?

7              MR. SCHACHT:  Well, it's precorroboration because he

8    hasn't said anything yet.  I'm going to make the argument that

9    if they had --

10             THE COURT:  If you challenge it on rebuttal, you can

11   put in the application.

12             MR. SCHACHT:  Well, I'm not going to say after he

13   confesses, I'm not going to say they had no reason to be scared

14   of him.  They certainly did after he confesses.

15             THE COURT:  I don't know where you're going on your

16   cross-examination, but, Mr. Bove, at this point, you don't need

17   this.

18             MR. BOVE:  That's fair.  I'll move on, Judge.

19             THE COURT:  But it may well be relevant in rebuttal.

20             MR. BOVE:  Thank you.

21             MR. SCHACHT:  Okay.  Thank you.

22             (Continued on next page)

23

24

25

1              (In open court)

2      BY MR. BOVE:

3      Q.   Special Agent Shannon, could the defendant have boarded a

4      commercial flight in the United States in May 2017?

5              THE COURT:   Could you repeat that question?

6      Q.   Could the defendant have boarded a commercial flight in the

7      United States in May 2017?

8      A.   No.

9      Q.   Was an arrest warrant eventually obtained for the

10     defendant?

11     A.   Yes.

12     Q.   When?

13     A.   On April 30th, 2017 -- I'm sorry, May 30th, 2017.

14     Q.   And were materials related to the warrants filed publicly

15     that day?

16     A.   They were not.

17     Q.   When was the defendant arrested?

18     A.   June 1st, 2017.

19     Q.   Did you participate directly in the arrest of the defendant

20     on the street?

21     A.   I did not.

22     Q.   Were there any physical circumstances that led for the

23     operation to be set up in that way?

24     A.   Yes.  At the time, I was very pregnant, and so I remained

25     at 26 Federal Plaza to process the defendant upon his arrival.

J58KKOU5                        Shannon - Direct

1    Q.  Is that an FBI office at 26 Federal Plaza?

2    A.  Yes, it is.

3    Q.  What time did the defendant get to that FBI office,

4    approximately?

5            THE COURT:  Why is this relevant?

6            MR. BOVE:  There are additional statements, Judge,

7    that the defendant makes.

8            THE COURT:  Okay.  Go ahead.

9    BY MR. BOVE:

10   Q.  About what time did the defendant get to the FBI offices at

11   26 Federal Plaza on June 1st, 2017?

12   A.  I believe the defendant arrived sometime between 11:45 a.m.

13   and noon.

14   Q.  Did anyone talk to the defendant when he arrived at the

15   FBI?

16   A.  Yes.

17   Q.  What was said?

18   A.  At that time, Special Agent Costello read Mr. Kourani his

19   Miranda rights.

20           THE COURT:  Were you there?

21           THE WITNESS:  I was, your Honor.

22   BY MR. BOVE:

23   Q.  Why were the Miranda warnings provided to the defendant at

24   that point?

25   A.  At that point, the defendant was under arrest, and he was

1    in FBI custody.

2    Q.  What happened next?

3    A.  The defendant was told that he would not be asked any

4    questions by us because we understood that he was represented

5    by counsel.

6    Q.  Was the defendant permitted to make any calls?

7    A.  He was.

8    Q.  What happened?

9    A.  Special Agent Costello dialed Mr. Denbeaux's number on his

10   cell phone and handed the phone to Mr. Kourani, and Special

11   Agent Costello and I exited the room, so he could have that

12   conversation alone.

13   Q.  About how long was the call?

14   A.  About 30 minutes.

15   Q.  What happened when the defendant completed the call with

16   Mr. Denbeaux?

17   A.  Once the defendant completed the call, we processed the

18   defendant.

19   Q.  After the processing was complete, did he ask to speak to

20   Mr. Denbeaux again?

21   A.  He did.

22   Q.  Was he permitted to do that?

23   A.  He was.

24   Q.  By himself or with you and Special Agent Costello?

25   A.  Special Agent Costello again dialed Mr. Denbeaux's number,

J58KKOU5                          Shannon - Direct

1    handed the defendant the cell phone, and we exited the room, so

2    he could have the conversation in private.

3    Q.  What, if anything, did the defendant say after that phone

4    call to you and Special Agent Costello?

5    A.  After the phone call, he told us that he had fired

6    Mr. Denbeaux, he was no longer his attorney, and that he wished

7    for us to get him someone from the public defenders office, he

8    wanted to cooperate.

9    Q.  Was a new attorney appointed to represent the defendant on

10   June 1st, 2017?

11   A.  Yes.

12   Q.  What was the new attorney's name?

13   A.  Peggy Cross-Goldenberg.

14   Q.  Did you speak to the defendant again on June 1st, 2017?

15   A.  We did.

16   Q.  Where was the next conversation?

17   A.  The next conversation was in an interview or conference

18   room in 26 Federal Plaza.

19   Q.  What was the purpose of that interview?

20            MR. SCHACHT:  Objection.

21            THE COURT:  Sustained.

22   Q.  What did you ask the defendant during the interview?

23   A.  We asked the defendant a series of questions related to

24   imminent threats that he was potentially aware of that the IJO

25   was involved in.

1  Q.  Did the defendant disclose any imminent threats during that

2  meeting?

3  A.  He did not.

4  Q.  Did he say anything about personnel from the Islamic Jihad

5  Organization?

6  A.  Yes.  The defendant stated that he had not met with those

7  people since 2013, and then corrected himself and said that he

8  had met with Fadi and another operative in September of 2015.

9  Q.  Where did the defendant sleep on the night of June 1st,

10  2017?

11  A.  The defendant slept at a hotel in FBI custody.

12  Q.  What happened the next day?

13  A.  The next day, the defendant was brought to court for his

14  court appearance.

15  Q.  Was the defendant's arrest eventually made public?

16  A.  That day, it was made public.

17          MR. BOVE:  Nothing further, Judge.

18          Start tomorrow?

19          MR. SCHACHT:  I'd like to start tomorrow.  Thank you,

20  Judge.

21          THE COURT:  Sure.

22          Okay.  Members of the jury, close up your books, give

23  them to Ms. Jones on the way out.  Don't discuss anything about

24  the case.  Keep an open mind.  We'll start at 10:00 o'clock

25  tomorrow with the cross-examination by Mr. Schacht of

1    Ms. Shannon.

2              (Jury not present)

3              THE COURT:  Okay.  Good night, everyone.

4              MR. SCHACHT:  Good night, your Honor.

5              (Witness temporarily excused)

6              (Adjourned to May 9, 2019 at 10:00 a.m.)

7                              *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

392

INDEX OF EXAMINATION

Examination of:                                    Page

 REGINALD DONALDSON

Direct By Mr. Bove . . . . . . . . . . . . . 175

Cross By Mr. Schacht . . . . . . . . . . . . 198

JARED EANNUCCI

Cross By Mr. Schacht . . . . . . . . . . . . 226

Redirect By Ms. Houle  . . . . . . . . . . . 230

KERI SHANNON

Direct By Mr. Bove . . . . . . . . . . . . . 231

                  GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1003, 301 and 302  . . . . . . . . . . . . 180

 1009, 601 – 603  . . . . . . . . . . . . . 216

 11   . . . . . . . . . . . . . . . . . . . 221

 116, 117 and 118  . . . . . . . . . . . . . 251

 801  . . . . . . . . . . . . . . . . . . . 277

 802  . . . . . . . . . . . . . . . . . . . 295

 9  . . . . . . . . . . . . . . . . . . . . 343

 804  . . . . . . . . . . . . . . . . . . . 356

 807  . . . . . . . . . . . . . . . . . . . 368

 114  . . . . . . . . . . . . . . . . . . . 377

 1007, 501–A, 501–B and 501–C  . . . . . . . 377