```
J59AAKOU1                      Jury Trial
```

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4             v.                        17 CR 417 (AKH)

 5   ALI KOURANI,
                                         Jury Trial
 6                 Defendant.

 7   ------------------------------x

 8                                       New York, N.Y.
                                         May 9, 2019
 9                                       10:00 a.m.

10   Before:

11        HON. ALVIN K. HELLERSTEIN

12                                       District Judge

13

14

15

16        APPEARANCES

17

18   GEOFFREY S. BERMAN
          Interim United States Attorney for the
19        Southern District of New York
     AMANDA L. HOULE
20   EMIL J. BOVE III
          Assistant United States Attorneys
21

22   ALEXEI SCHACHT
          Attorney for Defendant
23
     ALSO PRESENT:  KERI SHANNON, Special Agent FBI
24   MARGARET SHIELDS, Paralegal, US Attorney's Office

25
```

1          (Trial resumed; Jury present)

2          (Jury present)

3          THE COURT:  Good morning, everyone.  Be seated.

4          Ms. Shannon, you remain under oath and Mr. Schact is

5     ready for his cross-examination.

6     CROSS-EXAMINATION

7     BY MR. SCHACHT:

8     Q.  Good morning, Agent Shannon.

9     A.  Good morning, sir.

10    Q.  Do you remember yesterday we looked at an exhibit?

11         MR. SCHACHT:  Would you please put up Government

12    Exhibit 804 when you can.

13         Do you remember yesterday we looked at that exhibit?

14    A.  Yes.

15    Q.  And you testified that a colleague of yours took this

16    photo; is that correct?

17    A.  That's correct.

18    Q.  Do you know if your colleague has that chip that we see in

19    the photo or the FBI has it?

20    A.  That was not seized, no.

21    Q.  Do you know if a copy was made of it?

22    A.  No copy was made.

23    Q.  Yesterday do you recall testifying that the FBI had been

24    listening to Ali Kourani's telephone; do you remember saying

25    that?

1   A.   Yes.

2   Q.   Do you know for what period of time approximately the FBI

3   was listening to his telephone?

4   A.   Approximately, 2014 to 2016.

5   Q.   You'd also mentioned that the FBI had been monitoring his

6   e-mails.  Was that approximately for the same period of time?

7   A.   That's correct.

8   Q.   And was the FBI also monitoring his text messages?

9   A.   Yes.

10  Q.   Same timeframe, roughly?

11  A.   Roughly.

12  Q.   And were you also monitoring any of his encrypted

13  applications such as "What's App"?

14  A.   Yes.

15  Q.   Same timeframe again?

16  A.   Yes, sir.

17  Q.   You'd also testified yesterday that you had spoken to

18  witnesses about my client; do you remember saying that?

19  A.   Yes.

20  Q.   If you know the answer, how many witnesses, roughly, did

21  you and other FBI agents speak to about my client?

22           MR. BOVE:  Objection.

23           THE COURT:  Sustained.

24  Q.   How many witnesses did you personally speak to about my

25  client?

J59AAKOU1                         Shannon - Cross

1    A.  Maybe, approximately, eight.

2    Q.  And was that also in the 2014 to 2016 time period or a

3    different time period?

4    A.  A different time period.

5    Q.  What time period was that?

6    A.  The interviews that I conducted would have been between the

7    time periods of 2016 and; 17.

8    Q.  And in what year did you become an FBI agent?

9    A.  2013.

10   Q.  Do you remember yesterday we looked at a photo of someone

11   that you identified as Majed Abdullah, I believe?

12   A.  Yes.

13   Q.  And that was the man whose photo you'd left on the desk

14   during one of the interviews, right?

15   A.  Yes.

16   Q.  By the way, these interviews that you had with my client at

17   Seton Hall Law School, they were not electronically recorded to

18   your knowledge, were they?

19   A.  No.

20   Q.  That man, Mr. Abdullah, he appears, does he not, on the

21   website that you talked about yesterday "Stop 910"?

22   A.  I'm not certain if Majed Abdullah is on that website or

23   not.

24   Q.  The first time you met my client was at the airport where

25   you and Agent Ganci interviewed him; is that right?

1   A.  Yes.  It's the first time I spoke with him.

2   Q.  And do you recall that Agent Ganci testified about my

3   client being annoyed?

4            THE COURT:  You weren't present, right?

5            Sorry for interfering.

6            MR. SCHACHT:  No problem.  Thank you, judge.

7   Q.  Do you remember hearing Agent Ganci testifying that my

8   client was upset or concerned that he'd lost his job?

9   A.  I remember Agent Ganci talking about that.

10  Q.  Do you recall that yourself from your own memory at the

11  airport?

12  A.  Yes.

13           THE COURT:  What date are we talking about,

14  Mr. Schact?  Put it in a question.

15  BY MR. SCHACHT:

16  Q.  I think that was in September of 2016?

17  A.  It was September 12, 2016.

18  Q.  And on that day you interviewed my client at the airport?

19  A.  I did.

20  Q.  And he'd said to you that he was upset because he'd lost

21  his job with a chain of cellphone stores; is that right?

22  A.  I think he said something to that effect.

23  Q.  During the meetings that you had at Seton Hall Law School

24  with my client, would it be fair to say that he repeatedly was

25  pressing you to get his family members to the United States?

J59AAKOU1                       Shannon - Cross

1  A.  Yes.

2  Q.  And that he was asking for deadlines or guarantees of when

3  you could do that; is that fair to say?

4  A.  Yes.

5  Q.  And early on you gave him certain approximations of when it

6  might be possible to do that; is that fair to say?

7  A.  Yes.

8  Q.  And do you recall with regard to his children what

9  approximation you gave him?

10  A.  We told the defendant that if his information was truthful,

11  honest and valuable, we'd do our best to followthrough with

12  helping him out by the end of the summer of 2017.

13  Q.  And with regard to his children, what exactly did you mean

14  by "helping him out"?

15  A.  As we had explained to him, his children were in Canada, so

16  that would have required FBI and the United States government

17  coordinating or speaking with the Canadian government.  And so

18  that's what we meant, that we would pass along his requests and

19  that information to our supervisors to do what they were able

20  to in terms of speaking with the Canadian government.

21  Q.  And you understood from speaking to him and your

22  investigation that he and his wife were having their marriage

23  dissolved essentially, right?

24  A.  He said they were having marital issues.  I'm not sure of

25  the status of the marriage.

J59AAKOU1                        Shannon - Cross

1    Q.  Well, the reason the kids were not coming to the United

2    States -- the children are U.S. citizens, right?

3    A.  Yes, they are.

4    Q.  So, the reason they were not coming to the United States

5    was because their mom wasn't allowing them to go, right?

6    A.  I don't know the reason.

7    Q.  Did you ask what the reason was?

8    A.  I don't recall ever asking that particular question.

9    Q.  Before you became an FBI agent you were a civil lawyer,

10   right?  You said "civil litigator"?

11   A.  Yes.

12   Q.  And you know that if the mom of the children doesn't want

13   the kids to go to the United States in fact, there was nothing

14   the FBI could do to get the children to come here, right?

15   A.  I'm not familiar with any of that based on my practice of

16   law.  I did not practice family law.

17   Q.  If you didn't practice family law, then why did you tell

18   him you might be able to get his children there in a short

19   period of time?

20   A.  We didn't tell him that.

21   Q.  I thought you just said that you gave him a rough

22   estimation of the end of the summer you might be able to get

23   his children to the United States?

24   A.  We said "we might be able to help".

25   Q.  Why did you say you might be able to help if you don't know

1    anything about the law or the situation?

2    A.  I was personally not going to be the one coordinating that.

3    That was information that we were going to pass to our

4    supervisors and people much higher than us in our government.

5    Q.  Well, did you say to him "I don't know anything about the

6    law or the facts and I don't really know if I can help you but

7    I'll pass along your requests"?  You didn't say that, right?

8    A.  No.

9    Q.  You gave him the impression that you might be able to help

10   him, right?

11   A.  Yes.

12   Q.  And the reason you gave him that impression, you wanted him

13   to be truthful with you, right?

14   A.  We wanted him to be truthful with us, yes.

15   Q.  And you wanted to seem as if you could help him, right?

16   A.  I didn't want to seem like anything.

17   Q.  Well, didn't you want to seem honest?

18   A.  I am honest.

19   Q.  And you want to seem that way also, right?

20   A.  Yes.

21   Q.  And so, when you were speaking to him you wanted to seem

22   honest to him?

23   A.  Yes.

24   Q.  But if you were fully honest with him wouldn't you have

25   said, I don't know if I can actually do anything to help you?

J59AAKOU1                        Shannon - Cross

1    A.  No.

2    Q.  So, your definition of honest with my client is giving him

3    a deadline or an approximation of when you can do something

4    that you have no idea if you can do it?

5              THE COURT:  Sustained as argument.

6              You can't argue with a witness.

7              MR. SCHACHT:  Fair enough, judge.

8    Q.  Do you recall Government Exhibit 221?

9              MR. SCHACHT:  When you have a moment if you could

10   please put up Government Exhibit 221.

11             (Pause)

12   Q.  Do you recall that document, the notes of then lawyer Mark

13   Denbeaux that was given to you at the meeting?

14   A.  I do, sir.

15   Q.  When Mark Denbeaux gave you that set of notes, you

16   testified that you and Agent Costello stepped outside of the

17   room; is that right?

18   A.  Yes.

19             THE COURT:  Is it fair to call these "notes" rather

20   than "memorandum".

21             MR. SCHACHT:  I could just call it a document.

22             THE COURT:  I think it's a memorandum.

23             MR. SCHACHT:  Sure.

24   Q.  When you were given this memorandum you stepped outside and

25   you looked at it, right?

J59AAKOU1                         Shannon - Cross

1    A.  Yes.

2    Q.  And you saw that in the second line Mr. Denbeaux said --

3            MR. SCHACHT:  If you don't mind, please, if you could

4    zoom-in on the top two lines numbered one and two.

5            Thank you so much.

6    Q.  -- that Mr. Denbeaux told you in writing in my client's

7    presence that it was agreed between you that my client had

8    committed no crime and faces no prosecution; you read that at

9    the time, right?

10   A.  I did.

11   Q.  And then after you and Agent Costello read it you returned

12   to the room where Mark Denbeaux and Ali Kourani were seated,

13   right?

14   A.  Yes.

15   Q.  And if I recall what you said yesterday, you said that you

16   then said nothing about this document to them; is that right?

17   A.  Nobody said anything about the document.

18   Q.  And in your mind you thought, I didn't agree to anything

19   like what's in number two, right?

20   A.  Right.

21   Q.  Did you think that was honest of you not to correct the

22   misimpression of Mark Denbeaux and Ali Kourani?

23   A.  Yes.

24   Q.  You thought that was honest; that's your testimony?

25   A.  Yes.

J59AAKOU1                          Shannon - Cross

1    Q.  OK.  Do you recall my client testifying about being driven

2    to get some military training somewhere in Lebanon?

3    A.  At what time period, sir?

4    Q.  Well, how many time periods did my client tell you about

5    doing that?

6    A.  He talked about two different military type trainings; one

7    in 2000 and one in 2011.

8    Q.  And on both of those occasions, according to what he told

9    you, did he have some kind of mask or something over his head

10   so he couldn't see where he was going?

11   A.  In 2011.

12   Q.  And in 2000 do you recall did he mention anything about

13   having his head covered or he didn't say?

14   A.  He did not mention having his head covered at that

15   training.

16   Q.  Do you recall that my client at gun point was asking you

17   and Agent Costello to assist him in getting a job; you recall

18   that, right?

19   A.  Yes.

20   Q.  And in fact, yesterday we saw that he'd sent Agent Costello

21   a couple of his resumes; is that right?

22   A.  Yes.

23   Q.  And that was unsolicited.  You didn't ask him or Agent

24   Costello in your presence didn't ask for those resumes, right?

25   A.  Right.

J59AAKOU1                         Shannon - Cross

 1   Q.  And this was after my client had told you that he was a

 2   member of Hezbollah, right?

 3   A.  Yes.

 4   Q.  In your experience as an FBI agent, did it strike you as

 5   odd that a person that told you they were a member of a

 6   terrorist organization would seek your help in getting a job?

 7   A.  Yes.

 8   Q.  And he also asked for your assistance in getting an

 9   apartment in a highrise doorman building in Manhattan?

10   A.  Yes.

11   Q.  I assume that seemed odd to you also, right?

12   A.  Yes.

13   Q.  Do you recall that my client told you at one point that he

14   had done his own independent research on how to resist or

15   handle interrogations?

16   A.  Yes, he did say that.

17   Q.  Were there any other benefits, for lack of a better word,

18   other than the job, the visas for his relatives and the

19   highrise doorman building apartment that he asked you and Agent

20   Costello for?

21   A.  He also specified he wanted a job that was paying $120,000

22   a year.

23   Q.  And I assume based on your previous answers that someone

24   who has just told you they belong to terrorist organizations,

25   that would be strange for them to ask you for a job like that,

1    right?

2    A.  Yes.

3           MR. SCHACHT:  When have you a chance, if you could

4    please put Government Exhibit 172 on the screen please.  Thank

5    you.

6    Q.  Now, this is a picture of one of the checks that was

7    recovered from my client's apartment, right?

8    A.  Yes.

9           THE COURT:  I don't think it's in evidence yet.

10           MR. BOVE:  It is, your Honor.

11   Q.  And it's for a company obviously called Broadway Sportswear

12   Incorporated on 27th Street, right?

13   A.  Yes.

14   Q.  And you knew from talking to my client that he had a

15   clothing store on 27th Street in Manhattan, right?

16   A.  Yes.

17   Q.  And so when he talked to you about walking passed that

18   armory on 23rd Street on his way to work, he was talking about

19   his work at Broadway Sportswear on 27th Street here in

20   Manhattan, right?

21   A.  He didn't specify which location he was going to for work.

22   Q.  OK.  But you knew he worked on 27th at a clothing store,

23   right?

24   A.  Yes.

25   Q.  And you knew that the armory was on 23rd Street?

J59AAKOU1                          Shannon – Cross

1    A.  Yes.

2    Q.  And you knew from your investigation, is it fair to say,

3    that he was selling counterfeit clothing on 27th Street here in

4    Manhattan?

5    A.  Yes.

6    Q.  And you knew that he had actually been arrested at one

7    point for possessing or for selling counterfeit clothing,

8    right?

9    A.  Yes.

10             MR. SCHACHT:  Please switch to Government Exhibit 173.

11             Thank you so much.

12   Q.  And that was another check-off for a new spot Fashion Inc.

13   which was also found in his apartment, right?

14   A.  Yes.

15             MR. SCHACHT:  Thank you.  You can take that down.

16   Q.  And do you recall questioning him about the trip to China

17   he made shortly after he became a citizen, right?

18   A.  Yes.

19   Q.  And you testified yesterday he said that he had gone to

20   China or he said for business reasons, right, that's what he

21   said?

22   A.  Yes.

23   Q.  But wasn't he more specific than that?  Didn't he say that

24   he was going there to get counterfeit clothing?

25   A.  He didn't say he went there to get counterfeit clothing,

J59AAKOU1                          Shannon – Cross

 1    no.

 2    Q.  Do you recall one of the meetings at Seton Hall Law School

 3    occurred on April 5, 2015.  That was one of the days I think,

 4    right?

 5    A.  Yes, it was.

 6    Q.  And do you remember that on that day he actually broke down

 7    and was crying and you had to stop the meeting for a few

 8    minutes so he could collect himself?

 9    A.  Yes.

10    Q.  And the reason he was crying, it appeared that he was upset

11    about his kids, right?  Isn't that the topic that was being

12    discussed when he started crying?

13    A.  Yes.

14    Q.  And he was upset that they weren't here or he don't see

15    them, reasons of that sort; is that right?

16    A.  Yes.

17            THE COURT:  Can I see counsel for a minute?

18            (Continued on next page)

19

20

21

22

23

24

25

J59AAKOU1                         Shannon - Cross

1        (side bar)

2            THE COURT:  Mr. Schact, the question you asked about

3    the armory on 23rd Street --

4            MR. SCHACHT:  Yeah.

5            THE COURT:  I assume you are referring to the 69th

6    Regiment which is on 25th and 26th and Lexington.

7            MR. SCHACHT:  I may have misspoken, yeah.  There's

8    only one Armory there on the --

9            THE COURT:  I'll just tell the jury.

10           (In open court)

11           Members of the jury, you heard a question referring to

12   an armory on 23rd Street.  There isn't any on 23rd Street.  The

13   closest one is the 69th Regiment Armory which is located

14   between Park and Lexington between 25th and 26th Street.

15           MR. SCHACHT:  Thank you for that, judge.

16           THE COURT:  I know that because that's where the

17   Knickerbockers started their teams and those were their first

18   games.  As a kid I went to that armory.

19   BY MR. SCHACHT:

20   Q.  My question was that --

21           THE COURT:  He asked if in fact an armory located on

22   Lexington Avenue and Park Avenue and 25th and 26th Street was

23   closer to the defendant's place of work than what had been

24   suggested in the previous question.  And the answer was "yes".

25           MR. SCHACHT:  Thank you, your Honor.

1    Q.  Special Agent Shannon, do you recall my client telling you

2    that he would utilize his computer and cellphone to check for

3    e-mails from Fadi?

4    A.  I remember him talking about his e-mail.

5    Q.  And he would check his e-mail for e-mails from this person

6    called "Fadi", right?

7    A.  Yes.

8    Q.  And when he was talking about that e-mail he was talking

9    about the Ali.M.kourani@GMail account that we've seen a lot of,

10   right?

11   A.  That account and Alikoukou@hotmail.com.

12   Q.  And in addition he told you about a lot of other e-mail

13   accounts that he had that are connected to the clothing

14   business; is that right?

15   A.  Yes.

16   Q.  If you recall, was one of them called

17   Jacob'sFashion@hotmail.com?

18   A.  Yes.

19   Q.  And one was called Jacob.Kourani@GMail.com?

20   A.  Yes, I believe so.

21   Q.  One was called WMC@sportmail@GMail.com?

22   A.  Yes, I believe so.

23   Q.  By the way, did you find any e-mails from Fadi?

24   A.  Yes.

25          MR. SCHACHT:  And what exhibit number is that?

J59AAKOU1                        Shannon - Cross

1          THE COURT:  Why don't you and counsel for the

2     government agree on whatever it was.  You can't ask a witness

3     to remember what numbers --

4     Q.  Well, what does the e-mails say from Fadi?

5     A.  I would like to correct that.  We found the contact

6     information for Fadi's e-mail in his GMail information and

7     Alikoukou@hotmail.com information.

8     Q.  And reason you say you found the contact information for

9     Fadi is because my client told you this is the contact

10    information from Fadi, right?

11    A.  He told us that his handler utilized the name of a

12    childhood friend "Hilal Kadad" to create e-mail names, yes.

13         THE COURT:  Let me make that clear.

14         How did you find out that "Ali.Kourani" and

15    "Alikoukou" were account names used by the defendant?

16         THE WITNESS:  He told us that, your Honor.

17         THE COURT:  And --

18         THE WITNESS:  And we also had separately returns from

19    the, we had subscriber returns that indicated that those

20    accounts were registered to the defendant.

21         THE COURT:  So you knew it before he told you?

22         THE WITNESS:  Yes.

23         THE COURT:  And this childhood friend was used -- I

24    don't know in what sense it was used.

25         What was the name, Mr. Schact?

J59AAKOU1                         Shannon - Cross

 1              MR. SCHACHT:  It hasn't come out yet, in my
 2    cross-examination I mean.
 3              THE COURT:  Yes, it did.  The answer was that he told
 4    us that his handler utilized a name of a childhood friend
 5    "Hilal" something to create an e-mail name.
 6              Give us the context.
 7              THE WITNESS:  The defendant stated that his handler,
 8    Fadi, had requested that the defendant provide him with the
 9    name of a childhood friend.  The defendant gave his handler,
10    Fadi, the name "Hilal Kadad".  His handler stated he would
11    create e-mail contacts in the name "Hilal Kadad" to communicate
12    with the defendant via e-mail.
13    Q.  So, my question is the way you know that is because he told
14    you, right?
15    A.  Yes.
16    Q.  And so, if he's telling the truth then that's Fadi's
17    e-mail, right?
18    A.  Yes.
19    Q.  And if he is not telling the truth then it's not Fadi's
20    e-mail, right?
21    A.  Yes.
22    Q.  And you have no other evidence in court here that that is
23    Fadi's e-mail other than my client's word?
24    A.  Yes.
25              MR. SCHACHT:  Sorry, your Honor.  One moment.

J59AAKOU1                        Shannon - Redirect

1              (Pause)

2              MR. SCHACHT:  No further questions.  Thank you.

3              THE COURT:  Mr. Bove, thank you.

4    REDIRECT EXAMINATION

5    BY MR. BOVE:

6    Q.  Special Agent Shannon, Mr. Schact asked you some questions

7    this morning about conversations that you had with the

8    defendant relating to his children in Canada.  Do you recall

9    those questions?

10   A.  I do.

11   Q.  And he asked you whether you had made any promises to the

12   defendant relating to his children?

13   A.  Right.

14   Q.  Did you make any promises?

15   A.  No.  We were very clear we could not make any promise or

16   guarantees on behalf of the United States government.  We're

17   merely FBI agents.

18   Q.  Did you promise to do anything for the defendant in those

19   meetings --

20   A.  No.

21              MR. BOVE:  Ms. Shields, if you could bring up

22   Government Exhibit 802, please, and zoom-in on the messages.

23   Q.  I think you said yesterday that the yellow messages are

24   from Mark Denbeaux.  That's the attorney who represented the

25   defendant at Seton Hall?

1    A.  Yes, that is correct.

2    Q.  And the top message says, I understand that you can't

3    promise or guarantee.  Do you see that?

4    A.  I do.

5    Q.  And is that a message that Mr. Denbeaux sent to the FBI

6    following one of the meetings at Seton Hall?

7    A.  Yes.  Following my first meeting at Seton Hall on March 23,

8    2017, Mr. Denbeaux sent this message to Special Agent

9    Costello's cellphone following our meeting with the defendant.

10   Q.  Is that an accurate summary of the things that you said to

11   the defendant and Mr. Denbeaux in response to his requests for

12   benefits in these interviews?

13   A.  Yes, it is.

14        MR. BOVE:  Ms. Shields, if you could bring up

15   Government Exhibit 221.  This is the memorandum from

16   Mr. Denbeaux that we looked at a little bit this morning and

17   also yesterday.

18        Ms. Shields, if could you zoom-in on entry five,

19   please and highlight the top line.

20   Q.  So, you were asked some questions this morning about

21   references to the existence of agreements in this document.  Do

22   you recall those questions?

23   A.  I do.

24   Q.  Had you made any agreement was Mr. Denbeaux or the

25   defendant about immunity or prosecution?

1   A.  We made no agreements.

2   Q.  Could you have?

3   A.  No.  We were very clear.  We lacked authority to make any

4   agreements on behalf of the United States government or the

5   FBI.

6   Q.  And the line that's highlighted on the screen now says that

7   the dilemma is that the government wants its information before

8   making any commitment.  Do you see that?

9   A.  I do.

10  Q.  Is that an accurate summary of the position that you and

11  Special Agent Costello took in these meetings?

12  A.  It is.

13  Q.  And this phrase here, "wants its information before making

14  any commitment", why was that necessary?

15  A.  We explained to the defendant that we would need to ensure

16  that his information was truthful, honest and that it was

17  valuable, that his information would be vetted.  And that

18  couldn't happen until we had all of the information from the

19  defendant.

20  Q.  So, this line here in Government Exhibit 221, is that

21  another accurate summary from Mr. Denbeaux about the status of

22  these meetings and the things you said to the defendant about

23  promises and guarantees?

24  A.  Yes.

25  Q.  Are there inaccurate statements in other parts of this

J59AAKOU1                         Shannon - Redirect

1   document?

2   A.   There are.

3   Q.   Let's take a look at entry number eight.  This is another

4   part of Government Exhibit 221 that contains some comments by

5   Mr. Denbeaux, right?

6   A.   Yes.

7           MR. BOVE:  Ms. Shields, if you could highlight the

8   text that says if it is true there are agents who can help with

9   important considerations --

10           MR. SCHACHT:  Objection.

11           THE COURT:  He is asking a question.

12           MR. SCHACHT:  He just didn't read it correctly.

13           MR. BOVE:  Let me try again.

14           THE COURT:  Start again.

15   Q.   If it is true that our agency can't not help with important

16   considerations.  Do you see that?

17   A.   I do.

18   Q.   Had you communicated to Mr. Denbeaux and to the defendant

19   that you may not be able to provide the benefits that he was

20   demanding?

21   A.   Yes.

22   Q.   And then this line, this entry continues, because of lack

23   of power or lack of will; do you see those words?

24   A.   Yes.

25   Q.   Had you made clear to Mr. Denbeaux and the defendant that

1   you as an FBI agent lacked the power individually to guarantee

2   or make available the benefits that he was demanding?

3   A.  Yes, we did.

4               MR. BOVE:  Ms. Shields, you can take that down.  Thank

5   you.

6               Now, I'd like to take a look at Government Exhibit 222

7   in connection with the questions you received this morning

8   about discussion of benefits.  If you could zoom-in on the top

9   left corner note.  This is a document seized from the

10  defendant's apartment.

11              Ms. Shields, if you could highlight the text that

12  says:

13              I don't want to you feel any guilt if you are not able

14  to help me.

15  Q.  During the meeting at Seton Hall, did you make clear to the

16  defendant that you may not be in a position to provide the

17  things that he was demanding?

18  A.  Yes, I did.

19  Q.  And did he, nevertheless, continue to speak with you over

20  the course of five separate meetings?

21  A.  Yes.

22              THE COURT:  Have we established whose notes these are?

23              MR. BOVE:  I think that's something I am going to

24  address in closing, your Honor.

25              THE COURT:  These were found in the apartment?

J59AAKOU1                        Shannon - Redirect

1              THE WITNESS:  Yes, your Honor.  These were seized in

2      the defendant's apartment?

3              THE COURT:  Part of the search.

4              THE WITNESS:  Yes.

5      Q.  Who's name is at the top of this document?

6      A.  That's my first name, "Keri".

7      Q.  Do you see on the top two lines where it says "I swear on

8      my mom and daughter" and the next part is a little bit hard to

9      read and it ends with "but truth"?

10     A.  Yes.

11     Q.  Did the defendant say things like that during the meetings

12     at Seton Hall?

13     A.  Yes.  Occasionally, he would reference his mom or his

14     daughter that he is swearing on either of those two individuals

15     that he is being truthful with us.

16             MR. BOVE:  Ms. Shields, if you could zoom-out and I'd

17     like to focus on the top right corner.

18     Q.  Do you see that acronym at the top "ESO"?

19     A.  I do.

20     Q.  What does that stand for?

21     A.  External security organization.

22             MR. BOVE:  Ms. Shields, if you could zoom-in on the

23     bottom left quadrant, please, the bottom left of the entire

24     document.  Thank you.  And if you could highlight the bottom

25     three of the last four lines, one-on-one training, ask

J59AAKOU1                       Shannon - Redirect

1   questions, evaluate your interrogator.

2   Q.  Do you see that text?

3   A.  I do.

4   Q.  Did the defendant describe a training like that at Seton

5   Hall?

6   A.  He did.

7   Q.  And did he say who provided it to him in the one-on-one

8   setting?

9   A.  Yes.  The defendant stated that he had one-on-one training

10  with his handler, Fadi, in which he was taught how to resist

11  interrogations and never provide an interrogator with any

12  weaknesses to leverage.

13          MR. BOVE:  Ms. Shields, if could you focus and

14  highlight on the text that's on the screen that says

15  "everything else of Google Earth online research was true".

16  Q.  Do you see that, Special Agent Shannon?

17  A.  I do.

18  Q.  Did the defendant describe using Google Earth during the

19  meetings at Seton Hall?

20  A.  He did.

21  Q.  For what purpose?

22  A.  The defendant stated he used Google Earth to conduct

23  research with respect to 26 Federal Plaza and also 335 Adams,

24  the location where U.S. Secret Service maintains office space.

25  Q.  The two lines above that they say DMV got hired, hire

J59AAKOU1                       Shannon - Redirect

1    someone, parentheses, plates driver's licenses; do you see

2    that?

3    A.  I do.

4    Q.  During the meetings at Seton Hall did the defendant

5    describe a mission from the Islamic Jihad Organization that

6    related to the Department of Motor Vehicles?

7    A.  He did.

8    Q.  What did he say about that mission?

9    A.  The defendant stated he had been asked by his handler,

10   Fadi, about obtaining a job at Department of Motor Vehicles

11   because the Islamic Jihad Organization was interested in

12   identification documents such as driver's license and also

13   license plates.  And the defendant stated he explained to his

14   handler, Fadi, that it would look suspicious for someone with

15   as much education as he has to get a job at the DMV.

16          Fadi then instructed the defendant to try to befriend

17   or make an acquaintance of someone who works at the DMV so that

18   that person could be utilized to obtain those identification

19   documents.

20   Q.  When the defendant described that mission from the Islamic

21   Jihad Organization, did he say anything about whether that

22   methodology had been used in connection with other IJO attacks?

23   A.  Yes, he did.

24   Q.  What did he say?

25   A.  The defendant stated in the 2012 Burgas Bulgaria bus

J59AAKOU1                          Shannon - Redirect

1    bombing, one of the bombers responsible for that plot had

2    utilized a fake identification document, a fake driver's

3    license.

4    Q.  Continue.

5    A.  And that the IJO liked for their operatives to utilize fake

6    identification documents so as to obfuscate the involvement of

7    the IJO in the operation.

8    Q.  When the defendant described that attack, did he say where

9    the fake driver's licensed used by the bomber had been issued?

10   A.  Yes.  It was a U.S. driver's license issued in the state of

11   Michigan.

12   Q.  You were asked some questions by Mr. Schact this morning

13   about e-mail communications between the defendant and his IJO

14   handler, Fadi.  Do you recall those questions?

15   A.  Yes.

16          MR. BOVE:  Ms. Shields, can we go to page two of this

17   document, please.  And if you could rotate it, I'd like to

18   focus on the text that right now is on the top.  Can you

19   zoom-in on that, and if you could highlight the line that says

20   e-mail question mark, question mark, deleted.

21   Q.  Do you see that, Special Agent Shannon?

22   A.  I do.

23   Q.  What did the defendant tell you at Seton Hall that he did

24   with e-mail communications that he did with Fadi, his handler,

25   in the Islamic Jihad Organization?

J59AAKOU1                    Shannon - Redirect

1  A.  The defendant stated after receiving e-mails from Fadi he

2  would delete those e-mail immediately because he knew that they

3  were operational e-mails.

4          MR. BOVE:  You can take that down please, Ms. Shields.

5  Q.  You were asked some questions by Mr. Schact this morning

6  about the e-mail address that Fadi used to communicate with

7  him.  Do you recall those questions?

8  A.  I do.

9  Q.  I believe that you explained that the defendant had

10 identified Fadi, a childhood friend?

11 A.  He did.

12 Q.  What did the defendant tell you was the name of that

13 friend?

14 A.  "Hilal Kadad".

15 Q.  And you spoke to the defendant at Seaton Hall, did he tell

16 you where the actual Hilal Kadad lived at the time he

17 identified this name?

18 A.  Yes. he said he lived in United Arab Emirates, UA.

19 Q.  I think you said on cross this morning that you identified

20 e-mail accounts associated with that name "Hilal Kadad" saved

21 in the contacts for Alikoukou e-mail address?

22 A.  Yes.

23         MR. BOVE:  Let's take a look at those.  If you could

24 bring up 402 please.

25         (Pause)

J59AAKOU1                    Shannon - Redirect

1          MR. BOVE:  Start by zooming in on row 51.

2          (Pause)

3   Q.  Special Agent Shannon, directing your attention to Column B

4   in Row 51, what's the contact address saved in the e-mail

5   account used by the defendant, Alikoukou@Hotmail.com?

6   A.  Hilal_Kadad@hotmail.com.

7   Q.  Look at Column G in that row.  When was this saved to the

8   account?

9   A.  In October, October 19, 2011.

10  Q.  Do you see the last, the column with the last changed,

11  Column H?

12  A.  Yes.

13  Q.  When was the last modification made to this contact entry?

14  A.  July 1, 2012.

15  Q.  Now, when you talked to the defendant at Seton Hall did he

16  say anything about instructions from Fadi to stop using e-mail

17  to communicate?

18  A.  Yes.

19  Q.  And when did the defendant tell you that Fadi gave him that

20  instruction?

21  A.  Approximately, 2012.

22          MR. BOVE:  Ms. shields, you can take that down.

23          THE COURT:  Where did the defendant tell you that?

24  It's not clear from the question.

25          2012 is the time he was instructed or 2012 was the

1    time he told you?

2            THE WITNESS:  2012 was the time he was instructed,

3    your Honor, by his IJO handler.

4            MR. BOVE:  Thank you, judge.  Just got a couple more

5    questions.

6    Q.  You were asked some questions this morning by Mr. Schact

7    about the Amory on Lexington Avenue; do you recall those

8    questions?

9    A.  I do.

10   Q.  And there are questions related to a location of a store or

11   where the defendant worked; do you remember those?

12   A.  Yes.

13   Q.  How, if at all, was surveilling a location near a store

14   where the defendant worked be consistent with the use of a

15   cover identity maintained for purposes of the Islamic Jihad

16   Organization?

17   A.  That's exactly what the defendant stated the Islamic Jihad

18   Organization had trained him to do, to utilize patterns

19   consistent with his cover identity to conduct those operational

20   activities.

21   Q.  To set up a job near a military outpost so that you could

22   surveil it?

23   A.  Yes.

24   Q.  You were also asked some questions this morning by

25   Mr. Schact about the defendant's trip to China; do you recall

J59AAKOU1                          Shannon - Redirect

1    those questions?

2    A.  Yes.

3    Q.  We looked at the documents yesterday related to that trip,

4    the timing of the defendant that's naturalization, his

5    passport?

6    A.  Yes.

7    Q.  Then the Chinese visa and a days later the trip to China in

8    May of 2009; do you recall those documents?

9    A.  I do.

10   Q.  When you asked the defendant about the purpose of his trip

11   to China, I think your testimony this morning was that he

12   didn't mention going there to pick up counterfeit clothes; is

13   that right?

14   A.  That's right.

15   Q.  Did the defendant refer to medical devices during the

16   interviews at Seton Hall when you asked him about the purpose

17   of the trip to Chinese?

18   A.  Yes.

19   Q.  And in the context of the Islamic Jihad Organization and

20   things that they were doing in 2009, why is that relevant?

21           MR. SCHACHT:  Objection.

22           THE COURT:  Sustained.

23   Q.  What, if any, connection is there between the Islamic Jihad

24   Organization and medical devices?

25   A.  The Islamic Jihad Organization was in the process of

J59KKOU2                        Shannon - Recross

1    procuring dual use explosive precursors during that time to

2    include items that are found in commercial cold packs contained

3    in first aid kits.

4                MR. SCHACHT:  Objection.

5                THE COURT:  You're stating this on the basis of your

6    knowledge or the basis of what Mr. Kourani told you?

7                THE WITNESS:  The basis of my knowledge, your Honor.

8                MR. SCHACHT:  Same objection.

9                THE COURT:  Overruled.

10               MR. BOVE:  Nothing further, judge.

11               THE COURT:  Any further questions?

12               MR. SCHACHT:  Yes, your Honor.

13

14   RECROSS-EXAMINATION

15   BY MR. SCHACHT:

16   Q.  Do you recall Mr. Bove showed you some notes before that

17   are my client's notes, right?

18   A.  I believe they're your client's notes, yes, sir.

19   Q.  Well, maybe they are not his notes; is that your testimony?

20   A.  No.  I believe them to be his notes.

21   Q.  OK.  And at the top of them it says "dad here ASAP", right;

22   do you recall seeing that?

23   A.  Yes.

24               (Continued on next page)

25   BY MR. SCHACHT:

J59KKOU2                        Shannon - Recross

1   Q.  Do you recall at the first meeting, you gave what you

2   called estimations to him of when his family members could be

3   brought here?  Do you recall doing that?

4   A.  Yes.

5   Q.  And an estimation, obviously, is different than a

6   guarantee, right?

7   A.  Yes.

8   Q.  And it's different than a promise?

9   A.  Yes.

10  Q.  By giving an estimation, what you were telling him, am I

11  correct, is that you would try to get his family here, but you

12  couldn't guarantee it?

13  A.  Yes.

14  Q.  And you gave him some deadlines sort of on a calendar of

15  when you would try to do this by, right?

16  A.  Yes.

17  Q.  You mentioned that he told you about learning techniques to

18  resist questioning or resist interrogation, right?

19  A.  He did.

20  Q.  And, obviously, calling up the FBI and asking for a meeting

21  is inconsistent with the training that he told you about,

22  right?

23  A.  No.

24  Q.  Well, the training that he told you about was what to do if

25  the Israelis or some hostile force captures a person and are

J59KKOU2                      Shannon - Recross

1    interrogating you, right?

2    A.  No.

3    Q.  Well, was this even an interrogation?  No.

4    A.  I'm sorry, can you repeat that?

5    Q.  This was a friendly interview at a law school, right?

6    A.  This was an interview at a law school, yes.

7    Q.  But it wasn't what you would call in the FBI an

8    interrogation, was it?

9    A.  No.

10   Q.  Do you recall that he asked you for a contract?

11   A.  That he asked us for a contract?

12   Q.  When I say he, let me be specific.  Ali Kourani asked you

13   for a contract, so he would have a deal with the FBI in

14   writing?

15   A.  No.

16   Q.  You don't recall that?

17   A.  I don't.

18   Q.  Do you recall seeing on the notes two minutes ago that my

19   client wrote on the notes that he needed a contract from you?

20   If you don't --

21          MR. SCHACHT:  Could you pull up the notes again?  I'm

22   sorry.  Thank you.  I think it's in the bottom right quadrant.

23          MR. BOVE:  Your Honor, for the record, this is

24   Government Exhibit 222.

25          MR. SCHACHT:  Thank you.

1   BY MR. SCHACHT:

2   Q.  Do you see there, I guess one line from the bottom, it says

3   sign a contract?

4   A.  It says, "I need a coverup.  Signing contract."

5   Q.  Does that refresh your recollection about him asking you

6   for a contract?

7   A.  He didn't ask us for a contract.

8   Q.  He did not?

9   A.  He did not.

10  Q.  Did he ask you to get his father here ASAP?

11  A.  That, he did ask us.

12          MR. SCHACHT:  Thank you.  You can take that down.

13          Could you please go back to Government Exhibit 221.

14  And when you have a chance, could you go to the flip side of

15  that, the handwritten notes on the other side of that document.

16  Thank you.

17          Could you zoom in on the left-hand side of that,

18  please.  Thank you.

19  BY MR. SCHACHT:

20  Q.  These are my client's notes on his copy of Mr. Denbeaux's

21  memorandum that was found during the execution of the search

22  warrant in his apartment, right?

23          THE COURT:  You're referring differently to these

24  notes than the government did.  Is it established from your

25  concession, or anything else, that these are defendant's notes?

1          MR. SCHACHT:  I would certainly concede they're the

2     defendant's notes on the other side of his copy of the

3     memorandum.

4          MR. BOVE:  We're happy to stipulate, Judge, that the

5     notes reflected on the back of 221 and the entirety of 222 are,

6     in fact, the defendant's notes.

7          THE COURT:  Okay.

8     BY MR. SCHACHT:

9     Q.  Do you see there, in the upper right quadrant, my client

10    wrote, "They said they can do a lot"?

11    A.  Yes.

12    Q.  And then to the left of that he has, "Kids' visa, job,

13    justice, money," he's got all those things listed there?

14    A.  Yes, I see that.

15    Q.  Now, when my client told you that he was advised to get a

16    cover of a job while he was working as a Hezbollah operative,

17    did he tell you what type of job he was advised to get?  Or he

18    didn't mention that one way or the other?

19    A.  I don't recall that being mentioned, one way or the other,

20    the type of job.

21    Q.  He certainly didn't mention, did he, that he was advised to

22    get a job as a criminal selling counterfeit clothing, right?

23    A.  Right.

24    Q.  Because that would be the opposite of leading a

25    superficially normal life, right?

1   A.  I don't know.

2              MR. SCHACHT:  I have no other questions.

3              THE COURT:  Okay.

4              MR. BOVE:  Judge, I have one brief follow-up relating

5   to a door that was just opened.

6   REDIRECT EXAMINATION

7   BY MR. BOVE:

8   Q.  Special Agent Shannon --

9   A.  I apologize.

10  Q.  -- you were just asked some questions about the

11  conversation you had with Mr. Denbeaux and the defendant on

12  March 23rd, 2017, in which an estimate was provided about

13  timing.  Do you recall those questions?

14  A.  Yes.

15  Q.  And I want you to focus now on that specific part of the

16  meeting where that estimate was discussed.  Okay?

17  A.  Yes.

18  Q.  Did you describe any preconditions at that point to the FBI

19  doing anything -- before the FBI would try to do anything, what

20  did you say needed to happen?

21  A.  We told the defendant three things needed to happen:  He

22  had to be truthful, he had to be honest.  That meant he had to

23  tell us everything, he couldn't hold anything back, and he

24  could not lie to us.  The third thing was that his information

25  had to be valuable.

1            MR. BOVE:  Nothing further.

2            MR. SCHACHT:  Very briefly, your Honor.

3   RECROSS EXAMINATION

4   BY MR. SCHACHT:

5   Q.  Prior to your meeting him, hadn't other FBI agents already

6   met my client and spoken to him?

7            MR. BOVE:  Objection.

8            THE COURT:  Do you know that other FBI agents had

9   previously met with Mr. Kourani?

10           THE WITNESS:  I do know that, your Honor.

11           THE COURT:  Okay.  Are you finished?

12           MR. SCHACHT:  No, I have one follow-up question to

13  that.

14           THE COURT:  That's two questions.

15  BY MR. SCHACHT:

16  Q.  And those agents had already provided him with benefits

17  prior to him being honest and truthful, right?

18           THE COURT:  That's new ground.

19           MR. BOVE:  Objection.

20           THE COURT:  That's not part of the examination.

21           MR. SCHACHT:  I can go into it with another witness.

22  Thank you.

23           THE COURT:  Before we excuse Ms. Shannon, can I see

24  both of you?

25           (At the sidebar)

432

1            THE COURT:  We referred to the 69th Regiment Armory as

2      a military installation.  Is it?

3            MR. BOVE:  Yes, Judge, absolutely.  And we will

4      establish that through witness testimony this morning.

5            THE COURT:  You will?

6            MR. BOVE:  Yes.

7            THE COURT:  Okay.  Thank you.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J59KKOU2

```
 1              (In open court)

 2              THE COURT:  Let's take our midmorning break before the

 3    next witness comes.

 4              Close up your books, leave them by your chairs, don't

 5    discuss the case.

 6              Ms. Shannon, you're excused.  Thank you.

 7              THE WITNESS:  Thank you, your Honor.

 8              (Witness excused)

 9              (Jury not present)

10              THE COURT:  When you come back, have your next

11    witness, Mr. Bove.

12              MR. BOVE:  Yes, your Honor.

13              (Recess)

14              (Jury present)

15              THE COURT:  The next witness is Special Agent Stephen

16    Anest.

17              Ms. Jones will swear you.

18     STEPHEN ANEST,

19         called as a witness by the Government,

20         having been duly sworn, testified as follows:

21              THE WITNESS:  Special Agent Stephen, S-t-e-p-h-e-n,

22    last name Anest, A-n-e-s-t.

23              THE COURT:  You may inquire, Ms. Houle.

24              MS. HOULE:  Thank you, your Honor.

25
```

J59KKOU2                         Anest - Direct

1    DIRECT EXAMINATION

2    BY MS. HOULE:

3    Q.  Good morning, Special Agent.

4    A.  Good morning.

5    Q.  Where do you work?

6    A.  I work for a component of the United States Department of

7    Homeland Security, an agency called the Federal Protective

8    Services.

9    Q.  I'll refer to the Federal Protective Services as the FPS

10   during your testimony.

11           What is the mission of the FPS?

12   A.  The FPS provides law enforcement and security services to

13   federal facilities.  We provide protective services at United

14   States General Services Administration, government facilities

15   that are owned, leased, or occupied by the federal government.

16           THE COURT:  Try to speak a little more slowly and

17   louder.

18           THE WITNESS:  Yes, your Honor.

19   BY MS. HOULE:

20   Q.  And how long have you worked for the FPS?

21   A.  I started with the FPS in 2009.

22   Q.  What roles have you held there?

23   A.  I'm currently a special agent.  In 2016, I transitioned

24   from being a uniformed law enforcement officer, I was an area

25   commander, where I was basically a precinct commander for lower

J59KKOU2                              Anest - Direct

1    Manhattan.

2    Q.  What, generally, are your responsibilities as a special

3    agent at Federal Protective Services?

4    A.  As a special agent at FPS, my primary duties is to conduct

5    criminal investigations.  However, we also conduct covert

6    security testing of our contract security force, or contract

7    guards.  I also conduct surveillance detection at our

8    facilities in furtherance of our protective mission, and I

9    conduct threat assessments of our facilities as part of our

10   facility security assessment program.

11   Q.  What did you do before you joined FPS?

12   A.  I was on active duty as a commissioned officer with the

13   Army Reserve, where I was in a branch, military police.

14   Q.  As part of your work at FPS and in the military, have you

15   received training relating to physical security?

16   A.  Yes, I have.

17   Q.  Can you describe, generally, what types of training you've

18   received?

19   A.  Yes.  As a military police officer, I started off with the

20   military officer's basic course.  I'm still in the Army Reserve

21   today, so I continue that process.  I completed the Captain's

22   Career Course, the Army Physical Security Training Program --

23              THE COURT:  Slow, slow, slow.

24              THE WITNESS:  Yes, Judge.

25              -- the antiterrorism officer's course.  As a member of

J59KKOU2                         Anest - Direct

1    the Federal Protective Service, I've completed two academies,

2    one for our uniformed police division and one -- and the

3    criminal investigation training program.  As part of our

4    national academy, I completed our protective or our Physical

5    Security Training Program and a series of other shorter term

6    courses over the period of my service.  In addition, I'm a --

7    act as a certified protection professional.

8    Q.  Special Agent, could I ask you to just move a little closer

9    to the microphone?

10   A.  Sure.

11   Q.  Thank you.

12        You testified that as part of your responsibilities,

13   you participate in what you called threat assessments of

14   federal facilities; is that right?

15   A.  Yes.

16   Q.  Does the federal government have a standardized process for

17   these threat assessments?

18   A.  Yes, it does.

19   Q.  Can you describe that briefly?

20   A.  Yes.  The Interagency Security Committee lays out the

21   standards --

22        THE COURT:  Slow.

23        THE WITNESS:  The Interagency Security Committee lays

24   out the standards for risk management across the federal

25   government infrastructure sector.  That committee was

1    established after the bombing of the Murrah building in

2    Oklahoma City.  By executive order, that risk management

3    process applies to all federal government facilities.

4              FPS conducts a risk management process as part of the

5    sector of the government facilities that we provide risk

6    assessment for.  That facility security assessment process

7    includes various steps of gathering information.  We conduct

8    interviews.  We gather documents, plans, security information

9    about those buildings, construction information, information on

10   threats in the area, interviews with other law enforcement

11   agencies.  We conduct tests of the countermeasures or systems

12   that protect the buildings.  That would include guards, and

13   cameras, and things like that.  And we gather that information,

14   we complete a report, and make recommendations.

15   Q.  And those steps that you just described that are part of a

16   threat assessment process, have you employed those steps to

17   learn about a building at 26 Federal Plaza?

18   A.  Yes, I have.

19             MS. HOULE:  Ms. Shields, could you please bring up

20   what's already in evidence as Government Exhibit 9.

21   Q.  Special Agent, does this map accurately mark the location

22   at 26 Federal Plaza down at the bottom of Manhattan there?

23   A.  Yes, it does.

24             THE COURT:  I've taken judicial notice of that.

25             MS. HOULE:  Thank you, your Honor.

1                  THE COURT:  You needn't ask the witnesses.

2                  MS. HOULE:  Ms. Shields, could you move to the left

3       side of the screen, please, and on the right, could you please

4       bring up Government Exhibit 803, which is also already in

5       evidence.

6       BY MS. HOULE:

7       Q.  Special Agent, what is shown on the right side of the

8       screen at Government Exhibit 803?

9       A.  That's the front main entrance portion of 26 Federal Plaza,

10      the plaza located on Broadway between Duane Street and Worth

11      Street.

12      Q.  What is the level of security that FPS has determined is

13      necessary for 26 Federal Plaza?

14      A.  It's among the highest risk levels of facilities.

15      Q.  I'd like to talk through some specifics of that building.

16                  Approximately how many people are present in 26

17      Federal Plaza each day?

18      A.  The peak population of the facility is somewhere around

19      7,000.

20      Q.  And how does the size of 26 Federal Plaza compare to other

21      federal buildings in this country?

22      A.  It's the third largest federal facility in the country and

23      one of the largest outside of the National Capital Region.

24      Q.  Are there different federal agencies that have offices at

25      26 Federal Plaza?

1   A.  Yes, there are.

2   Q.  Approximately how many federal agencies are located there?

3   A.  Approximately 30.

4   Q.  Could you provide the jury with some examples of the

5   federal agencies located there?

6   A.  Yes.  The Federal Bureau of Investigation, the FBI, their

7   main New York field office is located there, they're among the

8   largest tenants.  Citizenship and Immigration Services, the

9   United States Court of international Trade is located on that

10  campus.  The United States Army Corps of Engineers, their

11  New York district office is located there.  There are various

12  other field offices of many regional headquarters of the Region

13  II area of New York are located there.

14  Q.  Are you familiar with a term "significant areas and

15  assets"?

16  A.  Yes.

17  Q.  What does that term mean?

18  A.  Those are areas on a facility or a building that we look at

19  that are significant to the building.  They're -- we would term

20  they're attractive, they're attractive targets.  Some of the

21  locations that we may identify in buildings are common areas

22  that you may notice, areas where people gather, infrastructure

23  of the building, whether there's generators or other key

24  engineering factors of the building, courtrooms, detention

25  facilities, important things within that building.

J59KKOU2                          Anest - Direct

1   Q.  When you say attractive target, what do you mean by that?

2   A.  That they would -- that a threat actor, or criminal, or

3   terrorist may view that as someplace that they would want to

4   perform an attack or an act.

5   Q.  Does 26 Federal Plaza have any of those significant areas

6   and assets?

7   A.  Yes.

8   Q.  Can you describe them, please?

9   A.  Sure.  It includes -- there's command posts and operation

10  centers located there.  As I mentioned earlier, they're the

11  offices, they have gathering places for people when they're

12  coming in the buildings, key engineering facilities,

13  courtrooms, detention areas, law enforcement offices.

14  Q.  Does 26 Federal Plaza have any location for the securing of

15  confidential information or classified information?

16  A.  Yes.  Classified information is held by various agencies

17  within the facility, and they have sensitive work areas.

18  Q.  Is there a daycare at 26 Federal Plaza?

19  A.  Could you repeat the question?

20  Q.  Is there a daycare at 26 Federal Plaza?

21  A.  Yes, there's a large daycare facility there, and there is

22  exterior grounds, there's playgrounds.

23  Q.  And those playgrounds, are they visible from the outside of

24  26 Federal Plaza?

25  A.  Yes, they are.

J59KKOU2                              Anest - Direct

1    Q.  I'd like to ask you about another term, the phrase "joint

2    operations center."  What is that?

3    A.  The joint operations center is where a state, local, or

4    government agency would manage their operation from.

5    Typically, it includes multiple agencies, and if it's a joint

6    operation center, it's basically a command post.

7    Q.  When is a joint operation center typically used?

8    A.  They'll be typically steady-state or current operations

9    periods that will have operations, maybe possibly, during

10   regular daytime hours.  However, typically, they're used during

11   an incident response and major events.

12   Q.  When you say "major events," what would that include?

13   A.  Major events could be anything from parades to other things

14   that are going on in the city.  One thing that comes to mind is

15   the U.N. General Assembly every year, and one thing that comes

16   to mind is maybe the Pope's visit, things like that.  Major

17   events, the president's visit to the city, things like that.

18   Q.  Is there a joint operation center at 26 Federal Plaza?

19   A.  Yes, there is.

20   Q.  In assessing the security at 26 Federal Plaza, have you

21   also reviewed the surrounding area?

22   A.  Yes, I have.

23   Q.  Why is that important?

24   A.  We look at the facilities not only from inside the

25   facility, but also the surrounding area.  It impacts the threat

J59KKOU2                           Anest - Direct

1    level of a facility; it impacts the general crime in an area.

2    26 Federal Plaza is located on a major federal campus, the

3    Manhattan Civic Center.  If you're familiar with the area, you

4    may look and see 26 Federal Plaza located with the Court of

5    International Trade, a national monument called the African

6    Burial Ground, the Ted Weiss Federal Building located at 290

7    Broadway directly across the street.

8              THE COURT:  What building is that?

9              THE WITNESS:  290 Broadway.

10             THE COURT:  What kind of building?

11             THE WITNESS:  Federal office building.

12             THE COURT:  Federal office building.

13             THE WITNESS:  And then also within that same area,

14   across the street, you have two courthouses, including this

15   one, the United States Attorney's Office, located at One

16   St. Andrew's Plaza.  Those are all federal facilities.  In

17   addition, you have state and local offices as well.

18             THE COURT:  And the MCC?

19             THE WITNESS:  Yes.

20             THE COURT:  A correctional facility?

21             THE WITNESS:  Yes.

22   BY MS. HOULE:

23   Q.  You mentioned, at the beginning of your testimony, that

24   part of your role is to conduct surveillance detection

25   operations?

J59KKOU2                          Anest - Direct

1    A.  Yes.

2    Q.  What does that mean?

3    A.  Surveillance detection is a process by where we're trying

4    to identify if someone is conducting hostile surveillance

5    against facilities we protect.

6    Q.  Let me interrupt you there.  What do you mean by "hostile

7    surveillance"?

8    A.  Hostile surveillance is someone conducting surveillance,

9    surveillance being observing in a covert manner, to gather

10   information or intelligence in furtherance of a possible attack

11   on a facility.  They would seek to gather information about the

12   vulnerabilities of a facility or building, the business

13   practices, the operations, things that we discussed earlier

14   about sensitive areas and assets.  Those are the things they

15   would seek to identify.

16   Q.  What types of surveillance detection operations do you

17   conduct?

18   A.  So we conduct surveillance detection operations in

19   coordination with our uniformed division, typically.  We have

20   operations for specific events or as part of our routine

21   protective operations.

22   Q.  Based on your work at the FPS, are you also familiar with a

23   building at 335 Adams Street in Brooklyn, New York?

24   A.  Yes, I am.

25   Q.  That's listed at the bottom of the map, on the left side of

J59KKOU2                          Anest - Direct

1   the screen as well, right?

2   A.  Yes.

3           MS. HOULE:  Ms. Shields, if you could turn to page 5

4   in Government Exhibit 803, which is on the right side of the

5   page.  And if you could rotate that.

6   Q.  Special Agent, what is shown in this photograph on the

7   right side of the page?

8   A.  335 Adams Street.

9   Q.  What's located inside of this building, as it relates to

10  your work?

11  A.  The United States Secret Service has a field office there

12  that is leased by the General Services Administration.

13  Q.  Is the building marked from the outside as a federal

14  facility?

15  A.  No, it is not.

16  Q.  Is there any indication on the outside of the building that

17  the Secret Service office is inside?

18  A.  No.

19  Q.  Is there information available on the Internet about the

20  Secret Service having an office there?

21  A.  Yes.

22  Q.  Let's talk through some of the specifics of this building.

23          Approximately how many people are in that building on

24  a given day?

25  A.  The peak population we have is 180, approximately.

1    Q.  And like your review of 26 Federal Plaza, have you also

2    reviewed the surrounding area of this building?

3    A.  Yes, I have.

4    Q.  What is in the area that's relevant to your threat

5    analysis?

6    A.  Similar to Manhattan, it's located in the Brooklyn Civic

7    Center.  It has a -- similar to Manhattan, it has a series of

8    federal buildings, including two courthouses, a post office,

9    local and state courts, other local and city offices, and

10   residential and some commercial.

11   Q.  Does 335 Adams Street also have a joint operations center?

12   A.  Yes.  They have a -- the Secret Service activates a joint

13   operations center there for specific events that they're

14   responsible for.

15   Q.  What types of events?

16   A.  National security special events.  When the Secret Service

17   is assigned one, they -- in New York City, they will activate

18   their joint operations center for that event.

19   Q.  Can you give some specific examples of events that would be

20   national security events that the Secret Service coordinates

21   out of that building?

22   A.  The United States -- Correction.  The U.N. General

23   Assembly, which is an annual event at the U.N., and one recent

24   one I can remember is the Pope's visit to New York.

25   Q.  You testified that you conduct surveillance detection

J59KKOU2

1   operations in connection with 26 Federal Plaza.

2           Do you conduct similar operations in connection with

3   this building, the Secret Service building?

4   A.  Yes, we have.

5           MS. HOULE:  One moment, your Honor?

6           THE COURT:  Yes.

7           (Pause)

8           MS. HOULE:  No further questions.

9           THE COURT:  Cross-examination, Mr. Schacht?

10          MR. SCHACHT:  I have no questions for this witness.

11   Thank you.

12          THE COURT:  You're excused.

13          THE WITNESS:  Thank you, Judge.

14          (Witness excused)

15          THE COURT:  Next witness.

16          MS. HOULE:  Your Honor, the government calls Special

17   Agent Gary Battista.

18    GARY BATTISTA,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21          THE WITNESS:  Gary Battista, B-a-t-t-i-s-t-a.

22          THE COURT:  You may inquire, Ms. Houle.

23          MS. HOULE:  Thank you, your Honor.

24          Your Honor, before I begin with this witness, I'd like

25   to read a stipulation between the parties.  It is at Government

J59KKOU2                        Battista - Direct

1    Exhibit 1012.

2              THE COURT:  Yes.

3              MS. HOULE:  The parties agree as follows:

4              First, that on November 8, 2013, the defendant was

5    arrested by officers of the New York City Police Department

6    following a lawful traffic stop;

7              Two, if called as a witness at trial, the arresting

8    officer would testify that during that traffic stop, on

9    November 8, 2013, the defendant stated in substance and in

10   part, "I have counterfeit boots in the back of the car.  I make

11   about $20 per pair.  I buy them for $20."

12             Following the arrest on November 8, 2013, the

13   defendant was charged with trademark counterfeiting in the

14   second degree, driving with an object obstructing vision, and

15   failing to stop at a stop sign.

16             On May 6, 2014, the defendant resolved the criminal

17   charges by pleading guilty in Queens County Criminal Court to

18   the charge of disorderly conduct.

19             Your Honor, the government offers 1012.

20             THE COURT:  Received.

21             (Government's Exhibit 1012 received in evidence)

22   DIRECT EXAMINATION

23   BY MS. HOULE:

24   Q.  Good morning.

25             Where do you work?

1   A.  Federal Bureau of Investigation New York office.

2   Q.  How long have you worked for the FBI?

3   A.  Eleven years.

4   Q.  What did you do before you joined the FBI?

5   A.  I was an infantry officer in the United States Army for

6   eight years.

7   Q.  Are you assigned to a particular squad at the FBI right

8   now?

9   A.  Yes, I am.  I'm --

10   Q.  What squad is that?

11   A.  Squad CT9.

12   Q.  Does CT9 have any particular focus?

13   A.  Yes.  We investigate the Iranian threat network, which

14   includes the Islamic Revolutionary Guard Corps and Lebanese

15   Hezbollah.

16   Q.  What is your position on CT9?

17   A.  Currently, the supervisory special agent.

18   Q.  How long have you held that position?

19   A.  Approximately 14 years.

20   Q.  Have you held any other positions on that squad?

21   A.  Yes.  Previously, I was a case agent on the squad for three

22   years.

23   Q.  Do you know a man named Ali Kourani?

24   A.  I do.

25   Q.  Do you see him in the courtroom today?

J59KKOU2                        Battista - Direct

1    A.  I do.

2    Q.  Could you identify him based on a piece of clothing that

3    he's wearing?

4    A.  Individual wearing glasses and a dark red shirt.

5            THE COURT:  The defendant is identified.

6            MS. HOULE:  Thank you, your Honor.

7    BY MS. HOULE:

8    Q.  Special Agent, if I could turn your attention to April 1st,

9    2016.

10           Did you meet with the defendant on that day?

11   A.  I did.

12   Q.  Was that the first time you met the defendant?

13   A.  Yes.

14   Q.  How did that meeting begin?

15   A.  That meeting began with me approaching Mr. Kourani at a

16   Starbucks restaurant in College Point.

17   Q.  Why did you approach him at a Starbucks?

18   A.  At that time, Mr. Kourani was by himself, and we wanted to

19   keep these conversations private.

20   Q.  What did you say when you approached him at the Starbucks?

21   A.  I introduced myself as a special agent with the FBI and

22   told him that I had an urgent matter that I needed to discuss

23   with him, it involves him and his family, and asked him to

24   follow me.

25   Q.  What was the defendant's response?

J59KKOU2                        Battista - Direct

1   A.  He looked at me, looked at my credentials, smiled and

2   agreed to follow.

3   Q.  What was his demeanor?

4   A.  Very calm.

5   Q.  Where did you go next?

6   A.  We went to a McDonald's restaurant, which was adjacent to

7   the Starbucks.

8   Q.  Did you meet with the defendant at the McDonald's?

9   A.  I did.

10  Q.  Was anyone present for that meeting with the defendant?

11  A.  Yes.

12  Q.  Who?

13  A.  There was another special agent and a member of a U.S.

14  intelligence agency.

15  Q.  How did you identify those two other people in the meeting

16  to the defendant?

17  A.  As my colleagues.

18  Q.  When you met with the defendant at the McDonald's, did you

19  tell him why you wanted to meet with him?

20  A.  I did.

21  Q.  What did you say?

22  A.  I told him that we had been watching him for a long time,

23  and I knew a lot about him, I knew about his previous criminal

24  activity, that he was arrested by NYPD, and we also knew about

25  his affiliation with Hezbollah.  Further, I told him that I

J59KKOU2                        Battista - Direct

1    knew that he was a father of two and was seeking financial

2    stability in his life.  And the reason that I was telling him

3    these things is that he had a unique opportunity, and that

4    opportunity was to enter into a relationship with the

5    U.S. Government, and that relationship would be based on truth

6    and honesty.  If he chose to take us up on that relationship,

7    he would have the opportunity to provide college education for

8    his kids, healthcare for his family, pursue any career that he

9    wanted, and if he did so, he wouldn't regret it.

10   Q.  When you mentioned things like providing college for his

11   kids or healthcare, what did you mean by that?

12   A.  That we would be able to financially support that.

13   Q.  At the McDonald's, what, if anything, did the defendant say

14   about whether he was willing to discuss Hezbollah with you?

15   A.  He told us that he would be willing to talk about Hezbollah

16   politics all day.

17   Q.  Did you continue to meet with the defendant at the

18   McDonald's?

19   A.  Not for too much longer.

20   Q.  What happened?

21   A.  We agreed that this wasn't the best environment to discuss

22   Hezbollah.  The McDonald's was crowded, we were actually seated

23   by a trashcan, there was lots of people walking by, so we

24   agreed to meet later that night.

25   Q.  What did you do next?

1    A.  I provided Mr. Kourani a previously unused cell phone.

2    Q.  And why did you give the defendant a cell phone that had

3    never been used before?

4    A.  We didn't want Mr. Kourani to have to explain to Hezbollah

5    any additional phone numbers in his personal phone when he goes

6    back to Lebanon.

7    Q.  When you would communicate with the defendant, what type of

8    phone would you use?

9    A.  Sure.  I also kept a previously unused cell phone for

10   myself.  In case Hezbollah came in possession of the phone that

11   we provided him, we didn't want that phone tied to any

12   U.S. Government phone numbers.

13   Q.  Did the defendant accept the cell phone from you?

14   A.  He did.

15   Q.  What happened next?

16   A.  So we agreed that we would meet later that night, at

17   approximately 6:00 o'clock.

18   Q.  What happened at 6:00 p.m.?

19   A.  Prior to 6:00, I called him at 5:00, and provided a street

20   corner for him to meet us at, told him to come alone and bring

21   his phone.  He showed up at 6:00 o'clock, and I, again, called

22   him.

23   Q.  What happened when you called him at 6:00 p.m.?

24   A.  When I called him at 6:00, I provided additional directions

25   for him to meet us at another location a few blocks away.

J59KKOU2                          Battista - Direct

1    Q.   And did you meet the defendant at that second location?

2    A.   I did.

3    Q.   Where did you go next?

4    A.   We went into an adjacent hotel, which was a Sheraton in

5    Flushing, Queens.

6    Q.   Why didn't you just tell the defendant to meet you at that

7    Sheraton in Queens?

8    A.   We wanted to make sure the defendant showed up by himself

9    and nobody else knew about the meeting.

10   Q.   When you brought the defendant into the hotel, what

11   happened next?

12   A.   I brought him up to the landing on the floor where the

13   hotel room was that we were going to meet him at, and I patted

14   him down.

15   Q.   Did the defendant have anything on him?

16   A.   He did.

17   Q.   What did he have?

18   A.   The only item on him was the cell phone that I had provided

19   him previously that day.

20   Q.   Did he have any identification on him?

21   A.   No wallet, no ID, no personal phone.

22              THE COURT:  This is still April 1?

23              THE WITNESS:  Yes, sir.

24              THE COURT:  2016?

25              THE WITNESS:  Yes, sir.

1    BY MS. HOULE:

2    Q.  Did you give the defendant any instructions at that point

3    in the meeting with regard to that cell phone you had provided

4    him?

5    A.  Yes.  We asked him to remove the battery.

6    Q.  Why did you do that?

7    A.  We wanted to ensure that the phone wasn't going to be used

8    to record the conversation or be exploited in any way.

9    Q.  And this meeting at the hotel with the defendant, who else

10   was present?

11   A.  The same two people from earlier that day.

12   Q.  What, if anything, did the defendant say to you about

13   whether he had told anyone he would be meeting with the FBI

14   that day?

15   A.  He said that he hadn't told anybody, that he wanted, also,

16   to keep these conversations secret, and actually told his wife

17   that he was going to get his glasses fixed.

18   Q.  During this meeting, did you ask the defendant about his

19   relationship with Hezbollah?

20   A.  I did.

21   Q.  What did he say?

22   A.  He denied having any membership in Hezbollah, said he was

23   not affiliated in any way, and said whatever information we had

24   was based on lies.

25   Q.  Did the defendant express any view of Hezbollah?

J59KKOU2                         Battista - Direct

1    A.  Yeah, he actually said that he hated Hezbollah.

2    Q.  Did he give a reason for that?

3    A.  Yes.  He relayed a story about a contentious divorce

4    between his sister and the son of Sheikh Hussein Kourani, who

5    he later described as one of the founding fathers of Hezbollah.

6    Q.  Did you ask the defendant any questions about Hezbollah

7    operations here in the United States?

8    A.  Yes.

9    Q.  What did he say?

10   A.  He said, during this meeting, that it -- it wouldn't make

11   any sense for Hezbollah to have any members in the United

12   States because their fight was in Lebanon.

13   Q.  Did the defendant say whether he was willing to have future

14   contact with the FBI?

15   A.  Yes.

16   Q.  What did he say?

17   A.  He agreed to take a call from us on April 4th at noon.

18   Q.  What was your goal in approaching the defendant that day?

19   A.  Our goal in approaching Mr. Kourani was to find out more

20   about Hezbollah IJO operations in the United States.

21   Q.  Did you say anything to the defendant about what would be

22   expected of him if he continued to meet with the FBI?

23   A.  Yes.  We asked for truth and honesty.

24   Q.  Directing your attention to April 4, 2016, did you speak

25   with the defendant by phone that day?

J59KKOU2                          Battista - Direct

1    A.  I did.

2    Q.  What was said on that call?

3    A.  We agreed to meet on April 6th.

4    Q.  And what phone did you use to call the defendant?

5    A.  I used my previously unused phone.

6    Q.  And what phone number did you call him at?

7    A.  The phone that I had given him on April 1st.

8    Q.  Did you meet with the defendant on April 6 --

9              THE COURT:  Excuse me.  You used your previously

10   unused phone?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  What do you mean?

13             THE WITNESS:  I also kept a -- we provided Mr. Kourani

14   a phone, and I also bought a phone that wasn't associated with

15   the U.S. Government.

16   BY MS. HOULE:

17   Q.  Did you meet with the defendant on April 6, 2016?

18   A.  Yes.

19   Q.  Where did that meeting take place?

20   A.  That meeting was at a hotel called the Carleton of Oak Park

21   in Chicago, Illinois.

22   Q.  Why did you meet with the defendant in Chicago on April 6th

23   when you had previously met with him in New York?

24   A.  He had moved to Chicago.

25   Q.  Did the defendant tell you if that move was previously

J59KKOU2                          Battista - Direct

1   planned?

2   A.  He did, and it was.

3   Q.  This meeting that you had with the defendant in Chicago on

4   April 6th, who else was present?

5   A.  The same two people in the previous meetings.

6   Q.  During this meeting, did the topic of the 2006 War between

7   Israel and Hezbollah come up?

8   A.  Yes.

9   Q.  What did the defendant say about that topic?

10  A.  Mr. Kourani stated that he was in the South of Lebanon in

11  his hometown of Yater with several family members.  After a few

12  days of engagement between Hezbollah and Israel, they realized

13  that this wasn't the normal engagement, so he and several

14  family members got in a car and drove to Damascus, Syria.  It

15  took them about a week to go up there.

16  Q.  Did the defendant tell you where he went after Syria?

17  A.  Yes.  He stayed one night in Damascus and then took a

18  Middle East Airlines flight back to New York.

19           THE COURT:  May I suggest that you, as to what happens

20  at a meeting, you just ask what happens at the meeting and who

21  said what to whom, and let it flow rather than direct the

22  topics.

23           MS. HOULE:  Thank you, your Honor.

24  BY MS. HOULE:

25  Q.  Special Agent, was anything further said about that topic

J59KKOU2                      Battista - Direct

1    of the 2006 War?

2    A.   Yes.  His sentiments about Israel came up.  He stated

3    that -- we asked him what did he feel about the impact of that

4    war.  He said that he was upset at this thing called Israel and

5    then went on to say that he hated Israel to death.  His

6    father's home was destroyed approximately two days before the

7    end of the war.  That was pretty much it about the war.

8              THE COURT:  How did the meeting start?

9              THE WITNESS:  That meeting started with us engaging

10   Mr. Kourani about some of the topics that we had discussed in

11   the previous meeting.

12             THE COURT:  So you initiated the conversation?

13             THE WITNESS:  Yes, your Honor.

14             THE COURT:  And you talked about some of the subjects

15   in the previous meeting.  Did you ask any questions?

16             THE WITNESS:  Yes.  In the previous meeting, he had

17   brought up an individual by the name of Husam Kourani.  We

18   talked about him a little bit.

19             THE COURT:  This is one of the founders you mentioned?

20             THE WITNESS:  No, sir.  He's a different individual, a

21   family member of Ali Kourani that was approached by the

22   U.S. Government.  He came up in the first meeting.  Mr. Kourani

23   said that he fell into the category of an individual that was

24   also approached by the United States Government that they were

25   seeking cooperation from.  He said that he pretty much fell

1    into that category now, and Mr. Kourani -- Husam Kourani should

2    have taken them up on the offer.  Instead, he had left for

3    Brazil.

4              So we discussed him a little bit more and also

5    discussed the divorce between his sister and the son of Sheikh

6    Hussein Kourani, because that really was something that

7    illustrated his sentiments about Hezbollah.

8              So then the topic of the war came up.

9              THE COURT:  Did you bring it up, or did he?

10             THE WITNESS:  We brought it up because it came up in

11   our first meeting on April 1st.  We didn't get into too much

12   detail on April 1st about it, so we wanted to talk about it a

13   little bit more.

14             THE COURT:  Go ahead.

15             And you told us what he said in your conversations

16   with Ms. Houle?

17             THE WITNESS:  Yes, your Honor.

18             THE COURT:  Anything else said at the meeting?

19             THE WITNESS:  There was one other thing about his --

20   he brought out -- at some point during the conversation, he

21   brought up -- he told us that we have to understand that he

22   still has family in Lebanon, and I took that to mean that he

23   feared some retribution against his family by Hezbollah if they

24   knew he was talking to the United States Government in the

25   United States.

1          MS. HOULE:  May I proceed, your Honor?

2          THE COURT:  Yes.

3   BY MS. HOULE:

4   Q.  If I could direct your attention, Special Agent, to your

5   following meeting with the defendant.

6          Was that on April 7, 2016?

7   A.  Yes.

8          THE COURT:  How did the meeting on April 6th end?

9          THE WITNESS:  He agreed to take a call from us at noon

10  the following day.

11         THE COURT:  And then you left?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  And he left?

14         THE WITNESS:  Yes, your Honor.

15         THE COURT:  Both at the same time?

16         THE WITNESS:  I walked Mr. Kourani out, I probably --

17  I went back into the hotel room, and then we left shortly

18  after.

19         THE COURT:  Okay.  Go on, Ms. Houle.

20  BY MS. HOULE:

21  Q.  So, turning to the next day, April 7, 2016, where did you

22  meet with the defendant that day?

23         THE COURT:  This is 2015?

24         MS. HOULE:  2016, your Honor.

25         THE COURT:  '16?

J59KKOU2                        Battista - Direct

1    Q.  Where did you meet with the defendant that day?

2    A.  It was at a restaurant in Chicago called Revolution Brewing

3    Company.

4    Q.  Why did you meet with the defendant at a public place this

5    time?

6    A.  We had met with Mr. Kourani a couple of times previously.

7    Obviously, those meetings were at a hotel room, and we felt

8    that Mr. Kourani was holding back a little bit, so we wanted to

9    change up the environment.

10   Q.  Was anyone else present for your meeting with the defendant

11   that day?

12   A.  Yes.  The same two individuals.

13   Q.  You said that Husam Kourani came up in your conversations

14   with the defendant?

15   A.  Yes.

16   Q.  Did you discuss him at this meeting?

17   A.  Yes.

18   Q.  What did the defendant say about Husam Kourani?

19   A.  So Ali Kourani described Husam Kourani as a former soldier

20   of Hezbollah who was approached by the United States Government

21   in the early 2000s.  He left suddenly, after being approached

22   by the U.S. Government, and was living in Brazil, as far as he

23   knew.

24   Q.  Did you ask the defendant anything in response to his

25   comments about Husam Kourani?

J59KKOU2                      Battista - Direct

1   A.  I did.  We asked Mr. Kourani if he could obtain his cell

2   phone or any phone number for Husam Kourani.

3   Q.  What did the defendant say?

4   A.  He said that he would get it for us.

5   Q.  Why did you ask the defendant to get a cell phone number

6   for Husam Kourani?

7   A.  At this point, we wanted to see if he would be willing and

8   able to carry out a simple task like getting a phone number.

9   Q.  Did the defendant discuss an individual named Hussein

10  Kourani?

11  A.  Yes.

12  Q.  What was said?

13  A.  So out of the blue --

14          THE COURT:  Isn't that the one we just talked about?

15          THE WITNESS:  No.  Sorry, sir.  Husam Kourani was an

16  individual that fled to Brazil.

17          THE COURT:  How do you spell his first name?

18          THE WITNESS:  H-u-s-a-m.

19          THE COURT:  Now we're talking about Hussein Kourani?

20          THE WITNESS:  Yes, your Honor.  This is different than

21  Sheikh Hussein Kourani that we discussed previously.

22          THE COURT:  We have discussed three Kouranis?

23          THE WITNESS:  Yes, your Honor.

24          THE COURT:  We discussed the Sheikh, whose son was

25  married to Ali Kourani's sister?

1           THE WITNESS:  Yes, your Honor.

2           THE COURT:  And then we discussed a Kourani who had

3     been approached by the United States?

4           THE WITNESS:  Yes, your Honor.

5           THE COURT:  Left that subject off, right?

6           THE WITNESS:  Yes, your Honor.

7           THE COURT:  And then we now have a third Kourani?

8           THE WITNESS:  Yes.  It's another Hussein Kourani, but

9     it's different than the Sheikh Hussein Kourani.

10    BY MS. HOULE:

11    Q.  What did the defendant say about Hussein Kourani?

12    A.  So we didn't ask any questions about Hussein Kourani out of

13    the blue.  The defendant brought him up and stated that pretty

14    much he knows that he's working for the United States

15    Government, it's obvious that he's working for the United

16    States Government, because he's able to carry on illegal

17    activities with no repercussion by the government.

18    Q.  Did you respond to that comment by the defendant?

19    A.  I did not.

20    Q.  Why not?

21    A.  I felt at this time that Mr. Kourani was trying to elicit

22    intelligence from us regarding U.S. Government sources.

23    Q.  Did the topic of the CIA come up at this meeting?

24    A.  Yes.

25    Q.  What was said?

J59KKOU2                          Battista - Direct

1    A.  Mr. Kourani asked us what importance he would be to the FBI

2    when the CIA had already recruited high-ranking members of

3    Hezbollah.

4    Q.  Did you respond to that?

5    A.  I did not.

6    Q.  Why not?

7    A.  Again, I felt like he was trying to elicit intelligence

8    from us regarding U.S. Government sources.

9    Q.  During your meeting with the defendant, did he say anything

10   about his own interactions with U.S. law enforcement?

11   A.  Yes.  Mr. Kourani told us that he was feeling stress by

12   U.S. law enforcement in the form of secondary screenings at

13   airports, which are additional interviews when taking flights

14   in from abroad and a delay in both his wife's and brother's

15   citizenship applications.

16   Q.  How did this meeting with the defendant end?

17   A.  So, at the end of this meeting, I walked Mr. Kourani out of

18   the restaurant.  As we were shaking hands to say goodbye, he

19   turned to me and said, it's going to take more than cookies.

20   Q.  What did you understand him to mean by that?

21   A.  So the previous night, we had given -- at our meeting at

22   the hotel, we had a box of cookies, among other treats, snacks,

23   over the course of the interview, and we told him that he could

24   take the cookies home to give to his daughter or family.  So

25   when he referred -- which he took.  So when he referred back to

1    the cookies as I was saying goodbye to him after the

2    restaurant, that it would take more than the cookies, I took

3    that as meaning it was going to take more than what we were

4    currently doing to get him to talk about his affiliation with

5    Hezbollah.

6    Q.  Turning your attention to April 13, 2016, did you again

7    meet with the defendant that day?

8    A.  Yes.

9    Q.  Where did that meeting take place?

10   A.  That meeting occurred at a Best Western Inn & Suites in

11   Chicago, Illinois.

12   Q.  Was anyone else present for the meeting with the defendant?

13   A.  Yes, the same two individuals.

14   Q.  You testified that at the last meeting, you asked the

15   defendant to obtain a phone number for Husam Kourani?

16   A.  Yes.

17   Q.  Did you discuss that with him at this meeting?

18   A.  We did.  We asked him if he was able to get the phone

19   number.  He said that he did not get it and claimed that the

20   prospect of getting a phone number for somebody that he hasn't

21   spoken to in years was stressing him out.  He didn't want to

22   ask cousins and whoever else he would need to ask for that

23   phone number because he thought that they would see this as --

24   that it would come off as suspicious.

25   Q.  At the beginning of the meeting, did the topic of the

1   defendant's wife's citizenship come up?

2   A.  Yes.

3   Q.  What was said?

4   A.  He thanked us for a call that he received from Citizenship

5   and Immigration Services setting up a meeting for his wife for

6   an interview on April 28th.

7   Q.  Did you respond when he said that?

8   A.  Did not.

9   Q.  Did the FBI have any role in setting up an immigration

10  interview for the defendant's wife?

11  A.  Yes.

12  Q.  Can you explain?

13  A.  So there is a member of the New York Joint Terrorism Task

14  Force assigned to Citizenship and Immigration Services.  We

15  coordinated with them to see if they would be willing to set up

16  an interview on April 28th.

17  Q.  Had the defendant's wife already applied for citizenship?

18  Was she already in that process?

19  A.  Yes.

20  Q.  Why did you need to coordinate with Citizenship and

21  Immigration Services?

22  A.  As FBI agents, we had no say in whether or not anybody gets

23  their citizenship or are in control of these processes at all.

24  Q.  During the course of this meeting with the defendant, did

25  you offer him any money?

1   A.  We did.

2   Q.  How much money?

3   A.  $5,000.

4   Q.  Did you have the money there with you at the meeting?

5   A.  Yes.

6   Q.  What happened with the money?

7   A.  So one of my colleagues offered Mr. Kourani the money.  He

8   took it in his hand and stated that he didn't expect this much,

9   and he hadn't earned it, and he would have to think about

10  whether or not he was going to take it, and then placed it on

11  the coffee table that was between us.

12  Q.  Why did you offer the defendant money at this meeting?

13  A.  We wanted to compensate him for the time that he had spent

14  with us so far.  He had responded to every request for a

15  meeting and spent hours with us.

16  Q.  So the defendant indicated he wasn't interested in that

17  money, but did he indicate that there was anything he was

18  interested in?

19  A.  Yes.  He stated his wife's citizenship meant more to him

20  than the money.

21  Q.  And, again, as an FBI agent, are you able to get the

22  defendant's wife's citizenship in the United States?

23          THE COURT:  He's already answered that question.

24  Q.  Did you ask the defendant any questions about his

25  association to Hezbollah during this meeting?

J59KKOU2                         Battista - Direct

1   A.  I did.

2   Q.  What did the defendant say?

3   A.  Mr. Kourani stated that he would be of no value to

4   Hezbollah because he resided in the U.S.

5   Q.  Did the topic of the defendant's last name, Kourani, come

6   up during this meeting?

7   A.  Yes.  At one point during the interview, Mr. Kourani said

8   that his last name, his family name, is the bin Laden of --

9   they're the bin Ladens of Lebanon.

10  Q.  Did the defendant explain what he meant by that at that

11  time?

12  A.  Not at this time.

13          THE COURT:  Did you have an understanding?  Did you

14  have an understanding of what he was saying?

15          THE WITNESS:  Yes, your Honor.

16          THE COURT:  Did you ask him?

17          THE WITNESS:  Not at this meeting.  At this point in

18  the interview, the interview was a little bit contentious, so

19  we just let that fall.

20  BY MS. HOULE:

21  Q.  How did the interview become contentious?

22  A.  So we wanted to discuss Mr. Kourani's insight into the

23  recruiting process of Hezbollah because we felt that he had

24  information regarding that topic.  So I asked him about it.  He

25  said that, again, that he would have no value because he

1  resides in the U.S., none of his cousins or family members

2  would be stupid enough to take Hezbollah up on that offer, and

3  that he had no insight into the recruiting process.  I told him

4  that I was confident that he does have insight into that

5  process, and it's at that point that he continued to deny it,

6  said that we were coming at him in two different directions,

7  and were reading from two different books.

8          THE COURT:  What do you mean by that?  What did he

9  mean by that?  What did you understand him to mean by that?

10         THE WITNESS:  I understood that to mean that we were

11 asking him questions that he didn't have the answer to.

12         THE COURT:  What was two different books?

13         THE WITNESS:  I think he was alluding to -- it was a

14 little unclear to me at the time, but my thoughts are he was

15 alluding to that we're asking him about personal stories and

16 family members, but we're also asking about the recruitment

17 process and his affiliation with Hezbollah, and that those were

18 the two books.  That was my best understanding of it.

19 BY MS. HOULE:

20 Q.  Did the topic of the CIA come up during this meeting?

21 A.  It did.

22 Q.  What was said?

23 A.  So, again, Mr. Kourani reiterated the thought that why

24 he -- he wouldn't be of any value to the FBI because the CIA

25 has already recruited high-ranking members of Hezbollah.

J59KKOU2                         Battista - Direct

1    Q.  Did you respond?

2    A.  I did not.

3    Q.  Why not?

4    A.  Again, because I felt that he was trying to elicit

5    intelligence from us regarding U.S. Government sources.

6              MS. HOULE:  Ms. Shields, if you could please bring up

7    Government Exhibit 109, which is already in evidence.

8    Q.  Special Agent, who is that a photo of?

9    A.  This is Mohammad Shawraba.

10   Q.  Did Mohammad Shawraba come up during your meeting with the

11   defendant?

12   A.  He did.

13   Q.  What was said?

14   A.  Mr. Kourani said, in addition to his point about CIA, he

15   brought up that Mohammad Shawraba was responsible for Hezbollah

16   operations being disrupted.

17   Q.  Did you have any discussion --

18             MS. HOULE:  You can take that down, Ms. Shields.

19   Thank you.

20   Q.  Did you have any discussion with the defendant about --

21             THE COURT:  Sorry.  He was responsible for what?  He

22   said Shawraba being responsible for Hezbollah being disrupted?

23             THE WITNESS:  Their operations being disrupted, yes,

24   your Honor.

25             THE COURT:  Is this in connection with some turning or

J59KKOU2                          Battista - Direct

1    flipping of --

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  Tell us.

4              THE WITNESS:  So, assessed by intelligence community

5    that Mr. Shawraba was recruited and is responsible for relaying

6    information that disrupted operations --

7              THE COURT:  That's what he told you?

8              THE WITNESS:  -- by the U.S. Government.

9              THE COURT:  Is that what he told you?

10             THE WITNESS:  He did not.

11             THE COURT:  You just knew this?

12             THE WITNESS:  I knew this, yes, your Honor.

13             THE COURT:  So he brought up the name?

14             THE WITNESS:  Yes.

15             THE COURT:  What did he say?

16             THE WITNESS:  Exact -- he didn't expand on it anymore.

17             THE COURT:  What do you remember he said?

18             THE WITNESS:  He simply stated that after he talked

19   about CIA recruiting high-ranking members of Hezbollah, he said

20   that Mohammad Shawraba specifically was responsible for

21   disrupted operations.

22             THE COURT:  And you let it drop?

23             THE WITNESS:  Yes, your Honor.

24   BY MS. HOULE:

25   Q.  Did you discuss with the defendant the FBI's investigation

1    into him?

2    A.  Yes.

3    Q.  What did you say?

4    A.  Well, at this point, I asked Mr. Kourani how he foresees

5    his life going if there's a more overt investigation of him,

6    which would entail interviews of family, friends, associates.

7    And he responded to bring it on because he had nothing to hide.

8    Q.  Before this meeting ended, did you show the defendant any

9    photographs?

10   A.  I did.

11   Q.  I'm showing you what's been marked for identification as

12   Government Exhibit 809.  If you could take it out of that

13   envelope and look at that document.

14          What is that?

15   A.  These are the photos that I showed Mr. Kourani on

16   April 13th.

17          MS. HOULE:  The government offers 809.

18          MR. SCHACHT:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibit 809 received in evidence)

21          MS. HOULE:  Ms. Shields, if you could please bring up

22   that exhibit on the screen.  And if you could zoom in on the

23   photo there --

24          THE COURT:  How will you identify each of the photos?

25   By page number?

1          MS. HOULE:  By page number, your Honor.  This is

2     page 1.

3          THE COURT:  Could I indulge you just two minutes?

4     Stay in your places.

5          (Pause)

6          THE COURT:  Continue, Ms. Houle.

7          MS. HOULE:  Thank you, your Honor.

8     BY MS. HOULE:

9     Q.  Special Agent, we were talking about the meeting that you

10    had with the defendant on April 13, 2016, and we were just

11    about to review a series of photographs that you showed the

12    defendant at that meeting; is that right?

13    A.  Yes.

14    Q.  So this is page 1 of that series.  Who is shown on the

15    screen here?

16    A.  This is Fadi Kassab.

17    Q.  What --

18    A.  Say that again.

19          THE WITNESS:  Fadi Kassab.

20          THE COURT:  Spell those names.

21          THE WITNESS:  K-a-s-s-a-b, the last name.  F-a-d-i is

22    the first name, your Honor.

23          THE COURT:  Thank you.

24    BY MS. HOULE:

25    Q.  What did the defendant say when you showed him this photo

1    of Fadi Kassab?

2    A.   Mr. Kourani stated that he recognized this individual from

3    the stop910 website, but he didn't remember his name, but

4    specifically remembers showing both his brother and father this

5    photo because he recognized him from their hometown of Yater.

6    Q.   What is the website stop910?

7    A.   So stop910 is a website that publicizes known IJO

8    operatives.

9         MS. HOULE:  Ms. Shields, could you please turn to page

10   4 of this exhibit.  And if you could zoom in on the picture.

11   Q.   Special Agent, what is the name of the person shown on that

12   photo?

13   A.   This is Majed Abdullah.

14   Q.   What did the defendant say when you showed him this photo?

15   A.   Mr. Kourani said that he did not recognize this individual.

16        MS. HOULE:  Ms. Shields, if you could turn to page 6,

17   please.  And zoom in on the picture.

18   BY MS. HOULE:

19   Q.   Who is that a photo of?

20   A.   This is a photo of Mustafa Badreddine.

21   Q.   Who is that?

22   A.   He is a -- was a leader in Hezbollah IJO.

23   Q.   What did the defendant say when you showed him this photo?

24   A.   When we showed him this photo, he stated that he recognized

25   this individual, said he was a big guy, meaning a high rank, in

1  Hezbollah, who had the same status of Imad Mughniyeh, but he

2  did not recall his name.

3  Q.  And who is Imad Mughniyeh?

4  A.  Imad Mughniyeh is a former leader of Hezbollah IJO that was

5  killed in February 2008.

6  Q.  How did this interview of the defendant end?

7  A.  The interview ended fine, even though it got contentious

8  during it.  He agreed to meet with us the following day.

9  Q.  So, turning your attention to that following day --

10            MS. HOULE:  You can take that down.  Thank you,

11  Ms. Shields.

12  Q.  Turning your attention to that following day, April 14,

13  2016, did you meet with the defendant that day?

14  A.  I did.

15  Q.  And where did that meeting take place?

16  A.  This meeting took place at Garfield Conservatory, which is

17  a public park in Chicago.

18  Q.  Who was present for your meeting with the defendant?

19  A.  This was a meeting with only myself.

20  Q.  Why did you meet with the defendant alone this time?

21  A.  Because the meeting we had the night before had gotten a

22  little contentious, we wanted to build back rapport with

23  Mr. Kourani, and we felt that a one-on-one meeting was the best

24  way to do so.

25  Q.  At the beginning of the meeting, did you and the defendant

J59KKOU2                    Battista - Direct

1   discuss why he had agreed to meet with the FBI?

2   A.  Yes.  Mr. Kourani stated that when we had first approached

3   him, he thought that this would be a good opportunity to

4   relieve some of the pressure that he's felt over the years and,

5   again, alluded back to the secondary screenings at the airport

6   and the delay in his family's citizenship application.

7   Q.  Did you respond to that?

8   A.  No.

9   Q.  Did you offer the defendant any money during this meeting?

10  A.  Yes.

11  Q.  How much money?

12  A.  $2,000.

13  Q.  What happened with the money?

14  A.  So I offered it to Mr. Kourani.  He refused to take it,

15  said he didn't know if it was a cultural thing, but even if he

16  was in dire need of money, he wouldn't take it from -- wouldn't

17  even ask family for it, and then he told me that I could give

18  the money to my boss.

19          THE COURT:  Going back to April 13, when you said you

20  offered him $5,000, and he put it on the table --

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  -- what happened at the end of the

23  meeting?

24          THE WITNESS:  He did not take it.

25          THE COURT:  So you took it back?

1          THE WITNESS:  Yes, your Honor.

2     BY MS. HOULE:

3     Q.  Why did you try and provide the defendant with money again

4     during this meeting when he had refused it during your prior

5     meeting?

6     A.  At the prior meeting, he stated that this was too much

7     money, that he hadn't earned that much, so we gave him a lesser

8     amount.

9     Q.  And what was the purpose of trying to give the defendant

10    money?

11    A.  Again, it was to indicate to him that his -- to compensate

12    him for his time.  His time was valuable to him, it was

13    valuable to us.

14    Q.  Did you discuss any other topic with the defendant during

15    this meeting?

16    A.  We just discussed various topics.  We were actually near a

17    coy pond, so the topic of fishing came up, which led to

18    hunting.  We talked about family, music.  That's about it.

19    Q.  At the end of the meeting, did the defendant indicate

20    whether he was willing to speak with the FBI again?

21    A.  Yes.  He agreed to meet with us the next week.

22    Q.  If I could direct your attention to April 20th, 2016.

23          Did you meet with the defendant that day?

24    A.  I did.

25    Q.  Where did that meeting take place?

J59KKOU2                         Battista - Direct

1    A.  This meeting took place in Horner Park, Chicago.

2    Q.  Is that a public park?

3    A.  Yes.

4    Q.  Was anyone else present during this meeting with the

5    defendant?

6    A.  The same two individuals from previous meetings.

7    Q.  At the beginning of this --

8              THE COURT:  The same two people on your side?

9              THE WITNESS:  Yes.

10             THE COURT:  You and somebody else?

11             THE WITNESS:  Yes, your Honor.

12             THE COURT:  Who was the other person?

13             THE WITNESS:  Another agent and another member of a

14   U.S. intelligence agency.

15   BY MS. HOULE:

16   Q.  At the beginning of the meeting, did you say anything to

17   the defendant about the information he had provided in the

18   prior meetings?

19   A.  Yes.  We started the interview and told him that his

20   discussions about stop910, and his knowledge about Hezbollah

21   IJO operatives, as well as his claim that his family is the bin

22   Ladens of Lebanon was an indication that he was paving the way

23   to want to talk about his affiliation with Hezbollah, and now

24   is the time to talk about it.

25   Q.  So when you brought up the website stop910, how did the

J59KKOU2                        Battista - Direct

1   defendant respond?

2   A.  He responded by saying that everybody in Lebanon knows

3   about the website stop910 because it's always broadcast through

4   the media.

5   Q.  When you brought up this comment about his family being the

6   bin Ladens of Lebanon, how did he respond to that?

7   A.  He asked us what we wanted to do about him having family

8   members that are part of Hezbollah, it's beyond his control,

9   and there was nothing he could do about it.

10  Q.  What was the tone of this meeting?

11  A.  It was, again, contentious.  He said that we were -- he

12  took these meetings as harassment.  He had spent a lot of time

13  with us and relayed some personal stories.

14  Q.  Did you bring anything to this meeting --

15  A.  I did.

16  Q.  -- to discuss with the defendant?

17  A.  Yes.

18  Q.  What did you bring with you?

19  A.  So we brought with us a blank proffer agreement.

20  Q.  What's a proffer agreement?

21  A.  A proffer agreement is something that can be executed

22  between defense counsel and prosecutors that would ensure that

23  the subject was not held liable for their statements.

24  Q.  As an FBI agent, are you able to execute a proffer

25  agreement?

J59KKOU2                        Battista - Direct

1   A.   No.

2   Q.   Then why did you bring one with you?

3   A.   We assessed, at this point, that one of the things that was

4   holding Mr. Kourani back from telling us the truth about his

5   affiliation with Hezbollah was fear of being held liable for

6   his statements, and we wanted to bring him an example of the

7   paperwork to show him that such agreements can be executed.

8   Q.   Were you able to show the defendant the proffer agreement?

9   A.   No.   It was in an envelope when we brought it.   I began to

10  tell Mr. Kourani that we brought him paperwork to look at that

11  would serve as an example of what I just described, but those

12  were pretty much the only words that I got out of my mouth.

13  And for the first time, during all of our meetings with

14  Mr. Kourani, he cussed and said that he doesn't want to look at

15  any bullshit paperwork.

16            THE WITNESS:   Sorry, your Honor.

17            THE COURT:   That's okay.   I heard that word before.

18  BY MS. HOULE:

19  Q.   Had the defendant previously said anything to you about

20  being concerned about his statements being used against him?

21  A.   Again, we asked Mr. Kourani how he saw his life going if

22  this investigation became more overt or intrusive, and, again,

23  he said we can bring it.

24  Q.   How did the meeting end?

25  A.   So the meeting ended with him walking away from the -- we

J59KKOU2                          Battista - Direct

1    were seated at a picnic table.  He walked away, but agreed that

2    he would keep the phone that we had provided him and would call

3    us if he ever decided to talk to us about the things that we

4    wanted to discuss.

5    Q.  I'd like to turn your attention to August 9th of 2016.  Is

6    that the next time that you met with the defendant?

7    A.  Yes.

8    Q.  Where did that meeting take place?

9    A.  This meeting occurred at the U.S. Embassy in Beirut,

10   Lebanon.

11   Q.  Why had you traveled to Beirut, Lebanon?

12   A.  At this point, Mr. Kourani was seeking U.S. Government

13   assistance in traveling back to the United States.

14   Q.  What did you understand about what type of assistance the

15   defendant was seeking?

16   A.  Mr. Kourani's passport was taken by the State Department

17   when he came in looking for assistance.

18   Q.  The first time that he came in looking for assistance, what

19   was he asking for?

20   A.  There was a family dispute that had happened in Lebanon,

21   and he was looking for the U.S. Government to intercede and

22   help him out in some way.

23            THE COURT:  Tell us how this came about.  Were you in

24   Lebanon in August of 2016 before this meeting?

25            THE WITNESS:  No.

 1              THE COURT:  Someone told you something?

 2              THE WITNESS:  Yes, your Honor.

 3              THE COURT:  Relaying a conversation from Mr. Kourani?

 4              THE WITNESS:  We had found out that he had reported --

 5     that he had gone to the embassy from the State Department and

 6     that he was seeking assistance.

 7              THE COURT:  And you decided to go to Lebanon?

 8              THE WITNESS:  Yes, your Honor.

 9              THE COURT:  And then the meeting comes about?

10              THE WITNESS:  Yes, your Honor.

11              THE COURT:  Go ahead.

12     BY MS. HOULE:

13     Q.  Was anyone else present for your meeting with the defendant

14     that day?

15     A.  Yes.  There was another special agent and a member of a

16     U.S. intelligence agency.

17     Q.  And the special agent, was he from the FBI?

18     A.  Yes.

19     Q.  What's his name?

20     A.  Special Agent Joseph Costello.

21     Q.  How did that meeting begin?

22     A.  So that meeting began with Mr. Kourani walking into the

23     room, we greeted each other, and he said that he wasn't

24     surprised to see me there.

25     Q.  Did you respond?

1   A.  I just told him that he probably shouldn't be surprised at

2   this point.

3   Q.  Did you discuss with the defendant his affiliation with

4   Hezbollah?

5   A.  Yes.

6   Q.  What did he say?

7   A.  Again, he continued to deny any affiliation with Hezbollah,

8   and that he was too smart to be recruited by the group.

9   Q.  Was there any discussion at this meeting of the defendant's

10  family members?

11  A.  Yes.

12  Q.  Did the defendant discuss an individual named Kassem

13  Kourani?

14  A.  He did.

15  Q.  K-a-s-s-e-m K-o-u-r-a-n-i?

16  A.  Yes, he did.

17  Q.  What did he say?

18  A.  He stated that Kassem Kourani is his brother who is the

19  face of Hezbollah and a political leader in Yater, Lebanon.

20          MS. HOULE:  Ms. Shields, could you please bring up

21  Government Exhibit 227, which is already in evidence.

22  Q.  Who is the person shown on this authorization card?

23  A.  This is Kassem Kourani.

24  Q.  Did the defendant discuss an individual named Mahmoud

25  Kourani?

1   A.  Yes.  He stated that Mahmoud Kourani was a cousin of his

2   and acknowledged our arrest, the FBI Detroit office's arrest,

3   of Mahmoud Kourani for material support to terrorism in the

4   early 2000s.

5          MS. HOULE:  Ms. Shields, could you please bring up

6   Government Exhibit 115, which is also already in evidence.

7   Q.  Who is that?

8   A.  That is Mahmoud Kourani.

9   Q.  Did the defendant discuss an individual named Maher

10  Kourani, M-a-h-e-r?

11  A.  Yes.

12  Q.  What did the defendant say about Maher Kourani?

13  A.  He stated that Maher Kourani is another cousin of his who

14  is also affiliated with Hezbollah.

15  Q.  Did the defendant say anything during this meeting about

16  his prior interactions with the FBI?

17  A.  Yes.  He stated that we're trying to frame him and put

18  words in his mouth.

19  Q.  And did he say anything about whether or not he had been

20  candid in the past?

21  A.  Yes.  He stated that he had been honest with us 90 percent

22  of the time.

23          I asked him what about the remaining 10 percent, with

24  which he responded that nobody can remember everything that

25  they tell somebody, and he doesn't remember what he's lied to

J59KKOU2                        Battista - Direct

1   us about or otherwise omitted.

2   Q.  Did you have any discussion with the defendant about

3   meeting with him in the future?

4   A.  Yes.

5   Q.  What did he say?

6   A.  He told us that he would be willing to talk to us for hours

7   about Hezbollah back in the United States.  I told him that for

8   us to take him up on that offer, we would want to hear

9   something meaningful from him right now.  So he told us to go

10  ahead and ask a question.  At that point, I asked him who he

11  reported to in Hezbollah.  He said he doesn't report to anybody

12  in Hezbollah because he's not a member.

13  Q.  How did the meeting end?

14  A.  The meeting ended with me telling Mr. Kourani that this was

15  his last chance to cooperate with the U.S. Government in this

16  investigation.  He said, that's fine, he has nothing further to

17  say.

18  Q.  Did you tell the defendant what that cooperation would need

19  to entail?

20  A.  I did not.

21  Q.  Was the defendant provided anything before he left?

22  A.  Yes.  We gave him his U.S. passport back.

23  Q.  In the weeks following this August meeting with the

24  defendant in Beirut, Lebanon, did the defendant attempt to

25  travel out of Lebanon?

J59KKOU2                          Battista - Direct

1   A.  Yes.

2   Q.  Was he able to travel?

3   A.  Not on his first try, no.

4           MS. HOULE:  Ms. Shields, could you please pull up

5   Government Exhibit 401-D-12, which is already in evidence.  And

6   if you could zoom in on the email portion of this.

7   Q.  Special Agent, what's the date of this email?

8   A.  The date is August 18, 2016.

9   Q.  So that's after your meeting with the defendant, right?

10  A.  Yes.

11  Q.  Your meeting was on August 9th?

12  A.  Yes.

13  Q.  Who is it from?

14  A.  It is from Beirut ACS, which stands for American Citizen

15  Services.

16  Q.  Who is it to?

17  A.  It's to Mr. Kourani.

18  Q.  And what is the subject listed?

19  A.  The subject is "Instructions On Your Return Home."

20  Q.  The email reads, "Attached please see the instructions per

21  our phone conversation."

22          Who signed this email?

23  A.  This is signed by Lidia Avakian, the consul of American

24  Citizen Services.

25  Q.  What is listed below?

J59KKOU2                        Battista - Direct

1   A.  U.S. Embassy Beirut.

2           MS. HOULE:  Ms. Shields, if you could please turn to

3   the attachment of this email.  And if you could zoom in on the

4   top third.

5   Q.  What was attached to this email?

6   A.  It's a letter from the Embassy of the United States of

7   America to Mr. Kourani.

8   Q.  And what is the instruction provided in this letter?

9   A.  It states:  "This is in response to your report to the

10  U.S. Government about travel difficulties that you experienced

11  in Beirut, Lebanon, on August 13, 2016.  In order to expedite

12  your return to the United States, we encourage you to make new

13  travel arrangements using the following guidelines."

14  Q.  Does the letter go on to describe what Mr. Kourani should

15  do to return to the United States?

16  A.  Yes.

17          MS. HOULE:  I'd like to pull up the reply to this

18  email.  Ms. Shields, if you could pull up Government Exhibit

19  401-D-14.  And if you could zoom in on the top portion of the

20  email, Ms. Shields.  Thank you.

21  Q.  What is the date of this email?

22  A.  August 18, 2016.

23  Q.  And the time?

24  A.  1:18 p.m.

25  Q.  And who is it from and to?

J59KKOU2                         Battista - Direct

1  A.  It's from Mr. Kourani to Beirut ACS.

2  Q.  And what does Mr. Kourani indicate to --

3          MS. HOULE:  Ms. Shields, if you could zoom in a little

4  more, actually, so we can see.  I'm sorry, zoom out, so that we

5  can see that this is in response to the prior email we

6  reviewed.

7  Q.  So he's writing to Lidia, who's the person from the embassy

8  in the email that we just reviewed, Special Agent?

9  A.  Yes.

10 Q.  And what does he write to Lidia?

11 A.  He says:  "Hi Lidia.  Thank you for following up with me.

12 I don't think I will be going back home soon since my kids will

13 be leaving to Canada, and I will be filing for divorce.

14 Hopefully, my long trip abroad will not affect the instructions

15 mentioned in this email.  I also owe you a drink for your

16 services and good caring.  Thank you, Ali Kourani."

17         MS. HOULE:  Thank you, Ms. Shields.  You can take that

18 down.

19 Q.  Just one more topic for you, Special Agent.  You said that

20 you met with the defendant at the U.S. Embassy in Beirut.  When

21 an embassy sends a communication to another part of the

22 U.S. Government, what is that communication called?

23 A.  A cable.

24 Q.  Are you familiar with cables in your work as an FBI agent?

25 A.  Yes.

1   Q.  Just in terms of the format of a cable, what is typically

2   listed at the top?

3   A.  At the top, on the header, is a date, a number assigned to

4   that cable, and the origin of that cable.

5   Q.  And below that, is the date of the cable typically listed

6   in full?

7   A.  Yes.

8   Q.  Can cables be marked as classified by the U.S. Government?

9   A.  Yes.

10  Q.  What does it mean for a document to be marked classified?

11  A.  So there are various levels of classification in the

12  U.S. Government, ranging from unclassified to top secret, based

13  upon the damage that it could cause to the United States if

14  that information was leaked to the public.

15  Q.  And secret, is that a type of classification that a

16  document could be marked as?

17  A.  Yes.

18  Q.  What does that mean, for something to be marked as secret?

19  A.  If something is marked as secret, that means that if this

20  information was leaked, it could cause severe damage to the

21  United States.

22  Q.  What about the designation "NOFORN," N-O-F-O-R-N?

23  A.  "NOFORN" is a caveat to the classifications that states

24  that this document should not be released to any foreign

25  nationals.

J59KKOU2                           Battista - Direct

1          MS. HOULE:  Ms. Shields, if you could please pull up

2     Government Exhibit 302-T, which is already in evidence.  And if

3     you could turn to page 4, please.  And, Ms. Shields, if you

4     could zoom in on the top two rows of this report from the

5     Internet Evidence Finder.

6     Q.  Special Agent, I'm focusing you on the translation column,

7     all the way over to the right.  At the top, there is listed --

8          MS. HOULE:  And if you highlight this, Ms. Shields.

9     Q.  -- "08 Beirut 237."

10         What does that indicate to you about what type of

11    document this is?

12    A.  It indicates that this is a cable.

13    Q.  And what is the date of the cable listed?

14    A.  The date is February 14th, 2008.

15    Q.  What is listed below that?

16    A.  Origin:  Embassy Beirut.

17    Q.  What does that indicate?

18    A.  It indicates that this cable came from the U.S. Embassy in

19    Beirut, Lebanon.

20         MS. HOULE:  Ms. Shields, if you could highlight the

21    line that begins with "Classification."  And, yes, continue

22    into the header.  Thank you.

23    Q.  So it says "Classification:  Secret."  What does that

24    indicate?

25    A.  That indicates if this information were leaked to the

J59KKOU2                        Battista - Direct

1    public, that it could cause serious damage to the U.S. national

2    security.

3    Q.  And written after that is N-O-F-O-R-N.  Is that the NOFORN

4    classification that you just referenced?

5    A.  Yes.

6    Q.  What does that mean again?

7    A.  It means it should not be given to any foreign nationals.

8              MS. HOULE:  Ms. Shields, if you could remove the

9    highlighting, and I am just focusing now on the entry below

10   that.  If you could highlight the first line, Ms. Shields.

11   Q.  Special Agent, what does that line indicate to you?

12   A.  Again, it indicates that this is a cable.

13   Q.  What is the date of the cable?

14   A.  The date is February 19th, 2008.

15   Q.  What is listed as the origin of the cable?

16   A.  Origin is "Embassy:  Beirut," meaning U.S. Embassy in

17   Beirut, Lebanon.

18   Q.  What's listed as the classifications?

19   A.  Classification is secret, NOFORN.

20             MS. HOULE:  Thank you, your Honor.  No further

21   questions.

22             THE COURT:  Cross-examination, Mr. Schacht?

23             MR. SCHACHT:  If you wouldn't mind, could you please

24   put the exhibit we just had up on the screen back up, please.

25   Thank you very much.

1   CROSS-EXAMINATION

2   BY MR. SCHACHT:

3   Q.  Agent Battista, what this shows is somebody's Safari search

4   history; is that right?  Or part of it, I should say?

5   A.  Yes.

6   Q.  And in the left-hand side, you could see that -- where it

7   says HTTP --

8             MR. SCHACHT:  If you could please zoom in just on the

9   top line, please.

10  Q.  -- that is -- the URL there is a newspaper called

11  Al-Akhbar, A-l hyphen A-k-h-b-a-r.  That's a newspaper dot-com;

12  is that right?

13  A.  I don't know.

14  Q.  And what is found at that URL, according to this document,

15  is some document that at some point, according to this, had

16  some secret categorization; is that right?

17  A.  It looks to be.

18  Q.  So you didn't look this up to see what this is?

19  A.  Not the cable itself, no.

20  Q.  Are you aware that this was a document that was released

21  and made public by WikiLeaks, that that's what the actual

22  document is?

23  A.  No.

24  Q.  And it's reprinted in a public newspaper; are you aware of

25  that?

J59KKOU2                              Battista - Cross

1   A.  No.

2   Q.  And it's an article about Lebanese officials meeting with

3   people in the U.S. Embassy in Beirut, Lebanon.  Are you aware

4   of that?

5   A.  No.

6   Q.  Do you have any idea why, if you don't know what this is,

7   the government is offering this in evidence?

8             MS. HOULE:  Objection.

9             THE COURT:  Sustained.

10  Q.  Are you aware of this having any relevance to whether or

11  not my client --

12            MS. HOULE:  Objection.

13  Q.  -- is guilty or not?

14            THE COURT:  Sustained.

15            MR. SCHACHT:  I'll reask the question.

16            THE COURT:  Mr. Schacht -- just a minute, Mr. Schacht.

17  If you feel that the document should not have been admitted,

18  you should have made an objection.  If you needed some facts to

19  support --

20            MR. SCHACHT:  Judge.

21            THE COURT:  Just a minute, Mr. Schacht.

22            -- to support an objection, you should have asked for

23  a voir dire.  I make the rulings on admissibility.  The

24  government, in its strategy, expressed by the assistants here,

25  make a decision what documents to put in, and when, and how.

1    Each attorney has its own concept of relevance.  If challenged,

2    I make the ruling, and that ruling stands.

3            So questions as to why something is done or whether

4    it's relevant or not, these are not for the witness, these are

5    for the Court, and you should pay no attention to this

6    whatever.

7            Go ahead, Mr. Schacht?

8            MR. SCHACHT:  I agree, Judge.

9            THE COURT:  I'm not asking your agreement or not.

10           MR. SCHACHT:  That's why I didn't --

11           THE COURT:  It doesn't make any difference to me if

12    you agree or not.  Go on, ask the next question.

13    BY MR. SCHACHT:

14    Q.  Do you know what this document is?

15    A.  Other than a cable, no.

16           THE COURT:  Mr. Schacht, in his questions, has assumed

17    certain facts.  Just because he has facts in his question

18    doesn't make them so.  Evidence is what the witness responds

19    responsive to the question, and anything that's in a question

20    is not evidence.

21    BY MR. SCHACHT:

22    Q.  Do you remember a little earlier you talked about a person

23    named Mohammad Shawraba?

24    A.  Yes.

25    Q.  And you said that Ali Kourani had told you that Mohammad

1    Shawraba was a person who was in Hezbollah, but who was an

2    informant for certain intelligence agencies, my client thought?

3    A.  No.

4    Q.  What did my client say he thought Mohammad Shawraba --

5    withdrawn.

6              What did my client say who he thought Mohammad

7    Shawraba was?

8    A.  He stated that Mohammad Shawraba was responsible for

9    Hezbollah operations being disrupted.

10   Q.  Disrupted on behalf of whom, did he say?

11   A.  No.

12   Q.  Have you personally been aware that Mohammad Shawraba, his

13   name has been in The New York Times as an Israeli informant?

14   A.  Not specifically, no.

15   Q.  You're aware that he's been named in major world media as

16   an Israeli informant, though, right?

17   A.  Yes.

18   Q.  You testified a few minutes ago that Ali Kourani told you

19   that his brother, Kassem, had been or was a member of

20   Hezbollah.  Is that what he said, my client?

21   A.  Yes.

22   Q.  As part of your investigation, you know that his brother,

23   Kassem, for some period of time, lived in New York City with

24   Ali Kourani, right?

25   A.  Partially true.  I knew he lived in New York City, yes.

 1              MR. SCHACHT:  Thank you very much.  I have no other

 2      questions.

 3              THE COURT:  Redirect?

 4              MS. HOULE:  No.  Thank you, your Honor.

 5              THE COURT:  Thank you.  You are excused.

 6              THE WITNESS:  Thank you, your Honor.

 7              (Witness excused)

 8              THE COURT:  Next witness.

 9              MR. BOVE:  The government calls Gregory Psoinos.

10       GREGORY PSOINOS,

11          called as a witness by the Government,

12          having been duly sworn, testified as follows:

13              THE WITNESS:  Gregory Daniel Psoinos.  The last name

14      is spelled P-s-o-i-n-o-s.

15              MR. BOVE:  May I inquire, Judge?

16              THE COURT:  Yes.

17              THE DEPUTY CLERK:  Could you spell your last name

18      again?

19              THE WITNESS:  P-s-o-i-n-o-s.

20              THE DEPUTY CLERK:  Thank you.

21              THE WITNESS:  Sorry.

22              THE COURT:  How is it correctly pronounced?

23              THE WITNESS:  Psoinos.

24              THE COURT:  Psoinos.

25              Go ahead, Mr. Bove.

1              MR. BOVE:  Thank you, Judge.

2     DIRECT EXAMINATION

3     BY MR. BOVE:

4     Q.  Mr. Psoinos, where do you work?

5     A.  I work in Albany, New York, at the New York National Guard

6     headquarters.

7     Q.  What is the National Guard?

8     A.  The National Guard is a federal and state military force.

9     It has a federal mission overseas, and it has a state mission

10    of defense domestically.

11    Q.  What is the federal mission overseas of the National Guard?

12    A.  When times of war or need of the government, they will

13    activate them as a federal force and deploy them overseas to

14    combat theaters for -- for support missions.

15    Q.  You mentioned a state mission as well?

16    A.  By order of the state, they could be called up for domestic

17    operations, civil support operations, where they will -- at the

18    governor's need, they'll help the emergency management for the

19    state and the local authorities respond to disasters.

20    Q.  To things like natural disasters?

21    A.  Natural disasters and man-made disasters.

22    Q.  When did you start working for the National Guard?

23    A.  I started working for the National Guard in 2007.

24    Q.  What did you do for work prior to joining the National

25    Guard?

1    A.   I served 11 years in the army, and I worked for Southwest

2    Airlines after I retired for about a year, and then I got the

3    job working for the National Guard.

4    Q.   What did you do during your service in the army?

5    A.   I was a combat infantryman and a sniper, and I worked in

6    combat units.

7    Q.   What's your title right now at the National Guard?

8    A.   I am the state's antiterrorism program manager, and I'm the

9    senior field intelligence officer for the New York National

10   Guard.

11   Q.   What do you do in your work as the antiterrorism program

12   manager?

13   A.   As the antiterrorism program manager, we look at our

14   facilities proactively and our policies, how we protect our

15   facilities from known or suspected terrorist threats, we look

16   at the threat trends, and from there, we advise the senior

17   commanders on actions to take to protect them.

18   Q.   You said that you're also serving as the senior field

19   intelligence officer?

20   A.   Yes.  As an alternate role, I communicate with the law

21   enforcement agencies outside the organization at the federal,

22   state, and local level, mostly the counterterrorism intel units

23   and the crime intelligence units.  And I work as a conduit, I'm

24   a consumer of information for the bosses, and what we see there

25   is we look at the trends that are happening around our

1   facilities nationally and internationally, and we apply --

2   Q.  When you say "our facilities,' are you referring to

3   National Guard facilities?

4   A.  National Guard facilities, yes.

5   Q.  Are you participating right now in any advisory councils?

6   A.  I chair the New England Region force protection advisory

7   council.  It is all of New England plus New York and New

8   Jersey.

9   Q.  You just used the term "force protection."  What does that

10  mean?

11  A.  Force protection is -- it is an umbrella of all security

12  matters that the military uses.  So it's different types of

13  security all under one umbrella to make sure that the programs

14  are all coordinated and synchronized.

15  Q.  The objective is to protect the force?

16  A.  Yes.

17  Q.  Have you received any training relating to physical

18  security since joining the National Guard?

19  A.  Yes.  I attended at least -- well, two army schools, four

20  weeks' worth of physical security training, and I attended four

21  or five antiterrorism officer courses.  There are different

22  titles.  Some are army, and some are the Department of Defense,

23  and some of them are DHS-run schools.

24  Q.  Are you familiar with the 369th Regiment Armory in Harlem?

25  A.  Very familiar.

1      MR. BOVE:  Ms. Shields, if you could please bring up

2  Government Exhibit 9 on the left.  And zoom in a bit, so we can

3  see the map a little bit.  On the right, bring up page 2 of

4  Government Exhibit 803, please.  Zoom in on the photo.  Thank

5  you.

6  Q.  Mr. Psoinos, do you recognize that photo on the right?

7  A.  Yes.  That's the Harlem Fifth Ave Armory, the 369th

8  Sustainment Brigade.

9  Q.  What, if anything, symbolic value does this armory have?

10      MR. SCHACHT:  Objection.

11      THE COURT:  Sustained.

12 Q.  How did this armory come into being?

13 A.  The armory was built after World War I when the 369th

14 infantry regiment, the Harlem Hellfighters, returned from

15 overseas, and it served as their home as the New York National

16 Guard.

17 Q.  What, if any, military unit is headquartered at this armory

18 today?

19 A.  The 369th Sustainment Brigade is headquartered there.

20 Q.  What's a sustainment brigade?

21 A.  A sustainment brigade is a larger level command that has

22 several battalions assigned under it, and their primary

23 function is to -- its logistics is taking care of the soldiers

24 that are forward-fighting.  For every one soldier firing a

25 rifle, there's about six soldiers that support them, get them

1   the food, fuel, bullets, medics.

2   Q.  Those six soldiers that you just referenced, they're part

3   of the sustainment brigade?

4   A.  They're the sustainment brigade.

5   Q.  About how many service members are a part of the 369th

6   Sustainment Brigade?

7   A.  A brigade is a very large unit, but in this facility, it's

8   about 700 people, a little over 700.

9           THE COURT:  By "this facility," which one?  On 2365

10  Fifth Avenue?

11  Q.  Is that the location of the Harlem armory we're talking

12  about?

13          THE WITNESS:  Yes, your Honor.

14  Q.  You mentioned the Harlem Hellfighters a moment ago.  Are

15  they deployed abroad to fight military conflicts?

16  A.  They have.

17  Q.  What are some of the conflicts?

18  A.  They served in every theater since their inception –

19  World War II, Korea, Vietnam, and, most recently, Afghanistan

20  and Iraq.

21  Q.  What are some of the ways that this armory on the screen is

22  used right now?

23  A.  The armory has two purposes.  We lease out part of the

24  building to a civilian organization, the Harlem Children's

25  Foundation, Harlem Children's –– and there, they are a

1   preparatory or afterschool program to help kids from K through

2   12 prepare for college and be successful.

3           The front half that you're looking at there, that's

4   where our administrative offices are, and although the National

5   Guard is a weekend -- one weekend a month activity, they do a

6   full-time staff that's required in order to maintain the

7   training, the pay, the promotions, the schools, and plan for

8   national defense missions and domestic missions.  So there's

9   continuous work.

10  Q.  Is equipment --

11          MR. SCHACHT:  I'm sorry.  Objection, your Honor.

12          THE COURT:  Overruled.

13  Q.  Is equipment stored at this facility?

14  A.  Yes.

15  Q.  What kinds of equipment?

16  A.  Everything from arms to vehicles.

17  Q.  Is this a headquarters facility for the brigade?

18  A.  It's a headquarters for the brigade.

19  Q.  What does that entail?

20  A.  The headquarters is where the command staff would work out

21  of.

22  Q.  About how many military personnel are at this armory on a

23  typical day?

24  A.  Around 70.

25  Q.  A moment ago, you mentioned monthly drilling obligation of

1    National Guard personnel?

2    A.   Yes.

3    Q.   How often does that happen at this armory?

4    A.   One weekend a month.

5    Q.   About how many personnel from the National Guard

6    participate in those drills?

7    A.   It would be around 700.

8    Q.   Now, are you familiar with the 69th Regiment Armory in

9    Manhattan?

10   A.   Yes, very familiar.

11          MR. BOVE:  Ms. Shields, on the right, if you could

12   bring up page 8, please.  Zoom in on the photo.

13   Q.   Is the building at 68 Lexington Avenue in the map on the

14   left?

15   A.   Yes.

16   Q.   When was this armory set up?

17   A.   Civil War.

18   Q.   Can you describe some of the history, please.

19   A.   It is the home to the 69th Irish infantry Regiment that was

20   stood up during the Civil War.

21   Q.   Is this armory a battalion headquarters?

22   A.   It's a battalion headquarters.

23   Q.   What does that mean?

24   A.   It's -- a battalion is a smaller level of command with

25   several companies that are assigned under it.

1    Q.  About how many service members are at this armory on a

2    typical day?

3    A.  The same, about 700, a little over.

4    Q.  You mentioned the 69th infantry regiment is based at this

5    armory?

6    A.  Yes.

7    Q.  About how many members are there in the 69th infantry

8    regiment?

9    A.  Again, it's a large regiment spread over the state, but in

10   this facility, it's about 700.

11   Q.  Has that regiment deployed to wars abroad?

12   A.  Yes, ever since the Civil War.

13   Q.  What are some of the ways that this armory is used today?

14   A.  Similar to the Harlem armory, it's the day-to-day

15   administrative duties of the unit.  The commander's

16   representatives, they conduct their training plans, they make

17   sure the soldiers are paid, that they're promoted, that they

18   have the proper schools, that they're prepared to mobilize for

19   either national defense or domestic operations.

20   Q.  Are you familiar with the term "joint operations center"?

21   A.  Yes.

22   Q.  What does that mean?

23   A.  A joint operations center, it's a term that we use for a

24   command control, a cell where the operations are conducted, and

25   directed out of, and coordinated, and synchronized.  The

1   commander doesn't normally stay there; the commander has a

2   staff that's designated to run the operations.

3   Q.   How is a joint operations center used in connection with an

4   emergency response?

5   A.   Normally, an emergency operations center, which is a JOC

6   that's only stood up at the time of an emergency when we need

7   it, and that's where the information comes into, the

8   communications are all tied into there, it's all synchronized,

9   and it's shared with the other liaisons to the activities.

10  It's complex, but it's basically the fusion cell for the

11  command of the operation.

12  Q.   It's where the leadership gathers during an emergency

13  response?

14  A.   It's where all the operations are coordinated.  It's the

15  commander's operation center.

16  Q.   You used the acronym JOC.  Is that joint operations center?

17  A.   Yes.

18  Q.   Is there a JOC, a joint operations center, at this armory?

19          MR. SCHACHT:  Objection.

20          THE WITNESS:  There is --

21          THE COURT:  Just a minute.

22          MR. SCHACHT:  Could we have a brief sidebar, your

23  Honor?

24          THE COURT:  Let me ask a few preliminary questions.

25          Is JOC an acronym or a person?

1                  THE WITNESS:  An acronym, your Honor.

2                  THE COURT:  What does it stand for?

3                  THE WITNESS:  Joint operations center.

4                  THE COURT:  And the joint operations center is located

5       where?

6                  THE WITNESS:  We have a state one at the state

7       headquarters in Albany that's 24/7.  We have a temporary one at

8       the Lexington Avenue armory, which we refer to as emergency

9       operations center.

10                 THE COURT:  Is that the 69th Regiment Armory?

11                 THE WITNESS:  Yes, your Honor.

12                 THE COURT:  Objection overruled.

13                 MR. SCHACHT:  May I have a sidebar, your Honor?

14                 THE COURT:  No.

15      BY MR. BOVE:

16      Q.  Is there equipment stored at this armory?

17      A.  Yes.  The same as the Harlem armory.

18      Q.  Does that include weapons?

19      A.  Yes.

20      Q.  And other military gear?

21      A.  Yes.

22      Q.  About how many people are at this armory on a typical day?

23      A.  Around 60.

24      Q.  Are there drills conducted at this facility?

25      A.  Yes.

1   Q.  About how many people participate in those drills?

2   A.  It could be upwards of 700.

3   Q.  Are you familiar with Joint Task Force Empire Shield?

4   A.  Yes.

5   Q.  What is Empire Shield?

6   A.  Joint Task Force Empire Shield was stood up on 9/11 and

7   remains functioning.  It is a state active duty force, so

8   instead of answering the call to the president, they're

9   answering the call to the governor, and they augment the law

10  enforcement agencies in the city -- the NYPD, the PAPD, and the

11  MTPD -- MTAPD -- in their critical infrastructure roles.  So

12  they are additional force for the police to use to secure those

13  sites.

14  Q.  Do personnel from the armories you just described

15  participate in Empire Shield?

16  A.  Some do.  The units -- the personnel are drawn from those

17  units from their weekend staff.  The traditional Guardsmen,

18  they refer to as an M-Day.  So they only do one week a month.

19  Q.  About how many service members in total participate in

20  Empire Shield?

21  A.  They're authorized to 750, and they're usually just below

22  750.  Sometimes they go over if they need to surge for an

23  incident.

24           THE COURT:  Is this a good time to break for lunch, or

25  do you have a few more questions on this point?

1          MR. BOVE:  I have about ten minutes more, Judge.

2          THE COURT:  Why don't we break for lunch now.

3          MR. BOVE:  Thank you.

4          THE COURT:  Members of the jury, close your books,

5     give them to Ms. Jones on the way out.  Don't discuss the

6     testimony.  We'll come back at 2:15.

7          (Continued on next page)

1          (Jury not present)

2          THE COURT:  You're excused.

3          THE WITNESS:  Thank you, your Honor.

4          (Witness temporarily excused)

5          MR. SCHACHT:  Judge, can I, very briefly, make a

6     record, or I can do it after lunch?

7          THE COURT:  Sure.  Everybody sit.

8          Counsel.

9          MR. SCHACHT:  Two things:

10          Number one, what I was objecting to during the

11     examination is with the exception, maybe, of the Empire Shield

12     material, almost every single question and answer was in the

13     present tense, and I don't think what the buildings are used

14     for today has any relevance because my client has been in jail

15     for two years, and the indictment covers 2002 to 2015.  So

16     whatever they're used for today is simply not relevant.

17          THE COURT:  Mr. Bove, when Mr. Psoinos comes back,

18     please ask him if what he's saying about today was also true as

19     to the period that Mr. Schacht mentions.

20          MR. BOVE:  I'm happy to do that, Judge.  Thank you.

21          MR. SCHACHT:  My second issue, Judge, is in response

22     to Special Agent Battista's testimony where he mentioned having

23     brought with him a proffer agreement that was not used or

24     signed.  I know I can't, at this point, relitigate or reopen

25     the suppression hearing, but with the Court's permission, I

1    would like to make a copy of that, that I've been given by the

2    government as a Government Exhibit -- I'm sorry, as a court

3    exhibit, and the reason for that is I think that Agent

4    Battista's testimony and information that I was not aware of at

5    the time of the suppression hearing contradicts, in significant

6    ways, the testimony of Agents Costello and Shannon, inasmuch as

7    they testified in court that they could not or would not be

8    able to present or offer any kind of a proffer agreement, and,

9    here, we have another agent who was going to show, albeit a

10   blank agreement, presumably for the purpose of my client being

11   at some point offered this.  And so I think it's a substantial

12   contradiction between what happened -- what was testified to at

13   the suppression hearing.

14           THE COURT:  There's two questions you asked.  Number

15   one is can this be made a Court exhibit?  The answer is yes.

16   Or you could -- what is stated in the record now?  Is it a

17   government exhibit for identification?

18           MR. SCHACHT:  I don't think -- I think it's simply a

19   document that I've been given as 3500 material.

20           MS. HOULE:  That's correct, your Honor.

21           THE COURT:  All right.

22           So, yes, you can offer it as a Court Exhibit, which

23   will be number 3.

24           MR. SCHACHT:  Thank you.  That's my application.

25           THE COURT:  It will be marked as such.

1      As to the other points you made, I don't think there's

2      any inconsistency whatever.  The -- Special Agent Battista

3      testified that he was bringing a blank form, but he

4      acknowledges, as well, that he had no power to create an

5      agreement, and that makes it quite consistent with the

6      testimony that was brought out at the suppression hearing.  I

7      so hold.

8            Let's break for lunch.

9            MS. HOULE:  Thank you, your Honor.

10           THE COURT:  One more thing I wanted to ask.  One

11     minute.

12           (Pause)

13           THE COURT:  Mr. Bove, the idea of these armories being

14     military installations, where does that come out in the

15     indictment?

16           MR. BOVE:  I'm not sure that it's referenced

17     specifically in the indictment.  It is referenced in the

18     complaint --

19           THE COURT:  Well, the indictment does reference that

20     what Mr. Kourani did, among other things, was to surveil

21     military installations, and now you're proving that the

22     military installations -- the armories are military

23     installations.  You haven't yet proved that they were

24     surveilled by Mr. Kourani, except possibly the 69th.

25           MR. BOVE:  There was testimony yesterday, Judge, that

 1    the defendant admitted to the FBI source that he surveilled

 2    both of the locations that Mr. Psoinos is testifying about.

 3              THE COURT:  So as to them being military

 4    installations, I wonder if you would agree, Mr. Schacht, that

 5    they are?

 6              MR. SCHACHT:  I would.

 7              THE COURT:  You would agree?

 8              MR. SCHACHT:  I would agree that they're military

 9    installations, yes.

10              THE COURT:  So do we need any more of this testimony?

11              MR. BOVE:  I think we do.  And if I could just

12    explain.  The relevance of this testimony and the testimony

13    from Mr. Anest before it is that the locations surveilled by

14    the defendant -- and there are four in evidence, 26 Federal

15    Plaza, the Secret Service building across the bridge --

16              THE COURT:  I know.

17              MR. BOVE:  -- those were not random selections by the

18    defendant or the Islamic Jihad Organization.  These are

19    incredibly strategic targets, by this man, in this

20    organization, that, if attacked, when the sleeper cell was

21    activated, if attacked, could cripple not just civilian

22    populations, but the infrastructure of the city to respond to

23    attack.

24              THE COURT:  You can continue.

25              MR. BOVE:  Thank you.

1          THE COURT:  Okay.  Have a good lunch.

2          MR. SCHACHT:  Thank you.  You, too.

3          (Luncheon recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                             AFTERNOON SESSION

1                                  2:15 p.m.

2            THE COURT:  Good afternoon, ladies and gentlemen.

3    Please be seated.

4            Mr. Psoinos, I remind you, you are still under oath.

5            Mr. Bove, you may continue.

6            MR. BOVE:  Thank you, judge.

7    BY MR. BOVE:

8    Q.  Good afternoon, Mr. Psoinos.

9            Before the lunch break you had started to explain what

10   Empire Shield was.  Generally, speaking what is Empire Shield?

11   A.  It's a state of active duty force comprised of the New York

12   Army and Air National Guard soldiers and airmen that serves

13   under the governor of New York to assist the law enforcement

14   agencies in New York City at the primary transit hubs and the

15   transit notes of transit.

16   Q.  I think you said before the lunch break that there are

17   personnel from the two armories that you talked about who are

18   assigned to assist with Joint Task Force Empire Shield.

19   A.  Yes.  The troops that they use to fill the ranks of Empire

20   Shield are drawn from the New York Army and Air National Guard

21   units across the state, primarily New York City because of the

22   location.  So, the soldiers that would drill on those units on

23   weekend drills with volunteers that fill those force and

24   they're paid by the -- state to serve as Empire Shield

1   soldiers, primarily just to assist the police.

2   Q.   When was Empire Shield created?

3   A.   It was born from 9/11.

4   Q.   What do you mean by that?

5   A.   The soldiers that responded to 9/11 to Ground Zero, they

6   had a force that was security.  They just maintained those

7   soldiers on state active duty after 9/11 to protect the

8   infrastructure for New York City.

9   Q.   Before we go further, I have one follow-up question related

10  to the testimony that you gave this morning related those two

11  armory facilities.  You described sort of the operations of

12  those facilities and personnel at those facilities, right?

13  A.   Yes, sir.

14  Q.   You provided some numbers of how they're staffed.

15          THE COURT:  Keep your voice up.

16          MR. BOVE:  Yes, your Honor.

17  Q.   Are the features of those armories similar in all material

18  respects dating back to 2009?

19  A.   Yes.

20  Q.   Getting back to Empire Shield, what types of things,

21  specifically, did Empire Shield personnel assist with in the

22  city?

23  A.   There are additional protection.  So, if the law

24  enforcement are engaged in their law enforcement duties, the

25  soldiers there, the airmen are there to provide additional

1     security to protect the city and assist the citizens in the

2     transportation areas.  So, when the police are involved with

3     the public we'll have our soldiers serve additional security.

4     They don't do police work but they assist the police.

5               THE COURT:  What is the Empire Shield?

6               THE WITNESS:  Your Honor?

7               THE COURT:  What is it?

8               THE WITNESS:  It's a volunteer force of soldiers that

9     instead of doing their one weekend a month, they serve

10    full-time in the city from locations, primarily, Fort Hamilton

11    and they go to the airports.  They go to the tunnels, the

12    bridges.  I'm sure folks have seen them at train stations

13    standing around in uniform.  They're a show of force.  They're

14    a presence and in the event of an incident they're there to

15    assist the police, mostly to secure the area in case there's

16    additional plots or activity that the police are not focused

17    on.

18    Q.  Have Empire Shield personnel assisted law enforcement in

19    connection with recent terrorist attacks?

20    A.  The most significant is the Chelsea bomber where we surged

21    additional 250 people and spread them across the city.

22    Q.  When you say "surged" what do you mean?

23    A.  We add more soldiers.  So, we have a primary force of 750

24    Empire Shield folks that are on full-time.  That's their

25    full-time job 24 hours a day, seven days a week.  In the event

1    that there's a large incident the governor can activate more.

2    And what we would do is in the case of Chelsea, we grew from

3    those units again from their part-time force, armed them, brief

4    themed and sent them out to work with the police.

5    Q.  What did the Empire Shield personnel do in response to that

6    attack?

7    A.  They provided more protection where the police were not.

8    Q.  Does Empire Shield provide assistance in connection with

9    natural disasters?

10   A.  They do.  They serve as the Joint Task Force command for

11   New York City.  So, if there's a natural disaster say Sandy,

12   snow storms, even tornadoes where there's additional assistance

13   needed by the authorities, that element commands the forces.

14   They'll use their forces, primarily, the QRF, Quick Reaction

15   Force.  And then any commands that activate part-time soldiers

16   will fall under their control.

17   Q.  Does the National Guard conduct site assessments of their

18   facility?

19   A.  We do.  We do it from the state level, my office and then

20   the commands below us.  So, we have the larger commands, a

21   division.  Then we have brigades, battalions at each level

22   they're supposed to perform assessments and inspections on

23   their facilities.

24   Q.  So, you participated in site assessments at the armory that

25   you described this morning?

1   A.  Yes.

2   Q.  And what are the basic steps that are taken in the site

3   assessments?

4   A.  We have several different security methodologies we use,

5   physical securities, one, how they're locking the building,

6   storing equipment.  Then we have an operational security

7   aspect, the op sect.  These are protecting information that's

8   not sensitive.  That's bits of information that might be

9   available to public to make sure we are not putting out a lot

10  of it where people can add that information, like a jigsaw

11  puzzle, one piece at a time.  My piece is the antiterrorism and

12  what we're looking at is the proactive approach to protecting

13  our facility.

14  Q.  So, let's focus on that for a minute, the antiterrorism

15  part of the site assessment.  What are some of the factors you

16  look at when you do site assessment of a National Guard

17  facilities, looking at the antiterrorism component?

18  A.  So, we use a methodology where we do a few different types

19  of assessments.  It starts with threat assessment and we're

20  looking at intelligence reporting that we're receiving,

21  everything from methodologies or tactics in what the potential

22  threats are doing overseas that they might actually import here

23  and use it.  We look at what regionally, in the northeast.

24  Then we look at New York and New Jersey and particularly, New

25  York City.  So, we'll look for a larger view to a very broad

1   view to a very specific view.

2           After we know what the threats are, who could be the

3   threat known or suspected and what their capable of doing, what

4   tools they use, how much training they have, what their intent

5   is, why they want to hurt us.  Then we conduct a vulnerability

6   assessment and we take the perspective of the potential threat,

7   the bad guy and we look at our facility to see if this is a

8   facility we want to attack, is it worth attacking and then what

9   types of vulnerabilities do they have.  What would they do if

10  we attack them.  How successful would it be and what types of

11  impact it'll have on the organization of the country.

12          After that piece we look at it from a criticality role

13  which is our perspective looking out, how we defend it, knowing

14  what our facility, what our mission is, what our assets are,

15  how critical the operation is to domestic and national defense.

16  Then we'll take a good hard look around the facilities, their

17  programs, policies, how they do business and try to identify

18  security gaps and vulnerabilities.  Then we'll make

19  recommendations to them and the senior leaders so that they can

20  apply resources that are available to protect that.

21          We take that information and then we finish it with a

22  risk assessment which gives us courses of action and

23  countermeasures to mitigate the risk to less the consequences.

24  We can't get rid of everything but we can lessen the risk.

25  Q.  When you are doing that kind of analysis do you rely at all

1   on open information, things available on the internet.

2   A.   It's the very first step that we do before we assess a

3   facility.

4   Q.   Why do you look at what's available on the internet as a

5   starting point?

6   A.   To see what information is out there that people can see.

7   It also preps us to where to focus our efforts when we are

8   doing our assessment, particularly, vulnerability.  If anybody

9   look at that there, then we can go and look at it on the ground

10  and see if there is going to be a gap in security that can be

11  exploited by a threat.

12  Q.   You mentioned one of the steps you take during an

13  antiterrorism assessment involves an analysis of a threat; is

14  that right?

15  A.   Yes.

16  Q.   Is one of the threats that you evaluate with respect to the

17  two armories that you talked about this morning, the threat of

18  state sponsored terrorism?

19  A.   Yes.

20  Q.   What is state sponsored terrorism?

21  A.   I think the best way I can explain it is you have the

22  backing of a formal government.  You have more available to

23  resources, whether it be training materials.  You, the

24  individuals have a higher level of skill sets.  So, if they

25  actually intend to hit a target, they're more capable.  It's

1    more likely a lot more complex and coordinated and the end

2    state is it serves the purpose of the state that's sponsoring

3    them.

4    Q.   What are some of the examples of sources of state sponsored

5    terrorism?

6    A.   The two biggest examples now are Iran and North Korea.

7    Q.   You said one of the things you look at when you thinking

8    about state sponsored terrorism is the difference of capability

9    of that level of threat; is that correct?

10   A.   Yes.

11   Q.   Do you also look at the types of strategies that are more

12   likely deployed by the state sponsored terrorist threat?

13   A.   In that, do you mean the purpose, one being more strategic

14   and one being less?

15   Q.   I'm just asking, is there a particular type of strategy

16   that you associate with state sponsored terrorists?

17   A.   State sponsored from our perspective would be more severe.

18   It's directed.  It's not somebody who is in the basement

19   reading online who's got grievance and grudges.  This is

20   somebody who's -- this is a threat that instead of hitting a

21   large group of people in Times Square where they would cause a

22   lot of chaos and harm, there's more of a purpose behind what

23   they're targeting.  Critical infrastructure would be one of

24   those things.  How bad would it hurt them if we hit several

25   nodes of critical infrastructure?  Will it stop business?  Will

1    it cause them to be -- from economy to transportation.  Will it

2    hurt the mission or the asset will compromise it?

3    Q.  Are you familiar with the term "preoperational

4    surveillance"?

5    A.  Yes.

6    Q.  What is that?

7    A.  It's part of attack operations.  It's once you identify a

8    target you apply resources to it and you conduct surveillance

9    and observation of that person or that facility over a period

10   of time to determine behaviors, patterns and the strength and

11   weaknesses of a facility or a person.

12   Q.  And what, if any, role can open source information play in

13   preoperational surveillance?

14   A.  It narrows the target.  It narrows the target from a large

15   pool.  You can determine just by the location whether it's

16   going to be more relevant or less relevant.  You can compare it

17   to other targets instead of picking one randomly.

18   Q.  Let's focus on the two armories you've described.  What

19   types of information could be obtained through preoperational

20   surveillance at those facilities?

21   A.  Those two facilities are pretty open view to the public.

22   Walking by everyday you wouldn't really notice much.  But if

23   someone was looking, they would see the times that it's in

24   operation, when people are coming and going, how many people

25   are coming and going, how the security is handled, what

1    doorways are used, what measures are put in place to defeat or

2    deter a terrorist or an attack.

3            And additionally, the uniforms people wear, the

4    symbols that they have, the insignias on the uniform could also

5    offer out key personnel in the leadership and identify people.

6    Q.  You mentioned uniforms.  How does the identification of

7    uniforms present a risk related to preoperational surveillance?

8    A.  We refer to a obscure breach or a covert breach.  Somebody

9    dresses as a soldier and they're able to bypass the security

10   because they look like them.  They're wearing the uniform

11   similar.

12   Q.  Does the National Guard use the term "command" and

13   "control" with respect to these two armories?

14   A.  It does.

15   Q.  What does that mean?

16   A.  Command and control, it's kind of a simple term that's hard

17   to explain.  It's the person in charge, the leader, that's

18   where the leader operates out of.  And then the control is the

19   operational piece of how they direct their forces and conduct

20   business.

21   Q.  And how would an attack that compromised operations at one

22   or both of these armories impact the function of the National

23   Guard?

24   A.  It would severely degrade our domestic operations, our

25   civil support operations.

1    Q.  When you say "severely degrade", what do you mean?

2    A.  It would make it very difficult.  We wouldn't be able to do

3    our job.

4              MR. BOVE:  Nothing further.

5              THE COURT:  Cross-examination, Mr. Schact?

6    CROSS-EXAMINATION

7    BY MR. SCHACHT:

8    Q.  Good afternoon, sir.

9    A.  Sir.

10   Q.  You mentioned that as part of your job you check open

11   sources to see what information is available to the public

12   about the two armories that we've discussed; is that right?

13   A.  Yes, sir.

14   Q.  And one of the armories, I think -- is it the 69th Armory

15   that has a famous bar inside of it?

16   A.  Yes.

17   Q.  What's the history of that bar inside the armory?

18   A.  The 69th Infantry Regiment is the home of the Irish

19   Regiment.  So, it has a strong Irish community.  Veterans of

20   the 69th infantry regiment, members of the association, they

21   have an Irish bar.  There's actually three of them in there.

22   One is more open to the members than the others.

23   Q.  And when you look up the armory on the Internet -- let me

24   back up.

25              Have you looked up the armory on internet?

1    A.  Yes.

2    Q.  And did you discover that the main thing that's known by

3    the open source is that it's got these famous bars inside?

4    A.  Yes.

5    Q.  It doesn't talk about any of this preparation for

6    antiterrorism on the internet, right?

7    A.  No.

8    Q.  It talks about, its got these beautiful historic bars; is

9    that fair to say?

10   A.  Yes.

11   Q.  Have you heard of the organization called "Hezbollah"?

12   A.  Yes.

13   Q.  And you know that to be a foreign terrorist organization;

14   is that right?

15   A.  Yes, sir.

16   Q.  And as part of your preparations, as part of your work, I

17   assume based on what you've said, am I correct that you

18   evaluate different foreign terrorist organizations; is that

19   right?

20   A.  Yes.

21   Q.  And you know from your work then that in the history of

22   Hezbollah, they have never once attacked within the continental

23   United States; you know that, right?

24   A.  Yes.

25            MR. SCHACHT:  I have no other questions.

1              MR. BOVE:  Very brief again.

2      REDIRECT EXAMINATION

3      BY MR. BOVE:

4      Q.  Mr. Psoinos, you were just asked some questions about your

5      assessment of the threat?

6      A.  Yes.

7      Q.  Posed by Hezbollah?

8              MR. SCHACHT:  Objection.

9              THE COURT:  Just ask the questions.  Objection is

10     sustained.

11     Q.  I'd like to focus on the time period from 2009 until 2015.

12     How would you assess during that timeframe the threat posed by

13     Hezbollah and Iran?

14             MR. SCHACHT:  Objection.

15             THE COURT:  The witness has not been asked any of

16     these questions and he is not here as an expert on the subject.

17             MR. BOVE:  Your Honor, Mr. Schact just asked him about

18     his assessment of --

19             MR. SCHACHT:  Judge, I object to this.

20             THE COURT:  Sustained.

21             MR. BOVE:  Nothing further, judge.

22             THE COURT:  Mr. Psoinos, the fact that Hezbollah has

23     never attacked within the United States, which you said you

24     agree.

25             THE WITNESS:  Yes, your Honor.

1              THE COURT:  Does that mean it won't attack in the

2     future.

3              THE WITNESS:  No, absolutely not.

4              THE COURT:  OK.  Thank you very much.

5              You are excused.

6              THE WITNESS:  Oh, I'm sorry.

7              THE COURT:  You're excused?  You want to hang around?

8              THE WITNESS:  No.  I'm sorry, your Honor.  I'm not

9     familiar with this whole process other than the TV shows.

10             THE COURT:  Now you do.

11             THE WITNESS:  Intimidated me.

12             MS. HOULE:  Your Honor, the government calls Officer

13    Gregory King.

14             THE COURT:  Members of the jury, we're going to go

15    till about 4:15/4:30 today.

16     GREGORY KING ,

17         called as a witness by the Government,

18         having been duly sworn, testified as follows:

19    DIRECT EXAMINATION

20    BY MS. HOULE:

21    Q.  Good afternoon, Officer King.

22             Where do you work?

23    A.  Homeland Security Investigations.

24    Q.  How long have you worked for Homeland Security

25    Investigations?

1   A.  Since 2009.

2   Q.  Where in the government does Homeland Security

3   investigations sit?

4   A.  It sits under the Department of Homeland Security.

5   Q.  When you first joined Homeland Security Investigations,

6   were you assigned to any particular group?

7   A.  Yes.  I was assigned to the Human Smuggling Squad.

8   Q.  How long did you work in the Human Smuggling Squad?

9   A.  Until 2015.

10  Q.  What did you do in 2015?

11  A.  I was reassigned to the Joint Terrorism Task Force here in

12  New York.

13  Q.  What is the Joint Terrorism Task Force?

14  A.  It's a task force investigative body of multiple agencies

15  to conduct counterterrorism investigations.

16          THE COURT:  Slow up.

17          THE WITNESS:  Yes, sir.

18  Q.  And on the Joint Terrorism Task Force, were you assigned to

19  any particular squad?

20  A.  Yes.

21  Q.  Which squad?

22  A.  CT-9.

23  Q.  What's the focus of CT-9?

24  A.  The focus is Lebanese Hezbollah.

25          THE COURT:  CT-9.

1    THE WITNESS:  Yes, sir.

2    Q.  Do you still work on CT-9?

3    A.  I do not.

4    Q.  Are you currently assigned to a post within Homeland

5    Security's National Security Division?

6    A.  Yes, I am.

7    Q.  When did you begin that post?

8    A.  2018.

9    Q.  Do you know a man named "Ali Kourani"?

10   A.  Yes, I do.

11   Q.  Do you see him here in the courtroom today?

12   A.  Yes, I do.

13   Q.  Could you identify him based on where he is sitting and a

14   piece of clothing he is wearing?

15   A.  Sitting over there in a red shirt.

16        MS. HOULE:  Your Honor, may the record reflect that

17   the witness has identified the defendant?

18        THE COURT:  Yes.

19   Q.  Directing your attention to April 18, 2015, did you observe

20   the defendant on that day?

21   A.  "September"?

22   Q.  September 18; excuse me.

23   A.  Yes, I did.

24   Q.  Where was that?

25   A.  Terminal One, JFK airport.

1    Q.  Why was the defendant at JFK airport that day?

2    A.  The defendant was flying in from Beirut, Lebanon.

3    Q.  Why were you there that day?

4    A.  I was there to conduct a secondary examination of the

5    defendant.

6    Q.  What's a secondary examination?

7    A.  It's an enhanced screening of travelers entering the United

8    States.

9    Q.  Why was the defendant subjected to additional screening

10   that day?

11           MR. SCHACHT:  Objection.

12           THE COURT:  Overruled.

13   A.  Because he was under investigation by the Joint Terrorism

14   Task Force.

15   Q.  Was the defendant interviewed as part of that secondary

16   examination?

17   A.  Yes, he was.

18   Q.  Were you present for that interview?

19   A.  No, I was not.

20   Q.  Why not?

21   A.  I was conducting -- the secondary examination had multiple

22   moving parts.  So, I was coordinating all of those parts.  And

23   secondly, the defendant had been secondary before by uniformed

24   CBP personnel and I didn't want to be in the room because we

25   didn't want the defendant to know he was under FBI

1    investigation.

2    Q.  When you say "CBP" what are you referring to?

3    A.  That is Customs and Border Protection.

4    Q.  So, at this point, had the defendant been told by the FBI

5    that he was under investigation?

6    A.  No, he had not.

7    Q.  During this secondary examination, was there any inspection

8    of the defendant's luggage?

9    A.  Yes, there was.

10   Q.  Did you observe that?

11   A.  No, I did not.

12   Q.  In connections with the secondary examination, was the

13   defendant's phone inspected?

14   A.  Yes, it was.

15   Q.  Were you present for that?

16   A.  I was.

17   Q.  In connection with that inspection of the defendant's

18   phone, did you observe anything about his phone?

19   A.  Yes.  We noticed that the SIM card was missing from his

20   phone.

21   Q.  What is a SIM card?

22   A.  SIM card is basically a computer chip that allows a user to

23   connect to a particular cellular network.

24   Q.  And can a SIM card be used to store data?

25   A.  Yes, it can.

1    Q.  Was the defendant carrying any travel documents at the time

2    of the secondary inspection?

3    A.  Yes, he was.

4    Q.  Did that include a U.S. passport?

5    A.  Yes, it did.

6    Q.  Were there copies made of the defendant's passport and any

7    other travel documents?

8    A.  Yes.

9    Q.  Is that typical for a secondary examination?

10   A.  Yes, it is.

11   Q.  Was the defendant's person searched, as well?

12   A.  Yes, it was.

13   Q.  So, were you present when the copies of the defendant's

14   passport were made?

15   A.  Yes, I was.

16   Q.  What did you observe?

17   A.  When the CBP officer placed the passport down on the copy

18   machine and pressed down on the top of the passport to get a

19   clear copy, he noticed that there was something under the

20   baggage claim sticker.

21   Q.  What happened next?

22   A.  At that point we peeled back the baggage claim sticker and

23   under that was a SIM card.

24   Q.  Did you document that discovery?

25   A.  Yes, I did.

1   Q.  I am showing you what's in evidence as Government Exhibit

2   804.

3           MS. HOULE:  Ms. Shields, if you could pull that up

4   please and turn to page two.

5           (Pause)

6   Q.  Officer, what is shown here?

7   A.  That is the SIM card as we observed it under the baggage

8   claim sticker.

9   Q.  Did you take this photograph?

10  A.  Yes, I did.

11          MS. HOULE:  Ms. Shields, could you turn to the first

12  page, please.

13          (Pause)

14  Q.  What is shown here?

15  A.  That is the same SIM card, just a clearer picture of the

16  SIM card number.

17  Q.  Did you remove the SIM card from underneath the bag and

18  sticker to take this picture?

19  A.  Yes, I did.

20  Q.  What did the CBP officer do with that SIM card after you

21  discovered it?

22  A.  He placed the SIM card back under the baggage claim sticker

23  and reaffixed the stick to the back of the passport.

24  Q.  Why did he do that?

25  A.  Because we did not want the defendant to know that we had

1   found the SIM card that had been secreted behind the baggage

2   claim sticker.

3   Q.  Does CBP have the ability to download the contents of a SIM

4   card?

5   A.  Yes, they do.

6   Q.  Was that done here?

7   A.  No, it was not.

8   Q.  Why not?

9   A.  We were operating under time constraints.  We wanted, like

10  I said earlier, we did not want the defendant to know that he

11  was under investigation by the FBI.  So we wanted to make the

12  secondary process as seamless as possible.  The equipment that

13  we would require to copy the SIM card was not located in that

14  terminal.  So, it would have taken in my estimation too long to

15  get that equipment to copy the SIM card.

16  Q.  In hindsight, what's your view of that decision not to have

17  the SIM card downloaded?

18  A.  If I had to do it all over again, I would have taken the

19  time to copy that SIM card.

20  Q.  Was the defendant's passport returned to him following that

21  inspection?

22  A.  Yes, it was.

23  Q.  Was he asked any questions about the SIM card under the

24  baggage claim sticker?

25  A.  No, not to my knowledge.

1   Q.  You said that the screening involved a search of the

2   defendant's person, his luggage and his electronics; is that

3   right?

4   A.  That's correct.

5   Q.  Was any other SIM card found?

6   A.  No.  It was not.

7          MS. HOULE:  No further questions, your Honor.

8          THE COURT:  Mr. Schact?

9   CROSS-EXAMINATION

10  BY MR. SCHACHT:

11  Q.  If you know what kind of data gets stored on a SIM card?

12  A.  Could store contacts and there is a potential to store

13  other types of media.

14  Q.  Doesn't it store most of what's on everybody's cellphone,

15  that's the storage device for what's on your cellphone?

16  A.  I think you can store, yes, and some of what's on

17  somebody's cellphone, yeah.

18  Q.  Do you know how long it takes to copy what's on a SIM card

19  to a computer or some otherwise?

20  A.  I do not.  I think a lot of that depends on how much media

21  is on that SIM card.

22  Q.  Would you agree with me that it can be done in a matter of

23  minutes?

24  A.  Potentially.

25  Q.  Do you recall that on the day that my client had the

1   secondary search that you participated in that he was kept

2   waiting for about three hours?  Do you recall that?

3   A.  I don't recall how long he was kept waiting, no.

4   Q.  Well, do you recall that it was hours that he was kept

5   waiting but do you recall that it was hours?

6   A.  It could have been hours.

7          MR. SCHACHT:  I have no other questions.

8          THE COURT:  Anything more?

9          MS. HOULE:  No.  Thank you, your Honor.

10          THE COURT:  Thank you very much, Mr. king.  You are

11   excused.

12          Next witness.

13          MR. BOVE:  Your Honor, the government calls

14   John Hansen.

15          THE COURT:  Come on up, sir.

16    JOHN HANSEN,

17       called as a witness by the Government,

18       having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY MR. BOVE:

21   Q.  Mr. Hansen, where do you work?

22   A.  I work at U.S. Citizenship and Immigration Services.

23   Q.  Is that sometimes called CIS?

24   A.  Yes.

25   Q.  When did you start working at Citizenship and Immigration

 1    Services or CIS?

 2    A.  In October of 2005.

 3              THE COURT:  Keep your voice up, sir.

 4              THE WITNESS:  In October of 2005.

 5    Q.  What did you do before you started to work at CIS?

 6    A.  I was a contractor for CIS and Legacy INS before that.

 7    Q.  You just used the term "Legacy".

 8    A.  I was a contractor for USCIS and Legacy INS Immigration and

 9    Naturalization Service before that.

10    Q.  When you use that term "Legacy" with respect to the

11    Immigration and Naturalization Service, what do you mean?

12    A.  INS was dissolved in 2005 when Homeland Security was

13    enacted and our functions turned over to USCIS.

14    Q.  Is CIS now part of Department of Homeland Security?

15    A.  Yes, it is.

16    Q.  When did you start working at INS?  When did you begin your

17    career in this?

18    A.  In April 199.

19    Q.  What are the titles that you have held at CIS and INS?

20    A.  I was a contractor general office worker until 2005, when I

21    became district communications officer, and then that position

22    changed in title to immigration services officer.  I was

23    promoted in 2009 to a senior immigration services officer and

24    in September of 2014 I became the district training officer for

25    New York.

1   Q.  What types of things did you do as an immigration services

2   officer?

3   A.  I would interview cases in which people were seeking

4   benefits from USCIS.

5   Q.  You mentioned that you were promoted to become the district

6   training officer for New York?

7   A.  Yes.

8   Q.  What region -- how does CIS define New York?

9   A.  We cover New York City, Brooklyn, the Brooklyn field

10  office, the Queens field office and Long Island field office.

11  Q.  And what are some of the things that you do as a district

12  training officer?

13  A.  Prepare training materials, train officers on the different

14  work assignments.  We train on law officer policies, procedures

15  regulations.

16  Q.  Do you coordinate trainings that relate to immigrant visas?

17  A.  Yes.

18  Q.  What about the naturalization process?

19  A.  Yes, I do.

20        MR. BOVE:  Your Honor, I have a stipulation to offer

21  at this point.

22        THE COURT:  OK.

23        MR. BOVE:  It's marked as Government Exhibit 1010.

24        Ladies and gentlemen, this is another one of these

25  agreements between the government and the defendant.

J59AAKOU3                      Hansen - Direct

1          THE COURT:  Mr. Bove, you need to keep your voice up

2     and not drop the last words of your sentence.

3          MR. BOVE:  I apologize, judge.

4          THE COURT:  The jury I'm sure can hear you but the

5     judge can't.

6          MR. BOVE:  I'm sorry.

7          This is another one of these agreements between the

8     government and the defense and this relates to documents

9     maintained by CIS where Mr. Hansen works.  So, we are going to

10    you through those documents today but the point of the

11    agreement in this stipulation is that they're official records

12    of CIS and therefore, admissible at this trial.

13         THE COURT:  You move their admissibility?

14         MR. BOVE:  I do, your Honor.

15         THE COURT:  Motion granted.

16         MR. BOVE:  So, the exhibits are 604 through 612 and

17    615 through 621, as well as the stipulation which is 1010.

18         MR. SCHACHT:  No objection.

19         THE COURT:  Received.

20         (Government's Exhibits 604-612, 615-621 and 1010

21    received in evidence)

22    Q.  Mr. Hansen, what is an immigrant visa?

23    A.  An immigrant visa is permission to enter the United States

24    and live here permanently.

25    Q.  Generally speaking, who is eligible for an immigrant visa?

J59AAKOU3                        Hansen – Direct

1  A.  In order found to be eligible you need to have a sponsor

2  which is typically a family member or a business.

3  Q.  Can a sponsor sometimes be one's spouse?

4  A.  Yes.

5  Q.  How does one go about applying for an immigrant visa?

6  A.  They would file form I130.

7  Q.  Is that a petition?

8  A.  A petition for alien relative, yes.

9  Q.  We'll look at one of those petitions in a minute.  But

10  before we do, how does the Department of Homeland Security and

11  CIS maintain records relating to applications like this?

12  A.  We keep "A" files with a unique number issued to one person

13  and those numbers are never reused.

14  Q.  And so then applications by that particular person are

15  maintained in the file forever?

16  A.  Forever, yes.

17          MR. BOVE:  Ms. Shields, could you bring up Government

18  Exhibit 616.

19  Q.  Mr. Hansen, I'd like to start by directing your attention

20  to the top right of the exhibit.  What is the title of this

21  document?

22  A.  Petition for alien relative.

23  Q.  Is this one of those petitions you mentioned a moment ago?

24  A.  Yes.

25  Q.  What is a petition for alien relative?

1    A.  This would be for a family based petition, someone who is

2    applying for their spouse, child or perhaps their brother and

3    sibling.

4              THE COURT:  This is one of the permissible categories

5    of admitting the person to citizenship in the United States.

6              THE WITNESS:  To be a lawful permanent resident.

7              THE COURT:  Tell us about the categories, how you come

8    into the United States.

9              THE WITNESS:  Depending on who is petitioned for you

10   you get a different code.  In this instance this is an IR2.

11   So, when we look at that we know it is an immediate relative of

12   a U.S. citizen, a child.

13   Q.  I'd like you to focus on the top right again.

14             MR. BOVE:  Ms. Shields, if you could zoom-in.

15   Q.  What does this stamp indicate?

16   A.  This indicates that the form was received in the

17   Information Unit of 26 Federal Plaza.

18   Q.  On what date?

19   A.  July 5, 2001.

20             MR. BOVE:  Now, Ms. Shields, if we could look at Parts

21   A, B and C of this document.

22             (Pause)

23   Q.  Mr. Hansen, let's start with Part B, who is listed as the

24   petitioner here?

25   A.  Wanda Reyes.

```
 1              MR. BOVE:  If could you highlight that.
 2     Q.  Now, on the right side of the screen who is listed as the
 3     alien relative?
 4     A.  Mohammad Ali Kourani.
 5              MR. BOVE:  Highlight that please, Ms. Shields.
 6     Q.  And in Part C, it's a little bit faint but there's a blue
 7     vertical stamp; do you see that?
 8     A.  Yes.
 9              MR. BOVE:  Ms. Shields, if could you zoom-in on that a
10     little bit.
11              (Pause)
12     Q.  What does this stamp indicate?
13     A.  This is indicating the petition was received in the
14     mailroom of 26 Federal Plaza on April 30, 2001.
15     Q.  Is there any significance to that date as it relates to an
16     application for an immigrant visa?
17     A.  Yes.  The law changed as of May 1, 2001, where someone who
18     is seeking to become a permanent resident would have needed to
19     enter the country lawfully.
20     Q.  So, on or before April 30, 2001, the alien relative could
21     have entered the United States illegally?
22     A.  The spouse of the U.S. citizen could have, yes.
23              MR. BOVE:  Ms. Shields, could you could zoom-in on
24     Parts B and C.
25              (Pause)
```

1    Q.  Mr. Hansen, what's the current address listed for Mohammad

2    Ali Kourani?

3    A.  3811 220th Street, Bayside, New York 11361.

4    Q.  If you could take a look at that left side of the screen,

5    how does that compare to the address listed for Wanda Yvette

6    Reyes?

7    A.  It is the same.

8    Q.  Focus on Part A in the top left, what is the purported

9    relationship between Ms. Reyes and Mohammad Ali Kourani?

10   A.  Husband and wife.

11           MR. BOVE:  If we could now take a look at Government

12   Exhibit 615.

13           (Pause)

14   Q.  Let's start again in the top right, Mr. Hansen.  What is

15   the title of this document?

16   A.  Form I485 application to register permanent resident or

17   adjust status.

18   Q.  What is this type of document used for?

19   A.  This would be for someone who is living in the United

20   States.  It can be filed at the same time as the I130 in order

21   to adjust status and become a permanent resident.

22           MR. BOVE:  Could you please zoom-in on part one of

23   this document.

24           (Pause)

25   Q.  Mr. Hansen, who is listed as the applicant here?

1    A.  Mohammad Ali Kourani.

2              MR. BOVE:  And now if we could look at page two please

3    and zoom-in on Part B.  I'm sorry.  Part Three.

4              (Pause)

5    Q.  Mr. Hansen, what is red pen on a CIS document indicate?

6    A.  Those are the notes made by the officer during the

7    interview.

8    Q.  And has that been a standard practice of CIS and INS before

9    dating back to 2000?

10   A.  Yes.

11   Q.  What is indicated in this part of the application?

12   A.  This is background information on the applicants, tells us

13   where they're from, their parents' names, how they entered the

14   country and if they received a visa, at what consolate.

15             MR. BOVE:  Ms. Shields, could you please highlight the

16   question on the right that asks "in what status did you last

17   enter".

18   Q.  Do you see that, Mr. Hansen?

19   A.  Yes.

20   Q.  There's an acronym there "EWI"?

21   A.  Yes.  That's usually stands for "entered without

22   inspection".

23             THE COURT:  What does that mean?

24             THE WITNESS:  That they crossed the border usually

25   without seeing someone from Border Patrol or Customs and Border

1   patrol.  So they were not inspected by a government official.

2   Q.  Would that have been a lawful entry?

3   A.  No.

4   Q.  Today can someone be eligible for an immigrant visa despite

5   entering without inspection, EWI?

6   A.  No.

7   Q.  But I think you said that that was possible prior to May 1,

8   2001?

9   A.  Yes.

10          MR. BOVE:  Now could you please zoom-in on Section B

11   of this exhibit.

12          (Pause)

13   Q.  So this is red pen again?

14   A.  Yes.

15   Q.  That indicates that it came from the interviewer?

16   A.  Correct.

17   Q.  Who is listed as the last child on the screen here?

18   A.  Ali Kourani.

19          MR. BOVE:  Ms. Shields, you could highlight that

20   please.

21          (Pause)

22   Q.  Why is this listed in red pen?

23   A.  It was not completed by the applicant when the form was

24   submitted.  It was disclosed during the interview.

25   Q.  Now, if we could take a look at page three please.  So,

1    there's a series of questions on this page.  Do you see that?

2    A.  Yes.

3    Q.  Then there are some red marks over certain of the answers?

4    A.  Yes.

5    Q.  What do those red marks indicate?

6    A.  That these questions were asked and answered and how they

7    are answered.

8    Q.  When you say "asked and answered", asked and answered when?

9    A.  During the interview.

10          MR. BOVE:  Ms. Shields, could you please zoom-in on

11   Question Four.

12          (Pause)

13          MR. BOVE:  And if you could highlight the term

14   "terrorist activity" at the end of the question.

15          (Pause)

16   Q.  Mr. Hansen, Question Four asks about assistance and

17   material support to any person in the organization involved in,

18   quote, any other form of terrorist activity; do you see that?

19   A.  Yes.

20   Q.  If someone had provided assistance to Hezbollah, would that

21   person have been eligible for an immigrant visa in 2001?

22   A.  No.

23   Q.  How was the Question Number Four on the screen answered

24   here?

25   A.  It was answered "no".

1             THE COURT:  Who is the person answering; is that Wanda

2     Reyes?

3             THE WITNESS:  Mohammad Kourani.

4             MR. BOVE:  If we could go back please to page one of

5     this exhibit, Ms. Shields, and zoom-in on the box in the right

6     titled "for INS use only".

7     Q.  There's another vertical blue stamp here.  What does that

8     indicate?

9     A.  That this form was filed with 26 Federal Plaza on April 30,

10    2001.

11    Q.  Now, is supporting documentation typically submitted in

12    connection with an application like this?

13    A.  Yes.  Generally, they submit proof of relationship and

14    basic eligibility.

15    Q.  Here the relationship at you issue is one of marriage?

16    A.  Correct.

17            MR. BOVE:  Let's start with Government Exhibit 617,

18    please, Ms. Shields.

19    Q.  Mr. Hansen, is this a document that was submitted in

20    connection with the application for an immigrant visa by

21    Mohammad Kourani?

22    A.  Yes.

23    Q.  And this looks like it's in Arabic?

24    A.  Correct.

25    Q.  What is the practice of CIS and INS before it with respect

1    to foreign language documents?

2    A.  The petitioner or applicant would have to submit a

3    certified translated copy.

4           MR. BOVE:  Can we please take a look at page two of

5    this exhibit.

6           (Pause)

7    Q.  Mr. Hansen, what does this purport to be?

8    A.  A divorce certificate.

9    Q.  Who is listed as the divorcee?

10   A.  Mohammad Kourani.

11          MR. BOVE:  If you could highlight that please.

12          (Pause)

13   Q.  Who is listed as divorcee?

14   A.  Hana Kourani.

15          MR. BOVE:  Ms. Shields, could you please highlight the

16   entry titled "place and date of divorce".

17          (Pause)

18   Q.  Mr. Hansen, what is the date listed on this document?

19   A.  February 17, 2001.

20          MR. BOVE:  If you could move this to the left, please,

21   and on the right side of the screen bring up Government Exhibit

22   618.

23          (Pause)

24   Q.  Mr. Hansen, what is Government Exhibit 618?

25   A.  A certificate of marriage between Wanda Reyes and Mohammad

 1   Kourani.

 2   Q.  What is the date on this certificate?

 3   A.  April 27, 2001.

 4          MR. BOVE:  Could you please highlight that date.

 5          (Pause)

 6   Q.  Mr. Hansen, do applicants for immigration benefit like this

 7   and immigrant visa sometimes include photographs?

 8   A.  Yes.

 9   Q.  For what purpose?

10   A.  As proof of the relationship.

11          MR. BOVE:  Ms. shields, if you could please publish

12   now in the main window Government Exhibit 619.

13   Q.  Is this is page one of a series of photos submitted in

14   connection with the application?

15   A.  Yes.

16          MR. BOVE:  If could you bring up page two please.

17          (Pause)

18          MR. BOVE:  And page three.

19          (Pause)

20          MR. BOVE:  Thank you.  You can take that down.

21          (Pause)

22   Q.  Mr. Hansen, in the case of a petition and an immigrant who

23   are both in the United States at the time that the application

24   is submitted, where is the application typically processed?

25   A.  At the local office having jurisdiction over the place

1    where they live.

2    Q.  Based on the way the process worked in 2001 and when this

3    application was submitted what, if anything, happened after the

4    documents were first sent in?

5    A.  They would have been received in the mail room and then

6    sent to the information room to be processed for the fee and

7    then the background checks would be run and then the applicant

8    and petitioner would be scheduled for the interview.

9              MR. BOVE:  Can we take a look at Government Exhibit

10   616 please.

11             (Pause)

12             MR. BOVE:  And zoom-in on the block below the title.

13   Q.  Mr. Hansen, do you see where it says "action stamp"?

14   A.  Yes.

15   Q.  What is indicated there?

16   A.  That the petition was denied.

17             MR. BOVE:  Can you zoom-in on the handwriting please.

18             THE COURT:  When was the petition submitted again?

19             THE WITNESS:  April of 2001.  I don't remember the

20   exact date.

21             MR. BOVE:  Zoom-out, please, Ms. Shield.

22             THE COURT:  It was submitted April 1, 2001 and denied

23   when?

24             MR. BOVE:  Zoom-in on that pen, please.

25             THE WITNESS:  Looks like March 2, 2004.

1          MR. BOVE:  Thank you.

2          Ms. Shields, could you please bring up Government

3   Exhibit 620 now and zoom-in on the top half of the page first

4   and highlight the respondent name.

5   Q.  Mr. Hansen, what is this?

6   A.  This is an order of an immigration judge.

7   Q.  With respect to whom?

8   A.  For Mohammad Ali Kourani.

9   Q.  What is indicated in the part of the order that is on the

10  screen here?

11  A.  That Mohammad Kourani did not contest his deport-ability

12  and requested to be allowed to leave the country voluntarily.

13  Q.  By what date was he required to leave?

14  A.  May 7, 2005.

15         MR. BOVE:  Now zoom-in on the bottom of the order so

16  we could see the date.

17  Q.  Mr. Hansen, when was this order issued?

18  A.  January 7, 2005.

19         MR. BOVE:  Now, I'd like to pause and take a look at

20  some travel records.  If you could move this part of Government

21  Exhibit 620 to the top of the screen and bring up Government

22  Exhibit 602 on the bottom.

23         (Pause)

24         MR. BOVE:  Please highlight the travel name.

25  Q.  So, that says Mohammad Kourani?

J59AAKOU3                        Hansen - Direct

```
 1   A.  Yes.
 2              MR. BOVE:  And if you could highlight the encounter
 3   date.
 4   Q.  What's date only the document?
 5   A.  April 25, 2005.
 6              MR. BOVE:  If you could please highlight the departure
 7   location and the arrival location.
 8              (Pause)
 9   Q.  So, this document lists a departure from JFK?
10   A.  Yes.
11   Q.  On April 25, 2005?
12   A.  Yes.
13              MR. BOVE:  Let's take a look at Government Exhibit
14   621.
15              (Pause)
16   Q.  What is the title of this document?
17   A.  I131, application for travel document.
18   Q.  What is this application used for?
19   A.  This application is used to apply for a refugee travel
20   document, or an advanced parole document or re-entry permit.
21   Q.  What's an advanced parole?
22   A.  An advanced parole is when someone is inside the United
23   States, they do not have legal status and they would like
24   advanced permission to return.
25   Q.  Directing your attention to the stamp just below the title
```

1   of the document.  When was this application received?

2   A.  February 14, 2007.

3          MR. BOVE:  Could you zoom-in on Part One of this

4   exhibit.

5          (Pause)

6   Q.  What's the name of the applicant listed, Mr. Hansen?

7   A.  Kassem Mohammad Kourani.

8          MR. BOVE:  Could you please highlight the name.

9   Q.  What is listed as the country of birth?

10  A.  Lebanon.

11         MR. BOVE:  Could you please move this part of the

12  exhibit up to the top and in the bottom bring up Government

13  Exhibit 227 and zoom-in on the card.

14  Q.  You see the name listed on the employment authorization

15  card on the bottom of the screen?

16  A.  Yes.

17  Q.  That the same name as listed on application?

18  A.  Yes, it is.

19         MR. BOVE:  Now, Ms. Shields, in the main window, I'd

20  like to take a look at Part Two in the bottom half of the

21  document.  If you could highlight subparagraph D.

22  Q.  What does this indicate?

23  A.  That Mr. Kourani was applying for advance parole document

24  to return to the United States after temporary foreign travel.

25         MR. BOVE:  Let's take a look at page two, please and

1    zoom-in if you could on Parts Three and Four.

2              (Pause)

3    Q.  Directing your attention to the top of the screen, what

4    does this part of the document say about Kassem Kourani's

5    requested travel date?

6    A.  He would like to leave as soon as possible for

7    approximately one month.

8    Q.  And then if you could look at the bottom of the screen,

9    what did the applicant say about the purpose of the proposed

10   travel?

11   A.  He says that his mother is ill.

12             MR. BOVE:  Could you please bring up Page Three and

13   zoom-in on Parts Eight and Nine.

14             (Pause)

15   Q.  Could you tell from this part of the document when the

16   application was submitted?

17   A.  I can tell when it was completed.  It was completed on

18   February 2, 2007.

19             MR. BOVE:  If you go back to Page One and zoom-in on

20   the top section above Part One.

21   Q.  Can you tell from this part of the document what the result

22   of application was?

23   A.  Yes.  It was denied on February 23, 2007.

24             MR. BOVE:  If you can move this part of the exhibit to

25   the top and the bottom, we are going to look at travel records

1  relating to Kassem Kourani.  This is Government Exhibit 603.

2  And zoom-in on the record and the legend, please.

3          (Pause)

4          MR. BOVE:  Highlight the travel name in the top row

5  and then the date/time.

6  Q.  Did you see that October 4, 2009?

7  A.  Yes.

8          MR. BOVE:  Could you please highlight the outbound

9  indication.

10          (Pause)

11 Q.  So, there is an "O" in that part of the record; do you see

12 that?

13 A.  Yes.

14 Q.  Do you see the departure location on the far right?

15 A.  Yes.

16 Q.  Does that say "JFK"?

17 A.  It does.

18          MR. BOVE:  Thank you, Ms. Shields.

19          THE COURT:  Let me understand this document.

20          MR. BOVE:  Yes, your Honor.

21          THE COURT:  This is a document for Kassem Kourani

22 dated October 4, 2009 to do what?

23          MR. BOVE:  This is a document reflecting --

24          MR. SCHACHT:  Withdrawn.  I mean, "objection".

25          THE COURT:  I am asking the witness.

1              THE WITNESS:  This is showing that Kassem Kourani left

2     the country.  The "O" indicates an outbound entry into the

3     system.

4              THE COURT:  He left the country on Newark

5     International Airport.

6              THE WITNESS:  No.  At JFK.

7              THE COURT:  I'm looking at the bottom.  I see JFD is

8     on the right but going to Brussels.

9              THE WITNESS:  Correct.

10             THE COURT:  What's the point Newark?  He comes back

11    the next month.

12             THE WITNESS:  That was in 2002.

13             THE COURT:  Explain this document.  What's happening?

14             THE WITNESS:  So, the first line, the top line is when

15    he left the country.  He left JFK and headed to Dubai.  The

16    first line --

17             THE COURT:  Dubai is -- where do you see Dubai?

18             THE WITNESS:  D-X-B.  The first line is when he

19    arrived in United States he came from Brussels to Newark

20    International Airport.

21             THE COURT:  So he lived here for seven years.

22             THE WITNESS:  Yes.

23             MR. BOVE:  Thank you, judge.

24             Ms. Shields, if you could take that down, I'd like to

25    look at another submission by Wanda Reyes.  This one is marked

1   Government Exhibit 604.  Could you bring that up please and

2   zoom-in on the top of the document.

3   Q.  When was this petition filed?

4   A.  December 31, 2001.

5          MR. BOVE:  Ms. Shields, could you zoom-in now on Parts

6   A, B and C.

7   Q.  In Part B who is listed as the petitioner?

8   A.  Wanda Kourani, formerly Reyes.

9          MR. BOVE:  Highlight the name in Question One and then

10   the last name "Reyes" in question 7.

11          (Pause)

12   Q.  Now, please take a look at Part C.  Who is listed as the

13   alien relative?

14   A.  Ali Kourani.

15          MR. BOVE:  If you could please highlight that.

16          (Pause)

17   Q.  Take a look please at Question Two in Part C.  What is

18   listed as the defendant's residence?

19   A.  Yater, Lebanon.

20          MR. BOVE:  If could you highlight that please.

21          (Pause)

22   Q.  Finally, if you could focus on Part A of the document.  In

23   this petition what is indicated about the relationship between

24   Ali Kourani, the defendant and Wanda Reyes?

25   A.  Wanda Reyes is claiming to be the stepmother of Ali

1    Kourani.

2            MR. BOVE:  Could you please turn to Page Four and

3    highlight the title of the document.

4    Q.  Do you see where it says "certificate of birth"?

5    A.  Yes.

6    Q.  Is this is a document that was submitted in connection with

7    the application by Ali Kourani for --

8    A.  Yes.  This was submitted with the I130.

9    Q.  Who is listed as the child?

10   A.  Ali Kourani.

11   Q.  Who is listed as the father?

12   A.  Mohammad Kourani.

13           MR. BOVE:  Ms. Shields, if you could highlight that.

14           (Pause)

15   Q.  Who is listed as the mother?

16   A.  Hana Kourani.

17           MR. BOVE:  Could you highlight that please,

18   Ms. Shields.

19           (Pause)

20           MR. BOVE:  Now, if we go back to page one please and

21   zoom-in again on top and I'd like to focus for a minute on the

22   stamp that says "approved".

23   Q.  What's indicated by that stamp, Mr. Hansen?

24   A.  That's the petition for alien relative was approved by the

25   Vermont Service Center on January 11, 202.

1   Q.  In the bottom left of this stamp there are the letters

2   V-S-C.  What does that stand for?

3   A.  The Vermont Service Center.

4   Q.  When this documents was filed in late 2001, what was the

5   next step in the process following approval of the petition at

6   the Vermont Service Center?

7   A.  The INS would forward the approved petition to the National

8   Visa Center under the Department of State.

9          MR. BOVE:  Could you please bring up Government

10  Exhibit 605.

11  Q.  Mr. Hansen, as much as you can read from the top of the

12  title of the document, what is this?

13  A.  An affidavit of support under Section 213A of the act.

14  Q.  What is the purpose of an affidavit of support?

15  A.  To show that the petitioner has the financial means to

16  support the beneficiary.

17         MR. BOVE:  If you could bring up page nine please.

18         (Pause)

19         MR. BOVE:  Zoom-in on Parts Five and Six.

20         (Pause)

21  Q.  Who signed this document?

22  A.  Wanda Reyes Kourani and Mohammad Kourani.

23  Q.  What are the dates listed by those signatures?

24  A.  July 7, 2003.

25         MR. BOVE:  If could you could highlight those dates

1   please.

2               (Pause)

3               MR. BOVE:  Now, I'd like to take a look at Part Three

4   on Page One if you could zoom-in on that.

5   Q.  Who is listed in this part of the affidavit as the

6   sponsored --

7   A.  Ali Kourani.

8               MR. BOVE:  Now, Ms. Shields, if you could zoom-in on

9   the box of this page labeled "for agency use only".

10              Thank you.

11  Q.  What is indicated on the screen there?

12  A.  That the affidavit meets the requirements of Section 213A.

13  Q.  And on what date was that the determination made according

14  to the author?

15  A.  July 15, 2003.

16              MR. BOVE:  Could we take at look at 606 now and start

17  by zooming-in from the top of the document through Question One

18  and get the title as well, please.  Thank you.

19  Q.  What is this?

20  A.  This is the application for immigrant visa and alien

21  registration.

22  Q.  What is this document used for?

23  A.  This would be the application filed for the immigrant visa

24  for permission to enter the United States.

25  Q.  Who is listed as the applicant here?

J59AAKOU3                        Hansen - Direct

1    A.  Ali Kourani.

2              MR. BOVE:  If you could highlight the warning.

3    Q.  So, this says warning, any false statement or concealment

4    of a material fact may result in your permanent exclusion from

5    the United.

6              States.  Do you see that?

7    A.  Yes.

8    Q.  Why is that warning included on this application?

9    A.  So, the applicant is aware of the consequences of not being

10   truthful.

11             MR. BOVE:  Ms. Shield, if you bring up Page Four

12   please of this exhibit and please remain on the bottom section

13   of the document, and if you could highlight the signature block

14   that says "signature of applicant".

15             (Pause)

16   Q.  Mr. Hansen, when was this application submitted?

17   A.  On July 15, 2003.

18   Q.  Can you tell from this part of the document where the

19   application was submitted?

20   A.  At the U.S. Consulate in Cyprus.

21             MR. BOVE:  Let's take a look at Page Three now please,

22   and if you could zoom-in on the instructions and the warning on

23   the top of the page.

24             (Pause)

25   Q.  There's another warning on this page of the exhibit; do you

1    see that?

2    A.   Yes.

3    Q.   The second sentence says even if you are issued an

4    immigrant visa and are subsequently admitted to the United

5    States providing false information on this form could be

6    grounds for your prosecution and/or deportation.

7         Do you see that

8    A.   Yes?

9         MR. BOVE:   Could you highlight that part of the

10   document.

11   Q.   Why is there a second warning at this point in the

12   application?

13   A.   To stress the importance of it and to make sure the

14   applicant knows that even if they are allowed in they would be

15   considered not lawfully admitted to the United States if they

16   lied on this form.

17        MR. BOVE:   Zoom-out, please, Ms. Shields.

18   Q.   There's a series of questions on this page that follow the

19   warning.   Do you see that?

20   A.   Yes.

21        MR. BOVE:   Let's zoom-in on Question 30C.   If you

22   could zoom-out a little bit to see the introductory language at

23   top of the box.

24   Q.   So, the introduction and the questions at the top of the

25   screen where the number 30 is and this question when you looked

1    down at 30C indicates that a person is ineligible for a visa if

2    he, quote, is a member or representative of terrorist

3    organization as currently designated by the U.S. Secretary of

4    State.

5            Do you see that?

6    A.  Yes.

7            MR. BOVE:  Could you please move this part to the left

8    and bring up page two of Government Exhibit 1001 on the right

9    and zoom-in on paragraph three.

10           Ladies and gentlemen, Government Exhibit 1001 is a

11   stipulation that was introduced during the testimony of Dr.

12   Levitt and it includes that language indicating that Hezbollah

13   was designated as a foreign terrorist organization by the

14   Secretary of State in 1997.

15           Ms. Shields, if you could bring 606.

16           THE COURT:  Do you want me to receive that or have I

17   already done that?

18           MR. BOVE:  You've already done that, your Honor.

19   Thank you.

20           If we can go back to 606 at page three and we are

21   going stay focused on Question 30C.

22   Q.  Mr. Hansen, in 2003 were current members of Hezbollah

23   eligible to receive immigrant visas into the United States?

24   A.  No.

25   Q.  And what would have happened if an applicant disclosed in

1   this application that he was a current member of the Hezbollah?

2   A.  The application would have been denied.

3           MR. BOVE:  Ms. Shields, let's lake a look at

4   Government Exhibit 607.

5   Q.  Mr. Hansen, what is this?

6   A.  This is the immigrant visa.

7           MR. BOVE:  Ms. Shields, if you could please zoom-in on

8   the top third of this exhibit.

9           (Pause)

10  Q.  Who was this visa issued to?

11  A.  Ali Kourani.

12          MR. BOVE:  Highlight that name in the top left.  Now,

13  let's take a look at the immigrant classification in the bottom

14  right of the document and zoom-in on the bottom right of the

15  document.

16  Q.  What does this part of Government Exhibit 607 indicate

17  about when the visa was issued?

18  A.  It was issued on July 16, 2003.

19          MR. BOVE:  Zoom-in now on the box with the red stamp

20  on the top left.

21  Q.  What does this indicate?

22  A.  That the Ali Kourani was admitted to JFK airport on

23  July 30, 2003 as an IR2, child of U.S. citizen.

24  Q.  After the defendant was admitted to the United States in

25  2003 using this visa, did he have any immigration status in

1   United States?

2   A.  He was a permanent resident.

3   Q.  Is that sometimes referred to as having a Green Card?

4   A.  Yes.

5         MR. BOVE:  Could you bring up page 12 of Government

6   Exhibit 608 and zoom-in on the card.

7   Q.  What is this Mr. Hansen.

8   A.  This is Ali Kourani's permanent resident card.

9   Q.  You said that after entering the United States in 2003 the

10  defendant had this status as a permanent resident?

11  A.  Yes.

12  Q.  Is it possible after obtaining that status and becoming a

13  United States citizen?

14  A.  Yes.  Typically after five years a lawful permanent

15  resident could apply for citizenship.

16        MR. BOVE:  Take a look at Government Exhibit 608

17  please and bring up page two.

18  Q.  Starting as we have with the top right, what is this

19  document?

20  A.  Application for naturalization.

21        MR. BOVE:  Zoom-in from the top to Section A.

22  Q.  Who is the applicant?

23  A.  Ali Kourani.

24  Q.  I'd look to focus for a minute on 2008.  Could you please

25  describe what the process was like for seeking a naturalization

1   as a U.S. citizen?

2   A.   The form would have been submitted to Vermont Service

3   Center.  They would have processed the fee and initiated the

4   background checks.  Once the background checks were completed,

5   application would be sent with the "A" file to the local office

6   for interview.

7           MR. BOVE:  Zoom back out please.  There are some red

8   marks on this document as well.  We see some of them on Page

9   One.

10  Q.   What does that indicate.

11  A.   Those are the marks of the interviewing officer during the

12  interview.

13          MR. BOVE:  Bring up page 11 of this document and

14  please zoom-in on part 11 up at the 207.  And if you could

15  highlight the text that begins "I certify".  The first sentence

16  here says I certify under penalties of perjury under the laws

17  of the United States of America that this application and the

18  evidence submitted with it are all true and correct.

19  Q.   Do you see that, Mr. Hansen?

20  A.   Yes.

21  Q.   Why is that included in this application for

22  naturalization?

23  A.   Because this is a legal form and the questions asked are

24  about eligibility for a benefit before the government.

25  Q.   Why does CIS need truthful information in response to

1    questions in this application?

2    A.  In order to make the right decision.

3          MR. BOVE:  Please bring up page eight of the document.

4    There are a series of questions here in this part of the

5    application.  I'd like to focus on Question Nine and the

6    subparts, and if you could highlight Subpart C.

7    Q.  So, Mr. Hansen, here the question is, have you ever been a

8    member of or in any way associated either directly or

9    indirectly with a terrorist organization.  Do you see that?

10   A.  Yes.

11   Q.  Why is that question asked in a naturalization application?

12   A.  To check for good moral character and to make sure that the

13   applicant has been lawfully admitted to the United States.

14   Q.  You just used a term "good moral character"?

15   A.  Yeah.

16   Q.  Is that a statutory term?

17   A.  Yes.

18   Q.  CIS has to apply when making these naturalization

19   decisions?

20   A.  Yes.

21   Q.  How is Question 9C answered in this document?

22   A.  "No".

23   Q.  What does that red mark over the answer mean?

24   A.  It means that the officer specifically asked that question

25   and the answer was "no".

J59AAKOU3                    Hansen - Direct

1    Q.  In 2008 would a current member of Hezbollah providing

2    material support to that foreign terrorist organization have

3    been eligible for naturalization?

4    A.  No.

5              MR. BOVE:  Ms. Shields, could you please bring up page

6    nine of the exhibit and if you could zoom-in from the top of

7    the page down to Question 15.

8    Q.  And focusing on Question 15 this asks, have you ever

9    committed a crime or offense for which you were not arrested.

10   Do you see that?

11   A.  Yes.

12   Q.  Why is that question asked?

13   A.  To give the applicant an opportunity to tell us the truth

14   about any crimes that they may have committed.

15   Q.  Here the answer on the application is "no".

16   A.  Correct.

17   Q.  Again, what does the red mark indicate?

18   A.  That the question was asked during the interview and

19   answered "no".

20   Q.  In 2008 what would have happened if the applicant answered

21   "yes" to this question and disclosed participation in federal

22   crimes of terrorism?

23   A.  The case would have been denied.

24   Q.  The application would have been denied.

25   A.  Yes.

J59AAKOU3                         Hansen - Direct

1    Q.  Is the same true, if the answer to this question was "yes"

2    and federal firearms offenses were disclosed --

3    A.  Yes.

4              MR. BOVE:  Ms. Shields, zoom back out please and now

5    I'd like to focus on the bottom page, Questions 23 and 24.

6    Q.  Let's start with 23.  This one says, have you ever given

7    false or misleading information to any U.S. Government official

8    while applying for any immigration benefit or to prevent

9    deportation, exclusion or removal?  Do you see that?

10   A.  Yes.

11   Q.  This question's answer was "no" in this application?

12   A.  Correct.

13   Q.  There's another red mark?

14   A.  Yes.

15   Q.  Is that the same meaning as you described?

16   A.  Yes.

17   Q.  Is an immigrant visa like the one that the defendant

18   obtained in 2003 considered an immigration benefit?

19   A.  It is.

20   Q.  For purposes of this question?

21   A.  Yes.

22   Q.  So what, if anything, would happen if a naturalization

23   applicant answered "yes" to this question and explain that he

24   failed to disclose membership in Hezbollah in a prior

25   application for an immigrant visa?

```
 1   A.  The application would be denied on the grounds that the
 2   applicant was not lawfully admitted.
 3   Q.  Not lawfully admitted in connection with that prior visa
 4   application?
 5   A.  Correct.
 6   Q.  Now, let's take a look at Question 24.  This one reads:
 7           Have you ever lied to any U.S. Government official to
 8   gain entry or admission into United States; do you see that?
 9   A.  Yes.
10   Q.  And they answer here is "no" with another red mark?
11   A.  Correct.
12   Q.  What, if anything, would have happened if the applicant
13   answered this question "yes" and disclosed that he had not told
14   U.S. officials when entering or exiting the United States prior
15   to submitting the application that he was a member of
16   Hezbollah?
17   A.  The application would have been denied for not being
18   lawfully admitted.
19           MR. BOVE:  Ms. Shields, could you please publish page
20   24 of Government Exhibit 208.
21           (Pause)
22   Q.  This looks like an envelope that contained the application?
23   A.  Yes.
24           MR. BOVE:  Ms. Shields, rotate the exhibit clockwise
25   to start.
```

 1            (Pause)

 2            MR. BOVE:  And zoom-in to the postage stamp on the

 3   right.

 4   Q.  What's the postmark date for this application?

 5   A.  August 19, 2008.

 6            MR. BOVE:  Zoom-in to the received stamp on the bottom

 7   left.

 8   Q.  What does this mean?

 9   A.  The mail was received on August 22, 2008 by the Vermont

10   Service Center.

11   Q.  Now, in 2008 when this was submitted to the Vermont Service

12   Center, what were the steps that CIS took to track and maintain

13   an application like this?

14   A.  The application issued is a receipt number and placed in a

15   file called a receipt file and it is housed in the receipt file

16   until the "A" file can, will be received by the office and then

17   combined together.

18   Q.  So, I think you mentioned the "A" file concept in the

19   beginning of your testimony?

20   A.  Yes.

21   Q.  That's the file that contains all prior immigration

22   applications submitted by a particular person?

23   A.  Yes.

24   Q.  So, basically the first step is getting the "A" file from

25   some storage facility so that the application for

J59AAKOU3                          Hansen – Direct

1    naturalization can be placed in it?

2              THE COURT:  Can I see counsel for a minute.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (side bar)

2              THE COURT:  Some of the jurors are nodding off.

3    You're going too fast and without structure as evidence.  And

4    I'm afraid that the jurors are not able to follow you with

5    this.  I don't know what to suggest or not.  One of the reasons

6    I've just called this conference was to wake up the jurors.

7    We'll go to about 4:15.

8              I would like to summarize the critical dates or have

9    you or both of you do the critical dates.  There's a lot of

10   different moving parts here.  There's a father and mother,

11   Mohammad Ali and the son, Ali, and the mother is Hana and the

12   stepmother is Wanda.  It would be good to have all these dates,

13   unless you object, cause it is kind of a summation at this

14   point.

15             MR. SCHACHT:  Judge, I mean obviously, I know the case

16   so I know what he is proving.  I think he'll make it clear in

17   summation.  The point is just that --

18             THE COURT:  Well, they are just nodding off now

19   because this is too many dates and disparate details being

20   elicited and I'd like to have them know.  Neither of you want

21   to do it, I'll do it.  But the next time because I want to be

22   sure I'm right.

23             MR. BOVE:  I think it's an excellent idea and

24   appreciate that the side bar.  What I would propose, judge, is

25   we had anticipated calling Ms. Shields on Monday morning to

J59AAKOU3                     Hansen – Direct

1   present another, a different type of summary chart, and what we

2   could do this weekend is prepare a summary chart relating to

3   key dates of this application.

4           THE COURT:  OK.  But make sure that Mr. Schact sees

5   it.

6           MR. BOVE:  Of course.

7           MR. SCHACHT:  He gives me everything.

8           MR. BOVE:  I will.  Right now I'll work as quickly as

9   I can to get just the records into evidence.

10          THE COURT:  OK.  Just go ahead.

11          MR. BOVE:  Appreciate the suggestion.  Thank you.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Members of the jury, this is hard to

3       follow because there's a lot of details that's being pulled

4       together for a number of different individuals and the names

5       are not so different that we can readily distinguish them.

6       Mr. Bove is going to continue eliciting the facts.  But on

7       Monday there'll be a summary chart that will show you the dates

8       and events of what happened so you'll be able to understand

9       this.  I know how difficult this is.

10             We are going break in another half hour or so.  If you

11      need a break now, we can break and come back.  I've noticed

12      that a number of you have been finding it hard to continue

13      being tentative.

14             Do you want to stretch?

15             (Pause)

16             THE COURT:  Go ahead, Mr. Bove.

17             MR. BOVE:  Thank you, judge.

18      Q.  Mr. Hansen, before that break we were talking about the way

19      that a naturalization application would be stored in the alien

20      file.

21      A.  Yes.

22             MR. BOVE:  So, what I would like to do right now is

23      talk a little bit about the physical location of the

24      defendant's file.

25             So, Ms. Shields, if you could bring up Government

1    Exhibit 612 please and zoom-in on the row that says "general

2    inquiry".

3    Q.   What is this document?

4    A.   This is a printout from our natural file tracking system

5    and it's showing where the "A" file is currently located.

6              MR. BOVE:  If you could move this to the left and

7    bring up page two of Government's 608 on the right, and zoom-in

8    on the top right corner.

9    Q.   How does this "A" number on the right compare to the one on

10   the far left?

11   A.   They are the same.

12   Q.   Is that the file number that you've been talking about?

13   A.   Yes.

14             THE COURT:  This number is the number for what?

15             THE WITNESS:  That is the "A" number that identifies

16   Ali Kourani.

17             THE COURT:  That's his number.

18             THE WITNESS:  His number.

19             THE COURT:  Just like a Social Security number is

20   unique to a person, his immigration is number is unique.

21             THE WITNESS:  Correct.

22             THE COURT:  Where ever the record is made, whether it

23   be in Oshkosh, Iowa or Beirut, Lebanon or New York City, the

24   same number is attached.

25             THE WITNESS:  Correct.

1          THE COURT:  And it's stored nationally.

2          THE WITNESS:  It is.

3          THE COURT:  So, it could be accessed in any particular

4     place where Homeland Security operates.

5          THE WITNESS:  Yes, it can.

6          THE COURT:  OK.  So that's the purpose of that number.

7          THE WITNESS:  Yes.

8          THE COURT:  We seen different documents today.  All of

9     these are documents that are administered by the Immigration

10    and Naturalization Service, right?

11         THE WITNESS:  Yes.

12         THE COURT:  And we've talked about an application for

13    citizenship, right?

14         THE WITNESS:  Yes.

15         THE COURT:  An application to travel?

16         THE WITNESS:  Yes.

17         THE COURT:  That is to travel and come back?

18         THE WITNESS:  Correct.  Permission to return.

19         THE COURT:  If you're here and you want to travel

20    without hope of coming back, you don't need permission or do

21    you?

22         THE WITNESS:  Depending on your status.  U.S. citizens

23    or permanent residents can travel at will.

24         THE COURT:  But if you are not a permanent resident

25    and you are not a citizen, you can't get out of the country

J59AAKOU3                         Hansen - Direct

 1    unless you get permission.

 2              THE WITNESS:  You would need permission to return.

 3              THE COURT:  What are the categories of people?  We

 4    have citizens, right?

 5              THE WITNESS:  Yes.

 6              THE COURT:  And we have permanent, lawful permanent

 7    residents?

 8              THE WITNESS:  Yes.

 9              THE COURT:  What kind of people are lawful permanent

10    residents and not citizens?

11              THE WITNESS:  Lawful permanent residents would be

12    Green Card holders, people who have been granted permanent

13    status in the United States.

14              THE COURT:  So, anyone who comes in here with

15    permission --

16              face the jury.

17              Anyone who comes here with permission to stay and live

18    is a lawful permanent resident.

19              THE WITNESS:  Certain people would come with a non

20    immigrant visa, which is mission to stay for a specific period

21    of time, such as like a student or a business visa coming just

22    on a temporary basis or a visitor visa, just for temporary

23    basis.  So that's the difference between an immigrant and a non

24    immigrant visa.

25              THE COURT:  And in order to get these various

J59AAKOU3                          Hansen – Direct

1    permissions, you have to make an application.

2              THE WITNESS:  There are certain countries that are on

3    our visa waiver list and they don't need a visa to come to the

4    United States.  These are mostly European nations.

5              THE COURT:  But to become a lawful permanent resident,

6    one has to make an application.

7              THE WITNESS:  Correct.

8              THE COURT:  To become a citizen one has to make an

9    application?

10             THE WITNESS:  Correct.

11             THE COURT:  In that application there are various

12   representations that are made?

13             THE WITNESS:  Yes.

14             THE COURT:  And if you make a false reputation you can

15   be punished.

16             THE WITNESS:  Correct.

17             THE COURT:  Including deportation.

18             THE WITNESS:  Yes.

19             THE COURT:  As to the dates, I think that tells you

20   what we've been doing and as to the dates they'll be in a

21   summary form on Monday.  So, I think you'll be able to follow

22   it a little better.

23             MR. BOVE:  Thank you, judge.

24             There are just a couple more documents.

25             THE COURT:  Try to be louder.  As the day goes on,

J59AAKOU3                         Hansen - Direct

1     voices have to be louder and more animated.

2              MR. BOVE:  I think you're right, judge.  I agree with

3     that.

4              Ms. Shields, could you bring up Government Exhibit 612

5     in the main window please and I'd like to focus on page five.

6     Q.  This is a series of entries tracking the location --

7              THE COURT:  What is this document?  Let's get

8     oriented.  What is this document?

9              THE WITNESS:  This is a printout from our national

10    file tracking system.

11             THE COURT:  A print out of what?

12             THE WITNESS:  It shows the history of the "A" file

13    where it was located.

14             THE COURT:  It records entries made from whatever

15    place.

16             THE WITNESS:  Every time an employee would move, the

17    file it would be scanned in to show the new location.

18             THE COURT:  This is a record of where it was scanned

19    in.

20             THE WITNESS:  Correct.

21             MR. BOVE:  Let's focus on the rows between

22    February 27, 2009 and March 31, 2009.

23    Q.  What can you tell from what's on the screen about what

24    happened with the defendant's naturalization application in

25    this timeframe?

J59AAKOU3                          Hansen - Direct

1    A.   The file went from the Vermont Service Center, otherwise

2    known as the Eastern Service Center to the New York City

3    district office and the Garden City field office.

4    Q.   Where is the New York City district office?

5    A.   26 Federal Plaza, New York, New York 10278.

6            MR. BOVE:  Ms. Shields, in the third entry from the

7    bottom, would you please highlight where it says "Section DE".

8    Thank you.

9    Q.   What is Section DE, Mr. Hansen?

10   A.   That is our data entry section.

11           MR. BOVE:  Thank you.

12   Q.   Now, I think you said earlier when you were describing the

13   naturalization process, that it also involves an interview; is

14   that right?

15   A.   Correct.

16           MR. BOVE:  Could you please bring up Government

17   Exhibit 609 and zoom-in on the top section please.

18   Q.   What is this document?

19   A.   This is the interview notice.

20           THE COURT:  I'm sorry?

21           THE WITNESS:  The interview notice.

22           MR. BOVE:  If you could please highlight the name "Ali

23   Kourani".

24           THE COURT:  What happens?  The person who wishes to be

25   interviewed receives a notice.

1           THE WITNESS:  Yes.  This would tell the person where

2    and when to appear for their interview.

3           THE COURT:  Please go on a certain date at a certain

4    time to a certain place where you will be interviewed.

5           THE WITNESS:  Correct.

6    Q.  Where does this document tell the defendant to come to a

7    certain place and on a certain time?

8    A.  Tells the applicant to appear at 711 Stewart Avenue, the

9    Citizenship and Immigration Service Office in Garden City New

10   York.

11          MR. BOVE:  Could you highlight the date of the

12   interview below the address block.

13   Q.  What was the date scheduled for the interview.

14   A.  Wednesday, April 1, 2009.

15          MR. BOVE:  Now, if you could bring up on left side of

16   the screen page 11 of Government Exhibit 608.

17          THE COURT:  Those of you who don't live in Long Island

18   Garden City, it's a town a bit to the east of the New York City

19   border in Long Island.

20          MR. BOVE:  Let's zoom-in please on Part 13.

21          THE COURT:  Doesn't have so many gardens.  It's just

22   called "Garden City".

23   Q.  What's indicated on left side of the screen?

24   A.  That the applicant was interviewed by the Immigration

25   Services Officer Diane Lawrence on April 1, 2009.

1    Q.  This is in red pen.  What does that mean?

2    A.  That it was written by the officer.

3        MR. BOVE:  Ms. Shields, in the main window could you

4    please bring up Government Exhibit 610.

5    Q.  What is this document?

6    A.  This is the Notice of Naturalization Ceremony.

7    Q.  What does this indicate?

8    A.  That the application was approved and the applicant was

9    scheduled to appear for an oath ceremony on April 15, 2009.

10       MR. BOVE:  Ms. Shields, if you could please highlight

11   the top half of the page.  Highlight the date of the notice and

12   the date of the interview -- excuse me -- the oath ceremony.

13       Finally, with respect to the naturalization

14   application, let's take look at Government Exhibit 611?

15       THE COURT:  Leave this document.

16       So, every Friday morning after this case is over, if

17   you want to see a naturalization ceremony you can come to this

18   court house on the first floor.  There are lots of people who

19   are applying for citizenship and their family.  An oath is

20   administered by a judge, a little bit of speech is given and

21   then they're then processed to become citizens.  We do it once

22   a week.

23       The Eastern District does everyday.  And also the

24   immigration offices in different parts of the country do it.

25   This is kind of a ceremony before you become a citizen.  You

1    take an oath and you pledge allegiance to the flag and then you

2    become a citizen.

3              Right?

4              THE WITNESS:  Yes.

5              MR. BOVE:  Now, the last exhibit we are going to look

6    at on this topic is Government Exhibit 611 please.

7    Q.  What is this?

8    A.  This is Ali Kourani's Certificate of Naturalization.

9    Q.  What is the date that it was issued?

10   A.  April 15, 2009.

11             MR. BOVE:  Your Honor, I have another stipulation to

12   offer.

13             THE COURT:  What date is this?

14             THE WITNESS:  April 15, 2009.

15             THE COURT:  That's when he became a citizen of the

16   United States?

17             THE WITNESS:  Yes.

18             MR. BOVE:  Your Honor, I have another stipulation to

19   offer.  This one is marked Government Exhibit 1011.  It's

20   another agreement between the parties.  This one indicates that

21   there are two applications submitted to the Department of State

22   which are marked as Government Exhibits 613 and 614 for which

23   the government and the defense agree that the exhibits 613 and

24   614 are official records of the State Department.

25             THE COURT:  As official records, I admit them into

J59AAKOU3                        Hansen - Direct

1    evidence and you could consider them just like all other pieces

2    of evidence.

3              MR. BOVE:  Thank you, your Honor.

4              (Government's Exhibits 1011, 613 and 614 received in

5    evidence)

6              MR. BOVE:  Ms. Shields, could you please bring up

7    Government Exhibit 613.

8    Q.  What is this?

9    A.  Application for a U.S. passport.

10   Q.  What is the name of the applicant listed?

11   A.  Ali Kourani.

12             MR. BOVE:  Could you zoom-in on the bottom left please

13   so that we can see the date of the application.

14   Q.  Can you read that?

15   A.  Yes.  It says April 15, 2009.

16             MR. BOVE:  Could you zoom-in on the box titled

17   "identifying documents".  The box above that please.

18   Q.  What is indicated here?

19   A.  Ali Kourani produced his Certificate of Naturalization as

20   proof of citizenship.

21             THE COURT:  This entitles him to get a passport plus a

22   fee.

23             THE WITNESS:  Correct.

24             MR. BOVE:  If we could take a look at Government

25   Exhibit 614 and zoom-in on the top.

J59AAKOU3                        Hansen - Direct

1    Q.  What is Government Exhibit 614?

2    A.  An application for U.S. passport by Ali Kourani.

3    Q.  Do you see the box in the red circle?

4    A.  Yes.  It indicates he is applying for a U.S. passport card?

5            MR. BOVE:  Could you please zoom-in on the bottom row.

6    Q.  When was this application submitted?

7    A.  Looks like April 5, 2013.

8            MR. BOVE:  Your Honor, I have nothing further.

9            THE COURT:  Mr. Hansen, what's the difference between

10   a passport and a passport card?

11           THE WITNESS:  A passport card is usually used for

12   traveling between the western hemisphere between the Caribbean,

13   Mexico, Canada and the United States.

14           THE COURT:  If one has a passport, why do you need a

15   passport cord?

16           THE WITNESS:  Sometimes it's just easier to carry.  A

17   passport book would be used for international travels, where a

18   passport card can be used between Canada, United States and

19   Caribbean.

20           THE COURT:  How about South American countries?

21           THE WITNESS:  I'm not familiar with these countries.

22           THE COURT:  So, if someone who has a passport might

23   also have a passport card?

24           THE WITNESS:  Yes.

25           THE COURT:  Mr. Schact.

1          MR. SCHACHT:  Thank you, your Honor.

2     CROSS-EXAMINATION

3     BY MR. SCHACHT:

4     Q.  A few minutes ago we were looking at the documents of

5     Mohammad Ali Kourani, not Ali Kourani; do you recall that?

6     A.  Yes.

7     Q.  And Mohammad Ali Kourani is the father of Ali Kourani?

8     A.  Correct.

9     Q.  And according to the exhibits that you reviewed, Mohammad

10    Ali Kourani was denied something in the United States, right?

11    A.  Correct.

12    Q.  What was he denied?

13    A.  He was denied permanent residence.

14    Q.  And could you determine from looking at those exhibits in

15    evidence the reason why?

16    A.  No, I could not.

17    Q.  Having that decision been made is it possible for him to

18    then in some point after the denial be given permission to come

19    into the United States lawfully?

20    A.  Depends on the reason for denial, he could potentially

21    return.

22    Q.  What would be a reason that he would not be allowed to

23    return?

24    A.  If he was denied for marriage fraud, he would be

25    permanently banned from re-entry.

J59AAKOU3                        Hansen - Cross

1             MR. BOVE:  When you have a chance, could you please

2     put up Government Exhibit 608.  Thank you very much.  And if

3     you could flip please to page nine of that exhibit.

4             THE COURT:  What is this exhibit.  Look at page one

5     for a moment.

6             MR. SCHACHT:  You are asking the witness, judge,

7     right, not me?

8             THE COURT:  Right.  Now I am just looking at it.  I'm

9     not familiar with the document.  What is this document?  Is

10    this a cover letter or what?

11            THE WITNESS:  Yes.  This is a cover letter for the

12    application for naturalization.

13            THE COURT:  OK.  And the application follows the cover

14    letter?

15            THE WITNESS:  Yes.

16    Q.  It looks like the whole exhibit has about 24 pages which is

17    the cover letter plus 23 pages of attachments and exhibits,

18    right?

19    A.  Yes.

20            MR. SCHACHT:  Will you please turn to page nine and

21    zoom-in on that section in the middle between questions 21 and

22    22 please.  Thank you very much.

23    Q.  And in that section my client told the Immigration Service

24    that he had been arrested and eventually pled guilty to an

25    offense, right; isn't that what that indicates?

1    A.  Yes.

2    Q.  So, at his interview with I think her name was Diane

3    Lawrence; was that her name, the woman who interviewed him?

4    A.  Yes.

5    Q.  She would have had the opportunity to ask him about what

6    occurred and why he pled guilty to something, right?

7    A.  Yes.

8    Q.  And whatever his answers were were satisfactory I assume,

9    is that right, because he was given citizenship?

10   A.  Correct.

11             MR. SCHACHT:  I have no further questions.

12             Thank you very much.

13             THE COURT:  Anything else?

14             MR. BOVE:  No, your Honor.  Thank you.

15             THE COURT:  Thank you very much, Mr. Hansen.  You are

16   excused.

17             THE WITNESS:  Thank you.

18             THE COURT:  Do you have something else today?

19             MS. HOULE:  Your Honor, we have another witness ready

20   and your Honor said that you intended to conclude around 4:15.

21   This witness will take longer than that.

22             THE COURT:  Can we go off the record and just have a

23   little chat.

24             (Discussion held of the record).

25             THE COURT:  Members of the jury, I think the logical

1   thing now is to break for the weekend.  It's four o'clock and

2   rather than having to disrupt the witness, we'll just have the

3   whole witness on Monday.  Close up your books and give them to

4   Ms. Jones.

5        We are a making good progress.  I'm pleased with the

6   progress and I think you will be also, but there is some more

7   to go before we finish.  So, don't discuss the case.  Keep an

8   open mind.  I'll see you Monday at ten o'clock.

9        (Jury not present)

10        THE COURT:  Be seated for a minute.

11        Mr. Bove, I think we could do a little better at

12   getting the jury understanding by starting with a question

13   like, I show you Government Exhibit whatever.  Describe the

14   exhibit.  Show the exhibit, the first page and then turn to

15   whatever page you want.  And then you can elicit from the

16   witness, for example, I want to elicit the dates of this, that

17   and that.  So, there could be a better orientation.  You are

18   doing this proper form and a lot of judges won't let you do

19   what I would suggest but I think it would be better and a

20   little summarization would be useful for these kinds of facts.

21        MR. BOVE:  Thank you, judge.  I'll do a better job on

22   Monday.

23        THE COURT:  You're doing a very good job but I think

24   it's a better way of keeping the jury's attention.

25        MR. BOVE:  I appreciate it.

J59AAKOU3                          Hansen - Cross

1              THE COURT:  And we're going to have a little summary

2    chart that deals with all the dates and all the people?

3              MR. BOVE:  Yes, your Honor.

4              THE COURT:  Great.  Have a great weekend.

5              MR. SCHACHT:  You too.  Thank you, judge.

6              (Adjourned to Monday, May 13, 2019, at ten a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                       Page

 3   Cross By Mr. Schacht . . . . . . . . . . . . . 396

 4   Redirect By Mr. Bove . . . . . . . . . . . . 414

 5   Cross By Mr. Schacht . . . . . . . . . . . . 427

 6   Redirect By Mr. Bove . . . . . . . . . . . . 432

 7   Recross By Mr. Schacht . . . . . . . . . . . 433

 8   STEPHEN ANEST

 9   Direct By Ms. Houle  . . . . . . . . . . . . 436

10   GARY BATTISTA

11   Direct By Ms. Houle  . . . . . . . . . . . . 449

12   Cross By Mr. Schacht . . . . . . . . . . . . 494

13   GREGORY PSOINOS

14   Direct By Mr. Bove . . . . . . . . . . . . . 499

15   Cross By Mr. Schacht . . . . . . . . . . . . 526

16   Redirect By Mr. Bove . . . . . . . . . . . . 528

17   GREGORY KING

18   Direct By Ms. Houle  . . . . . . . . . . . . 529

19   Cross By Mr. Schacht . . . . . . . . . . . . 537

20   JOHN HANSEN

21   Direct By Mr. Bove . . . . . . . . . . . . . 538

22   Cross By Mr. Schacht . . . . . . . . . . . . 589

23                    GOVERNMENT EXHIBITS

24   Exhibit No.                        Received

25    1012    . . . . . . . . . . . . . . . . . 449
```

1    809    . . . . . . . . . . . . . . . . 474

2    604-612, 615-621 and 1010   . . . . . . . . . 541

3    1011, 613 and 614   . . . . . . . . . . . . 587

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25