J5DKKOU1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA

4              v.                      17 CR 417 (AKH)

5    ALI KOURANI,
                                       Jury Trial
6              Defendant.

7    ------------------------------x

8                                      New York, N.Y.
                                       May 13, 2019
9                                      10:30 a.m.

10   Before:

11              HON. ALVIN K. HELLERSTEIN,

12                                     District Judge
                                         And A Jury

13

14

15                        APPEARANCES

16

17   GEOFFREY S. BERMAN
          United States Attorney for the
     Southern District of New York
18   AMANDA L. HOULE
     EMIL J. BOVE III
19        Assistant United States Attorneys

20

21   ALEXEI SCHACHT
          Attorney for Defendant

22   ALSO PRESENT:  KERI SHANNON, Special Agent FBI
     MARGARET SHIELDS, Paralegal, US Attorney's Office
23

24

25

J5DKKOU1                          Costello - Direct

 1                (In open court; jury present)

 2                (Trial resumed)

 3                THE COURT:  Good morning, members of the jury.  Be

 4     seated, everyone.  I'm sorry that I was late this morning.  I

 5     know that I delayed you because it's now 10:35.  Excuse me.

 6                Ms. Houle.

 7                MS. HOULE:  Your Honor, the government calls Special

 8     Agent Joseph Costello.

 9                THE COURT:  Okay.

10                Good morning.

11                Pay attention to the oath, please.

12      JOSEPH COSTELLO,

13          called as a witness by the Government,

14          having been duly sworn, testified as follows:

15                THE WITNESS:  Joseph Costello, C-o-s-t-e-l-l-o.

16                THE COURT:  You may inquire, Ms. Houle.

17                MS. HOULE:  Thank you, your Honor.

18                Your Honor, before I begin, I would just note for the

19     record that this is the witness through whom the government

20     will offer one of the defendant's proffer statements, and

21     that's on the consent of the defense.

22                THE COURT:  Okay.

23     DIRECT EXAMINATION

24     BY MS. HOULE:

25     Q.  Good morning.  Where do you work?

J5DKKOU1                        Costello - Direct

1    A.  I'm a special agent at the FBI.

2    Q.  How long have you worked for the FBI?

3    A.  Approximately four and a half years.

4    Q.  What did you do before you joined the FBI?

5    A.  I was a special agent at the United States Department of

6    State, Diplomatic Security Service.

7    Q.  To what squad are you currently assigned at the FBI?

8    A.  I'm currently assigned to C5, organized crime.

9    Q.  How long have you been on that squad?

10   A.  Just about a month.

11   Q.  What did you do before you were on that squad?

12   A.  I was assigned to CT9.

13   Q.  What is the focus of CT9?

14   A.  CT9 is focused on the Iranian threat network and Hezbollah.

15   Q.  How long were you on squad CT9?

16   A.  Approximately three and a half years.

17   Q.  Do you know a man named Ali Kourani?

18   A.  I do.

19   Q.  Do you see him here in the courtroom today?

20   A.  I do.

21   Q.  If you could identify him based on a piece of clothing that

22   he's wears and where he's sitting?

23   A.  Sitting over there, in the white shirt.

24        THE COURT:  Let the record reflect that that's the

25   identification of the defendant.

J5DKKOU1                         Costello - Direct

1             MS. HOULE:  Thank you, your Honor.

2    BY MS. HOULE:

3    Q.  Directing your attention to August 9th, 2016, did you meet

4    with the defendant that day?

5    A.  I did.

6    Q.  Was that the first time that you met the defendant?

7    A.  Yes.

8    Q.  And where was that meeting?

9    A.  The United States Embassy in Beirut, Lebanon.

10   Q.  Why had you traveled to Beirut?

11   A.  To interview the defendant.

12   Q.  Why was the defendant at the embassy that day?

13   A.  The defendant had previously come to the embassy seeking to

14   meet with the U.S. Government, and we had followed up to meet

15   with them then.

16   Q.  Who was present for your meeting with the defendant?

17   A.  Myself, the defendant, Special Agent Gary Battista from my

18   squad, and a member of a U.S. intelligence agency.

19   Q.  How did your meeting with the defendant begin?

20   A.  The meeting began when the defendant was brought into the

21   room.  He saw Special Agent Battista and stated he was

22   unsurprised to see him there.

23   Q.  During this meeting, did you discuss Hezbollah with the

24   defendant?

25   A.  Yes.

J5DKKOU1                          Costello - Direct

1    Q.  What did the defendant say?

2                THE COURT:  Let's just proceed and find out who said

3    what.  Let the meeting develop.

4    BY MS. HOULE:

5    Q.  How did the meeting proceed?

6    A.  The defendant stated he was not a member of Hezbollah.

7                THE COURT:  How did it start?  Who started the

8    meeting?  Who started the conversation?

9                THE WITNESS:  I can't recall exactly, your Honor, but

10   the defendant stated he was unsurprised to see Special Agent

11   Battista.

12               THE COURT:  Did he say why?

13               THE WITNESS:  He had previously met with Special Agent

14   Battista in the United States.

15               THE COURT:  What went on then?  What followed?

16               THE WITNESS:  We asked the defendant if he would be

17   willing to discuss with us his involvement with Hezbollah.

18               THE COURT:  Go ahead, Ms. Houle.

19               And he said?

20               THE WITNESS:  The defendant stated he was not

21   affiliated with Hezbollah, but he did have family members who

22   were in Hezbollah.

23   BY MS. HOULE:

24   Q.  Did he identify any particular family members?

25   A.  Yes.

J5DKKOU1                         Costello - Direct

1    Q.  Which ones?

2    A.  He stated his brother, Kassem Kourani, was the face of

3    Hezbollah, the political leader of Hezbollah in his home

4    village of Yater in South Lebanon.  He identified Maher

5    Kourani, I believe a cousin of the defendant, as a member of

6    Hezbollah, and, finally, he identified another cousin -- I

7    believe a cousin, excuse me -- Mahmoud Kourani, who was a

8    member of Hezbollah, who the defendant identified as having

9    been arrested by the FBI in the mid-2000s, in Detroit, for his

10   involvement with Hezbollah.

11   Q.  How did this meeting end?

12   A.  The meeting ended with the defendant stating he would be

13   willing to meet with the FBI again.

14   Q.  Did you say anything in response?

15   A.  We stated we'd be unwilling to meet with the defendant

16   unless he was willing to discuss his involvement, his personal

17   involvement, with Hezbollah.  The defendant stated he'd meet

18   with us for hours.  We stated unless he's going to discuss

19   Hezbollah and his involvement, we'd be unwilling to meet.

20   Q.  Directing your attention to March 22nd --

21            THE COURT:  So what happened then, the meeting broke

22   up?

23            THE WITNESS:  Yes, sir.  Yes, your Honor.

24            THE COURT:  Was there anything set for renewal or

25   continuation?

J5DKKOU1                        Costello - Direct

| 1 | THE WITNESS:  No, your Honor.  We stated to the |
| 2 | defendant that our investigation would be ongoing. |
| 3 | THE COURT:  How long did this meeting take place? |
| 4 | THE WITNESS:  Approximately an hour. |
| 5 | THE COURT:  An hour? |
| 6 | THE WITNESS:  Yes, sir. |
| 7 | BY MS. HOULE: |
| 8 | Q.  Directing your attention to March 22nd, 2017, did you |
| 9 | participate in a phone call that day with an attorney for the |
| 10 | defendant? |
| 11 | A.  Yes. |
| 12 | Q.  What is the name of that attorney? |
| 13 | A.  Mark Denbeaux. |
| 14 | Q.  Did anyone else participate in this call? |
| 15 | A.  Yes. |
| 16 | Q.  Who? |
| 17 | A.  Special Agent Keri Shannon from my squad. |
| 18 | Q.  How did the call proceed? |
| 19 | THE COURT:  Spell that. |
| 20 | THE WITNESS:  Sure.  Keri, K-e-r-i, last name Shannon, |
| 21 | common spelling, S-h-a-n-n-o-n. |
| 22 | THE COURT:  She was a witness -- she was a witness |
| 23 | here, right, Ms. Houle? |
| 24 | MS. HOULE:  Yes, your Honor. |
| 25 | BY MS. HOULE: |

J5DKKOU1                         Costello - Direct

1    Q.  What happened on that call?

2    A.  Mr. Denbeaux stated that he represented Mr. Kourani.  He

3    asked us a couple of questions.

4    Q.  What were those questions?

5    A.  The first of which was if Mr. Kourani was the subject of an

6    FBI investigation.

7    Q.  Did you respond to that?

8    A.  I did.  I stated it is the policy of the FBI not to comment

9    on the status of ongoing investigations.

10   Q.  Did Mr. Denbeaux respond to you?

11   A.  He did.  Mr. Denbeaux stated he did not think Mr. Kourani

12   cared one way or the other if he was the subject of an

13   investigation.  I then told Mr. Denbeaux that he could ask

14   Mr. Kourani why the FBI was interested in speaking with him.

15   Q.  Did Mr. Denbeaux have any other questions?

16   A.  Yes.

17   Q.  What?

18   A.  Mr. Denbeaux asked if the meetings with the FBI would be

19   kept confidential.

20   Q.  How did you respond?

21   A.  We said yes.

22   Q.  Did Mr. Denbeaux ask any additional questions in connection

23   with that confidentiality?

24   A.  Not that I recall, no.

25   Q.  Directing your attention to March 23rd, 2017, did you meet

1    with the defendant that day?

2    A.   Yes.

3    Q.   Where was that?

4    A.   Seton Hall University Law School.

5    Q.   Who was present for that meeting?

6    A.   Myself, Special Agent Keri Shannon, the defendant, and

7    Mr. Denbeaux.

8    Q.   How did the meeting begin?

9    A.   The meeting began by us, myself and Special Agent Shannon,

10   admonishing the defendant that he should tell us the truth

11   regarding his involvement with Hezbollah and to lie to the FBI

12   is a crime.

13           THE COURT:  Maybe I missed that, but in Denbeaux's

14   call of March 21 -- March 22, did it end with a request for a

15   meeting and granting of a meeting?

16           THE WITNESS:  Yes, your Honor.

17           THE COURT:  How did it end?  Tell me about that.

18           THE WITNESS:  To the best of my recollection, we may

19   have already coordinated the meeting for the 23rd, and the 22nd

20   was just a confirmation.  I don't recall precisely, your Honor,

21   but, yes, there was something along the lines of, see you

22   tomorrow.

23           THE COURT:  Who asked for the meeting?

24           THE WITNESS:  Mr. Denbeaux had initially contacted the

25   FBI on behalf of Mr. Kourani.

1          THE COURT:  Did you tell Mr. Denbeaux that you had

2      already told Kourani that you were not interested to talk with

3      him unless he was willing to talk about Hezbollah?

4          THE WITNESS:  No.

5          THE COURT:  Okay.  And the meeting actually occurred?

6          THE WITNESS:  March 23rd, your Honor.

7          THE COURT:  Proceed, Ms. Houle.

8      BY MS. HOULE:

9      Q.  Special Agent, you were describing how the meeting began.

10     A.  We had admonished Mr. Kourani to tell us the truth and that

11     to lie to the FBI could be a crime.  Mr. Kourani then began

12     listing what he wanted for his cooperation, benefits from the

13     government.  We explained to Mr. Kourani that as special agents

14     of the FBI, we can only be advocates for his benefits, but

15     before we could ever provide any advocacy, he would have to

16     tell us the whole and complete truth regarding his personal

17     involvement regarding Hezbollah.

18     Q.  What, specifically, did the defendant request?

19     A.  The defendant requested that his father and sister, who at

20     that time were living in Lebanon, be brought to the United

21     States, and that he have assistance in getting custody of his

22     two children, who, I believe, were living with his wife in

23     Canada.

24     Q.  So, focusing first on the defendant's request with respect

25     to his father, had the defendant's father previously tried to

J5DKKOU1                            Costello - Direct

1    become a United States citizen?

2    A.  Yes.

3    Q.  What happened with that application?

4    A.  It was denied.

5    Q.  If someone has been denied U.S. citizenship, can the FBI

6    request that the person be brought into the United States?

7    A.  Yes.

8    Q.  What does that process entail?

9    A.  The process is called a paroling someone in.  It's

10   colloquially called that.  The FBI makes a request to the

11   Department of Homeland Security, who then works alongside the

12   United States Department of State, to grant that person a visa

13   to enter the United States.  It's a request made by the FBI.

14   Q.  So who makes the final decision about whether the person

15   may be let into the United States?

16   A.  I believe both the Department of Homeland Security and the

17   U.S. State Department.

18   Q.  You said that the defendant also made a request with

19   respect to his children, that they be brought into the United

20   States from Canada; is that correct?

21   A.  Yes.

22   Q.  Were there any challenges to you assisting the defendant

23   with that request?

24   A.  Yes.

25

BY MS. HOULE:

Q.  What challenges?

A.  His children were with his wife who had legal custody of
them in Canada his wife, a Canadian citizen living there
legally.  And it would be very difficult for us to just go get
them or for us to advocate for that.  So we explained to the
defendant that we would have to work in cooperation with the
Canadian government and even then that would be very, very
difficult.

Q.  You said those things to the defendant at the March 23rd
meeting?

A.  Yes.

Q.  Did you make any suggestion to the defendant in connection
with his request regarding his children?

A.  Yes.  We even advised the defendant that he should retain
an attorney who deals specifically with child custody issues.

Q.  Did you discuss any timeframe with the defendant in
connection with his requests?

A.  Yes.

Q.  What was that?

A.  The defendant requested that we, the FBI, provide him a
timeframe that should he cooperate and be truthful with us on
how long it could take to bring his father and sister from
Lebanon.  I felt very uncomfortable giving that answer, as I
previously stated to the defendant, I'm not allowed to make

J5DAAKOU2                        Costello - Direct

1    promises.  I can't make promises.  I'm just an advocate.  And I

2    felt that giving that time estimate could be misconstrued.  I

3    asked for a minute to take a break and I called my supervisor.

4    Q.  What happened after you called your supervisor?

5    A.  I returned to the interview room.  I explained to both the

6    defendant and Mr. Denbeaux that I would provide them an

7    estimate but I wanted them to verbally acknowledge that it was

8    just an estimate, that I was speaking for government agencies

9    that I had no purview over.  And that again, even before any

10   advocacy could happen, we would need the defendant's full and

11   complete knowledge of his involvement with Hezbollah.  The

12   defendant and Mr. Denbeaux did verbally state, I understand

13   that it's just an estimate.  And then told them by the end of

14   summer -- we were meeting in March, so I said end of summer,

15   August of that year.

16   Q.  Special Agent, after you provided this estimate to the

17   defendant, what happened next in the meeting?

18   A.  The defendant thanked me.  Then there was a pause.  He

19   looked down.  He looked up.  And he said "I am 910 Islamic

20   Jihad".

21             THE COURT:  "I am 910th"?

22             THE WITNESS:  "910", your Honor.

23   Q.  What is 910?

24   A.  910 is the Unit number of Hezbollah's Islamic Jihad

25   Organization.

1    Q.  Did you ask the defendant any questions in response?

2    A.  Yes.  I thanked the defendant for that admission and then

3    asked him what it meant to him to be Islamic Jihad.

4    Q.  What did he say?

5    A.  The defendant stated that he is Hezbollah Black Ops and is

6    controlled by the Iranians.

7    Q.  Did the defendant say anything about how he had joined the

8    Islamic Jihad Organization?

9    A.  Yes.  Defendant in that meeting detailed to us both his

10   recruitment into the Islam Jihad Organization and his training.

11   Q.  What did he say about his recruitment?

12   A.  The defendant stated he was initially spotted and recruited

13   by a prominent local Shia sheik who he described at "the watch

14   key".  Forgive me.  I forgot the exact phrase.  But the first

15   individual who recruited him was a local Shia sheik.

16   Q.  Did he gave the name of that sheik?

17   A.  I'm blanking on it right now but he did, yes, I believe

18   Mohammad Kourani.  I may not be sure on that.

19   Q.  What else did the defendant say about his recruitment into

20   the Islamic Jihad Organization?

21   A.  The defendant stated that he also met with members of

22   Hezbollah security apparatus, intelligence apparatus and then

23   finally, he met with a mentor or a single handler with

24   Hezbollah.

25   Q.  Did the defendant provide the name of that handler?

J5DAAKOU2                          Costello - Direct

 1   A.  Yes.

 2   Q.  What was that?

 3   A.  Fadi, F-a-d-i.

 4            THE COURT:  Just a minute.

 5            (Pause)

 6            THE COURT:  I'm sorry.

 7            Go ahead, Ms. Houle.

 8            MS. HOULE:  Thank you, your Honor.

 9   Q.  Did the defendant describe what his responsibilities would

10   be in the Islamic Jihad Organization?

11   A.  Yes.  The defendant stated he would be expected to be

12   operational, to conduct activities on behalf of Islamic Jihad

13   worldwide, both in the United States where he resided at that

14   point, also within Lebanon as well.

15   Q.  You said that the defendant also described his training

16   within Hezbollah?

17   A.  Yes.

18   Q.  What did he say about that?

19   A.  The defendant detailed three separate training sessions he

20   conducted with Hezbollah.

21   Q.  What did he say?

22   A.  The first he detailed to us was a boot camp.  He called it

23   a 45-day training session in the year 2000.  The second and

24   third were training sessions he conducted or took part in once

25   he was a member of Islamic Jihad.

J5DAAKOU2                        Costello - Direct

1   Q.  What did the defendant say, generally, about what those

2   trainings consisted of?

3   A.  The first training, the 2000 training, the year 2000, it

4   was a 45-day boot camp conducted of shooting weapons, small

5   arms, AK-47 rocket-propelled grenades, small units tactics,

6   basic military training.  And then the two training sessions he

7   took part in following the Islam Jihad concerned interview

8   interrogations, counter-interviews.

9   Q.  Did the defendant describe any assignments he completed for

10  the Islamic Jihad Organization?

11  A.  Yes.

12  Q.  What did he say?

13  A.  The defendant detailed three separate assignments that he

14  completed on behalf of the Islamic Jihad Organization.

15  Q.  What were they?

16  A.  The first was he was tasked and he did complete scouting

17  United States military intelligence targets within the New York

18  City metropolitan area on behalf of Islam jihad.

19          The second, he was tasked with finding individuals in

20  the New York City area who could obtain weapons, guns on behalf

21  of Islam Jihad.

22          And the final session was he provided airport security

23  procedure information to Islamic Jihad on U.S. airports.

24  Q.  Did the defendant confirm that he had completed each of

25  those tasks?

1    A.  Yes.

2    Q.  How did the meeting end on March 23?

3    A.  The meeting ended with we thanked the defendant for his

4    time and his admissions.  We tentatively planned to meet again.

5    I again reminded the defendant that although we appreciated his

6    cooperation, until we received the full and complete truth

7    regarding his involvement with Hezbollah, we could not advocate

8    for him receiving any benefits.

9              Mr. Denbeaux and the defendant laughed and said I

10   sounded like a broken record because I had said that so much at

11   the beginning of the meeting.  I said, Give me a break.  I'm

12   just doing by job.

13             THE COURT:  Who asked to break the meeting?

14             THE WITNESS:  I can't recall, your Honor.

15             THE COURT:  Did you want to continue asking questions?

16             THE WITNESS:  No, your Honor.  It was, I think, fairly

17   late at night at that point.  We had met in the early evening,

18   so.

19   Q.  Following this meeting did Mr. Denbeaux send you any

20   communications?

21   A.  Yes.

22   Q.  In What format?

23   A.  I received a text message.

24   Q.  I am showing you Government Exhibit 802.

25             MS. HOULE:  Ms. Shields, if you could bring that up on

1   the screen please.

2            (Pause)

3   Q.  Special Agent, what is this?

4   A.  That is a screen shot from my cellular telephone of the

5   text message I received that night from Mr. Denbeaux.

6   Q.  The message is in yellow.  Who are those from?

7   A.  Mr. Denbeaux.

8   Q.  So, the top message "I understand that you can't promise or

9   guarantee", that was from Mr. Denbeaux?

10  A.  Yes.

11  Q.  And did you write in response, "Thank you.  I'm glad we're

12  on the same page"?

13  A.  Yes.

14  Q.  And this bottom message that's in yellow, "We always were",

15  that's from Mr. Denbeaux, correct?

16  A.  Yes.

17           MS. HOULE:  Thank you, Ms. Shields.  You can take that

18  down.

19           (Pause)

20  Q.  Turning your attention to March 30, 2017, did you have

21  plans with respect to the defendant that day?

22  A.  Yes.

23  Q.  What was supposed to happen?

24  A.  Myself and Special Agent Shannon were supposed to meet with

25  both the defendant and Mr. Denbeaux again at Seton Hall

J5DAAKOU2                        Costello - Direct

1    University Law School.

2    Q.  Did that happen that day?

3    A.  No.

4    Q.  Why not?

5    A.  I believe the defendant confused the dates and was not

6    present when we arrived.

7    Q.  Did you speak with Mr. Denbeaux at Seton Hall that day?

8    A.  Yes.

9    Q.  Was Special Agent Shannon present for that as well?

10   A.  Yes.

11   Q.  What did you discuss with Mr. Denbeaux?

12   A.  We grabbed a quick cup of coffee with Mr. Denbeaux and we

13   provided him information on the Islamic Jihad Organization.  I

14   explained to Mr. Denbeaux that it's a complex trained national

15   terrorist organization responsible for a lot of attacks dating

16   to the two bombings in Argentina in the early 90s, to the

17   Burgas attacks in 2012.  And as such it will take a significant

18   amount of time for the four of us meeting to fully flush out

19   the defendant's knowledge of Islamic Jihad.

20        THE COURT:  Did you elaborate on any of those

21   incidents?

22        THE WITNESS:  Yes, your Honor.

23        THE COURT:  Tell was you said.

24        THE WITNESS:  I stated that Islamic Jihad was

25   responsible for the Jewish Center attack in 1994, the AMIA

J5DAAKOU2                          Costello - Direct

1    bombing in Argentine.

2              THE COURT:  AMIA IS the organization, right?

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  The equivalent of a Jewish cultural

5    center.

6              THE WITNESS:  Yes, your Honor.  And also the bombing

7    in 1992 in Argentina as well.

8              We also provided, discussed with Mr. Denbeaux the 2012

9    Burgas Bulgaria bus attack in which a bus of Israeli tourists

10   was blown up in Bulgaria, along with the Bulgarian bus driver.

11   Q.  How did that meeting with Mr. Denbeaux end?

12   A.  I think Mr. Denbeaux may have texted or called a defendant

13   and we set up a separate date to make up the meeting.

14   Q.  Turning your attention to April 2, 2017, did you have a

15   call that day with Mr. Denbeaux?

16   A.  Yes.

17   Q.  Did anyone else participate in the call?

18   A.  To the best of my recollection, just myself and

19   Mr. Denbeaux.

20   Q.  What was said on this call?

21   A.  Mr. Denbeaux stated he had spoken with the defendant

22   regarding our upcoming scheduled meeting for April the 3rd.  He

23   stated that the defendant stated to him that he remained

24   adamant he should receive benefits for cooperating with the

25   U.S. government.

1        Mr. Denbeaux stated to me that he stated to the

2    defendant that we could not make promises, that he would have

3    to be fully truthful with us first before any advocacy would

4    happen.

5        I thank Mr. Denbeaux for admonishing his client and

6    reminded him that we could only be advocates and we would need

7    the full and complete truth regarding the defendant's

8    involvement with Hezbollah before anything could happen.

9    Q.  Directing your attention to April 3, 2017, did you meet

10   with the defendant that day?

11   A.  Yes.

12   Q.  Where was that meeting?

13   A.  Seton Hall University Law School.

14   Q.  Who was present?

15   A.  Special Agent Shannon, the defendant, myself and

16   Mr. Denbeaux.

17   Q.  How did the meeting begin?

18   A.  The meeting began by Mr. Denbeaux providing us a piece of

19   paper which he stated were his notes.

20   Q.  Did Mr. Denbeaux ask you to do anything with his notes?

21   A.  No.

22   Q.  What did you and Special Agent Shannon do with the notes?

23   A.  We took a few minutes to review them privately in the

24   hallway.

25   Q.  And what happened when you were in the hallway?

1   A.  We reviewed the notes.  We saw some things we agreed with

2   and we disagreed with.

3            MS. HOULE:  Ms. Shields, could you please bring up

4   Government Exhibit 221.

5   Q.  Special Agent, is this the document that Mr. Denbeaux

6   handed you?

7   A.  Yes.

8            MS. HOULE:  Ms. Shields, if you could zoom-in on the

9   top two points there.

10           (Pause)

11  Q.  This says what these meetings are not.  Point One, this is

12  not a plea negotiation nor is it a proffer of any sort.

13           What was your reaction to that point when you reviewed

14  the document?

15  A.  I agreed with it.

16  Q.  Turning to the next point, he is not seeking any kind of

17  immunity or protection.  Let me just stop there.

18           What was your reaction to that portion of Point Two?

19  A.  I agreed with it.

20  Q.  The line continues:  Because it has already been agreed he

21  has committed no crime and faces no prosecution.

22           What was your reaction to that portion of Point Two

23  A.  I disagreed with it.

24  Q.  Why?

25  A.  We had never discussed this with Mr. Denbeaux and the

1  defendant had admitted to being a member of a terrorist

2  organization.

3  Q.  While you were out in the hallway, did you and Special

4  Agent Shannon agree to any particular course of action?

5  A.  Yes.

6  Q.  What was that?

7  A.  We agreed to return to the room and answer any of

8  Mr. Denbeaux's or the defendant's questions regarding the

9  document.

10  Q.  Did you return to the room?

11  A.  Yes.

12  Q.  Did you say anything to Mr. Denbeaux or the defendant about

13  the document when you returned?

14  A.  I believe I stated to Mr. Denbeaux, Those are not your

15  notes.  And then at a point Mr. Kourani began speaking.

16  Q.  Did Mr. Denbeaux ask you any questions about that document?

17  A.  No.

18  Q.  Did the defendant ask you any questions about that

19  document?

20  A.  No.

21          THE COURT:  Before you get off that, leave it up for a

22  minute.

23          Did you and Denbeaux discuss what technically a

24  proffer is?

25          THE WITNESS:  No.

1          THE COURT:  Just left it the way it is.

2          THE WITNESS:  Yes.

3          THE COURT:  The way he said it with no further

4    elaboration?

5          THE WITNESS:  Yes.

6          THE COURT:  Go ahead.

7    Q.  Let's turn to the substance of your meeting with the

8    defendant.

9          You testified that in your prior meetings the

10   defendant described his trainings with Hezbollah?

11   A.  Yes.

12   Q.  Did he discuss that during this meeting?

13   A.  Yes.

14   Q.  What was said?

15   A.  The defendant stated he also attended another different

16   training session once he was recruited into Islamic Jihad.  It

17   was a training session specializing in the use of guns, AK-47s,

18   NP5s, PKN belt-fed machine guns, rocket-propelled grenades and

19   I believe Glock handguns.  He attended his training with Fadi,

20   his Mentor at Islamic Jihad.

21          THE COURT:  Attended with whom.

22          THE WITNESS:  Fadi.

23   Q.  You said that at your prior meeting with the defendant, he

24   described surveillance that he had conducted or the Islamic

25   Jihad Organization.  Was that topic discussed at this meeting?

1    A.   Yes.

2    Q.   What did the defendant say?

3    A.   The defendant stated that he had provided airport security

4    notes specific to JFK airport in Queens, New York to Islamic

5    Jihad.

6    Q.   During this April 3 meeting, did the defendant describe any

7    additional taskings that the IJO had given to him that he had

8    not told you about in the prior meeting?

9    A.   Yes.

10   Q.   What was that?

11   A.   The defendant stated he was tasked by IJO to obtain a

12   United States passport card.

13   Q.   Did the defendant say why the Islamic Jihad Organization

14   wanted him to obtain a passport card?

15   A.   Yes.

16   Q.   What did he say?

17   A.   The defendant stated that the IJO wanted him to obtain a

18   U.S. passport card that should his U.S. passport ever be seized

19   by a security service, he can then fly to Canada or Mexico on

20   his Lebanese passport and then enter the United States using

21   the passport card.

22   Q.   Did the defendant confirmed that he had obtained a U.S.

23   passport card?

24   A.   Yes.  I provided the defendant a copy of the DS11 from his

25   U.S. passport card application and he confirmed it as his.

1   Q.  Did you again meet with the defendant on April 5, 2017?

2   A.  Yes.

3   Q.  Was that meeting also held at Seton Hall?

4   A.  Yes.

5   Q.  Who was present?

6   A.  Myself, Special Agent Shannon, the defendant and

7   Mr. Denbeaux.

8   Q.  Did you participate in this meeting with the defendant?

9   A.  Not entirely, no.

10  Q.  What happened?

11  A.  The defendant requested to conduct the interview one-on-one

12  alone with Special Agent Shannon.

13  Q.  Did that occur?

14  A.  Yes.

15  Q.  Directing your attention to April 14, 2017, did you meet

16  with the defendant that day?

17  A.  Yes.

18  Q.  Was that also at Seton Hall?

19  A.  Yes.

20  Q.  Who was present for that meeting?

21  A.  Myself, Special Agent Shannon from my squad, the defendant

22  and Mr. Denbeaux.

23  Q.  During this meeting did you show the defendant any

24  photographs?

25  A.  Yes.

1    Q.  I am showing you what's in evidence as Government Exhibit

2    803.

3            MS. HOULE:  Ms. Shields, if you could bring that up on

4    the screen please.

5            (Pause)

6    Q.  Special Agent, what is shown here in this photo?

7    A.  26 Federal Plaza, the FBI's New York field office.

8    Q.  Did you show the defendant this photo during your meeting

9    on April 14?

10   A.  Yes.

11   Q.  What did the defendant say?

12   A.  The defendant stated or positively IDed it as a location

13   that he conducted surveillance of on behalf of the IJO.

14           MS. HOULE:  Ms. Shields, if you could turn to page

15   two, please.

16   Q.  What is this location?

17   A.  This is a U.S. Army National Guard facility in Harlem, New

18   York.

19   Q.  Did you show the defendant this photo on April 14?

20   A.  Yes.

21   Q.  What did he say?

22   A.  The defendant positively ID it as a location he surveilled

23   on behalf of the Islamic Jihad Organization.

24           MS. HOULE:  If you could turn to page five please and

25   rotate the picture.

J5DAAKOU2                          Costello – Direct

 1              (Pause)

 2    Q.  What's shown here?

 3    A.  The United States Secret Service New York field office in

 4    Brooklyn, New York.

 5    Q.  Did you show this photo to the defendant on April 14?

 6    A.  Yes.

 7    Q.  What did he say?

 8    A.  He positively identified it as a location he surveilled on

 9    behalf of Islam Jihad.

10              MS. HOULE:  If you could turn to page eight please.

11              (Pause)

12    Q.  What is shown here?

13    A.  That is the U.S. Army or U.S. Army 69 Regiment Armory in

14    lower Manhattan.

15    Q.  And did you show the defendant this photo?

16    A.  Yes.

17    Q.  What did he say?

18    A.  He positively identified it as a location that he scoured

19    and surveilled on behalf of the Islamic Jihad.

20    Q.  Did the defendant tell you how he had provided this

21    information to the Islamic Jihad Organization?

22    A.  Yes.

23    Q.  What did he say?

24    A.  He stated he provided it on a micro SD card.

25    Q.  And where did he bring that micro SD card?

1    A.  To Lebanon.

2    Q.  Did he say who he provided it to?

3    A.  Yes.  His handler, Fadi, or someone else with Islamic

4    Jihad.

5    Q.  During that meeting, did the topic of sleeper cells come

6    up?

7    A.  Yes.

8    Q.  What was said?

9    A.  The defendant stated he was a sleeper cell of Iran and

10   Hezbollah in the United States and in the event of a war

11   involving Iran or Hezbollah and the United States or Israel, he

12   would be expected to conduct activities in the United States or

13   anywhere else in the world.

14   Q.  Directing your attention to April 19, 2017, did you

15   participate in a phone call that day with Mr. Denbeaux?

16   A.  Yes.

17   Q.  Was anyone else on call?

18   A.  To the best of my recollection, just myself and

19   Mr. Denbeaux.

20   Q.  What was said on this call?

21   A.  Mr. Denbeaux stated he had spoken with the defendant

22   regarding an upcoming meeting and they felt it was in the

23   defendant's best interests to continue to meet with the FBI.

24   Q.  Did you respond?

25   A.  Yes.  I thanked him for that and I believe I confirmed our

1    upcoming meeting.

2    Q.   Directing your attention now to April 25, 2017, did you

3    participate in another phone call that day with Mr. Denbeaux?

4    A.   Yes.

5    Q.   Was anyone else on the call?

6    A.   To the best of my recollection, just myself and

7    Mr. Denbeaux.

8    Q.   What was said on this call?

9    A.   Mr. Denbeaux stated he had spoken with the defendant

10   regarding our planned meeting for the following day and that he

11   was confident the defendant would have a, quote, big day.

12   Q.   Turning your attention to that next day, April 26, 2017,

13   did you meet with the defendant that day?

14   A.   Yes.

15   Q.   Was that meeting also at Seton Hall?

16   A.   Yes.

17   Q.   Who was presented for that meeting?

18   A.   Myself, Special Agent Shannon, the defendant and

19   Mr. Denbeaux.

20   Q.   During that meeting, did the defendant raise the timing of

21   his recruitment into the Islamic Jihad Organization?

22   A.   Yes.

23   Q.   What did he say?

24   A.   The defendant stated when he had previously told us that he

25   was recruited into Islamic Jihad in 2010 that he had lied and

1  that he was, in fact, recruited in 2008.

2  Q.  Did the defendant say why he had previously given you a

3  different date?

4  A.  Yes.

5  Q.  What did he say?

6  A.  The defendant stated he did not want us, the government, to

7  know that he was a member of Hezbollah prior to obtaining

8  United States citizenship.

9  Q.  Did the defendant say why he had obtained United States

10  citizenship?

11  A.  Yes.

12  Q.  What did he say?

13  A.  He was tasked to obtain it by the Islamic Jihad

14  Organization.

15  Q.  Did the topic of the defendant's trainings come up during

16  this meeting?

17  A.  Yes.

18  Q.  What did he say?

19  A.  The defendant provided information on another separate

20  training session that occurred in an area called Birkat Jabrur.

21  Q.  Did the defendant describe what happened at that training?

22  A.  Yes.  It was a training in eastern Lebanon in the Bekaa

23  Valley where the defendant, along with other masked Islamic

24  Jihad operatives, were trained on weapons, attack tactics,

25  grenades, AK-47s, machine guns.

1          THE COURT:  Same stuff as before?

2          THE WITNESS:  Somewhat, your Honor.  My understanding,

3   this was a bit more less shooting and more tactics.

4          THE COURT:  What's the date of this meeting in Lebanon

5   training session?

6          THE WITNESS:  I don't recall exactly, your Honor.

7          THE COURT:  Did he give you a time, an estimate, days?

8   What was it?

9          THE WITNESS:  To the best of my recollection, this may

10  have been in 2011, your Honor.

11  Q.  Did the topic of the Israeli Defense Force come up at the

12  meeting?

13  A.  Yes.

14  Q.  What was said?

15  A.  The defendant stated he was tasked by the Islamic Jihad

16  Organization to identify high ranking IDF members in the New

17  York City area for assassination or recruitment.

18  Q.  Did the defendant say what, if anything, he did in response

19  to this tasking?

20  A.  Yes.

21  Q.  What did he say?

22  A.  The defendant stated he returned to New York and then

23  queried the social media business networking website LinkedIn

24  using such search terms like IDF and was able to identify

25  multiple individuals who were former or current members of the

J5DAAKOU2                          Costello - Direct

1    Israeli Defense Force.

2    Q.  What, if anything, did the defendant say about what

3    information he provided to the Islam Jihad Organization?

4    A.  Following this when he was in Lebanon being debriefed by

5    Fadi, his mentor, he stated to Fadi that you could identify IDF

6    members through LinkedIn.

7    Q.  Turning your attention to May 1, 2017, did you speak with

8    Mr. Denbeaux by phone that day?

9    A.  Yes.

10   Q.  Did anyone else participate in that call?

11   A.  Not to my recollection, no.

12   Q.  What was said on that call?

13   A.  Mr. Denbeaux called me to inquire, regarding any updates or

14   benefits for the defendant.

15   Q.  Did you respond?

16   A.  I again reminded Mr. Denbeaux that I was just an advocate

17   and our investigation was ongoing and I had no updates.

18   Q.  Directing your attention to May 3, 2017, did you receive a

19   message from Mr. Denbeaux that day?

20   A.  Yes.

21   Q.  I am showing what's been marked for identification as

22   Government Exhibit 8028.

23           What is that?

24   A.  It's a screen shot from my cellular telephone, a text

25   message sent to me from Mr. Denbeaux.

1            MS. HOULE:  The government offers Exhibit 808.

2            MR. SCHACHT:  No objection, your Honor.

3            THE COURT:  Received.

4            (Government's Exhibit 808 received in evidence)

5            MS. HOULE:  If you could please pull this up on the

6    screen.

7            (Pause)

8            MS. HOULE:  And if you could focus in, Ms. Shields,

9    from the top of the message through point three.

10           (Pause)

11   Q.  There are several phone numbers listed on this text

12   message, Special Agent.  Can you explain what they indicate?

13   A.  Sure.  So, the number on the left, (917)617-7039, is also

14   on the text.  That's a number I know to be the defendant's.

15   And then the number on the right, (201)214-6785, is

16   Mr. Denbeaux's number.

17           And then finally, you can see the text comes from the

18   6785 number, Mr. Denbeaux.

19   Q.  This message begins:

20           Based on my personal knowledge the following facts are

21   true.  The conclusion of our last meeting -- and I am going to

22   move down to point three -- that you and I would talk about the

23   government's plans to provide the assistance agreed upon.

24           What was your reaction to that portion of the message

25   from Mr. Denbeaux?

1    A.  I didn't understand it and didn't agree with it.

2    Q.  What didn't you agree with?

3    A.  We at no point ever agreed on any assistance from the

4    defendant.

5            THE COURT:  You had represented that you would

6    advocate.

7            THE WITNESS:  Yes, your Honor.  We stated multiple

8    times to both the defendant and Mr. Denbeaux that should the

9    defendant provide us the full and complete truth regarding his

10   involvement with Hezbollah that we would advocate.

11           THE COURT:  Go ahead.

12           MS. HOULE:  Ms. Shields, if you could zoom-out and

13   turn to the next page, please, and then if you could zoom-in on

14   point four through the bottom.

15           This is a continuation of the text message; is that

16   right, Special Agent?

17   A.  Yes.

18   Q.  Point four says:

19           When I called you about the government's plans, you

20   said two things.  My client had given you nothing that you did

21   not know already and that you had nothing for his assistance.

22           What was your reaction to that portion of the message?

23   A.  I didn't understand it.

24   Q.  Why not?

25   A.  Well, I believe Mr. Denbeaux was paraphrasing a

1    conversation we had, the conclusion of the fifth meeting with

2    Mr. Kourani on May 26, where I had said to him that the

3    defendant still had more knowledge regarding Hezbollah.

4    Q.  The message continues:

5            That means as his children who are American citizens

6    remain in danger along with his other family members.

7            What was your reaction to that portion of the message?

8    A.  It was -- I didn't understand it.

9    Q.  Were you aware of any danger that his children or family

10   members were in?

11   A.  No.  The defendant had provided us some information on his

12   mother-in-law.  But outside of that, we had no information

13   indicating any danger to both his children or his family

14   members in Lebanon.

15           THE COURT:  Was the defendant concerned about the

16   safety of his children?

17           THE WITNESS:  No, your Honor, not to my understanding,

18   no.  I felt that he did not like his in-laws and felt that they

19   were not going to raise his children as he would like them to

20   be raised but I knew of no safety concerns, your Honor.

21           THE COURT:  Did he express any fear or concern about

22   his father and sister in Lebanon?

23           THE WITNESS:  No.

24   Q.  The message continues:

25           And he has been abandoned after days of voluntary

1    cooperation to the government.  I am ashamed as an American and

2    as his lawyer.

3             What was your reaction to that portion of the message?

4    A.  I didn't understand that either.

5    Q.  Did you agree that the defendant had engaged in voluntary

6    cooperation to his government?

7    A.  Yes.

8    Q.  The message concludes with a question, How do you feel?

9    What did you do after you received this message?

10   A.  I called Mr. Denbeaux.

11   Q.  And what happened when you called him?

12   A.  I explained to Mr. Denbeaux that given the defendant had

13   admitted to being a member of a designated foreign terrorist

14   organization who had conducted operational activities in the

15   United States, that it would be very difficult for us to

16   discuss any advocacy for benefits at this point, and that

17   finally, someone else from the U.S. Government would be getting

18   in touch.

19            At that point, Mr. Denbeaux became very angry and

20   stated he would go to the media.

21   Q.  How did the call end?

22   A.  After that, I believe, Mr. Denbeaux hung up.

23   Q.  Directing your attention to May 17, 2017, did you again

24   speak by phone with Mr. Denbeaux that day?

25   A.  Yes.

1    Q.  Did you anyone else participate in that call?

2    A.  To my recollection, just my set and Mr. Denbeaux.

3    Q.  What was said on the call?

4    A.  Mr. Denbeaux stated he had spoken with the defendant and

5    the defendant wanted to return to Lebanon as he felt it was the

6    best chance to regain custody of his children.

7    Q.  Did Mr. Denbeaux ask you any questions about the defendant

8    returning to Lebanon?

9    A.  Yes.

10   Q.  What did he ask you?

11   A.  Mr. Denbeaux asked me if he felt it would be safe for the

12   defendant in Lebanon.

13   Q.  What did you do?

14   A.  I stated, the best question to ask that question would be

15   the defendant.

16   Q.  What did you do with the information from Mr. Denbeaux that

17   the defendant intended to travel to Lebanon?

18   A.  I immediately relayed it to my supervisors at the FBI.

19   Q.  Why did you do that?

20   A.  At that point our investigation was progressing.  We did

21   not want the defendant attempting to the flee the country.

22            MR. SCHACHT:  Objection.

23            THE COURT:  Is that what you told the supervisor?

24            THE WITNESS:  I provided the supervisor the

25   information regarding the defendant's desire to return to

1    Lebanon.

2              THE COURT:  Side bar.

3              (Continued on next page)

1          (side bar)

2          THE COURT:  What's the basis of the objection?

3          MR. SCHACHT:  I have multiple bases.  The first one is

4     his conversations with his supervisor are hearsay, unless

5     they're offered for some reasonable --

6          THE COURT:  Ms. Houle.

7          MS. HOULE:  I didn't ask about the specifics of his

8     conversation with his supervisor, your Honor.  I asked if he

9     had escalated the information about the defendant's intent to

10    flee.  I believe that that's relevant, particularly, since

11    defense counsel has made arguments regarding whether the FBI

12    should have arrested the defendant.

13         THE COURT:  That's so much of that statement you're OK

14    with.

15         MR. SCHACHT:  Well, I object first of all, to the use

16    of the word "flee" or "flight".  I've never in my --

17         THE COURT:  Well, that's his words.  I'll tell the

18    jury --

19         MR. SCHACHT:  In 30 years of, a defense lawyer never

20    calls the FBI and says my client's fleeing.

21         THE COURT:  So, you object to that as well?

22         MR. SCHACHT:  It's not flight.  Flight is when someone

23    secretly runs away.

24         THE COURT:  I think I'm going to sustain the

25    objection.

J5DAAKOU2                      Costello - Direct

1             MS. HOULE:  As to the comment made about flight, your

2     Honor, because I could separately inquire --

3             THE COURT:  Yes, because it's not taken for the truth.

4     It is reporting to the supervisor so that's the only thing

5     that's relevant.  And if the supervisor can be a witness, then

6     that would be something else.  But we take it up there.  But at

7     this point everything else is hearsay.

8             MS. HOULE:  May I inquiry, your Honor, of the witness

9     as to why the FBI was concerned that the defendant might travel

10    to Lebanon?

11            THE COURT:  No, no.

12            (Continued on next page)

13            (In Open Court)

14            THE COURT:  Members of the jury, the conversation with

15    the supervisor is hearsay.  All that is relevant is that

16    Mr. Costello reported to his supervisor.  What Costello said

17    and what the supervisor said are hearsay and you should not pay

18    any attention to it at all.  It is stricken from the record.

19            The last part is that Denbeaux tells Costello that his

20    client -- and Mr. Costello reports that fact to his supervisor.

21    What happens next you can ask.

22            MS. HOULE:  Thank, your Honor.

23    Q.  May 26, 2017, did you speak with Mr. Denbeaux by phone

24    again that day?

25    A.  Yes.

1    Q.  Did anyone else participate in this phone call?

2    A.  To the best of my recollection, just myself and

3    Mr. Denbeaux.

4    Q.  What was said on this call?

5    A.  Mr. Denbeaux stated he had spoken with the defendant.

6              THE COURT:  Mr. Denbeaux called you or you called

7    Denbeaux?

8              THE WITNESS:  I believe Mr. Denbeaux called me, your

9    Honor.

10   Q.  What was said on this call?

11   A.  Mr. Denbeaux stated he had spoken with the defendant and

12   the defendant at that point wanted to relocate to the midwest

13   of the U.S.

14   Q.  Did Mr. Denbeaux ask you any questions in connection with

15   the defendant's ability to travel?

16   A.  Yes.

17   Q.  What did he ask you?

18   A.  Mr. Denbeaux stated that in conversations with the

19   defendant he had learned the defendant to possibly be on the

20   no-fly list with the U.S. government.  Mr. Denbeaux asked me if

21   I knew the defendant to be on the no-fly list.  I stated that

22   it was the policy of the FBI not to comment on that.

23   Q.  Did you relay the information for Mr. Denbeaux about the

24   defendant's intent to travel to anyone?

25   A.  Yes, to my supervisor of the FBI.

1   Q.  You've testified about several meetings and conversations

2   that you had with the defendant and Mr. Denbeaux.  During any

3   of these conversations did Mr. Denbeaux ever ask you whether

4   the defendant could have immunity?

5   A.  No.

6   Q.  Did the defendant ever ask you about immunity?

7   A.  No.

8   Q.  Would you have been able to offer immunity?

9   A.  No.

10  Q.  Why is that?

11  A.  As a Special Agent in the FBI, that's not within my powers.

12  Q.  Was an arrest warrant ultimately obtained for the

13  defendant?

14  A.  Yes.

15  Q.  When was that?

16  A.  May 31, 2017.

17  Q.  When was the defendant arrested?

18  A.  The following day June 1, 2017.

19  Q.  And as part of that arrest, was the defendant transported

20  to 26 Federal Plaza on June 1?

21  A.  Yes.

22  Q.  Once at 26 Federal Plaza, did the defendant ask to make any

23  phone calls?

24  A.  Yes.

25  Q.  Did he make any calls?

J5DAAKOU2                           Costello - Direct

1    A.   Yes.

2    Q.   Who did he call?

3    A.   I believe he called Mr. Denbeaux.

4    Q.   How many times?

5    A.   Twice.

6    Q.   Following the defendant's calls to Mr. Denbeaux, did the

7    defendant make any statements to you?

8    A.   Yes.

9    Q.   What did he say?

10   A.   The defendant stated he wanted a new lawyer and they wanted

11   to cooperate with the FBI.

12   Q.   Was the defendant provided a new lawyer?

13   A.   Yes.

14   Q.   What was that?

15   A.   Peggy Cross-Goldenberg.

16   Q.   Directing your attention to the following day, June 2,

17   2017, did you meet with the defendant that day?

18   A.   Yes.

19   Q.   Who was present?

20   A.   Myself, Special Agent Keri Shannon, Assistant United States

21   Attorney Emil Bove and Amanda Houle, the defendant and Peggy

22   Cross-Goldenberg.

23   Q.   At the beginning of this meeting did the defendant sign an

24   agreement with the U.S. Attorney's Office?

25   A.   Yes.

J5DAAKOU2                    Costello - Direct

1    Q.   Did you observe him sign that agreement?

2    A.   Yes.

3    Q.   Did you keep a copy for your records?

4    A.   Yes.

5    Q.   Have you retrieved a copy in connection your testimony?

6    A.   Yes.

7    Q.   I am showing you what's been marked for identification as

8    Government Exhibit 810.  Is that the agreement that the

9    defendant signed on June 2?

10   A.   Yes.

11             MS. HOULE:  The government offers 810.

12             MR. SCHACHT:  No objection, your Honor.

13             THE COURT:  Received.

14             (Government's Exhibit 810 received in evidence)

15             MS. HOULE:  Ms. Shields, if you could please publish

16   the first page, and if you could zoom-in on the top paragraph.

17             (Pause)

18             MS. HOULE:  So, this is an agreement between the

19   defendant, Ali Kourani, his attorney and Assistant United

20   States Attorneys Emil Bove and Amanda Houle, on behalf of the

21   United States Attorney's Office for the Southern District of

22   New York.

23             Ms. Shields, if you could zoom-out an turn to the

24   second page and if you could zoom-in on the signature blocks.

25   Q.   Special Agent, who signed above the line that says

1    "client"?

2    A.  The defendant.

3    Q.  After the defendant signed this agreement --

4           THE COURT:  Are you going to do anything more with the

5    agreement?

6           MS. HOULE:  No, your Honor.  I am going to ask the

7    witness what happened next after he signed the agreement.

8           THE COURT:  The agreement is now in evidence.

9           MS. HOULE:  Yes, your Honor.

10           THE COURT:  No one knows what the contents are except

11    you and Mr. Schact.

12           MS. HOULE:  I believe, your Honor, that the government

13    will focus on certain portions of the agreement in closing.

14           THE COURT:  It's my policy that when you put any

15    document into evidence, the jury sees it and you go over it

16    with the jury so the jury gets an understanding of what's in

17    it.  Do you follow that?

18           MS. HOULE:  That's fine, your Honor.  I have a few

19    additional questions I can ask this witness.

20           THE COURT:  Put the agreement back up then.  Why don't

21    we let the jury read it.  It's in evidence.  Shouldn't they

22    understand it?

23           MS. HOULE:  Yes, your Honor.

24           THE COURT:  Go ahead.  OK.  Do it.  You don't need to

25    ask questions.  You could just let the jury read it.

1            MS. HOULE:  Ms. Shields, if you could zoom-in on the

2     top paragraphs labeled one, two and three please.

3            (Pause)

4            THE COURT:  What's a proffer agreement?  Do you know?

5            THE WITNESS:  Yes, your Honor.

6            THE COURT:  What is it?

7            THE WITNESS:  As an agreement entered between members

8     of the United States Attorney's Office and a defendant and his

9     attorney, the defendant will provide information regarding

10    criminal activity.

11           THE COURT:  What is the government's obligation with

12    you?

13           THE WITNESS:  That should the defendant be completely

14    truthful that they will not hold those statements against him.

15           THE COURT:  So, the government's promise is

16    conditioned upon the government's belief that full and truthful

17    information was given?

18           THE WITNESS:  Yes, your Honor.

19           THE COURT:  Go ahead.

20    Q.  Stating in paragraph three of this agreement, there are

21    certain conditions that --

22           THE COURT:  What's a cooperation agreement?

23           MR. SCHACHT:  Your Honor, I object to this.

24           THE COURT:  OK.  Then I sustain the objection.

25    Q.  In paragraph three of this agreement there are certain

J5DAAKOU2                          Costello - Direct

1   circumstances under which the government may use the

2   defendant's statements against him.  Was that portion of the

3   agreement reviewed with the defendant during this meeting on

4   June 2?

5   A.  Yes.

6           MS. HOULE:  You can take that down, Ms. Shields.

7           THE COURT:  Leave it up.

8           (Pause)

9           THE COURT:  OK.  These are the paragraphs you consider

10  relevant; is that right?

11          MS. HOULE:  Your Honor, these are the paragraph that

12  specifically relate to the defendant's statements that were

13  viewed at the beginning of the meeting.  There's another

14  portion of the agreement that I can highlight as well.

15          THE COURT:  Yes.

16          MS. HOULE:  Ms. Shields, if you could pull the

17  agreement back up in terms of page two.

18          (Pause)

19          MS. HOULE:  And if you could focus in on point six

20  please.

21          (Pause)

22          MS. HOULE:  Thank you.

23          Ms. Shields, you can take that down.

24          THE JUROR:  Your Honor, there were other paragraphs,

25  we didn't see.

1          THE COURT:  You want to show those?

2          MS. HOULE:  Sure.  Ms. Shields, if you could pull it

3     up and turn to page two.

4          (Pause)

5          MS. HOULE:  If you could turn to page one and focus on

6     paragraph four.

7          (Pause)

8          THE COURT:  Take it down.

9          (Pause)

10          THE COURT:  Sentencing is not an issue for the jury.

11     And other things in that agreement are not an issue for the

12     jury.  Typically, with a long document and also with a shorter

13     document, I ask counsel to relate to the jury that which

14     counsel considers relevant or useful for summation in this case

15     and for consideration by the jury in this case.

16          And defendant is privy to do the same thing with this

17     document in evidence.  So, we'll just be satisfied with what

18     Ms. Houle has developed and if Mr. Schact wants to develop

19     anything else, he may.  And the jury should consider that those

20     parts that they develop are the parts that are useful to this

21     case.

22          THE JUROR:  (Nodding).

23     BY THE COURT:

24     Q.  After the defendant reviewed the proffer agreement with his

25     counsel and the U.S. attorneys was the defendant asked

1    questions?

2    A.  Yes.

3    Q.  And during this June 2 meeting, was the defendant asked

4    about the things that he had previously admitted to you and

5    Special Agent Shannon about his involvement in Islamic Jihad

6    organization and Hezbollah?

7    A.  Yes.

8    Q.  What did the defendant say?

9    A.  The defendant stated that everything he did with Hezbollah

10   was true.

11   Q.  And did he address specifically what he had told Special

12   Agent Shannon about previously?

13   A.  Yes.

14   Q.  What did he say?

15   A.  He stated everything was true.

16          MS. HOULE:  One moment, your Honor?

17          Thank you.  No further questions.

18          THE COURT:  Let's take our midmorning break, members

19   of the jury.  Close your books.  Leave them on your chair.  Be

20   back in ten to.  Don't discuss the case.  Keep an open mind.

21          (Jury not present)

22          THE COURT:  See you in 15 minutes.

23          (Recess)

24          THE COURT:  Bring out the jury.

25          (Jury present)

1              THE COURT:  Be seated, everyone.

2              Mr. Costello, you remain under oath.

3              Mr. Schact, begin the cross-examination.

4              MR. SCHACHT:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MR. SCHACHT:

7    Q.  Agent Costello, you mentioned several times on

8    direct-examination that you'd spoken to a supervisor.  Was that

9    Gary Baptista you were talking about or somebody else?

10   A.  Somebody else.

11   Q.  Who was that you were speaking about?

12   A.  Supervisor Special Agent Jeffrey Hunter.

13   Q.  And it was since that timeframe that Gary Baptista was, the

14   head of CT-9?

15   A.  Yes.

16   Q.  Do you recall testifying on direct-examination about the

17   fact that my client told you he'd had essentially three

18   separate training sessions?

19   A.  Yes.

20   Q.  The first session I think, you said he said was in the year

21   2000?

22   A.  Yes.

23   Q.  And at that time he would have been approximately 16 years

24   old; is that right?

25   A.  Yes.

JOSEPH COSTELLO                Costello - Cross

1    Q.  And he told that you that training session was a Hezbollah

2    training session?

3    A.  Yes.

4    Q.  You mentioned before that my client had said that he had

5    transported the results of some surveillance that he'd done on

6    what you called a micro SD card; is that correct?

7    A.  Yes.

8    Q.  What is a micro SD card?

9    A.  A small device I guess, device you would put files on for

10   electronic files.

11          THE COURT:  Size of a fingernail.

12          THE WITNESS:  Yes, your Honor.  I think they can carry

13   in size micro SD cards.

14   Q.  And on an SD card you can have video files, for example, if

15   you took a video; is that right?

16   A.  Yes.

17   Q.  And that's different.  A micro SD card is different than

18   what people call a SIM card; is that right?

19   A.  I'm not sure.

20   Q.  You're not sure.

21          You've mentioned before that the training that he

22   described to you, he gave you, I think you used the word a

23   detailed description of his training; is that right?

24   A.  Yes.

25   Q.  And you yourself have had training, is that right, to

JOSEPH COSTELLO                  Costello - Cross

1   become an FBI agent?

2   A.  Yes.

3   Q.  And prior to that when you worked for the state department

4   you received extensive training I imagine; is that fair to say?

5   A.  Yes.

6              THE COURT:  One minute, please.

7              MR. SCHACHT:  Yes your Honor.

8              (Pause)

9              THE COURT:  Please come up off the record.

10             (Discussion held of the record)

11             THE COURT:  We're going to stop the testimony for a

12   short while for personal reasons.

13             (Recess)

14             THE COURT:  You can resume questioning.

15             MR. SCHACHT:  Thank you, your Honor.

16   Q.  Agent Costello, do you recall my client mentioning the term

17   "sleeper cell" or "sleeper agent", something to that effect?

18   A.  Yes.

19   Q.  Do you remember that he told you that he got that term from

20   the Israeli Mossad?

21   A.  No.

22   Q.  Do you recall him telling you that the Israeli Mossad had

23   sought to recruit what my client called "sleepers"?

24   A.  I do recall something to that effect, yes.

25   Q.  And my client explained to you that the point of a sleeper

JOSEPH COSTELLO              Costello - Cross

1   was that it would be someone who could live or maintain an

2   ostensibly normal life but secretly be working for some enemy;

3   do you recall that?

4   A.  Yes.

5              MR. SCHACHT:  Would you please put up Exhibit 808 when

6   you can on the screen and would you please zoom-in on the point

7   number four.  Thank you very much.

8              (Pause)

9   Q.  You'd mentioned before that this was a part of a text

10  message that my client's former lawyer, Mark Denbeaux, had sent

11  to you?

12  A.  Yes.

13  Q.  Do you see where Mr. Denbeaux says that you supposedly had

14  said that the defendant had given you nothing that you did not

15  already know and that he hadn't helped you essentially; do you

16  see that?

17  A.  Yes.

18  Q.  And was what Mr. Denbeaux said correct; had you stated that

19  to Mr. Denbeaux?

20  A.  No.

21  Q.  Had you said anything remotely like that?

22  A.  No.

23  Q.  Do you recall you and Mr. Denbeaux and Ali Kourani

24  discussing the danger to his family members in Lebanon?

25  A.  Not sure.  More specificity, please.

JOSEPH COSTELLO              Costello - Cross

1   Q.  Do you recall talking with my client about an incident he

2   had with his ex-wife and his mother-in-law and an argument that

3   they had about child rearing?

4   A.  Yes.

5   Q.  Do you recall that at the end of this problem that my

6   client had with his wife's family, a group of people he'd said

7   from Hezbollah tried to shoot up my client's family's house in

8   Lebanon; do you recall that?

9   A.  Not in those words, no.

10  Q.  Well, do you recall talking to him about an incident in

11  which people tried to shoot at his family's house?

12  A.  No.

13  Q.  So, when you said to me, not in those words, what did you

14  recall from my question in different words?

15  A.  The defendant stated once he received his kids from his

16  wife's family's home he returned to his home where his wife's

17  family members who were, he stated, Hezbollah militia members

18  surrounded his home for a few days.

19  Q.  And so, did you not think that if Hezbollah militia members

20  were surrounding my client's relatives that that might be

21  dangerous for his relatives?

22  A.  No.

23          MS. HOULE:  Objection.

24          THE COURT:  Overruled.

25          MR. SCHACHT:  Can you take that off the screen.

JOSEPH COSTELLO                    Costello – Cross

1           Thank you.

2   Q.  In this case would it be fair to say that the FBI was

3   physically surveilling meaning, literally following my client

4   for a number of years?

5   A.  Yes.

6   Q.  Do you know how many years the FBI was physically following

7   Ali Kourani?

8   A.  No.

9   Q.  Can you approximate?

10  A.  Sure.  The case was opened at approximately 2013.  There

11  was physical surveillance begun then and intimately from then.

12  Q.  And in addition to the physical surveillance you meaning,

13  the FBI, were listening to his phone calls, right?

14  A.  Yes.

15  Q.  And reading his e-mail, yes?

16  A.  Yes.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MR. SCHACHT:

2    Q.   And reading his email, yes?

3    A.   Yes.

4    Q.   And text messages?

5    A.   Yes.

6    Q.   And WhatsApp messages?

7    A.   Some.

8    Q.   It's your testimony, am I right, that you, meaning an FBI

9    agent, is not authorized to offer to an informant or possible

10   informant any kind of benefits?  Is that fair to say, that

11   that's what you have testified to?

12   A.   We can offer benefits.  We cannot make promises of

13   benefits.

14   Q.   What kind of benefits are you allowed, as an FBI agent, to

15   offer?

16   A.   The FBI can provide cash rewards for information.

17   Q.   Anything else?

18   A.   No, not that I know of.  Not off the top of my head.

19   Q.   If you know, what is necessary for an FBI agent to be able

20   to offer cash to an informant or a possible informant?

21   A.   Supervisory approval.  I think up to the special agent in

22   charge of the office.

23   Q.   Now, do you recall testifying previously, on March 26,

24   2018, in a hearing in the same case?

25   A.   Yes.

J5DKKOU3                    Costello - Cross

1   Q.  Do you recall, at that hearing, saying that FBI agents were

2   not allowed to offer cash to witnesses or informants?

3   A.  Yes.

4   Q.  And, so, in that time period, between that hearing and

5   today, you've learned that your prior testimony on that point

6   was incorrect; is that fair to say?

7   A.  Yes.

8   Q.  And you subsequently learned that prior to you meeting Ali

9   Kourani, that another FBI agent in the case, named Gary

10   Battista, had offered cash money to my client; is that right?

11   A.  No.

12   Q.  Do you recall that my client told you that one of his

13   motivations for speaking to you was that he wanted revenge on

14   his wife's family?  Do you recall talking to my client about

15   that?

16   A.  Yes.

17   Q.  What did my client say about wanting revenge on his wife's

18   family?

19   A.  To the best of my recollection, the client wanted the FBI

20   to add his wife's family to the No Fly List to prevent them

21   from transiting U.S. airways or utilizing U.S. air carriers.

22   Q.  You understood this to be a result of him being upset and

23   angry about his dispute with his wife and his wife's family?

24   A.  Yes.

25   Q.  Do you recall that, in addition to the benefits my client

1    was asking in terms of having his children, and his sister, and

2    his father given certain immigration help, he also was

3    interested in his brother, Moustapha?

4    A.  No.

5    Q.  Do you recall that on April 26, 2017, you were meeting with

6    my client at Seton Hall Law School?

7    A.  Yes.

8    Q.  Do you recall that at the end of the meeting, or during the

9    meeting, you told my client that Moustapha's deportation

10   proceedings had been deferred or delayed?  Do you recall that?

11   A.  Yes.

12   Q.  And the way that you knew about that was because someone

13   from Immigration and Customs Enforcement, a man named Adam

14   Panopoulos, had told you that his brother's deportation

15   proceeding was being deferred.  Do you recall that?

16   A.  No.

17   Q.  I would like to show you a document, which, for

18   identification purposes, is 3501-33, and ask you -- it's not in

19   evidence, so you can't read it out loud, but if you could just

20   quietly read that document to yourself, and I ask you, after

21   you've read it, whether that refreshes your recollection about

22   your email interaction with Mr. Panopoulos from Immigration and

23   Customs Enforcement?

24   A.  Yes.  Forgive me.  Myself and another agent on my old squad

25   received an email from Mr. Panopoulos that day.

1   Q.  So you had learned that Moustapha, the brother's,

2   deportation proceeding had been deferred, right?

3   A.  Correct.

4   Q.  And I think you were in the lobby of Seton Hall Law School

5   with my client, and my client thanked you for helping to defer

6   the immigration proceeding; is that fair to say?

7   A.  No.

8   Q.  My client -- you hadn't, by the way, personally done

9   anything to help Moustapha, right?

10  A.  Yes.

11  Q.  Yes, you had helped or --

12  A.  Sorry.  I had not done anything personally as a special

13  agent of the FBI to help Moustapha.

14  Q.  But my client thanked you because he was under the

15  impression that you had caused the deferral, right?

16  A.  No.

17  Q.  Do you recall him thanking you?

18  A.  Yes.

19  Q.  What did he thank you for?

20  A.  Something along the phrase of giving him the heads-up.

21  Q.  The heads-up about what?

22  A.  That his brother's immigration proceedings had been

23  deferred.

24  Q.  Now, as a result of your investigation in the case, you

25  developed an FBI agent-witness relationship with my client; is

1    that fair to say?

2    A.  I'm not sure I understand the question.

3    Q.  Well, you weren't friends with my client, right?

4    A.  No.

5    Q.  You had a professional relationship with him?

6    A.  Yes.

7    Q.  And my client asked you for help in obtaining a job; is

8    that right?

9    A.  Asked for the FBI's help.

10   Q.  And you, though, as the point person for the FBI, or one of

11   two point people for the FBI, in dealing with him, received an

12   email from my client asking for your help, right?

13   A.  Yes.

14           Well, no.  Forgive me, no.

15   Q.  Well, did he send you two copies of a resume?

16   A.  Yes.

17   Q.  And I think he did that in the middle of the time period

18   when you were meeting with him, having the five meetings; is

19   that right?

20   A.  Yes.

21   Q.  Did you read those resumes?

22   A.  No.

23   Q.  Did you open up the attachment?

24   A.  Maybe briefly, to see what they were, but beyond that, no.

25   I mean, I opened them, yes.

1    Q.   Did you notice that in one of the resumes, he lists being a

2    manager of some clothing companies, such as New Spot Fashion?

3    A.   No.

4    Q.   New Spot Fashion, by the way, that was one of the

5    counterfeit clothing businesses that my client was involved in,

6    right?

7    A.   Yes.

8    Q.   So did it strike you as odd or unusual that, under the

9    circumstances in which you knew each other, he would be asking

10   for your help in getting a job?

11   A.   Yes.

12   Q.   And it must have seemed especially unusual in that you were

13   an FBI agent, and he was listing a counterfeit clothing

14   business on his resume?

15   A.   No.  Again, I had not seen that on the resume.

16   Q.   When my client told you about getting the military

17   training, do you recall him telling you about being taken to

18   some location that was a drive away from where he was living?

19   A.   Yes.

20   Q.   And it was in a van or a truck that had windows blacked

21   out; is that right?

22   A.   Yes.

23   Q.   And the purpose of this, based upon your conversation with

24   my client, was that so anybody in the truck who was being

25   driven to some location would not know where they are, right?

J5DKKOU3                          Costello - Cross

1    A.  Yes.

2    Q.  And did he also mention about how he, and possibly other

3    people he was with, had their heads actually covered, so they

4    couldn't see where they were?

5    A.  Yes.

6    Q.  When my client was arrested, you took what is known in law

7    enforcement as some pedigree information from him; is that

8    right?

9    A.  Yes.

10   Q.  And pedigree information, generally, is things like

11   somebody's height, and weight, and what their address is, and

12   their phone number?

13   A.  Yes.

14   Q.  Did you also check his shoe size?

15   A.  Not that I recall, no.

16   Q.  Do you recall, if you know, learning that he wears size 11

17   shoes?

18   A.  No.

19   Q.  Do you recall him telling you that he used an alias,

20   calling himself Jacob was one of his -- a name that he used?

21   A.  Yes.

22   Q.  And that the name Jacob was for the purpose of the

23   counterfeit clothing business, so he wouldn't use his real

24   name?

25   A.  No.

1    Q.  No, he didn't say that, or, no, you don't recall?

2    A.  No, the defendant spoke regarding aliases, but I don't

3    remember the context.  I believe he stated he had multiple

4    aliases, some of them affiliated with Hezbollah.

5    Q.  Do you recall which aliases he used supposedly for

6    Hezbollah?

7    A.  A few, yes.  Or a couple, I suppose.

8    Q.  Did you personally look at my client's Facebook page and

9    the postings on it in connection with your investigation?

10   A.  Yes.

11   Q.  On his Facebook page, did you notice that he had some

12   people -- I think my son says they're called friends, I'm not

13   on Facebook, but that he had friends that posted pictures of

14   people with weapons?

15   A.  Yes.

16   Q.  But that those pictures were not posted by him, by my

17   client, but by his so-called friends?

18   A.  Yes.

19   Q.  You mentioned before that the address 335 Adams Street,

20   Brooklyn, houses one of the offices of the United States Secret

21   Service.  Do you remember testifying to that?

22   A.  Yes.

23   Q.  That's not a -- withdrawn.

24          The address, if you Google the United States Secret

25   Service office in New York, are you aware that that's

J5DKKOU3                        Costello - Cross

1   identified as the public office for the United States Secret

2   Service in the New York area?

3   A.  No.

4   Q.  That they actually have a Facebook page for 335 Adams

5   Street Secret Service, are you aware of that?

6   A.  No.

7   Q.  Did my client, at some point, ask you whether you, meaning

8   the FBI, were listening to his phone calls?

9   A.  Yes.

10  Q.  And at the time that he said that, am I right, you believed

11  him to be trying to get intelligence from you about what you

12  were investigating and doing?

13  A.  No.  I stated to the defendant that we can't comment on an

14  ongoing investigation, left it at that.

15  Q.  Right.  But I'm asking whether you thought he was trying to

16  learn about your investigation by asking that question.

17  A.  Yes, it's -- actually, withdraw that.  He did call to say

18  about what I thought, but I don't recall.

19  Q.  Okay.

20          On direct examination, you mentioned that -- and

21  you're right, I think it was your initial phone call with

22  Mr. Denbeaux, he had asked if the conversation or conversations

23  that were going to happen between Denbeaux's client, Ali

24  Kourani, and yourselves would be confidential, and you said

25  yes; is that right?

1    A.  No.

2    Q.  What is wrong about what I just said?

3    A.  My understanding was Mr. Denbeaux wanted the meetings with

4    the FBI to be kept confidential.

5    Q.  So that Mr. Denbeaux wanted the fact that you had met

6    confidential; is that what you're saying?

7    A.  Yes.

8    Q.  But he wasn't interested in confidentiality for what his

9    client said at the meetings?

10   A.  It wasn't discussed.  It was just a two-sentence exchange.

11   I think he said something along the lines of, will our meetings

12   with the FBI be kept confidential?  We said, yes.

13   Q.  When you said yes, what did you mean by the word

14   "confidential"?

15   A.  That we would be keeping it confidential at that time.

16   Q.  But what does the word "confidential" mean?

17   A.  Kept quiet.

18   Q.  Well, right now, you're talking about them in a public

19   courthouse, and they're being recorded.  Are you now violating

20   that promise of confidentiality?

21   A.  No.

22   Q.  Why not?

23   A.  It was never a promise.

24   Q.  It wasn't a promise?

25   A.  No.

1   Q.  So when you say to someone, this is going to be

2   confidential, that's not a promise to you?

3   A.  No.  At that point, it was difficult -- excuse me, it

4   wasn't difficult.  We didn't know what was going to happen.  We

5   didn't know what Mr. Kourani was going to say, we didn't know

6   what Mr. Denbeaux was going to say, and we had met in a public

7   place, so...

8   Q.  So wouldn't it have been more honest for you to have said,

9   I don't know whether I can keep it confidential because I don't

10  know what anyone's going to say at this meeting?

11  A.  No.

12  Q.  That would not have been more honest, in your mind?

13  A.  I can't speak to what's more or less honest.

14  Q.  Why can't you?

15  A.  I don't really understand the question.

16  Q.  You don't understand the question whether it's more honest

17  to say to someone, in a human interaction, I don't know what's

18  going to happen in the future, instead of misleading them?  You

19  don't know that?

20  A.  I would not say we were misleading him.  We answered him

21  yes.  And to say that more would also be more honest.  Or

22  honest, excuse me.

23  Q.  But you didn't want to be fully honest, I assume, because

24  you didn't want to scare away Mr. Kourani, right?

25  A.  No.

J5DKKOU3                          Costello - Cross

1   Q.  Well, why weren't you more honest, then, if you weren't

2   worried about scaring him away?

3   A.  Again, we didn't know where the meetings were going to go.

4   At that point, multiple members of the FBI had met with

5   Mr. Kourani, and we hadn't received any information regarding

6   his involvement with Hezbollah, and subsequent to that, we did

7   interview multiple people in the community regarding

8   Mr. Kourani.

9   Q.  Okay.  By the way, the multiple people you say you've

10  interviewed, none of them is a witness here in court, right?

11  A.  Not that I know of, no.

12  Q.  Now, the confidentiality, though, that you promised --

13  withdrawn.

14          Your use of the word "confidentiality" or

15  "confidential" was done because you wanted to convince him to

16  speak to you, right?

17              MS. HOULE:  Objection.

18              THE COURT:  Overruled.

19              THE WITNESS:  No.

20  BY MR. SCHACHT:

21  Q.  When Mr. Denbeaux handed you his page of notes, which is

22  Government Exhibit 221, you mentioned that there were some

23  things in it that you agreed with and some things you disagreed

24  with, right?

25  A.  Yes.

J5DKKOU3                          Costello - Cross

1    Q.  And one of the things you disagreed with was the line where

2    Mr. Denbeaux says, "Because as it has already been agreed, he

3    has committed no crime and faces no prosecution," you disagreed

4    with that sentence, right?

5    A.  Yes.

6    Q.  But you and Agent Shannon, after going out in the hallway

7    and discussing it together, decided that you would not say

8    anything about that disagreement, right?

9    A.  No.

10   Q.  And your thinking at the time was, you were here at the

11   meeting to hear what Ali Kourani had to say, right?

12   A.  Yes.

13   Q.  And you weren't interested in Mr. Denbeaux's thoughts at

14   that time, right?

15   A.  No.

16   Q.  And that's despite --

17          THE COURT:  No, you were not interested?  We've got a

18   double negative here.

19          THE WITNESS:  We were there for Mr. Kourani's

20   information, your Honor.

21   BY MR. SCHACHT:

22   Q.  And you didn't care that Mr. Denbeaux, at least, was under

23   the impression that there was some agreement that you had not

24   agreed to?

25   A.  No.

J5DKKOU3                          Costello - Cross

1    Q.  Were you not concerned about how that misunderstanding

2    would affect Ali Kourani?

3    A.  No.

4    Q.  Because all you wanted was, at that point, his information,

5    right?

6    A.  Yes.

7    Q.  Weren't you worried that, under those circumstances, he

8    might tell you things that were not true?

9    A.  I'm not sure I understand the question.

10            THE COURT:  Were you worried that he might tell you

11   things not true?

12            THE WITNESS:  Anytime I interview someone, I'm worried

13   they're not going to tell me the truth.

14            THE COURT:  Say that again?

15            THE WITNESS:  Anytime I would interview someone in the

16   course of my official duties, I would be concerned whether

17   they're telling me the truth or not.

18            THE COURT:  What do you mean by "concerned"?  You

19   anticipate that that might happen?

20            THE WITNESS:  Yes.

21   BY MR. SCHACHT:

22   Q.  Would you agree that in your experience interviewing

23   people, you're more likely to get honest information if there

24   was a clear understanding between the people who were talking

25   about what the consequences and the rules of the conversation

1    are?  Right?

2    A.  No.

3    Q.  Well, when you met with Peggy Cross-Goldenberg, and the

4    prosecutors here in the courtroom, and my client, you had a

5    written agreement about what could be used and said, right?

6    A.  Yes.

7    Q.  And you testified that that's an agreement that needs to be

8    signed by a prosecutor, right?

9    A.  Yes.

10   Q.  And that agreement lays out how the information can be

11   used, if at all, and under what circumstances, right?

12   A.  Yes.

13   Q.  It was discussed by Peggy Cross-Goldenberg, the two

14   prosecutors, and Ali Kourani, right?

15   A.  Yes.

16   Q.  And that was in your presence?

17   A.  Yes.

18   Q.  And that was done so that Ali Kourani would understand what

19   the rules of the conversation were, right?

20   A.  Yes.

21   Q.  Yet, when you, and Denbeaux, and Kourani spoke, there was

22   in your mind, at least, a very clear misunderstanding about

23   what the rules were, right?

24   A.  No.

25   Q.  No?

1          Well, when you read that line that says, "He faces no

2   prosecution," didn't you think that that was a misunderstanding

3   between you and Denbeaux?

4   A.  I didn't agree with the line.  I can't speak to the

5   understanding.

6          THE COURT:  Well, if he had an honest understanding in

7   what he wrote, and you had an honest understanding that was

8   different, your understandings are not the same?

9          THE WITNESS:  Yes, your Honor.

10          THE COURT:  But you didn't know if he had an honest

11   understanding of what he wrote?

12          THE WITNESS:  Correct.

13          MR. SCHACHT:  Thank you, your Honor.

14   BY MR. SCHACHT:

15   Q.  Now, with regard to the assistance that my client wanted

16   bringing his family to the United States, that's an area in

17   which you say you were not authorized to make any promises

18   because you need to go to another agency, right?

19   A.  Yes.

20   Q.  Among other reasons?

21   A.  Yes.

22   Q.  And that's why you and Denbeaux had the conversation, I

23   think at the first meeting, that was followed by Denbeaux

24   saying, I understand you can't guarantee or promise anything,

25   right?

J5DKKOU3                          Costello - Cross

1    A.  No.

2    Q.  No?  Well, when -- withdrawn.

3           In the first meeting, Denbeaux and Kourani were

4    pushing you to make promises, is that fair to say, about

5    helping his family?

6    A.  No.

7    Q.  They weren't?

8    A.  No.

9    Q.  Were they asking for promises?

10   A.  No.

11   Q.  Were they asking for help?

12   A.  Yes.

13   Q.  And you told them that you can try to help, but that you

14   can't promise; is that fair to say?

15   A.  Yes.

16   Q.  And they were pushing you, or at least Ali Kourani was

17   pushing you, to give sort of on the calendar a deadline or a

18   time period in which he could expect to get some relatives

19   here, right?

20   A.  Yes.

21   Q.  And you and Agent Shannon didn't want to be pinned down,

22   you testified, right, because you didn't know what you could

23   do, and you didn't know what he was going to say; is that fair

24   to say?

25   A.  Yes.

1   Q.   So, at some point in that conversation, you called the

2   supervisor, right?

3   A.   Yes.

4   Q.   And then was it in that same meeting where you gave, or you

5   and Agent Shannon gave, a kind of rough deadline, or timeline,

6   saying by the end of the summer of 2017, we might be able to

7   help?

8   A.   Not in those words, no.

9   Q.   Do you recall what words you used?

10  A.   Yes.

11  Q.   What words did you use?

12  A.   I was very specific that it wasn't a deadline, that it was

13  not a --

14          THE COURT:   You said it was an estimate, but what was

15  the estimate?

16          THE WITNESS:   End of summer.

17          THE COURT:   Of 2017?

18          THE WITNESS:   Yes, your Honor.   So we were meeting in

19  March, so August.

20          THE COURT:   So if he gave you what you considered full

21  and truthful information, you represented that you would

22  advocate the position of Kourani with regard to immigration?

23          THE WITNESS:   Yes.   Yes, your Honor.

24  BY MR. SCHACHT:

25  Q.   What was your basis for coming up with that estimate?   Why

J5DKKOU3                          Costello - Cross

1    did you say end of summer instead of one week or three years?

2    How did you come up with that timeline?

3    A.   Just thinking how long it takes for people to get issued

4    visas and my kind of understanding of it.  You have interviews

5    at the embassies of those who want the visas.  Obviously, a lot

6    of emails have to be exchanged, information exchanged of

7    Mr. Kourani's information he's providing to multiple government

8    agencies.  And I've been working for the government for a

9    little bit, so that stuff can take some time longer.

10              THE COURT:  What was the date of the meeting when you

11   made these representations?

12              THE WITNESS:  It was -- if I saw my notes, I could

13   remember better.  I'm trying to remember the exact date, your

14   Honor.

15              THE COURT:  Not exactly, approximate.

16              THE WITNESS:  March 23rd, 2017.

17              THE COURT:  March of 2017?

18              THE WITNESS:  Correct, your Honor.

19              THE COURT:  And the end of the summer, let's say,

20   would be September of 2017?

21              THE WITNESS:  Sure.  Yes, your Honor.

22              THE COURT:  So about six months?

23              THE WITNESS:  Yes.

24              THE COURT:  To advocate a position, but you weren't in

25   that advocate position until you got full and truthful

J5DKKOU3                          Costello - Cross

1    information?

2             THE WITNESS:  Yes, your Honor.

3             THE COURT:  You didn't know when you'd get that?

4             THE WITNESS:  Yes, your Honor.

5             THE COURT:  So, from that time, it would take six

6    months?

7             THE WITNESS:  Yes.  So, say in the course of that

8    month, we had received full and truthful information, even

9    then, still.

10             THE COURT:  So he gave you a lot of information that

11    particular evening when you were together with Professor

12    Denbeaux in Seton Hall University?

13             THE WITNESS:  Yes.

14             THE COURT:  And you said, well, it's late, let's call

15    it off, and we'll meet again, and you met a few days later?

16             THE WITNESS:  Yes, your Honor.

17             THE COURT:  I'm sorry, you go ahead.

18    BY MR. SCHACHT:

19    Q.  How long after that meeting did Denbeaux send you that text

20    message?

21    A.  Approximately 15 minutes, if I recall.

22    Q.  And that was -- according to those text messages that are

23    in evidence, that was about 4:50 p.m. on that day?  Does that

24    sound right to you?

25    A.  Yes.

1   Q.  Now, at each successive meeting, of the five meetings at

2   Seton Hall, is it fair to say that Denbeaux and Kourani were

3   becoming more and more impatient with you and Shannon not doing

4   anything?  Is that fair to say, to help the family get here?

5   A.  No.

6   Q.  Well, did you not have arguments with them about this topic

7   specifically?

8   A.  No.

9   Q.  So when you got the text message from Denbeaux in which he

10  says he's ashamed and how do you feel, did that come as a total

11  shock to you, out of the blue, that he was speaking to you in

12  that way?

13  A.  Yes.

14  Q.  Is it your testimony that between the March 23rd meeting

15  and you getting that text message, that Kourani and Denbeaux

16  never mentioned help with immigration in between those two

17  events?

18  A.  Oh, we discussed it, but there were never arguments.

19  Q.  And the discussions involved Kourani and Denbeaux

20  essentially accusing the FBI of dragging its feet, right?

21  A.  No.

22  Q.  What did the discussions involve?

23  A.  Sometimes in the meetings, Mr. Kourani would say -- for

24  example, I believe in the second meeting or the fourth

25  meeting -- forgive me, I don't remember which exactly --

1    Mr. Kourani said he wanted a doorman building in Manhattan or a

2    salary, and so instead of talking about, say, immigration

3    benefits, he would say that.  I would remind Mr. Kourani that

4    no matter what he wanted, whether it be immigration benefits or

5    anything else, that we would need the whole and complete truth

6    regarding his involvement with Hezbollah, and only then, could

7    we advocate on his behalf.

8                THE COURT:  You are starting to mumble.

9                THE WITNESS:  Sorry.

10               Restate everything, your Honor?

11               THE COURT:  Pardon?

12               THE WITNESS:  Would you like me to restate everything?

13               THE COURT:  No, no, just --

14   BY MR. SCHACHT:

15   Q.  When he asked you for a doorman building in Manhattan, did

16   that strike you as similar to the situation where he was asking

17   you for help in getting a job, it was highly unusual?

18   A.  I don't really understand the question.

19   Q.  Well, have you ever had anybody in your career who was a

20   witness ask you for a doorman building in Manhattan, from the

21   FBI?

22   A.  Not that I recall, no.

23   Q.  And so when he asked you, can you get him a doorman

24   building in Manhattan to live in, didn't that strike you as

25   unusual, in your experience?

J5DKKOU3                              Costello - Cross

1    A.  No, not at that point.

2    Q.  That struck you as a kind of normal demand for somebody in

3    his situation, who's just told you, according to you, that he's

4    a terrorist?

5    A.  No.

6    Q.  That didn't seem strange to you?

7    A.  No.  I'm saying that is a little unusual, but it was more

8    in line with a lot of his demands, so...

9    Q.  Which would be unusual, right?

10   A.  Compared to the others, yes.

11   Q.  You've testified here that he told you, essentially, that

12   he was working for a foreign terrorist organization, right?

13   A.  Yes.

14   Q.  And, at the same time, he's asking you for a doorman

15   building in Manhattan, right?

16   A.  Yes.

17   Q.  And he's asking you to help get him a job that pays

18   approximately $120,000 a year?

19   A.  Yes.

20   Q.  And he's asking you to bring a lot of relatives here,

21   including one, his father, who's barred from the United States

22   for ten years, right?

23   A.  No.

24              THE COURT:  No what?

25              THE WITNESS:  My understanding is his father could be

1    paroled.

2    BY MR. SCHACHT:

3    Q.  Other than the father being able to be paroled in,

4    everything else about my question, you'd agree with, right?

5    A.  He had discussed his father being brought here, yes.

6    Q.  So everything about that question, you'd agree with, right?

7           I can redo it.

8    A.  Please.

9    Q.  He told you he worked for Hezbollah and the Islamic Jihad

10   Organization, correct?

11   A.  Yes.

12   Q.  And at the same time, literally in the same meeting, he's

13   asking you to get him an apartment with a doorman?

14   A.  Yes.

15   Q.  And he's asking you to help bring his family here?

16   A.  Yes.

17   Q.  And he's asking you to help get him a $120,000-a-year job

18   in New York City, right?

19   A.  Yes.

20   Q.  And so my question is:  In that context, you've never, ever

21   spoken to a witness or a suspect who's behaved in that strange

22   a way, right?

23   A.  No.

24           THE COURT:  No, you haven't?

25           THE WITNESS:  No, I have spoken --

1                  THE COURT:  You have?

2                  THE WITNESS:  Yes.

3       BY MR. SCHACHT:

4       Q.  You've met other people who've told you they're members of

5       Islamic Jihad?

6                  THE COURT:  I don't think we need to get into that.

7       Q.  Were you worried at all --

8                  THE COURT:  Did the request that Denbeaux made or

9       Kourani made seem strange to you?

10                 THE WITNESS:  Which specific?

11                 THE COURT:  The request that the FBI should get him a

12      $120,000 job and find him an apartment in a very nice

13      neighborhood in Manhattan with a doorman?

14                 THE WITNESS:  Yes.

15                 THE COURT:  That's strange?

16                 THE WITNESS:  Yes, your Honor.

17                 THE COURT:  Did you ever get that kind of request

18      before?

19                 THE WITNESS:  No, your Honor.

20                 THE COURT:  Is that what you wanted, Mr. Schacht?

21                 MR. SCHACHT:  Thank you, your Honor.  Thank you very

22      much.

23                 THE COURT:  No charge.

24      BY MR. SCHACHT:

25      Q.  You were considering, if he was, in your view, fully

1   honest, having Mr. Kourani be an informant for the FBI, right?

2   A.  No.

3   Q.  Well, what was your purpose in speaking to him?

4   A.  To obtain all the information he had regarding his

5   involvement with Hezbollah.

6   Q.  And so there was no thought, in your mind, about maybe he

7   can help you to work against Hezbollah?

8   A.  There was.

9   Q.  And so maybe I shouldn't have used the word "informant,"

10  but you were seeking his help to help you fight against

11  Hezbollah?

12  A.  I was seeking his information.

13  Q.  Well --

14          THE COURT:  So you could --

15          THE WITNESS:  Yes.

16          THE COURT:  -- potentially make use of it?

17          THE WITNESS:  Yes, to counter Hezbollah.

18          THE COURT:  On behalf of the United States?

19          THE WITNESS:  Yes, your Honor.

20  BY MR. SCHACHT:

21  Q.  And when you were telling him that it was possible that you

22  could provide him with certain benefits, you were telling him

23  the truth, right?

24  A.  Yes.

25  Q.  You weren't lying to him about possible ways you could help

J5DKKOU3                          Costello - Cross

1   him, right?

2   A.  No.

3   Q.  You could only do that, though, it's your testimony, if he

4   became fully honest and a witness or informant, whatever word

5   you prefer, for the government, right?

6   A.  Yes.

7   Q.  And so --

8   A.  If I may?

9   Q.  No.  She can ask you on redirect.

10              At the time that he was arrested, the morning he was

11  arrested, there was a complaint signed by you against him,

12  right?

13  A.  Yes.

14  Q.  And that complaint was sealed, yes?

15  A.  Yes.

16  Q.  And sealed, in this context, means not open to the public?

17  A.  Yes.

18  Q.  And it was kept sealed for -- I'm not sure how many days,

19  but at least until after the meeting that you and Peggy

20  Cross-Goldenberg, and the prosecutors, and Mr. Kourani had,

21  right?

22  A.  Yes.

23  Q.  And the reason why you kept it sealed -- when I say "you,"

24  I mean the United States kept it sealed -- was to preserve the

25  possibility of him still being able to be a witness, right?

1    A.  Yes.

2    Q.  And then, eventually, it was unsealed, correct?

3    A.  Yes.

4    Q.  In all of these interactions at the five meetings that

5    we've discussed at Seton Hall, were you concerned -- based upon

6    his answers to your questions and his requests of you, were you

7    concerned at all about his mental state?

8    A.  I don't understand the question.

9    Q.  Were you concerned about his mental stability, whether he

10   could be a good informant or witness?

11   A.  No.

12   Q.  Were you concerned about his ability to operate as an

13   informant for you based upon your interviews with him?

14   A.  No.

15   Q.  Did you not think that his conduct in, for example, using

16   an Ali Kourani Gmail account, supposedly to be a Hezbollah

17   agent, was indicative of his lack of seriousness?

18   A.  No.

19   Q.  Did you think that his operating a counterfeit clothing

20   business while supposedly a sleeper agent for Hezbollah, that

21   that was indicative of his inability to be a reliable witness?

22   A.  No.

23   Q.  During these five meetings, you did not ask him, did you,

24   for any supporting evidence to support -- physical evidence --

25   to support the evidence that he was ever a member of 910,

1   right?

2   A.   No.

3           MR. SCHACHT:  I have no other questions.  Thank you.

4           THE COURT:  Redirect?

5           MS. HOULE:  Just briefly.  Thank you, your Honor.

6   REDIRECT EXAMINATION

7   BY MS. HOULE:

8   Q.   Special Agent, you were asked some questions about your

9   conversations with the defendant regarding the term "sleeper

10  cell"?

11  A.   Yes.

12  Q.   And you were asked whether there was additional

13  conversation having to do with Mossad and sleeper cells, right?

14  A.   Yes.

15  Q.   To be clear, what did the defendant say about his function

16  within a sleeper cell?

17  A.   The defendant stated he considered himself a part of a

18  sleeper cell.

19  Q.   You were asked some questions, Special Agent, about the

20  complaint being sealed in this case?

21  A.   Yes.

22  Q.   And that there was a time when the complaint was unsealed,

23  correct?

24  A.   Yes.

25  Q.   Why was the complaint unsealed at that point?

A.  At that point, we had assessed that the defendant was still

withholding information regarding his involvement with

Hezbollah.

        THE COURT:  Speak clearly.

        THE WITNESS:  At that point, we, in accordance with

the United States Attorney's Office, felt the defendant was

still withholding information regarding his involvement with

Hezbollah.

        THE COURT:  He had more to tell you?

        THE WITNESS:  Yes, your Honor.

        THE COURT:  And you felt he hadn't given it to you?

        THE WITNESS:  Yes, your Honor.

        MS. HOULE:  No further questions, your Honor.

        MR. SCHACHT:  Very briefly, your Honor.

RECROSS EXAMINATION

BY MR. SCHACHT:

Q.  You felt like he wasn't being honest with you, right?

A.  No.

        MR. SCHACHT:  Thank you.

        MS. HOULE:  Very briefly, your Honor?

        THE COURT:  Okay.

J5DKKOU3                        Costello - Recross

1    REDIRECT EXAMINATION

2    BY MS. HOULE:

3    Q.  You were just asked whether you thought the defendant was

4    being honest with you, Special Agent.  Did you think he was

5    being honest about his operations within Hezbollah?

6    A.  He was being honest, yes.  There was a bit -- yes, he was

7    being honest.

8               THE COURT:  He was telling you --

9               THE WITNESS:  He was telling us the truth.

10              THE COURT:  What he told you was true, but he also had

11   more information to give?

12              THE WITNESS:  Yes, your Honor.

13              MS. HOULE:  Thank you, your Honor.  No further

14   questions.

15              THE COURT:  Who gets the last word?  Who asks the last

16   question.

17   RECROSS EXAMINATION

18   BY MR. SCHACHT:

19   Q.  You felt that he was being honest, even though you had been

20   following him for a couple of years and couldn't come up with

21   any evidence against him?

22              MS. HOULE:  Objection.

23              THE COURT:  Sustained.

24              MR. SCHACHT:  No further questions.

25              THE COURT:  Okay.  You're excused.

J5DKKOU3

1              THE WITNESS:  Thank you, your Honor.  Thank you.

2              (Witness excused)

3              THE COURT:  Should we start a new witness now or after

4    lunch?

5              MR. BOVE:  The next witness is about half an hour,

6    Judge.  It might be a good time for a lunch break.

7              THE COURT:  Okay.  Let's take a lunch break now, until

8    2:15.  Close up your books give them to Ms. Jones.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Be seated.  I want to ask you a question.

3           Attempt to commit a crime is alleged in Count One and

4   Count Six of the indictment.  Is there really a case for

5   attempt?

6           MS. HOULE:  Your Honor, we do believe that it's

7   appropriate to have an attempt instruction here.  The defense

8   appears to be arguing that the defendant did not do much on

9   behalf of Hezbollah and --

10          THE COURT:  Does it make any difference if he did much

11  or little?

12          MS. HOULE:  We agree, your Honor, but we think that

13  argument could be confusing to the jury, so they should

14  understand that even an attempt would be sufficient to find him

15  guilty.

16          THE COURT:  But we're charging aiding and abetting and

17  willfully causing.  I fear that the prolixity of all these

18  instructions and their contention of what should be found is

19  potentially confusing.  Do you have any opinion on this,

20  Mr. Schacht?

21          MR. SCHACHT:  I mean, yes, Judge.  And my opinion -- I

22  was rereading the indictment last night -- is it's really long,

23  and some of the charges -- obviously, they have separate legal

24  elements, and they're technically legal, but I just think it

25  will bring more confusion to the jury.  I'm not expecting the

J5DKKOU3

```
1    government to consent to dismiss any counts, but --

2              THE COURT:  My feeling is that either he did it or he

3    didn't do it, and --

4              MS. HOULE:  Your Honor, you separately raised the

5    aiding and abetting instruction, which the government would

6    agree that that's not necessary to provide to the jury, but we

7    do think that the attempt instruction is important.

8              THE COURT:  If I can eliminate aiding and abetting and

9    willfully causing, I can deal with the situation.  I don't

10   think the jury will be confused.

11             MS. HOULE:  Thank you, your Honor.

12             THE COURT:  So I should --

13             MS. HOULE:  We will have the attempt instruction, but

14   not the aiding and abetting instruction?

15             THE COURT:  Yes.  There's also willfully causing.

16             MS. HOULE:  Right.  That's fine, your Honor.

17             THE COURT:  So we'll just deal with the crime itself,

18   the conspiracy to commit the crime, which is Count Two and

19   Count Four, and the attempt to commit the crime.

20             MS. HOULE:  Yes, your Honor.

21             THE COURT:  Okay.

22             MS. HOULE:  Thank you.

23             THE COURT:  Are you all right, Mr. Schacht?

24             MR. SCHACHT:  Yes.  Thank you very much, Judge.

25             THE COURT:  That is okay?
```

1          MR. SCHACHT:  Yes.  Thank you, your Honor.

2          THE COURT:  Thank you.

3          See you after lunch.

4          Another question:  I want to read the indictment.  I

5    think the indictment is a very difficult document to

6    understand.  And the way we did it -- you can sit -- the way we

7    did it in the voir dire seemed to me to be accurate.  You can

8    deal with that when we come together for the charging

9    conference, so you might have that in mind, or you can give me

10   a pared-down indictment that I can read.

11         MS. HOULE:  Okay.  Thank you, your Honor.  We'll

12   discuss it with defense counsel.

13         THE COURT:  I'd like to read the substantive

14   paragraphs.  I don't mean to exclude conspiracy.  As I raise a

15   count, I want to read that specific aspect of the indictment,

16   so if you can give me a pared-down indictment without the

17   emotive words, just the crime alleged, that would be good.  Can

18   you do that?

19         MS. HOULE:  Yes, your Honor.

20         THE COURT:  Great.  Okay, thanks.

21         MR. SCHACHT:  Thank you.

22         Are we done?  May I leave, your Honor?

23         THE COURT:  Yes.

24         MS. HOULE:  Your Honor, may we have one moment?

25         (Pause)

1          MS. HOULE:  Your Honor, I just want to make sure that

2     we understand the request.  So what your Honor is proposing is

3     that we would provide you a copy of the indictment that just

4     has the statutory allegations without, for example, the to wit

5     clauses and the overt acts alleged?

6          THE COURT:  I'm not directing you what to do, and you

7     may not be able to do it, but if you can eliminate that which

8     is not necessary in the indictment, so I can read something

9     intelligent to the jury, that would be helpful.

10          It would be good, also, if there was agreement between

11     counsel as to what properly should be read.

12          MS. HOULE:  Thank you, your Honor.

13          So we'll confer with defense counsel and come up with

14     a proposal for what your Honor would read from the indictment

15     in connection with the instruction on each charge.

16          THE COURT:  Yes.  Thank you.

17          MS. HOULE:  Understood.

18          THE COURT:  I'm not directing you.  I'm making this as

19     a suggestion.

20          MS. HOULE:  Thank you, your Honor.

21          THE COURT:  Thanks.

22          All right.  We're breaking for lunch.

23          (Luncheon recess)

24

25

AFTERNOON SESSION

2:15 p.m.

1

2

3          THE COURT:  Be seated.

4          Ms. Houle, how do you attempt to procure

5  naturalization fraud?

6          MS. HOULE:  By filing a fraudulent application, your

7  Honor.

8          THE COURT:  How do you attempt to provide substantial

9  assistance to a terrorist organization?  I'm failing to

10  understand the concept and I'd like some help at the end of the

11  session today.

12          MS. HOULE:  Understood, your Honor.

13          THE COURT:  OK.  Shall we get the jury?

14          MR. BOVE:  Yes, your Honor.

15          THE COURT:  Are we going to finish today?

16          MR. BOVE:  I expect so.  There are two witnesses left,

17  Margaret Shields, whose direct examination is about a half an

18  hour and David Smith from the ATF.  His direct is also about a

19  half hour or 40 minutes.

20          THE COURT:  We have no witnesses now on the stand?

21          MR. BOVE:  That's correct.

22          THE COURT:  So, the next witness will be?

23          MR. BOVE:  Margaret Shields.

24          THE COURT:  Where is she?  Right here.  OK.  Come up.

25          MR. BOVE:  Thank you, judge.

1            (Jury present)

2            THE COURT:  Be seated, everyone.

3            Mr. Bove has the next witness, Ms. Margaret Shields,

4    and first Ms. Jones will swear Ms. Shields.

5     MARGARET SHIELDS,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. BOVE:

10   Q.  Ms. Shields, where do you work?

11   A.  I work at the United States Attorney's Office.

12   Q.  And how long have you worked at U.S. Attorney's Office?

13   A.  About a year and a half.

14   Q.  What's your title there right now?

15   A.  I am a paralegal specialist.

16   Q.  For about how long have you been a paralegal at the U.S.

17   Attorney's Office?

18   A.  For about a year now.

19   Q.  What did you do before that?

20   A.  I was a college student.

21   Q.  Now, in addition to your work in a courtroom for this trial

22   did you also prepare some summary charts?

23   A.  Yes, I did.

24   Q.  Did some of those charts relate to the evidence of the

25   internet activity after defendant's laptop and e-mail account?

J5DAAKOU4                         Shields - Direct

1    A.  Yes, they do.

2              MR. BOVE:  So, I'd like to start by taking a look at

3    one of the reports that's in evidence relating to the laptop.

4    This is Government Exhibit 302.

5              Mr. DeLuca, if could you bring that up.  We are going

6    to start by focusing on a section of the report titled

7    classified URLs.  If you could zoom-in on that section of the

8    report, Mr. DeLuca, please.

9              I think there's a problem with one of the monitors,

10   judge.

11             (Pause)

12             THE JUROR:  Thank you, judge.

13             MR. BOVE:  Thank you, your Honor.

14   BY THE COURT:

15   Q.  Ms. Shields, we're looking at a section of the report

16   relating to the laptop on this title "classified URLs".  Do you

17   see that on the top left?

18   A.  Yes.

19   Q.  And now I'd like you to focus on the column that's titled

20   "URL"; do you see it?

21   A.  Yes.

22   Q.  Did you take any steps with the links in this part of the

23   report?

24   A.  I copied those URLs and pasted them into a web browser.

25   Q.  What, if anything, did you do after you put those links in

1   web browser?

2   A.  I saved the web page as a PDF.

3   Q.  Did you do that with respect to other parts of the report?

4   A.  Yes, I did.

5   Q.  What, if anything, did you do if you encountered a video

6   link?

7   A.  When there was a video link I downloaded the video and

8   saved it.

9   Q.  So, this is government 302 on the screen.  I'm going to

10  hand you a disk that's marked for identification as Government

11  Exhibit 302A.

12          Do you recognize that?

13  A.  Yes.

14  Q.  What is 302A?

15  A.  302A is a disk that contains the PDFs that I downloaded, as

16  well as the videos that I downloaded from the report that is

17  Government Exhibit 302.

18  Q.  How are the files named on the 302A?

19  A.  They're named after the record number in 302.

20  Q.  Did some of the materials that were loaded onto that disk

21  contain foreign language?

22  A.  Yes, they did.

23  Q.  And are there translations also included on that disk?

24  A.  Yes, they are.

25          MR. BOVE:  Your Honor, I offer 302A.

1             THE COURT:  A summary?

2             MR. BOVE:  Yes, your Honor.

3             THE COURT:  Mr. Schact.

4             MR. SCHACHT:  I apologize.  The actual disk is 302A?

5             THE WITNESS:  Yes.

6             THE COURT:  You are going to do something more with

7    that, right?

8             MR. BOVE:  Yes.  We are going to review the content of

9    the disk, your Honor.

10            MR. SCHACHT:  No objection.

11            THE COURT:  Received.

12            (Government's Exhibit 302A received in evidence)

13   Q.  Now, Ms. Shields, I'd like to you focus on --

14            THE COURT:  This is a disk that has on it only the

15   URLs mentioned in Exhibit 302?

16            MR. BOVE:  The testimony, your Honor, is that it

17   contains the actual websites that are at the address that's in

18   this report.

19            THE COURT:  OK.  How is the jury going to deal with a

20   disk?

21            MR. BOVE:  We'll make a laptop available during

22   deliberations.  It'll have nothing on it and they will be able

23   to load the disk into the laptop and look at the contents.

24            THE COURT:  Is that the first time they are going to

25   see that or you are going to tell them now what you want them

J5DAAKOU4                          Shields – Direct

1   to know?

2              MR. BOVE:  We are going to go through the disk right

3   now?

4              THE COURT:  Presumably, the information that they get

5   from the witness now will be sufficient to allow them to

6   deliberate.

7              MR. BOVE:  That is my hope, between that and my

8   summation, judge.

9              THE COURT:  It seems to me if they have more

10  information, rather than give a disk into the jury room, the

11  jury should come out and ask what they want to see and we'll

12  show it to them.

13             MR. BOVE:  That seems like a very reasonable approach.

14             THE COURT:  Wonderful.  Thank you.

15             I love it when lawyers think what I do is wonderful.

16             Go ahead, Mr. Bove.

17  Q.  Let's start by focusing on record 164 on the screen is this

18  one of the links that you navigated to?

19  A.  Yes, it is.

20             MR. BOVE:  Mr. DeLuca, could you please bring up that

21  document from Government Exhibit 302A.

22             (Pause)

23             MR. BOVE:  And zoom-in on the top part please.

24             (Pause)

25  Q.  What is this web page?

1    A.  This is an eBay search result for search term "gun".

2         MR. BOVE:  Now, let's go back to the laptop report

3    302.  If could you bring up the safari history section and I'd

4    like to focus on record 46923 please.

5         (Pause)

6    Q.  Ms. Shields, do you see the link on the right side of the

7    screen?

8    A.  Yes.

9    Q.  Is that another one of the links that's included on the

10   disk 302A?

11   A.  Yes, it is.

12        MR. BOVE:  Mr. DeLuca, could you please bring up that

13   document.

14        (Pause)

15        MR. BOVE:  Zoom-in on the text, please.

16   Q.  What is the date on the top of this document?

17   A.  December 1, 2013.

18   Q.  Could you please read the first two lines below the date?

19   A.  Mossad ordered this file received a copyright violation of

20   assassination and brutality program.

21        MR. BOVE:  Let's take a look at page two please and if

22   you could zoom-in on the note.

23   Q.  How did you access this part of the document?

24   A.  When I opened the PDF there was an icon reflecting that

25   there was that comment in the document, so I clicked on that

J5DAAKOU4                        Shields - Direct

1    and this pop up opened up.

2    Q.  What is the date in the top of the note?

3    A.  March 22, 2013.

4    Q.  Could you please read the two lines below the date?

5    A.  The Israeli Intelligence Agency has been intact and hacked

6    by activist groups and Sector 404 and anonymous.

7    Q.  Could you please read the last two lines on this note?

8    A.  The leaked data includes addresses, phone numbers and

9    general contact information regarding Mossad agents.

10            MR. BOVE:  Mr. DeLuca, could you please zoom back out.

11   Q.  Ms. Shields, there's a lot of black space on this document;

12   do you see that?

13   A.  Yes.

14   Q.  How did it get there?

15   A.  I redacted the document.

16   Q.  Before you redacted the document did you review it?

17   A.  Yes.

18   Q.  And what did you see in each row before you added the

19   redaction boxes?

20   A.  Personal identifying information such as names, addresses,

21   phone numbers and e-mail address.

22   Q.  About how many pages are there in this document?

23   A.  There are 418 pages.

24            MR. BOVE:  Mr. DeLuca, could you take us to page 418

25   please.

1           (Pause)

2   Q.  So, did you redact all of the personal identifying

3   information for this document?

4   A.  Yes.

5           MR. BOVE:  Mr. DeLuca, could you zoom-in on the row

6   number on the left.

7   Q.  How many rows were in this document?

8   A.  35,037.

9           MR. BOVE:  Let's go back to the "safari history"

10  section of the laptop report Government Exhibit 302.  If you

11  could zoom-in on record 115108.

12          (Pause)

13  Q.  Directing your attention to the right side of the screen

14  are parts of the title of this video's narrative; do you see

15  that?

16  A.  Yes.

17  Q.  Is there a translation of that title?

18  A.  Yes, there is.

19          MR. BOVE:  Mr. DeLuca, could you bring up page five

20  please of 302T, so we could take a look at translation.  And if

21  you could zoom-in on the top row and include the column titles.

22          (Pause)

23  Q.  How is this document prepared?

24  A.  I prepared this document by copying the Arabic language

25  from the Government Exhibit marked 302 and then send it to a

1    translator who filled in the translation column.

2    Q.  Are these translations part of the stipulation that was

3    read earlier at trial that the translations are accurate?

4    A.  Yes.

5           MR. BOVE:  Mr. DeLuca, if could you highlight the

6    translated title of record 115108.

7    Q.  What's the translation of that title?

8    A.  The servant of the honorable resistance Hassan Nasrallah

9    Fayed Hassan Nasrallah YouTube.

10          MR. BOVE:  Mr. DeLuca, could you please zoom in on the

11   translation of record 80720 on this page.

12          (Pause)

13   Q.  Focusing on the right side of the screen, Ms. Shields, what

14   the translated title of this video?

15   A.  YouTube Hezbollah tactics during July war live action July

16   war.

17          MR. BOVE:  Now, Mr. DeLuca, let's take a look at page

18   one of this exhibit.  If you could zoom-in please on the search

19   term and the URL for record 1063.  Let start with just the

20   search term in the URL please.

21          (Pause)

22   Q.  So, did you obtain a translation for the word after

23   Hezbollah here on the screen?

24   A.  Yes, I did.

25          MR. BOVE:  Mr. DeLuca, if you could zoom-in on the far

1   side of this row so we could take a look at the translation.

2   Q.  What was the translation of this title?

3   A.  Hezbollah eulogies.

4         MR. BOVE:  Mr. DeLuca, let's take a look at page six

5   of this exhibit and zoom-in on this row.

6         (Pause)

7   Q.  Let's focus again on the translation column.  What is the

8   translation of the title of this YouTube video?

9   A.  Hezbollah Marter Funeral.  Hezbollah YouTube.

10        MR. BOVE:  Now, I'd like to go back to page five for a

11  minute and let's zoom in again on record 5108.

12        (pause)

13  Q.  You testified about this record a moment ago.  Were you

14  able to access the YouTube link that's here on the screen?

15  A.  Yes, I was.

16  Q.  And is that a video that you put on 302A, the disk that's

17  on the witness stand?

18  A.  Yes, it was.

19        MR. BOVE:  Mr. DeLuca, could you please play the first

20  24 seconds of the video.

21        (Video playing)

22        MR. BOVE:  That's fine to play without the audio.

23  We'll take a look at the translation.  You can stop it there.

24  Q.  Ms. Shields, who is the speaker in this segment of the

25  video?

1    A.  That is Hassan Nasrallah.

2    Q.  There's a graphic in the top left corner; do you see that?

3    A.  Yes.

4    Q.  Who is in the top left corner?

5    A.  That is Imad Mughniyeh.

6    Q.  There's an image or a logo on the top right of the screen.

7    Do you recognize that?

8    A.  I do that is Al-Manar logo.

9    Q.  What about the flags behind the Al-Manar logo?

10   A.  The flag on the right is the Hezbollah flag and the flag on

11   left is the Lebanon flag.

12   Q.  Now, on the issue of Al-Manar logo --

13            MR. BOVE:  Mr. DeLuca, could you please bring up the

14   stipulation marked 1001 on page two.

15            (Pause)

16            MR. BOVE:  And zoom-in on paragraph four and highlight

17   the first sentence.

18            (Pause)

19            MR. BOVE:  Now, Mr. DeLuca, if you could play the rest

20   of that video please.

21            (Video playing)

22            MR. BOVE:  Thank you.

23   Q.  Was there a translation of the audio of that video

24   prepared?

25   A.  Yes, there was.

1          MR. BOVE:  Mr. DeLuca, could you bring up the

2     translation of the video.

3          (Pause)

4     Q.  So, the first page identifies the top participants as

5     Hassan Nasrallah; do you see that?

6     A.  Yes.

7          MR. BOVE:  Take a look at page two please.

8          And, Mr. DeLuca, if could you zoom-in on the

9     participant in the translation so that the jurors can read the

10    English, just the translation.  Thank you.

11         (Pause)

12         MR. BOVE:  I'll ask the jurors to look up when they're

13    done.

14         THE COURT:  -- is Hassan testimony identify whether

15    Hassan Nasrallah is mentioned in the first column on the left

16    and Hussein on right side of row four are the same people?

17         MR. SCHACHT:  Objection, your Honor.

18         MR. BOVE:  There is no testimony on that issue.

19         THE COURT:  I'm asking if there is anything in the

20    record.

21         MR. BOVE:  There is not.

22         May I proceed, judge?

23         THE COURT:  One minute.

24         (Pause)

25         THE COURT:  Look up when you're ready.

1          Yes, you may proceed.

2          MR. BOVE:  Thank you.

3          Mr. DeLuca, you can take that down.

4  Q.  Ms. Shields, I've placed on the witness stand a document

5  marked for identification as Government Exhibit 911; do you

6  recognize that?

7  A.  Yes, I do.

8  Q.  What is 911?

9  A.  This is a summary chart that I prepared after reviewing

10  documents from the Department of State and the department, the

11  U.S. Customs and Immigration Services.

12  Q.  Is that chart based on documents that are in evidence at

13  the trial?

14  A.  Yes.

15  Q.  That were offered during the testimony on Thursday of

16  Mr. Hansen?

17  A.  Yes.

18  Q.  Is Government Exhibit 911 a fair and accurate summary of

19  those voluminous records?

20  A.  Yes.

21          MR. BOVE:  Your Honor, I offer Government Exhibit 911

22  as a summary chart.

23          MR. SCHACHT:  Brief voir dire, your Honor?

24          THE COURT:  Go ahead.

25  VOIR DIRE EXAMINATION

1   BY MR. SCHACHT:

2   Q.  Just to be clear, Ms. Shields, what you've done is you've

3   taken out certain aspects of those documents that are

4   summarized in here.  So, you haven't merely reproduced every

5   single thing in those documents; is that fair to say?  Is that

6   clear?  Do you understand that?

7   A.  Correct.  It's a selection from those documents.

8          MR. SCHACHT:  Thank you.  I have no objection.

9          THE COURT:  Proceed.

10          MR. BOVE:  Mr. DeLuca, could you please bring up 911.

11          (Pause)

12          MR. BOVE:  So, let's start by zooming in on line four.

13          (Pause)

14   Q.  What's indicated here?

15   A.  This, I believe, indicates that on April 30, 2001 Wanda

16   Reyes filed a petition for alien relative and related

17   application for an immigrant visa on behalf of Mohammad

18   Kourani.

19          MR. BOVE:  Mr. DeLuca, if you could bring up page two

20   please and zoom-in on row five.

21          (Pause)

22   Q.  Ms. Shields, what's indicated on this date?

23   A.  This indicates that on December 31, 2001 Wanda Reyes filed

24   a petition for alien relative on behalf of the defendant in the

25   right column indicates the Government Exhibit number that that

1    information came from.

2              MR. BOVE:  Page four please, Mr. DeLuca.

3              (Pause)

4              MR. BOVE:  Zoom-in on row 13.

5    Q.  What is this one of, Ms. Shields?

6    A.  This indicates that on July 16, 2003, the United States

7    issued an immigrant visa to the defendant based on the category

8    immediate relative to relating to Wanda Reyes.

9              MR. BOVE:  Could we take a look at page five please,

10   Mr. DeLuca, and now zoom-in on row 15.

11             (Pause)

12   Q.  What is this one, Ms. Shields?

13   A.  This indicates that on July 30, 2003, the defendant departs

14   Lebanon and entered the United States using an immigrant visa

15   at John F. Kennedy International Airport.

16   Q.  Did you include information in this chart about the

17   defendant's application for naturalization?

18   A.  Yes, I did.

19             MR. BOVE:  Mr. DeLuca, could you please take us to

20   page nine and zoom-in on row 33.

21             (Pause)

22   Q.  What does this one way?

23   A.  On August 18, 2008, the defendant filed and/or submitted an

24   application for naturalization as a U.S. citizen.

25   Q.  So, the exhibit referenced there is Government Exhibit 608?

1    A.  Yes.

2              MR. BOVE:  Let's take a look at that briefly.

3              Mr. DeLuca, could you bring up 608 page two.

4              (Pause)

5    Q.  Is this that application, Ms. Shields?

6    A.  Yes, it is.

7              MR. BOVE:  Mr. DeLuca, if you could turn to page eight

8    of the exhibit and zoom-in on Question nine.

9              (Pause)

10   Q.  Ms. Shields, what was Question 9C in the application?

11   A.  Question 9C is:

12             Have you ever been a member or in any way associated

13   with a terrorist organization?

14   Q.  How did the defendant answer that question in this

15   application, Government Exhibit 608?

16   A.  He answered "no".

17             MR. BOVE:  Mr. DeLuca, if we could go back to the

18   summary chart 911 and refer to page nine -- excuse me -- page

19   11.

20             (Pause)

21             MR. BOVE:  Please, zoom-in on pages 40 and 41.

22   Q.  What is indicated here, Ms. Shields?

23   A.  This I believe indicates that on April 15, 2009, the

24   defendant was naturalized as a U.S. citizen and on the same

25   date the defendant applied for a U.S. passport.

1   Q.  I'm going to hand you another chart.  This one is marked

2   for identification as Government Exhibit 902.  Do you recognize

3   that?

4   A.  Yes, I do.

5   Q.  What is that exhibit?

6   A.  This is a chart that I prepared based on the Internet

7   activity associated with Ali.M.kourani@GMail.com which is

8   reflected in the Government Exhibit 401-C.

9   Q.  How did you prepare 902, the chart?

10  A.  I prepared the chart by taking the data from Government

11  Exhibit 401C and adding it into the time column and then the

12  search term "column".  And then if the search term "column"

13  contained foreign language, I copied that foreign language into

14  the transcription column and sent it to the translator who

15  filled in the translation column.

16  Q.  Does Government Exhibit 902 fairly and accurately show

17  internet activity from the e-mail account

18  Ali.M.kourani@GMail.com?

19  A.  Yes.

20  Q.  Does it also include fair and accurate translations of

21  certain of that internet activity?

22  A.  Yes.

23          MR. BOVE:  Your Honor, the government offers 902.

24          MR. SCHACHT:  No objection.

25          THE COURT:  Received.

1          (Government's Exhibit 902 received in evidence)

2          MR. BOVE:  Mr. DeLuca, could you please bring up that

3    exhibit.  If you could zoom-in on the top.

4    Q.  Could you please explain to the jury what the column titles

5    are?

6    A.  The first column is the line number.  The second column is

7    the timestamp.  That is the time that the search or the web

8    page visit happened.  The third column is the search term which

9    is taken from the Internet activity.  The fourth column is the

10   transcription column which contains the foreign language that I

11   found when copying the links into the Google browser.  And the

12   fifth column is the translation column that was prepared by the

13   translator.

14   Q.  Did you visit any of the links that are reflected in the

15   search term column here?

16   A.  Yes, I did.

17   Q.  I am showing you another disk.  This one is marked as 902

18   A.  What is 902A?

19   A.  902A contains PDFs of the, we believe pages that I visited,

20   as well as videos that I downloaded and their respective

21   translation.

22          MR. BOVE:  Your Honor, the government offers 902A.

23          MR. SCHACHT:  No objection.

24          THE COURT:  Received.

25          (Government's Exhibit 902A received in evidence)

1    Q.  Ow are the files on the disk 902 A named?

2    A.  They're named after the line number in 902.

3           MR. BOVE:  Mr. DeLuca, if you could bring up 902 the

4    chart again and let's take a look at page two.  If you could

5    zoom-in on line 21 please.

6           (Pause)

7    Q.  Why is 921 highlighted?

8    A.  It is highlighted because that is one of the links that I

9    followed and downloaded as PDF.

10   Q.  Is that what highlighted generally indicates on this

11   document a time when you visited a website and downloaded it to

12   that disk?

13   A.  Yes, it is.

14          MR. BOVE:  Mr. DeLuca, let's take a look at the

15   document associated with line 21.

16   Q.  What's the title of this document?

17   A.  The fighting conducted by Hezbollah and Maroon Al-Ras.

18          MR. BOVE:  Mr. DeLuca, if could you zoom-in on

19   paragraph 31.

20   Q.  What does the last sentence of this paragraph say?

21   A.  24 Hezbollah operatives were killed during the battles.

22          MR. BOVE:  Mr. DeLuca, could you bring us to page five

23   of this document please.

24          (Pause)

25          MR. BOVE:  Zoom-in on the photo and the caption.

1   Q.  Ms. Shields, what is the caption on this photo from the

2   defendant's internet history?

3   A.  Hezbollah operatives marching during the Assura festivities

4   in here.  Upper left Hassan Nasrallah speaks during the

5   festivities from -- a Hezbollah publication February 25, 2005.

6           MR. BOVE:  Could we please taking a look at page six,

7   Mr. DeLuca, and zoom-in on paragraph 33.

8           (Pause)

9   Q.  Ms. Shields, could you please read the first sentence of

10  this paragraph?

11  A.  During the war Hezbollah collected high quality

12  intelligence on the IDF's activity.

13          MR. BOVE:  Mr. DeLuca, could you please bring up page

14  32 of this document and zoom-in on paragraph 41.

15  Q.  What does the first sentence of this paragraph say?

16  A.  The Bekaa Valley Hezbollah's logistics area in which are

17  located recruitment offices, the offices of senior commanders,

18  security offices, logistics and supply store houses and

19  training and instruction camps.

20          MR. BOVE:  Zoom-in please on paragraph 42, Mr. DeLuca.

21          (Pause)

22  Q.  Could you please read the first sentence of this paragraph?

23  A.  As the urban center of the Bekaa Valley, the city of

24  Baalbek is also Hezbollah's primary stronghold.

25          MR. BOVE:  Now, I'd like to go back to the chart

1   Government Exhibit 902 and, Mr. DeLuca, let's take a look at

2   page three and on page three, lines 45 and 46.

3   Q.  What is reflected in these lines of the document?

4   A.  These lines reflect that on May 18, 2012, the user of the

5   account searched for Atlantic tactical and then shortly after

6   visited www.Atlantictactical.com.

7   Q.  Line 46 is highlighted and that is one of the ones you

8   visit and downloaded the disk?

9   A.  Yes, it is.

10          MR. BOVE:  Mr. DeLuca, could you please bring up that

11  website.

12          (Pause)

13          MR. BOVE:  Now, let's go back to Government Exhibit

14  902 the chart beyond page three and please zoom-in on row 47.

15          (Pause)

16  Q.  What is indicated here, Ms. Shields?

17  A.  This indicates that on July 18, 2012, the user of the

18  account conducted a search in a foreign language and the

19  translation of that search is a bond --

20          MR. BOVE:  Mr. DeLuca, could you please bring up a

21  translation of website from line 47.  So, before we zoom-in

22  there are some more redaction boxes on this document.

23  Q.  Do you see that, Ms. Shields?

24  A.  Yes.

25  Q.  Did you apply those?

1   A.  Yes.  I redacted the hits that were dated after the date of

2   the section.

3            THE COURT:  You redacted what?

4            THE WITNESS:  Some of the hits in the searches wee

5   dated after the date of the search in the internet activity.

6            THE COURT:  Could I see counsel for a moment off the

7   record.

8            (Discussion held of the record)

9            MR. BOVE:  Mr. DeLuca, could you please zoom-in on the

10  first website listed as a search hit and if could you highlight

11  "Al-Manar.com" please.

12           (Pause)

13  Q.  Ms. Shields, could you please read the text provided for

14  that website?

15  A.  As seen from the movie "A Bond Like a Vein", as soon as the

16  resistance started firing at the military barracks of the

17  Israeli occupation army.  The Hall was aroused with more

18  supplies and was...

19           MR. BOVE:  Let's go back to the chart please,

20  Mr. DeLuca, Government Exhibit 902 and zoom-in now on rows 56

21  and 57.

22  Q.  What is indicated here, Ms. Shields?

23  A.  This indicates that on December 7, 2012, the user conducted

24  a foreign language search and the translation of that search is

25  Trader Nassir.

1    Q.  Can you explain to the jurors how you got the Arabic text

2    that's in the second column from the right?

3    A.  Yes.  When I copied the goggle link that appears in the

4    parentheses into an internet browser the Arabic text showed up

5    in the tax term.

6    Q.  Then you copied and pasted that text into the chart?

7    A.  Correct.

8           MR. BOVE:  Mr. DeLuca, could you please move the part

9    of the exhibits up to the top the screen and on the bottom

10   dates and bring up the -- from line 56 and zoom-in on the

11   search in the first lit please.

12          (Pause)

13          MR. BOVE:  Please highlight where it says -- are

14   falling apart and more confessions.

15   Q.  Ms. Shields, how does the website on the bottom of the

16   screen compare to the website listed in row 57 at the top?

17   A.  They're both www.Keyom.com.

18          MR. BOVE:  Mr. DeLuca, could you now bring us to page

19   four of Government Exhibit 902 in the main window.

20          (Pause)

21          MR. BOVE:  Zoom-in on line 73.

22          (Pause)

23   Q.  What's reflected here, Ms. Shields?

24   A.  This reflects that on April 9, 2013, the user watched a

25   YouTube video which is in a foreign language and translation is

1    Siada Zaneb Shrine protection brigade.

2    Q.  Were you able to download that video?

3    A.  Yes, I was.

4           MR. BOVE:  Let's start by playing the first 30

5    seconds.

6           (video/audiotape playing)

7           MR. BOVE:  Now, if you could skip ahead and play from

8    1:37 to 2:07.

9           (Videotape/audiotape played)

10          MR. BOVE:  Now, let's play from 2:30 to three minutes

11   please.

12          (Video/audiotape playing)

13   Q.  Was there a translation of that video prepared?

14   A.  Yes, there was.

15          MR. BOVE:  Mr. DeLuca, could you please bring that up

16   and I'd like to start by taking a look at page three.  If you

17   could zoom-in on lines 22 through 25.

18          (Pause)

19   Q.  What is the translation of this part of the video?

20   A.  I saw the minute -- with the projectiles hitting them.  We

21   should cutoff the hands of those who did it.  We sacrifice

22   those next for your shrine.  The blood has reached neck high by

23   God's power.

24          MR. BOVE:  Let's take a look at page five of the

25   translation please if could you zoom-in on the bottom two

1   points of 50 and 51.  What does that part of the translation

2   say?

3   A.  He who doesn't pull his weapon has no loyalty.  The call

4   for death has some allowed.

5              MR. BOVE:  Now, if we could take a look at page six

6   please and zoom-in on page 6.

7   Q.  What is this part of the translation?

8   A.  So, your opinion is nothing but a refuted one.  Your days

9   are nothing but a count down and all you gather is to be

10  scattered.

11             MR. BOVE:  Let's go back to the chart, page four

12  Government Exhibit four please and zoom-in on page 74 and 75.

13  Q.  What is indicated on the screen here?

14  A.  This I believe indicates that on April 25, 2013, the user

15  search conducted foreign language search which translates to

16  tell nebe men.

17  Q.  Were you able to download the video reflected on page five?

18  A.  Yes, I was.

19             MR. BOVE:  Mr. DeLuca, could you please case the first

20  20 seconds of that video.

21             (Video playing)

22             MR. BOVE:  Now we are going to take a look at

23  translation of the video.

24             Mr. DeLuca, could you bring that up please.

25             (Pause)

1      MR. BOVE:  Let's take a look at page three and zoom-in

2  on lines 13 through 16.

3  Q.   What is this part of the translation?

4  A.   Every stubborn tyrant should know that our stubbornness is

5  firmer, that our jihad for Allah will continue until the day of

6  judgment when we are the Victors.

7      MR. BOVE:  Now, let's go back to the chart please,

8  Mr. DeLuca, Government Exhibit 902.  Let's take a look the page

9  six and on that row page 13.

10  Q.   What's indicated here, Ms. Shields?

11  A.   This indicates that on July 30, 2014, the user conducted a

12  foreign language search and the translation of that is Nahal

13  Aajj.

14      MR. BOVE:  Let's take a look at the translation of

15  that search page.

16      Mr. DeLuca, could you bring that up and zoom-in on the

17  search term and first result.

18  Q.   What is the title of the YouTube video that's the first

19  search result?

20  A.   YouTube aerial images of Israeli killing of Nahal Aajj

21  operations perpetrators.

22  Q.   Could you please read the text preview that's provided for

23  that video?

24  A.   After the arms actions published images of the operation

25  that took place in the Nahal Aajj in light of the killing of

1    two Israelis the Israeli army publishes the video...

2              MR. BOVE:  Now, let's go back to the chart 902 please

3    and this time page seven and if you could zoom-in on row 115.

4    Q.  What is this?

5    A.  This reflects that on March 26, 2015, the user conducted a

6    foreign language search and the translation of that search

7    is --

8              MR. BOVE:  Zoom-in on the search term in the image

9    results.

10             Now let's go back to 902 and this time on page seven

11   you could zoom-in on page 126.

12             (Pause)

13   Q.  What is indicated here, Ms. Shields?

14   A.  On November 16, 2015, the user conducted a search in a

15   foreign language and that translates to Hezbollah prisoner in

16   Syria.

17             MR. BOVE:  If you go to age eight and zoom-in on page

18   19.

19   Q.  What's indicated here?

20   A.  On November 26, 2015, the user conducted a search in a

21   foreign language which translates to Hezbollah.

22             MR. BOVE:  Now, let's took at the translation of that

23   page.  If you could zoom-in on the first page and the image

24   itself please.

25             (Pause)

1      MR. BOVE:  Now, let's go back to the charts 902 and

2   I'd like.

3   Q.  What is this one?

4   A.  This reflects that the user watched a YouTube video on

5   November 16, 2015.  It was in a foreign language and that

6   translates to Hezbollah three prisoners appear in this video.

7      MR. BOVE:  If you could zoom-in to the title of the

8   video and then the text review.

9   Q.  Ms. Shields, could you please read the first sentence of

10  the description of this video?

11  A.  Two days after their capture, Orient TV affiliated with

12  Omni Storefront broadcasted an interview with Hezbollah

13  prisoners held by the front, namely, Hassan -- and Mohammad --

14  while the third prisoner did not appear in the video.

15     MR. BOVE:  Let's go back to the chart please, page

16  eight, Government Exhibit 902.

17  Q.  What's indicated here, Ms. Shields?

18  A.  This indicates that on November 17, 2015 -- conduct two

19  more searches in a foreign language that translates to

20  Hezbollah prisoners.

21     MR. BOVE:  Nothing further, judge.

22     THE COURT:  Cross?

23     MR. SCHACHT:  Thank you, your Honor.

24  CROSS-EXAMINATION

25  BY MR. SCHACHT:

J5DAAKOU4                      Shields - Cross

1   Q.  The last video that we were just talking about that says

2   someone named Prolani is held prisoner by the Al-Nusra front;

3   do you recall that?

4   A.  Yes.

5   Q.  The Al-Nusra front is al-Qaeda, correct?

6   A.  I'm not aware of that affiliation.

7            THE COURT:  You just did what you were told?  You

8   don't have any independent information?

9            THE WITNESS:  I downloaded the video and I sent it for

10   translation.

11   Q.  Who picked the videos that you chose to send to

12   translation?

13   A.  Someone else.

14   Q.  Was it anybody who speaks Arabic, if you know?

15   A.  No.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

1    BY MR. SCHACHT:

2    Q.  No, you don't know, or, no, it's not someone who speaks

3    Arabic?

4    A.  I do not know if they speak Arabic or not.

5    Q.  Well, can you say who told you?

6    A.  The attorneys told me.

7    Q.  When you say "the attorneys," you mean the people seated

8    here in court today?

9    A.  Yes.

10   Q.  So you're not aware, then --

11            THE COURT:  She's here only as a person who created

12   some summaries of documents already in evidence.  She's not

13   originating anything.  The only function here --

14            MR. SCHACHT:  Judge --

15            THE COURT:  -- is to summarize what is already in

16   evidence.

17            MR. SCHACHT:  Then I'd like to approach for a moment.

18            THE COURT:  You may.

19            (Continued on next page)

20

21

22

23

24

25

1           (At the sidebar)

2           MR. SCHACHT:  I didn't object before, and maybe it's

3    my fault that I didn't object, but she did a lot of identifying

4    of people in videos, saying this person is Hassan Nasrallah,

5    this person is Imad Mughniyeh.  I allowed her to act as,

6    basically, an ID witness of people --

7           THE COURT:  These people were already identified.

8           MR. BOVE:  By multiple witnesses.

9           MR. SCHACHT:  Right.  But that doesn't mean -- photos

10   of those people are in evidence, but she's acting as much more

11   than someone just downloading links and copying them.

12          THE COURT:  Is that right?

13          MR. BOVE:  No, absolutely not, Judge.  There were two

14   questions along these lines, one related to Hassan Nasrallah,

15   the Secretary General of Hezbollah, who almost every witness at

16   this trial has identified, and there's a photograph --

17          THE COURT:  So what she's done is linked other

18   evidence to this?

19          MR. BOVE:  She created -- you summarized it accurately

20   on the bench, Judge.

21          THE COURT:  She summarized --

22          MR. BOVE:  Yes.

23          THE COURT:  -- but she added something from another

24   piece of evidence into the summary, right?

25          MR. BOVE:  I wouldn't even go that far, Judge.  It's

1    just there were two follow-up questions --

2             THE COURT:  Say again?

3             MR. BOVE:  I wouldn't even go that far, Judge.

4    Everything that's in the summary chart is directly documents in

5    evidence, and then I asked two follow-up questions about two

6    pictures that were on the screen that she was able to match up

7    with other pictures that are in evidence.

8             MR. SCHACHT:  Judge --

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J5DKKOU5                           Shields – Cross

1              (In open court)

2              THE COURT:  Members of the jury, may I excuse you.

3    We'll take a midafternoon break, or create one at this point in

4    time.  I have to have a discussion with the lawyers.  It's

5    easier if you're in the jury room.  Close up your books, leave

6    them on your chairs.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              Mr. Bove, Mr. Schacht, I'd like you to have

3     Ms. Shields bring up and identify that which Mr. Schacht is

4     complaining about, so I can make rulings.

5              MR. SCHACHT:  Well, Judge, what I'm complaining

6     about --

7              THE COURT:  I understand what you're complaining

8     about.  I want to see it.

9              MR. SCHACHT:  They're introducing Arabic language

10    things that she doesn't know what they say.

11             THE COURT:  I want to see it on there, and we'll

12    develop this information.  And then if you can object, you can

13    object.  I don't have enough of a record now to rule.

14             Ms. Shields, Mr. Schacht is raising certain objections

15    which requires us, without the jury being here, to identify

16    certain things.  So we're going to ask you to assist in doing

17    that.

18             THE WITNESS:  Yes.

19             MR. BOVE:  Your Honor, the video that Mr. Schacht

20    objected to at sidebar is a downloaded video from record 115108

21    on Government Exhibit 302.

22             THE COURT:  He's not objecting to that.  He's

23    objecting to her identification of somebody in that video.

24             MR. BOVE:  So I'm just making clear for the record the

25    video that we're talking about.  And we're going to bring it

1   up, so that your Honor and Ms. Shields can see it again.

2          THE COURT:  Understand what the objection is and what

3   it's not.  Mr. Schacht is not objecting to the video.  He's

4   objecting to an identification of a person in the video.

5          MR. SCHACHT:  I am also objecting to the videos.  I'm

6   really objecting to almost all of those videos.  I think I can

7   say --

8          THE COURT:  Well, they're all part of the record,

9   Mr. Schacht.

10          MR. SCHACHT:  That's right, your Honor.  While I'm not

11   objecting to the videos, I'm objecting to being cut off in my

12   cross-examination.

13          THE COURT:  I didn't cut you off.

14          MR. SCHACHT:  Well, Judge, you told me I can't --

15          THE COURT:  I want to make a ruling.  You made an

16   objection, and I want to make a ruling.  You told me that you

17   didn't object earlier, and I have to make a ruling.  I didn't

18   cut you off.  I'm letting you make a record now, and I need

19   that record to make the rulings in response to your objection.

20          MR. SCHACHT:  I'm sorry, I felt that you cut me off

21   when you, in front of the jury, said that she's simply a

22   compiler of information when I was trying to elicit from her

23   answers to my questions about the substance of the videos.

24          THE COURT:  I'll let you do that.

25          MR. SCHACHT:  Okay.  Then I --

1           THE COURT:  I'm not cutting you off, but before we go

2     forward, I just need to have a record of exactly what it is

3     you're objecting to.

4           MR. BOVE:  I think the objection --

5           THE COURT:  Let me hear from Mr. Schacht.

6           What is it you're objecting to?

7           MR. SCHACHT:  I'm objecting, if you will not --

8     although it seems like you will -- allow me to ask her

9     questions about the substance --

10          THE COURT:  Don't anticipate what I'm going to do.

11    Just tell me what you're objecting to.

12          MR. SCHACHT:  I objected to you preventing me from

13    asking her about what's in the video that she has seen, and

14    downloaded, and made a chart about.

15          THE COURT:  I don't object to that.  I'm not going

16    to -- and I don't think Mr. Bove is concerned about that

17    because he's already played that.  But you objected to

18    something in that video.

19          MR. SCHACHT:  I objected, your Honor, to you

20    permitting her to act as an identifying witness of people in

21    the videos.

22          THE COURT:  Exactly.  And that's what I want to

23    respond to.

24          MR. SCHACHT:  Fair enough.

25          THE COURT:  I may rule in your favor.

1        What I'd like to do is to call up that video and stop

2    it in the frame where she does that, and then we'll take it

3    from there.

4             MR. BOVE:  We're bringing up -- we don't need the

5    audio.

6             MR. SCHACHT:  Just so the record is clear, what

7    exhibit are we looking at?

8             MR. BOVE:  This is record 11508 from Government

9    Exhibit 302-A.  And the screen frame that Ms. Shields did the

10   identification from is at 24 seconds in the video.

11            THE COURT:  Stop the video.

12            Now, this guy who's making points, did she identify

13   him?

14            MR. BOVE:  Yes, your Honor.

15            THE COURT:  Is that your objection?

16            MR. SCHACHT:  That's one of them.  She identified

17   several people, and I don't think she knows this man

18   personally.  I highly doubt.

19            THE COURT:  But this is one of them, right?

20            MR. SCHACHT:  Yes.

21            THE COURT:  So, Ms. Shields?

22            THE WITNESS:  Yes.

23            THE COURT:  How did you come to identify this person?

24   How did you identify him?

25            THE WITNESS:  I identified him as Hassan Nasrallah.

1              THE COURT:  Hassan Nasrallah?

2              THE WITNESS:  Yes.

3              THE COURT:  How did you make that identification, on

4    what basis?

5              THE WITNESS:  His photo is a government exhibit in

6    evidence.  I also have been working on this case for about a

7    year now and am familiar with the faces --

8              THE COURT:  You're not here as an expert witness.

9              THE WITNESS:  Right.

10             THE COURT:  So what you've done is linked two

11   exhibits, right?

12             THE WITNESS:  Correct.

13             THE COURT:  I'm going to overrule the objection on the

14   basis that what Ms. Shields has done is to have a look at the

15   picture of Hassan Nasrallah --

16             Which is Exhibit what?

17             THE WITNESS:  It is Exhibit 103.

18             THE COURT:  -- and applied it to the picture.

19             THE WITNESS:  Correct.

20             THE COURT:  So can we bring up --

21             What is it, 1-0?

22             THE WITNESS:  103.

23             THE COURT:  Go ahead.

24             And put it next to one another.

25             Now, I can allow Mr. Bove to -- either on redirect, or

1    you can do it, Mr. Schacht, if you want to, to make it clear

2    the basis that Ms. Shields is testifying.  What she's doing is

3    linking two exhibits.  It's fair to do that as a summary.

4            MR. SCHACHT:  Well, Judge, I would prefer just to be

5    able to ask my questions of her about other things in the same

6    exhibit.

7            THE COURT:  What's the basis of her doing it?

8            MR. SCHACHT:  Well, she's looked at things --

9            THE COURT:  You want to ask what's the basis?

10           MR. SCHACHT:  She's identified the Lebanese and the

11   Hezbollah flag, for example.

12           THE COURT:  All right.  So we'll do --

13           MR. SCHACHT:  There's other things in the video which

14   I would like to ask her if she can identify what they are.

15           THE COURT:  Okay.  You may do that.

16           MR. SCHACHT:  Thank you.

17           THE COURT:  Anything else?

18           MR. SCHACHT:  No, nothing from me.

19           THE COURT:  Will someone close to the door knock three

20   times.

21           Thank you.  Excellent.

22           It looks like we're not going to finish today.

23           MR. BOVE:  It will be close.

24           THE COURT:  It's okay.  You don't need to knock

25   anymore.  She's heard.

1           (Jury present)

2           THE COURT:  Thank you, members of the jury.  Be

3   seated, please.

4           You may continue your cross-examination, Mr. Schacht.

5           MR. SCHACHT:  Thank you, your Honor.

6   BY MR. SCHACHT:

7   Q.  Before the break, Ms. Shields, do you recall I was asking

8   you about one of the searches which mentioned something called

9   Al-Nusra?  Do you recall that?

10  A.  Yes.

11  Q.  I think you had said that you were not aware if Al-Nusra

12  and al Qaeda are the same thing?

13  A.  Correct.

14  Q.  Do you recall in another exhibit -- it's 302 -- one of the

15  videos?  Do you recall that video?

16  A.  Yes.

17  Q.  In that video, number 302, there is a Lebanese flag and a

18  Hezbollah flag at one point in the video; is that right?

19  A.  Yes.

20  Q.  In the beginning of the video, you can see someone giving a

21  speech to what looks like a large group of people, right?

22  A.  Correct.

23  Q.  And you can see that there appears to be, in the front

24  couple of rows, the Lebanese military that is listening to the

25  speech.  Do you recall that?

1   A.  I do not remember that.

2          MR. SCHACHT:  Would you please put that video, at the

3   very beginning, up on the screen again.

4          THE COURT:  Identify which video we're talking about.

5          MR. SCHACHT:  302.

6          THE COURT:  There are several in there.

7          MR. BOVE:  It's record 115108.

8          MR. SCHACHT:  Thank you very much.

9   BY MR. SCHACHT:

10  Q.  Right there, you see there appear to be people wearing

11  military uniforms there in the front row?

12  A.  There appear to be people wearing uniforms in the front

13  row.

14         THE COURT:  Does it seem, also, to be a lot of other

15  people?

16         MR. SCHACHT:  Yes.

17  BY MR. SCHACHT:

18  Q.  And this is the same video that, a little bit later on, has

19  the Lebanese government flag next to the Hezbollah flag, right?

20  A.  Correct.

21  Q.  And Hezbollah, in Lebanon, is a legal entity that's part of

22  the government, right?

23  A.  I'm not an expert on Hezbollah.  I believe Dr. Levitt

24  testified about that relationship.

25  Q.  And you were present during his testimony, right?

J5DKKOU5                          Shields - Cross

1   A.  Correct.

2   Q.  And you heard him say that Hezbollah has membership in the

3   Lebanese parliament?

4   A.  I don't --

5           THE COURT:  I don't think this witness is here to

6   recap the testimony.

7   BY MR. SCHACHT:

8   Q.  Do you recall one of the Google searches said that a person

9   named Khattar Abdullah had been killed?  Do you recall that

10  search that you looked up and put on one of your sheets?

11  A.  Could you refresh my memory on the line number?

12  Q.  I'm not sure I could.

13          THE COURT:  Well, work with Mr. Bove.

14  Q.  But if you give me one moment.  It's line 115 of Government

15  Exhibit 902, and it says, "Martyr Commander Khattar Abdullah."

16          THE COURT:  Put it up, please.

17  Q.  You created this part of the document, right?

18  A.  Correct.

19  Q.  Based on the translator's translation that, in Arabic, that

20  says "Martyr Commander Khattar Abdullah?

21  A.  Correct.

22  Q.  This comes from a search on the website called Google.com?

23  A.  Yes.

24  Q.  None of this, by the way, is secret information, it's all

25  open source things that you found on the Internet?

1    A.  Correct.

2    Q.  Do you know who Khattar Abdullah is?

3    A.  I do not.

4    Q.  Do you have any idea if he is a Hezbollah person who was

5    killed by ISIS?

6               MR. BOVE:  Objection.

7               THE WITNESS:  I do not.

8               THE COURT:  Overruled.

9               What's the answer?

10              THE WITNESS:  I do not know.

11              THE COURT:  Again, members of the jury, just because

12   some item of fact or information is in a question, it is not

13   part of the record.  It's only the witness' answer in response

14   to questions that is the record.

15   BY MR. SCHACHT:

16   Q.  So the record is clear, the jury has no idea who this

17   person is based on your testimony, right, Khattar Abdullah?

18   A.  I do not know who that person is.

19   Q.  Right.

20              MR. SCHACHT:  Could you please put up Government

21   Exhibit 401-C.

22   Q.  This document, do you recall making this?

23   A.  Yes.

24   Q.  And what was this?  Or what is this?

25   A.  This is a document of Google.  It's a return from a Google

J5DKKOU5                          Shields – Cross

 1    search.  It's a Google search warrant return.

 2              THE COURT:  It's what?

 3              THE WITNESS:  A Google search warrant return.

 4    BY MR. SCHACHT:

 5    Q.  So this is the result of a search warrant that was executed

 6    at Google, or is this something you created?

 7    A.  It is a selection of searches from the Google search

 8    warrant return.

 9    Q.  So, at the ali.m.kourani@gmail account, there's actually

10    many more searches than this; is that right?

11    A.  Correct.

12    Q.  And these were selected by someone for use in this court

13    case, right?

14    A.  Correct.

15    Q.  Now, one of the websites that you talked about before is

16    called Cryptome, do you recall that, C-r-y-p-t-o-m-e?

17    A.  Yes.

18    Q.  And where did you find that website, Cryptome?

19    A.  That website was in the Safari history of Government

20    Exhibit 302.

21    Q.  And you then went to the actual website, Cryptome,

22    yourself, right?

23    A.  Correct.

24    Q.  When you went to Cryptome, you learned that it is a website

25    maintained by someone at the address 251 West 89th Street here

1   in Manhattan, do you recall that?

2   A.  I do not remember seeing that information when I visited

3   the website.

4           THE COURT:  Could you keep your voice up, please.

5           THE WITNESS:  Sorry.

6   BY MR. SCHACHT:

7   Q.  Did you scroll through or search through that website?

8   A.  No.  When I copied that link into the browser, all that

9   came up was the PDF that is Government Exhibit 4 on 302-A.

10  Q.  Is it fair to say that you only looked on the links that

11  you cut and paste from the Google search warrant return, you

12  didn't generally look at the websites that were referenced in

13  the Google search; is that right?

14  A.  Correct.  I only looked at the pages that I copied and

15  pasted from this document and also Government Exhibit 302.

16  Q.  So, then, you're not able to say anything about that or any

17  of the other websites, other than what you saw at those

18  cut-and-pasted links, right?

19  A.  Correct.

20  Q.  Now, I know this sounds like an obvious question, but

21  Google is not a secret website, right?

22  A.  Correct.

23  Q.  And neither is eBay, right?

24  A.  Correct.

25  Q.  And neither is YouTube, right?

1     A.  Correct.

2     Q.  And as far as you're aware, looking at anything on any of

3     those three websites is not, in and of itself, illegal, right?

4     A.  As far as I know.

5     Q.  By the way, the search that you were talking about in

6     401-C, or the series of searches, all of these searches are

7     from a person using, or having logged in, or accessed the Web

8     by ali.m.kourani@gmail, right?

9     A.  Correct.

10    Q.  As far as you know, that may have been Al Kourani here, the

11    man on trial in court, right?

12    A.  All I know is that it was the user ali.m.kourani@gmail.com.

13    Q.  But you don't know who the actual person was, right?

14    A.  Correct.

15    Q.  Approximately how many documents, total, would you say you

16    cut and paste the links from the ali.m.kourani@gmail account

17    onto the several charts that are into evidence now?

18    A.  Well, there are approximately 132 links in Government

19    Exhibit 902 and then a couple more from Government Exhibit 302.

20    Q.  So the total is, let's say, can we agree, it's under 200

21    total?

22    A.  Correct.

23              MR. SCHACHT:  Thank you.  I have no other questions.

24              THE COURT:  Redirect?

25              MR. BOVE:  No, your Honor.  Thank you.

1          THE COURT:  Thank you, Ms. Shields.

2          (Witness excused)

3          MR. BOVE:  The government calls David Smith, from the

4  ATF, Judge.

5   DAVID SMITH,

6       called as a witness by the Government,

7       having been duly sworn, testified as follows:

8          THE COURT:  Pay attention to the oath, please.

9          THE WITNESS:  My name is David Alan Smith.  My last

10  name is S-m-i-t-h.  A-l-a-n.

11          MR. BOVE:  May I inquire, Judge?

12          THE COURT:  You may.  As soon as we stop squeaking.

13          MR. BOVE:  Thank you.

14  DIRECT EXAMINATION

15  BY MR. BOVE:

16  Q.  Mr. Smith, where do you work?

17  A.  I work for the Bureau of Alcohol Tobacco and Firearms in

18  Martinsburg, West Virginia.

19  Q.  Is that sometimes referred to as the ATF?

20  A.  Yes.

21  Q.  What is your title right now at the ATF?

22  A.  I am a firearms enforcement officer.

23  Q.  When did you start at the ATF?

24  A.  I started in -- three years ago.

25  Q.  What do you do there?

 1  A.  I classify and perform technical reports on firearms and

 2  devices for law enforcement, both federal, state and local, for

 3  firearms manufacturers, for the public, and for Congress.

 4  Q.  Have you received any training at ATF relating to the

 5  identification of firearms?

 6  A.  Yes, I have.

 7  Q.  Could you please describe some of that training?

 8  A.  We read firearms periodicals.  I have received training in

 9  federal law.  I have gone to firearms manufacturers, trade

10  shows, armorers courses, and other things.

11  Q.  About how many hours, in total, approximately, have you

12  spent in trainings like that?

13  A.  Probably somewhere in the neighborhood of a thousand hours.

14  Q.  Are you responsible for providing training to others on the

15  identification of firearms?

16  A.  Yes, I am.

17  Q.  Could you please describe some of that work?

18  A.  I help provide training for firearms nexus, which is

19  determining where the firearms are made.  I provide training to

20  the firearms examiners academy.  I also provide training to

21  manufacturers as far as how to perform their markings and how

22  to do some of their manufacturer processes within compliance.

23  Q.  What did you do after you joined the ATF?

24  A.  I worked for the Department of Homeland Security.

25  Q.  What did you do at the Department of Homeland Security?

1    A.  I was a gunsmith or ordnance equipment expert.

2    Q.  Prior to that work, did you serve in the military?

3    A.  Yes, I did.

4    Q.  What part of the military?

5    A.  United States Marine Corps.

6    Q.  For how long did you serve in the Marine Corps?

7    A.  I served for eight and a half years.

8    Q.  Could you please describe some of the things that you did

9    during your service that relate to the identification of

10   firearms?

11   A.  While I was in the United States Marine Corps, they trained

12   me in what they considered small arms weapons, which is

13   everything from 30-millimeter cannons down to pistols, infantry

14   rifles.  I was also trained in small man-portable rocket

15   systems.  I performed maintenance modifications to those

16   systems for my first four years.  I then transferred and became

17   a precision weapons technician, where they sent me through a

18   naval machinist course and welding.  There, I performed

19   maintenance, prototype and development for different weapon

20   systems, including match weapons and especially sniper systems.

21   Q.  As a marine, did you teach any courses related to foreign

22   weapons?

23   A.  Yes, I did.  I worked with Explosive Ordnance Disposal on

24   foreign weapons that they were finding in caches in Iraq and

25   Afghanistan and taught them the ins and outs of those weapons,

1   so they would know when they had been modified and booby

2   trapped.

3   Q.   What were some of the types of foreign weapons that were

4   the focus of that course that you taught?

5   A.   AK-47s, RPDs, RPKs, PKMs, and RPG-7s.

6   Q.   Have you testified as an expert before in court?

7   A.   Yes, I have.

8          MR. BOVE:   Your Honor, I offer Mr. Smith as an expert

9   in firearms, machine guns, and destructive devices.

10          MR. SCHACHT:   No objection.

11          THE COURT:   Mr. Smith is an expert in those

12   categories.

13          MR. BOVE:   Thank you, Judge.

14   BY MR. BOVE:

15   Q.   I'd like to talk today, or start by talking, about some of

16   the photos of weapons identified by the defendant.

17          MR. BOVE:   So, Ms. Shields, if you could bring up

18   Government Exhibit 807, and we'll start with page 5.

19   Q.   Mr. Smith, what's shown on the screen?

20   A.   It's a Glock-type pistol.

21   Q.   What are some of the basic parts of a Glock pistol?

22   A.   You have a barrel, a slide, a frame or receiver.

23   Q.   Are you familiar with the term "magazine"?

24   A.   Yes.

25   Q.   What's a magazine?

1   A.  A magazine is the device that's actually used to hold the

2   rounds and feed those rounds into the weapon.

3   Q.  Are you familiar with the different parts or pieces of a

4   round of ammunition?

5   A.  Yes, I am.

6            MR. BOVE:  Ms. Shields, could you bring up Government

7   Exhibit 908 just for the witness and the Judge, please.

8   BY MR. BOVE:

9   Q.  Do you recognize that, Mr. Smith?

10  A.  Yes, I do.

11  Q.  What is it?

12  A.  It is a round of ammunition.

13  Q.  Does this fairly and accurately depict the different parts

14  of a round of ammunition?

15  A.  Yes, it does.

16  Q.  Will it assist you in describing those parts to the jury

17  today?

18  A.  Yes, it will.

19           MR. BOVE:  Your Honor, I offer 908.

20           MR. SCHACHT:  No objection.

21           THE COURT:  Received.

22           (Government's Exhibit 908 received in evidence)

23           MR. BOVE:  Ms. Shields, could you please publish that

24  for the jurors.

25           THE COURT:  I'd like Mr. Smith, also, to identify the

1    parts of the pistol.

2              MR. BOVE:  Yes, your Honor.  There are some

3    demonstrative exhibits, and I'm going to ask in a moment for

4    Mr. Smith to come down and explain those parts.

5              THE COURT:  Okay.

6    BY MR. BOVE:

7    Q.  Before we do that, let's start with the basics about a

8    piece of ammunition.  Could you please use the exhibit on the

9    screen to describe the parts of the round that we see?

10   A.  Yes, sir.

11             The part numbered 5, that's actually the primer.

12   That's the ignition source for a piece of ammunition.  Part 4

13   is typically a brass, steel, or nickel casing.  The part

14   labeled number 3 is the powder or propellant.  And then part 1

15   is actually the projectile or bullet.

16             MR. BOVE:  Ms. Shields, if we could go back to page

17   5 --

18             THE COURT:  Before you finish, Mr. Smith, how does

19   this work?

20             THE WITNESS:  Sir, the way this works is you have a

21   striker or a hammer that impacts the primer.  You'll see

22   there's a small hole in the casing in front of the primer.

23   Once that primer is ignited, it puts a jet of flame and hot gas

24   into the powder propellant that ignites that powder or

25   propellant.  Once that ignites, that pushes the bullet forward

1   out of the casing, and that's how the piece of ammunition

2   works, sir.

3           THE COURT:  Where is the ignition from?

4           THE WITNESS:  The initial ignition is the number 5.

5   That's the primer.

6           THE COURT:  What causes the ignition?

7           THE WITNESS:  Impact.  Inside the primer is a --

8   typically it's a glass and lead fulminate compound, and the

9   impact of that glass and lead fulminate compound between the

10  striker or hammer and the anvil of the case there actually

11  causes the ignition.

12          THE COURT:  You used the term "round."  What is a

13  round?

14          THE WITNESS:  A round is one piece of ammunition.

15          THE COURT:  Go ahead.

16  BY MR. BOVE:

17  Q.  Let's go back to page 5 of Government Exhibit 807.

18          This is the Glock that you recall talking about a

19  moment ago.  Are you familiar with the term "semiautomatic" in

20  reference to a firearm?

21  A.  Yes, sir.

22  Q.  What is that?

23  A.  It means that the weapon fires one round for each

24  individual pull of the trigger and automatically loads the next

25  round for firing.

1    Q.  What does automatic mean?

2    A.  Automatic means that it fires a round when you pull the

3    trigger and continues to fire until you release the trigger or

4    run out of ammunition.

5    Q.  Now --

6              THE COURT:  So all you have to do is to press the

7    trigger once?

8              THE WITNESS:  Yes, one single pull.

9              THE COURT:  And it will take all the bullets in the

10   magazine and dispel them, propel them?

11             THE WITNESS:  As long as you don't release the

12   trigger, yes, sir.

13             THE COURT:  Thank you.

14   BY MR. BOVE:

15   Q.  Have you brought an example of a Glock to help explain to

16   the jury how one of these pistols works?

17   A.  Yes, sir, I have.

18   Q.  Has that firearm been rendered inoperable for purposes of

19   bringing it into the courthouse and this courtroom?

20   A.  Yes, it has.

21             MR. BOVE:  Your Honor, we've marked the example of a

22   Glock as Government Exhibit 903 and offer it as an aid to the

23   jury.

24             MR. SCHACHT:  No objection.

25             THE COURT:  Received.

1           (Government's Exhibit 903 received in evidence)

2    BY MR. BOVE:

3    Q.  Mr. Smith, there's a cart in front of the front table here,

4    and Government Exhibit 903 is in there on the bottom.

5           MR. BOVE:  With the Court's permission, I'll ask the

6    witness to come down from the witness stand, retrieve

7    Government Exhibit 903, and describe how it works to the jury

8    from that position.

9           THE COURT:  Yes, go down, Mr. Smith.

10          THE WITNESS:  Thank you, sir.

11          THE COURT:  You can use that lectern to help you.

12          THE WITNESS:  Ladies and gentlemen, this is a Glock 17

13   pistol.

14   BY MR. BOVE:

15   Q.  How does a Glock 17 pistol work?

16   A.  A Glock 17 pistol is a locked breech, short recoil-operated

17   pistol.  The barrel has a cutout --

18          THE COURT:  What does that mean?  Tell the jury what

19   that means.

20          THE WITNESS:  Yes, sir.

21          The barrel has a cutout here that matches this cutout

22   in the slide or breech.  When the slide is all the way forward,

23   that is up and locked.  When you pull the trigger and fire a

24   round, what happens is you have recoil.  That's physics.  You

25   throw a certain amount of mass in one direction, you have an

1    explosive, you have the same force pushing in the opposite

2    direction.

3              So the slide and the barrel actually recoil together

4    about a quarter of an inch.  Then what happens is there's a cam

5    pin in here, and the barrel drops just slightly -- as you can

6    see right here, it's just below the slide -- and the slide will

7    continue back, extracting and ejecting that round, and then

8    stripping the next round off the magazine and loading it into

9    the chamber.

10   BY MR. BOVE:

11   Q.  What is the firing range for a Glock?

12   A.  Typically, 25 yards to 25 meters.

13   Q.  What does that range mean?  What does it indicate?

14             THE COURT:  You're standing here.  Look at the clock.

15   What's the distance?

16             THE WITNESS:  The distance should be 25 meters to

17   25 yards.

18             THE COURT:  Between you and the clock, what's the

19   distance, just to estimate the distance?

20             THE WITNESS:  About twice that distance, sir.

21             THE COURT:  Okay.

22   BY MR. BOVE:

23   Q.  So when we're talking about a firing range, what does that

24   refer to?

25   A.  That means an operator of this firearm should be able to

1  hit a single person or a person-sized target at that range.

2  Q.  What is the rate of fire for a Glock pistol?

3  A.  An operator should be able to fire somewhere between 20 and

4  30 rounds per minute.

5  Q.  Could you please describe some of the common uses and

6  advantages to this firearm?

7  A.  The common uses are police, law enforcement.  They're also

8  used for target shooting, self-defense.  Some of the -- I'm

9  sorry, what was the second part?

10  Q.  Advantages.

11  A.  The advantages are that it has a removable magazine, so

12  when you run out of ammunition, you can just insert another

13  loaded magazine, and being semiautomatic, it automatically

14  loads that next round every time you pull the trigger.

15  Q.  Where are blocks typically manufactured?

16  A.  They're typically manufactured in Austria and the United

17  States.

18  Q.  So you can put that one down, Government Exhibit 903.

19          MR. BOVE:  Ms. Shields, we're going to take a look at

20  page 2 of Government Exhibit 807.

21  Q.  And, Mr. Smith, you can use the screen that's right there

22  on the front table.  What is shown in this photo?

23  A.  This is a Heckler & Koch MP5.

24  Q.  Where is an MP5 typically manufactured?

25  A.  Typically in Germany.

1    Q.  Have you brought an example of an MP5 that is safe for

2    purposes of the courtroom to help show the jury how one of

3    these works?

4    A.  Yes, sir, I have.

5              MR. BOVE:  Your Honor, that exemplar is marked as

6    Government Exhibit 804, and I offer it as an aid to the jury to

7    assist the witness in explaining how an MP5 operates.

8              THE COURT:  Received.

9              (Government's Exhibit 804 received in evidence)

10   BY MR. BOVE:

11   Q.  So, Mr. Smith, I believe the MP5 is still in the bottom

12   tray of the cart.  If you can retrieve that.

13             THE COURT:  Show it to me first.

14             Okay.

15   Q.  How does an MP5 work?

16   A.  An MP5 works -- it's a firearm with a rifle bore.  It has

17   what's called a roller-delayed blowback system.  The bullet has

18   two rollers to move in and out and a small block that moves

19   behind it.  So when the bullet comes all the way forward, that

20   block moves forward into the bullet head and pushes those

21   rollers out.

22             Now, what happens is when you fire a projectile,

23   again, you have recoil.  You're putting a certain mass of

24   bullet in one direction, you have the same force going in the

25   other direction.  That recoil impulse moves that block

1   backwards.  Once it moves backwards far enough, that allows the

2   rollers to collapse, and under the pressure left within the

3   barrel between the bullet and the casing, it blows that bolt

4   back, you have a spring, it acts as a recoil and drive spring,

5   compresses that.  As it's doing that, it extracts, ejects, and

6   then loads the next round.

7   Q.  Are you familiar with the term "selector switch"?

8   A.  Yes, sir.

9   Q.  And do MP5s typically have a selector switch?

10  A.  Yes, they do.

11  Q.  Is there one on that exhibit?

12  A.  This is the selector switch right here.

13  Q.  What does the selector switch do?

14  A.  It allows you to select between safe, in this case,

15  semiautomatic, and fully automatic firing.

16  Q.  So what does safe mean?

17  A.  Safe means the weapon should not fire when you pull the

18  trigger.

19  Q.  And, to be clear, for this MP5, when the selector switch is

20  on semiautomatic, what does that mean?

21  A.  It means it will fire one round every time you pull the

22  trigger.

23  Q.  And automatic?

24  A.  Automatic, it will continue to fire rounds until you either

25  run out of ammunition or you release the trigger.

1              THE COURT:  Isn't that the same as the semiautomatic,

2      if you press the trigger and hold it down --

3              THE WITNESS:  Semiautomatic, if you pull the trigger,

4      it will fire one round.

5              THE COURT:  But if you hold that trigger down?

6              THE WITNESS:  It will still only fire one round on

7      semiautomatic.

8              THE COURT:  So I'm confused.  The Glock pistol, you

9      said that if you press the trigger, you don't release it, it

10     will discharge all the rounds in the magazine.

11             THE WITNESS:  I said if it was an automatic pistol.

12     The display we gave was a semiautomatic.  It would fire one

13     round.  Every time you pulled the trigger, even if you hold it

14     to the rear, it will fire one round.

15             THE COURT:  What makes it semiautomatic rather than

16     manual?

17             THE WITNESS:  Manual would be like a breech loading

18     shotgun or bolt action where you have to manually load the

19     rounds every time before you fire.

20             THE COURT:  So the semiautomatic refers to automatic

21     loading, but it has to be triggered each by compression?

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Fully automatic, if you push the trigger

24     once and hold it, it keeps on firing?

25             THE WITNESS:  Yes, sir, until you run out of

1    ammunition or you release the trigger.

2              THE COURT:  Yes.

3    BY MR. BOVE:

4    Q.  Is there a stock on that weapon?

5    A.  Yes, there is.

6    Q.  Could you please display it for the jury?

7    A.  This is a stock, and it is collapsable.

8    Q.  So what's the firing range for an MP5?

9    A.  Again, it's a point for an individual target about

10   100 yards or 100 meters.

11   Q.  What about the rate of fire?

12             THE COURT:  Four times the distance to the clock?

13             THE WITNESS:  Yes, sir.

14   BY MR. BOVE:

15   Q.  What about the rate of fire for an MP5?

16   A.  An operator should be able to fire somewhere between 30 and

17   60 rounds per minute, and it has a cyclic rate, which means if

18   it has an unlimited source of ammunition, it would be able to

19   fire about 600 rounds per minute.

20             THE COURT:  What do you mean by unlimited round of

21   ammunition?

22             THE WITNESS:  MP5s come with a detachable magazine,

23   limited to about 30 rounds, typically.  So in the process of

24   firing this weapon, you would be able to fire 30 rounds, then

25   you would have to take the time to exchange the magazine before

1   you could fire again.  If you had an unlimited magazine, this

2   weapon will actually fire about 600 rounds per minute.

3             THE COURT:  What's that mean, a continuous feed?

4             THE WITNESS:  Yes, sir, if you had some way to

5   continuously feed it.

6             THE COURT:  Someone else holding a string of rounds?

7             THE WITNESS:  Yes.  If you just had an unlimited

8   magazine capacity, this weapon would fire around 600 rounds per

9   minute.

10  BY MR. BOVE:

11  Q.  Is there a magazine included in the exemplar Government

12  Exhibit 904?

13  A.  Yes.  You will see the pistol grip to the rear, the

14  trigger, and then you will see the magazine.

15  Q.  So it's depicted in the photo, but not in the exhibit that

16  you're holding?

17  A.  Correct.

18  Q.  What are some of the common authorized uses for an MP5?

19  A.  These are commonly used by military and police.  They're

20  also used for some sport shooting.

21  Q.  When we're talking about authorized uses, what are some of

22  the common advantages to that firearm?

23  A.  Advantages are primarily length.  With the stock collapsed,

24  or even with it open, you have a short barrel, and, therefore,

25  it's easy to maneuver.  Also, being 9 millimeter, it's the same

1   round as is often used in officers' handguns, and it gives you

2   extended range.  A handgun only has about 25 meters' worth of

3   range.  This gives you up to about a hundred.

4   Q.  Have law enforcement personnel taken advantage of the

5   possibility of concealment of a firearm like that?

6   A.  Yes.  With the collapsed stock, this gets down fairly small

7   and can be concealed.

8   Q.  Thank you.  You can put that one down.

9        MR. BOVE:  Ms. Shields, if you can bring up page 4 of

10  the photographs that the defendant identified.

11  Q.  Mr. Smith, what's shown here?

12  A.  This is an AK-47.

13       MR. BOVE:  Ms. Shields, if you could zoom in on the

14  photo, please.

15  Q.  Mr. Smith, can you tell, from this particular photograph,

16  whether that AK-47 identified by the defendant is fully

17  automatic?

18  A.  Yes, I can identify this as a fully automatic AK-47.  If

19  you looked at the selector switch, right above it, you can see

20  the middle selector notch, which is the fully automatic notch.

21  Q.  Have you brought an example of an AK-47 type firearm that

22  is safe for purposes of the courtroom?

23  A.  Yes, sir, I have.

24       MR. BOVE:  Your Honor, we have marked that as 905, and

25  I offer it as an aid to the jury.

1          THE COURT:  Received.

2          (Government's Exhibit 905 received in evidence)

3   BY MR. BOVE:

4   Q.  Mr. Smith, if you could please retrieve Government Exhibit

5   905 from the cart.

6          THE COURT:  Can I see?  Thank you.

7   Q.  What is that, Mr. Smith?

8   A.  This is an AK-47.

9   Q.  Generally speaking, how does an AK-47 work?

10  A.  An AK-47 works with a rotating bolt and long-stroke piston.

11  The way that works is when you fire a round, the bullet travels

12  down the barrel until it passes the gas key right here.  Once

13  the bullet travels past the gas key, the gas is actually ported

14  up into the op-rod.  That gas then pushes on the op-rod, which

15  is attached to the bolt.  As that bolt and op-rod are pushed

16  back, the bolt rotates.  That unlocks it from the barrel

17  extension, allowing it to travel backwards, extracting,

18  ejecting, and then the drive spring pushes it back forward and

19  loads the next round.

20  Q.  Where does the gas come from that you referenced?

21  A.  When you fire a cartridge, that propellant powder, it

22  expands into hot gas, and that's the gases we're talking about.

23  Q.  What is the typical firing range for an AK-47?

24  A.  For a point target, AK-47s are typically used out to

25  300 meters.

J5DKKOU5                          Smith - Direct

1    Q.  When you say "point target," what do you mean?

2    A.  Again, I'm talking to an individual-sized target, so a

3    person-sized target.

4    Q.  What about the rate of fire for an AK-47?

5    A.  An AK-47 rate of fire for an individual is typically 30 to

6    60 rounds per minute, but, again, cyclic rate, if it had an

7    unlimited magazine, would be about 600 rounds per minute.

8    Q.  When we were making reference to the pitch on the screen,

9    you talked about the selector switch?

10   A.  Yes.

11   Q.  Is there a selector switch on the exemplar?

12   A.  This is the selector switch right here on the exemplar.

13   Q.  Could you please show the jury how that works?

14   A.  Right now, it's in the safe position, the bolt cannot be

15   moved all the way back to the rear.  If you slip -- select the

16   middle selector, that's fully automatic, and if pressed all the

17   way down, that's semiautomatic.

18   Q.  What are some of the common uses for an AK-47?

19   A.  It's a standard infantry rifle for a lot of militaries

20   around the world.

21   Q.  How is it used in that capacity?

22   A.  It is used for military to engage point targets or other

23   personnel and person-to-person combat.

24   Q.  What are some of the advantages associated with this

25   particular type of firearm?

1   A.  One of the advantages, it's very rugged.  It will work in

2   almost any condition.  It's very simple for the soldiers to

3   break down, clean, and maintain.  Also, it's very cheap to

4   manufacture.

5   Q.  Thank you.  You can put that one back.

6            MR. BOVE:  Ms. Shields, if you could bring up --

7            THE COURT:  Where is it made?

8            THE WITNESS:  Sir?

9            THE COURT:  Where is it made?  What countries make it?

10            THE WITNESS:  It was originally made in Russia.  It's

11   been made in most of the former Soviet Block countries -

12   Turkey, Iran, Iraq, Afghanistan, United States, China, North

13   Korea, and I'm sure other countries that I don't know off the

14   top of my head, sir.

15            THE COURT:  Does the U.S. Army use it?

16            THE WITNESS:  At times, yes, sir.

17            MR. BOVE:  Ms. Shields, could you please bring up page

18   3 of 807.  If you can zoom in on the pictures, please.

19   BY MR. BOVE:

20   Q.  Mr. Smith, do you recognize the firearm depicted in these

21   photos?

22   A.  Yes, sir.  They are PKM-type firearms.

23   Q.  What is a PKM-type firearm?

24   A.  It's what's considered medium weight belt-fed machine gun.

25   Q.  What does it mean to be a belt-fed machine gun?

1    A.  That means instead of having a magazine that supplies your

2    ammunition, you actually have a metallic linked belt or cloth

3    belt that all the rounds are set inside, and that's what feeds

4    the ammunition into the firearm.

5    Q.  How do the rounds that are used in an AK-47 compare to the

6    rounds that are used in a PKM?

7    A.  The rounds in an AK-47, they're smaller, they're lighter,

8    although they do have the same size projectile.  Because of

9    that, you have less powder, so they're traveling at a slower

10   velocity, which gives you a reduced range.

11   Q.  Are PKMs capable of being fired in anything but automatic

12   mode?

13   A.  No.

14   Q.  So it's always automatic?

15   A.  That's correct.

16   Q.  Have you brought an example of a PKM firearm that is safe

17   for purposes of this type courtroom?

18   A.  Yes, sir, I have.

19           MR. BOVE:  Your Honor, we have marked the examplar PKM

20   as Exhibit 906, and I offer that as an aid to the jury.

21           THE COURT:  Please.

22           (Government's Exhibit 906 received in evidence)

23   BY MR. BOVE:

24   Q.  Mr. Smith, could you please take 906 out of the cart.

25           How does a PKM-type firearm work?

1    A.  A PKM-type firearm actually works like an inverted AK.  You

2    have a rotating head bolt, you have an op-rod gas system, so

3    this firearm actually works from the open bolt instead of the

4    closed bolt like all the previous ones we've talked about.  So

5    with the bolt locked to the rear, you would put a belt of

6    ammunition from the right side into the weapon and close the

7    feed tray.  Because this has been made safe, I can't close the

8    feed tray.

9            Then, you would pull the trigger once the weapon is on

10   fire.  As the bullet comes forward, it strips around off the

11   belt, loads it into the chamber.  As that op-rod goes all the

12   way home, it causes the bolt to rotate, lock into the barrel

13   extension, and that moves the firing pin forward and fires.

14           The bullet travels down the barrel.  Once it passes

15   the gas key, the gas is ported off into the op-rod.  The gas

16   pushes on that op-rod, forcing the bolt carrier back.  As it

17   does so, that bolt rotates and unlocks, extracts, ejects the

18   casing, travels back, spring drives it back forward, strips the

19   next round as long as you hold the trigger down.  Once you

20   release the trigger, what will happen is the bolt will stop and

21   lock to the rear.

22   Q.  Is there a stabilization mechanism on that firearm?

23   A.  Yes.  There is a bipod right here.

24   Q.  Could you please display that for the jury?

25           What is the purpose of that?

1   A.  The purpose is so you can steady this weapon.  Typically,

2   you would fire this weapon when lying on the ground or having

3   it on a shelf or object that you can shoot off of.

4   Q.  Does the barrel of that firearm detach?

5   A.  Yes, it does.

6   Q.  Why?

7   A.  Due to the firing rate of this machine gun, the barrel gets

8   hot.  So that you can continue firing, it has a quick change

9   system, so you can remove the barrel, place another barrel, and

10  continue firing.

11  Q.  What's the typical firing range for a PKM?

12  A.  A PKM has a point target range of 800 meters and an area

13  target range of 1400.

14  Q.  When you say "area target range," what do you mean?

15  A.  It can hit -- typically, an area is considered three

16  minutes of angle.

17          THE COURT:  Sorry?

18          THE WITNESS:  It is considered three minutes of angle.

19  That means at 100 yards, one minute of angle would be one inch,

20  three inches would be three.  So you go 200, that's six inches,

21  and you keep working that out.

22          THE COURT:  So if you have a target 200 meters away,

23  you would raise the weapon an inch or two, whatever you said,

24  to compensate for the distance?

25          THE WITNESS:  No, sir.  It's an area target.  It means

1    that the accuracy of the weapon, if you're not shooting at an

2    individual, if you're firing an automatic mode for hitting an

3    area, you're expected to hit a six-inch area 200 yards.

4    300 yards, it would be -- sorry, yeah, 300 yards would be a

5    nine-inch area you would be expected to hit, and that would, of

6    course, move on out.  It's for hitting large groups of people

7    or vehicles, is what it's for.

8    BY MR. BOVE:

9    Q.  What's the rate of fire for a weapon like that?

10   A.  Typically, 200, 250 rounds per minute.  It can run cyclic

11   at 650 to 700 rounds per minute.

12   Q.  What does it mean to run cyclic?

13   A.  That means if you just hold the trigger down, and you have

14   an unlimited belt of ammunition, it will fire 600, 650 rounds

15   per minute.

16   Q.  What are some of the common uses for a PKM?

17   A.  Typically, this is used either for point targets, for

18   shooting at individuals, or for area suppression and combat.

19   If you're trying to keep an enemy's infantry heads down, you'll

20   use this type of weapon.

21   Q.  What are some of the advantages to the PKM?

22   A.  For its firing capabilities, it's relatively light.  As

23   long as you can link the rounds together, you can continue

24   firing.  Quick barrel change, so you don't have weapon heating

25   up and going out of service.

1    Q.  Thank you.  You can put that one back.

2         MR. BOVE:  Ms. Shields, if you can bring up page 1 of

3    Government Exhibit 807.

4         THE COURT:  Let's wait a moment.

5    BY MR. BOVE:

6    Q.  What is on page 1, Mr. Smith?

7    A.  That is an RPG-7.

8    Q.  Does the weapon --

9         MR. BOVE:  Can we zoom in, please, on the picture,

10   Ms. Shields.

11   Q.  Are there any distinct features of the weapon in the

12   photograph that you are able to identify?

13   A.  I'm able to identify the trigger mechanism, the sighting

14   system, the Venturi cone at the rear, and the rocket-propelled

15   grenade.

16   Q.  There's a white cap on the end of the grenade itself.  Do

17   you see that?

18   A.  Yes.

19   Q.  What is that?

20   A.  That is a piezo electrode.  It's a quartz crystal type

21   ignition system for that grenade.

22   Q.  What is it used for?

23   A.  It is used for detonating the grenade when it impacts a

24   target.

25   Q.  Have you brought an RPG that is safe for purposes of the

1   courtroom to help you describe it to the jury?

2   A.  Yes, I have.

3        MR. BOVE:  Your Honor, we've marked that as Government

4   Exhibit 907, and I offer it as an aid to the jury.

5        THE COURT:  Received.

6        (Government's Exhibit 907 received in evidence)

7   BY MR. BOVE:

8   Q.  Mr. Smith, there are two parts to this exhibit; is that

9   right?

10  A.  Yes.

11  Q.  Could you please show them to the jury and describe how one

12  of these works?

13  A.  This is an RPG-7.  It has a 40-millimeter bore, which the

14  rocket goes inside.  The tail end of the rocket goes into this

15  expansion chamber.  And it has an alignment stud that goes into

16  this notch right here.  It has a firing mechanism right here.

17  To fire it, you would have to load a rocket, cock the hammer,

18  take it off safe, and then pull the trigger.

19  Q.  When we were looking at the photograph, you mentioned the

20  cone?

21  A.  Yes.  This back here, the section right back here is what's

22  called a Venturi cone.  It's a blast cone for when you fire the

23  rocket, it directs the hot expelling gases.

24  Q.  Is there a recoil for this weapon?

25  A.  This is actually what is considered a recoilless rifle.

1    Q.  Can you describe what that means, please?

2    A.  What it means is instead of having a contained cartridge

3    that's pressing against the bolt face or something like that.

4    This has an open tube to the rear.  So when the rocket is in

5    here, what happens is you fire, the hammer hits a firing pin,

6    which hits the igniter on the rocket that ignites a black

7    powder charge.  That black powder charge expands within this

8    expansion chamber and pushes the rocket forward.  As it pushes

9    the rocket forward, physics again, you have to have expelled

10   gases going the other direction.  So whatever forces of

11   expelling gases you have going out the rear is what's pushing

12   the rocket forward in the front, so the shooter actually feels

13   no recoil.

14   Q.  Have you brought an example of the type of round that is

15   used for this weapon?

16   A.  Yes, I have.

17   Q.  Is that round also rendered safe for purposes of the

18   courtroom?

19   A.  Yes.  It is a dummy round.

20   Q.  Could you please take the dummy round out of the cart and

21   describe the different parts of it to the jury?

22   A.  Yes, sir.

23        This is a dummy thermobaric RPG round, 105 millimeter,

24   basically antitank or anti-armor.  The way this is designed is

25   we have your piezoelectric quartz crystal emission system right

1    here at the front, you have a spacing cone here inside here,

2    the main body, you would have an explosive charge, and

3    typically a copper disk.

4             And what this is designed is when this impacts your

5    target, it sets an electrical signal, ignites your explosive,

6    which liquifies that copper disk, and this distance gives you

7    your standoff.  There's a shaped charge in here of a particular

8    shape to force all that copper down to a point.  That's what

9    allows it to actually penetrate armor.

10   Q.  You just used the attorney "standoff"?

11   A.  Yes.

12   Q.  What does that mean?

13   A.  It means you have a distance between the object you're

14   trying to penetrate and the explosive.  Because this is

15   traveling at a velocity, it takes time for the electrical

16   charge to go back and detonate the explosive, so you have to

17   have a certain distance that's crushing at a known rate, so

18   that it will actually penetrate armor.

19   Q.  What are some of the other parts of that dummy round?

20   A.  Right here, you'll see the alignment stud for when you

21   actually place it into the RPG-7.  Back here is where you would

22   actually have that black powder charge and would actually cover

23   these fins, as you can see in the picture here.

24             This picture here is actually what is the rocket

25   motor.  So the way this works is when you fire it, it detonates

1    that black powder charge.  It then launches itself out the

2    RPG-7.  As it launches out, these fins deploy to give it

3    stabilization, and between ten and fifteen meters in front of

4    the muzzle, it will ignite the rocket charge.  That is to gain

5    velocity, also help with stabilization.  These ports here and

6    the port in the rear are for the rocket, and these fins here

7    are for that blast to help give it rotation and stabilization.

8    Q.  Are you familiar with the term "destructive device"?

9    A.  Yes.

10   Q.  What does that mean?

11   A.  That means any explosive, poison gas, mine, grenade, any

12   device like that.  It also means any weapon that fires a

13   projectile via either explosive or propellant that has a bore

14   over half an inch in diameter.

15   Q.  Does the -- the dummy round that you're holding, would a

16   live one meet the definition of destructive device?

17   A.  Yes.  It has a grenade on it, and, therefore, it would be a

18   destructive device.

19   Q.  What about the other part of this exhibit that you were

20   holding up a moment ago?

21   A.  The RPG-7, it has a 40-millimeter bore, which is over half

22   an inch.  12.5 millimeters would be half an inch.

23   Q.  Does that bore on the barrel of the weapon mean that it

24   meets the definition of destructive device?

25   A.  Yes.

1    Q.  So what is the firing range on one of these?

2    A.  Anti-armor, this has a range of about 200 meters.  If

3    you're going for a building or group of people, something like

4    that, it has a range of five to eight hundred meters.

5    Q.  What about the rate of fire?

6    A.  You can typically fire two to four of these per minute.

7    Q.  What are some of the common uses for an RPG?

8    A.  Common uses and what they were originally designed for is

9    anti-armor, for going against vehicles, tanks, things like

10   that.  They have also been used by personnel firing them at

11   either buildings or groups of people.  When this grenade goes

12   off, if it's going off against a building or the ground, it

13   will have a blast radius of about 15 meters.

14            THE COURT:  It blows a hole in a building?

15            THE WITNESS:  It can.  It's designed to penetrate

16   armor, so it will definitely blow a hole in the building.  It

17   will also cause shrapnel.

18            THE COURT:  How many of those rockets can a soldier

19   usually carry?

20            THE WITNESS:  They'll usually carry four to six in one

21   package.

22            THE COURT:  Four to six in a package?

23            THE WITNESS:  Yeah, they will carry four to six in one

24   backpack or package.

25            THE COURT:  It limits the number of uses it can have?

1              THE WITNESS:  Yes, sir.

2              THE COURT:  That's its shortcoming?

3              THE WITNESS:  Yes, sir.

4     BY MR. BOVE:

5     Q.  Thank you, Mr. Smith.  You can put that down.  I just have

6     a couple of more questions.

7              Today, you talked about five firearms:  A Glock, an

8     MP5 --

9              THE COURT:  Let Mr. Smith sit.

10             MR. BOVE:  Thank you, Judge.

11             THE WITNESS:  Thank you, sir.

12    BY MR. BOVE:

13    Q.  You've described five types of weapons, firearms:  A Glock,

14    an MP5, an AK-47, a PKM, and an RPG.  Did you do any research

15    to find out if there's a manufacturer of any of these weapons

16    in Lebanon?

17    A.  Yes, sir, I did.

18    Q.  During the course of that research, did you identify any

19    such manufacturer?

20    A.  I did not identify any known manufacturer of these

21    particular weapons in Lebanon.

22             MR. BOVE:  Nothing further, Judge.

23             THE COURT:  Before Mr. Schacht begins, can I see you

24    both at sidebar.

25             (Continued on next page)

1          (At the sidebar)

2          THE COURT:  We have the term in the indictment

3    "destructive device."  You were about to ask Mr. Smith that

4    question.

5          MR. BOVE:  I did ask.  I believe I did ask, Judge.  He

6    testified that he's familiar with the definition, and that both

7    of the round associated with the RPG, as well as the actual

8    launcher, they each individually meet that definition.

9          THE COURT:  What about the other weapons?

10         MR. BOVE:  He testified -- so they were focused on the

11   definition of machine gun, and the focus of that definition is

12   that word automatic.  The testimony is that the MP5, the AK-47,

13   and the PKM are all capable of being fired in that automatic

14   way, which means that they meet the definition of machine guns.

15         THE COURT:  But the Glock does not?

16         MR. BOVE:  It does not, your Honor.

17         THE COURT:  It does not?

18         MR. BOVE:  It does not, that's correct.

19         THE COURT:  The others do?

20         MR. BOVE:  Yes, your Honor.

21         THE COURT:  Okay.  Sorry.

22         MR. BOVE:  Thank you.

23         (Continued on next page)

24

25

1            (In open court)

2    CROSS-EXAMINATION

3    BY MR. SCHACHT:

4    Q.  Mr. Smith, about how long do you think it took you to learn

5    all of this expertise you have about these weapons?

6    A.  I have worked almost 20 years in the firearm industry.

7    Q.  You mentioned before that you did some research into the

8    manufacture or nonmanufacture of these weapons in Lebanon; is

9    that right?

10   A.  Yes, sir.

11   Q.  Did you serve overseas when you were serving in the

12   military?

13   A.  Yes, sir, I did.

14   Q.  Did you serve in Lebanon ever?

15   A.  No, sir, I did not.

16   Q.  Were you close to Lebanon, in Iran or Iraq?

17   A.  I was in Iraq, sir.

18   Q.  You're aware, though, that there are many weapons, let's

19   say, of this sort in Lebanon?  Are you aware of that?

20   A.  Yes, sir.

21   Q.  And you're aware that some of those weapons come from the

22   Government of Iran, right?

23   A.  Yes, sir.

24   Q.  And some of those weapons come from the Government of the

25   United States?

J5DKKOU5                          Smith - Cross

1    A.  Yes, sir.

2    Q.  And the Government of the United States gives a few hundred

3    million dollars a year to the Government of Lebanon for

4    weapons; is that right?

5              MR. BOVE:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  I would have no expertise or knowledge

8    on that, sir.

9    BY MR. SCHACHT:

10   Q.  But you're aware, though, that the Government of the United

11   States provides some aid to the Government of Lebanon, right?

12             MR. BOVE:  Objection.

13             THE COURT:  Overruled.

14             THE WITNESS:  I have no knowledge as to what exact aid

15   the United States gives foreign countries.

16   BY MR. SCHACHT:

17   Q.  Not exactly, but a moment ago, in response to my question,

18   you said that you were aware that the United States does

19   support the Government of Lebanon, right?  You answered that

20   question affirmatively?

21             THE COURT:  I don't think he did, but you asked the

22   question.

23             Does the government -- does the United States support

24   the Government of Lebanon?

25             THE WITNESS:  Not that I know of.  I know that the

J5DKKOU5                          Smith - Cross

1   United States, as I said before, does at times, provide weapons

2   to foreign countries.

3            THE COURT:  At least this is not part of your

4   expertise, is it?

5            THE WITNESS:  No, sir.

6            MR. SCHACHT:  I can have it read back later during

7   summation.  I'll get the transcript.  Thank you.

8            THE COURT:  It's not part of his expertise anyhow.  So

9   this is not why he's here.  He's here as an expert.

10           MR. BOVE:  Your Honor, I move to strike the questions

11   and answers regarding foreign aid.

12           THE COURT:  Motion granted.

13           MR. SCHACHT:  May we approach, your Honor?

14           THE COURT:  How do you know that there was no

15   manufacture of these weapons in Lebanon?

16           THE WITNESS:  I don't know conclusively that there

17   were no manufacturers in Lebanon, but via research in

18   periodicals, our publication library, and the Internet, I was

19   not able to find any known manufacturer in Lebanon.

20           THE COURT:  Is it part of your work to look at these

21   magazines' specialized articles?

22           THE WITNESS:  Yes, sir, it is.

23           MR. SCHACHT:  Judge, I move to strike the question and

24   answer earlier on direct examination, then.

25           THE COURT:  Overruled.  It's part of his expertise.

J5DKKOU5

1    BY MR. SCHACHT:

2    Q.   In these magazines and things that you read, did you read

3    where the weapons in Lebanon do come from?

4    A.   Occasionally, they do mention that weapons come from

5    outside Lebanon, but I don't have any direct source, and I have

6    not read any direct source on exactly where Lebanon is

7    procuring weapons.

8              THE COURT:  I think I can take judicial notice from

9    all of the newspaper articles that the public reads that

10   there's a proliferation of weapons in Lebanon, and I think we

11   can stop there.

12             MR. SCHACHT:  Thank you, Judge.

13             THE COURT:  From whatever source.

14             Anything else, Mr. Bove?

15             MR. BOVE:  No, your Honor.  Thank you.

16             THE COURT:  Thank you, Mr. Smith.

17             THE WITNESS:  Have a good day, sir.

18             (Witness excused)

19             THE COURT:  Mr. Bove?

20             MS. HOULE:  Your Honor, the government rests.

21             THE COURT:  That means the government has concluded

22   its case.  I need to take a ten-or fifteen minute break leave

23   the books closed on your chairs.

24             (Continued on next page)

25

J5DKKOU5

1          (Jury not present)

2          THE COURT:  Be seated, everyone.  I think, at this

3    point, the defendant can make motions.  I'd like to suggest, so

4    we don't impose on the jury, that we postpone the making of the

5    motions until after the defendant rests, and then the defendant

6    will make a motion as if it's made at the end of the government

7    case and before any defense.

8          MR. SCHACHT:  Your Honor, I'm happy to do that, and I

9    know I need to rest in front of the jury, but I plan --

10         THE COURT:  So that is okay?

11         MR. SCHACHT:  Yes, but I plan to rest without calling

12   any witnesses, so we can do that today, if your Honor wishes.

13         THE COURT:  Yes, okay.  Let's talk about going

14   forward.

15         Give me a moment, please.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1          THE COURT:  We could be ready tomorrow morning nine

2     o'clock to send you the charges by e-mail.  We could have a

3     charging conference at 11 o'clock.  We could have the jury come

4     back, come here at two o'clock or 2:30, 2:15 and we could have

5     part of the closings.  So, it might be better if we do all the

6     closings and even the instructions in one day.  What do you

7     think?

8          Who is going to give the summations for the

9     government.

10          MR. BOVE:  I am judge.

11          THE COURT:  That means you'll also do the rebuttal.

12          MR. BOVE:  Yes, your Honor.

13          THE COURT:  Give me an estimate of how long you think

14     it would be.

15          MR. BOVE:  I think it'll be about two hours, maybe a

16     little bit less.

17          THE COURT:  Mr. Schact, do you have any idea of how

18     long you'll be?

19          MR. SCHACHT:  I should be about 30 to 40 minutes.

20          THE COURT:  So, we could have the summations and the

21     instructions delivered to the jury on Wednesday and they could

22     start deliberating that night and into Thursday.

23          MR. BOVE:  That's fine with us, judge.  Thank you.

24          THE COURT:  Mr. Schact?

25          MR. SCHACHT:  Then we would just have the charge

J5DAAKOU6

1    conference at about 11 tomorrow.

2              THE COURT:  Yes.

3              MR. SCHACHT:  That's fine with me.

4              THE COURT:  OK.  All right.  Mr. Kourani, it's my

5    practice, even though I'm sure you and Mr. Schact have

6    discussed this, to make sure you are aware of your rights.  You

7    have a presumption of innocence which means you don't have to

8    put in any evidence at all or you can choose to put in

9    evidence.  It's up to you and it's up to you and your lawyer

10   together.  As part of the evidence that you put in you have a

11   right if you wish to testify or to call witnesses.

12             If you testify you will be cross-examined as any other

13   witness will cross-examined.  So, you have that right or after

14   discussions with your lawyer, you can waive that right.  If you

15   waive that right and do not testify, I will instruct the jury

16   that they can take no inference against you because you're

17   exercising your constitutional right not to testify.  I know

18   you've discussed this one more time and you can tell me,

19   perhaps, can you tell me now whether knowing all these rights

20   you choose, A, not to put in a defense or, B, not to testify.

21             THE DEFENDANT:  Yes, your Honor, I choose not to

22   testify.

23             THE COURT:  OK.  Knowing all these rights, you don't

24   have to put in a defense, right?

25             THE DEFENDANT:  Yes.

1          THE COURT:  Not to call any witnesses.

2          THE DEFENDANT:  We're not calling any more witnesses.

3          THE COURT:  OK.  Thank you.

4          So, I will tell the jury to come in at ten a.m. on

5    Wednesday.

6          MR. SCHACHT:  Thank you, your Honor.

7          One more thing also, if you would put permit me

8    instead of doing it this an afternoon since we are not doing

9    anything except the charge conference tomorrow, may I make my

10   motions tomorrow prior to the charge conference?

11         THE COURT:  Yes.  That will be a good idea and thank

12   you for reminding me.

13         OK.  That's fine.  Let's call in the jury.

14         (Jury present)

15         THE COURT:  Be seated, everyone.

16         Does the defendant wish to exercise his right not to

17   put in any testimony or do you wish to put testimony in?

18         MR. SCHACHT:  No, your Honor, we are not going to put

19   any testimony in and we rest.

20         THE COURT:  So, both sides have rested which means

21   that the evidentiary part of the case is over.  Tomorrow I have

22   a great deal of work to do with the lawyers and I think it's

23   silly for you to come in.  So, you come in on Wednesday at ten

24   o'clock.  You'll have the closings of both sides, and

25   instructions and perhaps you'll be able to begin to deliberate

1    and continue your deliberations as long as you need them.  So,

2    tomorrow you're off.

3            Now, this is the dangerous part of the case for juries

4    because you've heard all of the evidence.  It's a great

5    temptation to start putting everything together in your mind.

6    Don't do it.  You haven't finished with the case until you hear

7    the lawyers who've spent a great time with this case and are

8    eager to tell you what they think about the case and to sum up

9    the case for you.  And you haven't heard my instructions, so

10   don't know what law to apply.

11           Don't talk about the case with anyone, not even

12   amongst yourselves and don't even think about the case.  You

13   can do as much as that as possible and I'll see you Wednesday

14   morning at ten o'clock.  Close up your books.  Give them to

15   Henry on your way out.

16           (Jury not present)

17           THE COURT:  Be seated, everyone.

18           Mr. Bove and Ms. Houle, I asked you at the outset how

19   can there be an attempt with regard to Count Eight?  Indeed,

20   Count One.  I'm failing to understand this but --

21           MS. HOULE:  Your Honor?

22           THE COURT:  Give me a moment, Ms. Houle.

23           MS. HOULE:  Sure.

24           THE COURT:  Count Eight charges --

25           MS. HOULE:  I may be able to short circuit the

1   discussion of Count Eight, your, Honor because we are prepared

2   to strike the portion of the instruction regarding attempt.  We

3   are not arguing an attempt on Count Eight.

4           THE COURT:  OK.  Thank you.  Go back to Count One.

5   Count One is complete.  When someone knowingly provides

6   material support or resources to a foreign terrorist

7   organization including various ways of helping, what's an

8   attempt?

9           MS. HOULE:  So, your Honor, under the attempt

10  framework the defendant would need only to have formed the

11  intent to commit the crime of providing material support and

12  then taking a substantial step.  And we think that it's

13  important that the jury understands that here because, for

14  example, it would be sufficient under the statute for the

15  defendant to have come to the United States and gotten

16  citizenship here prepared and trained to commit an attack ready

17  to do so.  But not having committed an attack or done anything

18  further than that the defendant did do more than that.

19          THE COURT:  I understand.  That's a legitimate

20  argument.

21          Mr. Schact, any comment?

22          MR. SCHACHT:  I have no quarrel with that argument.  I

23  just think that we need to strip down the language a little bit

24  which I was talking with them about it.  I think we are going

25  to help your Honor by agreeing to have an abbreviated

J5DAAKOU6

1    indictment.

2              THE COURT:  Excellent.  OK.  We'll distribute the

3    charge will be nine o'clock tomorrow by e-mail.

4              MR. SCHACHT:  When I say I have no quarrel with that

5    argument in front of the jury, I have a quarrel with the

6    argument but --

7              THE COURT:  I understand.  All right.  We'll

8    distribute this to you by e-mail tomorrow at nine o'clock and

9    meet by 11 o'clock.

10             This case is then recessed until 11 o'clock.

11             (Adjourned to Tuesday, May 14, 2019 at 11 o'clock)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                             Page

 3   JOSEPH COSTELLO

 4   Direct By Ms. Houle  . . . . . . . . . . . . 597

 5   Cross By Mr. Schacht . . . . . . . . . . . . 646

 6   Redirect By Ms. Houle  . . . . . . . . . . . 680

 7   Recross By Mr. Schacht . . . . . . . . . . . 681

 8   Redirect By Ms. Houle  . . . . . . . . . . . 682

 9   Recross By Mr. Schacht . . . . . . . . . . . 682

10   MARGARET SHIELDS

11   Direct By Mr. Bove . . . . . . . . . . . . . 689

12   Cross By Mr. Schacht . . . . . . . . . . . . 716

13   DAVID SMITH

14   Direct By Mr. Bove . . . . . . . . . . . . . 735

15   Cross By Mr. Schacht . . . . . . . . . . . . 767

16                       GOVERNMENT EXHIBITS

17   Exhibit No.                               Received

18    808  . . . . . . . . . . . . . . . . . . . 629

19    810  . . . . . . . . . . . . . . . . . . . 640

20    302A  . . . . . . . . . . . . . . . . . . . 692

21    902  . . . . . . . . . . . . . . . . . . . 706

22    902A  . . . . . . . . . . . . . . . . . . . 706

23    908  . . . . . . . . . . . . . . . . . . . 739

24    903  . . . . . . . . . . . . . . . . . . . 743

25    804  . . . . . . . . . . . . . . . . . . . 746
```

905   . . . . . . . . . . . . . . . . . . . 752

906   . . . . . . . . . . . . . . . . . . . 755

907   . . . . . . . . . . . . . . . . . . . 760