J5FAAKOU1                    Jury Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4            v.                          17 CR 417 (AKH)

5   ALI KOURANI,
                                         Jury Trial
6                Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         May 15, 2019
9                                        10:00 a.m.

10  Before:

11       HON. ALVIN K. HELLERSTEIN

12                                       District Judge

13

14

15

16       APPEARANCES

17

18  GEOFFREY S. BERMAN
         Interim United States Attorney for the
         Southern District of New York
19  AMANDA L. HOULE
    EMIL J. BOVE III
20       Assistant United States Attorneys

21

22  ALEXEI SCHACHT
         Attorney for Defendant

23  ALSO PRESENT:  KERI SHANNON, Special Agent FBI
    MARGARET SHIELDS, Paralegal, US Attorney's Office
24

25

1            (Trial resumed; Jury present)

2            THE COURT:  Good morning, members of the jury.  Be

3    seated please.

4            Today we're going to hear summations and then after

5    the summations, my instructions on the law.  The summations

6    will be given first by the government and Mr. Bove will do

7    that.  Then by Mr. Schact for the defense and then Mr. Bove has

8    a short rebuttal that he is allowed and that will close the

9    summations.  After that I will deliver my instructions.  Of

10   course, we'll have breaks and lunch break throughout.

11           The summations by the lawyers are not evidence.

12   They're their version, their belief in how the evidence hangs

13   together and what it proves or doesn't prove.  Listen to the

14   lawyers because they've lived this case.  They don't have any

15   personal knowledge.  They're trying to remind you what you

16   heard in the evidence that came into this case.

17           So, Mr. Bove will start.

18           MR. BOVE:  Thank you, judge.

19           Good morning, ladies and gentlemen.

20           This is a case about what happens before a bomb goes

21   off, before shots are fired, before an attack here begins.

22   This case is about attack planning, things like hostile

23   surveillance, intelligence collection, watching, preparing.

24           The defendant was a sleeper cell operative, a

25   terrorist and a spy.  He was here fighting a secret jihad, a

shadow war for Hezbollah in the Islamic Jihad Organization.
Hezbollah spent years grooming the defendant for this jihad.
That began all the way back in 2000 when he attended a 45 day
Hezbollah boot camp.  There he learned things like military
tactics and how to shoot machine guns.  But something
unexpected happened that same year.  Israel withdrew from
Lebanon and so the defendant's skills on the battlefield were
not needed at that time.

What happened?  The defendant and his family turned
their sights toward the United States.  The defendant has
described his family as the Bin Ladens of Lebanon.  His father
came here in 2001.  He entered the country illegally and then
he entered into a sham marriage.  The defendant used that sham
marriage to get a visa and he came here in 2003.  When he got
here he enrolled at City University of New York, CUNY, and he
started taking course work towards a degree in my medical
engineering that he would never use other than as a cover, a
way to try to suggest that he was a regular guy living the
American dream instead of a terrorist sent here by Hezbollah to
attack that dream.

The defendant went home for the summer in 2006.  And
when he was there he witnessed the outbreak of a new war
between Lebanon and Israel.  He was still a trained soldier but
he chose not to fight.  At that point the defendant and his
family were too important to Hezbollah, so he came back to the

1    United States.  He continued to prepare for his jihad.  He
2    continued to study.  Now, Hezbollah declared that it won that
3    war in 2006 and they also took note of the defendant's
4    discipline and his skills.  He was smart.  His emerging cover
5    was strong, and his ties to the United States were valuable.
6    So, in 2008 Hezbollah recruited the defendant into the Islamic
7    Jihad Organization, the IJO.  Hezbollah's Black Ops Unit,
8    responsible for things like foreign intelligence collection,
9    the planning and execution of terrorist attacks.

10          Now, when the defendant joined the IJO something else
11   happened that year, the leader of the organization was
12   murdered.  His name was Imad Mughniyeh.  He was one of
13   Hezbollah's most accomplished terrorists at that time.

14          So that development made the defendant's new mission
15   with the IJO even more important because Hezbollah and the IJO
16   wanted revenge, vengeance.  They wanted to retaliate.  The
17   defendant embraced that new urgency.  The IJO trained him how
18   to use military grade weapons, the weapons that you saw in the
19   cart here in the courtroom during the trial, because he had to
20   be deadly for this new mission.

21          But it was a little different now.  When the defendant
22   joined the IJO he was promoted from soldier to spy.  It was now
23   his mission to come to the United States, this city and set up
24   a new front for Hezbollah's global terror campaign.  And so the
25   IJO taught the defendant new things, things like how to collect

1   intelligence, how to conduct surveillance, how to resist

2   interrogation if he had to.

3        After the defendant learned those things his first

4   mission was to deepen his cover in the United States to make it

5   stronger.  And so what did he do?  He came here and he applied

6   for U.S. citizenship.  He naturalized based on lies and fraud.

7   What next?  He got a U.S. passport, a new passport with blank

8   pages that hid his prior travel to Lebanon so it would be less

9   suspicious and he wouldn't be asked about it when he traveled

10  through airports.

11       After the defendant did those things, after he became

12  a citizen, after he got the passport he lurked in the shadows

13  here for years.  That is how a sleeper cell works.  And that is

14  what the defendant did.  He was here, ready, ready to

15  participate in acts of violence for the IJO, ready to spill

16  blood in the name of Hezbollah in this terrorist organization.

17  And he was here living undercover but he didn't sit idly.  The

18  defendant continued to go back to Lebanon and meet with IJO

19  personnel.  And there during those meetings he got taskings,

20  missions, assignments and then he came back.  And he did things

21  like study the security procedures at airports, collect

22  information, do surveillance on government buildings.  He

23  identified weapons supplies so that IJO operatives could get

24  guns to carry out attacks.

25       The things that the defendant did for Hezbollah make

1    it clear that he understood the enormous magnitude of what this

2    terrorist organization had in mind.  There are a lot of

3    government buildings in New York City.  The defendant chose 26

4    Federal Plaza.  Across the street from where you are sitting

5    right now, one of the largest federal buildings in the country,

6    a federal building with a daycare center and a playground

7    outside.  The defendant chose armories, places where the

8    military stores weapons and equipment to be used to protect the

9    city in response to a terrorist attack.  The defendant chose

10   places where classified information is stored and he also chose

11   places where people work to protect infrastructure that is so

12   critical and so critical to this city, things like bridges,

13   tunnels, train stations, utilities.

14          Ladies and gentlemen, this wasn't an accident.  These

15   targets were not random.  The defendant was a sophisticated

16   terrorist and he was helping the IJO position itself to conduct

17   a crippling attack here in the city.

18          Now, these things that the defendant did for Hezbollah

19   make him guilty of the charges in the indictment.  And you know

20   that he did those things.  You know that from his laptop.  You

21   know it from his e-mail accounts.  You know it from the

22   Facebook records.  You know it from the evidence that was

23   seized from the defendant's apartment.  You also know that the

24   defendant did these things because he confessed five separate

25   times.  In 2017 the defendant got a lawyer to set up some

J5FAAKOU1                    Closing Statement – Bove

1   meetings with the FBI at Seton Hall.  He requested that.

2           Now, we're going to talk today about some of the

3   reasons that drove the defendant to do that.  But let's be

4   clear, this man is no fool.  He set those meetings up

5   intentionally.  He met with the FBI voluntarily and he did that

6   as part of a calculated to try and get some things that he

7   wanted.  And the bottom line is this.  During five meetings at

8   Seton Hall the defendant admitted to doing things for Hezbollah

9   and for the IJO that make him guilty and the agents who

10  conducted those interviews that came to this trial and they

11  testified at that witness stand credibly and consistently about

12  what the defendant admitted to at Seton Hall.  And that is a

13  piece of the evidence here in this courtroom for you to

14  consider.  It is a powerful piece of evidence that shows you

15  that the defendant is guilty.  But it's just one part of the

16  evidence, ladies and gentlemen.

17          This is an entry from a document seized from the

18  defendant's apartment.  This is Government Exhibit 222.  And

19  there's no dispute at this trial that the defendant wrote this.

20  I need a cover up.  The fact that the defendant wrote this down

21  before he was arrested shows you that he understood he was

22  thinking about coming up with a coverup for his egregious

23  crimes against the United States.  And you can bet that right

24  now the defendant regrets having committed this thought to

25  writing, for sure.  Because this was a mistake on his part, a

1    slip up an error in the operational discipline that once made

2    him a star, a terrorist star in Hezbollah and the IJO.  But

3    even trained spies make mistakes and this was a slipup and now

4    it's a piece of evidence here at this trial and is another part

5    of reason that you know he is guilty.

6           Let's be clear.  The defendant doesn't have any burden

7    at this trial.  He doesn't need to do or say anything.  The

8    burden of proof is always on the government but this is a piece

9    of evidence, ladies and gentlemen.  And the fact that the

10   defendant wrote this down, it shows you that he knew before he

11   was arrested that what he had done was wrong and criminal and

12   illegal.  And the fact that the defendant wrote this down

13   before he was arrested, it means that you should be deeply

14   skeptical of efforts by the defense to try to explain away five

15   confessions corroborated by electronic evidence and items

16   seized from the defendant's apartment.

17          Now, this is one of the things that Mr. Schact said to

18   you during opening statements.  He made an argument.  He argued

19   that there is not any shred of evidence other than some

20   statements that the defendant made.  Mr. Schact said that to

21   you on the first day of the trial.

22          Now, look, again, the defense has ho burden.

23   Mr. Schact done have to say anything.  But you're entitled to

24   scrutinize arguments that are made to you, to think about

25   whether they make any sense.  So, is this right?  Is this an

accurate argument about what happened at this trial?  No.
Absolutely, not.

Now let's be clear.  Hezbollah trained the defendant
to operate in the shadows.  The IJO taught the defendant to be
careful.  But he made mistakes along the way, slipups like the
one we've already talked about, errors in operational
discipline that left a trail.  So, that evidence is here for
you to consider.

Let's talk about some of the types of evidence.  This
is the defendant's laptop seized from his apartment on the day
of his arrest marked as Government Exhibit 210.  And you know
that this laptop contains evidence of what the defendant was
doing on the Internet.  He was looking at Hezbollah propaganda.
He was researching Hezbollah military tactics.  And you know
that he used this laptop to carry out some of his activities
for the IJO.

You also know from the forensic analysis of this
laptop that the defendant tried to delete some of these things.
He tried to delete them because he realized that he had made
mistakes.  It wasn't consistent with his cover identity as a
biomedical engineer with a side business in counterfeiting to
be sitting at home hold up in the apartment looking at
Hezbollah propaganda and researching government buildings.  So,
this is one piece of the evidence that we're going to talk
about today.

J5FAAKOU1                        Closing Statement - Bove

1              This is another piece, ladies and gentlemen.  This is

2      Government Exhibit 902.  This is a document that reflects

3      additional internet activity by the defendant.  This one

4      instead of being tied to the laptop is tied to the defendant's

5      e-mail account, an account in his own name, Ali.M.kourani.  And

6      you know from this document that it reflects additional

7      research about Hezbollah additional reading an consumption of

8      Hezbollah propaganda and additional activities on behalf of the

9      IJO.

10             In this document this evidence tied to the e-mail

11     account is in many ways separate from the laptop because you

12     can get on your e-mail away from your computer.  Think about

13     how you use your e-mail in our everyday life on your phone.

14     So, this is basically a separate set, a separate source of

15     evidence about what the defendant was doing on the internet

16     that speaks to his intent and his motivations and what was

17     driving him.

18             This is another category of evidence.  These are

19     Facebook records.  We looked at these early in the trial.  And

20     you'll recall from the testimony of Mr. Donaldson that the

21     defendant deleted his chats, deleted his chats with members of

22     Hezbollah that went on in 2011.  He did that because he knew

23     they were incriminating.  Again, more cracks in his cover.

24     Biomedical engineers are not chatting with terrorists in

25     Lebanon.  So, he deleted those messages.  And I am going to

1    show you today what else the defendant was doing at the time in

2    2011 when he was chatting with Hezbollah members about things

3    he didn't want you to see.

4            This is Government Exhibit 222.  These are the notes

5    that I've already referred to seized from the defendant's

6    apartment on the day of his arrest.  In addition to that entry

7    I need a coverup.  There's a reference in the top right of this

8    document to the IJO, another acronym, another alias for that

9    terrace organization.

10           The defendant also wrote down, in this document he

11   wrote down on paper some of the things that he did for the IJO.

12   There's entries in here that we are going to look at today

13   about his training and about his missions.  This is another

14   piece of devastating evidence against this defendant.

15           This is Government Exhibit 219, cash.  You'll remember

16   from the first day of trial, Special Agent Ganci explained

17   where this came from.  Do you remember?  It was packed in a

18   suitcase, a suitcase with the defendant's identification,

19   documents, a suitcase stuffed in a closet by the front door of

20   the apartment.  Why?  This was a go-back, ladies and gentlemen.

21   This is the kind of thing that a trained spy keeps so that he

22   can flee on a moment's notice.  This is not the kind of thing

23   that a biomedical engineer keeps.  That is another reason that

24   you know that the defendant is guilty because this is not

25   normal behavior.  This is the behavior of a man who is a

1   trained spy for Hezbollah and who in May and June 2017 he knew,

2   he knew that what he had tried to do with the FBI at Seton Hall

3   had failed and he knew that he was going to be held accountable

4   for his crimes against the United States.  And that's what this

5   trial is really about, ladies and gentlemen.

6          So, this closing statement is my opportunity to walk

7   you through the evidence, to talk about what's in those records

8   that I've just looked at because it came in in bits and pieces

9   during the trial.  So, this is my chance to talk with you about

10  how it all fits all together and how it shows you that the

11  defendant is guilty, five confessions, the laptop, e-mail

12  accounts, Facebook records, things seized from his apartment.

13         Before I get started, I want to talk a little bit

14  about the charges in the case and I'm going to come back to

15  this at the end.  And please remember that when the lawyers are

16  done talking today, Judge Hellerstein is going to give detailed

17  instructions about the law and the elements in these charges.

18  Here is an overview.

19         There are eight counts in the indictment and they

20  basically fit into three categories.  This first category

21  relates to crimes providing support and services to Hezbollah.

22  And those are somewhat technical terms that the judge is going

23  to explain to you but it basically means this, ladies and

24  gentlemen.  The defendant is charged with taking steps to help

25  further Hezbollah's terrorist objectives.  They're not talking

1   about humanitarian or Hezbollah's politics.  These are crimes.

2   These are charges that relate to what the defendant did to

3   facilitate terrorist activities in the IJO.

4           The second category of charges is in the middle of the

5   screen.  This category relates to military training and

6   weapons, a part of the defendant's conduct that made him even

7   more dangerous, made it even more likely that someone would be

8   harmed in connection with what he was doing.

9           THE COURT:  This is not an exhibit, ladies and

10  gentlemen.  It's not an exhibit in the case.  It's part of the

11  summation.  It's an illustration Mr. Bove's created and using

12  in his summation.

13          MR. BOVE:  Thank you, judge.

14          So, Counts Three and Four relate to receiving military

15  training from Hezbollah which you know happened multiple times.

16  And the reason that that charge is here for you to consider is

17  that a terrorist who gets formal military training is even more

18  dangerous.

19          Count Five relates to the fact that the defendant

20  worked with others to use, carry and possess machineguns and

21  what are called under the law destructive devices, which is a

22  fancy term for arms and grenades.  And this charge relates to

23  the fact that after the defendant's training he possessed those

24  weapons and other people possessed those weapons.  And as a

25  result of the defendant's training by the IJO, he understand

1    that he was part of an organization that was working to use

2    weapons like that in connection with its terrorist activities.

3           The last category is on the right side of the screen

4    and it's really one count, naturalization fraud.  It's a

5    serious thing to be a citizen of the United States.  It's a

6    serious thing to apply and obtain citizenship.  This count

7    relates to the fact that the defendant at the direction of a

8    terrorist organization became a U.S. citizen to facilitate the

9    terrorist activities.

10          So, now let's get down to the evidence.  And here's a

11   little roadmap for what I'm hoping to cover this morning.  I'm

12   going to start with some background about Hezbollah and its

13   terrorist unit, the Islamic Jihad Organization.  Then we're

14   going to talk about the evidence that Hezbollah trained and

15   groomed the defendant, prepared him for this jihad.

16          Next, we'll talk about his promotion, his recruitment

17   to the Islamic Jihad Organization from soldier to spy.  We're

18   going to talk about the ways that the defendant was trained by

19   the IJO, things that they taught him so that he would be a more

20   effective terrorist spy and sleeper be operative.  We'll talk

21   about the trade crafts that he used.  Those are spy techniques

22   that you've seen in the evidence and we'll talk about those

23   today.  Then we're going to talk about some of the things the

24   defendant did for the IJO, his missions, things like the

25   surveillance that I've already mentioned, watching security

1    procedures at airports.  And then we'll talk a little bit at

2    the end about the investigation and what brought us here.

3           So, let's start with Hezbollah and the Islamic Jihad

4    Organization.  This evidence was provided to you at the trial

5    to help provide some context for the objective that Hezbollah

6    and the IJO and also to help you understand the things that

7    were personally motivating the defendant as he carried out

8    these activities here in the United States.

9           You heard from Dr. Levitt, this history is long and

10   it's complicated and I'm just going to touch on a few of its

11   features.  I want to be clear, again, this is not about

12   politics.  Trials are about evidence.  Trials are about doing

13   justice.  We're here to think about the evidence of the

14   defendant's participation in terrorist activities.  I'm going

15   to focus on Hezbollah's terrorist objectives and the same

16   objectives of the IJO.

17          So, let's start with some basics.  The parties have

18   agreed, they've stipulated that since 1997 Hezbollah has been

19   designated a foreign terrace organization by the U.S.

20   government.  The reason that we offer that stipulation is that

21   it's actually one of the elements for one of the crimes that

22   the U.S. government has formally designated Hezbollah.  So,

23   that's been true since 1997.

24          And just to pause here as I go through this, all the

25   exhibits that are on the screen are referenced for your notes

J5FAAKOU1                    Closing Statement - Bove

in the bottom right corner in bold.  And if there are parts of

transcript on the screen, those citations are down there as

well.

So, Hezbollah obviously started long before 1997.  You

heard that there were terrorist attacks in the early 1980s.

Hezbollah really emerges on the scene in 1985 through this open

letter to the public.  One of the things that he talked about

is Hezbollah's stated objective right from the beginning

targeting the United States since 1985.  How did they frame

that?  By quoting Ayatollah Khomeini, the former supreme leader

of Iran, supreme leader at the time of this letter.  And this

is what he had said and this is the 1985 letter.

The United States is the root of all evil.  And when

you join an organization with an objective like that and you

try and further its mission, this is what we're talking about,

ladies and gentlemen, targeting the United States.  You are

going to see that the defendant's internet history tracks most

of it.  He was excited about participating in it and it's

evidence of what was driving him when he did these things.

Let's be clear.  There have been some

cross-examination questions about whether it's illegal to

lookup some things on the internet or the fact that this stuff

was publically available.  The defendant is not charged with

illegal use of the internet.

Why does this evidence matter?  Because it gives you a

1    window into what was going on in the defendant's hoed.  We

2    don't have a mind reader hear.  This shows you what he was

3    doing.  And think about the context.  The defendant is leaving

4    that apartment.  He is going out in his life under this cover,

5    the biomedical engineer cover, the counterfeit clothing cover.

6    It takes discipline.  It takes restraint.  You have to avoid

7    slipups that will lead to more scrutiny by law enforcement.

8            Then he comes back into the apartment after what must

9    have been a hard day's work to just continue to try and hide

10   these things as you are doing things like collecting

11   intelligence and conducting surveillance.  He goes on the

12   internet and he is reading about things like this to help him

13   stay focused and committed.  So, here on the screen you can see

14   that in part of his internet history he has read about

15   Ayatollah Khomeini?  Those are two separate YouTube videos that

16   he is watching.

17           The 1985 letter from Hezbollah also talked about three

18   themes, three core features from members who are committed to

19   this part of the mission targeting the United States, Jihad

20   Mujaheed and Martyr.  And Dr. Levitt explained what those terms

21   mean.  Jihad is basically war, armed conflict.  And that is

22   Hezbollah, for purposes of this trial and what we are talking

23   about, that's the objective that we're talking about.

24   Terrorist activity through Jihad, through war.

25           And who are the Mujahedeen?  They are those warriors.

1   They are those terrorists.  What is martyrdom in this context?

2   Martyrdom is to die in the service of Hezbollah.

3          The defendant's internet history makes clear that he

4   was obsessed with these -- and he was here living a double life

5   in the United States.  These were the things that drove him,

6   that motivated him to earn that honor from Hezbollah of being a

7   martyr, to fight, to pursue Hezbollah's objectives in Jihad.

8   And so these are some examples of that evidence from the

9   laptop, YouTube video.  Hezbollah soldiers and the martyrs of

10  Hezbollah.

11         Second one, Hezbollah soldier two, posted video about

12  another martyr.

13         Finally, a YouTube video, Hezbollah Islamic resistance

14  Mujaheed martyrs.  These are the things that the defendant had

15  in his mind as he was planning and preparing and helping the

16  IJO get ready for an act.

17         Let's talk a little bit about Hezbollah's structure.

18  You heard from Dr. Levitt that the secretary general of

19  Hezbollah, Hassan Nasrallah.  His picture is here on the screen

20  on the left.  The defendant is very familiar with Nasrallah.

21  You saw a video yesterday during Ms. Shields' testimony.  This

22  is that video.  It's the second row here on the screen.

23         Ladies and gentlemen, that's not a video about

24  humanitarian aid.  These are soldiers in that video.  If you

25  could take a look at the unallocated clusters.  That's the part

1    of the computer where data goes after it's deleted.  So, the

2    defendant watched these videos and he understood what they

3    would show about his state of mind and his intent.  So, then he

4    tried to get rid of them.  So, both these videos about

5    Hezbollah found in the unallocated space of the laptop he tried

6    to open.

7            The Islamic Jihad Organization is a unit within

8    Hezbollah.  So, there is a stipulation on the screen that we're

9    in agreement on that.  The IJO is Hezbollah for purposes of

10   this trial.

11           On the screen here are two of the former leaders of

12   the Islamic Jihad Organization, Imad Mughniyah, who I already

13   mentioned, who killed in 2008 around the time of defendant --

14   and then Mustafa Badreddine, another leader of this terrorist

15   group.

16           I think it's really important as you are thinking

17   about what the IJO was doing, what was its role within

18   Hezbollah.  The IJO is a component of Hezbollah's Jihad

19   council, a group of leaders convened to think about how to

20   fight and commit acts of terrorism.  The IJO's purpose is to

21   carry out terrorism outside of Lebanon, to go outside of the

22   country, to fight elsewhere.  And so the defendant as a member

23   of the IJO was sent here as I said to help plan terrorist

24   attacks in the United States.  Hezbollah undertakes the

25   concerted effort to get propaganda out to recruit new fighters.

1         Mr. Schact was asked questions about other things that
2    they do.  I've referenced them already.  This trial is not
3    about that.  And the propaganda on the defendant's laptop is
4    not about that.  This is the video that we looked at yesterday.
5    On the left side of the screen in the top left is a logo of
6    Mughniyah.  Mughniyah is a terrorist.  He is a killer.  This is
7    not about politics.  This is about Hassan Nasrallah promoting
8    terrorism and idealizing and lauding the things that Mughniyah
9    did.  There's the Hezbollah flag behind Nasrallah.  And then
10   there's the Al-Manar logo.  Al-Manar is the formalized
11   component of Hezbollah to get out terrorist propaganda.

12        This is a stipulation that's in evidence.  And this
13   gives you a sense of the way that Hezbollah is focused on
14   recruiting and grooming fighters like the defendant.  Al-Manar
15   and Al-Nour are media arms of Hezbollah.  Al-Manar is also a
16   specially designated global terrorist entity in the United
17   States.

18        So, when the defendant is watching videos like this,
19   let's be clear, what he is doing is consuming propaganda of
20   terrorists to motivate himself to stay disciplined as he
21   continues to do things for the IJO.

22        In terms of history I've already referenced the 2006
23   war. I'm just going to go through a couple of events relevant
24   for you to think about because the defendant was either
25   affected y them or in some ways participated.  The 2006 war was

1    between Israel and Lebanon.  And the defendant admitted that he

2    was in Lebanon for part of that war in July.  He left and came

3    back and continued to train.

4        Now to be clear, if Hezbollah had wanted the defendant

5    to fight in that war, he was ready.  He had trained in 2000 and

6    he would have.  But he came back and continued to develop his

7    cover.  But his internet activity reflects that both he and the

8    people that he was working with were obsessed with this

9    conflict.  So here are a few examples.

10       June 29, 2008, a search for Winograd report.  Dr.

11   Levitt told you what that was.  That is a Israeli document by

12   former supreme court judge that is basically an analysis of

13   that war.  And it talks about some of the things that from

14   their perspective Israel did well and things they did not do so

15   well.  They were failures.  So he is reading about that to

16   study it, to think about Hezbollah military tactics.

17       Then also on the screen here are other documents of

18   things he was reviewing about that war.  Hezbollah tactics

19   during the July war, Hezbollah convoy in Beirut.  The defendant

20   was very focused on this particular conflict partly because he

21   lived there and if took place in part of south Lebanon where he

22   grew up.  But this is one of the things that motivated him.

23       As I've already said, in February 2008, the leader of

24   the IJO at the time was murdered.  Now, there are some

25   documents on the screen here and we talked about them during

1   the testimony of Gary Baptiste.  They are newspaper articles to

2   be clear.  These are newspaper articles about cables, formal

3   communications that had been classified and had been leaked.

4   There were objections and questions about why does this matter

5   that he is reviewing these newspaper articles?  Well, here's

6   the answer.

7           These cables were sent around the time that Mughniyah

8   was killed and the defendant was reading these cables to try

9   and understand who was responsible.  Dr. Levitt explained that

10  it was a joint endeavor by the U.S. and Israel.  This was

11  another one of those things that  motivated the defendant to be

12  here carrying out terrorist attacks.

13          And this doesn't matter that this is a public document

14  in a newspaper.  That's not the point.  The point is, what was

15  the defendant focused on?  What was motivating him?  Things

16  relating to the IJO and Hezbollah's war against the United

17  States.

18          Hezbollah was very focused on retaliating after the

19  death of Mughniyah.  You've heard testimony about the bombing

20  that happy happened in Bulgaria, the bombing of the busload of

21  Israeli tourists.  The defendant knew about that.

22          Here is another piece of the internet evidence.  He

23  watched the YouTube video about Hezbollah being suspected in

24  that bombing and he confirmed to the FBI that not only did he

25  know that the IJO carried this out, he believed that his

1    handler, his supervisor was someone who helped oversee the

2    planning of that attack.  That's how connected the defendant

3    was at the highest levels of the IJO and he understood fully

4    what the IJO was doing.  This wasn't just about taking some

5    pictures and downloading some things from Google Earth.  This

6    was about trying to kill people.

7         Here is some more evidence relating to the fact that

8    the defendant was well aware and very much invested in

9    Hezbollah and the IJO's mission of targeting the United States.

10   More internet activity all from the unallocated clusters on the

11   laptop, all things that he tried to delete, videos "Like

12   American Soldier Shot in Helmet", "Iran Versus America",

13   "Iranian Gunboats Harassed U.S. Navy".  These are the kinds of

14   things the defendant watched at home in the privacy of his

15   apartment where he thought nobody was looking at him after

16   spending a long day on the streets undercover as an IJO

17   operative.

18        This is some more of the propaganda.  Again, to

19   continue to give you a sense of what drove the defendant, what

20   his intentions were, his motivations.  Soldiers covered in

21   blood.  And this statement, He who doesn't pull his weapon has

22   no loyalty.  The call for death has come aloud.  That's the

23   martyrdom concept.  That's what the defendant was here

24   committed to.

25        Here is another except from a video and again the text

1    that speaks directly to what the defendant was doing here, what

2    motivated him.  And harm us with all your might and bring even

3    more.  We remain patient.  On the route of jihad we are

4    resolute.

5            In this concept of a patient jihad it's important for

6    a sleeper cell operative.  Like Ms. Houle told you at the

7    beginning of this trial, the defendant was here playing the

8    lawn game.  He was doing things to help advance IJO's tact

9    planning even if he hadn't been asked to directly carry out and

10   attack.  And those things that the defendant was doing, the

11   surveillance, collecting information, identifying weapons

12   suppliers, those are the services and support that he provided

13   to Hezbollah that make him guilty.

14           So, with that background let's talk a little bit

15   little about the way the Hezbollah groomed the defendant for

16   this jihad, the way they trained him.  As I said, this started

17   in 2000 with that boot camp, the defendant's first military

18   training, 45 days in the Bekaa Valley, something he described

19   to the FBI.  And then this document on the top left of the

20   screen is another link that the defendant looked at.  This is

21   something you saw from the testimony of Ms. Shields yesterday

22   where he is reading about and reminiscing about where his

23   training started.  The Bekaa Valley is Hezbollah's logistics

24   area.

25           That same year Israel withdraws from Lebanon as I said

1   and this is an excerpt from the testimony of Dr. Levitt about

2   that.  And so suddenly the defendant had been even as a

3   teenager preparing to fight an armed conflict on behalf of the

4   terrorist organization.  And now some of this conflict

5   dissipates a bit.  And this is the point which the defendant

6   and his family shift focus towards coming to the United States

7   towards targeting the United States.  That starts with these

8   false visa applications that you saw during the testimony of

9   Mr. Hansen and that are also in the summary chart that

10  Ms. Shields testified about yesterday.

11          So, how does this start?  Mohammad Kourani, the

12  defendant's father, shown here on the right side of screen

13  submits this application on April 30, 2001 -- that's the red

14  box -- purporting to have married Wanda Reyes.  Now, a couple

15  things about this.  This is one of those times that a picture

16  explains everything.  The marriage fraud is demonstrated right

17  on the screen there.  That is not a natural pose.  That is

18  someone that the defendant's father paid to set up this

19  marriage so that he could submit his visa application.

20          MR. SCHACHT:  Objection.

21          THE COURT:  Overruled.  It's argumentative.  It's

22  comments on what is already in evidence.

23          You may continue.

24          MR. BOVE:  Thank you, judge.

25          Now, I want to be clear.  Let's folk on the date of

J5FAAKOU1                    Closing Statement - Bove

1   this application because this testimony came at the end of a

2   long day last Thursday and it might have been missed.  This

3   application was submitted on the last day, the last possible

4   day that somebody could get a visa who had entered the United

5   States illegally.  Mr. Hansen explained that as of May 1, 2001

6   you couldn't apply for a visa if you entered without getting

7   here illegally.  So, that's how calculated this was.  They

8   figured this out.  Hezbollah sent the defendant's father here

9   and to apply for this thing at the last moment possible.

10        Here is the confirmation that the defendant did, in

11   fact, enter illegally.  At this time it was OK to just admit

12   that this EWI entry on the screen that's highlighted, "entry

13   without inspection", it was still legal to just admit to the

14   United States.  I got here illegally.  I now have this

15   marriage.  Now I'm applying for a visa.  That couldn't have

16   happened if the defendant's father had waited two or three days

17   to submit this application.  This was a calculated effort from

18   the beginning to get the defendant into the country.

19        Here's the defendant's application submitted a few

20   months after that, December 31, 2001.  His name is down in the

21   bottom of the screen in the red box and you can see that it's

22   claiming that Wanda Kourani, Wanda Reyes, is his stepmother.

23        What happens next?  The defendant wasn't in the United

24   States yet.  His father had come here illegally but the

25   defendant was waiting in Lebanon to see if they could really

1   pull this off.  And as the paperwork got processed and beat the

2   deadline, it was materializing.  The plan was coming to

3   fruition.  And so the defendant gets a visa and he travels from

4   Lebanon to Cyprus to file this document, application for an

5   immigrant visa, where he says to the United States, Wanda Reyes

6   is my stepmother and I would like to go to the United States to

7   live with here.  And there's a question on this document that's

8   one of the first lies that the defendant himself told in

9   connection with these visa applications.  He is asked if he is

10  a member or representative of a terrorist organization

11  currently designated by the United States.

12          Having attended a 45-day Hezbollah boot camp before

13  submitting this application, the answer to this question, the

14  truthful answer is emphatically "yes".  But he lied and he was

15  able to get a visa based on that lie.  Here it is.  Issued you

16  see on the top left.  July 30, 2003, the defendant gets a visa

17  to come here to the United States, one of the first steps in

18  establishing his cover identity because now it looks like he is

19  here lawfully.

20          The Permanent Resident card is what's referred to as a

21  Green Card.  So now he has that document.  It's an

22  identification document that in 2003 is an important part of

23  his cover, and it helps him enroll at CUNY to start on this

24  biomedical engineering degree course work.

25          Ladies and gentlemen, the defendant's not a biomedical

1   engineer.  He never did anything biomedical engineering.  I'm

2   not here to mock anybody's grades but he wasn't a serious

3   student.  This was all a cover.  He was setting himself up so

4   he could do things like go to China and say he was there to

5   look for medical devices.

6           The top of the screen is an excerpt from the testimony

7   of Gary Baptista from the FBI, explaining that when the

8   defendant had described his family as the Bin Ladens of

9   Lebanon.  And at bottom of the screen you can see one of the

10  first cracks in the plan of Hezbollah to get the defendant's

11  family into this country.

12          The United States figured out the first part of the

13  visa fraud.  They denied the application of the defendant's

14  father for that immigrant visa.  So, that is on the left side

15  of the screen, the denial on the red box.  Then on the right

16  side of the screen is the order of the immigration judge

17  telling the defendant's father that he needs to leave.  He

18  needs to go back to Lebanon.

19          So, he did.  But there's a really telling feature of

20  this document in the level of tradecraft that is going on here

21  that shows you how intentional this was to set the defendant up

22  in this sleeper cell.  You see the red box where it says

23  "passport Belgium"?  Where on earth did the defendant's father

24  get a Belgian passport?  I'll tell you where.  It's a fake

25  document from Hezbollah.  And you heard that the defendant

1    described this to the FBI, how the IJO and Hezbollah were

2    interested in obtaining false identification documents so that

3    their operatives could travel.  The defendant's father has no

4    connection to Belgium and here he is traveling on a document

5    like that.  Just more proof of the level of tradecraft that's

6    going on.  And a little bit of cracks along the way where you

7    can see the trail of what really happened here.

8                   THE COURT:  One minute please.

9                   (Pause)

10                  THE COURT:  Can I see counsel, please.

11                  (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (side bar)

2              THE COURT:  Mr. Bove, you were arguing that the

3    father's application relating to citizenship in Belgium was

4    fraudulent?

5              MR. BOVE:  That it was false, yes.

6              THE COURT:  What's the proof of that?

7              MR. BOVE:  The defendant admitted that to the FBI in

8    the interviews at Seton Hall.

9              THE COURT:  Was that an admission.

10             MR. BOVE:  Yes.

11             THE COURT:  OK.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In Open Court)

2           THE COURT:  You may continue, Mr. Bove.

3           MR. BOVE:  Thank you, your Honor.

4           This is copy of the defendant's Lebanese passport and

5    we are going to come back to this but I want you to remember

6    that after the defendant joined the IJO, he stopped bringing

7    this document into the country because he was trying to hide

8    and he didn't want to be asked at airports about the travel to

9    Lebanon reflected in this document.

10          But there was one error in this and it is that when he

11   had to submit his application for naturalization he submitted

12   photocopies of the passport and that's what these are.  So, you

13   can see that during the time that the defendant's father

14   traveled back to Lebanon on that Belgian passport, the fake

15   document, he continued to go back, continued to meet with -- go

16   back to Lebanon and meet with people who were Hezbollah

17   operatives.

18          There's another relative that was also sent to the

19   United States and then forced back to the Lebanon.

20          THE COURT:  What you showed is a Lebanese passport?

21          MR. BOVE:  Yes, your Honor.

22          The defendant's brother, Kassem Kourani, was here in

23   the United States issued an employment authorization, a card by

24   2005.  And remember the document that Mr. Hansen explained to

25   you where he was seeking a parole?  He wanted to go back to

1    Lebanon and then have permission to re-enter?  That application

2    was denied and he goes back in 2009 to live in Lebanon.  Who

3    was Kassem Kourani?  The defendant explained that.  Kassem

4    kourani is the face of Hezbollah in Yater, the defendant's

5    hometown.  And so now the defendant has two strong direct

6    immediate connections to Hezbollah living back home.

7              So, now we're up to the story until about 2008 or 2009

8    and so like I said, the defendant's father and his brother, two

9    of his most immediate connections to Hezbollah are back in

10   Lebanon.  Let's take a couple steps back now to talk about when

11   the defendant was actually recruited and promoted to the IJO,

12   the terrorist unit of Hezbollah.

13             This is the trip.  This is when it happened.  He goes

14   to Lebanon in late 2007 and he comes back to the United States

15   in January 2008.  The defendant said to the FBI at Seton Hall,

16   I was recruited in about 2000.  He eventually admitted that,

17   and these are the entries in the passport reflecting the trip.

18   What happened during this recruitment?  There were a few steps.

19   First, there was a cleric sheik, Hussein Kourani, who

20   approached the defendant about the IJO in Lebanon and he

21   introduced him to this man that the defendant only said was

22   named "Abdullah" and they had the first meeting to discuss the

23   IJO.

24             But it takes a lot more than that to get into this

25   elite terrorist organization.  So, there's a second meeting

1    with the members of the Hezbollah security Unit to vet him and

2    make sure he is prepared to do the work that is required to be

3    a member of the IJO.

4            And then the training starts.  The defendant described

5    this at Seton Hall.  There's a third meeting in Lebanon with

6    somebody from the Hezbollah Intelligence Unit where he is

7    taught from the earliest stages how to resist interrogations.

8            Next step, all in the same trip is his introduction to

9    his handler Majed Abdullah, who the defendant referred to at

10   Seton Hall as "Fadi".

11           MR. SCHACHT:  Objection.

12           THE COURT:  Comments on the evidence.  This was in the

13   evidence.  It's fair comment.  You can comment the other way.

14   The jury will make up its own mind.

15           MR. BOVE:  How do you know that Fadi is Majed

16   Abdullah?  Remember the first meeting at Seton Hall.  The FBI

17   very much wanted to know who the man was that was supervising

18   the defendant because that man was responsible for other acts

19   of terrorism.  There was blood on Fadi's hands and they wanted

20   to figure out who that was.  And so they showed the defendant

21   some pictures.  The defendant had seen this picture already

22   when he met with Gary Baptista in 200 and he said, don't

23   recognize him.

24           In 2017 the FBI puts this picture on the table and he

25   says, I'm not sure if that's my handler.  And then Special

1    Agent Shannon explained what happened.  They left the photo

2    there for the rest of the meeting and the defendant maybe

3    instinctively, maybe intentionally, unclear, he pointed to this

4    photo for the rest of the meeting when he was talking about his

5    handler, Fadi.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. BOVE:  (Continuing)  He just didn't want to give

2     up the name, ladies and gentlemen, but this is the defendant's

3     handler in Lebanon.

4          So what happens at the defendant's first meeting with

5     this handler, his terrorist mentor, his supervisor?  The

6     defendant gets taught the golden rule of unit 910.  That's the

7     unit number for the Islamic Jihad Organization.  The less you

8     know about the unit, the better.  The defendant was also told

9     that what he would do for the IJO was going to be kept a

10    secret, a secret even from other members of Hezbollah who were

11    not in the unit.  That's important when you think about his

12    interactions with other people in the case, like the relatives

13    of his wife, who were members of Hezbollah, they didn't know

14    what he was doing either.  That's how secret this was.

15         After the defendant meets with Fadi, he is taken on

16    this tour of South Lebanon.  This is another place where the

17    evidence intersects with that war in 2006 between Israel and

18    Lebanon.  Following that tour, they walk him through the

19    military tactics that IJO thought was successful.  He's

20    formally brought into the organization, he's formally a member

21    of the IJO.  He had joined Hezbollah in 2000, at that 45-day

22    boot camp, but now he's promoted to a spy for this terrorist

23    unit of Hezbollah.

24         How do you know that this was the trip where it

25    happened?  This is the place where the defendant's Internet

1    history tells the story.  He gets back, he departs Lebanon on

2    January 26, 2008.  Three days later, January 29, 2008, he's

3    reading about the 2006 War.  This is that search at the top

4    that we've already talked about, the fin grad report.  The name

5    is actually Winograd.  He's reading about the 2006 War because

6    he had just been taken on that tour, and he comes back, and

7    he's fascinated by it, he's got this new assignment, new set of

8    objectives that are motivating him, and he's on the Internet

9    reading about what's going on.  So that's how you know that

10   that was the trip, that by January 2008, the defendant was a

11   member of the Islamic Jihad Organization, promoted within

12   Hezbollah.

13          This is another example of the research that the

14   defendant was doing, the background reading that he was doing,

15   as soon as he got home.  He couldn't wait to get involved and

16   to further these objectives.

17          Let's pause for a moment.  I've said some things about

18   this laptop that's the defendant's, and I've said some things

19   about the defendant's email accounts.  How do you know that

20   these are his laptop and his email?  The laptop tells the

21   story.  These are all documents retrieved from the laptop - his

22   resume with the cover identities, with the email accounts

23   listed on the resume, there's a driver's license issued in his

24   name, there's a photograph of the defendant.  At the bottom of

25   the screen, you can see a reference to his -- there are two

1   email accounts, ali.m.kourani@gmail.com, and at the bottom of

2   the screen is a reference to the alikuku account that you heard

3   some testimony about.  There is no serious question that this

4   was the defendant's laptop, that this is the defendant's

5   Internet history, and this is what he was doing immediately

6   after he joined the IJO and came back to the United States.

7        The next thing that happens in the story is that the

8   defendant is back here, and you just saw those searches, and he

9   comes back in late January 2008, and then the leader of the IJO

10  is murdered, Imad Mughniyeh.  Dr. Levitt, I think in a very

11  succinct way, made clear Hezbollah's reaction to the death of

12  Mughniyeh.  This is a quote from Nasrallah:  Let there be open

13  war.  And the defendant was a part of that.  He was here

14  secretly, no question about that, but he was here to help

15  Hezbollah and the IJO position itself to retaliate for the

16  murder of Mughniyeh.

17       The defendant admitted as much to the FBI at Seton

18  Hall.  This is testimony from Special Agent Shannon about the

19  way the defendant described the death of Mughniyeh.  He says

20  they were desperate because they were looking to exact revenge

21  for the death.  This is what the defendant was a part of.  As

22  soon as he was sent back to the United States as an operational

23  terrorist for the IJO, this happens, and that drove him and

24  everything that happened after it.

25       Here's some more research for Al-Manar.  Again,

1    terrorist propaganda for Hezbollah, not politics, not

2    humanitarian aid, terrorism.  This is May 2008.  The defendant

3    is a full-pledged member of the IJO, he's out in the community,

4    living under this cover, but in his apartment, this is what

5    he's doing, thinking about the death of Mughniyeh and how they

6    are going to position themselves to retaliate.

7              Now we're going to talk a little bit about how the IJO

8    trained the defendant and his spy techniques, his tradecraft,

9    things that the defendant did that help you to understand that

10   he is guilty, things that normal people don't do in their

11   everyday lives.

12             THE COURT:  Mr. Bove's been talking about an hour now.

13   Does the jury need a break?

14             Keep going.

15             JUROR:  Keep going.

16             MR. BOVE:  So the first part of the defendant's

17   training, as I've said, was to resist interrogation.  There's a

18   note entry here at the bottom of the screen.  The defendant

19   wrote this down, this is from the document that was seized from

20   his apartment, confirmation that this actually happened.  So

21   you have Special Agent Shannon's testimony about what the

22   defendant said at Seton Hall, and then you have, in the

23   defendant's words, one-on-one training, ask questions, evaluate

24   your interrogator.

25             The defendant also was trained to use weapons by Fadi,

1    his handler.  This training is separate from what happened in

2    2000.  Trained to do things like shoot a Glock, an MP5, and an

3    AK-47, refreshing his knowledge of those weapons, preparing him

4    to use them if the time came in a terrorist attack.

5           The defendant said to Special Agents Shannon and

6    Costello at Seton Hall that Fadi used a particular email

7    account, and he described how that was set up.  Fadi asked for

8    the name of one of the defendant's childhood friends, somebody

9    who wasn't connected to Hezbollah, so that Fadi could set up an

10   email account using that person's name that would be less

11   suspicious and communicate with the defendant while he was in

12   the United States.  The name that the defendant gave Fadi was

13   Helal Kedal, and here you can see that shortly after the

14   defendant got back from being recruited to join the IJO,

15   there's a contact entry that is added to his email

16   alikuku@hotmail.com, and it's an email account in the name that

17   he provided to Fadi, a contact that was saved in March 2008,

18   just after the defendant came back.

19          This shows you -- this is one of the pieces that shows

20   you that everything that the defendant said and admitted to at

21   Seton Hall is true.  He didn't know that the FBI was going to

22   go get his email contacts and find this there.  He didn't know

23   the other pieces of the evidence that corroborate what he was

24   telling them.

25          The next step in the defendant's IJO training is the

formal military training.  He described this during several

meetings at Seton Hall.  In July 2011, he went back to Lebanon,

he went to a place called Birkat Jabbour, a military training

facility for Hezbollah and the IJO.  You can see his travel

records here on the screen.  He says to the FBI that this

training happened in July 2011.  He went back to Lebanon in

June 2011, and he returned from the United States in August,

and then there is an entry from his notes, reconfirmed in

writing, outside the meetings from the FBI on his own where he

was taking stock of what he had done, and this entry refers to

training.  It did involve a handgun.  MPs, referring to the MP5

and the Glock, and then at the end:  It was five days.  So this

is independent evidence corroborating the defendant's

confession about this training.

One important feature of this training that the

defendant described at Seton Hall is that there were at least

two high-level IJO operatives there, Fadi Kassab and Mohammad

Schawraba.  And Schawraba's name is going to come up in a

little bit, but this gives you a sense of what was going on in

this camp.  The defendant said there were about 25 operatives

there.  He said some of them had American accents, so they were

part of the same sleeper cell as the defendant.  And this is

not the rank and file IJO; this is the highest level of the

organization gathering to learn terrorist techniques.

These are the weapons that the defendant described

1    operating at this training.  You saw them in this courtroom.

2    And we brought those weapons here to help you get a sense that

3    these aren't just pictures, ladies and gentlemen.  And when the

4    defendant was at an IJO training camp, learning to operate a

5    thing like a PKM, a belt-fed machine gun, a rocket-propelled

6    grenade launcher, let's think for a minute about what's really

7    going on there.  This was not training for the Lebanese Army.

8    This was the training of a terrorist organization.  The people

9    at that camp, including the defendant, were training to turn

10   those weapons on civilians.  That is what terrorism is, and

11   that's what was going on at this camp.  This isn't Hezbollah

12   boot camp, it's not the Lebanese military.  This is preparing

13   to use weapons for acts of terrorism.

14          Now, I mentioned in the beginning that the defendant

15   has deleted some of his Facebook messages.  This is really the

16   first time in the evidence that that comes up.  So you see on

17   the bottom of the screen, there are deleted messages with

18   Mohammad Sadek.  These are out of the defendant's Facebook

19   account.  June 16, 2011, so a little bit before he comes to the

20   training.  And then on the top, there are deleted messages from

21   August 15, 2011, so right after he gets back.

22          So as the defendant is preparing to go to the training

23   and after he gets back, he's communicating with this guy,

24   Mohammad Sadek.  Who is Sadek?  Sadek is a close associate of

25   Hassan Nasrallah on his Facebook page, sitting on a couch, next

to him.  That is the level of contact within Hezbollah and the

IJO that the defendant had.  He was not a foot soldier.  This

was a high-ranking spy here in the city.

On the bottom of the screen, you can see that he

also -- the defendant also had in his phone a contacts entry

saved for Sadek with his cell phone, and you can see that he

also deleted that as well.

It's not four messages that the defendant deleted,

ladies and gentlemen.  He deleted 98 messages out of his

Facebook account with Sadek, the man on the couch next to the

Secretary General of Hezbollah, both before and after his

training.

It's also important to note that he didn't delete all

his messages.  You can see on the right side of the screen that

he had one in 2015 that he didn't get rid of.  He got rid of

the ones that were incriminating because he did not want you to

see them at this trial, and now you can understand why -

because he was talking to a high-ranking member of Hezbollah

about coming there for this training.

Now let's get back to the Helal Kedal email account,

the cover email account used by Fadi.  Around the time of that

training, a little bit after, October 2011, he sets up -- Fadi

sets up a new email account with a variant on this Helal Kedal

name.  This one is a Hotmail account, and you can see that it's

created.  On the top is the subscriber information with a

1    second email account used by Fadi.  You can see it's set up in

2    Lebanon, it was set up on October 15, 2011.  And then on the

3    bottom of the screen are the safe contacts from the defendant's

4    email, alikuku@hotmail.com.

5           Four days after that account was created, it's saved

6    in the account of the defendant.  That is because this was set

7    up, so that the defendant could have contact and receive

8    communications from the IJO while the defendant was in the U.S.

9    and his handler was in Lebanon.

10          More deleted chats, with a different person, Bilal

11   Kourani.  So right around the time that Fadi sets up a new

12   email account to covertly use to communicate with the

13   defendant, the defendant has a bunch of chat communications

14   with this guy, Bilal Kourani, all deleted.

15          Who's Bilal Kourani?  This is from his Facebook

16   account.  Bilal Kourani is a member of Hezbollah and a

17   Hezbollah soldier, someone who you can see from the photo on

18   the right side of the screen is committed to the idea of

19   martyrdom, as the defendant was.  The translation of that

20   picture, "I might come back or I might not, so forgive me," the

21   defendant is in the United States talking to someone who's

22   openly committed to Hezbollah and ready to die for that cause,

23   just like the defendant was.  And that is why the defendant

24   deleted those chats.

25          And just like with Sadek, he didn't delete everything.

1   The ones that were not incriminating -- here's one -- it's

2   still in the account.  He got rid of the ones that he didn't

3   want you to see because they were cracks in his cover, because

4   biomedical engineers don't communicate with Hezbollah members.

5          The defendant admitted at Seton Hall what happened

6   with the email accounts that Fadi used.  These two Helal Kedal

7   accounts.  He said he was instructed to get rid of them, to

8   stop using them, because the IJO was concerned that that

9   communications method had been compromised.  The defendant

10  wrote that down at the top of the screen.  This is from his

11  notes document, Government Exhibit 222, emails deleted.  So

12  when Mr. Schacht is arguing to you and suggesting that there

13  should be emails someplace, that they're not in evidence, this

14  is the answer - the defendant deleted his emails with Fadi, so

15  that you could not see them.  And he admitted that at Seton

16  Hall.  He said he deleted them as soon as he got them.

17         Here's the evidence that shows you you know what

18  happened.  Let's start at the top.  This is from the safe

19  contact entry from the defendant's email account.  So the email

20  address that Fadi was using was Helal, H-e-l-a-l.  This is an

21  entry from the forensic analysis of the defendant's laptop.  He

22  did a search for the word Helal, H-e-l-a-l, and you can see

23  that he's searching his Gmail account, ali.m.kourani.  Why?  To

24  purge the emails.  To make sure that he got rid of all of them.

25  I've shown you two of Helal Kedal emails, and it's the same

1    story with the second.  It's this other contact was spelled

2    Hilal, H-i-l-a-l, and what happened with that?  The defendant

3    did a search for that exact term H-i-l-a-l, so that he could

4    purge, even from his spam, the messages that he had had with

5    Fadi, so that you couldn't see them and wouldn't have evidence

6    of what he was doing.  But he slipped up, because this forensic

7    evidence is here, and now you can see what he was doing, and

8    you know why he deleted those messages, because they were with

9    his terrorist handler.

10            Another thing about the deleting of these messages:

11   The defendant said at Seton Hall that this happened in 2012.

12   When were these contacts last touched, last changed in the

13   defendant's email account, which you can see on the left,

14   alikuku?  The same day, the same time, in 2012.  This was a

15   concerted effort to stop using the accounts at this point.

16            The defendant also talked at Seton Hall about using

17   draft email messages to communicate, and, of course, he got rid

18   of them, just like he did the Fadi emails, with one exception.

19   And so how does this work?  Email accounts were set up, drafts

20   were saved, so that they could be read in other places.  So on

21   the defendant's phone, there are these examples of draft

22   emails -- one, two, three -- that weren't fully deleted from

23   his phone, so you can see that he was using this technique to

24   communicate.  And then the one draft email that the defendant

25   forgot to delete is the one that relates to China, his trip to

1   China.

2           Now, this draft was last saved in 2010.  That's after

3   he went to China, and we're going to talk about that trip in a

4   minute.  But these are all draft emails that corroborate what

5   the defendant was saying about using that method to

6   communicate.

7           The next thing that the defendant did to communicate

8   without people picking up on it or generating evidence of it

9   was to use cutouts, intermediaries.  So when he got to Lebanon,

10  his handler didn't call him, they called his father or his

11  brother, and so this is the testimony from Special Agent

12  Shannon where she described that.  This is a set of exhibits,

13  emails from the defendant's account, that give you a sense of

14  how the defendant and his father, his two most immediate

15  connections to Hezbollah, were living in Lebanon.  The

16  attachments to these emails show the data on the top left and

17  Hassan Kourani on the bottom left, living in a big house with a

18  BMW out front and a motorcycle, and the defendant said to the

19  FBI, I never got paid to do this, I was just doing it because I

20  wanted to.  Hezbollah was paying and setting up the defendant's

21  family in Lebanon as he provided this assistance in the United

22  States.

23          This is what's in the living room.  So this photo is

24  on the bottom right of the screen.  The family house in Yater

25  has a picture of Nasrallah sitting in the living room as the

1    centerpiece in that room.

2         Alikourani1985@hotmail.com, this is another person

3    that the defendant was communicating with who is a member of

4    Hezbollah, and to try and maintain this carve-out, so that he

5    wasn't communicating directly with his father, this person,

6    alikourani1985 was sending the defendant email messages on

7    behalf of his dad. So his dad applied for a new visa in 2013,

8    and that didn't work out, it was denied. Did his father reach

9    out directly to the defendant to tell him that? No, it was too

10   sensitive. He didn't want to be seen communicating directly

11   with him, so alikourani1985@hotmail.com sent him this message.

12   1985 is a reference to the open letter of Hezbollah when the

13   organization first announced itself, and you've seen the

14   evidence from this alikourani1985 email account. It's a

15   different person, it's not the defendant, but this is someone

16   else who's lauding Hassan Nasrallah, and then you can see at

17   the bottom right of the screen, posts this news article about a

18   relative who's captured on the battlefield in Syria, a

19   Hezbollah fighter, Mousa Kourani, captured in that conflict.

20        Ali Srour is another example of a person that

21   Hezbollah and the IJO used to communicate with the defendant

22   while avoiding direct contact with Fadi. The defendant told

23   the FBI who Ali Srour was, a member of Hezbollah who works on

24   missiles. So here's an example, ladies and gentlemen. Ali

25   Srour sends the defendant copies of his Lebanese passport, and

1    as I've already said, there was a concerted effort not to bring

2    that passport back into the United States.  So here you have

3    Srour, a member of Hezbollah assigned to missiles, sending that

4    copy to the defendant so that he can use it.

5          Lastly, on the tradecraft, the smuggled SIM card, the

6    SIM card that the defendant taped onto the back of his passport

7    underneath this sticker.  And Mr. Schacht cross-examined

8    witnesses about whether or not this was normal and how people

9    normally travel.  The reason you know that this was tradecraft,

10   that this was not just a normal traveler, first just look at

11   it.  Who does this?  But the second point is that the defendant

12   had taken the SIM card out of his phone, so the data that was

13   on that SIM card, he didn't want the U.S. Government to see as

14   he crossed the border, and so he took it out of his phone.  The

15   phone was missing the SIM card, and he slipped it under his

16   passport to hide it.

17         Now, look, they didn't take the data from that SIM

18   card, that's conceded -- there was an error in that way -- but

19   you still have this example, one of the cracks in the

20   foundation of the defendant's cover identity.

21         Now let's talk about the defendant's missions, the

22   things that he did here for the IJO.

23         There were six.  The one, deepen his cover identity

24   that I mentioned, the citizenship and the passport, and he

25   surveilled U.S. military and intelligence locations, he looked

J5FKKOU2                    Summation - Mr. Bove

at airport procedures in Toronto and at JFK, he was assigned,
and he did target and identify Israelis, he also located
weapons suppliers and established weapons storage.  So let's go
through these.

          This is the defendant's naturalization application,
submitted at the direction of the Islamic Jihad Organization,
on August 15, 2008.  So, remember, he joins in January 2008,
and then he applies for naturalization in August.

          These are the false statements in that application:
He denies being a member or even associated with a terrorist
organization.  He denies having committed any crimes for which
he was never arrested, and then he also denies having provided
any false or misleading information to U.S. authorities in
connection with his travel.  Four separate lies in this
document to obtain citizenship.

          This is the end result of that, ladies and gentlemen,
the naturalization certificate, that he obtained on April 15th,
2009.

          What happened on the same day?  The defendant comes
right into Manhattan and applies for his U.S. passport,
immediately using the naturalization certificate as the
document that was proof of his identity.  This was all part of
a concerted operation.

          He was Kassem Kourani, the face of Hezbollah in Yater
as his contact, and he says he has no travel plans at that

1    point.  This is April 15, 2009.  You can see in the bottom

2    left, he gets the passport on April 22nd.  April 30th, 2009, he

3    gets a visa to enter China, despite having said he has no

4    travel plans.  And then on May 3rd, 2009, the defendant goes to

5    China.

6         Now, look, you heard from Dr. Levitt about what the

7    IJO was doing in China in this time period.  They were looking

8    for suppliers of ammonium nitrate to make explosives.  The

9    defendant's travel to China, it's not random, and everything

10   was set up so he could do this immediately to help in this

11   mission, but say, no, I was not looking for ice packs with

12   ammonium nitrate.  I'm a biomedical engineer, I was going to

13   look for medical devices.  This is an example of the defendant

14   using his cover to carry out IJO operations.

15        One of the next things that happens in the story

16   keeping the defendant's cover identity is that he marries Leila

17   Abadi.  I'm not suggesting to you whether or not this was a

18   loving marriage, but what I am saying is that the defendant

19   married a Canadian citizen with ties to Hezbollah.  He

20   described the place where she lived in Lebanon as a compound

21   like Tora Bora, another bin Laden reference, and he talked

22   about conversations with his handler where they talked about

23   the utility of having connections to Canada, so he could travel

24   back and forth to Canada to conduct operations.

25        The next step in deepening the cover identity.  The

1    biomedical engineering degree wasn't enough, so then the

2    defendant starts to pursue an M.B.A. in the summer of 2012,

3    right after the marriage.

4           And let's be clear:  This was all a cover.  This is a

5    text message from the defendant's phone where he's talking to

6    his wife.  He says:  "When we first got married, I was doing

7    the fake shit with school."  He's talking about the M.B.A.  It

8    was done exclusively to enhance his cover, to try and make it

9    easier for the defendant to operate in the United States

10   without drawing suspicion.

11          Another thing that the defendant did a little bit

12   later, in 2013, was apply for a passport card.  He admitted at

13   Seton Hall why he did that.  His handler said:  Look, it's

14   possible you can be traveling, and the U.S. Government could

15   seize your passport, but if you can make it to Mexico or make

16   it to Canada, then you will be able to get back into the United

17   States using this card.  So you can see that he got that advice

18   during a trip to Lebanon in early 2013 -- that's the left side

19   of the screen -- and he submits the application in

20   April 2013 -- that's the middle document -- and then he gets

21   this passport card.  Ladies and gentlemen, he never used this

22   document.  It was just there for emergency purposes.

23          The next thing that the defendant did was collect

24   information and conduct surveillance of U.S. Government

25   facilities.  And these are the examples -- and, remember, you

J5FKKOU2                    Summation - Mr. Bove

1    know this not just because the defendant described it, but at

2    the meetings, he actually had his lawyer initial the places

3    that he surveilled.  So let's talk about them.

4            The first two, 26 Federal Plaza and 335 Adams Street,

5    the Secret Service offices.  And you can see in the top of the

6    screen, that the defendant actually conducted a Google search

7    in March 2013 for 26 Federal Plaza.  This is where the Internet

8    evidence corroborates the evidence of what the defendant was

9    doing here, it corroborates his admissions.

10           Now, the defendant said at Seton Hall what he did for

11   these two buildings, ultimately, was to download some images

12   from Google Earth and bring them back to Fadi, so they could

13   use them in an attack plan.  That's confirmed by the notes

14   entry, which says:  Everything else of Google Earth, online

15   research was true.  The defendant told the truth about what he

16   did to help the IJO target these two facilities.

17           Keep in mind what was going on at these two places.

18   335 Adams Street, Secret Service offices, classified

19   information handling and a joint operations center, the type of

20   place where leaders, and law enforcement, and the military get

21   together in a case of an emergency.  On the right side of the

22   screen is 26 Federal Plaza.  Those are some of the features of

23   that building that I've already touched on.  Thirty federal

24   agencies, more classified information, another operations

25   center, and a daycare center.  These are the places the

1   defendant targeted for the IJO.

2              The other two places are armory facilities, places

3   operated by the military, the armory in Harlem and an armory on

4   Lexington Avenue.  And you can see on the bottom of the screen,

5   that this is another place where the defendant slipped up.

6   There's a crack in his cover.  He did a Google search in

7   March 2014 for this location.  This is also another place where

8   the notes document shows you that the defendant actually did

9   these things.  Here is an entry that says "Outpost on 27th,"

10  which is near both where the defendant had his front with the

11  counterfeit clothing and also where the armory was, and then on

12  the second line, there's the reference to "Lex," Lexington

13  Avenue, the location that the defendant surveilled.

14             So what's going on at these two places?  Military

15  units are stationed there.  Both have about 700 military

16  personnel.  In Harlem, there is a Children's Zone, a community

17  center.  And then on the Lexington Avenue facility, another

18  joint operations center.  These are the types of places, ladies

19  and gentlemen, that targeting and attacking would help cripple

20  the entire city.  These aren't just high density populated

21  areas or places with a lot of military personnel; these are

22  strategic targets by the defendant and the IJO.

23             And remember what he said about the 69th Regiment

24  Armory.  He didn't just download some Google Earth images

25  there.  He actually took a video of the security outside that

1    location.  He admitted to doing that at Seton Hall, to using

2    his cover identity, the normal commute that he would take to

3    his counterfeit clothing store, to be on the streets near there

4    and to use his cell phone to videotape what was going on

5    outside that place, so that the IJO could see what the security

6    was like.

7              This is another piece of the defendant's surveillance

8    of military and intelligence outposts, and this is one we

9    haven't looked at yet.  These are three photos in evidence from

10   the defendant's laptop, photos of military personnel on the

11   street.  Look at the focus in those photos, ladies and

12   gentlemen.  Those aren't normal pictures.  Those aren't

13   pictures that a biomedical engineer takes.  Those are pictures

14   that a spy takes.  And why?  Mr. Psoinos explained why, and

15   it's on the screen here:  Identifying information about the

16   types of uniforms that people wear, the insignias, helps the

17   IJO to figure out who key personnel are in the organization,

18   helps the IJO figure out how military personnel are armed and

19   how they operate when they're out on the streets.  And so these

20   photos show more evidence of the defendant targeting military

21   and intelligence outposts here in the United States.

22             Another thing that the defendant admitted to doing was

23   studying security procedures at airports and, in particular,

24   JFK and Toronto Pearson.  So here is the testimony from Special

25   Agent Shannon on the top, that he had confessed to having done

1    that.  And it's fairly obvious, I think, why a terrorist

2    organization would want to know those things, they were

3    thinking about how to get terrorists, and weapons, and

4    contraband through airports, from Lebanon into Canada, from

5    Lebanon into the United States.  So what are some of the things

6    that the defendant looked at?  Exit points, security

7    checkpoints, camera locations, baggage claim procedures, again,

8    what uniforms were worn, questions asked during screenings.

9    This is all conduct that the defendant confessed to, and the

10   defendant took that information, and he brought it back to Fadi

11   in Lebanon, and that is another part of the support and the

12   services that the defendant provided as a terrorist to

13   Hezbollah and the IJO.

14          It's clear that he had enough time in both of these

15   airports.  The travel records and evidence show that he went

16   through JFK 19 times.  He went through Toronto seven.  Plenty

17   of time to do exactly what he confessed to doing - studying

18   security procedures.

19          The defendant admitted to being tasked by the IJO with

20   identifying and targeting Israelis and members of the Israeli

21   Defense Forces, the people who fought against Lebanon in that

22   2006 War.  What the defendant said at Seton Hall was that he

23   used the LinkedIn website to look up people who listed the

24   Israeli Defense Forces in their profiles, and he went back to

25   Lebanon, and he told Fadi, hey, this is how you can do this,

1     it's fairly straightforward, and this is a way that we can

2     locate Israelis and members of the IDF.  And the defendant's

3     Internet history shows that he was extremely committed to this

4     mission and constantly reviewing things about IDF personnel and

5     harming them.

6          Here are a few examples.  This is excerpts from a

7     document related to Google Earth on the laptop where there are

8     questions like what IDF airfield is this?  And in looking at

9     towns, the specific locations of towns in Israel.  And it's

10    another example of the defendant using Google Earth to collect

11    information that would be helpful to support IJO's goals.  And

12    in the context of all of the other evidence, ladies and

13    gentlemen, this isn't normal, innocent behavior.  This is the

14    defendant acting for the Islamic Jihad Organization.

15         You saw this document yesterday.  The defendant took

16    down off a public website a document with personal identifying

17    information for over 35,000 members of the Mossad, the Israeli

18    intelligence agency.  Publicly available?  Sure.  But the

19    question is for what purpose.  And you know why the defendant

20    took that down.  He took it down to bring it to Fadi to say,

21    hey, look at this, I'm helping, I'm capable, I'm in a position

22    to assist this organization, and I'm ready to act.

23         Fadi also asked the defendant to identify suppliers of

24    weapons.  As I said in the beginning, people who could help the

25    IJO get guns to be used in an attack.  So here you have some

1   evidence that the defendant, he did that, he followed that

2   instruction.  He came back, and he looked on eBay to try and

3   find weapons suppliers online, to try and find people that he

4   could connect with to get guns.

5           There's also this search, and this is from -- the

6   bottom document is from his email.  So, yes, a separate part of

7   his Internet history that shows he's looking at this Atlantic

8   Tactical website, another place to go and get weapons.  Now,

9   look, the defendant said at Seton Hall, I was told to do this,

10  I found these people, I brought them back to Fadi, and he

11  wasn't happy, he didn't like the work that I did here, he

12  wasn't pleased with my performance, because these weapons

13  suppliers that I found, he didn't think were reliable enough.

14  That doesn't matter for purposes of this case and your

15  deliberations a bit.  The issue here, the point, is that the

16  defendant was asked to do these things, he did them.  You know

17  that because he admitted to doing them and because it's backed

18  up by what is on his computer.  And he did everything that he

19  could to see that through, to put the IJO in a position to

20  carry out an attack.

21          In addition to finding weapons suppliers, the

22  defendant was also asked to find places to stockpile guns

23  because the IJO thought it might need a place to put a lot of

24  them.  And what the defendant said at Seton Hall was, at first,

25  Fadi asked me to figure out if it was possible to use front

1    companies to do this.  And this is a place, ladies and

2    gentlemen, where the defendant's cover identity really merges

3    with his IJO activities here in the United States, because this

4    is why the defendant had a counterfeiting business.

5    Mr. Schacht has made some arguments to you about, well, being

6    engaged in this petty illegal conduct is not consistent with

7    someone who was trying to stay under the radar.  In this case,

8    it was, and it was because he was assigned by the IJO to set up

9    front companies that would have premises that could be used to

10   store weapons.  So these are all checks seized out of the

11   defendant's apartment on the day he was arrested, June 1, 2017,

12   all with different names, all different fronts, and all part of

13   the defendant's effort to help the IJO find one of these places

14   where they could store weapons.

15        But remember what else the defendant said at Seton

16   Hall about this mission:  After he did all these things, and he

17   figured out the process for setting up these companies, it

18   turned out to be kind of tedious, it was a lot of work.  And so

19   here the defendant made a recommendation, a proposal.  He said

20   to Fadi, look, it would be better if we just get storage

21   lockers.  I can do that anonymously, and it's easy.  And he did

22   do that, at American Self Storage.  So you can see on the top

23   of this screen here are Internet searches related to American

24   Self Storage.  On the bottom is a picture of the American Self

25   Storage facility that Special Agent Shannon described.

1          The defendant finds this place, and then he takes out

2     a storage unit and an alias, the alias here, Jacob Lewis, on

3     this document dated October 16, 2009.  How do we know that this

4     is the defendant?  You have to follow the paper trail a bit.

5     So in the top left is the document we were just looking at

6     where the defendant initially rented this storage facility in

7     2009, a year after he joined the IJO.  Think about that timing.

8     It's not a coincidence.  In 2013, he files this

9     change-of-address form, October 2013, the same alias, Jacob

10    Lewis, and he lists a phone number.  So this is the bottom

11    left, (646)266-5373.  And around the same time, in 2013 -- and

12    these are all Government Exhibit 501, ladies and gentlemen -- a

13    separate document gets filed at American Self Storage for one

14    of the defendant's front companies, New Spot Fashion, but he

15    made a mistake, he connected the two inadvertently, he listed

16    the same phone number, and you can see that on the bottom of

17    the right side of the screen, (646)266-5373.  So the name of

18    the company on this form, like I said, is New Spot Fashion.

19    And how do you know that that's the defendant's?  Because at

20    the top right, you can see that one of the checks for New Spot

21    Fashion was seized out of his apartment.

22         So this is the defendant doing for the IJO what he was

23    asked to do, taking out a storage locker, so their weapons

24    could be stored there.  And keep in mind, the defendant doesn't

25    have to be the one who puts the weapons in the locker.  Once

1   that locker is available to the IJO, he can give the key to

2   Fadi, who can give it to someone else who can come in

3   completely unconnected to the locker and put the weapons there.

4   And this is part of the way that the IJO worked, part of the

5   tradecraft.  You have this man with a cover identity as a

6   counterfeiter taking out a storage locker, but taking it out

7   because he was tasked with doing it as a spy for the Islamic

8   Jihad Organization.

9           THE COURT:  Mr. Bove, it's 20 to 12:00.  I'll give you

10  25, 30 minutes for rebuttal.  If you want to use it up now, I'm

11  just letting you know how much time you have left.

12          MR. BOVE:  Judge, I think we had talked about I had

13  about two hours for this and then a brief rebuttal.  So I think

14  I have about 20 minutes left.

15          THE COURT:  All right.

16          MR. BOVE:  Thank you.

17          We're going to talk now about the investigation, the

18  investigation of the defendant.  This started in 2013, as

19  you're going to see, and what happened here is that the FBI and

20  law enforcement were taking steps to investigate the defendant,

21  to disrupt what was going on, and, at the same time, things

22  were happening to the defendant and the IJO that caused his

23  position in the organization to shift.  You're going to hear a

24  lot about the FBI's investigation today, I think probably more

25  from Mr. Schacht than me.  Let's be clear about one thing:  In

 1    the context of a counterterrorism investigation, which is what
 2    this was, the FBI's objective is to protect the public.  And
 3    that can be done in a lot of different ways.  One way, sure, is
 4    to arrest a terrorist and try him publicly in a courtroom, like
 5    is happening now.  But if there is a threat to the safety of
 6    the public, then the first objective is to stop that threat.
 7    And so there can be small victories along the way by
 8    confronting someone like the defendant, making it clear that
 9    the FBI knows what he's up to, so that he will stop what he's
10    doing, and you will see those incremental successes along the
11    way as we talk about the investigation.
12              The first thing that happens in this part of the story
13    is that the defendant gets arrested for his counterfeiting
14    activity in November 2013.  So this is important because it's
15    the first time he understands he's being investigated, and it's
16    important for another reason that relates to the Seton Hall
17    meetings.  The defendant gets pulled over in a traffic stop,
18    and he makes some admissions during that stop, and this is the
19    first time the defendant learns the important lesson when you
20    make statements to law enforcement, they can be used against
21    you.  So you know, from these facts, that the defendant was
22    well aware of that when he went to Seton Hall and attended
23    those meetings.
24              The next part of the story relates to what happened
25    with the IJO.  Remember Mohammad Shawraba, the man who was at

1    the defendant's training in July 2011?  All of a sudden, in

2    2014, after the defendant gets arrested, it becomes public that

3    Shawraba is actually a double agent, had been working for the

4    Israelis, and now the defendant has a problem because he has

5    been at this training camp with Shawraba, and he doesn't know

6    what Shawraba has said to the Israelis about him.  So Hezbollah

7    is concerned about that, and the defendant is concerned about

8    that.

9              January 2014, you see the beginning of a pattern.  The

10   defendant has been arrested by the NYPD, and he decides to try

11   and flip the situation a little bit, and he applies for a job

12   at the NYPD, just like he told the FBI that he wanted a job

13   working with them.  But he wasn't actually applying to work

14   there in a legitimate way.  He was trying to get a position in

15   the NYPD to collect intelligence.  He wasn't going to tell them

16   the truth about who he was.  And how do you know that?  Because

17   after he submitted the application, there's a series of

18   searches associated with his email account about how to defeat

19   a polygraph.  That's on the bottom of the screen.  And then

20   right above, he's thinking about how much money he's going to

21   make while collecting intelligence about the NYPD.

22             In late 2014, the defendant gets recalled back to

23   Lebanon because he's been arrested, he's having problems

24   related to Shawraba, and they want to know what's going on.

25   And this is where you can tell that the defendant had made some

1    headway with the NYPD, with his operation targeting the NYPD,

2    because he admitted at Seton Hall that when he went back, he

3    said, look, I have this contact now at the NYPD, his name is

4    Lieutenant York, here's his contact information, and he

5    provides that to the Islamic Jihad Organization.

6           How incredibly dangerous is that for Lieutenant York?

7    There's no legitimate purpose that that information was

8    provided for.  It was provided to the IJO by the defendant, so

9    that he could be targeted.  And that's reflective of the

10   defendant's intent all the way up to late 2014.

11          The defendant's last meeting with the IJO happened in

12   September 2015.  These are the entries from his American

13   passport, and he goes back, and what he said at Seton Hall was

14   that he was told he had been terminated from the unit.  That

15   happened because of the Shawraba situation, because the

16   defendant had these contacts with the NYPD.  His cover had

17   fallen apart, and so by September 2015, the IJO starts to part

18   ways with the defendant because he can't be effective anymore

19   as a spy.

20          He doesn't give up on reading about recent

21   developments, though, because he's still interested in

22   Hezbollah.  And, here, he's tracking what is going on on the

23   battlefield in Syria, when one of his relatives gets captured

24   in that fight.  So even though the defendant's out of the IJO,

25   he's still committed to Hezbollah, he's still a member of that

1    foreign terrorist organization.  And when you're thinking about

2    the charges in the case, that's really the question, his

3    connection to Hezbollah, not just the IJO.

4           In 2016, you heard from Special Agent Battista that

5    the FBI met with the defendant.  They went to him.  A few

6    things happened during these meetings.  The defendant said I

7    have no connections to Hezbollah, but he also displayed

8    tradecraft as he was doing it.  He shows up at the first

9    meeting without a phone, except the phone the FBI gave him,

10   without any identification.  That's not how a normal person

11   operates; that's how a trained spy operates.  He also uses the

12   meetings in April 2016 to try and collect information from the

13   FBI.  He's trying to gather intelligence about what the FBI

14   knows and what they're doing.  And he's not going to let the

15   FBI set up leverage on him, so he denies, he rejects offers of

16   money at that point.

17          And his posture was pretty clear in these meetings.

18   He tells Special Agent Battista, it's going to take more than

19   cookies for me to cooperate.  Another time he says you can

20   bring it.

21          And this is evidence that the defendant was still

22   engaged in spy games.  He's looking -- this is a search on his

23   phone searching for call recorded because he wants to collect

24   intelligence on what Special Agent Battista is saying to him in

25   his meetings that he could then trade with Hezbollah if it

1    suited him.

2          Special Agent Battista brings a proffer agreement.  He

3    says you could think about this document as a way to have a

4    legal protection for your statements.  The defendant says, I

5    don't want -- he doesn't even look at it, he says this is

6    bullshit.  He didn't care about protections for his statements.

7    He didn't care about that in 2016, and he didn't care about

8    that in 2017 at Seton Hall because that's not what this case

9    was about to him.

10         In the summer of 2016, he goes back to Lebanon, and

11   there is this altercation that you hear about between the

12   defendant, his wife, and his mother-in-law.  Ladies and

13   gentlemen, that was an incident of the defendant's own making,

14   a fight that he got in with his wife.  And so his story is that

15   some members of Hezbollah shot at his house.  That's entirely

16   consistent with him being in the IJO, because other than Fadi,

17   nobody knew that he had been in the IJO previously.

18         And then he gets his passport taken, and he has a

19   meeting at the U.S. Embassy with the FBI, and he says a couple

20   of things that are important.  One of them was:  I have this

21   cousin who was arrested for a material support charge in the

22   United States, Mahmoud Kourani.  Why does that matter, ladies

23   and gentlemen?  Because that shows that the defendant knew that

24   it was a crime to be supporting Hezbollah.  That's the same

25   crime that the defendant was charged with.  So if there's any

1   suggestion here that at Seton Hall the defendant didn't

2   understand that he had committed crimes, this puts the lie to

3   that argument.

4          Now let's start to talk about some of the motives that

5   the defendant had in setting up the meetings at Seton Hall.

6   You're going to see this a couple of times.  One of them was

7   revenge.  There are these text messages in his phone where he's

8   saying to other people, I'm just going to expose everything,

9   what you've done is just extra evidences.  So Mr. Schacht is

10  going to stand up and say, look, he wanted these meetings to be

11  confidential, he was relying on that.  Ladies and gentlemen, in

12  September 2016, the man is telling other people, I'm going to

13  expose this.  He made his decision to provide information to

14  the U.S. Government public before it even started.  He was

15  getting this out in the community, and he never cared about

16  confidentiality to the extent that Mr. Schacht is going to

17  suggest to you.

18         So March 2017, the defendant gets a lawyer to call the

19  FBI and set up these meetings.  The defendant's first motive in

20  doing that is a combination of benefits that he wants - he

21  wants his children to be taken from their mother in Canada and

22  brought to the United States, he wants his father brought to

23  the United States, so it's a combination of benefits and

24  revenge.  And you can see that in the defendant's texts, the

25  one we already looked at, I'm just going to expose everything,

1    but then he actually writes it down in his notes document,

2    Government Exhibit 222, I see a way to bring my kids or take

3    revenge.  That was the defendant's mindset going into these

4    meetings.  And what is he thinking about in terms of revenge?

5    That's elaborated on in the notes.  He's saying -- let's look

6    at the one on the bottom.  He wants to put his wife's family on

7    the no fly list, he wants to extradite another relative, and

8    he's thinking about how this will be stressful.  That's the

9    bottom entry that's highlighted.  So he wants a job that will

10   pay him more than $120,000.

11        What can you take from that?  What the defendant had

12   on his mind in March 2017 all involved him cooperating publicly

13   with the U.S. Government.  There was not going to be any

14   confidentiality.  People don't get extradited based on no

15   evidence.  The fact that he had provided information was always

16   if he cooperated in the way that he wanted to, he knew it would

17   be used, and these are the things that he's talking about

18   doing.  It was his intention.

19        So, again, this argument about the defendant expected

20   that these meetings would be kept confidential and that promise

21   was broken, it is belied, it is refuted, by the documents in

22   evidence.

23        Here are the two other objectives that the defendant

24   brought into those meetings, also an entry from his notes, his

25   words, another mistake in discipline on his part.  On the left

1   side of the screen, you can see "collect info," and what he

2   means by that is I'm going to use these meetings to collect

3   intelligence about what the FBI knows, what the agents are

4   aware of, where they are in their investigation, in case I want

5   to go back to Lebanon and try and trade that to reestablish

6   myself in Hezbollah.

7           On the right side of the screen, he's talking about

8   sending a message to the community.  I mean, there wouldn't be

9   a more clear refuting of this suggestion that these meetings

10  would be confidential.  He's actually hoping to use them as a

11  platform to send a message.

12          Before the first meeting, there's a call with

13  Mr. Denbeaux, and two things happen during this meeting that

14  matter.  Mr. Denbeaux says:  Is my client a target?  And the

15  agents basically say:  We're not going to tell you that, but he

16  knows the situation, we've talked to him a bunch.  And then in

17  the middle, what Mr. Denbeaux says next is important:  The

18  defendant, he said he doesn't even know if the defendant cares

19  if he was a target or not.  The defendant thought he was above

20  the law.  He wasn't thinking about could I be charged, what's

21  my status in this investigation.  He was there to get benefits,

22  he was there to get revenge, he was coming to Seton Hall to try

23  to send a message to the community.

24          The first meeting at Seton Hall, one of the most

25  important features of this meeting is that right at the

1     beginning, and multiple times throughout the meetings at Seton

2     Hall, the agents say, look, if you lie to us, you can be

3     charged with a crime.  Why does that matter?  It matters

4     because the defendant is being told that his statements can be

5     used against him.  They're saying if you lie, we're going to

6     prosecute you based on what happened in these meetings.  So

7     he's on notice that that could happen, that there's no promise

8     that the meetings are going to be confidential, and he's also

9     on notice, after March 23rd, that he's already committed a

10    crime in the meetings, because he intentionally lied during

11    those meetings.

12          What's one of the lies?  He lied about when he joined

13    the IJO.  He said I joined in 2010, and he said that because he

14    didn't want the FBI to know that his naturalization application

15    was fraudulent, he was trying to hide that.  So the defendant

16    committed a whole separate crime of lying during that first

17    meeting.

18          Agents testified that they told both the defendant and

19    Mr. Denbeaux repeatedly that no promises were made, and this is

20    the proof of that, ladies and gentlemen.  Mr. Denbeaux says I

21    understand you can't promise or guarantee.  That's on the day

22    of the March 23rd meeting.  It couldn't be more clear.  No

23    promises were made.

24          Mr. Schacht opened on the fact that the agents

25    promised things.  This is a lawyer sitting in the meeting

1     saying that that did not happen.  This is an entry on the right

2     from the defendant's notes.  And it ends with:  I don't want

3     you to feel any guilt if you are not able to help me.  That is

4     the defendant's mindset coming out of those meetings.  He

5     understands that the things he has demanded have not been

6     promised to him and that the agents might not be able to help

7     him.

8            March 30, 2017:  Supposed to be a meeting at Seton

9     Hall, but the meeting didn't happen.  What did happen was the

10    agents sat down with Mr. Denbeaux, and they said, look, your

11    client lied to us during that first meeting, he withheld

12    information, that's a lie.  So, Mr. Denbeaux, as of March 30th,

13    is on notice that the defendant has committed that false

14    statements crime during the first meetings.  And they also make

15    clear, look, this is serious business, the IJO is a terrorist

16    organization responsible for murders of civilians.  And so

17    Mr. Denbeaux, then, is on full notice that what his client is

18    talking about in these meetings is terrorist activity.

19           April 3, 2017:  This is the second meeting, and this

20    is where the coverup really comes in.  So this is an entry that

21    I've started on this morning, "I need a coverup - sign a

22    contract."  And this is that document.  The defendant knew he

23    wasn't going to get a contract, but he got his lawyer to slide

24    this document across the table and try and slip in this part

25    that says, "because it has already been agreed he has committed

1    no crime and faces no prosecution."  This was a lawyer trick

2    perpetrated by the defendant, and the FBI did not bite.  Nobody

3    in that room believed that the defendant had committed no

4    crime.  As I said, in Beirut, the defendant described his

5    understanding that Mahmoud Kourani had violated U.S. law on the

6    same charges that the defendant now faces at this trial.  So

7    the defendant knew that he had committed a crime of material

8    support to terrorism.  He knew he committed naturalization

9    fraud because he intentionally omitted that from the March 23rd

10   meeting, and he also knew that he had lied to the agents, a

11   third crime.  So nobody sitting in the room on April 3rd

12   actually believed that he had committed no crime.  This was

13   just a trick.

14            This other entry, "Faces no prosecution," where did

15   that come from?  Nobody ever said that to the defendant.  They

16   said just the opposite.  Special Agent Shannon testified that

17   during the first meeting, on March 23rd, 2017, it was explained

18   to the defendant we don't make prosecutorial decisions, the

19   Department of Justice prosecutors do, they are not in this

20   room.  So these entries in this document, they weren't

21   misleading to the defendant.  He knew that they were false.

22   This was an intentional ploy.  This was one of the steps in the

23   coverup operation that he was thinking about, and this is what

24   he's trying to fool you with at this trial.  He's trying to

25   convince you that he was in some way tricked into making these

1    statements.  The only tricks were played by the defendant.

2          The April 5th meeting helps you to understand that

3    Mr. Denbeaux's role here was in some ways very limited, that

4    the defendant was the person really driving these meetings.

5    How do you know that?  Because the defendant kicked

6    Mr. Denbeaux out of the room and decided that he would do the

7    interview alone with Special Agent Shannon.  The defendant got

8    Mr. Denbeaux to participate in this just to try and play that

9    game with the document.

10         The fourth meeting, the defendant identifies the

11   buildings that he surveilled.  Here, in response to this

12   argument about confidentiality, remember, he says, I'm

13   concerned that if I sign this document, it might get out to the

14   public, so I'm going to have Mr. Denbeaux do it, because he

15   knew that the agents were going to provide this information to

16   other people.

17         Fifth meeting, more admissions, and he identifies the

18   weapons that he used at the training.

19         In May, the defendant starts to make threats that

20   really reveal what his motivations were.

21         May 3rd, Mr. Denbeaux says to the FBI:  If you don't

22   get him the benefits, I'm going to the media, I'm going to take

23   this case public.  Mr. Schacht is about to tell you that the

24   defendant expected these things would be confidential.  The

25   defendant got his lawyer to threaten the FBI that he was going

1   to take it public before he was arrested.

2          The next threat is, I'm going to go to Lebanon, on

3   May 17th, and this is where that collect info entry in the

4   notes matters.  He's collected information and intelligence

5   from the FBI at these meetings, and he's threatening to take it

6   back to Lebanon to Hezbollah.

7          June 1st, this is the defendant's arrest, and here you

8   can see the laptop, the go bag, the notes document, and you can

9   see the combat boots that were seized in the defendant's

10  apartment, because he was getting prepared to go back to

11  Hezbollah and go back and fight.

12         After the defendant was arrested, he gets a new

13  lawyer, and he decides to come in and talk to the government

14  another time, and he signs an agreement.  That agreement says

15  nothing about confidentiality, because that was not what was

16  motivating the defendant.  The agreement did say that the

17  government may use statements made by the defendant, the

18  client, at the meeting to rebut any evidence or arguments

19  offered by or on behalf of the defendant.  And that provision

20  is important because that's why you heard about what happened

21  in this meeting, because when Mr. Schacht opened in this case,

22  he said, look, my client went to Seton Hall, he didn't tell the

23  truth, he didn't say all the things that happened, it wasn't

24  all true, he was trying to trick them.  That is contradicted

25  directly by this meeting, because the defendant sat down --

1    and, look, if there was a time where someone was going to make

2    clear, look, I didn't actually do the things that I said I did

3    at Seton Hall, that was all a ploy, I was trying to trick the

4    FBI into getting some benefits, that would have been the time.

5    There's a new lawyer, he's been arrested, immigration benefits

6    are basically off the table, but that's not what the defendant

7    said.  You heard what he said.  Look, everything that I told

8    the FBI that I did for the IJO, that was true, I did those

9    things.

10           So that is why you can trust and take to the bank the

11   accuracy of the defendant's five confessions at Seton Hall.  I

12   want to be clear about those confessions.  Judge Hellerstein is

13   going to instruct you on the law at the end of this case, and

14   one of the things that he is going to say to you, I expect,

15   what he says controls, but I expect that what he is going to

16   say is that, ladies and gentlemen, the statements from the

17   defendant at Seton Hall, they were collected in a lawful way.

18   No one's rights were violated at Seton Hall, and that's why

19   you've heard that evidence, that's why it was admissible in

20   this courtroom.  The proof of the defendant's confessions, five

21   of them, is a big part of the evidence of his guilt, but it's

22   not the only part, ladies and gentlemen.  You've now seen the

23   evidence on his laptop, you've seen the email evidence, the

24   Internet activity, you've seen those deleted chats from his

25   Facebook account, you've seen the go bag in his apartment.

J5FKKOU2                     Summation - Mr. Bove

1   Ladies and gentlemen, the evidence here is overwhelming.  One

2   confession would be enough.  You have five.  There's all this

3   independent evidence demonstrating what the defendant was doing

4   in those meetings.

5          So I ask that at the end of the arguments, and after

6   you've heard the judge's instructions on the law, and you go

7   back and deliberate, that you do justice here, that you do your

8   part in helping to protect the public.  This is a man who was

9   here in the United States for years trying to set up attacks,

10  targeting places with child centers, and now it's time for him

11  to be held accountable.  And based on all of the evidence in

12  the case, after you've deliberated, we ask that you find him

13  guilty on all counts.

14         Thank you.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Thank you, Mr. Bove.

2          May I see counsel at side bar.

3          (Continued on next page)

1            (side bar)

2            THE COURT:  Mr. Schact, I can have the jury take a

3    recess and then have you go ahead and make your statement and

4    we actually could then have the rebuttal by Mr. Bove and finish

5    the summations and break for lunch.

6            MR. SCHACHT:  Fine with me.

7            THE COURT:  Or we could have lunch now.

8            MR. SCHACHT:  I would rather do the first thing you

9    suggest.

10           THE COURT:  The jury take a recess --

11           MR. SCHACHT:  And then let me do --

12           THE COURT:  And then Mr. Bove will follow immediately

13   thereafter.

14           MR. SCHACHT:  Then lunch, then jury charge.

15           THE COURT:  Thank you.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In Open Court)

2          THE COURT:  Members of the jury, we are going to take

3   a recess at this point for 15 minutes and then when we come

4   back Mr. Schact will deliver his summation.  Mr. Schact has

5   advised me that he'll take less time than Mr. Bove.  So, we'll

6   see.  And then following Mr. Schact, Mr. Bove will have some

7   time but not much to do a rebuttal.  Then you'll have lunch and

8   you'll come back and I'll give you instructions.  Close up the

9   books, leave them on your chairs and keep an open mind.  Do not

10  discuss the case.

11          (Jury not present)

12          (Recess)

13          (Jury present)

14          THE COURT:  Be seated, everyone.

15          We'll now hear from Mr. Schact.

16          MR. SCHACHT:  Thank you very much, your Honor.

17          Members of the jury, once again you'll recall my name

18  is Alexie Schact and I have the responsibility and the

19  privilege to be Ali Kourani's lawyer.  What I want to say to

20  you today is that my client did commit a crime.  He lied and he

21  lied repeatedly to the FBI and that's illegal.  But he was not

22  then and he is not now, nor has he ever been a member of the

23  IJO or 910, these different kind of names that we've heard

24  about here.

25          What happened in this case and this is what I told you

1    I think my opening statement was that my client grew up in

2    south Lebanon close to the Israel border, we learned in a town

3    called Yater, Y-a-t-e-r and he knows intimately because he is

4    related both by blood and by marriage to people in Hezbollah.

5    He knows a lot about Hezbollah.  He had friends in Hezbollah.

6    One of the things that we saw and a lot of the evidence went by

7    quickly and there were times I think when it was hard for some

8    people to focus.  A lot of the evidence is not evidence about

9    him.  It's evidence about his friends.  And so I would hope

10   that because he is from a certain place in the world he is not

11   held responsible for who his friends are.

12          So, we saw, for example, a lot of entries from

13   Facebook.  One hundred percent of those pictures on Facebook

14   that you saw, you saw pictures of people with guns, Hezbollah

15   flags, flashing money, all kinds of different things that were

16   produced by the government into evidence, all of those pictures

17   are pictures that people who he knows posted on Facebook.  And

18   luckily in the United States you can't be guilty by

19   association.  If you could be guilty by association, then you

20   should convict by client.  He has associates and he has friends

21   and he has family members in Hezbollah.

22          But if you look carefully and clearly at the evidence,

23   you will find, you will see that he himself was not a sleeper

24   agent.  In fact, the evidence will show you I think that there

25   are no sleeper agents.  This is total fiction.  You heard from

1    Dr. Levitt, who was the expert witness called by the

2    government.  Dr. Levitt, I argued with him a little bit about

3    the nature of his expertise.  He is a person who used to work

4    at the FBI.  He got paid $550 an hour to come here and be a

5    expert, in quotes, about Hezbollah.  He told you he does not

6    speak Arabic.  He does not speak Farsi or Persian, the language

7    of Iran that supports Hezbollah.  He reads things on the

8    Internet and he talks to other people and this is the basis of

9    his expertise.  He told you that never in history --

10   Hezbollah's been in existence since about 1985.  Forget about

11   my client for a moment.  Never in history has anyone in

12   Hezbollah ever attacked or harmed anyone within the United

13   States.  I'm not here to defend Hezbollah.  Hezbollah is a

14   horrendous terrorist organization but it's based in the Middle

15   East.  You heard they attacked and killed people in Burgas,

16   Bulgaria and you heard that they killed people in Argentina

17   and, certainly, they've killed many people in the Middle East.

18   But they are not at war with the United States.

19        In his closing statement the prosecutor showed you a

20   quote.  I think it was from Hassan Nasrallah who is the head of

21   Hezbollah in 2008 or 2009, announcing we are at open war.  I

22   don't know what war he was talking about when he said that but

23   he wasn't talking about open war with the United States because

24   that statement was made 11 years ago and in that time

25   nothing -- forget about my client, again, nothing has happened

1   here.  Nothing.  We know this from their witnesses.  Don't take

2   my word for it.  They told you this.

3            There are no sleeper cells here.  You've heard no

4   evidence of sleeper cells here and you've heard a lot of

5   evidence and seen a lot of pictures of a lot of different

6   people involved in Hezbollah, people who've committed crimes,

7   horrible crimes, people who've done terrible things.  But none

8   of these people were doing any of these things in the United

9   States.

10           Hezbollah, we were told a few minutes ago, has been

11  paying the defendant's family.  I would like to suggest to you

12  and I promise you my closing statement won't take too long.

13  So, please follow with me.  Just as Mr. Bove said,

14  Mr. Denbeaux, a prior lawyer of my client's, did a lawyer

15  trick.  I would suggest to you that the government's closing

16  statement was an extremely artful, extremely articulate lawyer

17  trick, selecting little facts among the different facts in the

18  case and covering them with meaning that does not exist.

19           So, you saw a text message that my client sent to his

20  wife where he uses the expression "fake shit".  If you look at

21  that he's not saying fake shit about himself or about his

22  education.  He's selling fake shit, counterfeit clothing.

23  That's the business he's in.  That's proven.  He wouldn't be

24  doing the counterfeit clothing business if he was really on the

25  Hezbollah payroll.  Why would he risk getting arrested which,

1    of course, he was arrested we know in 2013 for selling or

2    possessing counterfeit boots.  That makes no sense.  And the

3    reason it makes no sense is because you know from common sense

4    and you know from the expert witness that the point of being a

5    so-called sleeper agent which is a concept that excisions in

6    the world is to be sleeping, not to be committing crimes

7    everyday.  It's to be asleep, acting normal.  He was not acting

8    normal.  He was selling counterfeit boots.  He was committing

9    crimes on a daily basis.

10          And the government is correct.  I have absolutely no

11   doubt that all of those documents -- it's government 501B.

12   These were the self storage Jacob Lewis documents.  This is

13   lawyer trick I'm talking about.  You know that my client's in

14   the counterfeit clothing business.  You know that he's trying

15   to hide his identity because he's committing a crime of selling

16   counterfeit clothing so he uses a fake name, Jacob Lewis.

17          He opens this self storage Unit.  It's in evidence.

18   For some reason he actually buys and pays a little extra to get

19   insurance.  He gets the Diamond Protection Plan insurance.  I

20   suggest to you that nobody who is storing weapons gets an

21   insurance plan for their storage Unit.  If there's fire, they

22   are not going to run to the insurance company and say, My guns

23   were burned down.  But if he has clothing in there or boots, he

24   might.

25          Also, you'll see in the seventh page of the document

1   there's actually an invoice for $16,080 in jeans and short

2   sleeved clothes to New Spot Fashion, the company that has one

3   of those checkbooks that was found at his house.  So, when I

4   said in my opening statement there's no evidence of him being a

5   terrorist, I contrast that to his counterfeiting business.

6   There's abundant evidence of that.  There's the storage Unit.

7   There's stuff that's purchased.  There's the fact that you know

8   that he had a business on 27th Street in Manhattan.  There's a

9   purchase order.  There's the fact that he was actually arrested

10  for it once before and told the police, I have counterfeit

11  boots and I make certain profits selling them.

12          The government you'll remember, introduced this in

13  evidence.  This is Government Exhibit 401E4 and you saw a lot

14  of documents about a Nike boot.  I thought what the government

15  was trying to say and the purpose of producing this was they

16  were going to say that this is somehow connected to a military

17  uniform or doing some kind of terrorism.  They didn't say that

18  in the closing statement.  But this is an example of what I'm

19  talking about when I say there is evidence of things to do with

20  clothing.  There's no evidence of anything to do with

21  terrorism.

22          Compare the two things.  I asked Ms. Shields how many

23  total entries have you put up for the jury to see?  Something

24  under 200.  These are the total number of things that have been

25  extracted from his devices over these years.

1          Taking out from those documents you see that all of

2     the supposedly incriminating information is on

3     AliKourani@GMail.  Why in the world would anybody who is

4     selling counterfeit shoes disguise their name as Jacob Lewis

5     but be a terrorist in his real name?  It makes absolutely no

6     sense.  There's another e-mail address that he used called

7     Alikuku which is almost his name.  But compare this to his

8     counterfeit business which he's in a foolish kind of half-assed

9     way, he's trying to conceal things.  Obviously, he's got the

10    evidence in his house.  So, he's not really that careful.  And

11    he's not really that smart.

12         Apologize for that.

13         He made mistakes, a lot of mistakes but if he was

14    really a terrorist he would have made the real big mistake.  He

15    would have had guns.  There's no guns.  There's no proof of him

16    ordering any guns.  There would have been messages.  You see

17    what the government is a capable of.  Think about this they are

18    following him.  You know from the evidence they're following

19    him for a couple of years around the world.  They show up in

20    New York in Queens.  They show up in Chicago.  They show up in

21    Lebanon.  They're following him through GPS.  They're following

22    him through travel.  They're listening to his phone calls.  He

23    can't erase his phone calls.  The FBI agents told you they were

24    listening to his phone calls for something like two years.

25    They were reading his texts his e-mails, his What's App

messages.  A lot of people think What's App is encrypted in
some way.  They're able to read that.  They're able to recover
and produce in evidence here in court things that he's actually
erased.

        So, what the government says -- and this is kind of a
lawyer trick also -- is they say the things that are erased
that you don't get to see are proof that he's guilty.  Think
about that for a minute.  He eras things.  So, we don't know
what they are and that shows he's guilty.  That makes no sense.
That is not fair.  That is not American.  I don't know about
you.  You'll consult your own life experience and common sense.
People erase things.  People erase things for a lot of reasons.

        He's got friends and family members who are in
Hezbollah.  You can imagine a lot of reasons why.  They showed
evidence here in his closing statement.  Mr. Bove showed you
that there were some things sent to him by friends about
Hezbollah that the friends wanted to share with him.  A lot of
people might want to erase that if a friend sends you
something -- and I've already told you he knows loads of
people.  Imagine, think about it as a close to home example.

        Imagine you live in New York City -- and me, for
example, I'm on 94th Street in Manhattan.  I know people in my
neighborhood.  Let's say I have a friend down the block who's a
drug dealer and I'm talking to my friend at the corner when I
get some coffee.  Let's say my friend is the kind of fool who

likes to send pictures of himself with money or something like
that.  He sends that to me.  I don't want to have that on my
phone but I'm still friends with him even though he's a fool
who sends me pictures like that.

       And so you know you see he has friends who sends him
pictures.  Some of these things have been erased, things like
this with money, friends in Lebanon with guns, all of these
kind of things.  And don't get me wrong.  My client, I'm not
defending everything about him.  I'm not saying you need to
like him or think he's a good guy.  He grew up, remember, you
know from the evidence he grew up in south Lebanon.  His dad's
house was blown up by the Israelis.  He's sympathetic maybe.

       I can imagine growing up in that atmosphere and
thinking the Lebanese Army Hezbollah, they're defending us.
I've seen my dad's house get blown up.  That's not what's on
trial.  Liking Hezbollah, liking or disliking Israel, that's
not part of this case.  That doesn't make him guilty or not
guilty.  Really it shouldn't play any role in the case.  And
the judge asked you all in jury selection whether you could put
aside in your deliberations the fact that he's a Muslim.  The
fact that he's an Arab but that's not really relevant to what's
happening here, a decision about whether he's guilty or not.
So, I really want to hold you to that.  I really hope you can
all do that.

       And the case is not about whether you like him or you

1   like his friends or you like his family.  It's about whether he

2   was a Hezbollah sleeper agent.  And on that point there's no

3   proof.  What do I mean by "no proof"?  Again, sorry for being a

4   little repetitive.  They're following him for years.  They

5   don't have one conversation.  They don't have one witness, not

6   one person who is going to say I saw him do something or I

7   heard him say something.  What they have and all they have are

8   his statements to the FBI and obviously, those statements are

9   highly incriminating and the question is why would he say those

10  things?  But of course, if they had more evidence they wouldn't

11  allow a terrorist to wander around.  He is wandering around.

12  They don't arrest him because they can't arrest him because

13  they have no evidence.  That's obvious.  So, the question is

14  why would he say these things?  And how would he say these

15  things?  How would he have the information?  How would he know

16  what to say?

17          This is my answer.  He grew up around Hezbollah

18  people, his wife's family you heard evidence, is in Hezbollah.

19  He's got relatives in Hezbollah.  He's got friends sending him

20  information about Hezbollah.  He's interested.  He's an

21  educated person.  He's an engineer with an MBA.  You see he's

22  reading about these things.  He's reading the Winograd report.

23  He's reading Winograd report because he's interested in the

24  world, in these things in Israel.  He doesn't like Israel, I

25  imagine, but he is interested in Israel and he is interested in

things that Israel did wrong.  He's interested in weapons

maybe.  You saw it.  He looked up some things on the Internet

about weapons.  I say to you, so what?  So what?

You heard from Reggie Donaldson -- I think that was

his name -- the expert from the U.S. Attorney's Office.  He

told you on the devices, the two devices there were close to

one million things collectively, e-mails, photos, videos, one

million.  I can't imagine what one million things would look

like if we spread it out here in court.  And out of these one

million things, what they bring you is Facebook photos sent to

him by jerky friends who may be criminals.  I don't know what

they are or they may just be soldiers.  I don't know.  Nobody

knows.  We don't know because we don't have the full evidence.

They send you, they show you that he's erased, some messages

with some trends.

He has a friend who likes Hezbollah.  You saw the

friend.  He's seated in a living room type space with Hassan

Nasrallah.  So, that's somebody he knows.  And he's got some

erased messages.  So, the government says this is proof that

this person in this photo is a terrorist and he's a terrorist

because they're erased.

Think about that for a second.  Imagine if you have a

friend who does something wrong and you have erased messages

with that friend.  That doesn't mean you did anything with the

friend.  So, what's the key question for me now?  The key

1   question is why would he say these things?

2           The reason why, you saw he had an opportunity early on

3   from Gary Baptista who is the head now of the Iran Hezbollah

4   FBI Unit.  He told you that he and another FBI agent and a

5   member of a intelligence agency spoke to my client.  You'll

6   remember they offered him amazing stuff.  This was amazing

7   testimony.  They stopped him.  They had some coffee with him

8   and they said, we'll pay for your kids' college.  Have you ever

9   had anybody from the government go up to you and tell you they

10  are going to pay for your kids' college?  I haven't.  I doubt

11  you have.  They offered him right on the spot in cash five

12  thousand dollars in cash even though he said to them, I'm not

13  in Hezbollah.  I don't know anything.  I can't help you.

14          And so, Agent Baptista said we wanted to compensate

15  him for their time, for his time.  This is like the 550 bucks

16  on hour that Levitt got just to give you a sense of the kind of

17  money the government has, the resources they can throw at these

18  problems when they want to.

19          So they offer this guy who they say is lying to them

20  $5,000 to lie to them.  Can you imagine what they would give

21  him if he told them what they wanted to know?  They would pay

22  for his kids' college.  So, what happens is there's a falling

23  out.  He and his wife had a falling out.  You heard evidence he

24  had a fight with his wife, his mother-in-law.  That's all true.

25  Some people from the wife's family shoot up his family's house.

He's had it.  He tells the FBI, I am sick of these people in

Hezbollah.  You see in his notes, he even told Agent Costello,

I want revenge on these people after this incident.  So, this

is his opportunity.  Eventually, he gets a lawyer, Denbeaux.

He meets with them.  He wants to screw them over.  He wants

revenge.  And so the only way to get any revenge is to say

they're in Hezbollah.  And how do you know that?  He's got to

admit something because they keep pushing him.

Remember, he has a list of things.  And I suggest in

your deliberations, don't just take the selected little parts

that Mr. Bove showed you.  You could look at my client's whole

notes together.  And it's instructive because you'll see

they're kind of like rambling stream of consciousness.  I don't

know how much really heads or tales you'll be able to make of

it.  But prominently all over the notes are the things that he

wants.  And so in here he talks about "no flight list", meaning

trying to mess up his wife's family.  He talks about what he

needs to get ASAP.  One of the things here says "Dad here

ASAP".  "Kids visas".  All these kinds of things.  "Money".  So

in his mind this is it.  He's finally going to do it.  I am

going to get revenge on my wife's family.  I am going to get

money and this is where the craziness of my client's plan is

clear.

So, Mr. Bove gets the last word as he should because

they have the burden of proof.  He may say nobody confesses to

1    something like this unless it's true.  And I submit to you that

2    my client does.  There's something a little wrong with him.  Do

3    you remember the testimony that came out when I was asking the

4    agents had he ever had an interaction with somebody where the

5    person says to them, I want you to get me an apartment in a

6    doorman building in the middle of Manhattan?  I want you to get

7    me a job that pays $120,000 a year.  And my client sends Agent

8    Costello his resumes.  Costello has asked for any resumes.

9    This is a bizarre crazy thing to do.  I'm not saying he is

10   mentally ill in some kind of way, that he is schizophrenic or

11   something like that.  I'm saying there's something wrong with

12   him.  His perspective was possibly off.  He attaches, you'll

13   notice if you compare the checks to his counterfeit clothing

14   business and the resume that he gave, you'll see he actually

15   puts on his resume that he sends to the FBI his job at the

16   counterfeit clothing business.  He seriously thinks the FBI is

17   going to get him a job based on his resume selling counterfeit

18   clothing.  That's crazy to use a colloquial term.  It's also

19   crazy that he could think he could say, yeah, I had all of this

20   Hezbollah training and I'm a sleeper agent here and i'm

21   scouting out locations.  All of this is totally crazy.  It's

22   not true.  There's nothing to support it.

23        Think about some of the things he says, the little

24   tells that he is lying.  One of the things he said supposedly

25   is he mentioned someplace called Birkat Jabrur where he

1    supposedly was having military training in Birkat Jabrur.  How

2    do we know that's false and made up?  The way we know is

3    because his story makes no sense.

4           He also told the FBI that they put stuff over the

5    people's heads and drove them in a blacked-out van.  Think

6    about this.  This is Hezbollah.  This is one of the premiere

7    terrorist organizations in world.  Do you think that when

8    Hezbollah takes you with your head covered in a blacked out van

9    so you don't know where you're going, they screw up?  No.  You

10   don't know where you are.  That's the whole point.

11          And so if you're at the training place and you're

12   meeting Hezbollah bigshots, they don't want anybody to know

13   where they are for obvious reasons.  They're secretive

14   dangerous terrorists.  So, he makes up the story and he fuses

15   together all of these different ideas.  How does he know this?

16   How does he know what to say?  What to make up?  You see he is

17   reading all of this stuff on the Internet.  He even told them

18   at one point, I am researching certain things.  He knows who

19   the people are.  I asked Levitt, this guy Shawraba, I think his

20   name was Mohammad Shawraba.  He was one of highest ranking

21   Hezbollah members who became an Israeli informant.  This is in

22   the newspaper.  That's why I asked him that.

23          What another thing?  Another thing that we know that

24   he lied about?  Think about the testimony that my client

25   claimed that he took certain Google Earth images and put them

1    on some kind of a micro SD card or some kind of a card so he

2    can smuggle that back to Lebanon.  This makes even less sense

3    than the Birkat Jabrur thing in the blacked-out van.  Google

4    Earth, nobody smuggles things on a disk from Google Earth.  You

5    just do that from your computer back in Lebanon.  Who would do

6    that?  They want to have it both ways.  They want to say he's a

7    highly sophisticated high ranking, high IQ, highly trained

8    terrorist.  But at the same time he's doing things like this.

9    He's using his GMail account.  That is not a highly trained,

10   highly sophisticated thing to do.

11            The boots, the Nike boots he bought them.  You'll see

12   the receipt.  It's in his name on his credit card in his real

13   name.  This is not the way sophisticated terrorists work.  Why

14   would he even be using his own computer at all?  Maybe you

15   would go to an internet cafe or public library somewhere.  I

16   don't know.  I am not a spy.  But you can tell based on your

17   common sense that none of that makes sense.

18            The photos, this is another example of what I'm

19   talking about when I say a "lawyer trick".  Of the million

20   documents there were three pictures and if you look closely at

21   the pictures they're pictures taken from the Rockefeller Center

22   area of what appear to be possibly American sailors.  Those

23   appear to be American sailors walking around in midtown

24   Manhattan.  That's not a military installation.  Of course you

25   can say well Rockefeller Center, an important building but they

1    are not going to be there tomorrow.  I don't know what they are

2    doing.  Maybe they are on Fleet Week.  Maybe they live in

3    Manhattan.  Who knows?  But this is not surveillance

4    photographs.  Just look at them.  And of course I'm not asking

5    you to, nor are the other million documents in evidence, but

6    you can imagine what the other million documents are.  They're

7    innocent documents which is why you didn't see them here.

8           So, it's by picking these few things out to try an

9    support their narrative that the government tell us the story.

10   And of course how does someone make up a story like this in

11   real life?  Of course as I told you in my opening statement,

12   there's certainly aspects of truth to it.  What are some of the

13   aspects of truth?  The defendant knows people and Hezbollah.

14   That's true.  But look at what he tells them.  Who does he

15   know?  He knows people he's related to basically.  And he's not

16   telling them anything more because he doesn't know anything

17   more which is why he says he wants revenge.  He's getting

18   revenge on some people he's related to.  People he feels angry

19   at betrayed with, whatever.

20          So, of course some of it is true.  But the key

21   elements what makes it a crime, those things are illegal.

22   There's nothing to support those things because, of course,

23   liking Hezbollah or having friends in Hezbollah is not illegal

24   in the United States.

25          Another aspect of the case that I wanted to mention is

1    the way that I think to some degree the FBI and he and Denbeaux

2    misled each other and so I am going to say something slightly

3    different than what Mr. Bove thought I was going to say about

4    the confidentiality point.

5              Denbeaux may be a tricky lawyer.  He may be a bad

6    lawyer.  I have no idea.  But with that document that they gave

7    to the FBI -- you'll remember this -- a document that says you

8    committed no crime and he is not going to be prosecuted.  And

9    the agents told you, Special Agent Costello in particular, told

10   you he didn't really care about the document because he just

11   wanted to try and get information from Ali Kourani.  I'm not

12   telling you there's anything illegal about that.  Mr. Bove is

13   correct.  That's why it's in evidence.  But there's something

14   misleading and tricky about it.

15             So, Ali Kourani could think and did think they've

16   offered to pay for my kids' school.  They're offering me

17   thousands of dollars.  They're offering me those things and if

18   you look at his stream of consciousness handwritten notes, a

19   lot of what is in there is what he wants and what he says

20   they've promised to do for him.  So, the fact that the FBI

21   doesn't complain about this, they just go, OK, thanks and they

22   give it back and they don't say, no, you're wrong.  Maybe

23   Denbeaux's trick worked because they haven't arrested him.

24   Now, in his mind they haven't arrested him because he hasn't

25   done anything wrong but he's thinking nothing's happening.

1          Of course I haven't commit any crime.  After of the

2     five meetings at Seton Hall, they let me leave.  Why do they

3     let me leave?  I haven't really done anything.  And the FBI

4     knows I haven't really done anything.  The FBI is not going to

5     allow a terrorist to run around.  But eventually, they decide

6     we think he's holding back and so they arrest him because they

7     are basically disappointed or angry with them.

8          And so when he says my brother-in-law's in Hezbollah

9     or my brother's in Hezbollah, those things may be true.  But

10    there's nothing to corroborate the fact that he was a sleeper

11    agent.  Nothing.  And Mr. Bove talks about the travel back and

12    forth at different documents and things.  I submit to you that

13    if you look closely at this evidence, that proves nothing.

14    Because it only backs into the story that my client tells when

15    my client says oh, I had some training in 2011.  Obviously, in

16    his head he knows when he went to Lebanon.  So, he has to say I

17    had training in 2011.  He can't say I had training in 2015 if

18    the FBI was following him and meeting him in Chicago because he

19    wasn't in Lebanon in 2015.

20         So, it's just confirming because if you think about

21    your own life experience how does somebody lie, somebody's

22    cheating on their wife.  They don't say, I was in Japan if they

23    were as an alibi unless they were in Japan.  People say

24    something that comes from their real life experience to cover

25    whatever it is or to make up the lie that they want to make up.

1    So his lies more or less match their aspects his life

2    experience.  He can't say I'm part of al-Qaeda or ISIS because

3    that has nothing to do with his life.  They're enemies of

4    Hezbollah and so it has to somewhat match.  Also, it has to

5    match because the people he wants revenge against are those

6    very same people from Hezbollah.

7            Finally, I would ask and again, like Mr. Bove said the

8    judge is going to instruct you on the law.  Listen closely to

9    the whole instruction but please in particular listen closely

10   to the instruction on what a reasonable doubt is.  And I would

11   ask that you consider this case as you should like in any

12   important decision in your own life.

13           When we make decisions am I going to buy a house?  Am

14   I going to get Harried?  Am I going to get divorced?  Should I

15   have children?  What is the level of certainty around the most

16   important decisions in our life that we need to have?  And I

17   suggest to you that looking at this case through that lens you

18   cannot have certainty that degree of certainty beyond a

19   reasonable doubt.  Certainty.

20           What happened here, my client made up some stories

21   because he had some insane cockeyed idea about getting a

22   highrise apartment and having his kids' college tuition paid

23   for and getting revenge on relatives.  And so he made up a

24   story that comes from his own life experience but for which

25   there is no support.  If someone like him who sells counterfeit

1    clothing said to you anything and who's a fan and has friends

2    with pictures of guns, you wouldn't credit what he says.  You

3    wouldn't make an important decision in your life based upon

4    what he says.  Nobody would.  And that's the problem obviously

5    for the government is so that's why the government's summation

6    lists all these other pieces of evidence before even getting to

7    the summation when we know the -- not the summation -- to the

8    confession.  Those five confessions at Seton Hall, all of that

9    evidence is the only evidence because they have been following

10   him and they had all the other evidence ahead of time.  They

11   have been listening to his calls and they didn't arrest him.

12   In fact, they didn't even arrest him until a little bit after

13   the fifth meeting.  We don't know what they were thinking.  I

14   can't speculate.  You can't speculate about why they didn't

15   arrest him after the first meeting but there is simply not

16   enough evidence to convince you beyond a reasonable doubt that

17   he was a sleeper agent for Hezbollah.

18            Thank you.

19            THE COURT:  Thank you, Mr. Schact.

20            Mr. Bove.

21            MR. BOVE:  May I proceed, judge?

22            THE COURT:  Yes.  This has to be brief, Mr. Bove.

23            MR. BOVE:  Yes, your Honor.

24            Ladies and gentlemen, that was truly incredible.  The

25   defendant in this case confessed five separate times and I

1    spent two hours this morning going through all the evidence

2    that corroborates that confession.  The defendant's travel

3    records corroborate it, the evidence on his laptop, the

4    evidence from his e-mail accounts, the evidence seized from his

5    apartment.

6            So, now the argument made to you by defense and they

7    don't have any burden.  The burden is entirely on the

8    government.  But the argument is, well, the defendant went to

9    Seton and he decided to make all of that up.  It was a lie.

10   That's ridiculous.  Who would do that?  Who would put

11   themselves in a position that the defendant did unless these

12   things were true?  Who would admit to targeting a building

13   across the street with a daycare center if that hadn't

14   happened?  No one.  The defendant told the truth in those

15   meetings in the documents to back this up.  Mr. Schact just

16   made a big deal about why would anyone just do Google Earth

17   research and bring it back to Lebanon?  The defendant

18   absolutely did that.

19           Ms. Shields, can we take a look at 222.

20           He wrote down that he did that. everything else of

21   Google Earth online research was true.  His writing, coupled

22   with what he'd seen when he described that, that's how you know

23   he's guilty.  These are the Google searches that I showed you

24   earlier he did at 26 Federal Plaza in March 2013.  He did those

25   searches before the Seton Hall meeting.  He created a trail.

1   And that trail is now before you to show that you that these

2   things actually happened.  The defendant did the things for the

3   Islamic Jihad Organization that he admitted to at Seton Hall.

4           How else do you know that this proffer meeting that I

5   talked about earlier, the one happened after the defendant was

6   arrested, he's got a new attorney.  Circumstances are

7   completely changed.  He's been arrested.  He now sees these

8   charges.  If it were really the case that the defendant had

9   made all these things up at Seton Hall, wouldn't that be the

10  time to bring that up?  Wouldn't that be the first words out of

11  your mouth?  Yes.  Yes.  Yes.

12          Just use your common sense on that one, ladies and

13  gentlemen, because what did the defendant say in that proffer?

14  Yes, everything that I did, everything I described at Seton

15  Hall, I did.  And that admission on June 2, 2017, the only way

16  that it makes sense is in the context of all the other

17  evidence, the fact that he went to Seton Hall to try and get

18  revenge, to try and get some benefits, to try and send a

19  message to the community and he admitted to doing those things

20  and so you know that is true from the other evidence, the

21  Google searches from his notes, here are more notes where he

22  writes down the armories that he researched.  He couldn't make

23  this up on the fly.  These are the records relating to the

24  e-mail account that his handler used.

25          Ladies and gentlemen, these things happened and the

1    defendant admitted to them because they were true.  He is not

2    crazy like.  I said earlier, he is no fool.  He was arrogant,

3    deeply arrogant.  He thought he was above the law and that he

4    could come into those meetings and describe these things and

5    that at that point in the investigation the agents were just

6    going to shower him with cash.

7          But remember how the meetings with Special Agent

8    Baptista ended.  He said it's going to take more than cookies.

9    Bring it.  You are going to need more than that.  So, that is

10   what happened here.  And the FBI continued to investigate.

11   Then the defendant came to Seton Hall and he confessed.

12         Now, a lot of other things that Mr. Schact said to you

13   today are just invitations to be distracted, to ignore the

14   evidence that's here which is five separate confessions and the

15   electronic evidence we talked about and wonder about why there

16   aren't other pieces evidence.  Well, I can address some of

17   those questions.

18         Why aren't there phone calls from the defendant's

19   phone?  Why wasn't the FBI able to intercept calls?  Because he

20   wasn't using his phone.  He admitted to that.  He was going to

21   Lebanon and people were calling his brother and his father.

22   There weren't any calls to intercept.  Why didn't the FBI

23   intercept What's App messages?  Because he wasn't using What's

24   App.  They were using this pretty primitive pager system to

25   communicate because they knew the FBI can intercept these

J5FAAKOU3                    Rebuttal — Bove

1   things.  This is how spies work.  This is how the defendant

2   worked.  This is why he was guilty.

3             (Continued on next page)

| | |
|---|---|
| 1 | MR. BOVE:  (Continuing)  One of the other things that |
| 2 | Mr. Schacht said is that, look, this sleeper cell thing, you |
| 3 | know it's a myth, there are no sleeper cells here in the United |
| 4 | States, Hezbollah hasn't targeted the U.S.  Hezbollah targeted |
| 5 | the United States in the opening letter in 1985 that I laid out |
| 6 | for you this morning.  There are sleeper cells here.  The |
| 7 | defendant described them, and there have been Hezbollah |
| 8 | operatives arrested in the United States for supporting |
| 9 | Hezbollah.  The defendant described that to Special Agent |
| 10 | Battista at the meeting in Beirut.  So there are Hezbollah |
| 11 | operatives here in the United States, the defendant was well |
| 12 | aware of it, and this idea that there is no real threat here |
| 13 | and -- it's a complete sideshow.  That's not the issue.  The |
| 14 | issue is:  Did the defendant do the things that he's charged |
| 15 | with?  Did he provide support and services to Hezbollah?  Did |
| 16 | he receive military training from Hezbollah?  Did he lie on |
| 17 | that naturalization application? |
| 18 | The answers to those questions are yes. |
| 19 | And let's keep in mind:  If the defendant was going to |
| 20 | come to Seton Hall and just make some things up to get |
| 21 | benefits, wouldn't he have done a better job of lying?  There |
| 22 | are things he refused to tell the FBI.  The FBI wanted to know |
| 23 | what he was doing in China related to the ammonium nitrate and |
| 24 | the ice packs.  He didn't provide that information.  The FBI -- |
| 25 | even on simple things, the IJO said -- excuse me, the FBI |

1    asked:  Look, you got this tour of South Lebanon, where did

2    they take you?  He said:  Oh, I'm not going to tell you that.

3    The Israelis might find that information helpful.  I'm going to

4    withhold that.  If the defendant was in these rooms at Seton

5    Hall five separate times making things up just to please the

6    FBI, he would have answered all their questions, and he would

7    have told a different story.  But he was careful about what he

8    said in there, and what he admitted to was true, and you know

9    that from these other documents that are in the record.

10          Think about the Facebook chats — I think Mr. Schacht

11    called that a lawyer trick.  Let's focus on the ones with

12    Mohammad Sadek.  The reason that those deleted chats, 98

13    deleted chats, matter is the timing, ladies and gentlemen.

14    It's not just that the defendant deleted them, it's not just

15    that he deleted chats with somebody who's sitting on the couch

16    next to the Secretary General of Hezbollah, he deleted those

17    chats because they happened immediately before and immediately

18    after he went to Lebanon to get military training.  So it's the

19    timing that shows you that he deleted them because they were

20    incriminating.

21          Last point:  One of the other things that Mr. Schacht

22    just said to you is that there's no evidence of attacks by

23    Hezbollah in the United States.  You haven't heard anything

24    about that.  Well, there's certainly no question that Hezbollah

25    was targeting the United States.  And the FBI doesn't have to

wait, they don't have to wait until something tragic happens.
The government doesn't have to wait until these attack planning
missions are successful.  You don't have to wait.  This
argument does not matter, that they were unsuccessful.  The FBI
did their jobs here.  They disrupted a serious terrorist threat
by approaching this man, saying, look, we're watching you.
That happened in 2016, and he stopped.  And in 2017, he
confessed five times.  He asked for those meetings, he brought
the FBI there, and he admitted to things that make him guilty.
You know those confessions are true because of all of the other
things that we talked about this morning.

          So I ask you to listen to the Judge's instructions
carefully.  You're going to hear what the elements are.  You're
going to hear that it wasn't necessary for the defendant to
complete an attack in the United States to be guilty of these
crimes.  It wasn't even necessary for him to successfully
provide services to Hezbollah, just an attempt to do that was
enough because this is so dangerous.

          Listen to the Judge's instructions about the
conspiracy charges.  It doesn't matter if he was successful.
Just the agreement to do these things is so dangerous, that
these are federal crimes, they're serious ones, and we have
proven that they were committed by the defendant, the defendant
sitting here in this courtroom, based on his confession, all
five of them, based on the laptop evidence, email accounts, the

1   Facebook records in his own handwriting, ladies and gentlemen.

2   These are his notes, the entry I just showed you, everything I

3   did on Google Earth was true.

4            Ladies and gentlemen, the defendant is guilty, he's

5   guilty of all the charges in the indictment, and we ask that

6   you return that verdict after your deliberations.

7            Thank you.

8            THE COURT:  Thank you, Mr. Bove.

9            I think now, members of the jury, will be a good time

10  for lunch.  When you come back, I will deliver the

11  instructions, and you will begin to deliberate.

12           In a moment Ms. Jones will be out to receive your

13  books.  It's 1:15 now.  What's the shortest time you can come

14  back?  2:00?  2:15.

15           JUROR:  2:15.

16           THE COURT:  2:15.  Okay, come back at 2:15.

17           Close up your books, give them to Ms. Jones on your

18  way out.  Do not discuss the case.  You may feel that you know

19  the case, that's all safe, everything else the lawyers have

20  summed up, but you must wait to hear the law that is to be

21  applied to the case.  Keep an open mind and don't discuss the

22  case.  I'll see you at 2:15.

23           (Jury not present)

24           THE COURT:  Okay.  We're recessed until 2:15.

25           (Luncheon recess)

J5FKKOU4

                         AFTERNOON SESSION

                            2:20 P.M.

          (In open court; jury not present; trial resumed)

          MR. SCHACHT:  Your Honor, do you know, have you
decided how late you're going to keep them tonight?

          THE COURT:  They'll decide.

          MR. SCHACHT:  Okay.

          (Continued on next page)

J5FKKOU4

1          (Jury present)

2          THE COURT:  Be seated, everyone.

3          Members of the jury, it's my practice, out of

4   deference for you, to stand while I deliver the charge, but

5   with eight counts, this charge can come up to about two hours,

6   and my arthritic hip won't allow it, so with your permission,

7   I'll sit.

8          My friend says that when you get to a certain age, the

9   topic of conversation when a few people meet are body parts.

10  It's very boring.

11         What I'm about to do, ladies and gentlemen, is to

12  deliver the instructions that deal with one of the main

13  standards of a constitutional right that deal with a jury

14  trial; namely, the presumption of innocence and reasonable

15  doubt.  And I will discuss the eight counts alleged in the

16  indictment and what the government has to prove with respect to

17  each count, and then I'll give you some guides on dealing with

18  various aspects of evidence, and, finally, we'll talk a little

19  bit about the methods of deliberations.

20         First, I want to thank you.  You have been a very

21  attentive and patient jury.  The evidence has been detailed,

22  and even though the subject is interesting, there's a great

23  difficulty in keeping attentive throughout a long time.  You've

24  done it, and I appreciate that very much.

25         I also want to remind you -- and I will say this

again, maybe a number of times -- how crucial a role you play.
There's nothing like the way the United States Constitution
guarantees the right to trial by jury.  No other country has
it, at least not in the same form.  You come in here, and I
think you've seen it throughout this trial, that you are
participants in the delivery of equal justice under the law.
Without that, our country would not be where it is.  We have
many faults, but one of the great things about this country and
about this Court is that we deliver justice fairly and
impartially, with equal justice under the law.  We have you to
thank for this, you and your colleagues that form the juries in
this courtroom.  I don't decide the facts, you do.  My job is
to give you the law.  It's your job to accept the law as I give
it to you and to apply the law to the facts, but no one can
interfere with your job as jurors - to listen, to decide fairly
and impartially and in accordance with the record, and come to
a decision.  That's your province, and nothing can take that
away.

          As I say, I have to give you the law not because I'm
wiser than anybody else, but it's my job, it's my function as a
judge, to run a trial fairly and efficiently and to give you
the law of the case that you have to apply.

          Consider my instructions as a whole when you
deliberate rather than singling out any one instruction as
stating the law.  You should not be concerned about the wisdom

J5FKKOU4

of any rule that I state.  Regardless of any opinion that you may have about what the law may be, or ought to be, or should be, it would violate your sworn duty to base a verdict upon any view of the law other than that which I give you in these instructions.

            A defendant begins trial presumed to be innocent of the allegations against him.  I instruct you that a defendant is presumed by you to be innocent throughout your deliberations until such time, if ever, that each of you is satisfied that the government has proved every element of the charged crime or crimes against the defendant beyond a reasonable doubt.  This presumption of innocence alone is sufficient to acquit the defendant unless you, as jurors, are unanimously convinced beyond a reasonable doubt of the defendant's guilt, charge by charge, after a careful and impartial consideration of all the evidence in the case.

            The defendant has pleaded not guilty, and, thus, the government has the burden to prove the charges against the defendant beyond a reasonable doubt.  This burden remains with the government throughout the entire trial and never shifts to the defendant.  The law never imposes upon a defendant in a criminal case the burden or duty of calling any witness, or producing any evidence, or proving himself or herself innocent.  Likewise, under our Constitution, a defendant has no obligation to testify because it is the government's burden to prove a

defendant guilty beyond a reasonable doubt.  If the government

fails to sustain its burden of proof as to any count, you must

find the defendant not guilty of that count.

          I've referred to reasonable doubt.  The question

naturally arises:  What is reasonable doubt?  The words almost

define themselves.  A reasonable doubt is a doubt based upon

reason and common sense.  It's a doubt that a reasonable person

has after carefully weighing all of the evidence.  It's a doubt

that would cause a reasonable person to hesitate to act in a

matter of importance in his or her personal life.  Proof beyond

a reasonable doubt must, therefore, be proof of such a

convincing character, that a reasonable person would not

hesitate to rely and act upon it in the most important of his

or her own affairs.

          The law does not require that the government prove

guilt beyond all possible doubt.  A reasonable doubt is not a

caprice or whim, it's not a speculation or a suspicion, it's

not an excuse to avoid the performance of an unpleasant duty.

It's not sympathy.

          It's the government's burden to prove each of the

elements of the crimes charged beyond a reasonable doubt.  The

defendant is under no duty to present evidence.  Nor do you

have to accept the testimony of any witness, even one who has

not been contradicted or impeached, if you find that witness

not to be credible.  You decide which witnesses to believe and

J5FKKOU4

which testimony is true.  You must look at all the evidence,
drawing upon your common sense and personal experience.

        If, after fair and impartial consideration of all the
evidence or lack of evidence in the case, you have a reasonable
doubt as to the guilt of the defendant on a particular count,
then it's your duty to acquit the defendant of that charge, by
checking the box "Not guilty" on the verdict sheet, which I
will explain in a bit.

        On the other hand, if, after fair and impartial
consideration of all the evidence, you are satisfied of the
defendant's guilt beyond a reasonable doubt, then you should
vote to convict by checking the "Guilty" box on the verdict
sheet.

        The fact that the government is a party and that the
prosecution is brought in the name of the United States of
America does not entitle the government or its witnesses to
greater or lesser consideration than that given to any other
party.  All parties, whether government or individuals, stand
as equals at the bar of justice.

        The evidence before you consists of the answers given
by witnesses -- that's their testimony -- the exhibits that
were received in evidence, and the stipulations of the parties.
Your verdict must be based solely upon the evidence developed
at trial or the lack of evidence.

        The defendant, Ali Kourani, is entitled to the

presumption of innocence, and it would be improper for you to

allow any personal feelings you might have about the nature of

the crime charged, or the person, or anything else that's not

derived from the merits to interfere with your decision-making

process.  Your verdict must be based exclusively upon the

evidence or the lack of evidence in the case.

         You may not consider any answer, testimony, or

exhibits that I directed you to disregard or that I directed be

stricken from the record.  If an answer was stricken, you must

entirely disregard it as though the words were never spoken.

Similarly, if an objection to a question was sustained before

the witness answered, you must disregard the question and draw

no inference from the wording of the question or speculate what

the witness might have answered.

         The charges against the defendant are set forth in an

indictment.  An indictment is a formal method of accusing a

defendant of one or more crimes.  The indictment is not

evidence, and no weight or significance should be given to it

or the allegations contained in it.  All an indictment is is an

accusation which sets the boundaries of what the government has

to prove, and the defendant is not charged with committing any

crime other than the crimes alleged in the indictment.  The

defendant has denied these charges.  As I say, he is entitled

to a presumption of innocence, and it's the government's

obligation to prove the charges, each of them, and each

J5FKKOU4

1    element, beyond a reasonable doubt.

2              The indictment contains eight counts.  Count One

3    charges that from at least in or about 2002 up to and including

4    in or about September 2015, the defendant provided, or

5    attempted to provide, material support or resources to a

6    foreign terrorist organization, Hezbollah.

7              Count Two charges that at least in or about 2002 up to

8    and including in or about September 2015, the same time period,

9    the defendant participated in a conspiracy to provide material

10   support or resources to Hezbollah.

11             Count Three charges that in or about 2011, the

12   defendant received military training from Hezbollah.

13             Count Four charges that in or about 2011, the

14   defendant participated in a conspiracy to receive military

15   training from Hezbollah.

16             Count Five charges that from at least in or about 2002

17   until at least in or about September 2015, the defendant

18   participated in a conspiracy to use and carry machine guns or

19   destructive devices in connection with the crimes of violence

20   charged in Counts One, Two, Three, and Four and to possess

21   machine guns or destructive devices in furtherance of those

22   crimes of violence.

23             We'll go over this in detail.  I'm just giving you the

24   introductory outlines.

25             Count Six charges the defendant from at least in or

about 2002 up to and including in or about September 2015, the

defendant violated, or attempted to violate, an executive order

and regulations issued pursuant to a law called the

International Emergency Economic Powers Act, IEEPA, by making

and receiving, and attempting to make and receive,

contributions of funds, goods, and services to Hezbollah.

Count Seven charges from at least in or about 2002

until at least in or about September 2015, the defendant

participated in a conspiracy to violate an executive order and

regulations issued pursuant to IEEPA by making and receiving

contributions of funds, goods, and services to and from

Hezbollah.

Count Eight charges that from at least in or about

2009, the defendant unlawfully procured U.S. citizenship by

naturalization in order to facilitate one or more acts of

international terrorism.

Each count, One through Eight, alleges a separate

crime.  You must consider each count of the indictment

separately, and you must return a separate verdict on each

count in which the defendant is charged.

I'm going to give you a verdict sheet.  You can't see

it here, but the foreperson will have it, and it will guide

your determinations.

So the first question is Count One:  Provision of

material support or resources to Hezbollah, how do you find the

1   defendant?  And there's a box for guilty and a box for not

2   guilty.

3           For Count Two, the conspiracy to commit the crime

4   alleged in Count One -- and conspiracy, as I'll tell you, is a

5   separate and independent crime from the crime that is the

6   object of the conspiracy -- same question:  How do you find the

7   defendant, guilty or not guilty?

8           Count Three:  Receipt of military training from

9   Hezbollah.  Again, it has the same boxes, and that continues

10  with Count One through Eight.

11          The defendant has pleaded not guilty to each count.

12  Thus, he denies the charges alleged against him.  In essence,

13  he says that he did not commit the offenses charged in the

14  indictment.  He has a presumption of innocence that works for

15  him.  The government has the obligation to prove each element

16  of these offenses beyond a reasonable doubt in order for you to

17  find the defendant guilty.  The defendant is not required to

18  disprove any element of any count charged.

19          The indictment, as I read, contains eight counts.  As

20  I said, each count charges a separate crime.  I think I've said

21  what I'm just about to say, so I'll skip this part.

22          Now I'm going to go into each of the substantive

23  crimes, and break them apart, and define their terms.

24          Count One of the indictment charges that from at least

25  in or about 2002 up to and including in or about

September 2015 -- and you will see that, that's a time period

for most of the counts -- in the Southern District of New

York -- that's this court and this district.  The Southern

District of New York is made up of Manhattan, Bronx,

Westchester, Putnam, Rockland, and counties across the Hudson

to the west.  So that from at least in or about 2002 up to and

including September 2015, in the Southern District of New York,

Lebanon, and elsewhere, Ali Kourani, the defendant, knowingly

did provide, and attempt to provide, material support or

resources to Hezbollah, knowing that Hezbollah was a designated

foreign terrorist organization, that Hezbollah engages and has

engaged in terrorist activity, or that Hezbollah engaged and

has engaged in terrorism.  So either it was a designated

foreign terrorist organization, or it engaged in terrorist

activity, or it engaged in terrorism.

          In order to sustain its burden of proof with respect

to Count One, the government must prove beyond a reasonable

doubt:

          First, that the defendant provided material support or

resources to Hezbollah, or attempted to do so;

          Second, that the defendant acted knowingly and

intentionally, including with knowledge that Hezbollah was one

of the following:  A designated terrorist organization, that it

engaged in or engages in terrorist activity, or that it has

engaged or engages in terrorism;

J5FKKOU4

1          And third, that one of the jurisdictional requirements

2     of the statute is satisfied.  Jurisdiction is a condition which

3     gives a particular court authority to hear a particular case

4     against particular people.  So there are certain factual

5     elements that had to be proved by the government in order for

6     this court to have jurisdiction, in order to have the

7     competence and authority to hear the case.

8          Now let me do this element by element.

9          First, the government has to prove beyond a reasonable

10    doubt that the defendant provided material support or resources

11    to Hezbollah.

12         I'm going to define these terms.  "Material support or

13    resources" is defined by the statute to include "any

14    property...or service, including currency or monetary

15    instruments," "Training, expert advice, or assistance, safe

16    houses, false documentation or identification, communications

17    equipment, facilities, weapons, lethal substances, explosives,

18    personnel...and transportation."  So if you've given one or

19    more of those, you've given material support or resources.

20         "Material support or resources" does not include

21    medicine or religious materials.  The defendant does not need

22    to have joined or become a member of the foreign terrorist

23    organization in order to have provided material support or

24    resources to the organization.

25         The words weapons, lethal substances and explosives

J5FKKOU4

| | |
|---|---|
| 1 | have the meaning that you understand them to have in ordinary |
| 2 | English. |
| 3 | Training means instruction or teaching designed to |
| 4 | impart a specific skill, as opposed to giving of general |
| 5 | knowledge. |
| 6 | Giving expert advice or assistance means advice or |
| 7 | assistance that's derived from scientific, technical, or other |
| 8 | specialized knowledge. |
| 9 | Personnel refers to one or more people jointly engaged |
| 10 | in a common undertaking.  The word "personnel" includes the |
| 11 | defendant himself.  It can -- in other words, one can |
| 12 | contribute himself, his own talents, and time and energy, to an |
| 13 | organization and be guilty for it if the government proves the |
| 14 | requisite conditions. |
| 15 | JUROR:  Your Honor? |
| 16 | THE COURT:  Yes. |
| 17 | JUROR:  Will we be getting a reference sheet with this |
| 18 | information, or -- |
| 19 | THE COURT:  No, you will not. |
| 20 | JUROR:  -- should we just write it all down? |
| 21 | THE COURT:  Yes. |
| 22 | So the word "personnel" can include the defendant |
| 23 | himself or other people.  A person provides personnel, as that |
| 24 | term is defined in the statute, if he provides Hezbollah with |
| 25 | himself or one or more individuals to work under Hezbollah's |

1    direction or control.

2         A person provides services, as that term is defined in

3    the statute, when a person performs work commanded or paid for

4    by another or done for the benefit of a foreign terrorist

5    organization, here, Hezbollah.  Only work performed in

6    coordination with, at the direction of, or for the benefit of

7    Hezbollah meets the definition of service.

8         If you find beyond a reasonable doubt that the

9    defendant provided material support or resources of any of the

10   types described in the statute, the element is satisfied.  You

11   must agree unanimously with respect to at least one of the

12   forms of material support or resources that the defendant

13   provided.

14        So, members of the jury, I gave you a listing of a

15   dozen categories of material support or resources.  In your

16   deliberations, in order to find the defendant guilty of this

17   element, you must agree as to the particular one or more forms

18   of assistance that the defendant gave.  I'm going to read the

19   list again.

20        Any property or service, including currency or

21   monetary instruments, training, expert advice or assistance,

22   safe houses, false documentation or identification,

23   communications equipment, facilities, weapons, lethal

24   substances, explosives, personnel -- that's himself or

25   others -- and transportation, but not medicine or religious

1    materials.

2            The second element of this count that the government

3    has to prove beyond a reasonable doubt is the defendant acted

4    knowingly and intentionally.  And these words, too, require

5    definition.

6            To prove that the defendant acted knowingly, the

7    government must prove that he acted voluntarily and not because

8    of mistake or accident.

9            To prove that the defendant acted intentionally, the

10   government must prove that the defendant acted deliberately and

11   purposefully.  That is, a defendant's acts must have been the

12   product of his conscious, objective decision, did know about

13   it, intended it, then it should have been deliberate.

14           The government also must prove that the defendant had

15   one or more of the following three types of knowledge:  (a)

16   knowledge that Hezbollah had been designated by the Secretary

17   of State as a terrorist organization, or (b) knowledge that

18   Hezbollah engaged in or engages in terrorist activity, or (c)

19   knowledge that Hezbollah engaged in or engages in terrorism.  I

20   will define these terms.

21           The parties have stipulated that Hezbollah, which

22   includes the Islamic Jihad Organization, was designated by the

23   Secretary of State as a foreign terrorist organization in 1997,

24   and that Hezbollah remains designated continuously up to today.

25           So you know that Hezbollah was designated by the

Secretary of State as a terrorist organization, but it's a
subject of proof and dispute if the defendant knew that or
acted intentionally with respect to that.  So it's either that
or the other two conditions.  One of them is terrorist
activity.  That includes highjacking or sabotage of an
aircraft, vessel, a vehicle, train, or other conveyance;

Seizing, detaining, or threatening to kill, injure, or
further detain another person to compel or coerce some third
party, including a government, to do or abstain from doing some
act;

3.  A violent attack upon an internationally protected
person, including employees and officials of governments or
international organizations;

4.  Assassinations;

5.  Use of any chemical, biological, or nuclear
weapons or device with intent to endanger, direct or
indirectly, the safety of one or more individuals or to cause
substantial damage to property;

6.  Use of any explosive, firearm, or other weapon or
dangerous device other than for monetary gain and with intent
to endanger, directly or indirectly, the safety of one or more
individuals or to cause substantial damage to property;

Or 7.  A threat, attempt, or conspiracy to do any of
the foregoing.

Those are the definitions of terrorist activity, and

J5FKKOU4

they may include any of these seven items.

The term "terrorism" means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents.  In other words, if some group within a nation, but not an overall nation, or agents of a group engage in terrorism -- that is, the premeditated, politically motivated violence -- that would be terrorism.

The government must prove beyond a reasonable doubt that the defendant had knowledge that Hezbollah had been designated by the Secretary of State as a terrorist organization or that Hezbollah engaged in or engages in terrorist activities of the type I have listed, or that Hezbollah engaged in or engages in terrorism.  The government must prove only one of these three categories of knowledge beyond a reasonable doubt.  Again, you must be unanimous as to which one, or more, of the three they proved.

One species of knowledge is when a person knows something, but makes believe it isn't so.  In determining if the defendant acted knowingly, you may consider if the defendant deliberately closed his eyes to what otherwise would have been obvious.  A person cannot willfully blind himself to that which is obvious and disregard what is plainly before him. If you find beyond a reasonable doubt that, during the relevant time period, the defendant was aware that there was a high

J5FKKOU4

probability that the offense was being committed, but

deliberately and consciously avoided confirming this fact, then

you may treat this deliberate avoidance of positive knowledge

as the equivalent of knowledge, and you can find that this

element is satisfied, unless you find that the defendant

actually believed that he was acting in a lawful manner or that

his lack of knowledge was due to mere carelessness, negligence,

or recklessness.

The instruction I just gave applies to the issue of

knowledge.  It does not apply to the issue of intent.  One

cannot intend to commit a crime unless the person has the frame

of mind to do it.  And one cannot attempt to commit an offense

unless the person specifically intends to commit the crime.

The third element that the government must prove has

to do with the Court's competence and authority to act.  The

government must prove one of three things:

The offense occurred, in whole or in part, within the

United States;

Or the offense occurred in or affected interstate or

foreign commerce;

Or the defendant is a national of the United States.

Interstate or foreign commerce includes the movement

of goods, services, money, or people from one state to another

or between the United States and a foreign country.  If the

offense could have a potential effect on interstate or foreign

commerce in any way, no matter how minimal, it is sufficient.
It's not necessary to prove that the defendant's particular
acts affected interstate or foreign commerce as long as the
offense as a whole could have had such a potential effect.  The
defendant does not have to know that his acts affected or could
potentially affect interstate or foreign commerce, all that's
important is that he do so.

The term "national of the United States" includes a
citizen of the United States, either a natural-born citizen,
one born here, or a naturalized citizen, one who became a
citizen through a naturalization process.  Both are considered
nationals of the United States.  And, again, you have to agree
on the particular criteria or more that is involved.  So,
again, there are three:  The offense occurred in whole or in
part within the United States;

Second, the offense occurred in or affected interstate
or foreign commerce;

Or (c) the defendant is a national of the United
States.

Any one of those three will do to give the Court
competence and authority to act.

JUROR:  Your Honor, may I ask another question?

THE COURT:  You may.  I wish any of you who have
questions would ask them of me.

JUROR:  On the last point about being a national of

J5FKKOU4

1    the United States, if we found, in the last -- in the eighth

2    count that that was -- there was something --

3              THE COURT:  Great question, and the answer is no.  If

4    he procured naturalization through fraud --

5              JUROR:  Yes.

6              THE COURT:  -- he's still a national.

7              JUROR:  That is what I wanted to know.  Thank you.

8              THE COURT:  It's the standards conferred by the

9    naturalization that counts.

10             JUROR:  Thank you.

11             THE COURT:  Any objection?

12             MR. SCHACHT:  Yes, your Honor.

13             THE COURT:  Step up, please.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. SCHACHT:  My objection is I have no idea whether

3   what you just said is true.  Obviously, it happened

4   instantaneously.  I've never researched this point.  I simply

5   don't know whether it's true or not.  I would just ask, also --

6          THE COURT:  You have an objection to cover you?

7          MR. SCHACHT:  If they ask any more questions, I would

8   ask that you tell them to defer them to the end and give us a

9   chance to research.

10         THE COURT:  No, I'm not going to do that.

11         MR. SCHACHT:  Okay.

12         THE COURT:  You know from argument, that when the

13  judge wants a question answered, he wants it answered now.

14         Mr. Bove, Ms. Houle, am I correct on the law?

15         MS. HOULE:  Your Honor, I believe you've properly

16  instructed the jury on the law.

17         THE COURT:  I did okay?

18         MS. HOULE:  Yes, your Honor.

19         THE COURT:  Okay.

20         MS. HOULE:  Thank you.

21         (Continued on next page)

22

23

24

25

1          (In open court)

2          THE COURT:  I encourage you to ask questions if you

3     have any.  This charge is not a formality; it's for you to

4     understand and apply.  One reason I don't give out -- there are

5     a few, but one reason I don't give out a printed charge is that

6     because nothing is ever a hundred percent complete.  Someone

7     asks a question, and it's important that the question be put to

8     me.  In this proper instance, I will ask the advice of counsel,

9     but if it's answered within the jury room, we don't know what

10    the story is.  And it's important, also, that jurors are equal,

11    and there's no experts within the jury.  Nobody who is a Ph.D.

12    in literature should be the one who interprets a judge's

13    instructions to the rest.  You're equal, and part of that

14    equality is if you have a question that you need answered, you

15    ask the question, and I will answer it.

16          The government does not have to prove that the

17    defendant actually provided material support or resources to

18    Hezbollah if it can prove beyond a reasonable doubt that he

19    attempted to do so.  If you prove an attempt, it's the same as

20    proving a crime itself.  But to prove attempt, the government

21    must prove beyond a reasonable doubt that the defendant

22    intended to commit the crime itself and willfully took some

23    action that was a substantial step in an effort to bring about

24    or accomplish the crime.

25          Mere intention to commit a specific crime does not

J5FKKOU4

1    amount to an attempt.  Mere preparation to commit the crime

2    does not constitute the crime.  The defendant's action must

3    constitute at least a substantial step toward the commission of

4    the crime.

5             The acts of a person who intends to commit a crime

6    will constitute an attempt where the acts themselves indicate

7    an intent to willfully commit the crime, and the acts are a

8    substantial step in a course of conduct planned to end in the

9    commission of the crime.  There is no requirement that an

10   attempt be successful, actually -- if it's successful, you

11   prove the crime -- or that the defendant actually carried out

12   the crime he was trying to commit.

13            If you find beyond a reasonable doubt that the

14   defendant attempted to commit the crime charged in Count One,

15   then he is guilty.

16            With respect to Count Two -- that ends Count One --

17   providing material assistance knowingly and intentionally.

18            JUROR:  I'm sorry, one more thing.

19            THE COURT:  Don't apologize.

20            JUROR:  I didn't hear if you made a ruling on the

21   objection about the question that I had asked previously.  I

22   assume you didn't say anything, so your --

23            THE COURT:  It's not necessary for me to do so.  If I

24   don't correct myself, what I said stands.

25            JUROR:  Then we assume what you said stands?

1          THE COURT:  Yes.

2          JUROR:  Okay.  Thank you.

3          THE COURT:  Objections are rulings on issues of law

4    and are not the jury's concern.  They really have no relevance

5    in what you're doing.  I give you the instruction, I listen to

6    what attorneys told me, and by not correcting it, it's the same

7    instruction.

8          Now, moving on to Count Two:  Conspiracy.  Conspiracy

9    to give material support to Hezbollah.  You'll notice that

10   Count One is the substantive crime; Count Two is the conspiracy

11   to commit that substantive crime.  Count Three, you'll hear, is

12   a substantive crime.  Count Four is the conspiracy to commit

13   that crime.

14         Conspiracy, I'll tell you, is a separate crime from

15   the object of the conspiracy, which itself may be a crime.

16         Count Two of the indictment charges that from at least

17   in or about 2002 up to and including in or about

18   September 2015, in the Southern District of New York, Lebanon,

19   and elsewhere, Ali Kourani, the defendant, and others, known

20   and unknown, knowingly did combine, conspire, confederate and

21   agree together and with each other to provide material support

22   or resources to Hezbollah.

23         Count Two further charges that it was a part and an

24   object of the conspiracy that Ali Kourani, the defendant, and

25   others, known and unknown, would and did agree to provide

Hezbollah with material support and resources, including

personnel, knowing that Hezbollah was a designated foreign

terrorist organization, that Hezbollah engages and has engaged

in terrorist activity, or that Hezbollah engages and has

engaged in terrorism.

A conspiracy is a separate crime, separate from the

substantive crime that is the object of the conspiracy.  A

conspiracy is a kind of criminal partnership, an agreement or

understanding between two or more persons to join together to

accomplish some unlawful purpose.  A conspiracy does not need

to include more than two people.  It can include many, but it

must include at least two.

With respect to Count Two, you may find the defendant

guilty of the crime of conspiracy to provide material support

or resources to Hezbollah even if the substantive crime,

providing material support or resources to Hezbollah, was not

actually committed or accomplished.  That's because conspiracy

is a separate crime.

You must find two elements beyond a reasonable doubt:

First, that the charged conspiracy existed; in other words,

that there was an unlawful agreement or understanding between

two or more people to achieve an unlawful object or plan;

And second, that the defendant knowingly and

intentionally joined the conspiracy with intent to further its

illegal purpose; that is, that he knowingly and intentionally

1    joined with at least one other person in the agreement in order

2    to violate the law.

3            The object of a conspiracy is the illegal goal that

4    the conspirators agree on or hope to achieve.  The conspirators

5    do not have to agree on the details of the conspiracy, so long

6    as they agreed on the essential nature of their plan.  Whether

7    the conspirators are, in fact, successful in achieving that

8    goal is not relevant.  Here, the object of the conspiracy

9    charged in Count Two was to provide material support or

10   resources to Hezbollah.  That's a separate crime.  But for the

11   conspiracy, the government must prove beyond a reasonable doubt

12   that two or more persons made an agreement or came to an

13   understanding to violate the law – here, the law against

14   providing material support or resources to Hezbollah.

15           The government is not required to show that two or

16   more people sat around the table and entered into a formal

17   contract or that they orally announced their agreement.  By its

18   nature, a conspiracy is often characterized by secrecy.

19   Express language or specific words are not required.  It's

20   sufficient if two or more persons, in any manner, whether they

21   say so directly or not, come to a common understanding to

22   violate the law.

23           In determining if there has been an unlawful

24   agreement, you may judge the acts and conduct of the alleged

25   members of the conspiracy.  Proof that an object of a

conspiracy was accomplished may be the most persuasive evidence
of the existence of the conspiracy itself.  In other words, the
success of the venture, if you believe it was successful, is
often the best proof of the unlawful agreement, but it's not a
necessary condition that a conspiracy actually succeed in its
purpose for you to conclude that the conspiracy existed.

          Therefore, you must first determine if the government
has established beyond a reasonable doubt the existence of the
conspiracy charged in Count Two of the indictment.  If, upon
consideration of all the evidence, direct and circumstantial,
you find beyond a reasonable doubt that two or more people
agreed or came to an understanding to work together to further
the unlawful scheme alleged in the indictment, proof of the
existence of the conspiracy is established.

          The second element of Count Two that the government
must prove beyond a reasonable doubt is that the defendant
knowingly and intentionally became a member of the conspiracy.
That is, did the defendant participate in that conspiracy with
knowledge of its unlawful purpose and with the specific
intention of furthering its objectives?

          I'm not going to repeat the definitions of knowingly
and intentionally unless someone wants me to.

          Knowledge is a matter of inference from facts proved.
To have guilty knowledge, a defendant need not know the full
extent of the conspiracy.  Similarly, a defendant need not know

all the activities of the conspiracy or even all the members of
the conspiracy.  A conspirator's liability is not measured by
the extent or duration of his participation or whether he
joined at the outset of the conspiracy or at some later time.
Indeed, each member may perform separate and distinct acts and
may perform them at different times.  Some conspirators may
play major roles, others minor roles.  Sometimes, a single act
may be enough to bring a defendant within the membership of a
conspiracy, provided that the defendant was aware of the
conspiracy and knowingly associated himself with its criminal
aims.  There must be knowing association; that is, one must be
aware of the conspiracy and knowingly participated in it, with
intent to bring about its illegal purpose.  The government must
prove all these things beyond a reasonable doubt.

Once someone knowingly and intentionally joins the
conspiracy, that person remains a conspirator until either the
conspiracy ends or the person leaves the conspiracy.

Mere association with one or more members of a
conspiracy, or even helping another member of a conspiracy,
does not automatically make the defendant a member.  Mere
knowledge or acquiescence without intentional and knowing
participation in the unlawful plan is not sufficient.  What is
necessary is that a defendant aid or participate in a
conspiracy with knowledge of at least one of its unlawful
purposes and with the intention to help accomplish that

purpose.

It is not necessary that the defendant receive or even anticipate any financial benefit from his participation, as long as he knowingly aided or participated in with the intention to help the conspirators achieve their unlawful purpose.

In sum, the government must prove beyond a reasonable doubt that the defendant knew of the conspiracy, that the defendant knew of the conspiracy's unlawful purpose, and that the defendant joined the conspiracy to further its unlawful objectives.

There is no requirement that the government prove any overt act with regard to this conspiracy.  The government need only prove beyond a reasonable doubt that there was a conspiracy, and that the defendant knowingly and intentionally joined it.

So, going back to the verdict sheet, Count One deals with the substantive crime; Count Two deals with the conspiracy, the separate crime of conspiracy.  For each, you're asked to check the appropriate box, guilty or not guilty.  If you unanimously satisfy your separate consciences, come to a finding of guilty, the government proved all it had to prove beyond a reasonable doubt, you check the box guilty.  If you unanimously come to the belief that the government failed to prove its case beyond a reasonable doubt, you check the box not

1    guilty.  In either event, your decision must be unanimous.

2                JUROR:  Judge, a question?

3                THE COURT:  Yes.

4                JUROR:  In regard to conspiracy, if he is -- if the

5    defendant is a member of Hezbollah, and has accepted missions,

6    and carried out those missions, is that the conspiracy, or is

7    it his actual acts in carrying out those missions that we have

8    to look at as conspiracy?

9                THE COURT:  The conspiracy is to provide material

10   support to Hezbollah.  The rest of it, I can't tell you because

11   it's really your decisions.

12               JUROR:  Thank you.

13               THE COURT:  Count Three of the indictment charges that

14   in or about 2011, in Lebanon and elsewhere, Ali Kourani, the

15   defendant, knowingly received military-type training from and

16   on behalf of Hezbollah, knowing that Hezbollah was a designated

17   foreign terrorist organization, or that it engages and has

18   engaged in terrorist activity, or that it engages or has

19   engaged in terrorism.

20               The government must prove beyond a reasonable doubt,

21   first, that the defendant received military-type training from

22   Hezbollah;

23               Second, that he acted knowingly and intentionally;

24               And third, that one of the jurisdictional requirements

25   of the statute is satisfied.

So the first element is that the defendant received military-type training from Hezbollah.

Military-type training includes training in means or methods that can cause death or serious bodily injury, or destroy or damage property, or disrupt services to critical infrastructure, or training in the use, storage, production, or assembly of any explosive, firearm, or other weapon, including any weapon of mass destruction.  The defendant received military-type training if he was provided, given, or otherwise obtained such training from Hezbollah.

The term "bodily injury" means any cut, abrasion, bruise, burn, or disfigurement, physical pain, illness, impairment of the function of a bodily member, organ, or mental faculty, or any other injury to the body, no matter how temporary.  The term "serious bodily injury" means a bodily injury that involves one or more of the following features:  A substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the functions of a bodily member, organ, or mental faculty.

Critical infrastructure means systems and assets vital to national defense, national security, economic security, public health or safety, including both regional and national infrastructure.  Critical infrastructure may be publicly or privately owned.  Examples of critical infrastructure include gas and oil production, storage, or delivery systems, water

J5FKKOU4

supply systems, telecommunications networks, electrical power

generation or delivery systems, financing and banking systems,

emergency services, including medical, police, fire, rescue

services, 911, and transportation systems and services,

including highways, mass transit, airlines and airports.

A weapon of mass destruction includes any explosive or

incendiary bomb grenade or rocket having a propellant charge of

more than four ounces and any combination of parts either

designated or intended for use in converting a device into a

weapon of mass destruction. The term "weapon of mass

destruction" does not include any device which is neither

designed, nor redesigned for use as a weapon.

The second element of Count Three that the government

must prove beyond a reasonable doubt is that the defendant

acted knowingly and intentionally, and with one or more of the

following three types of knowledge:  (a) knowledge that

Hezbollah had been designated by the Secretary of State as a

terrorist organization;

Or (b) knowledge that Hezbollah engaged in or engages

in terrorist activity;

Or (c) knowledge that Hezbollah engaged in or engages

in terrorism.

I have instructed you on all these terms, and unless

you want me to, I won't do it again.

And then the third or jurisdictional element the

1   government must prove beyond a reasonable doubt, that at least

2   one of the following criteria is satisfied:  The offense

3   occurred, in whole or in part, within the United States;

4          The offense occurred in or affected interstate or

5   foreign commerce;

6          Or (c) the defendant is a national of the United

7   States.

8          I have already defined all these terms.

9          And there's a box for Count Three, like the other

10  boxes, on the verdict form.

11         Now we're on Count Four.  This count charges that in

12  or about 2011, in Lebanon and elsewhere, Ali Kourani, the

13  defendant, and others, known and unknown, knowingly did

14  combine, conspire, confederate, and agree together and with

15  each other to receive military-type training from and on behalf

16  of Hezbollah.  This is the conspiracy to the substantive count.

17  Count Three, the substantive count, receiving military-type

18  training; Count Four is conspiracy.

19         Count Four further charges that it was a part and an

20  object of the conspiracy that Ali Kourani, the defendant, and

21  others, known and unknown, would and did receive military-type

22  training from and on behalf of Hezbollah, knowing that

23  Hezbollah was a designated foreign terrorist organization or

24  that it engages and has engaged in terrorist activity, or that

25  it engages and has engaged in terrorism.

J5FKKOU4

1          That finishes -- here are the elements of Count Four,

2    very much like the elements of Count Two.

3          The government must prove beyond a reasonable doubt

4    that each of the elements for a conspiracy charge have been

5    met.  That there was a conspiracy that the defendant knowingly

6    joined.

7          Count Four, the alleged object is different, it's to

8    receive military-type training from Hezbollah, which is a crime

9    that has the elements that I described to you in connection

10   with Count Three.

11         Now, before Count Four, there's one additional

12   requirement, and that is the requirement of an overt act.

13   Remember, I told you in Count Two, that conspiracy account of

14   providing material support, does not have any overt act

15   requirement.  Count Four does.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1          THE COURT:  The government must prove beyond a

2    reasonable doubt that one of the members of the conspiracy,

3    anyone, knowingly committed at least one overt act in

4    furtherance of the conspiracy.  The requirement of an overt act

5    is a requirement that some step or action to further the

6    conspiracy was taken during the life of the conspiracy by one

7    of the conspirators.  In order for the government to satisfy

8    its burden of proof the government doesn't have to prove that

9    the defendant himself committed any overt act, as long as it

10   proves beyond a reasonable doubt that either the defendant or

11   one of its alleged co-conspirators knowingly committed an overt

12   act in furtherance of the conspiracy.

13          An innocent lawful act standing alone can constitute

14   an overt act.  But the apparently innocent act sheds its

15   harmless character if it's a step in carrying out, promoting

16   aiding or assisting the conspiratorial scheme to violate the

17   law.  Therefore an overt act does not have to be an act that is

18   in and of itself criminal.

19          Similarly, an overt act would constitute the objective

20   of the conspiracy but it does have to be committed by a

21   conspirator and it does have to be in furtherance of the

22   conspiracy.

23          That carries us through Count Four and now we're up to

24   Count Five.

25          Count Five of the indictment charges that from at

least in or about 2002 up to and including in or about

September 2015 in the Southern District of New York, Lebanon

and elsewhere, Ali Kourani, the defendant, and others known and

unknown knowingly did combine, conspire, confederate and agree

together and with each other to violate the federal firearms

laws.  So this is another conspiracy to violate the firearms

laws.

          Count Five further charges that it was a part and an

object of the conspiracy that Kourani, the defendant, and

others known and unknown during and in relation to a crime of

violence which Kourani may be prosecuted in a court of the

United States would and did use and carry a machine gun and

other destructive devices.

          In the Counts One, Two, Three and Four are considered

crimes of violence providing material support to an enemy or

conspiring to do so, obtaining military training certain

agencies or conspiring to do so.  They're all considered

violating offenses.  So, this is conspiracy to commit a

conspiracy to further the purpose of violating federal firearms

laws.

          The government must prove beyond a reasonable doubt

that two elements for a conspiracy charged has been met.  And

those are the two elements I charged you in Count Two.  The

principle difference between Count Two and Count Five different

object of the conspiracy.  For Count Five the alleged object to

1  use or carry a firearm during and in relation to the crimes of

2  violence charged in Counts One, Two, Three and Four would be to

3  possess a firearm in furtherance of crimes charged in Counts

4  One, two, Three and Four.  So, either to use or carry a firearm

5  during and in relation to the crimes of violence charged in

6  One, Two, Three and Four or to possess a firearm.

7          The conspiracy charged in Count Five requires proof of

8  two propositions.  The first that the defendant committed a

9  crime of violence that could be charged in federal court.  That

10  criteria satisfies as a matter of law.  If you find the

11  defendant guilty of either or all Counts One, Two, Three or

12  Four.

13          Second, that the defendant or a co-conspirator

14  knowingly used or carried a firearm during and in relation to

15  the crimes of violence charged in Counts One, Two, Three and

16  Four or possessed a firearm in furtherance of those crimes.

17          Using a firearm requires an act of employment of a

18  firearm during and in relation to the commission of a crime.

19  It does not mean that a defendant or a co-conspirator must

20  actually fire or attempt to fire the firearm.  Although, it

21  obviously constitutes use.

22          Brandishing a firearm, displaying it or referring to

23  the firearm so that others present know that the firearm is

24  available if needed, all constitute use of a firearm.

25          The mere possession a firearm at or near the site of a

1   crime without active employment as I just described is not

2   however sufficient to constitute use of a machine gun or

3   destructive device.

4            Carrying.

5            That means to have a firearm within one's control so

6   that the firearm is available in such a way that it furthers

7   the commission of a crime of violence.  The defendant or a

8   co-conspirator may not available a firearm physically.  That

9   is, have had actual possession of a firearm on his person.  If

10  you find that a defendant or a co-conspirator had dominion and

11  control over the place where a firearm is located, had the

12  power an intention to exercise control over that firearm, that

13  the firearm was immediately available in such a way that it

14  furthered the commission of one of the crimes of violence

15  charged in Counts One, Two, Three or Four, then that individual

16  carried the firearm.

17           To possess a firearm can be proved in one of two ways.

18  Actual possession, that is having physical custody or control

19  of an object or showing that the person had the ability to

20  exercise substantial control over an object, even if he did not

21  have the object in his physical custody at a given time.  And

22  the person have the intent to exercise control would satisfy

23  the definition of possessed.

24           MS. HOULE:  Your Honor, may we have a brief side bar?

25           THE COURT:  Yes.

1                    (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

J5FAAKOU5                      Jury Charge

1              (side bar)

2              THE COURT:  Yes, Ms. Houle.

3              MS. HOULE:  Apologies, your Honor.  We are about

4    halfway through the charge.  So, we are wondering if this is a

5    good time to take a brief break.

6              THE COURT:  I'm glad you said this because I was

7    finding a little dizziness in me as well.  I don't want to

8    excuse the jury from the room though.

9              MS. HOULE:  Thank you.

10             THE COURT:  Good timing.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In Open Court)

2              THE COURT:  Sometimes after a tired day I like to sit

3    down in a nice chair and read and then what happens, within two

4    or three minutes is that the book drops to the floor.  So,

5    sometimes when I'm reading these extensive charges too I get

6    the feeling of, what did I just say?  A break is important.

7    But Ms. Houle made a very timely objection so that I could have

8    that break.

9              Control over an object may be demonstrated by the

10   existence of a working relationship between one person having

11   the power or ability to control the item and another person who

12   has actual physical custody.  The person having control

13   possesses the firearm because he has an affective working

14   relationship with the person who has actual physical custody of

15   the firearm and because he can direct the movement or transfer

16   a disposition of the firearm.

17             In addition, an individual may have possession of an

18   item that is not found on his person because that individual

19   has a relationship to the location where the item is

20   maintained.

21             In this matter, for example, a business person may

22   legally posses things that are scattered throughout a number of

23   stores or offices or installations throughout the country.

24   More than one person can have control over the same firearm.

25   The law recognizes that possession may be sole or joint.  If

one person alone is actual or constructive, possession of a

thing possession is sole.  If more than one person has

possession of it, then possession is joint.

          Possession of a firearm in furtherance of a crime of

violence requires that an individual possessed a firearm and

that the possession advanced or moved the crime forward.

          The mere presence of a firearm is not enough.

Possession in furtherance requires that the possession be

incident to an essential part of the crime.  The possession

must have played some part in furthering a crime of violence in

order for this element to be satisfied.

          As with Count Two, it is not necessary for the

government to prove that any overt act related to Count Five

took place.  As long as the government proves the existence of

the conspiracy charged in Count Five and that the defendant is

a knowing and intentional member of the conspiracy.  Only Count

Four requires overt act.

          Now with Count Five, if you find the defendant guilty

you have to go on and answer to special interrogatories which

are set out in the verdict form.  These require you to find if

the offense involves a machine gun or a destructive device.

          Question six asks if Count Five involves a machine

gun.

          Question seven asks if it involves a destructive

device.

 1          A machine gun is any weapon that shoots or is designed
 2     to shoot or can readily be restored to shoot automatically more
 3     than one shot without manual reloading by a single press of the
 4     trigger.
 5          Destructive device includes any explosive or
 6     incendiary bomb grenade or rocket having a propellant charge of
 7     more than four ounces and any combination of parts either
 8     designed or intended for use and converting the device into a
 9     weapon of mass destruction.
10          The term "destructive device" does not include any
11     device which is neither designed nor redesigned or used as a
12     weapon.
13          We're now up to Count Six.
14          JUROR NO. TWO:  Your Honor, can I ask a question on
15     Count Five?
16          THE COURT:  Yes.
17          JUROR NO. TWO:  So far I think that was maybe more
18     complicated in my mind than the others.  If we were to have
19     found the defendant guilty on Count Three military training, so
20     that the defendant in that example would be working with other
21     people using firearms as part of the military training.
22          THE COURT:  All right.
23          JUROR NO. TWO:  Under that circumstance would that
24     imply that the defendant was also guilty of Count Five or --
25          THE COURT:  No.  You have to find especially for Count

Five.  You could have military training on the use of all kinds

of weapons but Count Five focuses on machine guns or

destructive devices.

            THE JUROR:  OK.  Let me he re-clarify.  If in Count

Three the military training included those types of weapons,

then is it necessarily a conspiracy because there are multiple

people working together?  I just want to make sure I

understand.

            THE COURT:  Let me see if I can clarify this.

            It's common in indictments to allege -- let me

withdraw that.

            The crime is defined by the existence of certain

facts, a state of mind.  Those facts or some of those facts can

be a basis of a different crime.  So, there is some overlap or

there can be some overlap.

            You should ask yourself for each of the counts, did

the government prove beyond a reasonable doubt the elements

pertaining to that count?  So, your inquiry is separate, make a

separate inquiry with respect to Count Three and separate

inquiry with respect to Count Five.

            I don't want to answer it any more specifically than

that because I think I'd be telling you how to find and I don't

want to do that.

            I don't have an opinion on that.

            THE JUROR:  Thank you.

1           THE COURT:  Any objection?

2           MR. SCHACHT:  Yes, your Honor.  Thank you.

3           THE COURT:  Do you want to come up or just rest on

4     objection?

5           MR. SCHACHT:  I'll rest on the objection.

6           THE COURT:  All right.  We're up to Count Six.

7           Count Six charges that from at least in or about 2002

8     to and including in or about September 2015 in the Southern

9     District of New York, Lebanon and elsewhere, Ali Kourani, the

10    defendant, willfully attempted to and did make and receive a

11    contribution of funds, goods and services to and for the

12    benefit of as well as from Hezbollah.

13          The government must prove beyond a reasonable doubt --

14    I left something out when reading the charge.

15          The defendant willfully attempted to and did make or

16    receive a contribution of funds, goods and services to and for

17    the benefit of, as well as from Hezbollah in violation of

18    government regulations.

19          In order to sustain this burden of proof, with respect

20    to Count Six, the government must prove beyond a reasonable

21    doubt:

22          First, that the defendant violated an executive order

23    or regulations issued pursuant to IEEPA.

24          Second, the defendant committed a violation or

25    violations willfully.

1          Third, that the defendant did not have a license

2     issued by the office of foreign assets control to engage in the

3     conduct that violated the executive order or regulations.

4          Fourth, that there is some nexus or connection between

5     the prohibited conduct and the United States.

6          Let me break these down.

7          In January 1995, executive order 12947 was issued

8     pursuant to IEEPA and other statutes.  An executive order is an

9     order issued by the president or his office.  Generally, an

10    limitation or statute.  Statutes is law passed by Congress

11    meaning both in the house and senate and approved by the

12    president.  But under various laws you can have executive

13    orders.  And we have this execute I order 12947 applicable to

14    our case.

15         This executive order provides that all United States

16    persons anywhere in the world are prohibited from dealing with

17    or engaging in any transaction with Hezbollah.  The executive

18    order also prohibits anyone located within the United States

19    whether a U.S. person or not from dealing with or engaging in

20    any transaction with Hezbollah while that person is located

21    within the United States.

22         The executive order also prohibits both U.S person

23    located anywhere in the world and anyone at all located within

24    the United States from engaging in a transaction that evades or

25    avoids or attempts to evade or avoid the requirements of the

1    executive order.  And the executive order authorizes the United

2    States Department of Treasury to promulgate regulations

3    prohibiting persons from engaging in any transactions with

4    Hezbollah.

5            A part of the Treasury Department known as the Office

6    of Foreign Assets Control or "OFAC", subsequently issued

7    regulations pursuant to IEEPA and executive order 12947.  In

8    the regulations OFAC issued a series of prohibitions related to

9    Hezbollah.

10           First, OFAC prohibited U.S. persons anywhere from

11   receiving or providing funds, goods or any type of services to

12   Hezbollah.

13           Second, OFAC prohibited attempts to violate its

14   regulations relating to Hezbollah, conspiracy to violate OFACs

15   regulations relating to Hezbollah and any transaction that has

16   the purpose or effect of evading or facilitating evasion of

17   OFACs regulations related to Hezbollah.

18           The question is, did the defendant violate the

19   executive order, which prohibits persons from contributing

20   anything to Hezbollah?

21           The second element that the government must prove

22   beyond a reasonable doubt is that the defendant willfully

23   violated executive order of regulations.  An act is willful if

24   it's voluntary and intentional.  If it's done knowingly and

25   purposeful with the intent to do something that the law

1    forbids.

2              That is, the defendant's actions must have been the

3    product of his conscious objective rather than the product of a

4    mistakes, accident, mere negligence or some other innocent

5    reason.

6              The defendant must have acted with knowledge that his

7    conduct was unlawful and with a bad purpose to either disobey

8    or disregard the law.

9              Third, element the government must prove beyond a

10   reasonable doubt is that defendant did not obtain authorization

11   from OFAC to engage in transaction with Hezbollah or to provide

12   goods for services to Hezbollah.

13             The parties have stipulated that this element is

14   proved.

15             Fourth element of Count Six that the government must

16   prove beyond a reasonable doubt that there is some nexus or

17   connection between the United States and transactions, goods or

18   services at issue.  This element may be satisfied if the

19   transactions, goods or services were provided by the defendant

20   in part in the United States or if the defendant was a United

21   States citizen at the time they were provided to Hezbollah.

22             The defendant is also charged in Count Six with

23   attempting to violate an executive order and regulations, the

24   same executive order and regulations.  By making and receiving

25   and attempting to make and receive contributions of funds,

J5FAAKOU5                        Jury Charge

1   goods and services to Hezbollah.

2           We have gone over the law before and I don't propose

3   is do it again unless somebody wants me to.  We're done with

4   Count Six.

5           The question for Count Six, how do you find the

6   defendant, guilty or not guilty?

7           Count Seven charges that from at least in or about

8   2002, up to and including about September of 2015 in the

9   Southern District of New York, Lebanon and elsewhere, Ali

10  Kourani, the defendant, knowingly and willfully along with

11  others known and unknown, did combine, conspire, confederate

12  and agree together and with each other to make and receive a

13  contribution of funds goods and services to and for the benefit

14  of, as well as from Hezbollah.

15          Can I see counsel please.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

J5FAAKOU5                           Jury Charge

1           (side bar)

2           THE COURT:  How is Count Seven different from Count

3    Two?

4           MR. SCHACHT:  Count Two?

5           MS. HOULE:  The object of the conspiracy is simply as

6    to Count Seven that the object of the conspiracy in Count Two

7    is to provide material support and resources and for Count

8    Seven it's to violate the executive order regulations that your

9    Honor just described.

10          THE COURT:  How do you attempt a conspiracy -- OK.

11   Sorry.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In Open Court)

2          THE COURT:  Count Seven of the indictment is that from

3    in at least to in or about 2002, up to and including September

4    of 2015 in the Southern District of New York, Lebanon and

5    elsewhere -- I'm repeating -- Ali Kourani, the defendant,

6    knowingly and willfully along with others known and unknown,

7    did combine, conspire confederate and agree together and with

8    each other to make and receive a contribution of funds, goods

9    and services to and for the benefit of, as well as from

10   Hezbollah in violation of the executive order.

11         So, like the other pairs, the indictment alleges the

12   substantive count in Six and the conspiracy in Seven.

13         To satisfy its burden of roof with respect to Seven

14   the government must prove beyond a reasonable doubt each of the

15   two elements for conspiracy charged -- namely, that the

16   conspiracy existed and that the defendant knowingly and

17   intentionally joined it.

18         And these have been covered by instructions earlier

19   and I propose not to do it again.

20         There's a different object of this conspiracy.  It's

21   to make and receive and attempt to make and receive

22   contributions of funds, goods and services in Hezbollah in

23   violation of the executive order.

24         With respect to Count Seven, the government does not

25   have to prove any overt acts.

1          Count Eight charges that in or about 2009 Ali Kourani,

2     the defendant, in the Southern District of New York and

3     elsewhere knowingly procured contrary to law and naturalization

4     of any person to facilitate an act of international terrorists.

5     The government must prove beyond a reasonable doubt four

6     elements.

7          First, that the defendant provided false information

8     in a naturalization proceeding.

9          Two, the false information provided by the defendant

10    related to a material matter that is an important or

11    significant matter.

12         Third, the defendant acted knowingly.

13         Fourth, the defendant procured naturalization as a

14    result of a false information.

15         A naturalization proceeding includes written

16    applications submitted to the government in connection with the

17    effort to obtain naturalization.  A statement is false if it

18    was not true at the time that it was made or written.

19         I said that the false information has to be material

20    to prove materiality.  The government must prove that the

21    defendant's misrepresentation had a natural tendency to

22    influence the government's decision and that truthful

23    information would have disclosed facts relevant to the

24    defendant's qualifications for citizenship to cause a denial of

25    citizen shipment.

1          To act knowingly we've covered already and I don't

2     propose that we do that.

3          The fourth element that the government must prove

4     beyond a reasonable doubt that the defendant procured

5     naturalization as result of providing false information.  The

6     government must prove that the defendant actually obtained

7     United States citizenship as a result of material

8     misrepresentations.  This means that the government must prove

9     that if the defendant had provided immigration authorities with

10    the truthful information it would have raised a fair inference

11    that the defendant was not eligible for naturalization.

12         If you find that count, that's Count Eight, you check

13    the box and there is a special interrogatory with respect to

14    Count Eight.

15         If you find, and only if you find the defendant guilty

16    of committing Count Eight you, have to determine if beyond a

17    reasonable doubt the defendant committed this offense in order

18    to facilitate the commission of an act of international

19    terrorism.  And that's, the special interrogatory is question

20    11.

21         Was Count Eight committed to facilitate an act of

22    international terrorism?

23         The term "act of international terrorism" includes

24    providing material support or resources to Hezbollah as charged

25    in Count One of the indictment.  A conspire and to do so is

1    charged in Count Two of the indictment.  If you have found that

2    the defendant government proved beyond a reasonable doubt that

3    the defendant is guilty of either or both Count One and Count

4    Two and that the defendant committed the crime charged in Count

5    Eight as procuring naturalization, in order to facilitate the

6    crimes charged in either or both One and Two, you should answer

7    yes to the special interrogatory.

8            If you have found that the government failed to prove

9    beyond a reasonable doubt that the defendant committed the

10   crime charged in Count Eight, in order to facilitate either/or

11   both Count One or Count Two, you should answer "no".

12           Is that clear?

13           OK.  We have finished with the eight counts.  I will

14   now proceed to the rest of the instructions.

15           You should regard each count separately.  Ask

16   yourselves on each particular count did the government prove

17   the elements pertaining to the count, each of them beyond a

18   reasonable doubt?  Do it count-by-count independently for each

19   count.  The government can prove none, one, some or all eight

20   of the counts.

21           There's a requirement of venue also having to do with

22   the ability and competence and authority of a Court to act and

23   here a case involving a particular defendant.

24           With respect to Counts One through Seven, but not

25   Count Eight, Congress has determined that acts begun or

1    committed outside of the territorial jurisdiction of the United

2    States are chargeable under the statutes pertaining to Counts

3    One through Seven.  So, we all with respect to the Counts One

4    through Seven the crimes can be proved whether or not any

5    particular act occurred in the Southern District of New York.

6            It is enough if you find that the location where the

7    defendant was first arrested in the United States was in the

8    Southern District of New York which includes Manhattan and the

9    Bronx.  So, if he was arrested here.  That's enough.

10           Venue is also appropriate and is required for Count

11   Eight that the defendant caused by act in furtherance of

12   charged crime to occur within the Southern District of New

13   York.  The government need not prove that the crime itself was

14   committed in this district or that the defendant himself was

15   present here.  It's sufficient to satisfy this element if any

16   act in furtherance of a crime occurred within this district.

17           On this issue of venue and this issue alone, the

18   government may prove venue by a preponderance of the evidence.

19   That means the government must prove that is more likely than

20   not that venue is established.

21           The beyond a reasonable doubt standard is not required

22   a venue.  It is a part of every other element of every other

23   count.

24           The indictment makes reference to various dates.  It

25   does not matter if the specific act alleged occurred on or

1      about a particular date alleged in the indictment.

2              All that matters is there is a substantial similarity

3      between the dates charged in the indictment and the dates

4      established by the evidence.

5              It is sufficient if you find that the crimes charged

6      existed for some of the time within the period set forth in the

7      indictment, if not for all the indictment.

8              You've seen on some of the exhibits that there were

9      translations from Arabic to English.  It's English translation,

10     that's the evidence.  The parties have agreed that the

11     translations are accurate.

12             now I am going to talk to you about various forms of

13     evidence.  There are generally two kinds of evidence, direct

14     evidence and circumstantial evidence.  You may rely upon either

15     in reaching your decision.  Evidence is direct when exhibits

16     that are admitted into evidence show facts or when the

17     testimony is sworn to by witnesses who have actual knowledge of

18     them from something they derived from the exercise of their

19     senses, such as something they heard, something they saw,

20     something they smelled, something they touched and so on.

21             Circumstantial evidence is evidence that tends to

22     prove a disputed act by proof of other facts.  You infer on the

23     basis of reason and experience and common sense from an

24     established fact the existence or the nonexistent of some other

25     fact.

1          Circumstantial evidence is of no less value than

2     direct evidence.  As a general rule, the law makes no

3     distinction between direct and circumstantial evidence.  But

4     simply requires that before convicting any defendant, a jury

5     must be satisfied that his or her guilt was proved beyond a

6     reasonable doubt from all the evidence in the case.

7          Direct and circumstantial evidence each have their

8     respective strengths and weaknesses.  That's why the law

9     requires you to look at evidence as a whole.  Direct and

10    circumstantial includes whether upon all the evidence the

11    government has proved its case beyond a reasonable doubt.

12         We've talked about inferences.  Inferences are made

13    from one fact to another on the basis of reason, experience and

14    common sense.  An inference is not a suspicion or a guess. it's

15    a reasoned logical decision to include that a disputed fact

16    exists on the basis of another fact that you know exists.

17    There are times when different inferences may be drawn from

18    facts whether proved by direct or circumstantial evidence.  The

19    government may ask you to draw one set of inferences or the

20    defense may ask you to draw another.  It is for you and you

21    alone to decide what inferences you will draw.

22         An inference is a deduction or conclusion that you,

23    the jury, are permitted but not required to draw from the facts

24    that have been established by the direct or circumstantial

25    evidence.

1          So, while you are considering the evidence presented

2    you are permitted to draw from the facts that you find to be

3    proved such reasonable inferences as will be justify in light

4    of your common sense and experience.

5          Here again, let me remind you that whether based upon

6    direct or circumstantial evidence or upon the logical

7    reasonable inferences drawn from such evidence, you must be

8    satisfied of the guilt of the defendant beyond a reasonable

9    doubt.

10         This next section has to do with the credibility of

11   witnesses, how you evaluate, to what extent you consider a

12   witness credible or not.  There's no magic formula for

13   evaluating credibility.  You bring to this courtroom all the

14   experience and background of your lives and your everyday

15   affairs.  You determine for yourself everyday and in a

16   multitude of circumstances the reliability of statements that

17   are made now by others.  The same tests that you use in your

18   everyday matters of importance are the tests you use in your

19   deliberations.

20         Your decision whether or not to believe a witness may

21   depend on how this witness impressed you.  Was the witness

22   candid, frank and forthright?  Did the witness seem as if he or

23   she was hiding something, being evasive or suspect in some way?

24   How did the way in which the witness testified on

25   direct-examination compare with the way in which the witness

1    testified on cross-examination?  Was the witness's testimony

2    consistent or contradictory?  Did the witness appear to know

3    what the witness was talking about and did the witness strike

4    you as someone who was trying to report the knowledge that that

5    witness had accurately?

6           In evaluating credibility you may consider if the

7    witness testified inconsistently with something said at some

8    earlier time.  If a person says one thing at one time and

9    another thing at another time, you may consider such

10   inconsistency as indicating a lack of credibility.  But as you

11   know, that's not always the case.  Sometimes people remember

12   important things consistently and unimportant things

13   inconsistently.

14          You should consider if the inconsistency is important

15   or unimportant.  It's up you to use your common sense to decide

16   if the witness's testimony is credible or not.  How much you

17   choose to believe a witness may be influenced by the witness's

18   bias.  Does the witness have a relationship with the government

19   may affect how or she testifies.  Does the witness have an

20   interest in the outcome of the case or some incentive or

21   loyalty or motive that might cause the witness to shade the

22   truth?  Or does the witness have some bias, prejudice or

23   hostility that may have caused witness consciously or not to

24   give you something other than a complete accurate account of

25   the facts that witness testified about?  You may consider such

1    questions in deciding what weight you will give to a witness's

2    testimony.  If a witness has an interest in the outcome that

3    witness is not necessarily capable of giving truthful

4    testimony.

5         It is for you to decide to what extent, if at all, the

6    witness's interest has affected or colored the testimony a

7    witness gives.

8         The evidence of one witness's bias or prejudice or

9    hostility with respect to someone else requires you view to

10   witness's testimony with caution, to weigh the evidence with

11   care and to subject it to careful consideration.

12        If you find that witness willfully testified falsely

13   as to a material fact, you have the right to reject the

14   testimony of that witness in its entirety.  Alternatively, even

15   if you find that a witness has testified falsely or

16   inaccurately about one matter you may reject as false or

17   inaccurate that portion of the witness's testimony and accept

18   as true any other portion of the testimony that recommends

19   itself to your belief or which you may find corroborated by

20   other evidence in the case.

21        In essence, what you try to do in deciding credibility

22   is to size a person up in light of his demeanor, the

23   explanations given and all the evidence in the case, just as

24   you would in any important matter where you are trying to

25   decide if a person is truthful, straightforward and accurate in

that person's recollection.

You are not required to accept the testimony of a witness that is not contradicted or to credit a witness who was not impeached.  You may decide not to credit the testimony of a witness based simply on your evaluation of that witness and the testimony given by the witness.  In deciding the question of credibility, use your common sense, your good judgment and your experience.

You have heard evidence that witnesses discussed the facts of the case with lawyers before the witnesses appeared in court.  There's nothing unusual or improper about such a meeting or meetings.  It's common to do that.  The witness may not be made aware of the subjects of which that witness would be questioned, focused on those subjects and have the opportunity to review relevant exhibits before being questioned about them.  Such consultations help conserve your time and the Court's time.  In fact, it would be unusual for a lawyer call to a witness without consulting that witness in advance.  However, you may consider the consultations and meeting between counsel and the witness in evaluating a witness's credibility.

The testimony of a law enforcement officer should be considered by you just as any other evidence in the case.  In evaluating the officer's credibility, use the came guidelines as you apply to the testimony of all other witnesses.

The fact that a witness may be employed by the federal

977
J5FAAKOU5                           Jury Charge

1    government or by a state or city government as a law

2    enforcement official does not mean that that witness's

3    testimony is deserving of more or less consideration or carries

4    greater or lesser weight than the weight that you give to other

5    witnesses.

6            But it's legitimate for defense counsel to attack the

7    credibility of a law enforcement witness or a government

8    official on the ground that his or her testimony may be

9    influenced by personal or professional interests in the outcome

10   of the case.  Again, you decide, you evaluate the testimony and

11   give the testimony whatever weight you think it deserves.

12           You've heard evidence in the form of stipulations.  A

13   stipulation is an agreement between the parties that certain

14   facts are true or that a witness if called would have given

15   certain testimony or that a document would have stated certain

16   things.  You must accept the facts stipulated as true and that

17   the witness if called would have given the testimony of the

18   document stated that what the parties stipulated but you still

19   determine the weight to be given it that information.

20           There were charts and summaries that were shown and

21   which were marked as evidence in the case.  Those charts and

22   summaries are not better than the testimony or the documents

23   upon which they're based.  They are not themselves independent

24   evidence.  Therefore, you are to give no greater consideration

25   to the charts or summaries than you give to the underlying

evidence.

It is for you to decide if the charts correctly present the information in the underlying evidence.  You are entitled to consider the charts, schedules and summaries if you find that they are of assistance to you in analyzing the evidence and understanding the evidence.

You heard testimony from expert witnesses.  An expert is allowed to express his or her opinion on matters about which he or she has specialized knowledge or training.  Expert testimony is presented you on the theory that someone who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing the expert's testimony you consider the expert's qualifications, his or her opinions, his or her reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether to believe a witness's testimony.

You may give expert testimony whatever weight, if any, you find it deserves in light of all the evidence in the case. You should not accept a witnesses testimony simply because the witness is an expert.  Nor should you substitute such testimony for your own reason, judgment and common sense.  You are the determiners of facts, not the experts.  The experts could help you but it's your decision to make.

Among the exhibits you received you've seen some that

1    have been redacted or covered over or blacken.  You are to

2    concern yourself only with the part of the item that is

3    admitted into evidence and not speculate in any way of what was

4    in the part that was redacted.

5         There are several person's whose name you heard during

6    the trial who did not appear at trial and testify.  The

7    government is not required to call each and everyone it

8    interviewed.  You should not draw any inference as to what any

9    absent person would have testified to had they been called.

10   The question you have to decide is whether the evidence in the

11   trial proves beyond a reasonable doubt the crimes charged

12   against the defendant, Ali Kourani.

13        We don't have much more members of the jury.  Please

14   try or if you need a little bit of a break we can do that too

15   but there's not too much more.

16        Some of the people who may have been involved in the

17   events leading to this trial are not on trial and may not have

18   been witnesses.  You should not speculate about such people.

19   Nor should you draw any inference, favorable or unfavorable

20   toward the government or the defendant because of that.  Those

21   matters are not your concern and should have no bearing upon

22   your verdict as to the defendant's guilt.

23        The government has various investigative techniques

24   that it uses.

25        What techniques the government uses is not your

1    concern.  Your concern is the evidence before you whether it

2    proves beyond a reasonable doubt each and all the crimes

3    charged in each and all the elements of each crime charged.

4    There is no legal requirement that law enforcement officials

5    use any specific investigative techniques.

6            You have heard testimony about evidence seized in

7    various searches including testimony that when law enforcement

8    officers apprehended a defendant they seized evidence from him.

9    Evidence obtained from those searches where it was admitted in

10   evidence in this case and may properly be considered by you.

11   Whether you approve or disapprove of the methods by which this

12   evidence was obtained should not enter your deliberations.

13           The government's use of this evidence is lawful.  You

14   must regardless of your personal opinions, consider this

15   evidence along with all the other efforts in the case in

16   determining whether the government has proved the defendant's

17   guilt beyond a reasonable doubt.

18           (Continued on next page)

19

20

21

22

23

24

25

J5FKKOU6

1    THE COURT:  (Continuing)  You also heard evidence of

2    statements made by the defendant to the FBI.  Evidence in these

3    statements was properly admitted in this case and may properly

4    be considered by you.  We do not have any violation of

5    anybody's rights, and the government may properly use this

6    evidence.  Whether you approve or disapprove of the use of such

7    kinds of statements should not enter into your deliberations.

8    You give the statements such weight, if any, as you feel they

9    deserve in light of all the circumstances, but they're properly

10   to be considered along with all the other evidence in the case.

11   The defendant, Ali Kourani, did not testify in this

12   case.  Under our Constitution, a defendant has no obligation to

13   testify or to present any evidence, because it is the

14   government's burden to prove the defendant guilty beyond a

15   reasonable doubt.  That burden remains with the government

16   throughout.  It never shifts to a defendant.  A defendant is

17   never required to prove that he is innocent.

18   You may not attach any significance to the fact that

19   the defendant did not testify.  You may draw no adverse

20   inference against him.  You may not consider this against the

21   defendant in any way in your deliberations of this case.

22   I said before, and I say again, the fact that the

23   government is a party and that the prosecution is brought in

24   the name of the United States does not entitle the government

25   or its witnesses to greater or lesser consideration than that

given to any other party.  All parties, whether government or

individuals, are equals before this Court.

We are finished now with the evidence.  There are

certain aspects of this that need to be mentioned as well.

Throughout the case, the lawyers objected or called

for sidebars.  That's their obligation.  They have an

obligation zealously to represent the interests that they

represent.  The Assistant U.S. Attorneys represent the

government; the defense counsel represents the defendant.  Each

has an obligation zealously to present the case as best they

can for their respective clients.  That requires them to make

various objections, seek various rulings, ask for sidebars, and

the like.  That should not be held against them.  Nor are my

rulings on their objections relevant in any way.  These are

matters of law, and they should not enter into your

considerations.

And don't ask yourself if I like the lawyer or not or

which lawyers I may have liked better.  I have no opinion; I

like all the lawyers.  In any event, whether I like the lawyers

or not is not part of this case, it's not part of the evidence;

you should make no consideration about it.

From time to time I asked questions.  My questions are

no better than the questions of counsel for the parties.

Sometimes my questions were objected to, sometimes I sustained

those objections.  It's the witnesses' answer, to whoever asked

1  the questions, that constitute the evidence.

2            In determining the facts, rely upon your own

3  recollections of the evidence.  What the lawyers said -- in

4  their opening statements, in their closing statements, in their

5  objections or in their questions -- that's not evidence, the

6  questions put to a witness is not evidence.  Only the witness'

7  answer, taken in the context and responsive to the question, is

8  evidence, and anything I say during the trial or afterwards, or

9  in any of these things, any of these exercises, that's also not

10 evidence.  These are instructions as to the law and they should

11 give you no hint as to how to decide this case.  That's your

12 decision, not mine.

13           If you took notes during the course of the trial, you

14 may bring them into the jury room to use them to assist you in

15 your deliberations.  They may not be used to help persuade

16 another juror.  These notes are private to you, and should not

17 be used with respect to any other juror to persuade them or any

18 other way.

19           If, during your deliberations, you have doubt as to

20 what a witness said, you may ask for the repetition of that

21 witness' testimony, in which case, the reporter will find it

22 and we will send in transcripts to you.  It may take some time

23 to do that.  Continue your deliberations along the way.  But

24 it's the transcriptions of the evidence in this case and the

25 exhibits and the stipulations that count, not your notes.

1          The lawyers will collect all the exhibits and have

2     them available.  So if you want something reread, focus on the

3     particular part that you want reread.  If you want an exhibit,

4     focus on the particular exhibit that you want to see again.

5     Don't ask for large groups of exhibits or large blocks of

6     testimony.  We are not going to redo this trial.  We're now in

7     the deliberations phase.

8          The question of possible punishment of the defendant

9     should be of no concern to you.  It should not enter into or

10    influence your deliberations.  It's my job to sentence

11    defendants.  It's your job to weigh the evidence in the case

12    and to determine if the government proved the guilt of that

13    defendant -- count by count, beyond a reasonable doubt --

14    solely upon the evidence.  Under your oath as jurors, you

15    cannot allow a consideration of punishment that may be imposed

16    upon any defendant, if that defendant is convicted, to

17    influence your verdict in any way or to enter into your

18    deliberations.

19         Nor are you to be swayed by sympathy.  You're to be

20    guided solely by the evidence in this case and not by any

21    matter of sympathy or concern or any bias.  There's no bias for

22    or against the defendant or the government.  It's the record of

23    the facts.

24         A word about your deliberations:

25         Each juror is entitled to his or her opinion.  Each

J5FKKOU6

juror, however, has the obligation to express his or her

opinion in an effort to persuade other jurors who may feel

differently.   The very purpose of jury deliberations is to

discuss and consider the evidence together, to listen to the

arguments of fellow jurors, to present your individual views,

to consult with one another, and to reach an agreement, a

verdict, based solely and wholly on the evidence.   Each of you

must decide the case for yourself, after consideration of all

the evidence in the case with your fellow jurors.

You should not hesitate to change your opinions if,

after discussion with your fellow jurors, their view appears to

be correct and yours did not.   That's the purpose of

deliberations.   However, if, after carefully considering all

the evidence and the arguments of your fellow jurors, you

entertain a conscientious view that differs from theirs, you

should stick to your conscientious view and not abandon it

simply because you're outnumbered.

Your final vote is to reflect your conscientious

conviction on how the issues should be decided.   Your verdict,

whether guilty or not guilty -- stick to your conscientious

view even though you may be outnumbered, but listen to the

others and be ready to be persuaded to another point of view if

that seems to be the right thing to do.   In any event, your

verdict, guilty or not guilty, must be unanimous as to all

elements of all the counts charged against the defendant in the

1   indictment.

2            It would be improper for you to consider, in reaching

3   your decision as to whether the government sustained its burden

4   of proof, any personal feelings you may have about the personal

5   characteristics of the defendant, such as his race, religion,

6   national origin, sex or age.  All persons are entitled to the

7   presumption of innocence.  Your verdict must be based

8   exclusively upon the evidence and whether the government proved

9   the case beyond a reasonable doubt.

10            You will begin deliberating when all the jurors are

11  present and able to listen to each other's point of view.  Do

12  not begin before you are all present.  You have to be together

13  and reason as a jury, not separately.

14            Your first job should be to select a foreperson.  By

15  default, if you don't select, Juror No. 1 -- Juror No. 37, that

16  is, sitting in the first seat -- will be the foreperson but the

17  jury can elect anyone else.  Whoever it is should be identified

18  to me and counsel by a note passed out.  I mentioned before, in

19  your review of the evidence, perhaps you might want to hear

20  evidence against or see an exhibit or have me say again what I

21  told you in my charge or elaborate on it or answer questions

22  about it.  All of these come out by notes.  Ms. Jones will give

23  Juror No. 37 a stack of envelopes.  You can use the sheets in

24  your notebook for the notes.

25            In your notes, do not tell me what's going on in the

 1   jury.  I do not want to know who might be a recalcitrant juror

 2   or an unwilling juror or an uncooperative juror, or what the

 3   other jurors want, or anything else about your deliberations.

 4   Your note is simply to ask me the question you want to ask, and

 5   that's the limit of it.  Give me an note, sign it, date it, put

 6   it in an envelope, seal it, and you'll give it to the court

 7   security officer.

 8          When you reach a verdict, the foreperson will sign the

 9   verdict sheet, after all questions are answered, and in the

10   note to me, simply say the jury has reached a verdict.  Carry

11   in the verdict sheet with you, and in open court you will then

12   announce your verdict.  And, of course, don't tell me what it

13   is in the note.

14          I have covered everything I need to cover, but I'm

15   asking you to stay seated for a few minutes, and I will see the

16   lawyers at the sidebar.

17                  (Continued on next page)

18

19

20

21

22

23

24

25

J5FKKOU6

```
 1                 (At the sidebar)

 2                 THE COURT:  Any objections or comments from the

 3     government?

 4                 MS. HOULE:  No, your Honor.

 5                 THE COURT:  Any objections, other than you made

 6     before, or comments by the defense?

 7                 MR. SCHACHT:  Yes, your Honor.

 8                 Other than what I made before, on page 84, in the

 9     section entitled "Use Of Evidence Obtained In Searches And

10     Interviews," you removed, I think, the word "allegedly" and you

11     said that certain statements were made by my client.  In the

12     instructions it says --

13                 THE COURT:  I took out the word "allegedly"?

14                 MR. SCHACHT:  You took out the word "allegedly," I

15     think.

16                 MS. HOULE:  Your Honor, you --

17                 THE COURT:  Well, there's no issue that he made the

18     statements.  You said he made the statement, the government

19     said --

20                 MR. SCHACHT:  I said he made, certainly, some

21     statements.  I didn't go through every single statement, saying

22     which he said, which he didn't say.

23                 THE COURT:  I'm glad to repeat that and say

24     "allegedly."

25                 MR. SCHACHT:  Thank you.
```

J5FKKOU6

1          MS. HOULE:  Just to be clear, your Honor, the

2     instruction that you gave said, you have heard evidence of

3     certain statements.  You didn't say that the defendant made

4     those statements.  You said --

5          THE COURT:  I think I did, I think I did.  But whether

6     I did or didn't, it doesn't harm to do it again.

7          MS. HOULE:  My understanding, your Honor, is that

8     you're going to read that entire paragraph again, then?

9          THE COURT:  I think that's the right thing to do.

10          MR. SCHACHT:  That's fine.

11          THE COURT:  Okay.

12          After that, I have to dismiss the alternates.  It's my

13     practice to dismiss them and not have them stand by.  So I'll

14     do that and thank them for their services, and then we'll swear

15     the court security officer, and the jury can begin its

16     deliberations.

17          MR. SCHACHT:  That's fine with me.  Thank you.

18          THE COURT:  Okay?

19          MS. HOULE:  Thank you, your Honor.

20          (Continued on next page)

21

22

23

24

25

1          (In open court)

2          THE COURT:  Counsel have advised me that in

3    instructing you with regard to evidence obtained in searches

4    and seizures, I was incomplete.  I think I said that, or may

5    have said that, the defendant gave statements.  It's the

6    government's charge that he -- it's the government's contention

7    that he made statements.  The question whether he made

8    statements and what use to make of them is your decision.  I'll

9    reread that section of the instructions.

10         You have heard testimony about evidence seized in

11   various searches, including testimony that when law enforcement

12   officers apprehended the defendant, they seized evidence from

13   him.  Evidence obtained from those searches was admitted into

14   evidence in this case, and may properly be considered by you.

15   Whether you approve or disapprove of how it was obtained should

16   not enter into your deliberations.  The government's use of

17   this evidence is entirely lawful.  You must, therefore,

18   regardless of your personal opinions, consider this evidence

19   along with all the other evidence in the case, in determining

20   if the government has proved the defendant's guilt beyond a

21   reasonable doubt.

22         You also have heard evidence of statements allegedly

23   made by the defendant to the FBI.  Evidence of these statements

24   was properly admitted in this case, and may properly be

25   considered by you.  No one's rights were violated, and the

J5FKKOU6

1    government's use of this evidence is lawful.  Whether you

2    approve or disapprove of the use of these statements may not

3    enter into your deliberations.  Ultimately, you are to give the

4    statements such weight, if any, as you feel they deserve in

5    light of all the circumstances.

6              Are both counsel satisfied?

7              MS. HOULE:  Thank you, your Honor.

8              MR. SCHACHT:  Yes, your Honor.

9              THE COURT:  I now have an unpleasant duty.  By law, a

10   jury in a criminal case has to be made up of 12 people.  It's

11   our practice to have alternates because during the course of a

12   case, in many cases, things come up and a juror may have to be

13   excused and the existence of an alternate allows us to continue

14   without suffering a mistrial.  But at the point of

15   deliberations, the jury can only be 12.

16             So I have to excuse Jurors No. -- seated in seats 13

17   and 14, Jurors No. 14 and 59.  I want to thank you for the

18   close attention that you've given to this case and your

19   contribution as part of this jury, to hear it, and to pay

20   attention, and to enable us to go forward without fear of a

21   mistrial.  Thank you very much.  Ms. Jones will direct you

22   where to go.  You'll give her your books, she'll take them, and

23   she will destroy your notes.

24             Wait a minute, Jurors Nos. 14 and 59.  Your oath of

25   secrecy should continue until there is a verdict.  You can work

1    out with Ms. Jones how to hear about the verdict, but you are

2    to remain entirely secret about what happened.  That would

3    compromise the jury's verdict, if you were not to be secret.

4    Don't talk with anyone about the case.

5              (Alternate jurors excused)

6              THE COURT:  It's a quarter of 5:00.  How long do you

7    want to go?  How long do you want to deliberate tonight?

8              (Pause)

9              JUROR:  It's been a long day.  We should start fresh

10   in the morning.  That way --

11             THE COURT:  So why don't you deliberate for five

12   minutes.

13             JUROR:  Okay.

14             THE COURT:  At least identify your foreperson.

15             JUROR:  Okay.

16             THE COURT:  And then come back at 10:00 o'clock

17   tomorrow morning.

18             JUROR:  Can we agree to come back earlier if it works

19   for the jury?

20             THE COURT:  Yes.  What time would you like to come

21   back?

22             JUROR:  I don't know.  I have to talk to the other

23   jurors.

24             THE COURT:  Do it now.

25             (Discussion off the record)

1          JUROR:  10:00 o'clock it is.  Thank you, your Honor.

2          THE COURT:  Ten of 5:00, with deliberations, is hard

3    work.  As soon as Ms. Jones comes back, we will swear the court

4    security officer, and then you can retire and begin to

5    deliberate.

6          Ms. Jones will now swear the court security officer.

7          (Court security officer sworn)

8          THE COURT:  The jury may retire.

9          The record will show that the foreperson,

10   Juror No. 37, was given the verdict form and some envelopes.

11         You may retire.

12         (Jury retired to deliberate at 4:45 p.m.)

13         THE COURT:  Okay.  We are recessed.

14         MR. SCHACHT:  We're recessed for five minutes or for

15   the night?

16         THE COURT:  For the night.

17         MR. SCHACHT:  Thank you.

18         MS. HOULE:  I thought, your Honor, that they were

19   going to send out a note in a moment to indicate --

20         THE COURT:  We'll find out in the morning.

21         You want to wait?  Wait.  It's okay.

22         MS. HOULE:  I think we prefer to wait.  Thank you,

23   your Honor.

24         THE COURT:  The verdict form given to the jury made

25   slight changes in questions 6 and 7.  The way it had been

J5FKKOU6

1    worded was:  "Did Count Five involve a machine gun?"

2           And, "Did Count Five involve a destructive device?"  I

3    was concerned that literally questioned whether the allegations

4    contained these words.  So we changed it to read:  "6.  Did

5    your finding under Count Five involve a machine gun?"

6           "7.  Did your finding under Count Five involve a

7    destructive device?"

8           And that was the form we gave to the jury.

9           MS. HOULE:  Understood, your Honor.  Thank you.

10          MR. SCHACHT:  Thank you.

11          (Pause)

12          THE COURT:  There's no point in staying.

13          MR. BOVE:  Thank you, your Honor.

14          MR. SCHACHT:  Understood, your Honor.  Thank you.

15          (At 4:52 p.m. a note was received from the jury)

16          THE COURT:  The note reads:  "Juror No. 2 will be the

17   foreperson."  That is, Juror No. 41.

18          MR. SCHACHT:  Thank you.

19          (Adjourned to May 16, 2019 at 10:00 a.m.)

20                              * * *

21

22

23

24

25