UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

     -v.-

ALI KOURANI,

                Defendant.

17 Cr. 417 (AKH)

---

**THE GOVERNMENT'S OPPOSITION TO THE
DEFENDANT'S POST-TRIAL MOTIONS**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Emil J. Bove III
Amanda L. Houle
Assistant United States Attorneys
   *Of Counsel*

## TABLE OF CONTENTS

THE TRIAL EVIDENCE ..................................................................................................... 2

I. The Defendant's Hizballah Grooming ........................................................................ 2

II. The Defendant's IJO Recruitment ............................................................................. 3

III. The Defendant's IJO Training ................................................................................... 5

IV. The Defendant's IJO Missions ................................................................................. 6

    A. The Defendant's Cover Identity ............................................................................. 6

    B. The Defendant's Trip to China for Explosive Precursor Chemicals.................. 7

    C. Pre-Attack Surveillance on U.S. Government Facilities and Personnel ........... 8

    D. Airport Surveillance ................................................................................................ 9

    E. Targeting Israelis ..................................................................................................... 9

    F. Identifying Weapons Suppliers............................................................................. 10

    G. Identifying Weapons Storage Facilities .............................................................. 10

V. The Defendant's Admissions to the FBI and Arrest............................................... 10

ARGUMENT ....................................................................................................................... 11

I. The Government Established That the Defendant's Admissions to the FBI
Were Reliable and Admissible Based on Corroborating Evidence Offered at Trial ............... 11

    A. Applicable Law ...................................................................................................... 12

        1. Rule 29 ............................................................................................................... 12

        2. The Corroboration Rule .................................................................................... 12

    B. Discussion .............................................................................................................. 12

        1. Independent Evidence Established the Reliability and Admissibility
        of the Defendant's Statements ........................................................................ 13

        2. The FBI Did Not Guarantee That the Defendant's Statements Would Be Protected... 17

II. The Court Properly Instructed the Jury Regarding Evidence of
the Defendant's Admissions ........................................................................................... 19

    A. Relevant Facts ....................................................................................................... 19

    B. Applicable Law ...................................................................................................... 21

        1. Rule 33 ............................................................................................................... 21

        2. Defense Requests for Jury Instructions........................................................... 21

    C. Discussion .............................................................................................................. 21

CONCLUSION .................................................................................................................... 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

           -v.-                                  17 Cr. 417 (AKH)

ALI KOURANI,

                               Defendant.

       The Government respectfully submits this memorandum of law in response to the defendant's two post-trial motions pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.  (Dkt. No. 120).

       *First*, the defendant seeks a judgment of acquittal under Rule 29, arguing that there was insufficient corroborating evidence related to his admissions during interviews in 2017 by the Federal Bureau of Investigation ("FBI").  The motion misstates the corroboration rule, which required the Court, as evidentiary gatekeeper, to address whether the proof relating to the defendant's admissions was sufficiently reliable to be admissible.  Moreover, the Government offered independent evidence relating to the defendant's support of Hizballah and terrorist activities in the United States that established the admissibility of the challenged testimony, and also served as ample corroboration that the defendant engaged in the acts of terrorism that he admitted to the FBI.  Therefore, the defendant's Rule 29 motion should be denied.

       *Second*, the defendant moves for a new trial, under Rule 33, based on the Court's decisions related to two jury instructions that he proposed.  The Court's jury instructions included the substance of the first requested instruction, and properly rejected the second because it was inaccurate and unnecessary.  Therefore, the defendant's Rule 33 motion should also be denied.

## THE TRIAL EVIDENCE

The Government established at trial, as explained in more detail below, that the defendant was a terrorist who entered the United States under false pretenses in 2003 by concealing his membership in Hizballah. He then spent years developing a cover identity for use as a sleeper-cell operative in this country, ultimately naturalizing as a U.S. citizen while hiding his violent objectives. He joined Hizballah's Islamic Jihad Organization ("IJO") in 2008, around the time that Hizballah Secretary General Hassan Nasrallah declared "open war" against the United States and Israel. After that, the defendant helped the IJO and Iran prepare to execute attacks in the New York City area and elsewhere by, among other things, gathering intelligence relating to U.S. and Israeli facilities and personnel as well as security procedures at international airports, attempting to identify sources of an explosive-precursor chemical in Guangzhou, China, and identifying weapons suppliers and storage facilities in New York City for the IJO's use.

## I.  The Defendant's Hizballah Grooming

The defendant joined Hizballah in 2000, when he attended a 45-day military training in Lebanon's Beqaa Valley that he later described as "Hizballah boot camp" and "Hizballah 101." (Tr. 265-66). The trainers wore Hizballah military uniforms and taught the defendant, among other things, small-unit military tactics and how to fire pistols, AK-47 machineguns, and rocket-propelled grenade launchers ("RPGs"). (Tr. 267, 609).

In December 2000, after the defendant completed the training, Israel withdrew from South Lebanon, thereby ending an occupation that dated back to the early 1980s. (Tr. 94). Hizballah placed less emphasis on military capabilities, at least temporarily, following Israel's withdrawal, and the defendant's family started to establish a foundation in the United States. (Tr. 256). In 2001, the defendant's father traveled to Mexico and entered the United States illegally. (Tr. 256).

The defendant's father then traveled to the New York City area, where he entered into a fraudulent marriage with a woman named Wanda Reyes. (Tr. 256-57). On December 31, 2001, Reyes filed a petition seeking lawful permanent resident status for the defendant, referring to him as her "stepchild." (GX 604). The petition was approved in approximately July 2003, at which point the defendant submitted a visa application in which he lied by, among other things, stating falsely that he was not a member or representative of a "terrorist organization" such as Hizballah. (GX 606). The United States granted the defendant's application, and he entered the country as a lawful permanent resident on July 30, 2003. (GXs 607-08). Shortly thereafter, the defendant enrolled in a biomedical engineering program at the City University of New York, which functioned as a core component of his cover identity for Hizballah. (GX 216).

## II.  The Defendant's IJO Recruitment

Hizballah promoted the defendant by recruiting him to join the IJO during a trip to Lebanon that he took between December 28, 2007 and January 26, 2008. (GX 608). While the defendant was in Lebanon, a Hizballah cleric named Sheikh Hussein Kourani talked to the defendant about joining the IJO.[1] Sheikh Hussein Kourani then introduced the defendant to a Hizballah official known as "Abdullah." (Tr. 268). The meeting took place in a Hizballah-controlled part of the Beirut suburbs known as the "Dahieh." (Tr. 269). After the defendant met "Abdullah," he returned to the Dahieh four more times in January 2008 to meet with other Hizballah officials. (Tr. 271).

---

[1] Sheikh Hussein Kourani rose to prominence based on a declaration in the 1980s that United Nations personnel stationed in South Lebanon were "legitimate targets for Hizballah because they were preventing Hizballah from being able to attack the Israelis directly." (Tr. 104). The defendant described him as one of the "founding fathers" of Hizballah, and the defendant's sister married Sheikh Hussein Kourani's son. (Tr. 455).

First, the defendant met with a member of Hizballah's Security Unit.  (*Id.*).  Second, he met with a member of Hizballah's Intelligence Unit.  (Tr. 272).  The meeting lasted approximately two hours, and included training on how to "resist interrogations."  (*Id.*).  During this meeting, the defendant discussed his 2000 Hizballah training, and he was instructed to deny attending the training unless someone showed him a picture of himself at the camp.  (Tr. 272-73).

For the third meeting in which the defendant participated during his IJO recruitment, the defendant was picked up on a motorcycle in the Dahieh and taken to an underground parking garage.  (Tr. 273-74).  Inside the garage, the defendant met his IJO supervisor, or "handler," Majed Abdullah, a/k/a "Fadi" and "Hajj" ("Fadi").  (Tr. 274-75).[2]  Fadi managed IJO operatives based in the United States and Canada, including one of the perpetrators of the IJO's 2012 bombing in Bulgaria (who was a dual Lebanese-Canadian citizen).  (Tr. 352).  After the defendant spoke to Fadi, another member of Hizballah took the defendant on a tour of South Lebanon that focused on important locations in the July 2006 war between Hizballah and Israel (the "July 2006 War").  (Tr. 283).  The tour guide referred to the IJO as Hizballah's "antivirus to the problem that is Israel," which gave the defendant a sense of "pride."  (Tr. 283-84).  Following the tour, the defendant considered himself a full-fledged member of the IJO.  (Tr. 284).

On January 26, 2008, the defendant returned to the United States after Hizballah promoted him to the IJO.  (GX 608).  While still taking courses at CUNY, he started to view Hizballah propaganda and related materials on the Internet.  For example, on January 29, 2008, the defendant

---

[2] When FBI agents interviewed the defendant on March 23, 2017, they showed him a photograph of Fadi.  (Tr. 278; GX 801).  The defendant claimed that he "wasn't sure" if the photograph depicted Fadi.  (Tr. 278).  For the remainder of the interview, however, the defendant pointed to the photograph when discussing Fadi.  (*Id.*).

4

searched for a report regarding the July 2006 War that was written by a retired Israeli judge named Eliyahu Winograd and analyzed failures and shortcomings of the Israel Defense Forces ("IDF") in the conflict.[3]  (GX 902; Tr. 96).  On the same day, the defendant downloaded a separate report regarding the July 2006 War that described his hometown of Yater, Lebanon as a place where Hizballah "built arms storehouses" and "the site of one of the front command posts, which directed the abduction of two IDF soldiers."  (GXs 902, 902-A).

In February 2008, Imad Mughniyeh, the leader of the IJO, was murdered in Syria.  (Tr. 107).  During Mughniyeh's funeral, Hassan Nasrallah, the Secretary General of Hizballah, declared "open war."  (Tr. 108).  At that point, it became "important to Hizballah to exact revenge," and Hizballah "began to carry out surveillance of a series of attempted terrorist attacks around the world."  (Tr. 107-08).  In the wake of Mughniyeh's death, the defendant viewed Hizballah propaganda produced by Al Manar, a media component of Hizballah that is a Specially Designated Global Terrorist Entity in the United States, as well as leaked classified cables relating to Mughniyeh's death.  (GXs 902, 1001).

### III.  The Defendant's IJO Training

In addition to the defendant's military training by Hizballah in 2000, and the counter-interrogation training that he received from Hizballah's Intelligence Unit during his IJO recruitment in 2008, the IJO trained the defendant in counterintelligence techniques and additional military tactics.  Fadi provided one-on-one training to the defendant.  During a trip to Lebanon, a Hizballah driver took the defendant and Fadi to a location where they practiced firing pistols, MP5

---

[3] The IDF is Israel's military, and it consists of an army, an air force, and a navy.  (Tr. 80).  The majority of Israelis serve in the IDF for at least approximately three years following high school. (Tr. 80-81).

submachineguns, and AK-47 machineguns.  (Tr. 304).  In a separate session, Fadi gave the defendant more instructions regarding resisting interrogation, including to avoid disclosing "weaknesses" that could be leveraged.  (Tr. 334).

On June 21, 2011, the defendant left the United States to travel to Lebanon for IJO-specific military training.  (GX 601).  In Lebanon, he was picked up in a van and taken to an IJO facility near Birket Jabbour.  (Tr. 366).  Between 20 and 25 other IJO operatives participated in the training, including people with American accents.  (Tr. 292-93).  The defendant's July 2011 IJO training included classroom and outdoor components.  (Tr. 293).  In the classroom, the IJO provided the defendant with additional training regarding conducting and resisting interrogations. (Tr. 292, 333).  In the field, the defendant was trained on, and fired, a Glock pistol, an MP5 submachinegun, an AK-47 machinegun, a PKM Russian belt-fed machinegun, and an RPG.  (Tr. 369-372; GX 807).  The Glock was the defendant's "favorite," and he "slept" with the AK-47 during the training.  (Tr. 369, 371).

## IV.  The Defendant's IJO Missions

After the defendant joined Hizballah in early 2008, Fadi, his IJO handler, provided him with a series of missions that he carried out on behalf of the IJO in the United States and elsewhere.

### A.  The Defendant's Cover Identity

After the defendant joined the IJO, Fadi instructed him to obtain U.S. citizenship and a U.S. passport as soon as possible.  (Tr. 362).  The defendant understood that this mission was part of the IJO's preparations to retaliate for the murder of Mughniyeh.  (*Id.*).  On August 15, 2008, the defendant submitted an application for naturalization.  (GX 608).  The application contained several intentional lies related to Hizballah that served as the basis for the naturalization fraud charge in Count Eight of the Indictment.  Based on these lies, the United States granted the

defendant's application for naturalization.  He was sworn in as a United States citizen on April 15, 2009.  (GX 214).  Consistent with the assignment from Fadi, the defendant applied for a U.S. passport on the same day that he was naturalized.  (GX 613).

The defendant also married a Canadian citizen named Lila Abadi in 2012.  Abadi had connections to Hizballah (but not the IJO).  (Tr. 244, 261).  The defendant later described Abadi's family's home in Lebanon as a "compound" like "Tora Bora," *i.e.*, the Afghan cave complex that served as an Al Qaeda stronghold in 2001 and a suspected hideout for Usama bin Laden.  (Tr. 260).  Fadi told the defendant that he might be required to transport communications to operatives in Canada, where the IJO had a substantial operational presence, and the marriage improved the defendant's cover identity because the relationship made travel to Canada appear normal.  (Tr. 353-54).

In 2012, the defendant also enrolled in an MBA program at DeVry University's Keller Graduate School of Management.  (GX 217).  In a 2016 text message to his wife, the defendant described the MBA program as "fake shit with school."  (GX 303).

On April 5, 2013, at Fadi's instruction, the defendant applied for, and obtained, a U.S. passport card.  (GX 614; Tr. 586).  A U.S. passport card can be used to enter the United States at land border crossings and seaports.  (Tr. 223).  Fadi instructed the defendant that if the defendant's passport was seized by the U.S. government while the defendant was traveling operationally for the IJO, the defendant could use his Lebanese passport to fly to Mexico or Canada, and then cross via a land border back into the United States.  (Tr. 309).

## B.  The Defendant's Trip to China for Explosive Precursor Chemicals

Hizballah's "modus operandi" in the years after the defendant joined the IJO was to make explosives using ammonium nitrate obtained from medical icepacks.  (Tr. 118; *see also* Tr. 424).

At least two thwarted IJO attack plots, in Thailand in 2012 and Cyprus in 2015, involved icepacks manufactured in Guangzhou, China. (Tr. 118). When the defendant applied for a U.S. passport on April 15, 2009, he responded "No Plans Yet" to a question on the application about future travel plans. (GX 613). The defendant was issued the passport on April 22, 2009, and applied for a visa to enter China shortly thereafter. (GX 201). The visa was issued on April 30, 2009, and the defendant went to Guangzhou on May 3. (GX 201). The defendant claimed to the FBI that his 2009 trip to China was not taken at the IJO's direction, and he told an evolving series of lies about the purposes of the trip. (Tr. 318).[4]

## C. Pre-Attack Surveillance on U.S. Government Facilities and Personnel

Fadi instructed the defendant to "identify military and intelligence outposts in the New York City area, conduct surveillance, and provide information back to the [IJO]." (Tr. 288). The defendant targeted at least four government facilities: 26 Federal Plaza, the Secret Service offices at 335 Adams Street in Brooklyn, the 369th Regiment Armory in Harlem, and the 69th Regiment Armory in Manhattan. (*See* GX 803). Each of these buildings contains numerous sensitive features, such as government and military personnel, classified information, Joint Operations Command Centers used in connection with responses to terrorist attacks, and childcare facilities.

---

[4] In one FBI interview, the defendant claimed that it would have been impossible for the China trip to involve IJO activity because, he said at the time, he did not join the IJO until 2010. (Tr. 339). The defendant later admitted, however, that he had joined the IJO in 2008, and had lied in earlier interviews about the date he joined the IJO because he knew that the truth would jeopardize his naturalization. (Tr. 361). The defendant also tried to rely on the biomedical engineering degree that he obtained as part of his IJO cover identity, arguing that he went to China to attend an "export/import trade show that had to do with medical devices and equipment." (Tr. 319). During another interview, the defendant abandoned that strategy and tried to rely on a different fact from his background, a November 2013 arrest for counterfeit clothing sales (*see* GX 1012), by claiming that he went to China with a "contact in the counterfeit clothing business" to attend a "trade show." (Tr. 338).

The defendant told the FBI that his surveillance of 26 Federal Plaza, the Secret Service offices, and the 369th Regiment Armory in Harlem involved downloading images from Google Earth that he brought back to Fadi in Lebanon.  (*E.g.*, Tr. 291).  Collecting open-source information such as data from Google Earth is one of the first parts of the terrorist attack-planning cycle because the information can be used to "narrow[] the target from a large pool" instead of "picking one randomly."  (Tr. 522).  With respect to the 69th Regiment Armory in Manhattan, the defendant used his cellphone to videotape security personnel and external features of the building, which he also turned over to Fadi in Lebanon.  (Tr. 331).

### D.   Airport Surveillance

Hizballah and the IJO instructed the defendant that they were "very interested in airports" as well as "airport security protocols and procedures."  (Tr. 291).  In response, the defendant conducted surveillance at JFK and Toronto Pearson, and brought information to Fadi.  (*Id.*).  Between January 2008 and August 2015, the defendant took 19 flights through JFK.  (GX 601).  Between January 2008 and July 2014, the defendant took seven flights through Toronto Pearson.  (GX 601).

With respect to both airports, during meetings in Lebanon, the defendant provided Fadi with information about how passengers disembarked from planes, baggage-check procedures, security equipment, security personnel (including uniforms and how they were armed), and the locations of security checkpoints and cameras.  (Tr. 307, 337).

### E.   Targeting Israelis

Fadi asked the defendant to help identify Israelis in the New York City area, and in particular veterans of the IDF, so that the IJO could target them for assassination or, in the alternative, recruitment as sources.  (Tr. 240, 332-33).  Based on that instruction, the defendant

used the LinkedIn website to search for users with IDF connections.  (Tr. 374).  The defendant

claimed that he did not give Fadi any particular names, but told the FBI that he showed Fadi how

to run the searches so that the IJO could use his methodology.  (Tr. 374).

### F.  Identifying Weapons Suppliers

Fadi instructed the defendant to find people in the United States through whom the IJO

could obtain weapons for use in attacks.  (Tr. 237-38, 287).  The defendant identified between

approximately eight and 10 candidates, and gave their names to Fadi.  (Tr. 287).  Fadi expressed

concern about the candidates, however, and said that the IJO needed people whom it could rely on

for long periods of time.  (Tr. 287-88).

### G.  Identifying Weapons Storage Facilities

Fadi also instructed the defendant to set up locations where the IJO could stockpile

weapons in the New York City area.  (Tr. 238).  At first, Fadi asked the defendant to consider

opening front companies for that purpose.  (Tr. 238, 376).  The defendant had experience operating

several front companies, including "Broadway Sportswear" and "New Spot Fashion," and he

advised Fadi that it would be easier to set up storage lockers because the process was less formal.

(Tr. 376; *see also* GXs 171-74 (front-company checks seized from the defendant's apartment)).

## V.  The Defendant's Admissions to the FBI and Arrest

In March 2017, an attorney named Mark Denbeaux contacted the FBI and scheduled the

first of five interviews between the defendant and Special Agents Keri Shannon and Joseph

Costello.  (Tr. 246-48).  The interviews were held on March 23 and April 3, 5, 14, and 26, and all

of them were conducted at Mr. Denbeaux's office at the Seton Hall University School of Law.

During the interviews, the defendant admitted to much of the conduct described above in Sections

I through IV, but also withheld information and, at times, affirmatively lied.

On June 1, 2017, the FBI arrested the defendant and searched his apartment pursuant to a warrant.  (*E.g.*, Tr. 39).  The FBI seized from the defendant the passport and passport card that he obtained at the IJO's direction.  (GXs 201, 202).  During the search of the apartment, the FBI found a "go-bag" in the front closet with cash and identification documents (GXs 212-219), combat boots (GX 220), notes corroborating the defendant's admissions to the FBI (GXs 221, 222), and a laptop the defendant used during his crimes (GX 210).

## ARGUMENT

The defendant's post-trial motions focus on evidence related to his 2017 admissions to the FBI and proposed jury instructions regarding those admissions.  His evidentiary arguments mischaracterize the corroboration rule and the record.  The Court instructed the jury as the defendant proposed, to the extent his proposal was legally correct, and properly rejected his proposed instructions to the extent they misstated the law.  Therefore, the defendant's post-trial motions should be denied.

### I.   The Government Established That the Defendant's Admissions to the FBI Were Reliable and Admissible Based on Corroborating Evidence Offered at Trial

The defendant's Rule 29 motion challenges the corroborating evidence related to his five confessions during the FBI interviews at Seton Hall.  But Rule 29 does not provide a mechanism for a court to reject credible trial testimony that overwhelmingly established the defendant's guilt.  Moreover, the corroboration rule presents a question of admissibility for the Court to address in connection with its gatekeeping function.  At trial, the Government established the reliability, and therefore admissibility, of testimony relating to the defendant's 2017 admissions.  The same evidence, which fit into several independent categories, established that the defendant engaged in

the terrorist activities that he admitted during the interviews.  Accordingly, the defendant's Rule 29 motion should be denied.

### A.   Applicable Law

#### 1.   Rule 29

Rule 29 provides that a "court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).  "The Court must credit every inference that the jury might have drawn in favor of the government, and review all the evidence in conjunction, not in isolation."  *United States v. Baldeo*, No. 13 Cr. 125 (PAC), 2014 WL 6807833, at *1 (S.D.N.Y. Dec. 3, 2014) (internal quotation marks and citation omitted).

#### 2.   The Corroboration Rule

"[T]he modern corroboration rule requires only that there be 'substantial independent evidence which would tend to establish the trustworthiness of the statement.'"  *United States v. Bryce*, 208 F.3d 346, 354 (2d Cir. 2000) (quoting *Smith v. United States*, 348 U.S. 147, 152 (1954)).  "The corroboration rule thus serves a 'gatekeeping function' in that it prevents juries from convicting on unreliable evidence."  *United States v. Irving*, 452 F.3d 110, 118 (2d Cir. 2006). "[T]he corroborating evidence need not prove the essential elements of the crime."  *Id.*

### B.   Discussion

At trial, the corroboration rule presents a question of admissibility for the Court.  *See Irving*, 452 F.3d at 118.  The Court made this clear at the final pretrial conference on May 1, 2019:

I can decide if the confession or admission by the defendant is admissible, whether it's
sufficiently reliable to be admitted.  That's my burden, and I will do that.  Once it's in
evidence, once I say okay, then there's no more legal obligation of telling the jury you have
the point of corroboration.

(May 1, 2019 Tr. 16).  At trial, the Government offered evidence through four witnesses before

Special Agent Shannon testified regarding the defendant's 2017 admissions.  Special Agent Daniel

Ganci testified regarding, *inter alia*, items seized from the defendant's apartment on June 1, 2017,

including the defendant's notes from some of the interviews.  Dr. Matthew Levitt provided expert

testimony regarding Hizballah and the IJO, which corroborated the defendant's statements

regarding his terrorist activities.  Reginald Donaldson testified regarding evidence obtained from,

*inter alia*, the defendant's laptop, email accounts, and Facebook account, such as the Hizballah

propaganda the defendant viewed after joining the IJO and Internet searches related to his IJO

missions.  Jared Eannucci testified regarding travel records related to the defendant and others,

which corroborated the defendant's account of his IJO recruitment, training, and meetings in

Lebanon with his IJO handler.   After the Government laid that foundation of corroborating

evidence, the defendant did not renew his objection to the admissibility of testimony from Special

Agent Shannon regarding his 2017 admissions to the FBI.  (*See* Tr. 233).  Rule 29 does not allow

the defendant to ask the Court to simply set aside that testimony and order an acquittal.

### 1.  Independent Evidence Established the Reliability and Admissibility of the Defendant's Statements

Evidence regarding the defendant's admissions was admissible because there was ample

corroboration that established the trustworthiness and reliability of his statements, including the

circumstances of the meetings, the defendant's notes, travel records, and Internet evidence.

As a starting point, the circumstances of the five meetings at Seton Hall demonstrate the

reliability of the defendant's admissions.  The defendant requested each of the meetings.  He did

13

so through Mr. Denbeaux, an attorney with experience in criminal matters who was present with the defendant during four of the five sessions.[5]  The meetings were conducted at Mr. Denbeaux's office at Seton Hall rather than an FBI facility.  The defendant was free to leave at any point, and he did so during the April 14, 2017 interview.  (Tr. 355).  He nevertheless made overlapping admissions during the series of meetings that corroborated his statements during prior meetings.

The defendant's notes, which were seized from his apartment and offered during the testimony of Special Agent Ganci, also corroborate testimony regarding the defendant's admissions at Seton Hall.  *See United States v. Paracha*, 313 F. App'x 347, 350 (2d Cir. 2008) ("This standard is met given the ample documentary evidence—most notably, [defendant] was found to have a set of handwritten instructions outlining in detail the material support conspiracy he described before his arrest—establishing the reliability of the confession.").  In these notes, the defendant wrote down some of the things that he admitted to the FBI and emphasized the veracity of his statements.  (*See* GX 222).  The defendant's notes begin with the solemn declaration that, "swear[ing] on my mom & daughter," he was telling the "truth."  (*Id.* at 1).  He also confirmed that he conducted pre-operational surveillance for the IJO using Google Earth:  "Everything else of google earth online research was true."  (*Id.*).  Although the defendant asserts in his motion papers that there was "no evidence that he ever received any military training" (Def. Mem. at 4), his notes refer to "training" that "include[d] [a] hand gun, MP[5 submachinegun], [and] glock" (GX 222).  During the March 23, 2017 interview, the defendant described interrogation training, including being "coached [on] how to evade or avoid answering certain questions and also that he

_____

[5] During the April 5, 2017 interview, in an effort to gain leverage, the defendant excused Mr. Denbeaux and asked that only Special Agent Shannon interview him because "intelligence work is done one-on-one."  (Tr. 327).

14

was taught to deny everything and admit only things that your interrogator or questioner could prove." (Tr. 272).  The defendant's notes refer to "one on one training" that included being "asked questions, evaluate your interrogator." (GX 222).  On April 5, 2017, the defendant told the agents that the IJO had instructed him to try to get a job at a Department of Motor Vehicles so that he could access identification documents. (Tr. 332).  He wrote in his notes, "DMVs get hired / hire someone (plates, Driver licenses)." (*Id.*).  Because the defendant had no reason to believe the Government would ever see these notes, they are particularly strong corroboration of his admissions.

Evidence of the defendant's travel and immigration history provided additional corroboration for his statements. *See Irving*, 452 F.3d at 119 ("[T]he passport, employment and ATM records are circumstantial evidence corroborating [defendant's] travel to Honduras during the time of the events described in the journal.").  In this regard, the defendant told that FBI that the IJO had directed him to naturalize as a U.S. citizen, obtain a passport, and, later, obtain a U.S. passport card. (Tr. 241-42).  The Government offered the defendant's related applications for each of those things. (GXs 608, 613, 614).  The defendant also told the FBI that his father had entered into a fraudulent marriage with Wanda Reyes to gain status in the United States. (Tr. 256-57). The Government offered several documents obtained from the Department of Homeland Security that corroborated this admission. (GXs 615, 616, 619).  The defendant told the FBI that he had joined the IJO in Lebanon in 2008. (Tr. 265).  A copy of the defendant's Lebanese passport shows that he entered Lebanon on December 28, 2007, and left on January 26, 2008. (GX 608 at 22). The defendant admitted to the FBI that he had traveled to Lebanon and received military training from the IJO in July 2011. (Tr. 365).  Travel records show that the defendant departed the United States on June 21, 2011, and returned on August 4, 2011. (GX 601).

15

Internet and email evidence provided additional, independent corroboration for the defendant's statements. The defendant repeatedly searched for and viewed Hizballah propaganda, videos supporting Iran and/or targeting Americans and Israelis, speeches by Hizballah Secretary General Nasrallah, and even leaked classified cables regarding the February 2008 murder of Imad Mughniyeh. (GXs 302-T). In March 2013, the defendant downloaded personal identifying information for over 30,000 agents of Mossad, Israel's intelligence agency. (GXs 302, 302-A). One of the videos he watched featured soldiers covered in blood and warned, "On the route of jihad, we are resolute." (GX 302-A). Another stated, "He who doesn't pull his weapon has no loyalty[.] The call for death has come aloud." (*Id.*). All of this evidence corroborates the defendant's admissions regarding his motive and intent in providing material support and services to Hizballah, receiving and conspiring to receive military-type training from Hizballah, and defrauding the United States during the naturalization process by lying about his IJO membership.

The electronic evidence also corroborated specific aspects of the defendant's terrorist activities. He told the FBI that he had joined the IJO in 2008, and that his IJO "handler" set up an email account in the name of one of the defendant's childhood friends to use to communicate. (Tr. 363-64, 410). On March 13, 2008, the defendant saved as a contact an email account with a username that roughly matched the name of the friend the defendant identified, hilal.kdado@hotmail.com. (GX 402-B). On October 11, 2011, the defendant saved a second email contact with a similar username, helal_kedal@hotmail.com. (*Id.*). The defendant told the FBI that he and his IJO handler stopped using the email accounts in 2012. (Tr. 360-61). The defendant last modified those contacts on July 1, 2012. (GX 402-B).

The defendant also admitted to the FBI that he had conducted pre-operational surveillance of 26 Federal Plaza and the 69th Regiment Armory on Lexington Avenue. (Tr. 237). He

conducted Google searches for both locations.  (GX 401-C (rows 58-59, 86-88)).  He told the FBI that the IJO directed him to identify weapons suppliers.  (Tr. 287).  In 2009, the defendant conducted at least three searches of eBay for the term "gun."  (GX 902, 902-A).  In May 2012, the defendant searched for and visited a website for a company named Atlantic Tactical, which sells body armor, tactical gear, firearms, and other weapons.  (GX 902, 902-A).  The FBI also seized from the defendant's laptop surveillance photographs of military personnel on the street in New York City.  (GX 301).  These photographs were part of a surveillance strategy the defendant carried out to help the IJO identify the uniforms worn by different soldiers, as well as the significance of different parts of the uniforms, in an effort to identify high-value targets.  (Tr. 523).  Accordingly, several categories of independent evidence demonstrated the reliability of testimony regarding the defendant's 2017 admissions to the FBI, and provided more than enough corroboration to establish that the defendant committed the terrorist acts he had described to target U.S. and Israeli interests on behalf of the IJO.

### 2.  The FBI Did Not Guarantee That the Defendant's Statements Would Be Protected

The defendant's post-trial challenge to the reliability of his statements is based in large part on the argument that he believed his statements to the FBI would be kept "confidential," "meaning that the statements would not be used against him," and thus "there were none of the traditional bases for assuming these inculpatory statements were against penal interest."  (Def. Mem. at 3). The trial record undermines these claims, which are thus unavailing under Rule 29.

The defendant's confidentiality argument is based on a March 22, 2017 call between Mr. Denbeaux and Special Agents Shannon and Costello.  The agents told Mr. Denbeaux that they "would use [their] best efforts to keep confidential, the fact that [the defendant] was going to be

meeting with us." (Tr. 249).  There "was never a promise" of confidentiality, much less that future statements by the defendant, regarding topics the agents were unaware of at the time of the call, would not be used against the defendant.  (Tr. 659; *see also* Tr. 250).

Before starting the first interview on March 23, 2017, the agents warned the defendant that it was a crime to lie during the interview, and that his statements could be used against him in a prosecution for that crime.  (Tr. 253).  Following that warning, the defendant could not reasonably have believed that his statements during the interviews were somehow protected from use by law enforcement or prosecutors.  The defendant also refused to answer some questions, which also demonstrates his knowledge that his statements could be used against him.  (*E.g.*, Tr. 284, 354-55).[6]  In a text message to Special Agent Costello following the March 23 interview, Mr. Denbeaux confirmed, "I understand that you can't promise or guarantee."  (GX 802).  The message further demonstrates that the agents did not promise the defendant *anything*, including but not limited to confidentiality for his admissions.[7]  Mr. Denbeaux did not testify at the trial, and there was no evidence that he described his March 22 discussion regarding confidentiality to the defendant (accurately or otherwise).  Accordingly, the defendant's motion should be denied because the

---

[6] There was also evidence that at various times the defendant and Mr. Denbeaux wanted the situation to be public instead of confidential.  According to the defendant's notes, he was focused on being able to "send [a] message to [the] community."  (GX 221 at 2).  In a September 2016 text message, the defendant threatened to "expose everything."  (GX 303 at 10).  In May 2017, Mr. Denbeaux told Special Agent Costello that he planned to "go to the media" about the FBI's handling of the case.  (Tr. 630).

[7] During the second interview on April 3, 2017, Mr. Denbeaux provided a document to the agents that he described as "his assessment of things so far."  (Tr. 298; *see also* GX 221).  Consistent with Mr. Denbeaux's March 23 text message, the document confirmed that "the government wants [the defendant's] information *before making any commitment*."  (GX 221 at 1 (emphasis added)).  Mr. Denbeaux's document confirms that the agents had not promised the defendant anything, and does not even reference the purported promise of confidentiality now emphasized by current counsel.

Government established that his statements were corroborated, reliable, and admissible, and there was no evidence of the type of confidentiality guarantee described in his motion papers.

## II.   The Court Properly Instructed the Jury Regarding Evidence of the Defendant's Admissions

Under Rule 33, the defendant challenges the Court's decisions rejecting in part two jury instructions that he proposed related to his admissions.  In order to prevail on this post-trial motion, the defendant must establish not only that the Court's decisions were erroneous, but also that they resulted in manifest injustice.  He has not done so.

### A.   Relevant Facts

In a motion *in limine*, the defendant requested the following instruction to the jury regarding his statements to the FBI:

> It is for you to decide (1) whether the defendant made the statements that the FBI agents testified that he made, and (2) if so, how much weight, if any, to give them.  In making those decisions, you should consider all of the evidence about the statement, including the circumstances under which the statement may have been made and any facts or circumstances tending to corroborate or contradict the version of events described in the statement.

(Dkt. No. 80 at 2).  The only authorities the defendant cited in support of the request were 18 U.S.C. § 3501(c), and *Crane v. Kentucky*, 476 U.S. 683 (1986).

In the same motion, the defendant also requested the following jury instruction regarding corroborating evidence related to his confessions:

> Under our law, a person may not be convicted of an offense solely upon evidence of a confession or admission made by that person, without additional proof that the offense charged has been committed.  This law is designed to make sure that a person is not convicted, by his own words, of a crime that did not take place.  Thus, you may not convict the defendant solely on his own statements.  There must be some additional proof that the crime charged were committed.

(Dkt. No. 80 at 4).

19

The Government objected to the defendant's instruction regarding corroboration, and consented to an instruction regarding the jury's ability to decide the weight, if any, it should give the statements. (Dkt. No. 86 at 4-5). The Government also requested, based on anticipated defense arguments, that the Court instruct the jury that evidence of the statements had been properly admitted and that the FBI did not violate the defendant's rights during the interview. (*Id.* at 5).

At the charge conference on May 14, 2019, the defendant failed to object to the Court's decision not to include his proposed instruction regarding corroboration. Regarding voluntariness, the defendant argued that the jury should "not be instructed that the statements obtained from my client by the government were lawfully obtained." (Tr. 799). The defendant asserted that the jury "should also be charged that they could find on their own" that the defendant's statements were "involuntarily made" because "that is an issue for which the jury should be allowed to make their own determination." (*Id.*). The only authority that counsel cited for this request was *Crane*. (*Id.*).

After the parties' summations, the Court instructed the jury, in pertinent part:

> You also heard evidence of statements made by the defendant to the FBI. Evidence in these statements was properly admitted in this case and may properly be considered by you. We do not have any violation of anybody's rights, and the government may properly use this evidence. Whether you approve or disapprove of the use of such kinds of statements should not enter into your deliberations. You give the statements such weight, if any, as you feel they deserve in light of all the circumstances, but they're properly to be considered along with all the other evidence in the case.

(Tr. 981). Defense counsel subsequently asked the Court to emphasize that the defendant "allegedly" made statements to the FBI. (Tr. 988). The Court agreed and instructed the jury as follows:

> Counsel have advised me that in instructing you with regard to evidence obtained in searches and seizures, I was incomplete. I think I said that, or may have said that, the defendant gave statements. It's the government's charge that he—it's the government's contention that he made statements. The question whether he made statements and what use to make of them is your decision. I'll reread that section of the instructions.

20

(Tr. 990).  The Court then re-read the instruction, but emphasized to the jury that the defendant had "allegedly" made statements to the FBI.  (*Id.*).

### B.   Applicable Law

#### 1.   Rule 33

Rule 33 "motions for a new trial are disfavored in the Second Circuit."  *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).  "In order to grant a new trial, the Court must have 'a real concern that an innocent person may have been convicted.'"  *Baldeo*, 2014 WL 6807833, at *4 (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005)).

#### 2.   Defense Requests for Jury Instructions

A defendant seeking a jury instruction regarding a defense theory must establish that (i) the instruction "accurately represent[s] the law in every respect," (ii) the instruction "represents a theory of defense with a basis in the record that would lead to acquittal," and (iii) the defense theory "is not effectively presented elsewhere in the charge."  *United States v. Martinez*, 769 F. App'x 12, 14-15 (2d Cir. 2019).

### C.   Discussion

The defendant has not established that the Court's jury instructions were erroneous, much less that the instructions resulted in manifest injustice.

The defendant's requested instruction regarding the voluntariness of his statements to the FBI contained two sentences.  The Court "effectively presented" both to the jury.  *Martinez*, 769 F. App'x at 15.  The first sentence of the defendant's proposed instruction stated:  "It is for you to

21

decide (1) whether the defendant made the statements that the FBI agents testified that he made, and (2) if so, how much weight, if any, to give them."  (Dkt. No. 80 at 2).  The Court instructed the jurors that they should "give the statements such weight, if any, as you feel they deserve in light of all the circumstances," and later emphasized at the request of the defendant that "[t]he question whether he made statements and what use to make of them is your decision."  (Tr. 990). The second sentence of the defendant's proposed instruction stated:  "In making those decisions, you should consider all of the evidence about the statement, including the circumstances under which the statement may have been made and any facts or circumstances tending to corroborate or contradict the version of events described in the statement."  (Dkt. No. 80 at 2).  In this regard, the Court instructed the jurors that they should consider "all the circumstances."  (Tr. 981).  The Court was not obligated to provide the defendant's examples of relevant circumstances related to corroboration or contradiction, as such an instruction would have placed undue weight on the examples in an admitted non-exhaustive list.

The only authorities cited by the defendant, *Crane* and Section 3501, are not to the contrary. *Crane* is not about jury instructions.  There, the Supreme Court found error in a state court's decision to preclude a defendant from offering evidence at trial "about the environment in which the police secured his confession."  476 U.S. at 691.  Contrary to the defendant's post-trial arguments (Def. Mem. at 5), the Court placed no limitations on his ability to offer evidence or arguments relating to the 2017 interviews at Seton Hall.  Section 3501(a) directs that, after a court determines that a defendant's statements were voluntary, the court "shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances."  18 U.S.C. § 3501(a).  That is exactly what happened here, and the Court's instruction tracked Section 3501's language.

The defendant's post-trial motion does not challenge the Court's related instruction that the defendant's statements were lawfully obtained. Any such challenge would be meritless, particularly in light of portions of the defendant's opening in which he suggested that use of the statements was improper in light of the FBI's purported confidentiality guarantee (Tr. 18-19). *See United States v. Santiago*, 2 F. App'x 129, 130 (2d Cir. 2001); *United States v. Barcelo*, No. 13 Cr. 38, 2014 WL 4058066, at *14 (S.D.N.Y. Aug. 15, 2014); *see also Lego v. Twomey*, 404 U.S. 477, 489 (1972) (rejecting "petitioner's final contention that, even though the trial judge ruled on his coercion claim, he was entitled to have the jury decide the claim anew" based in part on the "normal rule that the admissibility of evidence is a question for the court rather than the jury"); *United States v. Anderson*, 394 F.2d 743, 748 (2d Cir. 1968) ("[T]here was no obligation on the part of the trial judge to submit the issue of voluntariness to the jury."); *United States v. Betancourt*, 586 F.3d 303, 307 (5th Cir. 2009) (finding no plain error in instruction that defendant's "statement is properly before you" and "has met the standards for admissibility in evidence before you") *United States v. Chichakli*, No. 09 Cr. 1002, 2014 WL 5369424, at *15 (S.D.N.Y. Oct. 16, 2014) (rejecting challenge to instruction that search evidence "was properly admitted" because "the propriety of a search is a legal question and this Court previously determined"). Therefore, the defendant's Rule 33 challenge to the Court's handling of his proposed instruction regarding the voluntariness of his statements should be denied.

The defendant's Rule 33 motion regarding the Court's decision not to give his corroboration instruction must meet the same fate because the defense instruction was not an accurate statement of the law. The defendant's proposal improperly demanded "additional proof that the offense charged has been committed." (Dkt. No. 80 at 4). As noted above, however, the cornerstone of the "modern corroboration rule" is reliability. *See Bryce*, 208 F.3d at 354. The

failure of the defendant's proposed instruction to draw this distinction was a sufficient basis to reject it. More broadly, jurors' function is assessing whether the admissible evidence, considered in its entirety, is sufficient for the Government to meet its burden. *See United States v. Paracha*, 313 F. App'x 347, 351 n.2 (2d Cir. 2008).[8] Therefore, the Court's decision to reject the defendant's corroboration instruction did not result in manifest injustice.

---

[8] Courts of Appeals in the First, Fourth, Seventh, and District of Columbia Circuits have all held that no instruction regarding corroboration is required. *United States v. McDowell*, 687 F.3d 904, 912 (7th Cir. 2012) ("Following the lead of two other circuits, we concluded in *Howard* that the matter was better left to the trial judge, and that the standard instructions regarding the government's burden of proof and the presumption of innocence are generally sufficient."); *United States v. Abu Ali*, 528 F.3d 210, 234 n.8 (4th Cir. 2008) ("[A] number of our sister circuits have held that a court need not instruct juries on the corroboration rule, even if requested to do so."); *United States v. Dickerson*, 163 F.3d 639, 642 (D.C. Cir. 1999) ("[T]he jury need not be separately instructed on the issue for it is akin to other admissibility issues, and therefore the trial judge alone decides whether the corroboration test has been met."); *United States v. Singleterry*, 29 F.3d 733, 738 (1st Cir. 1994) ("This has never been the law in the federal courts, and we decline to adopt such a rule today.").

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's post-trial motions.

Dated:  New York, New York
        July 9, 2019

                                      Respectfully Submitted,

                                      GEOFFREY S. BERMAN
                                      United States Attorney for the
                                      Southern District of New York

By:      _____/s/_____
            Emil J. Bove III
            Amanda L. Houle
            Assistant United States Attorneys
            212-637-2444/2421

Cc:    Defense Counsel
       (Via ECF)