UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA

        -against-                                            17 Cr. 417 (AKH)

ALI KOURANI ,


        Defendant.
------------------------------------------------------------------X


**SENTENCING MEMORANDUM ON
BEHALF OF ALI KOURANI**










ALEXEI SCHACHT, ESQ.
Attorney for ALI KOURANI
123 West 94th Street
New York, New York 10025
Tel: (646) 729-8180
Fax: (212) 504-8341
alexei@schachtlaw.net

**Table of Contents**

Preliminary Statement                                                              3

Introduction                                                                       3

The Nature And Circumstances Of The Offense
And The History And Characteristics Of The Defendant                               5

The Need To Avoid Unwarranted Sentence Disparities
Among Defendants With Similar Records Who Have Been
Found Guilty Of Similar Conduct                                                   10

Conclusion:
Given the Totality Of The Facts And Circumstances
Present Here A Sentence Of No More Than Ten Years
Served Would Be Fair, Just And Reasonable                                         14

**PRELIMINARY STATEMENT**

This Sentencing Memorandum is respectfully submitted on behalf of ALI KOURANI ("Mr. Kourani", "Ali" or "the defendant" herein) to aid the Court in determining the appropriate sentence in this case.

As the Memorandum discusses below, we believe that based upon all of the case's highly unusual circumstances a sentence of no more than ten years is warranted.[1] These facts include: 1) that Ali's actual conduct harmed no one; 2) that he voluntarily left behind the charged conspiracy; 3) that he decided to approach the FBI on his own before he could be even have been arrested and tried to help the United States to investigate Hezbollah and 4) that Ali's then lawyer made colossal and inexcusable blunders in his representation that led directly to this prosecution and conviction.

**INTRODUCTION**

Courts are largely unlimited as to the source or kind of information they may consider in sentencing a defendant so long as that information bears upon determining the proper sentence. **United States v. Carmona**, 873 F.2d 569, 574 (2d Cir.1989); *see also* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4. In that vein, courts are required to impose a "sufficient" sentence but "not [one] greater than necessary" to comply with the sentencing purposes of punishment, deterrence, protecting the public from further crimes of the defendant, and providing the defendant with

---

[1] The defendant believes that there is no ten-year minimum mandatory sentence for Count Three, the charge of 18 U.S.C. § 2339D, since the statute states that the punishment "shall be fined under this title or imprisoned for ten years, or both." So the Court may impose only a fine on this count and imprisonment on other counts.

needed educational, medical, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553 (a). Such a sentence is reasonable. And a non-Guideline sentence may not be presumed to be unreasonable, *see* **Gall v. United States**, 552 U.S. 38 (2007), and certainly in this case one would be more than reasonable. In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

(a) The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553[a][1]);

(b) The kinds of sentences available (§ 3553[a][3])(a prison sentence is mandatory);

(c) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (§ 3553[a][6]); and

(d) The need to provide restitution to any victims of the offense. (§ 3553[a][7])(there are no victims in this case so this factor does not apply here).

The directives of **United States v. Booker**, 543 U.S. 220 (2005) and § 3553(a) make clear that courts should not uncritically apply the guidelines. Such an approach would be inconsistent with the holdings of the merits majority in **Booker**, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in **Booker**, directing courts to consider all of the § 3353(a) factors, many of which the guidelines either reject or ignore. **United States v. Ranum**, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan. 19, 2005)(Adelman, J.).

Here, a Guidelines sentence would result in an absurdly high and unjust outcome.[2] We urge the Court to consider the relevant sentencing factors - the relevant ones are discussed below

---

[2] A word about Counts 1, 2, 6 and 7. Count One charged the defendant with the provision of material support to a terrorist organization and Count Two charged him with being in a conspiracy to do the same thing. Count Six charged Ali with making or receiving material support to a terrorist organization and Count Seven charged him with participating in a conspiracy to do the same. These charges are essentially duplicative and criminalize the identical
4

– and to sentence Ali to no more than ten years in jail. Such a sentence would be fair given the extraordinarily unique facts on this case and in consideration of sentences imposed in other "terrorism" cases.

## THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Ali Kourani is 35-years-old. He was born in Jeddah, Saudi Arabia, and is the oldest of five children. Ali's family was forced to leave Saudi Arabia after the First Gulf War when he was only five-years-old. This was due to financial burdens that the war placed on Ali's father who decided that it would be best for his family to move to Lebanon.

Life in Lebanon was difficult as well even though Mr. Kourani's father was able to reopen his small construction business that was forced to close down in Saudi Arabia. But after a couple of years Ali's father had to shutter it again as a result of the Civil War in Lebanon that engulfed the country in violence and chaos.

During that war Ali lost several family members to violence. His family was eventually forced to leave their home and they lived for about 33 days in a hospital due to the fighting. This was a very traumatic event in Ali's life. And the constant presence of death, guns, instability and danger was a permanently scarring experience for him. I ask the Court to consider the socio-cultural factors involved in the defendant's life and upbringing. Parts of Lebanon, like the Southern part where Ali grew up, are controlled by Hezbollah. As we learned at the trial from the Government's own expert witness, Matthew Levitt, while named a terrorist organization by the United States, Hezbollah is part of the Lebanese government and has representatives in it.

---

conduct in separate fashions, so Counts 6 and 7 should be dismissed. See generally. **United States v. Farhane,** 634 F.3d 127 (2d Cir. 2011). In the alternative, your Honor should certainly sentence the defendant to concurrent terms on all counts.

Supporting some of the goals of Hezbollah is "normal" in Lebanon, especially among people like those in Ali and his wife's circle who were victimized themselves by war and violence.

In search of a better life, Ali's father Mohammed left Lebanon for the United States in about the year 2000. His father opened a wholesale clothing business and this venture stabilized the Kouranis' financial situation. Eventually Ali moved to the United States and he was also in the clothing business. He also achieved two degrees in higher education and in 2012 Ali married Lila Abadi; they now have two children, Hannah Kourani, age 5, and Abbas Kourani, age 4. Hannah Kourani suffers from autism but is not presently receiving any treatment for that condition. In 2017, Ms. Abadi filed for divorce. Other than through lawyers, Ali and his wife have not been in contact for the past two years.

Mr. Kourani has suffered from depression since his youth. Given the circumstances of his upbringing, having been surrounded by war and death, this is totally understandable. These mental health issues are reflected in the Probation Report although the Report failed to mention that he did receive mental health treatment prior to his arrest and I have records from that treatment. Ali has talked to me about moments when he has cried thinks about all of the negative moments in his life. Ali also suffers from anxiety. Indeed, while he was already depressed his marital problems and family life stress exacerbated his condition.[3] And while these stressors may be common the fact that Hezbollah members affiliated with his wife's family were threatening him and his family were anything but "normal" circumstances. And it was while he was worried for his family's safety and after he had cut ties with the people he knew who were affiliated with Hezbollah that he sought to save his family and help the United States.

---

[3] Since being incarcerated the defendant has been depressed but he has tried to make positive use of his time. As the attached show, he has taken self-improvement classes, worked hard in the kitchen and practiced his religion (*see* Exhibit A, letters from MCC staff).

To that end, as your Honor has heard about repeatedly throughout the pre-trial hearings and trial in the case, the defendant sought out a lawyer to try to get his children and other relatives safely into the United States. Eventually Mark Denbeaux became his lawyer. As the Court is well aware, the FBI had been trying to obtain Ali's help for some time and he resisted their overtures even turning down large cash payments from FBI Special Agent Gary Battista.

There is no allegation that Ali was any longer involved in Hezbollah activity when he met with the FBI; nor has the Government ever even claimed that Ali's conduct harmed anyone. And that is because he never did harm anyone. Furthermore, the charged conduct ended in 2015 and the arrest and indictment occurred in 2017; so there was a period of at least 2 years before his arrest in which he voluntarily ceased any criminal conduct. Indeed, the defendant voluntarily disclosed information in detail about his own offense before he was going to be caught (to this day the Government could not prosecute him but for his own words) and so under the Guidelines he is entitled to a downward departure for that fact. *See* U.S.S.G. §5K2.16 - VOLUNTARY DISCLOSURE OF OFFENSE (POLICY STATEMENT):

> If the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a downward departure may be warranted. For example, a downward departure under this section might be considered where a defendant, motivated by remorse, discloses an offense that otherwise would have remained undiscovered. This provision does not apply where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent, or where the defendant's disclosure occurs in connection with the investigation or prosecution of the defendant for related conduct.

Another factor that supports our request for a lower non-Guideline sentence involves the Government's conduct. The FBI broke its promise to Ali to not tell anyone that he was talking to

7

the FBI and has now put his entire family and Ali himself at risk from reprisals. That is a life-long sentence that will follow Ali and his family all their days.

In any event, by the Spring of 2017, with Mr. Denbeaux at his side, Ali began speaking to the FBI. Significantly, Ali was conscious of needing legal protection and sought that protection. Put simply, Denbeaux did not know what he was doing and failed to protect his client. I remember your Honor's incredulity when questioning Denbeaux at the suppression hearing about his failure to obtain written guarantees from the Government. Denbeaux offered no defense for his failure and in a letter to the Court (*see* Exhibit B) he clearly has none.

I suppose that Denbeaux trusted the FBI when they lied to him about promising confidentiality. And I use "lie" because had the FBI been honest they would have said affirmatively that they can never talk about confidentiality since they may use what Ali says against him and/or Ali may have to one day be a witness in court. So not only was Denbeaux ineffective but the Government's misconduct in lying about confidentiality to Ali and Denbeaux should be considered as well in imposing sentence.[4]

Very significantly, at the trial the Court learned for the first time that the FBI did actually bring a sample of a proffer agreement to an early meeting with Ali, thus validating our suppression hearing argument that he would have received the benefits of a standard Southern District proffer agreement had Denbeaux simply asked for one. This omission doomed Ali.

---

[4] While this Court found that that the Sixth Amendment did not apply pre-indictment. The Second Circuit has found that under some circumstances a defendant's "Sixth Amendment rights attached only upon indictment, the district court properly considered pre-indictment state action that affected defendants post-indictment. When the government acts prior to indictment so as to impair the suspect's relationship with counsel post-indictment, the pre-indictment actions ripen into cognizable Sixth Amendment deprivations upon indictment." **United States v. Stein**, 541 F.3d 130, 153 (2008). Here the Government's actions pre-indictment certainly affected him post-indictment in the most extreme way.

But even worse, Denbeaux affirmatively gave horrendously incorrect legal advice to Ali. Ali specifically asked Denbeaux if he needed immunity, like former National Security Advisor General Flynn (*see* Exhibit C, text messages between Ali and Denbeaux provided to us by the Government in discovery), and he was told by Denbeaux that he did not (lines 117 and 118 of Exhibit C) even though he specifically asked his lawyer to get all the promises made by the Government in writing (line 122 of Exhibit C). Trusting his lawyer Ali expressed relief that he did not, thereby confirming Ali's suppression hearing testimony that he believed he would not be prosecuted for what he said to the FBI. Obviously, that advice was horribly wrong.[5]

So now your Honor is faced with the task of sentencing a defendant in this most unusual of cases. The nature of the crime is a serious one, of course, that is taken for granted by me. But despite the serious nature of the crime, the defendant is not alleged to have harmed anyone nor did he harm anyone. Moreover, as discussed above, he voluntarily and permanently ceased any illegal conduct prior to his arrest and of his own volition. In short, he is not now a threat to anyone. Obviously the FBI would not have allowed him to walk the streets if they truly believed he presented a threat to the public and had evidence of that fact.

Moreover, Ali sought to affirmatively assist the Government. That this was done with an eye toward his family's safety should not diminish its significance as it separates the case from the heartland of material support to terrorism cases. A related point is that as a result of the FBI's violation of its promise of confidentiality the defendant and his family are now sentenced to a life of danger with the very real threat of retribution by Hezbollah members. In particular, the defendant will be deported to Lebanon when his sentence is over and his life will certainly be in

---

[5] Another issue raised by this evidence is that the United States violated the defendant's constitutional rights by obtaining his confidential attorney-client text communications with his lawyer.

danger from Hezbollah or anyone there seeking to curry favor with Hezbollah by harming him. These aspects of the case also support the defendant receiving a non-Guideline sentence.

A truly unique factor in the case is that the defendant would not even be before the Court but for his lawyer's malpractice. It is that simple. Removing the defendant's own statements from the trial, for which his lawyer told him he did not need immunity, there was really no proof that a crime was committed, let alone that the defendant committed one. This is a truly outstanding factor in the case and militates in favor of lenience.

### THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT

In addition, to the highly unique fact pattern in this case, in which Ali himself approached the Government to assist it in an effort to insure his family's safety, it is essential to the determination of a fair sentence that the sentences of other similarly situated defendants be considered. Of course, there is no case similar to this in terms of its mitigating factors. But there are somewhat similar cases in terms of the conduct alleged in each case. And in those cases in which the criminal conduct is similar, and often more serious, the sentences were never more than 15 years and often much less than that.

For example, in **United States v. Mohamed Ibrahim Ahmed**, No. 10 Cr. 131 (S.D.N.Y. 2010)(Castel, J.), ECF No. 101, the defendant was an al Shabaab member convicted of providing material support to a terrorist organization and he received a 111-month sentence for providing money to that group and for buying and training in the use of machines guns and grenades. In addition, he actually went to Somalia to fight, having trained and provided weapons to the group.

10

In **United States v. Abdurasal Juraboev**, No. 15 Cr. 95 (E.D.N.Y. 2017)(Kuntz, J.), ECF No. 251, the defendant joined ISIS and wanted to kill President Obama and schemed to bomb Coney Island, New York. He also traveled to Syria to fight for ISIS. In that case, in which the conduct involved an actual specific plan to bomb a location in New York, the defendant received a 15-year sentence. Obviously this conduct was more serious than Ali's.

The case of **United States v. Wesam El-Hanafi**, No. 10 Cr. 162 (S.D.N.Y. 2015)(Wood, J.) ECF No. 211, is somewhat similar; Mr. El-Hanafi provided material support to Al Qaeda, including financial support of $67,000, and he also surveilled possible attack targets in New York City, including the New York Stock Exchange. He was sentenced to 15 years.

In **United States v. Patrick Nayyar**, No. 09 Cr. 1037 (S.D.N.Y. 2014)(Sweet, J.) ECF No. None 10/27/14, the defendant provided material support to Hezbollah by offering to provide guns, ammunition, bulletproof vests and night-vision goggles to a government informant. He received a 15-year sentence after a trial.

In other cases in this District in which defendants actually provided weapons to be used in terrorist attacks the sentences were far lower than the Guidelines in this case. So for example in **United States v. Ioannis Viglakis**, No. 12 Cr. 585 (S.D.N.Y. 2014)(Schofield, J.) ECF No. 64, the defendant, a weapons dealer, actually sent live rocket launchers to informants whom he believed were terrorists.  Viglakis received a sentence of only 10 years. Similarly, in **United States v. Virgil Flaviu Goergescu**, No. 14 Cr. 799 (S.D.N.Y.2016)(Abrams, J.) ECF No. 135, another professional weapons dealer, lost a jury trial and received a 10-year sentence. Neither of these men, to my knowledge, did anything like Ali to assist the United States. So if they received 120 months then it would be reasonable for Ali to receive even less.

Also worth examining are cases in this District in which people have been convicted of committing actual terroristic acts even if they were not members of terrorist organizations.

In **United States v. Paul M. Rosenfeld**, No. 19 Cr. 69 (S.D.N.Y. 2019) (Roman, J.), the defendant constructed and possessed a 200-pound bomb in his home and planned to detonate it on the National Mall on Election Day, in order to bring attention to the political philosophy of "sortition." Gov't Sent'g Mem. 2–5, ECF No. 26. No one was injured by his conduct. Id. at 6. He was sentenced to 16 months. ECF No. 29.

In **United States v. Richard Laugel**, No. 18 Cr. 443 (S.D.N.Y. 2018) (Engelmayer, J.), the defendant constructed, planted, and remotely detonated a pipe bomb on his neighbor's car in the Bronx. Gov't Sent'g Mem. 3, ECF No. 22. The neighbor was not injured. Id. A search of the defendant's home uncovered ammunition, homemade pistols, other guns, a bump stock, and silencers. Id. at 3–4. He was sentenced to 121 months. ECF No. 25.

In **United States v. Lawrence Mulqueen**, No. 13 Cr. 157 (S.D.N.Y. 2013) (Karas, J.), the defendant made threats against several New York politicians and supporters of President Obama. Gov't Sent'g Mem. 3–4, ECF No. 6. He also used Facebook to urge his social media followers to commit violence. Id. At his home, law enforcement found two rifles, ammunition, and bayonets. Id. at 4. He was sentenced to only 15 months. ECF No. 7.

Taken together these cases demonstrate that defendants in this District convicted of being members of terrorist organizations but who have not actually perpetrated any acts of violence have gotten sentences in the 10 to 15 year range. So too many people convicted of committing terroristic acts, even if not members of foreign terrorist organizations, have gotten significantly less prison time. Even professional illegal weapons dealers who sell weapons of war to terrorists have oftentimes received no more than ten years in prison.

This survey shows that a sentence of no more than ten years for Ali would certainly be fair even had he not voluntarily approached the United States Government years after the charged conduct occurred in an attempt to cooperate.

## CONCLUSION

**GIVEN THE TOTALITY OF THE FACTS AND CIRCUMSTANCES PRESENT HERE A SENTENCE OF NO MORE THAN TEN YEARS WOULD BE FAIR, JUST AND REASONABLE**

Given the totality of the facts and circumstances in this unique case a sentence of no more than ten years would be fair, just and reasonable.

Respectfully submitted,

**/s/ Alexei Schacht**

Alexei Schacht, Esq.
Attorney for ALI KOURANI
123 West 94th Street
New York, New York 10025
Tel: (646) 729-8180
Fax: (212) 504--8341
alexei@schachtlaw.net

Dated:        November 23, 2019