UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      -v.-

ALI KOURANI,

                 Defendant.

17 Cr. 417 (AKH)

**THE GOVERNMENT'S SENTENCING SUBMISSION**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Emil J. Bove III
Amanda L. Houle
Assistant United States Attorneys
   *Of Counsel*

## TABLE OF CONTENTS

THE OFFENSE CONDUCT ............................................................................................... 3

I. The Defendant Was Motivated by Hate and Intended Violence ............................................. 3

II. The Defendant's Hizballah Grooming ...................................................................... 5

III. The Defendant's IJO Recruitment ......................................................................... 6

IV. The Defendant's IJO Training ............................................................................. 8

V. The Defendant's IJO Missions .............................................................................. 9

A. The Defendant's Naturalization Fraud and Cover Identity ............................................... 9

B. The Defendant's Trip to China for Explosive Precursor Chemicals ..................................... 10

C. Pre-Attack Surveillance on U.S. Government Facilities and Personnel .................................. 11

D. Pre-Attack Surveillance Targeting International Airports ............................................... 12

E. Targeting Israelis ...................................................................................... 12

F. Identifying Weapons Suppliers .......................................................................... 12

G. Identifying Weapons Storage Facilities ................................................................. 13

VI. The Defendant's Admissions to the FBI and Arrest ...................................................... 13

VII. Additional IJO Terrorist Activities in the Americas Region ........................................... 15

A. Mohammad Hamdar ........................................................................................ 15

B. Samer El Debek ......................................................................................... 16

C. Alexei Saab ............................................................................................ 17


PROBATION AND THE GUIDELINES RECOMMEND LIFE IMPRISONMENT ................. 18

I. The Weapons of Mass Destruction Guideline Applies ...................................................... 18

II. The Obstruction Enhancement Applies .................................................................... 19

III. The Defendant Did Not Voluntarily Disclose His Crimes Under U.S.S.G. § 5K2.16 ....... 21

IV. The Offense Level and Guidelines Range Calculations ................................................... 22


ARGUMENT ............................................................................................... 24

I. The Section 3553(a) Factors Support a Life Sentence .................................................... 24

A. The Nature and Circumstances of the Defendant's Seven Crimes of Terrorism ............ 24

B. The Need for Specific Deterrence and to Protect the Public from Further Crimes
of the Defendant ......................................................................................... 28

C. The Need to Promote General Deterrence and Respect for the Law .............................. 31

II. The Court Should Impose Consecutive Terms of Imprisonment on Each Count
to Achieve an Appropriate Sentence ........................................................................ 33

A. Applicable Law ...................................................................................................... 33

B. Discussion ............................................................................................................. 33

    1. The Defendant's Conspiracy and Substantive Violations Warrant
Independent Punishments ....................................................................................... 34

    2. The Defendant's Material Support of Hizballah (Counts One and Two) .................. 35

    3. The Defendant's Military-Type Training from Hizballah (Counts Three and Four) ... 37

    4. The Defendant's IEEPA Violations (Counts Six and Seven) ..................................... 38

    5. The Defendant's Naturalization Fraud (Count Eight) ................................................ 38

III. The Defendant's Sentencing Arguments Are Meritless .................................................. 40

A. The Defendant's Personal Circumstances Are Not Mitigating ........................................ 40

B. The Defendant Did Not "Assist" the FBI by Pursuing Personal
Objectives at Seton Hall ................................................................................................ 42

C. The Defendant Was a Sophisticated Participant in the Seton Hall Interviews and
Is Not Entitled to Leniency Based on Mr. Denbeaux's Performance .................................. 43

D. The Defendant Is Not Entitled to Leniency Based on the FBI's Lawful Investigation ... 46

E. A Life Sentence for the Defendant Will Not Result in Unwarranted Sentencing
Disparities ..................................................................................................................... 47

    1. *United States v. Ahmed*, No. 10 Cr. 131 (S.D.N.Y.) ................................................. 47

    2. *United States v. Juraboev*, No. 15 Cr. 95 (E.D.N.Y.) ............................................... 48

    3. *United States v. El-Hanafi*, No. 10 Cr. 162 (S.D.N.Y.) ............................................ 48

    4. *United States v. Nayyar*, No. 09 Cr. 1039 (S.D.N.Y.) .............................................. 48

    5. *United States v. Viglakis*, No. 12 Cr. 585 (S.D.N.Y.) .............................................. 49

    6. *United States v. Goergescu*, No. 14 Cr. 799 (S.D.N.Y.) .......................................... 49

    7. Cases Without Terrorist Organizations ...................................................................... 50

F. The Defendant Waived His Meritless Multiplicity Argument Regarding His IEEPA
Violations (Counts Seven and Eight) .............................................................................. 50

IV. Count Eight Requires That the Defendant's Naturalization by Revoked ........................... 51

CONCLUSION ................................................................................................................. 53

## INTRODUCTION

The defendant is a convicted terrorist who spent almost 15 years working for Hizballah and Hizballah's Islamic Jihad Organization ("IJO") to target U.S. and Israeli interests, including children and other innocent civilians. Based on his crimes, both the Probation Office and the Sentencing Guidelines recommend a life sentence. For the reasons set forth below, all of the factors relevant to sentencing support the implementation of that recommendation through the imposition of consecutive statutory-maximum sentences on each of the seven counts at sentencing.

In the 1980s, Hizballah commenced a campaign of terror focused on Israel and the United States, which was inspired and backed by Iran. As a result, thousands, at least, are dead. Over time, the IJO emerged as a potent hybrid threat with sophisticated counterintelligence and attack-planning capabilities. The security risks Iran poses to the United States have also increased dramatically, as the Iranian government backs Hizballah and other proxies with hundreds of millions of dollars in aid on an annual basis, helping to position external attack plotters such as the IJO to carry out violence in our homeland and elsewhere.

The defendant joined Hizballah in 2000, was promoted to the IJO in 2008, established cover as a sleeper cell operative, fraudulently obtained citizenship, and thereafter participated in IJO attack-planning missions. The defendant was focused on Hizballah's jihad, and preoccupied with martyrdom—that is, dying for Hizballah's terrorist cause. As a highly trained terrorist and spy, he helped the IJO look for suppliers of explosive chemicals in China and firearms in New York. He spent years helping Hizballah and Iran prepare to strike strategic and vulnerable targets around New York City, such as federal facilities housing day care centers, critical infrastructure, counterterrorism command posts, and international airports, as well as members of the NYPD, the

Mossad, and the Israel Defense Forces ("IDF").

Despite the prolonged and grave nature of these terrorist activities, the defendant seeks the 10-year sentence that would be appropriate for an unsophisticated one-time drug trafficker who distributed a single kilogram of heroin.  *See* 21 U.S.C. § 841(b)(1)(A).  He has expressed no remorse to date, and argues repeatedly that he "harmed no one."  (Def. Mem. at 3).  It is safe to say that the parents of the small children who spend their days at targets surveilled by the defendant on behalf of the IJO disagree.  He dares suggest that he "sought to affirmatively assist the Government" despite obtaining citizenship as part of a terrorist mission and spending years devoted to harming the United States.  (Def. Mem. at 9).  He ignores all of the Court's conclusions following the suppression hearing, and seeks to blame the FBI and attorney Mark Denbeaux for the fact that his calculated strategy failed to secure immunity to which he was not entitled.  Put simply, Mr. Denbeaux's performance in 2017 does not excuse the defendant's acts of terrorism beginning in 2000.

The defendant is right in at least one respect.  This case is "highly unusual."  (*Id.* at 3).  But not for the reasons he suggests.  Following a successful long-term investigation by the FBI, the defendant is the first terrorist to be tried and sentenced in the United States on the basis of his IJIO activities.  The threat arising from the defendant's conduct will endure long past the termination of these proceedings.  Although the defendant now sits in jail, there is no way of knowing with certainty when or how Hizballah, Iran, and the IJO will use the intelligence the defendant collected to cause harm.  Arrests of other IJO operatives in Michigan, New Jersey, and Peru, which are described in more detail below, also demonstrate that the defendant is only an example of the pervasive threat in the region posed by this terrorist group.  Thus, the Court's decision in these

proceedings will send an important message. And the only appropriate message under the circumstances of this case is that those who are caught helping the IJO to plan for the murder of civilians on behalf of Hizballah and Iran will be punished to the maximum extent of the law.

## THE OFFENSE CONDUCT

The defendant entered the United States based on lies in 2003 by concealing his membership in Hizballah. He then spent years developing a cover identity in this country, ultimately naturalizing as a U.S. citizen while hiding his violent objectives. He joined the IJO in 2008, around the time that Hizballah Secretary General Hassan Nasrallah declared "open war" against the United States and Israel. After that, the defendant positioned himself in New York City to participate in an attack if called upon by Hizballah or Iran. One of his core IJO sleeper-cell missions was to wait, under cover, as part of a network of IJO operatives in the region that could be activated upon terrorist leaders' request. But the defendant did not sit idly. He helped the IJO and Iran prepare to execute terrorist attacks.

## I.   The Defendant Was Motivated by Hate and Intended Violence

Almost 20 years ago, the defendant started training with Hizballah's military to prepare to participate in acts of terrorism and violence against U.S. and Israeli personnel. In 2017, the FBI seized a laptop from the defendant's apartment, which makes clear that he remained focused on those objectives until the United States targeted him as part of a successful counterintelligence disruption plan dating back to 2012. The defendant's laptop provides a window into his pre-arrest state of mind, including his deadly intentions, his moral and legal culpability, and—based on all of those considerations—the significant risk of violent recidivism that he poses, which is itself sufficient to warrant a life sentence in order to protect the public.

3

The defendant used the laptop to view Hizballah and Iranian propaganda promoting acts of terrorism.  For example, below is a still image from a video containing a speech by Nasrallah, which contains an anti-Semitic graphic in the bottom left corner, an icon related to IJO founder Imad Mughniyeh in the top left corner, and Hizballah's flag on the right:



(GX 302, Record 115108).  The video was published by Al Manar, a distributor of Hizballah propaganda that is sanctioned in the United States as a Specially Designated Terrorist Entity, which the defendant searched for and used the laptop to follow.  (*See* GX 1001).

The defendant also used the laptop to watch propaganda videos of blood-soaked, heavily armed jihadis in military uniforms, and to listen to songs declaring a "call for death."  Below are

excerpts from some of the videos:

| Singer | The blood has reached neck high, by God's power |
|--------|------------------------------------------------|

| Singer | He who doesn't pull his weapon has no loyalty |
|--------|-----------------------------------------------|
| Singer | The call for death has come aloud |




(GXs 902, 902-A).  Similarly, the defendant watched videos on the laptop relating to the types of violence he hoped to help perpetrate, with titles such as "Insurgent Fires RPG at US Troops," "israel vs. hezbollah," and "Lebanon war brings grief to Israeli soldiers."  (GX 301).

## II.  The Defendant's Hizballah Grooming

The defendant embraced the violent terrorist ideology reflected in his laptop when he joined Hizballah in 2000.  He started by attending a 45-day military training in Lebanon's Beqaa Valley, which he later described as "Hizballah boot camp" and "Hizballah 101."  (Sept. 13, 2019 Presentence Investigation Report ("PSR") ¶ 20).  The trainers wore Hizballah military uniforms and taught the defendant, among other things, small-unit military tactics and how to fire pistols, AK-47 machineguns, and rocket-propelled grenade launchers ("RPGs").  (*Id.*).

In December 2000, after the defendant completed the training, Israel withdrew from South

Lebanon, thereby ending an occupation that dated back to the early 1980s. (*Id.* ¶ 21). Hizballah placed less emphasis on military capabilities, at least temporarily, following Israel's withdrawal, and the defendant's family started to establish a foothold in the United States. (*Id.*). Specifically, the defendant's father came to the United States illegally via Mexico in 2001, entered into a fraudulent marriage in New York City, and then used the illegal union to help the defendant obtain a visa. (*Id.* ¶¶ 21-22). The defendant entered the United States during the summer of 2003, based in part on his father's crimes and also by falsely stating in the visa application that he was not a member or representative of a "terrorist organization" such as Hizballah. (*Id.* ¶ 22). Shortly thereafter, the defendant enrolled in a biomedical engineering program at the City University of New York, which functioned as a core component of his cover identity for Hizballah. (*Id.* ¶ 23).[1]

## III.   The Defendant's IJO Recruitment

Hizballah promoted the defendant by recruiting him to join the IJO during a trip to Lebanon between December 28, 2007 and January 26, 2008. (PSR ¶ 24). While the defendant was in Lebanon, a Hizballah cleric named Sheikh Hussein Kourani talked to the defendant about joining the IJO.[2] Following that introduction, the defendant participated in a series of vetting meetings with IJO personnel in a Hizballah-controlled part of the Beirut suburbs known as the "Dahieh."

---

[1] In 2012, the defendant also enrolled in an MBA program at DeVry University's Keller Graduate School of Management. (GX 217). In a 2016 text message to his ex-wife, the defendant described the MBA program as "fake shit with school." (GX 303).

[2] Sheikh Hussein Kourani rose to prominence based on a declaration in the 1980s that United Nations personnel stationed in South Lebanon were "legitimate targets for Hizballah because they were preventing Hizballah from being able to attack the Israelis directly." (Tr. 104). The defendant described him as one of the "founding fathers" of Hizballah, and the defendant's sister married Sheikh Hussein Kourani's son. (Tr. 455).

(*See id.* ¶ 25).  The defendant met with Hizballah's Security Unit, obtained training on resisting interrogations, and was introduced to his IJO supervisor, Majed Abdullah, a/k/a "Fadi" and "Hajj" ("Fadi").  (*See id.* ¶ 26).[3]  At the end of the recruitment process, a Hizballah colleague described the IJO as Hizballah's "antivirus to the problem that is Israel," which gave the defendant a sense of "pride."  (Tr. 283-84).

On January 26, 2008, the defendant returned to the United States as a full-fledged member of the IJO.  (PSR ¶¶ 26-27).  While still taking courses at CUNY, he used the laptop to view Hizballah propaganda and related materials on the Internet.  For example, on January 29, 2008, the defendant searched for a report regarding the July 2006 War that was written by a retired Israeli judge named Eliyahu Winograd and analyzed failures and shortcomings of the IDF in the conflict. (GX 902; Tr. 96).  On the same day, the defendant downloaded a separate report regarding the July 2006 War that described his hometown of Yater, Lebanon as a place where Hizballah "built arms storehouses" and "the site of one of the front command posts, which directed the abduction of two IDF soldiers":

---

[3] When FBI agents interviewed the defendant on March 23, 2017, they showed him a photograph of Fadi.  (Tr. 278; GX 801).  The defendant claimed that he "wasn't sure" if the photograph depicted Fadi.  (Tr. 278).  For the remainder of the interview, however, the defendant pointed to the photograph when discussing Fadi.  (*Id.*).




(GXs 902, 902-A; *see also* PSR ¶ 30).

In February 2008, Imad Mughniyeh, the leader of the IJO, was killed in Syria. (Tr. 107). During Mughniyeh's funeral, Hassan Nasrallah, the Secretary General of Hizballah, declared "open war." (Tr. 108). At that point, it became "important to Hizballah to exact revenge," and Hizballah "began to carry out surveillance of a series of attempted terrorist attacks around the world." (Tr. 107-08). In the wake of Mughniyeh's death, the defendant viewed Hizballah propaganda produced by Al Manar, and press reports regarding leaked classified cables relating to Mughniyeh's death. (GXs 302-T, 902, 1001).

## IV.  The Defendant's IJO Training

In addition to the defendant's military training by Hizballah in 2000, and the counter-interrogation training that he received from Hizballah's Intelligence Unit during his IJO recruitment in 2008, the IJO trained the defendant in counterintelligence techniques and additional military tactics.

Fadi provided one-on-one training to the defendant after he was promoted to the IJO. For example, during a trip to Lebanon, a Hizballah driver took the defendant and Fadi to a location where they practiced firing pistols, MP5 submachineguns, and AK-47 machineguns. (Tr. 304). In a separate session, Fadi gave the defendant more instructions regarding resisting interrogation,

including to avoid disclosing "weaknesses" that could be leveraged.  (Tr. 334).

In addition, in July 2011, the defendant participated in an IJO training that included additional sessions on resisting interrogation and firearms training on a Glock pistol, an MP5 submachinegun, an AK-47 machinegun, a PKM Russian belt-fed machinegun, and an RPG.  (PSR ¶ 32; Tr. 369-372; GX 807).

## V.   The Defendant's IJO Missions

After the defendant joined Hizballah in early 2008, Fadi, his IJO handler, tasked him with a series of missions that he carried out on behalf of the IJO in the United States and elsewhere.

### A.   The Defendant's Naturalization Fraud and Cover Identity

First, Fadi instructed the defendant to obtain U.S. citizenship and a U.S. passport as soon as possible.  (PSR ¶ 27).  The defendant understood that this mission was part of the IJO's preparations to retaliate for killing Mughniyeh.  (*See id.*).  On August 15, 2008, the defendant perpetrated several intentional lies regarding his membership in Hizballah in a naturalization application.  (GX 608).  Based on these lies, the United States granted the defendant's application. He was sworn in as a United States citizen on April 15, 2009.  (PSR ¶ 33).  Consistent with the assignment from Fadi, the defendant applied for a U.S. passport on the same day that he was naturalized.  (*Id.*).

The defendant also married a Canadian citizen named Lila Abadi in 2012.  (*Id.* ¶ 87).  Abadi had connections to Hizballah (but not the IJO).  (Tr. 244, 261).  The defendant later described Abadi's family's home in Lebanon as a "compound" like "Tora Bora," *i.e.*, the Afghan cave complex that served as an al Qaeda stronghold in 2001 and a suspected hideout for Usama Bin Laden.  (Tr. 260).  Fadi told the defendant that he might be required to transport IJO

communications to operatives in Canada, where the IJO had a substantial operational presence, and the marriage improved the defendant's cover identity because the relationship made travel to Canada appear normal.  (Tr. 353-54).

On April 5, 2013, at Fadi's instruction, the defendant applied for, and obtained, a U.S. passport card.  (GX 614; Tr. 586).[4]  A U.S. passport card can be used to enter the United States at land border crossings and seaports.  (Tr. 223).  Fadi instructed the defendant that if the defendant's passport was seized by the U.S. government while the defendant was traveling for the IJO, the defendant could use his Lebanese passport to fly to Mexico or Canada, and then cross via a land border back into the United States using the card.  (Tr. 309).

**B.   The Defendant's Trip to China for Explosive Precursor Chemicals**

Hizballah's "modus operandi" in the years after the defendant joined the IJO was to make explosives using ammonium nitrate obtained from medical icepacks.  (Tr. 118; *see also* Tr. 424). For example, the media reported this summer that, in 2015, British authorities in London seized "thousands" of icepacks "filled [with] ammonium nitrate" from four properties linked to Hizballah.[5]  Moreover, at least two thwarted IJO attack plots, in Thailand in 2012 and Cyprus in 2015, involved icepacks manufactured in Guangzhou, China—where the defendant traveled in 2009.  (Tr. 118).

---

[4] The PSR states incorrectly that the defendant obtained a U.S. passport, rather than a passport card, on April 5, 2013.  (*See* PSR ¶ 22).

[5] *See, e.g.*, Zachary Halaschak, Iran-linked terrorists caught stockpiling explosives in London, *Washington Examiner* (June 10, 2019), *available at* https://www.washingtonexaminer.com/news/iran-linked-terrorists-caught-stockpiling-explosives-in-london.

When the defendant applied for a U.S. passport on April 15, 2009, he responded "No Plans Yet" to a question on the application about future travel plans.  (PSR ¶ 33).  The defendant was issued the passport on April 22, 2009, and applied for a visa to enter China shortly thereafter.  (*Id.*).  The visa was issued on April 30, 2009, and the defendant went to Guangzhou on May 3.  (*Id.*).  The purpose of the trip was for the defendant to develop relationships that the IJO could rely on to obtain ammonium nitrate to be used as an explosive precursor chemical.  (*Id.*; *see also id.* ¶ 34).

### C.   Pre-Attack Surveillance on U.S. Government Facilities and Personnel

Fadi also instructed the defendant to "identify military and intelligence outposts in the New York City area, conduct surveillance, and provide information back to the [IJO]."  (Tr. 288).  The defendant targeted at least four government facilities:  26 Federal Plaza, the Secret Service offices at 335 Adams Street in Brooklyn, the 369th Regiment Armory in Harlem, and the 69th Regiment Armory in Manhattan.  (PSR ¶¶ 36-37).  Each of these buildings contains numerous sensitive features, such as government and military personnel, classified information, Joint Operations Command Centers used in connection with responses to terrorist attacks, and childcare facilities.

The defendant told the FBI that his surveillance of 26 Federal Plaza, the Secret Service offices, and the 369th Regiment Armory in Harlem involved downloading images from Google Earth that he brought back to Fadi in Lebanon.  (PSR ¶¶ 37-38).  Collecting open-source information such as data from Google Earth is one of the first parts of the terrorist attack-planning cycle because the information can be used to "narrow[] the target from a large pool" instead of "picking one randomly."  (Tr. 522).  With respect to the 69th Regiment Armory in Manhattan, the defendant used his cellphone to videotape security personnel and external features of the building, which he also turned over to Fadi in Lebanon.  (PSR ¶ 38).

11

### D.   Pre-Attack Surveillance Targeting International Airports

Hizballah and the IJO instructed the defendant that they were "very interested in airports" as well as "airport security protocols and procedures."  (Tr. 291).  In response, the defendant conducted surveillance at JFK and Toronto Pearson International Airport, and brought the information to Fadi.  (PSR ¶ 40).  Between January 2008 and August 2015, the defendant took 19 flights through JFK.  (*Id.* ¶ 41).  Between January 2008 and July 2014, the defendant took seven flights through Toronto Pearson.  (*Id.*).

With respect to both airports, during meetings in Lebanon, the defendant provided Fadi with information about how passengers disembarked from planes, baggage-check procedures, security equipment, security personnel (including uniforms and how they were armed), and the locations of security checkpoints and cameras.  (*See id.*; Tr. 307, 337).

### E.   Targeting Israelis

Fadi asked the defendant to help identify Israelis in the New York City area, and in particular veterans of the IDF, so that the IJO could target them for assassination or, in the alternative, recruitment as sources.  (PSR ¶ 42).  Based on that instruction, the defendant used the LinkedIn website to search for users with IDF connections.  (*Id.* ¶ 43).  The defendant claimed that he did not give Fadi any particular names, but told the FBI that he showed Fadi how to run the searches so that the IJO could use his methodology.  (*Id.* ¶ 44).

### F.  Identifying Weapons Suppliers

Fadi instructed the defendant to find people in the United States through whom the IJO could obtain weapons for use in attacks.  (PSR ¶ 46).  In connection with that mission, on May 18, 2012, the defendant searched for and visited the website for a supplier of weapons and other gear

named Atlantic Tactical:



(GX 902, rows 45-46; GX 902-A).  The defendant ultimately identified between approximately

eight and 10 candidates, and gave their names to Fadi.  (*See id.*).  Fadi expressed concern about

the candidates, however, and said that the IJO needed people whom it could rely on for long

periods of time.  (*Id.*).

### G.  Identifying Weapons Storage Facilities

Fadi also instructed the defendant to set up locations where the IJO could stockpile

weapons in the New York City area.  (PSR ¶ 48).  At first, Fadi asked the defendant to consider

opening front companies for that purpose.  (*Id.*).  The defendant had experience operating several

front companies, including "Broadway Sportswear" and "New Spot Fashion," and he advised Fadi

that it would be easier to set up storage lockers because the process was less formal.  (*Id.*; *see also*

GXs 171-74 (front-company checks seized from the defendant's apartment)).

## VI.  The Defendant's Admissions to the FBI and Arrest

In March 2017, Mr. Denbeaux contacted the FBI and scheduled the first of five interviews

between the defendant and Special Agents Keri Shannon and Joseph Costello.  (Tr. 246-48).  The

interviews were held on March 23 and April 3, 5, 14, and 26, 2017, and all of them were conducted at Mr. Denbeaux's office at the Seton Hall University School of Law.  During the interviews, the defendant admitted to much of the conduct described above, but also withheld information and, at times, affirmatively lied.

On June 1, 2017, the FBI arrested the defendant and searched his apartment pursuant to a warrant.  (*E.g.*, Tr. 39).  The FBI seized from the defendant the U.S. passport and passport card that he obtained at the IJO's direction.  (GXs 201, 202).  During the search of the defendant's apartment, the FBI found a "go-bag" in the front closet with cash and identification documents:

 

(GXs 212-219).  Elsewhere in the defendant's apartment, the FBI found notes corroborating the

14

defendant's admissions to the FBI, the defendant's laptop, and a recently purchased pair of combat boots:



(GX 210).

## VII.   Additional IJO Terrorist Activities in the Americas Region

The Government established at trial that Fadi, the IJO supervisor in Lebanon who provided the defendant with most of his IJO missions, managed other IJO operatives in the United States and Canada.  (Tr. 274-75, 352).  Hizballah's acts of terrorism in the region date back to at least 1994, when IJO personnel detonated a truck bomb near a Jewish community center named *Asociación Mutual Israelita Argentina*, which killed 85 people and injured hundreds.  More recent arrests strongly suggest that Hizballah's efforts in both North and South America persist today and pose severe risks to the public.

### A.   Mohammad Hamdar

In November 2014, Peruvian counterterrorism police disrupted ongoing Hizballah attack plotting in Peru by arresting alleged IJO operative Mohammad Hamdar in Lima.  Hamdar, like the defendant, is a dual citizen.  Peruvian authorities believe Hamdar was surveilling vulnerable targets in preparation for an IJO attack that could have coincided with the United Nations Climate Change

Summit, which was scheduled to occur in Lima later that year.  For example, Hamdar targeted places associated with Israelis and the Jewish community in Peru, such as the Israeli Embassy in Lima and areas frequented by Israeli tourists—similar to Hizballah's 2012 bombing attack on a bus of Israeli tourists in Bulgaria.

Peruvian police found traces of nitroglycerine on Hamdar, and they seized from Hamdar's home surveillance photographs of houses and restaurants that are popular with tourists, as well as military-grade explosives, explosive precursor chemicals, and detonators.  Hamdar subsequently admitted to being a member of the IJO and to acting at the direction of the IJO in Peru, including preoperational surveillance similar in nature to the surveillance carried out by the defendant in New York City.

### B.  Samer El Debek

On June 1, 2017, the same day the defendant was arrested, the FBI arrested Samer El Debek near Detroit based on charges relating to El Debek's membership in the IJO.  According to the Complaint charging El Debek in this District, No. 17 Mag. 4154, El Debek was a dual Lebanese-American citizen, like the defendant, allegedly recruited to join the IJO in late 2007 or early 2008—around the same time as the IJO's recruitment of the defendant, and close in time to the onset of the Hizballah retaliation campaign ignited by the murder of Mughniyeh.  (*See* Compl. ¶ 15(e)).[6]  El Debek allegedly traveled to Thailand in May 2009—around the same time the defendant traveled to China to look for suppliers of ammonium nitrate—at the direction of the IJO

---

[6] The entirety of the text of the Complaint charging El Debek, and the description of the Complaint set forth herein, constitute only allegations against El Debek, and every fact regarding El Debek described herein should be treated as an allegation.

to clean up explosive precursors in a house in Bangkok that others in the IJO abandoned because of surveillance.  (*Id.* ¶¶ 21-22).  Like the defendant's travel to China, El Debek allegedly used his U.S. passport to take the trip.  (*Id.* ¶ 22).  Also like the defendant, El Debek allegedly conducted preoperational surveillance for the IJO.  Whereas the defendant targeted New York City, the IJO allegedly sent El Debek to take photographs in Panama at locations such as the U.S. and Israeli Embassies and the Panama Canal.  (*Id.* ¶ 29).

### C.  Alexei Saab

In July 2019, the FBI arrested Alexei Saab based on charges relating to his support of Hizballah's IJO.  According to the Complaint charging Saab in this District, No. 19 Mag. 6263, Saab allegedly joined Hizballah in approximately 1996 and was allegedly promoted to the IJO in approximately 2000 before entering the United States in approximately November 2008.  (Compl. ¶¶ 20(a)-(c)). [7]  In August 2008, which is the same month the defendant submitted his naturalization application in the United States, Saab naturalized as a U.S. citizen.  (*See id.* ¶ 20(d)).  Like the defendant, Saab allegedly conducted preoperational surveillance in New York City, including at airports, which the defendant also surveilled, as well as at the United Nations headquarters, the Statue of Liberty, Rockefeller Center, Times Square, and the Empire State Building.  (*Id.* ¶ 24(e)).

---

[7] The entirety of the text of the Complaint and Indictment charging Saab, and the description of the Complaint set forth herein, constitute only allegations against Saab, and every fact regarding Saab described herein should be treated as an allegation.

## PROBATION AND THE GUIDELINES RECOMMEND LIFE IMPRISONMENT

For the reasons set forth below, based on an offense level of 56 and Criminal History Category VI, the Guidelines recommend a sentence of life imprisonment.  The Probation Office recommends that the Court impose a life sentence.  (PSR at 28).

### I.  The Weapons of Mass Destruction Guideline Applies

The offense guideline applicable to Counts One, Two, Six, and Seven is U.S.S.G. § 2M6.1 because these crimes involved Hizballah providing the defendant with RPGs on two separate occasions in order to enhance his proficiency with deadly, military-grade weapons in connection with anticipated attacks on U.S. and Israeli interests.

The Guidelines analysis must begin with the manual's Statutory Index, which directs in the first instance that the offense guideline for the defendant's violations of 18 U.S.C. § 2339B (Counts One and Two), and the International Emergency Economic Powers Act ("IEEPA") (Counts Six and Seven) is U.S.S.G. § 2M5.3.  The cross references in Section 2M5.3, however, require the Court to apply U.S.S.G. § 2M6.1 if (i) the offense involved "the provision of" a "weapon of mass destruction"; and (ii) the offense level under U.S.S.G. § 2M6.1 is "greater than that determined" pursuant to U.S.S.G. § 2M5.3.

The cross reference applies because the definition of "weapon of mass destruction" includes "any destructive device as defined in section 921 of this title."   18 U.S.C. § 2332a(c)(2)(A).  Firearms Enforcement Officer Smith explained at trial that the grenade and the launcher on an RPG each constitute a "destructive device" under Section 921.  (Tr. 761).  Hizballah "provi[ded]" RPGs to the defendant during trainings in Lebanon—at least twice—in connection with Counts One, Two, Six, and Seven.  U.S.S.G. § 2M5.3(c)(3).  Specifically, the defendant

admitted to the FBI that he used an RPG at a Hizballah training in 2000 as well as an IJO-specific Hizballah training in July 2011.  (Tr. 235, 372-73, 609, 617, 624).  The Court also instructed the jury regarding the statutory definition of the term "destructive device," and the jury concluded that Count Five involved the use of such a weapon. (Tr. 958, 1004).  The "destructive device[s]" found by the jury pursuant to the definition in 18 U.S.C. § 921(a)(4) were "weapons of mass destruction" under 18 U.S.C. § 2332a(c)(2)(A).  Therefore, because the offense level of 56 calculated below pursuant to U.S.S.G. § 2M6.1 is greater than the offense level of 40 that would result under U.S.S.G. § 2M5.3,[8] the Court should apply U.S.S.G. § 2M6.1 on Counts One, Two, Six, and Seven.

## II.   The Obstruction Enhancement Applies

In connection with the defendant's pretrial motion to suppress, he lied in several respects in a desperate and transparent effort to avoid accountability for his conduct and his voluntary admissions.  The Government described the evidentiary support for this conclusion in its October 25, 2019 submission.  (Dkt. No. 131).  Based on any, and all, of the defendant's five separate lies to the Court, the obstruction enhancement is applicable.  *See* U.S.S.G. § 3C1.1.

*First*, the defendant testified falsely that the FBI agents "guarantee[d]" immigration

---

[8] If U.S.S.G. §§ 2M5.3(a)-(b) applied—and they do not—the offense level would be 40.  First, under U.S.S.G. § 2M5.3(a), the base offense level would be 26.  Second, pursuant to U.S.S.G § 2M5.3(b)(1), because (i) the offenses charged in Counts One, Two, Three, Four, Six, and Seven involved dangerous weapons, firearms, and explosives, and (ii) the offenses charged in those Counts involved the provision of material support or resources with the intent, knowledge, or reason to believe they were to be used to commit or assist in the commission of a violent act, two levels would be added.  Finally, pursuant to U.S.S.G. § 3A1.4(a), because Count Four is a felony that involved, or was intended to promote, a federal crime of terrorism, 12 levels are added.

benefits for his family members.  (Hearing Tr. 265).  The Court rejected this testimony in its post-hearing opinion, finding that "during, and after each of [the] meetings [with the defendant], the agents explained to Kourani that they were not authorized to make any promises or guarantees about potential benefits for Kourani's cooperation."  *United States v. Kourani*, No. 17 Cr. 417 (AKH), 2018 WL 1989583, at *2 (S.D.N.Y. Apr. 26, 2018).

*Second*, the defendant testified falsely that the FBI agents agreed that the defendant's statements during the 2017 meetings would not be used against him, and that he would not be prosecuted for lying to the FBI even if he lied during those meetings.  (Hearing Tr. 258, 317).  The Court rejected this testimony too.  *See Kourani*, 2018 WL 1989583, at *2 ("Kourani claims that the FBI agents offered him immunity or otherwise indicated, either to him or to his lawyer, that his statements would not be used against him.  Based on the testimony given at the evidentiary hearing and the sworn affidavits submitted by Kourani and Denbeaux, I find that no such offer of immunity or non-prosecution was made.")

*Third*, the defendant testified falsely that, upon reviewing Mr. Denbeaux's memorandum (GX 221), Special Agent Costello said, "I agree to it, I have no objections in it."  (Hearing Tr. 269).  The Court found no such evidence after considering and crediting the agents' testimony to the contrary.  *See Kourani*, 2018 WL 1989583, at *2 ("After receiving this document from Denbeaux, agents Costello and Shannon stepped out into the hall to confer.  They reviewed the document briefly, determined that it did not accurately capture the understanding of the parties, returned the document to Denbeaux without comment, and proceeded to interview Kourani.")

*Fourth*, the defendant testified falsely that he hired Mr. Denbeaux for "friendship [and] legal advice" when—in fact and as the Court found—the defendant hired Mr. Denbeaux in the

hope that "Denbeaux's experience in representing controversial clients in negotiations with the FBI could be utilized to resolve his immigration and child custody disputes." *Kourani*, 2018 WL 1989583, at *2 & n.2.

*Fifth*, the defendant testified falsely that the "reason" he was attacked in Lebanon during summer 2016 was because the Hizballah militia believed he was a government informant. (Hearing Tr. 244, 291). The defendant admitted to the FBI in 2016 and 2017, however, that the Hizballah militia confrontation arose from a family dispute the defendant had with his ex-wife and former mother-in-law. (Hearing Tr. at 25-26, 259-61).

## III. The Defendant Did Not Voluntarily Disclose His Crimes Under U.S.S.G. § 5K2.16

The defendant wrongly asserts that he is entitled to a downward departure pursuant to U.S.S.G. § 5K2.16 because, the defendant claims, he "voluntarily disclosed information in detail about his own offense before he was going to be caught." (Def. Mem. at 7). The defendant is wrong.

Section 5K2.16 only applies if the defendant "accepts responsibility" for his crimes. U.S.S.G. § 5K2.16. The defendant did the opposite. *See Kourani*, 2018 WL 1989583, at *3 ("As the [2017 Seton Hall] meetings went on, the agents again became convinced that Kourani was holding back vital information."). In May 2017, after the Seton Hall interviews, he conveyed threats to the FBI through Mr. Denbeaux that, *inter alia*, he was going to flee to Lebanon. (Tr. 630-31). When the FBI arrested him before he could do so, he proceeded to trial instead of accepting responsibility for his crimes. At trial, defense counsel argued to the jury—falsely—that the defendant "is not now, nor has he ever been a member of the IJO." (Tr. 887). To this day, the defendant still has not accepted responsibility for his acts of terrorism against the United States,

and he has not even suggested—nor could he—that any reduction is appropriate under U.S.S.G. § 3E1.1. The defendant's failure to accept responsibility precludes a departure under Section 5K2.16.

Furthermore, Section 5K2.16 does not apply "where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent." U.S.S.G. § 5K2.16. The defendant was well aware that the FBI had discovered his crimes, and was actively investigating him, long before the first meeting at Seton Hall in March 2017. For example, beginning in April 2016, Special Agent Battista and others confronted the defendant in Chicago regarding his membership in Hizballah. (Tr. 449-51). The defendant told Agent Battista that "it's going to take more than cookies" for him to admit his crimes. (Tr. 464). Thereafter, the FBI continued to confront the defendant at airports and in Lebanon, and he continued to lie. (*E.g.*, Tr. 244, 481). Thus, the departure is unavailable to the defendant because he did not admit to anything prior to being overtly confronted by FBI agents regarding their investigation of his membership in Hizballah and the IJO. *See Kourani*, 2018 WL 1989583, at *4 (finding that the defendant was "seeking a meeting with FBI agents" in 2017 "when his situation made doing so in his best interest"). For each of these two reasons, Section 5K2.16 does not apply.

## IV. The Offense Level and Guidelines Range Calculations

In light of the foregoing, and despite the anticipated dismissal of the defendant's conviction on Count Five, the Guidelines recommend a sentence of life imprisonment calculated as follows:

- Pursuant to U.S.S.G. § 3D1.2(b), the remaining counts—Counts One, Two, Three, Four, Six, Seven, and Eight—are grouped because they involved two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. (PSR ¶ 59).

- Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group, which is level 56 as calculated below pursuant to U.S.S.G. § 2M6.1 with respect to Counts One, Two, Three, Four, Six, and Seven. (PSR ¶ 60).[9]

- For the reasons stated above, the offense Guideline applicable to Counts One, Two, Three, Four, Six, and Seven is U.S.S.G. § 2M6.1.

- Pursuant to U.S.S.G. § 2M6.1(a)(1), the base offense level for Counts One, Two, Three, Four, Six, and Seven is 42 because the offenses were committed with intent to injury the United States, to aid a foreign nation (*i.e.*, Iran), and to aid a foreign terrorist organization (*i.e.*, Hizballah).

- Pursuant to U.S.S.G. § 3A1.4(a), because the offenses charged in Counts One, Two, Three, Four, Six, and Seven are felonies that involved, and were intended to promote, federal crimes of terrorism, 12 levels are added.

- Pursuant to U.S.S.G. § 3C1.1, because the defendant willfully obstructed and attempted to obstruct the administration of justice with respect to the prosecution of the offenses of conviction by providing materially false information to the Court in connection with a motion to suppress, two levels are added.

- Pursuant to Chapter 5, Part A (App. n.2), because the total calculated offense level of 56 is in excess of 43, the offense level is treated as 43.

Because the terrorism enhancement under U.S.S.G. § 3A1.4 applies, the defendant is in Criminal History Category VI. (PSR ¶ 75). At offense level 43 and Criminal History Category VI, the Guidelines recommend a sentence of life imprisonment and, as noted above, the Probation Office concurs in that recommendation.

---

[9] The offense level applicable to Count Eight is also 56. Specifically, pursuant to U.S.S.G. § 2L2.2(c)(1)(A), because the defendant used his fraudulently obtained U.S. passport in the commission of felony offenses—*i.e.*, the offenses charged in Counts One, Two, Six, and Seven—the offense level is calculated pursuant to U.S.S.G. § 2X1.1 based on the offenses charged in Counts One, Two, Six, and Seven.

## ARGUMENT

### I. The Section 3553(a) Factors Support a Life Sentence

The Section 3553(a) factors support the imposition of the life sentence recommended by the Probation Office and the Guidelines.

#### A. The Nature and Circumstances of the Defendant's Seven Crimes of Terrorism

The gravity of the defendant's conduct cannot be overstated. *See* 18 U.S.C. § 3553(a)(1). As noted in the PSR, his actions were "premeditated, extremely dangerous, and . . . motivated by a desire to injure as many innocent people as possible." (PSR at 28). The defendant's violent intentions are reflected in the Hizballah propaganda that he consumed in private, while leading a double life to cover up his activities as a lethal spy with extensive training in the use of military-grade weapons. The defendant spent almost 15 years lurking in the shadows as a terrorist supporting Hizballah's objectives of targeting Americans and Israelis around the world. While purporting to be a student and businessman in New York City, he collected attack-planning information for the IJO and waited patiently for orders to attack. And the preoccupation reflected in the defendant's laptop with the concept of "martyrdom"—which, as Dr. Levitt explained, means "one who is killed or dies" for "the cause of Hezbollah and Iran in support of Shia around the world and against their perceived enemies, first and foremost, Israel, and then the United States" (Tr. 88)—indicates that he wanted very much to participate in such an attack.

The defendant started on this path by attending a Hizballah boot camp in Lebanon in 2000. The foundation for his acts of terrorism in the United States was laid shortly thereafter through a calculated exploitation of controls on the U.S.-Mexico border, on behalf of Hizballah, by the defendant's father. He came to the United States illegally just prior to the September 11, 2001

attacks, and entered into a fraudulent marriage in New York City, which he used to help the defendant get a visa to enter the country.  The defendant then enrolled in school and started to sell counterfeit clothing as parts of his cover identity to mask the fact that, in his words, his family is "the [B]in Ladens of Lebanon."  (Tr. 468).

As a sophisticated, well-trained IJO operative positioned under deep cover in the United States, the defendant was part of an emerging threat posed by the IJO in the Americas region, about which little was known publicly before the FBI arrested the defendant and El Debek on the same day in 2017.  The defendant admitted that the IJO "was Iranian controlled."  (Tr. 234).  Indeed, the IJO's operations in the United States are a part of Iran's proxy network, and Iran has backed this threat by funding Hizballah in annual amounts ranging between $200 million and $800 million per year.  (Tr. 103).  Iran's support of Hizballah results in the "more severe" risks attendant to "state sponsored terrorism," as described at the trial, which in this context leads to increased focus on targeting nodes of critical infrastructure in attacks intended to cripple cities.  (Tr. 521).

The defendant told the FBI that he felt "pride" in being a member of the IJO, because it was Hizballah's "antivirus to the problem that is Israel," and his IJO activities supported the objectives of the terrorists who lead these organizations.  (Tr. 283-84).  It bears repeating that one of the biggest threats posed by the defendant, which is a part of his conduct most worthy of severe punishment, was his passive presence in the United States, under cover of normalcy, waiting to be activated to participate in an attack.  He was ready, willing, and able—indeed, eager—to perpetrate violence on behalf of Iran and Hizballah.  But that is not all that the defendant did.

Immediately after the defendant obtained citizenship and a U.S. passport that masked his frequent trips to Lebanon, he traveled to Guangzhou, China to help obtain ammonium nitrate that

the IJO could use in bombs targeting innocent people. The record is more than sufficient to conclude by a preponderance of the evidence that the defendant took the trip to support such terrorist activities. *E.g.*, *United States v. Vaugh*, 430 F.3d 518, 527 (2d Cir. 2005) ("[D]istrict courts may find facts relevant to sentencing by a preponderance of the evidence . . . ."). His first IJO mission was to obtain citizenship and a U.S. passport that would mask his ties to Lebanon when traveling on behalf of the IJO. As soon as he accomplished those tasks, while claiming that he had no immediate travel plans, he obtained a visa to enter China. The defendant went to Guangzhou around the same time that El Debek carried out an ammonium nitrate-related IJO mission in Thailand. "[T]housands" of icepacks containing ammonium nitrate were later seized in London, according to news reports.[10] And, as explained in the Complaint charging the defendant, icepacks from Guangzhou containing ammonium nitrate were later seized in Thailand in 2012 and in Cyprus in 2015. (Dkt. No. 1 ¶¶ 17(f), (i)).

In addition to IJO operations in Guangzhou, the defendant facilitated the IJO's capacity for violent terrorism in New York City and the surrounding region. He provided the IJO with information about how to obtain and store weapons. He collected information about security at JFK and Toronto Pearson airports during a total of 26 flights through those facilities, which he provided to the IJO. (Tr. 291; *see also* GX 601). Officer Eanucci confirmed at trial that such surveillance could help bad actors "conduct some sort of attack or [cause] some type of harm

---

[10] *See, e.g.*, Zachary Halaschak, Iran-linked terrorists caught stockpiling explosives in London, *Washington Examiner* (June 10, 2019), *available at* https://www.washingtonexaminer.com/news/iran-linked-terrorists-caught-stockpiling-explosives-in-london.

within the airport." (Tr. 208). The defendant provided the IJO with surveillance information regarding federal buildings such as 26 Federal Plaza—the third largest federal facility in the country—which houses approximately 30 agencies, 7,000 federal employees, facilities for handling classified information, "key engineering facilities," and a "large daycare facility" with "exterior . . . playgrounds." (Tr. 438, 440). The defendant conducted surveillance at military installations in Manhattan and Harlem. Approximately 70 military personnel work at the armory that the defendant targeted in Harlem, which also stores weapons and vehicles, hosts trainings for up to 700 members of the National Guard, and contains a large children's center. (Tr. 501-03).

The defendant also targeted individuals for the IJO. His laptop contained pictures of military personnel, which could be used by the IJO to mimic uniforms and gain entry to secure facilities to the United States. (GX 301, bookmarks 12-14; *see also* Tr. 542 ("Somebody dresses as a solider and they're able to bypass the security because they look like them.")). The laptop also contained a list of "leaked data" that included "addresses, phone numbers & general contact information" for over 35,000 Mossad agents, which the IJO could use to target or recruit these officials. (GX 302, record 46923; *see also* Tr. 693-94). The defendant showed IJO personnel how to search social media websites for IDF personnel "for purposes of assassination or recruitment." (Tr. 373-74). Separately, the defendant "provided the [IJO with] contact information for" an NYPD Lieutenant, which placed the Lieutenant and his relatives at risk of being targeted for intelligence operations and violence by the IJO. (Tr. 314).

The defendant was one of the crucial weapons in the "open war" that Nasrallah declared on behalf of Hizballah in response to the 2008 killing of Mughniyeh, the leader of the IJO. (Tr. 107-08). Collectively, the defendant's almost 15 year of activities for Iran, Hizballah, and the IJO

27

placed numerous civilians around the world—including children—in danger.  Thus, the defendant's claim that he "harmed no one" is simply wrong.  (Def. Mem. at 3).  To the extent the defendant finds evidence of physical injury resulting from his crimes to be lacking, he focuses far too much on that "fortuity."  *United States v. Stewart*, 590 F.3d 93, 175 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part).  "[W]e are not relegated to wait[ing] until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism."  *Id.* (internal quotation marks omitted).  "Congress has been unmistakably clear that, as a general matter, the achievement of actual harm may aggravate the seriousness of a terrorism crime but that the absence of proven harm does not mitigate such a crime."  *Id.*

As in *Stewart*, the absence of more concrete injuries "is in no sense attributable" to the defendant.  *Id.*  He targeted the United States despite the fact that this country offered him and his family refuge, even though he did not need it, and the privilege of citizenship, even though he was not entitled to it. The harm resulting from his actions is ongoing, as he provided information to the IJO that Hizballah could use to support an attack at any time.  Therefore, the nature and seriousness of the defendant's crimes amply support the sentence recommended by the Probation Office and the Guidelines.

## B.  The Need for Specific Deterrence and to Protect the Public from Further Crimes of the Defendant

The undisputed application of the Guidelines' terrorism enhancement in this case, at U.S.S.G. § 3A1.4(a) (*see* PSR ¶ 65), "reflects Congress' and the Commission's policy judgment 'that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.'"  *Stewart*, 590 F.3d at 172-

73 (Walker, J., concurring in part and dissenting in part) (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)).  Here, the Probation Office concluded that the defendant poses a "significant danger to the community," which "warrants incapacitation in order to promote just punishment and to protect the community."  (PSR at 28).  Probation is correct.  The defendant poses a significant risk of returning to dangerous crimes should he ever be released from prison. *See* 18 U.S.C. §  3553(a)(2)(B)-(C).  As a result, the risk of recidivism and the need to protect the public weigh in favor of incapacitating the defendant through a lengthy prison sentence.

One of the reasons that the defendant poses an ongoing risk, despite the public disclosure of his admissions to the FBI and subsequent conviction, is that he has learned information about the manner in which the FBI conducts counter-intelligence and law enforcement investigations that would be valuable to any enemy of the United States.  In this regard,

> [e]spionage differs from all other crimes in one unique, highly significant respect.  The purpose of espionage is political: to undermine the government of the United States with a view to its destruction. This goal is shared by all enemies of this country.  Countries antagonistic to the United States who would not offer asylum to murderers or thieves very likely will open their doors to one who shares their political purpose inimical to the United States.

*United States v. Kostadinov*, 572 F. Supp. 1547, 1551 (S.D.N.Y. 1983).  The defendant's work as an IJO spy will serve him well—and so too our enemies—should he be released.

Prior to the defendant's arrest in 2017, he was prepared to leave the United States to fight for Hizballah in Syria because the agents declined to find him the job, apartment, salary, and immigration benefits he felt he was owed.  Beginning in at least 2015, the defendant used his laptop to conduct searches for locations in Syria and read about members of Hizballah with the last name Kourani captured in Syria.  (GXs 302, 902).  For example, in November 2015, he conducted searches and watched videos with keywords such as "Hezbollah Prisoners Kourani"

and "Two of Hezbollah's three prisoners appear in a new video," which contained information about the capture in Syria of Hizballah fighters named Hassan Nazih Taha, Mohammad Mehdi Shuaib, and Mousa Kourani.  (GX 902, lines 129-132).  To equip himself to fight in Syria, the defendant purchased combat boots on May 1, 2017, about a month before his arrest.  (*See* GX 163).  There can be no question that the defendant planned to use the boots for combat; his laptop contained Internet history such as visits to "www.militaryboots.com/army-boots.html" and "Belleville 310 – Mens Hot Weather Tactical Combat Boots."  (GX 302).  Finally, on May 17, 2017, Mr. Denbeaux confirmed to the FBI that the defendant was preparing to return to Lebanon. (Tr. 630-31).  Thus, the defendant's commitment to Hizballah endured beyond his interviews with the FBI, which suggests a continued threat that he will return to terrorism and violence if he is released.

The defendant's Hizballah propaganda also reflects a life-long commitment to violence that is likely undeterrable.  For example, one video from the defendant's laptop—filled with violent imagery—declared that even if one "fill[s] the prisons" with members of Hizballah, the group will "remain patient" and "resolute" on "the route of jihad":

| Chorus | Bring your folly and fill the prisons with us |
|--------|-----------------------------------------------|
| Chorus | And harm us with all your might |
| Chorus | And bring even more; we remain patient |
| Singer | On the route of jihad, we are resolute |

(GX 902, Row 75-B-T).  These words motivated the defendant to persist in terrorism for years,

they are a part of his mindset as he approaches sentencing, and the video helps demonstrate why he will pose a threat to the United States for the remainder of his days.

Finally, the defendant's laptop also reflects a preoccupation with martyrdom. The defendant conducted searches for prior so-called "martyrs":

 

(GX 902, rows 51-T, 115-T). He also watched videos with titles such as "Hezbollah martyr funeral," "Hassan Nasrallah and hezbollah soldiers and the martyrs of hezbollah," and "Rare Footage[] of Hezbollah Islamic Resistance Mujahid Martyrs." (GX 301, bookmarks 18, 25). The defendant's focus on dying in support of the terrorist objectives of Hizballah and the IJO is yet another reason that a lengthy prison sentence is necessary.

In sum, the defendant's status as a Hizballah spy who has collected valuable information that could be used against the United States, his 2017 pre-arrest plans to fight for Hizballah in Syria, and his commitment to jihad and martyrdom demonstrate the substantial risk of dangerous recidivism and a pressing need to continue to protect the public—around the world—from this man. These considerations strongly support the Probation Office's recommendation of incapacitation.

### C.  The Need to Promote General Deterrence and Respect for the Law

"[G]iven the increasingly common nature of terrorism-related crimes," general deterrence

should "play a large part in the court's considerations" at sentencing.  *United States v. Doe*, 323 F. Supp. 3d 368, 390 (E.D.N.Y. 2018).  This case and others like it, including the arrests of Hamdar, El Debek, and Saab, make clear that Hizballah's IJO is one of the Iran proxies currently posing significant security risks in the Americas region and elsewhere.  Thus, using general deterrence to mitigate the threat posed by the IJO is an important feature of this sentencing.

For example, in January 2019, the U.S. Director of National Intelligence assessed that "Hizballah most likely maintains the capability to execute a range of attack options against US interests worldwide," and that "Iran almost certainly will continue to develop and maintain terrorist capabilities as an option to deter or retaliate against its perceived adversaries."[11]  These are precisely the types of things that the defendant did for the IJO in this country.  The Director of National Intelligence also predicted that, "[d]uring the next year, Hizballah most likely will continue to develop its terrorist capabilities, which the group views as a valuable tool and one it can maintain with plausible deniability."  Hizballah's continued pursuit of terrorism through the IJO and other means underscores the importance of general deterrence, and the need to promote respect for the law, at this sentencing.  People all over the world considering joining the IJO, or supporting Hizballah and other terrorist groups seeking to harm the United States, must understand that, if apprehended, they will be punished to the maximum extent of the law.  The Court's sentence in this case will be the first time that a terrorist is held accountable for supporting the IJO in the United States, and it is critical that the sentence deter others from doing so.

---

[11] *Available at* https://www.dni.gov/files/ODNI/documents/2019-ATA-SFR---SSCI.pdf.

**II.  The Court Should Impose Consecutive Terms of Imprisonment on Each Count to Achieve an Appropriate Sentence**

By committing each of the seven crimes at issue in this sentencing, the defendant caused distinct and serious harms that warrant significant punishment.  Accordingly, the Court should craft the sentence recommended by the Probation Office and the Guidelines by imposing the statutory maximum sentence on each of the defendant's seven crimes, and ordering that those sentences run consecutively.

**A.  Applicable Law**

"The presumption when Congress creates . . . distinct offenses is that it intends to permit cumulative sentences."  *Garrett v. United States*, 471 U.S. 773, 793 (1985).  "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment" to be imposed for all counts of conviction, "then the sentence imposed on one or more of the other counts shall run consecutively."  U.S.S.G. § 5G1.2(d).  "The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)."  18 U.S.C. § 3584(b).

**B.  Discussion**

The defendant's seven crimes fall into four categories:

1.  Material support to Hizballah, in violation of 18 U.S.C. § 2339B (Counts One and Two);

2.  Military-type training from Hizballah, 18 U.S.C. §§ 2339D and 371 (Counts Three and Four);

3.  Violation of sanctions imposed pursuant to IEEPA, in violation of 50 U.S.C. § 1705(a) (Counts Six and Seven); and

4. <u>Naturalization fraud</u> to facilitate an act of international terrorism, in violation of 18 U.S.C. § 1425(a) (Count Eight).

For each of the defendant's seven convictions, the Court should impose the statutory maximum sentence, with each to run consecutively.

### 1. The Defendant's Conspiracy and Substantive Violations Warrant Independent Punishments

Three of the four categories of crimes committed by the defendant are paired as conspiracy and substantive violations, which constitute different types of crimes that both warrant the maximum allowable punishment in light of the trial evidence.

"It is well settled that separate punishments are authorized for a substantive crime and conspiracy to commit the same crime." *United States v. Escobar*, 462 F. App'x 58, 68 (2d Cir. 2012). "This settled principle derives from the reason of things in dealing with socially reprehensible conduct: collective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts." *Callanan v. United States*, 364 U.S. 587, 593 (1961).

> Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise.

*Id.* at 593-94. For all of the reasons articulated by the Supreme Court in *Callanan* regarding the separate harms arising from conspiracy and substantive crimes, as well as the reasons set forth below, the Court should impose maximum sentences on the conspiracy-substantive pairs in Counts

34

One and Two (material support), Counts Three and Four (military-type training), and Counts Six and Seven (IEEPA sanctions violations).

### 2.   The Defendant's Material Support of Hizballah (Counts One and Two)

The Court should impose the statutory maximum 20-year consecutive sentences on the defendant's substantive and conspiracy convictions for providing material support to Hizballah, in violation of 18 U.S.C. § 2339B.  The statute's broad prohibition on providing material support to foreign terrorist organizations such as Hizballah is based on a congressional finding that these groups "'are so tainted by their criminal conduct that *any contribution to such an organization facilitates that conduct*.'"  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010) (quoting Antiterrorism and Effective Death Penalty Act of 1996, § 301(a)(7), 110 Stat. 1247) (emphasis added).   The defendant's support of Hizballah went far beyond the minimum required to violate the statute, and is deserving of maximum punishment, because his activities for the terrorist organization were prolonged, extensive, and for the benefit of the IJO—Hizballah's most dangerous external operations component.

Courts have routinely imposed maximum sentences in cases involving material support of foreign terrorist organizations.  *See Stewart*, 590 F.3d at 166 n.4 (Walker, J., concurring in part and dissenting in part) ("Most of these courts chose the maximum material support sentence available to them under federal law . . .").  The table set forth as Appendix B in *United States v. Stewart*, 597 F.3d 514 (2d Cir. 2010), describes several statutory-maximum sentences in material support cases, including sentences of 900 months, 564 months, and 540 months.  *See id.* at 530-31

(2d Cir. 2010).[12]  More recently, in *United States v. Raishani*, Judge Abrams sentenced a man who pleaded guilty—rather than proceeding to trial like the defendant here—to the statutory maximum of 20 years' imprisonment for an *attempt* to provide material support to ISIS, in violation of 18 U.S.C. § 2339B.  *See* 17 Cr. 421 (RA) (Dkt. No. 62 at 30).  In *Raishani*, the defendant voiced support ISIS for approximately two years, as opposed to the defendant's nearly 15 years of active support of Hizballah's terrorist operations.  (*Id.* at 5).  Raishani was arrested at the airport as he attempted to travel toward Syria to support ISIS.  (*See id.* at 8).  The defendant in this case, in contrast, traveled to Lebanon repeatedly and also to China on behalf of the IJO, and he helped with several IJO attack-planning operations in New York City.  Raishani's offense level was 20 levels lower than the defendant's (36 compared to 56), and his Guidelines' recommendation was 300 months rather than life.  (*Id.* at 4).

The 20-year maximum sentence for an *attempted* violation of Section 2339B in *Raishani* makes clear that the same sentence is appropriate for the defendant's *completed* violation of Section 2339B, as charged in Count One.  A 20-year sentence for the defendant's *conspiracy* violation of Section 2339B, as charged in Count Two, is also appropriate to punish the "collective criminal agreement" supported by the defendant.  *Callanan*, 364 U.S. at 593.  The defendant joined a conspiracy with high-ranking Hizballah officials, including Nasrallah and Fadi, the defendant's IJO handler who also managed other IJO operatives in the United States and Canada, including one of the perpetrators of the IJO's 2012 bombing in Bulgaria.  (Tr. 274-75, 352).  Thus, the

---

[12] In 2015, Congress increased the maximum penalty for a violation of Section 2339B from 15 to 20 years.  *See* Pub. L. 114-23, Title VII, § 704, 129 Stat. 300 (June 2, 2015).

maximum sentence on Count Two is appropriate to reflect the danger and criminality arising from the defendant's agreement with these extremely dangerous terrorists.

### 3. The Defendant's Military-Type Training from Hizballah (Counts Three and Four)

The Court should impose the maximum possible consecutive sentences for the defendant's substantive and conspiracy crimes relating to receiving military-type training from Hizballah and the IJO, in violation of 18 U.S.C. §§ 2339D, 371. Because the defendant's conviction under Section 2339D requires a 10-year prison term to the extent the Court imposes incarceration for that crime, *see* 18 U.S.C. § 2339D(a), the Court should impose 10- and 5-year sentences for Counts Three and Four, respectively.

The defendant was a tactically trained terrorist soldier for the IJO, posing in New York City as a student and counterfeit goods dealer, waiting to be activated by Hizballah or Iran for an attack and biding his time by carrying out IJO intelligence-collection missions. With respect to the defendant's conspiracy to receive military-type training, formalized group trainings like the ones the defendant attended in 2000 and in 2011 permit Hizballah and the IJO to impart standardized terrorist operating procedures on larger groups of its members, thereby increasing the efficiency of their recruitment and indoctrination efforts, and helping their operatives to position themselves to act with deadly force. And as to the defendant's substantive conviction for receiving military-type training, a terrorist inclined toward violence—as the defendant was—is far more dangerous once he obtains military training from the terrorist organization he is supporting. For all of these reasons, the Court should impose the maximum sentences of incarceration on Counts Three and Four.

### 4.   The Defendant's IEEPA Violations (Counts Six and Seven)

Although the defendant's "services" to Hizballah, as charged in Counts Six and Seven, are similar to his "material support" of Hizballah, as charged in Counts One and Two, the defendant's IEEPA violations harmed separate and important interests that warrant further punishment. Specifically, in addition to the defendant's violations of Section 2339B, his conduct violated (1) a congressional directive in IEEPA related to the "unusual and extraordinary threat" posed by Hizballah, 50 U.S.C. § 1701(a); (2) a pronouncement from President Clinton that Hizballah's threat implicates "national security, foreign policy, and econom[ic]" concerns, Executive Order 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995); and (3) regulations promulgated by the Treasury Department that seek to enforce IEEPA and further prohibit unlawful services to Hizballah, *see* 31 C.F.R. Part 595.

In the absence of additional punishment for the defendant's violations of these separate authorities, IEEPA's independent enforcement mechanisms will be demonstrated to lack teeth and the effectiveness of the sanctions program will be undermined.  In this regard, the "seriousness of the offense," "just punishment," the need to "promote respect for the law," and general deterrence, 18 U.S.C. § 3553(a)(2)(A)-(B), all support the statutory maximum sentences for the defendant's IEEPA violations in Counts Six and Seven.

### 5.   The Defendant's Naturalization Fraud (Count Eight)

In addition to the mandatory revocation of the defendant's naturalization, as discussed below in Part VI, the Court should also impose the maximum 25-year term of imprisonment for the naturalization fraud through which the defendant unlawfully obtained the privilege of U.S. citizenship.  The jury's conclusion that the defendant committed naturalization fraud to "facilitate

an act of international terrorism" actually understates the seriousness of this aspect of the defendant's conduct.  (Tr. 1005).  The defendant naturalized at the direction of the IJO as an integral part of his support of Hizballah.  The auspices of citizenship, and the U.S. passport and passport card that came with it, served as critical features of the defendant's cover identity and facilitated international travel in furtherance of his terrorist activities by obfuscating his substantial ties to Lebanon.  The defendant's abuse of the naturalization process to achieve these ends warrants maximum punishment.

"For terrorists, travel documents are as important as weapons," and "[t]he challenge for national security in an age of terrorism is to prevent the very few people who may pose overwhelming risks from entering or remaining in the United States undetected."  *The 9/11 Commission Report* at 383-84.[13]  The defendant serves as a ready example of the significance of this challenge for law enforcement and intelligence services.  He procured a visa, and later a naturalization certificate, a U.S. passport, and a U.S. passport card, all under false pretenses while positioning himself to act on behalf of Hizballah and the IJO as a sleeper cell operative in the United States.  The defendant's abuse of the naturalization process to facilitate his other crimes of terrorism warrants severe punishment because of the seriousness of this offense and the need to deter others from lying in citizenship applications.

---

[13] *Available at* https://www.9-11commission.gov/report/911Report.pdf.

## III.   The Defendant's Sentencing Arguments Are Meritless

Hoping to escape accountability for his crimes and the harm that he has caused, the defendant presents a series of meritless arguments in an effort to obtain leniency.  The Court should reject these claims.

### A.   The Defendant's Personal Circumstances Are Not Mitigating

The defendant's arguments based on his personal history are unavailing because he has not been honest about his background with the Probation Office.  For example, the defendant told Probation that his brother Kassem "works for a plant nursery" in Lebanon.  (PSR ¶ 80).  He told the FBI, on the other hand, that Kassem is the "the face of Hezbollah and a political leader in Yater, Lebanon."  (Tr. 483).  The defendant also told Probation that his ex-wife's relatives "are Hizballah members" and that he "believes that they influenced [her] decision to end the marriage."  (PSR ¶ 87).  The defendant omitted, however, that both his ex-wife and his former mother-in-law reported to authorities that the defendant abused them physically, as explained in the Government's April 1, 2019 motions *in limine*.

The defendant claims that he "lost several family members to violence" during the Lebanese Civil War.  (Def. Mem. at 5).  When asked about these casualties by Probation, however, "he did not provide specific details regarding the events surrounding their deaths."  (PSR ¶ 82).  The defendant also claims that "death, guns, and instability and danger" were "permanently scarring" to him.  (Def. Mem. at 5).  But he must have gotten over the scars because, approximately 10 years after the Lebanese Civil War ended, the defendant participated in a 45-day military boot camp that he described to the FBI as "Hezbollah 101 training" and involved several types of large weapons.  (Tr. 265).  Along the same lines, the defendant told Probation that he suffers from

"anxiety" and that "the sight of blood . . . causes him to lose consciousness."  (PSR ¶ 91).  These claims are difficult to square with the defendant having used his laptop to watch videos with titles such as "American Soldier Shot in Helmet," "Lebanon war brings grief to Israeli soldiers," "Insurgent Fires RPG at US Troops *Caught on Camara By US Soldiers in their Humvee," and "Convoy Escort – IED attack."  (GX 301, bookmarks 22, 24; GX 302).

The defendant also continues to argue that he and "his entire family" are "at risk from reprisals" based on his admissions to the FBI.  (Def. Mem. at 8).  The defendant's purported concerns are belied by the fact that he considered telling the press about his case before he was arrested.  Specifically, on May 10, 2017, before the FBI's investigation was public, the defendant told Mr. Denbeaux that "[m]edia is an open option" to discuss what he viewed as the FBI's "miscooperation."  (Def. Mem. Ex. C, rows 18, 20).  Mr. Denbeaux conveyed that threat to the Agent Costello.  (Tr. 630).   In addition, the defendant's admissions to the FBI were made public shortly after his arrest in June 2017, more than two years ago.  Although members of the defendant's immediate family reside in Lebanon, the Government is unaware of any information suggesting that those relatives have been threatened, much less harmed, and the defendant has provided none.  In fact, the defendant frequently communicates with relatives during recorded phone calls monitored by the Bureau of Prisons, and the purported "risk of reprisals" that he describes to the Court has never been discussed.  Therefore, the defendant is not entitled to a downward variance based on his personal characteristics.

**B.   The Defendant Did Not "Assist" the FBI by Pursuing Personal Objectives at Seton Hall**

The defendant did not "affirmatively assist the Government" in this case, and his participation in the FBI interviews at Seton Hall is not a mitigating consideration at sentencing. (Def. Mem. at 9).

The Court already found at the suppression hearing that "[a]s the meetings went on" at Seton Hall, "the agents again became convinced that Kourani was holding back vital information." *Kourani*, 2018 WL 1989583, at *3.   The agents were right.   For example, during one of the interviews, the defendant told the FBI that he would not disclose locations that the IJO brought him to in South Lebanon because "he was afraid [the FBI would] share the information with the Israelis." (Tr. 284).   More significantly, the defendant still has not disclosed the true objectives of his 2009 trip to China for the IJO.   This is all part of the IJO tradecraft Fadi taught the defendant in Lebanon, including "how not to provide an interrogator or a questioner with any weaknesses to leverage." (Tr. 334).

In *United States v. Fernandez*, the Second Circuit quoted at length the reasoning of Judge Cote in denying a downward variance at sentencing based on purported efforts to cooperate.   443 F.3d 19 (2d Cir. 2006).   Like the defendant in *Fernandez*, the defendant here "was not able ultimately to follow through in a full and complete admission about her criminal activities."   *Id.* at 25.   Moreover, one "obvious component of assisting the government" is "the prosecution of other wrongdoers."   *Id.* at 24.   As in *Fernandez*, the defendant has plainly failed in that regard, as he proceeded to trial and is not available to the Government in any respect as a witness against other members of Hizballah and the IJO who are actively targeting the United States and Israel.   Finally, cooperation

> might shed [light] on the character of a defendant, whether it shows the defendant has recognized the full implications of the choices they made in the past; [and] whether they have decided to make a clean and full break with that and change their life in a significant way.

*Id.* at 24.  The defendant did not do any of these things.  He lied to the FBI during the interviews at Seton Hall.  When the defendant failed to extract the benefits he was seeking, he tried to coerce the agents into acting for his benefit by threatening to talk to the press about his case.  After that failed, the defendant threatened to flee to Lebanon.  (Tr. 631-32).  Finally, far from making a "clean and full break" with Hizballah, the FBI found a "go-bag" ready for travel (including identification documents and cash) and recently purchased combat boots when agents searched the defendant's apartment in connection with the arrest.  Thus, none of the relevant considerations described in *Fernandez* support a variance based on the defendant's failed cooperation.

### C.  The Defendant Was a Sophisticated Participant in the Seton Hall Interviews and Is Not Entitled to Leniency Based on Mr. Denbeaux's Performance

The defendant is to be sentenced for his crimes, which the Government established at trial beyond a reasonable doubt, and the pertinent sentencing criteria related to those crimes, such as their seriousness, the ongoing need to incapacitate the defendant, and the importance of providing general deterrence to other members—and aspiring members—of the IJO.  As a result, the Court should reject the defendant's attempts to escape the consequences of his conduct by criticizing the performance of Mr. Denbeaux.

The Court already concluded after the suppression hearing that the defendant is "intelligent and well educated."  *Kourani*, 2018 WL 1989583, at *4.  He also "understood the situation he faced and had some level of familiarity with the FBI."  *Id.*  Most importantly, and as established in more detail below, the Court found that the defendant "behaved strategically," and so did Mr.

Denbeaux, as "a smart, experienced counsel, with a deep background of representing controversial defendants and negotiating with the FBI and prosecutors." *Id.* at *4-5. But the failure of their strategy does not warrant leniency now that the defendant has been convicted at trial.

The defendant participated in the first interview at Seton Hall on March 23, 2017. (Tr. 248). He confessed to nearly all of the charges in the Indictment during that interview, and Mr. Denbeaux confirmed in writing afterwards that he understood that the FBI could not "promise or guarantee" anything. (Tr. 250-94; GX 802). Over a week later, on March 31, the defendant sent a text message to Mr. Denbeaux that stated, in part, "I prefer all agreements to be documented and signed by both parties." (Def. Mem. Ex. C, row 122). The defendant did not feel strongly about that preference because he had already participated in one interview and no such agreement was ever executed. Rather, he proceeded with a different strategy because he and Mr. Denbeaux knew that the FBI would offer no agreement.

On April 1, 2017, the defendant sent Mr. Denbeaux a joke about "forming a club" with "Flyn" related to "immunity." (*Id.* row 118).[14] Mr. Denbeaux provided a vague response that he failed to explain at the suppression hearing or in his sentencing letter, but there must have been

---

[14] While seeking to use these messages as a leniency-earning sword at sentencing, defense counsel also argues in a footnote that the Government "violated the defendant's constitutional rights by obtaining his confidential attorney-client communications." (Def. Mem. at 9 n.5). He is wrong. As the Court is aware, during the course of the Government's investigation, any attorney-client communications "contained in the defendant's seized electronic devices and email accounts [were] . . . segregated by an Assistant U.S. Attorney who [was] not otherwise assigned to this case." (Dkt. No. 91 at 5). In advance of trial, the defendant advised the Court that he intended to offer testimony regarding legal advice he received from Mr. Denbeaux. (Dkt. No. 88 at 1-2). The defendant executed a privilege waiver, and the Court issued an order confirming the waiver. (Dkt. Nos. 95-1, 98; *see also* May 1, 2019 Tr. at 12-13).

some undocumented conversation between the two men.  Because two days later, at the second Seton Hall interview on April 3, 2017, Mr. Denbeaux handed the agents a document—which the defendant retained as part of the strategy and was later seized from his apartment.  The document stated that the defendant "is not seeking any kind of immunity or protection . . . ."  (GX 221 (emphasis added); *see also* Tr. 300).  As the Court already concluded, this was a strategic ploy by two sophisticated actors:  "Kourani was not seeking any kind of immunity because he knew he could not get it . . . . [T]his portion of the memorandum was an assertion by Denbeaux intended to 'boot-strap' his effort to obtain some level of protection for Kourani in relation to his desperate efforts somehow to bring his endangered family to the United States."  *Kourani*, 2018 WL 1989583, at *7.

The Court's findings regarding the strategic, but unsuccessful, gambit deployed by Mr. Denbeaux and the defendant in the April 3, 2017 interview are further supported by their jokes to each other about another ploy during the next interview.  Specifically, the defendant asked Mr. Denbeaux and Agent Costello to leave the interview so that he could "conduct the interview one-on-one with" Agent Shannon.  (Tr. 327).  In a text message the following day, the defendant described the interview tactic as a "game" intended to "make a hole in the wall of [the agents'] ignorance," and Mr. Denbeaux replied that he "liked watching [the agents'] faces when [Kourani] pulled the pin," apparently making a joke about a grenade to an admitted terrorist trained in such weapons.  (Def. Mem. Ex. C at 5, rows 99, 101).  These messages serve as additional evidence of strategic behavior by the defendant, rather than allegedly poor performance by Mr. Denbeaux, which in any event is not a relevant consideration at the defendant's sentencing.

**D.   The Defendant Is Not Entitled to Leniency Based on the FBI's Lawful Investigation**

Remarkably, the defendant also argues that he is entitled to a "lower non-Guideline sentence" because "[t]he FBI broke its promise to Ali." (Def. Mem. at 7).[15]  The Court already concluded that, "before, during, and after each of these meetings [at Seton Hall], the agents explained to Kourani that they were not authorized to make any promises or guarantees about potential benefits for Kourani's cooperation." *Kourani*, 2018 WL 1989583, at *2. "The agents had made it clear that specific benefits or promises were off the table until Kourani cooperated fully." *Id.* at *7. Mr. Denbeaux confirmed this understanding via text message. (GX 802).

The defendant is correct that, in 2016, Special Agent Battista brought "a sample of a proffer agreement to an early meeting." (Def. Mem. at 8). The Court already concluded that this was "quite consistent with the testimony that was brought out at the suppression hearing." (Tr. 511). And the defendant never even let Agent Battista take the document out of the envelop that he used to transport the document. Instead, the defendant "cussed and said that he doesn't want to look at any bullshit paperwork." (Tr. 480). Thus, to the extent this episode was, as the defendant claims, "[v]ery significant[]," it is only because the defendant demonstrated by his behavior that he was not interested in any form of immunity. The FBI is not on trial in this case, and the lawful and

---

[15] In support of this argument, the defendant cites *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008), for the proposition that "the Government's actions pre-indictment certainly affected him post-indictment in the most extreme way." (Def. Mem. at 8 n.4). *Stein* involved an appeal of a district court's dismissal of an indictment, and the opinion says nothing whatsoever about sentencing.   The *Stein* panel found, *inter alia*, that "the government thus unjustifiably interfered with defendants' relationship with counsel and their ability to mount a defense." 540 F.3d at 136. Here, on the other hand, the Court found no such interference after a lengthy suppression hearing and concluded that the defendant's "non-custodial statements were voluntarily made." *Kourani*, 2018 WL 1989583, at *7.

highly effective investigation that led to the defendant's conviction is not a mitigating consideration at sentencing.

## E. A Life Sentence for the Defendant Will Not Result in Unwarranted Sentencing Disparities

The defendant is the first operative from the IJO, a singularly sophisticated component of a foreign terrorist organization, to be caught and prosecuted in open court. Thus, prior sentencings in other cases will not result in "unwarranted" disparities if the Court applies the Guidelines and follows the recommendation of the Probation Office because there are no similarly situated defendants. 18 U.S.C. § 3553(a)(6). Searching without success for a basis for the woefully inadequate 10-year sentence the defendant is requesting, he points to a series of cases that he claims resulted in sentences that "were never more than 15 years and often much less than that." (Def. Mem. at 10). What the defendant's citations really establish, however, is that: (1) as noted above, courts typically sentence defendants convicted of providing or attempting to provide material support to a terrorist organization at or near the statutory maximum, and (2) cases involving the use of informants and "sting" operations often result in sentences that are less than the sentences imposed on criminals who provide the type of real, long-term, and dangerous support that the defendant provided to Hizballah.

### 1. *United States v. Ahmed*, No. 10 Cr. 131 (S.D.N.Y.)

In *United States v. Ahmed*, No. 10 Cr. 131, the defendant spent less than 18 months seeking to support al Shabaab by attending military training. (*See id.* Dkt. No. 95 at 3). Although he received a 111-month sentence, he pleaded guilty pursuant to a plea agreement that contemplated a maximum sentence of 120 months' imprisonment based on two violations of 18 U.S.C. § 371. (*Id.* at 10). As a result, the guilty plea in *Ahmed* offers no guidance about the appropriate sentence

47

for the defendant after trial convictions on seven terrorism offenses that carry a much greater aggregated maximum penalty.

### 2.   *United States v. Juraboev*, No. 15 Cr. 95 (E.D.N.Y.)

In *United States v. Juraboev*, No. 15 Cr. 95 (E.D.N.Y.), the defendant pleaded guilty to providing material support to ISIS, in violation of 18 U.S.C. § 2339B.  Juraboev's support of ISIS spanned less than a year and, whereas the defendant repeatedly traveled to Lebanon to meet with his IJO handler, Juraboev was arrested at JFK before he could reach Syria.  At the time of Juraboev's plea, Section 23339B provided for a statutory maximum sentence of 15 years' imprisonment, and that is the sentence the court imposed.

### 3.   *United States v. El-Hanafi*, No. 10 Cr. 162 (S.D.N.Y.)

In *United States v. El-Hanafi*, the defendant pleaded guilty to providing material support to al Qaeda, in violation of 18 U.S.C. § 2339B, and conspiring to do the same, in violation of 18 U.S.C. § 371.  He faced a maximum sentence of 20 years' imprisonment.  (*Id.* Dkt. No. 209 at 31). The court sentenced El-Hanafi to 15 years based on his "remorse, rehabilitation and physical suffering during confinement."  (*Id.* at 35).  The defendant has not exhibited any of those characteristics, and *El-Hanafi* is therefore inapposite.

### 4.   *United States v. Nayyar*, No. 09 Cr. 1039 (S.D.N.Y.)

In *United States v. Nayar*, No. 09 Cr. 1037 (S.D.N.Y.), the defendant and a co-conspirator participated in a series of meetings, between July 2009 and September 2009, with an informant posing as a Hizballah affiliate.  Based on the three-month sting operation, Nayar was sentenced to 15 years' imprisonment.  The defendant in this case, on the other hand, provided support and

assistance to real members of Hizballah and the IJO in furtherance of actual attack plots over a much greater period of time.  Thus, *Nayar* is not an apt comparator.

### 5.  *United States v. Viglakis*, No. 12 Cr. 585 (S.D.N.Y.)

In *United State v. Viglakis*, No. 12 Cr. 585, the defendant participated in weapons-related negotiations with an informant purporting to be a representative of the FARC for approximately 10 months.  (*Id.* Dkt. No. 55 at 11).  The defendant pleaded guilty to attempting to provide material support to the FARC, in violation of 18 U.S.C. § 2339B, which at the time carried a 15-year statutory maximum penalty.  (*Id.*).  In imposing a 10-year term of imprisonment, the Court credited that Viglakis had "provided information" to law enforcement and faced "serious," documented health problems.  (*Id.* Dkt. No. 66 at 35-36).  Therefore, the sentence in *Viglakis* is distinguishable on the basis of the "sting" technique used in the investigation, Viglakis's guilty plea, and other defendant-specific considerations.

### 6.  *United States v. Goergescu*, No. 14 Cr. 799 (S.D.N.Y.)

In *United States v. Goergescu*, No. 14 Cr. 799, before being ensnared in a "sting" investigation, Goergescu acted as an informant for two years (identifying approximately 25 targets to law enforcement), and he assisted the DEA in efforts to arrest a co-defendant.  (*Id.* Dkt. No. 137 at 17-18, 21).  Although the defendant purports to have "assist[ed]" the United States, his self-interested and limited admissions to the FBI at Seton Hall fall far short of Goergescu's efforts. Moreover, unlike Goergescu, the defendant's conduct was not part of a sting and was instead all too real.

### 7.  Cases Without Terrorist Organizations

The defendant also cites three cases involving defendants that he acknowledges "were not members of terrorist organizations."  (Def. Mem. at 12).  That is a dispositive distinction, and any disparities between those cases and the Court's sentence of the defendant would not be "unwarranted" in light of the defendant's long-term support of Hizballah and the IJO.  18 U.S.C. § 3553(a)(6).

### F.   The Defendant Waived His Meritless Multiplicity Argument Regarding His IEEPA Violations (Counts Seven and Eight)

In a footnote in his sentencing submission, the defendant argues that his IEEPA convictions (Counts Six and Seven) should be dismissed because they are "essentially duplicative and criminalize identical conduct in separate fashions."  (Def. Mem. at 4 n.2).  The defendant waived this argument by failing to file a motion to dismiss on this basis, and the claim is, in any event, meritless.

At a status conference on December 8, 2017, the court set a deadline for pretrial motions. The defendant filed a motion to dismiss the Indictment (Dkt. Nos. 119-20), but he did not argue under Rule 12(b)(3) that the Indictment should be dismissed because Counts One, Two, Six, and Seven "charg[ed] the same offense in more than one count (multiplicity)."  Fed. R. Crim. P. 12(b)(3)(B)(ii).  Therefore, he waived the argument he now presses upon the Court at sentencing. *E.g.*, Fed. R. Crim. P. 12(c)(3); *United States v. Sinnot*, 523 F. App'x 807, 809 (2d Cir. 2013) (finding that "multiplicity argument" was "waived" where defendant "failed to raise this argument before trial"); *see also United States v. Frazier*, No. 15 Cr. 153 (VSB), 2019 WL 761912, at *13 (S.D.N.Y. Feb. 21, 2019) ("[A]rguments which appear in footnotes are generally deemed to have been waived." (internal quotation marks omitted)).

Moreover, "[i]t makes no difference that the same conduct underlies multiple counts of [the defendant's] indictment, so long as the statutes proscribe distinct offenses." *United States v. Weingarten*, 713 F.3d 704, 710 n.5 (2d Cir. 2013); *see also United States v. Marrale*, 695 F.2d 658, 662 (2d Cir. 1982) ("If the offenses charged are set forth in different statutes or in distinct sections of a statute, and each section unambiguously authorizes punishment for a violation of its terms, it is ordinarily to be inferred that Congress intended to authorize punishment under each provision."). The material support charges in Counts One and Two are distinct from the IEEPA offenses in Counts Six and Seven because, *inter alia*: (1) IEEPA requires proof that the defendant violated a regulation or Executive Order issued pursuant to IEEPA, which is distinct from the terrorism designations at issue in Section 2339B(a) (Tr. 926, 960); (2) Section 2339B requires proof of knowledge relating to the foreign terrorist organization at issue that IEEPA does not, *see* 18 U.S.C. § 2339B(a)(1) (Tr. 926, 930);[16] and (3) IEEPA requires proof that the defendant acted "willfully," including with respect to the conspiracy charged in Count Seven, whereas Section 2339B requires proof that the defendant acted "knowingly and intentionally," *see* 50 U.S.C. § 1705(c) (Tr. 930, 960).

## IV.   Count Eight Requires That the Defendant's Naturalization by Revoked

As a result of the defendant's violation of 18 U.S.C. § 1425(a), as charged in Count Eight, the court "shall thereupon revoke, set aside, and declare void the final order admitting such person

---

[16] Specifically, to violate Section 2339B, "a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)."

to citizenship, and shall declare the certificate of naturalization of such person to be canceled."  8 U.S.C. § 1451(e); *see also, e.g.*, *United States v. Allouche*, 703 F. App'x 241, 244 (5th Cir. 2017) ("The penalties for violating either subsection [of § 1425] include both imprisonment and mandatory denaturalization.").   Therefore, the Government respectfully requests that the Court execute the enclosed proposed denaturalization order at the defendant's sentencing.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should impose a term of imprisonment consistent with the Guidelines' recommendation of life by imposing statutory maximum sentences for his crimes and ordering that the sentences run consecutively.  As noted previously, the Government will move to dismiss the defendant's conviction on Count Five after sentencing on Counts One, Two, Three, Four, Six, Seven, and Eight.

Dated: New York, New York
      November 26, 2019

Respectfully Submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:       _____/s/_____
               Emil J. Bove III
               Amanda L. Houle
               Assistant United States Attorneys
               212-637-2444/2421

Cc:    Defense Counsel
       (Via ECF)