JC3VKOUS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

      v.                      17 CR 417 (AKH)

ALI KOURANI,

          Defendant.        SENTENCE

------------------------------x

                             New York, N.Y.
                             December 3, 2019
                             11:47 a.m.


Before:

               HON. ALVIN K. HELLERSTEIN,

                             District Judge


                     APPEARANCES


GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
EMIL J. BOVE, III
    Assistant United States Attorney

ALEXEI M. SCHACHT
    Attorney for Defendant


ALSO PRESENT:  JOSEPH COSTELLO, FBI
               KERI SHANNON, FBI

1          (Case called)

2          MR. BOVE:  Good morning, Judge.

3          Emil Bove, for the government.

4          And I have with me Special Agents Keri Shannon and

5    Joseph Costello.

6          MR. COSTELLO:  Good morning, your Honor.

7          THE COURT:  How do you do?

8          MR. SCHACHT:  Hello, your Honor.

9          Alexei Schacht, for Ali Kourani.

10          THE COURT:  Good morning, Mr. Schacht.

11          Good morning, Mr. Kourani.

12          Mr. Kourani, it's my duty to sentence you today, and I

13    think there are quite a few things that we have to discuss

14    first.  Let me start by summarizing the indictment and the

15    statutory penalties that are involved.

16          So Count One charges you with providing material

17    support or resources or receiving such to Hizballah between

18    2002 and 2015.

19          Count Two is a conspiracy regarding the same conduct;

20    meaning that you had an agreement or entered into a conspiracy

21    to accomplish those purposes.

22          Count Three is receiving training in the use of

23    weapons and military tactics from Hizballah.

24          And Count Four is a conspiracy with regard to

25    achieving the purposes of Count Three.

JC3VKOUS

1          The maximum punishment for Counts One and Two is 20

2     years.  The maximum punishment for Counts Three and Four is ten

3     years.

4          MR. BOVE:  Your Honor, if I could.  The maximum

5     penalty for Count Four is five years, because the conspiracy

6     basis is --

7          THE COURT:  Thank you very much.

8          And for Count Two?

9          MR. BOVE:  That one is 20 years, because the

10    conspiracy provision is in --

11         THE COURT:  In the statute, right.  Okay.

12         Thank you for the correction.

13         Count Five charges a conspiracy to possess or carry

14    used machine guns in relationship to crimes of violence.  The

15    government has moved to withdraw Count Five, to have it

16    dismissed, and it is so ordered.

17         MR. BOVE:  Thank you, Judge.

18         THE COURT:  Count Six alleges an illegal contribution

19    or receiving of funds to Hizballah between 2002 and 2015.

20         And Count Seven alleges a conspiracy with regard to

21    No. 6.

22         The maximum punishment, I think, since these crimes

23    are subsumed in Counts One and Two, but allege different

24    purposes, have independent bases for their convictions, but the

25    punishment is the same; isn't that right, Mr. Bove?

1    MR. BOVE:  That's right, Judge.  The statutory maximum

2  for Counts Six and Seven is each 20 years.

3    THE COURT:  Twenty years each.

4    MR. BOVE:  Yes, Judge.

5    THE COURT:  And that could be consecutive or

6  concurrent.

7    MR. BOVE:  You have that discretion, yes.

8    THE COURT:  Count Eight alleges illegal procuring of

9  citizenship fraudulently, basically for failing to disclose

10  that Mr. Kourani was a member of Hizballah and providing

11  support to the same.  And that has a 25-year maximum penalty.

12    Those are the eight charges, seven remaining.  Have I

13  summarized it correctly as corrected by you, Mr. Bove?

14    MR. BOVE:  Yes, Judge, thank you.  And I apologize for

15  interrupting.

16    THE COURT:  And Mr. Schacht?

17    MR. SCHACHT:  Yes, I think it's been summarized

18  correctly; although I would argue that a consecutive

19  sentence --

20    THE COURT:  I will be giving you plenty of time to

21  argue on all counts.  There are a lot of things we're going to

22  argue this morning.

23    MR. SCHACHT:  I know that you'll give me time.

24    Thank you.

25    THE COURT:  And if I forget, you remind me.

1    MR. SCHACHT:  Your Honor, I just have one question

2  though.  With regard to Count One and Two, the 20-year maximum,

3  I know at some point there was a change in the guideline -- I'm

4  sorry, not in the guideline book, in the U.S. Code.  And so the

5  timing of those crimes, I think, arguably, it's not a 20-year

6  maximum, it might be a 15-year maximum if he did the crime

7  prior to the change in the law.

8    THE COURT:  Mr. Bove?

9    MR. BOVE:  The defendant was convicted at trial of

10  Counts One and Two, which carry a statutory maximum of 20 years

11  each.  That's straightforward.  This is the first time I'm

12  hearing that argument from the --

13    THE COURT:  I've never heard it before either.

14    MR. BOVE:  But, in any event, on the merits, the

15  statute that the defendant is charged and was convicted of

16  violating --

17    THE COURT:  He was providing material support

18  throughout that period.

19    MR. BOVE:  That's right, your Honor.

20    THE COURT:  At least part of the period must have been

21  covered by the statute.  Do you know when the statute changed?

22    MR. BOVE:  I believe the amendment -- if I could have

23  one moment.

24    It was June 2nd, 2015.

25    THE COURT:  That the statute changed?

1          MR. BOVE:  That the statutory maximum for Counts One

2     and Two was amended from 15 to 20 years.

3          THE COURT:  So the very end of the period.

4          MR. BOVE:  Yes.  The indictment alleges with all of

5     these counts, I believe, conduct up to and including 2015.  So

6     there's certainly conduct that occurred in the latter half of

7     2015.  So even if there's any merit to this argument about

8     retroactivity -- and I don't think that there is -- there's

9     evidence at trial about conduct post amendment that still

10    warrants the statutory maximum.

11         THE COURT:  I think that I would have required to give

12    a specific question to the jury to establish that.  Otherwise,

13    the jury would not have been adequately instructed.

14         MR. BOVE:  Respectfully, Judge, I disagree.  I don't

15    think there's an *Apprendi* issue here, because there are not

16    findings that you're making here at sentencing escalating the

17    defendant's sentencing exposure.  What's going on here is

18    you're applying --

19         THE COURT:  Well, I am, because if it's done before

20    June 2 of 2015, it's subject to a 15-year maximum per count;

21    whereas if he did this after June 2, 2015, it's subject to a

22    five-year enhancement of 20 years.

23         MR. BOVE:  I don't think that's right on the merits,

24    Judge.  I think that the defendant was charged in 2016 with a

25    crime that has a 20-year statutory maximum, and that is the

1  crime in the statute that he went to trial on and was convicted

2  for.

3          But even if the defendant is right, there was evidence

4  at trial that his conduct went beyond the time of the

5  amendment.  And so you're not -- this is different from a

6  situation like the drug case that you just heard where the jury

7  needs to make a finding about quantity so that you can escalate

8  from, for example, the five-year to the ten-year mandatory

9  minimum.

10          2339(b) has a statutory maximum.  That was the maximum

11  penalty at issue in the trial without objection.  Evidence was

12  credited by the jury beyond a reasonable doubt that the crime

13  took place with -- you instructed them about the time frame.

14  There was evidence of conduct that took place post June 2015.

15          And so here, as the probation department found and as

16  the evidence supports, the current version of the statute, with

17  the 20-year statutory maximum, is the one that applies.

18          THE COURT:  Excuse me for one moment.

19          (Pause)

20          THE COURT:  I confess that I have not researched this

21  subject.  We could say it could have been waived because it

22  wasn't brought up earlier.  However, I think it's rather

23  fundamental if it were to be analyzed in this fashion:

24          If one were to assign criminality to an earlier

25  period, that would be an *ex post facto* law.  Similarly, if

1   punishment is enhanced for the conduct occurring before the

2   effective date of the statute, that also is *ex post facto*.

3       The theory is is that a person who commits a crime

4   should know the consequences of criminality.  And he cannot

5   foresee that after he commits the crime the law will enhance

6   the criminality.  So I'm going to hold that since the jury was

7   not given the opportunity to decide if material acts occurred

8   after June 2, 2015, that Counts One and Two are subject to a

9   15-year maximum each.

10      As for the balance, there's no assignment of

11  difference, is there, Mr. Schacht?

12      MR. SCHACHT:  One moment, your Honor.  I'm sorry.

13      (Pause)

14      MR. SCHACHT:  I'm sorry, Judge.  I'm just checking on

15  my phone if Counts Five and Six, if the maximum changed on June

16  2nd, 2015, as well.

17      THE COURT:  Counts Six and Seven you mean?

18      MR. SCHACHT:  Yes, I'm sorry, Six and Seven I mean.

19      THE COURT:  Do you know, Mr. Bove?

20      MR. BOVE:  On that one I don't, Judge.  I'm surprised

21  that these questions are coming up, given all the briefing that

22  we --

23      THE COURT:  Yeah, well, that's the nature of life.

24      It's the same statute, isn't it?  2332(b)?

25      MR. BOVE:  I think right now the pending defense

1    objection is to the IEEPA violations, Counts Six and Seven,

2    which is 50 U.S.C. 1705.

3         THE COURT:  So it's when the regulations came into

4    effect?

5         MR. BOVE:  Well, there's some suggestion from the

6    defense table that the statutory maximums to Counts Six and

7    Seven changed as well.

8         THE COURT:  Well, Mr. Schacht does not know.

9         The trouble with this waiver point is that one could

10   think that this is jurisdictional and fundamental, subject to

11   plain error.

12        MR. BOVE:  According to my research, Judge, 50 U.S.C.

13   1705 was last amended in 2007 in connection with a separate

14   bill, distinct from the increase in the statutory maximums that

15   we just discussed with respect to Counts One and Two.

16        MR. SCHACHT:  Your Honor --

17        THE COURT:  2007.

18        MR. SCHACHT:  -- I just looked up 1705, and I found

19   something that says that it's in effect as of January 3rd,

20   2012.  But if that's correct, then it wouldn't have the same

21   effect as Counts One and Two.

22        THE COURT:  So what is it, 20 years each, Mr. Schacht?

23        MR. SCHACHT:  As to Count Seven, yes.  And as to

24   Count --

25        THE COURT:  Six.

1           MR. SCHACHT:  -- Six, yes.

2           THE COURT:  Twenty years as to each.  All right.

3           Now, with respect to Count Eight, there's a 25-year

4  maximum penalty.  There is also, under 5 U.S.C., Section

5  1451(e), an instruction that the court in which such conviction

6  is had, that is, a conviction under 18 U.S.C., Section 1425,

7  shall thereupon revoke, set aside, and declare void the final

8  order committing such person to citizenship, and shall declare

9  the certificate of naturalization of such person to be

10 canceled.

11          The government has submitted such an order, and I have

12 signed it, and it is -- it has been filed under ECF.

13          MR. BOVE:  Thank you, Judge.

14          That order was docketed.

15          THE COURT:  Pardon?

16          MR. BOVE:  That order was docketed.

17          THE COURT:  It was docketed.  Okay.

18          All right.  Now, the next thing I wish to do is to

19 take up the various objections to the facts in the PSIR.

20          Mr. Kourani, it is safe for me to say that you have

21 read the presentence investigative report very carefully, and

22 reported to Mr. Schacht all the errors or alleged errors that

23 you found; is that correct?

24          THE DEFENDANT:  That is correct, your Honor.  But I'm

25 not -- I didn't read the sentence memorandum before we came

1   here, so I don't know --

2          THE COURT:  Well, it's been with you, Mr. Kourani, for

3   some time.  It's dated July 15, 2019.

4          THE DEFENDANT:  I did put my objections, but I don't

5   know which ones were filed or were not filed.

6          THE COURT:  That's the one.  That's extant.

7          And since I have had many objections to various of its

8   terms, I assume that Mr. Schacht and you have had full

9   discussions about the presentence investigative report.

10          So I will proceed.

11          The first option is to --

12          MR. BOVE:  Judge, can we have one moment to confer

13   please?

14          THE COURT:  Yes.

15          (Counsel conferred)

16          MR. SCHACHT:  Your Honor, the government asked me to

17   put on the record whether or not I had shown the presentence

18   investigation report to my client, and I have.

19          What my client was referring to or one of the things

20   he was referring to is the government's sentencing memorandum,

21   which is true, he has not seen that document.

22          THE COURT:  We're not at that point yet, so we can

23   postpone it.

24          Paragraph 27 of the PSIR, I will strike the sentence

25   beginning with "Kourani understood" is the second sentence in

1    the paragraph and satisfies the defense objection.

2         Paragraph 29, I deny the objection.  The evidence

3    taken together support the inference that the SIM card was used

4    in a manner argued by the government.  Defendant plainly

5    admitted to funding information to the IJO, which stands for

6    what again, Mr. Bove?

7         MR. BOVE:  The Islamic Jihad Organization.

8         THE COURT:  Aside from photographs and videos.  And

9    the placement of the SIM card underneath the baggage label

10   further supports an inference of improper use.

11        Paragraph 33.  The objection is -- paragraph 33, I

12   think we have redrafted this.  Would Mr. Katz please give

13   copies to each, and we'll take a minute to read this.

14        (Pause)

15        THE COURT:  Mr. Bove, any objection?

16        MR. BOVE:  If I could have just one moment, Judge.

17   Thank you.

18        (Pause)

19        MR. BOVE:  Thank you, Judge.  I apologize.

20        The proposed amendment the government agrees is

21   factually accurate.  There is one additional fact in our

22   sentencing memorandum that we think bears on this issue.  It's

23   set out at page 10, and I can read it, your Honor.

24        THE COURT:  Just a minute.  I'll get it.

25        MR. BOVE:  And this fact, Judge, we submit --

1          THE COURT:  Which fact is it?

2          MR. BOVE:  It's under subsection B, the sentence

3     beginning:  "For example, the fact that this summer it was

4     reported that in 2015, British authorities in London seized

5     thousands of ice packs filled with ammonium nitrate from four

6     properties linked to Hizballah."

7          From our perspective, Judge, that's another fact that

8     is a part of the chain of inferences that support the

9     conclusion we're advocating at the sentencing, which I'll do

10    later when we get to the 3553 factors.  But that conclusion is,

11    we submit --

12         THE COURT:  I don't think it's necessary to add on.

13    It's hearsay, and Mr. Kourani has not seen this.

14         When was it submitted, Mr. Bove?

15         MR. BOVE:  Our submission was filed --

16         THE COURT:  November 26.

17         MR. BOVE:  Yes, Judge.

18         THE COURT:  Not much time.

19         I deny the government's objection.

20         Mr. Schacht.

21         MR. SCHACHT:  I object to this basically for the same

22    reasons that I objected initially to this paragraph as prepared

23    by probation, which is that it draws, like the government said,

24    a series of inferences that I don't think are warranted.

25         THE COURT:  Well, the source is identified and the

1    inferences are carefully tied.  In fact, there are no

2    inferences in here.

3            MR. SCHACHT:  That's where I respectfully disagree.

4            Huangpu, China is larger than New York City in terms

5    of population.  If I travel to New York City, and on some

6    previous occasion people have committed crimes in New York

7    City, it doesn't mean that I am committing the same crime that

8    someone else may have committed in that city.  I just think

9    it's much too --

10           THE COURT:  I will add at the end of that "the

11   defendant objects to this inference."  That's the only

12   inference that was drawn.  I find that the inference is

13   properly drawn.

14           All right.  I'll move on now.

15           Paragraph 48, objection is overruled.  Kourani

16   concedes that these businesses existed, at least in part, as a

17   front for counterfeit businesses; and it is, in any case,

18   reasonable to infer that this business was conducted in part to

19   shroud Kourani's criminal activity under the appearance of a

20   regular merchant.

21           The next issue is paragraph 51.  Defendant's objection

22   is denied, with the exception that the last phrase, "so that

23   the lieutenant could be targeted" is deleted.

24           The next is paragraph 56.  I'm going to rewrite this

25   as follows:  To omit from line 2 the phrase "Kourani testified

1    falsely," to strike the last sentence, and to insert "Defendant

2    denies that he testified falsely.  The Court ruled in favor of

3    the government."  I'm adding "and rules."

4            So it will read as follows:  "According to the

5    government, Kourani testified falsely during an evidentiary

6    hearing related to his trial about certain aspects of his

7    interviews with law enforcement agents, his motivation for

8    hiring counsel, and his claim of being promised that the

9    statements he made during a March 2017 meeting with the FBI

10   would not be used against him.  Defendant denies that he

11   testified falsely.  The Court ruled and rules in favor of the

12   government."

13           And I will not be making the upward adjustment of two

14   points.

15           I agree with the government that there are

16   contradictions.  And I agree with the government that my

17   finding was against Mr. Kourani.  But for two reasons I made

18   the modifications that I did.  And I'm disinclined to make the

19   two upward levels of adjustment because I feel that defendants

20   should be encouraged to testify; that the issue of credibility

21   can be drawn by the jury or by the government; and that unless

22   the case is extremely clear, more clear than is involved here,

23   there is an appearance of punishment for testifying that I

24   don't think should be appropriate.  So that's with 56.

25           The next is 67.  It's the same point.  And what I've

1    done here is changed the last sentence so it reads:  "Defendant

2    objects to such upward adjustment."

3              I think that covers all the objections, Mr. Schacht.

4              MR. SCHACHT:  Yes, your Honor, it does.

5              THE COURT:  The next is to find and apply the

6    sentencing guidelines.  It's difficult for us to do that

7    because the probation analysis was based on Count Five of the

8    indictment, which has been withdrawn.

9              The government argues that the proper guide for

10   analysis is first a group under Section 3D1.2(b) of the

11   guidelines; Counts One, Two, Three, Four, Six, Seven, and

12   Eight, because they involve two or more acts or transactions

13   connected by a common criminal objective constituting part of a

14   common scheme or plan.

15             The next step, the government would apply the most

16   serious of the counts comprising the group, that is, the

17   highest offense level of the counts in the group.  And that's

18   under Section 3D1.3(a) of the guidelines.  The government

19   calculates this as level 56, pursuant to Section 2M6.1 of the

20   guidelines.

21             I'll pause at this point and ask Mr. Schacht if he

22   agrees with the analysis so far?

23             MR. SCHACHT:  That 2M1.6 controls this issue?

24             THE COURT:  2M6.1.

25             MR. SCHACHT:  2M6.1 I mean, yes.

1          THE COURT:  You agree?

2          MR. SCHACHT:  Yes.

3          THE COURT:  That means that the guideline level is 56.

4          MR. SCHACHT:  Well, I agree that that section applies,

5     but I also think though, especially given that Count Five is

6     removed, that --

7          THE COURT:  We haven't counted that.

8          MR. SCHACHT:  Yes.  But I think that that essentially

9     forms the basis of some of the underlying adjustments that are

10    in paragraphs 63, 64, 62.  So I think he's being punished under

11    the guidelines, even though Count Five is missing.

12         THE COURT:  So what would you have me do?

13         MR. SCHACHT:  I would say if you took out those --

14    those counts, he would be down to -- not those counts, I'm

15    sorry, those adjustments, he would be down 21 fewer levels, and

16    so it might be a level 35.

17         THE COURT:  Well, let's work this through.

18         The government does it this way:  Pursuant to Section

19    2M6.1(a)(1), the base level is 42.  Because the offenses were

20    committed with intent to injure the United States, to aid a

21    foreign nation that is Iran, and to aid a foreign terrorist

22    organization.  We can leave out Iran, although I think it is

23    well-documented that the force behind Hizballah is Iran.  It's

24    sufficient that it's injuring the United States and the foreign

25    terrorist organization.  And so that would make a base level of

1    42.

2         Paragraph Section 2M6.1(a)(1) reads that the base

3    level is 42, if the offense was committed with intent, A, to

4    injure the United States or, B, to aid a foreign nation or a

5    foreign terrorist organization.  Well, it's in a disjunctive

6    and it's enough to find it aids Hizballah, but it clearly

7    injures the United States.  And that's as far as we have to go.

8    So that makes it 42.

9         Any objection to that, Mr. Schacht?

10        MR. SCHACHT:  I mean, the way you ruled on it in the

11   disjunctive, I don't think that the conduct --

12        THE COURT:  It's what it says.

13        MR. SCHACHT:  -- as alleged, harmed the United States.

14   I agree that the crime of conviction aids Hizballah.

15        THE COURT:  All right.  Well, that's sufficient.  But

16   I would simply note for the record that Hizballah blew up the

17   marine barracks in Beirut, causing scores of deaths of American

18   soldiers.  And it doesn't need much more than that.

19        However, the United States has labeled Hizballah a

20   terrorist organization; it's inimical to the foreign policy of

21   the United States in the area.  Hizballah is a force of

22   unsettlement and extreme danger to the United States interests.

23   And I find it clearly is against the interest of a foreign

24   nation -- against the interest of -- its intent to injure the

25   United States and to aid a foreign terrorist organization.

JC3VKOUS

1          MR. SCHACHT:  I think my client's conduct though has

2     to harm the United States, not what was done by some other

3     people, arguably before Hizballah was created.  And there's

4     some debate about exactly when that organization was formed.

5          THE COURT:  Well, to me, lending himself to Hizballah,

6     and he came back to Hizballah for further training while he was

7     a United States citizen, is sufficient to indicate that he

8     intended to injure the United States.  And he knew it was a

9     terrorist organization; he knew it was labeled as a terrorist

10    organization.  So I find it's 42.

11         Next, the government, under Section 3A1.4(a), would

12    add 12 levels, because the underlying counts are felonies that

13    involved and were intended to promote federal crimes of

14    terrorism.

15         Would you define the federal crimes of terrorism,

16    Mr. Bove.

17         MR. BOVE:  Yes, Judge.

18         Those are defined by reference in the guidelines to

19    U.S. Code, 18 U.S.C., 2332(b).

20         THE COURT:  Yes.

21         MR. BOVE:  Subsection --

22         THE COURT:  One minute.  Go ahead.

23         MR. BOVE:  Subsection (G)(5), Judge.  And if you have

24    the same gray book that I have, it's page 879.

25         THE COURT:  I've got it.

1          As used in this section, the term "federal crimes of

2    terrorism" means an offense that, A, is calculated to influence

3    or affect the conduct of government by intimidation or coercion

4    or to retaliate against government conduct.

5          And there's a long list of what else it has to do.

6          But I'm not sure I agree that it's calculated to

7    influence.

8          MR. BOVE:  Judge, here we're focused less on the term

9    "influence," although I think it applies more on the terms

10   later in that paragraph, intimidate, coerce, and retaliate.

11   Those are all central aims of Hizballah, outlined by leader

12   after leader, as well as aims of Iran, outlined by leader after

13   leader of that country.

14         The defendant told the FBI -- and this was established

15   at the trial -- that he was aware of those aims.  And, Judge,

16   in support of those aims, he was here helping to plan attacks

17   in this city.  And we established at trial that they were --

18   that the planning was sophisticated, to do things that would

19   cripple the city in response to other terrorism efforts;

20   cripple things like places where we house secure information,

21   places where the military deploys to respond to attacks.  So

22   these were sophisticated efforts that the defendant

23   participated in to facilitate attacks that would intimidate or

24   coerce the United States into doing things such as --

25         THE COURT:  One I remember is the armory that is

1   adjacent to the Columbia University Medical School and

2   Hospital, Presbyterian Hospital.

3          MR. BOVE:  That was one such armory, Judge.  There was

4   also the one in Harlem with the children's center.

5          THE COURT:  And there's a third one in Brooklyn.

6          MR. BOVE:  The two that the defendant surveilled are

7   the one in Manhattan and Harlem.

8          THE COURT:  Yes.

9          What's your observation, Mr. Schacht?  And then I'll

10  make a finding.

11         MR. SCHACHT:  I think the government introduced

12  evidence that my client was a sleeper agent, I think the word

13  was used, maybe even by my client in an interview, that he was

14  a sleeper agent.  This was all undercover.  He wasn't doing

15  anything -- and he didn't do anything -- publicly by definition

16  or anything to influence anybody.  Anything he may have done

17  was --

18         THE COURT:  How about the second part?

19         MR. SCHACHT:  -- was secret.

20         THE COURT:  Mr. Bove argues affect the conduct of

21  government by intimidation or coercion.

22         MR. SCHACHT:  He didn't coerce or intimidate anybody.

23  He took photographs, the evidence showed, and looked at various

24  things and provided information.

25         THE COURT:  It's calculated to affect the conduct.  It

```
1    doesn't have to accomplish it.

2              MR. SCHACHT:  Look, he --

3              THE COURT:  It animates intention, that's really what

4    it does.

5              MR. SCHACHT:  His intention was what he did; his

6    intention was to collect information.  He didn't harm anybody.

7              THE COURT:  For what purpose?

8              MR. SCHACHT:  In fact, nobody --

9              THE COURT:  For what purpose?  Why would he go up to

10   the armory on 170th Street and Fort Washington Avenue?

11             MR. SCHACHT:  Well, I think he said why.  He was

12   collecting information.

13             THE COURT:  For what purpose?

14             He sent the information to Hizballah.

15             MR. SCHACHT:  The purpose is if the United States

16   attacked Iran, Iran would have sleeper agents in place, I

17   think, is the concept, and they might attack the United States.

18   I think that would be the purpose.

19             THE COURT:  Go with me, Mr. Schacht, without jumping.

20             There is no such great aesthetic value in the armory

21   near the Presbyterian medical school as to excite the aesthetic

22   qualities of Hizballah or leaders thereof.

23             MR. SCHACHT:  The reason why Hizballah instructs

24   people to do things like take photos of the outside of

25   buildings is not that they need to know what the outside of the
```

1    buildings look like.  These are essentially loyalty tests.

2         If I can get someone to do some simple task, like take

3    a photograph, where I could easily get a better quality

4    photograph from the internet, I've gotten them, therefore, to

5    do something.

6         THE COURT:  The photographs are taken the time of day,

7    it shows crowds, it shows assemblages.  I find that --

8         MR. SCHACHT:  I don't think anybody needs to take a

9    photo of 26 Federal Plaza to know that during the day there's

10   people on lower Broadway near 26 Federal Plaza.

11        It's clearly a test.  Everybody knows what's in 26

12   Federal Plaza and what it looks like.  And there's millions of

13   beautiful photos on the internet.

14        THE COURT:  Then the test is the same purpose; it's

15   all part of a plan of Hizballah to find that soft and effective

16   objects of the United States which can be terrorized and cause

17   the intimidation of a population.

18        I find that the government is correct, and I add 12

19   levels, which now brings us up to 54.

20        Next up is the obstruction of justice, which I'm not

21   going to find.

22        And the last is an instruction under Chapter 5, Part

23   A, Application Note 2, that where the total calculated offense

24   level exceeds 43, the offense level is treated as 43.  So I

25   find that the proper offense level is 43.

1          Excuse me.

2          There's no criminal history.  The range of custodial

3    punishment is 360 months to life.

4          MR. BOVE:  Judge, if I could, pursuant to 3A1.4(b),

5    the criminal history is VI.  And so at level --

6          THE COURT:  Oh, am I mistaken?  Just a minute.

7          Looking at paragraph 74 within the PSIR, it says zero.

8          MR. BOVE:  Judge, if I could just ask you to take a

9    look at -- I believe it's paragraph 75 after that.  The

10   terrorism enhancement requires Criminal History Category VI.

11   So that's guidelines Section 3A1.4(b).

12         THE COURT:  There's no difference in the guidelines

13   between zero and six criminal history points.

14         MR. BOVE:  That's correct, Judge.  The guidelines

15   recommendation in either case is life.

16         THE COURT:  Okay.  I need a two-minute recess at this

17   point.

18         MR. BOVE:  Judge, this might be a time for the

19   defendant to look at the government's sentencing submission as

20   well.

21         THE COURT:  Yes.  Why don't we do that.

22         Marshal, I'd like to -- please be seated, everybody.

23   And let's stay seated.

24         I'd like to leave Mr. Kourani in place so he can read

25   the sentencing guidelines and have an opportunity with

1    Mr. Schacht, unless you both prefer him do it back there.

2              What do you want, Mr. Schacht?

3              MR. SCHACHT:  We're comfortable right here, if that's

4    all right.

5              THE COURT:  Okay.

6              THE MARSHAL:  No problem, your Honor.

7              THE COURT:  All right, marshals?

8              I'll be back in a moment.

9              Be seated.  I'd like everyone to stay seated please.

10   Don't get up for anything.  You can leave the room if you want

11   to.

12             (Recess)

13             THE COURT:  Mr. Schacht, you're still looking, right?

14             MR. SCHACHT:  We're ready to go forward, your Honor,

15   whenever you're ready.

16             THE COURT:  I need another two minutes.

17             MR. SCHACHT:  Okay.

18             (Recess)

19             THE COURT:  Are you ready, Mr. Schacht?

20             MR. SCHACHT:  Yes, your Honor.  Thank you.

21             THE COURT:  Any observations so far?

22             MR. SCHACHT:  Any observations?

23             THE COURT:  Comments so far, before you begin to argue

24   under 3553.

25             MR. SCHACHT:  Do I have any comments about the

1   probation report?

2              THE COURT:  No, comments up to where we are now.

3              MR. SCHACHT:  No, no, nothing other than what I've

4   already said or what I've submitted in writing.  Thank you.

5              THE COURT:  So I would like to raise a question.

6              First, I think I stated that the range of custodial

7   punishment was 360 months to life.  I think I erred when I said

8   that.  It's life under 43.

9              MR. BOVE:  The guidelines recommendation is life.

10             THE COURT:  Yes.

11             MR. BOVE:  I agree, Judge.

12             THE COURT:  Okay.

13             Second, the statutory maxima are 15 years for Counts

14  One and Two, ten to five years for Three and Four, 20 years for

15  Six and Seven, 25 years for Eight.

16             So if I were to give a life sentence, it would mean

17  that I would have to apply the statutory maxima consecutively,

18  not concurrently.

19             MR. BOVE:  That's right, Judge.  If you were to do so,

20  the available statutory maximum is 110 years, based on your

21  ruling earlier relating to Counts One and Two.

22             THE COURT:  But that's different from the guidelines.

23             MR. BOVE:  It is, Judge.  The guidelines recommend

24  life.  They also instruct that under these circumstances, the

25  way to implement the guidelines recommendation where it's

1  appropriate -- and we think it is here -- is to impose each

2  count to run consecutively.  So under these circumstances --

3          THE COURT:  Your proposal is that I sentence

4  consecutively.

5          MR. BOVE:  Yes, Judge.

6          THE COURT:  To reach life.

7          MR. BOVE:  To reach 110 years.

8          THE COURT:  But then is my sentence -- let's say for

9  the sake of argument I do that, 110 years or is it life?

10         MR. BOVE:  It would be 110 years, Judge.

11         THE COURT:  Not life.

12         MR. BOVE:  Correct.

13         THE COURT:  Second -- or maybe it's third.  I want to

14 go back to Section 2 of the guidelines, 2M6.1.  You have a

15 footnote somewhere, Mr. Bove, that there's an alternative way

16 of looking at this, which would use 2M5.1.

17         MR. BOVE:  I did, Judge.  Just to lay that out --

18         THE COURT:  So let me just --

19         MR. BOVE:  -- candor --

20         THE COURT:  I understand.  I understand.

21         But since it's the Court's job to look at all this

22 through, I want to ask a couple of questions.

23         2M6.1 deals with unlawful activity involving nuclear

24 material, weapons or facilities, biological agents, toxins or

25 delivery systems, chemical weapons or other weapons of mass

1    destruction, attempt, or conspiracy.

2         One could argue that weapons of mass destruction in

3    this context should have the destructive capability equivalent

4    to adulteration of the water system, or spreading of disease

5    through biological agents, or use of nuclear material.  And

6    that would create a suggestion to me that this may not be the

7    right guideline.  Because, typically, when we have a string of

8    adjectives, we are to interpret the general in the light of the

9    specific.  And the specificity here is of weapons that are

10   truly of much more mass destruction than that could be

11   delivered from an RPG.

12        Furthermore, if you look at the definitions of

13   "weapons of mass destruction," which appears in the application

14   notes under 2M6.1, we are drawn to the statute, Section

15   2332A(c)(2)(B), (C), and (D).  So let's look at that statute.

16        MR. BOVE:  Judge, we are now -- for our definition of

17   "weapons of mass destruction," we're relying on Subsection

18   (c)(2)(A).

19        THE COURT:  Yes, but that has been left out.  That's

20   the point I was making.  The definitions here as to the term

21   "weapon of mass destruction" means, (A), any destructive device

22   as defined in Section 921 of this title.  But that's omitted

23   from the sentencing guidelines.  And (B) and (C) and (D) are

24   the types of destructive capability that I was talking about.

25   (B) talks about release, dissemination, or impact of toxic or

1    poisonous chemicals or their precursors, biological agents,

2    toxins, or vectors; radiation or radioactivity at a level

3    dangerous to human life.

4         They've left out Section 921, types of materials --

5    Mr. Schacht, you're on the winning side here, so please keep

6    seated -- which made me wonder whether the right way to look at

7    this is under Section 25 -- 2M5.1, which punishes evasion of

8    export controls, financial transactions with countries

9    supporting international terrorism, which suggests not what

10   we're doing here with some level below what we're doing here.

11        But if we were to do that, we would supply a base

12   level of 26, because it's national security controls or

13   controls relating to the proliferation of nuclear, biological,

14   or chemical weapons or materials, or a financial transaction

15   with a country supporting international terrorism.  So that

16   there are national security controls that are involved, and

17   there are financial transactions with a country supporting

18   international terrorism that's involved.  That would bring us

19   to base level 26.

20        And I don't think there are any adjustments provided

21   in that section.  Level 26 brings us to 63 to 78 months of

22   punishment under the guidelines, which I think is much too low.

23        What I'm suggesting is that neither 2M5.1 or 2M6.1 are

24   applicable.

25        There's also 2M5.3, providing material support or

1     resources to designated foreign terrorist organizations, or

2     specially designed global terrorists, or for a terrorist

3     purpose.  And there, the base level is 26.  And if the offense

4     involved a provision of dangerous weapons, firearms,

5     explosives, funds, with the intent, knowledge, or reason to

6     believe such funds would be used to purchase any of those

7     items, or other material support or resources, with the intent,

8     knowledge, or reason to believe they are to be used to commit

9     or assist in the commission of a violent act may increase by

10    two levels.  That brings us to 28.

11          Level 28 is 78 to 97 months.

12          The short of this is that there's nothing really that

13    applies perfectly.

14          MR. BOVE:  Judge, if I could.

15          THE COURT:  Yes, Mr. Bove.

16          MR. BOVE:  So I understand your ruling on 2M6.1.

17          Understood.

18          I submit then that the way to identify the guideline

19    that applies under these circumstances is to go to the

20    statutory index, which is Appendix A of the guidelines.  And I

21    would start by focusing on Counts One and Two, which are

22    violations of 18 U.S.C. --

23          THE COURT:  Appendix A is a different book?

24          MR. BOVE:  It's the back --

25          THE COURT:  No, it's the back of the book, yes.

1          MR. BOVE:  Should be the back.  It's the back of my

2     manual.

3          THE COURT:  So we look at 2332.

4          MR. BOVE:  2339(b), that's Counts One and Two, direct

5     that the applicable guideline is 2M5.3.

6          THE COURT:  Which I just read.

7          MR. BOVE:  You did, Judge.  It was the second one.

8          And then with respect to --

9          THE COURT:  2M5.3, what do you mean by the second one?

10         MR. BOVE:  You went through two guidelines analyses.

11         THE COURT:  I think 2M5.3 is more apt than 2M5.1.

12         MR. BOVE:  Then I agree with that, Judge.

13         So then going to 2M5.3, I agree that the base offense

14    level is --

15         THE COURT:  It comes out to 28, with the adjustment.

16         MR. BOVE:  Applying the base offense level of 26, plus

17    two under (b)(1).

18         And then there's the terrorism enhancement, which

19    calls -- which you've already ruled applies; that's Section

20    3A1.4, and calls for another 12 levels.

21         THE COURT:  Which brings us to 40.

22         MR. BOVE:  Correct.

23         And then, Judge, because it's Criminal History

24    Category VI --

25         THE COURT:  Because it's terrorism, it's 360 to life.

1          MR. BOVE:  We're back where you started correctly

2     before the break at 360 to life.

3          THE COURT:  Mr. Schacht.

4          MR. SCHACHT:  Yes, your Honor.

5          I think 2M5.3 is more applicable, and I maintain my

6     objection though about the terrorism enhancement applying.

7          THE COURT:  But I find that it applies, and I think --

8     under Criminal History I, it would be 292 to 365 months.  If

9     you'd make the Criminal VI adjustment, that's 360 to life.  I

10    find it's 360 to life.  And that was the guideline that we'll

11    be working under.  Okay?

12         All right.  That is the guideline.

13         Now we go to the considerations of 3553(a).

14         Mr. Schacht, I'll be glad to hear you on behalf of

15    your client.

16         MR. SCHACHT:  Thank you, your Honor.

17         As you know from my sentence memorandum, I'm asking

18    that you sentence my client to a nonguideline sentence under

19    3553(a).  And the reason why I'm asking for that -- or I should

20    say there's really two primary reasons:

21         The first reason is because I think the facts here are

22    unique, and a unique case calls for a nonguideline sentence.

23         The second set of reasons, which I'll get to in a

24    couple of moments, deals with the issue of conformity of

25    sentences and making sure that my client's sentence is not

1  disproportionate to similarly situated people charged with

2  similar conduct.

3          First of all, part of what makes this case unique is

4  that my client stopped any illegal conduct on his own prior to

5  being arrested, so that you know from the indictment that we've

6  been talking about that the charged conduct ends, according to

7  the indictment, in about September of 2015.

8          My client then was not interviewed and arrested until

9  2017.  So there's just about a two-year -- almost a two-year

10  period in which he's not even alleged to have committed any

11  crimes.

12          And the reason for that is because he stopped doing

13  anything he was doing on his own prior to talking to the FBI or

14  being arrested or prosecuted.  And so I think that factor is

15  significant and ought to be considered when weighing what

16  sentence to give.  And it goes right to the heart of part of

17  the government's argument for what I consider to be a grossly

18  excessive sentence, which is that my client supposedly poses an

19  ongoing danger to the United States or to other people.

20          And I think that part of the argument against that

21  that I've made is that he stopped doing anything on his own,

22  even before being punished, even before being arrested; and

23  that that is one significant factor weighing in favor of his

24  nondangerousness.

25          The other significant factor is at the time, I think

1   you could tell from the government's behavior that even the

2   government did not really think that he any longer posed a

3   danger.  Because what made him dangerous, the government would

4   say, would be his association with a foreign terrorist

5   organization.  Taken out of that organization, he's just a

6   normal person.  He wasn't robbing people, shooting people,

7   raping people, doing whatever kinds of dangerous conduct some

8   people engage in.

9         His conduct here was a function of his life

10  experience; obviously his family, certain things that caused

11  him to be involved in this situation, growing up in the way

12  that he did.  And then he became disillusioned with that, and

13  he voluntarily left the conspiracy, so to speak.  Just like in

14  a drug case, when someone withdraws voluntarily from a drug

15  case, they are no longer a drug dealer.  So to the degree that

16  he sits here today and he's convicted of providing material

17  support and related crimes to a terrorist organization, he's no

18  longer that person.  And he wasn't that person at the time in

19  2017.

20        Now, how do we know that?

21        Part of the reason we know that is because the

22  government met with him repeatedly and let him go from the

23  meetings and didn't arrest him at that time.  The government,

24  we know, was hoping that, in their view, he would be honest.

25  And if he were honest, we learn from the testimony, they might

1    never have incarcerated him at all.

2            So obviously, in the government's view, he does not

3    pose and did not pose, even at that time in 2017, a really

4    substantial risk or any risk of dangerousness to the community.

5    I cannot believe that the government would allow a dangerous

6    terrorist to run free in our country if they could prevent

7    that.  I simply don't believe it.  I think the government knew

8    that he was no longer a danger to anyone.

9            Another point that I made in my submission that I just

10   want to mention briefly, your Honor, because this came into --

11   this issue came to fruition in the suppression hearing.  And I

12   think it's relevant because I've asked you to consider as a

13   3553(a) factor the disastrous legal advice that my client got

14   from Mark Denbeaux prior to his arrest.

15           This is another highly unique -- I've searched, I

16   cannot find another case with this same fact pattern.  And I

17   assume one doesn't exist.

18           What should have happened here is Mr. Denbeaux should

19   have gotten a proffer agreement for Mr. Kourani.  If that had

20   happened, if all of those interviews had been conducted subject

21   to a standard Southern District proffer agreement, none of

22   those statements would be admissible in the direct case.

23           THE COURT:  What makes you think it would have been

24   available?

25           MR. SCHACHT:  What makes me think it would have been

available -- and I wasn't aware of this, nor was your Honor at the time of the suppression hearing; I didn't learn this until the trial -- was that at the trial, Special Agent Gary Battista testified that at one of the first -- I don't remember was it the first or second meeting with Mr. Kourani before Agents Costello and Shannon became involved, he brought along -- Agent Battista brought along a sample proffer agreement to show to the defendant. The defendant was alone; he was not at that time represented by a lawyer.

And so the fact that an FBI agent, who turned out to be the supervisor of the group, we learned later on, brought that sample agreement, and my client was without legal counsel and, unfortunately for him, didn't sign such an agreement, but it was brought to a meeting. And so for that reason alone, I know they would have offered it.

The other reason I know they would have offered it is because there's absolutely no downside to the government. In that posture, in my experience, they always offer a proffer agreement. Why would they not? If they have someone who can give them information, if they're honest about Hizballah, they are not going to tell the person, Walk away. We're not interested in your information. They'll have the person sign a proffer agreement and get the information and see what they can do with it. The government would have no incentive to refuse to do that.

1    And so -- and this is why I say that Mr. Denbeaux's

2  advice was so awful, and your Honor found that it was part of

3  some strategy.  Your Honor did not know at the time that you

4  found out at the suppression hearing about Agent Battista

5  having the sample of a proffer agreement.

6    Also --

7    THE COURT:  That doesn't mean they would have given

8  it, Mr. Schacht.

9    MR. SCHACHT:  I'm sorry, Judge, say that again?  I

10  didn't hear you.

11    THE COURT:  Doesn't mean they would have given it.

12  They had it.  They felt that defendant was not forthcoming;

13  that he was giving them information they had.

14    MR. SCHACHT:  Right.  But they give the proffer

15  agreement before the person is not forthcoming or lies.

16    THE COURT:  Well, there's usually a dance that goes

17  on, and counsel makes suggestions for what the person may

18  testify, and there's a decision to give or not give a proffer

19  agreement.

20    I don't find the inference that you suggest to be a

21  proper one to draw.  And you know my findings that I made

22  following the suppression hearing.

23    MR. SCHACHT:  Yes.

24    THE COURT:  And I do not change them.

25    MR. SCHACHT:  The government has reiterated those

1    findings to some degree in their sentence submission.  And part

2    of what I object to about that submission and, respectfully, in

3    your Honor's suppression hearing motion, is both the government

4    and your Honor have referred to this as some sort of strategy

5    on the part of Mr. Denbeaux and maybe Mr. Kourani; yet no one

6    is able to articulate what that strategy would be.  There is no

7    possible reason for a competent defense lawyer --

8              THE COURT:  I'm not going to go into that again,

9    because it's -- my attitude was expressed in my rulings.

10             MR. SCHACHT:  Yes, I agree.  And I simply want to put

11   on the record --

12             THE COURT:  And if they are wrong, I'm sure you'll

13   appeal me.

14             MR. SCHACHT:  I will.

15             But I also think though, your Honor, I'm not simply

16   discussing the suppression hearing, I'm mentioning this again

17   because I think it's relevant to the issue of sentence.  And

18   you saw that in Exhibit C to my sentence memorandum, where I've

19   attached for your Honor text messages between the defendant and

20   Mr. Denbeaux.

21             And in those text messages, which obviously they did

22   not know at the time were being surveilled, my client says to

23   Mr. Denbeaux, Shouldn't we be getting promises from them in

24   writing, or words to that effect.  And Mr. Denbeaux says no.

25             If that is not ineffective -- and I mean that not

1   simply in the Sixth Amendment sense of ineffective, I mean it

2   colloquially --

3        THE COURT:  I'm not going to consider that in

4   relationship to the sentence.  Why don't you save that for the

5   Court of Appeals.

6        MR. SCHACHT:  I need to make a record in order to make

7   that argument to the Court of Appeals.

8        THE COURT:  You've made your record.  I know you

9   disagree with what I ruled.  That's enough.  You're not waiving

10  anything.

11       This is a sentence.  I'm interested in Mr. Kourani as

12  a person.

13       MR. SCHACHT:  As I said, your Honor, as a person, I'm

14  not here to defend anything he did, I'm not here to defend

15  Hizballah.  There is no defense from me for Hizballah.

16       But my defense of him is that he stopped this conduct

17  on his own, unlike many of the people who I cite, many of the

18  defendants who I cite in my sentence memo, several of whom were

19  caught in the middle of criminal conduct, either in stings that

20  were run by the FBI or the DEA, or people who were caught in

21  the process of committing their crimes.  And I've listed for

22  you many, many cases where people charged with what I believe

23  to be similar conduct -- perhaps two of whom went to trial, the

24  rest of whom pled guilty -- got sentences of really no more

25  than 15 years.  And some of them --

1          THE COURT:  The government's sentencing memorandum has

2     pointed out significant distinctions as between this case and

3     those cases.

4          MR. SCHACHT:  I don't think those are significant

5     distinctions.  One of the distinctions they draw in the case of

6     *Patrick Nayyar* is that he was caught in a sting.  I don't see

7     how someone who is caught in a sting is less of a criminal than

8     someone who's caught by their going with a lawyer to confess to

9     the FBI.  That's not a valid distinction to me, your Honor.

10    Otherwise, people caught in stings would have lesser

11    punishment.

12         I've never heard the government stand up in court and

13    say, Someone should get less punishment because we caught them

14    in a sting.  This is the first case I've ever heard them argue

15    that.  They were caught in the sting because they were

16    suspected of being criminals, presumably they were not

17    entrapped, and the government targeted them and caught them

18    because they were wanted or suspected of committing criminal

19    activity.  So I disagree with you, your Honor, that those are

20    significant distinctions.

21         Some of the people, I agree, I cited three cases, I

22    believe, where people committed terroristic acts, but they were

23    not themselves members or seeking to aid a terrorist

24    organization.  I'm not sure that that is such a significant

25    distinction, your Honor.

1    If I'm in a building or I'm a person who's killed or

2    blown up or whatever, I don't think that me as the victim or

3    even society-at-large really cares that much -- definitely the

4    victim doesn't care -- whether the person is acting alone or

5    assisting some organization. I think that conduct is really

6    quite similar.

7    And in many of the cases that I cite, the conduct is

8    actually, in my opinion, worse, just the person is not a member

9    of a terrorist organization. But what they are doing, what

10   they are convicted of doing, is far worse than anything my

11   client is alleged to have done.

12   And so for those reasons, Judge, I think the fact that

13   my client stopped this conduct on his own, he approached the

14   government -- and I know that the government says, Well, he

15   wasn't really helpful to us; he held back information. And

16   taking that as a given for the sake of sentence, your Honor, he

17   still approached the government. That is a drastically

18   different situation than any of the other cases. He stopped

19   committing his acts, his criminal acts; and he approached the

20   government with a lawyer.

21   Now, you've already found that Denbeaux and Kourani

22   were playing some games and were tricky. That may be. For the

23   sake of the sentence, I concede that. That still takes him way

24   out of the normal case. He called them up and he met with them

25   in Seton Hall University. This is a drastically different

1    situation than any of the cases that I cited.

2         And certainly the government has cited no cases for

3    someone in a situation like my client, getting life in prison.

4    And that's because there are no cases like that.  And I know

5    you can't give him life in prison.  Really what I'm talking

6    about is any kind of a really extensive prison sentence.  There

7    are no cases like that.  Nobody gets life in prison for a

8    victimless crime.  It just doesn't happen.

9         And I understand we can say with a terrorist

10   organization, society is a victim in some general sentence of

11   the word.  But that's baked into the sentences of the people

12   for whom I gave you cases, people belonging to Al Shabab or

13   ISIS or Al Qaeda, other arguably worse terrorist organizations

14   or let's say they are the same.  And those people get 10, 12,

15   15 years, and they didn't stop the conduct on their own.  One

16   of them did.  And they didn't approach the government with a

17   lawyer the way my client did.

18        And so all of these factors, I think, take it

19   drastically outside the heartland of cases.  And under a

20   reasonable 3553(a) analysis, your Honor, you should give him a

21   much lower nonguideline sentence.

22        Thank you.

23        THE COURT:  The government found lots of evidence in

24   Mr. Kourani's home.  It was suggestive to me, anyhow, of

25   continuing involvement with Hizballah, and awaiting a time when

he would get a signal to do something in the interest of Hizballah. So I find it difficult to find out that he stopped his criminal activity.

MR. SCHACHT: I'm not sure what evidence you're referring to. He had some Nike boots made by the company Nike that he ordered in his own name on the internet. And the government, I think, was creating the impression or sought to create the impression that these Nike shoes that were olive drab in color, might be used as some kind of a military uniform or something like that. I don't think you could find that.

Also, he had a passport, his passport, and he had some money. And the government sought to characterize that as what they called a "go bag." I'm not sure what you're to make of that.

As you know from the evidence --

THE COURT: Well, he used the passport to travel. He used the American passport to get in and out of the United States. And he used the Lebanese passport to move around the world.

MR. SCHACHT: Well, that was -- he used that within the scope of the indictment, yes. But the fact that he kept his American passport is not an indication that he was continuing to do anything. That was simply his passport.

The fact that he had money in the house, loads of people have money in the house; certainly loads of people who

1  are in the cash business of selling counterfeit clothing have

2  money.  And so I don't think there was anything remotely in the

3  house like a weapon or anything to even indicate he ever had a

4  weapon outside of Lebanon.  So I just don't think that's a fair

5  inference from the facts.

6          THE COURT:  Mr. Bove.

7          MR. BOVE:  Judge, this is a unique case.  This is the

8  first time in this courthouse that a member of the IJO is being

9  sentenced for his conduct on behalf of that organization.  The

10  first time in the courthouse and the first time in the country.

11  And so for that reason, any of the cases that Mr. Schacht has

12  cited to you, those aren't fair comparisons.

13          THE COURT:  No, I agree.  The comparisons are not

14  fair.  But I sentence people to the magnitude that we're

15  talking about here very rarely in 21 years.  And where I have,

16  the crimes have been dreadful.

17          I remember one crime of a Chinese gang preying on

18  illegal Chinese people who would come here to work, who, in

19  effect, were imprisoned by their employers.  And this gang

20  kidnapped and further shook down the parents living in China.

21  And when one person was accidentally killed, he was defaced and

22  buried without identity.  And I gave that person the maximum I

23  could give, which is, I think, somewhere in the vicinity of

24  what we're talking about here.

25          MR. BOVE:  And Judge, you should do that here now,

1    impose the maximum available sentence, and here's why:

2            You should do that because of the seriousness of what

3    this man did, and I'm going to get into that.  But you should

4    also impose the statutory maximum because your voice will be

5    heard today.  Your voice will be heard in Lebanon, by the

6    leaders of Hizballah; your voice will be heard by Iran, who's

7    directing IJO operatives.  Your voice today will protect the

8    public in this city, and your voice today will protect children

9    and citizens and occupants of Israel being targeted by

10   Hizballah in conflict situations.

11           General deterrence is a critical, crucial aspect of

12   this sentencing --

13           THE COURT:  From what I know of Israeli punishments,

14   they don't punish as severely as we do.

15           MR. BOVE:  Judge, I think that if Mr. Kourani were

16   apprehended by Israeli authorities as an IJO operative doing

17   the things that he did, I'm not sure it would be left to the

18   criminal justice system.

19           THE COURT:  He's 35 years old now.

20           MR. BOVE:  As I said in the submission --

21           THE COURT:  If I gave him 30 years or 35 years, the

22   chances of his return to criminality are very slim, certainly

23   in this country; he's likely to be deported when he's finished.

24   And what kind of life can he have after that anyhow?

25           MR. BOVE:  Well, two points, Judge:  First, the

JC3VKOUS

1  obligation to protect the public doesn't stop at our border.

2  It doesn't matter much --

3       THE COURT:  We're protected.  And if a person is at

4  all likely to commit criminality is small.

5       MR. BOVE:  Well, Judge, that's what distinguishes this

6  terrorism case from the types of violent crime cases that

7  you've just cited from your past experience.

8       The defendant is ideologically committed to this

9  cause, a cause of harming the United States and creating

10  violence on behalf of this organization around the world.

11       This is something from his laptop, Judge.  This is

12  what motivates the defendant:  Fill the prisons with us, and

13  harm us with all your might, and bring even more.  We remain

14  patient.  On the route of Jihad, we are resolute.

15       Judge, that is the defendant's mindset.

16       THE COURT:  How recent were those messages?

17       MR. BOVE:  That's seized from the laptop that was in

18  his apartment.  That is a video, Judge.

19       THE COURT:  But do we know when the message was sent

20  to him?

21       MR. BOVE:  We know that it was a video on his laptop

22  on the day he was arrested.  That is the type --

23       THE COURT:  But we don't know when that video was put

24  into his laptop, do we?

25       MR. BOVE:  No, Judge.  But I submit that the fact that

1    it was still in his laptop on the day he was arrested speaks to

2    his state of mind on that day and today as well; that this is a

3    man who has committed himself to supporting Hizballah.

4            THE COURT:  This is in response to Mr. Schacht's point

5    that there is no further evidence of criminality.

6            MR. BOVE:  That's right, Judge.  This is not a man who

7    stopped this crime.  This is a man who decided in 2017 that he

8    had a deal he wanted to make to get some benefits, a game to

9    play with Mr. Denbeaux to try and extract something from the

10   FBI, and so he would barter some information to try and win.

11           He lost.

12           When this man was arrested, in his apartment were

13   combat boots, yes, made by Nike, but, nevertheless, combat

14   bats.  His laptop his searches -- or website visits for places

15   like militaryboots.com.  He viewed another web page with the

16   title Men's Hot Weather Tactical Combat Boots.  Why does the

17   climate matter?  Because the defendant was getting ready to go

18   back to Lebanon and to join Hizballah in conflict, in combat in

19   Syria.  There are searches on his laptop as he follows

20   Hizballah's activities in Syria.  Mr. Denbeaux called the FBI

21   after the Seton Hall interviews were concluded.

22           THE COURT:  After the what?

23           MR. BOVE:  After the Seton Hall interviews were

24   concluded, Mr. Denbeaux called Special Agent Costello, and he

25   said, My client thinks that the best thing for him to do is

1    return to Lebanon.  And that is because, Judge, based on the

2    combat boots, the cash stashed in his apartment in a suitcase

3    with his identification documents, that is because the

4    defendant was getting ready to go back to Lebanon with those

5    boots and take up combat and arms with Hizballah in Syria.

6           This is not a man who stopped supporting Hizballah;

7    this is a man who was committed to the language in the video

8    that I read to you, resolute in the path of jihad.  And that's

9    a reason, Judge, that for the remainder of his days, he will

10   pose a threat to the public.

11          I agree that if there's a time when this man completes

12   his incarceration here in the United States, he's going to be

13   removed from the country.  That doesn't mean he's not a threat.

14   It doesn't mean he's not a threat to other people outside the

15   United States, nor does it mean that he's not a threat to this

16   country.  How do we know that?  The China conduct, Judge.

17          And I think you've made fair findings here today based

18   on all of the evidence we've talked about that the purpose of

19   that trip in 2009 was to facilitate efforts by the IJO to get

20   access to ammonium nitrate, a chemical that this organization

21   used to make explosives, and was found using attempting to make

22   explosives as recently as -- reported recently as this summer

23   in London.

24          THE COURT:  When was that summer in London?  What

25   dates are we talking about now?

1    MR. BOVE:  The reporting about this came out this

2  summer.  The seizure of these ice packs was in 2015.

3    THE COURT:  That's in the London newspaper.  I can't

4  go by that.

5    MR. BOVE:  If that's right, Judge, then go by what

6  happened in Cyprus, go by what happened in Bulgaria, go by what

7  happened in Thailand.  These are places where the IJO attacked

8  U.S. and Israeli --

9    THE COURT:  We're finding that he did not sign off; he

10  was still available to Hizballah.  That's proposition number

11  one, and that's the relevance of this, that things can pop up.

12    MR. BOVE:  He's still available in a combat, in a

13  terrorist capacity.  Just as importantly, Judge, as you think

14  about when would it be safe to have this man be at liberty in

15  anyplace in the world, he's just as important and just as

16  helpful to any terrorist group based on his intelligence

17  gathering, based on his training as a spy, based on the things

18  that he learned here conducting surveillance in the United

19  States, and based on the experiences that he's had in this

20  case.  Think about those experiences, Judge.

21    He's had a bunch of one-on-one interactions with FBI

22  agents in a variety of capacities.  You've heard about those in

23  2016, here and in Chicago; in 2017 at Seton Hall.  He's

24  gathered information about the way that these agents work,

25  about the way that they conduct interrogations.  He's gathered

1   information about the way that the FBI collects evidence.  All

2   of that is extraordinarily valuable to terrorists and other

3   foreign powers who are conducting intelligence operations in

4   this country.

5           And that information, Judge, it's not going to matter

6   if he's physically capable of taking up arms against the United

7   States or someone else on behalf of Hizballah.  He just needs

8   to be able to speak.  And as long as this man is in possession

9   of this information and has the faculties to convey it to any

10  of these enemies of the United States, he will remain a threat.

11          And that is another reason, Judge, apart from general

12  deterrence, and in addition to it, that the appropriate

13  sentence on these unique facts, the first time that somebody

14  has been caught doing what the defendant did, the appropriate

15  sentence is the statutory maximum.

16          There's a lot said in the defendant's submission, and

17  there have been things said today about this being a victimless

18  crime.

19          THE COURT:  It's not.

20          MR. BOVE:  I'm not going to dwell on it then, Judge,

21  because that's not accurate.  It's not even close.  And what it

22  really reflects is a failure by Mr. Schacht and the defendant

23  to grapple with the extraordinary gravity of what the defendant

24  did in this country for 15 years, and the gravity of what he

25  has enabled on the part of Hizballah and the IJO for years to

1    come.  Because we just don't know what happened with the

2    information that we provided, nor do we know how much

3    information the defendant actually did provide.

4            Again, he admitted to a variety of things in Seton

5    Hall.  I think there's more than enough in the record for you

6    to conclude that he also withheld some of the most serious

7    things that he passed on to this organization.  And we just are

8    not in a position to really even evaluate the extent of what

9    could happen based on that information, other than to know that

10   it presents an ongoing risk.  That's another feature of this

11   that warrants the maximum available punishment.

12           I haven't said anything yet about the naturalization

13   fraud, what it means to abuse the process of immigration.  And

14   you've seen it, the evidence supports a chain of that, starting

15   in 2000, when the defendant's father traveled here illegally

16   over the U.S./Mexico border on behalf of Hizballah, and

17   basically set up a nucleus based on a fraudulent marriage that

18   allowed the defendant to come here, establish a false cover as

19   a student, as a counterfeit --

20           THE COURT:  We're not going to punish Mr. Kourani for

21   the crimes of his father.

22           MR. BOVE:  That's absolutely right, Judge.

23           THE COURT:  So we're talking about what he did.  And

24   he lied about his membership.  He didn't disclose that he was a

25   member of Hizballah.

1          MR. BOVE:  That's true, Judge.  But I submit to you

2     that, based on the chain of events, there's every reason to

3     conclude that the defendant was well aware of the very

4     calculated way in which his father came here to establish a

5     basis so that he could seek a visa.

6          In any event --

7          THE COURT:  No, but that's not for -- the evidence is

8     that he used his citizenship to travel to areas and to cover

9     his travel to areas that he might not otherwise been able to

10    do.

11         MR. BOVE:  Yes, Judge.  And that alone -- if that was

12    the only charge in this case --

13         THE COURT:  That's pretty serious.

14         MR. BOVE:  It is extraordinarily serious.

15         Congress allowed for an enhancement in the statute

16    when a crime like this, naturalization fraud, is committed to

17    facilitate an act of terrorism.  And the defendant did that and

18    more.  This is not just -- he didn't just use citizenship and a

19    passport to help facilitate his travel back and forth to

20    Lebanon.  That's a part of this, but in a way it's the most

21    relatively insignificant part of it.

22         The defendant naturalized, got a passport, and went

23    immediately to China on an IJO operation to explore explosives.

24    That part of this alone, Judge, the naturalization fraud, for

25    that extremely dangerous purpose, is another reason that the

1    maximum punishment is available.

2            I'm happy to respond to the points about Mr. Denbeaux,

3    Judge.

4            THE COURT:  I think I've got your point.

5            If I were to sentence Mr. Kourani to a term of years,

6    what would I do about supervised release?

7            MR. BOVE:  I don't think that there's a mandatory

8    minimum of supervised release, Judge.  I do think that it would

9    depend on the term of years.  But to the extent it is

10   foreseeable that the defendant would ever be released, we do

11   think that at least a three-year term, to ensure that there's a

12   supervision during the course of his removal, would be

13   appropriate.

14           THE COURT:  Longer?  Is three years the maximum?

15           MR. BOVE:  If I could have one moment, Judge.

16           MR. SCHACHT:  When you have a moment, your Honor, I'd

17   like to respond.  I don't want to cut off Mr. Bove.  I'd just

18   like to respond.

19           THE COURT:  Yes, I'll let you.

20           MR. BOVE:  I think the maximum would be five years,

21   Judge.  Keep in mind that there's going to be a removal if and

22   when the defendant is released.  So it's unlikely that he will

23   be supervised for any significant period of time.  But in order

24   to cover for that period when the administrative process has

25   taken place, that might make sense.

1          THE COURT:  Is there any ability to pay a fine?

2          MR. BOVE:  We're not seeking a fine, Judge.

3          There's one last point that I would like to address,

4     and it touches on this idea that the defendant voluntarily

5     stopped this conduct.  Again, what was found in his apartment

6     on the day of his arrest, that refutes that concept.  This was

7     a man who was prepared to go fight up until the time he was

8     incapacitated and the handcuffs were applied.

9          But there's also this point that Mr. Schacht has made

10    about the defendant approaching the FBI and doing this -- at

11    times it was almost suggested -- to assist the United States

12    Government as a patriot out of the goodness of his heart.

13         THE COURT:  He argued for a departure, which I'm not

14    going to give him.

15         MR. BOVE:  And that's appropriate, Judge, because it's

16    factually inaccurate.

17         What happened here in this case was that there was a

18    long-term investigation by the FBI that involved a number of

19    investigative and other techniques that you're aware of, an

20    interview strategy that started long before the Seton Hall

21    meetings, in a process of lawfully and fairly putting pressure

22    on the defendant so that he understood that he was being

23    watched and being surveilled; he understood that he would have

24    to curtail the activities that he was carrying out on behalf of

25    Hizballah.

1     This isn't something where the FBI wasn't prepared to

2     do anything, and suddenly the defendant walked into Seton Hall

3     and there was a case.  This was a multi-year investigation

4     targeting the defendant.  It went in a certain way.  The

5     defendant happened to come in and make those statements.  So,

6     of course, we took advantage of that.

7          But that doesn't speak to any view on the part of my

8     office or the FBI or any part of the government that the

9     defendant didn't pose a threat.

10         What happened here is that he was being monitored.

11    There was a successful investigation.  He's now the first

12    defendant to be convicted of the crimes on the basis that he's

13    been convicted for.  And the evidence in this case has revealed

14    what Hizballah and what the IJO is doing here in this city, in

15    this country.  We've cited to you other examples of IJO

16    operations here in the United States and in South America.

17         In this context, Judge, based on what the defendant

18    did, how long he did it, the dangerousness involved, the people

19    that he targeted, children, Judge, the daycare center across

20    the street, and based on the message that this sentence is

21    going to send all over the world to our enemies and to our

22    allies, all of these reasons, Judge, they call for the maximum

23    available sentence in this unique, extraordinary case.

24         THE COURT:  Thank you, Mr. Bove.

25         Mr. Schacht.

1          MR. SCHACHT:  Yes, Judge.

2          The government keeps talking about the kids across the

3     street in the 26 Federal Plaza.  My client didn't harm any

4     kids; and, in fact, nobody from Hizballah has ever harmed

5     anyone within the United States.  I'm not saying they are

6     innocent, that's not my point.

7          My point is the case is not unique when compared to

8     the Al Qaeda/Al Shabab/ISIS people that I referenced in my

9     memo, and cases you know about from being a judge in the

10    building for 21 years.  The fact that he's the first IJO person

11    is maybe of historical interest, but it doesn't mean he's worse

12    than people like Al Qaida or ISIS operatives who actually

13    killed people in New York City, have been convicted of it, and,

14    of course, those people get life in prison.  But that's because

15    their conduct is worse.

16         And then just with regard to the literal sentencing

17    formula that you're going to use, I would ask you not to impose

18    consecutive sentences.  Certainly on Counts One and Two, it's

19    essentially -- it's the same conduct; it's the underlying count

20    and the conspiracy to do the same, just as Six and Seven are --

21    one is the crime itself, the substantive crime, and the other

22    one is the conspiracy.

23         And really, with the exception of Count Eight, which

24    is the immigration fraud, those other counts are really all the

25    same conduct repackaged in different ways.  And, of course, I'm

1    not saying the government did anything improper, they didn't;

2    they are allowed to charge the case how they choose to charge

3    it.  But to sentence someone consecutively for different counts

4    that really involve the same conduct, I think that would also

5    be inappropriate.

6           And also, my final word, your Honor, I'm not saying my

7    client was a patriot by approaching the FBI.  That was not my

8    point.  He was trying to help himself and help his family.  He

9    was self-interested, absolutely.  That was his motivation, not

10   to save the United States from Hizballah.  But that shows that

11   he was no longer a threat.

12          And Mr. Bove talked about, well, the government's

13   strategy was to let him leave the meetings.  And that's fine.

14   But they charged the conduct as ceasing in 2015.  I think you

15   can take -- we were talking before about drawing inferences.  I

16   think you can draw inferences that he was no longer a threat to

17   the United States by approaching the FBI, confessing,

18   essentially, and that's what the whole trial was about, the

19   government says he confessed.  People who are dangerous

20   terrorists don't confess to FBI agents in Newark law school

21   buildings.  He was done.  And that's really my point, your

22   Honor.  Thank you.

23          THE COURT:  Thank you, Mr. Schacht.

24          Mr. Kourani, you have the right to address me, if you

25   wish.  You have the right to address me, if you wish to address

1    me.  You don't have to.

2              THE DEFENDANT:  Sure, your Honor.

3              This is my personal letter, your Honor.

4              THE COURT:  Sorry?

5              THE DEFENDANT:  There is my personal letter.

6              THE COURT:  This is your what?

7              THE DEFENDANT:  Personal letter.

8              THE COURT:  Personal letter.  Okay.

9              THE DEFENDANT:  Can I take the podium, if you don't

10   mind?

11             THE COURT:  No.  Stay where you are.  Mr. Schacht will

12   bring the -- move it close to you and I'll be able to hear you.

13   You don't have to bend down to it; just move the -- move it

14   close to you.  Right.  Okay.

15             THE DEFENDANT:  Good evening, your Honor.

16             I would like to start today by apologizing to my

17   parents for all the hard time and the trouble I caused them

18   because of this case.  I was always the easiest and the most

19   disciplined kids they always had.  I don't remember giving them

20   hard time, as they always said.  But with this case, I think I

21   made up for all the good behavior.  Mom, dad, I'm really sorry.

22   I hope God will give me the will, the right circumstances to

23   make it up for you.

24             The government, overreaching in this case, amounted to

25   a violation of the due process of law and every right granted

1    to me as a U.S. citizen by the Constitution.  The most

2    important incident of all the other violation that shows the

3    government abuse of its federal power at its hand to seek a

4    conviction was the Beirut Embassy incident.

5           When I went to the American Embassy in Beirut, that's

6    in 2016, seeking refugee as a U.S. citizen, because my life and

7    my kids' life, who are also U.S. citizen by birth, were in

8    danger.  The fact that my life was in danger is not a disputed

9    fact between me and the government.  The government debated the

10   causes of such a danger.  And they may be right, maybe I

11   overthought things, maybe I exaggerated the way it really

12   happened.

13          I explained to the consulate at that time the threats

14   to my life and the necessity that I should go back to the

15   United States with my kids.  Instead of providing me, me and my

16   kids, with the help and the sanctuary, she decided to comply

17   with the FBI demands and confiscate my passport.

18          The government left a U.S. citizen -- three U.S.

19   citizens to face their fate just because of an ongoing

20   investigation.  The government acted that there is no need for

21   a justice system.

22          I remember when the CIA agent was interrogating me in

23   the embassy, he was holding his passport -- my passport, my

24   U.S. passport, in his hand the whole time.  I remember his

25   complimenting me about the Guess shirt I was wearing.  And I

1    said to him that it may be the last time I will be wearing it.

2    I need my passport to go back to the U.S.  The CIA agent still

3    insisted on interrogating me first before he would decide to

4    give me back my passport.

5         I'm here today because God wanted me to be alive.  The

6    government gave me a death sentence already in Beirut.  The

7    government abuse of its federal power during this case violated

8    all aspect of the due process of law.  I wonder what will be

9    next, dismembering dissidents at the embassies, or turning such

10   sanctuaries into black sites.  Just for this reason, I ask your

11   Honor to dismiss this case.

12        When I talk to the government, I know I will put my

13   kids and my family at risk.  But it never crossed my mind the

14   government will be so incompassionate, so inhuman to prosecute

15   me or even take me to the trial.  As one of the lawyers said to

16   me, that, you know, the government take you to the trial based

17   on only what you have said to them, that should be on a

18   postcard.

19        Concerning my political opinion, your Honor, you know,

20   Hizballah -- I don't see Hizballah as a terrorist organization.

21   Hizballah is the strongest political party in Lebanon that have

22   influence on most of the Middle East countries.  If it wasn't

23   for Hizballah, ISIS would have -- ISIS, Islamic State, would

24   have raided my village, majority of Shiite Muslim, a minority,

25   killed every man and boy, raped every woman and girl, and then

1   sold them as sex slave.

2           It happened in Iraq.  It happened in Syria.  And it

3   will have happened in Lebanon, if it wasn't for Hizballah.

4           Hizballah hold ISIS with Iraqi and American forces

5   after 2014.  The most weird thing is that the U.S. Government

6   acknowledge and deal with the Lebanese government that has

7   Hizballah members as deputies, as ministers, as political

8   officials.

9           The government have a double standard.  They want to

10  apply the law and break it at the same time.  And this is an

11  opinion protected by the First Amendment of the Constitution.

12          The government kept complaining at all times that I

13  was not forthcoming, although I had all the reasons to be

14  forthcoming, the most important of which is the safety of my

15  kids or to be reunited with my kids.

16          So before my trial in May, I hired a lawyer, Mr. Larry

17  Herrmann, just to try to negotiate a deal with the government

18  and try to arrange a meeting with the prosecutor, took me all

19  of those things, all of those issues.

20          Although all of their complaints that I was not

21  forthcoming, they refused to meet with me.  My lawyer

22  Mr. Herrmann said to the prosecutor that him as a U.S. citizen,

23  a navy veteran, who served in the -- who served in Vietnam and

24  got injured there, cannot ignore someone who have something to

25  say about a national security matter.

1      Because of people like Mr. Herrmann, my hands are

2  still open for the U.S. Government, but for the right persons.

3  This events drew the line between a prosecutor seeking a

4  conviction by any means and a navy veteran, a real U.S. citizen

5  who care about his country.

6      THE COURT:  Let me remind you that your case came

7  before a jury; that we had a trial.  The trial gave you every

8  right that you had.  I don't remember if you testified or not.

9      Did he testify, Mr. Schacht?

10      MR. SCHACHT:  No, he only testified at the suppression

11  hearing, your Honor.

12      THE COURT:  But he had the right to testify.  He

13  talked about bringing Mr. Denbeaux in to testify.  Mr. Denbeaux

14  never showed.

15      So it was not the government prosecutors, the CIA or

16  the FBI or anyone else who found you guilty, it was a jury.

17  You had every right to defend yourself, and you did defend

18  yourself.  And you had a very able attorney that was here to

19  defend you.

20      As for what happened with the CIA in Lebanon, I can't

21  speak.  But there's nothing strange in about asking questions

22  or interrogating someone who is under suspicion.  You

23  eventually got your passport back; you came back to the United

24  States.  You can't blame the government because you're

25  estranged from your wife and she divorced you and brought the

1  kids to Canada.

2          So I don't know where you're going with your

3  statement, but if you want to continue, you may continue.

4          THE DEFENDANT:  When an FBI agent testified that they

5  didn't want to arrest me at first, and then the prosecutor

6  asked for a jail time in years, that tell us there's a big

7  thing wrong in this case.  Because of this reason, I ask your

8  Honor to dismiss this case.

9          THE COURT:  Thank you, Mr. Kourani.

10         I'll take a short break.

11         THE DEFENDANT:  No, I'm not done.

12         THE COURT:  You're not done yet.

13         THE DEFENDANT:  Still got two pages, your Honor.

14         THE COURT:  How many more pages do you have?

15         THE DEFENDANT:  Two pages.  Less than two minutes.

16         THE COURT:  How many?

17         THE DEFENDANT:  Two pages.

18         THE COURT:  Two pages?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Okay.

21         THE DEFENDANT:  The FBI agents lied in this case, and

22  they keep lying.  Only time will reveal the truth.  The

23  government was worried that the five meetings in Seton Hall to

24  be recorded, there are obvious reason for those worries.

25         I don't like my personal life, how it was dragged into

1    this case.  I'm not going to stand here today to talk about the

2    prosecutor's GPA or his marriage life.  I was not raised to

3    stick my nose in someone else's personal life.  I didn't learn

4    in school to take advantage of a conflict, to attack someone's

5    character or his personal problem.

6              Finally, I was born during a bloody civil war.

7              THE COURT:  You were born what?

8              THE DEFENDANT:  I was born during a bloody civil war

9    where people got killed because of the name of the God they

10   worship, witness to invasion, and three major wars.  I lost

11   friends, cousins, and others.  I witnessed my aunt raising six

12   kids by herself after losing her husband.  I witnessed my best

13   teacher collapsing in class several times after losing all her

14   kids in a massacre.

15             I'm a child of a war, a name I didn't choose, but my

16   place of birth chose for me.  And that's why I want my kids to

17   stay far away from that region while they are raised by me.

18             I have just three points, you know, my lawyer, he

19   didn't raise during the objections to the government, and you

20   know --

21             THE COURT:  Go ahead.

22             THE DEFENDANT:  One of those things, your Honor, is

23   the boots that you keep talking about, the boot I did order it

24   from --

25             THE COURT:  The boots.

1    THE DEFENDANT:  The boots, the camouflage boots.  I

2  did order it from an online store.  And there is tons of text

3  messages, and I think the prosecutor read them, between me and

4  my cousin, who's a lieutenant in the Lebanese army.  And that

5  was a gift for him, for his graduation.

6    Your Honor, I'm size 11 in shoes, and that boots were

7  size 10.  And, you know, I had them in the house for almost a

8  month just waiting for someone to go to Lebanon so that I could

9  send it with them to my cousin.

10    The China trip, I hope you don't take it into

11  consideration, because whoever the FBI is looking for, he's

12  still out there.  I didn't lie about that fact.  And I've never

13  lied to them.  I gave them three names, three alibis.  They

14  could have investigated those alibis and make sure I was

15  telling the truth, but he just wanted to keep everything an

16  open-end question or an open-ended investigation.

17    And the video Mr. Bove was talking about, that's an

18  ISIS video.  If you want to send a message to the Lebanese

19  people, he's sending the wrong message.  You know, if someone

20  is affected by Hizballah propaganda or -- he won't be watching

21  an ISIS video, simple as that.

22    THE COURT:  Mr. Kourani, my job is not to send

23  messages; my job is to find a just punishment.

24    THE DEFENDANT:  Thank you, your Honor.  That's all.

25    THE COURT:  I'll take a short break, and be right

1    back, and we'll order the sentence.

2              MR. BOVE:  Judge, if I could just point out -- because

3    I think it's extremely significant to what you're about to do.

4              One thing that was omitted from any of the papers in

5    this case was an acceptance of responsibility or a renunciation

6    of association with Hizballah.  The defendant just praised

7    Hizballah.  He remains committed --

8              THE COURT:  I heard what you heard, Mr. Bove.

9              MR. BOVE:  Thank you.

10             THE COURT:  Be seated.  Keep to your seats.

11             I'll be back in two minutes.

12             (Recess)

13             THE COURT:  To review where we are, to determine that

14   the proper sentencing guideline is Section 2M5.3, providing a

15   base level of 26, an upward adjustment for using dangerous

16   weapons of 2, an upward adjustment of terrorism under Section

17   3A1.4 of the guidelines, providing a net offense behavior level

18   of 40.  Level 40, Criminal History VI, because of terrorism,

19   yields a range of custodial punishment of 360 years to life.

20             We determined that a life sentence, because of the way

21   the statutory maximum worked out, is inappropriate; and that if

22   one were to take every one of the statutes that are involved,

23   One, Two, Three, Four, Six, Seven, and Eight, the addition is

24   110 years.

25             So what is a just punishment here?  That is the

1  question that has been lurking throughout.  Past the

2  guidelines, we need to devise a punishment that fits the crime

3  and satisfies the various factors of Section 3553(a).

4          I'll state my conclusion first and then double back

5  and add the reasons why I come to that.

6          My conclusion is that a just punishment here would be

7  40 years, followed by five years of supervised release,

8  recognizing that because Mr. Kourani is no longer a citizen,

9  he's subject to deportation to Lebanon after he finishes his

10 term of punishment.  But if for whatever reason he's here,

11 he'll be subjected to five years of supervised release.

12         Here is how the 40 years breaks down.  It's rather

13 complicated.

14         Counts One, Two, Six, and Seven reach generally the

15 same subject and group of acts:  Providing material support and

16 resources, and receiving material support and resources from

17 and to Hizballah or to and from Hizballah, and conspiracy with

18 regard to that, and pretty much the same group of things under

19 Six and Seven.

20         Counts Six and Seven have a 20-year maximum term, all

21 of which I'm applying to run concurrently.  One and Two have a

22 15-year each maximum term, which I'm applying concurrently with

23 each other, and to the extent the 15 years, concurrently with

24 Six and Seven.

25         So let's pause for a moment and reach a subtotal.  We

1  have a subtotal of 20, applying Counts One, Two, Six, and

2  Seven.

3          Counts Three and Four reach different conduct:

4  Receiving training in the use of weapons and military tactics

5  from Hizballah, and conspiracy with regard to the same.  The

6  conspiracy count, Count Four, has a maximum term of five years.

7  The substantive acts, Count Three, have a maximum term of ten

8  years.  Those years will be applied to a sentence concurrently.

9  So it's ten years, of which five years is concurrent.  And

10  those ten years will be consecutive to the 20 years of One,

11  Two, Six, and Seven, yielding a subtotal now of 30.

12          Count Eight, procuring fraudulent citizenship, has a

13  maximum term of 25 years.  I believe that ten years would be

14  the appropriate term there, consecutive to One, Two, Three,

15  Four, Six, and Seven, all of which adds to 40 years, to be

16  followed by five years of supervised release.

17          I do not have the breakdown, and that will be provided

18  by either the separate document or the judgment.

19          There's no ability to pay a fine or discernible

20  ability to pay a fine.  There's no restitution in this case.

21  So there's no fine and no restitution.  There's a mandatory

22  special assessment of $700.

23          Now, 3553(a) of Title 18 provides the factors to be

24  considered in imposing the sentence, all of which is to be

25  sufficient, but not greater than necessary to comply with the

1    purposes set forth in paragraph 2 of this subsection:  The need

2    for the sentence imposed to reflect the seriousness of the

3    offense, to promote respect for the law, and to provide just

4    punishment for the offense; to afford adequate deterrence to

5    criminal conduct, to protect the public from further crimes of

6    the defendant; and to provide the defendant with needed

7    educational or vocational training, medical care, or other

8    correctional treatment in the most effective manner.  That last

9    provision, subparagraph D, is really not applicable here, but

10   the others are.

11          It's hard to think of a more serious offense than to

12   engage in terrorism against the United States and against its

13   foreign policy.  Hizballah came into our visible existence when

14   it blew up our military barracks in Beirut that had been

15   established to provide peace in that country.  And it's

16   continued in many different forms, spawning different acts of

17   terrorism by different organizations, which has much affected

18   the lives of all of us for decades now.

19          That kind of punishment is serious.  It needs

20   deterrence against others doing it; it needs a high sentence to

21   promote respect for the law, that the law is adequate to

22   protect our citizenry, and to protect the public from further

23   crimes of the defendant.  Because if he were not adequately

24   punished, he will be dangerous.

25          A punishment of 40 years, or 480 months, will -- when

1  added to the 35 years of life that defendant has, he's 35 years

2  old -- create a condition where his useful life is spent in

3  prison.  That's a sign.  Promoting respect for the law,

4  protecting the public in a proper way, and yet not imposing a

5  sentence that is greater than necessary to accomplish the

6  objectives of sentencing.  That explains what I did.

7           These will be the conditions of supervised release.

8  All the papers I've been shuffling here, I can't put my fingers

9  on the PSIR.  Thank you.

10          The mandatory conditions appearing on page 29 of the

11  PSIR are imposed.  The standard conditions 1 through 12

12  appearing at the bottom of page 29, page 30, the full page 30,

13  and the top of page 31, are imposed.  The special conditions,

14  obeying the immigration laws, complying with the directives of

15  immigration authorities, submitting his person and property,

16  etc., to a search, and being supervised by the district of his

17  residence, are imposed.

18          There's also a suggestion here of an outpatient mental

19  health treatment program.  It doesn't seem to me that it's

20  appropriate.  Mr. Schacht, do you agree?

21          MR. SCHACHT:  Well, he's not going to be on supervised

22  release, so I don't think it really matters.

23          THE COURT:  Well, I don't impose it.

24          And I think that is the sentence.

25          MR. SCHACHT:  Your Honor, I would ask that you make

1    one recommendation, if you're willing, which is that my client

2    is optimistic that he will be able to begin again to have

3    contact with his children, who live in eastern Canada.  And so

4    for the purpose of them possibly being able to visit him, he

5    asked me specifically if you would be willing to recommend FCI

6    Ray Brook in far Upstate New York, near the Canadian border, or

7    some facility near the Canadian border that might allow him to

8    have contact with his children while he's incarcerated.

9             THE COURT:  I'm going to leave it to the discretion of

10   the Bureau of Prisons.

11            I advise you, Mr. Kourani, that under the

12   Constitution, you have a right to appeal.  I'm sure you

13   discussed appeal with Mr. Schacht.  But you have your full

14   appellate rights.  If you can't afford a lawyer, the government

15   will provide a lawyer free of charge.

16            Are there underlying counts, Mr. Bove?

17            MR. BOVE:  No, your Honor.  And we've addressed Count

18   Five in dismissing that.

19            THE COURT:  That's correct.

20            Is there anything more that I need to do?

21            MR. BOVE:  No, your Honor.

22            MR. SCHACHT:  No, your Honor.

23            And I told him I will be filing a notice of appeal on

24   his behalf for him.

25            THE COURT:  Yes.  I instruct you to do so timely.

JC3VKOUS

1          MR. SCHACHT:  I will.

2          THE COURT:  All right.  Thank you, all.

3          MR. BOVE:  Thank you, Judge.

4          THE COURT:  Let's be seated while the marshals take

5    care of Mr. Kourani.

6          MR. SCHACHT:  Thank you, your Honor.

7          THE COURT:  Thank you, Mr. Schacht.

8          Were you CJA?

9          MR. SCHACHT:  No, I'm retained.

10          THE COURT:  Okay.  Thank you, all.

11                              *    *    *